# 14-2854-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

—against—

INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## SPECIAL APPENDIX

ZACHARY D. FASMAN, ESQ.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

TRACI L. LOVITT, ESQ.
JONES DAY
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

WILLIS J. GOLDSMITH, ESQ.
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant IBM*

(*Counsel continued on inside cover*)

MARK RAYMOND CARTA, ESQ.
MARGARET ANN TRIOLO, ESQ.
CARTA, MCALISTER
  & MOORE, LLC
1120 Boston Post Road
Darien, Connecticut 06820
(203) 202-3103

*Attorneys for Plaintiff-Appellee*
  *James Castelluccio*

# TABLE OF CONTENTS

PAGE

Opinion and Order dated July 23, 2014 denying Motion for Judgment
as a Matter of Law, denying Oral Motion for Judgment as a
Matter of Law, denying Renewed Motion for Judgment as a
Matter of Law, and denying Motion for New Trial or Remittitur
(Docket No. 236) .............................................. SPA-1

Ruling on Plaintiff's Motion for Attorneys' Fees,
dated July 23, 2014 (Docket No. 237) .......................... SPA-36

Final Judgment entered in favor of James Castelluccio against IBM,
dated July 28, 2014 (Docket No. 240).......................... SPA-59

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,
          - Plaintiff
     v.                                    CIVIL NO. 3:09CV1145(TPS)

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
          - Defendant

## Opinion and Order

The plaintiff James Castelluccio sued the defendant Internal Business Machines Corporation ("IBM"), alleging that IBM terminated his employment on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the New York State Human Rights Law ("NYSHRL"), NY CLS Exec § 196(a).  After a nine-day trial, the jury returned a verdict for Castelluccio on his claim of age discrimination under the ADEA and NYSHRL.  The jury awarded Castelluccio $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,000 for emotional distress damages.  IBM now moves for judgment pursuant to Fed.R.Civ.P 50, or, in the alternative, for a new trial or remittitur pursuant to Fed.R.Civ.P. 59.[1]  (Doc. #202).  For the reasons set forth below, IBM's motion is DENIED.

## I. BACKGROUND FACTS

The background facts and proceedings at trial are familiar to

---

[1]Castelluccio has filed a motion for attorneys' fees and costs and supplemental motion for attorneys' fees.  (Doc. ## 197, 231). The court addresses these motions in a separate Opinion and Order also released today.

the parties and the court will not repeat them in depth.   Mr.
Castelluccio spent his entire professional career at IBM.   He began
work in the data center as a computer operator in March 1968 and
occupied positions of increasing responsibility and station
throughout his tenure.   (Doc. #108, at 1-2; Doc. #213, at 129).
His career reached its pinnacle when in 2005 he was named Vice
President of Public Service Delivery ("VP PSD").   (Doc. #213, at
160).   In that capacity he oversaw the work of 2,500 employees who
provided information technology services to 30 commercial accounts.
(Id. at  109, 168).   As an executive, Castelluccio consistently
received performance appraisals rating him as a solid or above
average performer.[2] (Doc #214, at 255, 260; P. Exs. ##4, 7-10, 13-
14).

     The events leading up to this lawsuit began in February 2007
when Joanne Collins-Smee became Castelluccio's direct supervisor.
At that time, Castelluccio was one month shy of his 60th birthday
and the oldest of eight vice presidents reporting directly to
Collins-Smee.   (Doc #214, at 253).   Despite his solid or above

---

[2]All employees at IBM are rated annually through a procedure
called the personal business commitment ("PBC").   (Doc. #213, at
110).   Employees are rated on a scale of 1 through 4.   The PBC
ratings are described as follows:   PBC 1, among the top
contributors;   PBC 2+, above average contributor;   PBC 2, solid
contributor;   PBC 3, among the lowest contributors, needs to
improve;  PBC 4, unsatisfactory.   (Id. at 115-117; P. Ex. #1, at 7).
Castelluccio received PBC's of 2 or 2+ while at IBM, although in
February 2008 Joanne Collins-Smee rated Castelluccio a PBC 3 before
changing his rating to a PBC 2. (Doc. #217, at 937-938).

average performance appraisals, Collins-Smee immediately took steps to reduce Castelluccio's responsibilities at IBM before terminating his employment altogether in June of 2008.

In fact, after Collins-Smee's brief sit-down meeting with Castelluccio during her first month as supervisor, she recommended that he be removed from the position of VP PSD. (Doc #214, at 258-259). By June of 2007, Collins-Smee had succeeded in removing Castelluccio from that position, and named Miguel Echavarria, a 49 year-old eleven years Castelluccio's junior, as his replacement. (Doc. #214, at 344-345). At this time, Collins-Smee demoted Castelluccio to Delivery Project Executive ("DPE") of Wellpoint, which was universally regarded as IBM's most troubled account. (Id., 345-346). In November of 2007, Collins-Smee informed Castelluccio that she was removing him from the position of Wellpoint DPE and placing him "on the bench," that is, he would remain at IBM but without a permanent work assignment. (Doc. #214, at 378). In June of 2008, Collins-Smee notified Castelluccio that he would be terminated at the end of the month unless he found another position. (Doc. #215, at 480). Castelluccio was unable to secure permanent employment and was terminated accordingly.

Prior to his last day at IBM, but after being notified by Collins-Smee of his imminent termination, Castelluccio lodged a complaint of age discrimination with IBM's Human Resources representative, Russell Mandel. Mandel conducted an internal

SPA-4

investigation, or as it is called at IBM, an "open door" investigation, into Castelluccio's complaint of age discrimination and concluded that management had treated him fairly with respect to his termination.[3]  (Doc. #18, at 6).

Thereafter, Castelluccio commenced the present action, which was tried to the jury over nine days in January of 2014.  After the close of Castelluccio's case, IBM moved for a directed verdict on his claim of age discrimination pursuant to Fed.R.Civ.P. 50(a), contending that the record contains no evidence that would allow a reasonable jury to conclude that Mr. Castelluccio's age was the "but for" cause of his termination from IBM.  The court took the motion under advisement in keeping with the practice of the Second Circuit.  (Doc. #217, at 1118).

On January 24, 2014, the jury returned its verdict, finding that IBM had unlawfully terminated Mr. Castelluccio on the basis of age and that the termination represented a willful violation of the law.  The jury awarded Castelluccio $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,000 for emotional distress damages.  (Doc. #187).

_____

[3]IBM states the following with respect to the open door investigation process: "The Open Door process reviews actions or inactions by management which directly related to and affect an employee.  All issues, except policy decisions and operational business issues, are eligible for review under this process. . . . The intent of the process is to ensure an objective and thorough review of the issues.  The process will not make legal determinations.  It will, however, determine whether the employee was treated fairly."  (D. Ex. #109, at 4).

4

On February 25, 2014, IBM timely filed a renewed motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, or, alternatively, for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure, contending, inter alia, that the record does not support the jury's findings with respect to (1) age discrimination, (2) willfulness, and (3) damages based on emotional distress and (4) back pay.  IBM also argues (5) that a new trial must be granted because the plaintiff's attorney made an improper remark in closing argument that prejudiced the jury. (Doc. #179).

## II. Analysis/Discussion

A. Motion for Judgment as a Matter of Law under Rule 50(b)

Pursuant to Federal Rule of Civil Procedure 50(b), the court may enter judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis.  The court must give deference to all credibility determinations and reasonable inferences of the jury, without weighing the evidence or assessing the credibility of the evidence.  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998).

The court may not substitute its judgment for that of the jury.  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995).  Judgment as a matter of law may only be granted if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or if there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it. Cruz v. Local Union No.3 of the Int'l Bhd. Of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir.1994).

The court must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor. Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir.1998).

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[4]  A plaintiff may obtain relief under the ADEA if the plaintiff proves by a preponderance of the evidence that age was the "but-for" cause of the challenged employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).  A violation of the ADEA can be proven by either direct or circumstantial evidence. Carlton v. Mystic

---

[4]In addition to his ADEA claim, Mr. Castelluccio brings an age discrimination claim under the NYSHRL.  Because the same legal analysis applies to age discrimination claims brought under the NYSHRL and the ADEA, see Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.2001), the court's analysis of the ADEA claim applies with equal force to the NYSHRL claim.

Transp. Inc., 202 F.3d 129, 135 (2d Cir.2000).

1. The Jury's Finding of Age Discrimination

IBM claims that the evidence presented at trial was insufficient to show that Castelluccio's age was the "but-for" cause of his termination. IBM first contends that evidence of statements made by Collins-Smee to Castelluccio concerning his age and eligibility for retirement cannot be viewed as direct evidence of age discrimination because they were innocuous statements and so far removed from the termination decision as to constitute inadmissible stray remarks.[5]

a. Direct Evidence

Although direct evidence of discrimination is not necessary to support a finding under the ADEA, Carlton v. Mystic Tramp. Inc., 202 F.3d 129, 135 (2d Cir.2000), the jury could have reasonably found that comments made by Collins-Smee concerning Castelluccio's age and eligibility for retirement constituted direct evidence of age discrimination. (Doc. #214, at 250-251, 386, 435; Doc. #215, at 557). Collins-Smee denied making some or all of the comments at issue; however, the jury was not required to believe her and was free to credit Castelluccio's testimony. On review, the court "must disregard all evidence favorable to the moving party that the

_____

[5]In the court's order denying IBM's motion for summary judgment, the court found that evidence that Collins-Smee raised the issue of Castelluccio's retirement during her initial meeting with him, and on occasions thereafter, supported Castelluccio's prima facie case of age discrimination. (Doc. #109, at 11-12).

