# 14-2854-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

—against—

INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## JOINT APPENDIX
## VOLUME I OF VI
## (Pages A-1 to A-276)

ZACHARY D. FASMAN, ESQ.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

TRACI L. LOVITT, ESQ.
JONES DAY
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

WILLIS J. GOLDSMITH, ESQ.
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant IBM*

(*Counsel continued on inside cover*)

MARK RAYMOND CARTA, ESQ.
MARGARET ANN TRIOLO, ESQ.
CARTA, MCALISTER
  & MOORE, LLC
1120 Boston Post Road
Darien, Connecticut 06820
(203) 202-3103

*Attorneys for Plaintiff-Appellee*
  *James Castelluccio*

# TABLE OF CONTENTS

PAGE

## Volume I of VI

*Castelluccio v. International Business Machines Corp.*,
Case No. 09-cv-1145 (TPS) (D. Conn.) Docket Sheet . . . . . . . . . . . . . . . . A-1

Complaint, dated July 20, 2009 (Docket No. 1) . . . . . . . . . . . . . . . . . . . . . . . .  A-33

Affirmation of Zachary D. Fasman in Support of IBM's Motion for
Summary Judgment, dated September 20, 2010
(Docket No. 47-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-53

Exhibit 4 to the Affirmation of Zachary D. Fasman —
Excerpts from the Deposition of Joanne Collins-Smee
(Docket No. 47-5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-56

IBM's Memorandum of Law in Support of its Motion for Summary
Judgment, dated September 20, 2010 (Docket No. 49) . . . . . . . . . . . . .  A-107

IBM's Memorandum of Law in Support of Motion to File
Confidential Documents Under Seal, dated September 20, 2010
(Docket No. 53) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-154

Plaintiff's Memorandum of Law in Support of Opposition to
Defendant's Motion for Summary Judgment,
dated November 15, 2010 (Docket No. 70) . . . . . . . . . . . . . . . . . . . . . . . .  A-160

Memorandum of Decision and Order denying Defendant's Motion for
Summary Judgment, dated August 21, 2012 (Docket. No. 108) . . . . .  A-213

Parties' Joint Trial Memorandum, dated September 13, 2013
(Docket No. 133) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-229

Exhibit C to Affirmation of Mark R. Carta in Support of
Castelluccio's Motion to Preclude, dated November 22, 2013 —
Open Door Report (Docket No. 156-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-250

ii

PAGE

Exhibit G to Affirmation of Mark R. Carta in Support of
Castelluccio's Motion to Preclude, dated November 22, 2013 —
Email from R. Mandel to K. Holmes dated June 20, 2008
(Docket No. 156-7) ............................................... A-255

Ruling on Plaintiff's Motion to Preclude Evidence,
dated December 23, 2013 (Docket No. 163) ....................... A-258

Defendant's Memorandum of Law in Support of its Motion for
Judgment as a Matter of Law, dated January 17, 2014, with
Exhibit (Docket No. 179) ........................................ A-265

**Volume II of VI**

Transcript of Trial, dated January 13, 2014 (Docket No. 175)........... A-277

Transcript of Trial, dated January 14, 2014 (Docket No. 176)........... A-330

Transcript of Trial, dated January 15, 2014 (Docket No. 177)........... A-388

Transcript of Trial, dated January 16, 2014 (Docket No. 178)........... A-444

Transcript of Trial, dated January 17, 2014 (Docket No. 182)........... A-507

**Volume III of VI**

Transcript of Trial, dated January 21, 2014 (Docket No. 183)........... A-560

Transcript of Trial, dated January 22, 2014 (Docket No. 184)........... A-603

Transcript of Trial, dated January 23, 2014 (Docket No. 185)........... A-658

Transcript of Trial, dated January 24, 2014 (Docket No. 186)........... A-710

Plaintiff's Trial Exhibit 1—
The IBM Personal Business Commitments Program,
dated February 17, 2004 ......................................... A-720

iii

PAGE

Plaintiff's Trial Exhibit 4—
    Castelluccio's Personal Business Commitment, Assessment
    Period: 1/1/2007 to 12/31/2007 .................................... A-733

Plaintiff's Trial Exhibit 14—
    Castelluccio's Personal Business Commitment, Assessment
    Period: 1/1/2006 to 12/19/2006 .................................... A-734

Plaintiff's Trial Exhibit 16—
    WellPoint Contract Overview, Bob Zapfel Review,
    dated June 2, 2006 ............................................... A-739

Plaintiff's Trial Exhibit 17—
    WellPoint Red Team Review, dated June 21, 2006 ................. A-789

Plaintiff's Trial Exhibit 29—
    Email dated February 28, 2007 from J. Collins-Smee to K.
    Holmes Re: Need to Replace J. Castelluccio ...................... A-834

Plaintiff's Trial Exhibit 31—
    P. Kerine Five Minute Drill Summary ............................. A-835

Plaintiff's Trial Exhibit 53—
    Email dated April 27, 2007 from D. Liederbach to
    J. Collins-Smee Re: Miguel ...................................... A-844

Plaintiff's Trial Exhibit 56—
    J. Collins-Smee Five Minute Drill Summary ...................... A-846

Plaintiff's Trial Exhibit 60—
    Email dated August 9, 2007 from M. Boxer to R. Zapfel,
    M. Lautenbach and S. Mills Re: Production Issue ................. A-852

Plaintiff's Trial Exhibit 62—
    Email dated August 22, 2007 from K. McDonald to M. Boxer ...... A-853

iv

PAGE

Plaintiff's Trial Exhibit 64—
    Email dated September 8, 2007 from K. McDonald to M. Boxer
    Re: DPE ...................................................... A-854

**Volume IV of VI**

Plaintiff's Trial Exhibit 66—
    R. Zapfel's Five Minute Drill Summary .......................... A-855

Plaintiff's Trial Exhibit 67—
    WellPoint Executive Operating Committee Meeting Report –
    Fourth Quarter Review .......................................... A-861

Plaintiff's Trial Exhibit 68—
    WellPoint Client Satisfaction Survey, dated February 14, 2008 ..... A-865

Plaintiff's Trial Exhibit 69—
    Meeting Notice dated January 10, 2008 to A. Weststeyn
    Re: J. Castelluccio Career Opportunities .......................... A-870

Plaintiff's Trial Exhibit 70—
    Email dated January 14, 2008 from J. Castelluccio to
    A. Weststeyn Re: Our phone conversation ......................... A-871

Plaintiff's Trial Exhibit 71—
    Email dated May 1, 2008 from A. Weststeyn to J. Castelluccio
    Re: Job Opportunities ........................................... A-872

Plaintiff's Trial Exhibit 72—
    Email dated May 4, 2008 from J. Castelluccio to A. Weststeyn
    Re: Job Search .................................................. A-873

Plaintiff's Trial Exhibit 73—
    Email dated January 18, 2008 from J. Castelluccio to
    G. Mastriforte Re: UK's DVLA Sr. PE Opportunity ............... A-875

v

PAGE

Plaintiff's Trial Exhibit 74—
    Email dated March 28, 2008 from J. Castelluccio to
    G. Mastriforte Re: Sr. PE Opportunities........................... A-877

Plaintiff's Trial Exhibit 75—
    Meeting Notice dated January 9, 2008 to J. Castelluccio
    Re: Personal Phil Guido........................................... A-878

Plaintiff's Trial Exhibit 76—
    Email dated February 27, 2008 from Castelluccio to G. Walker
    Re: Personal and Confidential .................................... A-879

Plaintiff's Trial Exhibit 78—
    Email dated April 7, 2008 from J. Castelluccio to
    M. Barnett Re: Your call ......................................... A-880

Plaintiff's Trial Exhibit 79—
    Email dated April 14, 2008 from M. Barnett to J. Castelluccio
    Re: Our Discussion Yesterday .................................... A-881

Plaintiff's Trial Exhibit 80—
    Email dated April 23, 2008 from J. Castelluccio to B. Barnett
    Re: For our discussion ........................................... A-882

Plaintiff's Trial Exhibit 81—
    Email dated May 20, 2008 from B. Barnett to J. Castelluccio
    Re: Network Position ............................................ A-884

Plaintiff's Trial Exhibit 82—
    Email dated May 9, 2008 from C. Murphy to G. Walker
    Re: Actions/Notes from May 7 Five Minute Drill.................. A-885

Plaintiff's Trial Exhibit 83—
    Email dated May 13, 2008 from M. Echavarria to ME Directs,
    forwarding J. Collins-Smee email Re: Organizational changes...... A-888

vi

PAGE

Plaintiff's Trial Exhibit 88—
    Email dated May 13, 2008 from J. Castelluccio to J. Overacre
    Re: Attached is my resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-890

Plaintiff's Trial Exhibit 90—
    Email dated May 21, 2008 from J. Collins-Smee to
    J. Castelluccio Re: Resume. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-891

Plaintiff's Trial Exhibit 91—
    Email dated May 20, 2008 from J. Collins-Smee to
    J. Castelluccio Re: Resume. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-893

Plaintiff's Trial Exhibit 92—
    Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
    Re: J. Castelluccio – Executive Separation Talking Points . . . . . . . . . A-895

Plaintiff's Trial Exhibit 93—
    Email dated June 10, 2008 from J. Castelluccio to R. Atkins
    Re: Our phone conversation of a week ago . . . . . . . . . . . . . . . . . . . . . . . . A-897

Plaintiff's Trial Exhibit 99—
    Letter dated April 15, 2009 from J. White to M. King
    Re: Castelluccio NYSDHR/EEOC Charge. . . . . . . . . . . . . . . . . . . . . . . . . A-898

Plaintiff's Trial Exhibit 204—
    Report of Parties 26(F) Planning Conference,
    dated October 5, 2009 (Docket No. 18) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-905

Plaintiff's Trial Exhibit 259—
    Plaintiff's Demonstrative Exhibit – IBM's Reasons for
    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-928

Defendant's Trial Exhibit 12—
    Email chain dated April 25, 2006 from D. Liederbach to K. Jones
    Re: WLP Resource Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-929

vii

PAGE

Defendant's Trial Exhibit 13—
    Email dated May 9, 2006 from D. Liederbach to K. Jones Re:
    Personal and Confidential ........................................ A-931

Defendant's Trial Exhibit 28—
    Email chain dated January 26, 2007 from J. Collins-Smee to D.
    Liederbach cc: C. Adler; L. Serra Re: Wellpoint Labor
    Investments ..................................................... A-932

Defendant's Trial Exhibit 29—
    Email chain dated September 20, 2006 from D. Liederbach to J.
    Collins-Smee Re: Service Delivery at WellPoint – Urgent ......... A-937

Defendant's Trial Exhibit 32—
    Email chain dated February 16, 2007 from J. Collins-Smee to K.
    McDonald Re: my barrage of emails .............................. A-942

Defendant's Trial Exhibit 34—
    Email chain dated February 18, 2007 from D. Liederbach to J.
    Collins-Smee cc: C. Adler Re: Request for Meeting .............. A-943

Defendant's Trial Exhibit 36—
    Email dated February 28, 2007 from J. Collins-Smee to
    K. Holmes ...................................................... A-946

Defendant's Trial Exhibit 45—
    Email chain dated March 31, 2007 from J. Collins-Smee to D.
    Liederbach; J. Castelluccio Re: Wellpoint – Monday ............. A-947

Defendant's Trial Exhibit 48—
    Email chain dated May 4, 2007 M. Boxer to K. McDonald ......... A-948

Defendant's Trial Exhibit 52—
    Email dated May 15, 2007 from K. McDonald to J. Collins-
    Smee cc: D. Liederbach; E. McCabe; J. Shimkus; R. Zapfel Re:
    Delivery Leadership ........................................... A-950

viii

PAGE

Defendant's Trial Exhibit 54—
   Email chain dated May 22, 2007 from M. Boxer to K. McDonald ... A-952

Defendant's Trial Exhibit 109—
   IBM's U.S. Concerns and Appeals Program (Open Door,
   Panel Review & Confidentially Speaking)......................... A-954

Defendant's Trial Exhibit 117—
   Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
   Re: J. Castelluccio Executive Separation Talking Points ........... A-965

Defendant's Trial Exhibit 124—
   Email chain dated May 14, 2008 from R. Mandel to K. Moran
   Re: Dir Global Interlock Process – Actions Pending for Daniels
   approval ...................................................... A-967

Defendant's Trial Exhibit 128—
   Email chain dated April 1, 2008 from R. Mandel to K. Moran Re:
   Candidate for Network Services Integration Position, with
   attachment .................................................... A-971

Defendant's Trial Exhibit 135—
   Email chain dated May 20, 2008 from G. Walker to R. Mandel
   Re: JG Castelluccio Resume..................................... A-976

Defendant's Trial Exhibit 136—
   Email chain dated May 20, 2008 from G. Walker to R. Mandel
   Re: JG Castelluccio Resume..................................... A-979

Court Exhibit 1—
   Jury Instruction Regarding Positions Open while Castelluccio
   on the Bench .................................................. A-981

Court Exhibit 2—
   Letter from Jury .............................................. A-982

IBM's Marked Witness List, dated January 24, 2014
   (Docket No. 188) .............................................. A-984

ix

PAGE

Castelluccio's Marked Witness List, dated January 24, 2014
    (Docket No. 189) ................................................. A-985

Court Exhibit List, dated January 24, 2014 (Docket No. 190) ........... A-986

Charge to the Jury, dated January 24, 2014 (Docket No. 194) ........... A-987

Judgment entered in favor of James Castelluccio against IBM,
    dated January 28, 2014 (Docket No. 195) ........................ A-1004


**Volume V of VI**

Affidavit of Mark R. Carta in Support of Plaintiff's Motion for
    Attorneys' Fees, Prejudgment Interest, Costs and Compensation
    for Increased Tax Liability, dated February 11, 2014
    (Docket. No. 199) ............................................... A-1005

    Exhibit 4 to Affidavit of Mark R. Carta—
    Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
    (Docket. No. 199-4) ............................................ A-1031

    Exhibit 3 to Affidavit of Mark R. Carta—
    Rucci, Burnham & Carta, LLP Invoice, dated August 29, 2008
    (Docket. No. 199-10) ........................................... A-1102

    Exhibit 4 to Affidavit of Mark R. Carta—
    Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
    (Docket. No. 199-11) ........................................... A-1201


**Volume VI of VI**

Defendant's Renewed Motion for Judgment as Matter of Law,
    or, in the Alternative, for New Trial/Remittiture,
    dated February 25, 2014 (Docket No. 202) ....................... A-1272

Declaration of Zachary D. Fasman, dated April 3, 2014
    (Docket. No. 223) .............................................. A-1325

x

PAGE

Exhibit 6 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Summary Judgment
(Docket No. 223-6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1334

Exhibit 8 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Trial Preparation
(Docket No. 223-8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1341

Plaintiff's Reply to IBM's Opposition to Plaintiff's Motion for
Attorneys' Fees, dated April 17, 2014 (Docket No. 229) . . . . . . . . . . A-1366

Affidavit of Mark R. Carta in Support of Plaintiff's
Supplemental Motion for Attorneys' Fees,
dated June 2, 2014 (Docket. No. 232) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1390

Declaration of Zachary D. Fasman, dated June 23, 2014,
with Exhibit A (Docket. No. 235) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1395

Opinion and Order, dated July 23, 2014, denying Motion for
Judgment as a Matter of Law, denying Oral Motion for Judgment
as a Matter of Law, denying Renewed Motion for Judgment as a
Matter of Law, and denying Motion for New Trial or Remittitur
(Docket No. 236) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1414

Ruling on Plaintiff's Motion for Attorneys' Fees,
dated July 23, 2014 (Docket No. 237) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1449

Final Judgment entered in favor of James Castelluccio against IBM,
dated July 28, 2014 (Docket No. 240) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1472

IBM's Notice of Appeal, dated August 11, 2014
(Docket No. 241) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1473

APPEAL,CLOSED,EFILE,REFCNF

## U.S. District Court
### United States District Court for the District of Connecticut (New Haven)
### CIVIL DOCKET FOR CASE #: 3:09-cv-01145-TPS

| | |
|---|---|
| Castelluccio v. International Bus Machines Corp | Date Filed: 07/21/2009 |
| Assigned to: Judge Thomas P. Smith | Date Terminated: 01/28/2014 |
| Referred to: Judge William I. Garfinkel (Settlement) | Jury Demand: Plaintiff |
| Cause: 29:626 Job Discrimination (Age) | Nature of Suit: 442 Civil Rights: Jobs |
| | Jurisdiction: Federal Question |

**Plaintiff**

**James Castelluccio**  represented by  **Amy S. Zabetakis**
Rucci, Burnham, Carta, Carello &
Reilly, LLP
30 Old Kings Highway South
P.O. Box 1107
Darien, CT 06820
203-899-3300
Fax: 203-655-4302
Email: azabetakis@rucciburnham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathryn A. Sherman**
Ricci Burnham Carta Carello & Reilly
LLP
30 Old Kings Highway South, PO Box
1107
Darien, CT 06820
203-899-3300
Fax: 203-655-4302
Email: ksherman@rucciburnham.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Margaret A. Triolo**
Carta, McAlister & Moore, LLC
1120 Boston Post Rd
Post Office Box 83
Darien, CT 06820
203-202-3100
Fax: 203-202-3102
Email: margaret@cmm-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark R. Carta**

Carta, McAlister & Moore, LLC
1120 Boston Post Rd
Post Office Box 83
Darien, CT 06820
203-202-3100
Fax: 203-202-3102
Email: mark@cmm-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**International Bus Machines Corp**     represented by     **Alexander W Wood**
Paul Hastings LLP - NY
75 East 55th Street
New York, NY 10022
212-318-6000
Fax: 212-319-4090
Email:
Alexanderwood@paulhastings.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allan S. Bloom**
Paul Hastings LLP - NY
75 East 55th Street, 1st floor
New York, NY 10022
212-318-6377
Fax: 212-319-4090
Email: allanbloom@paulhastings.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Deborah E. Hryb**
Paul Hastings LLP - NY
75 East 55th Street
31st Floor
New York, NY 10022
212-318-6422
Fax: 212-752-2573
Email: deborahhryb@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick W. Shea**
Paul Hastings LLP - NY
75 East 55th Street

New York, NY 10022
212-318-6000
Fax: 212-319-4090
Email: patrickshea@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sandi F. Dubin**
Paul Hastings LLP - NY
75 East 55th Street
31st Floor
New York, NY 10022
212-318-6000
Fax: 212-319-4090
Email: sandidubin@paulhastings.com
*TERMINATED: 12/08/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd C Duffield**
Paul Hastings LLP - NY
75 E. 55th Street
New York, NY 10022
212-318-6000
Fax: 212-319-4090
Email: toddduffield@paulhastings.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Dean Fasman**
Proskauer Rose LLP -NY
Eleven Times Square
New York, NY 10036-8299
212-969-3000
Fax: 212-969-2900
Email: ZFasman@proskauer.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2009 | 1 | COMPLAINT against International Bus Machines Corp (Filing fee $350, receipt number B018219), filed by James Castelluccio. (Heard, J.) (Entered: 07/21/2009) |
| 07/21/2009 | 2 | Order on Pretrial Deadlines: Motions to Dismiss due on 10/21/2009. Amended Pleadings due by 9/19/2009. Discovery due by 1/20/2010. Dispositive |

| | | |
|---|---|---|
| | | Motions due by 2/19/2010. Signed by Clerk on 7/21/2009. (Heard, J.) (Entered: 07/21/2009) |
| 07/21/2009 | 3 | ELECTRONIC FILING ORDER - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Mark R. Kravitz on 7/21/2009. (Heard, J.) (Entered: 07/21/2009) |
| 09/08/2009 | 4 | NOTICE of Appearance by Patrick W. Shea on behalf of International Bus Machines Corp (Shea, Patrick) (Entered: 09/08/2009) |
| 09/09/2009 | 5 | NOTICE of Appearance by Deborah E. Hryb on behalf of International Bus Machines Corp (Hryb, Deborah) (Entered: 09/09/2009) |
| 09/11/2009 | 6 | Corporate Disclosure Statement by International Bus Machines Corp. (Shea, Patrick) (Entered: 09/11/2009) |
| 09/11/2009 | 7 | NOTICE of Appearance by Kathryn A. Sherman on behalf of James Castelluccio (Sherman, Kathryn) (Entered: 09/11/2009) |
| 09/14/2009 | 8 | MOTION for Leave to Appear Pro Hac Vice Attorney Zachary D. Fasman. Filing Fee $25.00. Receipt Number N028457. by International Bus Machines Corp. (Malone, P.) (Entered: 09/14/2009) |
| 09/14/2009 | 9 | ORDER granting 8 Motion for Attorney Zachary Dean Fasman to Appear Pro Hac Vice for International Bus Machines Corp added. Signed by Clerk on 9/14/09. (Malone, P.) (Entered: 09/14/2009) |
| 09/14/2009 | 10 | MOTION for Attorney Allan S. Bloom to Appear Pro Hac Vice by International Bus Machines Corp. Filing Fee $25.00. Receipt Number N028458.(Malone, P.) (Entered: 09/14/2009) |
| 09/14/2009 | 11 | ORDER granting 10 Motion for Attorney Allan S. Bloom to Appear Pro Hac Vice. Attorney Allan S. Bloom for International Bus Machines Corp added. Signed by Clerk on 9/14/09. (Malone, P.) (Entered: 09/14/2009) |
| 09/14/2009 | 12 | MOTION for Attorney Sandi F. Dubin to Appear Pro Hac Vice by International Bus Machines Corp. Filing Fee $25.00. Receipt Number N028459. (Malone, P.) (Entered: 09/14/2009) |
| 09/14/2009 | 13 | ORDER granting 12 Motion for Attorney Sandi F. Dubin to Appear Pro Hac Vice. Signed by Clerk on 9/14/09. (Malone, P.) (Entered: 09/14/2009) |
| 09/17/2009 | 14 | NOTICE of Appearance by Sandi F. Dubin on behalf of International Bus Machines Corp (Dubin, Sandi) (Entered: 09/17/2009) |
| 09/17/2009 | 15 | NOTICE of Appearance by Allan S. Bloom on behalf of International Bus Machines Corp (Bloom, Allan) (Entered: 09/17/2009) |
| 09/17/2009 | 16 | NOTICE of Appearance by Zachary Dean Fasman on behalf of International Bus Machines Corp (Fasman, Zachary) (Entered: 09/17/2009) |
| 09/18/2009 | 17 | ANSWER to 1 Complaint with Affirmative Defenses by International Bus Machines Corp.(Fasman, Zachary) (Entered: 09/18/2009) |
| 10/05/2009 | 18 | REPORT of Rule 26(f) Planning Meeting. (Carta, Mark) (Entered: |

| | | 10/05/2009) |
|---|---|---|
| 10/08/2009 | 19 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephonic Scheduling Conference set for 10/21/2009 at 08:30 AM before Judge Mark R. Kravitz. Plaintiff's attorney will initiate the telephone conference call. After all of the parties are on the conference call, they should then call chambers at (203) 773-2022 on the above date and time. Counsel are ordered to be court to be prepared to discuss the merits of all pending motions. Please Note that the parties should commence discovery immediately in accordance with the discovery plan set forth in their 26(f) Report and they should not delay discovery pending the conference scheduled herein or entry of a scheduling order. (Carotenuto, R.) (Entered: 10/08/2009) |
| 10/21/2009 | 20 | Minute Entry for proceedings held before Judge Mark R. Kravitz: Telephone Scheduling Conference held on 10/21/2009. 3 minutes (Ghilardi, K.) (Entered: 10/21/2009) |
| 10/23/2009 | 21 | CASE MANAGEMENT ORDER: Counsel are expected to read the attachments to the Case Management Order.Telephonic Status Conference set for 3/10/2010 08:45 AM before Judge Mark R. Kravitz; Amended Pleadings due by 10/20/2009; Discovery due by 7/20/2010; Dispositive Motions due by 9/20/2010; Joint Status Report due by 3/12/2010; Trial Ready Date 10/20/2010; Joint Trial Brief due by 10/20/2010. Signed by Judge Mark R. Kravitz on 10/23/09. (Malone, P.) (Entered: 10/26/2009) |
| 10/23/2009 | 22 | ORDER REFERRING CASE to Magistrate Judge William I. Garfinkel for Settlement Conference. Signed by Judge Mark R. Kravitz on 10/23/09. (Malone, P.) (Entered: 10/26/2009) |
| 10/28/2009 | 23 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Pre-Settlement Conference set for November 4, 2009 @2:00 PM before Judge William I. Garfinkel. Counsel for the plaintiff shall initiate this call. Once all parties are on the line, please contact Chambers at (203)579-5593. A date for the settlement conference will be set during the telephone call. As the Court requires parties or their representatives with settlement authority to attend the settlement conference, counsel should obtain dates of unavailability from their clients over the next 120 days and have their own calendars available to aid in the scheduling. During the telephone call, counsel should be prepared to discuss what information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference for the discussions to be productive. This telephone conference will not be rescheduled based on requests from counsel. If counsel is not available at the scheduled time, please arrange for coverage by another lawyer who will have the necessary background knowledge to participate. (Sanders, C.) (Entered: 10/28/2009) |
| 11/04/2009 | 24 | Minute Entry for proceedings held before Judge William I. Garfinkel: Telephone Pre-Settlement Conference held on 11/4/2009. 30 minutes (Sanders, C.) (Entered: 11/05/2009) |
| 11/05/2009 | 25 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE |

| | | |
|---|---|---|
| | | COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Settlement Conference set for February 10, 2010 @10:30 AM before the Honorable William I. Garfinkel in courtroom 437, 4th Floor, 915 Lafayette Blvd., Bridgeport, CT. Counsel shall check in with Judge Garfinkel's chambers, room 429 prior to the conference. PLEASE REVIEW THE SETTLEMENT CONFERENCE ORDER ATTACHED. (Sanders, C.) (Entered: 11/05/2009) |
| 11/05/2009 | 26 | STIPULATION *of Confidentiality* by International Bus Machines Corp., James Castelluccio (Attachments: # 1 Text of Proposed Order for Confidentiality Stipulation and Agreement)(Dubin, Sandi) Modified on 11/9/2009 to correct filers (Malone, P.). (Entered: 11/05/2009) |
| 11/06/2009 | 27 | ORDER Approving and Granting with the exception of Paragraphs (B)(3) and (B) (4) re documents filed with or submitted in evidence to the Court re 26 Stipulation of Confidentiality, filed by James Castelluccio, International Bus Machines Corp. Signed by Judge Mark R. Kravitz on 11/6/09. (Malone, P.) (Entered: 11/09/2009) |
| 11/20/2009 | 28 | STIPULATION *to file amended answer pursuant to Rule 15 (a)* by International Bus Machines Corp. AND James Castelluccio (Attachments: # 1 Text of Proposed Order Order, # 2 Certificate of Service)(Fasman, Zachary) FILERS Modified on 11/23/2009 (Bauer, J.). (Entered: 11/20/2009) |
| 11/23/2009 | 29 | ORDER. Construing 28 Stipulation to File Defendant's Amended Answer and Affirmative Defenses as a Motion for Leave to File an Amended Answer, said Motion is granted. Defendant shall file its Amended Answer and Affirmative Defenses no later than November 30, 2009. Signed by Judge Mark R. Kravitz on 11/23/2009. (Carotenuto, R.) (Entered: 11/23/2009) |
| 11/23/2009 | 30 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference set for 11/30/2009 at 11:00 AM before Judge Mark R. Kravitz. Plaintiff's attorney will initiate the telephone conference call. After all of the parties are on the conference call, they should then call chambers at (203) 773-2022 on the above date and time. (Carotenuto, R.) (Entered: 11/23/2009) |
| 11/23/2009 | | Answer deadline updated for International Bus Machines Corp to 11/30/2009. (Ghilardi, K.) (Entered: 11/24/2009) |
| 11/24/2009 | 31 | ENTERED IN ERROR: *Amended* ANSWER to 1 Complaint with Affirmative Defenses by International Bus Machines Corp. (Attachments: # 1 Certificate of Service)(Fasman, Zachary) Modified on 11/25/2009 (Bauer, J.). (Entered: 11/24/2009) |
| 11/24/2009 | 32 | AMENDED ANSWER to 1 Complaint with Affirmative Defenses by International Bus Machines Corp. [CORRECTION to entry 31](Bauer, J.) (Entered: 11/25/2009) |
| 11/30/2009 | 33 | Minute Entry for proceedings held before Judge Mark R. Kravitz: Telephone Conference held on 11/30/2009. 30 minutes(Court Reporter Finkelstein.) (Ghilardi, K.) (Entered: 12/02/2009) |

Case 14-2854, Document 62, 03/18/2015, 1460796, Page19 of 289

| 02/09/2010 | 34 | AMENDED - NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Settlement Conference is rescheduled to February 16, 2010 @11:00 AM in before The Honorable William I. Garfinkel, in courtroom 437, 4th Floor, 915 Lafayette Blvd., Bridgeport, CT 06604. Counsel shall check in with Judge Garfinkel's chambers, room 429 prior to the conference. THE PREVIOUS ISSUED SETTLEMENT CONFERENCE ORDER REMAINS IN EFFECT. (Sanders, C.) (Entered: 02/09/2010) |
| 02/16/2010 | 35 | Minute Entry for proceedings held before Judge William I. Garfinkel: Settlement Conference held on 2/16/2010. Case not settled. Counsel will contact Chambers when they are ready to schedule another settlement conference in this matter. Total Time: 5 hours and 00 minutes (Sanders, C.) (Entered: 02/17/2010) |
| 03/03/2010 | 36 | Joint STATUS REPORT by James Castelluccio, International Bus Machines Corp. (Fasman, Zachary) (Entered: 03/03/2010) |
| 03/09/2010 | 37 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. Telephone Conference set for 3/30/2010 08:45 AM before Judge Mark R. Kravitz. Plaintiff's attorney will initiate the telephone conference call. After all of the parties are on the conference call, they should then call chambers at (203) 773-2022 on the above date and time. (Berwick, B.) (Entered: 03/09/2010) (Entered: 03/09/2010) |
| 03/22/2010 | 38 | ENTERED IN ERROR: NOTICE by James Castelluccio *Disclosure of Expert Witness and Notice of Filing Expert Witness Report* (Sherman, Kathryn) Modified on 3/23/2010 (Brown, S.). (Entered: 03/22/2010) |
| 03/23/2010 | | Docket Entry Correction re Entered in Error: 38 Notice re Disclosure of Expert Witness and Notice of Filing Expert Witness Report; Discovery is NOT to be filed pursuant to Local Rule(s) (Brown, S.) (Entered: 03/23/2010) |
| 04/01/2010 | 39 | NOTICE of Appearance by Amy S. Zabetakis on behalf of James Castelluccio (Zabetakis, Amy) (Entered: 04/01/2010) |
| 04/15/2010 | 40 | Minute Entry for proceedings held before Judge Mark R. Kravitz: Telephone Status Conference held on 4/15/2010. 12 minutes(Court Reporter Finkelstein.) (Ghilardi, K.) (Entered: 04/19/2010) |
| 07/15/2010 | 41 | First MOTION for Extension of Time of 21 Case Management Order, by James Castelluccio.Responses due by 8/5/2010 (Sherman, Kathryn) Modified on 7/16/2010 to change motion(Brown, S.). (Entered: 07/15/2010) |
| 07/16/2010 | 42 | ORDER. Currently pending before the Court is 41 Plaintiff's First Motion For Leave To Amend Case Management Order. Defendant shall respond to this Motion no later than July 21, 2010. Signed by Judge Mark R. Kravitz on 7/16/2010. (Carotenuto, R.) (Entered: 07/16/2010) |
| 07/19/2010 | | Set Deadlines as to 41 MOTION for Extension of Time. Responses due by 7/21/2010 (Ghilardi, K.) (Entered: 07/19/2010) |

| 07/21/2010 | 43 | Memorandum in Opposition re 41 MOTION for Extension of Time filed by International Bus Machines Corp. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Fasman, Zachary) (Entered: 07/21/2010) |
|---|---|---|
| 08/03/2010 | 44 | ORDER. Pending before the Court is Plaintiff James Castelluccio's 41 First Motion for Leave to Amend Case Management Order. Under the 21 Case Management Order entered in this case on October 23, 2009, Mr. Castelluccio's expert reports were to be served by March 20, 2010, and Defendant International Business Machines Corp.'s expert reports were to be served by April 20, 2010. All discovery -- including expert depositions -- was to be completed by July 20, 2010. Nevertheless, on July 15, 2010 -- nearly four months after the deadline for Mr. Castellucio's counsel to file expert reports and only five days before the close of discovery -- counsel for Mr. Castelluccio moved to amend the Case Management Order to permit disclosure of an additional "rebuttal" expert report. Counsel for Mr. Castelluccio seeks to extend the deadline for disclosure of Plaintiff's expert reports until August 30, 2010, and to extend the deadline for all discovery until September 30, 2010. Defendant opposes both extensions.<br><br>Mr. Castelluccio's 41 First Motion for Leave to Amend Case Management Order is DENIED. Under Rule 16(b)(4) of the *Federal Rules of Civil Procedure*, a scheduling order may be modified only for good cause. "A finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). Counsel for Mr. Castellucio has not shown good cause, and has not acted diligently. When Defendant disclosed its expert on employability and mitigation on April 27, 2010 -- which the Court recognizes was one week past the deadline set by this Court for disclosure of Defendant's experts -- counsel for Mr. Castellucio could have sought additional time to locate and disclose a rebuttal expert. Instead, counsel for Mr. Castellucio waited nearly three months and filed the present motion only five days before the end of the scheduled discovery period. The Court agrees with Defendant that amending the scheduling order would indeed prejudice Defendant, not only be requiring Defendant to depose an additional expert in preparation for trial, but also by delaying the close of discovery, the deadline for filing of dispositive motions, and the trial date. That said, even though it is past July 20, 2010, the parties may take the deposition of Dr. Charles Sodikoff, which the parties agreed to postpone until after this Court's decision on the present motion.<br><br>Signed by Judge Mark R. Kravitz on 8/3/2010. (Hatch-Miller, M.) (Entered: 08/03/2010) |
| 09/17/2010 | 45 | ORDER OF TRANSFER. Case reassigned to Judge Dominic J. Squatrito for all further proceedings. Signed by Clerk on 9/17/10. (Johnson, D.) (Entered: 09/17/2010) |
| 09/20/2010 | 46 | MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff by James Castelluccio.Responses due by 10/11/2010 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Carta, Mark) (Entered: 09/20/2010) |
|  |  |  |

Case 14-2854, Document 62, 03/10/2015, 1460796, Page21 of 289

| | | |
|---|---|---|
| 09/20/2010 | 47 | MOTION for Summary Judgment by International Bus Machines Corp.Responses due by 10/11/2010 (Attachments: # 1 Exhibit Fasman Affirmation in Support of motion for Summary Judgment, # 2 Exhibit Ex. 1, # 3 Exhibit Ex. 2, # 4 Exhibit Ex. 3, # 5 Exhibit Ex. 4, # 6 Exhibit Ex. 5, # 7 Exhibit Ex. 6, # 8 Exhibit Ex. 7, # 9 Exhibit Ex. 8, # 10 Exhibit Ex. 9, # 11 Exhibit Ex. 10, # 12 Exhibit Ex. 11, # 13 Exhibit Ex. 12, # 14 Exhibit Ex. 13, # 15 Exhibit Ex. 14, # 16 Exhibit Ex. 15, # 17 Exhibit Ex. 16, # 18 Exhibit Ex. 17, # 19 Exhibit Ex. 18, # 20 Exhibit Ex. 19, # 21 Exhibit Ex. 20, # 22 Exhibit Ex. 21, # 23 Exhibit Ex. 22, # 24 Exhibit Ex. 23, # 25 Exhibit Declaration of K. McDonald w/ Exhibits A-N Filed Under Seal, # 26 Exhibit Declaration of D. Liederbach w Exhibits A-C Filed Under Seal)(Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 48 | Statement of Material Facts re 47 MOTION for Summary Judgment filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 49 | Memorandum in Support re 47 MOTION for Summary Judgment filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 50 | MOTION to Preclude Exclude Testimony of Dr. Gary Crakes by International Bus Machines Corp.Responses due by 10/11/2010 (Attachments: # 1 Exhibit Affirmation of Zachary Fasman in Support of Motion to Exclude Testimony of Dr. Crakes, # 2 Exhibit Ex. A, # 3 Exhibit Ex. B, # 4 Exhibit Ex. C, # 5 Exhibit Ex. D, # 6 Exhibit Ex. E, # 7 Exhibit Ex. F, # 8 Exhibit Ex. G, # 9 Exhibit Ex. H, # 10 Exhibit Ex. I)(Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 51 | Memorandum in Support re 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 52 | MOTION to Seal Exhibits by International Bus Machines Corp. (Attachments: # 1 Exhibit Fasman Ex. 9, # 2 Exhibit Fasman Ex. 10, # 3 Exhibit Fasman Ex. 12, # 4 Exhibit Fasman Ex. 15, # 5 Exhibit Fasman Ex. 16, # 6 Exhibit Fasman Ex. 18, # 7 Exhibit Fasman Ex. 19, # 8 Exhibit Fasman Ex. 21, # 9 Exhibit Fasman Ex. 22, # 10 Exhibit Fasman Ex. 23, # 11 Exhibit Declaration of K. McDonald, # 12 Exhibit Ex. A, # 13 Exhibit Ex. B, # 14 Exhibit Ex. C, # 15 Exhibit Ex. D, # 16 Exhibit Ex. E, # 17 Exhibit Ex. F, # 18 Exhibit Ex. G, # 19 Exhibit Ex. H, # 20 Exhibit Ex. I, # 21 Exhibit Ex. J, # 22 Exhibit Ex. K, # 23 Exhibit Ex. L, # 24 Exhibit Ex. M, # 25 Exhibit Ex. N, # 26 Exhibit Declaration of D. Liederbach, # 27 Exhibit Ex. A, # 28 Exhibit Ex. B, # 29 Exhibit Ex. C, # 30 Exhibit Ex. E to Motion to Exclude Testimony, # 31 Exhibit Ex. F to Motion to Exclude Testimony, # 32 Exhibit Ex. G to Motion to Exclude Testimony)(Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 53 | Memorandum in Support re 52 MOTION to Seal Exhibits filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 54 | CERTIFICATE OF SERVICE by International Bus Machines Corp re 49 Memorandum in Support of Motion, 47 MOTION for Summary Judgment, 48 Statement of Material Facts (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/20/2010 | 55 | CERTIFICATE OF SERVICE by International Bus Machines Corp re 51 Memorandum in Support of Motion, 50 MOTION to Preclude Exclude |

Case 14-2854, Document 62, 03/12/2015, 1460796, Page22 of 289

| | | |
|---|---|---|
| | | Testimony of Dr. Gary Crakes (Fasman, Zachary) (Entered: 09/20/2010) |
| 09/22/2010 | 56 | AFFIDAVIT re 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff Affirmation Signed By Kathryn A. Sherman filed by James Castelluccio. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Sherman, Kathryn). (Entered: 09/22/2010) |
| 10/08/2010 | 57 | Joint MOTION for Extension of Time to File Response/Reply as to 47 MOTION for Summary Judgment until November 10, 2010 and December 1, 2010 respectively by James Castelluccio, International Bus Machines Corp. (Sherman, Kathryn) (Entered: 10/08/2010) |
| 10/08/2010 | 58 | Joint MOTION for Extension of Time to File Response/Reply as to 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff, 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes until November 10, 2010 by James Castelluccio, International Bus Machines Corp. (Sherman, Kathryn) (Entered: 10/08/2010) |
| 10/08/2010 | 59 | Joint MOTION for Extension of Time to File Response/Reply as to 52 MOTION to Seal Exhibits until November 10, 2010 and December 1, 2010 respectively by James Castelluccio, International Bus Machines Corp. (Sherman, Kathryn) (Entered: 10/08/2010) |
| 10/12/2010 | 60 | ORDER granting 57 Motion for Extension of Time to File Response re 47 MOTION for Summary Judgment Responses due by 11/10/2010. The defendants shall have until December 1, 2010 to reply to plaintiff's response. Signed by Judge Dominic J. Squatrito on 10/12/10. (Pike, C.) (Entered: 10/12/2010) |
| 10/12/2010 | | Set/Reset Deadlines as to 47 MOTION for Summary Judgment. Responses due by 11/10/2010. Reply to response due by 12/1/2010. (Pike, C.) (Entered: 10/12/2010) |
| 10/12/2010 | 61 | ORDER granting 58 Motion for Extension of Time to File Response re 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes, 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff. Responses due by 11/10/2010. Signed by Judge Dominic J. Squatrito on 10/12/10. (Pike, C.) (Entered: 10/12/2010) |
| 10/12/2010 | | Set/Reset Deadlines as to 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes, 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff. Responses due by 11/10/2010. (Pike, C.) (Entered: 10/12/2010) |
| 10/12/2010 | 62 | ORDER granting 59 Motion for Extension of Time to File Response re 52 MOTION to Seal Exhibits. Responses due by 11/10/2010. Defendants shall have until December 1, 2010 to file a reply to plaintiff's response. Signed by Judge Dominic J. Squatrito on 10/12/10. (Pike, C.) (Entered: 10/12/2010) |
| 10/12/2010 | | Set/Reset Deadlines as to 52 MOTION to Seal Exhibits. Responses due by 11/10/2010. Reply due by 12/1/10. (Pike, C.) (Entered: 10/12/2010) |
| 11/04/2010 | 63 | OBJECTION re 52 MOTION to Seal Exhibits filed by James Castelluccio. (Zabetakis, Amy) (Entered: 11/04/2010) |
| | | |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page23 of 289

| 11/09/2010 | 64 | Second MOTION for Extension of Time to File Response/Reply as to 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff, 47 MOTION for Summary Judgment, 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes by James Castelluccio, International Bus Machines Corp. (Sherman, Kathryn) (Entered: 11/09/2010) |
|---|---|---|
| 11/10/2010 | 65 | ORDER granting 64 Motion for Extension of Time to File Response to 47 MOTION for Summary Judgment until November 15, 2010. The defendant shall have until December 6, 2010 to respond to plaintiff's opposition. Granting motion for extension of time until November 15, 2010 to respond to 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff and 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes. Signed by Judge Dominic J. Squatrito on 11/10/10. (Pike, C.) (Entered: 11/10/2010) |
| 11/10/2010 | | Set/Reset Deadlines as to 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes, 47 MOTION for Summary Judgment, 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff. Responses due by 11/15/2010. Reply to opposition of Summary Judgment is due on 12/6/2010. (Pike, C.) (Entered: 11/10/2010) |
| 11/11/2010 | 66 | MOTION for Leave to File Excess Pages by James Castelluccio. (Carta, Mark) (Entered: 11/11/2010) |
| 11/12/2010 | 67 | ORDER granting 66 Motion for Leave to File Excess Pages. Signed by Judge Dominic J. Squatrito on 11/12/10. (Pike, C.) (Entered: 11/12/2010) |
| 11/15/2010 | 68 | Memorandum in Opposition re 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff filed by International Bus Machines Corp. (Attachments: # 1 Exhibit A)(Fasman, Zachary) (Entered: 11/15/2010) |
| 11/15/2010 | 69 | Memorandum in Opposition re 47 MOTION for Summary Judgment filed by James Castelluccio. (Sherman, Kathryn) (Entered: 11/15/2010) |
| 11/15/2010 | 70 | Memorandum in Opposition re 47 MOTION for Summary Judgment filed by James Castelluccio. (Attachments: # 1 Statement of Material Facts, # 2 Affidavit, # 3 Affidavit, # 4 Affidavit)(Sherman, Kathryn) (Entered: 11/15/2010) |
| 11/15/2010 | 71 | CERTIFICATE OF SERVICE by James Castelluccio re 70 Memorandum in Opposition to Motion (Sherman, Kathryn) (Entered: 11/15/2010) |
| 11/15/2010 | 72 | OBJECTION re 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes filed by James Castelluccio. (Attachments: # 1 Affidavit)(Zabetakis, Amy) (Entered: 11/15/2010) |
| 11/16/2010 | 73 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 01, # 2 Exhibit 02, # 3 Exhibit 03, # 4 Exhibit 04, # 5 Exhibit 05, # 6 Exhibit 06, # 7 Exhibit 07)(Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 74 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 08, # 2 Exhibit 09, # 3 Exhibit 10, # 4 Exhibit 11, # 5 Exhibit 12, # 6 Exhibit 13) (Sherman, Kathryn) (Entered: 11/16/2010) |

| 11/16/2010 | 75 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 14, # 2 Exhibit 15, # 3 Exhibit 16, # 4 Exhibit 17, # 5 Exhibit 18, # 6 Exhibit 19, # 7 Exhibit 20, # 8 Exhibit 21, # 9 Exhibit 22, # 10 Exhibit 23, # 11 Exhibit 24, # 12 Exhibit 25, # 13 Exhibit 26, # 14 Exhibit 27)(Sherman, Kathryn) (Entered: 11/16/2010) |
|---|---|---|
| 11/16/2010 | 76 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 28, # 2 Exhibit 29, # 3 Exhibit 30, # 4 Exhibit 31, # 5 Exhibit 32, # 6 Exhibit 33, # 7 Exhibit 34)(Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 77 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 35)(Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 78 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 36)(Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 79 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 37 - 1 of 4) (Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 80 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 37 - 2 of 4) (Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 81 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 37 - 3 of 4) (Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 82 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 37 - 4 of 4) (Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 83 | EXHIBIT by James Castelluccio re 70 Memorandum in Opposition to Motion, 47 MOTION for Summary Judgment. (Attachments: # 1 Exhibit 38, # 2 Exhibit 39, # 3 Exhibit 40, # 4 Exhibit 41, # 5 Exhibit 42, # 6 Exhibit 43, # 7 Exhibit 44, # 8 Exhibit 45, # 9 Exhibit 46, # 10 Exhibit 47, # 11 Exhibit 48, # 12 Exhibit 49, # 13 Exhibit 50)(Sherman, Kathryn) (Entered: 11/16/2010) |
| 11/16/2010 | 84 | EXHIBIT to Affirmation of Mark R. Carta by James Castelluccio re 82 Exhibit, 76 Exhibit, 79 Exhibit, 80 Exhibit, 83 Exhibit, 74 Exhibit, 70 Memorandum in Opposition to Motion, 75 Exhibit, 73 Exhibit, 77 Exhibit, 81 Exhibit, 78 Exhibit. (Sherman, Kathryn) . (Entered: 11/16/2010) |
| 11/29/2010 | 85 | MOTION for Leave to File Excess Pages re the reply memorandum in support of motion for summary judgment by International Bus Machines Corp. (Hryb, Deborah) . (Entered: 11/29/2010) |
| 12/04/2010 | 86 | ORDER granting 85 Motion for Leave to File Excess Pages. Signed by Judge Dominic J. Squatrito on 12/03/2010. (Kandil, S.) (Entered: 12/04/2010) |

**A-13**

| | | |
|---|---|---|
| 12/06/2010 | 87 | REPLY to Response to 47 MOTION for Summary Judgment Defendant IBM's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment filed by International Bus Machines Corp. (Fasman, Zachary). (Entered: 12/06/2010) |
| 12/06/2010 | 88 | AFFIDAVIT re 47 MOTION for Summary Judgment, 87 Reply to Response to Motion Affirmation of Zachary D. Fasman Signed By Zachary D. Fasman filed by International Bus Machines Corp. (Fasman, Zachary) . (Entered: 12/06/2010) |
| 12/06/2010 | 89 | REPLY to Response to 52 MOTION to Seal Exhibits Defendant's Reply to Plaintiff's Objection to Defendant's Motion to File Documents Under Seal filed by International Bus Machines Corp. (Fasman, Zachary) . (Entered: 12/06/2010) |
| 12/06/2010 | 90 | REPLY to Response to 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes Defendant's Reply to Plaintiff's Objection to Defendant's Motion to Exclude Testimony of Dr. Gary Crakes filed by International Bus Machines Corp. (Fasman, Zachary) . (Entered: 12/06/2010) |
| 12/07/2010 | 91 | MOTION for Sandi F. Dubin admitted Pro Hac Vice to Withdraw as Attorney by International Bus Machines Corp. (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Text of Proposed Order)(Fasman, Zachary) (Entered: 12/07/2010) |
| 12/08/2010 | 92 | ORDER granting 91 Motion to Withdraw as Attorney. Attorney Sandi F. Dubin terminated. Signed by Judge Dominic J. Squatrito on 12/8/10. (Pike, C.) (Entered: 12/08/2010) |
| 12/08/2010 | 93 | MOTION Permission to File Sur-Reply Brief re 87 Reply to Response to Motion by James Castelluccio.Responses due by 12/29/2010 (Sherman, Kathryn) (Entered: 12/08/2010) |
| 12/09/2010 | 94 | RESPONSE re 93 MOTION Permission to File Sur-Reply Brief re 87 Reply to Response to Motion filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 12/09/2010) |
| 12/10/2010 | 95 | ORDER granting 93 Motion file Sur-Reply to 87 Reply to Response to Motion on or before December 17, 2010. Signed by Judge Dominic J. Squatrito on 12/10/10. (Pike, C.) (Entered: 12/10/2010) |
| 12/17/2010 | 96 | RESPONSE re 87 Reply to Response to Motion filed by James Castelluccio. (Attachments: # 1 Affidavit)(Sherman, Kathryn) (Entered: 12/17/2010) |
| 12/22/2010 | 97 | MOTION to Amend/Correct 70 Plaintiff's Local Rule 56(a)(2) Statement by James Castelluccio. Responses due by 1/12/2011 (Carta, Mark) . (Entered: 12/22/2010) |
| 12/23/2010 | 98 | RESPONSE re 97 MOTION to Amend/Correct 70 Plaintiff's Local Rule 56(a)(2) Statement filed by International Bus Machines Corp. (Fasman, Zachary) . (Entered: 12/23/2010) |
| 12/28/2010 | 99 | ORDER granting 97 Motion to Amend/Correct Plaintiff's Local Rule 56(a)(2) Statement. Signed by Judge Dominic J. Squatrito on 12/28/2010. (Kandil, S.) |

| | | (Entered: 12/28/2010) |
|---|---|---|
| 06/13/2011 | 100 | ORDER denying 52 Motion to Seal. In its current form, the Motion to Seal filed by IBM fails to adhere to D. Conn. L. Civ. R (5)(e), and to the order of November 6, 2009, (dkt. # 27). In its reply to the objection, however, IBM asks for an opportunity to correct this defect with respect to certain specific materials it believes to be highly confidential. (Dkt. # 89, p. 8.) The Court invites IBM to do so by filing, no later than July 15, 2011, a renewed Motion to Seal which rigorously adheres to D. Conn. L. Civ. R (5)(e), and to the order issued November 6, 2009. SO ORDERED. Signed by Judge Dominic J. Squatrito on 06/13/2011. (Kandil, S.) (Entered: 06/13/2011) |
| 07/15/2011 | 101 | MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer by International Bus Machines Corp. (Attachments: # 1 Exhibit C to the Declaration of David Liederbach, # 2 Declaration of Keenie McDonald, # 3 Exhibit A to Declaration of Keenie McDonald, # 4 Exhibit E to Declaration of Keenie McDonald, # 5 Exhibit F to Declaration of Keenie McDonald, # 6 Exhibit G to Declaration of Keenie McDonald, # 7 Exhibit J to Declaration of Keenie McDonald, # 8 Exhibit K to Declaration of Keenie McDonald, # 9 Exhibit N to Declaration of Keenie McDonald, # 10 Declaration of Brett Mercer)(Fasman, Zachary) (Entered: 07/15/2011) |
| 07/15/2011 | 102 | Memorandum in Support re 101 MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 07/15/2011) |
| 07/15/2011 | 103 | AFFIDAVIT re 102 Memorandum in Support of Motion,, 101 MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer Signed By Zachary D. Fasman filed by International Bus Machines Corp. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Fasman, Zachary) (Entered: 07/15/2011) |
| 07/18/2011 | 104 | Sealed Document: seal documents by International Bus Machines Corp re 102 Memorandum in Support of Motion, 101 MOTION to Seal (Renewed) Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer, 103 Affidavit. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Affidavit, # 9 Affidavit) |

| | | (Blue, A.) (Entered: 07/18/2011) |
|---|---|---|
| 07/22/2011 | 105 | Memorandum in Opposition re 101 MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer filed by James Castelluccio. (Attachments: # 1 Affidavit)(Sherman, Kathryn) (Entered: 07/22/2011) |
| 08/08/2011 | 106 | REPLY to Response to 101 MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer *Defendant's Reply to Plaintiff's Objection to Defendant's Renewed Motion to File Documents Under Seal* filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 08/08/2011) |
| 08/12/2011 | 107 | NOTICE by International Bus Machines Corp re 47 MOTION for Summary Judgment *of Supplemental Authority in Support of Defendant's Motion for Summary Judgment* (Fasman, Zachary) (Entered: 08/12/2011) |
| 08/21/2012 | 108 | MEMORANDUM OF DECISION AND ORDER denying 47 Motion for Summary Judgment. Signed by Judge Dominic J. Squatrito on 8/21/12. (Glynn, T.) (Glynn, T.). (Entered: 08/21/2012) |
| 08/22/2012 | 109 | Docket Entry Correction re 108 Order on Motion for Summary Judgment modified to add pdf. (Glynn, T.) (Entered: 08/22/2012) |
| 09/28/2012 | 110 | MOTION for Attorney(s) Todd C. Duffield to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2640437) by International Bus Machines Corp. (Attachments: # 1 Exhibit A - Declaration of Todd C. Duffield)(Shea, Patrick) (Entered: 09/28/2012) |
| 09/28/2012 | 111 | MOTION for Attorney(s) Alexander W. Wood to be Admitted Pro Hac Vice (paid $25 PHV fee; receipt number 0205-2640460) by International Bus Machines Corp. (Attachments: # 1 Exhibit A - Declaration of Alexander W. Wood)(Shea, Patrick) (Entered: 09/28/2012) |
| 10/01/2012 | 112 | ORDER granting 110 Motion to Appear Pro Hac Vice of Attorney Todd C. Duffield; granting 111 Motion to Appear Pro Hac Vice of Attorney Alexander W. Wood. Signed by Judge Dominic J. Squatrito on 10/1/12. (Pike, C.) (Entered: 10/01/2012) |
| 10/25/2012 | 113 | MOTION for Leave to Reopen the Deposition of Plaintiff James Castelluccio by International Bus Machines Corp.Responses due by 11/15/2012 (Fasman, |

| | | |
|---|---|---|
| | | Zachary) (Entered: 10/25/2012) |
| 11/06/2012 | 114 | RULING granting in part and denying in part 46 Motion to Preclude; granting in part and denying in part 50 Motion to Preclude, Signed by Judge Dominic J. Squatrito on 11/5/12. (Blue, A.) (Entered: 11/06/2012) |
| 11/13/2012 | 115 | OBJECTION re 113 MOTION for Leave to Reopen the Deposition of Plaintiff James Castelluccio filed by James Castelluccio. (Carta, Mark) (Entered: 11/13/2012) |
| 11/27/2012 | 116 | REPLY to Response to 113 MOTION for Leave to Reopen the Deposition of Plaintiff James Castelluccio filed by International Bus Machines Corp. (Attachments: # 1 Affidavit of Zachary D. Fasman in Support of Motion) (Wood, Alexander) (Entered: 11/27/2012) |
| 03/28/2013 | 117 | RULING AND ORDER granting in part and denying in part 101 Motion to Seal. Signed by Judge Dominic J. Squatrito on 3/28/13. (Glynn, T.) (Entered: 03/28/2013) |
| 04/11/2013 | 118 | MOTION to Preclude Testimony of Dr. Gary Crakes by International Bus Machines Corp.Responses due by 5/2/2013 (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Exhibit A to Affirmation of Zachary D. Fasman, # 3 Exhibit B to Affirmation of Zachary D. Fasman, # 4 Exhibit C to Affirmation of Zachary D. Fasman)(Fasman, Zachary) (Entered: 04/11/2013) |
| 04/11/2013 | 119 | Memorandum in Support re 118 MOTION to Preclude Testimony of Dr. Gary Crakes filed by International Bus Machines Corp. (Attachments: # 1 Certificate of Service of Motion to Preclude, Affirmation of Zachary D. Fasman and Memorandum of Law in Support of Motion)(Fasman, Zachary) (Entered: 04/11/2013) |
| 04/15/2013 | 120 | ORDER granting 113 Motion. The reopened deposition of the plaintiff shall be limited to a period of time not to exceed two hours. The scope of the reopened deposition shall be limited to the plaintiff's efforts to mitigate his damages from April 16, 2010 to the present. Signed by Judge Dominic J. Squatrito on 04/15/2013. (Ring, T.) (Entered: 04/15/2013) |
| 04/22/2013 | 121 | EXHIBIT by International Bus Machines Corp re 47 MOTION for Summary Judgment. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Attachment 3, # 4 Attachment 4, # 5 Attachment 5, # 6 Attachment 6, # 7 Attachment 7) (Fasman, Zachary) (Entered: 04/22/2013) |
| 04/22/2013 | 122 | EXHIBIT by International Bus Machines Corp re 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes. (Attachments: # 1 Attachment 1) (Fasman, Zachary) (Entered: 04/22/2013) |
| 04/30/2013 | 123 | OBJECTION re 119 Memorandum in Support of Motion, 118 MOTION to Preclude Testimony of Dr. Gary Crakes filed by James Castelluccio. (Carta, Mark) (Entered: 04/30/2013) |
| 04/30/2013 | 124 | AFFIDAVIT re 123 Objection , 118 Motion, 119 Memorandum Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Carta, Mark) Modified on 5/1/2013 to edit text to link documents. (Blue, A.). (Entered: 04/30/2013) |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page29 of 289

| | | |
|---|---|---|
| 05/02/2013 | 125 | NOTICE of Appearance by Margaret A. Triolo on behalf of James Castelluccio (Triolo, Margaret) (Entered: 05/02/2013) |
| 05/14/2013 | 126 | REPLY to Response to 118 MOTION to Preclude Testimony of Dr. Gary Crakes filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 05/14/2013) |
| 06/05/2013 | 127 | RULING AND ORDER granting 118 Motion to Preclude. Signed by Judge Dominic J. Squatrito on 6/5/13. (Glynn, T.) (Entered: 06/06/2013) |
| 07/12/2013 | 128 | ORDER. The deadlines established in this case for completion of discovery and the filing of dispositive motions having passed, the parties are hereby ordered to submit their Joint Trial Memorandum by August 12, 2013. This case shall be trial ready September, 2013. IT IS SO ORDERED. Signed by Judge Dominic J. Squatrito on 7/12/13.(Pike, C.) (Entered: 07/12/2013) |
| 07/12/2013 | | Set Deadlines/Hearings: Trial Brief due by 8/12/2013 Trial Ready Date 9/2013. (Pike, C.) (Entered: 07/12/2013) |
| 08/01/2013 | 129 | MOTION for Extension of Time until 09/09/2013 To File Joint Trial Memorandum Set Deadlines/Hearings by James Castelluccio. (Carta, Mark) (Entered: 08/01/2013) |
| 08/02/2013 | 130 | ORDER granting 129 Motion for Extension of Time until September 9, 2013 to file their joint trial memorandum. This case shall be trial ready October, 2013. Signed by Judge Dominic J. Squatrito on 8/2/13. (Pike, C.) (Entered: 08/02/2013) |
| 08/02/2013 | | Set Deadlines/Hearings: Trial Brief due by 9/9/2013 Trial Ready Date 10/2013 (Pike, C.) (Entered: 08/02/2013) |
| 09/06/2013 | 131 | MOTION for Extension of Time until September 13, 2013 to file Joint Trial Memorandum by International Bus Machines Corp. (Fasman, Zachary) (Entered: 09/06/2013) |
| 09/11/2013 | 132 | ORDER granting 131 Motion for Extension of Time until September 13,2013 to file a joint trial memorandum. Signed by Judge Dominic J. Squatrito on 9/11/13. (Pike, C.) (Entered: 09/11/2013) |
| 09/11/2013 | | Set Deadlines/Hearings: Trial Brief due by 9/13/2013 (Pike, C.) (Entered: 09/11/2013) |
| 09/13/2013 | 133 | TRIAL MEMO *"JOINT"* by International Bus Machines Corp., James castelluccio. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Fasman, Zachary) Modified on 9/17/2013 to add filer. (Blue, A.). (Entered: 09/13/2013) |
| 09/13/2013 | 134 | TRIAL MEMO *Memorandum of Law on Evidentiary Issues* by International Bus Machines Corp. (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Fasman, Zachary) (Entered: 09/13/2013) |
| | | |

| | | |
|---|---|---|
| 09/13/2013 | 135 | "ENTERED IN ERROR" Consent NOTICE by International Bus Machines Corp *and Reference of a Civil Action to a Magistrate Judge* (Fasman, Zachary) Modified on 9/17/2013 (Blue, A.). (Entered: 09/13/2013) |
| 09/13/2013 | 136 | TRIAL MEMO *Memorandum of Law on Evidentiary Issues* by James Castelluccio. (Carta, Mark) (Entered: 09/13/2013) |
| 09/17/2013 | 137 | MOTION for Extension of Time until October 8, 2013 To File A Response to Memorandum on Evidentiary Issues 134 Trial Memo, by James Castelluccio. (Carta, Mark) (Entered: 09/17/2013) |
| 09/17/2013 | 138 | Joint MOTION for Extension of Time until October 8, 2013 To File Responses to Memoranda on Evidentiary Issues 134 Trial Memo, 136 Trial Memo by James Castelluccio, International Bus Machines Corp. (Carta, Mark) (Entered: 09/17/2013) |
| 09/18/2013 | 139 | CONSENT to Jurisdiction by US Magistrate Judge by James Castelluccio, International Bus Machines Corp. Case reassigned to Magistrate Judge Thomas P. Smith. This matter has been transferred to a magistrate judge. All non-efiled submissions should be filed at the seat of court where the magistrate judge presides. The case number will remain the same, but must be followed by the magistrate judge's initials. <br> Signed by Judge Dominic J. Squatrito on 9/18/13.(Sunbury, B.) (Entered: 09/18/2013) |
| 09/20/2013 | 140 | ORDER granting 138 Motion for Extension of Time. Signed by Judge Thomas P. Smith on September 20, 2013. (Pylman, J.) (Entered: 09/20/2013) |
| 09/20/2013 | 141 | ORDER dismissing 137 Motion for Extension of Time as moot in light of 140 ORDER granting 138 Joint Motion for Extension of Time. Signed by Judge Thomas P. Smith on September 20, 2013. (Pylman, J.) (Entered: 09/20/2013) |
| 09/23/2013 | 142 | Set/Reset Deadlines as to Responses due by 10/8/2013 (Sunbury, B.) (Entered: 09/23/2013) |
| 09/23/2013 | 143 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 1/6/2014 at 10:00 AM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Thomas P. Smith. Jury Selection set for 1/7/2014 at 10:00 AM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith; Jury Trial set for 1/7/2014 at 12:00 PM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith. (Pylman, J.) (Entered: 09/23/2013) |
| 10/03/2013 | 144 | Second MOTION for Extension of Time until October 11, 2013 File Responses 134 Trial Memo, 140 Order on Motion for Extension of Time, 136 Trial Memo by James Castelluccio, International Bus Machines Corp. (Carta, Mark) (Entered: 10/03/2013) |
| 10/04/2013 | 145 | ORDER granting 144 Motion for Extension of Time. Signed by Judge Thomas P. Smith on October 4, 2013. (Pylman, J.) (Entered: 10/04/2013) |
| 10/11/2013 | 146 | MOTION to Continue *trial date to January 13, 2014* by International Bus |

| | | Machines Corp. (Attachments: # 1 Text of Proposed Order)(Fasman, Zachary) (Entered: 10/11/2013) |
|---|---|---|
| 10/11/2013 | 147 | RESPONSE re 136 Trial Memo filed by International Bus Machines Corp. (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Fasman, Zachary) (Entered: 10/11/2013) |
| 10/11/2013 | 148 | RESPONSE re 134 Trial Memo, *RE: Defendant's Memo of Law on Evidentiary Issues* filed by James Castelluccio. (Carta, Mark) (Entered: 10/11/2013) |
| 10/11/2013 | 149 | AFFIDAVIT re 148 Response Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit)(Carta, Mark) (Entered: 10/11/2013) |
| 10/15/2013 | 150 | ORDER granting 146 Motion to Continue. Pretrial Conference will remain set for 1/6/2014 at 10:00 AM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Thomas P. Smith. Jury Selection set for 1/13/2014 at 10:00 AM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith; Jury Trial set for 1/13/2014 at 12:00 PM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith. (Pylman, J.) (Entered: 09/23/2013). No further requests to adjust trial dates in this case shall be granted. Signed by Judge Thomas P. Smith on October 15, 2013. (Pylman, J.) (Entered: 10/15/2013) |
| 10/15/2013 | 151 | NOTICE OF E-FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Pretrial Conference set for 1/6/2014 at 10:00 AM in Chambers Room 258, 450 Main St., Hartford, CT before Judge Thomas P. Smith; Jury Selection set for 1/13/2014 at 10:00 AM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith; Jury Trial set for 1/13/2014 at 12:00 PM in Courtroom One, 450 Main St., Hartford, CT before Judge Thomas P. Smith. (Pylman, J.) (Entered: 10/15/2013) |
| 11/07/2013 | 152 | MOTION Permission to Give Opening Statements at Trial and Provide Jurors with Exhibit Notebooks by James Castelluccio, International Bus Machines Corp.Responses due by 11/28/2013 (Carta, Mark) (Entered: 11/07/2013) |
| 11/14/2013 | 153 | ORDER. By no later than November 22, 2013, the plaintiff shall file his brief concerning the admissibility of the open door investigation, identifed in his fax communication to the Court. The defendant shall in turn file its reponse no later than November 29, 2013. Signed by Judge Thomas P. Smith on November 14, 2013. (Pylman, J.) (Entered: 11/14/2013) |
| 11/22/2013 | 154 | MOTION to Preclude IBM's OPEN DOOR EVIDENCE by James Castelluccio.Responses due by 12/13/2013 (Carta, Mark) (Entered: 11/22/2013) |
| 11/22/2013 | 155 | Memorandum in Support re 154 MOTION to Preclude IBM's OPEN DOOR |

| | | |
|---|---|---|
| | | EVIDENCE filed by James Castelluccio. (Carta, Mark) (Entered: 11/22/2013) |
| 11/22/2013 | 156 | AFFIDAVIT re 155 Memorandum in Support of Motion, 154 MOTION to Preclude IBM's OPEN DOOR EVIDENCE Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Carta, Mark) (Entered: 11/22/2013) |
| 11/29/2013 | 157 | REPLY to Response to 154 MOTION to Preclude IBM's OPEN DOOR EVIDENCE filed by International Bus Machines Corp. (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Exhibit A to Affirmation of Zachary D. Fasman, # 3 Exhibit B to Affirmation of Zachary D. Fasman, # 4 Exhibit C to Affirmation of Zachary D. Fasman, # 5 Certificate of Service)(Fasman, Zachary) (Entered: 11/29/2013) |
| 12/02/2013 | 158 | ORDER granting 152 Motion to Give Opening Statements at Trial and Provide Jurors with Exhibit Notebooks. Signed by Judge Thomas P. Smith on December 2, 2013. (Pylman, J.) (Entered: 12/02/2013) |
| 12/02/2013 | 159 | MOTION to Compel *the Production of Documents* by James Castelluccio.Responses due by 12/23/2013 (Carta, Mark) (Entered: 12/02/2013) |
| 12/02/2013 | 160 | Memorandum in Support re 159 MOTION to Compel *the Production of Documents* filed by James Castelluccio. (Attachments: # 1 Exhibit)(Carta, Mark) (Entered: 12/02/2013) |
| 12/02/2013 | 161 | AFFIDAVIT re 160 Memorandum in Support of Motion, 159 MOTION to Compel *the Production of Documents* Signed By James Castelluccio filed by James Castelluccio. (Carta, Mark) (Additional attachment(s) added on 12/4/2013: # 1 Affidavit REPLACEMENT PDF) (Sunbury, B.). (Entered: 12/02/2013) |
| 12/02/2013 | 162 | AFFIDAVIT re 160 Memorandum in Support of Motion, 159 MOTION to Compel *the Production of Documents* Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Carta, Mark) (Additional attachment(s) added on 12/4/2013: # 5 Affidavit REPLACEMENT PDF) (Sunbury, B.). (Entered: 12/02/2013) |
| 12/23/2013 | 163 | ORDER granting 154 Motion to Preclude. See attached ORDER. Signed by Judge Thomas P. Smith on December 23, 2013. (Pylman, J.) (Entered: 12/23/2013) |
| 12/23/2013 | 164 | Memorandum in Opposition re 159 MOTION to Compel *the Production of Documents* filed by International Bus Machines Corp. (Attachments: # 1 Affirmation of Zachary D. Fasman, # 2 Ex A.)(Fasman, Zachary) (Entered: 12/23/2013) |
| 12/26/2013 | 165 | CERTIFICATE OF SERVICE by International Bus Machines Corp re 164 Memorandum in Opposition to Motion (Fasman, Zachary) (Entered: 12/26/2013) |
| 12/27/2013 | 166 | MOTION for Reconsideration re 163 Order on Motion to Preclude by International Bus Machines Corp.Responses due by 1/17/2014 (Attachments: |

|  |  | # 1 Certificate of Service)(Fasman, Zachary) (Entered: 12/27/2013) |
|---|---|---|
| 12/30/2013 | 167 | Memorandum in Opposition re 166 MOTION for Reconsideration re 163 Order on Motion to Preclude filed by James Castelluccio. (Carta, Mark) (Entered: 12/30/2013) |
| 12/31/2013 | 168 | ORDER. In light of the fact that there are unresolved evidentiary questions in this case, the court understands that it may not be practical for the parties to submit final versions of the exhibit binders at the pretrial conference. The time frame for filing the exhibit binders shall be discussed at the pretrial conference. Signed by Judge Thomas P. Smith on December 31, 2013. (Pylman, J.) (Entered: 12/31/2013) |
| 01/07/2014 | 169 | Minute Entry for proceedings held before Judge Thomas P. Smith: Pretrial Conference held on 1/7/2014. Total Time: 3 hours and 30 minutes. (Pylman, J.) (Entered: 01/07/2014) |
| 01/07/2014 | 170 | ORDER denying 159 Motion to Compel as moot in light of the agreements reached between the parties and the court at the pretrial conference. Signed by Judge Thomas P. Smith on January 7, 2014. (Pylman, J.) (Entered: 01/07/2014) |
| 01/08/2014 | 171 | ORDER. The parties are asked to review Judge Smith's voir dire procedures, which are outlined in the attached document. Signed by Judge Thomas P. Smith on January 8, 2014. (Pylman, J.) (Entered: 01/08/2014) |
| 01/08/2014 | 172 | ORDER. The parties shall work together to produce a joint verdict form, which shall be submitted to the court by no later than January 13th. Signed by Judge Thomas P. Smith on January 8, 2014. (Pylman, J.) (Entered: 01/08/2014) |
| 01/08/2014 | 173 | MOTION to Amend/Correct 133 Trial Memo, by James Castelluccio.Responses due by 1/29/2014 (Attachments: # 1 Exhibit)(Carta, Mark) (Entered: 01/08/2014) |
| 01/12/2014 | 174 | Supplemental RESPONSE re 134 Trial Memo, *Memorandum of Anticipated Evidentiary Issues* filed by International Bus Machines Corp. (Attachments: # 1 Certificate of Service)(Fasman, Zachary) (Entered: 01/12/2014) |
| 01/13/2014 | 175 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Selection and Jury Trial held on 1/13/2014. Jury Trial Continued to 1/14/14 10:00AM. Total Time: 5 hours and 40 minutes(Court Reporter Allen.) (Attachments: # 1 Jury Trial) (Sunbury, B.) (Entered: 01/14/2014) |
| 01/14/2014 | 176 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/14/2014. Jury Trial Continued Until January 15,2014 at 10:00AM. Total Time: 6 hours and 45 minutes(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/15/2014) |
| 01/15/2014 | 177 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/15/2014. Jury Trial Continued Until 1/16/14 10:00AM. Total Time: 5 hours and 35 minutes(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/16/2014) |
|  |  |  |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page34 of 289

| 01/16/2014 | 178 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/16/2014. Jury Trial Continued Until 1/17/14 10:00AM. Total Time: 6 hours(Court Reporter Wendy.) (Sunbury, B.) (Entered: 01/17/2014) |
| --- | --- | --- |
| 01/17/2014 | 179 | MOTION for Judgment as a Matter of Law by International Bus Machines Corp.Responses due by 2/7/2014 (Attachments: # 1 Exhibit 1)(Fasman, Zachary) (Entered: 01/17/2014) |
| 01/17/2014 | 181 | Oral MOTION for Directed Verdict by International Bus Machines Corp. (Sunbury, B.) (Entered: 01/21/2014) |
| 01/17/2014 | 182 | Proceeding held before Judge Thomas P. Smith: taking under advisement 181 Motion for Directed Verdict; Jury Trial held on 1/17/2014. Jury Trial Continued until January 21, 2014 10:00AM. Total Time: 5 hours(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/21/2014) |
| 01/20/2014 | 180 | Memorandum in Opposition re 179 MOTION for Judgment as a Matter of Law filed by James Castelluccio. (Carta, Mark) (Entered: 01/20/2014) |
| 01/21/2014 | 183 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/21/2014. Jury Trial Continued Until January 22, 2014 11:00AM. Total Time: 4 hours and 20 minutes(Court Reporter Allen) (Sunbury, B.) (Entered: 01/22/2014) |
| 01/22/2014 | 184 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/22/2014. Jury Trial continued Until January 23, 2014 10:00AM. Total Time: 5 hours and 15 minutes(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/23/2014) |
| 01/23/2014 | 185 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial held on 1/23/2014. Jury Trial Continued Until January 24, 2014 10:00AM. Total Time: 3 hours and 15 minutes(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/24/2014) |
| 01/24/2014 | 186 | Minute Entry for proceedings held before Judge Thomas P. Smith: Jury Trial completed on 1/24/2014. Total Time: 1 hour and 15 minutes(Court Reporter Allen.) (Sunbury, B.) (Entered: 01/27/2014) |
| 01/24/2014 | 187 | JURY VERDICT For James Castelluccio Against International Business Machines Corporation in the total amount of $2,499,783.40 (Sunbury, B.) Modified on 1/27/2014 to correct total amount. (Entered: 01/27/2014) |
| 01/24/2014 | 188 | Marked Witness List by International Bus Machines Corp. (Sunbury, B.) (Entered: 01/27/2014) |
| 01/24/2014 | 189 | Marked Witness List by James Castelluccio. (Sunbury, B.) (Entered: 01/27/2014) |
| 01/24/2014 | 190 | Marked Court Exhibit List. (Sunbury, B.) (Entered: 01/27/2014) |
| 01/24/2014 | 191 | Marked Exhibit List by James Castelluccio. (Sunbury, B.) (Entered: 01/27/2014) |
| 01/24/2014 | 192 | Marked Exhibit List by International Bus Machines Corp. (Sunbury, B.) (Entered: 01/27/2014) |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page35 of 289

| 01/24/2014 | 194 | Jury Charge. (Sunbury, B.) (Entered: 01/28/2014) |
|---|---|---|
| 01/27/2014 | 193 | ORDER. The Court has identified a computational error of six cents with respect to Answers 2A, 2B and 2C on the verdict form. The jury found that the plaintiff was entitled to $1,345,042 in back pay and benefits (Answer 2A), reduced by $345,150.36 to reflect benefits already received (Answer 2B). Pursuant to the instructions, this should have resulted in an award of $999,891.64 in back pay and benefits (Answer 2C). However, the jury listed $999,891.70, an error of six cents. The Court hereby resolves the discrepancy in favor of the defendant. The Clerk shall issue judgment in favor of the plaintiff in the amount of $999,891.64 for back pay and benefits, $999,891.64 in light of the jury's finding that the defendant willfully violated the law, and $500,000 for emotional distress damages, for a total award of $2,499,783.28, plus statutory interest from the date the judgment is entered. Signed by Judge Thomas P. Smith on January 27, 2014. (Slitt, M.) (Entered: 01/27/2014) |
| 01/28/2014 | 195 | JUDGMENT entered in favor of James Castelluccio against International Bus Machines Corp.<br><br>For Appeal Forms please go to the following website:<br>http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms<br>Signed by Clerk on 1/28/14.(Sunbury, B.) (Entered: 01/28/2014) |
| 01/28/2014 | | JUDICIAL PROCEEDINGS SURVEY: The following link to the confidential survey requires you to log into CM/ECF for SECURITY purposes. Once in CM/ECF you will be prompted for the case number. Although you are receiving this survey through CM/ECF, it is hosted on an independent website called SurveyMonkey. Once in SurveyMonkey, the survey is located in a secure account. The survey is not docketed and it is not sent directly to the judge. To ensure anonymity, completed surveys are held up to 90 days before they are sent to the judge for review. We hope you will take this opportunity to participate, please click on this link:<br><br>https://ecf.ctd.uscourts.gov/cgi-bin/Dispatch.pl?survey<br>(Sunbury, B.) (Entered: 01/28/2014) |
| 01/30/2014 | 196 | MOTION to Stay re 195 Judgment, *or in the Alternative for a Remittitur or a New Trial* by International Bus Machines Corp.Responses due by 2/20/2014 (Attachments: # 1 Certificate of Service)(Fasman, Zachary) (Entered: 01/30/2014) |
| 02/11/2014 | 197 | MOTION for Attorney Fees *, Costs, Prejudgment Interest, and Compensation for Increased Tax Liability* by James Castelluccio.Responses due by 3/4/2014 (Carta, Mark) (Entered: 02/11/2014) |
| 02/11/2014 | 198 | Memorandum in Support re 197 MOTION for Attorney Fees *, Costs, Prejudgment Interest, and Compensation for Increased Tax Liability* filed by James Castelluccio. (Attachments: # 1 Exhibit Affidavit of Scott R. Lucas, # 2 Exhibit Declaration of David C. Shaw, Esq.)(Carta, Mark) (Entered: 02/11/2014) |
| 02/11/2014 | 199 | AFFIDAVIT re 197 MOTION for Attorney Fees *, Costs, Prejudgment* |

| | | |
|---|---|---|
| | | *Interest, and Compensation for Increased Tax Liability*, 198 Memorandum in Support of Motion, Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit Rucci, Burnham, Carta Retainer Letter, # 2 Exhibit Carta, McAlister & Moore, LLC Retainer Letter, # 3 Exhibit Rucci, Burnham Invoices, # 4 Exhibit Carta, McAlister & Moore, LLC Invoices, # 5 Exhibit Copy of Verified Bill of Costs, # 6 Exhibit Prejudgment Interest Calculation, # 7 Exhibit Increased Tax Liability Calculation)(Carta, Mark) (Additional attachment(s) added on 2/12/2014: # 8 Exhibit 1, # 9 Exhibit 2, # 10 Exhibit 3, # 11 Exhbit 4, # 12 Exhibit 5, # 13 Exhibit 6, # 14 Exhibit 7) (Sunbury, B.).REPLACEMENT OCR SEARCHABLE PDF (Entered: 02/11/2014) |
| 02/11/2014 | 200 | BILL OF COSTS by James Castelluccio. (Attachments: # 1 Exhibit Depositions - Court Reporter Fees and Transcripts, # 2 Exhibit Trial Transcripts, # 3 Exhibit Mediation Fee, # 4 Exhibit Trial Expenses, # 5 Exhibit Expenses Related to Attendance at Trial)(Carta, Mark) (Additional attachment(s) added on 2/12/2014: # 6 REPLACEMENT OCR SEARCHABLE PDF) (Sunbury, B.). (Entered: 02/11/2014) |
| 02/18/2014 | 201 | STIPULATION *FOR TEMPORARY STAY* by James Castelluccio. (Carta, Mark) (Entered: 02/18/2014) |
| 02/25/2014 | 202 | MOTION for Judgment as a Matter of Law (Responses due by 3/18/2014, ), MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial/Remittitur* by International Bus Machines Corp. (Attachments: # 1 Memorandum in Support Defendants Memorandum of Law in Support of Its Renewed Motion for Judgment as a Matter of Law or, in the Alternative, For New Trial/Remittitur, # 2 Certificate of Service by Zachary D. Fasman)(Fasman, Zachary) (Entered: 02/25/2014) |
| 02/26/2014 | 203 | ORDER. In accordance with the parties' Joint Stipulation For Temporary Stay 201 , the execution of the judgment 195 entered in this case is hereby stayed until such time as the Court rules on the defendant's Rule 50 and 59 Post-Trial Motions. Signed by Judge Thomas P. Smith on February 26, 2014.(Slitt, M.) (Entered: 02/26/2014) |
| 02/26/2014 | 204 | ORDER denying as moot 196 Motion to Stay. See Dkt. #203. Signed by Judge Thomas P. Smith on February 26, 2014. (Slitt, M.) (Entered: 02/26/2014) |
| 03/12/2014 | 205 | MOTION for Extension of Time until March 26, 2014 to File Memorandum in Opposition 202 MOTION for Judgment as a Matter of Law MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial/Remittitur* by James Castelluccio. (Carta, Mark) (Entered: 03/12/2014) |
| 03/13/2014 | 206 | ORDER granting 205 Motion for Extension of Time. The plaintiff shall file his Memorandum in Opposition to 202 Defendant's Motion for Judgment as a Matter of Law by no later than March 26, 2014. The Defendant's reply shall be filed 14 days from the date the plaintiff's Memorandum in Opposition is filed. Signed by Judge Thomas P. Smith on March 13, 2014. (Pylman, J.) (Entered: 03/13/2014) |
| 03/13/2014 | 207 | ORDER. The parties have advised the Court that they have a difference of opinion as to whether the defendant's response to the plaintiff's fee petition is |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page37 of 289
A-25

| | | |
|---|---|---|
| | | due now, as opposed to being due after the Court has ruled on IBM's post-trial motions. The Court finds that the Joint Stipulation for Stay refers only to the enforcement of a judgment, and not to all pending matters. The Court will proceed with resolution of all issues at one time. Any relief granted by the Court with respect to the defendant's post-trial motions will be taken into account when considering the plaintiff's fee petition. Because the defendant's position was taken in good faith and was based on its interpretation of the joint stipulation, the defendant shall be afforded the full twenty-one day response period. Accordingly, the defendant's response to the fee petition should be filed no later than April 3, 2014. Signed by Judge Thomas P. Smith on March 13, 2014. (Pylman, J.) (Entered: 03/13/2014) |
| 03/14/2014 | 208 | Set/Reset Deadlines as to 202 MOTION for Judgment as a Matter of Law MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial*. Responses due by 3/26/2014 (Sunbury, B.) (Entered: 03/14/2014) |
| 03/20/2014 | 209 | ORDER denying 200 Bill of Costs, filed by James Castelluccio without prejudice as prematurely filed. A bill of costs should be filed within fourteen days after the District Court judgment becomes final due to the expiration of the appeals period without an appeal being filed or the issuance of a mandate by the Court of Appeals. D. Conn. L. Civ. R. 54(a)1. No judgment has entered in this case. Thus, the appeals period has not yet commenced and the Bill of Costs is premature.<br>Signed by Clerk on 3/20/2014.(Thomas, D.) (Entered: 03/20/2014) |
| 03/25/2014 | 210 | MOTION for Leave to File Excess Pages by James Castelluccio. (Carta, Mark) (Entered: 03/25/2014) |
| 03/26/2014 | 211 | ORDER granting 210 Motion for Leave to File Excess Pages. Signed by Judge Thomas P. Smith on March 26, 2014. (Slitt, M.) (Entered: 03/26/2014) |
| 03/26/2014 | 212 | Memorandum in Opposition re 202 MOTION for Judgment as a Matter of Law MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial/Remittitur* filed by James Castelluccio. (Carta, Mark) (Entered: 03/26/2014) |
| 03/31/2014 | 213 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-13-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page38 of 289

**A-26**

| 03/31/2014 | 214 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-14-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
|---|---|---|
| 03/31/2014 | 215 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-15-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 216 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-16-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 217 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-17-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove |

| | | |
|---|---|---|
| | | personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set to 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 218 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-21-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set to 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 219 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-22-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set to 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 220 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-23-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will |

Case 14-2854, Document 62, 03/12/2015, 1460796, Page40 of 289

| | | |
|---|---|---|
| | | assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 03/31/2014 | 221 | TRANSCRIPT of Proceedings: Type of Hearing: Trial. Held on 01-24-14 before Judge Thomas P. Smith. Court Reporter: Wendy J. Allen. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/29/2014. (Allen, W.) (Entered: 03/31/2014) |
| 04/03/2014 | 222 | Memorandum in Opposition *Memorandum in Support of Defendant's Opposition to Plaintiff's Motion for Attorneys' Fees* re 197 MOTION for Attorney Fees *, Costs, Prejudgment Interest, and Compensation for Increased Tax Liability* filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 04/03/2014) |
| 04/03/2014 | 223 | AFFIDAVIT re 222 Memorandum in Opposition to Motion, 197 MOTION for Attorney Fees *, Costs, Prejudgment Interest, and Compensation for Increased Tax Liability Declaration of Zachary D. Fasman* Signed By Zachary D. Fasman filed by International Bus Machines Corp. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15)(Fasman, Zachary) (Entered: 04/03/2014) |
| 04/07/2014 | 224 | MOTION for Leave to File Excess Pages by International Bus Machines Corp. (Attachments: # 1 Exhibit Certificate of Service)(Fasman, Zachary) (Entered: 04/07/2014) |
| 04/08/2014 | 225 | ORDER granting 224 Motion for Leave to File Excess Pages. Signed by Judge Thomas P. Smith on April 8, 2014. (Slitt, M.) (Entered: 04/08/2014) |
| 04/09/2014 | 226 | REPLY to Response to 202 MOTION for Judgment as a Matter of Law MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial/Remittitur* filed by International Bus Machines Corp. (Attachments: # 1 Exhibit A: Declaration of |

Case 14-2854, Document 62, 03/13/2015, 1460796, Page41 of 289

| | | |
|---|---|---|
| | | Zachary D. Fasman, # 2 Certificate of Service)(Fasman, Zachary) (Entered: 04/09/2014) |
| 04/15/2014 | 227 | MOTION for Leave to File Excess Pages by James Castelluccio. (Carta, Mark) (Entered: 04/15/2014) |
| 04/16/2014 | 228 | ORDER granting 227 Motion for Leave to File Excess Pages. Signed by Judge Thomas P. Smith on April 16, 2014. (Pylman, J.) (Entered: 04/16/2014) |
| 04/17/2014 | 229 | REPLY to Response to 197 MOTION for Attorney Fees , *Costs, Prejudgment Interest, and Compensation for Increased Tax Liability* filed by James Castelluccio. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Carta, Mark) (Entered: 04/17/2014) |
| 04/17/2014 | 230 | Supplemental AFFIDAVIT re 229 Reply to Response to Motion, Signed By Mark R. Carta filed by James Castelluccio. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Carta, Mark) (Entered: 04/17/2014) |
| 06/02/2014 | 231 | Supplemental MOTION for Attorney Fees by James Castelluccio.Responses due by 6/23/2014 (Carta, Mark) (Entered: 06/02/2014) |
| 06/02/2014 | 232 | AFFIDAVIT re 231 Supplemental MOTION for Attorney Fees Signed By Mark R. Carta filed by James Castelluccio. (Carta, Mark) (Entered: 06/02/2014) |
| 06/05/2014 | 233 | ORDER. The court does not intend to hold oral argument on the post-trial motions in this case. Signed by Judge Thomas P. Smith on June 5, 2014. (Pylman, J.) (Entered: 06/05/2014) |
| 06/23/2014 | 234 | Memorandum in Opposition *Memorandum in Support of Defendant's Opposition to Plaintiff's Supplemental Motion for Attorneys' Fees* re 231 Supplemental MOTION for Attorney Fees filed by International Bus Machines Corp. (Fasman, Zachary) (Entered: 06/23/2014) |
| 06/23/2014 | 235 | AFFIDAVIT re 234 Memorandum in Opposition to Motion, *Declaration of Zachary D. Fasman* Signed By Zachary D. Fasman filed by International Bus Machines Corp. (Attachments: # 1 Exhibit A, # 2 Certificate of Service) (Fasman, Zachary) (Entered: 06/23/2014) |
| 07/23/2014 | 236 | ORDER denying 179 Motion for Judgment as a Matter of Law, denying 181 Oral Motion for Judgment as a Matter of Law, denying 202 Renewed Motion for Judgment as a Matter of Law, and denying 202 Motion for New Trial or Remittitur. See attached Opinion and Order. Signed by Judge Thomas P. Smith on July 23, 2014. (Slitt, M.) (Entered: 07/23/2014) |
| 07/23/2014 | 237 | ORDER granting in part and denying in part 197 Plaintiff's Motion for Attorney Fees, Prejudgment Interest, and Compensation for Increased Tax Liability, and granting 231 Supplemental Motion for Attorney Fees. See attached Ruling. Signed by Judge Thomas P. Smith on July 23, 2014. (Slitt, M.) (Entered: 07/23/2014) |
| 07/23/2014 | 238 | ORDER granting in part, and denying in part, nunc pro tunc, 166 Defendant's Motion for Reconsideration and/or Clarification of the Court's 163 Order on |

| | | |
|---|---|---|
| | | Plaintiff's Motion to Preclude Evidence. Although the motion was denied orally at the pre-trial conference, the ruling was amended during the course of the trial. See 236 at 23-28. Signed by Judge Thomas P. Smith on July 23, 2014. (Slitt, M.) (Entered: 07/23/2014) |
| 07/23/2014 | 239 | ORDER denying as moot 173 Motion to Revise Joint Trial Memorandum. Signed by Judge Thomas P. Smith on July 23, 2014. (Slitt, M.) (Entered: 07/23/2014) |
| 07/28/2014 | 240 | FINAL JUDGMENT entered in favor of James Castelluccio against International Bus Machines Corp.<br><br>For Appeal Forms please go to the following website: http://www.ctd.uscourts.gov/forms/all-forms/appeals_forms<br>Signed by Clerk on 7/25/14.(Blue, A.) (Entered: 07/28/2014) |
| 08/08/2014 | 241 | NOTICE OF APPEAL as to 236 Order on Motion for Judgment as a Matter of Law, Order on Motion for Directed Verdict,, Order on Motion for New Trial,,,, by International Bus Machines Corp. Filing fee $ 505, receipt number 0205-3327282. (Fasman, Zachary) (Entered: 08/08/2014) |
| 08/08/2014 | 242 | MOTION to Stay re 240 Judgment, *Defendant's Motion to Stay Execution of the Judgment and for Approval of Supersedeas Bond* by International Bus Machines Corp.Responses due by 8/29/2014 (Attachments: # 1 Exhibit A) (Fasman, Zachary) (Entered: 08/08/2014) |
| 08/13/2014 | 243 | RESPONSE re 242 MOTION to Stay re 240 Judgment, *Defendant's Motion to Stay Execution of the Judgment and for Approval of Supersedeas Bond* filed by James Castelluccio. (Carta, Mark) (Entered: 08/13/2014) |
| 08/18/2014 | 244 | Supersedeas BOND in the amount of $ $4,147,460,454. posted by International Bus Machines Corp, Receipt Number 783747 (Blue, A.) (Additional attachment(s) added on 8/18/2014: # 1 REPLACEMENT PDF, # 2 Receipt) (Blue, A.). Modified on 8/19/2014 to edit text(Kelsey, N.). (Entered: 08/18/2014) |
| 08/18/2014 | 245 | Docket Entry Correction re 244 Bond (Attachments: # 1 REPLACEMENT PDF) (Blue, A.) (Entered: 08/18/2014) |
| 08/19/2014 | 246 | ORDER granting, with the consent of the plaintiff, 242 Defendant's Motion to Stay Execution of the Judgment under Rule 62(d) and for Approval of Supersedeas Bond. See 243 and 244 . Signed by Judge Thomas P. Smith on August 19, 2014. (Slitt, M.) (Entered: 08/19/2014) |
| 08/22/2014 | 247 | Index to Record on Appeal by International Bus Machines Corp re 241 Notice of Appeal, 230 Affidavit, 98 Response, 190 Exhibit List, 152 MOTION Permission to Give Opening Statements at Trial and Provide Jurors with Exhibit Notebooks , 49 Memorandum in Support of Motion, 100 Order on Motion to Seal,, 173 MOTION to Amend/Correct 133 Trial Memo, , 106 Reply to Response to Motion,,, 192 Exhibit List, 108 Order on Motion for Summary Judgment, 239 Order on Motion to Amend/Correct, 76 Exhibit, 163 Order on Motion to Preclude, 237 Order on Motion for Attorney Fees,,, 197 MOTION for Attorney Fees , *Costs, Prejudgment Interest, and Compensation* |

*for Increased Tax Liability*, 119 Memorandum in Support of Motion, 232 Affidavit, 166 MOTION for Reconsideration re 163 Order on Motion to Preclude , 70 Memorandum in Opposition to Motion, 189 Witness List, 52 MOTION to Seal Exhibits, 226 Reply to Response to Motion, 187 Jury Verdict, 94 Response, 26 Stipulation, 212 Memorandum in Opposition to Motion, 195 Judgment, 87 Reply to Response to Motion, 88 Affidavit, 122 Exhibit, 176 Jury Trial - Held, 50 MOTION to Preclude Exclude Testimony of Dr. Gary Crakes, 238 Order on Motion for Reconsideration, 203 Order, 63 Objection, 118 MOTION to Preclude Testimony of Dr. Gary Crakes, 17 Answer to Complaint, 24 Settlement Conference, 84 Exhibit, 236 Order on Motion for Judgment as a Matter of Law, Order on Motion for Directed Verdict,, Order on Motion for New Trial,,,, 82 Exhibit, 231 Supplemental MOTION for Attorney Fees , 46 MOTION to Preclude Expert Testimony of Dr. Charles Sodikoff, 171 Order, 156 Affidavit, 121 Exhibit, 107 Notice (Other), 97 MOTION to Amend/Correct *Plaintiff's Local Rule 56(a)(2) Statement*, 28 Stipulation, 124 Affidavit, 202 MOTION for Judgment as a Matter of Law MOTION for New Trial *Defendants Renewed Motions for Judgment as a Matter of Law or, in the Alternative, for New Trial/Remittitur*, 177 Jury Trial - Held, 167 Memorandum in Opposition to Motion, 164 Memorandum in Opposition to Motion, 79 Exhibit, 68 Memorandum in Opposition to Motion, 154 MOTION to Preclude IBM's OPEN DOOR EVIDENCE, 95 Order on Motion for Miscellaneous Relief, 127 Order on Motion to Preclude, 102 Memorandum in Support of Motion,, 117 Order on Motion to Seal, 214 Transcript,,,, 161 Affidavit, 123 Objection, 215 Transcript,,,, 213 Transcript,,,, 191 Exhibit List, 47 MOTION for Summary Judgment, 101 MOTION to Seal *(Renewed)* Exhibit C to the Declaration of David Liederbach, the Declaration of Keenie McDonald and Exhibits A,E,F,G,J,K and N and the Declaration of Brett Mercer, 186 Jury Trial - Completed, 35 Settlement Conference, 73 Exhibit, 184 Jury Trial - Held, 172 Order, 182 Order on Motion for Directed Verdict, Jury Trial - Held, 178 Jury Trial - Held, 204 Order on Motion to Stay, 175 Jury Trial - Begun, 194 Jury Instructions/Charge, 170 Order on Motion to Compel, 32 Amended Answer to Complaint, 216 Transcript,,,, 222 Memorandum in Opposition to Motion, 201 Stipulation, 196 MOTION to Stay re 195 Judgment, *or in the Alternative for a Remittitur or a New Trial*, 200 Bill of Costs, 218 Transcript,,,, 209 Order,, 72 Objection, 149 Affidavit, 120 Order on Motion for Miscellaneous Relief, 147 Response, 174 Response, 96 Response, 217 Transcript,,,, 105 Memorandum in Opposition to Motion,, 80 Exhibit, 93 MOTION Permission to File Sur-Reply Brief re 87 Reply to Response to Motion, 83 Exhibit, 240 Judgment, 148 Response, 114 Order on Motion to Preclude, 133 Trial Memo, 33 Status Conference, 157 Reply to Response to Motion, 193 Order,,,, 169 Pretrial Conference, 158 Order on Motion for Miscellaneous Relief, 183 Jury Trial - Held, 188 Witness List, 27 Order, 77 Exhibit, 185 Jury Trial - Held, 221 Transcript,,,, 99 Order on Motion to Amend/Correct, 126 Reply to Response to Motion, 48 Statement of Material Facts, 40 Status Conference, 134 Trial Memo, 220 Transcript,,,, 153 Order, 29 Order, 113 MOTION for Leave to Reopen the Deposition of Plaintiff James Castelluccio, 160 Memorandum in Support of Motion, 223 Affidavit,, 179 MOTION for Judgment as a Matter of Law , 180 Memorandum in Opposition to Motion, 155 Memorandum in Support of Motion, 89 Reply to Response to Motion, 219 Transcript,,,, 74

Case 14-2854, Document 62, 03/13/2015, 1460796, Page44 of 289

| | | |
|---|---|---|
| | | Exhibit, 53 Memorandum in Support of Motion, 90 Reply to Response to Motion, 198 Memorandum in Support of Motion, 162 Affidavit, 136 Trial Memo, 234 Memorandum in Opposition to Motion, 51 Memorandum in Support of Motion, 199 Affidavit,,, 75 Exhibit, 115 Objection, 159 MOTION to Compel *the Production of Documents*, 235 Affidavit, 1 Complaint, 103 Affidavit,,, 116 Reply to Response to Motion, 181 MOTION for Directed Verdict, 81 Exhibit, 56 Affidavit, 78 Exhibit, 104 Sealed Document, 229 Reply to Response to Motion,. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Fasman, Zachary) (Entered: 08/22/2014) |
| 09/03/2014 | 248 | Index to Record on Appeal by James Castelluccio re 241 Notice of Appeal, 247 Index to Record on Appeal,,,,,,,,,,,,,,,,,,,,. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. (Carta, Mark) (Entered: 09/03/2014) |
| 09/03/2014 | 249 | Index to Record on Appeal by James Castelluccio re 241 Notice of Appeal, 247 Index to Record on Appeal, 18 Report of Rule 26(f) Planning Meeting. For docket entries without a hyperlink, contact the court to arrange for the document(s) to be made available to you. #248 CORRECTED. (Blue, A.) (Entered: 09/04/2014) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">03/09/2015 19:40:05</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>jd6199:3729194:3943867</td><td><strong>Client Code:</strong></td><td></td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>3:09-cv-01145-TPS</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>24</td><td><strong>Cost:</strong></td><td>2.40</td></tr>
</table>

FILED

2009 JUL 21  P 12: 11

U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,                    :
           Plaintiff              :          CIVIL ACTION NO.
                                       :
VS.                                    :          **309CV1145 MRK**
                                       :
INTERNATIONAL BUSINESS                 :
MACHINES CORPORATION                   :
           Defendant.             :          JULY 20, 2009

## COMPLAINT

The Plaintiff, James Castelluccio ("Mr. Castelluccio"), files this Complaint against International Business Machines Corporation ("IBM") and states the following:

### NATURE OF THE ACTION

This action is brought by Mr. Castelluccio against IBM, his former employer of forty years, for: (1) unlawfully and willfully terminating him on the basis of his age, in deprivation of his rights secured by the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, as amended; (2) terminating him on the basis of his age in violation of New York State Human Rights Law ("NYSHRL"), NY CLS Exec § 296(a); and (3) unlawfully and willfully terminating him in retaliation for making an internal complaint of age discrimination in deprivation of his rights secured by 29 U.S.C.

1

§ 623(d) and section 15 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 215, as well as NYSHRL § 296(d).

In connection with Mr. Castelluccio's claims, he seeks reinstatement or front pay, compensatory money damages for lost wages, lost benefits and other employee compensation, money damages for emotional distress as well as liquidated damages and attorneys' fees.

<u>JURISDICTION</u> <u>AND</u> <u>VENUE</u>

1.      This Court has original jurisdiction over this controversy pursuant to the ADEA, 29 U.S.C. § 626(b), and 28 U.S.C. § 1331.

2.      This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(i) in that the action involves citizens of different states and an amount in controversy in excess of $75,000 exclusive of interest and costs.

3.      This Court also has supplemental jurisdiction over Mr. Castelluccio's age discrimination and retaliation claims under NYSHRL § 296(a) pursuant to 28 U.S.C. § 1367(a).

4.      On November 17, 2008, Mr. Castelluccio filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR").

2

5.      Mr. Castelluccio's charge was filed with the EEOC within the time limits prescribed in 29 U.S.C. § 626(d).

6.      On June 18, 2009, the EEOC issued a Notice of Right to Sue ("Notice") authorizing Mr. Castelluccio to file suit against IBM within 90 days of Mr. Castelluccio's receipt of the EEOC's Notice. This Complaint is filed within the specified 90 day period.

7.      On July 16, 2009, the NYSDHR issued a Determination and Order of Dismissal for Administrative Convenience of Mr. Castelluccio's complaint.

PARTIES

8.      Mr. Castelluccio is 62 years of age and currently resides at 85 Davenport Lane East, Stamford, Connecticut.

9.      At all times relevant herein, IBM was and is a stock corporation and employer within the meaning of 29 U.S.C. § 630(b) duly organized and existing under the laws of the State of New York, employing at least 20 employees.

STATEMENT OF CLAIMS

Factual Background

10.     Mr. Castelluccio began working for IBM in March of 1968 as a Computer Analyst.

3

11.     Mr. Castelluccio's consistent good performance at IBM was rewarded with progressive salary increases and promotions during the span of his 40 years of service to the Defendant.

12.     More recently, in or about 2000, Mr. Castelluccio was promoted to the level of Vice President.

13.     In or about 2005, Mr. Castelluccio was promoted to Vice President of Public Sector Delivery for IBM's Integrated Technology Division.

14.     Mr. Castelluccio's performance reviews in his position as Vice President were positive and above-average. In 2005, he received a rating of "above average contributor," and in 2006 he received a rating of "solid contributor."

15.     Pursuant to IBM's "Personal Business Commitments (PBC) – Assessments and Ratings" document, a "solid contributor" rating is defined as: "Consistently achieves goals and meets job expectations; is reliable in doing job. Demonstrates appropriate level of knowledge, skill, effectiveness and initiative."

16.     In or about February of 2007, Mr. Castelluccio's existing supervisor, Kelton Jones, was replaced by Joanne Collins-Smee ("Ms. Collins-Smee"), who is approximately ten years younger than Mr. Castelluccio.

4

17.     Within one week of Ms. Collins-Smee's commencement as Mr. Castelluccio's supervisor, Ms. Collins-Smee held a meeting with Mr. Castelluccio wherein she asked him how old he was and suggested that he was "old enough" to bridge to retirement at that time. Mr. Castelluccio replied that he was not interested in bridging to retirement.

18.     Ms. Collins-Smee made additional comments to Mr. Castelluccio regarding his ability to bridge to retirement in or about November 2007 and March 2008.

19.     Ms. Collins-Smee also indicated to Mr. Castelluccio in or about March 2007 that one of his direct reports, Ken Wisse ("Mr. Wisse"), was old enough to retire as well. Mr. Castelluccio informed Ms. Collins-Smee in response that Mr. Wisse played a valuable role in his organization and was his primary backup.

20.     In or about March of 2007, the Senior Delivery Project Executive ("SDPE") assigned to work on IBM's account with its customer Wellpoint ("Wellpoint account") resigned due to the high stress and difficulty of the position.

21.     In or about late March of 2007, Ms. Collins-Smee announced that Mr. Castelluccio would assume the SDPE position for the Wellpoint account until a replacement could be found. Mr. Castelluccio was told that his assumption of this

5

position—which was *in addition to*, not in lieu of, his duties attendant to his current position as Vice President—was temporary.

22.     Wellpoint's Chief Information Officer rejected the candidate initially intended to fill the SDPE position at Wellpoint, Ken Weiss, before he was scheduled to begin his duties in mid-April of 2007.

23.     In or about June of 2007, Ms. Collins-Smee announced the hiring of Miguel Echavarria ("Mr. Echavarria") to fill Mr. Castelluccio's position as Vice President of Public Sector Delivery for IBM's Integrated Technology Division. At that time, Ms. Collins-Smee informed Mr. Castelluccio that he was to perform the SDPE position at Wellpoint on a full-time basis from that point forward.

24.     Mr. Echavarria was approximately ten years younger than Mr. Castelluccio at the time he replaced Mr. Castelluccio in his position as Vice President.

25.     Mr. Echavarria had less experience than Mr. Castelluccio and was less qualified for the position.

26.     Mr. Castelluccio was not previously informed that he would be replaced in his Vice President position and was not informed that he was removed from this position due to any performance deficiencies.

6

27.    At all relevant times, Ms. Collins-Smee knew that the Wellpoint account was a particularly demanding account.

28.    Despite the degree of difficulty associated with the Wellpoint account, Mr. Castelluccio performed well in his role as SDPE for Wellpoint and accomplished substantial progress in meeting the client's objectives and IBM's financial needs and concerns.

29.    Mr. Castelluccio's effectiveness on the Wellpoint account was undermined, however, by Ms. Collins-Smee's actions. On two separate occasions after Mr. Castelluccio was assigned as SDPE on the Wellpoint account, Ms. Collins-Smee rejected Mr. Castelluccio's Purchase Request to obtain a Blackberry PDA that was a standard IBM-approved technology. Mr. Castelluccio sought the PDA to assist him in the management of the Wellpoint accounts by providing timely notification of problems or client issues. IBM had an automated system that sent out electronic emails when a customer system outage occurred, including details on the nature of the problem, the time of outage and the number of customer clients impacted. The system also provided a call-in number to allow Mr. Castelluccio to resolve the issue with both IBM technicians and the customer.

The PDA was needed to provide a communications link to allow Mr. Castelluccio to correspond with Wellpoint and the IBM support team assigned to the account. The PDA would have provided Mr. Castelluccio with the unlimited ability to send and receive emails as well as "instant messages" to discuss with his team any necessary additional support, which was critical to timely responding to these client problems. The PDA would have provided Mr. Castelluccio with 24-hour email capability to allow him to immediately respond to Wellpoint's issues or requests that frequently arose after work hours. Ms. Collins-Smee's denials of these requests occurred in or about April and June of 2007.

30.    In or about June of 2007, Ms. Collins-Smee presented Gordon Crawford ("Mr. Crawford") to the Wellpoint Chief Information Officer as a candidate for the SDPE position for his approval.

31.    In or about November 2007, Ms. Collins-Smee informed Mr. Castelluccio that Mr. Crawford would be replacing him as SDPE for the Wellpoint account. In this meeting, Ms. Collins-Smee referenced Mr. Castelluccio's age and pointedly repeated again that he was old enough to bridge to retirement. Although Mr. Castelluccio felt pressured by Ms. Collins-Smee's repeated reference to his age and ability to retire, he replied that he was not interested in retiring.

8

32.    Mr. Castelluccio remained on the Wellpoint account until on or about January 5, 2008.

33.    In a customer satisfaction survey dated February 13, 2008 that measured Wellpoint's satisfaction for 2007, the period for which Mr. Castelluccio served as the primary SDPE on the account, Wellpoint measured its overall satisfaction as an "8" out of a possible "10."

34.    In January 2008, Mr. Castelluccio received his performance review for 2007 that was completed by Ms. Collins-Smee.  Mr. Castelluccio outlined all of his accomplishments from 2007 in his roles as Vice President and SDPE for Wellpoint in his "PBC" document.  Ms. Collins-Smee awarded Mr. Castelluccio with a "2" rating as a "solid contributor," which is the same rating he had received in 2006.

35.    No issues regarding Mr. Castelluccio's performance in either his position as Vice President or as SDPE for Wellpoint were noted in his 2007 performance review. In Ms. Collins-Smee's narrative overall assessment of Mr. Castelluccio for 2007, she stated, in relevant part:

> [Mr. Castelluccio] started the year as the ITDelivery VP for Public Sector. In the second half of the year, he was acting PE on the Wellpoint account. In the Public Secor [sic] role [Mr. Castelluccio's] team reduced headcount significantly and we were able to continue to meet our service level objectives. On the Wellpoint account, [Mr. Castelluccio] and the team has

[sic] made significant progress on programs to improve service quality and
reduce cost. . . .

36.     After Mr. Castelluecio was removed from the Wellpoint account, Ms.
Collins-Smee refused to provide him with any new work assignments for approximately
six months despite his requests for such assignments and although he was still employed
by IBM and she remained his supervisor. Rather, in order to be productive, Mr.
Castelluccio was forced to seek assignments on his own initiative.

37.     In a meeting requested by Mr. Castelluccio in which he sought from Ms.
Collins-Smee to be assigned meaningful work in March of 2008, Ms. Collins-Smee again
made reference to Mr. Castelluccio's retirement and his age.  In a discussion of Mr.
Castelluccio's future with IBM, Ms. Collins-Smee matter-of-factly stated—*for the third
time overall*—that Mr. Castelluccio had an opportunity to retire since he was old enough.
Although he was significantly demoralized by her repeated suggestions of retirement, Mr.
Castelluccio again indicated that he was not interested in retiring.

38.     Since his removal from the Wellpoint account in early January 2008, Ms.
Collins-Smee had not only totally ignored Mr. Castelluccio, but she had also excluded
him from important meetings.  As a result, Mr. Castelluccio was denied the opportunity
to demonstrate his capabilities so that he could secure a future job opportunity elsewhere
at IBM.

10

39. Ms. Collins-Smee agreed that she would assist Mr. Castelluccio in obtaining an equivalent executive position at IBM, but failed to recommend him for several positions that had opened up after November of 2007. Additionally, Ms. Collins-Smee only made inquiries into available executive positions (which are not posted in IBM, unlike non-executive positions) for Mr. Castelluccio as a result of his repeated requests. Moreover, she delayed making these inquiries until late May of 2008, merely one week before she gave Mr. Castelluccio notice of his termination.

40. On or about February 15, 2008, Mr. Castelluccio sent an e-mail communication to Garret Walker ("Mr. Walker"), a human resources professional at IBM. In this e-mail, Mr. Castelluccio opposed conduct by Ms. Collins-Smee that he perceived as age discrimination. He expressed his concern that he was being targeted by Ms. Collins-Smee without justification and that his career was being jeopardized in order to "hasten his retirement." Mr. Castelluccio also put Mr. Walker on notice that he had not been made aware of or considered for available positions within and outside his organization, as he had requested and as Ms. Collins-Smee had agreed.

41. Mr. Castelluccio further discussed his concerns with Mr. Walker in meetings held on or about February 29, 2008 and March 4, 2008, wherein Mr.

11

Castelluccio specifically informed Mr. Walker that he opposed Ms. Collins-Smee's actions demonstrating her intent to terminate his employment on the basis of his age.

42.     On or about May 20, 2008, Ms. Collins-Smee informed Mr. Castelluccio that a severance package had been prepared for him with a date of termination of June 30, 2009.

43.     On or about June 23, 2008, at Mr. Castelluccio's request, IBM's Human Resources Department initiated an "Open Door Investigation" into Mr. Castelluccio's claim that his impending termination was due to his age.

44.     Mr. Castelluccio's employment was terminated effective June 30, 2008.

45.     On August 11, 2008, Mr. Castelluccio was notified that the Open Door Investigation resulted in a determination that he was treated "fairly" with respect to his termination.   Mr. Castelluccio was not provided with any details for the basis of this conclusion or with the results reached through any of the various interviews that IBM's human resources department allegedly took regarding the circumstances surrounding Mr. Castelluccio's termination and his claim of age discrimination.

46.     As an executive-level employee at IBM who had worked for IBM for virtually all of his professional life, Mr. Castelluccio is highly familiar with IBM's termination process.

12

47.    Prior to an employee's termination at IBM, managers were instructed to administer "progressive discipline," by informing the employee of his or her performance concerns and allow the employee an opportunity to remedy such performance concerns within a specific period of time.   However, despite his decades of superior job performance and his 40-year career with IBM, IBM, acting through Ms. Collins-Smee, failed to adhere to its well-established progressive discipline practice.

48.    In the year prior to being wrongfully terminated, Mr. Castelluccio's annual salary and bonus totaled approximately $284,998.

## VIOLATIONS OF LAW

**Count One**  *(Violation of the ADEA)*

49.    IBM's actions in terminating Mr. Castelluccio's employment were wilful, unlawful and discriminatory on account of his age in violation of the provisions of the ADEA, 29 U.S.C. §§ 621, et seq.

50.    Specifically, the following facts and circumstances demonstrate IBM's discriminatory violation:

(a)    Mr. Castelluccio was terminated by IBM at age 61, at which time he was the oldest individual employed within IBM's "IT America's Delivery" organization and

13

the oldest of five Vice Presidents heading up various "sectors" within the organization who reported to Ms. Collins-Smee;

(b)     Mr. Castelluccio's supervisor from March 2007 until his termination, Ms. Collins-Smee, made repeated inappropriate references to Mr. Castelluccio regarding his age and his ability to "bridge to retirement";

(c)     Ms. Collins-Smee's bias statements began as early as one week after assuming her role as his supervisor and continued until shortly before his termination;

(d)     These repeated references were made in discussions with Mr. Castelluccio in which he was addressing his future employment opportunities at IBM and were therefore highly demoralizing;

(e)     Ms. Collins-Smee's decision to remove Mr. Castelluccio from his position as Vice President made it more difficult for him to succeed in his job performance due to the difficulty of the Wellpoint account;

(f)     Ms. Collins-Smee elected to replace Mr. Castelluccio in his position as Vice President with a less qualified individual who was ten years younger without just cause and never told Mr. Castelluccio in advance that he would be replaced in this position or that his performance in the position was at issue;

14

(g)     Mr. Castelluccio was informed that his employment was terminated due to poor job performance despite the facts that: (i) he never received an unfavorable performance review while at IBM and had been rated a "solid contributor" for his performance in 2007; and (ii) Wellpoint's customer satisfaction survey completed in February 2008 rated IBM's service in 2007, under Mr. Castelluccio's supervision, with an 8 out of 10;

(h)     Mr. Castelluccio never received any progressive discipline pursuant to IBM's custom and practice;

(i)     Ms. Collins-Smee failed to provide Mr. Castelluccio with any work assignments whatsoever following January of 2008, thereby making it nearly impossible for him to meet any performance standards during that time; and

(j)     Ms. Collins-Smee made only two inquiries on Mr. Castelluccio's behalf regarding available executive-level positions and did so just *one week* before providing him with notice of his impending termination, presumably at a time when a decision to terminate him already had been made.

51.     IBM's actions as set forth herein justify an award, inter alia, of back pay, reinstatement or front pay, liquidated damages, attorney's fees and benefits against IBM.

15

**Count Two**  *(Retaliation in Violation of ADEA)*

52.     IBM's actions in terminating Mr. Castelluccio's employment were retaliatory on account of his complaint alleging a violation of the provisions of the ADEA, 29 U.S.C. §§ 621, et seq., and violated his rights secured by 29 U.S.C. § 623 (d) of the ADEA and section 15 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 215, prohibiting retaliation.

53.     Mr. Castelluccio opposed treatment that he perceived as age discrimination in a complaint made to Mr. Walker, an IBM human resources professional whose job it was to investigate and resolve such complaints.

54.     Mr. Castelluccio made age discrimination complaints to Mr. Walker in writing on February 15, 2008 and orally on February 29, 2008 and March 4, 2008.

55.     Mr. Castelluccio was notified on or about May 20, 2008—less than three months after his final discussion with Mr. Walker—that a severance package had been prepared for him with a date of termination of June 30, 2008.

56.     Mr. Castelluccio requested that a formal investigation into the circumstances of his termination be initiated by IBM on or about June 23, 2008.

57.     Mr. Castelluccio's employment was terminated on June 30, 2008.

16

58.   A causal connection exists between Mr. Castelluccio's termination and his engagement in protected activity under 29 U.S.C. § 623(d), as demonstrated in part by the short period of time between Mr. Castelluccio's opposition of illegal discriminatory practices and the notification of his impending termination.

59.   IBM's actions as set forth herein justify an award, inter alia, of back pay, reinstatement or front pay, liquidated damages, attorney's fees and benefits against IBM.

**Count Three**  *(Age Discrimination in Violation of NYSHRL)*

60.   IBM's actions in terminating Mr. Castelluccio's employment were wilful, unlawful and discriminatory on account of his age in violation of the provisions of NYSHRL § 296(a).

61.   As a result of IBM's actions, Mr. Castelluccio suffered from severe emotional distress.

62.   IBM's actions as set forth herein justify an award, inter alia, of back pay, reinstatement or front pay, emotional distress and other compensatory damages, attorney's fees and benefits against IBM.

17

**Count Four**  *(Retaliation in Violation of NY Human Rights Law)*

63.     IBM's actions in terminating Mr. Castelluccio's employment were retaliatory on account of his complaint alleging a violation of the provisions of NYSHRL § 296(a), and violated his rights secured by NYSHRL § 296(d), prohibiting retaliation.

64.     As a result of IBM's actions, Mr. Castelluccio has suffered from severe emotional distress.

65.     IBM's actions as set forth herein justify an award, <u>inter alia</u>, of back pay, reinstatement or front pay, emotional distress and other compensatory damages, attorney's fees and benefits against IBM.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court to enter:

(a)     A judgment declaring that Defendant discriminated against Plaintiff in violation of 29 U.S.C. §§ 621-634, 29 U.S.C. § 215(d) and NYSHRL §§ 296(a) and (d) and 29 U.S.C. § 215(d);

(b)     A money judgment representing compensatory damages, including lost wages, and all other sums of money, including retirement benefits and other employment benefits;

(c)     A money judgment representing liquidated damages for Defendant's willful violations of the ADEA;

(d)     A money judgment representing interest on this Court's award from the date of Plaintiff's termination until the date of payment on a compound basis;

18

Case 14-2854, Document 62, 03/13/2015, 1460796, Page63 of 289
Case 3:09-cv-01145-TPS   Document 1   Filed 07/21/09   Page 19 of 20

A-51

(e)     A money judgment representing compensatory damages for emotional distress pursuant to Defendant's violations of NYSHRL §§ 296(a) and (d);

(f)     An Order directing Defendant to reinstate Plaintiff or, in the alternative, front pay for seven (7) years;

(g)     A money judgment to recoup any tax loss suffered by Plaintiff as a result of receiving a lump sum award;

(h)     That the Court retain jurisdiction over this action until Defendant has fully complied with the Orders of this Court and that the Court require Defendant to file such reports as may be necessary to supervise such compliance;

(i)     The costs of suit, including an award of reasonable attorneys' fees pursuant to 29 U.S.C. §§ 626(b) and 216(b); and

(j)     Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands trial by jury of all questions of fact raised in this action.

19

Dated at Darien, Connecticut this 20th day of July, 2009.

THE PLAINTIFF
JAMES CASTELLUCCIO

BY:

MARK R. CARTA (ct06645)
KATHRYN A. SHERMAN (ct25641)
Rucci, Burnham, Carta & Carello, LLP
30 Old Kings Highway South
Post Office Box 1107
Darien, Connecticut 06820
(203) 899-3332 (Phone) (203) 655-4302 (Facsimile)
mcarta@rucciburnham.com
ksherman@rucciburnham.com

20

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,                          CIVIL ACTION NO.
                                             3:09 CV 1145 (DJS)
                    Plaintiff,

        -   against –


                                             September 20, 2010

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                    Defendant.


## AFFIRMATION OF ZACHARY D FASMAN

Zachary D. Fasman, a member of the firm of Paul, Hastings, Janofsky & Walker

LLP, counsel for Defendant, affirms and says:

1.      Attached as **Exhibit 1** is a true and correct copy of Plaintiff's Complaint,

dated July 20, 2009.

2.      Attached as **Exhibit 2** is a true and correct copy of Defendant's Amended

Answer, dated November 19, 2009.

3.      Attached as **Exhibit 3** is a true and correct copy of excerpts from the

original transcript of the deposition of James Castelluccio ("Plaintiff"), taken on January 25,

2010.

4.      Attached as **Exhibit 4** is a true and correct copy of excerpts from the

original transcript of the deposition of Joanne Collins-Smee ("Collins-Smee"), taken on February

4, 2010.

5.      Attached as **Exhibit 5** is a true and correct copy of excerpts from the original transcript of the deposition of Keith Holmes ("Holmes"), taken on April 9, 2010.

6.      Attached as **Exhibit 6** is a true and correct copy of excerpts from the original transcript of the deposition of Garrett Walker ("Walker"), taken on January 29, 2010.

7.      Attached as **Exhibit 7** is a true and correct copy of excerpts from the original transcript of Barbara Brickmeier, taken on April 19, 2010.

8.      Attached as **Exhibit 8** is a true and correct copy of excerpts from the original transcript of Patricia O'Malley, taken on April 21, 2010.

9.      Attached as **Exhibit 9** is a true and correct copy of Plaintiff's Work History Detail Report.

10.     Attached as **Exhibit 10** is a true and correct copy of Defendant's Response to Interrogatory No. 2, Ex. A.

11.     Attached as **Exhibit 11** is a true and correct copy of Exhibit 10 from the deposition of Collins-Smee.

12.     Attached as **Exhibit 12** is a true and correct copy of the IO 5-Minute Drill for ITD, dated April 5, 2007.

13.     Attached as **Exhibit 13** is a true and correct copy of Exhibit 14 from the deposition of Collins-Smee.

14.     Attached as **Exhibit 14** is a true and correct copy of Exhibit 7 from the deposition of Plaintiff.

15.     Attached as **Exhibit 15** is a true and correct copy of Exhibit 13 from the deposition of Plaintiff.

16.     Attached as **Exhibit 16** are true and correct copies of Five Minute Drills,

dated from June 2007 to June 2008.

      17.    Attached as **Exhibit 17** is a true and correct copy of Exhibit 10 from the deposition of Plaintiff.

      18.    Attached as **Exhibit 18** is a true and correct copy of Exhibit 19 from the deposition of Holmes.

      19.    Attached as **Exhibit 19** is a true and correct copy of Exhibit 18 from the deposition of Plaintiff.

      20.    Attached as **Exhibit 20** is a true and correct copy of Exhibit 24 from deposition of Plaintiff.

      21.    Attached as **Exhibit 21** is a true and correct copy of the Open Door investigation report, dated August 5, 2008.

      22.    Attached as **Exhibit 22** is a true and correct copy of correspondence from Russell Mandel to Plaintiff, dated August 11, 2008.

      23.    Attached as **Exhibit 23** is a true and correct copy of IBM's About Your Job policy.

Dated: New York, New York
       September 20, 2010

ZACHARY D. FASMAN

# EXHIBIT 4

Collins-Smee, Joanne

1

2     UNITED STATES DISTRICT COURT

3     DISTRICT OF CONNECTICUT

4     ----------------------------)

5     JAMES CASTELLUCCIO,

6           Plaintiff,

7           vs.        Civil Action No.

8     INTERNATIONAL BUSINESS     3:09-cv-1145(MRK)

9     MACHINES CORPORATION,

10           Defendant.

11     ----------------------------)

12

13

14                 CONFIDENTIAL

15     DEPOSITION OF JOANNE COLLINS-SMEE

16           New York, New York

17           February 4, 2010

18

19

20

21

22

23

24     Reported by:

       Linda Salzman

25     JOB NO. 26898

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential

 2   position?

 3        A.  About two years.

 4        Q.  Do you recall when you left that

 5   position?

 6        A.  No.

 7        Q.  What was your next position, if

 8   any?

 9        A.  General manager of industrial

10   services.

11        Q.  What were your responsibilities?

12        A.  Sales and support for all of our

13   industrial clients in global technology

14   services.

15        Q.  How long did you hold that

16   position?

17        A.  About two years.

18        Q.  Next position, if any?

19        A.  The one I'm in now.

20        Q.  Which is?

21        A.  General manager, integrated

22   technology services.

23        Q.  When did you first take that

24   position?

25        A.  February '07.  Or very end of Jan
```

Collins-Smee, Joanne

1      J. Collins-Smee - Confidential

2      '07.

3          Q.  And that's your current position?

4          A.  Yes.

5          Q.  Would you describe your

6      responsibilities in that position?

7          A.  I'm responsible for the delivery of

8      service to all of our strategic outsourcing

9      clients in North America, Canada, North

10     America, including Canada and Latin America.

11         Q.  And approximately how many people

12     do you manage?

13         A.  Today?

14         Q.  Yes.

15         MR. FASMAN:  I'm going to ask for a

16     clarification, if that's okay, counsel.

17         MR. CARTA:  Sure.

18         MR. FASMAN:  You mean overall,

19     everyone who's under her?  Daily

20     management?

21         MR. CARTA:  That's a good question.

22         Q.  Let's start from the bottom and

23     work up, which is how many people in the IBM

24     hierarchy are beneath you, if you know?

25         A.  I don't understand the question.

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential

 2        Q.  At that time.

 3        A.  Yes.

 4        Q.  Since that time, have the titles

 5   changed?

 6        A.  Yes.

 7        Q.  Let's go back to that time.  Let's

 8   start with when you began within your current

 9   GM position, February, January of 2007, how

10   many people at that time were you managing

11   directly?

12        A.  I don't remember.

13        Q.  You said 12 now, I think, did I

14   hear that correctly?

15        A.  Yes.

16        Q.  Was it more than 20 then?

17        A.  No.

18        Q.  Was it approximately the same

19   number, 12?

20        A.  I don't remember.

21        Q.  Was it is more than five?

22        A.  Yes.

23        Q.  Was it more than ten?

24        A.  Yes.

25        Q.  So somewhere between 10 and 20?
```

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2        A.  Yes.

3        Q.  And were those people that you were

4    managing in 2007, was their title VP of a

5    particular sector?

6        A.  Not all of them.

7        Q.  How many were VP of sectors?

8        A.  Then?

9        Q.  Then, yes.

10       A.  I think five.

11       Q.  Were the others that you were then

12   managing, did they have a similar title?

13       A.  I don't understand the question.

14       Q.  Sure.

15           The five that we've just

16   identified, they had a similar title, VP of

17   some sector.

18       A.  Yes.

19       Q.  The other people that you were

20   managing, did they have a similar title to

21   one another?

22       A.  No.

23       Q.  The others, besides the five VP of

24   specific sectors in 2007 that you were

25   managing, what was their function?

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2       A.  It varied.

3       Q.  Did they share any common

4   functions?

5           MR. FASMAN:  I'm going to object.

6   I think that's unclear.

7           You can answer if you understand

8   it.

9       A.  I don't.

10      **Q.  Can you explain why you were**

11  **managing that group?  Did that whole group of**

12  **people have something in common?**

13      A.  They all worked with me to support

14  our clients in the Americas.

15      **Q.  In what particular aspect of IBM's**

16  **business?**

17      A.  Strategic outsourcing.

18      **Q.  When was there a change in title?**

19  **You just alluded to the fact that titles**

20  **changed.**

21          **When did that occur?**

22      A.  We're constantly evolving.

23      **Q.  So you just don't recall, is that**

24  **it specifically?**

25      A.  Yes.

Collins-Smee, Joanne

```
1          J. Collins-Smee - Confidential

2          Q.  You've told me that generally you

3     recall that the issues that Mr. Jones

4     referenced had to do with leadership, and I

5     want to know if you recall Mr. Jones saying

6     anything else about the issues with

7     Mr. Castelluccio's performance?

8          A.  There may have been conversation

9     about Jim's involvement with the sector

10    leaders that ran the public sector, and that

11    there was unhappiness with Jim's support for

12    the sector that may have come up.

13         Q.  You say it may have.  Do you have a

14    recollection of whether it did or not?

15         A.  I'm not sure.  I'm not sure.

16         Q.  Did you have conversations with

17    anyone else in which there were complaints

18    registered about Mr. Castelluccio's

19    involvement with sector leaders and their

20    unhappiness with his level of support?

21         MR. FASMAN:  Objection.  At any

22    time?

23         Q.  Let's say in the first year, 2007.

24         A.  Yes.

25         Q.  With whom?
```

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2        A.  Dave Liederbach.

3        Q.  Was that one or more than one

4    conversation?

5        A.  Several.

6        Q.  **What do you recall of those**

7    **conversations?**

8        A.  That he was not happy with Jim's

9    performance in support of his accounts.

10       Q.  **Which accounts would those have**

11   **been, WellPoint?**

12       A.  And whatever other accounts were in

13   the public sector.

14       Q.  **And whatever else means yes to**

15   **WellPoint; is that right, yes to WellPoint?**

16       A.  Yes to WellPoint.

17       Q.  **And there were other accounts in**

18   **the public sector -- let me ask you this.**

19       **Were all of the accounts Jim was**

20   **working on, was Liederbach also involved in**

21   **all of those?**

22       A.  Yes.

23       Q.  **So there was congruity there?**

24       A.  Yes.

25       Q.  **Do you recall taking notes with**

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential
 2        A.  During the very first time I spoke?
 3        Q.  Sure.
 4        A.  I don't remember that.
 5        Q.  How about in subsequent
 6   conversations with Mr. Liederbach concerning
 7   Mr. Castelluccio?
 8        A.  Yes.
 9        Q.  And what do you recall
10   specifically, if anything, Mr. Liederbach
11   saying with respect to Mr. Castelluccio in
12   those subsequent conversations?
13        A.  Concern about lack of leadership
14   and issues that needed resolution.  That
15   there was a concern about getting them
16   resolved.
17        Q.  Can you help me understand better
18   what you mean by "issues that needed
19   resolution"?
20        A.  Service delivery issues.
21        Q.  Such as, if you recall?
22        A.  Outages.
23        Q.  I've heard that term many times.
24           What exactly is an outage?
25        A.  It could be a variety of things.
```

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2     It's basically an interruption of service for

3     a client.  IT service.

4          Q.  So generally it would be any time

5     services were interrupted, meaning ceased or

6     a level was dropped?

7          A.  Both.

8          Q.  So an outage could be a diminution

9     in the level of IBM's performance as well as

10    just a ceasing of IBM's ability to perform

11    services?

12         A.  Could you repeat that, please?

13         Q.  I'm giving you an either-or and it

14    could be a multitude of things.

15             Can you explain in your own words

16    what you -- how the term outage is used at

17    IBM in your experience?

18         A.  It's either an interruption of

19    continuous service for a client, or a

20    degradation of service.

21         Q.  And that was a significant problem

22    at WellPoint in 2007?

23             MR. FASMAN:  Objection.  I don't

24    think she testified to that.

25             You can answer.

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2       Q.  I'm asking.

3       A.  I don't understand.

4       Q.  Did the WellPoint account have

5   repeated problems with outages?

6       A.  They had a series of service

7   delivery issues.

8       Q.  Outages --

9       A.  Not all of them were outages.

10      Q.  Okay.  Were outages among the

11  problems that they had at WellPoint?

12      A.  Yes.

13      Q.  What else do you recall

14  Mr. Liederbach explaining with respect to

15  "issues" that needed resolution?

16      A.  He wasn't happy with Jim's level of

17  involvement with the sector.

18      Q.  And what does that mean level of

19  involvement?

20      A.  These roles require very close

21  interaction between the role Dave Liederbach

22  had and the role that Jim had.

23          MR. CARTA:  Mark this 4.

24          (Plaintiff's Exhibit CS 4,

25  Document, marked for identification, as

Collins-Smee, Joanne

1      J. Collins-Smee - Confidential

2      said this.

3          Q.   And I just want to know if you have

4      a specific recollection of the discussion.

5          A.   I'm telling you my recollection.

6          Q.   So you have a specific recollection

7      of saying Jim, you and I need to figure out

8      what you're going to be doing next.

9          A.   Yes.

10         Q.   And in that context, he indicated

11     to you, as best you can recall, that he had

12     no interest in retiring?

13         A.   I don't remember a strong

14     discussion like that, no interest.

15         Q.   What, if anything, do you recall

16     Jim saying in that conversation about

17     retirement?

18         A.   That he was very interested in

19     continuing to work.  So that's what we were

20     going to pursue.

21         Q.   Do you know where you were in the

22     process of finding a permanent DPE for

23     WellPoint at that time?

24         A.   I don't.

25         Q.   Do you have a recollection of

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2        A.  Yes.

3        Q.  On the date indicated, February 28,

4    2007?

5        A.  Yes.

6        Q.  At this point approximately how

7    long had you been working with

8    Mr. Castelluccio?

9        A.  About a month.

10       Q.  The first sentence says, "We need

11   to replace Jim Castelluccio.  I will fill you

12   in tomorrow."

13          Do you see that?

14       A.  Yes.

15       Q.  What was the basis of the decision

16   at that time that you needed to replace

17   Mr. Castelluccio?

18       A.  He was not working out.  He wasn't

19   exhibiting the proper leadership of the

20   accounts in the public sector.

21       Q.  And this was, I want to make sure

22   you understand, you were talking about

23   replacing him as VP of public sector; is that

24   right?

25       A.  Yes.

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2   yes.

3       Q.  Do you remember whether this was a

4   face-to-face meeting?

5       A.  It probably was.  It could have

6   been over the phone, but it probably was.

7       Q.  And what do you recall of what you

8   said to Mr. Castelluccio in this

9   conversation, if anything?

10      A.  We discussed that there had been --

11  that I, first of all, had been there for a

12  month and have watched his performance as the

13  VP, that I had also received lots of

14  complaints from Dave, Dave's team, Keenie

15  McDonald, and that we needed to move him.

16      And I remember Dave -- or excuse

17  me, Jim being -- saying yeah, you know, this

18  has been rough.  Let's look for the next

19  opportunity here.

20      So it was not a surprise meeting

21  because we had several other calls along the

22  way about, you know, status on the accounts,

23  et cetera.

24      Q.  Now I don't understand.  What other

25  calls had you had?

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2            MR. CARTA:  Okay good.

3            Mark this 14.

4            (Plaintiff's Exhibit CS 14, E-mail

5        dated 3/27/07, marked for

6        identification, as of this date.)

7        Q.  Do you recognize this as an e-mail

8    that you sent to Keith Holmes on March 27,

9    2007?

10       A.   Yes.

11       Q.   And is this the e-mail in which

12   Keith is announcing that Miguel Ecchavaria,

13   E-C-C-H-A-V-A-R-I-A, is going to be the new

14   VP for public sector?

15           MR. FASMAN:  Objection.  That's not

16       what it says at all.

17       A.  What it says is that Dave and I

18   have agreed but it has to go to the next

19   level for approval, so....

20       Q.  Do you know how long it was before

21   Mr. Ecchavaria was approved for the position?

22       A.  I'm not sure.

23       Q.  There's a sentence also, "We have

24   agreed on the backfill for Mike Morin, the

25   DPE at WellPoint."

Collins-Smee, Joanne

1       J. Collins-Smee – Confidential

2       Q.   And you wouldn't need the approval

3    of anybody from WellPoint?

4       A.   No.

5       MR. CARTA:  Mark this 15.

6       (Plaintiff's Exhibit CS 15, E-mail

7    dated 3/31/07, marked for

8    identification, as of this date.)

9       Q.   Do you recognize this as a --

10   withdrawn.

11       Do you understand this to be an

12   e-mail that you sent to Dave Liederbach on

13   March 31, 2007?

14       A.   Yes.

15       Q.   On the bottom, it also looks to be

16   a message from a Blackberry that you sent to,

17   would have been Dave Liederbach and Jim

18   Castelluccio?

19       A.   Yes.

20       Q.   And does this affirm your

21   understanding that Jim was appointed to the

22   WellPoint account in the capacity as, quote,

23   acting DPE?

24       MR. FASMAN:  Objection.  This says

25   what it says.

Collins-Smee, Joanne

| | |
|---|---|
| 1 | J. Collins-Smee - Confidential |
| 2 | A.  Yes. |
| 3 | Q.  And does this accurately reflect |
| 4 | your understanding of Jim's appointment at |
| 5 | that time? |
| 6 | A.  At that time. |
| 7 | Q.  Correct. |
| 8 | And at that time, the understanding |
| 9 | was he was supposed to be acting DPE at |
| 10 | WellPoint until when? |
| 11 | A.  Well, it says here until we put the |
| 12 | new person in on April 16th.  I don't |
| 13 | remember what was the circumstances |
| 14 | surrounding that. |
| 15 | Q.  But the initial intent was that |
| 16 | basically he was going to be -- initial |
| 17 | intent that he was just going to be acting |
| 18 | starting on April 1st through April 16th; is |
| 19 | that right? |
| 20 | A.  Yes. |
| 21 | Q.  And it's your position that you had |
| 22 | informed Mr. Castelluccio that he was being |
| 23 | replaced as VP of public sector at that time? |
| 24 | A.  We had already had the discussion |
| 25 | that he was being replaced several weeks |

Collins-Smee, Joanne

```
 1         J. Collins-Smee - Confidential

 2         Q.  Who assumed Mike Morin's

 3   responsibilities after he resigned?

 4         A.  Jim did.

 5         Q.  Do you see in --

 6         A.  There was a prior exhibit on that,

 7   I think, actually.

 8         Q.  Do you see in your e-mail to

 9   Keenie, you say, "Mike needed to move off

10   this account anyway.  This was way too much

11   for him."

12            What did you mean by, "this was way

13   too much for him"?

14         A.  He felt that he had worked there

15   for a significant period of time and he was

16   concerned that he wanted to leave, that it

17   was, you know, it was a difficult job for

18   him.

19         Q.  You characterize the WellPoint

20   situation as "a difficult situation."

21            Do you see that later in the same

22   sentence?

23         A.  Yes.

24         Q.  Do you agree that's an apt

25   description?
```

Collins-Smee, Joanne

1         J. Collins-Smee - Confidential

2         A.  Yes.

3         Q.  You later, I believe, indicated or

4    chose to try to assign Mr. Morin to another

5    position after he resigned?

6         A.  Yes.

7         Q.  Do you remember what position he

8    was relocated to?

9         A.  Yes.

10        Q.  And what position was that?

11        A.  The DPE director level at The

12   Hartford.

13        Q.  Hartford Insurance Company?

14        A.  Yes.

15        Q.  Is he still there; do you know?

16        A.  Yes.

17        Q.  How does the size of the IBM

18   assignment at The Hartford compare to the

19   size of the IBM assignment at WellPoint?

20        MR. FASMAN:  I'm going to object

21   to the characterization of size.  That

22   could mean a lot of different things,

23   but you can answer if you know.

24        A.  It's comparable, I think.

25        Q.  Comparable, okay.

IBM/Casteliuccio                                    Page  166

Collins-Smee, Joanne

1      J. Collins-Smee - Confidential

2      A.  I don't remember.

3      Q.  And do you recall Mike indicating

4   to you that there were others whom he

5   believed would be resigning shortly?

6      A.  I don't remember.

7      Q.  Did you ever indicate to

8   Mr. Castelluccio that moving him to the

9   WellPoint account was a move intended to

10   improve his performance?

11      A.  He was not successful as the VP of

12   public service.  My hope was that he would be

13   successful in the DPE role, and we never had

14   a specific conversation about that being an

15   improvement plan to become the VP again

16   because that wasn't a possibility.

17      Q.  And why wasn't that a possibility?

18      A.  Because I had just taken him out of

19   that role.

20      Q.  So when you say it wasn't

21   possibility for him to become -- question

22   withdrawn.

23      MR. CARTA:  May I have the answer

24   read back, please?

25      (Whereupon, the requested portion

Collins-Smee, Joanne

1    J. Collins-Smee - Confidential

2    was read back by the court reporter.)

3    Q.   At the time you assigned him to the

4    WellPoint account, you were aware that that

5    was a difficult situation, to use your words,

6    from the e-mail; is that right?

7    A.   Yes.

8    Q.   Had there been anybody who had been

9    successful at that position?

10    MR. FASMAN:  I'm sorry.  During

11    what period of time?

12    Q.   At any time since you landed the --

13    since IBM landed the WellPoint account?

14    A.   I only know about my time there,

15    and the only one in that role was Mike during

16    my tenure there, and my hope was that Jim was

17    a vice-president with lots of experience,

18    already knew the WellPoint account, so I

19    assumed that he would be successful in that

20    role.

21    Q.   The question was:  Had anybody

22    prior to him been successful prior to

23    Mr. Castelluccio?

24    A.   I'm not aware.  I'm only aware of

25    Mike.

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential

 2    situations that you're referring to, lapse of

 3    time or changed circumstances, did any of

 4    those occur with respect to him?

 5        A.  No.

 6        MR. FASMAN:  I think she testified

 7    there was a second time that you did

 8    discuss it with him.

 9        A.  Yes, when I gave -- yes.

10        Q.  At the exit interview process and

11    you said you thought it was appropriate then?

12        A.  Yes.

13        Q.  I understand that.

14        A.  Yes.

15        Q.  Did you ever present

16    Mr. Castelluccio as a candidate to WellPoint

17    for the permanent position of DPE?

18        A.  I think I discussed that with

19    Keenie and with Dave McDonald.  It was my

20    hope that he would work out as the permanent.

21        Q.  And when did you discuss that?

22        A.  I'm not sure exactly.

23        Q.  You said you think.

24        Do you have a specific recollection

25    of that discussion?
```

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2          Q.   Yes.  It said he was going to be

3     acting until the 16th of April.

4          A.   I don't remember what the 16th of

5     April was.

6          Q.   I think you were hoping Ken Weiss

7     would come on at that point.

8          A.   I'm not sure.

9          Q.   Let me try this another way.

10          Initially I think we established

11     that Mr. Weiss, you were hoping that he would

12     move into the DPE role at WellPoint?

13          A.   Was he the first candidate?

14          Q.   I think so.

15          A.   He was the first candidate.

16          Q.   And then there was another

17     candidate we talked about Deleo, I think his

18     name was?

19          A.   No, Deleo was never presented to

20     the client.

21          Q.   He was vetted to be a potential

22     candidate; was he not?

23          A.   Yes.

24          Q.   Then there was, I think, a Raymond

25     Johnson?

Collins-Smee, Joanne

```
1         J. Collins-Smee - Confidential

2         A.  Yes.

3         Q.  He was presented and then rejected?

4         A.  I believe so.

5         Q.  And then after that, Mr. Crawford

6    -- question withdrawn.

7             Then after that Mr. Crawford was

8    vetted and presented; is that correct?

9         A.  Yes.

10        Q.  Was there any point in time when

11   IBM was not looking for someone else to step

12   into the DPE role while Mr. Castelluccio was

13   serving in that capacity for WellPoint?

14        A.  I'm confused what the question is.

15        Q.  Sure.

16            Did there come a point in time when

17   IBM decided to cease looking for someone to

18   replace Mike Morin as DPE on the WellPoint

19   account?

20        A.  Cease looking?

21        Q.  Yes.  I assume you ceased looking

22   after you found Mr. Crawford, right?

23        A.  Yes.

24        Q.  Between the time Mike Morin

25   resigned and the time Mr. Boxer accepted
```

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2       Mr. Crawford, was IBM looking for that entire

3       period of time for somebody else to replace

4       Mike Morin?

5          A.  I don't think so.

6          Q.  And why do you say that?

7          A.  Because I was hoping that they

8       would be very pleased with the leadership

9       that Jim was providing on the account.

10          Q.  I understand that's what you were

11      hoping.

12          A.  Yes.

13          Q.  Was the process of seeking a

14      replacement for Mike Morin terminated before

15      Mr. Crawford was accepted?

16          A.  After he was accepted by the

17      client, it was terminated.

18          Q.  Between the time that Mike Morin

19      left and the time Mr. Crawford was accepted

20      by Boxer, was that process in place the

21      entire time?

22          A.  I don't remember, but I don't think

23      it was on every single drill.  I don't

24      remember.

25          Q.  When do you think it was not on a

Collins-Smee, Joanne

1      J. Collins-Smee - Confidential

2    drill, what time period?

3        A.   Maybe after Ken Weiss didn't work

4    out, maybe that period of time.

5        Q.   Between Ken Weiss and the Deleo

6    candidate?

7        A.   Not DeLeo.  He was never presented

8    as a candidate.

9        Q.   I understand that, but he was

10   vetted and discussed as a candidate.  I'm

11   talking about the process to replace

12   Mr. Morin.

13        I understand your testimony, that

14   you were hoping that Mr. Castelluccio was

15   going to be a successful DPE for WellPoint.

16   That really isn't my question.

17        My question is:  While

18   Mr. Castelluccio was serving as DPE, is it

19   true that IBM continued to look for another

20   DPE until it found Mr. Crawford?

21        MR. FASMAN:  I think the witness

22   has already testified as to what her

23   recollection was.

24        You can answer again if you want.

25        A.   I think what I said previously was

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2     we may have had a gap during the period where

3     we thought Jim could be the man. I'm not

4     sure exactly the timing.

5        Q.   You're not sure when that period

6     was?

7        A.   No.

8        Q.   Was Jim informed of that?

9        A.   Informed of what?

10        Q.   Of the fact that you had ceased

11     looking for another replacement and that you

12     had hoped he would, quote, be the man?

13        A.   We had discussed WellPoint being an

14     assignment for him.

15        Q.   WellPoint being an assignment. I'm

16     not asking about being an assignment. I'm

17     asking about a permanent assignment.

18        A.   We discussed that it could be a

19     permanent assignment.

20        Q.   Who is we?

21        A.   I don't understand the context.

22        Q.   When you say we discussed?

23        A.   Jim and I.

24        Q.   Anybody else?

25        A.   When I was discussing it with Jim?

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2              Do you have a specific recollection

3     of discussing that with Mr. McDonald?

4         A.  Well, they did give me input on

5     Jim's performance.  I don't know if it was in

6     this circumstance or not.

7         Q.  Do you have a specific recollection

8     of talking -- question withdrawn.

9              Do you have a specific recollection

10    of saying to Mr. McDonald:  We are

11    considering proposing to you Jim Castelluccio

12    as the permanent DPE on your WellPoint

13    account?

14        A.  I don't remember a specific

15    conversation saying that.

16        Q.  What, if anything, do you remember

17    specifically Mr. McDonald -- is it

18    Mr. McDonald?

19        A.  Yes.

20        Q.  That Mr. McDonald saying to you

21    about Mr. Castelluccio, if anything?

22        A.  They were not happy with Jim's

23    leadership and involvement on the account.

24        Q.  And when did he say that to you?

25        A.  I don't remember exactly.

Collins-Smee, Joanne

1           J. Collins-Smee - Confidential

2           Q.   When you say "they," who are you

3      referring to?

4           A.   He and Mark Boxer, their client's

5      side.

6           Q.   Have you seen any document in which

7      they put that in writing?

8           A.   Put what in writing?

9           Q.   The fact that they were not happy

10     with Mr. Castelluccio's involvement, as you

11     just said?

12          A.   Not that I remember.

13          Q.   Did you ever indicate to

14     Mr. Castelluccio that his performance with

15     WellPoint needed to be improved or he would

16     be removed from the account?

17          A.   Yes.

18          Q.   When was that?

19          A.   Multiple times.

20          Q.   Let's go through them one at a

21     time.

22              How many times do you believe you

23     told Mr. Castelluccio that?

24          A.   Several.

25          Q.   Were they face to face, were they

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2    in writing, were they over the phone?

3        A.   Over the phone.  Maybe one or two

4    face to face.

5        Q.   If you looked at Exhibit 2, would

6    that help at all in terms of when those

7    conversations would have taken place?

8        A.   No, because this certainly wasn't a

9    comprehensive list of every time he and I

10   spoke.

11       Q.   What is your best recollection of

12   what you said to him in terms of his

13   performance at WellPoint?

14       A.   There were several conversations on

15   the inability to reach him during critical

16   client situations, and the client was calling

17   me in the middle of the night.  Happened

18   repeatedly, so there were several

19   conversations related to that.

20           There were conversations related to

21   his lack of leadership during bridge calls,

22   which are very high severity situations with

23   the client.

24       Q.   Explain that to me what you mean,

25   "bridge call".

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2          A.   You're managing a large team of

3     people on a phone and I counseled him that

4     the client, as well as Keenie, felt that he

5     was not exerting leadership with these large

6     teams of people, that they couldn't get to

7     the bottom of situations and he wasn't

8     exerting leadership with the team.

9          Q.   Do you know how Mr. Castelluccio

10    performed against the agreed matrix for

11    evaluating him in 2007?

12         MR. FASMAN:   Objection.  It

13    assumes that there were such matrix.

14         MR. CARTA:  That's fair.  I will

15    lay a foundation.

16         Q.   As part of the PCB process, did

17    Mr. Castelluccio and you agree to certain

18    performance goals for 2007?

19         A.   At the beginning of 2007.

20         Q.   Correct.

21         And was there an opportunity for

22    you to modify those at any point if you

23    needed to?

24         A.   They could have been modified, yes.

25         Q.   And do you recall indicating to

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2     probably got back into a back and forth with

3     him on that.

4          Q.   What would you have said?

5          A.   That as a DPE you're responsible to

6     manage those calls as well as do the

7     strategic work necessary on an account so

8     that you don't get on those outage calls

9     going forward.  So you have to balance both.

10         Q.   Was Mike Morin able to do that?

11         A.   Mike wasn't.

12         Q.   And Mike was the only DPE on the

13    account previously; is that right?

14         A.   He was the director level DPE

15    before Jim was there, yes.

16         Q.   I got it.

17         A.   I don't know if there was anybody

18    before him.

19         Q.   I just want to ask a couple quick

20    questions about Mr. Castelluccio's request

21    for a Blackberry, or a PDA.

22              Do you recall there being such a

23    request made of you by Mr. Castelluccio?

24         A.   I don't remember that.

25         Q.   Can you just summarize for me the

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential

 2    meeting in November you again broached the

 3    subject of his bridging to retirement?

 4        MR. FASMAN:  Again?  She already

 5    testified that she -- well, I'm going to

 6    object to the question.

 7        But you can answer on the general

 8    subject.

 9        MR. CARTA:  I will rephrase.

10    Q.  Do you recall whether in the

11    discussion you had with him in November you

12    discussed with him at that time his bridging

13    to retirement or his taking retirement?

14        MR. FASMAN:  I don't think she --

15    I have to object.  You're putting words

16    in her mouth in terms of November.  She

17    already said she doesn't recall exactly

18    when this meeting was.

19        MR. CARTA:  Oh, I see.

20    Q.  The date of the meeting is less

21    important than the content, so I will

22    rephrase the question.

23        MR. FASMAN:  Thank you.

24    Q.  At the time you informed

25    Mr. Castelluccio that he was being replaced
```

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2     on the WellPoint account, do you recall

3     initiating a discussion with him again about

4     his retiring?

5          MR. FASMAN:   Objection.  Again.

6     A.   Again?

7          MR. FASMAN:   She never testified

8     that it occurred previously.

9     A.   Right.

10    Q.   I thought you said it occurred

11    previously?

12    A.   No.

13    Q.   I will simplify the question.

14    That's fine.

15         Do you recall in the conversation

16    you had with Mr. Castelluccio in which you

17    told him he was being take place off the

18    WellPoint account, initiating a discussion

19    about him taking retirement?

20    A.   I don't know if -- I don't remember

21    specifically.  We could have discussed that.

22    He may have broached it.  I may have broached

23    it.  I don't remember specifics.

24    Q.   Do you remember whether in that

25    discussion whenever it took place about him

Collins-Smee, Joanne

```
1            J. Collins-Smee - Confidential
2     being replaced, there was a discussion about
3     his age?
4        A.  Never.
5        Q.  You say never with a fair amount of
6     vehemence.
7            You would agree it would have been
8     highly inappropriate for you to mention his
9     age in that conversation?
10           MR. FASMAN:  I am going to object.
11      Highly inappropriate is subjective and
12      it's not relevant to this.
13           You may answer if you wish.
14       Q.  You can answer.
15       A.  I would never discuss age with any
16     employee.
17       Q.  Let me loop back to the PBC process
18     for a moment.
19           Do all full-time employees at IBM
20     participate in an annual PBC?
21       A.  All regular employees?
22       Q.  Yes.
23       A.  Yes.
24       Q.  And that's an annual process?
25       A.  Yes.
```

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2          A.   More than once.

3          Q.   What do you recall, how many

4    conversations did you have with him, if you

5    know?

6          A.   At least two, maybe three.

7          Q.   What I would like to do is just

8    sequentially go through those conversations

9    and see what you recall.

10         What do you recall of the first

11   such conversation?

12         A.   I had given him a PBC 3 and we went

13   through the reasons for that.  And Jim was

14   very concerned about the rating and brought

15   up that I wasn't recognizing all his

16   contributions.

17         Q.   Do you remember anything else about

18   the first conversation?

19         A.   I think we agreed to speak again

20   where he was going to enunciate all his

21   contributions that he felt I wasn't

22   reflecting in the PBC.

23         Q.   We referred a few moments ago to an

24   employee summary?

25         A.   The employee summary is actually

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2     with respect to the several significant

3     remediation projects, you pointed that this

4     isn't something that Mr. Castelluccio did

5     singlehandedly, there were others that were

6     participating in achieving those goals, is

7     that your point?  I just want to make sure I

8     understand it.

9        A.  It's that he didn't lead these

10    necessarily.  He may have been a participant

11    in it.

12       Q.  Anything else?  Any others?

13       A.  The rest of them kind of restate

14    what was already written actually.

15       Q.  At the conclusion of your second

16    conversation, was it determined that you

17    would award him a 2 rating?

18       A.  It might have been the third

19    conversation.  We had at least two

20    conversations.  Maybe three.

21       Q.  So at the end of the second or the

22    third conversation, it was concluded that you

23    were going to give him a rating of 2; is that

24    correct?

25       A.  Yes.

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2        MS. DUBIN:  Objection to form.

3        You can answer.

4       A.   Did I change the PBC rating?

5       Q.   You heard the question.  The

6    question was you gave him a 2 rating in the

7    end, right?  We don't have any dispute about

8    that, the document establishes --

9       A.   I gave him a 2, yes.

10      Q.   And is it fair to assume that when

11   you gave him a 2, that that was the result of

12   your discussions with him and your

13   reflections about what was the appropriate

14   rating?

15       MS. DUBIN:  Objection to form.

16       You can answer.

17      A.   I don't remember exactly what I

18   went through in my, you know, what happened,

19   all that period of time, but I know I gave

20   him a 2 at the end.

21      Q.   And that was the result of

22   everything that you went through leading up

23   to that; was it not?

24      A.   I assume so.

25      Q.   And is it my understanding that

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2      there's a final rating for a year, I mean,

3      there's not preliminary, intermediate,

4      there's just one final rating; is that right?

5          MS. DUBIN:  Objection to form.

6          A.  I had given him his rating, which

7      was a 3, so that was what was entered into

8      the system as his rating.  We had our

9      discussions and I changed the rating to a 2.

10         Q.  So the final rating was 2?

11         A.  Yes.

12         Q.  Would you agree that the give and

13     take between an employee and a manager with

14     respect to the rating, that that's an

15     integral part of the PBC process?

16         A.  It's not usually.

17         Q.  In this particular instance with

18     respect to Mr. Castelluccio in 2007, was that

19     an integral part of the review process, the

20     discussion with him and his providing you

21     with additional details concerning his

22     performance?  Was that extraneous?

23         A.  It wasn't extraneous.

24         Q.  It was not?

25         A.  No.

Collins-Smee, Joanne

```
 1        J. Collins-Smee - Confidential

 2        Q.  Have you seen this letter before?

 3        A.  No.

 4        Q.  Do you know who Russ Mandel is?

 5        A.  Yes.

 6        Q.  Are you aware -- before reading

 7    this, were you aware he conducted an open

 8    door in connection with Mr. Castelluccio?

 9        A.  Yes.

10        Q.  When did you first learn about

11    that?

12        A.  Probably when I was interviewed as

13    part of the open-door process.

14        Q.  And what, if anything, did

15    Mr. Mandel tell you Mr. Castelluccio had

16    indicated to him?

17        A.  I don't remember he indicated

18    anything.

19        Q.  Did Mr. Mandel indicate to you that

20    Mr. Castelluccio had claimed age

21    discrimination?

22        A.  No, I don't remember that.

23        Q.  What do you remember, if anything,

24    about your meeting with Mr. Mandel in the

25    context of an open-door investigation
```

Collins-Smee, Joanne

1          J. Collins-Smee - Confidential

2          A.  Yes.

3          Q.  Did that ever occur?

4          A.  Yes.

5          Q.  What specifically happened?

6          A.  I was counseled.

7          Q.  By whom?

8          A.  By Tim Shaunghnessi.

9          Q.  What did Tim Shaunghnessi tell you?

10         A.  That I overrated Jim.

11         Q.  And what was the bases of

12    Mr. Shaunghnessi's opinion or statement that

13    you had overrated Mr. Castelluccio?

14             MS. DUBIN:  Objection if you know.

15         A.  I don't know.

16         Q.  What do you recall of your

17    conversation -- let me withdraw that.

18             Do you remember if you had a

19    telephone conversation with Mr. Shaunghnessi

20    or whether it was a face-to-face meeting?

21         A.  It was face to face.

22         Q.  When did that occur?

23         A.  I'm not sure.

24         Q.  Was it after this letter, if you

25    know, August of 2008?

IBM/Castelluccio                                    Page 272

Collins-Smee, Joanne

```
 1          J. Collins-Smee - Confidential

 2       A.  I'm not sure.

 3       Q.  Was it in 2008?

 4       A.  Yes.

 5       Q.  Was it before or after Mr. -- if

 6   you know, Mr. Castelluccio was terminated by

 7   IBM?

 8       A.  I'm not sure.

 9       Q.  And as best you can recall, what

10   specifically did Mr. Shaunghnessi say to you?

11       A.  I don't recall the exact

12   conversation.

13       Q.  What, if anything, do you recall of

14   the conversation?

15       A.  That I had overrated Jim.

16       Q.  And what was your response?

17       A.  That he was right.

18       Q.  Was there any outcome beyond that

19   discussion with Mr. Shaunghnessi?

20       A.  Could you -- I don't understand

21   your question.

22       Q.  Was that the end of the discussion?

23   Was there anything else that came out of your

24   discussion with Mr. Shaunghnessi?

25       A.  No.
```

Collins-Smee, Joanne

1       J. Collins-Smee - Confidential

2            MS. DUBIN:  Objection.  I don't

3       think you laid a foundation regarding

4       her knowledge of when the open door was

5       initiated.

6            MR. CARTA:  Fair enough.  That's

7       fine.

8       Q.  Do you know when the open-door

9    investigation was initiated?

10      A.  No.

11      Q.  Do you know that the open-door

12   investigation was initiated prior to the time

13   that you met with Mr. Mandel?

14      A.  That would be why Russ would meet

15   with me.

16      Q.  Good, okay.  So let's take that as

17   a point in time.

18      A.  Okay.

19      Q.  Do you remember whether

20   Mr. Shaunghnessi spoke to you about your

21   rating of Mr. Castelluccio before or after

22   you met with Mr. Mandel?

23      A.  After.

24      Q.  I would like to turn our attention

25   to the January-February timeframe of 2008.

Collins-Smee, Joanne

1           J. Collins-Smee – Confidential

2               MS. DUBIN:  Objection, compound

3       question.

4           You can answer.

5       A.   Can you break those down, please?

6       Q.   What steps did you take to help

7    Mr. Castelluccio find a job in that timeframe

8    2007 and the first two months in 2008?

9       A.   Why the first two months of 2008?

10      Q.   Because that's the way I framed the

11      question.

12              MS. DUBIN:  I'm going to object to

13      the question and the facts assume the

14      premise.

15          If you understand, you can answer.

16      Q.   Is it easier if I just make it

17   2007?  I will be glad to do that for you,

18   ma'am, if that makes the question easier for

19   you.

20      A.   In 2007?

21      Q.   What specific steps can you

22   identify that you took to assist

23   Mr. Castelluccio to obtain employment

24   elsewhere in IBM in 2007?

25      A.   I counseled him on him looking and

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2    checking with his colleagues, networking,

3    that's how executives usually get new roles

4    in IBM.

5        Q.  So you provided counseling.

6            What else?

7        A.  In 2007, I'm not sure he was on any

8    of the other drills, the Mofat drill or -- I

9    know you showed me some documents earlier.

10   I'm not sure when he started being on those

11   other drills.

12       Q.  What, if anything, did you have to

13   do with him getting added to those drills?

14       A.  I discussed it with HR.  And then

15   he was added.

16       Q.  You have a specific recollection of

17   discussing with HR adding him to other

18   drills?

19       A.  I don't remember a specific

20   conversation, but it's probable.

21       Q.  But you don't remember?

22       A.  I don't remember a date and a

23   specific conversation.

24       Q.  Who in HR do you believe you spoke

25   with to have him added to other five-minute

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2    drills?

3        A.  It would be Keith Holmes.

4        Q.  Anybody else?

5        A.  He would have spoken to his HR

6    colleagues that supported the other areas.

7        Q.  And did you review any other

8    five-minute drills to see if Mr. Castelluccio

9    was indeed listed on any of them?

10        A.  I remember being part of other

11    five-minute drills where we discussed Jim's

12    availability.

13        Q.  And what other five-minute drills

14    were you a part of where his candidacy was

15    discussed?

16        A.  My boss'.

17        Q.  Mr. Zapfel's?

18        A.  Yes.

19        Q.  Any others?

20        A.  He was on, I think he was also on

21    Pat Kerin's drill.

22        Q.  Okay.  Anything else that you did

23    in 2007 to assist Mr. Castelluccio in

24    obtaining employment elsewhere in IBM?

25        A.  Not that I remember right now.

Collins-Smee, Joanne

1      J. Collins-Smee - Confidential

2          MR. CARTA:  Let's go off the record

3      for a minute, please.

4          (Recess taken from 5:35 p.m. to

5      5:43 p.m.)

6   BY MR. CARTA:

7      Q.  In 2008, what steps, if any, can

8   you specifically recall that you took to

9   assist Mr. Castelluccio to obtain employment

10  elsewhere in IBM?

11     A.  I represented Jim during drills.  I

12  encouraged him to network and get out there

13  and talk to his colleagues.

14     Q.  Right.

15     A.  I spoke to a couple of people

16  directly that had big areas of responsibility

17  that I thought Jim's skill set might be a

18  match for.

19     Q.  And who were those people?

20     A.  I don't remember all of them.

21     Q.  You said you spoke to a couple of

22  people.

23     A.  Uh-huh.  I spoke to Liz Smith, who

24  ran a big technology team.  I think I spoke

25  to whoever was the CIO at that point of IBM.

IBM/Castelluccio                                    Page  296

Collins-Smee, Joanne

1        J. Collins-Smee - Confidential

2    I probably spoke to my colleagues, a couple

3    of my colleagues that worked for my boss

4    about their areas.

5        Q.   Were those conversations that took

6    place in May of 2008?

7        A.   Some were in May.  Others were

8    through the year.

9        Q.   What do you recall, if anything, of

10   the circumstances surrounding

11   Mr. Castelluccio being offered a severance

12   package in June of 2008?

13       A.   Jim was looking for a job for about

14   five-and-a-half months at that point.  Had

15   not found anything.  So we decided that he

16   would be given a severance package.

17       Q.   And who is "we"?

18       A.   Myself with my boss.

19       Q.   Mr. Zapfel?

20       A.   Yes.

21       Q.   And did anyone else participate in

22   that decision?

23       A.   I'm sure HR was privy to some of

24   those conversations.

25       Q.   They're privy to the conversations,

Collins-Smee, Joanne

```
 1          J. Collins-Smee - Confidential

 2     but did anyone else participate in the

 3     decision?

 4        A.  I'm confused at the question.

 5        Q.  Did anyone else participate in the

 6     decision to sever Mr. Castelluccio's

 7     employment at that time?

 8        A.  Not that I remember.

 9        Q.  And the reason it was decided to

10     terminate him at that time was because he

11     wasn't able to find work in 2008?

12        A.  Yes.

13        Q.  What conversations, if any, do you

14     recall having with him indicating to him that

15     his employment was being severed?

16        A.  When he received the package.  I

17     told him he was receiving the package.

18        Q.  Did you hand him the package?

19        A.  I don't remember if I gave it to

20     him or if my HR partner gave it to him or

21     sent it to him.

22        Q.  Do you recall whether you met with

23     him first and told him the package was

24     coming, and then Mr. Holmes -- if you recall,

25     Mr. Holmes then gave him the package after
```

Collins-Smee, Joanne

```
1          J. Collins-Smee - Confidential

2     that?

3          A.   I don't remember the sequence.

4     Probably I met with him before Keith would

5     send it.

6          Q.   What do you recall, if anything,

7     with respect to the meeting you had with

8     Mr. Castelluccio in which you informed him

9     that he was being severed?

10         A.   I don't remember the exact

11    conversation.

12         Q.   What, if anything, do you remember?

13         A.   I remember telling him that he had

14    not found a job, that he was going to be

15    severed and that he would also be able to

16    take his retirement, that would be part of

17    the, you know, the package.

18         Q.   At that time, did you tell him he

19    was being fired for cause?

20         A.   No, I don't know what you mean.

21         Q.   Did you use the phrase "for cause"?

22         A.   No, I don't think so.

23         Q.   At that time, did you tell him he

24    was being fired because of poor performance?

25         A.   I don't think so, no.
```

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,

                Plaintiff,

– against –

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Defendant.

CIVIL ACTION NO.
3:09 CV 1145 (DJS)

September 20, 2010

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT IBM'S MOTION FOR SUMMARY JUDGMENT</u>**

ORAL ARGUMENT IS REQUESTED

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|

I.     INTRODUCTION ................................................................1

II.    STATEMENT OF FACTS ................................................3

    A.    Castelluccio's Employment as Vice President of Public Sector Delivery ................................................3

    B.    Castelluccio is Removed From the Role of VP PSD and Reassigned as the Senior DPE on the WellPoint Account ........................6

    C.    WellPoint Is Dissatisfied with Castelluccio's Leadership on Its Account ................................................7

    D.    Castelluccio is Removed from the WellPoint Account and Responsible for Securing A New Assignment ........................10

    E.    Castelluccio's 2007 Performance Evaluation and February 15, 2008 Email to Garrett Walker ................11

    F.    Castelluccio's Inability To Secure A New Assignment Resulted In His Separation ................................13

        1.    Collins-Smee Notifies Castelluccio on June 2, 2008 of His Termination ................................14

        2.    Castelluccio's June 13th Complaint of Age Discrimination and the Resulting Open Door Investigation ................15

ARGUMENT ................................................................17

I.     CASTELLUCCIO'S CLAIMS OF AGE DISCRIMINATION FAIL AS A MATTER OF LAW ................................................17

    A.    Castelluccio Cannot Meet the Burden Of Proving That His Age Was the "But-For" Cause Of His Alleged Mistreatment ........................17

    B.    Castelluccio Cannot Raise a Credible Claim of Age Discrimination With Regard To His Termination From IBM ........................20

    C.    Castelluccio's Alleged Evidence Of Age Discrimination Is Plainly Insufficient To Create Any Inference Of Inappropriate Conduct ............22

        1.    Three Isolated References to Retirement Plans During a Period of More than a Year Is Not Proof of Age Discrimination ................................22

        2.    Castelluccio Has No Other Evidence Of Age Discrimination ................................26

    D.    Castelluccio's Claims Regarding Removal From the VP of Public Sector and the WellPoint Positions Are Time-Barred ........................29

    E.    Castelluccio's Lateral Transfers Do Not Constitute Adverse Employment Actions ................................30

TABLE OF CONTENTS
(continued)

Page

F.    Even if Castelluccio's Transfer Claims Were Timely and Involved
      Adverse Actions – Which They Do Not – These Actions Were
      Plainly Based Upon Legitimate Business Reasons ................................31

G.    Castelluccio's Red Herring Claim Concerning "Just Cause" Is
      Irrelevant..........................................................................................32

II.    CASTELLUCCIO'S RETALIATION CLAIMS FAIL AS A MATTER
       OF LAW ...........................................................................................33

A.    Castelluccio Cannot Convert His Termination Into Retaliation By
      Complaining About Discrimination After-The-Fact ................................34

B.    Castelluccio's Attempt To Characterize His February Complaint
      As Protected Activity Is Unavailing .......................................................35

C.    Even Assuming *Arguendo* That Castelluccio's February Email
      Could Be Construed as a Complaint of Discrimination, His
      Complaint Was Never Conveyed to the Decision-Maker, Collins-
      Smee ...................................................................................................37

III.    CONCLUSION ...................................................................................38

TABLE OF AUTHORITIES

Page(s)

CASES

*Abbate v. Cendant Mobility Servs. Corp.,*
   No. 3-03-cv-1858 (DJS), 2007 WL 2021868 (D. Conn. July 13, 2007) ................................. 20

*Abdu-Brisson v Delta Air Lines, Inc.,*
   239 F.3d 456,466 (2d Cir, 2001) ........................................................................................... 17

*Alam v. HSBC Bank USA, N.A.,*
   No. 07 Civ. 3540 (LTS) (JCF), 2009 WL 3096293 (S.D.N.Y. 2009), *aff'd,* No. 09-
   4468-CV, 2010 WL 2573588 (2d Cir. June 28, 2010) .......................................................... 19

*Ash v. Tyson Foods, Inc.,*
   546 U.S. 454 (2006) ............................................................................................................... 28

*Baron v. Port Auth. of New York and New Jersey,*
   271 F.3d 81 (2d. Cir. 2001) .................................................................................................... 33

*Blumenschine v Prof'l Media Group, LLC,*
   No. 302CV2244 (DJS), 2005 WL 3019122 (D. Conn. Nov. 9, 2005) ................................... 17

*Bombero v. Warner-Lambert Co.,*
   142 F. Supp. 2d 196 (D. Conn. 2000) .................................................................................... 38

*Byrnie v Town of Cromwell Bd. of Educ.,*
   243 F. 3d 93 (2d Cir. 2001) .................................................................................................... 27

*Charles v Connecticut Judicial Branch,*
   556 F. Supp. 2d 123 (D. Conn. 2008) .................................................................................... 30

*Coccaro v AT&T Corp.,*
   No. 303CV914 (DJS), 2005 WL 1711967 (D. Conn. July 20, 2005) ..................................... 27

*Colosi v. Electri-Flex Co.,*
   965 F.2d 500 (7th Cir. 1992) .................................................................................................. 23

*Cordes v. Gaymar Indus., Inc.,*
   No. 99-7886, 205 F.3d 1322, 2000 WL 232136 (2d Cir. Feb. 2, 2000) ........................... 18, 29

*Donahue v. Norwich Roman Catholic Diocesan Corp.,*
   No. 3:05 CV 413 (CFD), 2008 WL 821890 (D. Conn. Mar. 26, 2008) ................................. 38

*Drummond v. IPC Int'l, Inc.,*
   400 F. Supp. 2d 521 (E.D.N.Y. 2005) .................................................................................... 28

TABLE OF AUTHORITIES
(continued)

Page(s)

*EEOC v. Texas Instruments, Inc.,*
  100 F.3d 1173 (5th Cir. 1996) .................................................................................... 23

*Faldetta v. Lockheed Martin Corp.,*
  No. 98 Civ. 2614 (RCC), 2000 WL 1682759 (S.D.N.Y. Nov. 9, 2000) ................................ 21

*Galabya v. New York City Bd. of Educ.,*
  202 F.3d 636 (2d Cir. 2000) .............................................................................. 30, 31

*Garrett v. Garden City Hotel, Inc.,*
  No. 05-CV-0962 (JFB)(AKT), 2007 WL 1174891 (E.D.N.Y. Apr. 19, 2007) ....................... 35

*Gorzynski v. JetBlue Airways Corp.,*
  596 F.3d 93 (2d Cir. 2010) ............................................................................... 19, 24

*Gross v. FBL Fin. Servs., Inc.,*
  __ U.S. __, 129 S. Ct. 2343 (2009) .......................................................................... 18

*Hampton v. Diageo N. Am., Inc.,*
  No. 3:04cv346 (PCD), 2008 WL 350630 (D. Conn. Feb. 7, 2008) ................................... 35

*Harvey v Mark,*
  352 F. Supp. 2d 285 (D. Conn. 2005) ....................................................................... 17

*Henderson v. Gen. Elec. Co.,*
  469 F. Supp. 2d 2 (D. Conn. 2006) ..................................................................... 19, 25

*Holcomb v. Iona Coll.,*
  521 F.3d 130 (2d Cir. 2008) .................................................................................. 18

*Holowecki v. Fed. Express Corp.,*
  No. 09-3477-cv, 2010 WL 2573864 (2d Cir. June 24, 2010) ...................................... 17, 19

*Holt v. KMI-Cont'l, Inc.,*
  95 F.3d 123 (2d Cir. 1996) .................................................................................... 29

*Int'l Healthcare Exch., Inc., v. Global Healthcare Exch.,*
  470 F. Supp. 2d 345 (S.D.N.Y. 2007) ....................................................................... 36

*Kalra v. HSBC Bank USA, N.A.,*
  567 F. Supp. 2d 385 (E.D.N.Y. 2008) ....................................................................... 21

*Kessler v. Westchester County Dep't of Soc. Servs.,*
  461 F.3d 199 (2d Cir. 2006) .................................................................................. 34

TABLE OF AUTHORITIES
(continued)

Page(s)

*Kolesnikow v. Hudson Valley Hosp. Ctr.*,
    622 F. Supp. 2d 98 (S.D.N.Y 2009) ............................................................... 29

*Martin v. Town of Westport*,
    329 F. Supp. 2d 318 (D. Conn. 2004) ............................................................ 35

*Matlosz v. J.P. Morgan Chase*,
    No. 03 Civ. 6235 (JGK), 2005 WL 2242196 (S.D.N.Y. Sept. 3, 2005) .................. 37

*McDonnell-Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ..................................................................................... 17

*Montana v. First Fed. Sav. & Loan Ass'n of Rochester*,
    869 F.2d 100 (2d Cir. 1989) ......................................................................... 27

*Morrison v. Potter*,
    363 F. Supp. 2d 586 (S.D.N.Y. 2005) ............................................................ 31

*Nieves v Avalonbay Cmtys., Inc.*,
    No. 3:06CV00198 (DJS), 2007 WL 2422281 (D. Conn. Aug. 23, 2007) ............... 27

*O'Connor v. Consol. Coin Caterers Corp.*,
    517 U.S. 308 (1996) ..................................................................................... 27

*O'Hazo v Bristol-Burlington Health Dist.*,
    599 F. Supp. 2d 242 (D. Conn. 2009) ....................................................... 17, 18

*Pasha v. William M. Mercer Consulting*,
    No. 00 Civ. 8362 (RWS), 2004 WL 188077 (S.D.N.Y. Feb. 2, 2004) .................. 26

*Phillips v. Centrix Inc.*,
    No. 09-1012-cv, 2009 WL 4255427 (2d Cir. Dec. 1, 2009) ................................ 19

*Pipkin v. Bridgeport Bd. of Educ.*,
    323 F. Supp. 2d 326 (D. Conn. 2004) ............................................................ 29

*Pratesi v. New York State Unified Ct. Sys.*,
    No. 08-4828 (DRH) (MLO), 2010 WL 502950 (E.D.N.Y. Feb. 9, 2010) ............... 30

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) ...................................................................... 23, 26

*Robles v. Argonaut Rest. & Diner, Inc.*,
    No. 05 CV 5553 (JSR), 2009 WL 3320858 (S.D.N.Y. Oct. 9, 2009) .................... 37

TABLE OF AUTHORITIES
(continued)

Page(s)

*Savarese v. William Penn Life Ins. Co. of New York,*
    418 F. Supp. 2d 158 (E.D.N.Y. 2006) ....................................................................31

*Scaria v. Rubin,*
    117 F.3d 652 (2d Cir. 1997) ...............................................................................27

*Schnabel v Abramson,*
    232 F.3d 83 (2d. Cir. 2000) ...........................................................................17, 18

*Schug v. Pyne-Davidson Co.,*
    No. 3:99-CV-1493 (CFD), 2001 WL 34312877 (D. Conn. Dec. 10, 2001)............................23

*Szarzynski v. Roche Labs., Inc.,*
    No. 07-CV-6008, 2010 WL 811445 (W.D.N.Y. Mar. 1, 2010) .......................................36, 37

*Tomassi v. Insignia Fin. Group, Inc.,*
    478 F.3d 111 (2d Cir. 2007) ...............................................................................24

*Vuong v. New York Life Ins. Co.,*
    2009 WL 306391 (S.D.N.Y. Feb. 6, 2009), *aff'd,* No. 09-0974-cv, 2010 WL 93157
    (2d Cir. Jan. 12, 2010) ...................................................................................30

*Wado v. Xerox Corp.,*
    991 F. Supp. 174 (W.D.N.Y. 1998) ........................................................................29

*Wagner v. Geren,*
    No. 8:08 CV 208, 2009 WL 2105680 (D. Neb. July 9, 2009)...............................................23

*Wallace v O.C. Tanner Recognition Co.,*
    299 F.3d 96 (1st Cir. 2002).................................................................................25

*Wanamaker v. Columbian Rope Co.,*
    108 F.3d 462 (2d Cir. 1997) ...............................................................................18

*Williams v Quebecor World Infiniti Graphics,*
    456 F. Supp. 2d 372 (D. Conn. 2006)......................................................................26

*Zawacki v. Realogy Corp.,*
    628 F. Supp. 2d 274 (D. Conn. 2009)......................................................................35

*Zerilli-Edelglass v. New York City Transit Auth.,*
    333 F.3d 74 (2d Cir. 2003) ...............................................................................29

*Ziegler v. Beverly Enterprises-Minnesota,Inc.,*
    133 F.3d 671 (8th Cir. 1998) ...............................................................................23

TABLE OF AUTHORITIES
(continued)

Page(s)

STATUTES

29 U.S.C. §623(d)................................................................................................34

29 U.S.C. §626(d)(2)..........................................................................................29

## I.     INTRODUCTION

Plaintiff James Castelluccio, a former IBM executive, claims that he was the victim of age discrimination and retaliation when IBM separated him on June 30, 2008.  Nothing could be further from the truth.

For several years prior to the events in this case, Castelluccio had been the subject of numerous well-documented complaints by peers, subordinates and external clients regarding his lack of leadership, initiative and focus as the Vice President of Public Sector Delivery ("PSD") for IBM's Integrated Technology Delivery organization ("ITD").   Significantly, Castelluccio admitted that he has no evidence that any of these individuals harbored any age-based animus towards him.

When his new manager Joanne Collins-Smee (herself over 50 years old) removed him from the VP PSD position in February 2007 as a result of these complaints, she reassigned him to another position, with no change in salary or benefits, where he would be in charge of just one account instead of thirty.  Castelluccio did not succeed in this position either, engendering any number of complaints from the client and co-workers.  He was removed from that position, at the client's specific request, effective January 1, 2008 and replaced by a long-term IBM manager who at the time was 60, only one year younger than Castelluccio.  IBM then provided Castelluccio six months at full salary, with no operational responsibilities, to use his contacts to find another position within IBM.  Despite the assistance of his manager, Castelluccio failed to find a new role at IBM and was separated on June 30, 2008.

Castelluccio's sole evidence of alleged age discrimination is his naked allegation that, on three separate occasions spanning more than a year, his manager referenced his

eligibility to receive full retirement benefits, should he choose to retire. Even if Ms. Collins-Smee referred to his retirement exactly as alleged – which she denies – three comments about retirement eligibility during the course of a year will not support an inference of age discrimination. There are no allegations that his manager denigrated him in any way, referred to his age in an adverse fashion, or demanded that he retire. There is no statistical evidence to support his claim of age discrimination (indeed, quite to the contrary), and no proof that any executive at IBM was provided with more than 6 months to find another position prior to termination. His manager's alleged comments must be viewed in the context of his need to find a new position at IBM, precipitated by the well-documented, pre-existing record of dissatisfaction with Castelluccio's performance in several different positions on the part of both internal and external customers.

Castelluccio's retaliation claim is even more clearly flawed because he can point to no "opposition" conduct prior to the termination decision on which to base a retaliation claim. His first complaint of age discrimination occurred in an email dated June 13, 2008, several days *after* Castelluccio was offered a separation package (and several days after he first met with counsel). His efforts to recast an earlier email to IBM Human Resources as protected "opposition" simply will not withstand scrutiny. More importantly, it is undisputed that his supervisor, who made the decision to terminate his employment, knew nothing about any such complaint at the time that decision was made.

For the reasons set forth in this Memorandum, IBM is entitled to summary judgment on each of Plaintiff's claims.

II.    STATEMENT OF FACTS[1]

A.    Castelluccio's Employment as Vice President of Public Sector Delivery.

Castelluccio joined IBM in March 1968, and became a Vice President in August 2000, a Band C level executive position within IBM.[2] (Pl. Dep. 116:4-7, 121:5-9; Fasman Aff. Ex. 9 (Plaintiff Work History Detail Report at IBM00000847).)[3]  On or about January 1, 2005, he was appointed Vice President of Public Sector Delivery, within IT Delivery Americas, an organization focused on setting up and maintaining Information Technology (IT) resources for companies, including installing and maintaining IT hardware, managing IT networks and processes, and refreshing equipment as necessary.  (Fasman Aff. Ex. 9; Holmes Dep. 79:23-80:22; Pl. Dep. 119:22-25.)   ITD services clients who are brought into IBM by their parent organization, Global Technology Services ("GTS"). (Liederbach Decl. ¶ 3; Brickmeier Dep. 16:22-17:4.)[4] As VP PSD, Castelluccio led and managed the teams responsible for delivering IT

---

[1] For the reasons explained more fully below, Castelluccio cannot challenge his two lateral transfers in this proceeding on timeliness grounds and because these transfers were not adverse employment actions.  IBM submits that the facts surrounding those transfers (and any disputes about those facts) are not material to this lawsuit, which should be limited to Castelluccio's termination.  The discussion of the circumstances leading up to Castelluccio's termination are set forth in this Memorandum, and in IBM's accompanying Rule 56 statement, to provide context for the Court, and also to provide factual background in the event the Court were to conclude that Castelluccio can challenge his transfers as well as his termination.

[2] At IBM, there are four levels or "bands" of executive positions:  A, B, C, and D.  Band A is the most senior executive and Band D is the lowest level executive position.  (Pl. Dep. 179:11-180:9; Brickmeier Dep. 80:5-11.)

[3] "Fasman Aff. Ex. __" refers to the exhibits attached to the accompanying Affirmation of Zachary D. Fasman, dated September 20, 2010.  In addition, true and correct copies of excerpts from original transcripts of depositions of Plaintiff James Castelluccio ("Pl. Dep."), Joanne Collins-Smee ("Collins-Smee Dep."), Keith Holmes ("Holmes Dep."), Garrett Walker ("Walker Dep."), Barbara Brickmeier ("Brickmeier Dep."), and Patricia O'Malley ("O'Malley Dep.") are attached as Fasman Aff. Exs. 3-8, respectively.

[4] "Liederbach Decl." refers to the accompanying Declaration of David Liederbach, dated September 16, 2010.

3

resources to more than thirty public sector IBM accounts. (Pl. Dep.123:17-126:22, 142:6-21.) His responsibilities also included managing "the financials, [and] the other performance issues that go with the delivery side of those contracts," customer satisfaction, i.e. "deliver[ing] day-to-day running of the customer's environment" as well as interacting with internal IBM clients within the GTS organization, who handle the sales and customer relations side of those contracts. (Pl. Dep. 125:10-126:22.)

Throughout Castelluccio's tenure as Vice President of PSD, complaints persisted from both internal and external clients regarding his responsiveness and leadership.   In particular, David Liederbach,[5] the General Manager of the Public Sector organization within GTS, received numerous complaints from his subordinates and customers about Castelluccio and as early as 2006 raised the possibility of a need for a leadership change with Arthur Kelton Jones, Castelluccio's then first-line manager. (Liederbach Decl. ¶ 4-5, Ex. A.)  Liederbach spoke directly with Castelluccio in May, 2006 about his concerns and obtained a commitment from Castelluccio to improve communications, service delivery execution and to provide "[c]lient centric and proactive leadership."  (Pl. Dep. 106:9-107:4; Liederbach Decl.¶ 6, Ex. B.)

Despite this, Castelluccio continued to draw criticism from both internal and external clients. (Liederbach Decl.¶ 7.)  In addition to Liederbach, the Senior Account Executive for WellPoint, Keenie McDonald,[6] received numerous complaints about Castelluccio's performance from his colleagues, who complained that Castelluccio was not responsive and not

---

[5] Liederbach's responsibilities included sales and client relations on all GTS contracts in the public sector. (Liederbach Decl. at ¶ 2.)

[6] Ms. McDonald was Managing Director for IBM Sales and Distribution responsible for the WellPoint account.  (McDonald Decl. ¶ 1.) "McDonald Decl." refers to the accompanying Declaration of Keenie McDonald, dated September 18, 2010.

providing necessary leadership on this account.  (McDonald Decl. ¶ 4, Ex. A.)  McDonald also raised her concerns directly to Castelluccio.  (McDonald Decl. ¶ 5, Ex. B.)

In early February 2007, Joanne Collins-Smee took over as Castelluccio's first-line manager, replacing Kelton Jones as General Manager of IT Delivery Americas. (Collins-Smee Dep. 20:18-21:2.)  Collins-Smee was 50 years old at the time.  (Fasman Aff. Ex. 10 (Defendant's Response to Interrogatory No. 2 Exhibit A at 1).)  As manager of a team of IBM Vice Presidents and senior executives, Collins-Smee had overall responsibility for the delivery of IT and strategic outsourcing services to IBM clients in the Americas.  (Collins-Smee Dep. 20:18-21:10, 24:7-26:7.)  Liederbach immediately discussed with her his on-going concerns about Castelluccio and his desire for a quick management change to replace Castelluccio, a course he had advocated unsuccessfully in the past. (Liederbach Decl. ¶ 8, Ex. C; Collins-Smee Dep. 49:16-50:24, 62:5-63:20, 64:13-22.)  Liederbach specifically had concerns about Castelluccio's lack of leadership and his responsiveness.  (Liederbach Decl. Ex. C; Collins-Smee Dep. 62:9-63:20.)  McDonald raised similar concerns almost immediately after Ms. Collins-Smee took over.  (McDonald Decl. ¶ 6, Ex. C.)

Collins-Smee and Liederbach continued their dialogue about Castelluccio during the month of February.  Liederbach told Collins-Smee that he had concerns about Castelluccio's lack of leadership in resolving outages, specifically when the client suffered either an interruption or degradation in service, and other service delivery issues.  (Liederbach Decl. ¶ 9; Collins-Smee Dep. 62:9-63:20, 64:13-22.)  Collins-Smee observed Castelluccio during this time as well, and had concerns herself about his performance. (Collins-Smee Dep. 119:7-23.)

B.     Castelluccio is Removed From the Role of VP PSD and Reassigned as the Senior
DPE on the WellPoint Account.

By the end of February, Collins-Smee had decided that Castelluccio should be removed from his VP role managing the Public Sector because he was not "exhibiting the proper leadership of the accounts in the public sector." (Collins-Smee Dep. 117:10-20.)  On February 28, 2007, Collins-Smee spoke with Castelluccio about the need to replace him.  (Collins-Smee Dep. 119:3-23; Fasman Aff. Ex. 11 (Collins-Smee Dep. Ex. 10, IBM00093410).)  Collins-Smee explained that she had observed him, she had received numerous complaints from Liederbach and his team, McDonald and her team, and she needed to move him elsewhere. (Collins-Smee Dep. 119:7-15.)  Shortly thereafter, she relayed this conversation to Keith Holmes, her Human Resources representative.  (Fasman Aff. Ex. 11.)  In her email, she noted that Castelluccio "understands," "wants to move," and "knew for a while that it was not working out." (Fasman Aff. Ex.11.)

Collins-Smee asked Holmes to start a search for Castelluccio's replacement. (Holmes Dep. 57:7-21)  The VP PSD position was placed on a Five Minute Drill, an internal IBM procedure for filling management slots, where IBM organizations compile lists of open executive positions, slates of employees who may be qualified for such roles, lists of employees who are available for new roles because they are not currently in a position, and then discuss the employees and their suitability for various roles. (Fasman Aff. Ex. 12 (April 5, 2007 Five Minute Drill at IBM00099186)); Holmes Dep. 80:3-7; Brickmeier Dep. 77:20-78:10.)  Through this process, Miguel Echavarria, a 27 year IBM Band C executive, was identified as the best candidate for the VP PSD position.  (Collins-Smee Dep. 146:7-22; Fasman Aff. Ex. 13 (Collins-Smee Dep. Ex.14 IBM00093411).)  At the time, Echavarria was 49 years old.  (Fasman Aff. Ex. 10 at 1.)

6

At the same time, Collins-Smee requested that Castelluccio be placed on the Five Minute Drills for ITD and GTS, to help find him another position. (Fasman Aff. Ex. 11.) Holmes "supported the 5-Minute Drill effort" at this time in terms of helping Castelluccio find another position. (Holmes Dep. 88:2-8.) Castelluccio would be listed as an individual who was available for another position and be discussed on the calls to see if anyone knew of a position for him, and to suggest him as a candidate. (Holmes Dep. 90:3-91:20, 112:4-19.)

On March 31, 2007, however, Collins-Smee decided to reassign Castelluccio, at least temporarily, as the Senior Delivery Project Executive ("SDPE") on the WellPoint account, replacing the WellPoint DPE who had resigned earlier in March. (Collins-Smee Dep. 148:11-149:2; Pl. Dep. 156:15-24; Fasman Aff. Ex. 14 (Pl. Dep. Ex. 7 IBM00011671).) Although this position had been a lower-rated D Band Director position, Castelluccio remained a Vice President, Band C executive in this role, with no change in his salary and benefits. (Pl. Dep. 179:11-181:18.)

In June 2007, Echavarria replaced Castelluccio in the VP PSD role. (Fasman Aff. Ex. 2, Amended Answer ¶ 23; Pl. Dep. 163:11-23.). While Castelluccio now alleges that he was angry about being replaced by Echavarria, Castelluccio never claimed that his replacement by Echavarria was an act of age discrimination until after he was notified that his IBM employment was at an end, more than a year later. (Pl. Dep. 177:3-10, 184:19-22.)

C.    WellPoint Is Dissatisfied with Castelluccio's Leadership on Its Account.

Collins-Smee expected Castelluccio's performance to improve following his reassignment to a role managing a single account. (Collins-Smee Dep. 168:7-169:20.) Castelluccio's oversight of the WellPoint account since its inception and his IBM knowledge and

7

experience suggested he was well suited to step in for the DPE who resigned. (*Id.* Pl. Dep. 166:4-167:24.) WellPoint was a difficult account, but by his own estimation Castelluccio had been used by his prior managers as a troubleshooter for such accounts and "had built a reputation as a person who comes in and fixes troubled accounts." (Pl. Dep. 167:8-24, 254:19-255:6; Fasman Aff. Ex. 15 (Pl. Dep. Ex. 13 at IBM00017433); Collins-Smee Dep. 165:19-166:2.) Had Castelluccio performed well in this role, IBM would have considered retaining him in that assignment, if he so desired. (Collins-Smee Dep. 214:15-20; Holmes Dep. 140:10-23.)

This did not happen. In fact, WellPoint quickly became dissatisfied with Castelluccio's leadership. (McDonald Decl. ¶ 8, Exs. D and E.) WellPoint's main complaints about Castelluccio related to the inability to reach him during critical situations and his lack of leadership on the SWAT calls. (Collins-Smee Dep. 230:11-231:8.) A "SWAT call" is an all hands-on-deck conference call generated by a critical client situation – the IBM team and the client's team get together to figure out what is causing the outage, and why "a piece of the customer's environment is down and not working." (Pl. Dep. 134:2-13.) The SDPE (or DPE) is responsible for managing "SWAT calls" and the strategic work required on the account. (Collins-Smee Dep. 235:4-9.)

From March 2007 through August of 2007, Keenie McDonald, IBM's Managing Director for the WellPoint account, raised numerous complaints she received from Mark Boxer, WellPoint's Chief Operating Officer, regarding Castelluccio and poor service delivery. (McDonald Decl. ¶ 9.) For example:

- In March 2007, Boxer complained that the outages that took their call centers down were "due to poor delivery from IBM." (McDonald Decl. ¶ 10; Ex. F at IBM00085685).) In response to an email, McDonald stressed, "our failure to

8

execute on items we agree to is killing us at this account." (McDonald Decl. ¶ 10, Ex. G.).

- In April 2007, McDonald raised another outage issue about which Boxer had complained, stating that "our delivery response to the incident appears to have been poor," and noted that Boxer called multiple times complaining that "[IBM's] poor response…is in large part because we do not have a delivery leader minding wellpoint." (McDonald Decl. ¶ 11, Ex. H (IBM00086683).)

- In May 2007, Boxer also complained that "Jim is invisible from what I can tell." (McDonald Decl. ¶ 12, Ex. I at IBM0086951.)

- In early June 2007, McDonald stressed the need to find another DPE after another outage at WellPoint, stating "we have a temporary person in place who adds no value at all & the client sees it," and noted that "Boxer said the lack of delivery leadership is evident and frustrating to WellPoint." (McDonald Decl. ¶ 13, Exs. J and K at IBM00087133.)

- Boxer sent emails in August 2007 asking "where is jim c in all this" when WellPoint was having a serious issue with an outage. (McDonald Decl. ¶ 14, Ex. L.)

Boxer finally reported to McDonald that, "Bob [Zapfel] needs to know we are out of time on delivery leadership." (McDonald Decl.¶ 15, Ex. M at IBM00088169.) Boxer expressly criticized the "lack of consistent, dedicated and engaged account specific delivery leadership," and months after Castelluccio was fully engaged in the WellPoint role, Boxer noted that he welcomed the idea of a "new delivery leader who will help us sort out the challenges we face together." (McDonald Decl.¶ 16, Ex. N.)

Given WellPoint's dissatisfaction with Castelluccio, Collins-Smee continued the search for a permanent replacement for the SDPE position on the WellPoint account. (Collins-Smee Dep. 217:9-221:7, 228:16-229:5.) Ultimately, Gordon Crawford, a Band C executive returning to the US from an assignment in Europe, was selected and approved to fill the Senior DPE-WellPoint position. (Holmes Dep. 138:19-139:24; Collins-Smee Dep. 218:7-23.)

Crawford at the time was 60 years old, just one year younger than Castelluccio.  (Fasman Aff. Ex. 10 at 4.)

      D.    Castelluccio is Removed from the WellPoint Account and Responsible for Securing A New Assignment

In November 2007, Collins-Smee informed Castelluccio of Crawford's selection and that Castelluccio was being removed from the SDPE position effective January 1, 2008. (Pl. Dep. 71:7-19, 193:12-194:7.)  Castelluccio also claims that Collins-Smee said that he could "bridge to retirement" or "we need to find you a job."  (Pl Dep. 71:20-72:12.)  Collins-Smee does not recall how the issue of retirement came up but recalls that Castelluccio said he was interested in continuing to work, and that is what they agreed to pursue. (Collins-Smee Dep. 101:15-20.)  Castelluccio admits in this conversation that they discussed that he would need to look for another assignment and Collins-Smee agreed to assist him in his search.  (Pl. Dep. 208:13-209:2.)[7]  Once again, although Castelluccio now claims to have been upset about

---

[7]  According to Castelluccio, Collins-Smee made one prior comment about retirement. Castelluccio testified that in his first meeting with Collins-Smee in February 2007, the first words out of Collins-Smee's mouth were "how old?", then she stopped herself and said "you are old enough to bridge to retirement, right?", to which he responded that he had no desire. (Pl. Dep. 25:6-23.)  Collins-Smee denies asking about Castelluccio's age at any time, and denies raising retirement during this initial meeting. (Collins-Smee Dep. 240:24-242:16.)  Moreover, because Castelluccio had turned 60 in March, 2007 and had 30 years of service, he was eligible for a full pension and would have had no need to bridge to retirement.  (Pl. Dep. 34:17-35:2; Fasman Aff. Ex. 9).  Significantly, Castelluccio admitted that Collins-Smee never said that he was too old to do the job or made any other adverse comments related to his age, and never suggested that he retire.  (Pl. Dep. 36:3-38:5.)  In fact, Castelluccio recalled that Collins-Smee spent the rest of their initial meeting discussing his accounts with him, specifically WellPoint, and that he did not leave this initial meeting with Collins-Smee feeling that he was removed from his position or that any action was going to be taken against him.  (Pl. Dep. 61:6-22.) Castelluccio never complained to anyone about these alleged comments until this litigation. (Pl. Dep. 60:19-61:22.)

Crawford replacing him, he did not contact Human Resources or file any internal complaint at the time. (Pl. Dep. 203:22-204:7.)

Beginning in June 2007 and continuing through June 2008, Collins-Smee and Holmes included Castelluccio's name as part of the monthly Five Minute Drill process to assist him in identifying a new role. (Holmes Dep. 78:16-79:11; Collins-Smee Dep. 293:21-295:25, 296:7-13; Fasman Aff. Ex. 16 (Five Minute Drills from June 2007-June 2008).)   As discussed above, this Five Minute Drill process allows executives the opportunity to obtain different positions within the organization when they seek or are asked to make a career change. Executives, particularly those with IBM careers as long as Castelluccio's, are expected to draw on their own network of contacts within IBM to locate an alternative position to continue their careers. (Brickmeier Dep. 109:20-110:4) ("[I]f somebody's on the bench…it really is up to that individual to decide who they want to approach to let them know of their personal circumstance.") While current managers may assist in a job search, responsibility for success always remains with the executive. (Brickmeier Dep. 107:7-24) ("Ultimately it's the person's responsibility to find another job or things to do.")   Collins-Smee assisted his search by proactively recommending him to other managers on multiple occasions. (Collins-Smee Dep. 296:7-297:8.)

E.   Castelluccio's 2007 Performance Evaluation and February 15, 2008 Email to Garrett Walker.

In January 2008, Collins-Smee prepared Castelluccio's performance review for 2007; she rated him a "3" in the electronic system before discussing his performance review with him.   (Collins-Smee Dep. 254:7-16, 267:1-9.)   When Collins-Smee relayed her proposed evaluation to Castelluccio, he became upset and argued with Collins-Smee that he deserved a

11

higher rating.  *Id.*  Collins-Smee reconsidered his rating and ultimately changed it to a "2".
(Collins-Smee Dep. 264:21-25, 266:25-267:11; Holmes Dep. 77:3-8.)[8]

On February 15, 2008, Castelluccio wrote to Garrett Walker, Vice President,
Human Resources, IT Delivery (Walker Dep. 24:25-25:5), complaining about his 2007 review,
even though Collins-Smee had already changed his evaluation to a higher rating.  (Fasman Aff.
Ex. 17 (Pl. Dep. Ex. 10).)  Castelluccio's e-mail reads (in pertinent part):

> I completed a contested PBC evaluation on January 31, 2008.  my
> original evaluation, two days before, dropped my performance
> rating…After a subsequent phone conversation and my three page
> document restating my year's work, the rating was changed.
>
> I am not challenging the new rating; however I am concerned with
> the circumstances that led to the unfounded initial evaluation.  It
> was apparent to me that my prior write-up was of my contributions
> was not read.  My performance was dropped without any
> supporting data.
>
> ***
>
> The conclusion to be drawn from these events is that my
> performance was intentionally dropped … as a pretext to future
> plans, perhaps to hasten a retirement."

Walker scheduled a meeting with Castelluccio to determine what his concerns
were.  (Walker Dep. 62:23-63:22.)  Castelluccio and Walker subsequently met and discussed
Castelluccio's long-term career and his interest in how to pursue another job within IBM.
(Walker Dep. 63:23-64:13.)  They did not discuss his retirement or even his performance
evaluation, according to Walker.  (*Id.*)  Castelluccio now claims he raised a complaint of age

---

[8] At his deposition, Castelluccio testified that he never in fact was given the lower rating, but that
Collins-Smee was merely thinking about rating him a "3" and that she never changed his rating.
(Pl. Dep. 216:17-217:9; 227:6-13.)  This recent testimony conflicts with Castelluccio's own
contemporaneous writings about the performance rating as seen in his February 15, 2008 email
to Garrett Walker.

discrimination with Walker at this meeting (well before he was ever advised of any separation).[9] It is undisputed, however, that Walker took no steps to open an internal investigation into the matter, *see* n.9, and that neither Castelluccio nor Walker told Collins-Smee about Castelluccio's email or their subsequent meeting, or about any alleged complaint raised by Castelluccio concerning Collins-Smee. (Pl. Dep. 88:10-25; Walker Dep. 65:8-13.) Collins-Smee testified without equivocation that she knew nothing about this complaint at the time she terminated Castelluccio's employment. (Collins-Smee Dep. 270:4-22.)

        F.     Castelluccio's Inability To Secure A New Assignment Resulted In His Separation.

        Castelluccio continued to draw his full salary from January 1 through June 30, 2008, although he was assigned no job duties or responsibilities. (Pl. Dep. 256:20-257:3.) During this time, Castelluccio's sole task was to perform a job search. As discussed above, Castelluccio was placed on (i) the Bob Zapfel IO IT Delivery drills (worldwide) from June 2007 through June 2008 in the Key People to Move Section, with his entry noting he was "available for C or D jobs. Included in GTS drill," and in May 2008 was listed on the slate of candidates for the Director Global BTO Delivery position; and (ii) at least one GTS Americas Five Minute Drill in October 2007. (Fasman Aff. Ex. 16 (Five Minute Drills from June 2007-June 2008).) Castelluccio admitted that he did not want to be considered for a public sector position because of his issues with Liederbach. (Pl. Dep. 255:20-256:5.) While he was supposed to be trying to

---

[9] Walker vehemently denies this. (Walker Dep. 46:15-47:15; 62:10-22.) Walker testified that had Castelluccio even alluded to age discrimination in this conversation, Walker would have initiated an Open Door Investigation and followed protocol for handling a complaint of discrimination (Walker Dep. 47:4-15, 50:9-51:15, 62:10-22), which is exactly what he did several months later when Castelluccio in fact raised an age discrimination issue.

find another position internally, Castelluccio admitted that he "probably took more time off [between January and June 2008] than [he has] any time else in [his] career", which included paid vacation time off. (Pl. Dep. 263:13-264:5.)

1.     Collins-Smee Notifies Castelluccio on June 2, 2008 of His Termination.

After five months without any progress, Collins-Smee ultimately decided to terminate Castelluccio because he had failed to find another position. (Collins-Smee Dep. 297:9-20, 298:9-12, 299:6-7.) On May 30, 2008, Holmes provided Collins-Smee with talking points for her upcoming meeting with Castelluccio regarding his separation, and expressly noted for her discussion with Castelluccio that they "have been actively discussing [him] on numerous Drills, however, these discussion have not resulted in a new assignment for [him]" and that she "will continue to bring [his] name forward for consideration, to see if we can identify an opportunity for [him] during the next 30 days." (Fasman Aff. Ex. 18 (Holmes Dep. Ex. 19 at IBM00097767).)

Collins-Smee met with Castelluccio on June 2, 2008 to offer him a separation package, and notified him that his termination would be effective June 30, 2008, unless he found another position in the interim. (Fasman Aff. Ex. 19 (Pl. Dep. Ex. 18); Collins-Smee Dep. 298:13-299:17.) Collins-Smee never told Castelluccio he was terminated for cause or for performance reasons. (Collins-Smee Dep. 299:18-25.) During that meeting, Collins-Smee mentioned that Castelluccio was entitled to receive an enhanced separation package, in exchange for a release, and that he could retire. (Pl. Dep. 91:13-92:13; Collins-Smee Dep. 299:6-17.) Castelluccio met with Holmes after he received the separation packet, and told Holmes that he blamed Liederbach for much of what happened to him. (Holmes Dep. 156:13-

157:14.)Castelluccio never told Holmes that he was terminated for age discrimination.  (Holmes Dep. 159:15-17.)

2.   Castelluccio's June 13th Complaint of Age Discrimination and the Resulting Open Door Investigation.

On June 13, 2008, two weeks after he was notified of his impending termination and two days after he had consulted with attorneys about the separation agreement and release of claims that he had been provided, Castelluccio emailed Walker and lodged a complaint of age discrimination.  (Pl. Dep. 285:23-289:10, 291:10 -292:4; Fasman Aff. Ex. 20 (Pl. Dep. Ex. 24 (IBM00011690).)   The June 13, 2008 email attempts to recharacterize the prior email and discussions with Walker stating, in relevant part:

> \*\*\*
>
> …I raised my concerns with you that my manager's goal was to eliminate my position based on my age.
>
> In retrospect, reading through my notes, I see that I was systematically marginalized by my manager for the purpose of terminating my employment:
>
> - excluded from information pertaining to my work
>
> - superficial assistance in job placement
>
> - lower performance evaluation (which was later changed)
>
> - repeated references to my age and retirement eligibility
>
> \*\*\*
>
> …It is unseemly that a new manager is allowed to come into the department and undermine my professional reputation and my career based on age discrimination.
>
> (Fasman Aff. Ex. 20.)

In contrast to the statement in this email that Collins-Smee made repeated references to his age and retirement eligibility, Castelluccio admits (i) he recalls Collins-Smee made only one comment about his age and only one comment about the age of any other person

15

between February 2007 and June 2008 (Pl. Dep. 82:13-83:5); and (ii) he had only three conversations with Collins-Smee where she raised his eligibility for retirement. (Pl. Dep. 53:7-25, 75:11-21, 91:13-92:13.)  He has also admitted that no one else besides Collins-Smee had discriminated against him in any way. (Pl. Dep. 95:2-99:25.)

Upon receiving this email, Walker (who was no longer working with IT Delivery) sent the email to Russell Mandel, a senior Consulting HR Professional who runs IBM's internal appeals programs, for follow-up and to initiate an Open Door investigation. (Walker Dep. 72:3-74:6.)[10]  Walker viewed the email to contain a serious allegation regarding age discrimination and sent it directly to employee relations. (Walker Dep. 75:9-21.)

Mandel proceeded to open and conduct an Open Door investigation. (Fasman Aff. Ex. 21 (Open Door Investigation Report, IBM00091619-22).)  Mandel conducted a broad investigation, interviewing 21 individuals in addition to Castelluccio. *Id.*  The Open Door investigation uncovered a wealth of support for the complaints raised about Castelluccio's performance that had precipitated his removal from both the VP PSD position and the WellPoint SDPE position. *Id.*  Mandel observed that Collins-Smee had erred by overstating Castelluccio's 2007 performance, noting that "even '3' [the original, lower rating later raised in his favor] was a 'charitable' assessment considering Mr. Castelluccio's lack of success in 2007." *Id.*  The investigation also concluded that Collins-Smee's efforts to assist Castelluccio in finding a new role were consistent with IBM policy and that there was no evidence that any of her actions were

---

[10] An Open Door investigation is one of several internal mechanisms IBM has established to deal with employee complaints. (O'Malley Dep. 29:7-34:23.)  Mr. Mandel, as a senior Human Resources executive, conducts all of the Open Door investigations involving executives. (Walker Dep. 52:18-53:4.)

the result of age discrimination. *Id.*   Collins-Smee was, however, counseled for inflating Castelluccio's performance rating. (Collins-Smee Dep. 272:19- 273:17, 275:19-23.)

Castelluccio's employment with IBM ended on June 30, 2008, at which time he retired under IBM's retirement plan with his full pension. (Fasman Aff. Ex. 9 at IBM00000847.) On August 11, 2008, Mandel informed Castelluccio that the Open Door investigation had been completed and it was determined that he had been treated fairly regarding his separation from IBM. (Fasman Aff. Ex. 22 (IBM00094100).)  This lawsuit ultimately ensued. (*See* Complaint, Fasman Aff. Ex. 1.)

## ARGUMENT

I.    CASTELLUCCIO'S CLAIMS OF AGE DISCRIMINATION·FAIL AS A MATTER OF LAW.

A.    Castelluccio Cannot Meet the Burden Of Proving That His Age Was the "But-For" Cause Of His Alleged Mistreatment.

Under the familiar burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), a plaintiff claiming age discrimination bears the initial burden of establishing a *prima facie* case by establishing that: "(1) he is a member of the protected class; (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action rise to an inference of age discrimination." *Abdu-Brisson v Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (footnote omitted); *accord Holowecki v. Fed. Express Corp.*, No. 09-3477-cv, 2010 WL 2573864, at *1 (2d Cir. June 24, 2010); *Schnabel v Abramson*, 232 F.3d 83, 87 (2d. Cir. 2000).[11]

---

[11] *And see O'Hazo v Bristol-Burlington Health Dist.*, 599 F. Supp.2d 242, 256 (D. Conn. 2009); *Blumenschine v Prof'l Media Group, LLC*,  No. 302CV2244 (DJS), 2005 WL 3019122, at *4 (D. Conn. Nov. 9, 2005); *Harvey v Mark*, 352 F. Supp. 2d 285, 288 (D. Conn. 2005).

If the plaintiff is able to establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. *Id.* Once such a reason is provided, the burden shifts back to the plaintiff, who must show that the employer's action was, in fact, the result of discrimination. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *Cordes v. Gaymar Indus., Inc.*, No. 99-7886, 205 F.3d 1322, 2000 WL 232136 (2d Cir. Feb. 2, 2000). And it is well-established that "once the employer has proffered its non-discriminatory reason, the employer will be entitled to summary judgment … unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *O'Hazo v Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 256-57 (D. Conn. 2009) (quoting *James v N.Y. Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000).[12]

Significantly, in *Gross v. FBL Fin. Servs., Inc.*, __ U.S. __, 129 S. Ct. 2343 (2009), the Supreme Court held that a plaintiff in an age case must shoulder a heightened burden in proving discrimination, and must prove by a preponderance of the evidence that age was the "but-for" cause of the employer's adverse employment action, not merely a motivating factor. *Gross*, 129 S.Ct. at 2352. The Second Circuit has embraced the Supreme Court's analysis in *Gross* and applied it to claims for relief under the ADEA and NYSHRL, explaining that "*Gross* changes the latter part of [the *McDonnell-Douglas*] formulation by eliminating the mixed motive analysis that circuit courts had brought into the ADEA from Title VII cases. [citations omitted] *Gross* makes clear that 'a plaintiff bringing a disparate treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the

_____

[12] Age discrimination claims brought under the NYSHRL are governed by the same standards as those brought under the ADEA. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997) (citing *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1158 (2d Cir. 1993).

challenged adverse employment action' and not just a contributing or motivating factor." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (applying *Gross* to analysis of ADEA and NYSHRL claim.)  The Second Circuit has held that in analyzing ADEA claims on summary judgment, it is ultimately the plaintiff's burden to prove that the alleged adverse employment action was, in fact, caused by his age, and not merely that age was a motivating or contributing factor. *Holowecki v. Fed. Express Corp.*, No. 09-3477-cv, 2010 WL 2573864, at *1 (2d Cir. June 24, 2010) (affirming summary judgment for employer where plaintiffs failed to establish that age was the "but-for" cause of the employer's adverse action); *Alam v. HSBC Bank USA, N.A.*, No. 07 Civ. 3540 (LTS) (JCF), 2009 WL 3096293, at *8 (S.D.N.Y. 2009), (under the ADEA, the plaintiff must establish that discrimination was the "but-for" cause of the employer's decision), *aff'd*, No. 09-4468-CV, 2010 WL 2573588 (2d Cir. June 28, 2010).[13]

Plaintiff cannot present evidence sufficient to meet this burden.   The sole adverse action suffered by Plaintiff – and the sole action Plaintiff can challenge in this lawsuit – is his June 2008 termination.   Plaintiff has no credible evidence to establish that his age was the "but-for" cause of his separation.   Therefore, summary judgment is warranted. *Phillips v. Centrix Inc.*, No. 09-1012-cv, 2009 WL 4255427, **1-2 (2d Cir. Dec. 1, 2009) (affirming summary judgment for employer because plaintiff had failed to adduce sufficient evidence to support a reasonable inference that age was the "but-for" cause of the employer's adverse action).[14]

---

[13]  *Cf. Henderson v. Gen. Elec. Co.*, 469 F. Supp. 2d 2, 13 (D. Conn. 2006) (gender discrimination claim in which proof of motivating or contributing factor sufficient to satisfy plaintiff's burden of proof).

[14] IBM submits that Plaintiff cannot present sufficient evidence to establish a *prima facie* case of age discrimination, in that his termination did not occur under circumstances giving rise to an inference of age discrimination.   Even if the Court were to conclude to the contrary, for the

(continued...)

B.  Castelluccio Cannot Raise a Credible Claim of Age Discrimination With Regard To His Termination From IBM.

There is absolutely no question why Plaintiff was terminated from IBM; Castelluccio was separated because he was unable to find a position within IBM after spending *six months without any operational responsibility at full salary* searching for one.[15] (O'Malley Dep. 126:7-12.). Significantly, Castelluccio admitted that he had no basis to argue that the six month period of time provided to him was inappropriate. (Pl. Dep. 272:3-14, 273:4-11.) He has not brought forth any evidence establishing that he should have been afforded more than six months to find a new position, nor has he identified any IBM executive who was provided with more time to find an alternative position within the organization. Indeed, the entire manner in which IBM handled Castelluccio's separation from employment is a textbook example of the appropriate treatment of an executive who failed to take advantage of a generous period of paid leave to find himself another position within the organization. (Holmes Dep. 173:22-174:21; Collins-Smee Dep. 296:7-297:8). In the absence of evidence showing others who were treated more favorably – and the record contains absolutely none – any claim of disparate treatment must fail.

---

(...continued)

reasons explained in the text IBM has clearly met its burden of articulating a legitimate non-discriminatory reason for Plaintiff's treatment, requiring him to prove by a preponderance of the evidence that age was the but-for cause of his treatment.

[15] This is therefore not a case where Plaintiff can avoid summary judgment by proving that the employer's proffered reason for his treatment is not the actual reason. *Cf. Abbate v. Cendant Mobility Servs. Corp.*, No. 3-03-cv-1858 (DJS), 2007 WL 2021868, at *8, *10 (D. Conn. July 13, 2007) (denying summary judgment on gender discrimination claim but granting motion on ADEA claim). There is not a shred of evidence in the record that IBM terminated Castelluccio for any reason other than his failure to find another position within IBM after many months of trying.

Although he has no evidence regarding more favorable treatment of comparators, Castelluccio has simply argued that Collins-Smee should have done more to help him find another position, (Pl. Dep. 272:3-14), a claim that has absolutely no legal foundation. It is hornbook law that an employer has no legal duty to find another job for an individual as an alternative to termination. *See Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *10 (S.D.N.Y. Nov. 9, 2000) (under the ADEA, employer "is not obligated to find another position for an employee who is about to be terminated, even if he is qualified for that position."); *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 400 (E.D.N.Y. 2008) (employer was under no obligation to provide employee with another position after terminating him for performance and behavioral issues).

Moreover, this claim overlooks Plaintiff's own responsibility to locate an alternative position within the organization. Castelluccio has absolutely no evidence that Collins-Smee did anything less for Castelluccio than she or other executives did for others, or that she did anything less than was required of her under IBM corporate policies. Indeed, IBM's Open Door investigator concluded that Collins-Smee had gone out of her way to help Castelluccio find another position. (Fasman Aff. Ex. 21 at IBM00091621) ("Ms. Collins-Smee, her manager [], and her HR support [team of five] all indicate that she was very aggressive in trying to place Mr. Castelluccio even immediately after being removed from the public sector role in 2007.")

It is significant that Garrett Walker, a senior IBM Human Resources executive to whom Castelluccio came to complain, provided Castelluccio with coaching to explain the number of different ways Castelluccio could pursue looking for new opportunities. (Walker Dep. 44:21-46:9.) Yet rather than accepting his own responsibility for locating another position

21

within IBM, Castelluccio took "more time off in this period … than [he] ha[d] any time else in [his] career." (Pl. Dep. 263:13-264:5). Rather than discriminating against him because of his age, IBM treated Castelluccio fairly and generously, retaining him on the payroll, at his full senior executive salary, for six months while he and his manager tried to obtain alternative employment for him. Castelluccio's claim that Collins-Smee was required to find him another position has no evidentiary foundation and presents no issue of material fact for the jury.

      C.      Castelluccio's Alleged Evidence Of Age Discrimination Is Plainly Insufficient To Create Any Inference Of Inappropriate Conduct.

           1.     Three Isolated References to Retirement Plans During a Period of More than a Year Is Not Proof of Age Discrimination.

The only "evidence" that Castelluccio has adduced to support his claim of age discrimination is his testimony that his manager, Joanne Collins-Smee, made three isolated references to Castelluccio's eligibility "to bridge to retirement" - in February 2007, November 2007 and March 2008.[16] (Pl. Dep. 75:11-21; 91:13-92:13.) Even assuming *arguendo* that Castelluccio's allegations are true, these three references to his retirement plans, during a period of more than a year, do not demonstrate age bias and cannot preclude summary judgment in this case.

Discussion of retirement, standing alone, is not proof of age discrimination. The Second Circuit has made clear that "[t]he ADEA does not make all discussion of age taboo."

---

[16] As discussed above, Castelluccio does not allege that anyone other than Collins-Smee discriminated against him or made any references to his age or his retirement. (Pl. Dep. 95:2-99:25.) While Collins-Smee denies making the references as alleged by Plaintiff, for the purposes of this motion IBM assumes these references were made as alleged. It is undisputed that Collins-Smee raised Castelluccio's eligibility for retirement in communicating his termination and separation package to him, but Plaintiff does not include this remark in his list of discriminatory comments. (Pl. Dep. 91:13-92:13.)

*Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997). Employers have legitimate reasons to confirm employees' interest in taking early retirement, which is considered an "issue that [is] germane to the joint interests of the employee and the Company..." *Id.*; *see also Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter [] inquiries [into employees' plans for retirement] by treating them as evidence of unlawful conduct."); *Wagner v. Geren*, No. 8:08 CV 208, 2009 WL 2105680, at *5 (D. Neb. July 9, 2009) (suggestion on two occasions that employee accept early retirement does not support claim of discrimination under the ADEA). In the context of ADEA claims, "comments concerning retirement can be made without suggesting age discrimination." *Schug v. Pyne-Davidson Co.*, No. 3:99-CV-1493 (CFD), 2001 WL 34312877, at *5 (D. Conn. Dec. 10, 2001). Any such comments "must be viewed in context, along with the specific language used and the number of times the comments were made." *Id.*[17]

The Second Circuit has found that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by

---

[17] This approach squares with the law in other circuits. *See Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter [ ] inquiries [into employees' plans for retirement] by treating them as evidence of unlawful conduct."); *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (personnel director's remark to plaintiff that "it's just that you've reached that age and years of service that we can bridge you to retirement" was a stray remark). Further, employers lawfully may suggest retirement to eligible employees who are underperforming without violating the ADEA. *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 676 (8th Cir. 1998) (noting a history of poor performance that began before the first discussion of retirement and the employer's preference to end the employment relationship through retirement rather than termination); *Wagner*, 2009 WL 2105680, at *5 (holding that because the employee was both eligible for retirement and his employer was dissatisfied with his performance, the employer's suggestion that the employee take early retirement does not provide a reasonable basis for inferring age discrimination).

discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  In *Tomassi*, the Second Circuit concluded that a consistent pattern of age-related remarks, including comments regarding retirement, may give rise to an inference of discrimination where a decision-maker made such comments to the plaintiff once a month during a two-year period, including asking plaintiff whether she could "keep up with some of the work," whether she was "[t]ired of working," whether she was "tired of the commute," suggested "wasn't it time to retire," and whether she would be better off retiring so that she could "take time off to rest".  *Id.* at 112.  Moreover, during that two year period, the plaintiff received a promotion, pay raises and positive evaluations, undermining the employer's stated performance-based reasons for her termination.  In her termination meeting, she was told she "get[s] along with the seniors" and that her supervisor "figured maybe [she] could do some work with the seniors."  *Id.* at 113-114.  When the plaintiff was terminated, she was replaced with a worker 38 years younger. *Id.*  The Second Circuit reversed the district court's grant of summary judgment to the employer because of these extreme circumstances – none of which is present in this case.  *Id.*

There is a significant question whether *Tomassi*, which applied a motivating factor analysis, remains good law in light of *Gross* and the Second Circuit ruling in *Gorzynski v JetBlue Airways Corp.*, *supra*.[18] Even if it is, however, all that Castelluccio alleges here are three isolated comments about eligibility for retirement, during the course of more than one year, two

---

[18] In *Gorzynski*, the Circuit specifically described *Tomassi* as a decision where, "before *Gross*, the employee could prevail if the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find 'that her dismissal was motivated *at least in part* by age discrimination.' *Tomassi*, 478 F.3d at 114 (emphasis added)".  Given the Circuit's specific reference to *Tomassi* in this fashion, and its repeated decisions holding that ADEA plaintiffs must prove "but for" causation, discussed above, IBM submits that *Tomassi* is no longer good law.

of which arose in the context of discussing whether Plaintiff wanted to pursue other positions within the company.  Significantly, Plaintiff's own testimony negates any improper implications from these conversations:

- Castelluccio admitted that Collins-Smee raised the subject of his possible retirement on only three occasions, two of which occurred at times when Plaintiff's next steps within IBM were uncertain – once when he was removed from a role and once when he was searching for a new role within the Company. [19]

- Castelluccio further admitted that Collins-Smee at no point denigrated Castelluccio in any way, used any age-linked epithet, or referred to his age in an adverse fashion.

- Significantly, on each occasion Collins-Smee's statement is alleged to have been an inquiry, unaccompanied by any suggestion that Castelluccio retire, any statement that he was too old to do the job, or anything else that Castelluccio understood as being an adverse comment because of his age.  (Pl. Dep. 36:10-25, 37:24-38:10, 74:23-75:21.)

---

[19] Castelluccio's claim that Collins-Smee started to ask about his age when they first met in February 2007 changes nothing, and is plainly negated by Castelluccio's failure to report this allegedly severe misconduct in flagrant violation of IBM rules. (Pl. Dep. 60:19-61:22.)  Even assuming *arguendo* that Collins-Smee began to make a comment about Castelluccio's age in their first meeting, an unfinished comment made 18 months before the adverse action is a stray remark that is not indicative of age discrimination. *See, e.g., Wallace v O.C. Tanner Recognition Co.*, 299 F.3d 96, 100 (1st Cir. 2002) (inquiries into age and retirement plans unrelated to the decisional process are stray remarks not probative of age discrimination, citing *Shorette v. Rite Aid of Maine,*155 F.3d 8, 13 (1st Cir. 1998) (asking the plaintiff "how old he was and when he planned to retire" was "a textbook example of an isolated remark which demonstrates nothing"); *and see Henderson v Gen. Elec. Co.*, 469 F. Supp. 2d 2, 15 (D. Conn. 2006) ("Stray remarks, absent some nexus between the alleged comments and the adverse action, cannot prove a claim of employment discrimination." (citations omitted)).

25

These three isolated comments during the course of more than one year about the possibility of retirement, divorced from any other evidence of age discrimination, simply cannot support an inference of age discrimination and do not even come close to the severity or frequency of conduct the Circuit in *Tomassi* found warranted a trial. These three alleged comments, taken at face value, fall squarely within the kind of retirement discussion that the Second Circuit has held does not violate the ADEA. *Raskin*, 125 F.3d at 63; *Pasha v. William M. Mercer Consulting*, No. 00 Civ. 8362 (RWS), 2004 WL 188077, at *5 (S.D.N.Y. Feb. 2, 2004).[20]

> 2.    Castelluccio Has No Other Evidence Of Age Discrimination.

Castelluccio's other allegations in support his age discrimination claim fall short and indeed, the record evidence negates any inference of discrimination or pretext.

> a.    Castelluccio's Replacements Were Both in the Protected Class and One Was Only One Year Younger Than Castelluccio

IBM's replacement of Castelluccio in his VP PSD position and the SDPE for WellPoint position by individuals within the protected age group (ages 49 and 60 respectively), and specifically his replacement on the WellPoint account by Crawford, who at 60 was only one

---

[20] Your Honor's decision in *Williams v Quebecor World Infiniti Graphics*, 456 F. Supp. 2d 372 (D. Conn. 2006) is not to the contrary. In *Williams*, the plaintiff proffered evidence creating myriad factual disputes calling into question the employer's claim that his position was eliminated to reduce costs and overhead. 456 F. Supp. 2d at 384. In such circumstances, Your Honor held that 5 comments by managers about age and retirement, all occurring within several months of the decision to terminate the plaintiff's employment, were not stray remarks because they "must be viewed in light of all surrounding circumstances." 456 F. Supp. 2d at 385. There are no similar factual disputes in this record whatsoever, and the three alleged comments by Ms. Collins-Smee occurred during a lengthy period of time, not contemporaneously to the termination decision. Moreover, as in *Tomassi*, Your Honor noted in *Williams* that "a fact finder could find that these remarks were not stray comments, but rather an indication that the decision to terminate plaintiff was *at least in part motivated by discrimination*." 456 F. Supp. 2d at 385 (emphasis added). Given that the accepted standard in ADEA cases is now "but for" causation and not motivating factor, *see supra* n. 18, ADEA decisions premised upon a "motivating factor" analysis no longer remain controlling law.

year younger than Castelluccio, negates any possible inference of age discrimination. "[A] replacement within the same protected class cuts strongly against any inference of discrimination." *Nieves v Avalonbay Cmtys., Inc.*, No. 3:06CV00198 (DJS), 2007 WL 2422281 at *11 (D. Conn. Aug. 23, 2007) (citations omitted). A one-year age difference will not, as a matter of law, permit an inference of age discrimination. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (an inference of discrimination cannot be drawn from the replacement of one worker with another worker insignificantly younger). If Collins-Smee was engaged in age discrimination, she was doing a very bad job of it.[21]

Moreover, Castelluccio has no basis to challenge any of IBM's hiring decisions concerning his replacements. Both Echavarria and Crawford were identified as the best candidates for the roles through the 5 Minute Drill procedure and IBM's business judgment regarding that decision should not be second-guessed. *See Byrnie v Town of Cromwell Bd. of Educ.*, 243 F. 3d 93, 103 (2d Cir. 2001) (to prevail in a claim based on comparative qualifications, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" (citation omitted)); *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (a court may not merely substitute its judgment for that of a business judgment); *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) (affirming summary judgment where employer made business judgment regarding value of candidate's experience as superior qualifications); *see*

---

[21] Although Echavarria at 49 was 11 years younger than Plaintiff, this alone cannot defeat summary judgment. *See Coccaro v AT&T Corp.*, No. 303CV914 (DJS), 2005 WL 1711967 at *7 (D. Conn. July 20, 2005) (noting that replacement by a younger worker "is not sufficient to defeat summary judgment.") (citations omitted).

*generally Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (discussing plaintiff's burden to prove clearly superior qualifications in order to present a *prima facie* case of discrimination in hiring).

> b.      Collins-Smee is Part of the Protected Class.

Collins-Smee was in her 50's at the time she decided to terminate Castelluccio's employment, and thus is included in the same protected age group as Castelluccio. This fact provides an inference against discrimination in this case. *Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (a well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class).

> c.      Castelluccio Can Point To No Statistical Evidence Showing that
> IBM Discriminated Against Executives On the Basis Of Age

Castelluccio cannot point to any statistical evidence to support a claim that IBM discriminates against executives on the basis of age; indeed, the evidence is to the contrary. As information produced in discovery reveals, during the past three years, a significant number of the executives in ITD Americas organization were over 40 years of age: In 2007, 112 Band C and D executive level members of IBM's ITD America's organization were over the age of 40, and 8 were over the age of 60, and older than Castelluccio at the time. (Fasman Aff. Ex. 10 (Defendant's Response To Interrogatory No. 2 Exhibit. A at1-3).) In 2008, 80 Band C and D executive level members of IBM's ITD America's organization were over the age of 40, and 5 were older than Castelluccio at the time. (*Id.* at 4-5.) In 2009, 88 Band C and D band executive level members of IBM's ITD America's organization were over the age of 40, and 6 were over 62 - *older* than Castelluccio. (*Id.* at 6-7). Clearly, IBM is not trying to force out employees

28

Castelluccio's age and older. *See Pipkin v. Bridgeport Bd. of Educ.*, 323 F. Supp. 2d 326, 331 (D. Conn. 2004) (granting summary judgment for employer where employer hired employees who were over 50 years of age and noting that such actions "belies any claim of age discrimination").[22]

    D.    Castelluccio's Claims Regarding Removal From the VP of Public Sector and the WellPoint Positions Are Time-Barred.

Under the ADEA, a timely charge is a prerequisite to suit. 29 U.S.C. §626(d)(2). A charge must be filed within 180 days of the alleged unlawful discrimination or within 300 days "if the claimant initially filed a complaint with a state or local agency...or within thirty days of receiving notice that the state or local agency has terminated proceedings, whichever is earlier. " *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 132 (2d Cir. 1996). Untimely claims are routinely dismissed. *See, e.g., Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80-81 (2d Cir. 2003) (affirming dismissal of sex and disability claims where the plaintiff filed her EEOC charge 357 days after receiving notice of her termination).

---

[22] Castelluccio's apparent claim that at the time of his termination he was the oldest of Collins-Smee's direct reports cannot, as a matter of law, create a material issue with respect to an age claim, and is simply not relevant to any legitimate inquiry regarding age discrimination. *Wado v. Xerox Corp.*, 991 F. Supp. 174, 189 (W.D.N.Y. 1998) ("Plaintiff's age, standing alone, is insufficient to satisfy his burden of proof. . . . If it were [sufficient], any employer who terminated one of the oldest employees in any particular unit could be forced to litigate an ADEA claim all the way to trial"); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 115-16 (S.D.N.Y 2009) (finding that, even if plaintiff were the oldest employee at the time of her termination, that fact, standing alone, would not provide a sufficient basis to infer that her employer had a bias against older employees); *Cordes v. Gaymar Indus., Inc.*, 205 F.3d 1322, 2000 WL 232136, at *1 (2d Cir. Feb. 2, 2000) (plaintiff's allegation that he was the oldest employee fired that year and that he was the only employee in his department to be fired not sufficient to withstand summary judgment).

Plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR") on November 17, 2008, and dual filed with the Equal Employment Opportunity Commission ("EEOC") on that same date. (Fasman Aff. Ex. 1 (Complaint ¶4).). Therefore, any claims based on events prior to January 20, 2008 – and specifically, Castelluccio's replacement as VP PSD by Echavarria in early 2007 and his replacement by Crawford as SDPE on the WellPoint account in December 2007 – are time-barred under the ADEA.[23]

E.     Castelluccio's Lateral Transfers Do Not Constitute Adverse Employment Actions.

Assuming *arguendo* that Plaintiff's claims related to removal from two prior positions were not time-barred, they are not actionable because the two transfers do not rise to the level of adverse employment actions.   An "adverse employment action" is a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted).   To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*   A materially adverse change might be indicated by a decrease in wage or salary, a less distinguished title or a material loss of benefits – none of which is present in the instant case.   *Id. And see Charles v Connecticut Judicial Branch*, 556 F. Supp. 2d 123 (D. Conn. 2008) (denial of lateral transfer not an adverse action).

---

[23] The Ledbetter Fair Pay Act of 2009 does not compel a different result, because that Act applies only to claims of compensation discrimination. *Pratesi v. New York State Unified Ct. Sys.*, No. 08-4828 (DRH) (MLO), 2010 WL 502950, at *6 (E.D.N.Y. Feb. 9, 2010) (limiting application of Ledbetter Act to compensation discrimination claims, as opposed to claims involving discrete acts of discrimination such as failure to promote or retaliation); *Vuong v. New York Life Ins. Co.*, 2009 WL 306391, at *7-8 (S.D.N.Y. Feb. 6, 2009) (applying Ledbetter Act to compensation claim but not failure to promote claim), *aff'd*, No. 09-0974-cv, 2010 WL 93157, at *1 (2d Cir. Jan. 12, 2010).

Castelluccio admits that his salary remained unchanged and that he kept his title of Vice President (Band C) after he was removed from the VP PSD position and placed in the SDPE role on the WellPoint account.  His title and salary continued after he was removed from that position, and he was given six months to look for another opportunity within IBM without any operational responsibilities.  Even if Castelluccio's potential claims regarding his lateral transfer to the SDPE position and his transfer out of the SDPE role were not time barred – which they are – such transfers do not constitute adverse employment actions.  *Savarese v. William Penn Life Ins. Co. of New York*, 418 F. Supp. 2d 158, 162 (E.D.N.Y. 2006) (rearrangement of duties did not constitute an adverse employment action); *Morrison v. Potter*, 363 F. Supp. 2d 586, 591-592 (S.D.N.Y. 2005) (reassignment to different job did not constitute an adverse employment action); *Galabya*, 202 F.3d at 641 (lateral transfer was not an adverse employment action).

> F.   Even if Castelluccio's Transfer Claims Were Timely and Involved Adverse Actions – Which They Do Not – These Actions Were Plainly Based Upon Legitimate Business Reasons.

IBM has supplied ample and uncontroverted evidence of its legitimate, non-discriminatory business reasons for Castelluccio's two transfers.  As described above and highlighted below, Castelluccio's performance in both the Public Sector and WellPoint positions was sorely lacking.

The extensive documentary evidence discussed above establishes beyond any doubt that Castelluccio was not performing adequately in either of these two positions.  This evidence comes from Castelluccio's peers as well as from IBM clients, and demonstrates a long history of unacceptable performance.  Indeed, Castelluccio has admitted that he knew there were complaints about his leadership and the delivery operations he managed. (Pl. Dep. 31:4-32:3,

102:2-18, 106:9-107:4.)  It is uncontroverted that as early as May, 2006, Castelluccio discussed his problems in the Public Sector role with David Liederbach, who was dissatisfied with Castelluccio's supervision of the delivery operation to Liederbach's clients.  Castelluccio, as a result of his meeting with Liederbach, agreed to improve communications and service delivery execution.  (Liederbach Decl. ¶ 6; Pl. Dep. 106:9-108:2)    The same unfortunate pattern continued with the Wellpoint account, however, with extensive undisputed evidence regarding complaints from the client and Ms. McDonald about continued poor performance.

In evaluating this evidence, it is critical to underscore that Castelluccio has admitted under oath that the numerous people who complained about his performance in these positions – including not only Mr. Liederbach and Ms. McDonald, but numerous peers who complained as well – were *not* engaged in discrimination against him due to his age.  (Pl. Dep. 96:17-99:25.)  Castelluccio thus cannot claim that any of the internal and external complaints regarding his performance that ultimately precipitated Collins-Smee's decision to remove and/or transfer Castelluccio have anything to do with his age; indeed, he has testified to the contrary. Accordingly, there can be no dispute as to IBM's legitimate concerns regarding Castelluccio's performance problems, the effect on its business, and its need to remove Castelluccio from these two roles.

G.    Castelluccio's Red Herring Claim Concerning "Just Cause" Is Irrelevant.

Perhaps in recognition of his fatal failure to adduce any evidence that age was the cause of the complaints about his performance in either position, Castelluccio has alleged that his removal from the Public Sector Delivery role and the WellPoint account were disciplinary actions that required "just cause."  Putting aside for the moment the several obvious legal problems with this argument – that these were not adverse employment actions, and that this is

32

an age discrimination and retaliation case, and not a contract claim alleging that IBM has failed to comply with its own policies -- IBM policies do not require "just cause" for any employment decision, and certainly not a lateral transfer with no change in title, salary or benefits.  Indeed, Castelluccio himself admitted that employees have routinely been removed from client accounts due to personality conflicts or other reasons, and that he himself removed individuals from accounts for those exact reasons, without any counseling, warning or progressive discipline.  (Pl. Dep. 126:23-131:4.)  For example, when Castelluccio was in the Public Sector position, he removed one of his employees, Mark Francese, from an account because the customer had requested that Castelluccio "get rid of Mark".  (Pl. Dep. 131:25-133:20.)  IBM is in a client service business, and when Castelluccio was faced with a client relations problem, he removed and reassigned the IBM employee the client complained about.  Collins-Smee acted in the exact same manner.  Castelluccio cannot raise a genuine question of material fact regarding these transfers, even assuming they were actionable as a matter of law.[24]

## II.   CASTELLUCCIO'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW

In order to establish a *prima facie* case of unlawful retaliation, a plaintiff must prove that:  (1) he or she engaged in some protected activity; (2) the employer knew of the

---

[24] For the same reason, any claim that Plaintiff's termination was improper without a showing of just cause fails as a matter of law, even assuming *arguendo* that such a claim falls within the boundaries of his complaint. IBM is an at-will employer. (Fasman Aff. Ex. 23 (About Your Job Policy at IBM00091975, IBM00091986).)  Castelluccio could point to no IBM policy that required just cause before a person is terminated or replaced in his or her position. (Pl. Depo. 214:6-15).  It is well-settled under New York law that "an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Baron v. Port Auth. of New York and New Jersey*, 271 F.3d 81, 85 (2d Cir. 2001).  The presumption of at-will employment may only be rebutted by establishing an "express limitation in the individual contract of employment curtailing an employer's right to terminate at will." *Id.* (internal quotations omitted) Castelluccio has identified no such writing, and therefore IBM did not need just cause to terminate Castelluccio's employment.

protected activity, (3) the employer subjected him or her to some adverse employment action, and (4) there is a causal connection between the protected activity and the adverse action. *See Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206-207 (2d Cir. 2006). Protected activity under the ADEA requires evidence of either participation in an investigation, proceeding or litigation under the ADEA, or opposition to any practice made unlawful by the ADEA. 29 U.S.C. §623(d).

Castelluccio's retaliation claims under the ADEA and the NYSHRL fail because there is no evidence that he was terminated as a result of engaging in protected activity. Castelluccio's complaint of age discrimination was made on June 13, 2008, *after* he was informed of his termination, and thus cannot support a retaliation claim based on his termination. His February 15, 2008 complaint to Human Resources about his performance evaluation does not constitute protected activity as a matter law, and even if it did it is undisputed that this complaint was never revealed to Collins-Smee, the decision-maker in this case. Accordingly, Castelluccio's retaliation claims should be dismissed.

A.   Castelluccio Cannot Convert His Termination Into Retaliation By Complaining About Discrimination After-The-Fact

Castelluccio's claim that his termination was linked to his "opposition to age discrimination" based on a complaint he made to Garrett Walker in February, 2008 is completely baseless. (Fasman Aff. Ex. 1 (Complaint ¶58).)   The sole protected conduct Castelluccio engaged in was his June 13, 2008 internal complaint to Garrett Walker of age discrimination – made nearly *two weeks after* Castelluccio was notified that he would be terminated if he did not secure another position at IBM by June 30.   It is hornbook law that an employee may not convert a termination into a retaliatory act by complaining of discrimination after being notified of his

34

termination. *Zawacki v. Realogy Corp.*, 628 F. Supp. 2d 274, 284 (D. Conn. 2009); (a termination that pre-dates the filing of an administrative charge cannot be an act of retaliation caused by the filing); *Hampton v. Diageo N. Am., Inc.*, No. 3:04cv346 (PCD), 2008 WL 350630, at *10 (D. Conn. Feb. 7, 2008) (granting summary judgment to employer on retaliation claim and noting "[i]n order for adverse employment action to be retaliatory, it must occur after the protected activity took place."); *Martin v. Town of Westport*, 329 F. Supp. 2d 318 (D. Conn. 2004) (employee failed to make prima facie case of retaliation under Title VII where alleged adverse action took place before employee filed discrimination complaint).

B.   Castelluccio's Attempt To Characterize His February Complaint As Protected Activity Is Unavailing.

In his June 13th email, written shortly after he first consulted counsel, and subsequently in his Complaint, Castelluccio attempts to recharacterize his February 15, 2008 email to Walker as a complaint of age discrimination. (*See* Fasman Aff. Ex. 20.) On its face, the February email makes no mention of age discrimination at all. (*See* Fasman Aff. Ex. 17.) To the contrary, Castelluccio focuses in this email on how he believes he was treated unfairly by Collins-Smee in his original 2007 evaluation (which had already been changed to a more favorable rating) and merely speculates that she initially rated him less favorably "as a pretext to future plans, perhaps to hasten a retirement".

To constitute activity protected by the ADEA, a complaint of age-based discrimination must be sufficient to place an employer "on notice that the complainant believes discrimination is occurring." *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962 (JFB)(AKT), 2007 WL 1174891, at *20 n.18 (E.D.N.Y. Apr. 19, 2007) (quoting *Ramos v. City of New York*, No. 96 Civ. 3783(DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997)). While the complaint

35

does not need to mention discrimination specifically or use particular language, an ambiguous complaint that does not make the employer aware of allegedly discriminatory misconduct does not constitute protected activity. *Int'l Healthcare Exch., Inc., v. Global Healthcare Exch.*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007). Thus, a complaint of behavior that the plaintiff "thought was unfair to him or uncalled for" does not constitute protected activity, nor does a complaint about a supervisor generally. *Szarzynski v. Roche Labs., Inc.*, No. 07-CV-6008, 2010 WL 811445, at *12 (W.D.N.Y. Mar. 1, 2010) (citations omitted).

Significantly, Walker, a veteran Human Resources executive with nearly two decades of experience, did not view the February email as one alleging age discrimination. Walker testified that the February email from Castelluccio was "confusing," resulting in a follow up meeting with Castelluccio in which Castelluccio did not even raise the issue of retirement or discrimination. (Walker Dep. 62:23-64:13.) Indeed, in the meeting that Walker had with Castelluccio to discuss the email, their discussion focused on his pursuing a new position with the company.[25] (Walker Dep. 63:23-64:13.) Neither Castelluccio's email nor his meeting with Walker placed IBM on notice that he felt he was being discriminated against, and thus it cannot constitute protected activity to support a claim of retaliation. Walker testified unequivocally that if the February email or his follow-up conversation with Castelluccio raised a discrimination complaint, he would have taken the very acts he did in response to the June 13 email where there was a complaint of age discrimination. (Walker Dep. 47:4-15, 50:9-51:15, 62:10-22.)

---

[25] Castelluccio's testimony on his meeting with Walker is undercut by his testimony that Collins-Smee in fact never awarded him a lower performance rating at any point in time. *See* n.8, *supra*. Castelluccio's own February email to Walker complained that his performance rating was lowered, a statement that he now claims was based upon a "poor choice of words." (Pl. Dep. 227:2-13.)

The law is clear that unfair treatment alone does not constitute discrimination and a complaint about such conduct cannot support a *prima facie* case of retaliation. *See Szarzynski*, 2010 WL 811445, at *12; *Robles v. Argonaut Rest. & Diner, Inc.*, No. 05 CV 5553 (JSR), 2009 WL 3320858, at *8 (S.D.N.Y. Oct. 9, 2009) (finding complaints directed at general allegations of verbal harassment, not harassment based on national origin or age, cannot support a retaliation claim); *Matlosz v. J.P. Morgan Chase*, No. 03 Civ. 6235 (JGK), 2005 WL 2242196, at *7 (S.D.N.Y. Sept. 3, 2005) (granting summary judgment on a retaliation claim where the employee's complaint of unfair treatment did not put the employer on notice that she believed her unfair treatment was due to some characteristic protected by anti-discrimination laws).

C.    Even Assuming *Arguendo* That Castelluccio's February Email Could Be Construed as a Complaint of Discrimination, His Complaint Was Never Conveyed to the Decision-Maker, Collins-Smee.

Even if Castelluccio's February 2008 email is viewed as a complaint of age discrimination – which it is not – there is no causal link between Castelluccio's complaints to Walker and his termination.   It is undisputed that Collins-Smee was never made aware of Castelluccio's "complaint":

- Castelluccio admitted that he did not tell Collins-Smee about his February email to Walker or his subsequent meeting with Walker.  (Pl. Dep. 88:10-25.)

- Walker testified that he never told Collins-Smee about his meeting with Castelluccio concerning the February email.  (Walker Dep. 65:8-13.)

- Walker did not open an investigation or in any way publicize any alleged claims of discrimination.  (Walker Dep. 47:4-15, 50:9-51:15, 62:10-22.)

○ Collins-Smee testified that she knew nothing about a claim of age discrimination at the time she made the decision to terminate Castelluccio's employment. (Collins-Smee Dep. 270:4-22.)

There is no evidence whatsoever in the record which could allow Castelluccio to establish that the decisionmaker knew about his allegedly protected activity prior to making the decision to terminate him. Accordingly, Castelluccio cannot establish a causal connection between the alleged protected conduct (complaint of age discrimination) and the adverse action (his termination). *Donahue v. Norwich Roman Catholic Diocesan Corp.*, No. 3:05 CV 413 (CFD), 2008 WL 821890 (D. Conn. Mar. 26, 2008) (no causal connection existed where plaintiff admitted she did not complain to person who gave final approval to hire selected candidate and others did not know about complaint when considering plaintiff's application); *Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 209 (D. Conn. 2000) (retaliation claim under Title VII failed where supervisor did not know about CHRO complaint until after making decision to terminate plaintiff).

III.   CONCLUSION

For the reasons set forth above, IBM respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's Complaint in its entirety, together with such other and further relief as the Court deems just and proper.

Dated:  September 20, 2010           Respectfully submitted,
        New York, New York

                                     PAUL, HASTINGS, JANOFSKY & WALKER
                                     LLP

                        By:          _____
                                     Zachary D. Fasman (phv0899)
                                     Patrick W. Shea (ct07071)
                                     Sandi F. Dubin (phv03597)
                                     75 East 55th Street
                                     New York, NY  10022-3205
                                     Telephone:  (212)  318-6000
                                     Facsimile:  (212) 319-4090
                                     zacharyfasman@paulhastings.com
                                     patrickshea@paulhastings.com
                                     sandidubin@paulhastings.com

                                     Counsel for Defendant
                                     INTERNATIONAL BUSINESS MACHINES
                                     CORPORATION

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES CASTELLUCCIO,<br><br>              Plaintiff,<br><br>   -  against –<br><br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION,<br><br>              Defendant. | CIVIL ACTION NO.<br>3:09 CV 1145 (DJS)<br><br><br><br><br>September 20, 2010 |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO FILE CONFIDENTIAL DOCUMENTS UNDER SEAL**

I.        INTRODUCTION

        Defendant International Business Machines Corporation ("IBM") submits this memorandum in support of its Motion to File Confidential Documents Under Seal.  As set forth below, IBM respectfully requests that certain documents and declarations submitted in support of Defendant's Motion for Summary Judgment and Defendant's Motion to Exclude Testimony be placed under seal due to the confidential nature of the information contained therein.  The privacy interests of IBM, its employees and Plaintiff in the sealed information outweigh any benefit that the public would have in this information.

II.        DISCUSSION

        Simultaneously herewith, IBM is submitting a Motion for Summary Judgment and a Motion to Exclude Testimony that contain exhibits and declarations that are confidential in

nature according to paragraph B(1) to the parties' Confidentiality Stipulation and Agreement (Docket No. 26), filed with this Court on November 5, 2009 and subsequently approved on November 6, 2009 (Docket No. 27).

Paragraph B(1) of the "So-Ordered" Confidentiality Stipulation and Agreement provides that certain categories of documents are considered confidential and protected from disclosure in pre-trial proceedings:

> information…that contain or are derived from trade secrets; other confidential or proprietary research or development information; confidential information concerning International Business Machines Corporation's ("IBM") internal policies, practices, and procedures; information concerning IBM's investigation into any employee complaints; information concerning IBM's relationships with its clients that is not made available to the public by IBM; information concerning IBM's business strategies, revenues, sales, and profits that is not made available to the public by IBM, or other commercial, personal, and private information of IBM or James Castelluccio, i.e., all medical records or medically-related information; financial information (including but not limited to tax returns, W-2s, pay stubs, profit and loss statements relating to income earned or received due to ownership or financial interest in any entity or property); personal documents and information (including driver's license, passport, birth certificate, resumes, letters of reference or recommendation, college and graduate school transcripts); and any similar information relating to Castelluccio's immediate family members, that is entitled to confidential treatment under the Federal Rules of Civil Procedure shall be designated Confidential ("Confidential information") for the purpose of pretrial proceedings and furnished to other parties pursuant to the terms of this Stipulation.

The documents that IBM seeks to file under seal fall into several discrete categories listed above: (1) personnel information, such as dates of birth, dates of hire, employee's titles during several years in an IBM organization[1], Plaintiff's Work History Detail and severance documentation; (2) documents concerning IBM's investigation into Plaintiff's

---

[1] This information is relevant to Defendant's Motion for Summary Judgment, as Plaintiff claims IBM discriminated against him based on his age.

complaint of age discrimination, including the Open Door report and letter to Plaintiff regarding same; (3) IBM company policy About Your Job that is not made publicly available; (4) the Declaration of Bret Mercer concerning IBM equity practices that is not made publicly available; (5) Five Minute Drill documents which contain highly confidential and proprietary business information about IBM's customers and accounts and executive placement information that is held strictly confidential within the company itself; (6) Plaintiff's stock options exercise activity; (7) declarations from IBM executives David Liederbach and Keenie McDonald testifying about and attaching documents detailing confidential business, proprietary and financial information concerning IBM accounts and business strategies, that if disclosed could not only place IBM at a competitive disadvantage in its industry, but could damage its business relationship with a customer.

IBM's declarations and exhibits contain information that is not revealed to the public and which directly detail IBM's internal and proprietary business systems and client service mechanisms.   Indeed, all IBM employees sign a confidentiality agreement upon employment with the Company and again agree to maintain confidentiality upon their separation from employment.   IBM goes to great lengths to protect its confidential and proprietary business information.   To reveal such information to the general public would have an injurious effect on IBM vastly disproportionate to any need for the public to view these records and communications.

Similar to the case at bar, in *Mashantucket Pequot Tribe v. Town of Ledyard*, No. 06-CV-1212, 2008 WL 4298377, at *12-13 (D. Conn. Sept. 18, 2008), the information subject to the protective order and motion to seal included information that the moving party considered

confidential and proprietary because disclosure could result in (1) putting it at a disadvantage in its industry and (2) damaging its business relationship with one of its vendors.  The court in *Mashantucket Pequot Tribe* granted the motion to seal documents containing financial information related to the party's business, financial information relating to the proprietary business relationship with its vendors, and other proprietary business records not revealed to the public for the same reasons that the Court granted the party's protective order of the same documents.  These are precisely the concerns underlying the parties' protective order in the instant case and IBM's Motion to File Confidential Documents Under Seal.  *See also*, Fed. R. Civ. P. 26(c)(1)(G) (citing as a basis for a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way.")

Therefore, pursuant to Local Rule 5(e)(3) and for the same reasons that the Court approved the parties' Confidentiality Stipulation and Agreement and issued the Protective Order, the Court should also grant IBM's Motion to File Confidential Documents Under Seal.

III.    CONCLUSION

For the above-stated reasons and for the reasons underlying the parties' Confidentiality Stipulation and Agreement, IBM respectfully requests that the Court approve its Motion to File Confidential Documents Under Seal in this action.

Dated:  September 20, 2010        Respectfully submitted,
        New York, New York

                                  PAUL, HASTINGS, JANOFSKY & WALKER
                                  LLP

                        By:       /s/ Sandi F. Dubin
                                  Zachary D. Fasman (phv0899)
                                  Patrick W. Shea (ct07071)
                                  Sandi F. Dubin (phv03597)
                                  75 East 55th Street
                                  New York, NY  10022-3205
                                  Telephone:  (212)  318-6000
                                  Facsimile:  (212) 319-4090
                                  zacharyfasman@paulhastings.com
                                  patrickshea@paulhastings.com
                                  sandidubin@paulhastings.com

                                  Counsel for Defendant
                                  INTERNATIONAL BUSINESS MACHINES
                                  CORPORATION

**CERTIFICATE OF SERVICE**

I hereby certify that on September ___, 2010, a copy of the foregoing

Memorandum of Law in Support of Motion to File Confidential Documents Under Seal

was filed electronically and served by mail on anyone unable to accept electronic filing.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing.  Parties may access this filing through the

Court's CM/ECF System.


_____/s/ Sandi F. Dubin_____
Sandi F. Dubin (phv03597)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES CASTELLUCCIO, | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:09 CV 1145 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION | : | |
| Defendant. | : | NOVEMBER 15, 2010 |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   RELEVANT FACTS ...........................................................................................2

III.  LEGAL STANDARD .......................................................................................18

IV.   ARGUMENT ....................................................................................................20

      A.   The Elements of a Claim Under the ADEA ............................................20

      B.   A Reasonable Jury Could Conclude That Mr. Castelluccio Has ...................22
           Established a *Prima Facie* Case of Age Discrimination

           1.   Mr. Castelluccio Suffered Three Adverse Employment Actions....................23

           2.   A Reasonable Jury Could Conclude That the Adverse Employment ............25
                Actions Mr. Castelluccio Suffered Occurred Under Circumstances
                Giving Rise to an Inference of Discrimination

                a.   Replacement by a Substantially Younger Employee ............................26

                b.   Suggestion of Retirement by Ms. Collins-Smee....................................28

                c.   Disparate Treatment Regarding Job Placement....................................30

                d.   Ms. Collins-Smee's Attempt to Lower Mr. Castelluccio's Rating ......33

      C.   A Reasonable Jury Could Conclude that IBM's Alleged Non-Discriminatory
           Reasons for Its Adverse Employment Actions Constituted Pretext for Illegal
           Age Discrimination ................................................................................33

           1.   The Reasons Provided by IBM Are False ........................................................34

                a.   Mr. Castelluccio's Removal as VP of Public Sector and ....................34
                     Assignment to WellPoint

                b.   Removal From the WellPoint Account....................................................38

                c.   Termination of Employment....................................................................43

           2.   IBM's Actions Support Conclusion of Age Discrimination............................47

      V.   CONCLUSION ................................................................................................50

## I.    INTRODUCTION

The Plaintiff, James G. Castelluccio ("Mr. Castelluccio"), respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment and supporting Memorandum of Law ("D.Br.") filed by the Defendant, his former employer, International Business Machines Corporation ("IBM").  As set forth in detail below, several genuine disputed issues of material fact exist in this age discrimination case that preclude an award of summary judgment.[1]

At the outset, it should be noted that, upon careful scrutiny, a number of IBM's positions in its Motion for Summary Judgment are riddled with inconsistencies. For example, IBM maintains in is Memorandum of Law that Mr. Castelluccio's performance had no bearing on his ultimate dismissal and that he was dismissed solely "because he was unable to find a position within IBM." (D. Br. 20).  Although it now maintains there "is absolutely no question why Plaintiff was terminated from IBM," this position is directly contrary to the position IBM took in its Response to Mr. Castelluccio's complaint with the New York State Division of Human Rights ("Response").  As described in further detail below, IBM is equally adamant in its Response that Mr. Castelluccio was terminated on the basis of his poor job performance.

Even within its current memorandum, IBM takes highly inconsistent positions. For example, IBM argues strenuously that Mr. Castelluccio had "a long history of unacceptable performance." (D. Br. 31).  Indeed, without even speaking to Mr. Castelluccio's prior manager or troubling to review his performance review for 2006 that had been completed only 30 days earlier, Mr. Castelluccio's new manager, Ms. Collins-Smee, made an independent assessment in less than one month that he needed to be removed from his position as VP of Public Sector. The problem with this position is

---

[1] Mr. Castelluccio voluntarily withdraws the retaliation claims set forth in Courts Two and Four of his Complaint, as he is unable to establish that his complaints of age discrimination made to Garrett Walker were communicated to the decisionmaker, Ms. Collins-Smee.

that it leaves IBM hard-pressed to explain why it subsequently assigned Mr. Castelluccio to one of its most troubled accounts, while still requiring him to discharge his VP of Public Sector responsibilities. IBM unsuccessfully tries to vault over the gap in its logic by asserting that Mr. Castelluccio "had a reputation as a person who comes in and fixes troubled accounts." (D. Br., 8). Yet, IBM cannot explain how Mr. Castelluccio could simultaneously be a poor performer who needed to be replaced as VP of Public Sector *and* a highly skilled troubleshooter appointed to fix the troubled account. Finally, IBM's argument that it assigned Mr. Castelluccio to the troubled account as an opportunity to improve his performance strains credulity, in that his manager was informed that Mr. Castelluccio would likely "implode" from the strain of performing two full-time positions. IBM's failure to explain these significant inconsistencies prevent it from prevailing on its Motion for Summary Judgment.

## II.    RELEVANT FACTS

Mr. Castelluccio was terminated by IBM after 40 years of employment—his entire professional career—in June 2008, when he was 61 years old. (Plaintiff's Local Rule 56(a)(2) Statement of Disputed Material Facts ["Pl. Facts"], at ¶1).[2]  The path to Mr. Castelluccio's termination began in February 2007, however, with the arrival of his new younger manager, Joanne Collins-Smee ("Ms. Collins-Smee"). Beginning from Mr. Castelluccio's first face-to-face meeting with Ms. Collins-Smee, through his eventual termination the following year, she repeatedly discriminated against him on the basis of his age. Ms. Collins-Smee was the decisionmaker for all three adverse employment actions suffered by Mr. Castelluccio between February 2007 and June 2008. Her overt conduct – and failure to act – towards Mr. Castelluccio after he declined to retire from IBM supports an inference that age discrimination was the true reason for his termination.

---

[2] All evidence cited in support of each paragraph in the Plaintiff's Local Rule 56(a)(2) Statement of Disputed Material Facts incorporated by reference to said paragraph, unless otherwise stated.

2

**Mr. Castelluccio's Performance and Replacement as VP of Public Sector**

During his career at IBM, Mr. Castelluccio received a series of promotions and rose through the ranks to attain a position at the Executive Vice President level (known as "Band C") in August of 2000. (Pl. Facts, ¶2). In January of 2005, Mr. Castelluccio attained the position of Vice President of Public Sector Delivery ("VP of Public Sector") for IBM's Integrated Technology Division ("ITD"). (Id., ¶3). His duties included overall management of the day-to-day performance of over 30 contracts in IBM's Public Sector division. (Id., ¶4).

Mr. Castelluccio's direct supervisor in his position as VP of Public Sector was Arthur "Kelton" Jones ("Mr. Jones"), who was Vice President and Senior Services Delivery Executive for the ITD Americas organization until his retirement in early 2007. (Id., ¶¶6-8). All IBM employees receive a formal, comprehensive annual evaluation known as a PBC. (Id., ¶127; Affidavit of James Castelluccio, dated November 15, 2010, filed in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Pl. Aff."], at ¶12). Mr. Jones gave Mr. Castelluccio positive PBC's for 2005 and 2006 and never indicated to him that his performance was unsatisfactory.[3] (Pl. Facts, ¶¶9, 11, 13, 53). Mr. Jones assessed Mr. Castelluccio's performance as VP of Public Sector in 2005 as "2+," which means "above average contributor." (Id., ¶13). He completed Mr. Castelluccio's 2006 performance review on January 25, 2007 and rated Mr. Castelluccio a "2" ("solid contributor"). (Id., ¶¶9, 11). In his written assessment of Mr. Castelluccio's performance for 2006, Mr. Jones specifically praised Mr. Castelluccio's solid leadership and people management skills. (Id., ¶53). During 2007, Mr. Castelluccio attained several important goals and made substantial improvements as VP of Public Sector. (Id., ¶¶16-18).

Upon Mr. Jones' retirement at the end of January 2007, his position was assumed by Ms. Collins-Smee, who was ten years younger than Mr. Castelluccio. (Id., ¶¶8, 19). On or around

---

[3] Mr. Castelluccio's consistently earned performance ratings of satisfactory or above average throughout his career at IBM. (Pl. Facts, ¶15).

February 22, 200, in Mr. Castelluccio's first face-to-face meeting with Ms. Collins-Smee as his manager, prior to even introducing herself, Ms. Collins-Smee began by asking Mr. Castelluccio his age. Ms. Collins-Smee specifically said to Mr. Castelluccio, "How old--", then stopped mid-sentence and said, "You're old enough to bridge to retirement, right?" (Id., ¶¶20-22). Mr. Castelluccio strongly replied that he had no desire to retire, and Ms. Collins-Smee did not respond. (Id., ¶¶24-25).

At the time of Ms. Collins-Smee's statement, Mr. Castelluccio had not considered retirement or discussed retirement with his prior supervisors. (Id., ¶26). It is undisputed that under IBM's own practices and procedures, it was inappropriate for Ms. Collins-Smee to ask Mr. Castelluccio his age. (Id., ¶27). Indeed, Mr. Castelluccio testified that Ms. Collins-Smee's conduct implied to him that she believed he was too old to do his job. (Id.). At the time of Ms. Collins-Smee's statement, Mr. Castelluccio was approximately one week shy of his 60th birthday. (Id., ¶28). Pursuant to IBM's Pension Plan, Mr. Castelluccio became eligible to retire with full pension benefits on his 60th birthday. (Id., ¶29). At the time of Ms. Collins-Smee's statement, Mr. Castelluccio was the oldest out of all of the Vice Presidents who directly reported to Ms. Collins-Smee. (Id., ¶30).

Ms. Collins-Smee did not raise this inquiry in the context of a casual discussion of Mr. Castelluccio's future plans at IBM. (Id., ¶31). Rather, this inquiry was the first statement made to Mr. Castelluccio in a meeting convened to discuss the status of the accounts for which he was responsible. (Id., ¶¶31-32). At no point during their meeting did Ms. Collins-Smee bring to Mr. Castelluccio's attention any alleged problems with his job performance or inform him that she intended to remove him from his position as VP of Public Sector. (Id., ¶33).

In contrast to Mr. Castelluccio's clear recollection of his first meeting with Ms. Collins-Smee, she has no specific recollection of the meeting. (Id., ¶35). Through discovery in this lawsuit, Mr. Castelluccio learned that approximately **six days** after their initial meeting, on February 28, 2007,

Ms. Collins-Smee sent an email to the IBM Human Resources Executive assigned to work with her indicating that she had determined that Mr. Castelluccio needed to be replaced as VP of Public Sector. (Id., ¶36).   IBM has identified no conduct attributable to Mr. Castelluccio between the time Ms. Collins-Smee became Mr. Castelluccio's supervisor in early February and her email of February 28, 2007 warranting her precipitous decision to replace Mr. Castelluccio.  (See Defendant's Local Rule 52(a)(1) Statement, dated September 20, 2010).

Although Mr. Castelluccio is certain that Ms. Collins-Smee never made her intentions known to him, she stated to her HR executive that she had spoken with Mr. Castelluccio, and "he understands and also wants to move, he knew for a while that is was not working." (Pl. Facts, ¶¶37-38). Ms. Collins-Smee's statement was patently false.  (Id., ¶39).  Mr. Castelluccio would not have agreed to be replaced as Vice President unless an open position had been identified for him and there was an agreement in place for him to assume that position. (Id., ¶40).  At no time in February, March, April or May of 2007 did Ms. Collins-Smee inform Mr. Castelluccio that his performance as VP of Public Sector was sub-par, nor did she bring to his attention any complaints about his performance.  (Id., ¶¶41, 51).

In March 2007, a somewhat similar incident occurred between Ms. Collins-Smee and Mr. Castelluccio.  Without any reason to do so, Ms. Collins-Smee commented to Mr. Castelluccio that one of his direct reports, Ken Wisse, was "old enough to retire."  (Id., ¶42).  It was only after Ms. Collins-Smee commented on Mr. Wisse's retirement eligibility that she inquired about his job function.  (Id., ¶43).   At this time, Mr. Wisse was 59 years old.[4]  (Id., ¶42).

In March of 2007, Ms. Collins-Smee selected Miguel Echavarria, 11 years junior to Mr. Castelluccio, to replace him in his VP of Public Sector position. (Id., ¶44).   Her articulated

---

[4] All references made to individuals' ages in this Memorandum refer to the individual's age at the time that the employment decision went into effect, rather than the individual's current age.

subjective basis for removing Mr. Castelluccio from his position was that he "was not working out" and "wasn't exhibiting the proper leadership of the accounts in the public sector." (Id., ¶50). Although Ms. Collins-Smee had received complaints about Mr. Castelluccio's performance from two of her colleagues at IBM,[5] she did not fully rely on their assessments, but claims she made her own independent observations. (Id.). Notably, IBM contends that some of these same complaints were made to Mr. Castelluccio's former manager, Mr. Jones. In contrast to Ms. Collins-Smee, Mr. Jones did not find these complaints to be indicative of poor performance, as he specifically praised Mr. Castelluccio's solid leadership and people management skills in Mr. Castelluccio's 2006 PBC and did not make mention of the complaints. (Id., ¶53).

Furthermore, Ms. Collins-Smee admits she did not review Mr. Castelluccio's 2006 comprehensive, annual evaluation prior to making her decision, despite the facts that she had access to it and it had been completed approximately one month earlier by Mr. Castelluccio's prior supervisor, Mr. Jones. (Id., ¶¶45-46). Ms. Collins-Smee claims, however, that after she assumed Mr. Jones' position, she spoke with him regarding Mr. Castelluccio's job performance and other personnel matters as part of the transition process. (Id., ¶47). Specifically, Ms. Collins-Smee testified that Mr. Jones told her that Mr. Castelluccio's appointment as VP of Public Sector "hadn't worked well previously," and that there had been "issues" in the role relating to "leadership on the accounts." (Id.). Mr. Jones directly and unequivocally contradicts Ms. Collins-Smee's testimony on these points. (Id.). Mr. Jones averred not only that he **never** discussed Mr. Castelluccio's performance with her, but also that he never had **any** conversation with her regarding the transition

---

[5] Specifically, IBM alleges that Ms. Collins-Smee received complaints regarding Mr. Castelluccio from David Liederbach ("Mr. Liederbach"), who was General Manager, Public Sector, IBM Global Technology Services, in 2007 and was a peer of Ms. Collins-Smee. (Pl. Facts ¶¶48-49). Ms. Collins-Smee testified that she had no occasion to seek advice from Mr. Liederbach. (Id., ¶49). IBM also alleges that Keenie McDonald purportedly complained to Ms. Collins-Smee about Mr. Castelluccio. Ms. McDonald was Managing Director for IBM's WellPoint account in 2007, which was just one of nearly *30 accounts* managed by Mr. Castelluccio. (Id., ¶52). Notably, the complaints made by Mr. Liederbach and Ms. McDonald were neither shared with Mr. Castelluccio, nor documented in his PBC. (Id., ¶51).

A-168

Case 14-2854, Document 62, 03/13/2015, 1460796, Page180 of 289
Case 3:09-cv-01145-DPS   Document 69   Filed 11/15/10   Page 9 of 53

of his duties, despite his attempts to do so. (Id.). Mr. Jones' testimony casts a sizeable shadow of doubt on the truthfulness of Ms. Collins-Smee's testimony and her veracity in general.

**Mr. Castelluccio's Assignment to the WellPoint Account and Subsequent Removal**

The WellPoint service contract was universally regarded as a deeply troubled contract on which IBM was losing millions of dollars. (Id., ¶¶55-59). Ms. Collins-Smee immediately became aware of the problems with WellPoint when she assumed her role as General Manager of ITD Americas. (Id., ¶¶54, 68-72). Mr. Liederbach described the WellPoint contract to Ms. Collins-Smee as his "largest, most important and most challenged client/contract." (Id., ¶54). The CIO of WellPoint, Mark Boxer ("Mr. Boxer") was also reputed to be hard to work with and difficult to please. (Id., ¶73).

Michael Morin ("Mr. Morin"), the Delivery Project Executive ("DPE") assigned to the WellPoint account, had raised significant concerns about the handling of the WellPoint account and expressed his frustration with IBM's failure to address the delivery issues with the WellPoint account. (Id., ¶61). As a result of the overwhelming strain that the position placed on him, Mr. Morin resigned on March 20, 2007. (Id., ¶62). Ms. Collins-Smee instructed Mr. Castelluccio to temporarily assume Mr. Morin's duties immediately while the search for his replacement ensued.[6] (Id., ¶63).

In addition to continuing to serve as VP of Public Sector, Ms. Collins-Smee formally designated Mr. Castelluccio as "acting DPE" for WellPoint on March 31, 2007. (Id., ¶64). This was intended as a two-week assignment until the candidate previously selected for the position, Kenneth

---

[6] Immediately following Mr. Morin's resignation, Ms. Collins-Smee stated that the WellPoint account "was way too much for [Mr. Morin], he has been very frustrated and been unsuccessful turning this difficult situation around." (Pl. Facts, ¶74). Despite Mr. Morin's resignation from the WellPoint account and apparent lack of success, IBM retained him and he is now serving in the same capacity (i.e., as a DPE) at a comparably sized IBM account. (Id., ¶75). Mr. Morin was 55 years old in March of 2007. (Id., ¶76).

Weiss, age 47, would be available to assume responsibility for the role.[7]  (Id., ¶¶64, 67).  However, Mr. Weiss did not assume the role of DPE of WellPoint as scheduled because his candidacy was rejected by Mr. Boxer.  (Id., ¶77).  Accordingly, Mr. Castelluccio continued to perform two full-time positions as VP of Public Sector and DPE of WellPoint throughout April, May and part of June 2007.  (Id., ¶78).  In his role as VP of Public Sector, in addition to work on other Public Sector accounts, Mr. Castelluccio was required to perform substantial work on a "Resource Action," and a "LEAN" initiative.  (Id., ¶¶78-80, 84).  These two companywide initiatives were complex and required a great deal of his time and energy during April and May of 2007. (Id., ¶81).  Ms. Collins-Smee was certainly aware of the extraordinary demands these two assignments placed upon Mr. Castelluccio.  (Id., ¶82).  Indeed, there is strong suggestion that the assignment of Mr. Castelluccio to these dual roles was a calculated attempt to compel him to retire.  This view is bolstered by a candid email sent by Mr. Liederbach to Ms. Collins-Smee in which he stated that between working on the WellPoint account and the Resource Action, Mr. Castelluccio will "**implode**."  (Id., ¶83).

In June of 2007, Ms. Collins-Smee informed Mr. Castelluccio that she had replaced him as VP of Public Sector with Miguel Echavarria and that he would be working on the WellPoint account as DPE on a full-time basis.  (Id., ¶85).  Prior to this date, Mr. Castelluccio had been unaware that he was being replaced in his VP of Public Sector position, despite the fact that Ms. Collins-Smee had made the decision in late February.  (Id., ¶86).

Although Mr. Castelluccio believed that he had been assigned as the new DPE of WellPoint as of June 2007, discovery revealed that his assignment was viewed as "temporary" by Ms. Collins-Smee, IBM and WellPoint.  (Id., ¶87).  Ms. Collins-Smee continued to lead a search for a permanent

---

[7] Notably, IBM's commentary to the job posting for the WellPoint DPE position on April 5, 2007, stated that Robert Zapfel, Ms. Collins-Smee's manager, was concerned that "customer issues" might arise if Mr. Weiss's responsibilities were split between WellPoint and another account. (Pl. Facts, ¶66).  Mr. Zapfel gave conditional approval to Mr. Weiss's assignment to WellPoint provided that IBM disclosed that he would be performing another role in addition to his role at WellPoint. (Id.).

A-170

Case 14-2854, Document 62, 03/13/2015, 1460796, Page182 of 289
Case 3:09-cv-01145-DPS   Document 69   Filed 11/15/10   Page 11 of 53

candidate for the WellPoint DPE job continuously between April and September 2007, when Mr. Castelluccio's replacement ultimately was approved. (Id., ¶89). Mr. Castelluccio was never formally presented to Mr. Boxer or interviewed as IBM's candidate for the DPE position. (Id., ¶90). Rather, Mr. Boxer always viewed Mr. Castelluccio as an "interim DPE" and a temporary leader. (Id., ¶91). Several other younger candidates (ages 46, 48, 55, and 44) were vetted for the WellPoint DPE position between April and September of 2007. (Id., ¶¶92-94, 96, 98). Three of those candidates were rejected and one was rendered unavailable by his supervisor. (Id., ¶¶93, 95, 97, 99). In early September 2007, IBM considered Gordon Crawford, then 59 years old, for the WellPoint DPE position. (Id., ¶100). Mr. Boxer approved the selection of Mr. Crawford as WellPoint DPE in mid-September 2007. (Id., ¶101).

On or about November 21, 2007, Ms. Collins-Smee scheduled a meeting with Mr. Castelluccio, during which she informed him that he was being replaced as DPE of WellPoint by Mr. Crawford beginning in January of 2008. (Id., ¶103). Prior to that time, Mr. Castelluccio did not know that he was being replaced as DPE of WellPoint or that Mr. Crawford was being considered for the position. (Id., ¶104). When Mr. Castelluccio asked Ms. Collins-Smee about his future with IBM during this meeting, she *again* told him that he was eligible to bridge to retirement.[8] (Id., ¶105). Mr. Castelluccio *again* informed Ms. Collins-Smee that he had no interest in retiring, to which Ms. Collins-Smee responded that she would assist him in finding a new position at IBM. (Id., ¶106).

Mr. Castelluccio was not informed of any specific "complaints" made by WellPoint regarding his performance until after he filed this lawsuit. (Id., ¶109). The majority of "complaints" made by WellPoint related either to IBM's failure to assign a *permanent* DPE to its account, or to Mr. Castelluccio's inability to devote sufficient time to WellPoint due to his assignment to two full-time

---

[8] Ms. Collins-Smee has admitted discussing retirement with Mr. Castelluccio in the context of a discussion of "new roles" for him at IBM, but could not recall specific details of the conversation. (Pl. Facts, ¶107). Ms. Collins-Smee recalls that Mr. Castelluccio was very interested in continuing to work and made it absolutely clear that he was not interested in retirement. (Id., ¶¶108, 255).

jobs. (Id., ¶110). Mr. Boxer also complained about Mr. Castelluccio not being on a "crit sit" or "SWAT" call, only to be informed either that Mr. Castelluccio was, in fact, on the call or was away on vacation. (Id., ¶111). Ms. Collins-Smee could not recall any document wherein any WellPoint representative complained about Mr. Castelluccio's performance on the account. (Id., ¶112). Mr. Castelluccio was never placed on a "performance improvement plan," nor was he given an interim PBC review with amended performance goals, in contravention of IBM's PBC policy applicable to all full-time employees. (Id., ¶¶113, 127). He was not even afforded an informal performance review. (Id., ¶113).

The objective evidence demonstrates that the WellPoint account *improved* under Mr. Castelluccio's management. (Id., ¶¶114-120). A client satisfaction survey completed by WellPoint in February 2008 for work performed in 2007 revealed an overall satisfaction rating of 8 out of 10, and it was noted that "the pace of improvement in the last six months is probably faster than the previous eighteen by far."[9] (Id., ¶¶115, 118).

Significantly, it is not uncommon at IBM for customers on highly troubled contracts to complain about services or individuals or request that particular individuals be removed from the account. (Id., ¶121). Because these complaints usually pertain to faults within the contract itself or to personality conflicts, such complaints generally are not viewed as indicative of poor job performance.[10] (Id., ¶122). If the conflict between the customer and the IBM employee cannot be

---

[9] Mr. Castelluccio's positive performance as DPE of WellPoint is also substantiated by notes of appreciation regarding both his individual performance and the successful performance of his team. (Pl. Facts, ¶119). Further, a chart of "performance highlights" on the account documented that the number of outages on the account decreased dramatically in April of 2007 and remained consistently lower for the rest of the year. (Id., ¶120). The monthly losses also significantly decreased during Mr. Castelluccio's tenure. (Id.).

[10] For example, Mr. Boxer specifically requested that Mr. Liederbach—the IBM employee who negotiated the WellPoint contract—no longer be involved with the account, stating that he "would be personally disappointed if [he] found that [Mr. Liederbach] was still somehow directly in the mix on wellpoint even albeit behind the scenes and not visible to me directly." (Pl. Facts, ¶124). Despite Mr. Boxer's dissatisfaction with Mr. Liederbach, this did not negatively impact on his career at IBM. (Id., ¶125). WellPoint also

A-172

Case 14-2854, Document 62, 03/13/2015, 1460796, Page184 of 289
Case 3:09-cv-01145-DFS Document 69 Filed 11/15/10 Page 13 of 53

resolved, then the IBM employee typically is moved to an alternate account. (Id., ¶123).

At the end of January, 2008, Ms. Collins-Smee contacted Mr. Castelluccio and informed him that she was "thinking of" lowering his PBC rating for 2007. (Id., ¶128). Mr. Castelluccio was surprised to learn this because he previously sent her a summary of all of the accomplishments he had achieved in his dual roles during 2007. (Id.). During the conversation, it became evident to Mr. Castelluccio that Ms. Collins-Smee had not read his summary, as she did not argue or contest any of his points. (Id., ¶129). Rather, Ms. Collins-Smee asked him to provide an expanded summary, which he did. (Id., ¶¶129-130). Ms. Collins-Smee contacted Mr. Castelluccio after reviewing the summary and agreed that he deserved a "2" PBC rating for 2007. (Id., ¶131). While IBM now takes great pains to distance itself from this document, the operative fact remains that in Ms. Collins-Smee's final, year-end evaluation, she rated Mr. Castelluccio as a "solid contributor." (Id.). Furthermore, this official rating was approved by Ms. Collins-Smee's manager, Robert Zapfel. (Id., ¶132).

The optional comments Ms. Collins-Smee made in Mr. Castelluccio's 2007 PBC did not indicate that his performance in 2007 was unsatisfactory or that he had been removed from his position for performance-based reasons. (Id., ¶134). Rather, the comments were positive overall and noted that the team led by Mr. Castelluccio on the troubled WellPoint account "made significant progress on programs to improve service quality and reduce cost…" (Id., ¶135). Ms. Collins-Smee did not inform Mr. Castelluccio at any point orally or in writing that she viewed his performance as unsatisfactory and gave no indication that his job was in jeopardy. (Id., ¶136). Given IBM's well-established protocol for managers to identify performance goals and provide feedback to employees on how to achieve those goals (id., ¶¶140-144), the absence of any remediation measures or documented criticism of Mr. Castelluccio, casts grave doubt on her revisionist portrayal of Mr. Castelluccio as a sub-par performer.

---

specifically requested that other IBM employees be removed from its account at various times. (Id., ¶126). Those employees were placed in alternate positions at IBM. (Id.).

**Ms. Collins-Smee's Failure to Follow IBM's Job Placement Procedures**

It is common practice at IBM for employees to be transferred between positions and departments as needed, for various reasons. (Id., ¶146). An IBM employee who is not assigned to a specific role and does not have a defined full-time responsibility is deemed "benched." (Id., ¶147). IBM employees typically do not spend a long time "on the bench" before being assigned to a new position or temporary work. (Id., ¶148). One of IBM's "promotion principles" in 2008 was to ensure placement of senior executives "on the bench" before promoting new executives. (Id., ¶149). It is also typical at IBM to inform executives as soon as possible that they are going to become available for a new position so they can work with their supervisor to find a new role at IBM and avoid being benched. (Id., ¶154). For the same reason, it is customary to inform an employee if he or she is working in a "temporary" role. (Id., ¶155). It is unusual for an IBM executive to be removed from a position without first arranging for a temporary or permanent assignment to an alternate account. (Id., ¶156). After Mr. Castelluccio was removed from the WellPoint account, however, he was essentially "benched," although he continued to work on the transition of the WellPoint account for several weeks through January and February of 2008. (Id., ¶161).

Contrary to IBM's practices, Ms. Collins-Smee did not give Mr. Castelluccio any temporary assignments or projects in 2008, despite her presumed knowledge of such assignments. (Id., ¶¶162-167). If Mr. Castelluccio had been assigned to a special project or temporary assignment, it would have assisted him in finding an alternate position at IBM because it would have provided him with continued access to co-workers and allowed him to increase his skills and capabilities. (Id., ¶168).

Mr. Castelluccio needed Ms. Collins-Smee's assistance in locating a new position within IBM, particularly because executive positions at IBM are not posted. (Id., ¶170). The support of an employee's immediate supervisor is "one of the major support structures" at IBM and such support

was an "important avenue" for getting onto a slate of candidates for an open position. (Id., ¶171).  If

a manager or executive "sponsor" does not advocate for an executive during a Five Minute Drill, it

impacts that executive's ability to find a new position at IBM. (Id., ¶173).

Executive positions are identified in documents known as "Five Minute Drills."[11] (Id., ¶150).

These documents are distributed among IBM management and discussed on a monthly basis in

meetings also referred to as "Five Minute Drills." (Id., ¶152).  It is IBM protocol for executives

without jobs to be identified on Five Minute Drills.  (Id., ¶174).  It is also the primary responsibility

of the executive's General Manager to make the executive visible to others and to place the

executive on the Five Minute Drill as soon as possible.  (Id., ¶¶172, 174).   The participants of the

Drill are the only individuals who are authorized to view the Five Minute Drill Report. (Id., ¶177).

The participants of each Drill include the direct reports of the General Manager who is

running the Drill. (Id., ¶178).   When Ms. Collins-Smee removed Mr. Castelluccio from his position

as VP of Public Sector, he was not given access to her Five Minute Drills, or any other IBM Five

Minute Drills.  (Id., ¶180).  Ms. Collins-Smee approved all executive and customer-facing roles filled

within the ITD Americas organization and had control over which employees were submitted for

consideration as candidates on her Five Minute Drills.  (Id., ¶¶183-184).    Ms. Collins-Smee also

participated in the Five Minute Drills of other groups and could have advanced Mr. Castelluccio as a

---

[11] Generally, each Five Minute Drill contains a section announcing personnel changes, a section listing open
job opportunities and the candidates being considered for each job, and a section listing executives who are
ready to be moved.  (Pl. Facts, ¶153).  There are several different iterations of the Five Minute Drills.  (Id.,
¶175).  Various organizations within IBM conducted their own Five Minute Drills and the contents of the
documents generated in the drills are deemed "confidential." (Id.). The ITD Americas Five Minute Drill was
related to Ms. Collins-Smee's organization, ITD Americas, and facilitated by Mr. Holmes.  (Id., ¶176).  Other
Five Minute Drills at IBM in 2007-2008 included those identified as "TTD," "IT Delivery," "IO for ITD" and
"IO ITD Zapfel" (collectively "Zapfel Drills") were run by Robert Zapfel and identified executive openings
and tracked executive movement in the entire IO ITD organization, including ITD Americas.  (Id., ¶181).
The Five Minute Drills identified as "GTS" were run by Patrick Kerin and identified executive openings and
tracked executive movement in the Global Technology Services organization.  (Id., ¶182).

candidate for positions in other organizations.[12] (Id., ¶¶185-186).

Although Ms. Collins-Smee had determined in February of 2007 to replace Mr. Castelluccio as her VP of Public Sector and it would have been appropriate for her to place him on her Five Minute Drill at that time, he was not placed on the "ITD Americas" until January 2008, nearly one year later. (Id., ¶192). Moreover, the January 2008 ITD Americas drill was the *only* time Mr. Castelluccio ever appeared on any of her monthly drills. (Id., ¶193).

Mr. Castelluccio was treated less favorably than similarly situated younger executives with respect to job placement.[13] Ms. Collins-Smee announced seven personnel changes within her organization in May 2008. (Id., ¶200). Mr. Castelluccio was qualified for all of the positions described in the email, but Ms. Collins-Smee did not inform him of these job openings. (Id., ¶201). All of the individuals who filled those positions were younger than Mr. Castelluccio. (Id., ¶202). One position filled by Tim Smith, age 51, was described as a "special assignment" reporting to Ms. Collins-Smee.[14] (Id., ¶¶203-204). Various other positions in Ms. Collins-Smee's organization for which Mr. Castelluccio was qualified, but not considered as a candidate, were awarded to executives with less experience who were at least 10 years younger than Mr. Castelluccio. (Id., ¶¶232-240). These included Ed Fung, age 38; Ed Tidik, age 50; Donald Woodward, age 50; Ron Atkins, age 46; Richard DeLeo, age 50; Jim Carrubba, age 50; Douglas Farris, age 50; and Bettina Hines, age 50.

---

[12] An employee cannot choose to be included on a "short list" of candidates for a position on his own initiative. (Id., ¶187).

[13] Although Mr. Castelluccio was a Band C executive, he is similarly situated to Band D executives with respect to job placement.. The commentary to the posting of Mr. Castelluccio's VP of Public Sector position specifically noted that there was a "very small pool" of Band C jobs and Mr. Castelluccio needed to "consider D roles." (Pl. Facts, ¶198). Mr. Castelluccio informed Ms. Collins-Smee that he was willing to consider Band D positions in addition to Band C positions. (Id., ¶196). Where Mr. Castelluccio's name appeared on Five Minute Drills, it typically stated that he was "available for C or D jobs." (Id., ¶197). Band C IBM executives are often considered for Band D roles. (Id., ¶199).

[14] In total, six newly created positions were filled in May 2008, including five in the Integrated Operations organization, over which Ms. Collins-Smee had direct input or control. (Id., ¶207). Mr. Castelluccio was considered for only one of those positions, which was the position outside of Integrated Operations. (Id.).

(Id.).

Mr. Castelluccio was also qualified but not considered for temporary executive assignments available in 2008.  (Id., ¶¶208-09, 214-17).  One temporary assignment was granted to an executive named William Ireland, age 53, who had a negative performance history.  (Id., ¶¶209-10).  Notably, Mr. Ireland was described by Garrett Walker, the IBM Human Resources VP for ITD, as "an average performer at best," and "a guy who wants to sit in the back seat." (Id., ¶210).  Mr. Walker said he was "not impressed" by Mr. Ireland and stated that, "[w]e should not be pushing hard to place a US assignee into highly key positions in growth regions who is [sic] average performer or less *and has indicated he wants to bridge to retirement.*"  (Emphasis added).  (Id., ¶¶210, 212).  Mr. Walker further stated that Mr. Ireland was "less then 2 years from retirement . . . and we should NOT be puttin [sic] him in play for international assignments because it is convenient." (Id., ¶213).  Yet, Mr. Ireland was assigned to a temporary international executive assignment in lieu of Mr. Castelluccio. (Id., ¶209).

Remarkably, Mr. Castelluccio was considered for only **3** out of **106** positions at IBM for which he was qualified over the course of fifteen months, as determined on the basis of the Five Minute Drills provided in discovery, and listed as a potential candidate for just one position. (Id., ¶¶2218, 220, 231).  Mr. Castelluccio was not informed of his candidacy for that one position and did not receive an interview. (Id., ¶¶221-23).  The position was filled by Kevin Hassett, who was a Band 10 non-executive in May 2008, two levels lower than Mr. Castelluccio's Band C status, and approximately ten years younger than Mr. Castelluccio.  (Id., ¶¶224-25).

The evidence demonstrates that Ms. Collins-Smee raised Mr. Castelluccio as a candidate for only two positions.  (Id., ¶227).  Mr. Castelluccio was interviewed for one of these positions as a result of his own initiative. (Id., ¶228).  With respect the second position, Ms. Collins-Smee merely asked that Mr. Castelluccio's name be added to the slate in a Five Minute Drill "for the record." (Id.,

¶229).  This second position was too little, too late as it occurred approximately two weeks before Ms. Collins-Smee presented Mr. Castelluccio with his separation papers and informed him that he had until June 30, 2008 to find a new job or else be terminated from IBM.  (Id., ¶¶258-59).

Further, at least six younger executives in the ITD Americas organization whose assignments ended or who were removed from their positions were added to Ms. Collins-Smee's Five Minute Drill and quickly placed in new roles in lieu of Mr. Castelluccio.  (Id., ¶¶241-47).  The ages of those executives were 43, 44, 56, 45, 44, and 47.  (Id., ¶¶242-47).  Notably, the average age of the Vice Presidents who reported to Ms. Collins-Smee in 2009, one year after his termination, is *eleven* years younger than Mr. Castelluccio.  (Id., ¶268).

**Mr. Castelluccio's Termination**

Mr. Castelluccio contacted Garrett Walker, then a Vice President of Human Resources in the ITD organization at IBM, on February 15, 2007, to discuss his concern that Ms. Collins-Smee had threatened to lower his PBC rating in an effort to jeopardize his future career and to pressure him to retire.  (Id., ¶248).  He further expressed his frustration with Ms. Collins-Smee's failure to assist him to find a new role or assign him any temporary work. (Id.).  Mr. Walker counseled Mr. Castelluccio to meet with Ms. Collins-Smee and urge her to assist him in locating a position or to provide him with work assignments. (Id., ¶250).  Subsequently, Mr. Castelluccio scheduled a meeting with Ms. Collins-Smee in March of 2008.  (Id., ¶251).

In that meeting, Ms. Collins-Smee glibly responded to Mr. Castelluccio's request for her assistance that if no meaningful work could be found for him, he should look at retiring from IBM. (Id., ¶253).  Mr. Castelluccio again stated - for the third time - that he did not want to retire and wanted to continue his career at IBM. (Id., ¶254).  Ms. Collins-Smee conceded that it would have been inappropriate to raise the issue of retirement with Mr. Castelluccio repeatedly where he had made clear his lack of interest in retirement.  (Id., ¶256).  Ms. Collins-Smee's repeated references to

16

retirement, after Mr. Castelluccio clearly indicated his lack of interest in retirement, telegraphed to Mr. Castelluccio that she believed he should retire from IBM.  (Id., ¶257).

On or about May 20, 2008, Mr. Castelluccio met with Ms. Collins-Smee at her request, and she informed him that he would be given until June 30, 2008 to find a new position or else his employment with IBM would be terminated.   (Id., ¶¶258-59). She did not indicate that his termination was due to poor job performance.  (Id., ¶260). In this meeting, Ms. Collins-Smee mentioned once again that Mr. Castelluccio was eligible to retire.  (Id., ¶261).  Following this meeting, Ms. Collins-Smee made a handful of perfunctory inquiries into potential job leads for Mr. Castelluccio.  (Id., ¶262).  Mr. Castelluccio was presented with a severance package on June 2, 2008 and given 21 days to review and accept it.  (Id., ¶¶263, 266).   On June 30, 2008, Mr. Castelluccio's employment with IBM was terminated and he commenced his involuntary retirement.  (Id., 264).

Prior to his termination, Mr. Castelluccio made another complaint of age discrimination to IBM's Human Resources Department.  (Id., ¶269).  A Human Resources representative for IBM, Russell Mandel, initiated an "Open Door" investigation pursuant to IBM's policies and procedures. (Id., ¶270).  In an email to Mr. Holmes dated June 30, 2008, Mr. Mandel noted that if Mr. Castelluccio accepted the severance agreement, the Open Door investigation would be terminated, thereby putting into question the true objective of the investigation.  (Id., ¶272).  Mr. Castelluccio did not accept the severance agreement within the time allotted. (Id., ¶¶266-67).

At the time of Mr. Castelluccio's termination, the Open Door investigation was still pending.  (Id., ¶271).  Mr. Castelluccio was informed in writing by Mr. Mandel on August 11, 2008—well after the expiration of his severance consideration period—of Mr. Mandel's conclusion that management treated him fairly regarding his termination.  (Id., ¶273).  Mr. Castelluccio was not provided with a copy of Mr. Mandel's Open Door Report, nor was he given an opportunity to rebut any of the statements made therein, despite his request to do so.  (Id., ¶275).

It is telling that, although Mr. Mandel was a Consulting HR Professional for IBM and had no expertise in Mr. Castelluccio's field, he expressed his opinion in the Open Door report that Ms. Collins-Smee had "confused issues" in assessing Mr. Castelluccio with a "2" rating for 2007, and should have given Mr. Castelluccio a "3" rating. (Id., ¶276). Mr. Mandel authored an instructive memorandum to Ms. Collins-Smee's supervisor, Timothy Shaughnessy, Vice President of IT Delivery, counseling him to reprimand her for her "mistake." (Id., ¶277).

In his investigation, Mr. Mandel did not ask Ms. Collins-Smee any questions related to her alleged age bias, although it would have been proper to do so. (Id., ¶279). Rather, Mr. Mandel questioned Ms. Collins-Smee only as to Mr. Castelluccio's job performance. (Id., ¶280). The Open Door Report also contradicts Ms. Collins-Smee's testimony identifying at least one conversation she had with Mr. Castelluccio wherein retirement was discussed. (Id., ¶281).

Although IBM now maintains that Mr. Castelluccio was not terminated for poor job performance, but rather from his inability to locate alternate employment within IBM, IBM refused to hire him for a temporary position that became available in July 2010. (Id., ¶282). Mr. Castelluccio was notified that a "select group" of retired IBM Vice Presidents were being contacted due to IBM's need for experienced Vice Presidents to work on various temporary assignments and was asked to let IBM know if he was interested. (Id., ¶¶283-84). Mr. Castelluccio immediately indicated his interest in returning to IBM, but never heard back from IBM. (Id., ¶¶285-86).

### III.    LEGAL STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." (Internal quotation marks omitted.) Williams v.

_____, 456 F.Supp.2d 372, 382 (D. Conn. 2006). A "material fact" is one whose resolution will affect the ultimate determination of the case. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u>

The role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." <u>Edwards v. William Raveis Real Estate, Inc.</u>, 3:08-CV-1907 JCH, 2010 WL 3829060, at *3 (D. Conn. Sept. 22, 2010). Thus, in assessing the record, the Court is to view all inferences and ambiguities in a light most favorable to the nonmoving party. <u>Williams</u>, <u>supra</u>, at 382. "If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 151 (2d Cir. 2000). Further, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves v. Sanderson Plumbing Prod. Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097 (2000).

Summary judgment is sparingly used in discrimination cases, where intent and state of mind are at issue, in that "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).[15]  In the instant case, numerous genuine disputed issues of material fact exist that preclude the granting of summary judgment.

---

[15]See also, <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996) ("Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination").

A-181

Case 14-2854, Document 62, 03/13/2015, 1460796, Page193 of 289
Case 3:09-cv-01145-DFS Document 69 Filed 11/15/10 Page 22 of 53

## IV.   ARGUMENT

### A.   The Elements of a Claim Under the ADEA

The ADEA seeks to "promote employment of older persons based on their ability rather than age ... [and] to prohibit arbitrary age discrimination in employment...." 29 U.S.C. § 621(b). The ADEA further makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[16]

Proof of a violation of the ADEA may be established through either direct or circumstantial evidence. Carlton v. Mystic Transp. Inc., 202 F.3d 129, 135 (2d Cir. 2000). "Direct evidence" of discrimination typically consists of a "smoking gun," such as "an admission by the defendant through a facially discriminatory policy or in an official piece of writing." Edwards, supra, at *5. The Second Circuit has aptly noted that, "[d]irect evidence of discrimination is not necessary . . . because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail. . . ." Carlton, supra, at 135. The Supreme Court likewise has noted that, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Michalic. v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S.Ct. 6 (1960).

It should be noted at the outset that IBM's interpretation of Gross v. FBL Financial Services, Inc., 555 U.S. ___, 129 S. Ct. 2343 (2009), is exaggerated and incorrect.  In Gross, the Supreme Court determined that burden shift in "mixed-motives" cases, as articulated in Price

---

[16] "[I]t is important for a court when reviewing this kind of case to bear in mind the findings Congress made at the time of the ADEA's enactment. Among those findings was that older workers are disadvantaged in retaining employment and regaining it after being discharged, and that unemployment among older workers, relative to younger ones, was high." Carlton v. Mystic Transp. Inc., 202 F.3d 129, 134 (2d Cir. 2000).

Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989), is not available in age discrimination cases under a strict reading of the ADEA.[17] Gross, supra, at 2350. Significantly, the Supreme Court explicitly recognized that "[t]here is no heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion that age was the 'but for' cause of their employer's adverse action . . . and we will imply none." Gross, supra, at 2351, n.4. Despite the Supreme Court's clear elucidation of its holding, IBM nevertheless incorrectly argues that "a plaintiff in an age case must shoulder a *heightened burden* in proving discrimination." (Emphasis added) (D.Br., 18). Notably, the Supreme Court held that, going forward, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action." Id., at 2351. Therefore, the Court did not hold that mixed motives cases may not be brought under the ADEA, only that the burden of persuasion does not shift to the employer.[18]

The analysis of Mr. Castelluccio's claims is governed by the McDonnell Douglas burden shifting test, which is well-settled:

> First, a plaintiff must establish a *prima facie* case of age discrimination. . . . To establish a *prima facie* case of age discrimination, a plaintiff must show four things: (1) he is a member of the protected class; (2) he is qualified for [his] position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination. . . . The burden of establishing a *prima facie* case is not a heavy one. One might characterize it as minimal. . . . Once the plaintiff has established a *prima facie* case of age discrimination, 'the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions'. . . . If, however, the employer articulates such a legitimate, nondiscriminatory business rationale, 'the plaintiff has the burden of proving that [her] age was the real reason for [her] discharge'. . . . That is, 'the final burden rests on the plaintiff to prove not

---

[17] Moreover, IBM's argument may be rendered moot in light of legislation currently pending before Congress (H.R. 3721; S. 1756), which would amend the ADEA and essentially overturn Gross by permitting a "mixed motives" burden shift in age discrimination cases, as was similarly achieved through the Civil Rights Act of 1991's amendment of Title VII.

[18] See Jones v. Oklahoma City Pub. Sch., 617 F.3d 1273, 1277-78 (10th Cir. 2010), wherein the Tenth Circuit refused to apply a heightened evidentiary requirement on an ADEA plaintiff to "prove that age was the *sole* cause of the adverse employment action" pursuant to Gross. (Emphasis added.) The Court explained that its precedent had long established that an employer may be held liable under the ADEA if "age was the factor that made a difference." Id.

A-183

only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff.'

(Citations omitted.) Kelley v. Sun Microsystems, Inc. 520 F.Supp.2d 388, 401 (D. Conn. 2007).

To defeat IBM's Motion for Summary Judgment, Mr. Castelluccio may rely "on the evidence constituting the *prima facie* case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason for the adverse action." Carlton, supra, 202 F.3d at 135. In Reeves, supra, the Supreme Court explained that proof that the employer's proffered explanation for its decision is unworthy of credence constitutes "circumstantial evidence that is probative of intentional discrimination. . . ." Reeves, supra, 530 U.S. at 147. Evidence that the employer's reason is false, in addition to the establishment of the *prima facie* case, usually is sufficient to permit the issue to be decided by the jury. Id., at 148.[19]

### B.   A Reasonable Jury Could Conclude That Mr. Castelluccio Has Established a *Prima Facie* Case of Age Discrimination

IBM's argument that Mr. Castelluccio cannot raise a credible claim of age discrimination with respect to the employment actions taken against him at IBM must fail in light of the evidence presented by Mr. Castelluccio in support of his *prima facie* case. Mr. Castelluccio easily satisfies the requirements of a *prima facie* case of discrimination with respect to the adverse employment actions made by IBM, which burden may be satisfied by "minimal" and "*de minimus*" evidence. Pleau v. Centrix, Inc., 3:06-CV-01626 DJS, 2008 WL 4380515, at *4 (D. Conn. Sept. 24, 2008).

The evidence in this case demonstrates the following:  (1) Mr. Castelluccio was terminated at the age of 61 and thus falls within the protected class; (2) he was undoubtedly qualified[20] for both

---

[19] Age discrimination claims brought under the New York State Human Rights Law are governed by the same standards as those brought under the ADEA. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 467 (2d Cir. 1997).

[20] To establish this prong of his *prima facie* case, Mr. Castelluccio need only make a "minimal showing" that he possessed the basic skills necessary for the performance of the job. Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001).

22

**A-184**

positions from which he was removed in 2007 and for nearly 100 other positions at IBM for which he was not considered as a candidate for transfer; (3) he suffered multiple adverse employment actions, including: (a) removal from a permanent position to an "acting" role on a troubled account; (b) removal from the "acting" position to a "bench" position with no job responsibilities; and (c) eventual discharge from employment at IBM; and (4) the actions occurred under circumstances giving rise to an inference of discrimination.

### 1.   Mr. Castelluccio Suffered Three Adverse Employment Actions

IBM argues that the only actionable claim of discrimination properly before this Court is Mr. Castelluccio's termination, due to the applicable 180-day and 300-day statutes of limitations.  (D.Br. 29).  IBM's argument, however, fails to countenance the doctrine of equitable tolling.

The Second Circuit has recognized that "in appropriate circumstances the time periods governing filing of an age discrimination charge with the EEOC may be 'tolled or delayed.'" Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985).  In Cerbone the Second Circuit noted that, although the applicable period typically begins to run as of the employer's commission of the unlawful act, "court[s] might in some cases permit tolling as a matter of fairness."  Id.  The Court identified examples where the doctrine might apply, including: "to relieve a plaintiff who was actively misled by his employer, or who was prevented in some extraordinary way from exercising his rights," and where, "it would have been impossible for a reasonably prudent person to learn that [an employment decision] was discriminatory."  Id., at 49.

In this case, until he obtained documents produced by IBM in response to discovery propounded in this lawsuit, Mr. Castelluccio had no idea that Ms. Collins-Smee had decided to remove him as VP of Public Sector immediately after becoming his supervisor.  Similarly, while he knew his initial assignment to the WellPoint account was a stopgap measure, once he was replaced in his VP position, he was led to understand that his new position was to serve as the DPE on the

23

A-185

Case 14-2854, Document 62, 03/13/2015, 1460796, Page197 of 289
Case 3:09-cv-01145-DPS Document 69 Filed 11/15/10 Page 26 of 53

WellPoint account. Only through discovery did Mr. Castelluccio learn Ms. Collins-Smee always viewed him as "temporary" in the WellPoint position and had presented multiple younger candidates for the job he was performing while he was performing it. Ms. Collins-Smee's actions were deceptive and actively misled Mr. Castelluccio regarding her intentions and his job security at IBM. If Ms. Collins-Smee had not actively misled Mr. Castelluccio, he would have been on notice that these transfers were detrimental, and he might have been alerted to Ms. Collins-Smee's discriminatory animus. Instead, he only acquired actual knowledge of facts comprising his cause of action when Ms. Collins-Smee informed him that she was thinking of lowering his PBC rating at the end of January 2008. It was not until that time that Mr. Castelluccio reasonably could have determined that his replacement as VP of Public Sector and later his removal as DPE of WellPoint were discriminatory.

IBM also incorrectly argues that these "lateral transfers" do not constitute adverse employment actions because Mr. Castelluccio's title and salary were unchanged. (D.Br. 30-31). There is no "bright line rule" regarding which employment action qualifies as sufficiently "adverse," and courts must make this determination on a case-by-case basis. Nakis v. Potter, 422 F.Supp.2d 398, 419 (S.D.N.Y. 2006). As this Court noted in Gallo v. Second Taxing Dist. of City of Norwalk Operating Under Name of S. Norwalk Elec. & Water, 507 F. Supp. 2d 164, 174 (D. Conn. 2007), a transfer qualifies as an adverse employment action "if the reassignment is, in truth, a demotion." Further, "a transfer that arguably alter[s] the terms and conditions of his employment in a negative way, is sufficient to satisfy the McDonnell Douglas prima facie test." Id.; see also, Nakis, supra, at 420.

Mr. Castelluccio's "lateral transfers" may not have lowered his salary, but they were clearly demotions that negatively altered the terms and conditions of his employment. His removal as VP of Public Sector in which he managed 30 accounts and his assignment as DPE of WellPoint which just was one of these accounts was clearly a demotion. This demotion was also adverse in that Mr.

Castelluccio was removed from a permanent position to "acting" DPE on one of IBM's most troubled accounts. Mr. Castelluccio's subsequent transfer from acting DPE of WellPoint to a "benched" role with no work assignments was indisputably a demotion. In its own Memorandum, IBM characterized this benched position as "paid leave." (D.Br. 20). Thereafter, his opportunities for advancement were severely curtailed. IBM's so-called "lateral transfers" were the first steps in a three-step process that ultimately led to his termination.

At the very least, however - as this Court has recognized - IBM's prior actions may be considered as evidence of IBM's discriminatory intent and in support of Mr. Castelluccio's claim that his termination was due to age discrimination. Wilks v. Elizabeth Arden, Inc., 507 F.Supp.2d 179, 192 (2007). Although IBM attempts to argue that "the facts surrounding" Mr. Castelluccio's transfers are not material to this case (D.Br. 3, n.1), it is well-settled that Mr. Castelluccio is not barred from using prior acts as "background evidence" to support any claim of discrimination that this Court determines to be timely. Id., at 193; see also, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102, 122 S.Ct. 2061 (2002).

### 2. A Reasonable Jury Could Conclude That the Adverse Employment Actions Mr. Castelluccio Suffered Occurred Under Circumstances Giving Rise to an Inference of Discrimination

Mr. Castelluccio has produced sufficient evidence to establish a genuine disputed issue of material fact as to whether his transfers and termination occurred under circumstances giving rise to an inference of discrimination. IBM improperly analyzes the evidence in this case as discrete, isolated acts, rather than on a cumulative basis. Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).[21] Rather, Mr. Castelluccio's claim must be assessed on the basis of the totality of the

---

[21] In Byrne v. Town of Cromwell Board of Education, 243 F. 3d 93, 102 (2d Cir. 2001), the Court explained, "[a]t summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. See Howley, 217 F.3d at 151; Stern v. Trustees of Columbia Univ., 131 F.3d 305, 314 (2d Cir.1997); cf. Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (holding that an

evidence, not on each fact standing alone.  See id.  It is also improper for Mr. Castelluccio's termination to be viewed separately from the prior transfers orchestrated by Ms. Collins-Smee, as those transfers resulted in his being benched and his ultimate termination.  As such, the evidence must be viewed collectively.[22]

### a.   Replacement by a Substantially Younger Employee

Mr. Castelluccio was replaced in his position as VP of Public Sector by an employee eleven years younger.  This age difference is presumptively "substantial" under the ADEA and establishes an inference of age discrimination.[23]  See Tarshis v. Riese Org., 211 F.3d 30, 38 (2d Cir. 2000); Hartley v. Wisconsin Bell, 124 F.3d 887, 893 (7th Cir. 1997).  At the time of this replacement, Mr. Castelluccio was the oldest of all of Ms. Collins-Smee's direct reports.  Notably, the average age of Ms. Collins-Smee's direct reports in 2009, one year after Mr. Castelluccio's termination, was eleven years younger than Mr. Castelluccio.

Despite IBM's characterization of this employment action as a "hiring decision," this was *not* an instance where Mr. Castelluccio and Mr. Echavarria applied for the same job and Mr. Castelluccio

---

invidious discriminatory purpose may often be inferred from the totality of the relevant facts)." (Internal quotation marks omitted).

[22] Although Mr. Castelluccio submits that IBM engaged in three discrete discriminatory adverse employment actions, the analysis of Mr. Castelluccio's *prima facie* case and establishment of pretext will be discussed collectively, particularly as the prior transfers led to his eventual termination.

[23] IBM's assertion that a replacement employee who falls within the same protected class negates an inference of discrimination is plainly inapplicable here.  It is well-settled that "*McDonnell Douglas's* fourth *prima facie* factor, as applied to ADEA cases, is properly modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." Pleau v. Centrix, Inc., supra, 2008 WL 4380515, at *5, n.3. See also, Keathley v. Ameritech Corp., 187 F.3d 915, 920 (8th Cir. 1999) ("[I]t is considered 'hornbook law' that the ADEA action can be based on discrimination between older and younger members of the protected class"); Whittington v. Nordam Group Inc., 429 F.3d 986 (10th Cir. 2005) ("[t]he replacement of a 45-year-old by a 40-year-old would be less suspicious than the replacement of a 62-year-old by a 57-year-old.  Comparing a 62-year-old worker with one who is 57, an employer may think it better to retain someone who will stay with the company another eight years . . . rather than one who would be retiring in three years"); and Edwards, supra, 2010 WL 3829060, at *7 ("difference between someone 'in their forties' and someone 'in their fifties' could appear much more pronounced to a decision-maker").

was not selected, as in <u>Byrnie v. Town of Cromwell Bd. Of Educ.</u>, 243 F.3d 93, 103 (2d Cir. 2001). Rather, Mr. Castelluccio was cast out of his position as VP of Public Sector to make way for Mr. Echavarria, a substantially younger employee.[24]

Mr. Castelluccio's subsequent "replacement" by an individual close to his age in the WellPoint position does not impact his *prima facie* case.  *First*, the record is clear that Mr. Castelluccio was never presented as a candidate for the WellPoint position and was viewed by IBM and by the client as the "interim" DPE.  In that he never actually *had* the job, he could not actually be *replaced* in that job. Rather, his temporary assignment to WellPoint was a mere pit-stop along the road to his eventual termination, and a reasonable jury could conclude that this assignment was intended either to coerce his voluntary retirement, or to set him up for failure to support his termination.

*Second*, Mr. Crawford's age does not preclude Mr. Castelluccio from prevailing on his claim that he was discriminated because of his age.  See <u>Hodges v. Rensselaer Hartford Graduate Ctr., Inc.</u>, 3:06-CV-850 (PCD), 2008 WL 793594, at *6 (D. Conn. Mar. 20, 2008) ("[b]ecause the purpose of federal statutes such as the ADEA is 'protecting individuals, rather than a protected class as a whole,'" the failure of a decision-maker to discriminate against other members of the protected class did not "give rise to an inference that the decision-maker did not discriminate against Plaintiff' or "cast doubt on the sufficiency of Plaintiff's *prima facie* case").  Accordingly, IBM cannot escape liability for discriminating against Mr. Castelluccio even if it proves favorable treatment of other members of his protected class.  See <u>id.</u>; see also <u>Vancour v. Bozzuto's Inc.</u>, No. 03-CV-2088 (JBA), 2006 WL 758636, at *7 n. 6 (D.Conn. Mar. 24, 2006).

*Third*, Mr. Crawford's age is insignificant in light of the fact that several other candidates previously were considered or presented to WellPoint for the DPE position instead of Mr.

---

[24] IBM's argument that this fact "alone" cannot defeat summary judgment (D.Br. 27, n. 21) is correct, but improper in light of the fact that Mr. Castelluccio has produced a wealth of additional evidence to support his claim.  IBM again fails to address the evidence cumulatively.

Castelluccio, all of whom were significantly younger than Mr. Castelluccio (ages 46, 48, 55 and 44). Essentially, therefore, Mr. Crawford was chosen by *WellPoint*, not IBM. The proper focus with respect to IBM's discriminatory actions relating to this transfer is on Ms. Collins-Smee's conduct: (a) in failing to submit Mr. Castelluccio as a candidate to WellPoint; (b) misleading him and then failing to inform Mr. Castelluccio of her intentions with respect to his future at IBM; and (c) in failing to consider him for available positions in her organization for which he was qualified during 2007. It is well settled in this jurisdiction that, "[a]n inference of discriminatory intent may be established by, *inter alia*, ... 'the sequence of events leading to the plaintiff's discharge.'" Miller v. Hartford Fire Ins. Co., 652 F.Supp. 2d 220, 231 (2009) (citing Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009)).

        **b.**    **Suggestions of Retirement by Ms. Collins-Smee**

An inference of age discrimination can also be drawn from Ms. Collins-Smee's repeated references to retirement when making decisions affecting Mr. Castelluccio's future at IBM, despite the fact that he made it "absolutely clear" to her he had no interest in retiring. Ms. Collins-Smee raised age and retirement in her very first meeting with Mr. Castelluccio.[25] Moreover, this inquiry was the *first sentence* Ms. Collins-Smee spoke to Mr. Castelluccio while acting as his manager. This inquiry was not made with respect to Mr. Castelluccio's future at IBM, but rather was brought up in a meeting to discuss Mr. Castelluccio's accounts. Therefore, this case is analogous to cases in which

---

[25] The fact that Ms. Collins-Smee was a member of the protected class under the ADEA does not support an adverse inference against age discrimination, as IBM argues. (D.Br. 28). In Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998), the Supreme Court rejected the presumption that one member of a protected class cannot discriminate against another member of the same class, noting that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." In Hodges, supra, 2008 WL 793594, at *6, Judge Dorsey declined to make an inference against discrimination where the decision-maker was over the age of 40, noting: "Several courts have held that there is no reason why the . . . reasoning [in Oncale] should not apply to age discrimination cases," citing, *inter alia*, Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir.2003) (en banc); and Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361 (7th Cir.2001).

an inference of discrimination was made on the basis of references to retirement made by a supervisor contemporaneously with decisions about the employee's future. See, e.g., Williams, supra 456 F.Supp.2d at 385.[26]   Tellingly, there is documentary evidence that Ms. Collins-Smee decided to remove Mr. Castelluccio from his position as VP of Public Sector within *six days* after this first meeting.  This decision was made after Ms. Collins-Smee had supervised Mr. Castelluccio's for barely one month, without reviewing Mr. Castelluccio's 2006 PBC prepared one month earlier, and despite the absence of any conduct by Mr. Castelluccio in this short period warranting her derailing of his 40-year career at IBM.[27]   IBM also cannot colorably claim that Ms. Collins-Smee's conduct in this initial meeting (which must be taken as true in deciding this Motion) was reasonable, in that they conceded that such conduct would be "severe misconduct in flagrant violation" of IBM rules. (D.Br. 25, n.19).

Ms. Collins-Smee raised retirement to Mr. Castelluccio twice more, despite his clear statement to her in February 2007 that he was not interested in retiring and wanted to continue working at IBM.  In November 2007, Ms. Collins-Smee informed Mr. Castelluccio that he was being replaced as DPE of WellPoint and relegated to the "bench" and brought up his eligibility for retirement a second time.  Mr. Castelluccio again strongly stated that he was not interested in retirement.  Subsequently, in March 2008, Mr. Castelluccio convened a meeting with Ms. Collins-Smee to discuss her failure to assist him in finding a new position at IBM as she had promised.  In

---

[26] See also, *e.g.*, Carlton, supra, 202 F.3d at 136; Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 564 (1st Cir. 1986); Guthrie v. J.C. Penney, Inc., 803 F.2d 202, 208 (5th Cir. 1986); Schug v. Pyne-Davidson Co., 3:99-cv-1493 (CFD), 2001 WL 34312877, at *4-5 (D.Conn. Dec. 10, 2001); Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68-69 (E.D.N.Y. 2005); and Rottersman v. CBS, 726 F.Supp. 484, 492 (S.D.N.Y. 1989).

[27] IBM claims these remarks are "negated" on the basis of Mr. Castelluccio's failure to report them to Human Resources. (D.Br. 25, n.19).   Mr. Castelluccio's failure to report the "flagrant violation" is certainly understandable based on his version of the meeting, wherein he had no idea that his performance was being questioned or that his job was in jeopardy, and the comments cannot be "negated" for his failure to report them.  The significance of the comments is heightened by the facts that were revealed in discovery, namely that Ms. Collins-Smee surreptitiously decided to remove from his position shortly after this meeting, without informing him of her intent.

that meeting, Ms. Collins-Smee made with her third unsolicited invitation. She told Mr. Castelluccio that if no "meaningful work" could be found for him, he should consider retirement. Ms. Collins-Smee's conduct demonstrates an improper bias against Mr. Castelluccio due to his age. See, e.g., Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 564 (1st Cir. 1986) (repeated retirement inquiries could be interpreted as harassment or "a broad hint" that Plaintiff should retire, particularly since he previously expressed clear intention not to retire). In that Ms. Collins-Smee was the decision-maker with respect to the adverse employment actions taken against Mr. Castelluccio here and had an instrumental role in Mr. Castelluccio's attainment of "meaningful work" and an alternate position at IBM, her comments are particularly invidious and supportive of an inference of discrimination. See Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68-69 (E.D.N.Y. 2005); Rottersman v. CBS, 726 F.Supp. 484, 492 (S.D.N.Y. 1989).

Further indicative of Ms. Collins-Smee's age bias is a remark she made to Mr. Castelluccio in March 2007, regarding Kenneth Wisse. Ms. Collins-Smee asked Mr. Castelluccio about Mr. Wisse's age and also noted that he was "old enough" to retire. Only after referencing his age did she ask about his job duties.

### c. Disparate Treatment Regarding Job Placement

Ms. Collins-Smee's actions in failing to make any legitimate efforts to place Mr. Castelluccio in an alternate position, while actively placing younger, similarly situated employees, supports a strong inference of discrimination. Landwehr v. Grey Advertising, Inc., 211 A.D.2d 583, 583-84 (N.Y. App. Div., 1st Dep't, Jan. 31, 1995) (evidence that plaintiff was qualified for positions awarded to younger employees in reduction in force established prima facie case and raised material questions of fact regarding pretext); see also, Rottersman, supra, 726 F.Supp. at 489, 492 (failed attempts to relocate employee after reorganization despite relocation of younger employees supported prima facie case of age discrimination; and Vaughn v. Mobil Oil Corp., 708 F. Supp. 595, 600-01 (S.D.N.Y.

1989) (evidence of discrimination existed where employer located new positions only for employees outside of protected class).

Ms. Collins-Smee did not place Mr. Castelluccio on her Five Minute Drills for nearly a year after she determined to remove him from his VP position, until January of 2008. And, even then he was inexplicably removed after one month, although his greatest chance to find a new position was within ITD Americas. Mr. Castelluccio was listed on various other Five Minute Drills during 2007, but was completely unaware of that fact. Further, Mr. Castelluccio was not considered as a candidate for *any jobs* whatsoever in 2007, despite the fact that he was highly qualified for dozens of jobs available during that time, including jobs within Ms. Collins-Smee's organization over which she had control that were awarded to substantially younger, less qualified employees.

The objective evidence demonstrates that Ms. Collins-Smee did not advocate on behalf of Mr. Castelluccio and a reasonable jury could conclude that she did not do so because of his age.[28] It is telling that out of **95** separate available positions for which he was qualified between March 2007 and June 2008, Mr. Castelluccio was considered for only **three** and listed as a candidate for only **one**. Ms. Collins-Smee acted as Mr. Castelluccio's executive sponsor at various Five Minute Drills, and had the ability to recommend him as a candidate for available positions or request his addition to the Drill as a "person to discuss." With Mr. Castelluccio's impressive record of service and loyalty to IBM and "Band C" skill level, it can be inferred that if Ms. Collins-Smee had advocated for him as IBM alleges that she did, he would have been named an official candidate for much more than just one position.

---

[28] IBM argues that it was not legally obligated to find Mr. Castelluccio another position after he was replaced as DPE of WellPoint and that Ms. Collins-Smee did no less for him than was required under IBM policies. (D.Br. 21). While it is true that IBM had no "legal duty" to find Mr. Castelluccio an alternate position, it is equally true that if an employer engages in a practice of transferring employees to other positions rather than terminate them, as IBM does by virtue of its Five Minute Drill process, then the employer cannot engage in that activity in a discriminatory manner. See, e.g., Binder v. Long Island Lighting Co., 57 F.3d 193, 200-01 (2d Cir. 1995), abrogated on other grounds by the holding in Reeves, supra, 530 U.S. 133, at 148.

By contrast, various younger executives in Ms. Collins-Smee's organization whose assignments ended or were removed from their positions in 2007 were added to her Five Minute Drill and quickly placed in new roles or "lined up" for new positions in lieu of Mr. Castelluccio. Five of these employees were at least fifteen years younger than Mr. Castelluccio. Ms. Collins-Smee also transferred and promoted younger, less experienced executives into available positions in her organization for which Mr. Castelluccio was qualified during 2007 and 2008. One placement was a described as a "special assignment," which was given to a 51 year-old executive with a background and performance history similar to that of Mr. Castelluccio with 17 years less service to IBM. (Pl. Facts, ¶¶203-06).

Mr. Castelluccio was also passed over for temporary executive assignments that were awarded to younger, less qualified executives, including a temporary executive assignment given to William Ireland, age 53. Mr. Ireland received this temporary executive assignment in lieu of Mr. Castelluccio despite the fact that, prior to his placement, Mr. Walker (the Human Resources VP who facilitated the Five Minute Drills for Ms. Collins-Smee's supervisor) had noted deficiencies with his performance. With respect to Mr. Ireland's general reassignment in IBM (not his eventual placement), Mr. Walker conveyed his opinion that IBM should not "push hard" to place Mr. Ireland because he indicated his intention to "bridge to retirement" and was less than two years from retirement.

Mr. Walker's comments demonstrate a negative attitude toward placement of retirement-age employees and reflect a stereotype that employees nearing retirement are not as diligent or motivated as younger employees. His comments also support a reasonable inference that Mr. Castelluccio was not considered for the temporary position awarded to Mr. Ireland because he had reached retirement age already, particularly as Mr. Walker seriously questioned Mr. Ireland's job performance. See Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998) (statements by

non-decisionmakers can be evidence that discriminatory atmosphere pervades the workplace and infects personnel decisions). Notably, Mr. Castelluccio never indicated his intent to retire and continuously avowed his commitment to keep working.

        **d.**       **Ms. Collins-Smee's Attempt to Lower Mr. Castelluccio's Rating**

An inference of discrimination is also demonstrated by Ms. Collins-Smee's attempt to lower Mr. Castelluccio's 2007 PBC rating to a "3," without sufficient basis. Ms. Collins-Smee informed Mr. Castelluccio that she was "thinking of" rating him a "3," but did not provide him with any explanation for her decision and could not defend any of the points that he raised to her about his performance. After reviewing Mr. Castelluccio's summary of accomplishments in 2007, Ms. Collins-Smee agreed that his performance warranted a "2" rating. Ms. Collins-Smee's attempt to lower Mr. Castelluccio's performance rating without justification, in conjunction with her failure to assist him to find meaningful work and prior comments regarding retirement, further supports an inference that she discriminated against him on the basis of his age. See Miller, supra, 652 F.Supp. 2d at 231-32 (Jury could reasonably infer discrimination on basis of references to eligibility for retirement occurring close in time to discipline and find that employer's actions were part of an extended effort to end plaintiff's employment).

        **C.**       **A Reasonable Jury Could Conclude that IBM's Alleged Non-Discriminatory Reasons for Its Adverse Employment Actions Constituted Pretext for Illegal Age Discrimination.**

IBM has proffered legitimate, non-discriminatory reasons for its adverse employment decisions against Mr. Castelluccio. Specifically, IBM contends that Mr. Castelluccio was removed as VP of Public Sector and DPE of WellPoint due to his "long history" of "unacceptable performance" and internal and external complaints about his performance that precipitated Ms. Collins-Smee's decisions. (D.Br., 31-32). As set forth below, however, Mr. Castelluccio has provided evidence creating a genuine disputed issue of material fact as to

whether Mr. Castelluccio's performance was actually "unacceptable" and whether the decisions were made upon that basis. As to Mr. Castelluccio's termination, IBM contends that he was separated "because he was unable to find a position within IBM" after six months. (D.Br., 20). Mr. Castelluccio also has provided evidence that substantially challenges the veracity of this reason, including evidence that other younger executives were treated more favorably. Notably, Mr. Castelluccio is not required to *prove* that these reasons were pretext - that is the province of the jury. Rather, the Plaintiff is required only to adduce evidence from which a reasonable factfinder could determine that the employer's reason was false or upon which discrimination could be inferred.

A plaintiff can show pretext by "revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002). "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993)

    **1.**    **The Reasons Provided by IBM Are False**

        **a.**    **Mr. Castelluccio's Removal as VP of Public Sector and Assignment to WellPoint**

The objective evidence demonstrates that Mr. Castelluccio's performance as VP of Public Sector was positive and did not justify his removal from the position and replacement with Mr. Echavarria. This is not a case where the fact finder is required to piece together informal notes and comments about Mr. Castelluccio's performance. IBM conducts annual, formal and comprehensive

evaluations of its employees in the form of PBC's.  Significantly, Mr. Castelluccio's positive PBC for 2006 was completed by Mr. Jones only one month prior to his removal from his position by Ms. Collins-Smee.  Notably, Mr. Jones specifically praised the very same leadership and people management skills that Ms. Collins-Smee claims she found wanting in less than 30 days.

A finding of pretext is further supported by Mr. Jones' striking repudiation of Ms. Collins-Smee's sworn statement that she spoke with him regarding Mr. Castelluccio's job performance.  As Mr. Jones made clear in his affidavit, he never discussed Mr. Castelluccio's job performance with Ms. Collins-Smee, nor did he discuss with her *any* personnel matters, contrary to her testimony. This readily supports a finding of pretext, in that the jury could conclude that Ms. Collins-Smee was untruthful regarding her discussion with Mr. Jones and that she fabricated this conversation as an "after the fact" justification for her decision, particularly as she admitted to failing to review Mr. Castelluccio's 2006 PBC assessment prior to deciding to replace him. See Maschka v. Genuine Auto Parts Co., 122 F.3d 566, 570-71 (8th Cir. 1997).

Ms. Collins-Smee's failure to review Mr. Castelluccio's' 2006 PBC also supports a finding of pretext.  Notably, IBM has not cited any evidence whatsoever showing that Mr. Castelluccio's performance declined during the brief window of time between Mr. Jones' assessment and Ms. Collins-Smee's decision.  See Fast v. Southern Union Co., Inc., 149 F.3d 885 (8th Cir. 1998) (reasonable jury could find that decisionmaker's termination of plaintiff with 30 years of service without reviewing performance reviews was motivated by discrimination), and Zimmitti v. Aenta Life Ins. Co., 64 F.Supp.2d 69, 82-83 (D.Conn. 1999) (significant downturn in performance evaluation over short period of time coincided with arrival of new, younger manager).[29]

_____

[29] See also, Nembhard v. Mem'l Sloan Kettering Cancer Ctr., 104 F.3d 353, at *4-5 (2d Cir. 1996) (affirming age discrimination verdict where 41-year-old plaintiff was replaced by 40-year-old, noting that although age difference alone did not necessarily support inference of discrimination, a reasonable jury could make that inference in light of other evidence, including "harsh treatment of a veteran employee with a near-unblemished employment record").

Ms. Collins-Smee's alleged reason for removing Mr. Castelluccio as Public Sector VP is also questionable. Specifically, Ms. Collins-Smee stated that she removed Mr. Castelluccio because he "was not working out" and was not "exhibiting the proper leadership of the accounts in the public sector." Her subjective evaluation is plainly contradicted, however, by Mr. Jones' assessment of Mr. Castelluccio only weeks earlier. In addition, "[a]n employer's subjective evaluations are not adequate [justification] by themselves because they may mask prohibited prejudice." Williams, supra, 456 F.Supp.2d at 384. An employer may not use completely subjective and unarticulated standards to judge employee performance. Id. Rather, the evidence produced by the employer "should be [both] objective and competent." Id. Significantly, Ms. Collins-Smee never informed Mr. Castelluccio that his performance as VP of Public Sector was deficient. Although she now claims she orally indicated her dissatisfaction to Mr. Castelluccio concerning his performance, the record is void of any contemporaneous written support of her claim. Rather, the operative fact that IBM would have the Court ignore is that at the conclusion of 2007, in her January 2008 formal PBC evaluation, she rated Mr. Castelluccio a "2" for his 2007 performance and noted that, "[i]n the Public Secor [sic] role Jim's team reduced headcount significantly and we were able to continue to meet our service level objectives." (Pl. Facts, ¶135).

IBM's purported reliance on complaints made to Ms. Collins-Smee regarding Mr. Castelluccio's performance is misplaced. First, Ms. Collins-Smee does not claim that she expressly relied on these complaints in making her decision. Rather, she claims that she appraised his performance independently during the month of February and determined that he was "not working out." (See D.Br. 5). Notably, Ms. Collins-Smee did not discuss these complaints with Mr. Castelluccio to obtain his version of events. Second, although Mr. Liederbach[30] alleges that he

---

[30] IBM's argument that Mr. Castelluccio admitted that he knew complaints had been made about his performance is overblown. Notably, the meeting held between Mr. Castelluccio and Mr. Liederbach in 2006 was not a discussion of Mr. Castelluccio's performance problems, as argued by IBM. Rather, it was a

A-198

Case 14-2854, Document 62, 03/13/2015, 1460796, Page210 of 289
Case 3:09-cv-01145-DPS   Document 69   Filed 11/15/10   Page 39 of 53

previously raised the same complaints to Mr. Jones, Mr. Castelluccio's prior supervisor, Mr. Jones never even mentioned these complaints to Mr. Castelluccio or alluded to them in his 2006 PBC, which supports an inference that they were not significant.[31]

IBM's alleged claim of poor performance is further negated by Ms. Collins-Smee's subsequent actions toward Mr. Castelluccio and the credence of IBM's explanation for these actions. In its Motion for Summary Judgment, IBM contends that Ms. Collins-Smee "expected" Mr. Castelluccio's performance to improve on the WellPoint account and that he was "well suited" to take over for Mr. Morin. (D.Br. 7-8). IBM further states that if he had performed well in the role, IBM would have considered retaining him in the position.

The evidence belies IBM's statements, however. Mr. Castelluccio was appointed "acting DPE" only until a permanent candidate was accepted by the client. He was never presented as a candidate to WellPoint or interviewed for the position. IBM's argument that assignment to WellPoint was intended to "improve" Mr. Castelluccio's performance is also untenable, given that the WellPoint account was one of IBM's most troubled accounts and the client's CIO, Mark Boxer, was notoriously difficult to work with. It is further questionable why IBM would assign Mr. Castelluccio to one of its most high profile troubled accounts if his performance as VP of Public Sector was unsatisfactory. Significantly, WellPoint was Mr. Liederbach's "largest, most important and most challenged client/contract," and Ms. McDonald was WellPoint's Managing Director. If Ms. Collins-Smee had in fact taken their complaints about Mr. Castelluccio's performance seriously, it begs the question as to why she would assign Mr. Castelluccio to be directly responsible for

---

discussion as to how the two teams could better communicate with each other. Indeed, it would have been inappropriate for Mr. Liederbach to discuss performance issues with Mr. Castelluccio, who was not his supervisor.

[31] Significantly, in <u>Gorzynski v. Jetblue Airways Corp.</u>, 596 F.3d 93, 107 (2d Cir. 2010), the Second Circuit recognized that although criticisms from other employees may support an employer's actions against an employee, minimal weight may be afforded to those complaints where, as here, the complaints were not recorded independently as part of a formal disciplinary process.

WellPoint.

A reasonable jury could conclude that Ms. Collins-Smee assigned Mr. Castelluccio to take on this difficult position after he refused to retire, knowing that the former DPE at WellPoint had resigned due to the overwhelming stress of the position. This is especially true in view of the fact that at the time of his initial assignment to WellPoint, he was also expected to continue to discharge is responsibilities as VP. In a striking admission concerning the situation in which Mr. Castelluccio was being placed, Mr. Liederbach volunteered that the strain of performing two jobs would likely cause Mr. Castelluccio to "implode." This inference is also supported by evidence that Ms. Collins-Smee had no future plan for Mr. Castelluccio when she decided to remove him as VP of Public Sector, despite IBM's typical practice of attempting to find new roles for executives who are displaced. Further, Ms. Collins-Smee's actions all but ensured that Mr. Castelluccio would be unable to devote sufficient time to the WellPoint account to please the client. By designating Mr. Castelluccio as the "temporary" DPE to the client, he was inherently viewed as a lame duck.

**b.**     **Removal From the WellPoint Account**

IBM's proffered non-discriminatory reason for Mr. Castelluccio's removal from the WellPoint account also lacks credence. (D.Br. 7-9). At the outset, it is clear that Mr. Castelluccio was never seriously considered as a candidate for the position, nor was he ever assigned to the role on a permanent basis. Mr. Castelluccio was removed from the account as part of a plan that was set in motion before he was even assigned as the "acting" DPE. Regardless of his performance, IBM had always planned to remove Mr. Castelluccio from the position. Significantly, despite his 40 years of service, that plan did not provide at all for Mr. Castelluccio's future at IBM.

Even if the jury believed that IBM and Ms. Collins-Smee had considered Mr. Castelluccio as a contender for the permanent DPE role, however, additional evidence of pretext exists. In its Memorandum, IBM claims that WellPoint made a specific "request" that Mr. Castelluccio be

removed from the account.   (D.Br., 1).   Yet, IBM's 100,000-plus page document production revealed no such request. [32]   Even if WellPoint had made such a request, however, those requests were common on troubled accounts and are not conclusive of an employee's performance. WellPoint had requested that Mr. Liederbach no longer be involved in its account, and yet he suffered no negative repercussions. Other employees removed from WellPoint also were relocated. Accordingly, if WellPoint made such a request or was dissatisfied, the proper protocol would have been to reassign Mr. Castelluccio to another account or begin an active search for a new position for him.   Neither of these actions was taken.

Regarding the "complaints" made by WellPoint (specifically Mr. Boxer) regarding Mr. Castelluccio's performance, the majority either express his dissatisfaction with IBM's failure to assign a *permanent* DPE to the account, or with Mr. Castelluccio's inability to devote his full attention to the account prior to June 2007, when he was still performing responsibilities as VP of Public Sector.   Mr. Castelluccio's assignment to two full-time positions also counters IBM's claim that his job performance was unsatisfactory.   Peyton v. Kellermeyer Co., 115 Fed. Appx. 825, 831 (6th Cir. 2004) (employee's assignment to additional accounts causing him to be "spread too thin" refuted claim of poor performance).

Notably, Mr. Boxer repeatedly referred to Mr. Castelluccio as the temporary or interim DPE, demonstrating that he never viewed him as a permanent candidate for the role.   For example, in a May 15, 2007 email from Mr. Boxer to Ms. McDonald (attached as Exhibit D to Ms. McDonald's affidavit), he stated that "working with an *interim leader* is not an ideal situation" (emphasis added) and noted that Mr. Castelluccio "may not be able to devote enough time to [WellPoint]."   Ms.

---

[32] If IBM's portrait of Mr. Castelluccio's "long history of unacceptable performance" (D. Br. At 31) were accepted, then it would be expected that at least one document could be produced in which WellPoint requested that Mr. Castelluccio be removed from its account.   Mr. Boxer was anything but timid in his demand that Mr. Liederbach be removed from the WellPoint account, and protested loudly when he learned Mr. Liederbach might still be involved "behind-the-scenes." (Pl. Facts, ¶124).

39

McDonald forwarded Mr. Boxer's email to Ms. Collins-Smee, noting that Mr. Castelluccio "has not been able to devote enough time to wellpoint."[33]  Significantly, one of the "complaints" from Mr. Boxer regarding Mr. Castelluccio's unavailability for "crit sit" relied on by IBM in support of its Motion was explained in a subsequent email, where Mr. Boxer was informed that Mr. Castelluccio was on vacation in Europe. (See Exs. L and M to Ms. McDonald's affidavit).

Finally, several of the "complaints" alleged in Ms. McDonald's affidavit constitute inadmissible hearsay and should not be considered by this Court.  Ms. McDonald repeatedly references statements purportedly made to her by Mr. Boxer, and IBM improperly relies in part on these statements to demonstrate that Mr. Castelluccio's performance was unsatisfactory to the client. (See Exs. E, F, H, and J attached to Ms. McDonald's Affidavit).[34]

IBM cannot rely on any of these "complaints" to conclusively demonstrate that they influenced Ms. Collins-Smee in her decision to remove Mr. Castelluccio as he adduced evidence that would allow a reasonable jury to disbelieve her claim.  Specifically, Ms. Collins-Smee *continually* searched for a permanent candidate for the position during Mr. Castelluccio's tenure in the role and never presented him as a candidate to WellPoint.  Moreover, Ms. Collins-Smee could not recall any specific complaint about Mr. Castelluccio's performance made in writing by WellPoint.  There is also evidence that she never specifically raised any of these purported complaints with Mr. Castelluccio,

---

[33]Juxtaposed to Mr. Castelluccio's formal PBC for 2007 are a series of emails which either contain generic complaints about IBM's staffing of WellPoint or specific complaints about IBM's failure to assign a permanent DPE to its account.  IBM places considerable "spin" on these emails.  For example, during a period of time in which IBM presented three candidates to WellPoint for the DPE position and each one in turn was rejected by Mr. Boxer, IBM argues that Mr. Boxer's statement that IBM is "out of time on delivery leadership" is an indictment of Mr. Castelluccio's performance rather than an expression of frustration with IBM's parade of candidates. (See Exhibit M to Ms. McDonald's Affidavit).  A reasonable jury could conclude that this complaint regarded the manner in which IBM staffed the account and its failure to locate a permanent DPE, rather than any deficiency in Mr. Castelluccio's performance.

[34] References to hearsay evidence in Ms. McDonald's affidavit should be stricken as improper.  Additionally, Ms. McDonald's statement in Paragraph 7 of her affidavit regarding Ms. Collins-Smee's state of mind in assigning Mr. Castelluccio to the WellPoint account should be stricken as she cannot attest to personal knowledge of Ms. Collins-Smee's actual intentions.

nor did she mention them in his 2007 PBC.[35] Further, Mr. Castelluccio was not given an "interim" PBC reflecting his alleged poor performance, nor placed on a performance improvement plan, which is contrary to IBM's PBC policy applicable to all IBM employees.[36]

Additionally probative of pretext is the objective evidence demonstrating that service to WellPoint *improved* under Mr. Castelluccio's eight-month tenure as acting DPE. While relying heavily on its selective emails, IBM apparently hopes the Court will overlook WellPoint's client satisfaction survey completed in February 2008 for work performed in 2007. In this contemporaneous document completed by WellPoint, Mr. Castelluccio's delivery team earned an overall satisfaction rating of 8 out of 10, and it was noted that "the pace of improvement in the last six months is probably faster than the previous eighteen by far." (Pl. Facts, ¶¶115, 118).[37] Mr. Castelluccio respectfully invites the Court to consider the opposite fact pattern. How persuasively could Mr. Castelluccio argue that he was a "solid contributor" based entirely on a series of carefully selected emails if the formal, comprehensive evaluations of his performance completed by his past two managers expressly stated that he needed to be removed from his position and the operative client

---

[35] As is clear from the parties' respective Memoranda to this Court, there is a genuine disputed issue of material fact concerning Mr. Castelluccio's job performance. IBM would have the Court ignore the compelling contemporaneous documentation of Mr. Castelluccio's performance as a "solid contributor." Not only did Mr. Castelluccio have a long history of earning this rating and better, but in 2007, the very time period in which IBM is now most critical of Mr. Castelluccio's performance, Ms. Collins Smee awarded Mr. Castelluccio a "2" PBC rating, and this rating was approved by Mr. Zapfel.

[36] See Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) ("departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the [employment] decision"). In that the PBC process applies to all full-time IBM employees and does not specifically exempt executives, these procedures should have been used if Mr. Castelluccio's performance was deemed deficient. See Huff v. UARCO, Inc., 122 F.3d 374, 381 (7th Cir. 1997) (question of fact as to whether terms of employee manual applied to supervisors where language stated it applied to "employees," as supervisors are also employees).

[37] Similarly, given IBM's heavy reliance on WellPoint's alleged dissatisfaction with Mr. Castelluccio's performance, and the absence of a written request to remove Mr. Castelluccio, one would think the Court would at least be entitled to a Declaration from Mr. Boxer before being asked to summarily dismiss Mr. Castelluccio's claims.

satisfaction survey gave IBM an overall low rating under his management?  At the very least, the question of whether Mr. Castelluccio's performance warranted his removal from WellPoint and prior to that as VP of Public Sector, is a genuine issue of material fact barring summary judgment.

Pretext may also be inferred on the basis of factual inconsistencies in IBM's Open Door Report and evidence that IBM engaged in a post hoc attempt to denigrate his performance in anticipation of litigation.  Significantly, Mr. Castelluccio's employment was terminated while the Open Door Investigation was still pending.  The investigation did not conclude until after the time expired for Mr. Castelluccio to sign IBM's proposed severance agreement. If he had signed the severance agreement, the investigator admitted he would have ended the investigation thus casting doubt on the integrity of the investigation.   The Open Door report also states that Ms. Collins-Smee denied mentioning age or retirement to Mr. Castelluccio, other than in his termination meeting.  Yet, Ms. Collins-Smee's deposition testimony clearly refutes this statement in that she admits discussing retirement with Mr. Castelluccio on at least one other occasion and that he made it "absolutely clear" he did not want to retire.  Ms. Collins-Smee also admitted that the investigator made no inquiries as to any age bias she may have had, and focused only on Mr. Castelluccio's job performance.   Remarkably, the report makes no mention whatsoever of any steps taken to investigate whether Mr. Castelluccio was the subject of age discrimination.  Rather, the Open Door Report centered mostly on Mr. Castelluccio's alleged shortcomings, raising issues not mentioned in any of his performance reviews or discussions with his superiors.

Finally, pretext may be inferred by the investigator's conclusion that Ms. Collins-Smee "erred" in her assessment of Mr. Castelluccio, explaining that she "confused issues" in rating him with a "2."   The investigator authored an instructive memorandum to Ms. Collins-Smee's supervisor, Timothy Shaughnessy, counseling him to reprimand her for her "mistake," which he did. The investigator's conclusion and subsequent reprimand of Ms. Collins-Smee *after* Mr. Castelluccio's

termination "reek[s] of after-the-fact rationalization" sufficient to support pretext.  Maschka, supra, 122 F.3d at 570-71; see also, Cartlon, supra, 202 F.3d at 137 (lack of negative performance review, warning or written criticism of job performance indicates reason for termination was an afterthought).[38]

### c.      Termination of Employment

IBM's alleged non-discriminatory reason for Mr. Castelluccio's termination from IBM—as explained in its Motion for Summary Judgment—is that he was unable to find an alternate position at IBM after remaining on the payroll with no "operational responsibilities."  IBM argues that there is no way that Mr. Castelluccio can claim this reason is false.  Yet, the evidence in this case presents many questions of fact regarding disparate treatment of Mr. Castelluccio concerning his job placement that call into question the legitimacy of this proffered reason.

At the outset, it is significant that IBM's proffered reason for Mr. Castelluccio's termination has not remained consistent.  It is true that Ms. Collins-Smee did not inform Mr. Castelluccio that he was being terminated on the basis of his performance.  However, at the first opportunity to legitimize its decision, at a time when it was acting through its legal counsel, IBM claimed Mr. Castelluccio's termination was performance based.  Specifically, in its Response to Mr. Castelluccio's complaint filed with the New York State Division of Human Rights ("Response"), IBM plainly

---

[38] The conclusions reached in the Open Door Report regarding Mr. Castelluccio's job performance cannot be relied upon by IBM as evidence of that fact, in that they rely entirely upon statements made to him by other individuals, not on the investigator's personal knowledge, and thus constitute hearsay.  Moreover, the Report is inherently unreliable in that it was prepared after Mr. Castelluccio's termination and failure to sign his severance agreement, in anticipation of litigation.  If IBM were permitted to rely on this document as a "business record," then employers could admit hearsay evidence documenting alleged performance problems after an employee's termination to support a defense to a discrimination complaint simply by following a regular recording system.  See Lewis v. Velez, 149 F.R.D. 474 (S.D.N.Y. May 19, 1993) ("incident reports" prepared by correctional facility in civil rights action did not constitute "business records" because they lacked trustworthiness and reliability).

A-205

Case 14-2854, Document 62, 03/12/2015, 1460796, Page217 of 289
Case 3:09-cv-01145-DPS   Document 69   Filed 11/15/10   Page 46 of 53

declares that the nondiscriminatory reason for his termination was "poor performance."[39] (Response attached as Ex. 50 to the Affirmation of Mark Carta, November 15, 2010, filed in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, IBM00091574). Further, the "Open Door" report focuses almost entirely on his alleged performance issues, not his inability to locate a new position. It is well settled that "[i]nconsistent or. . .post-hoc explanations for a termination decision may suggest discriminatory motive." Weiss v. JPMorgan Chase & Co., 332 Fed. Appx. 659, 663 (2d Cir. 2009). Finally, Mr. Castelluccio's separation was classified by IBM as category "8J," which essentially translates to "involuntary retirement due to performance." (Pl. Facts, ¶265).

A finding of pretext is also supported by Ms. Collins-Smee's inaction toward Mr. Castelluccio regarding his job search and procedural irregularities committed by Ms. Collins-Smee. IBM argues that it was ultimately Mr. Castelluccio's responsibility to locate a new position. If this were true, then at the very least Mr. Castelluccio should have been informed as soon as possible that he should be looking for a new position, rather than being informed when he was placed on the bench. Placing this responsibility entirely on Mr. Castelluccio is also inconsistent with IBM's practices, particularly because executives have no access to executive job postings made in Five Minute Drills and cannot nominate themselves for these positions.

IBM's Human Resources employees testified to the importance of a supervisor's assistance in securing a new position at IBM. Ms. Collins-Smee's discriminatory animus toward Mr. Castelluccio impacted on her efforts to relocate him. The evidence reveals that she did not place him on her organization's "Five Minute Drill" until January 2008, and kept him on the Drill only for that one month, although she admitted that it would have been proper for her to have added him to

---

[39] See Maschka, supra, 122 F.3d at 570 (employer's response to administrative agency in age discrimination investigation properly admitted to demonstrate inconsistent explanation for termination decision in support of pretext).

44

her Drill if she was helping him find a new job.  She also failed to ensure that he was listed on Pat Kerin's GTS Drill, with the exception of one month.  Significantly, Ms. Collins-Smee was aware of open positions in these organizations and had the ability to advance Mr. Castelluccio as a candidate or make Mr. Castelluccio aware of these positions, which she clearly did not do.  She further admitted that she did not actively assist him in searching for a job in 2007 (Pl. Facts ¶190), despite the fact that she knew his position on WellPoint was temporary and several jobs for which he was qualified became available during that time.  A large number of the jobs in Ms. Collins-Smee's organization, as well as other IBM organizations, were assigned to younger, less experienced executives.[40]   Ms. Collins-Smee had ultimate control over which employees were added as candidates for jobs in her organization, and approved any selections made by her direct reports.

Pretext also may be inferred on the ground that the little assistance Ms. Collins-Smee did provide to Mr. Castelluccio was clearly *pro forma*.  Danville v. Regional Lab Corp., 292 F.3d 1246, 1251 (10th Cir. 2002), citing Stern v. Trustees of Columbia Univ., 131 F.3d 305, 310, 312-14 (2d Cir. 1997).  Ms. Collins-Smee made a handful of perfunctory email inquiries to her colleagues at IBM about possible placements for Mr. Castelluccio toward the end of May 2008, *after* she notified him that he would be receiving a severance package and would have until the end of June 2008 to find a new position or be terminated.  Notes reflecting activity at a May 2008 Five Minute Drill give a glimpse into the character of Ms. Collins-Smee's half-hearted support.  These notes indicate that Ms.

---

[40] Notably, IBM cannot argue that Mr. Castelluccio was "overqualified" for Band D positions or that he is not similarly situated to Band D executives.  Several IBM managers noted that Mr. Castelluccio would need to consider Band D positions in addition to Band C positions, and Mr. Castelluccio agreed to do so once he was notified of his need to find a new position.  Further, the evidence supports a conclusion that Band C executives are frequently considered for Band D roles.  Therefore, Mr. Castelluccio is similarly situated to Band D employees against whom he was competing for various jobs, per IBM's own instructions to him.  In addition, characterizing Mr. Castelluccio as "overqualified" defies common sense, in that "overqualified" cannot mean "unqualified," as noted by the Second Circuit in Taggart v. Time Inc., 924 F.2d 43, 47 (2d Cir. 1991) (noting that denial of employment to older job applicant because he has too much experience, training or education "is simply to employ a euphemism to mask the real reason for refusal, namely, in the eyes of the employer the applicant is too old").

Collins-Smee asked that Mr. Castelluccio be added as a candidate for a position "for the record."
This supports an inference that her advocacy for Mr. Castelluccio was a "sham."  A reasonable jury
could also infer from the fact that Mr. Castelluccio was listed as a candidate for only *one* job out of
95 for which he was qualified, that Ms. Collins-Smee did not properly assist Mr. Castelluccio in his
job search, and that this severely impacted his ability to find a new position at IBM.  Placing Mr.
Castelluccio on a Five Minute Drill, without any additional assistance, was also a "pro forma" action.
At the very least, Ms. Collins-Smee should have provided Mr. Castelluccio with support in his job
search that was equal to the support she provided to younger executives in her organization.

IBM's argument that Mr. Castelluccio cannot point to any other executive who received
more time to look for a job while on the bench does not entitle it to judgment as a matter of law.
This argument is a red herring, in that would have the Court ignore the facts that resulted in Mr.
Castelluccio being relegated to the bench and to the fact that he clearly was treated differently from
other executives.  Most executives are not removed from their positions unless another position is
arranged for them in advance.  If those executives are removed and placed on the bench, they are
generally given priority for job openings that arise, which was noted as a "promotion principle" in
several GTS Drills.  Moreover, Mr. Castelluccio has identified at least one executive, Akshay Parikh,
who spent a significantly longer time "on the bench" than him.  Unlike Mr. Castelluccio, Mr. Parikh
was not terminated and, in fact, was placed in a new position after ten months without a permanent
role.  (Pl. Facts, ¶166).

IBM's Human Resources employees confirmed that executives on the bench also are
typically given temporary assignments or projects to work on while they search for a permanent
position and that such assignments could be beneficial. Unlike other IBM employees on the bench,
such as Mr. Parikh, Mr. Castelluccio was not given any temporary assignments, despite his repeated
requests to Ms. Collins-Smee.  Ms. Collins-Smee's rationale that it would be "highly unusual" to

assign part-time work to a Vice President (Pl. Facts, ¶163), is refuted by the testimony of IBM's Human Resources employees and evidence of temporary assignments in Five Minute Drills. Indeed, Mr. Castelluccio's temporary assignment as DPE of WellPoint belies Ms. Collins-Smee's statement.

Although IBM characterizes Mr. Castelluccio's lack of assignments as positive, Mr. Castelluccio was eager to contribute to IBM, as he had done for the last 40 years. He also knew that his chances of locating a position would greatly improve if he were assigned to a temporary project, since that would give him exposure to other organizations that may offer him a position. Ms. Collins-Smee admitted that she gave Mr. Castelluccio no work assignments in 2008. Yet, by failing to assign him any work whatsoever, Mr. Castelluccio was disadvantaged in his job search.

Pretext is further supported by the fact that during the pendency of this suit, Mr. Castelluccio was contacted as part of a "select group" of retired VP's for temporary work at IBM, but was not hired back after he contacted IBM and conveyed his interest. If Mr. Castelluccio truly had been terminated due to his failure to find a job at IBM, then it begs the question as to why he would not be re-hired after IBM contacted him regarding temporary job openings for which he was deemed qualified.

## 2. IBM's Actions Support Conclusion of Age Discrimination

Mr. Castelluccio has articulated multiple questions of fact from which IBM's discriminatory intent can be inferred and which establish his *prima facie* case. In addition, the evidence further demonstrates that IBM's articulated non-discriminatory reasons for its actions were pretext for unlawful age discrimination.

First, Ms. Collins-Smee created positions in her organization for younger executives while Mr. Castelluccio was searching for a job and also placed other younger executives in positions in lieu of Mr. Castelluccio soon after they became available. Mr. Castelluccio was not considered for dozens of positions for which he was qualified, which ultimately were awarded to younger

executives with less experience.  A reasonable jury could infer that Ms. Collins-Smee treated Mr. Castelluccio differently on account of his age.

Second, Ms. Collins-Smee made several inappropriate age-related comments to Mr. Castelluccio that could be interpreted by a reasonable jury as evidence of her discriminatory intent toward him on the basis of his age.  Although IBM attempts to dismiss Ms. Collins-Smee's discussion of retirement as either casual inquiries into Mr. Castelluccio's future plans or "stray remarks," the context in which the comments were made reveal they were neither.  Ms. Collins-Smee's statements clearly were not casual inquires as to future plans and were not made *after* a termination decision already had been made and the employer opted to provide an employee with an option to retire.  Cf. Young v. Gen. Foods Corp., 840 F.2d 825, 831 (11th Cir. 1988) (no evidence of discrimination where it was undisputed that employer decided to fire employee *before* offering him alternative choice of retirement).  Therefore, the cases cited by IBM in support of this argument are neither applicable nor persuasive.

Ms. Collins-Smee's repeated inquiries about Mr. Castelluccio's interest in retirement also were not "stray remarks." Comments made by an employer reflecting a discriminatory motive are sufficient to raise a triable issue regarding whether the articulated reasons for the employer's conduct constituted pretext, and such comments must be viewed in light of all surrounding circumstances. Williams, supra, 456 F.Supp. at 384-85.  The proper focus "is on whether there is a nexus between the comments and the decision to terminate the employee." Id., at 385.  "When other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001); see also, Carlton, supra, 202 F.3d at 136 (one comment suggesting retirement may bear a more ominous significance when considered within the totality of evidence).

Mr. Castelluccio has presented substantial evidence that would permit a jury to view Ms. Collins-Smee's comments as indicative of her discriminatory intent, as set forth in detail herein, including the fact that he was the oldest of her direct reports in 2007 and began to ask him his age within moments of their first meeting. Moreover, the context of the statements also indicates that Ms. Collins-Smee had discriminatory intent, in that she made contemporaneous adverse decisions regarding his employment. Although Ms. Collins-Smee may not have used the exact words, "I think you should retire," that sentiment was implied by her repeated statements following Mr. Castelluccio's unequivocal indications that he had no interest in retiring. See Guthrie, supra, 803 F.3d at 208.[41]

Pretext for age discrimination may also be inferred by Ms. Collins-Smee's inquiry as to the age and retirement status of another employee in her organization, Kenneth Wisse. A reasonable jury could infer that this inquiry demonstrated her fixation on the age of her employees rather than their qualifications, particularly when combined with all of the other circumstantial evidence of her discriminatory bias.

Additionally, Mr. Walker's comments regarding Mr. Ireland support an inference that Mr. Castelluccio was terminated on the basis of his age. Mr. Walker was responsible for running the Five Minute Drills for Mr. Zapfel, on which Mr. Castelluccio was listed as a "person to move" for several months with no activity. It is reasonable to infer that Mr. Castelluccio was not considered

---

[41] Defendant argues that Ms. Collins-Smee's statements were not improper on the basis that they were made "only" three times and twice occurred at times when Plaintiff's next steps at IBM were uncertain. (D.Br. 25). Yet, Mr. Castelluccio's future at IBM was only "uncertain" *because of* Ms. Collins-Smee's actions. Therefore, her comments are even more dubious because she made them at times when she made adverse employment decisions against Mr. Castelluccio. See Williams, supra, 456 F.Supp. at 385. IBM further argues these statements were not improper because they did not use any age-linked epithet or a statement that Mr. Castelluccio was "too old to do t he job." (D.Br. 25). Invidious comments regarding age are not required, however, to establish that Ms. Collins-Smee's comments were not "stray remarks," and the Defendant has not cited any authority to the contrary. Those types of comments would constitute direct evidence of discrimination in and of themselves, and have no bearing on the significance of Ms. Collins-Smee's statements here. Finally, IBM argues that Ms. Collins-Smee did not make any suggestion of retirement. (D.Br. 25). As noted above, however, even if Ms. Collins-Smee did not tell Mr. Castelluccio that she thought he should retire, the implication was clear under the circumstances.

for any new positions for which he was qualified because IBM negatively stereotyped older workers at or near retirement age as less diligent or motivated than younger employees and would not make similar efforts to find them new positions.

## V.    CONCLUSION

Mr. Castelluccio has provided a wealth of evidence supporting the existence of myriad genuine disputed issues of material fact that would preclude summary judgment from being granted in this case.  Specifically, the following disputed issues of material fact support a conclusion that Mr. Castelluccio was ultimately terminated on the basis of his age: (1) whether Mr. Castelluccio's job performance as VP of Public Sector and acting DPE of WellPoint was positive; (2) whether Ms. Collins-Smee took certain actions regarding his removal from these positions and made comments regarding his age and retirement; (3) whether Mr. Castelluccio's assignment to the WellPoint account was intended to force him to retire; (4) whether Mr. Castelluccio was ever considered as a permanent candidate for the WellPoint account; (5) whether Ms. Collins-Smee treated younger executives more favorably with respect to job placement and failed to follow IBM protocol with respect to Mr. Castelluccio particularly after he was assigned to the "bench"; (6) whether Mr. Castelluccio complained to Human Resources about Ms. Collins-Smee's conduct prior to his termination; (7) whether Ms. Collins-Smee made additional comments regarding retirement in March 2008; (8) whether IBM's Open Door investigation was conducted in good faith or constituted an attempt to justify Mr. Castelluccio's wrongful termination; and (9) whether IBM's recent failure to hire Mr. Castelluccio contravened its articulated legitimate non-discriminatory reason for his termination.

On the basis of the foregoing issues of disputed material fact, and the arguments set forth herein, Mr. Castelluccio respectfully requests that the Court deny IBM's Motion for Summary Judgment, and allow Mr. Castelluccio to present his claims to a jury.

THE PLAINTIFF
JAMES CASTELLUCCIO

BY: _____/S/_____
MARK R. CARTA (ct06645)
KATHRYN A. SHERMAN (ct25641)
Rucci, Burnham, Carta, & Carello, LLP
30 Old Kings Highway South, Post Office Box 1107
Darien, Connecticut 06820
(203) 899-3300 (phone) - (203) 655-4302 (facsimile)
mcarta@rucciburnham.com
ksherman@rucciburnham.com

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,                          :
      Plaintiff,                              :
                                   :
v.                                          :        CIVIL ACTION NO. 3:09CV1145 (DJS)
                                   :
INTERNATIONAL BUSINESS                       :
MACHINES CORPORATION,                        :
      Defendant.                              :

MEMORANDUM OF DECISION AND ORDER

      The plaintiff, James Castelluccio ("Castelluccio"), brings this action against the

defendant, International Business Machines Corporation ("IBM"), alleging unlawful termination

on the basis of age in violation of the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. §621, *et seq.*, and the New York State Human Rights Law ("NYSHRL"),

NY CLS Exec § 296(a).[1] Castelluccio is a resident of Connecticut and IBM is a corporation

organized and existing under the laws of the State of Connecticut. Now pending before the Court

is the defendant's motion for summary judgment, in which the defendant contends that it is

entitled to summary judgment because the plaintiff has failed to set forth sufficient evidence that

would permit a reasonable juror to find that the defendant terminated the plaintiff on the basis of

his age. For the reasons stated below, the defendant's motion for summary judgment (**doc. # 47**)

is **DENIED** .

I. BACKGROUND

      IBM hired Castelluccio in March 1968. In August 2000 Castelluccio was promoted to a

---

      [1]The complaint had also included  claims of retaliatory termination in violation of the
ADEA, the federal Fair Labor Standards Act and the NYSHRL, but the plaintiff has conceded
that he cannot prove those claims. Consequently the retaliatory termination claims are deemed
abandoned.

Vice President position (referred to as a "Band C" executive position). In January 2005

Castelluccio was appointed Vice President of Public Sector Delivery ("VP PSD"). As VP PSD,

Castelluccio led and managed the teams responsible for delivering IT services to more than thirty

public sector IBM accounts.

At the time Castelluccio became VP PSD, his direct supervisor was Arthur "Kelton"

Jones ("Jones") who was a Vice President and Senior Services Delivery Executive within IBM.

On January 25, 2007, prior to his retirement, Jones assessed Castelluccio's performance for his

work during the year 2006. By way of background, all IBM employees received an annual

formal, comprehensive evaluation as part of IBM's Personal Business Commitments Program

("PBC"). For the year 2006, Jones rated Castelluccio a "2," or "solid contributor." A "2" rating

was defined by IBM as "[c]onsistently meets job responsibilities; is reliable in doing job;

demonstrates appropriate level of knowledge, skills, effectiveness and initiative." (Doc. # 74-3, at

8.) In the written assessment of Castelluccio's performance for 2006, Jones specifically noted that

Castelluccio "provide[d] solid leadership to the team" and "also provided sound leadership across

his team in dealing with the ongoing people management responsibilities." (Doc. # 74-2, at 20.)

While noting that "the financials performance was way off the target and expected results of the

business," the assessment also noted that "Jim and team have made changes that are pointed at

improving the financials in 2007" and acknowledged that "this past year was difficult." (*Id.*)

Jones never alerted Castelluccio to any concerns Jones had regarding Castellucio's performance

in 2006 or at any other time.

Upon Jones' retirement, his position was assumed by Joanne Collins-Smee ("Collins-

Smee"), who became Castelluccio's direct supervisor in February 2007. Collins-Smee was 50

years old at that time. Castelluccio's first face-to-face meeting with Collins-Smee took place on or around February 22, 2007. According to Castelluccio, Collins-Smee began her first meeting with him by asking his age. More specifically, Castelluccio contends that Collins-Smee said to him "'How old - - ,' then stopped mid-sentence and said, 'You're old enough to bridge to retirement, right?'" (Doc. 70-2, at 4, ¶ 28.) Castelluccio further contends that "[i]n response, [he] strongly replied that [he] had no desire to retire." (*Id*. at 4, ¶ 30.) Collins-Smee did not bring to his attention any alleged problems with his job performance or inform him that she intended to remove him from his position as VP PSD.

At the time of Castelluccio's first meeting with Collins-Smee, he was approximately one week shy of his 60th birthday and was the oldest of the Vice Presidents who reported directly to Collins-Smee. Under the terms of IBM's pension plan, Castelluccio became eligible to retire with full pension benefits on his 60th birthday. At the time of his first meeting with Collins-Smee, Castelluccio had not considered retirement or discussed retirement with his prior supervisors.

On February 28, 2007, Collins-Smee sent an email to the IBM Human Resources Executive assigned to work with her in which she stated: "We need to replace Jim Castellucio [sic] - I will fill you in tomorrow - Dave L has requested this, had asked months ago from Kelton but, no action. I spoke to Jim C today - he understands and also wants to move, he knew for a while that it was not working." (Doc. # 75-4, at 2.) At her deposition, Collins-Smee testified that she had said that Castelluccio needed to be replaced because "[h]e was not working out. He wasn't exhibiting the proper leadership of the accounts in the public sector." (Doc. # 47-5, at 14: 18-20.)  According to Castelluccio, "I did not tell Ms. Collins-Smee during this [February 22, 2007] meeting, or at any time thereafter, that I knew my role as VP of Public Sector was not

working out. After working for IBM for 40 years, I would never have agreed to be replaced as

Vice President unless an open position had been identified for me and there was an agreement in

place for me to assume the new position." (Doc # 70-2, at 5, ¶¶ 37, 38.)

On March 31, 2007, Collins-Smee designated Castelluccio as the acting Delivery Project

Executive ("DPE") for IBM's WellPoint account. According to Castelluccio, this responsibility

was in addition to his duties as VP PSD and was a temporary assignment until the individual

selected for the permanent WellPoint DPE position, Kenneth Weiss, became available on April

16, 2007. Castelluccio also contends that the WellPoint account "was one of the most

problematic contracts that IBM had in the Global Services Division." (Doc. # 70-2, at 5, ¶ 34.)

According to Castelluccio, it was not uncommon for customers on highly troubled accounts, like

the WellPoint account, to register complaints about services or individuals. Because these

complaints usually pertained to faults within the contract itself or to personality conflicts, they

generally were not accepted as indicative of poor job performance.

When Mr. Weiss did not assume the role of DPE for the WellPoint account in April 2007,

Castelluccio "continued to perform two full-time positions as VP of Public Sector and DPE of

WellPoint throughout April, May and part of June 2007." (*Id.* at 6, ¶ 48.)   In June 2007 Collins-

Smee informed Castelluccio that he was being replaced as VP PSD by Miguel Echavarria, who

was 49 years old at that time, and that he would now be working as DPE of WellPoint on a full-

time basis. In November 2007 Collins-Smee met with Castelluccio and informed him that he was

being replaced as DPE of WellPoint by Gordon Crawford, who was 59 years old at that time, as

of  January 1, 2008. Prior to that time, Castelluccio did not know that he was being replaced in

his position as DPE of WellPoint or that Mr. Crawford was being considered for the position.

-4-

While he was employed by IBM, Castelluccio was not informed about any specific complaints made by WellPoint regarding his performance as WellPoint DPE and, according to Castelluccio, "[t]he majority of 'complaints' made by WellPoint raised by IBM [after he filed this lawsuit] related either to IBM's failure to assign a *permanent* DPE to its account or to [his] inability to devote sufficient time to WellPoint due to [his] assignment to two full-time jobs." (*Id*. at 8, ¶ 66.) Castelluccio further asserts that IBM's performance on the WellPoint account improved during the time in which he was the WellPoint DPE.

At his November 2007 meeting with Collins-Smee, Castelluccio asked her about his future with IBM and she initially responded by telling him that he was eligible to bridge to retirement. After Castelluccio informed Collins-Smee that he had no interest in retiring, she responded by telling him she would assist him in finding a new position at IBM. "Collins-Smee's assistance to [Castelluccio] in locating a new position within IBM was extremely important, particularly because executive positions at IBM are not posted to employees and are often kept confidential until a candidate is selected." (*Id.* at 10, ¶ 86.)

In January 2008, Castelluccio learned that Collins-Smee was considering lowering his PBC rating for the year 2007. After Castelluccio sent Collins-Smee additional information concerning his accomplishments during 2007, Collins-Smee agreed that he deserved a "2" PBC rating for 2007 and he was ultimately given the rating "PBC 2: solid contributor" for that year. (Doc. # 74-2, at 26.) Collins-Smee's overall assessment of Castelluccio for 2007 noted the following: "In the Public Sector role Jim's team reduced headcount significantly and we were able to continue to meet our service level objectives. On the Wellpoint account, Jim and the team has [sic] made significant progress on programs to improve service quality and reduce cost . . . .

-5-

Jim needs to continue to focus on those activities that would demonstrate effective leadership to both the IBM team as well as the client." (*Id.*)

From the time he learned he was being replaced as the DPE of WellPoint, which was in November 2007, until the time of his termination in June 2008, Castelluccio engaged in a job search  for a position within IBM. During this period a number of executive positions at IBM for which Castelluccio was qualified were filled by younger candidates. Castelluccio was not considered for most of these executive positions, nor was he aware of them until after they had been filled. Collins-Smee was aware of various open positions within IBM for which Castelluccio was qualified and had the ability to advance him as a candidate for those positions but did not do so.  Castelluccio continued to draw his full salary during this time period, but Collins-Smee did not give him any new work assignments or projects in 2008.

In March 2008 Castelluccio met with Collins-Smee to discuss his lack of meaningful work assignments and to request that she fulfill her earlier promise to assist him in finding another position at IBM. At that time, Collins-Smee told Castelluccio that if no meaningful work could be found for him, he should consider retiring from IBM. Castelluccio repeated that he had no interest in retiring and wanted to continue working at IBM. In May 2008 Collins-Smee informed Castelluccio that he would be given until June 30, 2008 to find a new position or else his employment with IBM would be terminated. Collins-Smee again mentioned that Castelluccio would be eligible to retire.

On June 2, 2008, Castelluccio was presented with a severance package, which contained a general release of IBM, by an IBM Human Resources representative and was told he had until June 23, 2008 to sign the severance agreement. Castelluccio did not sign the severance agreement

and his employment with IBM was terminated on June 30, 2008. At that time he began collecting his pension under the IBM retirement plan.

On June 13, 2008, Castelluccio lodged a complaint of age discrimination with IBM. On August 11, 2008, he was informed in writing by Russ Mandel, an IBM Human Resources representative, that Mr. Mandel had concluded that management treated Castelluccio fairly with regard to his termination.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Division of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (internal quotation marks omitted). In making that determination, the Court must "construe the evidence in the light most favorable to the non-moving party and . . . draw all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal quotation marks omitted).

"The moving party bears the burden of showing that he or she is entitled to summary judgment." *Id.* at 69.  The movant can satisfy that burden by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).

B. Age Discrimination Claims Under the ADEA and the NYSHRL

The ADEA's purpose is to "promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in employment . . . ." 29 U.S.C. § 621(b). Pursuant to the ADEA "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a). The ADEA's prohibition against age discrimination protects "individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

"Claims brought pursuant to the ADEA are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), tripartite burden-shifting framework." *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 21-22 (2d Cir. 2011). "In a nutshell, a plaintiff first bears the minimal burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *McPherson v. N.Y. City Dept. of Education*, 457 F.3d 211, 215 (2d Cir. 2006)

(internal quotation marks omitted). In the context of an ADEA claim, once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, "the plaintiff must show that a reasonable jury could conclude by a preponderance of the evidence that [the plaintiff's age] was a 'but for' cause of [the adverse employment action]." *Timbie*, 429 F. App'x at 22 (internal quotation marks omitted). "Age discrimination claims brought under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301, are governed by the same standards as those brought under the ADEA." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997).

Direct or circumstantial evidence may be used to prove a violation of the ADEA. *See Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 135 (2d Cir. 2000). The Second Circuit has noted that "[d]irect evidence of discrimination is not necessary, because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employees is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." *Id.* (citation omitted).

### i. Prima Facie Case

"In order to establish a prima facie case of age discrimination, [Castelluccio] must show (1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced  adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). A plaintiff's burden in establishing a prima facie case of discrimination is "de minimis." *Timbie*, 429 F. App'x at 22.

The evidence before the Court demonstrates that Castelluccio was terminated at the age of 61 and thus falls within the protected age group and that IBM evaluated Castelluccio's 2006 and 2007 job performance and rated him a "2," which is considered satisfactory. With regard to experiencing adverse employment action, Castelluccio's complaint explicitly alleges that "IBM's actions in terminating Mr. Castelluccio's employment were wilful, unlawful and discriminatory on account of his age in violation of the [ADEA and the NYSHRL]." (Doc. # 1, at 13, ¶ 49 and 17, ¶ 60.) Although Castelluccio's memorandum in opposition to IBM's motion for summary judgment asserts that he experienced two other adverse employment actions (removal as VP PSD and subsequent removal as WellPoint DPE) that constitute additional actionable claims, these claims may not be considered because "a plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint." *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007).

In terms of asserting additional claims, the two removal actions would be unavailing to Castelluccio in any event, since they would be in the nature of "[d]iscrete acts . . . which fall outside the limitations period [and] cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin v. Port Authority of New York & New Jersey*, Nos. 10-1904-cv (L), 10-2031-cv (XAP), 2012 U.S. App. LEXIS 14088,  at *53 (2d Cir. July 10, 2012). Pursuant to 29 U.S.C. § 626(d)(1), a charge alleging unlawful age discrimination in employment must be filed with the Equal Employment Opportunity Commission within 180 days, or in some circumstances within 300 days, after the occurrence of the alleged unlawful practice. In his complaint, Castelluccio alleges he filed a charge of age discrimination with the Equal Employment Opportunity Commission on

November 17, 2008, which is more than 300 days after both his removal as VP PSD and removal as WellPoint DPE. (Doc. # 1, at 2, ¶ 4.) Castelluccio does not maintain that the two removal actions occurred within the applicable limitations period, but argues instead that the doctrine of equitable tolling should be applied in this instance to avoid the conclusion that those two actions are barred by the statutory limitations period. The Court is not persuaded by Castelluccio's argument that the facts he has presented bring his situation within the scope of the doctrine of equitable tolling as expressed by the Second Circuit in *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45 (2d Cir. 1985). The Court does not find that "the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of action." *Id.* at 48. The Court does agree with Castelluccio, however, that it may "properly admit[] background evidence predating the onset of the limitations period," *Chin*, 2012 U.S. App. LEXIS 14088, at *4, as to the termination claim, which is within the limitations period.

The Court further concludes that the evidence before it, construed in the light most favorable to the non-moving party, i.e., Castelluccio, could support a finding that this adverse employment action occurred under circumstances giving rise to an inference of discrimination.'"An inference of discriminatory intent may be established by, *inter alia*, . . . the sequence of events leading to the plaintiff's discharge.'" *Miller v. Hartford Fire Insurance Co.*, 652 F. Supp. 2d 220, 231 (D. Conn. 2009) (quoting *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)). Castelluccio has provided evidence that during his initial meeting with his new supervisor, Collins-Smee, and on other occasions thereafter, Collins-Smee raised the issue of Castelluccio's retirement, despite the fact that Castelluccio had never expressed any interest in

retiring and, to the contrary, had told Collins-Smee that he did not want to retire. Castelluccio has

also provided evidence that at the time he was VP PSD, he was the oldest of the VPs reporting to

Collins-Smee, and that he was replaced in that position by an individual who was eleven years

younger than Castelluccio. He  further provided evidence that after he was assigned as the

WellPoint DPE on an "interim" basis, he was never presented as a candidate for the permanent

position of WellPoint DPE, and that after he was replaced on the WellPoint account, he was not

given any further responsibilities or duties. Finally, Castelluccio has provided evidence that

Collins-Smee did not, as she had indicated she would do, assist him in finding another position

within IBM and that there were numerous available executive positions within the company for

which he was qualified but not considered. The Court finds that Castelluccio has satisfied his

minimal burden of establishing a prima facie case of age discrimination.

ii.  Legitimate, Nondiscriminatory Reason

The second step under *McDonnell Douglas* is the articulation of a legitimate,

nondiscriminatory reason for the adverse employment action by the defendant. IBM asserts that

Castelluccio's termination was based on legitimate business reasons. According to IBM,

"Castelluccio's performance in both the Public Sector and WellPoint positions was sorely

lacking," and he had "a long history of unacceptable performance." (Doc. # 49, at 39.) IBM

claims that Castelluccio "has admitted that he knew there were complaints about his leadership

and the delivery operations he managed." (*Id.*) Additionally, IBM contends that Castelluccio was

separated from service because he was unable to find a new position within the company after six

months of searching. Thus IBM has articulated legitimate, nondiscriminatory reasons for

Castelluccio's termination and, for that reason, IBM has met its *McDonnell Douglas* burden of

production.

### iii.  Pretext

Since the defendant has met its burden of articulating a legitimate, nondiscriminatory reason for Castelluccio's termination, the Court must "determine, by looking at the evidence [Castelluccio] has proffered and the counter-evidence [IBM] has presented, whether [Castelluccio] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [IBM's] decision to [terminate him]. In this respect it is important to consider whether the explanations that [IBM] gave for [Castelluccio's termination] were pretextual." *Gorzynski*, 596 F.3d at 107.  "Relying on the same evidence that supports an inference of discriminatory intent, [Castelluccio] could meet this burden. Viewed in the light most favorable to [Castelluccio], the evidence could support a conclusion that [IBM's] stated reason[s] [were] pretextual, and that [IBM] planned to remove [Castelluccio] as an employee, and ultimately did remove him, on the basis of his age." *Miller*, 652 F. Supp. 2d at 232.

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). With regard to IBM's stated reason that Castelluccio's performance was sorely lacking and that he had a long history of unacceptable performance, Castellucio has provided evidence that for the year 2006 he was rated a "2," which

means he was a "solid contributor." In his written assessment of Castelluccio's performance for that year, his supervisor (Mr. Jones) specifically noted Castelluccio's solid leadership and people management skills. Castelluccio also offered proof that Collins-Smee had attempted to lower Castelluccio's rating to a "3" for the year 2007, but did not provide Castelluccio with any explanation for her decision to lower his rating. After reviewing Castelluccio's summary of accomplishments for the year 2007, Collins-Smee ultimately agreed that his performance warranted a "2" rating.

Additionally, Collins-Smee sent an email to an IBM Human Resources executive six days after her initial meeting with Castelluccio, and less than one month after becoming his direct supervisor, in which she stated: "We need to replace Jim Castellucio [sic] - I will fill you in tomorrow - Dave L has requested this, had asked months ago from Kelton but, no action. I spoke to Jim C today - he understands and also wants to move, he knew for a while that it was not working." (Doc. # 75-4, at 2.) Castelluccio has provided evidence that he never told Collins-Smee "that I knew my role as VP of Public Sector was not working out," (doc. # 70-2, at 5, ¶ 37), and IBM has acknowledged that Collins-Smee did not tell Castelluccio that he was terminated for cause or for performance reasons.

With regard to IBM's stated reason that Castelluccio was separated from service because he was unable to find a new position within the company after six months of searching, Castelluccio has provided evidence that Collins-Smee had told him she would assist him in finding a new position but failed to do so, despite the fact that "Collins-Smee's assistance to [Castelluccio] in locating a new position within IBM was extremely important, particularly because executive positions at IBM are not posted to employees and are often kept confidential

-14-

until a candidate is selected." (*Id*. at 10, ¶ 86.)  Castelluccio has also provided evidence that there were numerous available executive positions within the company for which he was qualified but not considered.

The Court finds that the evidence produced by Castelluccio could support a conclusion that IBM's stated reasons for his termination were pretextual, and that "a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [IBM's] decision to [terminate him]." *Gorzynski*, 596 F.3d at 107.  For that reason, the defendant's motion for summary judgment is denied as to the plaintiff's ADEA claim.  Because "[a]ge discrimination claims brought under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301, are governed by the same standards as those brought under the ADEA," *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997),  the defendant's motion is also denied as to the plaintiff's claim of age discrimination under the NYSHRL.

## III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment (**doc. # 47**) is **DENIED** as to the two remaining counts in the complaint, i.e., Count One (Violation of the

ADEA) and Count Three (Age Discrimination in Violation of NYSHRL).

**SO ORDERED** this 21st  day of August, 2012.

_____/s/ DJS_____
DOMINIC   J.   SQUATRITO
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,                :          CIVIL ACTION
              Plaintiff            :          NO. 3:09 CV 1145 (DJS)
                                   :
                                   :
vs.                                :
                                   :
INTERNATIONAL BUSINESS             :
MACHINES CORPORATION,              :
              Defendant.           :          SEPTEMBER  13, 2013


**PARTIES' JOINT TRIAL MEMORANDUM**

**1.      Trial Counsel**

**Plaintiff:**

Mark R. Carta
Margaret A. Triolo
CARTA, McALISTER & MOORE, LLC
1120 Boston Post Road
Darien, CT 06820
Tel. No. (203) 202-3100
Fax No. (203) 202-3102
mark@cmm-law.com

**Defendant:**

Zachary D. Fasman
Todd C. Duffield
Alexander W. Wood
PAUL HASTINGS LLP
75 East 55th Street
New York, NY 10022
Tel. No. (212) 318-6315
Fax. No. (212) 230-7707
zacharyfasman@paulhastings.com
toddduffield@paulhastings.com
alexanderwood@paulhastings.com

**2.**      **Jurisdiction**

This Court has jurisdiction over this action pursuant to: 28 U.S.C. § 1331 as it concerns a federal question; 28 U.S.C. § 1332 as there exists diversity of citizenship between the parties and the amount in controversy exceeds $75,000; and, under the principles of supplemental jurisdiction set forth in 28 U.S.C. § 1367(a).

On November 17, 2008, Mr. Castelluccio filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and New York State Division of Human Rights ("NYSDHR") alleging discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA") and the New York State Human Rights Law §296(a) ("NYSHRL").  The EEOC issued a Notice of Right to Sue on June 18, 2009.  The NYSDHR issued a Determination and Order of Dismissal for Administrative Convenience on July 16, 2009.

**3.**      **Jury/Nonjury**

Mr. Castelluccio demands a trial by jury.

**4.**      **Length of Trial**

The parties estimate that trial will require 5-9 days.

**5.**      **Further Proceedings**

The parties do not believe that any further proceedings are necessary prior to trial other than the resolution of the evidentiary issues set forth below in Paragraph 11.

6.    **Nature of the Case**

(a)    **Plaintiff:**

Mr. Castelluccio brings this action against IBM, his former employer of forty years, for unlawfully and willfully terminating him on the basis of his age, in deprivation of his rights secured by the ADEA and NYSHRL.

Mr. Castelluccio's employment was terminated by IBM at age 61, at which time he was the oldest individual employed within IBM's IT America's Delivery Organization.  During the sixteen month period that Mr. Castelluccio was supervised by Ms. Collins-Smee, she made a number of inappropriate remarks to him about his age and ability to "bridge to retirement."   Ms. Collins-Smee removed Mr. Castelluccio from two positions without discussion as to his job performance and without resort to IBM's progressive discipline policies.  In both positions, Mr. Castelluccio was replaced by younger individuals, one as much as ten years younger.   In addition, Ms. Collins-Smee assigned Mr. Castelluccio simultaneously to two full-time positions in a clear attempt to cause him to resign from IBM.   Finally, during the period of January 2008 through June 2008, Ms. Collins-Smee failed to provide Mr. Castelluccio with any work assignments, making it impossible for him to meet any performance standards during that time.  Although IBM uses specific procedures for placing individuals in new positions, Ms. Collins-Smee made only two inquiries on Mr. Castelluccio's behalf, and did so just one week prior to notifying him of his pending termination.  During this time period, Ms. Collins-Smee had the opportunity to assist in placing Mr. Castelluccio in many dozens of other positions, but failed to do so, consistently filling these positions with younger employees.  Mr. Castelluccio reported to the IBM Human Resources department that he perceived that he was being discriminated against on the basis of his age.   IBM's internal investigation into Mr. Castelluccio's claim of age

3

discrimination, concluded after his termination, found that he was treated fairly.  Despite never having received an unfavorable performance review, Mr. Castelluccio was told at the time of his termination that he was being terminated for poor job performance.  Subsequently, IBM claimed to have terminated Mr. Castelluccio for failure to find a position within IBM.

Mr. Castelluccio seeks money damages consisting of: (1) lost wages, including, but not limited to, salary increases, bonuses and incentive pay;  (2) benefits, including but not limited to, 401(k) contributions, health benefits, pension benefits, restricted stock units and/or other equity awards; (3) liquidated damages;  (4) compensation for emotional distress; (5) attorneys' fees;  (6) costs, interest, and damages to compensate for increased tax liability; and  (7) such further relief as the Court deems appropriate.

**(b)    Defendant:**

IBM denies that Plaintiff's termination was in any way attributable to his age.  IBM had a legitimate, non-discriminatory reason for terminating Plaintiff's employment in June, 2008; namely, that after providing Plaintiff six months of full pay and benefits with no operational responsibilities to find an alternate position at IBM, Plaintiff failed to find a new position.  IBM was not required to carry Plaintiff without a position indefinitely.

Plaintiff cannot show that age was the "but for" cause of his termination, which he is required to do in order to prevail.  IBM removed Plaintiff from two prior positions – as Vice President of Public Sector Delivery and as Senior Delivery Project Executive assigned to the WellPoint account – based upon numerous well documented internal and external client complaints about Plaintiff's performance, which dated back before Ms. Collins-Smee became his manager.  Instead of terminating Plaintiff's employment as a result of those complaints, IBM continued to pay Plaintiff his full salary and benefits for 6 full months to allow him Plaintiff to

4

find another position within IBM.  Despite the assistance of his manager and others, Plaintiff failed to find a new role at IBM and was separated on June 30, 2008, receiving his IBM pension.

Plaintiff's claim that Ms. Collins-Smee made comments about his retirement eligibility do not begin to prove age discrimination.  Even if Ms. Collins-Smee referred to Plaintiff's retirement exactly as he has alleged – which she denies – three innocuous comments about retirement eligibility during the course of a year and a half do not prove age discrimination. Plaintiff does not claim that Ms. Collins-Smee denigrated him in any way, referred to his age in an adverse fashion, or demanded that he retire.  Moreover, the individuals IBM selected to replace Plaintiff in his prior positions were 49 and 59 respectively – well within the same protected age category as Plaintiff, and Ms. Collins-Smee herself was 50 years old at the time of these events.  There simply is no evidence of age discrimination in this case.

IBM carefully investigated Plaintiff's claim of age discrimination through its well-established internal procedures.  The head of its internal appeals process interviewed 21 witnesses during the course of an extensive investigation, and concluded that Plaintiff had been treated fairly and without discrimination.  That conclusion was correct.

**7.**   **Trial by Magistrate Judge**

The parties consent to trial by Magistrate Judge Thomas Smith and have filed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form with the Clerk of Court.

**8.**   **List of Witnesses**

   **Plaintiff:**

Plaintiff reserves the right to call any of the witnesses identified by Defendant and reserves the right to call additional witnesses for purposes of rebuttal or impeachment.  On his case in chief, Plaintiff will call the following witnesses at trial:

1.   <u>**James Castelluccio**</u>**, 85 Davenport Lane East, Stamford, Connecticut 06903**

Mr. Castelluccio will testify regarding: his family and educational background; the history of his employment with IBM including the various jobs he performed, accounts on which he worked, and accolades he received; the compensation he received while employed by IBM including raises, bonuses, equity awards, incentive compensation and benefits; his first meeting with Ms. Collins-Smee after she became his supervisor; Ms. Collins-Smee's inquiry as to his age; Ms. Collins-Smee's repeated references to his ability to retire; his removal from his position as Vice President of Public Sector Delivery by Ms. Collins-Smee; his placement as Delivery Project Executive for the WellPoint account and subsequent removal from that account by Ms. Collins-Smee; his performance reviews, including that prepared by Ms. Collins-Smee; the individuals who replaced him in his positions as VP Public Sector and DPE of WellPoint; the compensation paid to those individuals including raises, incentive compensation, benefits and equity awards; the status of the WellPoint account before, during and after he oversaw it; the individual who handled the WellPoint account prior to Mr. Castelluccio's assignment to it; IBM's Red Team Review and its Five Minute Drill procedures; IBM's Resource Action and LEAN initiative;  the meaning and implications of being "on the bench"; the lack of efforts made by Ms. Collins-Smee and others to assist him to obtain a new position at IBM; his qualifications for various positions that were listed on Five Minute Drills during the relevant time period; the circumstances surrounding his wrongful termination by IBM; his complaint of age discrimination to IBM; the Open Door Investigation conducted by IBM; the age discrimination proceedings he initiated through the EEOC and NYSDHR; IBM's employee training regarding discrimination; IBM's progressive discipline policies; the monetary damages he suffered as a

result of his discriminatory termination by IBM; the emotional pain and suffering caused by

IBM's discriminatory conduct; and his efforts to locate a job since the time of his termination.

**2.** **Gary Crakes, 860 Ward Lane, Cheshire, Connecticut 06410**

Gary Crakes, PhD is an economist who will serve as plaintiff's expert witness. He will

testify regarding: his training and professional background; his experience as an expert witness;

his review of documents concerning Mr. Castelluccio's compensation while employed at IBM;

he will explain his method of calculation; and summarize the total economic losses that Mr.

Castelluccio incurred as a result of his wrongful termination including: lost wages; 401(k)

contributions; health benefits; incentive compensation; reductions to pension benefits; and

increased tax liability.

**3.** **Arthur Kelton Jones, 7314 Admiral Park Drive, Leander, Texas 78645**

Mr. Jones was an IBM executive who supervised Mr. Castelluccio when he was Vice

President of Public Sector Delivery. He will testify regarding: his employment at IBM and the

positions he held there; his supervision of Mr. Castelluccio; Mr. Castelluccio's job performance

and professional reputation; IBM's employee performance review procedures; the performance

reviews he conducted of Mr. Castelluccio; his interaction with Ms. Collins-Smee regarding Mr.

Castelluccio at the time she replaced Mr. Jones as Mr. Castelluccio's supervisor; IBM's

employee training regarding discrimination; IBM's progressive discipline policies; the meaning

and implications of being "on the bench"; IBM's Red Team Review; Resource Actions, LEAN

initiative and Five Minute Drill procedures; Mr. Castelluccio's qualifications for jobs which

were listed on Five Minute Drills during the time that he was looking for a position within IBM;

the status of the WellPoint account before Mr. Castelluccio's assignment to it and the roles of

various individuals who worked on this account; IBM's procedures regarding the re-assignment

and termination of an employee; whether IBM's termination of Mr. Castelluccio allegedly based upon his failure to find a position within IBM was consistent with IBM's standard procedures; whether Ms. Collins-Smee's efforts to find a position for Mr. Castelluccio were consistent with IBM's standard procedures; and whether IBM's handling of Mr. Castelluccio's age discrimination claim was consistent with IBM's standard procedures.

    **4.**    <u>**Joanne Collins-Smee**</u>**, 143 Weaver Street, Greenwich, CT 06831**

Ms. Collins-Smee is a General Manager at IBM who supervised Mr. Castelluccio from February 2007 until his termination. She will testify regarding: her comments to Mr. Castelluccio regarding retirement; her meetings with Mr. Castelluccio while acting as his supervisor; her decision to remove Mr. Castelluccio from the position of VP Public Sector and assignment to the WellPoint account; the status of the WellPoint account; Mr. Castelluccio's job performance and PBC review; her decision to remove Mr. Castelluccio from the WellPoint account; her role in attempting to place Mr. Castelluccio in a new position at IBM; her efforts to include Mr. Castelluccio in Five Minute Drills; the lack of work assignments given to Mr. Castelluccio from January to June 2008; Mr. Castelluccio's termination; IBM's Five Minute Drill procedures, both generally and specifically as to Mr. Castelluccio; and IBM's progressive discipline procedures, both generally and specifically as to Mr. Castelluccio; IBM's employee training regarding discrimination; and her knowledge of the Age Discrimination in Employment Act.

    **5.**    <u>**Michael G. Morin**</u>**, 13 Fair Street, Enfield, Connecticut 06082**

Mr. Morin is a retired IBM executive who held the position of DPE for the WellPoint account immediately prior to Mr. Castelluccio. He will testify regarding: his employment history at IBM; his knowledge of Mr. Castelluccio and his professional reputation; his

experience as DPE of the WellPoint account; the status of the WellPoint account while he served

as its DPE and at the time that Mr. Castelluccio assumed this position; IBM's responsiveness to

WellPoint's concerns and issues; his performance reviews while serving as DPE of WellPoint;

his decision to resign from IBM, and subsequent decision to remain at IBM; his employment

subsequent to his tenure as DPE of the WellPoint account; IBM's procedures when faced with

client dissatisfaction; IBM's Five Minute Drill procedures; IBM's progressive discipline

procedures; and IBM's employee training regarding discrimination.

**Defendant:**

IBM reserves the right to call any of the witnesses identified by Plaintiff and reserves the

right to call additional witnesses for purposes of rebuttal or impeachment.  In addition, IBM will

call the following witnesses at trial:

    1.    **Joanne Collins-Smee, 294 Route 100, Somers, New York 10589**

Ms. Collins-Smee will testify about her mandate when she became manager of the ITD

Americas, the roles assigned to Plaintiff while she was his manager and expectations for

performance in those roles, the complaints she received from David Liederbach and Keenie

McDonald regarding Plaintiff's performance, the decisions to remove Plaintiff from the VP-PSD

and SDPE-WellPoint roles, the improvements that occurred following his replacement, the

efforts she took to assist him to locate a new role after he was removed from WellPoint, her

discussions with Plaintiff about his retirement eligibility and the decision to impose a deadline

for Plaintiff to secure a new role.

    2.    **David Liederbach, 590 Madison Avenue, New York, New York 10022**

Mr. Liederbach will testify about his role as General Manager of Public Sector, his

dissatisfaction with Plaintiff in his VP-PSD role, his complaints to Plaintiff's manager in 2006

and his conversations at that time with Plaintiff, and the reasons he asked Ms. Collins-Smee to replace Plaintiff.

**3.**     **Keith Holmes**, **294 Route 100, Somers, New York 10589**

Mr. Holmes will testify about Ms. Collins-Smee's decision to remove Plaintiff from the VP-PSD role and then the SPDE role for WellPoint, the selection of Miguel Echavarria to replace Plaintiff as VP-PSD, the selection of Gordon Crawford to replace Plaintiff as SPDE for WellPoint, the Five Minute Drill process, including the placement of Plaintiff's name on Five Minute Drills to assist Plaintiff's efforts to locate a new position from June 2007 until his termination the following June, the general availability of Band C and D roles in 2007-08 for someone with Plaintiff's background and his personal knowledge of Ms. Collins-Smee's efforts to assist Plaintiff in his job search.

**4.**     **Keenie McDonald,** **150 Kettletown Road, Southbury, Connecticut 06488**

Ms. McDonald will testify about her dissatisfaction with Plaintiff in the SPDE role for WellPoint, her conversations with Plaintiff about his lack of leadership and visibility on the WellPoint account, the complaints she received from WellPoint executives about Plaintiff, and her plea to Robert Zapfel and Joanne Collins-Smee to replace Plaintiff on the WellPoint account.

**5.**     **Gordon Crawford,** **3039 E Cornwallis Road, Research Triangle Park, North Carolina 27709**

Mr. Crawford will testify about the state of the WellPoint account when he took over from Plaintiff, and his efforts to improve the performance of that account.

6.      <u>Charles Sodikoff</u>, 1320 Sandra Lane, North Merrick, New York 11566

Mr. Sodikoff is an expert in recruitment/placement and will testify about Plaintiff's job search efforts following his termination of employment from IBM compared to the industry standard for such job searches.

7.      <u>Russell Mandel</u>, 150 Kettletown Road, Southbury, Connecticut 06488

Mr. Mandel will testify about the Open Door investigation he conducted for IBM following Mr. Castelluccio's June 2008 complaint and his findings related to that investigation.

<u>Testimony by Deposition</u>

A.      **Plaintiff:** Plaintiff designates the following witnesses who will testify by deposition:  Patricia O'Malley, Jack Overacre, Garrett Walker and Barbara Brickmeier. Transcript designations are as follows:

| <u>Deposition Transcript Designation</u> | <u>Party</u> | <u>Objection</u> |
|---|---|---|
| Patricia O'Malley 55:2 to 56:8 | Plaintiff | FRE 402 – Irrelevant |
| O'Malley 67:4 to 68:3 | Plaintiff | FRE 402 – Irrelevant |
| O'Malley 75:19 to 76:25 | Plaintiff | No objection |
| O'Malley 79:4-24 | Plantiff | FRE 402 – Irrelevant |
| O'Malley 110:2-25 | Plaintiff | FRE 402 – Irrelevant |
| O'Malley 111:2 to 112:21 | Plaintiff | FRE 402 – Irrelevant FRE 801 – Hearsay |
| O'Malley 127:2-25 | Plaintiff | FRE 402 – Irrelevant |
| Jack Overacre 20:1-25 | Plaintiff | FRE 402 – Irrelevant |
| Overacre 29:5 to 30:25 | Plaintiff | FRE 402 – Irrelevant |
| Overacre 41:3-15 | Plaintiff | FRE 402 – Irrelevant |
| Overacre 87:5 to-88:18 | Plaintiff | FRE 402 – Irrelevant FRE 801 – Hearsay |
| Garrett Walker 84:18 to 85:22 | Plaintiff | FRE 402 – Irrelevant |

11

A-240

Case 14-2854, Document 62, 03/13/2015, 1460796, Page252 of 289
Case 3:09-cv-01145-TPS   Document 133   Filed 09/13/13   Page 12 of 21

| Deposition Transcript Designation | Party | Objection |
|---|---|---|
| Walker 90:3 to 91:20 | Plaintiff | FRE 402 – Irrelevant |
| Walker 96:8-12 | Plaintiff | FRE 402 – Irrelevant |
| Walker 97:5 to 98:9 | Plaintiff | No objection |
| Walker 105:9 to 106:25 | Plaintiff | No objection |
| Walker 109:5 to 111:12 | Plaintiff | No objection |
| Walker 118:8-21 | Plaintiff | FRE 402 – Irrelevant |
| Walker 119:8 to 121:23 | Plaintiff | FRE 402 – Irrelevant |
| Walker 148:5-21 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Walker 149:3 to 150:8 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Walker 160:2-24 | Plaintiff | FRE 402 – Irrelevant |
| Barbara Brickmeier<br>31:3 to 32:17 | Plaintiff | FRE 402 – Irrelevant |
| Brickmeier 81:3 to 82:21 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Brickmeier 89:1 to 90:25 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Brickmeier 95:19 to 97:19 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Brickmeier 107:7-24 | Plaintiff | No objection |
| Brickmeier 108:2-17 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Brickmeier 112:2-16 | Plaintiff | FRE 402 – Irrelevant<br>FRE 403 – Confusion |
| Brickmeier 113:3 to 114:2 | Plaintiff | FRE 402 – Irrelevant |

B.     **Defendant:**  Defendant designates the following witnesses who will testify by deposition:  Barbara Brickmeier, Patricia O'Malley and Garrett Walker.  Transcript designations are as follows:

| Deposition Transcript Designation | Party | Objection |
|---|---|---|
| Barbara Brickmeier 74:15-22 | Defendant | Relevance.  Deponent's Answer reveals that she misconstrued the question. Any probative value is outweighed by the danger of confusion and unfair prejudice. |
| Brickmeier 77:20-78:17 | Defendant | No objection |

| Deposition Transcript Designation | Party | Objection |
|---|---|---|
| Brickmeier79:23-80:8 | Defendant | No objection |
| Brickmeier 80:12-81:2 | Defendant | No objection |
| Brickmeier 81:24-82:21 | Defendant | No objection |
| Brickmeier 89:1-12 | Defendant | No objection |
| Brickmeier 89:24-90:17 | Defendant | No objection |
| Brickmeier 100:16-101:14 | Defendant | Relevance.  The designation does not include the question to which the deponent was responding.  Any probative value is outweighed by the danger of confusion and unfair prejudice. |
| Brickmeier 105:1-106:8 | Defendant | As to 105:9-20.  Relevance and speculation.  The witness states that she does not know the answer to the question and then speculates. |
| Brickmeier 107:14-108:13 | Defendant | No objection |
| Brickmeier 112:17-23 | Defendant | Relevance.  Speculation. |
| Patricia O'Malley 13:23-14:11 | Defendant | Relevance.  Background information on deponent. |
| O'Malley 20:14-21:22 | Defendant | No objection |
| O'Malley 59:8-60:5 | Defendant | No objection |
| O'Malley 68:4-25 | Defendant | No objection |
| O'Malley 77:2-78:6 | Defendant | No objection |
| O'Malley 123:23-125:2 | Defendant | No objection |
| O'Malley 125:23-126:12 | Defendant | Relevance.  Speculation. |
| O'Malley 130:13-24 | Defendant | Hypothetical.  Compound question.  Any probative value is outweighed by the danger of confusion and unfair prejudice. |
| O'Malley 136:5-137:18 | Defendant | No objection |
| Garrett Walker 44:16-46:9 | Defendant | Relevance.  Assumes facts that may not be in evidence. Testimony is based on the deponent's review of a document which may not be in evidence at the time of the introduction of this testimony at trial. Any probative value is outweighed by the danger of confusion and unfair prejudice. |
| Walker 46:15-25 | Defendant | No objection |
| Walker 47:4-15 | Defendant | No objection |
| Walker 50:9-51:10 | Defendant | No objection |
| Walker 71:16-73:3 | Defendant | Relevance.  Assumes facts that may not be in evidence. Testimony is based on the deponent's review of a document which may not be in evidence at the time of the introduction of this testimony at trial. Any probative value is outweighed by the |

| Deposition Transcript Designation | Party | Objection |
|---|---|---|
| | | danger of confusion and unfair prejudice. |
| Walker 109:25-110:14 | Defendant | No objection |

**9.      Exhibits**

Plaintiff's exhibit list is attached hereto as Exhibit A.

Defendant's exhibit list is attached hereto as Exhibit B.

**10.     Trial to Court/Jury**

**A.      Stipulation of Uncontroverted Facts**

The parties stipulate to the following relevant facts:

1.    Mr. Castelluccio is a citizen of the State of Connecticut, currently residing in Stamford.

2.    IBM is a multinational corporation organized and existing under the laws of the State of New York.

3.    In 2008, IBM employed 398,455 employees worldwide.

4.    At all relevant times, IBM was and is an employer within the meaning of 29 U.S.C. § 630(b) and N.Y. Exec. Law § 292.

5.    At all relevant times, Mr. Castelluccio was an employee as defined by 29 U.S.C. § 630(f) and N.Y. Exec. Law § 292(6).

6.    IBM hired Mr. Castellucio in 1968 as a Computer Analyst.

7.    Mr. Castelluccio received salary increases and promotions during his 40 years of employment with IBM.

8.    In August of 2000, IBM promoted Mr. Castelluccio to the level of Vice President (referred to as a "Band C" executive position).

9.    In January of 2005, IBM promoted Mr Castelluccio to Vice President of Public Sector Delivery for IBM's Integrated Technology Division.

10.   As Vice President of Public Sector Delivery, Mr. Castelluccio led and managed the teams responsible for delivering IT services to more than thirty public sector IBM accounts.

11.    In or about February of 2007, Mr. Castelluccio's supervisor, Kelton Jones, retired and was replaced by Joanne Collins-Smee ("Ms. Collins-Smee"). Ms. Collins-Smee was 50 years old at the time.

12.    In late February, 2007, IBM decided to remove Mr. Castelluccio from his position as Vice President, Public Sector Delivery.

13.    IBM selected Miguel Echavarria to replace Mr. Castelluccio as Vice President Public Sector Delivery.  The change was effective in June 2007. Mr. Echavarria was 49 years old at the time.

14.    From April 2007 until January, 2008, Mr. Castelluccio served as the Senior Delivery Project Executive on the WellPoint account.

15.    As Senior Delivery Project Executive on the WellPoint account, Mr. Castelluccio retained the title of Vice-President, Band C executive and earned the same salary and benefits.

16.    In or about November 2007, Ms. Collins-Smee removed Mr. Castelluccio from the position of Senior Delivery Project Executive at WellPoint and informed him that Gordon Crawford, a Band C executive returning to the US from an assignment in Europe, had been selected to fill this position.

17.    Mr. Crawford assumed responsibility as the Senior Delivery Project Executive on the WellPoint account effective January 1, 2008.  Mr. Crawford was 59 years old at the time.

18.    When he was removed from the WellPoint position, Mr. Castelluccio and Ms. Collins-Smee agreed that Plaintiff would need to look for alternate employment with IBM and Ms. Collins-Smee agreed to assist him in his search.

19.    As is customary for senior IBM Executives, IBM continued paying Mr. Castelluccio his full salary and benefits, while he looked for another position with IBM.  He had no operational responsibilities at this time

20.    IBM maintains a "Five Minute Drill" process, in which IBM organizations compile lists of open executive positions, slates of employees who are qualified for the role, and lists of employees who are available for new roles because they are not currently in a position or seeking a change. The organizations then discuss the employees and their suitability for the open positions.

21.    In January, 2008, Ms. Collins-Smee informed Mr. Castelluccio that she intended to rate his performance for the 2007 year as a "3", which is defined by IBM as "among the lowest contributors, needs to improve."  After reviewing a summary of his 2007 achievements prepared by Mr. Castelluccio, Ms. Collins-Smee changed his evaluation to a "2",

which is defined by IBM as "consistently meets job responsibilities, solid contributor." In her final evaluation she stated in his "Overall assessment": "Jim started the year as the ITD Delivery VP for Public Sector. In the second half of the year, he was acting PE on the Wellpoint account. In the Public Sector role Jim's team reduced headcount significantly and we were able to continue to meet our service level objectives. On the Wellpoint account, Jim and the team has made significant progress on programs to improve service quality and reduce cost (data center migrations, renegotiating sw, hw vendor contracts). Jim needs to continue to focus on those activities that would demonstrate effective leadership to both the IBM team as well as the client."

22. On or about May 20, 2008, IBM informed Mr. Castelluccio that his employment would be terminated effective June 30, 2008, unless he found another position within the Company in the interim.

23. On June 13, 2008, Mr. Castelluccio lodged a complaint with IBM's Human Resources Department, claiming that he was being systematically marginalized by his manager for the purpose of terminating his employment as a result of age discrimination.

24. The IBM human resources department conducted an "Open Door Investigation" into Mr. Castelluccio's complaint. An "Open Door" investigation is an internal mechanism IBM has established to deal with employee complaints.

25. Mr. Russell Mandel, a senior Consulting HR Professional who runs IBM's internal appeals programs, conducted the Open Door investigation.

26. Mr. Castelluccio found no alternate employment with IBM and on June 30, 2008, IBM terminated Mr. Castelluccio's employment. Mr. Castelluccio was 61 years old at the time. He was entitled to and is receiving his IBM pension.

27. On August 11, 2008, Mr. Mandel informed Mr. Castelluccio that the "Open Door" Investigation had concluded that his separation from IBM was not the result of age discrimination.

28. In July of 2009 Mr. Castelluccio commenced this lawsuit against IBM.

     **B.**     **Agreed Statement of Contested Issues of Fact and Law**

The parties submit the following general statement of the contested issues of fact and law to be litigated in this action.  There are numerous factual and legal sub-issues, which fall within the scope of the issues listed below, that will be presented at trial.

      **1.**     **Agreed Statement of Contested Issues of Fact**

       a.     Whether Mr. Castelluccio can show by a preponderance of the evidence that age was the "but for" cause of the termination of his employment.

       b.     Whether the reasons given by IBM for Mr. Castelluccio's termination were a pretext for age discrimination.

       c.     If Mr. Castelluccio establishes that IBM's termination of his employment was in violation of the ADEA, was it a willful violation?

       d.     If Mr. Castelluccio establishes that IBM terminated his employment because of his age, what damages did he suffer?

       e.     Whether Mr. Castelluccio mitigated his damages?

      **2.**     **Agreed Statement of Contested Issues of Law**

       a.     Whether IBM's termination of Mr. Castelluccio violated the Age Discrimination in Employment Act?

       b.     Whether IBM's termination of Mr. Castelluccio violated the New York State Human Rights Law?

      c.      If Mr. Castelluccio establishes that IBM terminated his employment because of his age, what categories of damages is Mr. Castelluccio entitled to recover?

      d.      If Mr. Castelluccio establishes that IBM terminated his employment because of his age, what amount of damages is Mr. Castelluccio entitled to recover?

**C.**      **Proposed <u>Voir</u> <u>Dire</u> Questions**

Mr. Castelluccio's proposed V<u>oir</u> <u>Dire</u> questions are attached as Exhibit C.

IBM's proposed <u>Voir</u> <u>Dire</u> questions are attached as Exhibit D.

**D.**      **Proposed Jury Instructions**

Mr. Castelluccio's proposed jury instructions are attached as Exhibit E.

IBM's proposed jury instructions are attached as Exhibit F.

**11.**      **<u>Anticipated Evidentiary Problems</u>**

The parties are concurrently filing evidentiary memoranda addressing the below anticipated evidentiary problems.

**A.**      **Plaintiff:**

      1.      Whether evidence of compensation paid to Mr. Castelluccio's successor, Miguel Echavarria, in his position as VP of Public Sector in 2008 through 2013 is admissible as relevant to Mr. Castelluccio's economic loss?

      2.      Whether Dr. Crakes should be permitted to testify as to Mr. Castelluccio's loss based on a calculation that considers the compensation paid to Mr. Echavarria (exclusive of stock options and/or incentive stock units) while

in his position as VP Public Sector during the 2008 through 2013 time period?

**B.**   **Defendant:**

1.   IBM is moving to exclude evidence mentioning any compensation or stock options received by Plaintiff's successors as this information has been precluded by the Court's rulings on IBM's *Daubert* Motions and is not relevant regarding Plaintiff's supposed damages.

2.   IBM is moving to exclude evidence relating to any supposed failure to apply "progressive discipline" to his removal from two prior positions, because the evidence relates solely to removals from positions that the Court has already determined may not be litigated in this case, and because IBM has no progressive discipline policies in effect for executives.

3.   IBM is moving to exclude evidence comparing Plaintiff's qualifications with the qualifications of the candidates selected by IBM to fill managerial positions open from January 1, 2008 through June 30, 2008 while Plaintiff sat on the bench.  This evidence is not relevant to Plaintiff's claim that he was terminated on June 30, 2008 because of his age.

4.   IBM is moving to exclude evidence regarding Plaintiff's son's accident and his physical condition, as this evidence is not relevant to any claim in this case.

5.   IBM is moving to exclude from evidence the separation agreement it offered Mr. Castelluccio under Fed. R. Evid. 408, and in the alternative is

moving to strike any monetary amount in that separation agreement under

Fed. R. Evid. 403.

RESPECTFULLY SUBMITTED,

THE PLAINTIFF                              THE DEFENDANT
JAMES CASTELLUCCIO                        INTERNATIONAL BUSINESS MACHINES CORP.

BY:____/s/ Mark R. Carta_____   BY: ____/s/ Zachary D. Fasman_____
   MARK R. CARTA (ct06645)                    ZACHARY D. FASMAN (phv0899)
   MARGARET A. TRIOLO                         TODD C. DUFFIELD
   CARTA, MCALISTER & MOORE, LLC             ALEXANDER W. WOOD
   1120 Post Road, Post Office Box 83         PAUL HASTINGS, LLP
   Darien, Connecticut 06820                  75 EAST 55TH Street
   (203) 202-3100                             New York, NY 10022-3205
   Mark@CMM-Law.com                           (212) 318-6000
                                              zacharyfasman@paulhastings.com
                                              toddduffield@paulhastings.com
                                              alexanderwood@paulhastings.com

20

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES CASTELLUCCIO, | CIVIL ACTION NO. |
| Plaintiff, | 3:09 CV 1145 (DJS) |
| – against – | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | September 13, 2013 |
| Defendant. | |

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2013, a copy of the foregoing Parties' Joint Trial Memorandum  was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

　　　　　　　　　　　　/s/ Zachary D. Fasman
　　　　　　　　　　　　Zachary D. Fasman (phv0899)

Exhibit C

Personal and IBM Confidential

Date:                    August 5, 2008

Memorandum to:          File

Subject:                Open Door - Mr. James G. Castelluccio

## I.  FACT SUMMARY

Mr. James G. Castelluccio, a former band C executive in the ITD organization contacted the corporate office on June 17, 2008. He complained that he was being "constructively discharged" by his management as a result of age discrimination, including his manager failing to aggressively find him another executive position. His assessment that his manager's actions and inactions are a result of age discrimination arises  from comment(s) that his manager made stating that he is old enough to retire.

## II.  PERSONS INTERVIEWED

| NAME | TITLE | DIV | LOCATION |
|------|-------|-----|----------|
| Mr. Gregory D. Burnett | Executive Talent Prog Mgr | CHQ | Somers, NY |
| Ms. Joanne Collins Smee | GM ITD Delivery - Americas (originator's 1st line Mgr) | ITD | Somers, NY |
| Mr. Gordon Crawford | VP Strategic Outsourcing | ITD | Raleigh, NC |
| Mr. Miguel A. Echavarria | VP Public Sector Delivery | ITD | Raleigh, NC |
| Mr. Luis Fernandez | VP & Sr PE of Wellpoint | GTS | Alpharetta, GA |
| Mr. Mark Franzese | Sr DPE Wellpoint | ITD | Somers, NY |
| Mr. Keith E. Holmes | HR Director - ITD | CHQ | Somers, NY |
| Mr. David Liederbach | GM Public Sector | GTS | Somers, NY |
| Ms. Keenie McDonald | Managing Director Wellpoint | S&D | Southbury, CT |
| Ms. Constance B. Murphy | HR Resources Consultant | CHQ | Bedford, NH |
| Mr. Jack R. Overacre | VP Quality & Svc Mgt Compet | ITD | Raleigh, NC |
| Mr. Chris S. Nicoletti | VP Healthcare Industry | GTS | Bethesda, MD |
| Mr. Michael G. Morin | Sr DPE The Hartford | ITD | Hartford, CT |
| Mr. Patrick J. Ryan | DPE Wellpoint | ITD | Waltham MA |
| Ms. Molly M. Schleiss | HR - Compensation (Former GTS Talent) | CHQ | Yorktown Hts, NY |
| Mr. John Shimkus | VP, MBPS | MBPS | Somers, NY |
| Ms. Regina Urqhart | DPE Wellpoint | ITD | Southbury, CT |
| Mr. Garrett Walker | HR Vice president | CHQ | Somers, NY |
| Ms. Brian Whitfield | VP State & Local Gov't | GTS | Somers, NY |
| Mr. Kenneth Wisse | Director Public Sector | ITD | Southbury, CT |
| Mr. Robert Zapfel | GM Business Development | GTS | Somers, NY |

## III.  INVESTIGATION

1

Performance:

When Ms. Joanne Collins-Smee was first announced as the general manger of IT Delivery and Mr. Castelluccio's first-Line manager in February 2007, she was told by Mr. David Liederbach, GTS Public Sector Vice President, that Mr. Castelluccio was not living up to his expectations as the Vice President for ITD delivery. More specifically, the focus of Mr. Liederbach complaints were based on Mr. Castelluccio's performance on two critical and difficult customer accounts (i.e., Wellpoint and State of Texas). Mr. Liederbach complained that in both of these situations, Mr. Castelluccio failed to demonstrate leadership in staffing including failing to replace a resources, and in "CritSit" situations including not being reachable but also failing to lead and fix the situation(s) when there. Based on her confirmation of the lack of leadership, she replaced Mr. Castelluccio in the Public Sector role with Mr. Miguel A. Echavarria and made Mr. Castelluccio the Senior DPE of Wellpoint (while maintaining his band C level) in the hopes of him improving his performance with a single account as focus. However, the same types of issues continued to plague Mr. Castelluccio's performance until he was removed from his position at the behest of the customer, Mr. Liederbach, and the S&D Wellpoint Managing Director, Ms. Keenie McDonald after only two months in the position, and was offered an executive separation allowance for performance. Mr. Liederbach confirms that Mr. Castelluccio appeared to be "overwhelmed" by these two accounts, and did not make the proper changes, including in the staffing area, at an appropriate pace of change on either account, even after Wellpoint was his only focus. In addition, Mr. Liederbach's concerns are documented back to April, 2006 to Mr. Castelluccio's former manager, Mr. Kelton Jones. Ms. McDonald's assessment of Mr. Castelluccio's performance was that he was never visible on the account in either role, was very ineffective, demonstrated no leadership in "CritSit" situations, and was referred to as a "no-op" by the customer. In addition, she states that she has seen an immediate improvement by Mr. Castelluccio's replacement at Wellpoint, Mr. Gordon Crawford.

Additional confirmation of Mr. Castelluccio's issues come from Mr. John Shimkus, the former GTS Vice President of Healthcare, and his replacement, Mr. Chris S. Nicoletti, as well as the GTS Vice President of State and Local Government, Ms. Brian Whitfield. Mr. Whitfield comments that he dealt rarely with Mr. Castelluccio though Mr. Castelluccio should have been more involved in the State of Texas deal, and that Mr. Castelluccio seemed to be struggling in the job, having problems staffing up and was "missing in action" during "CritSits"; and his replacement Mr. Echavarria is much more effective. Mr. Shimkus also states that Mr. Castelluccio could not staff, was very ineffective, did not execute on commitments and did not address issues. One example provided by Mr. Shimkus was he had an issue with the performance of a Wellpoint Service delivery manager where Mr. Shimkus asked Mr. Castelluccio to address the issue in January 2007. Mr. Castelluccio never addressed the issue by providing a suitable backfill. Mr. Nicoletti states that he had problems with Mr. Castelluccio in much the same areas -- service cost issues, staffing and engagement, and that Mr. Echavarria takes much greater personal responsibility for issues. In fact, he states that when he was on the phone with Mr. Castelluccio and Mr. Castelluccio's Public Sector Director, Mr. Kenneth Wisse, it was Mr. Wisse who was able to answer most questions and address most issues. (This is confirmed by Mr. Wisse who refers to Mr. Castelluccio as a "hands off manager." Even Mr. Michael G. Morin, who was the Senior DPE on Wellpoint before he asked to be removed from the account

2

agrees that Mr. Echavarria is a more "hands on" manager.

Mr. Luis Fernandez, the Senior GTS Project executive for Wellpoint is even more critical. He states that Mr. Castelluccio was "very ineffective," did not have a good grasp of the issues and customer requirements, made commitments and failed to follow through, "deflected" escalations, did not participate, and lacked innovative solution to issues including failing to solve resource issues for 6-12 month intervals without checkpoints or reasons. Mr. Fernandez points out that he would send Mr. Castelluccio notes with proposed "get well" strategies, and never hear back from him. Mr. Fernandez and most of the executives above complained to both Mr. Castelluccio as well as his and their own management teams.

Mr. Castelluccio lack of aggressive solutions to the Wellpoint deal is echoed over and over again by the various Deputy Project Executives who reported to him on Wellpoint --  Mr. Mark Francese, Mr. Patrick J. Ryan and Ms. Regina Urqhart. There is also general agreement that Mr. Castelluccio's replacement on Wellpoint, Mr. Crawford is doing a better job with the account and/or is more visible to the customer. This is echoed by Mr. Liederbach and Mr. Wisse.

Mr. Echavarria states that when he took over the Public Sector role, it was in a state of disarray, as was Wellpoint, and that he frequently had to step in on Wellpoint, even when Mr. Castelluccio was the Senior PE. Mr. Crawford similarly is critical of Mr. Castelluccio. He indicates that improvement he has brought to Wellpoint comes from basic "blocking and tackling" moves on his part, including cost cutting through additional use of Global Resources, stabilizing the account where there wasn't sufficient "change management" controls, and higher involvement in "high visibility" outages.

Mr. Castelluccio recommended that I speak to Mr. Jack R. Overacre Jr., Vice President responsible for quality, because Mr. Castelluccio had to invoke Mr. Overacre and his team to get the necessary resources to fix issues on Wellpoint. According to Mr. Castelluccio, this was necessary to get the GTS management (e.g., Mr. Liederbach, etc.) to deal with what was a very difficult contract, and the GTS was unwilling to listen to Mr. Castelluccio "reasonable" requests. Mr. Overacre confirms that the contract was a difficult, but found GTS management willing to accept the need to add resource when he presented the issues to them, correctly. Moreover, Mr. Overacre is critical of Mr. Castelluccio for not being aggressive enough in seeking additional resources, as well as lacking sufficient involvement in "CritSits."

<u>Placement:</u>

Ms. Collins-Smee, her manager, Mr. Robert Zapfel, and Ms. Collins-Smee's HR support (i.e., Mr. Gregory D. Burnett, Mr. Keith E. Holmes, Ms. Constance B. Murphy, Ms. Molly M. Schleiss, and Mr. Garrett Walker) all indicate that she was very aggressive in trying to place Mr. Castelluccio even immediately after being removed from the public sector role in 2007. This included placing him on both Americas and Global ITD "5-minute drills," personally recommending him for positions inside and  outside ITD. In fact, most interviewed indicated that they were "surprised" that Ms. Collins-Smee was as aggressive at placing Mr. Castelluccio as she was, considering his performance in both roles.

3

CONFIDENTIAL                                        IBM00092520

IV.  ISSUES

Was Mr. Castelluccio's performance underrated?

No. Mr. Castelluccio was universally seen as under involved, insufficiently aggressive in solving issues on the part of his internal and external customer(s), his own direct reporting management team and his replacements. However, Ms. Collins-Smee confused issues in her assessment of Mr. Castelluccio's performance in 2007. First she assessed him as a "3," and then reassessed him as a "2" or "solid contributor" after he challenged her "3" assessment despite removing him from his position on Wellpoint. It is this investigator's view that even a "3" was a "charitable" assessment considering Mr. Castelluccio's lack of success in 2007.

Was Ms, Collins-Smee sufficiently aggressive in placing Mr. Castelluccio.

Yes. Most executives in her position have been much lees aggressive I placing poor performing direct reporting executives.

Were any of Ms. Collins-Smee's actions, a result of age discrimination.

No. Ms. Collins-Smee denies making any age .or retirement comments to Mr. Castelluccio, with the exception of one conversation. This conversation occurred in June when Ms. Collins-Smee offered Mr. Castelluccio an executive separation package, and she indicates that she stated that the executive separation package provided Mr. Castelluccio the "opportunity to retire from IBM with benefits and payments, as described in the Executive Separation Agreement" sent to him, and these speaking point were provided to Ms. Collins-Smee by her HR support, Mr. Holmes. This is supported by talking points provided to Ms. Collins-Smee by Mr. Holmes in a e mail dated May 30, 2009.

V.  MANAGEMENT INVOLVEMENT

Ms. Collins-Smee erred by over assessing Mr. Castelluccio's performance for 2007. She  should be counseled on her error and her performance assessment "write-up" should address this error.

VI.  FOLLOW-UP ACTIVITY

None.

VII.  RECOMMENDED CHANGES IN POLICIES AND PRACTICES

None.

Investigator's Name:        Russell E. Mandel
Investigator's Title:        Consulting HR Professional
Investigator's Location:    Somers, NY

4

Exhibit G



| | | |
|---|---|---|
| **RUSSELL E**<br>**MANDEL**/Somers/IBM | To | Keith E Holmes/Armonk/IBM@IBMUS |
| 06/30/2008 01:51 PM | cc | |
| | bcc | |
| Default custom expiration<br>date of 06/30/2009 | Subject | Re: *IBM Confidential: Fw: Open Door |

I told both Jim and Joanne that he goes today, though I'm still investigating. If he signs the release, he gets the money, and I stop investigating, If he does not sign the release, there are 2 paths:

    1) I find in his favor and bring him back, or
    2) I do not find in his favor, and will give him 48 hours to sign the release. If he then signs, he gets the money. If he doesn't sign, he doesn't get the        money.

Russell E. Mandel
Consulting Human Resources Professional
Global Employee Relations
MD 4303
Route 100, Somers, N. Y., 10589
914-766-4170 (t/l 826-4170); Fax: 914-766-8461

Keith E Holmes/Armonk/IBM

| | | |
|---|---|---|
| **Keith E Holmes**/Armonk/IBM | To | RUSSELL E MANDEL/Somers/IBM@IBMUS |
| 06/30/2008 01:03 PM | cc | |
| | Subject | *IBM Confidential: Fw: Open Door |

Russ, It's June 30th, and we are at a decision point with Jim.  Can you give me an update on the Open Door?

Thanks,

Keith E. Holmes
Director of Human Resources - ITDelivery

Phone: (914) 766-4297; T/L: 8/826-4297
Email: keholmes@us.ibm.com

Assistant:  Carmen Manicchio
External: (914) 766-4031; T/L: 8/826-4031

"The best method of overcoming obstacles is the team method." - Colin Powell

----- Forwarded by Keith E Holmes/Armonk/IBM on 06/30/2008 12:58 PM -----

| | | |
|---|---|---|
| **RUSSELL E**<br>**MANDEL**/Somers/IBM | To | Keith E Holmes/Armonk/IBM@IBMUS |
| 06/24/2008 09:43 AM | cc | |
| | Subject | Open Door |

IBM00094167



When was Jim put onto the drills and which ones.
- Jim was put onto the ITD worldwide drill under "Key People to Move" in June 2007 to give him visibility with Bob Zapfel and the global ITD leadership team
- Jim was added to the ITD Americas 5 min drill under "Key People to Move" in December 2007 to make sure he was condisdered for band C and badn D opportunities in the Americas.
- We also asked the GTS team to include him in their 5 min drills in December
- In May and June Joanne also reached out to a number of her peers and colleagues in other parts of IBM to see if they might have opportunities for Jim.

Who else should I interview who was on calls with Jim!
- Mark Franzese - Sr DPE on WellPoint
- Mike Morin - Past Sr DPE WellPoint
- Regina Urquhart - DPE on Wellpoint
- Ken Wisse - Director of Account Management, under Jim Castelluccio and under Miguel Ecavarria

Russell E. Mandel
Consulting Human Resources Professional
Global Employee Relations
MD 4303
Route 100, Somers, N. Y., 10589
914-766-4170 (t/l 826-4170); Fax: 914-766-8461

CONFIDENTIAL

IBM00094168

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,
        - Plaintiff
        v.                                    CIVIL NO. 3:09CV1145(TPS)

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
        - Defendant

### Ruling on Plaintiff's Motion to Preclude Evidence

The plaintiff, James Castelluccio, alleges that the defendant, International Business Machines Corporations ("IBM"), terminated his employment on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §621, *et seq.*, and the New York State Human Rights Law ("NYSHRL"), NY CLS Exec § 196(a).  The matter is set down for jury trial on January 13, 2014.

Now pending before the Court is the plaintiff's motion to preclude the introduction of evidence concerning the investigation conducted by IBM in response to Mr. Castelluccio's claim of age discrimination.  See Doc. #154.  The proposed evidence includes: the report of IBM's consulting human resources professional, Mr. Russell Mandel, which summarizes the findings of his  "open door" investigation into Mr. Castelluccio's report of discrimination (Doc. #156-3); hand written notes prepared by Mr. Mandel during interviews with IBM employees (Doc. #156-2); and Mr. Mandel's testimony regarding the findings of the open door investigation (Doc. #133, at 11)(collectively, the "open door evidence").  For

the reasons stated below, Mr. Castelluccio's motion to preclude the open door evidence **(Doc. #154)** is **GRANTED.**

The facts and procedural history of this case are familiar to the parties, and the Court will not repeat them in depth.  Mr. Castelluccio began work at IBM in March 1968.  (Doc. #108, at 1-2). In November 2007, when Mr. Castelluccio was 60 years old, he was informed by his superior, Ms. Joanne Collins-Smee, that he was being replaced as Delivery Project Executive ("DPE") of IBM's Wellpoint account, effective, January 1, 2008.  After being removed from this position, Mr. Castelluccio was considered to be "on the bench," that is, he remained employed by IBM at full pay but without a work assignment.  (Id. at 4-5).  During this period, Mr. Castelluccio engaged in a search to find a new position at IBM.  On June 2, 2008, Ms. Collins-Smee met with Mr. Castelluccio to offer him a separation agreement and notified him that his termination would be effective on June 30, 2008, unless he found a new position within the company.  Ultimately, Mr. Castelluccio was unable to secure another position, and his employment was terminated accordingly.  He did not sign the separation agreement.  (Id. at 6).

On June 13, 2008, after being presented with the separation agreement from Ms. Collins-Smee, but before his termination date, Mr. Castelluccio lodged a complaint of age discrimination with IBM. Thereafter, Mr. Mandel conducted the open door investigation into

2

Mr. Castelluccio's report of age discrimination.  Mr. Mandel concluded that IBM had treated Mr. Castelluccio fairly with regard to his termination, and informed Mr. Castelluccio of the findings of his investigation on August 11, 2009.  (<u>Id.</u> at 7).

Mr. Castelluccio now seeks to preclude admission of the open door evidence at trial on the basis that its probative value is far outweighed by its prejudicial effect and that it will confuse the jury and delay the proceedings.  IBM argues that the open door evidence is relevant and critically important to allowing the jury to understand its motive at the time of Mr. Castelluccio's termination, and that, in any event, it falls within the business records exception to the hearsay rule.  IBM states that it would not introduce the open door evidence for the purpose of proving the truth of its underlying facts, but to show that it carefully investigated Mr. Castelluccio's complaint of age discrimination and that, based upon that investigation, believed that his complaint was not true at the time.

The Federal Rules of Evidence ("F.R.E.") have long recognized the business records exception, Fed.R.Evid. 803(6)(b), to the hearsay doctrine, which permits the admission of documents containing hearsay provided there is a foundation sufficient to support its admission.  Courts have also held, albeit in the context of adjudicating dispositive motions, that human resource department investigations constitute business records under Rule

803(6).  See, e.g., Brauninger v. Motes, 260 F. App'x 634, 637 (5th Cir.2007) (investigation notes were based on investigators' personal knowledge and were the result of a regularly conducted business activity that was an ordinary part of the investigators' duties as human resources managers); Mensez-Nouel v. Gucci Am., Inc., 10 CIV. 3388 PAE, 2012 WL 5451189 (S.D.N.Y. Nov. 8, 2012) aff'd on other grounds, 12-4896-CV, 2013 WL 5584317 (2d Cir. Oct. 11, 2013) (investigation report is a business record); O'Brien v. International Business Machines, Inc., No.06-4864 (FLW), 2009 WL 806541 (D.N.J. Mar. 27, 2009) (IBM's open door investigation is a business record).  Moreover, even when an internal report does not meet the requirements of a business record, the court retains discretion to allow its admission for a legitimate non-hearsay purpose.  Vahos v. Gen. Motors Corp., No. 06-cv-6783, 2008 WL 2439643, at *4 (E.D.N.Y. June 18, 2008) (holding that investigative report was admissible at summary judgment stage for the "non-hearsay" purpose of proving that the decision-makers who discharged plaintiff believed that he acted improperly).

Although the court might be able to conclude that open door evidence falls within the business records exception to the hearsay rule, or admit it for the limited purpose of allowing IBM to establish its motive for Mr. Castelluccio's termination, the court agrees with the plaintiff that the analysis should proceed yet further to determine whether the probative value of the open door

4

evidence exceeds its prejudicial effect. <u>See</u> Fed.R.Evid. 403; <u>see also</u>, <u>Paolitto v. John Brown E & C Inc.</u>, 151 F.3d 60, 64 (2d Cir.1998)(stating "the fact that evidence is within an exception to the hearsay rule does not by itself make it admissible *per se*," and, "[t]he district court generally has discretion to exclude hearsay on other grounds, such as where the evidence's probative value is substantially outweighed by the danger of unfair prejudice").

The prejudicial effect of the open door evidence is obvious. Although the open door investigation purports to have determined whether Mr. Castelluccio was treated fairly, it represents only the findings and conclusions of IBM, as opposed to Mr. Castelluccio's account of the circumstances surrounding his termination. This was not an investigation conducted by a neutral party; rather, one conducted by Mr. Mandel, who selected whom to interview and what evidence to consider. There was no hearing, no evidence offered, no sworn statements and no opportunity for Mr. Castelluccio to respond to the criticisms leveled against him, let alone conduct direct or cross-examination of witnesses. Evidence that would have been favorable to Mr. Castelluccio is absent from Mr. Mandel's report. It does not include Mr. Castelluccio's annual performance reviews, or indicate that Mr. Mandel interviewed Mr. Castelluccio's previous manager or clients for whom Mr. Castelluccio worked.

Moreover, the open door investigation focuses more on Mr.

Castelluccio's job performance than his claim of age discrimination.  Much of the report concerns certain executives' estimation of Mr. Castelluccio's performance on two difficult customer accounts, as opposed to whether he was terminated because of his age.  (Doc. #156-3).  Consequently, the open door evidence, while purporting to make objective findings, not only offers an assessment of Mr. Castelluccio's job performance complicated with the biases identified above, but also minimizes his complaints of age discrimination.

There is also reason to suspect that the purpose of the investigation was more to exonerate IBM than to determine if Mr. Castelluccio was treated fairly.  By Mr. Mandel's own admission, had Mr. Castelluccio signed the separation agreement releasing IBM from all legal liability, he would have discontinued his investigation.[1]  Had the purpose of the open door investigation been truly to determine if an IBM employee was treated unfairly, the investigation would have been borne to its natural conclusion irrespective of the specter of litigation.

The court cannot admit evidence that would so unduly prejudice

---

[1]On June 30, 2008, Mr. Mandel stated in an email to Keith E. Holmes, Director of Human Resources-IT Delivery: "I told both [Mr. Castelluccio and Ms. Collins-Smee] that [Mr. Castelluccio] goes today, though I'm still investigating.  If he signs the release, he gets the money, and I stop investigating, [i]f he does not sign the release, there are 2 paths: 1) I find in his favor and bring him back, or 2) I do not find in his favor, and will give him 48 hours to sign the release.  If he then signs, he gets the money. If he doesn't sign, he doesn't get the money."  (Doc. #157-2).

the plaintiff.  To the extent that IBM wishes to present evidence demonstrating its reasons for terminating Mr. Castelluccio's employment, it is free to introduce at trial the same evidence considered by Mr. Mandel.  For the reasons stated herein, Mr. Castelluccio's motion to preclude the open door evidence is **(Doc. #154) GRANTED.  IT IS SO ORDERED.**

   **Dated at Hartford, Connecticut this   23rd   day of December, 2013.**

                                    /s/ Thomas P. Smith
                                    **Thomas P. Smith**
                                    **United States Magistrate Judge**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES CASTELLUCCIO, | : | CIVIL ACTION |
| Plaintiff | : | NO. 3:09 CV 1145 (TPS) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION, | : | |
| Defendant. | : | January 17, 2014 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR JUDGMENT AS A MATTER OF LAW**

Defendant IBM ("IBM") respectfully submits this Motion for Judgment as a Matter of Law pursuant to Rule 50. The Court has now seen, by way of the presentation of Plaintiff James Castelluccio's ("Plaintiff") case, that the record contains no evidence that would allow a reasonable jury to conclude that Plaintiff's age was the "but for" cause of his termination from IBM. IBM therefore requests that the Court enter judgment in its favor.

**I.      PLAINTIFF HAS NOT MET HIS BURDEN OF PROVING THAT AGE WAS
THE BUT FOR CAUSE OF HIS TERMINATION.**

The Supreme Court has held that a plaintiff in an age discrimination case must shoulder a heightened burden in proving discrimination, and must prove by a preponderance of the evidence that age was the **but for** cause of the employer's adverse employment action, not merely a motivating factor. *See Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167 (2009). As the Second Circuit has stated, "*Gross* makes clear that a plaintiff bringing a disparate treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the **but-for** cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynksi v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (quotation

omitted, emphasis added).  That burden cannot be met through surmise or speculation—Plaintiff must prove by a preponderance of the evidence that IBM terminated his employment intentionally <u>because of</u> his age, and must carry that burden throughout.  *Holowecki v. Fed. Express Corp.*, No. 09-3477-cv, 2010 WL 2573864, at *1 (2d Cir. June 24, 2010) (judgment for employer where plaintiffs failed to establish that age was the but for cause of the employer's adverse action); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited [age] discrimination occurred.'") citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000); *Norton v. Sam's Club*, 145 F.3d 114, 118-119 (2d Cir. 1998), *cert. denied*, 525 U.S. 1001 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Alam v. HSBC Bank USA, N.A.*, No. 07 Civ. 3540, 2009 WL 3096293, at *8 (S.D.N.Y. Sept. 28, 2009) (under the ADEA, the plaintiff must establish that discrimination was the but for cause of the employer's decision), *aff'd*, No. 09-4468-CV, 2010 WL 2573588 (2d Cir. June 28, 2010).  Plaintiff has clearly not carried his burden here.

   A.   <u>Inquiries About Retirement Do Not Establish a Case of Age Discrimination.</u>

   Plaintiff has claimed that his manager, Joanne Collins-Smee, made three isolated and non-coercive references to his eligibility "to bridge to retirement", and would now have the Court allow the jury to decide whether these references, allegedly made during a period beginning well more than a year before his termination, can support an inference of unlawful

discrimination.  Even if these references occurred exactly as described by Plaintiff, they are not sufficient to support a finding of age discrimination, as a matter of law.[1]

Discussion of retirement, standing alone, is not proof of age discrimination.  The Second Circuit has made clear that "[t]he ADEA does not make all discussion of age taboo."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).  Employers have legitimate reasons to confirm employees' interest in taking early retirement, which is considered an "issue that [is] germane to the joint interests of the employee and the Company".  *Id.*  In the context of ADEA claims, "comments concerning retirement can be made without suggesting age discrimination."  *Schug v. Pyne-Davidson Co.*, No. 3:99-CV-1493 (CFD), 2001 WL 34312877, at *5 (D. Conn. Dec. 10, 2001).  Any such comments "must be viewed in context, along with the specific language used and the number of times the comments were made."  *Id.*  Clearly the context provided by the evidence heard from Plaintiff does not support a claim of age discrimination; these were infrequent and intermittent inquiries during nearly 18 months.  Additionally, and as the Court has heard, Plaintiff himself testified that an inquiry regarding retirement is not inappropriate at IBM. Neither is it inappropriate in this Circuit.

**B.    Plaintiff's Allegation that Ms. Collins-Smee Asked Him His Age in February 2007 Also Does Not Establish Age Discrimination.**

Even when it comes to the one explicitly age-based remark suggested by Plaintiff, it is well settled in the Second Circuit that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."  *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  Courts consider allegedly discriminatory comments to rise above the level of mere stray marks and

---

[1] Significantly, Plaintiff admitted during his deposition and on the stand that he could not recall exactly what words were used in two of the three meetings.

constitute direct evidence of discrimination when the statements are:  "(1) made by the decision maker or one whose recommendation is sought by the decision maker; (2) related to the specific employment decision challenged; and (3) made close in time to the decision."  *Santora v. All About You Home Care Collaborative Health Care SVC, LLC*, No. 3:09CV00339 (DJS), 2012 WL 1964965, at *4 (D. Conn. May 31, 2012).  "Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." *Dixon v. Int'l Federation of Accountants*, 416 F. App'x 107, 166 (2d Cir. 2011) *citing Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).  There must be some kind of meaningful and relevant nexus between the remarks and the employment decision in question.  *See, e.g., Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight.").   Absent evidence of a connection between the alleged remarks and the employment decision in question, such remarks are simply irrelevant.  *See, e.g., Hasemann v. United Parcel Service of America, Inc.*, No. 3:11-cv-554, 2013 WL 696424, at *7 (D. Conn. Feb. 26, 2013) ("Although [the alleged discriminator's] comments could be viewed as discriminatory by a reasonable juror, the comments were not made in relation to the employment decision at issue and were not related to the decision making process.").

Here, the sole age-linked inquiry is half a statement; according to Mr. Castelluccio, in early February, 2007, Ms. Collins-Smee started to say "how old" and stopped herself.  Such a remark, made nearly a year and a half prior to Mr. Castelluccio's termination, is not proof of anything.  The ADEA does not prevent an inquiry as to age.  No reasonable juror could possibly conclude that an alleged age reference made by Ms. Collins-Smee when she took over as

Plaintiff's manager in early February 2007 could have anything to do with his subsequent termination in mid-2008.

In this connection, courts in this Circuit also routinely require that to be admissible, comments must occur within a relatively short time frame in terms of the adverse action in question. Courts routinely refuse to find remarks relevant or admissible when made more than a few months prior to the adverse action in question. *See, e.g., Id.* at *7 ("comment made at least **five months** before plaintiff's termination was not sufficient to create an inference of discrimination.") (quotation omitted, emphasis added); *see also Buckman v. Caylon Sec. (USA) Inc.*, 817 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) ("[a]lthough a reasonable juror could find that the remark itself was discriminatory, [a remark made in isolation **five months** before plaintiff's discharge] was too remote in time and context to support a reasonable inference that [plaintiff's] discharge was a result of . . . discrimination.") (quotations omitted, emphasis added); *Georgy v. O'Neill*, No. 00-CV0660(FB), 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (alleged discriminatory comment **six months** prior to plaintiff's termination was "the kind of isolated and stray remark insufficient, without more, to raise an inference of discrimination.") (quotation omitted); *Legendre v. Chase Manhattan Bank*, No. 94-CIV2911 (JES), 1996 WL 514874, at *6 (S.D.N.Y. Sept. 10, 1996) (finding that discriminatory remark made eight months before the plaintiff's termination was "too remote in time and place" to create a rational inference of employer's discriminatory intent).

In this case, an isolated half-statement Ms. Collins-Smee allegedly made a year or more before Plaintiff's termination can only be considered a stray remark and does not raise an inference of age discrimination.

A-270

Case 14-2854, Document 62, 03/13/2015, 1460796, Page282 of 289
Case 3:09-cv-01145-TPS   Document 179   Filed 01/17/14   Page 6 of 10

## II.   THERE IS NO OTHER EVIDENCE OF AGE DISCRIMINATION ON THIS RECORD.

Plaintiff offers three further arguments that he suggests provide an inference of age discrimination:  (1) that Ms. Collins-Smee failed to assist him in finding a new role within IBM; (2) that other positions were filled within IBM that he should have been considered for; and (3) that IBM has provided "shifting" explanations for Plaintiff's termination, which suggests that its reasons are evidence of pretext.  None of these theories has any legal foundation.

### A.   Plaintiff's "Failure to Assist" Claim Has No Legal Foundation.

Plaintiff claims that Ms. Collins-Smee was obligated to find him (a high level executive with more than 40 years of experience at IBM) another position after being removed from his VP-PSD and WellPoint roles and that, because she did not go to the lengths that Plaintiff expected, this is evidence of age discrimination.   There is no logical or legal reason to so conclude.  Courts in this Circuit do not require that an employer give preferential treatment to an employee because of his or her age, or to find an employee another job as an alternative to termination.  *See, e.g., Alam v. HSBC Bank USA, N.A.*, No. 07 Civ. 3540, 2009 WL 3096293, at *11 (S.D.N.Y. Sept. 28, 2009) (upholding the recommendation of the dismissal of the plaintiff's ADEA claim because "[o]nce again, the company was not obligated to find [plaintiff] a replacement job as long as its refusal to relocate or rehire him was based on non-discriminatory reasons."); *see also Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614 (RCC), 2000 WL 1682759, at *10 (S.D.N.Y. Nov. 9, 2000) (under the ADEA, employer "is not obligated to find another position for an employee who is about to be terminated, even if he is qualified for that position."); *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 400 (E.D.N.Y. 2008) (employer was under no obligation to provide employee with another position after terminating him for performance and behavioral issues).

6

Plaintiff's complaint that Ms. Collins-Smee did not do enough to find him a new position within IBM is insufficient as a matter of law as an attempt to prove that she was motivated by discriminatory animus.  Indeed, the alleged failure to find him a position is neutral in terms of employment discrimination, and no evidence has been introduced to show otherwise.

**B.    Plaintiff's Failure to Secure Any of the 106 Positions He Identifies Does Not Create an Inference of Age Discrimination.**

As to the seven positions filled in May, 2008 by Ms. Collins-Smee, Plaintiff has not shown he was more qualified than those chosen; indeed, he testified that he was equally qualified with all of the individuals in question.  Neither has he made a serious attempt to show that someone with his background and obvious managerial difficulties would have been considered for any of those positions.  In order to demonstrate that his failure to secure those jobs is evidence of discrimination, Plaintiff would have to prove that his qualifications were so superior to those that ended up filling those positions that no reasonable person, in the exercise of impartial judgment, could have chosen those individuals over Plaintiff for the jobs in question.

Here, Plaintiff has made no attempt to show that his proffered comparators are "similarly situated in all material respects," *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997), or that he had such "superior" qualifications that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (citation omitted); *accord Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 348 (D. Conn. 2008) ("no evidence that [plaintiff's] credentials were 'so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'").  Plaintiff has

A-272

Case 14-2854, Document 62, 03/12/2015, 1460796, Page284 of 289
Case 3:09-cv-01145-TPS   Document 179   Filed 01/17/14   Page 8 of 10

simply pointed to the seven individuals who filled those positions and, in a conclusory fashion, stated that he was more qualified.  This does not begin to rise to the level of direct evidence of discrimination or even "background evidence" of discrimination.  *See Bringley v. Donahoe*, 499 F. App'x 116, 118 (2d Cir. 2012) (plaintiff's "conclusory contentions that [the other candidate] was 'less senior' and 'less qualified' than she was at the time of that decision . . . do not raise a triable issue" of pretext).

As to the roughly 100 other positions that were filled by managers other than Ms. Collins-Smee, Plaintiff has stipulated that he is not claiming that his failure to be hired for these positions was discriminatory, or that IBM's selection of someone other than Plaintiff for these positions is evidence of age discrimination.  *See* Exhibit 1, §¶ 4, attached hereto.  These decisions are therefore entirely irrelevant to Ms. Collins-Smee's motivation for Castelluccio's termination.  Evidence of actions taken by managers other than the person responsible for a plaintiff's allegedly discriminatory treatment is almost always irrelevant.  *See Harris v. Chand*, 506 F.3d 1135, 1440 (8th Cir. 2007) (noting the district court did not err in concluding that "[w]hat some other unit manager did to another employee in a different situation at a different time" is irrelevant); *Naval v. Herbert H. Lehman Coll.*, No. 97 CV 6800(RJD), 2004 WL 3090578, at *8 n. 7 (E.D.N.Y. Sept. 15, 2004) (noting that actions taken by other decision-makers were irrelevant to the plaintiff's claim).

Plaintiff's theory of this case is that Ms. Collins-Smee was the sole decision maker and sole discriminator.  As to the positions she filled in 2008, Plaintiff has offered no evidence that would support a legal argument that his failure to be placed in those roles was due to age discrimination.  As to the other 100 positions, Ms. Collins-Smee was not responsible for having them filled and Plaintiff has again offered no evidence that he was qualified for any of these

positions, much less that he was the most qualified individual for these positions. As to either, Plaintiff's claims fail as a matter of law.

### C.    IBM's Multiple Reasons for Terminating Plaintiff Are Not "Shifting Explanations" and Do Not Show Pretext for Age Discrimination.

Plaintiff claims that because, at the start of this litigation, IBM claimed that Plaintiff was terminated due to poor performance and now claims that he was terminated due to his inability to secure another position within IBM over 6 months, that this is a "shifting explanation" that is evidence of pretext. But Plaintiff has testified he was never told he was terminated for cause or for performance reasons, although there were plenty of performance reasons at play in the run-up to his being placed on the bench. In that respect, the facts offered by IBM have not changed in any meaningful way so as to permit an inference that IBM had a discriminatory motive. *See Lomotey v. Connecticut-Dep't of Transp.*, 355 Fed. App'x 478, 281 (2d Cir. 2009) (rejecting argument that employer's non-discriminatory reason for its decision was pretextual because the reason offered during litigation was a further explication of the original reason).

More to the point, courts in this Circuit consistently refuse to find pretext when the multiple reasons given by employers for terminating employees are true (and often related)—as they are here. *See Timothy v. Our Lady of Mercy Medical Center*, Fed. App'x 17, 20 (2d Cir. 2007) (no pretext for discrimination when the multiple explanations given by the employer were "facially plausible and adequately supported by admissible evidence in the record"); *Singh v. Air India Ltd.*, 108 Fed. App'x 9, 10 (2d Cir. 2004) (finding that the company's multiple reasons for terminating the plaintiff was not evidence of pretext because the multiple reasons were non-discriminatory and were related); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001)

9

(no inconsistency suggesting pretext because the multiple reasons given by the employer were "variations . . . on the same theme rather than separate inconsistent justifications.").

Plaintiff was placed on the bench because his performance issues led to him being removed from his two prior positions.  He was then terminated because he could not secure another position within IBM for half a year.  These reasons are obviously related and the evidence has borne them out.  An important reason that IBM is no longer highlighting Plaintiff's performance issues in the immediate context of his termination is because Judge Squatrito, in his Order regarding IBM's summary judgment motion (Docket No. 108), expressly held that the two position removals were not justiciable.  *See id.* at *10.  IBM is therefore now focusing on Plaintiff's inability to secure another position within IBM (a reason that has been given throughout this litigation) as the reason for his termination, but this can hardly qualify as a "shifting explanation" and is certainly not evidence of pretext for age discrimination.

### III.   CONCLUSION

For all the reasons stated above, IBM respectfully requests that this Court grant judgment as a matter of law in its favor pursuant to Rule 50.

Dated:   January 17, 2004                    Respectfully submitted,
         New York, New York

                                            /s/ Zachary D. Fasman
                                            Zachary D. Fasman (phv0899)
                                            Todd S. Duffield (phv05685)
                                            Alexander W. Wood (phv05686)
                                            75 East 55th Street
                                            New York, NY  10022-3205
                                            Telephone:  (212) 318-6000
                                            Facsimile:  (212) 319-4090

                                            Counsel for Defendant
                                            INTERNATIONAL BUSINESS MACHINES
                                            CORPORATION

# EXHIBIT 1

<u>**Stipulated Jury Charge regarding open Band C and D positions**</u>

1.  Ladies and Gentlemen, you have heard testimony that there were approximately 106 Band C and Band D executive job openings identified in certain "Minute Drill" meetings during the period January 1, 2008 through June 30, 2008.

2.  Of those approximately 106 openings, 16 of them were posted and filled in Joanne Collins-Smee's organization.  The remaining positions were in other areas of IBM's business.  Joanne Collins-Smee could have requested that Mr. Castelluccio be considered for those positions.  However, the decisions about who to place in those positions were made by executives other than Joanne Collins-Smee.

3.  Mr. Castelluccio offers this evidence to show the number of positions that were open during the period from January 1, 2008 until June 30, 2008.  Mr. Castelluccio asserts that Ms. Collins-Smee should have disclosed these positions to him, given him an opportunity to apply for them and, in some cases, recommended him for these positions.

4.  Mr. Castelluccio does not claim that he should have been hired for these positions and you should not treat IBM's selection of someone other than Mr. Caselluccio for any of these open positions as evidence of age discrimination.

## CERTIFICATE OF SERVICE

I, TRACI L. LOVITT, hereby certify that on March 13, 2015, I filed an

electronic copy of the foregoing JOINT APPENDIX VOLUME on the Court's

CM/ECF system, which caused it to be served on all counsel of record.

Dated:        March 13, 2015

/ s / Traci L. Lovitt
Traci L. Lovitt, Esq.
Jones Day
100 High Street
Boston, Massachusetts 02110
(617) 960-3939
*Attorney for Defendant-*
*Appellant IBM*