7

jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. at 151, 120 S.Ct. 2097.

According to Castelluccio, the first comments occurred in February 2007, during his first meeting with Collins-Smee. (Doc. #214, at 250-251, Doc. #216, at 802). Castelluccio testified that Collins-Smee asked, "You're old enough to retire, right"? (Doc. #214, at 251). Castelluccio also testified that Collins-Smee stated "How old are-" as if to ask how old he was, before stopping herself mid-sentence. (Doc. #215, at 557). Castelluccio testified that the second reference to his eligibility for retirement occurred in November of 2007, when Collins-Smee informed him that he was being replaced as DPE of the Wellpoint account and placed on the bench. (Doc. #214, at 386; Doc. #217, at 928-929). Castelluccio testified that Collins-Smee mentioned his eligibility for retirement a third time in March of 2008, when he met with her to discuss his lack of meaningful work assignment and to request that she assist him in locating another position or temporary assignment at IBM. (Doc. #214, at 435).

Prior to trial, IBM filed a motion seeking to exclude age based remarks made by Collins-Smee. (Doc. #174). This court denied that motion on the basis that whether the remarks were probative of age discrimination was a question of fact best left to the jury. (Doc. #214, at 223). At the charging conference, IBM asked this court to include the following instruction to the jury:

8

SPA-9

Case 14-2854, Document 61, 03/13/2015, 1460795, Page12 of 63
Case 3:09-cv-01145-TPS   Document 236   Filed 07/23/14   Page 9 of 35

"Inquiries about retirement are not evidence of age discrimination. You may not rely upon them as proof of age discrimination.  It is not improper for an employer or supervisor to inquire as to its employees plans for the future." (Doc. #220, at 1571).  Again, the court declined to include IBM's proposed jury instruction. However, in an effort to meet IBM half-way, the court nevertheless instructed the jury, "[a]n inquiry about retirement is not necessarily evidence of age discrimination." (Doc. #221, at 1725). At the charging conference, IBM stated that it could "live with that" instruction.  (Doc. #220, at 1574).

"[T]he stray remarks of a decisionmaker, without more, cannot prove a claim of employment discrimination. . . ." Weichman v. Chubb & Son, 552 F.Supp.2d 271, 284 (D.Conn.2008) (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir.2001)). However, "the court should not categorize a remark as 'stray' or 'not stray' and then disregard that remark if it falls under the 'stray' category." Weichman, 552 F.Supp.2d at 284 (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115-26 (2d Cir.2007)). "Instead, the court must consider all the evidence in its proper context. . . . [T]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be." Id. (quoting Tomassi, 478 F.3d at 115).

Whether certain comments were made by Collins-Smee and the

9

extent to which they reflected an ageist animus was therefore a question of fact properly submitted to the jury. It was not a question of law by which this court was bound to render those statements inadmissible as stray remarks. See e.g., Pasha v. William M. Mercer Consulting, Inc., 2004 WL 188077 at * 6 (S.D.N.Y.2004) (factfinder to conclude whether remarks directly manifest discriminatory attitude). Moreover, although the court declined to adopt IBM's proposed jury instruction, it nevertheless instructed the jury that not all inquires about retirement are necessarily evidence of age discrimination. (Doc. #221, at 1725). Having been cautioned by the court that not all comments about age and retirement are evidence of age discrimination, the jury was left to decide for itself what weight, if any, should be given to the remarks in question. This court cannot conclude that the remarks in question were so remote in time as to have been rendered inadmissible on that basis alone.

Neither can this court agree with IBM's position that the statements concerning age and retirement were innocuous. The remarks at issue were not made by an individual at IBM without the authority to make personnel decisions; rather, they were made by Collins-Smee, who was Castelluccio's direct supervisor and who had the authority to terminate him. (Doc. #217, at 955). The comments were particularly significant when considered in the context of the personnel decisions made by Collins-Smee regarding Castelluccio.

10

For example, after their initial meeting in February 2007, when Collins-Smee allegedly made an age-related comment and the first inquiry about retirement, Collins-Smee sent an email to Keith Holmes in the Human Resources Department stating "[w]e need to replace Jim Castelluccio." (P. Ex. #29).   By June of that year, Collins-Smee removed Castelluccio from his position as VP PSD and had replaced him with Miguel Echavarria who was eleven years his junior.   This was a rather abrupt ending to Castelluccio's tenure as VP PSD, especially in light of the fact that he had been rated a 2 performer by Kelton Jones only a couple weeks prior to Collins-Smee's email to Holmes, and that Collins-Smee initiated the removal action with less than a month's time to evaluate his performance. (Doc. #214, at 255, 260).   The next remark Collins-Smee made concerning Castelluccio's eligibility for retirement occurred in November 2007.  This remark was particularly significant because it occurred during a conversation in which she told Castelluccio that he was being removed from the position of Wellpoint DPE and relegated to the bench.   (Doc. #214, at 386; Doc. #217, at 928-929).[6]   Collins-Smee's third reference to Castelluccio's eligibility for retirement was made in March of 2008 when

_____

[6]Although IBM's decision to remove Castelluccio from the DPE and VP SD position are not actionable in this case, the circumstances surrounding those employment decisions is background evidence relevant to whether he was terminated unlawfully.  See Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir.2012).  (Doc. #109, at 11-12).

11

Castelluccio met with her to seek her assistance in locating a new position at the company. (Doc. #214, at 435). This comment was significant in light of the fact that Collins-Smee did not locate him work she identified he might be suited for, and ultimately terminated his employment two months later. (Id. at 436-437).

All of the comments therefore occurred in the context of an adverse employment decision and were legally sufficient to sustain an inference of age discrimination. Tomassi v. Insigni Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir.2007). The comments were direct evidence that could reasonably be viewed as supporting Catelluccio's claims, and the comments were properly presented to the jury for their review. Whether those were innocuous comments, were a reflection of Collins-Smee's discriminatory intent, or fell somewhere in between was a determination to be made by the jury.

> b. Circumstantial Evidence

IBM next contends that the circumstantial evidence offered by Castelluccio does not establish age discrimination. It argues that the circumstantial evidence has no legal foundation because there is no evidence that links IBM's purportedly adverse treatment of Castelluccio to corresponding evidence that younger, similarly situated employees were treated differently. This court disagrees.

There is no rigid rule for determining whether a plaintiff has demonstrated circumstances giving rise to an inference of discrimination. Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91

(2d Cir.1996).  "The Court must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law."  Chambers v. TRM Ctrs. Corp, 43 F.3d 29, 37 (2d Cir.1994).  Because an employer who discriminates is unlikely to leave a "smoking gun" attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.  See, e.g., Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991).  In considering the circumstantial evidence before the jury, the court is mindful that proving unfair treatment is not the same as proving age discrimination.  See Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998) ("[t]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age") (emphasis in original).

The circumstantial evidence in this case reasonably supported the jury's finding of age discrimination.  Perhaps the most significant evidence from which the jury could have inferred ageist animus was Collins-Smee's failure to assist Castelluccio find a new position at IBM and her failure to advise him of the availability of open positions.  Collins-Smee failure in this regard was particularly apparent in her half-hearted advocacy during the formal process through which executives are placed at IBM called

"five minute drills."  Five minute drills refer to both a document that identifies open positions and the executives available to fill them, as well as the 30 minute meeting amongst high level executives in which the positions and executives identified in the document are discussed for placement.  The five minute drills are strictly confidential at IBM, which means that not only are the executives available for placement not invited to the closed door meetings, but the open positions are not posted outside of the process itself.  (Doc. #213, at 85-86).  Consequently, it is very difficult for one to secure a position through the five minute drill process without someone in the meeting advocating their placement.

Collin-Smee's efforts, or lack thereof, to locate Castelluccio a position were so ineffectual, that after close to two months on the bench, Castelluccio complained to Garret Walker in Human Resources that he "was not made aware or considered for available positions within and outside the organization."  (Doc. #214, at 428; P. Ex. 76).  The positions that Castelluccio was not considered for included the DPE role on the Quest outsourcing contract, which was in an area in which he had particular expertise.  (Id. At 428-430).  Castelluccio's belief that he was not considered for placement was in keeping with the observation of Keith Holmes who testified that Collins-Smee "rarely" mentioned Castelluccio during the five minute drills conducted in her

organization. (Doc. #219 at 1361-1362). Even after Castelluccio, on the counsel of Walker, met with Collins-Smee in March of 2008 to ask for work, Collins-Smee still refused to give him a work assignment. Instead, she unilaterally raised the issue of retirement, and did not assign Castelluccio temporary work in the area of audits and control after leading him to believe she would to so. (Doc. #214, at 435-437).

The jury was ultimately instructed that there were 106 Band C and Band D executive job openings identified in five minute drills during the six month period that Castelluccio was on the bench. (Doc. #194, at 10). Of the 106 openings, 16 were filled in Collins-Smee's organization. (Id.). The jury could have inferred ageist animus from Collins-Smee's failure to consider Castelluccio for the positions in her organization even though he had the expertise that should have qualified him for consideration. (Doc. #214, at 348; Doc. #217, at 1031, 1033, 1050, 1052, 1054). The jury could also have drawn an inference of age discrimination from the fact that Collins-Smee did not advance Castelluccio for consideration on nearly all of the drills conducted by other executives at the company in which the remaining positions were being filled.

Collins-Smee's failure to advocate for Castelluccio during the five minute drill process was particularly significant in light of the expectations placed on supervisors to identify executives

15

without permanent work assignments and to lobby on their behalf when vacancies were being filled in the executive ranks through the five minute drill process. Collins-Smee testified that it was her responsibility to put Castelluccio on a five minute drill, and her predecessor, Kelton Jones, testified that finding a position for an executive without a permanent assignment was a function of his managerial responsibility. (Doc. #216, at 807; Doc. #217, at 1086). Jones testified that it was commonplace to meet this responsibility not only through the five minute drill process, but also by advocating on the employee's behalf outside of the process. (Doc. #217, at 1073-1074). Because Collins-Smee did not do her job and advocate for Castelluccio during five minute drills, let alone regularly list his name on a slate of candidates available for placement during the five minute drills she conducted, managers with the authority to hire him did not know of his experience and skills for the position in question, much less know that he was available in the first place.[7] The closed nature of the five minute drills also meant that Castelluccio could not advocate on his behalf or even know what positions were available. With a manager in Collins-Smee who left him in the lurch, Castelluccio did not stand much of chance in the five minute drill process.

The jury could have reasonably concluded that Collins-Smee's

---

[7]Collins-Smee did not list Castelluccio as available for placement on her five minute drills with one exception, which was in January of 2008. (Doc. #214, at 350; P. Ex. 56).

failure to assist Castelluccio find a job or consider him for open positions left him comparably worse off than similarly situated younger individuals.  For example, one month before Castelluccio was fired, Collins-Smee hired seven individuals into executive positions within her organization who were younger than Castelluccio.  (P. Ex. 83).  The jury heard evidence that Castelluccio was qualified for positions in Collins-Smee's organization; however, in spite of her responsibility to find a position for a displaced employee, Collins-Smee did not consider him for those positions or even advise him that they were available. (Doc. #214, at 348).  Unlike Castelluccio, the younger employees hired to Collins-Smee's organization benefitted from being discussed in those five minute drills and identified as employees available for placement.  The jury could have therefore reasonably inferred ageist animus from Collins-Smee's decision to exclude him from the five minute drill process and to not consider him for open positions in her organization.

B. IBM's Motion for New Trial or Remittitur under Rule 59(a)(1)

IBM also claims that a new trial, or in the alternative, remittitur, is warranted because the record does not support the jury's findings with respect to willfulness and damages based on emotional distress and back pay.  IBM also claims that a new trial is warranted because Castelluccio's counsel made improper remarks in closing argument.

17

Pursuant to Federal Rule of Civil Procedure 59(a)(1), a new trial may be granted for "any reason for which a new trial has heretofore been granted in an action at law in federal court."  The standard for granting a new trial differs in two ways from that governing Rule 50 motions: (1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.  DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir.1998) (citation omitted).  Although a trial court is afforded considerable discretion under Rule 59(a), a motion for a new trial should be granted only when, in the opinion of the district court, "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." Id. at 133, quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir.1992) (alteration in original).  Moreover, the mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial.  Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir.1983).

1. Willfulness

IBM first contends that a new trial is warranted because the jury improperly found that IBM willfully violated the law when it terminated Castelluccio's employment.  IBM argues that the court contributed to this error by precluding the results of its

18

internal, "open door" investigation of Castelluccio's complaint of age discrimination.  This court disagrees.

As a general rule, the question of willfulness is properly left to the jury, and a reviewing court is "not permitted to substitute [its] judgment for that of the jury" even if it "might have resolved the issue differently had [it] been the finder of fact." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1572 (2d Cir.1989).  Well-established precedent recognizes that the willfulness necessary to support liquidated damages under the ADEA can be established either by proof that a defendant actually knew that his conduct violated federal law or by reckless disregard of that fact.  See Hazen Paper Co. V. Biggins, 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).  Here, if Collins-Smee terminated Castelluccio's employment because of his age and knew that doing so was a violation of the ADEA, or showed reckless disregard for that fact, then the jury could have reasonably concluded that she willfully violated the law.

The court cannot conclude that the jury reached a seriously erroneous result in finding that IBM willfully terminated Castelluccio's employment.  The jury heard testimony from Collins-Smee that she received training on discrimination laws on a regular basis, including laws pertaining to age discrimination.  (Doc. #216, at 810).  Not be deterred by her knowledge of the law, Collins-Smee nevertheless made employment decisions that adversely

affected Castelluccio based on his age.

Collins-Smee testified that she believed that it was not appropriate to ask an employee his age. She did so anyway at her first meeting with Castelluccio in February of 2007, and removed him from the VP PSD position shortly thereafter. (Doc. #215, at 557). Collins-Smee also testified that she knew it was improper to ask an employee if he wanted to retire after the employee made it clear he had no interest in doing so. She nevertheless raised the issue of retirement with Castelluccio on at least three occasions despite his indication that he had no interest in leaving IBM. (Doc. #214, at 250-251, 386, 435; Doc. #215, at 557; Doc. #217, at 928-929, 963-964). She even brought up the issue of retirement in March of 2008 when Castelluccio came to her asking for work or her assistance in locating a new position. (Doc. #214, at 435). Collins-Smee also testified that she new it was not appropriate to base employment decisions on age. Yet the record supports a finding that Collins-Smee's employment decisions were motivated by age bias. She removed Castelluccio from two positions in spite of his PBC 2 performance appraisals, she abandoned her responsibility to find him work, she placed him on the bench in spite of an abundance of work available, she failed to advance his name for over 100 open executive positions in other organizations, and she did not even consider him for positions in her own organization but instead considered, and ultimately hired, younger employees.

The jury could have concluded that Collin-Smee's treatment of Castelluccio was driven less by indifference than by a calculated desire to remove an older employee from her organization. While she did almost nothing for him in the way of job placement, she went out of her way to exclude him from relevant emails, certain professional development opportunities, and to thwart his ability to effectively communicate with the customer. For example, in February 2008, Collins-Smee invited all of her vice presidents and directors to participate in a seminar in Lexington, Kentucky, except for Castelluccio, who was the oldest vice president in her organization. (Doc. #214, at 413-414). Not only was Castelluccio not invited, Collins-Smee denied his request for a copy of the literature discussed at the conference. (Id. at 415-415). IBM never even offered an explanation for Collins-Smee's actions in this respect.

Likewise, Castelluccio's repeated requests for a Blackberry to communicate with the CIO of Wellpoint, IBM's most troubled account, were also denied. (Id. at 313-314, 360-361). Not only was Castelluccio not given the technology to effectively communicate with the client, evidence adduced at trial revealed that Collins-Smee meant for him to hold the position of Wellpoint DPE only on a temporary basis. At the time, Collins-Smee did not so much as do Castelluccio the courtesy of informing him that the position was temporary. (Id. at 363). Instead, six months into his tenure, she

abruptly notified him that he was being replaced as Wellpoint DPE
and placed on the bench.  At no point did she notify him that the
customer had any problem whatsoever with his work performance.  In
a rather festive spirit, she chose the day before Thanksgiving to
notify Castelluccio of her decision to remove him from the
position.  (Id. at 375, 378).

Not only did Castelluccio not know at the time that his
position as Wellpoint DPE was temporary, he learned later that
Collins-Smee was proposing replacements to the client behind his
back.  (Id. at 363).  In fact, she provided a total of five
candidates to Wellpoint during Castelluccio's tenure as DPE, who
were on average twelve years younger than Castelluccio.  (Id. at
368).  At no point was Castelluccio ever presented to the client as
a permanent DPE candidate.  (Id. at 361).  Indeed, it was only
after Wellpoint had rejected the five younger candidates, that
Collins-Smee resigned to offer Gordon Crawford, who was roughly the
same age as Castelluccio, the position on a permanent basis.  (Id.
at 373-374).  One can only imagine how difficult it must have been
for Castelluccio to service the Wellpoint account with a boss in
Collins-Smee who regularly auditioned his replacement to the
client, and would not so much as provide him with a Blackberry so
that he could adequately communicate with the Wellpoint CIO.

Collins-Smee's tacit acknowledgment of her own wrongdoing was
revealed in the surreptitious way in which she announced the seven

individuals younger than Castelluccio whom she hired into her organization in May of 2008.  As if to hide the fact that she had not even considered Castelluccio for these openings, she sent an email to her team announcing the new hires, but made sure to exclude Castelluccio from the correspondence.  (P. Ex. 83).

Perhaps the most egregious example of Collins-Smee's willful conduct were notes from a five minute drill immediately preceding Castelluccio's termination, in which she asked that his name be added to a slate of candidates "for the record," even though someone else's selection for that position had been all but finalized.  (Doc. #216, at 848-49).  Collins-Smee was aware of her wrongful conduct, and in this instance directed others to create a paper trail in order to insulate herself from scrutiny in the future.  Based on this evidence, the jury could have concluded that Collins-Smee acted in a purposeful, deliberate and calculated fashion, and that her treatment of Castellucio was downright bully-ish.  See Benjamin v. United Merchs. & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir.1989) (upholding liquidated damages "when the proof shows that an employer was indifferent to the requirement of the governing statute and acted in a purposeful, deliberate, or calculated fashion").

a. Open Door Evidence

IBM contends that this court's preclusion of evidence related to its "open door" investigation deprived it of the opportunity to

SPA-24

Case 14-2854, Document 61, 03/13/2015, 1460795, Page27 of 63
Case 3:09-cv-01145-TPS   Document 236   Filed 07/23/14   Page 24 of 35

demonstrate that its actions were not willful.  The evidence related to the "open door" investigation included: the report of IBM's consulting human resources professional, Russell Mandel, which summarized the findings of his investigation into Castelluccio's report of discrimination (Doc. #156-3); hand-written notes prepared by Mandel during interviews with IBM employees (Doc. #156-2); and Mandel's testimony regarding the findings of the "open door" investigation (Doc. #133, at 11)(collectively, the "open door evidence").  IBM argues that it should have been allowed to not only present evidence concerning the open door investigation in full, but also to demonstrate that Mandel, not Collins-Smee, had the final authority to terminate Castelluccio's employment.

Whether IBM terminated Castelluccio because of his age was a question to be decided by the jury over the course of a nine day trial rather than a question decided by IBM's ex parte investigation before the trial began.  In considering whether to preclude the "open door" investigation, this court found that the "open door" investigation represented only the findings and conclusions of IBM, as opposed to Castelluccio's account of the circumstances that lead to his termination.  The investigation was not conducted by a neutral party, but by Mandel, who decided which parties to interview and what evidence to consider.  Castelluccio was not offered the opportunity to present his own evidence, cross examine the witnesses or respond to criticisms leveled against him.

The court also found that the investigation focused more on Castelluccio's job performance than on his complaint of age discrimination and that there was reason to suspect that the investigation was designed more to exonerate IBM than to determine if Castelluccio was treated fairly. (Doc. #163, 5-7). Accordingly, prior to trial, the court granted Castelluccio's motion to preclude the "open door" evidence on the basis that its prejudicial effect on the jury would outweigh its probative value. (Id.). Doing so was not improper.

Nevertheless, the court later determined that IBM should be allowed to present evidence that it carried out the "open door" investigation in order to demonstrate to the jury that it did not act in a willful fashion in terminating Castelluccio. Consequently, the court modified its order precluding the open door evidence and allowed Mandel to testify for the limited purpose of establishing that a thorough investigation was conducted into Castelluccio's complaint of age discrimination. (Doc. #219, at 1440-1449, 1468). The parties agreed prior to Mandel's testimony that he would not reveal the findings of his open door investigation. (Doc. #218, at 1292-1297). The court also understood the parties to agree that Mandel would not reveal that he had the authority to reinstate Castelluccio, since doing so would allow the jury to deduce the findings of the investigation. (Id. at 1464).

The court therefore allowed Mandel to testify that he conducted a four- to six-week long investigation of Castelluccio's complaint of age discrimination that included interviews of 21 of Castelluccio's coworkers. (Id. at 1452-1453). Mandel testified that this investigation was conducted because IBM understands the law with respect to discrimination, and believes that it is important, serious and should be obeyed. (Id. at 1468). IBM was therefore given opportunity to demonstrate that its actions were not willful. In spite of this evidence, the jury still found that IBM had willfully terminated Castelluccio because of his age. Its finding in this respect is an acknowledgment of Collins-Smee's willful termination of Castelluccio's employment and IBM's failure to undue her unlawful action thereafter.

IBM's more narrow argument that this court erred by improperly precluding evidence that Mandel had the power to reinstate Castelluccio also fails. Despite the understanding between the parties, IBM ultimately solicited testimony from Mandel, which revealed that he did in fact have the power to reinstate Castelluccio if he found in his favor. Mandel stated:

> If I found . . . in Jim's favor, we would bring him back to the business; and if not, he would – the package that had been offered would still be available to him, because the last date that the package would be available would have been June 30th. And it wouldn't be fair for him not to have that package available to him; so therefore, he would have 48 hours to review the package if I did not find in his favor. (Id. at 1458)

Immediately thereafter, Castelluccio moved to strike this testimony on the basis that it violated the agreement that IBM would not testify as to Mandel's authority to reinstate Castelluccio if he found in his favor. (Id. at 1458). Although the court excused the jury at this point, the court did not sustain counsel's objection and specifically declined plaintiff's counsel's request to strike Mandel's testimony from the record. (Id. at 1467). The record therefore contains evidence that Mandel had the power to reinstate Castelluccio if he concluded that Castelluccio was not treated fairly. Ultimately, the court did not preclude Mandel's testimony in this respect as IBM now claims.[8]

On balance, IBM introduced evidence that it conducted an internal investigation into Castelluccio's complaint of age discrimination and that it had the power to reinstate him if it determined that his complaint was meritorious. In light of the evidentiary record, this court cannot conclude that IBM was

---

[8]Even assuming *arguendo* that the court erred by not allowing IBM to admit the open door evidence in full or belabor the fact that Mandel had the authority to reinstate Castelluccio, the court concludes that any error is harmless. First W. Bank, N.A. v. Hotz. Corp., CIV. N-84-619 WWE, 1990 WL 150450 (D. Conn. Sep. 28, 1990) ("[T]he burden of showing harmful error rests with the moving party."). The purpose of an investigation conducted by a human resources department is defeated if the investigator does not have the authority to reinstate an employee after determining that the employee has been discriminated against. This fact was self-evident to the jury; the fact that Mandel could have reinstated Castelluccio if he determined that Castelluccio was terminated because of his age was not lost on them. Consequently, this court cannot conclude that IBM was prejudiced by not being allowed to further develop at trial what was already apparent to the jury.

27

prejudiced.

2. Damages based on emotional distress

IBM next argues that a new trial or remittitur is warranted because the jury's award of $500,000 in emotional distress damages is not supported by the record.

Under federal law, an award will not be disturbed unless it is "so high as to shock the judicial conscience and constitute a denial of justice." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990); accord Kirsh v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir.1998).  In calculating remittitur, the court must use the "least intrusive"– and "most faithful to the jury's verdict" method of "reduc[ing] the verdict only to the maximum that would be upheld by the trial court as not excessive." Earl v. Bouchard Transp. Co., Inc., 917 F.2d 1320, 1328-30 (2d Cir.1990).

Meritorious garden-variety emotional distress claims in federal courts in this Circuit have typically commanded awards between $30,000 and $125,000. See Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir.2006) (affirming $100,000 award where the plaintiff had no evidence of medical treatment, but offered testimony of humiliation, embarrassment, loss of self-confidence, sleeplessness, headaches, stomach pains, and other physical pain); Cross v. N.Y. Transit Auth., 417 F.3d 241, 258 (2d Cir.2005) (affirming $50,000 award where plaintiff testified to experiencing anger, humiliation, and frustration, but did not seek medical

treatment); <u>Meacham v. Knolls Atomic Power Lab.</u>, 381 F.3d 56, 78 (2d Cir. 2005), <u>vacated on other grounds</u>, 544 U.S. 957 (2005) (affirming $125,000 award where plaintiffs offered no proof other than testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress); <u>Watson v. E.S. Sutton, Inc.</u>, 02 CIV. 2739 (KMW), 2005 WL 2170659 at *16 (affirming $120,000 award where plaintiff experienced depression and visited a therapist but had no permanent psychological injury).

Although Castelluccio's emotional distress is garden-variety inasmuch as he presented no corroborating testimony or evidence of medical treatment, the court concludes that the specific circumstances of this case, including IBM's egregious treatment of Castelluccio, justify an upward departure from the typical emotional distress damages award. Castelluccio offered testimony of the physical effects of emotional distress including mood swings, sleepless nights, weight loss, and hair loss; however, the physical effects that Castelluccio suffered represent only a fraction of the emotional distress the jury could reasonably have concluded he suffered (Doc. #216, at 676-678). The jury's award reflects a recognition that the actions of Collins-Smee weighed especially heavy on Castelluccio. Castelluccio's countenance, gentle bearing, and heartfelt testimony suggested a man that was particularly sensitive and whose very nature invited being marginalized in the workplace by the likes of Collins-Smee.

Collins-Smee did more than simply terminate Castelluccio's employment; she shattered the very foundation of his identity as an IBMer.  The jury bore witness to a man who was utterly devastated by the termination of his employment from a company at which he spent over 40 years, who was reduced to pleading for work during his final months on the bench, and who, at 61 years of age, struggled in vain to secure employment after he had been finally ousted from the company.  The jury's award reflects an understanding of the magnitude of Castelluccio's emotional distress.  Based on the evidence adduced at trial this court concludes that the jury's award does not shock the conscience and accordingly will not adjust it downward.

3. Damages based on back pay

IBM next claims that the jury's back pay award is inconsistent with Castelluccio's sworn testimony.  It argues that Castelluccio's testimony indicates, one, that he planned to retire at 65, not 66 as the jury found, and, two, that Castelluccio was receiving a certain amount in pension benefits, not the smaller figure found by the jury.  This court disagrees.  The jury's back pay and benefits figure was properly calculated and is not inconsistent with the record.

"When confronted with a potentially inconsistent jury verdict, the court must 'adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" <u>Turley v. Police Dep't of the</u>

City of N.Y., 167 F.3d 757, 760 (2d Cir.1999) (citation omitted).

"A Court's role is to reconcile and preserve whenever possible a

seemingly inconsistent jury verdict. Densberger v. United

Technologies, Corp., 125 F.Supp.2d 585, 598 (D. Conn.2000) (quoting

Indu Craft, Inc. v. Bank of Baroda, 46 F.3d 490, 497 (2d Cir.1995)

(citations omitted).

The record supports the jury's finding that Castelluccio

planned to retire at age 66.  IBM points to two statements in the

record that indicate that Castelluccio planned to retire at age 65,

not age 66.  First, when asked at what age he planned to retire,

Castelluccio stated: "I would be 65, 66 would be the age." (Doc.

#213, at 108).  Based on this statement, the jury could have

reasonably concluded that Castelluccio planned to retire at 66.

The second statement IBM argues establishes that Castellucio

planned to retire at 65 is, when asked what age he turned in 2013,

the year in which he ended his job search, he answered: "Last year,

65." (Doc. #215, at 532).  The record before the jury, however,

reflects that Castelluccio actually turned 66 in 2013, not 65.  (P.

Ex. #59).  The jury could have reasonably concluded that

Castelluccio misstated the age he turned in 2013 and was not bound

to conclude otherwise.  The jury also heard testimony from

Castelluccio's damages expert, Dr. Crakes, who stated,

"[Castelluccio] intended to work to age 66." (Doc. #218, at 1161).

In addition, the evidence before the jury included Dr. Crakes's

notes indicating that Castelluccio planned to retire at 66 and an exhibit of Dr. Crakes's damages calculations of Castelluccio's economic loss through his 66th birthday. (P. Exs. ##201, 213). The record amply supports the jury's finding that Castelluccio planned to retire at age 66.

IBM next argues that, with respect to the pension and benefits that Castelluccio would not have received had he remained at IBM, his testimony indicates that he was receiving $78,000 in pension benefits annually, not the lower figure determined by the jury. The jury found that Castelluccio would have received $1,345,042 in back pay and benefits had he retired at 66. (Doc. #187, at 1). From this figure, the jury was instructed to deduct the amount of retirement pay that Castelluccio received, but would not have received, had he remained at IBM. The figure that the jury arrived at, $345,150.36, is the same figure calculated by Dr. Crakes. (Id.). That figure assumed that Castelluccio would have worked for an additional 4.67 years had he not been terminated and that he was receiving $73,908 in annual pension benefits. IBM argues that because Castellucio testified that his annual pension benefit was "78,000 or something like that," that the jury should have used the $78,000 figure in determining the amount to deduct from the back pay and benefits figure. (Doc. #216, at 676). Obviously, the jury was not bound to use Castelluccio's off-the-cuff estimation of his pension benefits, and properly relied on the figure arrived at by

32

the damages expert in this case.

IBM next claims that the jury's findings with respect to mitigation of damages were not supported by the record. IBM argues that it was entitled to a deduction from the back award based on Castelluccio's failure to mitigate damages because it had proven by a preponderance of evidence that suitable work existed for Castelluccio after his termination. It also argues that the record does not support the jury's findings that Castelluccio made reasonable efforts to seek employment. This court disagrees.

Victims of employment discrimination are required to mitigate their damages. See Dailey v. Societe Generale, 108 F.3d 451, 455 (2d Cir.1997). A discharged employee must "use reasonable diligence in finding other suitable employment," which need not be comparable to their previous positions. Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 & n. 15, 102 S.Ct. 3057, 3065-66 & n. 15, 73 L.Ed.2d 721 (1982). Typically, the employer has the burden to demonstrate (1) that suitable work existed in the marketplace and that (2) its former employee made no reasonable effort to find it. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir.1998) (citing Dailey, 108 F.3d at 456).

Here, the jury found that IBM met only one of these requirements, that is, it concluded that suitable work existed for Castelluccio, but also concluded that Castelluccio made reasonable efforts to seek employment. (Doc. #187, at 2). Consequently, the

jury was not required to deduct a value from the back pay award simply because IBM proved that there was suitable work for Castelluccio in the marketplace.

Moreover, the jury's finding that Castelluccio made reasonable efforts to seek employment was overwhelmingly supported by the record.  For example, Castelluccio testified that he continued his efforts to find a job full time, for six days a week over a period of four and a half years.  (Doc. #216, at 516-525).  During this period, Castelluccio maintained records of his efforts to secure a job, which included lists chronicling 300 jobs he applied to or networking events he attended, 250 meetings or web seminars he attended to maintain and update his skills, and over 100 internet based resources he utilized to locate work.  (P. Exs. ##103, 104, 105).  Castelluccio testified that he relied heavily on online sources that advertised jobs for executives, including NetShare, ExecuNet and Health Care IT, that he searched for jobs in various print publications, and hired a consultant and worked with numerous executive recruiters in order to find a new position.  (Doc. #216, at 519, 521, 523-525).  Based on the weight of this evidence the court will not disturb the jury's finding that Castelluccio made reasonable efforts to seek employment.

4. Improper Remarks

Finally, IBM argues that a new trial is warranted because Castelluccio's counsel called IBM's attorney an exceptionally able

34

New York trial lawyer.[9]  The court is confident that the jury understood this comment as praise for IBM's attorney and that the statement was not designed to invoke in the jurors feelings of regional prejudice.  Consequently, this court cannot conclude that this statement so prejudiced the jury as to warrant a new trial, let alone that the statement was even improper on its face.  See Patterson v. Balsamico, 440 F.3d 104, 119 (2d. Cir.2006) ("Not every improper or poorly supported remark made in summation irreparably taints the proceedings."); Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 271 (2d Cir.1999) ("Rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.") (internal quotations marks omitted).  A new trial is not warranted on this basis.

For the reasons stated herein, IBM's renewed motion for a judgment as a matter of law, or in the alternative, new trial or remittitur, is DENIED.

**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut this 23rd   day of July, 2014.**

                                        /s/  Thomas  P.  Smith
                                        **Thomas P. Smith**
                                        **United States Magistrate Judge**

---

[9]Plaintiff's counsel actually referred to IBM's counsel as an "*extraordinarily* able New York trial lawyer"). (Doc. #220, at 1710) (emphasis added).

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,
          - Plaintiff
      v.                                    CIVIL NO. 3:09CV1145(TPS)

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
          - Defendant

### Ruling on Plaintiff's Motion for Attorneys' Fees

Following a nine-day trial, the jury returned a verdict in favor of the plaintiff, James Castelluccio, on his claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the New York State Human Rights Law ("NYSHRL"), NY CLS Exec § 196(a), against the defendant, International Business Machines Corporation ("IBM"). Judgment in the amount of $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,000 for emotional distress damages has been entered. (Doc. #195). Castelluccio has filed a motion for an award of attorney's fees, prejudgment interest, and compensation for increased tax liability as a prevailing party under the ADEA.[1] See 29 U.S.C. § 626(b); (Doc. #197). Castelluccio has also filed a supplementary motion for attorneys' fees for work related to certain post-trial motions in this case. (Doc. #231).

For the reasons that follow, Castelluccio's motion for

---

[1]Castelluccio also seeks an award for costs incurred in this litigation. The court does not address Castelluccio's application for costs because it is premature and must be submitted to the clerk of court, not the court itself.

attorney's fees, prejudgment interest, and compensation for increased tax liability **[Doc. #197]** is **GRANTED in PART and DENIED in PART**. Castelluccio is awarded $894,053.50 in attorneys' fees for work set forth in that motion. Absent objection, he is awarded $13,236 in prejudgment interest, and $209,488 in compensation for increased tax liability.

Castelluccio's supplementary motion for attorneys' fees **[Doc. #231]** is **GRANTED**. He is awarded $102,360.00 in attorneys' fees for work set forth in that motion.

## I. DISCUSSION

An award of attorneys' fees is mandatory to a prevailing party under the ADEA. Hagelthorn v. Kennecott Corp., 710 F.2d 76, 86 (2d Cir. 1983) (Detje v. James River Paper Corp., 167 F. Supp. 2d 248, 250 (D. Conn. 2001)). In determining an appropriate fee award, both the Second Circuit and the Supreme Court "have held that the lodestar-- the product of a reasonable rate and the reasonable number of hours required by the case-- creates a presumptively reasonable fee." Milea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir.2011) (citing Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany, 522 F.3d 182 (2d Cir.2008); Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010)). "'[T]he most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'" Farrar v. Hobby, 506 U.S. 103, 114 (1992), quoting Hensley v.

2

Eckerhart, 461 U.S. 424, 436, 103 S. Ct. 1993, 76 L. Ed. 2d 40 (1983). The court notes at the outset that the jury found in favor of Castelluccio on every claim he advanced at trial, and that the jury verdict was left undisturbed by the court in its denial of IBM's motion for judgment as a matter of law, or new trial, or remittitur. (Doc. #202).

In response to Castelluccio's motion for attorneys' fees (Doc. #197), IBM objects to four categories of activity that it believes should be excluded from Castelluccio's attorneys' fees calculation: (1) secretarial tasks and routine work; (2) abandoned claims, unsuccessful motions, and tasks unrelated to the outcome of the case; (3) tasks billed to two or more attorneys; and (4) work that has been "block" billed. IBM objects also, on similar grounds, to: (5) Castelluccio's (Doc. #231) supplementary motion for attorneys' fees. IBM does not contest the reasonableness of the hourly rate of Castelluccio's counsel. The court addresses each category IBM identifies in turn.

**1. Routine Legal Work and Secretarial Tasks**

IBM first claims that the fees Castelluccio seeks for secretarial tasks and routine work is excessive. It asks the court to deduct 4.4 hours of secretarial work from the attorneys' fee award and to also reduce by 50 percent the billable hours for the following work: 22.3 hours spent drafting the federal complaint; 25 hours spent negotiating a confidentiality agreement; 17.2 hours

spent drafting discovery requests; 272.30 hours spent drafting the
response and sur-reply to IBM's motion for summary judgment; 4.4
hours spent preparing Castelluccio for a second deposition; and
1,054.70 hours spent preparing for trial. Castelluccio claims that
IBM's estimation of hours billed for many of these tasks is
inaccurate and that the time actually billed was justified.

In instances where the record supports competing conclusions
regarding the amount of time billed, the court affords the benefit
of the doubt to Castelluccio.  This approach is supported by the
presumption that the lodestar figure represents a reasonable fee
and also by the courts' belief that Castelluccio's counsel, who has
sworn to the accuracy of the billing statements, is in a better
position than IBM to attest to the amount of time billed for
certain tasks.  Accordingly, the court accepts the representation
of counsel that he billed only 12.1 hours for negotiating a
confidentiality agreement and only 240 hours to contest IBM's
motion for summary judgment.  The expenditure of time to negotiate
the confidentiality agreement was reasonable, especially in light
of the fact that it required review of language proposed by IBM and
was put in place for IBM's benefit.  The time billed to contest
IBM's motion for summary judgment, which included a warranted sur-
reply, was also reasonable.  See e.g., Serricchio v. Wachovia Sec.,
LLC, 706 F.Supp.2d 237, 258 (D.Conn.2010) aff'd, 658 F.3d 169 (2d
Cir.2011) (294.25 hours of attorney time spent opposing motion for

4

summary judgment was reasonable).

The court also accepts Castelluccio's representation concerning the time he spent drafting discovery requests. The record reasonably supports Castelluccio's position that IBM has overestimated the amount of time he spent drafting discovery requests inasmuch as IBM's estimation includes time Castelluccio was billed for responding and objecting to IBM's requests for production, scheduling a settlement conference, participating in a conference call with a Magistrate Judge, and reviewing IBM's confidentiality agreement. (Doc. #223-5). The court therefore finds that the time Castelluccio was billed to respond to discovery requests was reasonable.

The court also accepts Castelluccio's representation that time for certain secretarial tasks was not billed by his attorneys. The court has reviewed the entries in question, which include time spent drafting the federal complaint, reviewing the law and the court's ruling, and finds that these tasks do not amount to work that is secretarial in nature. To the extent IBM identifies a time entry related to filing the complaint, the court accepts Castelluccio's representation that the time for that task was billed to a paralegal.

The court also disagrees with IBM's position that the time Castelluccio spent preparing for trial was excessive. The court finds that IBM's estimate of the hours billed to Castelluccio for

trial preparation is overly broad.  Its estimate collects entries dating back to 11 months before trial and does not challenge any single entry with specificity.  (Doc. #223-8).  Accordingly, the court cannot conclude that the hours billed to Castelluccio for the purpose of trial preparation were excessive.

The court, however, agrees with IBM's position that a reduction of attorneys' fees is warranted for the time spent drafting the federal complaint in this case.  (Doc. #223-4).  The court finds that 22.3 hours for this task is excessive in light of the fact that the complaint was produced on the heels of litigation at the administrative level.  Accordingly, the court reduces attorneys' fees for this excessive work by $2,811.

The court also agrees with IBM's position that a reduction of attorneys' fees is warranted for time spent preparing Castelluccio for a second day of deposition.  While the court does not believe that Castelluccio acted in bad faith, it finds that a second deposition was induced to some extent by Castelluccio's failure to produce prior to the first deposition all documents related to his efforts to mitigate damages.  Accordingly, the court reduces attorneys' fees for the second day of Castelluccio's deposition by $792.50.

### 2. Abandoned Claims, Unsuccessful Motions, and Other Tasks

IBM next claims that Castelluccio should not be awarded attorneys' fees for certain abandoned claims and theories,

unsuccessful motions, and tasks unrelated to the outcome of the case. A plaintiff who prevails on some but not all of his claims is not entitled to a fee award for unsuccessful claims that were based on different facts and different legal theories. <u>Hensley</u>, 461 U.S. at 434, 103 S.Ct. 1933). However, a plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and unsuccessful claims were interrelated and required essentially the same proof. <u>Murphy v. Lynn</u>, 118 F.3d 938, 951 (2d Cir.1997), <u>cert denied</u>, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998); <u>Lunday</u>; <u>Grant v. Bethlehem Steel Corp.</u>, 973 F.2d 96, 101 (2d Cir.1992), <u>cert. denied</u>, 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); <u>DeLeon v. Little</u>, No. 3:94CV902RNC, 2000 WL 435494, at *4 (D.Conn. Mar.2, 2000).

### A. Abandoned Claims and Theories

IBM specifically argues that Castelluccio should not be permitted to recover attorneys' fees for the following abandoned claims: (1) his claim that IBM allegedly breached an implied contract, which was abandoned before the complaint was filed; (2) his claim for retaliation, which was abandoned after the close of discovery; (3) his claim that IBM violated its progressive discipline policy; (4) his claim that his pension should not be used to offset his damages claim; (5) his efforts to introduce evidence of a coworker's earnings as evidence supporting his claim

7

for lost stock options; and (6) his failed application to amend the case management plan in order to designate a rebuttal expert.

With respect to Castelluccio's claims of breach of implied contract and retaliation, the court finds that these claims are factually interrelated to Castelluccio's claim of wrongful termination such that no reduction of fee is warranted. Dominic v. Consol. Edison Co. Of New York, Inc., 822 F.2d 1249, 1259 (2d Cir. 1987) ("[W]hen a plaintiff's claims for relief involve a common core of facts or are based on related legal theories, the lawsuit cannot be viewed as a series of discrete claims."  (Internal quotations and brackets omitted)).  In addition, the court finds that those claims were reasonably viable legal theories that counsel had a duty to investigate.  To disallow attorneys' fees in this respect would serve only to discourage attorneys' from investigating all reasonable theories of recovery.  See Marisol A. ex. re.. Forbes v. Guiliani, 111 F.Supp.2d 381, 393 (S.D.N.Y. 2000) ("Preventing . . . prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise successful litigation may discourage attorneys from zealously representing their clients and raising novel but reasonable arguments on their behalf.").  In any event, the court finds that time spent on these claims does not appear to be unreasonable, and notes that the claims were timely abandoned when Castelluccio determined they were not meritorious.  Accordingly, no reduction of attorneys' fees is

warranted for the abandoned claims of breach of implied contract and retaliation.

Likewise, the court disagrees with IBM that Castelluccio should not be allowed to recover attorneys' fees associated with efforts to introduce evidence of his successor's earnings in order to establish damages for his wrongful termination. IBM argues that attorneys' fees should not be awarded because Castelluccio did not ultimately introduce this evidence at trial, opting instead to base his theory of damages on his own earnings. Castelluccio argues that not introducing this evidence was a reasonable litigation decision designed to streamline the evidence at trial. "The relevant issue . . . is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir.1992). Applying this analysis, the court cannot conclude that it was unreasonable to explore a successor's earnings as a possible measure of damages and to thereafter abandon that theory in order to streamline the presentation of evidence at trial. Accordingly, the court will not reduce the attorneys' fees award in this respect.

The court also disagrees with IBM's claim that Castelluccio should not be awarded attorneys' fees associated with his argument that IBM violated its progressive discipline policy. IBM argues

that this time is not compensable because Castelluccio abandoned this argument.  The record reveals that Castelluccio filed a motion to admit evidence of IBM's failure to follow its progressive discipline policy prior to trial.  (Doc. #148).  The court granted that motion in part at the pretrial conference.  Specifically, it held that evidence of interim reviews would be admissible, but disallowed evidence of performance improvement plans.  At trial, Castelluccio ultimately introduced evidence of IBM's policy regarding interim reviews through Kelton Jones.  (Tr. 1062 and 1065).  This testimony established that interim reviews applied to all executives at IBM, including Castelluccio, and, considered against the fact that Castelluccio never received one, allowed the jury to draw an inference of age discrimination.  This argument was therefore not abandoned.  Accordingly, the court cannot conclude that Castelluccio abandoned his claim that IBM violated its progressive discipline policy or that a reduction of attorneys' fees is warranted in this respect.

The court also disagrees with IBM's position that Castelluccio abandoned his claim concerning how pension benefits should factor into the calculation of damages.  At the pretrial conference, Castelluccio argued that IBM had the burden to establish the amount to be deducted from Castelluccio's damages in order to account for pension payments he received after his termination.  Castelluccio argues that he pursued this claim on a good faith belief that an

10

open question of law existed as to which party had the burden to establish this offset amount, but ultimately decided not to introduce into the record an appealable issue after finding no controlling precedent.  Because the parties discussed this point with the court at the pretrial conference, the court cannot conclude that this claim was abandoned.  Nor can the court conclude that a reasonable attorney would not have pursued what appeared to be an open question of law.  Accordingly, no reduction of attorneys' fees is warranted here.

The court, however, finds that Castelluccio should not be awarded attorney's fees for his failed application to amend the case management plan in order to extend the deadline for disclosure of an expert witness to rebut IBM's expert on employability and efforts to mitigate damage.  The court denied that motion on the basis that Castelluccio was tardy in seeking additional time and had not acted diligently or shown good cause for the extension. (Doc. #44).  The court finds that it would be unreasonable for IBM to bear the costs associated with the motion to amend the case management plan in light of the court's findings in this respect. The court will reduce the billable hours associated with Castelluccio's application to amend the case management plan by $575.

## B. Unsuccessful Motions and Other Tasks

IBM next argues that Castelluccio should not be able to

recover for the following unsuccessful motions and other tasks not related to the outcome of the case.  IBM specifically argues that Castelluccio should not be able to recover attorneys' fees for: (1) 128.10 hours opposing its two motions to preclude expert testimony; (2) 72.20 hours deposing Barbara Brickmeier, Patricia O'Malley, Garret Walker, and Jack Overacre; (3) 40.7 hours opposing its application to seal; (4) 27 hours spent on a motion to compel discovery; and (5) 22.4 hours spent on a motion to revise the parties' pre-trial stipulations with respect to IBM's pre-trial investigation.  This court disagrees.

Castelluccio's opposition to IBM's motion to preclude the expert testimony of his damages expert, Dr. Crakes, was not an unreasonable expenditure of time.  IBM sought to preclude Dr. Crakes's testimony on the basis that, inter alia, his opinion was based on an unreliable methodology concerning the exercise of stock options.  (Doc. #50, 51).  This position was challenged by Castelluccio in his response.  (Doc. #72).  In granting in part and denying in part IBM's motion to preclude expert testimony, the court agreed with IBM that Dr. Crakes's methodology with respect to the exercise of stock options was unreliable, and accordingly deemed inadmissable that portion of his testimony.  However, the court held that Dr. Crakes would otherwise be able to testify on the issue of Castelluccio's economic loss as indicated in other areas of the report.  (Doc. #114).  The court sees no reason why it

12

should now disallow Castelluccio's partially successful response to IBM's motion to preclude expert testimony. The court cannot conclude that a reasonable attorney would not have pursued Castelluccio's argument that economic damages should be based on stock options.

In the same vein, the court cannot conclude that attorneys' fees are unreasonable for efforts to revise Dr. Crakes's methodology and Castelluccio's opposition to IBM's second motion to preclude expert testimony. After the court's order deeming Dr. Crakes's testimony concerning the exercise of stock options unreliable, Castelluccio sought to cure the defect by basing the valuation of stock options on an arguably less speculative metric-- the stock options awarded to his successor. (Doc. #123). The court again held that this second approach did not cure the speculative nature of Dr. Crakes's opinion. (Doc. #127). Although Castelluccio was unsuccessful in this respect, the court cannot conclude that a reasonable attorney would not have similarly engaged in efforts to incorporate a generally recoverable component of damages. Grant, 973 F.2d at 99. Accordingly, the court will not reduce attorneys' fees in this respect.

Neither does the court agree with IBM's argument that a reduction of fees is warranted for the depositions of Brickmeier, O'Malley, Walker and Overacre, who IBM claims added nothing to the litigation or the outcome of the case. It was not unreasonable for

13

Castelluccio to depose Brickmeier, O'Malley, Walker and Overacre, because those very individuals were identified by IBM in response to Castelluccio's Rule 30(b)(6) deposition Notice. <u>Serricchio v. Wachovia Sec., LLC</u>, 706 F. Supp. 2d 237, 258 (D. Conn. 2010), <u>aff'd</u>, 658 F.3d 169 (2d Cir.2011) (finding that time billed to depose witnesses designated pursuant to Fed. R. Civ. P. 30(b)(6) and 26 was compensable).

The court also disagrees with IBM's position that a fees reduction is warranted for time Castelluccio spent opposing IBM's motions to seal certain material submitted in supported of its motion for summary judgment and motion to exclude expert testimony. IBM argues that Castelluccio's opposition to its motion to seal was unnecessary and therefore not compensable. The court finds no basis to conclude that this opposition was an unnecessary expenditure of time. The opposition was induced by IBM's filing of the motions to seal in the first instance. Moreover, the court, in granting in part and denying in part IBM's motion to seal, agreed with Castelluccio on many of the points of contention raised in his opposition. (Doc. #117). No reduction of attorneys' fees is warranted for Castelluccio's justified expenditure of time in this respect.

The court also disagrees with IBM's position that a fees reduction is warranted for Castelluccio's motion to compel discovery. (Doc. #159). Castelluccio filed this motion several

months before trial to compel the discovery of certain documents related to IBM's performance review procedures as well as documents related to its "open door investigation." IBM argues that Castelluccio's motion to compel was unsuccessful and that it was untimely because it was filed more than three years after discovery closed. The motion to compel was filed well after the close of discovery; however, the court notes that it may have been engendered to some extent by IBM's failure to produce these documents when Castelluccio requested them in 2009. In addition, the court disagrees with IBM's position that the motion to compel was unsuccessful. Rather, the motion to compel was largely rendered moot by the court's subsequent order at the pretrial conference precluding much of the evidence related to performance review procedures and its order precluding evidence of IBM's open door investigation. (Doc. ## 163, 170). Castelluccio should not be denied attorneys' fees for a motion to compel discovery in light of the court's evidentiary rulings thereafter, which obviated the need for the production of most of the documents in question.

The court also disagrees with IBM that a reduction of time is warranted for time spent on an unsuccessful motion to revise the parties' pretrial stipulations with respect to IBM's pre-trial investigations. Before trial, the parties stipulated in the joint trial memorandum to certain facts regarding IBM's open door investigation, which were to be read to the jury. When the court

15

later granted Castelluccio's motion to preclude the open door evidence, IBM contacted Castelluccio seeking to enter into a revised stipulation of facts with regard to the open door investigation. The parties were unable to reach an agreement regarding the revision. Thereafter, Castelluccio filed the motion to revise the joint trial memorandum seeking to remove references to the open door investigation altogether. IBM now argues that the time Castelluccio spent on this motion was excessive. Castelluccio argues that the time IBM identifies as excessive does not pertain to the motion to revise the joint trial memorandum; rather, it concerns time spent reviewing the stipulations proposed by IBM subsequent to the court's ruling granting Castelluccio's motion to preclude the open door evidence. The court accepts Castelluccio's representation of the expenditure of time in this respect. Further, the court's review of the billing entries in question do not support IBM's position that some 22.4 hours were spent on the motion to revise the pre-trial stipulations. IBM has included a multitude of other tasks, such as Castelluccio's review and revision of exhibit lists and IBM document production, into its estimation of time spent on the motion. No reduction of time is warranted in this respect.

### 3. Tasks Billed to Two or More Attorneys

IBM next seeks a reduction of 314.2 hours or $87,039.50 for Castelluccio's regular use of two or more attorneys throughout this

16

case on the same task, or interoffice communication between lawyers. It cites the following as the most egregious examples of this practice: two lawyers attend the Rule 26(f) conference and various routine teleconferences with the court; two lawyers appear to defend plaintiff's deposition and attend those of IBM's witnesses; two lawyers appear at non-binding mediation; and four lawyers confer about whether to make a settlement counter-offer. Castelluccio argues that the billing entries at issue reflect reasonable collaboration between attorneys, that whenever possible he was either not billed or billed at a reduced rate when more than one attorney attended a deposition, and that two partners were never present at any court preceding, including trial.

It is not uncommon for parties to recover attorneys' fees for the collaboration of multiple attorneys on a case, when the district court decides that such collaboration is appropriate given the scope and complexity of the litigation. See, e.g., New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1146 (2d Cir.1983) ("Prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist. Nor are counsel forbidden from receiving fees for background research."); Luca v. County of Nassau, 698 F.Supp.2d 296, 305-07 (E.D.N.Y.2010) (awarding attorneys' fees and costs to two attorneys who collaborated on appellate brief and oral argument); Lenihan v. City

17

of New York, 640 F.Supp. 822, 826 (S.D.N.Y.1986) ("intra-office conferences among attorneys familiar with and working on particular litigation enhance the possibility of competent and efficient litigation, and hours spent in such conferences are not reduced under the rubric of 'billing judgment' unless the result is unproductive.").

The court notes as an initial matter that IBM's position that Castelluccio's counsel spent 314.2 hours working jointly on tasks is a gratuitous over-statement of the time billed in this respect. The 314.2 hours identified in IBM's exhibit 14 include a collection of entries that contain the word "confer" or indicate that counsel discussed an issue with each other or worked together in some respect.  Because notations reflecting this collaboration are included alongside other tasks in block time entries, many, if not most of the entries, also record tasks that the attorney or another member of the office performed independently.  IBM does not attempt to account for those tasks completed independently and asks for a wholesale reduction of the 314.2 hours it identifies.  Therefore, the time that Castelluccio was actually billed for tasks completed by multiple attorneys is substantially less than what IBM claims. Further, the court finds that the 314.2 hours of billing entries in question reflect a collaborative work process as opposed to duplicative billing.  Collaboration on all manner of tasks was not unreasonable in light of the scope and factual complexity of the

18

case.  The time sheet reflects a level of cooperation between
attorneys that would be expected in a case of this nature.
Accordingly, no reduction of time is warranted here.

**4. Block Billing**

IBM claims that a reduction of attorneys' fees is warranted
for the remaining tasks charged in this case to account for
Castelluccio's practice of "block-billing," that is, the
aggregation of multiple tasks into a single billing entry.  To
account for this practice, IBM argues that an additional 35 percent
reduction of attorneys' fees, or $173,942.47, is warranted for the
remainder of tasks identified in Castelluccio's fee application
that it has not specifically challenged above.  IBM argues that
Castelluccio's counsel deliberately engaged in block billing in
order to conceal his time entries from subsequent judicial review.

The court finds it very hard to believe that Castelluccio's
counsel deliberately engaged in block billing in order to conceal
his time entries from its review.  In any event, the block billing
entries at issue comply with the Second Circuit's requirements of
specificity because such entries specify "the date, hours expended,
and the nature of the work done."  <u>Carey</u> 711 F.2d at 1148.
Although  courts have levied across the board reduction for block
billing entries in some instances, "more often, courts have ordered
such reductions for block-billing only where there was evidence
that the hours billed were independently unreasonable or that the

block-billing was mixing together tasks that were not compensable, or not at all compensable at the same rate." See Hnot v. Willis Group Holdings Ltd., 01 CV. 6558 GEL, 2008 WL 1166309 at *6 (S.D.N.Y. Apr. 7, 2008) (citing collected cases). Here, IBM does not identify which time entries it claims are improper. In the absence of evidence that Castelluccio has obscured unreasonable billing, the court will not impose an across the board penalty simply because a law firm has engaged in a generally accepted billing practice. See Hnot 2008 WL 1166309 at *6.

**5. Supplemental Motion for Attorneys' Fees**

Finally, IBM objects to Castelluccio's (Doc. #231) supplemental motion for attorneys' fees. In Castelluccio's supplemental motion, he seeks attorneys fees for work related to, inter alia, his (Doc. #197) motion for attorneys' fees, including (Doc. #198) a memorandum of law in support of that motion, and (Doc. #229) a reply to IBM's opposition to the motion. He also seeks attorneys' fees for work related to his lengthy memorandum of law in opposition to IBM's motion for judgement as a matter of law, or new trial or remittitur. (Doc. #212). In total, Castelluccio seeks in his supplemental motion fees of $102,360.00, representing 302 hours of work performed by attorneys or paraprofessionals. (Doc. 232).

IBM claims that this figure should be reduced by a total of $54,733.90. IBM specifically argues that 119.80 hours, or

$40,642.50, for work associated with the bill of costs and fee application is excessive for such routine work, and should be reduced by 50 percent. IBM also argues that 18.7 hours, or $15,445.83, should be excluded from the fee award to account for redundant and duplicative billing practices. Finally, IBM argues that the balance of the fee award Castelluccio seeks in his supplemental motion should be reduced by 45 percent, or $29,966.81, to account for block billing entries.

The court has reviewed the billing entries in question and cannot conclude that a reduction of fees is warranted. The court disagrees with IBM's position that the attorneys' fees associated with the bill of costs and fee application are excessive. The attorneys' fees charged for this purpose are explained in large part by the lengthy memorandum of law Castelluccio submitted in support of the motion, his reply to IBM's opposition to the motion, and time spent assembling affidavits and time sheets in support of the motion. (Doc. ## 198, 229). Moreover, much of this work was billed by an associate, as opposed to a partner, and therefore billed at an appropriate rate.

In addition, the court can not conclude that a reduction of fees is warranted for work IBM describes as duplicative. IBM asks for a reduction of fees for time Castelluccio's attorneys spent conferring with each other concerning various aspects of the bill of costs, fee application and other trial post-trial motions.

These notations were included alongside other tasks in various billing entries.  Consequently, the court cannot conclude that any time spent in this respect was excessive in the first instance.  In addition, the court has reviewed the billing entries in question, and concludes that they reflect justifiable collaboration between attorneys as opposed to a duplication of fees.

Finally, the court cannot conclude that an across the board reduction of fees is warranted for block billing entries.  Like the other block billing entries IBM challenges above, IBM does not present evidence that Castelluccio obscured these billing entries either.  Accordingly the court will not reduce the attorneys' fees award for an acceptable billing practice.

## II. CONCLUSION

For the reasons stated herein, Castelluccio's supplementary motion for attorneys' fees [**Doc. #231**] is **GRANTED**.  He is awarded $102,360.00 in attorneys' fees for work set forth in that motion.

Castelluccio's motion for attorney's fees, prejudgment interest, and compensation for increased tax liability [**Doc. #197**] is **GRANTED in PART and DENIED in PART**.  Castelluccio is awarded $894,053.50 in attorneys' fees for work set forth in that motion.  Absent objection, he is awarded $13,236 in prejudgment interest, and $209,488 in compensation for increased tax liability.

The Clerk is directed to issue a Final Judgment in the amount of $3,718,920.78.

IT IS SO ORDERED.

Dated at Hartford, Connecticut this <u>23rd</u> day of July, 2014.


<u>/s/  Thomas  P.  Smith</u>
Thomas P. Smith
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO           :

      Plaintiff,           :   CASE NO. 3:09CV1145 (TPS)

V.           :

INTERNATIONAL BUSINESS MACHINES           :
CORPORATION           :
           :
    Defendant.

## FINAL JUDGMENT

This action having come on for consideration of the plaintiff's Motion for

Attorneys' Fees, Costs, Prejudgment Interest, and Compensation for Increased Tax

Liability and plaintiff's Supplemental Motion for Attorneys' Fees, before the Honorable

Thomas P. Smith, United States Magistrate Judge; and the Court having considered the

full record of the case including applicable principles of law, filed a Ruling on Plaintiff's

Motions for Attorneys' Fees granting in part and denying in part Motion for Attorneys'

Fees, Costs, Prejudgment Interest, and Compensation for Increased Tax Liability, and

granting Supplemental Motion for Attorneys' Fees.  Plaintiff is awarded $996,413.50 in

attorneys' fees, $13,236.00 in prejudgment interest, and $209,488.00 in compensation

for increased tax liability;  It is therefore

    **ORDERED, ADJUDGED AND DECREED** that judgment be and is hereby

entered in favor of the plaintiff in the total amount of $3,718,920.78.

    Dated at Hartford, Connecticut, this 25th day of July, 2014.


                ROBIN  D. TABORA, Clerk

                By  /s/  AB
                  Angela Blue
                  Deputy Clerk

EOD: July 28th, 2014

# CERTIFICATE OF SERVICE

I, TRACI L. LOVITT, hereby certify that on March 13, 2015, I filed an electronic copy of the foregoing SPECIAL APPENDIX on the Court's CM/ECF system, which caused it to be served on all counsel of record.

Dated:      March 13, 2015

/ s / Traci L. Lovitt
Traci L. Lovitt, Esq.
Jones Day
100 High Street
Boston, Massachusetts 02110
(617) 960-3939
*Attorney for Defendant-*
*Appellant IBM*