# 14-2854-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

—against—

INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**JOINT APPENDIX
VOLUME II OF VI
(Pages A-277 to A-559)**

ZACHARY D. FASMAN, ESQ.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

TRACI L. LOVITT, ESQ.
JONES DAY
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

WILLIS J. GOLDSMITH, ESQ.
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant IBM*

(*Counsel continued on inside cover*)

MARK RAYMOND CARTA, ESQ.
MARGARET ANN TRIOLO, ESQ.
CARTA, MCALISTER
  &MOORE, LLC
1120 Boston Post Road
Darien, Connecticut 06820
(203) 202-3103

*Attorneys for Plaintiff-Appellee*
  *James Castelluccio*

# TABLE OF CONTENTS

PAGE

## Volume I of VI

*Castelluccio v. International Business Machines Corp.*,
    Case No. 09-cv-1145 (TPS) (D. Conn.) Docket Sheet . . . . . . . . . . . . . . . . A-1

Complaint, dated July 20, 2009 (Docket No. 1) . . . . . . . . . . . . . . . . . . . . . . . . A-33

Affirmation of Zachary D. Fasman in Support of IBM's Motion for
    Summary Judgment, dated September 20, 2010
    (Docket No. 47-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-53

    Exhibit 4 to the Affirmation of Zachary D. Fasman —
    Excerpts from the Deposition of Joanne Collins-Smee
    (Docket No. 47-5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-56

IBM's Memorandum of Law in Support of its Motion for Summary
    Judgment, dated September 20, 2010 (Docket No. 49) . . . . . . . . . . . . A-107

IBM's Memorandum of Law in Support of Motion to File
    Confidential Documents Under Seal, dated September 20, 2010
    (Docket No. 53) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-154

Plaintiff's Memorandum of Law in Support of Opposition to
    Defendant's Motion for Summary Judgment,
    dated November 15, 2010 (Docket No. 70) . . . . . . . . . . . . . . . . . . . . . . A-160

Memorandum of Decision and Order denying Defendant's Motion for
    Summary Judgment, dated August 21, 2012 (Docket. No. 108) . . . . . A-213

Parties' Joint Trial Memorandum, dated September 13, 2013
    (Docket No. 133) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-229

Exhibit C to Affirmation of Mark R. Carta in Support of
    Castelluccio's Motion to Preclude, dated November 22, 2013 —
    Open Door Report (Docket No. 156-3) . . . . . . . . . . . . . . . . . . . . . . . . . A-250

ii

PAGE

Exhibit G to Affirmation of Mark R. Carta in Support of
    Castelluccio's Motion to Preclude, dated November 22, 2013 —
    Email from R. Mandel to K. Holmes dated June 20, 2008
    (Docket No. 156-7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-255

Ruling on Plaintiff's Motion to Preclude Evidence,
    dated December 23, 2013 (Docket No. 163) . . . . . . . . . . . . . . . . . . . . . . . A-258

Defendant's Memorandum of Law in Support of its Motion for
    Judgment as a Matter of Law, dated January 17, 2014, with
    Exhibit (Docket No. 179) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-265

**Volume II of VI**

Transcript of Trial, dated January 13, 2014 (Docket No. 175). . . . . . . . . . A-277

Transcript of Trial, dated January 14, 2014 (Docket No. 176). . . . . . . . . . A-330

Transcript of Trial, dated January 15, 2014 (Docket No. 177). . . . . . . . . . A-388

Transcript of Trial, dated January 16, 2014 (Docket No. 178). . . . . . . . . . A-444

Transcript of Trial, dated January 17, 2014 (Docket No. 182). . . . . . . . . . A-507

**Volume III of VI**

Transcript of Trial, dated January 21, 2014 (Docket No. 183). . . . . . . . . . A-560

Transcript of Trial, dated January 22, 2014 (Docket No. 184). . . . . . . . . . A-603

Transcript of Trial, dated January 23, 2014 (Docket No. 185). . . . . . . . . . A-658

Transcript of Trial, dated January 24, 2014 (Docket No. 186). . . . . . . . . . A-710

Plaintiff's Trial Exhibit 1—
    The IBM Personal Business Commitments Program,
    dated February 17, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-720

iii

PAGE

Plaintiff's Trial Exhibit 4—
  Castelluccio's Personal Business Commitment, Assessment
  Period: 1/1/2007 to 12/31/2007 .................................... A-733

Plaintiff's Trial Exhibit 14—
  Castelluccio's Personal Business Commitment, Assessment
  Period: 1/1/2006 to 12/19/2006 .................................... A-734

Plaintiff's Trial Exhibit 16—
  WellPoint Contract Overview, Bob Zapfel Review,
  dated June 2, 2006 ............................................... A-739

Plaintiff's Trial Exhibit 17—
  WellPoint Red Team Review, dated June 21, 2006 ................. A-789

Plaintiff's Trial Exhibit 29—
  Email dated February 28, 2007 from J. Collins-Smee to K.
  Holmes Re: Need to Replace J. Castelluccio....................... A-834

Plaintiff's Trial Exhibit 31—
  P. Kerine Five Minute Drill Summary............................. A-835

Plaintiff's Trial Exhibit 53—
  Email dated April 27, 2007 from D. Liederbach to
  J. Collins-Smee Re: Miguel ...................................... A-844

Plaintiff's Trial Exhibit 56—
  J. Collins-Smee Five Minute Drill Summary ...................... A-846

Plaintiff's Trial Exhibit 60—
  Email dated August 9, 2007 from M. Boxer to R. Zapfel,
  M. Lautenbach and S. Mills Re: Production Issue................. A-852

Plaintiff's Trial Exhibit 62—
  Email dated August 22, 2007 from K. McDonald to M. Boxer ...... A-853

iv

PAGE

Plaintiff's Trial Exhibit 64—
   Email dated September 8, 2007 from K. McDonald to M. Boxer
   Re: DPE ...................................................... A-854

**Volume IV of VI**

Plaintiff's Trial Exhibit 66—
   R. Zapfel's Five Minute Drill Summary ........................... A-855

Plaintiff's Trial Exhibit 67—
   WellPoint Executive Operating Committee Meeting Report –
   Fourth Quarter Review ........................................... A-861

Plaintiff's Trial Exhibit 68—
   WellPoint Client Satisfaction Survey, dated February 14, 2008 ..... A-865

Plaintiff's Trial Exhibit 69—
   Meeting Notice dated January 10, 2008 to A. Weststeyn
   Re: J. Castelluccio Career Opportunities .......................... A-870

Plaintiff's Trial Exhibit 70—
   Email dated January 14, 2008 from J. Castelluccio to
   A. Weststeyn Re: Our phone conversation......................... A-871

Plaintiff's Trial Exhibit 71—
   Email dated May 1, 2008 from A. Weststeyn to J. Castelluccio
   Re: Job Opportunities ........................................... A-872

Plaintiff's Trial Exhibit 72—
   Email dated May 4, 2008 from J. Castelluccio to A. Weststeyn
   Re: Job Search ................................................. A-873

Plaintiff's Trial Exhibit 73—
   Email dated January 18, 2008 from J. Castelluccio to
   G. Mastriforte Re: UK's DVLA Sr. PE Opportunity ............... A-875

v

PAGE

Plaintiff's Trial Exhibit 74—
Email dated March 28, 2008 from J. Castelluccio to
G. Mastriforte Re: Sr. PE Opportunities...........................A-877

Plaintiff's Trial Exhibit 75—
Meeting Notice dated January 9, 2008 to J. Castelluccio
Re: Personal Phil Guido...........................................A-878

Plaintiff's Trial Exhibit 76—
Email dated February 27, 2008 from Castelluccio to G. Walker
Re: Personal and Confidential.....................................A-879

Plaintiff's Trial Exhibit 78—
Email dated April 7, 2008 from J. Castelluccio to
M. Barnett Re: Your call..........................................A-880

Plaintiff's Trial Exhibit 79—
Email dated April 14, 2008 from M. Barnett to J. Castelluccio
Re: Our Discussion Yesterday......................................A-881

Plaintiff's Trial Exhibit 80—
Email dated April 23, 2008 from J. Castelluccio to B. Barnett
Re: For our discussion............................................A-882

Plaintiff's Trial Exhibit 81—
Email dated May 20, 2008 from B. Barnett to J. Castelluccio
Re: Network Position..............................................A-884

Plaintiff's Trial Exhibit 82—
Email dated May 9, 2008 from C. Murphy to G. Walker
Re: Actions/Notes from May 7 Five Minute Drill...................A-885

Plaintiff's Trial Exhibit 83—
Email dated May 13, 2008 from M. Echavarria to ME Directs,
forwarding J. Collins-Smee email Re: Organizational changes......A-888

vi

PAGE

Plaintiff's Trial Exhibit 88—
 Email dated May 13, 2008 from J. Castelluccio to J. Overacre
 Re: Attached is my resume ....................................... A-890

Plaintiff's Trial Exhibit 90—
 Email dated May 21, 2008 from J. Collins-Smee to
 J. Castelluccio Re: Resume....................................... A-891

Plaintiff's Trial Exhibit 91—
 Email dated May 20, 2008 from J. Collins-Smee to
 J. Castelluccio Re: Resume....................................... A-893

Plaintiff's Trial Exhibit 92—
 Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
 Re: J. Castelluccio – Executive Separation Talking Points ......... A-895

Plaintiff's Trial Exhibit 93—
 Email dated June 10, 2008 from J. Castelluccio to R. Atkins
 Re: Our phone conversation of a week ago ....................... A-897

Plaintiff's Trial Exhibit 99—
 Letter dated April 15, 2009 from J. White to M. King
 Re: Castelluccio NYSDHR/EEOC Charge......................... A-898

Plaintiff's Trial Exhibit 204—
 Report of Parties 26(F) Planning Conference,
 dated October 5, 2009 (Docket No. 18) .......................... A-905

Plaintiff's Trial Exhibit 259—
 Plaintiff's Demonstrative Exhibit – IBM's Reasons for
 Termination ................................................... A-928

Defendant's Trial Exhibit 12—
 Email chain dated April 25, 2006 from D. Liederbach to K. Jones
 Re: WLP Resource Action ...................................... A-929

vii

PAGE

Defendant's Trial Exhibit 13—
    Email dated May 9, 2006 from D. Liederbach to K. Jones Re:
    Personal and Confidential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-931

Defendant's Trial Exhibit 28—
    Email chain dated January 26, 2007 from J. Collins-Smee to D.
    Liederbach cc: C. Adler; L. Serra Re: Wellpoint Labor
    Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-932

Defendant's Trial Exhibit 29—
    Email chain dated September 20, 2006 from D. Liederbach to J.
    Collins-Smee Re: Service Delivery at WellPoint – Urgent . . . . . . . . . A-937

Defendant's Trial Exhibit 32—
    Email chain dated February 16, 2007 from J. Collins-Smee to K.
    McDonald Re: my barrage of emails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-942

Defendant's Trial Exhibit 34—
    Email chain dated February 18, 2007 from D. Liederbach to J.
    Collins-Smee cc: C. Adler Re: Request for Meeting . . . . . . . . . . . . . . A-943

Defendant's Trial Exhibit 36—
    Email dated February 28, 2007 from J. Collins-Smee to
    K. Holmes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-946

Defendant's Trial Exhibit 45—
    Email chain dated March 31, 2007 from J. Collins-Smee to D.
    Liederbach; J. Castelluccio Re: Wellpoint – Monday . . . . . . . . . . . . . . A-947

Defendant's Trial Exhibit 48—
    Email chain dated May 4, 2007 M. Boxer to K. McDonald . . . . . . . . . A-948

Defendant's Trial Exhibit 52—
    Email dated May 15, 2007 from K. McDonald to J. Collins-
    Smee cc: D. Liederbach; E. McCabe; J. Shimkus; R. Zapfel Re:
    Delivery Leadership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-950

viii

PAGE

Defendant's Trial Exhibit 54—
    Email chain dated May 22, 2007 from M. Boxer to K. McDonald... A-952

Defendant's Trial Exhibit 109—
    IBM's U.S. Concerns and Appeals Program (Open Door,
    Panel Review & Confidentially Speaking)......................... A-954

Defendant's Trial Exhibit 117—
    Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
    Re: J. Castelluccio Executive Separation Talking Points ........... A-965

Defendant's Trial Exhibit 124—
    Email chain dated May 14, 2008 from R. Mandel to K. Moran
    Re: Dir Global Interlock Process – Actions Pending for Daniels
    approval ..................................................... A-967

Defendant's Trial Exhibit 128—
    Email chain dated April 1, 2008 from R. Mandel to K. Moran Re:
    Candidate for Network Services Integration Position, with
    attachment ................................................... A-971

Defendant's Trial Exhibit 135—
    Email chain dated May 20, 2008 from G. Walker to R. Mandel
    Re: JG Castelluccio Resume..................................... A-976

Defendant's Trial Exhibit 136—
    Email chain dated May 20, 2008 from G. Walker to R. Mandel
    Re: JG Castelluccio Resume..................................... A-979

Court Exhibit 1—
    Jury Instruction Regarding Positions Open while Castelluccio
    on the Bench ................................................. A-981

Court Exhibit 2—
    Letter from Jury .............................................. A-982

IBM's Marked Witness List, dated January 24, 2014
    (Docket No. 188) ............................................. A-984

ix

PAGE

Castelluccio's Marked Witness List, dated January 24, 2014
　　(Docket No. 189) ............................................................ A-985

Court Exhibit List, dated January 24, 2014 (Docket No. 190) .......... A-986

Charge to the Jury, dated January 24, 2014 (Docket No. 194).......... A-987

Judgment entered in favor of James Castelluccio against IBM,
　　dated January 28, 2014 (Docket No. 195) ...................... A-1004

### Volume V of VI

Affidavit of Mark R. Carta in Support of Plaintiff's Motion for
　　Attorneys' Fees, Prejudgment Interest, Costs and Compensation
　　for Increased Tax Liability, dated February 11, 2014
　　(Docket. No. 199) ........................................................ A-1005

　　Exhibit 4 to Affidavit of Mark R. Carta—
　　Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
　　(Docket. No. 199-4) ..................................................... A-1031

　　Exhibit 3 to Affidavit of Mark R. Carta—
　　Rucci, Burnham & Carta, LLP Invoice, dated August 29, 2008
　　(Docket. No. 199-10) ................................................... A-1102

　　Exhibit 4 to Affidavit of Mark R. Carta—
　　Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
　　(Docket. No. 199-11) ................................................... A-1201

### Volume VI of VI

Defendant's Renewed Motion for Judgment as Matter of Law,
　　or, in the Alternative, for New Trial/Remittiture,
　　dated February 25, 2014 (Docket No. 202) ...................... A-1272

Declaration of Zachary D. Fasman, dated April 3, 2014
　　(Docket. No. 223) ........................................................ A-1325

x

PAGE

Exhibit 6 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Summary Judgment
(Docket No. 223-6) ............................................ A-1334

Exhibit 8 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Trial Preparation
(Docket No. 223-8) ............................................ A-1341

Plaintiff's Reply to IBM's Opposition to Plaintiff's Motion for
Attorneys' Fees, dated April 17, 2014 (Docket No. 229) .......... A-1366

Affidavit of Mark R. Carta in Support of Plaintiff's
Supplemental Motion for Attorneys' Fees,
dated June 2, 2014 (Docket. No. 232) ........................... A-1390

Declaration of Zachary D. Fasman, dated June 23, 2014,
with Exhibit A (Docket. No. 235)............................... A-1395

Opinion and Order, dated July 23, 2014, denying Motion for
Judgment as a Matter of Law, denying Oral Motion for Judgment
as a Matter of Law, denying Renewed Motion for Judgment as a
Matter of Law, and denying Motion for New Trial or Remittitur
(Docket No. 236) ............................................. A-1414

Ruling on Plaintiff's Motion for Attorneys' Fees,
dated July 23, 2014 (Docket No. 237)........................... A-1449

Final Judgment entered in favor of James Castelluccio against IBM,
dated July 28, 2014 (Docket No. 240)........................... A-1472

IBM's Notice of Appeal, dated August 11, 2014
(Docket No. 241) ............................................. A-1473

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO    )
    Plaintiff    ) 3:09-cv-01145 (TPS)
                    )
VS                    ) January 13, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION   ) Federal Building
    Defendant    ) Hartford, Connecticut


VOLUME 1
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.


Reporter: WENDY J. ALLEN, RPR, CRR, LSR #00221

---

**Page 2**

1
2    Representing the Plaintiff
3    Carta McAlister & Moore, P.C.
     1120 Boston Post Road
4    Post Office Box 83
     Darien, CT  06820
5      By:  Mark R. Carta, Esq.
             mark@cmm-law.com
6      By:  Margaret A. Triolo, Esq.
             margaret@cmm-law.com
7    By:  Troy Bailey, Esq.
8
9    Representing the Defendant

10   Paul Hastings, LLP
     75 East 55th Street
     New York, NY  10022
11     By:  Zachary Fasman, Esq.
             Zacharyfasman@paulhastings.com
12     By:  Todd C. Duffield, Esq.
             Toddduffield@paulhastings.com
13   By:  Jean-Marie Gutierrez
14
15   ALSO PRESENT:

16   Daniel Fox, Esq.
     IBM in-house counsel
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              I N D E X
2
3    WITNESSES:                    PAGE:

     James Castelluccio
4       Direct Examination by Mr. Carta............  108
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1          THE COURT:  Good morning.  My name is
2    Judge Thomas P. Smith, and I'm going to be presiding
3    at this trial.
4          This case is known as James Castelluccio
5    versus International Business Machines Corporation,
6    otherwise known as IBM.  This is an employment
7    discrimination case brought by the Plaintiff, James
8    Castelluccio, against his former employer, IBM.  The
9    Plaintiff has brought this action under federal law,
10   specifically the Age Discrimination and Employment Act
11   of 1967, as well as state law, New York State law,
12   which we'll go into detail more at a later time.
13         The Plaintiff alleges that IBM unlawfully
14   and willfully terminated his employment on the basis
15   of age.  Now, the Plaintiff seeks to recover monetary
16   damages to the extent allowed under the two laws, that
17   is the federal law and the New York employment law.
18   IBM denies the allegations and denies that Mr.
19   Castelluccio's termination was in anyway attributable
20   to his age.
21         Now, I would ask the clerk now to
22   administer the voir dire oath to all of our
23   prospective jurors.  Please rise.
24         (Jurors administered voir dire oath)
25         THE COURT:  Please be seated.

| Page 5 |
|---|

1      Now, madam clerk, can you announce the
2  names and jury numbers of the 24 individuals who have
3  already been randomly selected
4      THE CLERK: Juror number 90, please come
5  forward.
6      Juror number 63.
7      Juror number 19.
8      Juror number 68.
9      Juror number 95.
10     Juror number 54.
11     Juror number 59.
12     Juror number 60.
13     Juror number 367.
14     Juror number 5.
15     Juror number 28.
16     Juror number 26.
17     Juror number 69.
18     Juror number 123.
19     Juror number 24.
20     Juror number 57.
21     Juror number 113.
22     Juror number 10.
23     Juror number 7.
24     Juror number 98.
25     Juror number 50.

| Page 6 |
|---|

1      Juror number 32.
2      Juror number 67.
3      And juror number 16.
4      We have one missing. Juror number 16,
5  juror number 6, juror number 32? You have to come
6  forward
7      THE COURT: Okay. Now, ladies and
8  gentlemen, I'm going to be asking you some questions,
9  and then when I'm finished asking my questions, I'm
10 going to turn the matter over to counsel for each side
11 and allow them to conduct a brief individual voir
12 dire.
13     Now, this process we're going through is
14 known as the voir dire process, and that's a French
15 term, and it means, roughly translated, to speak the
16 truth. So you've been sworn in, and you're going to
17 be asked questions, and you're going to have to answer
18 the questions truthfully, whether they're put to you
19 by me, or by the lawyers, or one side or the other.
20     Now, the first thing I'd like to do is
21 tell you that the trial in this case is going to start
22 today, and it's my intention that we're going to be
23 starting the trial around 12, 12:30, 1 o'clock, and up
24 until then we're going to be picking the jury and
25 we're going to be getting out of the way certain

| Page 7 |
|---|

1  housekeeping things that we have to do.
2      But right now I want to ask you a
3  question that concerns timing, exclusively timing,
4  nothing but timing. This case is going to start
5  today, January 13th, and it's going to continue the
6  14th, the 15th, the 16th, and the 17th, which is a
7  Friday.
8      Then we're going to have the weekend and
9  it's going to be a long weekend because Monday the
10 20th of January is Martin Luther King Day, which is a
11 federal holiday, so we have that day off. At least
12 from court duty. I don't know what your employers
13 have to say about it. Don't get me in the middle.
14 I'm only the judge.
15     Then we're going to resume, if need be,
16 the 21st and continue the 22nd and continue the 23rd,
17 which is a Thursday, and my prediction is at the
18 latest we'll conclude on the 24th, which is Friday.
19 So basically we're talking two court weeks, with the
20 exception of the second week will be a four-day week
21 because we have Dr. King's day off.
22     Now, focusing just on those days, and
23 those days only, let me ask you, is there anyone among
24 you who has a truly serious and legitimate reason why
25 he or she cannot serve as a juror on this case during

| Page 8 |
|---|

1  those days? And I should tell you, there's a
2  possibility that this could conclude before then. I
3  mean I have a tendency to make sure we move as quickly
4  as we can, and we have some very able lawyers in this
5  case who know what they're doing, so things should
6  move expeditiously. So I think it could be shorter
7  than that.
8      The 13th to the 24th. Is there anyone
9  among you who has a serious legitimate reason why he
10 or she cannot serve as a juror in this case? If so,
11 we'll go to the far back row, and raise your hand.
12     In the third row back there, what is your
13 juror number and what is your name?
14     JUROR #59: 59.
15     THE COURT: Counsel all get that? You'll
16 have to bear with me, ladies and gentlemen. I had
17 really great hearing until 1968. I had really good
18 hearing. I could hear a pin drop at the far end of
19 the building. But we were engaged in some activities
20 that involved gunfire back then and I seriously
21 impaired my hearing at that time. Not serious enough
22 to get a Purple Heart or even an early release, but
23 seriously enough so that you really have to keep your
24 voices up. I know that's hard to do because sometimes
25 I have a hard time keeping my voice up. So bear with

Page 9

1  me on that, please. And I ask counsel to do the same.
2        Yes, ma'am, what is it?
3        JUROR #59: I don't know if you consider
4  it -- I start my next semester of school the 23rd, so
5  the only problem I would have is the two days I go to
6  school Thursday, Friday, and then Tuesdays, after the
7  23rd.
8        THE COURT: So you'd have a problem on
9  Thursday the 23rd.
10        JUROR #59: Yes.
11        THE COURT: And on Friday the 24th.
12        JUROR #59: Yes.
13        THE COURT: And you're a college student?
14        JUROR #59: Yes.
15        THE COURT: Whereabouts you go?
16        JUROR #59: Manchester Community.
17        THE COURT: Anybody else on that far row?
18        We'll go to the middle row now. Yes,
19  sir.
20        JUROR #367: Number 367. I work for
21  Merrill Lynch. I actively manage money for clients on
22  a daily basis. Even when I take a vacation I don't
23  take off more than a week at a time. Two weeks I
24  think would be very difficult for me.
25        THE COURT: Okay. Thank you very much.

Page 10

1  You're right here in Hartford?
2        JUROR #367: In Hartford, yes.
3        THE COURT: Ma'am?
4        JUROR #28: Juror 28. I have a husband
5  that had a problem with his health, and it was mild,
6  but he's the one that's driving me because I don't
7  drive the highway. I also am the only one that works
8  in my house. He had a mild stroke.
9        THE COURT: You're the sole source of
10  income for your house right now?
11        JUROR #28: Yes.
12        THE COURT: Your husband is ill?
13        JUROR #28: Yes. I'm working with
14  children right now.
15        THE COURT: Okay. And you depend on him
16  for transportation?
17        JUROR #28: Yes, sir.
18        THE COURT: All right. Is there anyone
19  else in that middle row?
20        Okay, let's move down to the first row.
21  Is there anyone who has a serious legitimate excuse
22  why he or she could not serve as a juror during that
23  period?
24        Well, the record should indicate that we
25  have received the responses that we've received,

Page 11

1  counsel have had an opportunity to note the responses,
2  and so I'll move on.
3        Is there any prospective juror who has a
4  reason so personal and so private that he or she would
5  prefer to come up to the bench and disclose it to me
6  without speaking out about it in open court?
7        Okay, the record should indicate that
8  there's no response.
9        Is there anyone among you who has a
10  vision problem or a hearing problem that would
11  interfere with your ability to see the witnesses in
12  this case, any video exhibits which may be shown, or
13  to hear the testimony of the witnesses? If so, would
14  you raise your hand.
15        All right, the record should reflect no
16  response.
17        Now, is there anybody here who is taking
18  any medicine that would impair his or her ability to
19  concentrate on the testimony, the arguments of
20  counsel, or the instructions of the Court? I mean
21  what we want to know, we all get a headache now and
22  then, we all have an aspirin now and then. We're not
23  talking about that. We're talking about something
24  that really makes you incapable of concentrating and
25  paying attention.

Page 12

1        The record should indicate there's no
2  response.
3        Now, other than what you've just heard
4  today about the case from me, is any one of you
5  familiar with this case? Anybody familiar with any of
6  the allegations in this case other than what I've told
7  you?
8        The record should indicate no response.
9        Is there anybody here who's familiar with
10  any of the parties of this case? And I'll start first
11  with Plaintiff's side. Is there anyone among you who
12  is familiar with Plaintiff's counsel and witnesses?
13  And I'm going to allow him in a little bit to
14  introduce more lengthy, at a greater length, introduce
15  himself and the Plaintiff and everyone at Plaintiff's
16  table, but right now, just recognizing that
17  distinguished looking man in the blue suit and the
18  yellow tie, is there anybody who's familiar, who knows
19  who he is?
20
21        Okay. Well, there's no reason you
22  should, because he's from, what I refer to as the
23  southern district of Connecticut, but there's really
24  only one district of Connecticut. But all right. So
25  you don't know him and his client, Mr. Castelluccio,

Page 13

1  the gentleman in the gray suit in the middle?
2       All right. The record should indicate no
3  response.
4       Now, let's turn to IBM. Is there any one
5  of you who is familiar with IBM? I would think that
6  unless you're from Venus you probably have heard of
7  IBM. And it's International Business Machines
8  Corporation.
9       And I'm sure many of you are too young to
10 remember this, but when the state of the art was the
11 state of the art, the cutting edge was the IBM
12 Selectric typewriter with the interchangeable balls.
13 Elements, I think you called them. They had italics
14 elements, and scientific elements. They don't make
15 them anymore, I understand. Maybe they do. But they
16 were a really good product.
17      And the problem today is that, I think,
18 is that you might be able to get a hold of an IBM
19 Selectric typewriter, but you might have a difficult
20 time getting somebody who knows how to repair it,
21 because the technology has moved on. Then again,
22 maybe IBM has a division that deals with repairing
23 Selectric typewriters, I don't know.
24      But other than that, IBM, it's a big
25 company, successful corporation, makes business

Page 14

1  machines, have made all kinds of machines, but one
2  which I think the ordinary layperson like myself or
3  you would be most familiar with would be maybe the
4  Selectric typewriter.
5       I would now like to ask the lawyers in
6  this case, beginning with Plaintiff's lawyer, to
7  introduce himself and his law firm and his client to
8  you.
9       MR. CARTA: Morning. My name is Mark
10 Carta. I am a lawyer with the law firm of Carta,
11 McAlister & Moore. I represent James Castelluccio.
12 Mr. Castelluccio is the Plaintiff in this action, and
13 you'll be hearing him testify at length. With me at
14 counsel table is Margaret Triolo and Troy Bailey.
15      In terms of witnesses, the will call Mr.
16 Castelluccio to testify. We're also going to be
17 calling Mike Morin, who's from Enfield, and I saw a
18 number of people here are from Enfield so I mention
19 that specifically. We're going to be calling as well
20 Kelton Jones. Mr. Jones lives in Austin, Texas.
21 We'll be calling Dr. Gary Crakes. He's an economist
22 and he'll be testifying about Mr. Castelluccio's
23 damages. And finally we'll be calling Ms.
24 Collins-Smee. Ms. Collins-Smee is Mr. Castelluccio's
25 former supervisor, and she's the one that

Page 15

1  discriminated against him based on his age. Thank
2  you.
3       THE COURT: Okay. Is there anyone among
4  you who knows any of these people whose names have
5  been mentioned?
6       Yes, ma'am.
7       JUROR #10: I know a Michael Morin. I
8  don't know if it's the same person.
9       THE COURT: And your number?
10      JUROR #10: 10.
11      THE COURT: You're 10, number 10. And so
12 Michael Morin you know is about how old, if you had to
13 guess?
14      JUROR #10: 50, 60.
15      THE COURT: So he's not a fellow student
16 or worker?
17      JUROR #10: Co-worker at a past job, at a
18 retailer.
19      THE COURT: I could have sworn you said
20 pot shop. I was going to say business has a way of
21 spreading. I didn't know that it was here from
22 Colorado yet.
23      Well, the nature of your relationship
24 with him is just that he's a casual acquaintance,
25 would that be fair to say?

Page 16

1       JUROR #10: Yes.
2       THE COURT: Now, if indeed this gentleman
3  were the gentleman whom you had familiarity with,
4  would that in any way affect you? And that is, would
5  it affect your assessment of credibility, would it
6  affect the weight you'd attach to his testimony, would
7  you give it more weight or less weight, or would you
8  find it more believable or less believable than if it
9  had come from the mouth of a witness that you never
10 had an encounter with?
11      JUROR #10: Potentially more believable.
12 I think -- I like to think I would have like a, you
13 know, non-biased opinion, but if it's someone that I
14 know, it's possible.
15      THE COURT: It's possible, but if -- let
16 me ask you this: If I told you that you and you alone
17 had the task of judging the credibility of the
18 witness, would you be able to compartmentalize your
19 familiarity with this gentleman and isolate a little
20 box and say okay, I'm going to judge him solely on the
21 basis of what I've heard today here in the proceedings
22 in this case rather than on the basis of everything
23 else, would you be able to do that?
24      JUROR #10: Yes.
25      THE COURT: And you'd be able to -- if I

Page 17

1　told you that you had to do it, you would be able to
2　set aside any personal beliefs that you previously had
3　or that you still might hold about him as a gentleman,
4　he could come in here and testify that it's Tuesday,
5　and you could believe him, but we all know it's not
6　Tuesday.  So you'd be okay if this gentleman were one
7　of the witnesses who was called by the Plaintiff?
8　　　　　JUROR #10:  Yes.
9　　　　　THE COURT:  Okay.
10　　　　　Now, do we have anybody else?  Yes, sir.
11　　　　　JUROR #367:  Number 367.  My wife and I
12　personally own IBM stock.
13　　　　　THE COURT:  Well, that was a question I
14　was going to ask later on, but --
15　　　　　JUROR #367:  Okay, sorry.
16　　　　　THE COURT:  That's all right.  So do you
17　have familiarity with the corporation, and I am going
18　to be asking that question, or was going to be asking
19　it later on.  Is there anybody here who either
20　personally or with a spouse or a partner owns IBM
21　stock?
22　　　　　Okay, the record should indicate that
23　there is no response.
24　　　　　And by partner I mean, you know, civil
25　union, marriage, just ongoing co-habitation, any kind

Page 18

1　of close relationship with a stockholder of IBM.
2　　　　　The record should indicate no response,
3　with the exception of　　　　.  Thank you, sir.
4　　　　　Now, I'm going to turn now to the
5　attorneys for IBM and ask them to introduce themselves
6　and tell us about their witnesses.
7　　　　　MR. FASMAN:  Your Honor, thank you.
8　　　　　Ladies and gentlemen, good morning.  My
9　name is Zack Fasman.  I'm a partner with Paul
10　Hastings, is the name of my law firm.  I'm joined here
11　at counsel table with my partner Todd Duffield, Daniel
12　Fox, who's an in-house counsel at IBM, and Jean Marie
13　Gutierrez, who runs this show.
14　　　　　Our witnesses are going to be in this
15　case Joanne Collins-Smee, who I have to say in
16　contrast to Mr. Carta did not discriminate against Mr.
17　Castelluccio.  And the following witnesses are IBM
18　personnel who you may or may not know.  David
19　Liederbach, Keenie McDonald, Gordon Crawford, Keith
20　Holmes, Russell Mandel, and then we'll have an expert
21　witness by the name of Charles Sodikoff, who is an
22　expert on recruiting.
23　　　　　THE COURT:  All right.  Thank you, Mr.
24　Fasman.
25　　　　　Now, is there anyone among you who knows

Page 19

1　anyone who has been introduced or mentioned by Mr.
2　Fasman?
3　　　　　Okay, the fourth gentleman in.  Yes.
4　　　　　JUROR #50:  Juror number 50.  I don't
5　know any of those particular individuals personally,
6　but as an attorney for Pratt & Whitney I'm actually
7　currently negotiating an attorney-client privilege
8　matter with IBM and their in-house counsel.
9　　　　　THE COURT:  Okay.  You work for Pratt?
10　　　　　JUROR #50:  Yes.
11　　　　　THE COURT:  And in compliance?
12　　　　　JUROR #50:  In intellectual property.
13　　　　　THE COURT:  And whereabouts do you work,
14　in East Hartford?
15　　　　　JUROR #50:  In East Hartford, Your Honor.
16　　　　　THE COURT:  And your name again, sir?
17　　　　　JUROR #50:  It's　　　　.
18　　　　　THE COURT:  Thank you, sir.
19　　　　　Is there anyone else who knows or
20　believes that he or she may know any of the people
21　that Mr. Fasman has mentioned, any of the lawyers, any
22　of the technical support people who Mr. Fasman
23　mentioned?
24　　　　　The record should indicate no response.
25　　　　　Have any of you had any business dealings

Page 20

1　of any kind with IBM, you know, beyond simply having
2　purchased an IBM product, a Selectric or whatever.
3　　　　　Name and your number
4　　　　　JUROR #95:  95.  I was previously
5　employed by IBM.
6　　　　　THE COURT:  You did at one time work for
7　IBM?
8　　　　　JUROR #95:  Yes, I did.
9　　　　　THE COURT:  And whereabouts was that?
10　　　　　JUROR #95:  In Hartford.
11　　　　　THE COURT:  In Hartford, okay.  And what
12　did you do there?
13　　　　　JUROR #95:  I was part of the consulting
14　group that worked for them.
15　　　　　THE COURT:  Okay.  Thank you, sir.
16　　　　　Is there anyone else besides the
17　gentleman in the back row or the second row?  How
18　about the first row?
19　　　　　JUROR #50:  Just the basic same answer I
20　previously gave, and I have negotiated with IBM
21　previously.
22　　　　　THE COURT:  Okay.  Now, is there anyone
23　out there who has any feelings about IBM that might
24　cause him or her to lean toward or against IBM because
25　of those personal dealings or experiences?

Page 21

1        Okay, we have the gentleman on the top.
2   And your name?
3        JUROR #95:          , 95.
4        THE COURT:  Okay.  Now, is there anybody
5   among you who believes that IBM would be likely to
6   discriminate against a person, an employee, on the
7   basis of his or her age?
8        Okay, the record should indicate no
9   response.
10       Do any of you have any reason to believe
11  that IBM would be likely to discriminate against
12  someone on the basis of some other characteristic such
13  as religion, race, national origin, ethnicity, sexual
14  orientation, or any other basis?
15       Okay.  So am I fair in inferring from the
16  lack of response that you have no reason to believe
17  that IBM is a likely discriminator.
18       Okay.  The record should indicate that
19  the jury has indicated its agreement with my
20  statement.
21       Now, have you read any newspaper articles
22  or seen or heard any other type of reporting
23  concerning this case?
24       The record should indicate no response.
25       Has anyone ever talked to any of you

Page 22

1   about the facts of this case?
2        All right.  The record should indicate no
3   response.
4        In general is there any one of you who
5   has formed any opinions how companies treat employees
6   over the age of 40?
7        Yes, I see one hand down there in the
8   first row.  Your name, sir?
9        JUROR #24:  Juror number 24.
10       THE COURT:  Thank you, sir.
11       Is there anyone among you who has formed
12  an opinion or a belief or a preconceived notion about
13  how a large company like IBM would be likely to treat
14  older individuals, that is individuals over 40?
15       Okay.  The record should indicate no
16  response.
17       Let's move on to a little bit different
18  area.  Have you or any member of your family ever been
19  a party to a lawsuit?
20       We'll start way up in the back row.  Yes,
21  ma'am, would you state your name and juror number
22       JUROR #19:          , 19.  My husband
23  had a case against American Airlines.
24       THE COURT:  What kind of case was it?
25       JUROR #19:  Discrimination.

Page 23

1        THE COURT:  It was a discrimination on
2   the basis of age?
3        JUROR #19:  Injury, he had an injury.
4        THE COURT:  And you felt that -- who's
5   his employer?
6        JUROR #19:  American Airlines.
7        THE COURT:  You felt that American
8   Airlines treated him in an unfairly discriminatory way
9   because of that injury?
10       JUROR #19:  Yes.
11       THE COURT:  Okay.  And this is something
12  that counsel can follow up in their voir dire
13  questions if there's anything.
14       Did you actually bring a lawsuit?
15       JUROR #19:  They went bankrupt, so...
16       THE COURT:  The company went bankrupt?
17       JUROR #19:  Yes.
18       THE COURT:  So you were --
19       JUROR #19:  Out of luck.
20       THE COURT:  Out of luck.  Okay.  Sorry.
21       JUROR #19:  No problem.
22       THE COURT:  Anybody else in that back
23  row?
24       Okay, we'll move down to the second.
25       A JUROR:  What was the question?  In a

Page 24

1   general lawsuit, or specifically against a
2   corporation?
3        THE COURT:  Any lawsuit at all.
4        A JUROR:  Three years ago my wife was hit
5   by a teenager, sustained injuries.  We won the
6   lawsuit.
7        THE COURT:  Motor vehicle accident?
8        A JUROR:  Yes.  We were going to court
9   but it was settled.
10       THE COURT:  Your wife was a driver or
11  passenger?
12       A JUROR:  She was a passenger.
13       THE COURT:  A passenger?
14       A JUROR:  Yes.  Someone hit us.
15       THE COURT:  You were driving?
16       A JUROR:  Yes.
17       THE COURT:  And your wife suffered
18  serious injuries?
19       A JUROR:  Yes.
20       THE COURT:  The matter was put into suit?
21       A JUROR:  Yes.
22       THE COURT:  And then later on it was
23  settled?
24       A JUROR:  Yes.
25       THE COURT:  Okay.  Anyone else in the

6 (Pages 21 to 24)

## Page 25

1  second row?
2       JUROR #123: My husband filed a suit --
3  juror 123. My husband filed an age discrimination
4  suit against his employer at that time.
5       THE COURT: And when was that?
6       JUROR #123: Oh, probably a good 30 years
7  ago.
8       THE COURT: About 30 years ago?
9       JUROR #123: Yes.
10      THE COURT: And who was the employer?
11      JUROR #123: It was a small company in
12  Windsor Locks, Adams Industries. They are no longer
13  in business.
14      THE COURT: And did the case proceed to
15  trial?
16      JUROR #123: I don't know if -- no, it
17  didn't go to trial. They settled out of court.
18      THE COURT: Okay. Thank you ma'am.
19      I see someone else in the middle row.
20  Yes, ma'am.
21      JUROR #26: Number 26. I sued somebody
22  who hit me in my automobile in small claims.
23      THE COURT: Did you get relief?
24      JUROR #26: I did not.
25      THE COURT: Someone hit you?

## Page 26

1       JUROR #26: Correct.
2       THE COURT: And didn't pay for the
3  damages?
4       JUROR #26: Correct.
5       THE COURT: And you sued him in small
6  claims court. And was there a hearing?
7       JUROR #26: There was a hearing, and I
8  was not successful.
9       THE COURT: You were not successful,
10  okay.
11      We'll move down to the first row. Yes,
12  ma'am, your name and juror number.
13      JUROR #113: Juror 113. I was -- I sued
14  a driver who hit me back in 2000. It was settled out
15  of court.
16      THE COURT: Okay, thank you.
17      Anyone else in the first row?
18      All right. The record should reflect
19  that other than the responses that have been given
20  there are no more responses.
21      Is there any one of you who has ever been
22  a witness in a trial where you've come to the bench,
23  called by one side or the other, placed under oath,
24  and asked to testify and indeed did testify? Is there
25  anyone who's ever been -- the top row, no. The second

## Page 27

1  row. Yes, ma'am. Your name and juror number
2       JUROR #69: My name is    and my juror
3  number is 69. I was a witness in a medical lawsuit,
4  and I was called to the stand because I took care of a
5  patient who was -- whose family was claiming that
6  standard of care had not been followed at that
7  particular time. And the ruling was against the
8  plaintiff. They discovered that standard of care was
9  being followed at that particular time. So I was a
10  witness for the hospital.
11      THE COURT: Okay, witness for the defense
12  in a medical malpractice action. That was in state
13  court here in Connecticut or some other location?
14      JUROR #69: No, it was here in
15  Connecticut.
16      THE COURT: In Hartford?
17      JUROR #69: Yes, sir.
18      THE COURT: Do you remember the name of
19  the Judge?
20      JUROR #69: I'm sorry, I do not.
21      THE COURT: That could be a good thing.
22      Is there anyone in the first row? Yes,
23  ma'am, you have testified?
24      JUROR #57: Twice. Juror 57. I was an
25  EMT for New Britain EMS and was the first responding

## Page 28

1  EMT on the scene of two separate murders to which
2  myself and my partner testified at both separate
3  cases. And yes, I do remember the judge's name.
4       THE COURT: Who was the judge?
5       JUROR #57: Judge Harry Hammer.
6       THE COURT: So do you remember you were
7  called by the prosecution?
8       JUROR #57: Yes, in both cases.
9       THE COURT: And do you recall what the
10  result was?
11      JUROR #57: Oh, no. I was only there the
12  first couple of days and -- well, maybe I guess I do
13  know the result. I don't know about -- I know they
14  were both found guilty, but I can't tell you about
15  sentencing or anything like that.
16      THE COURT: Okay. But you remember the
17  stressfulness of having to testify.
18      JUROR #57: Oh, I was terrified.
19      THE COURT: I would be, too.
20      JUROR #57: I was terrified. I was 22
21  years old.
22      THE COURT: That's just a natural human
23  reaction. I'm terrified up here asking you these
24  questions.
25      As I've said before, I'm going to allow

A-284

Page 29

1    counsel to end up with brief individual voir dire so
2    that they can follow up on any question that they want
3    to, or plug any gaps that may have been left.
4          Has any of you ever served on a jury
5    before?
6          Okay, we see two people in the second
7    row. Yes, ma'am.
8          JUROR #26: Juror number 26. There was
9    an individual who was seeking damages for a slip and
10   fall.
11         THE COURT: Did the jury reach a verdict
12   or was it settled during the trial?
13         JUROR #26: We reached a verdict.
14         THE COURT: For whom did you find?
15         JUROR #26: We found for the plaintiff,
16   but we only awarded medical bills to be covered and
17   $2,000 in damages, pain and suffering.
18         THE COURT: Okay, so you --
19         JUROR #26: It was a minor slip and fall.
20   That's how we found it.
21         THE COURT: You regarded it as a minor
22   case, and you awarded compensatory damages of about
23   $2,000.
24         JUROR #26: Yes, sir.
25         THE COURT: Anyone else? Your name and

Page 30

1    juror number, please.
2          JUROR #123: Juror 123. I was a juror in
3    a case in court in Manchester concerning someone who
4    was dealing in stolen cars, and we went to jury, a
5    trial, and he was found guilty.
6          THE COURT: Okay. This was a criminal
7    case?
8          JUROR #123: Yes.
9          THE COURT: Kind of getting back to the
10   issues involving employment, is there anyone among you
11   who has ever felt that your employer gave you an
12   unfair or unjust criticism or evaluation, someone that
13   was just not fair, in your opinion?
14         Okay. The record should indicate no
15   response.
16         Is there anyone among you who has been
17   forced to retire at a certain age?
18         The record should indicate no response.
19         Is there anyone among you who has a
20   family member who has been forced to retire at an
21   early age? Or forced to retire at a certain age?
22         Okay. The record should indicate no
23   response.
24         Is there anyone among you who feels that
25   he or she has been the victim of workplace

Page 31

1    discrimination?
2          The record should indicate there's no
3    response.
4          Is there anyone among you who has ever
5    been accused of workplace discrimination?
6          The record should indicate no response.
7          Is there any one of who you has acted at
8    one time or another as a supervisor or an employer?
9          We'll start with the back row. Yes,
10   ma'am, your name and juror number.
11         JUROR #19:          , number 19. I
12   am a supervisor currently for CT Works in Enfield.
13         THE COURT: And how many people do you
14   supervise?
15         JUROR #19: Seven.
16         THE COURT: Yes, sir.
17         JUROR #63: Juror 63. I work as a
18   lifeguard supervisor, both in Connecticut and Georgia.
19         THE COURT: As a lifeguard supervisor?
20         JUROR #63: Yes, sir.
21         THE COURT: Anyone else?
22         JUROR #95: 95. I am a supervisor at a
23   consulting firm up in Windsor.
24         THE COURT: Okay. Thank you. Anyone
25   else in the top row?

Page 32

1          Second row, anybody been an employer or
2    supervisor? Yes, ma'am, first one.
3          JUROR #60: Juror number 60. I for years
4    have worked for various employers as a supervisor.
5    I'm a management accountant, management accounting
6    team.
7          THE COURT: Thank you. Yes, ma'am.
8          JUROR #26: Juror number 26. I was a
9    supervisor in the U.S. Air Force.
10         THE COURT: Okay, thank you.
11         Yes, ma'am.
12         JUROR #69: Juror number 69. I own a
13   small business and we have anywhere from seven to 30
14   people employed.
15         THE COURT: Oh, my gosh. And that
16   business is here in Connecticut?
17         JUROR #69: Yes, sir. It's in East
18   Hartford, Granny's Pie Factory. I myself am Granny.
19         THE COURT: I'm not going there.
20         Yes, ma'am, at the end.
21         JUROR #123: Juror 123. I worked as a
22   nursing supervisor at St. Francis Hospital. I am now
23   retired.
24         THE COURT: Okay, thank you.
25         Yes, sir, I think the first gentleman

Page 33

1    here.
2            JUROR #24:  Director at Lincoln
3    Financial, estate filing and compliance.  Juror 24.
4            THE COURT:  Yes, ma'am.
5            JUROR #57:  Juror 57.  I hold two jobs
6    but one of them with the City of Bristol.  I'm a
7    lifeguard supervisor.  All year long.
8            THE COURT:  And how many people do you
9    supervise?
10           JUROR #57:  It depends on the time of
11   year.  At this time at the indoor pool there's
12   approximately 30, and that swells into summer in the
13   outdoor pools to about 70.
14           THE COURT:  Where are these pools
15   located?
16           JUROR #57:  There's three in Bristol.
17           THE COURT:  In Bristol?
18           JUROR #57:  Yes.
19           THE COURT:  Okay, thank you.
20           Yes, ma'am.
21           JUROR #10:  Juror number 10.  I'm
22   currently a store manager for a boutique, and I manage
23   about five people.  Previously I have managed about
24   ten in a previous job.
25           THE COURT:  Okay.  Thank you, ma'am.

Page 34

1            Yes, sir.
2            JUROR #50:  Number 50.  I have two
3    attorneys reporting to me at Pratt & Whitney.
4            THE COURT:  Thank you.
5            JUROR #67:  Juror number 67.  I work for
6    an owner of apartment complexes, manage maintenance.
7            THE COURT:  Where are the apartment
8    complexes in?
9            JUROR #67:  I'm currently in Connecticut,
10   but I was up in Massachusetts.
11           THE COURT:  Is there any one of you who
12   has had the occasion to discharge and/or discipline an
13   employee?
14           We'll start in the back row.
15           JUROR #19:  Juror 19.  I was involved in
16   a discharge of an employee.
17           THE COURT:  Were you in favor of the
18   discharge?
19           JUROR #19:  Yes.
20           THE COURT:  You were?
21           JUROR #19:  Yes.
22           THE COURT:  Anyone else in the top row?
23           We'll go to the second row.  Yes, ma'am.
24           JUROR #60:  Juror number 60.  I have
25   participated in the discharge of an employee while not

Page 35

1    actively discharging them, left that to the personnel
2    department.
3            THE COURT:  Part of the process.
4            JUROR #60:  Yes.
5            JUROR #26:  Number 26.  And I had to
6    discharge an airman who was a drug abuser.
7            THE COURT:  I'm sorry, I didn't get that.
8            JUROR #26:  I had to discharge an airman
9    who was a drug abuser.
10           THE COURT:  Are you actually in the Air
11   Force?
12           JUROR #26:  No, I'm not anymore.
13           THE COURT:  You were?
14           JUROR #26:  I was, for ten years.
15           THE COURT:  Wow.  Enlisted or officer?
16           JUROR #26:  Enlisted.
17           THE COURT:  What grade were you when you
18   were discharged?
19           JUROR #26:  I was a staff sergeant when I
20   got out.
21           THE COURT:  That's good.  How long were
22   you in?
23           JUROR #26:  Ten years.
24           THE COURT:  Ten years.  Okay, thank you.
25           Yes, ma'am.

Page 36

1            JUROR #69:  Juror number 69.  I work as a
2    nurse also, and I was involved as a charge nurse, in
3    speaking to somebody about practicing out of their
4    scope of practice, which led to disciplinary action.
5    And as a business owner I had to -- I was involved in
6    the process of discharging someone.
7            THE COURT:  Okay, thank you.
8            We'll go to the first row.  Yes, ma'am.
9            JUROR #57:  57.  As part of our duties I
10   have been involved with the termination of a couple
11   of -- well, three employees.
12           THE COURT:  Okay, thank you.
13           JUROR #10:  I have terminated an
14   employee.
15           THE COURT:  You have terminated an
16   employee?
17           JUROR #10:  Yes.
18           THE COURT:  That's at the boutique?
19           JUROR #10:  At a prior retailer,
20   department store.
21           THE COURT:  Anyone else in the first row?
22           Yes, sir.
23           JUROR #67:  Juror number 67.  I've been
24   involved in numerous dismissals for non-performance.
25           THE COURT:  Okay.

Page 37

1 Has any one of you ever been involved in
2 the investigation of an employee's complaint of
3 discrimination?
4 Second row.
5 JUROR #69: Juror number 69. In the
6 business about a year or so ago an employee brought a
7 complaint of sexual harassment, so I investigated
8 that, and it ended up resolved to this person's
9 satisfaction.
10 THE COURT: Okay. So you participated in
11 an investigation in an attempt to see if the problem
12 could be resolved?
13 JUROR #69: Yes, sir.
14 THE COURT: And it couldn't be resolved.
15 JUROR #69: We made changes to our
16 visitation policy. She claimed that a visitor
17 sexually harassed her, coming into the shop, so we
18 made changes to that particular policy, and I followed
19 up with her, and she in writing said that the
20 situation was handled to her satisfaction, and that
21 was the end of the discrimination suit.
22 THE COURT: So you were part of the team
23 that investigated an allegation.
24 JUROR #69: Yes, sir.
25 THE COURT: Of illegal discrimination.

Page 38

1 JUROR #69: Yes, sir.
2 THE COURT: And you investigated this
3 matter along with others to try to see if you could
4 resolve the problem.
5 JUROR #69: Yes, sir.
6 THE COURT: And you were able to resolve
7 it.
8 JUROR #69: Yes.
9 THE COURT: Anyone else?
10 Okay. Now, this is kind of a
11 hypothetical question, but if an employee is
12 performing a job, and doing so successfully, is there
13 anyone among you who believes that the employee should
14 be able to decide when to retire, regardless of age?
15 Okay, we got the fourth row back here.
16 JUROR #59: I believe that you should be
17 able to choose when you want to retire. Number 59.
18 THE COURT: I got the first part, I got
19 the number, I got the "I believe that," but what do
20 you believe?
21 JUROR #59: You should choose when you
22 want to be able to retire.
23 THE COURT: So you agree with me. Let me
24 spin this question around here for a minute. If a
25 person is doing a good job, is there anybody who

Page 39

1 believes that he should not be permitted to work as
2 long as he's able to do that job?
3 Okay. I think the question was clear,
4 and I infer from the fact that there are no responses
5 to that, that it's the opinion of the jury panel that
6 if a person is doing a good job, a necessary job, a
7 good job, is performing his functions, then he should
8 not be forced to retire because of his age.
9 Okay. As reformulated by me, the record
10 should indicate that every juror has indicated
11 agreement that a person who's doing a good job at a
12 necessary job should be able to work and should not be
13 subject to a mandatory retirement age.
14 Now, is there anyone among you who has
15 worked for an employer for more than 20 years?
16 Yes, ma'am
17 JUROR #5: Juror number 5.
18 THE COURT: For whom have you worked for
19 more than 20 years?
20 JUROR #5: Light Mills Company in
21 Southington, Connecticut.
22 THE COURT: How long?
23 JUROR #5: 34.
24 THE COURT: 34. My gosh. I've been a
25 judge for 34 years. We could have started together.

Page 40

1 Yes, ma'am
2 JUROR #28: 28 number. I was a crossing
3 guard for the City of Bristol for 30 years.
4 THE COURT: 30 years?
5 JUROR #28: Yes.
6 THE COURT: Congratulations.
7 JUROR #28: Thank you.
8 THE COURT: All of those little kids got
9 across the street safely because of you. That's good.
10 That's something to be proud of.
11 Anybody else? Second row, no more. Oh,
12 yes.
13 JUROR #123: Juror 123. I worked at St.
14 Francis for a total of probably 36 to 40 years. I
15 lost count.
16 THE COURT: Okay. There's no one else.
17 Yes, sir. I'm sorry.
18 JUROR #7:          , number 7. Worked
19 for Kimberly Clark Corporation, been employed for over
20 21 years.
21 THE COURT: Very good. You're a young
22 man.
23 Has anyone among you ever had
24 discrimination -- I'm sorry. Is there anyone among
25 you who has ever had diversity or discrimination

| | |
|---|---|
| **Page 41** | **Page 43** |

**Page 41**

1　training?

2　　　　Okay, we'll go up to the first row.

3　　　　JUROR #19: Juror number 19. I have that

4　training in my current position.

5　　　　JUROR #95: 95. Last time was probably

6　20 or so years ago, but yes, I have.

7　　　　THE COURT: Discrimination,

8　anti-discrimination training? Okay. Next? Yes,

9　ma'am.

10　　　　JUROR #59: 59. I've had discrimination

11　training in my current job now.

12　　　　THE COURT: Yes, ma'am.

13　　　　JUROR #60: Juror 60. I have had both

14　anti-harassment and discrimination training with the

15　management team of my employer.

16　　　　THE COURT: Anyone else in the second

17　row? Yes, ma'am.

18　　　　JUROR #26: 26. I've had training and

19　I've actually conducted training.

20　　　　THE COURT: Okay. So you train and

21　you've been a trainer.

22　　　　JUROR #26: Yes, sir.

23　　　　THE COURT: Have you given training on

24　age discrimination, for example, for anti-age

25　discrimination?

**Page 42**

1　　　　JUROR #26: Yes, I have.

2　　　　THE COURT: So you've covered the whole

3　spectrum.

4　　　　JUROR #26: Yes, Your Honor.

5　　　　THE COURT: Okay, thank you.

6　　　　Yes, ma'am.

7　　　　JUROR #69: Juror 69. As part of our

8　yearly competencies at St. Francis we have a diversity

9　training.

10　　　　JUROR #123: Juror 123. Part of our

11　mandatory at the hospital is anti-discrimination.

12　　　　THE COURT: So you participated in that.

13　　　　JUROR #123: Yes.

14　　　　THE COURT: Okay. Yes, sir.

15　　　　JUROR #24: 24. We have a program in

16　place at the company annually.

17　　　　THE COURT: Yes, ma'am.

18　　　　JUROR #57: Number 57. In both my jobs

19　it's required as an OSHA consultant I do a lot of HR

20　work, we do discrimination classes and training and

21　everything, and as a lifeguard supervisor it's up to

22　me to present that to them.

23　　　　JUROR #113: 113. As part of my function

24　at work I have to participate in training for

25　harassment, discrimination.

**Page 43**

1　　　　THE COURT: Thank you. Yes, ma'am.

2　　　　JUROR #10: Working at different various

3　retailers I've received diversity training probably

4　most everywhere.

5　　　　THE COURT: Yes, sir.

6　　　　JUROR #7: Juror 7. Not sure if it's

7　annual, I believe it is, but harassment,

8　discrimination and code of conduct training through my

9　company.

10　　　　THE COURT: Yes, sir.

11　　　　JUROR #98: Number 98. Yearly mandatory

12　training for discrimination and harassment.

13　　　　THE COURT: Yes, sir.

14　　　　JUROR #50: Juror 50. UTC has all sorts

15　of training including harassment, discrimination.

16　　　　THE COURT: Yes, sir.

17　　　　JUROR #67: Juror 67. We undergo it

18　every year as part of our yearly training.

19　　　　THE COURT: Okay. Thank you.

20　　　　Is there any -- probably asked this. Is

21　there anyone among you who has had military service?

22　Second row.

23　　　　JUROR #26: Number 26.

24　　　　THE COURT: Air force?

25　　　　JUROR #26: I was in the Air Force, yes,

**Page 44**

1　sir.

2　　　　THE COURT: Is there anyone among you who

3　is a member of a labor union? Number 26.

4　　　　JUROR #26: I work for the State of

5　Connecticut and I'm part of the union.

6　　　　THE COURT: Is there anyone among you who

7　has ever had a really serious dispute with his or her

8　employer?

9　　　　Yes, sir.

10　　　　JUROR #63: Juror number 63.

11　　　　THE COURT: Who was the employer?

12　　　　JUROR #63: Energy Connection LLC of

13　Canton, Connecticut. The conflict that I had with

14　them was that I was not registered for my electrical

15　apprenticeship and I lost hours towards my

16　apprenticeship, so I left the company, and there was a

17　conflict between myself and the employer over

18　unemployment benefits.

19　　　　THE COURT: Anybody else?

20　　　　Okay. The record should indicate there's

21　no response.

22　　　　Is there anyone among you who believes

23　that are there any circumstances where it is

24　appropriate to treat an employee differently solely

25　because of that employee's age?

11 (Pages 41 to 44)

Page 45

1  Okay.  The record should indicate no
2  response.
3  Is there anyone among you who believes
4  there are just too many laws which protect employees
5  from unfair treatment by employers?
6  The record should indicate no response.
7  Is there anyone among you who believes
8  that too much time or effort is spent on considering
9  and guarding against age discrimination in the
10 workplace?
11 The record should indicate there's no
12 response.
13 Is there anyone among you who believes
14 that people should not bring complaints of
15 discrimination against their employers?
16 Is there anyone among you who thinks that
17 claims for age discrimination are made too frequently?
18 The record should indicate no response
19 again.
20 Is there anyone among you who believes
21 that there should be a cap, that is a limit, on the
22 amount of damages that can be awarded in an age
23 discrimination case?
24 The record should indicate no response.
25 Okay.  Now, do you realize that if you

Page 46

1  are selected as a juror, you have an absolute duty, a
2  sworn duty, to keep an open mind in this case until
3  you have heard all of the evidence, all of the closing
4  arguments, and the Court's instructions to you on the
5  law?  In other words, you've got to keep an open mind.
6  You got two sides here, each one of which is looking
7  to you for fairness, and you can't pre-judge.  You
8  have to wait until you hear all the testimony, you see
9  or otherwise examine any exhibits that are introduced,
10 you hear the lawyers make their closing arguments, and
11 you hear the Court's jury instructions.  You can't
12 even begin to deliberate until you've heard all of
13 those things and then you're sent to the jury room and
14 told okay, please select a foreperson, and begin your
15 deliberations.  You all understand that?  Anyone not
16 understand that?
17 Okay.  Is there anyone who can think of
18 anything that might prevent you from being completely
19 fair to both sides in this case?
20 Yes, sir.
21 JUROR #95:  95.
22 THE COURT:  Okay.  Thank you, sir.
23 Anyone else?
24 Does anyone not understand that a company
25 such as IBM, in fact in this case IBM, is entitled to

Page 47

1  the same fair and impartial treatment as any other
2  party to a lawsuit?
3  The record should indicate that the
4  jurors have acknowledged that they understand this.
5  Is there anyone among you who holds any
6  views, one way or another, concerning employment laws
7  prohibiting unlawful discrimination that would make it
8  difficult for you to decide this case and the facts in
9  this case fairly and impartially?
10 The record should indicate no response.
11 Is there anyone among you who believes
12 that just because an employer -- or excuse me.  Is
13 there anyone among you who believes that just because
14 an employee has been with a particular employer for a
15 long period of time, that employee is basically immune
16 from being terminated for legitimate reasons?
17 The record should indicate that no one
18 holds such a belief.
19 Now, if during the course of this a
20 witness said something or a lawyer asked a question
21 and the Court for one reason or another as a legal
22 matter sustained, that is upheld, an objection to that
23 question, and said ladies and gentlemen, I instruct
24 you, you have to disregard that answer, is there
25 anyone who would have a problem following my

Page 48

1  instructions?
2  Remember, you're going to be sworn to
3  apply the law that I give you and to follow the law.
4  You're not going to be able to fashion your own law,
5  but you're going to be required to apply the law that
6  I give you and obey the law that I give you, and if I
7  told you, ladies and gentlemen, please disregard that
8  answer, would you be able to just disregard it?
9  You'll able to take notes.  Each one of
10 you will have a notepad and somebody could write down
11 disregard, or if you had written something, you cross
12 it out, but the important thing is, if I tell you that
13 you must disregard something, you really must
14 disregard it.  Everyone understand that?
15 The record should indicate that every
16 juror has indicated his or her understanding.
17 Now, would any of you have reluctance
18 about returning a verdict for a substantial sum of
19 money if you believed that the Plaintiff established a
20 case for age discrimination?
21 The record should indicate no response.
22 Do any of you -- suppose it's better to
23 ask this the other way.  Do you believe that a person
24 can't suffer emotionally as a result of
25 discrimination?

Page 49

```
1        THE COURT:  Yes, ma'am.
2        JUROR #59:  59.  Yes, I believe.
3        THE COURT:  Appears to me that every
4   juror has nodded his or her head in agreement with the
5   fact or in agreement with the position that somebody
6   can indeed suffer emotionally as a result of
7   discrimination.
8        Do you believe that a person who has
9   suffered emotional discrimination may be entitled to
10  compensatory damages as a result of that
11  discrimination?
12       Okay.  The record should indicate all
13  jurors are in agreement.
14       Now, before I turn this over to counsel
15  for a brief individual voir dire I just want to ask
16  one more time, based on what you know so far and what
17  you've said so far, is there anything that would cause
18  you to believe that you couldn't be fair in this case?
19       The record should reflect that there is
20  no response.
21       Several members of the prospective panel
22  have shaken her heads indicating that they hold no
23  such feelings.
24       I've already had the lawyers introduce
25  themselves and their law firms, identify to you the
```

Page 50

```
1   parties and witnesses, and I have conducted a voir
2   dire which is an amalgamation of the questions that
3   counsel have asked me to ask.  I will now turn this
4   over to counsel to permit the lawyer for each side to
5   conduct a brief individual voir dire and follow up on
6   any things that I forgot to ask or any questions that
7   counsel thinks should be followed up on.
8        So Mr. Carta, with that please go ahead.
9        MR. CARTA:  Now, then, my name is Mark
10  Carta.  I represent the Plaintiff, James Castelluccio,
11  in this matter.
12       Your Honor, I'm very pleased with the
13  questioning, and I just have a couple of very brief
14  points that I want to ask.
15       Juror number 95, you indicated that you
16  had some feelings about IBM, and you didn't articulate
17  what those were.  Were those also the feelings that
18  you said you thought might influence your ability to
19  be fair, and can you just explain what that is, sir?
20       JUROR #95:  Our unit had been purchased
21  by IBM.  It was 2002.  I was part of a three-person
22  negotiation team that IBM was attempting to sell our
23  unit.  My dealings with personnel at IBM didn't go too
24  favorably.  We had many contentious moments.  Our unit
25  was sold off, and May 1st of 2003 I was no longer...
```

Page 51

```
1        MR. CARTA:  And do you think if the Judge
2   directs you to be objective and listen to the
3   testimony that's going to be given here today or over
4   the course of the next two weeks, that you would be
5   unable to let your past experience be put aside and
6   you wouldn't be able to be fair to IBM?
7        JUROR #95:  I would like to believe I
8   could be, but I guess I can't say that I absolutely
9   could be.
10       MR. CARTA:  Even if the Judge directed
11  you to listen just to the testimony and make a
12  decision based upon just what you heard here in the
13  courtroom, do you think you could be fair and
14  objective?
15       JUROR #95:  Yes.
16       MR. CARTA:  Thank you.
17       Juror number 123.  You indicated, I
18  believe, that your husband had filed an age
19  discrimination case involving some situation
20  completely different from what we have here, is that
21  right?
22       JUROR #123:  Yes.
23       MR. CARTA:  And again, if the Judge
24  directed you to just make your decision based upon
25  what happens here, what happens in the courtroom, the
```

Page 52

```
1   documents and testimony that are here, do you think
2   your prior experience would prevent you from being
3   objective in terms of making a proper decision in this
4   case?
5        JUROR #123:  No.
6        MR. CARTA:  You think you could be
7   objective?
8        JUROR #123:  I do.
9        MR. CARTA:  You seem confident of that.
10  Are you sure?
11       JUROR #123:  I do, yes.
12       MR. CARTA:  Thank you.
13       Juror number 24.  You indicated, I think,
14  that you had some opinion about older employees or
15  that you had some experience -- I wasn't quite sure, I
16  couldn't hear you.  Could you share with us what that
17  opinion was?
18       JUROR #24:  Previous employer, large
19  corporation, I was with them for 14 years, sterling
20  reviews, let go at age 52, was put in outplacement
21  that they provided with 14 other members, ten of which
22  all of them were over 50.  We all had an opinion about
23  that, but never pursued it.
24       MR. CARTA:  So that's your personal
25  experience?
```

13 (Pages 49 to 52)

Page 53

1        JUROR #24:  Yes.
2        MR. CARTA:  Well, let me ask you the same
3    question.  Given the fact that this is a different
4    employer and a different situation, and a different
5    person who's life has been affected, do you think that
6    your prior experience would so taint your judgment
7    that you couldn't be a fair and objective if the Judge
8    asked you to be fair and objective?
9        JUROR #24:  I could be fair and
10   objective.
11       MR. CARTA:  You think you could.  Thank
12   you very much.  Appreciate that.
13       That's all.
14       THE COURT:  Mr. Carta, thank you, sir.
15   Mr. Fasman.
16       MR. FASMAN:  Ladies and gentlemen, thank
17   you.
18       Your Honor, that was -- I can see why the
19   lawyers get just a few minutes for voir dire.  It was
20   very nice.  Thank you.
21       Just a couple of questions.          ,
22   let me just go back to the questions that Mr. Carta
23   asked you.  Are you sure of that?  I mean I just --
24   IBM is here, and it wants a fair and impartial jury,
25   and I heard at least some hesitancy in your voice when

Page 54

1    you answered him about being fair and objective.  If I
2    asked you to tell us the bottom line, is that the
3    bottom line?
4        JUROR #95:  Yes.
5        MR. FASMAN:  Okay.  Are any of you
6    members of an advocacy group, Mothers Against Drug
7    Driving, anything along those lines, anything that
8    relates to this?
9        JUROR #26:  I'm a parent advocate on the
10   Psychotropic Medicine Committee at DCF.
11       MR. FASMAN:  Anybody else?  Okay.
12       According to the law, a person who seeks
13   damages in an employment lawsuit in a termination case
14   has an obligation to do everything reasonably possible
15   to find another job to reduce his damages.  Does that
16   rule sound fair to you?  Is that a rule that you think
17   you could apply?  Anybody here have any problem with
18   applying that rule?  No?  All right.
19       19, you mentioned your husband's lawsuit
20   against American Airlines.
21       JUROR #19:  That's correct.
22       MR. FASMAN:  I was also having trouble
23   hearing back there, too.  It's a big courtroom.  I
24   didn't understand the details of that.  What were the
25   details of that?  What was it?  What was it about?

Page 55

1        JUROR #19:  Back in 2008, and he was
2    injured, and upon his return they asked him to take a
3    program that never even existed in the company, or
4    else he would be terminated.
5        MR. FASMAN:  And what was the outcome?
6        JUROR #19:  American Airlines went
7    bankrupt and the outcome is nothing.
8        MR. FASMAN:  Is that going to affect you
9    one way or the other in this case?
10       JUROR #19:  No.
11       MR. FASMAN:  No?
12       Let me ask all of you, if you were a
13   party in this case expecting a fair trial, would you
14   be willing to have a juror with your frame of mind sit
15   on that jury, on the jury?  Anyone say no?  Okay.
16       Judge, that's all I have.  Thank you
17       THE COURT:  Thank you, Mr. Fasman.
18       MR. FASMAN:  Thank you.
19       THE COURT:  I'll allow the lawyers a
20   couple of minutes to caucus before I ask them to
21   approach the bench, and while you're caucusing among
22   yourselves I'll just tell you that during the trial
23   from time to time a question may come up, and counsel
24   may ask to approach the bench, or I might ask the
25   lawyers to come up to the bench so we can discuss

Page 56

1    something.  We don't mean to be rude to you.  It's the
2    last thing we mean.  But what we're doing is we're
3    dealing with certain legal questions that I have to
4    decide, and the lawyers have to make their legal
5    arguments, and we don't want to put before you things
6    that really don't have to be before you.
7        In this case I'm the judge of the law,
8    you are the judges of the facts, and at the
9    appropriate time I'll instruct you on the law, and
10   then you will take those instructions -- you'll have a
11   copy of those instruction, you'll take them in with
12   you to the jury room, and you can read them over or
13   refer to them or parts of them at any time you want
14   when you're deliberating, and you're the ones who are
15   charged with the responsibility of deciding the facts.
16       Now, have counsel had enough time to meet
17   with me and the clerk up here, or would you like a
18   couple more minutes?
19       MR. FASMAN:  Couple more minutes, please,
20   Your Honor.  Thank you.
21       THE COURT:  Let me just continue on with
22   my -- I want you to be comfortable.  I want you to be
23   relaxed.  I don't like waiting, and because of that I
24   don't like to keep people waiting.  I really don't.
25   There will be times during this case where you think

Page 57

1    oh, boy, we're going to start at exactly 10 o'clock,
2    or we're going to start at 9:30, and you don't start
3    exactly when we said we're going to start.
4         Usually that's due to conversations that
5    I've had with the lawyers on both sides about whether
6    there are steps we can take to shorten the proceedings
7    or to expedite the proceedings, and I found in my
8    experience that by having these conversations with the
9    lawyers, a lot of times we're able to contract what
10   was thought to be a much longer case into a smaller
11   one.
12        So if you're waiting, we keep you
13   waiting, please do not think that it's because I don't
14   value your time. I do. If I do keep you waiting, it
15   will be because I have something else that I have to
16   do which is designed to make your job easier and
17   quicker.
18        We're fortunate this is not my criminal
19   month, so I won't have interruptions all day long.
20   It's difficult to conduct a trial, at least it is for
21   me, when it's my criminal month, because people are
22   brought in before the Court for various offenses and
23   they have to be advised of their rights at that
24   particular point, we have to be hooked up with
25   counsel, and so I mean that's an interruption, but

Page 58

1    this is not my criminal month, so that should go
2    smoothly. And I have tried to clear my calendar up of
3    mostly everything else that I have to do.
4         Mr. Carta, Mr. Fasman, are you gentlemen
5    ready? Please approach the bench.
6         (Conference held at sidebar)
7         MR. CARTA: I think that the college
8    student, juror 59, she's indicated she doesn't think
9    she can take the time.
10        MR. FASMAN: I agree.
11        THE CLERK: 15?
12        THE COURT: Yes.
13        MR. FASMAN: What about the fellow that
14   owns IBM stock?
15        MR. CARTA: Yes.
16        MR. FASMAN: We have to strike him.
17   That's 367.
18        MR. DUFFIELD: Also juror 28 said that
19   she was the sole provider for her family.
20        MR. CARTA: The attorney negotiating the
21   deal with IBM.
22        THE COURT: That's trouble. I think
23   that's trouble.
24        MR. FASMAN: I don't think that's cause,
25   either.

Page 59

1         THE COURT: I do.
2         MR. FASMAN: Did you strike him, Judge?
3         THE COURT: Yes.
4         MR. CARTA: That's all I have for cause.
5         MR. FASMAN: Despite what you just said,
6    I still would strike the fellow in the last row who's
7    obviously had a bad employment experience with IBM, a
8    bad experience with IBM. I know he said he could be
9    fair and impartial. I think that that's --
10        THE COURT: I agree.
11        MR. DUFFIELD: 95.
12        THE COURT: Gentlemen, you got to be
13   careful now, because we're down to 13, and we need
14   eight, and it's going to be the first eight on the
15   list. So personally, I don't think I've ever seen a
16   more acceptable panel.
17        MR. FASMAN: Yeah, they're pretty good.
18        THE COURT: They all seem okay except for
19   the ones we identified.
20        THE CLERK: So are we going to do
21   challenges now?
22        THE COURT: Yes.
23        MR. CARTA: Can you review for a moment
24   which ones have been stricken?
25        THE CLERK: Number 15 excused for cause.

Page 60

1    Number 59. Number 367 excused for cause. Number 28
2    excused for cause. And number 50 excused for cause.
3         MR. CARTA: So you want to know who we
4    exercise on the first eight as peremptory challenges?
5         MR. FASMAN: One at time?
6         THE CLERK: Right.
7         MR. CARTA: Juror 60.
8         MR. FASMAN: And we'll strike number 63
9    on the list.
10        MR. CARTA: Juror 26, number 12 on the
11   list.
12        MR. FASMAN: We would like to strike
13   number 54 on the list.
14        MR. CARTA: Strike juror 69, number 13 on
15   the list.
16        MR. FASMAN: We'll strike number 123.
17        THE CLERK: Before I read these, juror
18   number 1 is juror number 90, juror number 2 is juror
19   number 19, juror number 3 is juror number 68, juror
20   number 4 is juror number 5, juror number 6 is
21
22        MR. DUFFIELD: I thought he was stricken.
23        MR. FASMAN: I thought he was stricken.
24   I thought we struck this fellow on the end who had to
25   come up with an opinion about how employers deal with

Page 61

1 older workers based on his prior experience, I thought
2 you said he was stricken. Can I call one other
3 strike?
4 THE COURT: Zack, there was a witness --
5 you think that there was a witness who answered that
6 older people could be treated differently by
7 employers?
8 MR. FASMAN: No, I thought that he said
9 that he thought that corporations treat older workers
10 improperly based on his prior experience.
11 THE COURT: Somebody in this courtroom
12 said that?
13 MR. CARTA: I didn't hear that.
14 THE COURT: I didn't hear that.
15 MR. FASMAN: He did answer your question
16 that way, Judge.
17 THE COURT: There was one question.
18 MR. FASMAN: Then he talked about the
19 fact that he'd been laid off by a prior employer after
20 14 years and had been forced into an untenable
21 situation.
22 MR. CARTA: And I thought I asked him
23 about his judgment and he said he could be objective
24 if directed to do so. He's the gentleman in the front
25 row on the far left.

Page 62

1 THE COURT: This is an otherwise
2 acceptable jury to everyone? Can you work with this?
3 I mean if you strike this man? I want to make sure we
4 have enough.
5 MR. CARTA: Let me see if we can work it
6 out. Just a second, please.
7 MR. FASMAN: I think I have to strike him
8 for cause then.
9 THE CLERK: Which one, sir?
10 MR. FASMAN: If he's not struck.
11 THE CLERK: Number 24?
12 MR. FASMAN: 24, yes. I take one back.
13 THE CLERK: Okay. So you're striking
14 this one. Which one are you taking back?
15 MR. FASMAN: 123. Right above it.
16 THE CLERK: We'll start again. Juror
17 number 1 is      Juror number 2 is      Juror
18 number 3 is  . Juror number 4 is  . Juror
19 number 5 is  . Juror number 6 would be  .
20 Juror number 7 would be      . Juror number 8 would be
21  .
22 MR. FASMAN: Yes.
23 THE CLERK: Let's go over it one more
24 time. Juror number 1 is      Juror number 2 is
25      Juror number 3 is  . Juror number 4 is

Page 63

1 . Juror number 5 is   . Juror number 6 is
2 . Juror number 7 is   . Juror number 8 is
3
4 THE COURT: All set?
5 MR. FASMAN: Yes.
6 THE COURT: All set, Mark?
7 MR. CARTA: Yes.
8 (Conference concluded at sidebar)
9 THE COURT: All right. Are counsel
10 satisfied with the jury?
11 MR. CARTA: Yes, Your Honor.
12 MR. FASMAN: Yes, Your Honor.
13 THE COURT: And are counsel satisfied
14 with the jury selection process and the voir dires?
15 Anything that the parties would like me to do along
16 those lines?
17 MR. CARTA: Absolutely, Your Honor.
18 MR. FASMAN: We're absolutely happy, Your
19 Honor. Thank you.
20 THE COURT: Okay. Madam clerk, would you
21 please read the names of the jurors.
22 THE CLERK: When I read your number
23 please stand. Juror number 90, juror number 19, juror
24 number 68, juror number 5, juror number 123, juror
25 number 57, juror number 113, and juror number 10.

Page 64

1 THE COURT: Okay. Those of you who are
2 standing have been selected as the jurors in this
3 case. And don't go anywhere. Those of you who have
4 not been selected, those of you who came in, I thank
5 you for participating in this process. Even though
6 you weren't selected you enabled us to do what we have
7 to do to select the jury. We have a good jury in this
8 case. Those of you who are not standing, with my
9 thanks, are excused.
10 (Jury panel excused)
11 THE COURT: Now, we have to do some
12 paperwork, the clerk has to do some paperwork getting
13 things in order, and counsel and I have to discuss
14 some legal points. So we're going to have to ask you
15 to go into the jury room and probably wait for us 15
16 minutes. However, the good news is, there's coffee in
17 the jury room, and, even better, there are chocolate
18 chip cookies. There's a bathroom in there.
19 So if you'd like to go into the jury room
20 and adjust yourselves and get the memo pads and that
21 sort of thing, we'll be calling you back in, and at
22 that point I'm going to give you some very preliminary
23 instructions about what to do. Then after I do that
24 I'm going to allow counsel, if they want to, to make
25 brief opening statements. Have counsel decided on

Page 65

1    that issue?
2         MR. CARTA: Yes, Your Honor. We intend
3    to do so.
4         MR. FASMAN: Yes, and we do too, Your
5    Honor.
6         THE COURT: Okay. So counsel are going
7    to make brief opening statements. Then when they
8    finish making those statements I'm going to say, Mr.
9    Carta, call your first witness. Then the witness will
10   come to the witness stand and the trial will be begun.
11   Of course then you'll be sworn in, a jurors' oath
12   before we begin the trial, but for now, just go in. I
13   can actually attest that the coffee is much better
14   here and now than it was in 1968. Much better. And
15   you can drink as much as you want. And I hope the
16   budget can give you enough chocolate chip cookies for
17   these good people. Okay, folks. You may follow the
18   clerk.
19         (Jurors excused)
20         THE COURT: So be comfortable. When Ms.
21   Sunbury has done all of the forms that need to be
22   filled out and the paperwork that's necessary, we'll
23   get the jury back in here. Don't let me forget to
24   swear the jury in.
25         MR. CARTA: May I have a men's break?

Page 66

1         THE COURT: I'm going to go and recess
2    until Barbara calls me.
3         MR. CARTA: Okay.
4         THE COURT: Okay. Good job, gentlemen,
5    very good job.
6         MR. CARTA: Thank you.
7         MR. FASMAN: Thank you, Your Honor.
8         THE COURT: It was suggested to me that
9    maybe it would make sense to send the jury to lunch,
10   and they come back about 1 o'clock, 1:05, somewhere in
11   there. They will have full stomachs and they'll be
12   ready to go. If you want to get something, you can
13   get something to eat as well.
14        MR. FASMAN: Whatever's good, Your Honor.
15   That's fine with us, sure.
16        THE COURT: Remember, tell them not to
17   talk to anybody about the case, and they're not to
18   talk among themselves about the case.
19        THE CLERK: Yes.
20        (Recess taken from 12:18 p.m. to 1:28 p.m.)
21        THE COURT: Anything else to take up, or
22   can we call the jury in? Fine.
23        (Jurors present)
24        THE COURT: Well, welcome back, ladies
25   and gentlemen. I don't know who suggested it, but it

Page 67

1    was one of these bright thoughtful individuals out
2    here that suggested while we take up these legal
3    matters we have to take up, would it make sense to let
4    the jury go to lunch and then come back, and I
5    scratched my head and said hey, that makes really good
6    sense, and so we got word to you.
7         Chocolate chip cookies in there?
8         A JUROR: We're saving some for the
9    afternoon.
10        THE COURT: In case you're wondering,
11   these two handsome young up and coming men are,
12   farthest away on your left, Michael Slitt, and closest
13   to the Court is Jake Pylman. And each year federal
14   judges get to hire two able lawyers, males and
15   females, to help us out with a lot of the work that
16   the job entails, and I consider myself very fortunate
17   to have them. So you might see them scurrying around,
18   and I don't want you to have to guess who they are.
19   They're fine lawyers.
20        This is the point where I'm going to be
21   giving you preliminary instructions. But first you
22   have to be sworn in, so I would ask you to please
23   stand, raise your right hands while the clerk swears
24   you in.
25        (Jurors were sworn by the clerk)

Page 68

1         THE COURT: Now, ladies and gentlemen,
2    it's going to be -- I should say ladies and
3    gentleman -- it's going to be your job to decide the
4    facts in this case on the basis of the evidence that's
5    presented before you here in court. I will instruct
6    you as to the law, and you must apply the law that I
7    give you to the facts as you find them to be. That's
8    how you will reach your verdict. In your
9    deliberations you must follow the law that I give you
10   whether you agree with it or not.
11        You must not take anything that I say or
12   do during this trial as indicating what your verdict
13   should be. Don't be influenced by my taking notes,
14   because my notes may have nothing to do with the
15   matter at hand, and they might have nothing to do even
16   with this case.
17        Now, it's the duty of the Court to
18   sustain or to overrule objections that are made by the
19   attorneys in this case. You should not hold it
20   against any attorney for objecting, nor should you
21   infer that I have any particular feelings about this
22   case or about the attorney from the way that I rule on
23   the objection.
24        You will decide the facts of this case
25   from the evidence which will be presented here in

Page 69

1  court. The evidence in a trial usually consists of
2  the testimony that you hear from the mouths of the
3  witnesses here in court, any documents that are
4  introduced into evidence, and any stipulations or
5  agreements by the lawyers that I instruct you to
6  accept.
7         The following things are not evidence and
8  you should not consider them as evidence in deciding
9  the facts of this case: The statements and the
10  arguments of the lawyers, the questions and the
11  objections of the attorneys, anything that I
12  instruct you to disregard, and anything that you may
13  have seen or heard when the court is not in session,
14  even if it's said or done by a party or a witness to
15  this case.
16         Now, there are two kinds of evidence,
17  direct evidence and circumstantial evidence. Direct
18  evidence is testimony by a witness about what that
19  witness personally saw, heard or did. Circumstantial
20  evidence, on the other hand, is indirect evidence of
21  one or more facts from which you may infer another
22  fact.
23         If, for example, a witness testified that
24  it's raining outside, that would be direct evidence
25  that it's raining outside. On the other hand, if a

Page 70

1  witness testified that people are coming into the
2  courtroom or into the federal building with dripping
3  umbrellas, you would have circumstantial evidence from
4  which you may infer or you may conclude that it's
5  raining outside.
6         Now, you may consider direct and
7  circumstantial evidence in deciding a case. The law
8  permits you to give equal weight to both, and I
9  instruct you that circumstantial evidence may be just
10  as good and strong as direct evidence.
11         Sometimes I may order the evidence be
12  stricken from the record or that you ignore or
13  disregard the evidence, and that means that when
14  you're deciding the case you should not consider the
15  evidence that I've told you to disregard. Also,
16  sometimes evidence is admitted for a limited purpose.
17  When I instruct you that evidence has been admitted
18  for a limited purpose, you may consider that evidence
19  only for that limited purpose, and no other.
20         Now, I want to talk to you about burden
21  of proof. You may be familiar -- you probably are
22  familiar with the burden of proof that applies in a
23  criminal case. We've all seen television dramas
24  involving crimes and trials before judges, and in
25  those cases the prosecution has the burden of proving

Page 71

1  its case beyond a reasonable doubt.
2         Now, you should take that concept, beyond
3  a reasonable doubt, that phrase, beyond a reasonable
4  doubt, and just put it completely aside. That has
5  nothing to do with this kind of case. This is not a
6  criminal case. This is a civil case.
7         In a civil case like this one the
8  Plaintiff has the burden of proving the case by what's
9  called a preponderance of evidence. That means that
10  the Plaintiff has to produce evidence which when
11  considered in light of all the facts leads you to
12  believe that what the Plaintiff claims is more likely
13  true than not. If the Plaintiff fails to make that
14  burden, then the verdict must be for the Defendant.
15         I'll read that again. That's very
16  important.
17         Proving a case by a preponderance of
18  evidence means that the Plaintiff has to produce
19  evidence which considered in light of all of the facts
20  leads you to believe that what the Plaintiff claims is
21  more likely true than not.
22         That's the burden that the Plaintiff must
23  carry. If the Plaintiff fails in this carrying of the
24  burden of proof, then your verdict must be for the
25  Defendant.

Page 72

1         Now, you should note, or you have noted
2  that the Defendant, IBM, is a corporation. You should
3  not let -- you cannot let bias or prejudice or
4  sympathy play a part in your deliberations. Defendant
5  IBM is a corporation. Corporations are entitled to
6  the same fair trial as a private individual.
7         I'll repeat that.
8         You should not let bias, prejudice or
9  sympathy play a part in your deliberations. Defendant
10  IBM is a corporation. Corporations are entitled to
11  the same fair trial as a private individual.
12         Now, from time to time you may hear a
13  lawyer object to a particular question or the
14  introduction of an exhibit into evidence. If I
15  overrule the evidence, the question may be answered or
16  the exhibit may be received into evidence. If I
17  sustain the objection, then the question may not be
18  answered at that time, and/or the exhibit cannot be
19  received into evidence at that time.
20         If I sustain an objection to a question
21  or to the admission of an exhibit, you must ignore the
22  question and must not guess as to what the answer to
23  the question might have been. As already discussed,
24  you must not consider evidence that I've ordered
25  stricken from the record.

Page 73

1　　　　Now, gentlemen, do we have expert
2　witnesses in this case?
3　　　　MR. CARTA: Yes, Your Honor.
4　　　　MR. FASMAN: Yes, we do too, Your Honor.
5　　　　THE COURT: Okay. Thank you.
6　　　　Now, when knowledge of technical subject
7　matter may be helpful for the jury, a person who has
8　special knowledge or experience in that technical
9　field is what we call an expert. An expert is someone
10　who is permitted to state his or her opinion on those
11　technical matters. However, you are not required to
12　accept that opinion. As with any other witness, it is
13　up to you to decide whether to rely on it and how much
14　weight, if any, to give the testimony of an expert
15　witness.
16　　　　And of course as with any other witness
17　you may consider any evidence of unbiased, as well as
18　the data, the methodology and the reasons being used
19　in support of that opinion.
20　　　　As jurors you should not begin
21　deliberating or discussing this case among yourselves
22　or discussing the claims or the parties or the
23　witnesses until the trial has concluded and you have
24　been instructed more fully on the law.
25　　　　Second, do not talk with anybody else

Page 74

1　about this case or talk to anyone who has anything to
2　do with it until the trial has ended and you've been
3　discharged as jurors. Anyone else includes your
4　family and friends. Now, of course you can tell your
5　family and friends that you are a juror in a civil
6　case in the U.S. District Court, but avoid telling
7　them anything about the case until you have been
8　discharged. This is an instance where it's just
9　better for you to say to friends and spouses,
10　significant others, I just can't talk about it right
11　now, so let's leave it at that.
12　　　　Next, don't let anyone talk to you about
13　this case. If somebody should try to talk to you
14　about this case, please report it to me immediately.
15　　　　Do not read or listen to any coverage the
16　media may or may not give to this case. Do not
17　conduct any research of your own or any investigation
18　of your own.
19　　　　And finally, don't make up your minds
20　about the verdict and what it should be until after
21　you have been more fully instructed on the law and
22　have deliberated with your fellow jurors and have
23　discussed the evidence in the jury room. Keep an open
24　mind until you reach your decision.
25　　　　You will be permitted to take notes

Page 75

1　during the trial if you wish. My experience over the
2　years has been some jurors like to take notes, some
3　jurors don't take notes. If you do keep notes, take
4　notes, bear in mind that those notes that you take are
5　being taken to assist you. They are not evidence in
6　the case. Rather, they're to assist you in jogging
7　your memory of what you've seen or what you've heard
8　or what your thoughts are. But those observations
9　themselves are not evidence in the case.
10　　　　At the end of the day the clerk will
11　collect your notebooks and return them to you the next
12　morning. When the case is all over, they will be
13　collected by the clerk and destroyed in the normal
14　course of business.
15　　　　Now, at the end of the trial you're going
16　to have to make your decision based on what you recall
17　of the evidence. You will not have a transcript of
18　the testimony to consult, and it's difficult and
19　time-consuming to locate lengthy testimony in the
20　stenographer's notes, and then have the stenographer
21　read it back. So I urge you to pay close attention to
22　the testimony as it's being given. We will have no
23　transcript that you can look at and read, because at
24　transcript is generated at a much later date, if at
25　all.

Page 76

1　　　　Now, jurors are not permitted to ask
2　questions of the parties, the witnesses or the
3　attorneys. However, if you can't hear a witness or a
4　lawyer, just raise your hand, let me know, say I can't
5　hear, or speak louder, and we'll be able to deal with
6　it that way.
7　　　　The same is true with respect to the need
8　to take a break for matters of personal convenience.
9　I mean how long can people go without having to
10　stretch? If you reach a point where someone really
11　needs a break, just give me the time out signal, I'll
12　see it, and we'll take a break. No one here wants you
13　to be uncomfortable.
14　　　　Now, here's an outline that I try to
15　adhere to in all of my cases. We'll begin taking
16　testimony at 10 o'clock in the morning, and we'll
17　continue until 11:30 a.m., at which point we take a 15
18　minute break. We will resume about 11:45 and continue
19　until 1 p.m., at which time we will take a break for
20　lunch.
21　　　　Our lunch break will normally be from 1
22　to 2. Sometimes we might make it from 12:30 to 1:30,
23　or, you know, it's going to be in that area. We're
24　going to let a witness finish answering the question.
25　We're not going to curtail a witness's ability to

19 (Pages 73 to 76)

---

Page 77

```
 1   answer a question, if it can be answered relatively
 2   quickly, but that's the ballpark.  That's what we're
 3   shooting for.
 4           And we are hoping that if we go from 1 to
 5   2 for lunch, we'll begin promptly at 2 o'clock, we'll
 6   continue until 3:30, at which time we'll take a 15
 7   minute break.  Then at quarter to 4 we'll come back
 8   and we'll continue until 5 p.m.  The proceedings will
 9   end at 5 p.m.  The lawyer may finish asking a question
10   or a witness may finish answering a question, but many
11   of you have childcare concerns, familial
12   responsibilities, and 5:00 p.m. will mark the end of
13   your day.
14           And tomorrow you will report back to the
15   same room, and you have to be here by 9:45 at the
16   latest.  And we hope that there'll be coffee and some
17   sort of solid refreshment more nutritious than
18   chocolate chip cookies, yet less new industry
19   nutritious than oatmeal.  So you can pretty well count
20   on the day ending at 5 o'clock for you.
21           I want to say something about the day
22   beginning.  We're going to be beginning to take
23   evidence at 10 o'clock, but don't think that that's
24   when we're starting our day, because we start our day,
25   lawyers start their day, I start my day, much, much,
```

Page 78

```
 1   much before 10 o'clock.  I have other cases, the
 2   lawyers have work to do in this case, so we are
 3   putting our time to good use.
 4           Now, occasionally during the trial it
 5   might be necessary to take up more lengthy matters, in
 6   which case I may ask you to go back to the jury room
 7   while we discuss these legal issues, and perhaps our
 8   discussion of the legal issues will make the case move
 9   faster and more smoothly.
10           I'm now going to permit counsel to
11   conduct, or to deliver, I should say, opening
12   statements.
13           Mr. Carta, I call on you first, sir.
14           MR. CARTA:  Thank you, Your Honor.
15           Good afternoon.  Mr. Castelluccio and I
16   appreciate your willingness to participate in this
17   trial.  I know that for some of you it's a sacrifice.
18   And we really thank you for that.
19           I'm going to spend the next 15 to 20
20   minutes outlining the key points in our case in the
21   hope of trying to set a general framework for you to
22   understand once you start hearing the evidence.
23           As Judge Smith has already explained,
24   this is an age discrimination lawsuit.  The suit was
25   filed by James Castelluccio against IBM.  It is based
```

Page 79

```
 1   upon the conduct by a high-ranking executive at IBM,
 2   Ms. Collins-Smee.  Ms. Collins-Smee was Mr.
 3   Castelluccio's immediate boss.  He worked for her for
 4   about 17 months.
 5           This is not a simple case.  Civil rights
 6   violations such as age discrimination are not obvious.
 7   Often age discrimination is only revealed when an
 8   employer's conduct is scrutinized over a period of
 9   time.  It would be easier if this case were a TV drama
10   and I could tell you, you know, let's look at the
11   videotape or let's go to the definitive DNA test and
12   then we'll know the truth.
13           However, age discrimination is a mental
14   process.  Therefore, determining whether someone's
15   conduct is tainted by an age bias, you have to figure
16   out what was their motive, why did they do what they
17   did.  Sometimes that motive can be seen from their
18   overt conduct; as the Judge said, their direct
19   behavior.
20           More often than not age discrimination is
21   revealed in what a person fails to do.  It is shown by
22   the way a manager treats older employees differently
23   than the way they treat younger employees.
24           Age discrimination can be inferred from
25   the way a manager disregards accepted practices and
```

Page 80

```
 1   procedures.  And you'll see IBM has no short list of
 2   practices and procedures.
 3           Mr. Castelluccio did not and never asked
 4   for a guarantee of employment.  What he did expect and
 5   what he's legally entitled to is the right to work
 6   free from illegal age discrimination.  IBM had a
 7   bargain with Mr. Castelluccio.  It got from him a
 8   willingness to work 12-hour days, sometimes seven days
 9   a week, a commitment that Mr. Castelluccio honored for
10   40 years, a commitment that produced for IBM from Mr.
11   Castelluccio and his team tens of millions of dollars
12   annually, a commitment that Mr. Castelluccio willingly
13   made.  In exchange Mr. Castelluccio was assured that
14   he would be evaluated based upon his performance, not
15   his age.
16           You are likely to hear from IBM about its
17   slogan, "Your career is your responsibility."  You
18   will learn that Mr. Castelluccio had an exceptional
19   career at IBM.  He started at the very bottom, entry
20   level position.  He rose to the level of vice
21   president.  How did he do that?  As a result of
22   talent, hard work, and incredible commitment.
23           In his 40 years at IBM Mr. Castelluccio
24   trusted that he would be judged based upon objective
25   criteria, based upon the merit of his performance.
```

Page 81

1  Throughout his career he took responsibility for
2  improving his skills. He advanced his career by
3  taking on greater and greater jobs with more and more
4  responsibility, and he was fairly rewarded for his
5  work. That is, until Ms. Collins-Smee became his
6  boss.
7      At one level Mr. Castelluccio's case is
8  about an employee who spent 40 years learning and
9  living by a set of values only to be betrayed,
10  betrayed by Ms. Collins-Smee who never saw beyond the
11  60 year-old vice president she inherited as part of
12  her recent promotion.
13      He was the oldest of eight -- of her
14  eight vice presidents, a lifetime worker who had
15  wanted to continue to work and who doggedly refused to
16  crumble under the pressure of an impossible mountain
17  of work that she had assigned to him, a mountain of
18  work that had already forced into retirement a highly
19  skilled peer.
20      Mr. Castelluccio, if he can be criticized
21  at all, it's over how long it took him to come to
22  realize that Ms. Collins-Smee was playing by an
23  entirely different set of rules. As IBM will
24  emphasize in its cross-examination, in some ways it is
25  remarkable that it took Mr. Castelluccio as long as it

Page 82

1  did to realize that he was being treated differently
2  because of his age. I would submit to you that Mr.
3  Castelluccio's reluctance to realize what was going on
4  is actually evidence of the extent to which he
5  believed IBM would not tolerate age discrimination.
6      Mr. Castelluccio and I are simply asking
7  you to listen carefully, to listen thoughtfully to the
8  evidence. We will establish through evidence of Ms.
9  Collins-Smee's overt behavior and to what she failed
10  to do that she engaged in a 17-month campaign, a
11  campaign to demoralize, overwork, isolate, and then
12  ultimately to dismiss Mr. Castelluccio.
13      Mr. Castelluccio will testify about the
14  overt acts Ms. Collins-Smee -- that demonstrated her
15  age bias. He will tell about how she began to ask him
16  in their very first face-to-face meeting, she began to
17  ask him his age, and then she caught herself
18  mid-sentence and said, oh, and then she answered her
19  question, oh, you're old enough to bridge to
20  retirement, right?
21      Although Mr. Castelluccio was eligible to
22  retire at 60, Ms. Collins-Smee admits that he told her
23  that he had no interest whatsoever in retiring. He
24  felt that he was on the top of his game, and he wanted
25  to continue to work at IBM. He liked it there. It

Page 83

1  was his life.
2      Nevertheless, Mr. Castelluccio will tell
3  you how Ms. Collins-Smee unilaterally raised the
4  question of his retirement on two more occasions in
5  the brief 17-month period she worked -- he worked for
6  her.
7      Another overt act of Ms. Collins-Smee
8  that reveals her age bias is her assignment of him to
9  one of the most troubled contracts in IBM's entire
10  outsourcing business. The contract was between IBM
11  and a large healthcare company known as Wellpoint.
12  You'll hear a lot about Wellpoint.
13      Ms. Collins-Smee is likely to tell you
14  that she assigned Mr. Castelluccio to the Wellpoint
15  account in order to give him an opportunity to
16  demonstrate his turn-around -- his ability to turn
17  around troubled accounts.
18      Please keep in mind that both of the
19  predecessors of IBM in the same position had been
20  unsuccessful at turning around the Wellpoint account.
21  And also the magnitude of the problems on that
22  account. IBM's own experts who came in and
23  objectively assessed the problems with the account
24  estimated that they would lose $40 million, $40
25  million in one year.

Page 84

1      Also listen carefully to the evidence of
2  the other responsibilities Ms. Collins-Smee piled on
3  Mr. Castelluccio at the same time he was being put
4  into the position that the two prior -- his two
5  predecessors had been unsuccessful at.
6      Please also reflect on the fact that when
7  Ms. Collins-Smee assigned Mr. Castelluccio to his
8  position, she never followed the stated procedures,
9  which is to introduce the new employee to the client,
10  have them get to know each other and get a certain
11  rapport. That was the standard procedure, and that
12  did not happen here.
13      More importantly, Ms. Collins-Smee
14  presented a parade of other candidates to Wellpoint
15  for the same position that Mr. Castelluccio had been
16  assigned to, a parade of candidates that continued
17  even after she told Mr. Castelluccio, this is your
18  job.
19      Also keep in mind that she did not
20  disclose to Mr. Castelluccio while he was in that
21  position that this parade of candidates to the client
22  was going on behind his back.
23      Ms. Collins-Smee's age bias towards Mr.
24  Castelluccio is also apparent in what she failed to
25  do. Mr. Castelluccio will testify that Ms.

Page 85

1    Collins-Smee repeatedly kept him in the dark about
2    decisions that she was making with respect to his
3    career, decisions that would ultimately end his
4    career.
5         You will hear Mr. Castelluccio explain
6    that Ms. Collins-Smee did not disclose to him for four
7    months, four months, her first decision to replace him
8    in his position as vice president, a decision she had
9    made within days of when she first met him face to
10   face.
11        Later when she removed him from his
12   second position and gave him no new work, she waited
13   for over two months after she had chosen his
14   replacement. All of that time he could have been
15   looking for other work, he could have been exploring
16   other opportunities. He didn't know it. He didn't
17   know the decisions had been made behind his back.
18        Mr. Castelluccio will also explain how
19   IBM's confidential system for placing executives in
20   new positions works. The system is known as the
21   5-minute drills. They're basically -- 5-minute drills
22   are basically the name of a document and an event.
23   When IBM has a new opening, they want to let a certain
24   number of executives know about that opening, or if
25   they have some executives available, they want to let

Page 86

1    other executives know about that availability.
2         But all of that information is
3    confidential. It's not like the regular jobs at IBM
4    that are posted. These jobs are only known within a
5    certain sector of people, only the people who are
6    participating on the 5-minute drill, and that's why
7    it's so critical for executives at Mr. Castelluccio's
8    level to be able to participate in that drill and to
9    have someone there to be his advocate.
10        You will see from the documents, the
11   5-minute drill documents themselves, how Ms.
12   Collins-Smee failed to use the system to assist Mr.
13   Castelluccio to find a new position at IBM. With
14   respect to the few instances in which she did provide
15   him with some assistance, please take note that they
16   occurred in two instances only weeks before he was
17   fired. Read the two non-committal transmittal letters
18   that she sent to her colleagues. The letters
19   themselves, it's very clear that she had not even
20   called her colleagues before sending along the
21   information about Mr. Castelluccio. By any standards
22   these two letters do not qualify as recommendations.
23        Ask yourself if hers is the conduct of a
24   manager who is really trying to assist one of her
25   executives to locate a new position. Is she really

Page 87

1    trying to help him find a job, or is this the
2    conduct -- is this conduct more consistent with the
3    behavior of a manager looking to create the appearance
4    of trying to help someone, and even at that, at the
5    very eleventh hour, the conduct of someone with her
6    own agenda.
7         In addition to Mr. Castelluccio's
8    testimony we are calling Mike Morin to testify. Mike
9    Morin is the IBM executive who Mr. Castelluccio
10   replaced on the Wellpoint account. He will explain in
11   more detail -- in somewhat more detail the situation
12   into which Ms. Collins-Smee placed Mr. Castelluccio.
13   Mr. Morin will provide important background so that
14   you can evaluate for yourself the merits of the
15   criticism that was later pointed at Mr. Castelluccio
16   for his performance in that job.
17        IBM's placement of Mr. Morin in a new
18   position after he resigned from Wellpoint is also the
19   best evidence of the way it's supposed to be done, the
20   way Mr. Morin ultimately attained new work is the way
21   executives are supposed to be placed at IBM.
22   Therefore, please compare the way IBM treated Mr.
23   Morin with the way Ms. Collins-Smee treated Mr.
24   Castelluccio, a dramatic contrast.
25        We next intend to call Ms. Collins-Smee

Page 88

1    to the stand. She does not dispute that she raised
2    the issue of Mr. Castelluccio's retirement in at least
3    one conversation. She even admits that he made it
4    perfectly clear to her that he wanted to continue to
5    work.
6         She cannot contest the fact that within
7    six days of their first face-to-face meeting with Mr.
8    Castelluccio she sent an e-mail to her HR executive
9    stating, quote, we need to replace Jim, nor can she
10   distance herself from her admission in this same
11   e-mail, quote, I need to get him on Pat Karin's
12   5-minute drill. That's something she failed to do not
13   for one month or two months, but for seven months.
14   Seven months after she made the decision and said I
15   need to get him on Pat Karin's drill, she didn't do
16   it.
17        And try as she might, she cannot explain
18   away the operative fact that at the end of 2007 she
19   engaged Mr. Castelluccio in IBM's formal evaluation
20   process. It's called a PBC process, and you'll hear
21   quite a bit about that, and you'll have a good
22   understanding of the formality and legitimacy of it
23   and the importance of it.
24        After some discussion and some
25   deliberation with Mr. Castelluccio, she made a final

Page 89

1    determination that Mr. Castelluccio was a solid
2    contributor, and therefore she rated him a 2. You
3    will see her trying as hard as possible to get away
4    from what she did. At the time she rated him a 2.
5         Finally, given IBM's rigorous training of
6    its managers, Ms. Collins-Smee cannot claim that she
7    did not know her discriminatory treatment of Mr.
8    Castelluccio was illegal. That's the willfulness
9    issue that you'll need to decide at the end of the
10   trial. Again, given IBM's rigorous training of its
11   managers which they will not deny, Ms. Collins-Smee
12   cannot claim that she did not know her discriminatory
13   treatment of Mr. Castelluccio was illegal.
14        Our fourth witness is Dr. Gary Crakes.
15   Dr. Crakes is an economist. He will share with you
16   his calculation of Mr. Castelluccio's economic loss.
17   This calculation is based upon a number of
18   conservative assumptions. For example, when he did
19   the calculation he assumed that there would be no
20   increase in Mr. Castelluccio's raises. He just
21   flat-lined it assuming that he would get the same
22   salary for the whole period of time.
23        Our final witness is Kelton Jones.
24   Mr. Jones is one of the founders of IBM's outsourcing
25   business and is not retired. Before retiring he was

Page 90

1    the general -- he was a general manager at IBM and Mr.
2    Castelluccio's supervisor.
3         Among other things, Mr. Jones will
4    testify about IBM's confidential 5-minute drill, how
5    it's supposed to be used, how he used it, and how it's
6    used to get executives new positions.
7         Mr. Jones will also discuss IBM's
8    performance review procedure, IBM's management
9    training regarding age discrimination, and Mr. Jones
10   will share with you his assessment of Mr.
11   Castelluccio's job performance, his reputation and his
12   qualifications for jobs that became available while
13   Mr. Castelluccio was relegated to what's called the
14   bench, jobs that Ms. Collins-Smee chose not to
15   disclose to him, didn't tell him that they were open.
16        Mr. Jones will also testify about the
17   transition of his position to Ms. Collins-Smee. Ms.
18   Collins-Smee came in and stepped into his shoes when
19   Mr. Jones retired.
20        Finally, Mr. Jones will address the
21   question of whether Ms. Collins-Smee's placement of
22   Mr. Castelluccio on the bench and her lack of support
23   for him once there, whether that was consistent with
24   past practices and procedures at IBM.
25        Just a moment to go through the rest of

Page 91

1    what we expect to happen. We have been informed that
2    IBM intends to call six of its current employees as
3    witnesses. We expect that they will present evidence
4    of the extensive problems at Wellpoint and that
5    they'll try to attribute those problems to Mr.
6    Castelluccio.
7         When listening to these witnesses there
8    are three things that I'd like to have you keep in
9    mind, one of which I've already discussed, which is
10   that Mr. Castelluccio's final formal review, the one
11   he received from Ms. Collins-Smee, she awarded him a
12   2, which is a solid -- which means solid performance.
13   Despite what IBM's witnesses may tell you now, before
14   Mr. Castelluccio complained of age discrimination Ms.
15   Collins-Smee only gave him a favorable rating but she
16   voluntarily praised his performance in the overall
17   performance section of her evaluation, and we'll read
18   that to you. Significantly, you will also learn that
19   Ms. Collins-Smee's boss affirmed the decision,
20   affirmed her decision that Mr. Castelluccio deserved a
21   2 rating.
22        Second, you will hear extensive evidence
23   about one specific contract, that's the Wellpoint
24   contract. And Mr. Castelluccio had two different
25   relationships with the Wellpoint contract. Wellpoint,

Page 92

1    IBM will admit, as it must, that it was a deeply,
2    deeply troubled account, that no one person was able
3    to turn around quickly. Each of the various people
4    assigned to that contract definitely made progress,
5    and we'll talk to you about that, but it wasn't
6    something that one person could turn around.
7    Particularly without adequate support.
8         Please keep in mind that most of the time
9    Mr. Castelluccio was involved with the Wellpoint
10   account, Wellpoint was only one -- only one of 30
11   different contracts that he was responsible for. That
12   changed in the end, but initially it was only one of
13   the 30 contracts he was responsible for.
14        The third thing I want you to keep in
15   mind is we want you to take note of the multiple
16   responsibilities assigned to Mr. Castelluccio in the
17   three-month period when he was first assigned to take
18   Mike Morin's position on Wellpoint. That critical
19   three-month period is significant. Keep in mind that
20   during that period Mr. Castelluccio was not only still
21   holding down his responsibilities as vice president,
22   but he had those in addition to the responsibilities
23   of Mike Morin, the person who was crushed by the work
24   and actually quit.
25        In a rare moment of candor one of Ms.

Page 93

1    Collins-Smee's peers, a peer who fully understood the
2    magnitude of the problems on the Wellpoint account,
3    states in an e-mail to her that the multiple
4    responsibilities she is heaping on Mr. Castelluccio
5    will, and I quote, cause him to implode.
6            At the appropriate time the parties will
7    also -- have also agreed to have certain deposition
8    testimony read to you from three IBM employees.  This
9    testimony will focus on the understanding of these
10   employees with respect to IBM's internal practices and
11   procedures.
12           So in conclusion, IBM is certain to tell
13   you this is a simple case.  Although IBM's witnesses
14   may testify at length about their view of Mr.
15   Castelluccio's performance on the Wellpoint contract,
16   IBM would be pleased to have you consider Ms.
17   Collins-Smee's conduct only in the last six months
18   before she fired Mr. Castelluccio.  That was the time
19   during which he was put on the bench, with no work to
20   do.
21           We will demonstrate to you that even in
22   this six month period her age bias is apparent.  She
23   not only removed him from one full-time position and
24   failed to place him in another position, but she
25   provided him with no temporary work.  Rather than

Page 94

1    that, she just put him on the bench, said find a job
2    if you can.  Once on the bench she isolated him from
3    his peers and kept him in the dark about scores of
4    open executive positions that she knew about and he
5    had no access to.
6            The principal question you'll be required
7    to answer is why did Ms. Collins-Smee fire Mr.
8    Castelluccio after a successful 40 year career?  Why
9    did she do it?  Mr. Castelluccio will tell you that
10   Ms. Collins-Smee was motivated by age discrimination.
11   When Mr. Castelluccio informed Ms. Collins-Smee that
12   he had no interest in retiring, the evidence will show
13   that Ms. Collins-Smee waged a 17-month campaign
14   against him designed to push him out the door because
15   she thought he was too old to work.
16           Ultimately she was able to relegate him
17   to the bench without a position in order to isolate
18   him from his peers and his contacts.  Once he was
19   isolated and left with no work to do, she terminated
20   him, claiming he was being terminated for not having a
21   position.  A situation she herself had created.
22           Please think critically about the
23   justification IBM now gives for firing Mr.
24   Castelluccio, that justification being they couldn't
25   find a job for him.  The evidence will show that not

Page 95

1    only is IBM's explanation implausible, but it has
2    changed over time, and that's significant.  When
3    somebody does something like age discrimination, they
4    look for whatever reason they can, whatever
5    justification they can.  The evidence will show that
6    not only is IBM's explanation implausible, as I said,
7    but it changed.
8            Initially IBM sought to justify Ms.
9    Collins-Smee's conduct by claiming that Mr.
10   Castellucio's performance was the reason he was
11   fired, it was performance.  Most recently IBM has
12   changed its position.  Why?  Because the evidence will
13   show that up to and including the year he was
14   terminated Mr. Castelluccio never received a negative
15   performance review.
16           Although Mr. Castelluccio was not able to
17   turn around the Wellpoint account overnight, he and
18   his team met key performance milestones and were well
19   along the way to bringing Wellpoint to a break even
20   situation.
21           Despite the time that IBM will spend
22   showing what it believes is evidence of Mr.
23   Castellucio's poor performance, in the end, in the
24   end it will not say that performance was the reason
25   Mr. Castelluccio was fired.  Instead, IBM will try to

Page 96

1    convince you that Mr. Castelluccio was fired simply
2    because it couldn't find him a job.
3            You'll hear evidence of procedures IBM
4    uses to place its executives, and you have to ask
5    yourself, is it likely that a 40-year veteran who had
6    previously held many different executive positions
7    across many of IBM's different industries, why IBM
8    could not find him a place anywhere?  Does that make
9    sense?
10           When you hear evidence of how overworked
11   and stressed IBM executives were in this specific
12   business, in their outsourcing business at the time,
13   ask yourself, does it make sense that Ms. Collins-Smee
14   fired him because there was no work for Mr.
15   Castelluccio to perform?  Or was there some other
16   reason?
17           In deciding what was really driving Ms.
18   Collins-Smee's agenda, we ask one thing, scrutinize
19   what you hear carefully.
20           Thank you very much
21           THE COURT:  Thank you, Mr. Carta.
22           Mr. Fasman.
23           MR. FASMAN:  Ladies and gentlemen, good
24   afternoon.  Thank you also for agreeing to sit in in
25   case and to be fair and impartial in judging these

Page 97

1   issues.  As I said earlier, my name is Zack Fasman.
2   I'm joined at our trial table by my partner Todd
3   Duffield, and next to Mr. Duffield is Ms. Collins-Smee
4   herself.  We're privileged to represent IBM, one of
5   America's truly great companies.
6           This is an age discrimination case, and
7   what you will eventually be asked to decide is whether
8   Mr. Castelluccio was terminated because he was 60
9   years old at the time.  He and his counsel, Mr. Carta,
10  have the burden of convincing you that he was
11  terminated because of his age, that he would not have
12  been terminated if he'd been younger.
13          So what I would simply ask you to do, as
14  you hear the evidence in this case, is to ask
15  yourself, does this prove age discrimination?  Does
16  this show that he was treated this way because of his
17  age?  Because at the end of the trial when you go back
18  into the jury room to deliberate, that's the question
19  you are going to have to answer.
20          Now, this is a somewhat unusual age
21  discrimination case because Mr. Castelluccio admitted
22  that no one at IBM, except for Ms. Collins-Smee, ever
23  said or did anything to him that made him believe they
24  were biased because of his age.  No one.  There were
25  no adverse age references, no improper comments,

Page 98

1   nothing.
2           And even with regard to Ms. Collins-Smee,
3   he admits that she never told him that he was too old
4   to do the job, that he was getting long in the tooth,
5   or even that he should retire, much less ever calling
6   him an old man.  There was none of that.  You will
7   hear no age bias remarks at all here.
8           Now, the reason for that is that IBM
9   tends to be a pretty mature place.  IBM is not
10  Facebook.  It's a hundred years old.  And at the
11  executive level one almost never finds anyone in their
12  thirties.  In fact, almost all of the people involved
13  in this case are 50 years old or older.
14          Ms. Collins-Smee was 50 when she made the
15  decision to remove Mr. Castelluccio from two
16  positions.  She filled one of those positions with
17  Miguel Echavarria, who at the time was 49 years old.
18  She pulled him out of the other position and filled
19  the second one with Gordon Crawford, who was 59 years
20  old.  Mr. Castelluccio was 60 years old.  That's
21  hardly evidence of a youth movement.
22          Mr. Castelluccio claims that Ms.
23  Collins-Smee brought up retirement as an option for
24  him in three conversations during the 18-month period.
25  She denies making those comments as he claims, but

Page 99

1   those comments should not be relevant to your
2   decision.  It's not illegal for an employer to ask an
3   employee whether he wishes to retire.  It's done every
4   day, when an employee gets close to reaching his
5   retirement age.
6           Mr. Castelluccio admitted himself during
7   his deposition it wasn't forbidden to discuss
8   retirement as an option with an individual who was
9   eligible to retire.  And Mr. Castelluccio admitted,
10  again in sworn testimony, that Ms. Collins-Smee never
11  said, You ought to retire, or, I want you to retire.
12  It was only, according to him, Retirement is an option
13  if you wish.
14          And according to him, again, these
15  comments were made at three separate points.  We don't
16  agree with this, but even taking him at his word, they
17  were made in February 2007, ten months later in
18  November 2007, and five months after that in March
19  2008.  That's it.  Retirement is an option if you
20  wish.  And that's their evidence of age
21  discrimination, and that's the basis for which Mr.
22  Carta says she was involved in a 17-month campaign to
23  eliminate him from the workplace.
24          Even if you believe their version of
25  events, which we don't think you should, three

Page 100

1   references to retirement during 18 months does not
2   prove that his age had any connection with his
3   termination in June 2008.
4           Mr. Castelluccio also alleges that in
5   their first meeting in February 2007 she started to
6   ask him how old he was, said how old, and then stopped
7   herself before saying that.  Ms. Collins-Smee denies
8   that completely.  She will testify that she never
9   asked an employee how old he was.
10          And Mr. Castelluccio, although he will
11  get on the witness stand and tell you he was shocked
12  by her comment, didn't report it to human resources at
13  the time.  He knew how to report a problem if he
14  wanted to report a problem.  But he didn't go to human
15  resources or register any complaint at all about what
16  he was shocked about.
17          He did, in fact, file an interim
18  complaint of discrimination, but not until a year and
19  a half later.  A year and a half later, and only after
20  he had been told that if he didn't find a job for
21  himself in the next month, his employment would be
22  terminated.
23          As to that complaint of discrimination,
24  the parties have stipulated, it was investigated by
25  IBM under IBM's well-established appeals process.  You

Page 101

1  will hear from Russ Mandel, who runs IBM's internal
2  appeals process, about his investigation.
3      But as I say, even if she started to ask
4  him his age back in February 2007, that's not proof of
5  anything unlawful. Congress never said that no one
6  can ask anyone about their age, and there are a
7  million different reasons why that might have been
8  said.
9      But the whole point is, he was terminated
10  in June of 2008. This comment was made supposedly in
11  February of 2007, 18 months earlier. Those things
12  aren't linked up.
13      Now, I've said repeatedly, and I'll say
14  again, this is about his termination in June of 2008.
15  He will introduce evidence about his being removed
16  from two positions in 2007. One, from the initial
17  position he held when Ms. Collins-Smee took over, vice
18  president of Public Sector division, and then he was
19  placed on the Wellpoint account, which we started to
20  talk about, and he was removed from that at the end of
21  2007.
22      Mr. Castelluccio did not challenge those
23  removals at the time. The Court has held that those
24  removals can't be challenged in this case. So again,
25  I say what's before you is his termination in 2008.

Page 102

1  These two things happened in 2007, and the issue
2  you'll have to decide is the later termination, but
3  not these.
4      But these are relevant as background, and
5  as background, Mr. Castelluccio's claim that you'll
6  hear that he was removed from these jobs improperly is
7  absolutely untrue. We have and you will see literally
8  dozens of written complaints about his performance in
9  both positions from people who he has admitted were
10  not biased against him because of his age. Many of
11  these complaints were made well before Joanne
12  Collins-Smee ever became his supervisor.
13      In fact, his principal internal client in
14  his first position as vice president of Public Sector
15  division, David Liederbach, who will testify before
16  you, told Mr. Castelluccio's prior supervisor, Mr.
17  Jones, who you've heard about, in 2006 he said to Mr.
18  Jones, You need to replace Mr. Castelluccio, he is not
19  doing the job, he said repeatedly. You'll see it in
20  writing. He talked to Mr. Castelluccio about it, what
21  he was doing wrong.
22      And that was many months before Ms.
23  Collins-Smee ever showed up. And when she did show
24  up, Mr. Liederbach went to her and said listen, you
25  need to replace Mr. Castelluccio, this is not working,

Page 103

1  please do so.
2      You'll see and hear from witnesses who
3  would tell you that Mr. Castelluccio was not
4  responsive. He didn't follow through on things that
5  he had committed to do. He was not visible to
6  clients. He was removed from the first position, as I
7  say, as the vice president of the Public Sector
8  division, and then a job came up on the Wellpoint
9  account.
10      Mr. Carta has said, oh, the Wellpoint
11  account was a troubled account. It was a troubled
12  account. It was a difficult account for IBM, no
13  question about that. But it was not an impossible
14  account.
15      The reason it was not an impossible
16  account is that Mr. Castelluccio, who was ultimately
17  replaced on that account at the end of 2007 by Gordon
18  Crawford, who as I said was 59 years old at the time
19  to his 60 years old, Mr. Gordon Crawford came in, he
20  fixed the account. WellPoint's a great account for
21  IBM.
22      Gordon Crawford put his nose to the
23  grindstone and got it done. He did it himself. And
24  you'll hear it. You'll meet Mr. Crawford. You'll
25  hear what he did. You'll hear from people that know

Page 104

1  the account what he did. It wasn't impossible. It
2  was tough, no question about it, but this was not
3  something that Mr. Castelluccio couldn't have done if
4  he had wanted to do it.
5      And as to his initial assignment to that
6  account, he claims that he was a specialist in
7  troubled accounts, and you'll see him say that to
8  various people. I asked him during his deposition, I
9  said, If you had this open account and you were
10  sitting in Ms. Collins-Smee's shoes and you had a
11  specialist in troubled accounts available, wouldn't
12  you assign yourself to this account? And he said,
13  That would have made sense. So I don't understand how
14  his assignment to this account is proof of anything
15  other than a sensible business decision.
16      I said when I started this opening
17  statement that I was privileged to represent IBM, and
18  here's one reason. Why after being pulled off of
19  these two positions IBM did not fire Mr. Castelluccio?
20  Instead of terminating Mr. Castelluccio they gave him
21  six full months at full executive pay, full executive
22  benefits, to try to find himself a new position within
23  the organization. Six full months to find something
24  else.
25      Ms. Collins-Smee agreed to assist him in

26 (Pages 101 to 104)

Page 105

1    this search, and she did just that. She put him on
2    executive placement drills. She listed him as a
3    person to move. She recommended him to colleagues and
4    sought out positions for him. She will testify as to
5    what she did, and so will Mr. Holmes.
6         In fact, you heard Mr. Carta talk about
7    his personal business commitment ratings performance
8    evaluation where she evaluated him as a 2, a solid
9    performer. She actually called him, Mr. Castelluccio,
10   and said Jim, I think I have to give you a 3 because
11   you didn't do well this year, and he complained and
12   said, You shouldn't really do this, and she thought
13   about it, and you'll hear her testify to this effect,
14   that he was at that time looking for another position,
15   that if she gave him a 3 he'd have even more
16   difficulty finding another position, so she gave him a
17   2.
18        Now, he claims she should have done more
19   for him, put him on more drills, gone to more
20   colleagues. She'll testify as to exactly what she
21   did. But as Mr. Carta said, there is a saying at IBM,
22   which is, "Your career is your responsibility."
23   You're in charge of your career. Mr. Castelluccio was
24   responsible for using his own networks, developed over
25   40 years, to knock on doors, to meet with people he

Page 106

1    knew at IBM, and to find himself another position
2    within the organization. Instead, as he testified
3    during his deposition, he took more time off during
4    this six months that he was supposed to be finding a
5    job than he ever took while he was at IBM. And you'll
6    also see he was looking for jobs outside IBM at the
7    same time.
8         But the most important thing, and the
9    thing I would ask you to bear in mind, it was not Ms.
10   Collins-Smee's job, but his, to locate another
11   position. That's the way IBM works. And IBM had
12   given him five months, full pay, full benefits, no
13   responsibilities, to find a new position.
14        Ms. Collins-Smee met with him and told
15   him he had one month to find another position, and if
16   not, IBM would have to let him go. And that's what
17   happened. He didn't find another position within the
18   month. He retired. He's been receiving his full
19   retirement benefits, which he continues to receive,
20        Now, if they could show that IBM treated
21   younger employees more favorably in this whole
22   process, that might be proof of age discrimination,
23   but there's no evidence of that. There's no evidence
24   that anyone younger was treated any better than he was
25   throughout this process.

Page 107

1         And even Mr. Castelluccio when I asked
2    him, do you think six months was a reasonable period
3    of time to find a new position, he said yes.
4         At the end of the day, IBM terminated him
5    after a full six months with full pay and benefits,
6    searching for a new job at IBM with no success, and I
7    submit to you that's not age discrimination, but it
8    was fair and generous treatment.
9         So let me in closing just urge you again
10   as you listen to the evidence, listen for evidence of
11   age discrimination. We're confident that at the end
12   of the day, having listened carefully for such
13   evidence you'll conclude there wasn't any.
14        Thanks very much.
15        THE COURT: Thank you, Mr. Fasman.
16        Mr. Carta, call your first witness.
17        (James Castelluccio, sworn by the clerk)
18        THE CLERK: Please state your name for
19   the record.
20        THE WITNESS: James Castelluccio.
21        THE CLERK: Your city and state where you
22   live, please.
23        THE WITNESS: Stamford, Connecticut.
24        THE COURT: Mr. Castelluccio, don't be
25   bashful at all about moving that microphone up so it

Page 108

1    gets close to you. That's not the greatest microphone
2    in the world but it's the best that we have.
3         Okay, Mr. Carta.
4
5         DIRECT EXAMINATION BY MR. CARTA:
6
7    Q  Deep breath. Ready to go?
8       Why did you bring this lawsuit?
9    A  I brought it because I felt I was fired by IBM
10   because of my age, age discrimination.
11   Q  And when did you start working at IBM?
12   A  Started in March of 1968.
13   Q  And for how many years did you work there
14   before you were terminated?
15   A  40 plus years.
16   Q  And your termination was effective June 30 of
17   2008?
18   A  That's correct.
19   Q  And what was your age at the time you were
20   dismissed?
21   A  I was 61.
22   Q  And at what age did you hold -- what age had
23   you planned to retire?
24   A  I hadn't thought of it at that time. It would
25   be 65, 66 would be the age. Still had some family at

Page 109

1  home, so my expectation was that would be the age I
2  would retire.
3      Q    And what was the highest position that you
4  held at IBM?
5      A    I had reached the vice president level.
6      Q    And would you describe your responsibilities,
7  the ones that you held when you were vice president?
8      A    There are two positions as vice president.
9  One was running IBM's largest commercial contract,
10 Wellpoint.
11     Q    Very end.
12     A    Very end I was vice president Public Sector.
13     Q    And how many people reported to you directly?
14     A    I was managing the workload --
15     Q    Directly or indirectly.  I'm sorry.
16     A    I was managing the workload of about 2,500
17 people.
18     Q    2,500?
19     A    Yes.
20     Q    And do you recall what your compensation
21 package included as a vice president of Public Sector
22 at IBM?
23     A    At that position it was your base salary, your
24 annual incentive, which was more or less a bonus,
25 stock options, particularly retention stock options,

Page 110

1  IBM contribution to W-2, and so forth.
2      Q    I'd like to -- before we proceed through your
3  career and education I want to just step aside for a
4  moment and talk about the evaluation procedure so that
5  when we get to talk about your evaluations we'll have
6  it in some context.
7           Does IBM have an annual evaluation procedure
8  that it uses?
9      A    Yes, it does.
10     Q    And how frequently are its employees rated?
11     A    It's a requirement.  Every employee is
12 required to be evaluated once a year annually.
13     Q    Every employee at every level?
14     A    All 450,000 IBMers, it's all full-timers are
15 required to be evaluated, go through evaluation.
16     Q    And what is that procedure called?
17     A    Personal business commitment.
18     Q    So the acronym is PBC?
19     A    Yes, it is.
20     Q    Were you evaluated -- how would you
21 characterize the PBC process?
22     A    It was a very formal process, and it was like
23 the -- I could describe the process, but it was a very
24 rigid process that was like the major point of salary
25 increase, promotions, and so forth.  So it was very

Page 111

1  formal and very well-monitored by human resources and
2  tracked.  All managers must report on it.
3      Q    And take a look at Exhibit 1.  What is Exhibit
4  1?
5      A    This is the manager's -- I believe it's the
6  manager's manual.  It's actually a website -- must be
7  a ScreenScape off a website of IBM's PBC commitment.
8  So it's a manual about the various steps you have to
9  go through and how you document the procedure and
10 actually go through the formal evaluation.
11     Q    And were you responsible for completing the
12 PBC reviews of the employees who work for you?
13     A    Absolutely.
14     Q    And what training did you receive in
15 connection with that process?
16     A    It evolved over my years in management, but it
17 starts with formal management training about PBCs.
18 You do role playing, and so forth, so you understand
19 what are the different aspects of it and how do you
20 set goals, and so forth.
21          On an annual basis we have to go through an
22 annual educational process.  I think most recently
23 when I left it was a web access of training, so you
24 went through that formal training on an annual basis.
25     Q    And you were held responsible for maintaining

Page 112

1  adherence to the manual?
2      A    Absolutely.
3      Q    And are there steps that you're supposed to
4  follow?
5      A    Yes, there are.
6      Q    And what are those?
7      A    In the beginning of the year, assuming you're
8  just starting off the year, generally in the February
9  time frame, January, February, is when we're required
10 to do it, you have to set goals and objectives for
11 your employees, something you should measure them on
12 through the balance of the next following 12 months.
13          Generally those objectives are -- factors that
14 go into that is you have certain things you're
15 supposed to be performing in your business unit, your
16 particular department, your area.  Those are built
17 into the set of objectives that are put together.  The
18 manager and their employee must agree on those
19 objectives.  And that starts to trigger for the
20 evaluation period to occur.
21          So it's done very early in the beginning of
22 the year.  It's tracked.  We have to report whether
23 we've completed all of these goal settings across our
24 employees.  So it's very -- I know I'm repeating
25 myself here, but it's a very formal and very tracked

Page 113

1    process, because it's so important.
2       Q   And the criteria upon which you're evaluated,
3    are they subjective, objective?
4       A   Well, they evolve to very objective, because
5    we wanted to take the subjective part out of it so
6    there would be less disagreement at the end of the
7    year when you're being evaluated between the employee
8    and manager.
9       So we were setting measurable results. And
10   particularly in the area that I was in, there were
11   measurements. And it said that, for example, you may
12   have to reduce cost in your unit by X percent, and you
13   will be given a percentage that you have to reduce it,
14   and at the end of the year it's very simple to do the
15   scoring on that to say you met it, you didn't meet it,
16   you overachieved, you did some, and then you can
17   calculate how the person's evaluated based on that.
18      Q   And at the conclusion of the procedure, you've
19   established your goals, then you document your
20   results, what's the third step, what's the final step?
21      A   Actually if I can go back to the document in
22   part, because during the year you're executing against
23   these goals you and your manager have agreed to, and
24   it's a document, so you can refer back to it if you
25   lose track. So during the year you're being measured

Page 114

1    on that.
2       At the end of the year before you have your
3    meeting with your manager to sum up your year, how you
4    performed, the employee puts together a set of what
5    they feel they've accomplished against those goals.
6    So you actually summarize your activity for those 12
7    months, the things you did, that you were successful,
8    how successful, and so forth, and then that's
9    forwarded to your manager. So your manager has been
10   observing you during the year to see how you're
11   performing, and making your own judgment now you're
12   assisting by providing your input into that, and
13   seeing how you perform.
14      Q   And what does that all funnel down -- what's
15   the conclusion at the end?
16      A   When it's all crunched together, you then meet
17   with your manager, and they determine how well you did
18   against that criteria. So they evaluate you, and they
19   give you a formal rating on how you did.
20      Q   What impact, if any, does an employee's PBC
21   rating have on that employee's compensation in the
22   future?
23      A   Oh, it's like the major measurement on how you
24   deal with that. Dollars are allocated to the business
25   unit. They take a look at how individuals perform and

Page 115

1    then the allocation of those dollars across those
2    individuals based on their performance.
3       Q   What impact, if any, does it have on an
4    employee's long-term career at IBM?
5       A   It's very important. I mean not only salary,
6    which is an immediate, but also career-wise, because
7    people look at and will ask how an individual is
8    evaluated, what -- we use numerical numbers, but what
9    was he rated, what was that person rated, when you're
10   considering looking at candidates to fill a position,
11   so you're looking across all the candidates and what
12   their ratings were so you kind of get a calibration of
13   how well they're doing.
14      Q   So you it boils down to a single number, and
15   what during the relevant time period, 2000 to 2008,
16   what was the range of ratings that was used at IBM?
17      A   We had four. The top rating was a 1,
18   numerical 1, then it was 2 plus, followed by a 2, then
19   there was a 3, and then a 4 was the lowest rating.
20      Q   And where does those ratings appear? I mean
21   if was there information that defines those ratings?
22      A   Yes. In the actual publication, the
23   documentation for the personal business commitment
24   program, those numbers are actually identified in
25   there, and that's what I'm looking at.

Page 116

1       Q   And what does a number 1 rating mean?
2       A   Number 1, as I said before, is your top
3    performer, and it's among the top contributors for
4    that year, so it's how they're rated in that year, and
5    under the definition a little bit -- because you have
6    to look at the description and definition. The
7    description, for example, would say for a 1 performer,
8    achieved exceptional results, purely stands out from
9    the rest and is a role model for the IBM values.
10      Q   And how is a 2 plus rating, how is that
11   defined?
12      A   2 plus says you're doing more than what you
13   were asked to do. You're an above average
14   contributor, and you go above and beyond your job
15   responsibilities, and you outperform most of your
16   peers in that area.
17      Q   And how about a 2?
18      A   Two says you're doing everything that's
19   expected of you. You consistently meet your job
20   responsibilities. You're reliable in your job. You
21   demonstrate the appropriate knowledge of skills. You
22   know what you're doing. You're demonstrating you're
23   qualified and you're performing, you know, all of the
24   things that you're being asked to perform.
25      Q   And how about a 3?

Page 117

1    A    A 3 is -- this is among the lowest
2  contributors, and when you're rated a 3, you need to
3  improve in that area.  You're not meeting what's
4  required of you in the job.  You're doing some but not
5  all of the requirements.
6    Q    In lieu of a numerical rating do the managers
7  sometimes use standard phrases or words to mean the
8  same thing?
9    A    Yeah, it varied.  It depends on your heritage
10 as a manager, but you use descriptions sometimes, top
11 contributor, above average.  They'll go into the
12 description part of this and use some of the text off
13 the description part.  A solid contributor.
14   Q    Solid contributor is used with a 2?
15   A    2, yes.
16   Q    And how did IBM define a 4 rating?
17   A    That's an unsat.  There are a few of those,
18 but it's says that you're not meeting even the minimum
19 requirements of your job.
20   Q    Do you know what percentage of IBM employees
21 typically receive either a 2 plus or a 2 rating?
22   A    Actually IBM used to have a skew that they
23 would send out in the beginning of the year.  When you
24 were setting goals with your employees there was a
25 skew that went out to all the managers and said we

Page 118

1  expect you in your department, your distribution to
2  be -- the bulk of it was in the 2 plus and the 2, 65
3  to I think it was 80 percent of the people reporting
4  to you were expected to fall within this range.  And
5  then it was, I think, 5 to 7 percent in the 1
6  performance, and then down below that in 3 performance
7  it was, again, whatever -- I can't do the math now,
8  but whatever the delta between those numbers are.
9         And we had to -- in the beginning of the
10 appraisal process we would have to report -- before we
11 actually conducted the evaluation with the employee we
12 would have to go through -- as a manager we'd have to
13 determine what we thought we would give each of the
14 individuals, and we'd have to report that distribution
15 to IBM HR to say this is what we're expecting as far
16 as distribution in our area.
17   Q    Take a look at Exhibit 2.  What is Exhibit 2?
18   A    This is the online manual that talks about --
19 it's not what we have on the screen, but it talks
20 about how you set your goals, how you go about setting
21 your goals as a manager.
22        There's also a guide for employees as well, so
23 the employee knows how -- who may not be in
24 management -- how they're supposed to work with their
25 manager to set the goals.

Page 119

1         And then it continues through after you set
2  the goals, how do you document results.  Because I
3  mentioned there's a responsibility an employee has for
4  documenting the results, so the manual explains how to
5  do that, for the manager as well as the employee.
6         And then you also in this manual -- it's not
7  what we're looking at here, but it talks about how you
8  do the rating, how does a manager conduct the rating,
9  what should the employee expect when they go into the
10 rating.
11        After you've been through it a few times as an
12 employee you understand what needs to be done as a
13 manager and non-manager, but we still go through
14 annual formal training on how you do this process
15 because it's so important and there shouldn't be any
16 confusion.
17   Q    And Exhibit 3, what is Exhibit 3?
18   A    Exhibit 3 is a document that really goes
19 through kind of -- as you're conducting -- it's not
20 what we have here, but it's as you're conducting the
21 evaluation with the individual, some of the things you
22 should listen for.  So an employee may get very
23 defensive in some spots, how do you deal with that, a
24 person being defensive.  If an employee is puzzled by
25 something, what you -- kind of how you should read

Page 120

1  when you're meeting with the employee and actually
2  conduct that evaluation, and it gives you pointers on
3  what you should be looking for, what you should do and
4  what you shouldn't do.
5    Q    Does the PBC procedure also report supervisors
6  with an optional means of further elaborating on the
7  numerical assessment?
8    A    Yeah.  The structure and format is you have
9  your goals set up front, then you have your agreed to
10 accomplishments, then there's the rating, and after
11 the rating is agreed to, your manager, not you as the
12 employee, but your manager has the option, they can
13 write in some description on.  Some utilize it, some
14 don't.
15   Q    And are employees provided with copies of
16 their evaluation?
17   A    Yes, they are.
18   Q    And typically when does that occur, when you
19 give the copy of the evaluation?
20   A    It's after you've agreed and you're told what
21 your evaluation is.  You actually have to -- because
22 it's all done online now, you have to do it
23 electronically.  I would as an employee have to sign
24 off on it, and then my manager would then sign off on
25 it, and that's where they have the option of bringing

Page 121

1    that description, whether they want to make any
2    additional comments.
3        Q   Is there anyone else above your manager who
4    also participates in this process?
5        A   Yes. What we've done, I guess, kind of to
6    make sure there's equity in the system, we also make
7    your manager, or in my case if I was the manager my
8    manager would have to also sign off on every
9    evaluation I gave to my employees.
10       Q   And in what way does the second level manager
11   indicate whether he or she approves the evaluation?
12       A   Well, the second level manager's really
13   responsibility is looking for consistency across his
14   managers and the organization. So you have one
15   manager that's very lenient in one area and one who's
16   really a very difficult evaluator, so the second line
17   managers looking for fairness across it.
18       And in some cases the second line manager --
19   well, fairness across all of the managers. And in
20   some cases the second line manager knows the
21   individual who has just been evaluated and can also
22   lend their comments on it.
23       Q   And in your role as vice president were you
24   required to approve the PBC evaluations performed by
25   those who were reporting directly to you?

Page 122

1        A   Absolutely. That was a requirement. Second
2    level approval and signoff.
3        Q   And what was the point of requiring the second
4    level manager to also participate in this formal
5    process?
6        A   That was, as I mentioned, a bit is for equity
7    across and fairness across the system, so the managers
8    were treating like level individuals in evaluating on
9    the same criteria across the various -- where I may
10   have had seven managers reporting to me, I was looking
11   for consistency across the seven managers and fairness
12   across the seven managers.
13       Q   And in your career have you ever successfully
14   caused a manager's PBC rating to be revised when you
15   were in the second tier as a manager's manager, were
16   you involved in the process and actually had --
17       A   Yes, I have done that before.
18       Q   So the idea is that the manager's manager,
19   their signature on the PBC is not just a rubber stamp?
20       A   I would hope it wasn't a rubber stamp, or
21   believed to be a rubber stamp by an IBM executive line
22   manager. There's no point in going through the extra
23   step. No, it was -- it was -- second line managers --
24   I was a second line manager. You understood that your
25   responsibility was for looking for fairness across all

Page 123

1    of your managers' PBC, so you did take the time to
2    look at it, and sign off on it.
3        Q   Take a look at Exhibit 4, please.
4        A   I recognize that. Is that my PBC?
5        Q   It is.
6        A   Okay.
7        Q   Why don't you look in your book because we're
8    having a portion of it held up.
9        A   I do. I have it here.
10       Q   So what is Exhibit 4?
11       A   Exhibit 4 is the actual rating of the formal
12   PBC that I went through on January 24th, 2008.
13       Oh, so in 2008 my last formal PBC, this was my
14   rating of that, and this is the rating that --
15       Q   This is the last rating you got before you
16   were fired, and this is the rating that -- who gave
17   you this evaluation?
18       A   This was done by Joanne Collins-Smee. And
19   this is for my work for 2007. So just not to be
20   confused, this was done in January 2008, but it was
21   for all of my work in 2007. And it's a solid
22   contributor, which says that you're doing everything
23   that's required of you, and you're demonstrating your
24   knowledge and ability to do that.
25       Q   In addition to the rating, you said that part

Page 124

1    of the process is the also optional comment section?
2        A   Yes.
3        Q   Actually it's the overall assessment?
4        A   Right.
5        Q   And is that required for the supervisor to
6    fill that out?
7        A   No, it's not mandatory. Some do, some don't.
8        Q   And would you read to the jury what is stated
9    optionally by Ms. Collins with respect to your
10   performance in 2007?
11       A   Yeah. In --
12       MR. FASMAN: Your Honor, may I object to
13   that? The jury can read that.
14       THE COURT: I'm sorry?
15       MR. FASMAN: May I object to that? The
16   jury can read what Ms. Collins-Smee wrote.
17       THE COURT: Okay. This is in evidence?
18       MR. CARTA: It is.
19       THE COURT: Objection's noted, it's
20   overruled. You can answer the question.
21       THE WITNESS: Okay. Again, this "Overall
22   Assessment" is the heading for the area that's
23   optional for managers. So what you're seeing here is
24   Joanne Collins-Smee chose to write these comments in
25   there to kind of summarize my activity, and she said,

Page 125

1  "Jim started the year as the ITD vice president for
2  Public Sector."
3      And we've already heard in the opening
4  arguments that I was there until June 5th of 2007.
5      "In the second half of the year he was acting
6  VP on the Wellpoint account. In the Public Sector
7  role Jim's team reduced head count significantly and
8  were able to continue to meet our service level
9  objectives."
10     And just as a point of understanding on that,
11 that says that we've committed to customer service
12 level objectives, we're meeting it, we're doing what
13 the customer is expecting from us on the service side.
14     "On the Wellpoint account Jim and the team has
15 made significant progress on programs to improve
16 service quality."
17     We heard about all the problems. We'll hear
18 more about that.
19     "Making significant steps to improve the
20 quality service to Wellpoint, the customer, and also
21 to reduce costs."
22     And we'll see the financials on that later.
23     "Particularly in these areas: Data center
24 migration, negotiating, SW."
25     Software, so you understand, software

Page 126

1  licensing. Like you get Microsoft on your servers at
2  work, and hardware vendor contracts, which are
3  generally what we call break fix. If one of these
4  hardware boxes, IT boxes break, you call them and they
5  come in and they fix the service on it. So we were
6  renegotiating -- I was renegotiating with them in
7  trying to reduce that.
8      "Jim needs to continue to focus on those
9  activities that would demonstrate effective leadership
10 to both the IBM team as well as the client."
11     Q  And did anyone else approve this rating?
12     A  Yes. This would, as we discussed before,
13 would have to go to Joanne Collins-Smee's manager, who
14 at that time was Robert Zapfel.
15     Q  And what was his position, if you recall, in
16 the organization?
17     A  He was I believe the title of general manager,
18 and he was responsible for -- we talked about -- we
19 didn't talk about it yet, but the area of business of
20 outsourcing for IBM, and he had global responsibility.
21 So where Joanne had one segment of the world, she had
22 the Americas, Bob Zapfel managed one step above that,
23 and he had the whole -- the world. Europe, Asia, so
24 forth.
25     Q  And to what extent, if any, did Mr. Zapfel

Page 127

1  have actual direct experience working with you in
2  2007?
3      A  One would think in his level he would have
4  little, but he had a lot. I was in meetings with him.
5  He called me up to have him briefed. He called my
6  cellphone. He's called my house. And I had a lot of
7  dialogue with him back and forth over the second half
8  of 2006, particularly in reference to the Wellpoint
9  contract, as you would expect. So he knew what my
10 work and what I was achieving on that, and my
11 effectiveness on that contract.
12     Q  So let's step aside for a second and talk
13 about what didn't happen. Throughout your career at
14 IBM, did IBM ever -- did IBM have established
15 practices for disciplining underperforming employees?
16     A  Yes, it did. Very -- again, a very
17 well-documented well-understood program for managers.
18     Q  Were you ever once disciplined?
19     A  No.
20     Q  Throughout your career at IBM, did IBM have
21 established procedures in place for warning employees
22 that the procedures were inferior?
23     A  Yes. It's expected, because there's such a
24 trust between the manager -- I mean the employee and
25 the manager, that if there is any indication of any

Page 128

1  dissatisfaction, it has to be brought to the employee.
2  The employee has to know so the employee can
3  understand it and do whatever's necessary to correct
4  it if that were the case, and that was my practice,
5  and you're taught in management school that's what you
6  should do.
7      Q  And did you provide -- were you provided any
8  such written warnings?
9      A  No.
10     Q  Now I want to go to where we typically would
11 start, which is go through your background a little
12 bit.
13     A  Okay.
14     Q  What formal education did you have before
15 starting at IBM at age 21?
16     A  I started out at Providence College, didn't
17 finish at Providence College.
18     Q  What was the highest level of education you
19 achieved at IBM?
20     A  I was selected for the IBM executive MBA
21 program and I went through that program.
22     Q  Are you married?
23     A  Yes, I am.
24     Q  Have children?
25     A  Yes, I do.

32 (Pages 125 to 128)

Page 129

1    Q   And did you tell me, what's your current age?
2    A   Current, 66.
3    Q   Let's walk you through your career rather
4  quickly at IBM.  What was your first position at IBM?
5    A   It was entry level.  I worked in the data
6  center as a computer operator.
7    Q   And shortly after starting at BM did IBM
8  invite you to participate in a six-week programming
9  school?
10       MR. FASMAN:  Objection to form, Your
11 Honor.
12       MR. CARTA:  I'll rephrase.
13 BY MR. CARTA:
14   Q   What, if anything, did IBM invite you to
15 participate in after six weeks?
16   A   I was selected by IBM to attend programming
17 school.
18   Q   And what skills, if any, did you learn there?
19   A   Well, it's -- probably no one would know what
20 it is now because it was so long ago, but it was
21 assembler language.  It was programming to build
22 applications like payroll, inventory, and I was
23 learning how to program to do that type of work.
24   Q   And what was your next position at IBM?
25   A   I was made a manager, of the data center.

Page 130

1    Q   Of the whole data center?
2    A   Well, part of the data center.  It was two
3  shifts I was responsible for, so two-thirds of the
4  data center.
5    Q   And how many people did you manage in that
6  capacity?
7    A   I managed -- it was about 50 people.
8    Q   And on what basis were you promoted?
9    A   My skills that I demonstrated.  I mean
10 manager's generally looking for is leadership, someone
11 who can -- with interpersonal skills, you can motivate
12 people, you can work with people, and plus being in
13 the field that we're in, there has to be a level of
14 technology skills that you needed, and I'm assuming
15 that's what they based the promotion on.
16   Q   How long were you at IBM before you received
17 this first promotion?
18   A   I think it was within my first year.
19   Q   At some point early on in your career were you
20 identified and evaluated for your potential?
21   A   Yes, I was.
22   Q   And when was that, as best you can recall?
23   A   If I recall correctly, it was in -- I wasn't
24 with the company that long.  I think it was 1968.
25   Q   How were you selected?

Page 131

1    A   Actually it was -- I was surprised, pleasantly
2  surprised, but it was a rigorous process where you
3  would have to be -- managers would have to nominate
4  individuals who they wanted to be considered for this,
5  and there was a criteria they had to go through in
6  order to nominate someone, that nomination from all
7  these managers, and it kept going up and being
8  filtered down and sorted and sorted until it got to
9  the executive level, who had the ultimate decision on
10 that, and they decided out of all the candidates that
11 were provided to them who would attend that session.
12   Q   So you had to have an executive sponsor you to
13 get into the program?
14   A   Yeah.  My executive -- my business unit would
15 have to represent me, or think enough of me to bring
16 me forward, and then it went to another executive in
17 IBM who had other executives report to them, kind of
18 confusing, but they made the final decision on who
19 would attend.
20   Q   Can you give us some idea, approximately, how
21 many people were in competition for, let's say, one
22 spot?
23   A   Oh, God.  On my unit alone, I'm not sure exact
24 number, but there had to be 20,000 of us that were
25 within that one director's responsibility.

Page 132

1    Q   And how did you perform in that program?
2    A   Very interesting.  I did well.  I think I did
3  well, because I wasn't asked to leave.  And then when
4  I got back to the office I was called in by this
5  executive, and I was told that the evaluation that
6  they had written up on me -- and there were executive
7  observes in this session.  It was kind of an
8  interesting exercise.  But the report that they wrote
9  up on me said that I was someone that was identified
10 that they should take, you know, and do other things
11 with them as a result of my evaluation.
12   Q   And in terms of your career, what was the
13 consequence of that evaluative process?
14   A   It was interesting, because what was explained
15 to me at the time -- the idea was if you're going to
16 be an executive at IBM -- IBM is huge -- they wanted
17 to move you around to different areas in IBM, so you
18 could get a background on how those areas perform, and
19 you get a better appreciation for IBM as a total
20 business.  So what he told me at that point, even
21 though I enjoyed the job I was in, he told me they
22 would start moving me around to different assignments
23 across IBM, and that's what happened.
24   Q   And can you recall a number of the geographic
25 locations to which you were later assigned?

A-310

Page 133

1      A    Wow, they had me all over.  I was in
2    Washington, D.C., working with the federal government.
3    They put me down there for that.  Chicago, Illinois.
4    I went there in middle of winter, which is not
5    pleasant.  Nice city.  And I was working on banking so
6    they got me into the financial area, sector, of IBM,
7    so I was working with the IBM sales team out there on
8    that.  I was in Palo Alto, California, working on the
9    networking area for IBM.  I think it was Denver,
10   Colorado.
11     Q    What business area were you involved in when
12   you were in Colorado?
13     A    Colorado was -- I think it was our business
14   recovery.  Yeah.  I'm not a hundred percent sure, but
15   I think that's what it was at that time.
16     Q    What's that mean, business recovery?
17     A    That's when a data center crashes, working on
18   it somewhere else, that type of work.
19     Q    Other locations?
20     A    I worked in White Plains, New York.
21     Q    Is that where the headquarters is for IBM?
22     A    It was for our business unit at that time.  It
23   was 1133 Westchester Avenue.
24     Q    Did you work in New Jersey?
25     A    Yes, I'm sorry, I did work in New Jersey.  I

Page 134

1    spent -- hopped around different areas, all around.
2      Q    What business were you involved in there?
3      A    That was telecommunications.  That was
4    companies that manufacture communications equipment.
5      Q    In 1989 did IBM select you to participate in
6    its graduate business management program?
7      A    Yes.
8      Q    Do you recall how many IBM employees were
9    selected to receive this training at that time?
10     A    I think our class size was 25, 20 to 25.
11     Q    And that was out of how many people?
12     A    The who was putting up the candidates was
13   probably about 1,500 people that were being
14   considered.
15     Q    And please describe the purpose of the
16   graduate training program?
17     A    It was really to -- it was an accelerated MBA
18   program, a mini-down MBA program.  Companies, I guess,
19   all do that.  It's an executive MBA program.
20     Q    And was the program part-time or full-time?
21     A    Well, that was the thing, you had to be freed
22   up from your current assignment and it was full-time,
23   and the rules were your manager, your department, no
24   matter what happened, they couldn't pull you back, you
25   would have been on a do-not-disturb position while you

Page 135

1    were attending that.
2      Q    How many days a week was it?
3      A    Seven days a week.  It was a crash MBA
4    program.  We worked on weekends.  We had homework,
5    quizzes, so forth.
6      Q    And where was it conducted physically?
7      A    It was in -- I believe it was stayed in dorms
8    in Pace University, which I think is Westchester
9    County.
10     Q    What was the curriculum, just quickly?
11     A    They flew in professors from Arizona
12   University that taught the course, so they were there
13   for the duration of this.
14     Q    And those are the professors.  What
15   curriculum?
16     A    It was really -- it was MBA.  How do you run a
17   business.  It was no longer the technical side, which
18   is where I had been.  When I was moving around I was
19   learning all the different technical things.  This was
20   more on a higher level on how you run a -- doing
21   financial forecasting, reading financial reports.
22   There were courses in microeconomics, macroeconomics,
23   statistics, so forth.
24     Q    Did you successfully complete that program?
25     A    Yes, I did.

Page 136

1      Q    And were you graded for your work?
2      A    Yes, we were.
3      Q    I'd like to have you take a look at Exhibit 5
4    and just quickly identify what that document is,
5    please.
6      A    That's a congratulations on graduating the MBA
7    program, and it's signed by Larry Ford, who was a
8    senior executive at IBM.
9      Q    And do you recall where you stood in your
10   class?
11     A    I was in the top third.
12     Q    Generally in the nearly 30-year period between
13   1968 and 1996, what happened in your career?  Trying
14   to accelerate this forward, so between '68 and all the
15   way to '96, just generally, what was the process?
16     A    Well, I was on this movement around various
17   parts of IBM, and I was very fortunate because I was
18   getting promoted into different jobs as I moved along
19   this window of time, and which was interesting.  It
20   was a very rewarding time; difficult time because you
21   were moving around so much.
22     Q    At what rate did you receive these promotions,
23   generally?
24     A    Not a hundred percent sure, but I think it was
25   like every two or three years they would move me to a

Page 137

1   different job, a different position.
2       Q   And were you working in any one particular
3   kind of business at that time period?
4       A   In that period of time, no. I was moving
5   around. That's what the concept was, to move around
6   and get experience, a broad experience.
7       Q   And what experience, if any, did you get in
8   IBM's networking design and engineering area?
9       A   Oh, that was -- I enjoyed that the most. But
10  in that particular area it was really designing --
11  obviously learning simulation runs of networking
12  designs. I was doing engineering design work. We
13  were looking at product. We were prototyping products
14  that IBM was selling, network products at that point,
15  and I was involved with all of that.
16      Q   Did you have any experience in that time
17  frame -- what experience, if any, did you have in that
18  time frame with respect to sales, technical sales and
19  engineering sales?
20      A   I did get exposed to that when I was in
21  Chicago at -- I can't think of the name of the bank,
22  but I was reporting to the branch manager in that
23  area, and that was on the sell side. There actually
24  the salesman were selling IBM products out there. I
25  was tagged along as to assist the sales team in the

Page 138

1   selling of that, and that was more bringing my
2   technical knowledge to the sales team, to assist the
3   sales team, but it was also to teach me how it all
4   works in the marketing area of IBM.
5       Q   Can you estimate the approximate number of
6   positions that you held in that 27-year period between
7   '68 and '95?
8       A   Wow. Like I said, my experience was every
9   couple years I would move to a different job, so every
10  couple years it's three, ten, twelve, ten positions,
11  maybe, eight.
12      Q   At some point -- after getting that diverse
13  background, at some point did you become specialized?
14      A   Yes.
15      Q   And approximately when was that?
16      A   That was around '95, '96.
17      Q   And in what area?
18      A   It was IBM outsourcing.
19      Q   Can you help us understand what that means?
20      A   I'll try. At that point IBM was getting
21  into -- not only -- prior to that we had been selling
22  products, IBM products, to provide maintenance to kind
23  of what I described before. Now we were getting into
24  taking over someone's entire IT organization. So --
25      Q   IT standing for?

Page 139

1       A   I'm sorry, information -- it's information
2   technology. And it's really going into a company
3   that -- a company could be like a bank, and the bank
4   has these terminals and these servers that help run
5   their business. We would go in with an approach as
6   part of our outsourcing business and tell the bank,
7   we'll take over running all of that stuff to servers,
8   the network screens that your tellers have, you
9   concentrate on your core business, which is finance,
10  accounts, selling, loans, so forth, and that was
11  outsourcing, and we did that in all the industries,
12  all aspects.
13      Q   So you're starting to focus on the strategic
14  outsourcing work. What was your first promotion to an
15  executive level position?
16      A   It was certainly after I went in there, I was
17  promoted to a director level.
18      Q   When you say "went in there", what do you
19  mean?
20      A   When I went into the outsourcing part of
21  IBM -- excuse me. I'm sorry. I was promoted like
22  within the first year, and shortly after that I was
23  promoted to the director of an outsourcing contract.
24      Q   And we're going to need to get into a little
25  bit more IBM-ese here. Was there a band or a label

Page 140

1   associated with that promotion?
2       A   Yeah. I guess because they're computers we
3   have to deal with binary numbers, but as you saw on
4   the PBC, IBM is like 1, 2, 2 plus, 2 blah, blah, blah,
5   and that equates to something in English. In the
6   executive ranks there were bands, there were four band
7   levels, and they were A, B, C, D, the top being the A
8   position, and the entry level being the D position.
9   When I became director I entered into at the low end,
10  which was the D executive.
11      Q   Was that the first time you'd actually entered
12  the ranks of what IBM acknowledges as an, or describes
13  as an executive level?
14      A   Yes.
15      Q   And that was a Band D?
16      A   That was a Band D, correct.
17      Q   And what level had you been immediately prior
18  to that? What's below the Band D?
19      A   I was -- again, we had a different number
20  system, but I believe it was a band -- but it was a
21  senior advisory level, so it was the highest level you
22  could achieve at that position, so it's like band --
23  I'm pretty sure it was a Band 10.
24      Q   You're saying 10?
25      A   Ten, number 10.

Page 141

1    Q   What was your first executive title -- what
2  was your title in that position that you were promoted
3  to in 1996?
4    A   The title I had was senior delivery project
5  exec.  Which was --
6    Q   What does that mean?
7    A   SDP.  It really is -- you're in charge of
8  managing a bunch of people, and delivering the
9  services that are contained within that outsourcing
10  department.  So the example I used before, the bank,
11  it would be the people would work for me and I had
12  overall responsibility for managing the day-to-day
13  running of that information technology infrastructure
14  that was there.
15    Q   And was there a specific company that you were
16  promoted to have that role for?
17    A   Yes.  I was specifically assigned -- when I
18  became the director and then senior DPE position, I
19  was assigned to one contract, which was United
20  Healthcare.
21    Q   And what were your responsibilities as the DPE
22  at United Healthcare?
23    A   I was on the side that was responsible for
24  delivering day-to-day services to that customer,
25  United Healthcare.  All of their IT components was my

Page 142

1  responsibility, to make sure it was available and
2  running for them.
3    Q   What was your understanding as to why you were
4  selected to run that particular account?
5    A   Well, United Healthcare at that point was one
6  of the earlier contracts that we had, and we had
7  some -- IBM had issues -- okay, let me restate it.
8  United Healthcare had issues with IBM on that
9  contract, issues as to what was included in the
10  contract, what IBM should be doing, which we weren't
11  doing.
12        There were also financial issues with that --
13  IBM had some financial problems with the way that
14  contract was structured and put in place.  And on the
15  customer side they had an IBM executive who was the
16  primary one that was interfacing with IBM, and being
17  dissatisfied in that area he was writing many, many
18  notes and calling many senior executives in IBM to
19  complain.
20    Q   And how did you come to get introduced to that
21  position?  How did you get presented to the client, if
22  at all?
23    A   The practice that we go through, which makes a
24  great deal of sense, is the customer is unhappy with
25  IBM, they were going to introduce me into that

Page 143

1  position that I would take over and try to fix the
2  problems that existed there, but they wanted to
3  make -- IBM wanted to make sure that the customer was
4  satisfied with me coming into that position, so they
5  wanted to give the customer the right of refusal on
6  me, so I had to have -- I went -- I flew out to
7  Minneapolis, with my boss, and I was scheduled an
8  interview with the CIO for United Healthcare.
9    Q   And did United Healthcare accept you as the
10  DPE?
11    A   Up to that point it was the most grilling
12  interview I went through, but yeah, they were
13  satisfied with what we exchanged in that.
14        And the reason it's important is, they can
15  validate my background, other than looking at a resumé
16  or someone saying it, because they can ask you
17  questions, and you did -- you don't just meet with the
18  CIO, you meet with some of the other executives that
19  he has.  So they get a couple windows of opportunity
20  to talk to you to find out whether you're right, I
21  have the right skills to help them address what they
22  have.
23        But it also gives you moving into that role
24  the opportunity to sit with the CIO and the senior
25  vice president to understand what their expectations

Page 144

1  were, what are the real issues.  Because you hear a
2  lot of that in the background, but until -- and
3  sometimes it's translated by an IBMer who doesn't want
4  to say it's IBM's fault, or by a customer blaming IBM
5  and it really isn't IBM's fault.  So it gives you an
6  opportunity to sit there and listen to them, and they
7  can tell you what they believe are the priority areas
8  that need to be addressed, so if you do anything else,
9  Jim, I want you to concentrate on this aspect first.
10    Q   How many people were you supervising in that
11  position as the DPE on the United Healthcare account?
12    A   I think it was -- I've lost track -- a little
13  over a hundred, I believe, in that role.
14    Q   Do you recall any milestones that you and your
15  team achieved?
16    A   The situation I went into, and why I was
17  placed in there, was because of serious customer
18  satisfaction issues.  The customer was unhappy with
19  IBM.  Some of it was justified, but some of it, quite
20  honestly, when we got in there, was not justified.  It
21  was a misunderstanding.
22        The other part of it was IBM had serious
23  financial problems, and when IBM has serious problems
24  on a contract like that, of course you tend not to
25  make investments that are necessary to fix, address

Page 145

1  the issues, so -- because our financial windows are
2  measured on such quarter to quarter to quarter, so
3  there are financial sides, investment concerns.
4      And what we were able to do is we were able to
5  convince IBM through planning and showing what we
6  could do, So you may have to spend a little bit more,
7  IBM, but we can show you over the long haul, you can
8  actually reduce the run cost of keeping that customer
9  in place. So it may cost you some now, but we'll get
10 that recovery later on.
11     So we were able to convince them, and we were
12 able to execute on that, so we did improve the
13 day-to-day running of that account, and as a result
14 the customer was very satisfied, so the customer Sat
15 went up, so we helped IBM financials and we helped the
16 customer.
17     Q  What awards, if any, did you win for your role
18 in that turnaround?
19     A  I forgot what they were called at that time,
20 but there were -- at the time the head of all of
21 Americas outsourcing, there was a recognition award.
22 I honestly don't recall specifically what it was, but
23 it came from the general manager who was running all
24 this outsourcing for IBM, and it was actually
25 financial I was given recognition through.

Page 146

1      Q  And you served in that position as DPE on the
2  United Healthcare for how long?
3      A  I think I was there for about four years.
4      Q  1996 to 1999, sound about right?
5      A  Yeah, that is right, because I know where I
6  went next.
7      Q  So what was your next executive position?
8      A  From there it was decided, because -- well, I
9  mean United Healthcare at that point had stabilized,
10 and they took me and gave me -- instead of one
11 contract they gave me -- I think it was six contracts,
12 that IBM had me then manage, contracts like --
13 something that -- United Technology was one of the
14 contracts, and United Technology had all the different
15 divisions, so Pratt & Whitney up here was one of
16 those, and I think we were managing the outsourcing
17 with that. Sikorsky Aircraft down in -- south. So
18 those are two that were in Connecticut. So it was
19 United Technology and its divisions, it was Stanley
20 Tools, it was Starwood Hotels, the luxury hotels.
21 There were a couple other in that mix also. So it was
22 a collection of different contracts.
23     Q  And what was your title? Do you recall?
24     A  Yeah. I was acting like a senior VP. I was
25 director, I think of delivery services, but I was a

Page 147

1  senior VP over these individual contracts that had
2  their own leads on them.
3      Q  And at that point how many employees were you
4  responsible for?
5      A  That number would be larger. I think the size
6  of the contract -- United Healthcare had the largest
7  data center in Newington. It had to be over 500
8  people at that point.
9      Q  And what band -- had there been a change in
10 the band that you were in?
11     A  No. I was still at the director level, Band D
12 level.
13     Q  And at what point, if ever, did you attain the
14 level of vice president?
15     A  That was my --
16     Q  Question withdrawn. Let me ask you this. How
17 long were you in that position?
18     A  That was fairly short. I was only in that, I
19 think -- I believe it was less than two years.
20     Q  So that was up through sometime in year 2000?
21     A  It was into 2000.
22     Q  And at what point did you attain the level of
23 vice president?
24     A  That's when I was promoted to the vice
25 president level, in the latter part of 2000, I think

Page 148

1  like October of 2000.
2      Q  And what band were you promoted to at that
3  point?
4      A  Going back to IBM's A, B, C, D, rankings, I
5  had been at a D and moved up one notch to a C level.
6      Q  In 2000 when you first achieved the level of
7  vice president, what was your job title?
8      A  I was vice president of service delivery for
9  Lucent Technology.
10     Q  So you'd gone from managing several contracts
11 back to just managing one?
12     A  Yes, but one very large contract.
13     Q  Explain what your position was.
14     A  I had responsibility for -- again, I hope I'm
15 not confusing anyone, but again, using the bank
16 example, we were going to take over the servers in the
17 bank and the teller screens and whatnot. This was at
18 a much grander scale. It was Lucent Technologies,
19 which was in New Jersey, which was a huge company. It
20 was a spin-off from when AT&T divided, and they took
21 all of the technology and engineering part and that
22 became Lucent Technology. Bell Labs went there. And
23 it was a very, very large contract. In fact, it was
24 the largest contract IBM had ever signed, and I
25 believe to date had ever signed as an outsource. It

Page 149

1    was what they called a mega deal for IBM.
2    Q    And how many people worked under you in that
3    position?
4    A    That was a big leap forward.  That was 3,200
5    people that reported to me in various capacities in
6    that contract, and that was across the U.S., and we
7    had a sprinkling in Europe as well.
8    Q    Please summarize for the jurors what your
9    responsibilities were as vice president on the Lucent
10   Technologies contract?
11   A    It was really running -- we took over running
12   all of their IT, and it was huge.  They were as big as
13   IBM at that point, which was huge.  I think they had
14   like 400,000 employees working for them.  That's why
15   I'm saying, 3,200 of us to work with.  We took over
16   all their cites where they had data centers, managing
17   all the of the smaller servers, which are smaller
18   computers, bigger than a desktop, but we took over
19   managing those across the U.S. as well.
20        So it was running of all of that.  We had a
21   help desk.  And it's -- I don't want to sound like
22   bragging, but I'm just trying to set the scope on
23   this.  The help desk we were running received over
24   10,000 calls, like, a day.  It was huge.  They would
25   get business calls -- we had a team -- we built a

Page 150

1    whole center in Boulder, Colorado, to accommodate all
2    that.  So it was huge.  And the revenue on that
3    contract, as I said, in one year, one year alone to
4    IBM was a billion dollars.  That was the revenue to
5    IBM.
6    Q    I'm sorry, what?
7    A    One billion dollars.  So it was huge.
8        And the part that I managed was, I didn't
9    manage the sell side, I managed the cost side that was
10   responsible for maintaining the sites in the data
11   center, so my cost on it that I was managing at that
12   time was $600,000 worth of costs.  $600 million worth
13   of costs, I'm sorry.
14   Q    I want to just go back a second.  When you
15   were going to be placed in the Lucent Technology
16   position, what process did you go through, if any, to
17   be introduced to the client?
18   A    Oh, that was an absolute must.  I went down --
19   I think I had something like four or five interviews,
20   with Lucent.  I actually met with the CIO.  I met with
21   three of their executives -- they were senior vice
22   presidents, they weren't vice presidents -- two of
23   which we were taking over what they had been
24   previously running.
25        And same thing.  They talked about what their

Page 151

1    issues were, what their expectations were.  They got
2    an opportunity to ask me about my background, and they
3    did.  They asked me about my background, would someone
4    from United Technology be willing to -- could they
5    call someone from United Technology and ask about me.
6    So they did a thorough background check on me before I
7    was accepted into the position.
8    Q    And what site work -- what sites were you
9    working at at that time?
10   A    My physical location was in New Jersey, and I
11   pretty much -- the CIO was moving around, and
12   generally on these outsourcing deals we co-reside with
13   the executive that is dealing with IBM on the
14   contract.  So I moved -- I think I started in
15   Parsippany.  It was the three locations that I went
16   to, and Murray Hill was the last location I wound up.
17   That was their old Bell Labs building.  So I moved
18   between these three locations.
19   Q    And what hours did you typically work in that
20   position?
21   A    Well, these jobs are all demanding jobs.  In
22   that particular one, you were in the office -- general
23   rule of thumb is you get in five minutes before the
24   CIO, you a leave five minutes after the CIO leaves,
25   but which was hard because he was a workaholic.  But

Page 152

1    in the office a good ten hours, and then on call for
2    the balance of the day and the night.  And it wouldn't
3    be unusual if there was an outage somewhere, you'd get
4    a call, or the CIO had a question, or one of his
5    senior VPs would get a call.  It was seven days a
6    week.  It was Sunday through Saturday.
7    Q    Do you recall what your salary was in that
8    position in 2000, approximately?
9    A    Oh, boy.  With compensation?
10   Q    I mean compensation, not salary, total
11   compensation.
12   A    I think it was like $280,000.  I'm not a
13   hundred percent sure.
14   Q    Could it be 192?
15   A    It could.
16   Q    What do you think it was?
17   A    It was a lower number.  280 sounds high.
18   Probably around 200,000, because I was in that range
19   for a while, so I would guess...
20   Q    And in your first year as vice president
21   running the Lucent Technologies contract, what was
22   your PBC rating?
23   A    First year on that contract I was a 2 plus.
24   Q    Please identify the next document.
25   A    I only see one page.

Page 153

1    Q   Actually go to document 7.
2    A   This is one page out of the PBC.
3    Q   So that indicates you got 2 plus, is that
4  right?
5    A   That's what that is.
6    Q   And this is a case where they used the words
7  rather than the number?
8    A   Right. Not sure why, but yeah. Well, if you
9  look at the 2 plus, the description for 2 plus is you
10  achieved everything and exceeded things.
11    Q   And would you please review the overall
12  assessment made by your manager for your first year in
13  that position?
14    A   Yes. Under "Jim had done an extraordinary job
15  managing the Lucent account. The severe problems in
16  Lucent's business has caused a rapid decline in the
17  services and staffing on the contract. Through Jim's
18  leadership as the DPE we were able to anticipate
19  reductions, support the Lucent customer's needs, and
20  also exceed the contract profitability targets set by
21  our business. Jim is considered by all execs in
22  GSD --" which is the unit I was in "-- as one of the
23  best DPEs in the strategic outsourcing--" that's the
24  outsourcing "-- business and the model for --"
25    Q   I'm sorry?

Page 154

1    A   There's a second part of that.
2    Q   You can read it from yours. What's the rest
3  of it say?
4    A   Well, here it is. It was "-- a model for SO
5  DPEs managing large complex contracts. Had our
6  overall SO business been more successful in 2001 and
7  achieved its plan, Jim's personal performance would
8  far exceeded --" in fact, some interesting story on
9  that.
10    Q   I'm sorry?
11    A   This is a 2 plus rating, but that was the year
12  our whole business unit didn't do well, and from --
13  the first time I ever saw it in IBM, but anyone that
14  was rated a 1 had to be downgraded, because the
15  business unit didn't meet -- even though the
16  individual exceeded, the business unit didn't do it at
17  a grander scale, and the edict came from above that
18  anyone who was rated a 1 would be -- had to be
19  downgraded because there would be no 1s in the unit.
20    Q   And you received a 2 plus nevertheless?
21    A   Right. And I think that's why that comment
22  was put in there. "Far exceeded" was the term that's
23  used for a 1 performer.
24    Q   And how long did you run that contract?
25    A   That was a little over two years, I believe.

Page 155

1    Q   Do you recall what your PBC rating was in the
2  second year in the Lucent Technology contract?
3    A   Yes. The restriction was lifted and I
4  achieved a 1 performance.
5    Q   Would you please identify Exhibit 8? What is
6  Exhibit 8?
7    A   Here's the rating. Again, it's extraordinary.
8    Q   Okay. What other awards or other forms of
9  recognition did you receive from IBM in your second
10  year on the Lucent Technology contract?
11    A   We went to Golden Circle. We went to 100
12  Percent Club. I did get -- our team was recognized at
13  the -- I think it was the Golden Circle.
14    Q   What does that mean, Golden Circle?
15    A   It's a recognition event for top performance.
16  The Golden Circle was more -- a lot of these
17  recognitions were on the sales side, but they were
18  bringing in the people that supported the sales side
19  that also helped the sales side be successful, and
20  that's what we might get, so it was people across the
21  U.S., actually the Americas, and we were chosen to
22  attend.
23    Q   You said something about being invited to the
24  100 Percent Club. What was that?
25    A   The 100 Percent Club really had the strict

Page 156

1  marketing side of IBM and they continued that
2  recognition event as well.
3    Q   And you stated that you were in that position
4  until late 2002, is that right?
5    A   Yes.
6    Q   And what was your next position?
7    A   From there I moved to brand new business for
8  IBM. It was a startup business. The title was On
9  Demand, but anyone -- people would recognize it today
10  as cloud computing. So this was IBM's creation to
11  start the cloud computing, which we called at that
12  point in time On Demand. So it was something brand
13  new. It was drawn up on a sheet of paper, and that
14  was it. It was one page, this is the concept. And I
15  was brought in with the team to actually take it from
16  this one page concept into an actual service that IBM
17  could sell.
18    Q   So it was sort of a new startup sponsored by
19  IBM?
20    A   Yes.
21    Q   And what were your responsibilities in that
22  position?
23    A   That was soup to nuts. It was define what the
24  services could -- what service we would offer. It
25  was -- you had to figure out what it would cost to

Page 157

1  provide those services, what services, how we would
2  market those services, how we would price those
3  services. We'd work with consultants on this. I
4  brought in consultants to help us evaluate this.
5      So it was a small team that was put together
6  of expertise in all these different areas, someone
7  from legal, someone from contracts, someone from HR,
8  someone from IBM technology area. We had a marketing
9  team in there, so we looked at advertising, and so
10  forth. And that's what we put together to build this
11  offering of IBM.
12      Q   And what was your position there? What band
13  were you in?
14      A   When I was there I was a vice president, still
15  a Band C.
16      Q   And did you go from this plan to actually
17  having a product that you were able to sell?
18      A   Yes, we actually did. We -- surprisingly,
19  with a lot of work -- it was very interesting because
20  it was something very new for me to go into. But we
21  actually did come up -- we sold services. I think we
22  sold close to a billion dollars of new contracts into
23  this service. Now, that's not for one year. That's
24  over -- a contract would be for three years, so you
25  have to take that and divide it by three, and so

Page 158

1  forth.
2      Our customers were -- Williams Sonoma, is one.
3  We had Hallmark, which was interesting because that's
4  the first time Hallmark was going to allow you -- they
5  were offering up flowers, roses, for Valentine's Day,
6  so there was a lot of risk that we were doing for
7  them, otherwise they would -- they invested a fortune
8  in some farm in South America for roses, and we had to
9  really give it off right so that when Valentine's Day
10  would come around you could go in and order roses.
11  The other area were the video store.
12      Q   Blockbuster?
13      A   Blockbuster, right. Blockbuster was a
14  different approach. Blockbuster was struggling
15  financially, so saw this as an opportunity to save --
16  to reduce their expenses for IT and -- so those were
17  some, and we had more that came in with that.
18      Q   And by whom were you chosen to run this new
19  venture?
20      A   Tony Macina.
21      Q   And who was Mr. Macina?
22      A   I think at that point in time he was a general
23  manager. I believe he was running -- he had global
24  responsibilities I think for IBM's outsourcing from
25  the delivery side. So like the side of IBM that I was

Page 159

1  a part of. I believe that's what his role was. But
2  he was the one that came up with this concept and had
3  gone forward in the business with the business model
4  on how this thing would work, this On Demand or Cloud.
5      Q   And when had you worked with Mr. Macina
6  previously, if at all?
7      A   I had worked -- Mr. Macina was my boss when I
8  was at Lucent Technologies.
9      Q   So you had just been working with him --
10      A   Right, right.
11      Q   -- fairly soon previously.
12      In that position, the startup position, how
13  many people did you supervise, if you recall?
14      A   That was a small group of subject matter
15  experts. There were, I think, 20 to 30 of us. That's
16  all.
17      Q   And --
18      A   To get it started.
19      Q   Can you identify Exhibit 9, please? What is
20  Exhibit 9?
21      A   That's my PBC rating, or completed PBC
22  evaluation for me, for -- that would have been for two
23  thousand -- my work in 2003, and it's my rating and
24  comments by my manager.
25      Q   And how long were you in that position?

Page 160

1      A   I believe I was there for almost two years.
2  We had the launch. The launch was a success. We had
3  the customers come in, and then I moved on. I was
4  there until the beginning of 2005, that I recall.
5      Q   And Exhibit 10. Can you identify that
6  document?
7      A   Yes. That's a -- that's my PBC for 2004.
8      Q   That would be your second year in that VP of
9  On Demand computing position?
10      A   That's right.
11      Q   What was your PBC rating?
12      A   I was a 2 performer.
13      Q   So let's pick up with 2004. What was your
14  next position at IBM?
15      A   I was asked to be the vice president of Public
16  Sector.
17      Q   And this was the position that ultimately Ms.
18  Collins-Smee removed you from?
19      A   That's correct.
20      Q   So let's start -- when were you assigned to be
21  vice president of Public Sector?
22      A   I was asked and accepted and assigned -- my
23  actual start date was January 1st, 2005.
24      Q   And what is meant by Public Sector, what's
25  that mean?

**A-317**

Page 161

1    A   Again, working with basically the same thing.
2  We're still running -- I'm not going to go back to the
3  bank example, but we're still running all the IT
4  hardware equipment that businesses used to support
5  their business.
6       Public Sector was a grouping of like customers
7  under what we called the sector, and the like grouping
8  was I had state and local government, I had health and
9  life sciences, and I also had federal government.  So
10 any contracts in those areas or any interaction with
11 those from delivering day-to-day service, they would
12 fall under my area of responsibility.
13   Q   I think it might be helpful to look at the
14 organizational chart, which is Exhibit 11, and maybe
15 that will put some of this in context for the jurors.
16      THE COURT:  Before we go into this,
17 Barbara reminds me we've been going since 2:30.  Do
18 you think we should take a short break?
19      MR. CARTA:  That'd be fine.
20      THE COURT:  Until about ten minutes to 4?
21 That okay?  Hopefully the coffee is still warm in
22 there.
23          (Jurors excused)
24      MR. CARTA:  Ten minute break?
25      THE COURT:  Yeah, let's take a break

Page 162

1  until five minutes to 4.
2       MR. CARTA:  Excellent.  Thank you.
3       THE COURT:  You're welcome.
4       (Recess taken from 3:39 p.m. to 3:57 p.m.)
5       THE COURT:  Please resume, Mr. Carta.
6  BY MR. CARTA:
7    Q   Mr. Castelluccio, can you use this
8  organizational chart to try to help us understand the
9  hierarchy?  We've been talking about lots of different
10 people and lots of different levels, and I think it
11 might be helpful.
12      MR. FASMAN:  Your Honor, if I could make
13 one request, we've got a fan right above us and it's
14 hard to hear Mr. Castelluccio.  It's harder to hear
15 Mr. Carta because he's facing away from us.  Could I
16 ask you to speak up a little bit?
17      THE COURT:  You can move that and adjust
18 it.
19      MR. CARTA:  I moved it because I didn't
20 want to be too loud.
21 BY MR. CARTA:
22   Q   Can you use this chart, and if it helps you to
23 stand and point, I think I'd ask you to do that so the
24 jurors can follow you.
25   A   Can I do that?

Page 163

1    Q   Yes, absolutely.
2       THE COURT:  You want him to use a
3  pointer?  What is it you propose to do?
4       MR. CARTA:  I just want him to stand up
5  and use the chart so the jurors can see what he's
6  pointing to.
7       THE COURT:  You're talking about the
8  screen?
9       MR. CARTA:  On that screen, yes.
10      THE COURT:  Oh, I just caught sight of
11 that monitor now.  My peripheral vision is not great.
12      You can stand up, and let me move down
13 here.  Mr. Fasman and co-counsel, if you'd like to
14 come up both so you can see and hear at the same time.
15      MR. FASMAN:  I'll take a look, Judge.
16 Thanks.
17 BY MR. CARTA:
18   Q   Let's start with you.  Where are you on this
19 chart?
20   A   Work from the bottom up?
21   Q   Sure.
22   A   This is me over here.  And as I described
23 earlier, in 2005, January 2005, I became vice
24 president of Public Sector, and that's me.  And what
25 you see across here, it's a little hard to read, but

Page 164

1  it's trying to show a higher tier.  These are my
2  peers.  So Carol McHattie was vice president Financial
3  Sector, and she had her own set of contracts that she
4  managed based on the Financial Sector.  So she had
5  banks, you know, J.P. Morgan, so forth.
6       Then you move across, it's the same.  Jim
7  Dickman was Industrial Sector, Joe Corranno was
8  Distribution Sector.  And one that's missing from
9  this, there was actually a fifth of us, that were
10 assigned to a sector, and it should be another bar
11 here, and that was Communications Sector, vice
12 president Communication Sector, and that was Tony
13 Grimaldi.  I think it was Sue Tang was vice president
14 of Canada, so she had a geography, she didn't have a
15 sector.
16      And Kim Smith was -- he was vice president of
17 Security Risk Management, so he kind of watched all of
18 us that we stayed in compliance, weren't violating
19 contract regulations, government regulations, and so
20 forth, as far as audits, and so forth.
21      And then Diane over here on the far right, she
22 owned most of the people that she gave to this crowd
23 over here for us to do our day-to-day ranges.
24   Q   When you say "own people", what do you mean by
25 that?

A-318

Page 165

1    A   They actually reported to her.  She hired
2    them, she fired them, she managed those people.  We
3    would -- this group over here, the sector people, we
4    would go to her and say I need five people who know, I
5    don't know, Microsoft Windows, because this client has
6    a lot of desktops that are Microsoft.  She would find
7    the people in her organization, Jim, you can have
8    those, and over here I would assign them to one of the
9    contracts of my business.
10        So anytime we needed -- we would identify what
11   we need, we would go to her and say we need five of
12   these, six of these, seven of those, and she was
13   supposed to provide them in a pseudo just-in-time
14   fashion, and when I was done using them, because maybe
15   it was a short project with the customer, we would
16   give them back to her and she would allocate them
17   somewhere else.  So that was the dynamics going on.  A
18   little confusing, but it actually worked most of the
19   time.
20   Q   So going up above you, to whom did all those
21   people report?
22   A   All the blue people worked in the Americas;
23   Canada, U.S., and South America all reported in to
24   Joanne Collins-Smee.  Initially in 2005 it was Kelton
25   Jones.  Kelton owned this organization when I first

Page 166

1    took this job.  He was the one that recruited me for
2    the job, and later on when he retired Joanne
3    Collins-Smee came in, and when she appeared, in
4    February 2007, so we all reported to her.  She did our
5    PBCs and so forth.
6    Q   Earlier we talked about Mr. Zapfel being the
7    second line manager who approved your critical rating,
8    2008?
9    A   Yes.
10   Q   And 2007.
11   A   Joanne had Americas.  As you can see, there's
12   some like her that had Europe, someone had Asia
13   Pacific, so forth.  They had a similar structure, but
14   reported into them.  So Joanne had Americas, and
15   Joanne reported to the general manager of ITDelivery
16   for all of these geographies or regions, and that --
17   initially when I was reporting to Kelton when I first
18   took the job in 2005, that person was Tony Macina, and
19   then Tony left about the same time that Kelton left,
20   so the two people I'd been working with for probably
21   the last three, four years of my service was with
22   Kelton Jones and Tony Macina in those positions.  They
23   retired, Joanne came in here, Joanne Collins-Smee and
24   Bob Zapfel came there, and then he reported up to
25   Moffat, and if you went up above that he reported to

Page 167

1    the chairman of the board.
2    Q   And what part of that hierarchal chart
3    reflects people who were in the delivery --
4    outsourcing delivery business?
5    A   Across the world?  This was all outsourcing.
6    Q   So that captures the hierarchy of people who
7    were involved in that kind of business around the
8    world?
9    A   Right.  So going back to your point before,
10   Joanne or Kelton give my PBC.  What I explained
11   before, we had my annual evaluation, he or she would
12   sign it, it'd go up to Zapfel and Zapfel would sign
13   it.
14        Now, my particular case, I had a lot of
15   interaction with him.  Good or bad, I had a lot of
16   interaction with him.  So he knew firsthand what I was
17   doing.  You might look at this thing, and how could
18   you possibly know what you were doing.
19   Q   So let's go back to your chair, and we're
20   picking up -- that's where you were as senior vice
21   president and that's to whom you reported?
22   A   Correct.
23   Q   And again, just the business that that whole
24   sector was in, that Integrated Technologies, I think
25   it says Integrated Ops, what was that business within

Page 168

1    IBM?
2    A   That was all part of our contracts that we
3    negotiated with the companies.  Like I used the
4    example before, United Technology.  We would go in and
5    take over running their IT departments.  We'd take the
6    people, we take their equipment, and we would run it
7    for them on a day in and day out basis.
8    Q   In 2005 when you first became vice president
9    of Public Sector, specifically what were your
10   responsibilities?
11   A   Maybe I should explain a little bit of Public
12   Sector so you understand it.  I had 30 contracts.  We
13   called them commercial contracts, but I had 30
14   contracts that I was responsible for doing this day in
15   and day out type of service, and the contracts were
16   grouped into different groupings.  I had healthcare,
17   and in the healthcare world, the kinds of contracts we
18   had in there, it was your insurers, like United
19   Healthcare, or Wellpoint, or Blue Cross Blue Shield.
20        So every year when you go in you do your
21   signups at the end of the year, it was one of those
22   companies like them that we were providing the IT
23   services for them.  We didn't have anything else to
24   do.  We weren't administrators, we were just running
25   what we always referred to as the plumbing that keeps

Page 169

1  that running.
2      We also had hospitals.  That was another part
3  of the healthcare and life sciences piece.  So for
4  example, I had two contracts in New York City that I
5  was running, which was NYU Medical Hospital, which is
6  a teaching hospital, and Mount Sinai Hospital, and I
7  was responsible to the IT, running the IT within that,
8  and I'll explain a little bit more what that's like.
9      And then I had the pharmaceuticals.  So
10  Johnson & Johnson, AstraZeneca, it was research and
11  coming up with new drugs.  They also had large IT
12  organizations that we took over and ran.
13      And then we also had a couple that would
14  actually be the drug trials, like Colgate, J&J or
15  AstraZeneca had Colgate through drug trials, and we
16  would run that.  That's on the healthcare life
17  sciences side.
18      When you get into the state and local it was
19  government.  So for example, Commonwealth of
20  Pennsylvania, we ran their data center for them.  We
21  took over running that program for Pennsylvania.  If
22  you ever get a speeding ticket in Chicago, the
23  notification that you receive that's run off the
24  computers that you have to pay this fine, we were
25  running those systems, that Chicago downtown traffic

Page 170

1  was running.
2      Then we had child services, in California, a
3  few other states, Indiana.  There were others that we
4  were running for them.
5      And I also mentioned I had federal government.
6  So we had contracts with U.S. Forestry where we were
7  running equipment that was sitting actually in the
8  towers where they were looking out for forest fires
9  and we were managing that equipment for them.
10      We were also doing it for Homeland Security.
11  So all of the records of the passbook and for across
12  the border, we were running a lot of systems for them,
13  and there were other contracts behind them.  Kind of
14  get an idea of the different types was companies.
15  Q   So what you've been talking about are an
16  example of the 30 contracts that you were overseeing
17  in that position as vice president?
18  A   Yes.
19  Q   Can you explain the services that you were
20  providing?  Let's just say for a hospital, just drill
21  down one level just for a minute, what was going on
22  with respect to one specific contract?
23  A   I don't know if there's any nurses here, but
24  I'll try to explain.  In a hospital, when you -- and
25  I'll use different areas of what we took over running

Page 171

1  for them.  In the admissions office when you go in and
2  you sit down with the administrator on the other side
3  of the table and he's asking all -- or she's asking
4  all the questions, what's your coverage, address, who
5  should we notify first if something happens, and so
6  forth, when they're sitting at that terminal typing,
7  we're actually managing that terminal, and we're
8  managing what it's connected to, which is a bunch of
9  servers behind it.  So we're managing that, making
10  sure it's available to that administrator, so when you
11  walk in to the hospital to be admitted, it's running
12  for you.
13      Once you get beyond that and you're in the
14  hospital, the doctor walks around -- now they don't
15  have clipboards anymore, they have this -- like an
16  iPad that they're walking around with, portable
17  device.  What we were responsible for is that iPad was
18  connected to, again, a database of information about
19  the patient in that particular room; what they were
20  treated for, any vital signs that they had, any
21  medication they were on.  So the doctor had available
22  to him, as they walked around, they could just give
23  the room -- I'm assuming the room number, and it would
24  pull up that up information.  We made sure all those
25  things were running to be able to provide that

Page 172

1  information.
2      And then the doctor, go one step further, is
3  if the doctor, they want to issue a new prescription
4  for an individual, they would go out to the nurse's
5  station -- and the nurse's station has multiple
6  terminals out there.  We were making sure those
7  terminals were up and running.  And when a
8  prescription's put in, it goes down to the pharmacy,
9  which is usually on a different floor.  We were also
10  supporting that.
11      So in a hospital there's a lot of vital
12  systems there that we had to make sure is up and
13  available to the doctor and nurses and pharmacists.
14  Q   So back to the next higher level, the 30
15  contracts that you were running, can you give the
16  jurors your best estimate of the total revenues that
17  were generated by all of those 30 contracts for IBM?
18  A   I believe as an aggregate of all of the
19  individual contracts, it was about 700, $700 million a
20  year in revenue that we were collecting against these
21  customers.
22  Q   Can you give us a general idea of the annual
23  revenues generated on one of the contracts, just a
24  range?
25  A   It varies.  There were little contracts that

1    we had.  There would be as low as, say, $10 million,
2    to -- the bigger contracts in this particular area,
3    the sector I had, was probably in the neighborhood of
4    about $40 million, $46 million.
5    Q   What was the typical length of one of those
6    contracts?
7    A   IBM preferred when they negotiated to get a
8    seven-year contract.  That was kind of the standard we
9    were trying to go to.  Customers were getting smaller,
10   didn't want to be tied up with us for seven years, and
11   they were setting up for a smaller period of time,
12   like three.  So it was three to seven year what IBM
13   wanted to set up.
14   Q   And your compensation in that position was
15   just a little over $200,000, around 217, is that
16   right?
17   A   That's correct.
18   Q   So to what extent were you the one responsible
19   for the quality of the services and the customer
20   satisfaction on all of those 30 contracts?
21   A   Well, we had day-to-day delivery of that and
22   were responsible for making sure that service was
23   available to the customer day in and day out, and we
24   had measured things that the customer was -- well, the
25   customer had measurements that we were being held to

1    as far as how we performed against all those things,
2    and for customer staff, we were a good part of it.  We
3    weren't a hundred percent of it, but we were a good
4    portion of it.  If they're satisfied with us because
5    we were keeping them running, we'd get a favorable
6    result.
7    Q   And in the role as vice president Public
8    Sector, with what frequency did you field complaints
9    registered by customers?
10   A   Well, that really varied.  Complaints were not
11   unusual.  You have a relationship role, you have a
12   customer with higher expectations than what we think
13   we sold them.  So it varied.
14       The better the way a contract was negotiated
15   and agreed to with a customer -- so it's like if you
16   have your kitchen redone and you're sitting with the
17   contractor and he's telling you what color the
18   cabinets, how many pieces, and so forth, when it's
19   there, and he delivers on that, you're satisfied, but
20   if he comes in and says, I'll give you nice cabinets,
21   without getting into the details, and then he puts
22   them in and it's the wrong color, something like that,
23   you're dissatisfied.  So the better we had these
24   contracts defined where we told them what the cabinet
25   would look like, we had less issues.  Fewer

1    complaints.
2       The other side of that is where you didn't
3    have that well-defined where you stated things that
4    weren't achievable, they were very upset.  They had
5    every right to be upset, and they would register, and
6    they used every means possible to register, and they
7    kept up with those complaints until they were
8    satisfied something was fixed.
9       And some of it was a decision on IBM's part,
10   too, where we couldn't afford to deliver everything we
11   told the customer, so we would cut back and try to
12   hold back costs on that, and as a result the delivery
13   side was trying to meet the expectations of the
14   customer, but didn't have all the dollars to get the
15   necessary people, the necessary equipment, or get
16   newer equipment, and the customer perceived it as
17   fail, and we took risks on poorly written contracts
18   like unfortunately at the expense of the customer.
19   Q   So would you briefly summarize the
20   achievements of the Public Sector team in 2005, your
21   first year in that position?
22   A   Actually in 2005 when I took over we had one
23   really bad situation in New York City, but in spite of
24   that, when you compare -- on the org chart, my peers
25   there, we actually had measurements against each

1    other.  We outperformed the other sectors as far as
2    customer Sat.  We had the highest customer Sat rating
3    of all of my peers in that organization.  In fact, our
4    customer Sat is rated on a scale of 1 being the lowest
5    and 10 being the highest, and we had something like 10
6    of our contracts score as perfect, totally satisfied
7    with us.  So we had a very high score.  And our
8    financials, we were able to grow the business.  We
9    were able to show that we could deliver these services
10   in this sector, and as a result we had revenue growth.
11   Q   I think you indicated when you were looking at
12   the org chart, but to whom were you reporting at that
13   point, 2005?
14   A   2005 I was reporting to Kelton Jones.
15   Q   And his position, again, was?
16   A   He was the general manager of -- he made --
17   his title may have been vice president, but vice
18   president and GM are interchangeable at IBM, but he
19   essentially ran all ITD America, so he had all of the
20   Americas delivery responsibility.
21   Q   Did Mr. Jones provide you with an annual
22   review for your first year as vice president of Public
23   Sector?
24   A   Yes, he did.
25   Q   And do you recall what rating you received?

Page 177

1    A   I believe I was a 2 plus.
2    Q   Could you look at Exhibit 13, please.
3        THE COURT:  That was 18?
4        MR. CARTA:  I'm sorry, 13.
5        THE WITNESS:  It's a 2 plus, above --
6    PBC, that's three on top, you've seen a couple of
7    these already, above average contributor.
8    BY MR. CARTA:
9    Q   And would you you would you mind reading the
10   highlighted portion of your overall assessment,
11   please?
12   A   Sure.  "Jim provided strong leadership to his
13   team and led them in a very strong delivery
14   performance for the Public Sector across 2005.  Jim
15   provided key leadership in support of critical
16   situation management --" we call them Crit Sits
17   "-- within the sector accounts and key leadership in
18   driving balance in cost management."  That's where I'm
19   doing the equation of cost and delivery execution
20   across the accounts.
21       "Jim led his team in helping the sector
22   achieve their profit plans, and he and his team met or
23   exceeded his spend targets in every quarter."
24       Down at the bottom it says, "Jim and his team
25   do need to improve on the outlook/commitment roadmap

Page 178

1    process around full year plans and quarter to quarter
2    dynamics.  This is a changing dynamic in our business
3    process and I know with the rigor Jim brings to his
4    overall management he and his team will get this
5    addressed as a focus area."
6    Q   So is it unusual in the overall assessment for
7    a manager to suggest to you the areas in which they
8    want you to continue to improve?
9    A   Generally not at all, is the answer.  And
10   during the actual evaluation process when you're
11   sitting with the employee and going through that, a
12   lot of times -- not a lot of times -- you bring up
13   these issues with them, and then you have the option
14   of just summarizing at the end so it's clear when you
15   leave there that's an area you want to focus on,
16   was forecasting cost.  And we put it in there to make
17   sure I understood it, we had discussed it, here's
18   something I want you to look at.
19   Q   Did you also continue to work for Mr. Jones
20   for all of 2006?
21   A   Yes.
22   Q   Were there any important changes in your
23   responsibilities in your second year as vice president
24   of Public Sector?
25   A   My responsibilities stayed the same.

Page 179

1    Q   Again, would you briefly summarize the major
2    achievements, if any, of your team in the second year
3    as VP of Public Sector, 2006?
4    A   2006?  Well, in 2006 a lot happened.  2006 was
5    a -- that was a difficult year, and a difficult year
6    in the sense that we had two large contracts that was
7    within my sector that were extremely profitable for
8    IBM, and that was United Healthcare, and that was
9    Pacific Care, both insurers that you register -- I
10   mentioned before about when you go and get your
11   benefits -- they were too large.  In fact United
12   Healthcare at that time was the largest Healthcare
13   provider in the U.S.  We had those two contracts.
14       They decided they didn't want to continue
15   doing business with IBM and they terminated their
16   contracts, and the reason that happened was they had a
17   new CIO team come in and they feel more comfortable
18   running their own business than giving it to someone
19   else to run.  That's not unusual.  That happens.  So
20   they took -- those two contracts were terminated,
21   which were very, very profitable for IBM.
22       They were, in fact, masking a problem that was
23   starting to surface on another contract.  They were
24   masking the problem of how bad Wellpoint was.  We had
25   signed Wellpoint in -- I think it was July of 2005.

Page 180

1    We were really getting into running it in 2006, and
2    the financials on those were not really that visible
3    until the two that were offsetting the damages from
4    Wellpoint left IBM, and now you had this huge -- I
5    don't know what it was.  It was like a -- I don't want
6    to say a number because I don't remember, but it was a
7    large number of revenue and profit, and the main thing
8    is profit for IBM, that left, taking it back in-house.
9    And what that looked at -- you had this other contract
10   now that was new that was starting to have a
11   significant effect on the other 28 contracts that were
12   still within the Public Sector, and it got a lot of
13   attention.
14   Q   In terms of your other achievements in terms
15   of the second year as VP of Public Sector, how did you
16   do in terms of the -- what you call the customer Sat
17   or customer satisfaction ratings?
18   A   We lost our two favorite accounts, right?  But
19   we continued to lead my peers in performance on client
20   satisfaction.
21   Q   And did you have any significant audits during
22   that one-year period?
23   A   That's another thing I should mention.  2006
24   was also interesting because we had audits of how we
25   were running and handling the business, and those were

Page 181

1    corporate audits. We do our own internal friendly
2    audits to help you know where you may have problems
3    and then you can actually address. There's no penalty
4    for friendly ones, but when you had a corporate audit,
5    IBM goes out -- I think at the time it was PWC,
6    PricewaterhouseCoopers. And they bring them in to do
7    an audit. And that particular audit, when it's done,
8    I believe it has to be reported all the way to the
9    chairman's office. We had seven contracts within my
10   sector. It was like a feast on Public Sector, of
11   doing audits across the seven individual contracts
12   within our sector, which puts a lot of stress and
13   lot of focus within our area.
14      Q   And how did your seven contracts do, the ones
15   that got audited?
16      A   It was a lot of sleepless nights, but we
17   passed all seven. All seven were reported back to the
18   chairman's office and to the board that we had passed
19   the seven audits successfully.
20      Q   What was the biggest challenge your team was
21   facing in 2006?
22      A   2006, as I mentioned, was the surface of the
23   Wellpoint contract and how bad it was. We had a
24   glimpse of it in the end of 2005, but it really became
25   in focus in 2006.

Page 182

1       Q   There's something called a transition phase.
2    Can you explain what the transition phase is in the
3    context of the outsourcing business that you were
4    overseeing?
5       A   Transition is any new contract we signed,
6    outsourcing contract -- like, for example, I was
7    talking about -- Wellpoint, for an example, we signed
8    that contract -- Wellpoint, by the way, is an
9    insurance provider. They rival -- the two leaders in
10   the industry, the Americas, at least, is United
11   Healthcare and Wellpoint. They're the two largest.
12   By far they dwarf the Blue Cross Blue Shield, so
13   forth. In fact, they were sweeping up Blue Cross and
14   Blue Shield.
15      Q   You were talking about transitions.
16      A   We go through this long period of time of
17   negotiating the contract and then we -- when the
18   customer signs, we go through a transition period, and
19   we say we're going to transition what you have the way
20   you're running it and the way we prefer to run it
21   within IBM. And we do that because we feel that's our
22   core. We perfected it and we're able to do what
23   you've been doing at a much lower cost, much more
24   stable and predictable environment than what you had
25   before.

Page 183

1       And during transition is when we start
2    converting it over to the IBM way of doing things, and
3    that includes putting special tools out in the
4    environment, it includes changing the way they do
5    things, process type work, and it also means the
6    people that we bring over with that project to IBM, so
7    in this particular case there were a number of
8    Wellpoint employees that were running the department
9    as part of our outsourcing deal, we brought them and
10   made them IBMers, transitioning into IBM, and there
11   was like 380 or 390 people that fell into that
12   category, so we took a large population that were
13   Wellpoint employees and brought them into IBM.
14      Q   In 2006 where were you in that process, where
15   were you sequentially?
16      A   2006, there were delays in -- there were a lot
17   of delays for a number of reasons. I won't go into
18   that. But that was causing some of the problem. The
19   customer was changing their mind on some things. We
20   were beginning to transition in -- the major parts of
21   the transition -- they had a data center. We wanted
22   to take a bunch of their data centers and move it into
23   one so they could sell those buildings off and get rid
24   of those leases and save money, and that transition
25   into that center required their center to be upgraded

Page 184

1    power-wise, because they were -- you were doing more
2    in there. So they had a major event, so there would
3    be a successful power upgrade in the beginning of the
4    year, and then later on they wanted to get out of the
5    California data center, which was built on a fault in
6    California, had severe -- a single feed of power, so
7    it was very susceptible to power outages. They
8    couldn't deal with it, and it was a disaster. They
9    knew it. I'm not saying anything that they wouldn't
10   agree to. It was a disaster. So they were very
11   anxious to get out of there because it was a time bomb
12   ticking on them. So we had to get this power upgrade,
13   which was -- had to happen first, and then we could go
14   out there and take that center and move it into the
15   center of Richmond, Virginia.
16      Q   We'll go into that in more detail. I'm trying
17   to deal with high profile in 2006. Were you able to
18   reduce any costs on the Wellpoint contract in 2006?
19      A   Yeah. To give you an order of magnitude on
20   this, in 2006, when United Healthcare and Pacific Care
21   left, we zeroed in on Wellpoint, and Wellpoint was
22   going to lose $46 million to IBM. Or $48 million to
23   IBM.
24         So by running that contract, we were having
25   more cost than we had revenue, and for one year alone

Page 185

1  we were going to lose $48 million on that contract.
2  You don't fix that overnight. But what we were able
3  to do is take some of the quick paths to get fixes in.
4      So working with my team and part of the
5  collective team that's working on this, we were able
6  to mitigate some of the damages from that down to $23
7  million.
8      Q   And was the customer satisfaction survey
9  conducted on Wellpoint in that first year?
10     A   No, it wasn't.
11     Q   Your second year on the job, the first year of
12 the Wellpoint contract?
13     A   2006, which was the first full year of running
14 Wellpoint.
15     Q   Right, second year on the job as VP.
16     A   2006 there wasn't a Wellpoint customer Sat
17 done.
18     Q   Correct. Okay. Did you discuss the
19 challenges of Wellpoint with Mr. Jones, Kelton Jones?
20     A   Yes. I mean it was so significant, you can't
21 hide something like that. It has to be brought
22 forward to the business. The business needs to know,
23 they have this huge contract they just signed.
24     Q   So to what extent did you find him
25 knowledgeable about the challenge they were being

Page 186

1  faced on the Wellpoint contract?
2      A   Well, we did a couple things in 2006. Really
3  zeroing in on what was wrong, we had a good sense of
4  what was wrong, but we needed verification. So we
5  knew in -- going into 2006 that we had this problem.
6      Q   Did you receive an evaluation from Mr. Jones
7  at the end of 2006?
8      A   Yes.
9      Q   And that's Exhibit -- can you identify Exhibit
10 14?
11     A   Yes, that's it. That's my 2006 performance
12 that was evaluated in January.
13     Q   And what was your rating?
14     A   I was a 2 solid contributor.
15     Q   On the bottom of the overall assessment, is
16 there a discussion of the Wellpoint contract?
17     A   Yes.
18     Q   Is there a reference to -- please review that
19 with the jury, if you would.
20     A   The highlight, "Jim had a solid year in people
21 management responsibilities. He and his team dealt
22 with a very difficult environment around one of the
23 troubled accounts."
24     Q   What troubled account was that?
25     A   That was Wellpoint.

Page 187

1      Q   Okay. Go ahead.
2      A   "This account was under severe financial and
3  performance stress, and the workload and stress on the
4  people was significant. He and his team were able to
5  deal with this, continue to work on options to relieve
6  the situation around the people side of the account
7  issue."
8      Q   What does that mean, "people side of the
9  account issue," what did you understand it to mean?
10     A   Well, we were so understaffed on that contract
11 based on what was negotiated, people were quitting.
12 We were working them around the clock and we were
13 losing a great deal of talent because they couldn't
14 stay in the work environment and they were quitting.
15 We also couldn't get the necessary skills in some
16 areas that we needed because they weren't available
17 within IBM.
18     Q   Okay. The last sentence, please.
19     A   "Jim also provided sound leadership across his
20 team in dealing with the ongoing people management
21 responsibilities."
22     Q   Did you receive a raise for 2006?
23     A   Yes, I did.
24     Q   And do you happen to recall what your total
25 compensation package was at that point, at 280,000 I

Page 188

1  think you said earlier?
2      A   Yes, this was the year, right.
3      Q   And who participated in determining your
4  compensation package?
5      A   Actually it starts with your manager, so it
6  would be Kelton, and then it works across the unit, so
7  I'm sure Bob Zapfel had some view in this. Well, at
8  that time it would have been Tony Macina was involved.
9  Kelton would have looked across his organization. He
10 would allocate developers to go with it.
11     Q   So let's talk about this in a little more
12 detail. And I'll try to go through it quickly, if we
13 can, but there are some important numbers here.
14     So among the 30 contracts that you were
15 overseeing, as vice president of Public Sector, one
16 was the Wellpoint contract, is that correct?
17     A   Correct.
18     Q   Did you say when that contract went into
19 effect?
20     A   It was signed, I believe, in July of 2005.
21     Q   And for how many years was the contract
22 scheduled to run?
23     A   It was a seven-year contract.
24     Q   And do you recall the total revenues that it
25 was supposed to generate for IBM?

Page 189

1    A    It was $720 million.
2    Q    And that's reflected in Exhibit 15?
3    A    That's correct.
4    Q    I think you said earlier that there were a
5  number of employees that were going to be -- that were
6  former Wellpoint employees that were going to become
7  IBM employees as part of the transition process?
8    A    Right.
9    Q    And approximately how many were those?
10    A    Well, this says 380, but I think the number
11  was more like 390, but it was close enough.
12    Q    And do you recall how many locations Wellpoint
13  had?
14    A    They had four large data centers, but they
15  were in locations -- they had processing centers for
16  doing claim processing, where your administrators
17  would be seated for that, and that was across the 80
18  locations across the U.S. I'm sorry, it was three
19  main centers, California, Missouri, Georgia, would be
20  the --
21    Q    How many locations coming -- in the aggregate?
22  Do you know?
23    A    Data centers?
24    Q    Just locations.
25    A    Locations was 80. There were over 80

Page 190

1  locations.
2    Q    I think you indicated that Wellpoint and
3  United Healthcare were in the same business?
4    A    The two largest companies, healthcare
5  insurers.
6    Q    What were the services that were being
7  provided by IBM to the Wellpoint account?
8    A    We were managing, again, all of their -- what
9  I call its servers. And there are different size
10  servers. Not to confuse anyone, but there's little
11  ones that support little departments, processing, and
12  very large ones that run a whole business unit, and
13  large ones was claim, called engine.
14        So every time when you submitted -- if you
15  were a -- Wellpoint was your insurer and you were
16  submitting a claim, because you had come from the
17  doctor, you were managing the servers that the actual
18  claim processing was taking place, and even the
19  printing of the reports that you could then mail --
20  now they do them through e-mails -- but you would get
21  a paper report as a result of that, and we were
22  managing all of that for them. Enrollments. Any
23  disputes we would handle.
24    Q    I think you also said there were two major
25  critical projects that needed to be accomplished early

Page 191

1  on?
2    A    Yeah. The CIO made it very clear that the two
3  most critical projects he had in 2006 was -- and it
4  was value driven by the fact that the data center --
5  his data center in California which we were now
6  managing was in a meltdown, and his two critical
7  things, which he made it very clear, was get
8  California into his Richmond center, but for that to
9  happen there had to be a major upgrade in the Richmond
10  center, and the major upgrade in the Richmond center
11  had to be done while they were still doing their
12  business processing, they were still doing claims
13  processing. So you had to figure out -- almost like
14  the expression, you have to change the wheels on the
15  car while it's running, and that's what -- we had to
16  put a plan in place to do that, without disrupting
17  their business.
18    Q    And when did IBM really fully begin to
19  understand the magnitude of the problems with the
20  Wellpoint account?
21        MR. FASMAN:  Objection, Your Honor.
22        THE COURT:  Basis, sir?
23        MR. FASMAN:  I don't think he can testify
24  as to what IBM understood in any case.
25        THE COURT:  What do you think were the

Page 192

1  reasons?
2        THE WITNESS:  IBM knew in 2006 -- I mean
3  all levels.  You know, the financial officer in IBM
4  knew, executive level, senior executive levels in IBM
5  knew that we were troubled, one step away from --
6        THE COURT:  The objection's sustained.
7  BY MR. CARTA:
8    Q    Mr. Castelluccio --
9        THE COURT:  Stop.  The question may
10  stand, but the response will be stricken, because it
11  is not responsive.
12        Would you either re-ask the question, Mr.
13  Carta -- I prefer that you re-ask the question rather
14  than ask the court reporter to read it back.
15        So I wold ask you please to listen very
16  carefully to Mr. Carta's question and confine your
17  answer to just his question.
18        Go ahead.
19  BY MR. CARTA:
20    Q    My question was in error.  I will rephrase it.
21        When did you begin to understand the magnitude
22  of the problem at Wellpoint.
23    A    In the first quarter of 2006.
24    Q    And what was -- what were the circumstances
25  under which that became apparent to you?

Page 193

1    A   We were starting to look at the financials
2    associated with the account, what it was costing us to
3    deliver these services to the customer versus what our
4    contract cost model said it should cost for us to
5    deliver these services.
6    Q   And what became apparent with respect to the
7    contract itself, if anything?
8    A   There were a lot of -- I mean there were
9    errors in simple calculations.  A bad number was
10   plugged in one of the formulas.  That generated a big
11   problem for us.  The team that put together the
12   costing that went with the contract, with the terms of
13   the contract, had severely undersized the environment
14   of the customer, had severely underestimated how
15   antiquated some of the equipment was that we were
16   taking over.  There were assumptions made that were
17   false assumptions, and we were starting to discover
18   those errors and assumptions.
19   Q   Can you give an example of the last point, the
20   outdated equipment?
21   A   They had a mail system in place that -- if you
22   have an e-mail subscriber, you expect your e-mail to
23   be available, but the e-mail system that they had in
24   place was -- it was -- make sure I don't use an IT
25   term, but if you were trying to get e-mail from

Page 194

1    California to someone on the east coast, it had only
2    one path to get there.  If at any point along that
3    3,000 mile path something goes wrong, your e-mail is
4    not forwarded, it's stopped, and it's not only your
5    e-mail, but everyone in your geographic area in
6    California can no longer communicate with someone on
7    the east coast.
8    And the reason for that is they had
9    implemented it -- I don't think it was designed -- I
10   think it was implemented that there was a single path,
11   a single box that everyone had to go through to get to
12   their next destination.  That single box was old.  It
13   was undersized.  The software in it was not
14   maintained.  So it was down many levels on it.  So it
15   was an old system that was undersized and
16   underpowered.
17   Q   You also said there were pricing issues with
18   respect to the contract.  Can you give an example of
19   one of those?
20   A   Just one example of that, on how it can
21   magnify, storage was a problem, and storage in this
22   business is -- all your claim information has to be
23   kept somewhere.  It's not in my cabinets anymore.
24   It's out on, you know, IT equipment where it's being
25   stored.  And we charge a price for every piece of data

Page 195

1    that they want to store in that environment.
2    The price we had put out there I think was
3    calculated at -- I think it was like 86 cents a gig.
4    A gig is just a piece of information.  So it was 86
5    cents for a piece of your information to be stored in
6    their system.  When we looked at this we realized that
7    it should have been 2.45, not 86 cents, and by the
8    way, it was costing us -- that's what we should have
9    charged them, 2.45, and by the way, it was costing us
10   2.85 to deliver it, so even if we had the right price
11   for it, we had a problem with cost of delivering it.
12   And when you look at that, it was -- trying to
13   think of the size of the problem -- I think over the
14   life, it was a $56 million problem alone just going
15   from 86 to 2.45.  And that's a simple example of one
16   of the problems on the contract.
17   And that's not easy to fix.  Because what we
18   are saying is it should have been 2.45, it's costing
19   us 2.85 to do it, we need to get below 2.45, but we're
20   never going to get down to 86, it's impossible.  So
21   that's an area that came forward as a problem, and the
22   only way to solve that is you have to go back to the
23   customer and see if you can renegotiate that piece.
24   Q   Can you give an example of a contract term
25   issue that arose on the Wellpoint contract?

Page 196

1    A   An example of that is where they interpreted
2    that we had agreed to take over a piece of their
3    business that we never had figured -- we never
4    expected to take over that piece of the business.  We
5    had priced it, considered it.  It was something we
6    didn't want.  Not that we didn't want, we just didn't
7    put it in the contract.
8    Q   What was that piece of business?
9    A   There was one area called FileNet, another
10   area called the Blackberry services.  And those two
11   areas we just -- it wasn't in the contract.  You look
12   at the contract, there was no reference in there at
13   all, but they expected us to deliver it.  And believe
14   me -- Blackberry in particular -- because Blackberry
15   was their mobile device that every -- the CIO, at
16   least, I know at his level, he used that every day to
17   communicate with his Blackberry and use it for e-mail,
18   and voice, obviously.  And we didn't have any
19   support -- we didn't have skill in that area to
20   provide that support.  And the problem was every time
21   he couldn't send a message, he got on the phone and he
22   would be screaming about, I've lost access.
23   And it was a big -- it was fair, it was a big
24   impact to him.  The problem was, he expected that we
25   had signed up for it, and we didn't sign up for it, so

Page 197

1    we weren't ready for it, and we didn't have a great
2    deal of knowledge in IBM, didn't know how to do that.
3    We did staff up for it, but it caused problems.
4            MR. FASMAN:  I have to make the same
5    objection.  I mean Mr. Castelluccio's speaking on
6    behalf of IBM.  There's no evidence he negotiated the
7    contracts, no evidence of any of this.
8            THE COURT:  Okay.  Your objection's
9    noted, and it is not unmeritorious.  But I think the
10    better way to handle it is to not give a narrative of
11    everything that went on, but rather to confine
12    yourself to answering Mr. Carta's question.  He knows
13    what to ask and where he's going.  Just answer his
14    questions, we'll move things along a little better.
15            So the answer will stand, but again, your
16    objection, Mr. Fasman, is not unmeritorious.
17            MR. FASMAN:  Thank you, Your Honor.
18    BY MR. CARTA:
19    Q    What role did you perform in due diligence in
20    connection with the negotiation of the agreement
21    between IBM and Wellpoint?
22    A    None.  I didn't have any involvement in that.
23    Q    What role did you perform, if any, in
24    connection with the pricing of the Wellpoint contract?
25    A    I didn't perform any role in that.

Page 198

1    Q    Did you have any role in setting the terms and
2    conditions of the Wellpoint contract?
3    A    No, I did not.
4    Q    What group had that responsibility?
5    A    That was the GTS organization, the sales side.
6    Q    Is that -- can you see that on your chart?
7    A    That's a different organization.
8    Q    Let's pull that up.  Do we have the chart,
9    please?
10            MR. FASMAN:  I'm sorry, what exhibit is
11    that?
12            MR. CARTA:  It's 11.  I think there's two
13    exhibits.
14            MR. FASMAN:  Thank you.
15    BY MR. CARTA:
16    Q    Can you point out what you referred to as the
17    GTS service organization on that chart?
18    A    Yes.  That's this organization right here,
19    beginning from the senior level to the Americas level
20    to the Public Sector level.
21    Q    And where is the ITDelivery group relative to
22    that?
23    A    In this line of reporting.  So this is where I
24    would be, and this is where Kelton Jones and Joanne
25    would be.

Page 199

1    Q    Is that Mr. Zapfel right above in green?
2    A    That's -- yes.
3    Q    So it's an independent group within IBM to
4    handle the contract negotiations and due diligence?
5    A    Yes.
6    Q    And what is the -- your group is in charge of
7    delivery.  What is the GTS group, what's their
8    responsibility?
9    A    They actually sell the contract to the
10    customer.  They target whoever the customer may be.
11    They negotiate the contract with them, and they sell
12    it to them.  So they were like the sales side.
13    Q    And what position at IBM was specifically
14    responsible for the work of GTS on the Wellpoint
15    contract?
16    A    That was Dave Liederbach.
17    Q    Take a second and look at Exhibit 16.  You
18    referred to Mr. Zapfel on a number of occasions.  Did
19    Mr. Zapfel, the general manager of the Global
20    Technology Systems, did he request an overview of the
21    Wellpoint contract?
22    A    Yes, he did.
23    Q    And who contributed to that overview?
24    A    It was led by -- the actual gathering of
25    putting the presentation together was led by Dave

Page 200

1    Liederbach, and then we had members who were involved
2    with the account assist in getting the data together
3    for him.
4    Q    And was that review reduced to writing?
5    A    Yes, it was.
6    Q    And would you please review quickly the
7    summary, the situation summary that appears on page 2
8    of that document?
9    A    The highlight.  "The current contract
10    represents a great deal for Wellpoint."
11    Q    What does that mean, "a great deal"?
12    A    It was a great deal for them because we would
13    improve the way they were running their business.  So
14    we could bring our expertise into their environment,
15    and deliver that a little -- theoretically deliver at
16    a lower cost than what they were capable of doing.
17    Q    Continue, please.
18    A    "IBM has made improvements in delivery and in
19    the overall leadership."
20    Q    That's Mr. Zapfel's point of view.  And when
21    was this report prepared?
22    A    June 2nd, 2006.
23    Q    Okay.  And the last highlighted point?
24    A    "The current relationship is stressed,"
25    meaning between IBM and Wellpoint.

50 (Pages 197 to 200)

Page 201

```
1      Q   On page 18 is there reference to projected
2   losses?
3      A   The same 2006 report?
4      Q   Yes.
5           MR. FASMAN: I'm sorry, is there a number
6   on the bottom?
7           MR. CARTA: Lower left-hand corner.
8           MR. BAILEY: 5619.
9           MR. FASMAN: Thank you.
10          THE COURT: This is Exhibit 16, Mr.
11   Carta?
12          MR. CARTA: Yes, Exhibit 16, Bates number
13   far right lower corner 5619.
14          THE COURT: Thank you.
15   BY MR. CARTA:
16      Q   So my question is, did the Zapfel report
17   summarize the annual negative impact of the various
18   variables that were analyzed?
19      A   Yes. That's represented by the 44.5 million
20   in the first column. That was a division figure.
21   That's the -- that would total $44.5 million for IBM.
22      Q   And did Mr. Zapfel's group also project the
23   total amount of the negative impact of those problems
24   over the seven-year term of the contract?
25      A   Yeah. The summary of that for seven years is
```

Page 202

```
1   the total on that column down on the right, and the
2   total is -- these mistakes were going to cost IBM
3   210.2 million.
4      Q   Okay. And the next page of the report, does
5   Mr. Zapfel's report discuss the relationship again
6   with the client?
7      A   Yes, it does.
8      Q   And what does the report indicate?
9      A   It says "CIO with the screw-the-vendor
10   attitude."
11      Q   And who's that a reference to?
12      A   The CIO at that point in Wellpoint was Mark
13   Boxer.
14      Q   So that was Mr. Zapfel's assessment of the
15   person he was dealing with at IBM? I mean at
16   Wellpoint?
17          MR. FASMAN: It's labeled as Zapfel. I
18   don't know whose report it actually is.
19          THE COURT: Okay. Let's take a break
20   here. My exhibits in my folder don't seem to coincide
21   with your numbering, Mr. Carta. Maybe you could --
22          MR. CARTA: It's Bates 5620. It's the
23   next page.
24          THE COURT: 5620?
25          MR. CARTA: Are the last digits.
```

Page 203

```
1           THE COURT: One second. I have 95620,
2   says "relationship".
3           MR. CARTA: Yes.
4           THE COURT: "Building relationships and
5   partnerships with the business has been difficult, CIO
6   with the screw-the-vendor attitude."
7           Precisely what's your question, sir?
8           MR. CARTA: I asked him to -- what's what
9   CIO that was referring to.
10          THE WITNESS: It was WellPoint's CIO, and
11   at the time it was Mark Boxer.
12   BY MR. CARTA:
13      Q   In your experience working on the Wellpoint
14   account both as a vice president and then later on as
15   the DPE, to what extent did you experience that
16   attitude?
17      A   I'm not sure how to answer that. I mean there
18   were times that were very difficult, very
19   unreasonable, and it was for the purpose of -- you
20   know, they viewed us as a vendor rather than a
21   partner. We like to be called a partner. We were a
22   vendor. They felt that by taking a very aggressive
23   approach with us, we would do things, whether it was
24   in the contract or not in the contract.
25      Q   Let's move on. Did IBM also conduct the
```

Page 204

```
1   independent assessment of the Wellpoint contract in
2   June of 2006?
3      A   Yes.
4      Q   And is there a term that was used for that
5   investigation?
6      A   Yes. It's called the Red Team Review.
7      Q   And let's step back for a second. What --
8   before we get into the specific Red Team Review of
9   Wellpoint, are you familiar with the purposes and
10   procedures followed with respect to Red Team Reviews?
11      A   Yes, I am.
12      Q   What's the purpose?
13      A   It's used very infrequently, and the purpose
14   of it is to go for an independent team, take a look
15   at -- and it's really targeting contracts. It's an
16   independent team that can come in and do an assessment
17   of the state of the contract and how we're doing, all
18   aspects of the contract and how we are performing
19   against that contract.
20      Q   When you say "independent," what do you mean?
21   Can you be more specific, please?
22      A   It's a group that has no allegiance to any one
23   of the sectors. They're independent of that. They're
24   IT, finance, contract, expertise that are brought in
25   to look at, like I said, one of these contracts, which
```

**A-328**

Page 205

1 aren't many, to take a look at, so they try to stay
2 neutral, so they can't be part of the actual delivery
3 component.
4    Q    And in what instances would a Red Team Review
5 be initiated?
6    A    It could happen, I believe, two ways. One is
7 it could be requested by an executive. In my case it
8 could have been requested by any one of the
9 executives. Liederbach, Joanne Collins-Smee. Any
10 exec can call it, but it has to be justified. There
11 has to be a valid reason for it.
12    Q    And what would be a valid reason, in your
13 experience?
14    A    Serious financial problems, major customer Sat
15 issues, major delivery problems, contract terms. So
16 it's all of them. Sometimes unfortunately you wind up
17 with one contract that has all of them.
18    Q    Was a Red Team Review initiated of the
19 Wellpoint contract?
20    A    Yes, it was.
21    Q    By whom?
22    A    Actually I looked forward to Kelton, and I
23 needed some clarification, because I was getting
24 arguments that it was not as bad as I was portraying
25 it. So I went to Kelton, who had to authorize it as

Page 206

1 the executive, and he felt it was time to come in and
2 take a look at this.
3    Q    So you initiated the request, he approved it?
4    A    Yes.
5    Q    What role, if any, did you perform in the
6 actual Red Team Review itself?
7    A    Well, it's designed to be an independent
8 review, so I was available to answer any questions,
9 but I did not participate or try to influence it in
10 any way.
11    Q    In terms of getting some perspective of the
12 frequency of Red Team Reviews, did any of your other
13 30 contracts have Red Team Reviews?
14    A    No. There wasn't a need to.
15    Q    At the conclusion of this independent analysis
16 did the Red Team Review also generate a summary of its
17 conclusions?
18    A    Yes, they did.
19    Q    Can you identify Exhibit 17, please.
20    A    Oh, I'm sorry, yes. That's the summary of the
21 Red Team Review for Wellpoint, on the Wellpoint
22 contract.
23    Q    And at that point how would you characterize
24 the internal dynamic between the employees working to
25 deliver the required services to Wellpoint and the

Page 207

1 employees who had sold that business?
2    A    Well, there was confrontation constantly. I
3 mean you had two major problems. You had the delivery
4 side struggling to get what it needs to fix it, and
5 you had the sales side that sold it trying to stem the
6 financial problems on it. And with that you just
7 battled over -- battled constantly, and some pretty
8 ugly battles occurred. It just happens when it's like
9 this.
10    Q    Mr. Castelluccio, did you work with others to
11 create a recovery plan to address the problems at
12 Wellpoint?
13    A    Yes, I did.
14    Q    And so the Wellpoint contract became effective
15 in July, the Red Team Review was then conducted in
16 June. Approximately when did you begin those plans
17 and when, if ever, did those plans actually get
18 created, reduced to a formal plan?
19    A    We actually started the work on the plan and
20 it was in the second quarter of, if I get the years
21 right here, the second quarter of 2006, we started
22 developing the plan. We were very anxious to see the
23 output from the Red Team Review to make sure that what
24 we -- we were taking action against were the biggest
25 problems. I mean we had a pretty good handle on where

Page 208

1 it was, but we used this as validation against that.
2 And it was a joint effort. It was not only the
3 delivery side, but these only work if you work with
4 the sales side as well, so we were working jointly
5 together to figure out what we can do to try to
6 address these issues.
7    Q    And who developed the plan?
8    A    Well, I actually led the plan from initiating
9 it from the delivery side, but we had my peers on the
10 sales side as well working with it.
11    Q    And can you identify Exhibit 19, please.
12    A    That is the Wellpoint staffing and
13 restructuring program.
14    Q    This is the one that you oversaw?
15    A    Yes.
16        THE COURT: Before we get into that, Mr.
17 Carta, I look at the clock up there, and that says
18 that it's almost 5 o'clock. It says about 4:58, but
19 the watch that my wife gave me for a milestone
20 birthday, which I celebrated a while ago, says it's 5
21 o'clock, and --
22        MR. CARTA: I know well enough to defer
23 to your wife, Your Honor.
24        THE COURT: I do, too. And so I suggest
25 that the witness step down, and if defense counsel

Page 209

1   have no objection and plaintiff's counsel have no
2   objection, we will adjourn court for today, and I will
3   be in this room in this chair tomorrow at 9:45. I
4   will be in my chambers probably quarter to 9 onward in
5   case I have to resolve any issues that may exist, and
6   you're welcome to walk up if you want to. But I'm
7   going to be here at 9:45.
8           And members of the jury, you have to
9   check in to just this room. You don't have to go to
10  the clerk's office. You check in here. And you'll
11  have the same room. Hopefully there'll be coffee and
12  refreshments of some kind.
13          Don't talk about the case. Don't think
14  about it. Go home, have a pleasant evening, drive
15  safely, and we will see you here tomorrow at 10
16  o'clock.
17          THE CLERK: 9:45.
18          THE COURT: They will be here -- they
19  will see this place, but they won't see me until 10,
20  but at 10 you'll see me. Okay? Have a pleasant
21  evening.
22          (Jurors excused)
23          THE COURT: All right. Nothing from
24  counsel? We're going to lock the door and the
25  documents will be safe.

Page 210

1           MR. CARTA: Thank you.
2           THE COURT: So have a good evening.
3           (Court adjourned)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 211

1           CERTIFICATE OF REPORTER
2
3       I Hereby certify that the foregoing 210 pages
4   are a complete and accurate computer-aided
5   transcription of my original stenotype notes taken in
6   the Matter of James Castelluccio VS International
7   Business Machines Corporation, which was held before
8   The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9   District Court, 450 Main Street, Hartford,
10  Connecticut, on January 13, 2014.
11
12
13          Wendy Allen, RMR, CRR
14          Notary Public
15
16
17  My commission expires: April 15, 2015
18
19
20
21
22
23
24
25

53 (Pages 209 to 211)

Page 211

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JAMES CASTELLUCCIO     )
    Plaintiff     ) 3:09-cv-01145 (TPS)
                   )
VS              ) January 14, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION   ) Federal Building
    Defendant      ) Hartford, Connecticut



VOLUME 2
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.















Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

---

Page 213

1          I N D E X
2
3  WITNESSES:                    PAGE:
4  James Castelluccio
5      Direct Examination by Mr. Carta............. 228
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 212

1
2  Representing the Plaintiff
3  Carta McAlister & Moore, P.C.
     1120 Boston Post Road
4  Post Office Boxer 83
   Darien, CT  06820
5     By:  Mark R. Carta, Esq.
           mark@cmm-law.com
6     By:  Margaret A. Triolo, Esq.
           margaret@cmm-law.com
7  By:  Troy Bailey, Esq.
8
9  Representing the Defendant
10  Paul Hastings, LLP
    75 East 55th Street
    New York, NY  10022
11     By:  Zachary Fasman, Esq.
            Zacharyfasman@paulhastings.com
12     By:  Todd C. Duffield, Esq.
            Toddduffield@paulhastings.com
13     By:  Jean-Marie Gutierrez
14
15  ALSO PRESENT:
16  Daniel Fox, Esq.
    IBM in-house counsel
17
18
19
20
21
22
23
24
25

---

Page 214

1          THE COURT:  The record should reflect
2  that it's 10:03.
3          MR. CARTA:  By your wife's watch or the
4  watch up here?
5          THE COURT:  No, actually I have been
6  standing out in the hall with my law clerks talking
7  about current political developments, political
8  situation, prepared to come in here at exactly 10
9  o'clock, because I said I would be, and you will note
10  that at exactly 10 o'clock the clerk of the court, Ms.
11  Sunbury, came to the door and told me that there was a
12  problem with a juror's parking, a juror had parked in
13  a tow zone, and Ms. Sunbury asked me what she thought
14  I should do, and I said I think we ought to let this
15  person go out and quickly move his car, because the
16  last thing anybody wants in a case is a juror who's
17  really angry that his car has been towed.  So that
18  juror, I don't know if it's the gentleman or one of
19  the women on the jury, that person has gone out, is
20  moving his or her car, and will be right back.
21          This is going to be -- this is an
22  example, you know, little delay, but it could save a
23  lot of time because we're not going to have a
24  disgruntled juror.  But I was ready.
25          MR. CARTA:  It turns out that it's

Page 215

1 fortuitous, because there are two issues that Mr.
2 Fasman would like to address with the Court, actually
3 one he would, and one that the two of us would like to
4 address with the Court.
5 THE COURT: Okay.
6 MR. FASMAN: So Judge, we wanted to bring
7 before you two things. You'll recall that we -- on
8 the hundred position issue, you asked us to go out and
9 come up with a stipulated jury charge that could be
10 read to the jurors as to what this was about, so that
11 they didn't think that there were a hundred positions
12 that he should have filled. We have not,
13 unfortunately, been able to resolve those issues, and
14 we have competing versions that we think Your Honor
15 ought to take a look at.
16 THE COURT: Okay.
17 MR. FASMAN: And it should be done --
18 you're going to bring it up now, right?
19 MR. CARTA: Yes.
20 MR. FASMAN: So the hundred, I think we
21 need to come to a conclusion before the evidence comes
22 in this morning.
23 THE COURT: Could you refresh my
24 recollection?
25 MR. CARTA: Yes, Your Honor. There were

Page 216

1 5-minute drills, and on the 5-minute drills there's a
2 summary, our summary of those, in which it indicates
3 the number of positions that were actually open during
4 that time period, and there was a question of whether
5 or not we were going to have mini trials on whether
6 Mr. Castelluccio was qualified for each one of those
7 positions, and we said we weren't claiming that he
8 should have been hired, we were simply claiming that
9 he should have been informed so that he had an
10 opportunity to apply for them and to use his resources
11 to obtain those positions.
12 So we've agreed on the most fundamental
13 point, which is we're not trying to introduce that
14 evidence to establish that those are positions that he
15 should have been hired for, and I think both of our
16 proposals address that, in effect. I think the first
17 two paragraphs --
18 MR. FASMAN: First paragraph is the same.
19 MR. CARTA: -- is the same, second one IS
20 slightly different.
21 MR. FASMAN: Slightly different. And
22 then we have a couple of others. Maybe Your Honor
23 wants to take a look at the competing versions.
24 THE COURT: I'd like to do that, yes.
25 MR. FASMAN: May I hand them up to you?

Page 217

1 THE COURT: Please do, Mr. Fasman.
2 MR. CARTA: Your Honor, our thought here
3 is that that chart should say not only what we're not
4 asking for, but it should say with equal measure and
5 with some balance what it is we are asking for. So
6 we've tried to keep ours a little bit simpler. Our
7 sense is that IBM, the last three paragraphs basically
8 say the same thing, which is he's not asking for this,
9 he's not asking for this, he's not asking for this,
10 and I just think it's repetitive and a little
11 overreaching.
12 THE COURT: Okay.
13 MR. FASMAN: I would offer, Your Honor,
14 I'm not wedded to all of the paragraphs, but I do --
15 and I don't have Mr. Carta's right in front of me
16 because I gave you my copy. I think his is repetitive
17 in it says Joanne Collins-Smee could have requested
18 that Mr. Castelluccio be considered for these
19 positions, and then it says Mr. Castelluccio asserts
20 Ms. Collins-Smee could have disclosed these positions
21 to him, given him an opportunity to apply for, and in
22 some cases recommended him for these positions.
23 That's theirs.
24 So I would think that paragraph 2 ought
25 to be ours. Paragraph 3, if they want to say -- use

Page 218

1 that for paragraph 3, that's fine with me.
2 MR. CARTA: At this point you're not
3 opposing our paragraph 3?
4 MR. FASMAN: I don't love it, but it's
5 your assertion.
6 MR. CARTA: Right.
7 THE COURT: Well, so I gather we have, or
8 I have before me two proposed competing charges on the
9 same subject, and each of you concedes that the other
10 one's proposed submission is okay and would not create
11 error, but each of you prefers your own and believes
12 that your own would be more likely to lead the jury to
13 the right conclusion. Is that a fair statement?
14 MR. FASMAN: Yes, I think so. I think
15 the real question is confusion, Your Honor. That's
16 why we wanted to do this in the first place. You
17 remember we brought this up at the PTC.
18 THE COURT: Michael, could you take
19 these? And we'll look these over. Obviously we're
20 not going to be charging the jury today, but --
21 MR. FASMAN: I think, Your Honor, if I
22 may, we wanted this read at the time. I mean that was
23 the whole point. Because we're going to get into the
24 hundred positions, and I think we agreed that before
25 Mr. Carta could put forth that chart -- remember the

Page 219

1  chart of the hundred six positions? They changed the
2  chart around. But I think if this just goes into the
3  record, it's highly prejudicial, and that's why we
4  agreed that we would do this.
5       THE COURT: Okay. We're not going to do
6  it right now, though.
7       MR. FASMAN: I think that was the
8  intention.
9       MR. CARTA: At the time the evidence is
10  introduced, and I'm not quite sure when that's going
11  to be, this morning or this afternoon, but the idea
12  was to do it contemporaneously with the proffer of the
13  document.
14       THE COURT: Okay. Well --
15       MR. CARTA: I don't think we're going to
16  get to it before the morning break. Maybe not even.
17  I'm not sure exactly, but would say not even possibly
18  before noon.
19       THE COURT: Are we moving along according
20  to your contemplation?
21       MR. FASMAN: He's the captain.
22       MR. CARTA: I tried to cut out some
23  testimony last night, make it move along a little
24  faster. I mean I initially thought it would take a
25  full two days. I explained that to Mr. Fasman. I'm

Page 220

1  trying to see if I can do it by the end of today.
2  That's my goal.
3       THE COURT: Okay. I believe in allowing
4  counsel to try their own cases, and I don't intend to
5  put either of you on a short leash, but I think we
6  should try to move it along. Yesterday was kind of a
7  meet and greet and getting to know you situation. I
8  think that the jury appreciates that the Plaintiff was
9  an important executive at IBM, and had held a series
10  of very important jobs, and now I think we've
11  established that we should try to move it along.
12       One thing I would ask you to do, both
13  sides, with your witnesses, is speak to them, and
14  before they take the stand tell them that you would
15  like them to confine their answers to the questions,
16  and if a question is susceptible of a yes or no
17  answer, to give that, because you gentlemen have built
18  your case and you know where you're going, and
19  narratives, while interesting, consume a lot of time,
20  and consume the jury's interest, and we've got to keep
21  the jury interested. Yesterday it seemed to me that
22  all of the jurors were quite interested. I think we
23  got a good jury.
24       MR. CARTA: Yes.
25       MR. FASMAN: Appears to be, Your Honor.

Page 221

1       THE COURT: It's one of the better juries
2  I've had in a long time. They're taking notes,
3  they're listening.
4       So let's just try to move it along.
5       They're going to let us know when the
6  juror has moved his car?
7       THE CLERK: I'll check.
8       THE COURT: You really, you can't make
9  this stuff up.
10       MR. CARTA: Your Honor, I think the other
11  thing, I can't remember who asked me, something about
12  I haven't been moving each exhibit into evidence, and
13  that's my understanding, that all of the book is in
14  evidence already. I think that's our understanding.
15       MR. FASMAN: I think we've agreed on
16  that, Your Honor.
17       THE COURT: That's my understanding, too.
18  I think that's the mark of good counsel. You talk
19  about things beforehand. It's the mark of experienced
20  counsel, people who really know what they're doing.
21  It is a pleasure -- I shouldn't say that at this
22  point, but it's a pleasure to try a case where the
23  lawyers are experienced, they're obviously
24  experienced, they are gentlemen, fighting hard for
25  their respective clients, and they are demonstrating

Page 222

1  the significant skills that they have, and so I
2  appreciate your hard work, gentlemen.
3       MR. CARTA: Thank you, Your Honor.
4       MR. FASMAN: Thank you.
5       Your Honor, I had one more issue that I
6  wanted to bring up. We filed a memorandum the other
7  day on stray remarks. And I know that we have raised
8  that with regard to two issues. One is these comments
9  back in February 2007, and their lack of connection to
10  the discharge in June 2008. I think we're right on
11  the law. I don't want to -- I'm presuming that you're
12  going to allow this into evidence, but it's still our
13  position that they're not admissible, and I don't want
14  to waive that, and so we submitted that memorandum on
15  evidentiary issues.
16       The other one is with regard to Mr.
17  Jones. We've not deposed Mr. Jones, and I think to
18  the extent Mr. Jones is going to come in here and say,
19  well, Ms. Collins-Smee told me in 2006 she hated old
20  people, I mean that's just improper, and that is a
21  stray remark, and I don't think that has any business
22  in this case. So those are our positions.
23       THE COURT: Okay. Well, with respect to
24  the first -- and I've considered both your arguments.
25  With respect to the first point you make, I think

Page 223

1  it's -- you're asking me to decide as a matter of law
2  that these are stray remarks, and I think the Court
3  would have the power to do that, but I think that in
4  this case, in as much as you mentioned in your opening
5  remarks, whether indeed those remarks were made is a
6  factual issue, which I decline to decide as a matter
7  of law.  The jury can decide, were these remarks made.
8        Second, were these remarks ageist or
9  discriminatory in nature, or were they just, you know,
10  random babblings that go on in every workplace.  I
11  think that, too, is a factual issue.
12        So whether they were said and really
13  whether they were stray remarks I believe are issues
14  of fact that could be decided as issues of law, but I
15  think the better way to handle it is let the evidence
16  come in, and you make your argument, Mr. Fasman, you
17  make your competing argument, Mr. Carta, as to these.
18  The jury might find that there's gray issues, and if
19  there's a proposed instruction on stray remarks I'll
20  give it
21        MR. CARTA:  There is one.
22        MR. FASMAN:  There is one.
23        MR. CARTA:  There is one, Your Honor.
24        THE COURT:  All right.  So your motion in
25  limine, sir, is denied, but I encourage you to address

Page 224

1  that in your closing argument, as you did in your
2  opening statement.
3        MR. FASMAN:  Your Honor, I just call your
4  attention to one other point we raise with regard to
5  Mr. Jones, who left -- he left when she came in.  I
6  mean I don't want to have something from 2003 -- I
7  have no idea whether they spoke to each other or not,
8  I don't think they did, but I don't want to have
9  somebody dredge up something from 2003 or 2005 and
10  have it come in and influence the jury.  Those are
11  classic stray remarks, and those have no -- she didn't
12  utter them, or if she did utter them, those were years
13  earlier.  She was not his supervisor at the time.  I
14  don't think -- I don't see how that possibly could
15  bear on anything.
16        THE COURT:  I think I have to know just
17  what it is Mr. Jones is going to say that Ms.
18  Collins-Smee said to him.  You know, what
19  are the words that he would put in her mouth.
20        MR. FASMAN:  I don't really know what
21  those are, Your Honor.  That's why I'm -- I mean Mr.
22  Carta said that that was not going to be the case and
23  we weren't going to get Mr. Jones up there and he was
24  not going to mention alleged comments about older
25  workers, but I wanted to be on record that that should

Page 225

1  not be done.  I presume that's still the case.
2        MR. CARTA:  Well, I have to tell you,
3  Your Honor, I had never asked that question to Mr.
4  Jones until it was raised to me, and now it's been
5  raised twice, and I certainly will talk to him about
6  it, but that was not in my initial inquiry with him,
7  that was not part of what I expected to proffer from
8  him, but I would be absolutely less than prudent, now
9  that IBM has raised twice the fact that they're
10  concerned that Ms. Collins-Smee may have said to him
11  ageist remarks, not to take that up with him, and when
12  I do talk to him I'll ask him about it.
13        MR. FASMAN:  I don't -- Your Honor, this
14  is out of an abundance of caution.  She says she
15  didn't talk to him about this at all, but I don't want
16  to be surprised by it, and I don't want these nice
17  people sitting here to hear somebody say -- I don't
18  know, who knows, maybe she said, I don't like the
19  Yankees, or, I don't like -- you know.
20        THE COURT:  I don't like the Yankees.
21  Excuse me.  Let me retract that.
22        MR. FASMAN:  If we're talking about
23  comments back in '05, before she was his supervisor
24  about, you know, about some other person, she didn't
25  even know Mr. Castelluccio at the time.  I mean that's

Page 226

1  just so farfetched.  That's all I'm talking about, is
2  something farfetched like that.
3        THE COURT:  Well, you know, I'm thinking
4  that we'll revisit this subject, and if this gentleman
5  who's going to be called by Mr. Carta says that he had
6  a conversation with Ms. Collins-Smee in which Ms.
7  Collins-Smee said, you know, if there's one thing I
8  can't stand in this world, it's old people, people
9  over 40, that's coming in.  If she said, you know, we
10  got to energize this operation, new thoughts, new
11  creativity, some new blood, I mean that's -- that
12  arguably shouldn't even come in.  But I mean we have
13  to know what it is, what words will Mr. Jones
14  attribute to her.
15        MR. FASMAN:  Well, maybe I can ask this,
16  Your Honor:  That before anything like that comes up,
17  that we get fair notice, and then I'll re-raise it if
18  there's an issue.
19        MR. CARTA:  I think that's fair.
20        THE COURT:  I think that's fair.  We'll
21  excuse the jury, we'll talk about it.
22        MR. CARTA:  I don't want to poison the
23  jury.
24        MR. FASMAN:  And I just don't want it to
25  come out of left field.

Page 227

1       THE COURT:  Fair enough.  I think that's
2  a fair suggestion.
3       MR. FASMAN:  Thank you, Your Honor.
4       THE COURT:  You're welcome, sir.
5       Are we all set to resume now, Mr. Carta?
6       MR. CARTA:  Yes, I am.
7       THE COURT:  May I ask the clerk to get
8  the jury.
9       (Jurors present)
10      THE COURT:  Please be seated, ladies and
11 gentlemen.  Good morning to you.
12      THE JURORS:  Good morning.
13      THE COURT:  Well, so much for my
14 timetable.  We tried.  And I think probably this
15 morning is on me.  I should have told you earlier how
16 The Hartford police department is just very, very
17 strict on enforcement and ticketing of cars parked in
18 certain areas, and maybe the clerk can tell you at a
19 break the location of an inexpensive, reasonably
20 inexpensive parking place, or Michael, Jacob, either
21 one of these gentlemen can tell you good parking
22 places around here, but close to the court.
23      So the record should reflect that
24 everybody's back, everybody's happy, everybody's
25 smiling, we're ready to begin.  Mr. Carta.

Page 228

1       MR. CARTA:  Good morning.
2       THE JURORS:  Morning.
3
4  CONTINUED DIRECT EXAMINATION BY MR. CARTA:
5
6  Q   I think where we left off is we were talking
7  about Exhibit 19, which is the WellPoint staffing and
8  restructuring plan, is that correct, Mr. Castelluccio?
9  A   Yes.
10 Q   And when was the recovery plan itself
11 completed?
12 A   In --
13 Q   The drafting of the plan, I mean, not the
14 execution of the plan.
15 A   The draft was completed in -- on November two
16 thousand -- I forget.  2006.
17 Q   With respect to the parts of the contract for
18 which the resources were inadequate, what was done?
19 A   We had identified the total number of
20 resources or people and skills that we were short, and
21 we actually put together a plan that said we need this
22 many people with this many skills, and then we also
23 looked at what other action we could do that we could,
24 you know, minimize the cost impact that would have on
25 the contract by bringing in additional.

Page 229

1  Q   And do you recall the approximate number of
2  additional employees that were recommended in the
3  recovery plan?
4  A   Yes.  Our initial sizing was over a hundred,
5  but we were going to try to deal with 51 people.
6  Q   By way of summary, I'm going to just step
7  back, since we've had a little break here, try to
8  summarize a little bit.  As VP of Public Sector, what
9  specific steps did you take to address the problems of
10 WellPoint?
11 A   Well, after we really understood -- we had
12 gone through the practice of understanding what was
13 wrong, we actually developed this plan.  We also
14 switched out some resources, some people that we had
15 working on it, and we started executing that plan, and
16 we incrementally went through it.
17 Q   And you initiated the Red Team Review?
18 A   Yes.  If you're looking at overall, the Red
19 Team Review is a confirmation of what we thought was
20 wrong with the contract.  In fact, it highlighted some
21 of the areas that were more dramatic than we thought.
22 We developed this restructuring plan, or recovery
23 plan, whatever -- that's an internal term -- but
24 essentially it was, given what we just saw on the Red
25 Team and what we knew before, how do we go in and fix

Page 230

1  each of these problems that existed.
2  Q   What else did you do with respect to
3  personnel?
4  A   I changed over some personal, some key
5  positions I felt needed some other individuals.
6  Q   What role specifically did you bring in new
7  people for and who were they?
8  A   There were really two critical areas that I
9  needed to change the skill out.  One was what we
10 call -- he was the lead manager, or executive,
11 actually who did the day-to-day running of that, and
12 that was what we call the senior DPE, delivery project
13 exec, and the person I had in there I decided to
14 replace because that person had pretty much what we
15 call internally burned out in that position because of
16 all the issues.
17 Q   That was Mr. Martez?
18 A   Dave Martez.  And I brought in someone that I
19 had worked with before, had worked for me before, and
20 I put him in that position.
21 Q   And who was he?
22 A   That was Mike Morin.
23 Q   And Mr. Morin will be someone who would be
24 testifying later in this trial?
25 A   That's correct.

Page 231

```
1      Q   And you said you'd worked with Mr. Morin
2   before.  Just in what context, please?
3      A   Yesterday we talked about one of my first
4   positions as moving into the executive branch, I was
5   assigned to a contract that IBM had called the United
6   Healthcare, which was here -- they had a large
7   installation here in Hartford, and Mike was already on
8   that contract working it for IBM.
9          I came in, and that was one of those early
10  troubled contracts that I was put on, and Mike and I
11  worked on it.  And United Healthcare, I think I
12  mentioned yesterday, is a competitor to WellPoint.
13  They both are insurance companies, health insurance
14  companies, very similar.  One focused more on Blue
15  Cross Blue Shield corporations, and one focused more
16  on Medicare Medicaid services.  So he had worked with
17  me -- he had helped me correct the problems that we
18  had on United Healthcare, and he was very good at it.
19     Q   So in a similar situation he had been
20  instrumental in helping turn it around?
21     A   Yes.
22         MR. FASMAN:  I've been very patient, but
23  these are leading questions, that particular one.
24         THE COURT:  Well, okay.  Let's watch the
25  leading questions except when they're topical in
```

Page 232

```
1   carrying a witness from one topic to another.
2          So the objection's noted, it's sustained,
3   but I'll let the answer stand.
4   BY MR. CARTA:
5      Q   What, if anything, did you do in terms of
6   addressing what happened to help in the day-to-day
7   management of the contract?
8      A   Well, the first thing I just mentioned, I
9   brought Mike Morin in.  Mike brought with him some
10  other key people who worked with him on United
11  Healthcare that were experienced in this area that
12  were very reliable, very good in their positions, and
13  he brought them with him into the role.
14     Q   Do you happen to remember who they were and
15  what their specific assignments were in WellPoint?
16     A   Yes.  Regina Urkuart, who took over running
17  the large server, the large -- the data centers.  She
18  was excellent at that.  She was brought in for that.
19  We brought in John Halloran.  John Halloran was the
20  other manager I brought in, and he was good at dealing
21  with daily outages.  He was very good at that, in
22  getting on with the customer and working through those
23  problems and just managing that whole situation.
24     Q   And that team of people was brought in
25  approximately when?  Do you recall?
```

Page 233

```
1      A   We brought them in in early part of 2006.
2      Q   In early 2007 did you bring in some other
3   important additional personnel?
4      A   Mike was the key one coming in first, but then
5   we also had -- we had talked about it yesterday -- a
6   transition phase we go through, and someone who is
7   going to take a look at -- WellPoint's key two
8   projects was -- sorry -- the power down in Richmond,
9   Virginia, and data center move out of California into
10  that center, and those were the two critical to-dos,
11  pass/fail type of thing for IBM in 2007, and I brought
12  Mark Franzese in to oversee that and manage that for
13  me.
14         In addition, I also brought -- well, Mark
15  had worked for me before, and I brought him in to do
16  that because I knew what his capabilities were.  He
17  was the perfect person for that position.
18         I'd also brought in Julie Taylor prior to
19  that, a month earlier than that, to come in, and she
20  was a very good project manager.  She was excellent
21  with customers, excellent with daily issues, and there
22  was no nonsense with her as far as getting things
23  done.
24     Q   Were there any other high level changes made
25  on the WellPoint contract in 2006, the fall of 2006?
```

Page 234

```
1   Not at your initiation, necessarily.
2      A   The other -- what happened in 2006 was Mike,
3   my counterpart over on the sale side -- I talked about
4   it yesterday.  I'm delivering, and there's someone
5   over here that sold the contract.  That individual was
6   asked to be removed from the contract by the CIO of
7   WellPoint.
8      Q   And that CIO I think you previously identified
9   as whom?
10     A   I'm sorry, that's Mark Boxer, Mr. Boxer.
11     Q   And who was the person they asked to be
12  removed?
13     A   It was Dave Liederbach.  That happened
14  somewhere around July, August time frame of 2006.
15     Q   And what, if anything, were you told about
16  referring to Mr. Liederbach when interacting with
17  WellPoint personnel?
18     A   We were told we could not mention his name in
19  any means with the customer.
20     Q   And by whom were you told that?
21     A   We were told -- actually, at that point it was
22  Keenie McDonald who was kind of the focal point on
23  this now.  She was the one that repeatedly told us, do
24  not mention Dave, because Mr. Boxer does not want to
25  hear about him.  Mr. Boxer insisted he get off the
```

Page 235

1   account.
2       Q   As a result of Mr. Liederbach's being taken
3   off the WellPoint account, what, if any, consequences
4   did you observe with respect to his career there?
5       A   It just continued.  There was no -- that there
6   was no penalty.  There was no penalty that Boxer --
7   Mr. Boxer insisted he be removed.  He continued to do
8   what he had been doing before with the other 30
9   accounts with contracts.
10      Q   And who came in and stepped into -- well, who
11  replaced Mr. Boxer, if anyone?
12      A   Well, not Mr. Boxer, Mr. Liederbach.
13      Q   I'm sorry, thank you.
14      A   When Mr. Liederbach was removed from the
15  day-to-day contact, he wasn't removed from his job,
16  but he was removed from having dialogue with the
17  customer at all.  A person by the name of Keenie
18  McDonald came in and took over the overall interface
19  role or the lead role for IBM in dealing with the
20  WellPoint customer.
21      Q   Let's talk about Ms. McDonald a little bit
22  more.  Well, question withdrawn.
23          Is the way that IBM responded to Mr. Boxer's
24  complaints about Mr. Liederbach, is that one of the
25  reasons that you maintained Ms. Collins-Smee

Page 236

1   discriminated against you on the basis of your age?
2           MR. FASMAN:  Objection, Your Honor.
3   That's so leading.
4           THE COURT:  Sorry, sir?
5           MR. FASMAN:  Objection.  That's
6   completely leading.  That's an argument question.
7           THE COURT:  Mr. Carta, can you rephrase
8   that?
9           MR. CARTA:  Sure.
10  BY MR. CARTA:
11      Q   What is your belief with respect to the
12  difference between the way you were treated and the
13  way Mr. Liederbach was treated with respect to the
14  complaints that were made by Mr. Boxer?
15      A   Well, we haven't discussed that to this point,
16  but it was very different.  I'm not trying to
17  discredit David Liederbach, but when he was removed it
18  didn't change really anything for him other than he
19  couldn't talk -- he couldn't have any firsthand
20  knowledge of the account by talking to the customer.
21  When I was removed, it was -- there were consequences.
22  So I was treated very different.  But we also had
23  different managers that were treating us at that
24  point.  I had Joanne Collins-Smee that was treating
25  me, and it was Pat Kerin that was treating Dave

Page 237

1   Liederbach.
2       Q   Let's take a look at Exhibit 21, please.  Can
3   you identify that document?
4       A   Yes, I can.  It's a letter from Keenie
5   McDonald, who I mentioned took over managing the IBM
6   relationship with the customer, and it was addressed
7   to Luis Fernandez and John Shimkus.
8       Q   That's the top e-mail, and then there's a
9   second e-mail below that?
10      A   That's a direct -- that's an e-mail from Mr.
11  Boxer at WellPoint, CIO, to Keenie McDonald.  So the
12  bottom one is the first note exchange, and then the
13  top is the second exchange.
14      Q   Can you just review those with us starting
15  with Boxer's e-mail, which is almost on the bottom but
16  not quite the bottom, the first page?
17      A   Right.  He's writing, as I said, to Keenie
18  McDonald, and this is February -- Valentine's Day of
19  2007.  And basically he had gone to Keenie, says, "We
20  were mistaken that Dave L --" meaning David
21  Liederbach "-- is still in the mix on our account."
22  And he goes on to say -- this is, again, the CIO
23  speaking -- "I would be personally disappointed if I
24  found that he was still somehow directly in the mix on
25  WellPoint, even albeit behind the scenes and not

Page 238

1   visible to me directly."
2       Q   And how did Ms. McDonald respond to that?
3       A   She responded, "Mark, Dave Liederbach is not
4   calling the shots on WellPoint.  What we do or do not
5   do, that is my job.  As I described to you, I have the
6   P&L --" which is profit and loss, whether we make
7   money or lose money "-- relationship and client
8   satisfaction responsibility for WellPoint across the
9   IBM brands."  Which means -- a little confusing -- but
10  IBM has different divisions that were dealing with
11  WellPoint.  She was supposed to be the one that tied
12  all those divisions that were dealing with WellPoint,
13  one single voice going to -- then the other
14  highlighted part, "Dave Liederbach is not our problem.
15  The fact that I'm losing --" now she's speaking about
16  IBM "-- losing money -- losing a significant amount of
17  money is my problem inside IBM."
18      Q   And I wonder if it might help to refer to the
19  organizational chart again, the second one, so that
20  you can put in place where Ms. McDonald was in that
21  hierarchy.
22      A   Could I stand up?
23      Q   Please, if it helps, yes.
24      A   We saw this yesterday, and really it's a
25  hierarchy of IBM, but that's the head of IBM, that's

Page 239

1    the chairman, CEO of IBM. There's really three -- IBM
2    is much bigger than this, but what we were depicting
3    is the service side and outsourcing side, and as I
4    mentioned yesterday, I'm down here, the Public Sector,
5    working through Joanne to the chairman's office.
6         This is David Liederbach. Initially he was a
7    peer of mine in this side. And this is the sale side.
8    As I said, there's a sale, you go out and negotiate,
9    make all the commitments, price it and endorse -- sign
10   it. Then he turns it over to us and we'd manage it.
11        The person was just commented on is Keenie
12   McDonald, and she's over here, and this was pure sell
13   side of IBM. It's the old -- I shouldn't say
14   traditional -- it was what we call the blue suits.
15   They were out there and selling. And they sold
16   everything. They sold services that we provided, they
17   could sell cover boxes, they could sell programming
18   support, and so forth. So that was the sale side.
19        In the confusion on these outsourcing
20   contracts, because they were so big, they tried to
21   say -- customers were complaining of getting calls
22   from the same salesman I had gotten before in IBM,
23   we've outsourced a lot of this to you, how do I tie
24   this all together, it doesn't make sense to me, and
25   that's why they created this line of positions. They

Page 240

1    created a position of managing director, which then
2    said, you're in charge of working the entire
3    relationship of IBM to that single customer. We were
4    assigned one customer.
5         Q   And that's the role that was assigned to Ms.
6    McDonald?
7         A   Right. She was over here, and -- so you can
8    see, we all had different paths up the food chain.
9         Q   Okay. Thank you.
10        I want to see if we can move along a little
11   more quickly. We talked previously about the Richmond
12   power down. In addition to developing a turnaround
13   plan and initiating the Red Team Review and those
14   personnel enhancements that you made, was there
15   another critical aspect of your early fulfillment that
16   you personally were responsible for?
17        A   Yes. And that was the California data center.
18   That was a make or break on the contract. Moving
19   their data center that we took over and moving it into
20   this Richmond site that we had just successfully
21   powered up.
22        Q   And what position were you when that was being
23   executed?
24        A   I was in a role that was responsible for the
25   WellPoint contract, and that was the DPE role.

Page 241

1         Q   We'll get to that, but just --
2         A   But it was my responsibility -- I had brought
3    Mark Franzese, that I had mentioned before, we built
4    the team, we built the project managers, we had the
5    client reviews, the whole nine yards, and we were
6    responsible, and I was accountable for that.
7         Q   When you say you were accountable, to what
8    extent did senior management take an interest in that
9    particular milestone?
10        A   As I said before, this was a make or break for
11   us with this contract. If we screwed this up, I'm
12   sure they would have terminated the contract or
13   taken -- because I've seen it on other contracts where
14   that's happened.
15        In this case my second line manager -- and if
16   you're looking at this chart, you're going up my path
17   where it says general manager, ITDelivery, Bob Zapfel
18   was in that position. He called me and -- because the
19   customer had contacted him and said, You better not
20   screw this up. Mr. Zapfel called me and had me review
21   with him our detailed project plans. I spent a long
22   time with Mr. Zapfel going through the plan.
23        Q   Would you please identify Exhibit 22?
24        A   Yes. This is an e-mail from Mr. Zapfel to me,
25   and he has a large distribution list on it of several

Page 242

1    people. You can see Keenie McDonald on there, Joanne
2    Collins-Smee on there, David Liederbach on there.
3    Because this is, again, an internal memo, so there was
4    no need to keep Dave off the list. And this was
5    following -- oh, this was following a meeting that Mr.
6    Zapfel had had with Mr. Boxer, the CIO.
7         And Mr. Boxer had asked Mr. Zapfel -- so
8    that's WellPoint to IBM -- he asked me to personally
9    satisfy myself that we have right plans and people to
10   both power upgrade and to move. "Jim, I'd like --"
11   well, "Jim, I'd like you to take the lead to leverage
12   Diane --" Diggelmann -- oh, this is actually the
13   power -- I'm sorry. I mixed two things. This is the
14   power upgrade. This is the first one we had to
15   succeed. So this is where Boxer says, I need you, Mr.
16   Zapfel, to reassure me -- he didn't go to Joanne, he
17   went to Joanne's boss, to make sure he was trying to
18   get high enough in IBM, and essentially Mr. Zapfel
19   says he wants me to take the lead on that.
20        Q   And can you identify Exhibit 23?
21        A   This is -- I jumped ahead. This still has to
22   do with the power down -- not to confuse anything --
23   that was happening in February. The first few steps.
24   Mr. Zapfel sends -- actually he sends it -- I think it
25   was addressed to me, but it copied all the IBMers, the

A-338

Page 243

1   senior management team.  And he basically says --
2   after he had discussed -- I had taken him through the
3   detailed plans for the power upgrade, he called Mr.
4   Boxer and he spoke with Mr. Boxer and essentially
5   reassured him that, you know, that we had a plan in
6   place, we were executing the plan, a very tight plan,
7   it was a complicated deal, so forth.
8       Q   And then in the end he says, "Obviously, at
9   the end, it will be a successful outcome that
10  matters."
11      A   Yes, very optimistic, but -- well, I
12  shouldn't...
13      Q   Just explain again quickly, why was the power
14  down critical?
15      A   They were -- as I said, California, that was
16  their big problem, and that ran a major part of their
17  business, because it was all the claims processing, so
18  if that thing went down -- and it wasn't the type of
19  thing it would just fail and take you an hour to bring
20  it back up.  It would go down and you would never
21  recover those because it would be power surges, power
22  drops, and so forth.  It was literally a mess, their
23  facility, and it would damage their equipment out
24  there, which meant they would never get their business
25  back up.  It would have been a long, long, long,

Page 244

1   elongated recovery.
2       So they wanted to get out of that as quickly
3   as possible.  We couldn't move fast enough to get them
4   out.  And in order to receive it at the other end,
5   Richmond, we had to -- we were bringing in all this
6   additional power demand.  We had to upgrade everything
7   in that building; air conditioning, floor space,
8   raised floor, networking coming into it, the whole --
9   there's a lot that goes into building a data center,
10  and we had to get this in place at the Richmond
11  location.
12      Q   So when was the power down in Richmond
13  ultimately performed?
14      A   I'm trying to think of the date, but it was
15  shortly after this.  I don't recall the specific date,
16  but it was --
17      Q   "After this" meaning after February 15th?
18      A   After February 15th.
19      Q   And what happened?
20      A   We did it, and we did it successfully.
21      Q   Was that success reflected in a series of
22  e-mails?
23      A   Yes.
24      Q   Let's go through very quickly, can you
25  identify Exhibit 24?

Page 245

1       A   24, yes.  It's an e-mail from Mr. Zapfel to
2   John Shimkus, who I'm not sure why he sent it to John,
3   but he sent to John, who was part of our team working
4   on this, and copies all of us, and says "Great job."
5       Q   So that's from Zapfel.  And can you identify
6   Exhibit 25?
7       A   This, again, is -- it's an internal e-mail
8   from IBM.  The other one was internal, also.  This is
9   an internal e-mail from Dave Liederbach to the team
10  that says, "Great progress, great job."
11      Q   Okay.  And 27.  Or 26, I guess.
12      A   This one, again, is another internal -- yeah,
13  it's an internal e-mail from Keenie McDonald, who was
14  the person I told you had come in to take over the
15  account.  She basically says the same thing.  I mean
16  everyone who's who in IBM was pretty much involved in
17  this.
18      Q   And 27, please.
19      A   It's another level of management that's
20  thanking everyone for the job that was done, and the
21  highlighted says, "Fantastic job, great."  The Dave
22  McDonald that's referenced in this is actually -- he's
23  a vice president over on the WellPoint -- working for
24  WellPoint, that reported to Mark Boxer, the CIO.  So
25  he's a very vice president over there, and the comment

Page 246

1   that was re-made back through John Moorman, the author
2   of this message, is that we exceeded his expectations.
3       Q   Okay.  And do these e-mails enable you to
4   refresh your recollection as to when the power down
5   was successfully completed?
6       A   Because this says February 19th, I'd have to
7   look at the string, but it was between the 15th and
8   the 19th, and it was probably a weekend.  So whatever
9   weekend fell in there, it would have been that weekend
10  that we had done that.  Because this is saying it's
11  done, and Zapfel's earlier note says I've reviewed it,
12  we're are good to go with it.
13      Q   So February 19th, approximately?
14      A   Right.
15      Q   So let's talk about what happened in the
16  management above you about this time.  In the end of
17  2006 was it announced that -- what was announced, if
18  anything, with respect to Mr. Jones?
19      A   He was announced as retiring from IBM.
20      Q   And when was his retirement supposed to be
21  effective, or when was it effective?
22      A   I'm not sure of the exact date, but he was
23  there until about the second week in March and then he
24  left.
25      Q   And who replaced him?

Page 247

1    A   Joanne Collins-Smee.
2    Q   And upon his retirement was she your new
3   supervisor?
4    A   Yes.
5    Q   And when did that -- when did she become your
6   new supervisor?
7    A   I believe her effective date was February 1st
8   of 2007.
9    Q   So to what extent did the -- were both Ms.
10  Collins-Smee and Mr. Jones still at IBM at the same
11  time, to what extent did they overlap?
12   A   Well, they overlapped, I would say, January,
13  February, until he left in March, which I believe was
14  the second week in March.
15   Q   And what was Ms. Collins-Smee's position at
16  that time, when she moved over?
17   A   She became general manager of ITD delivery
18  Americas, was her official title.
19   Q   Had you worked directly with Ms. Collins-Smee
20  prior to that?
21   A   No.
22   Q   And when did you first meet with Ms.
23  Collins-Smee in her capacity as your supervisor?
24   A   February 22nd.
25   Q   February 22nd.  So --

Page 248

1    A   In 2007.
2    Q   Three days after the Richmond power down?
3    A   Correct.
4    Q   And where did that meeting take place?
5    A   It was in her office.
6    Q   And what was your understanding of the purpose
7   of the meeting?
8    A   Well, she had sent out an e-mail to all of her
9   vice presidents that had sector responsibility, so
10  there were five of us, and she had sent an e-mail out
11  to us with a general description of what she wanted us
12  to prepare and come in to talk to her about, really
13  relating to the contracts in outsourcing.
14   Q   And directing your attention to Exhibit 28,
15  can you identify that document, please?
16   A   Yes.  That's the e-mail that she sent to us.
17  The distribution list on top is all her direct
18  reports.  I'm sorry, where it says "To," that's all of
19  her direct reports.  And this is what she asked us to
20  prepare.
21        She wanted us to come in to meet with her and
22  talk about "what delivery situations you and your
23  clients are most concerned about right now."  And
24  there's other things in there.  It says, "Finally, I
25  would like you to come to our meeting with ideas on

Page 249

1   how we address our two goals simultaneously," which
2   was improvement of the delivery services, as well as
3   head count reductions.  So those two main topics were
4   what she was asking us to come in to prepare and
5   discuss with her.
6    Q   And what, if anything, did you do in
7   preparation for your meeting with your new boss?
8    A   I called my managers together and I shared
9   this with them, and I said we need to put a couple
10  slides together, to satisfy her request, and we worked
11  together on what we would put together.
12        I also worked with each of the 30 contracts
13  that I had, because this is really -- I need to go
14  back to each individual contract and find out what
15  their concerns and issues were and how they were
16  addressed.  So with all that we gathered, we netted it
17  down to a couple slides.  I think it was four or five
18  slides that I had that I was prepared to go in and
19  present to her.
20   Q   And what happened when you actually met with
21  Ms. Collins-Smee?
22   A   My time with her was scheduled for February
23  22nd, and I met with her in her office.
24   Q   Who else was present?
25   A   It was just myself and Joanne Collins-Smee.

Page 250

1    Q   Do you have a specific recollection of that
2   meeting?
3    A   Yes, I do.
4    Q   And what do you recall?
5    A   I came with my five slides and folder prepared
6   and rehearsed to address, and in the very opening
7   comments she asked about my age and about my
8   retirement.
9    Q   And what was your response?
10   A   Well, I was surprised that she brought that
11  up.  My initial was I was surprised that she brought
12  that up because the agenda was something else, for the
13  meeting.
14        After she said that, I explained to her that I
15  had not considered retirement at that point, nor --
16  you know, it wasn't something I was thinking of at
17  that point, because there was no need to.  I mean I
18  was -- I had just come off of a 2 performance, so I'm
19  looking at, you know, I'm a solid contributor to the
20  business.  I'm doing everything the business is asking
21  me to do.  It's -- I had a PBC a couple weeks before
22  that that said yes, that's the case.  And my role as
23  vice president of that sector, which this would have
24  been going into my third year at that, the first year
25  and second year I had overachieved what they asked me

Page 251

1    to do, and both were formally documented in the
2    evaluation. So retirement hadn't -- you know, I felt
3    good about going to work, I was contributing, and I
4    hadn't thought of retiring, and basically that's what
5    I told her. Not that I hadn't thought of it, but, you
6    know, retirement wasn't something I was concerned
7    about.
8        Q   What specifically do you recall her saying
9    with respect to retirement?
10       A   Her words were a little strange. She said,
11   "You're old enough to retire, right?" So it was a
12   statement followed by a question mark.
13       Q   And did that question make sense to you?
14       A   No, because I was already at the age that I
15   could retire, so --
16       Q   How far were you from your age of 60?
17       A   Actually this was a week before my birthday.
18   It was a week before I was going to turn 60 years old.
19       Q   Were you equivocal or on the fence about the
20   fact that you had no interest in retiring?
21           MR. FASMAN: Judge, with all due respect,
22   that's leading, too.
23           THE COURT: Can you rephrase that, Mr.
24   Carta?
25           MR. CARTA: Sure, pleased to.

Page 252

1    BY MR. CARTA:
2        Q   To what extent, if at all, did you equivocate
3    in your response to Ms. Collins-Smee with respect to
4    her question about whether you were interested in
5    bridging to retirement?
6        A   Well, there was no question when I spoke to
7    her -- I mean this is my first meeting with her, and I
8    spoke to her professionally in that I'm not
9    considering retirement at this point. There was no
10   reason to at this point, as I described before, and I
11   think she understood that. She accepted that answer.
12       Q   Okay. To what extent did this experience
13   influence you to bring this lawsuit?
14       A   Well, at the very end when I left, you know,
15   when I was being walked out the door, you know, you
16   look at all of this, and you come back to -- it's
17   difficult, but you start piecing all these different
18   events together, and I realized that that was the very
19   first time where my age was a factor in my ability --
20   my capabilities of performing in the job.
21       Q   To what extent, if any, did you intend to
22   leave any doubt in Ms. Collins-Smee's mind about your
23   interest in retirement?
24       A   She had to leave that meeting convinced that
25   that wasn't something that I was contemplating.

Page 253

1        Q   Prior to this had you discussed retirement
2    with any of your supervisors or HR personnel at IBM?
3        A   No.
4        Q   And at that time were you, in fact,
5    considering retirement?
6        A   No.
7        Q   How many vice presidents reported to Ms.
8    Collins-Smee?
9            I think if we had the organizational chart
10   that would be helpful, please.
11       A   I think at that point she had eight vice
12   presidents reporting to her.
13       Q   And -- let's just see.
14       A   I mentioned on this chart there is --
15   someone's left off, and that's Tony Grimaldi, who was
16   a vice president in the Communications Sector. There
17   could be one more on there.
18       Q   Exclusive of yourself, what was the range of
19   their ages?
20       A   They were from early mid-forties to 50. I
21   think there was one that was 52 years old as the
22   oldest.
23       Q   And who was the oldest of the group?
24       A   It was me. I was the only 60 year-old amongst
25   those eight vice presidents.

Page 254

1        Q   Okay. Let's go back to the meeting. You came
2    with the slides, you had this initial encounter. What
3    happened next?
4        A   Well, after we ended the discussion about
5    retirement, we did discuss -- well, that was the only
6    one of the topics that I was able to bring up, and we
7    talked -- I brought -- I spoke about several of the
8    issues that were with the contract, you know, the
9    financials, deliveries, the contract, everything that
10   we saw yesterday, I brought it up at a very high
11   level.
12       Q   And the materials that you brought in response
13   to her question, what happened to that?
14       A   I never got to use them.
15       Q   Did she in that meeting identify any annual
16   goals that she wanted you to achieve in 2007?
17       A   No.
18       Q   Did she indicate to you in that meeting --
19   question withdrawn.
20           What did she indicate to you in that meeting,
21   if anything, with respect to her concerns about your
22   past performance?
23       A   Nothing. There was no discussion of my
24   performance at all. Which I would have -- you know,
25   there shouldn't have been. I just had the appraisal

Page 255

1  two weeks before.
2      Q   And you mentioned that twice.  Let's put that
3  back into context.  Two weeks before you had received
4  a rating, a PBC rating, from whom?
5      A   From Kelton Jones.
6      Q   That was in January of 2007, and that would
7  have been the evaluation for 2006?
8      A   Right.  It was -- I think the actual
9  evaluation took place -- I think it was, like, January
10  28th.  So it was actually the end of January, but --
11  in 2007, but it was for my performance in 2006.
12      Q   So it was just a matter of weeks before that
13  you had received your rating for the prior year?
14      A   Correct.
15      Q   And there was no discussion of that, either?
16      A   No.
17      Q   Did you discuss any of the other 29 contracts
18  for which you were responsible?
19      A   No.  I mean the 30 plus contracts that I was
20  managing, and the only one we talked about was -- and
21  it was very brief -- was WellPoint.
22      Q   And what do you recall specifically, if
23  anything, about your discussion with respect to
24  WellPoint in that meeting with Ms. Collins-Smee?
25      A   Well, I mean we went -- I -- again, I had a

Page 256

1  very high level view -- I had actually one slide
2  talked about WellPoint, although I never pulled out
3  the slide to discuss it with her because of what
4  had -- the way that whole dialogue was going, but I
5  talked about high level, the financial problems, the
6  cost to IBM, and a very high level view that we had
7  gone through, and we were addressing the issues.  I
8  didn't want to just drop in there and say here's
9  everything wrong and walk out.  It was like here's
10  major what's wrong and here's the actions we're doing
11  to address some of these, but we still had a problem.
12  The main thing I wanted her to understand, we still
13  had this financial investment problem.  I couldn't get
14  the dollars to do everything that we wanted to do.
15      Q   So based upon your past experience in
16  transition meetings such as this, with the new
17  supervisor, was this -- how would you characterize
18  this meeting?
19      A   It was very unusual, because of the retirement
20  and age issue.
21      Q   Did Ms. Collins-Smee give you any indication
22  that she had done any review of your past performance?
23      A   No.
24      Q   Did Ms. Collins-Smee allude in any way to any
25  discussions she had with Mr. Jones about you, your

Page 257

1  prior supervisor?
2      A   No.
3      Q   At a much later time did you speak with Mr.
4  Jones about whether he had had a transition meeting
5  with Ms. Collins-Smee in which your past performance
6  was discussed?
7      A   Yes.
8      Q   You discussed that with him.  And as a result
9  of that discussion, what was your understanding of
10  whether Ms. Collins-Smee ever spoke to Mr. Jones?
11      A   She hadn't.
12      Q   She had not?
13      A   Right.
14      Q   She never spoke to him?
15      A   No.
16      Q   And do you recall anything else of
17  significance that happened during that meeting?
18      A   No.  It was very short.  It was like 20
19  minutes, and then her secretary interrupted us and
20  said, You have to get onto your next meeting, and that
21  was it.
22      Q   And how were things left at the conclusion of
23  the meeting?
24      A   I left the meeting going back and continuing
25  on as the vice president of Public Sector and doing

Page 258

1  the things that I had done leading into the meeting
2  and going backward.
3      Q   And what was your understanding with respect
4  to how, the quote, retirement issue had been left?
5      A   My view was, it was, you know, a lapse of
6  judgment on her part in bringing it up, because it's
7  so -- IBM's policy says you don't bring up age, you
8  don't, unless the employee initiates it, and my
9  thinking was it was a lapse of judgment, it's over and
10  done with, and then we just continue on from there.
11      Q   As a result of that meeting, did you talk to
12  anybody else, did you speak to anybody at HR, speak to
13  your wife about what had happened?
14      A   No.  I didn't -- no.  Because I thought it was
15  over and done with.  It was just...
16      Q   Okay.  Let's move on.
17          Six days after your first meeting with Ms.
18  Collins-Smee did she send an e-mail to her HR
19  specialist?
20      A   Yes.
21      Q   And I'd ask you to identify Exhibit 29,
22  please.
23      A   This is an internal e-mail that Joanne
24  Collins-Smee sent to Keith Holmes, who -- I'm not sure
25  whether he was a vice president of HR or director in

Page 259

1  HR, but it was the HR executive assigned to her in her
2  organization. And she tells Keith, "We need to
3  replace --" me.
4      Q   I'm sorry, I didn't hear you.
5      A   I'm sorry. She said she needs to "replace Jim
6  Castelluccio, I'll fill you in tomorrow," so forth.
7      Q   And when did you first learn of this e-mail?
8      A   Well, I wasn't copied on this. I mean that's
9  evident in the note. And I was not aware that this
10 had taken place until after I was -- left IBM, and as
11 part of this lawsuit we asked for documents, and those
12 documents were provided by IBM.
13     Q   Did Keith Holmes, the HR person, did he send
14 you a copy of this e-mail?
15     A   No, he did not.
16     Q   Did he alert you in any way to the fact that
17 he had received an e-mail such as this from Ms.
18 Collins-Smee?
19     A   No.
20     Q   Did either of them mention this e-mail to you?
21     A   No.
22     Q   Are you saying that you had no idea that she'd
23 made a determination to replace you at that time?
24     A   No, I had no knowledge that this was
25 happening.

Page 260

1      Q   In this e-mail Ms. Collins-Smee states that
2  your role as VP was not working out. Is that true?
3      A   Well, I would have liked to have had that
4  discussion with her on that, because, again, I had
5  just -- I mean this is dated 2/28. On January 28 I
6  had just been evaluated as a 2 performer. On that.
7  So it can't -- well, it -- there's nothing in my
8  performance review that says that there were
9  shortcomings in my performance as vice president of
10 the sector.
11         Plus, we had a successful year. We had
12 reduced cost in the sector. We had -- our -- 29 of
13 our 30 customers said -- gave us a very high customer
14 stat rating. They were very satisfied with our work.
15 And the only one with a problem was WellPoint, and we
16 know why that was, what we'd gone through. So that --
17     Q   Let me ask you to focus on answering just my
18 question.
19     A   I'm sorry.
20     Q   It's okay. Did Ms. Collins-Smee tell you that
21 your role at IBM was not working out? She states that
22 she told you.
23     A   No.
24     Q   In this e-mail Ms. Collins-Smee states you
25 indicated that you knew for a while that it was not

Page 261

1  working out. Is that true?
2      A   No.
3      Q   In her e-mail she states that you stated that
4  you wanted to move into a PE role. What's your
5  response to that?
6      A   No, I didn't. Well, the discussion never took
7  place in the meeting, and that wouldn't be something I
8  would put first as my first choice to move to.
9      Q   Okay. So two things. That didn't happen?
10     A   Right.
11     Q   And why doesn't it make sense?
12     A   Well, my experience over the last five to
13 seven years was more in the DPE role than -- the
14 delivery side than on the sale side, so really my
15 strengths was on the delivery side, so if I were to
16 look at -- to move to another position, it would be
17 within the delivery side of this outsourcing group and
18 not over on the sale side.
19     Q   And PE is on the sale side?
20     A   I'm sorry, yes, PE is on the sale side. PE
21 teamed up with DPE, so you had the seller with the
22 deliverer.
23     Q   Is there a reason, if any, why -- that exists
24 why you never have agreed to simply move off a
25 position?

Page 262

1      A   Well, I at least wanted to understand if that
2  were to happen. But you just wouldn't do it. It's
3  different if there's -- I'm thinking -- someone's
4  proposing something to you, but in this case you
5  wouldn't just say yeah, just take me out of my
6  position. I don't know, I'm not explaining it well,
7  but it's -- you just wouldn't do it.
8      Q   Why not?
9      A   If you're productive in what you're doing, why
10 would you be willing to step into a position that has
11 no definition? In the outsourcing business you never
12 wanted to be in a position like that anyhow, where
13 you're not assigned to something specifically,
14 because -- with resource balancing and movement about,
15 a lot of things weird can happen.
16     Q   So it's not unusual to be moved out of a
17 position?
18     A   No.
19     Q   But what happens -- what happened in your
20 experience at IBM when that happened, when someone was
21 moved out of a position?
22     A   Well, usually one of two things. If you're
23 moving someone out of a position, you've already
24 thought it through and you've identified a position
25 you want them to take over and be responsible for. So

13 (Pages 259 to 262)

Page 263

1  you're going from this level position but you're going
2  to that position type of thing. There are some
3  circumstances where a contract terminates and it comes
4  up abruptly and someone now is no longer on the
5  contract and you have to place them within the
6  organization.
7      Q   In that time period, the period when you had
8  just received your recent review and Ms. Collins-Smee
9  sent this e-mail saying you need to be replaced, had
10  there been any dramatic failure by you or your team?
11      A   No.
12      Q   Had any customer registered any significant
13  complaints about your performance?
14      A   No.
15      Q   To your knowledge, now that you've seen
16  documents, were there complaints registered by
17  WellPoint throughout that entire period?
18      A   Yeah. WellPoint -- again, 30 contracts, you
19  do get -- you do get complaints. I mean we talked
20  about that yesterday. That happens. That's natural
21  in this thing. And if someone does something wrong,
22  you know, they power down something accidentally,
23  you'll get a complaint about that, and that's -- that
24  happens.
25      WellPoint was the exception because it was in

Page 264

1  such a poor state from what we were trying to do that
2  it was constant. We were constantly getting
3  complaints from WellPoint. And it should have been
4  anticipated. We're trying to fix it as fast as we
5  can, but there were complaints.
6      I did not personally. And I was on calls with
7  Mark Boxer, the CIO. I was on calls with Dave
8  McDonald, who was his, I mentioned before, his senior
9  vice president he reported to. But I had -- they're
10  not shy about sending notes. I did not receive
11  anything from Mark Boxer. Mark Boxer didn't say Jim,
12  you got to go or something. I never received anything
13  like that.
14      Q   Had Mrs. Collins-Smee at your meeting given
15  you any reason to think that your 40-year career at
16  IBM was in jeopardy?
17      A   No.
18          MR. FASMAN: Objection.
19          MR. CARTA: I'll rephrase.
20  BY MR. CARTA:
21      Q   What, if anything, had Ms. Collins-Smee done
22  to indicate to you that your 40-year career at IBM was
23  in jeopardy?
24      A   Nothing. It wasn't -- we didn't address it.
25      Q   Okay. Let's move on to the other highlighted

Page 265

1  sentence, portion of that e-mail, in Ms.
2  Collins-Smee's e-mail. It also says, quote, I also
3  need to get Jim on Pat Kerin's 5-minute drill.
4  Correct?
5      A   That's correct.
6      Q   Let's take two minutes and discuss in a little
7  more detail what 5-minute drills are, and then we'll
8  go into what actually happened.
9      A   Okay. The 5-minute drill -- and it's not five
10  minutes, it generally runs for 30 minutes. And it's a
11  monthly meeting that's held, and the purpose of the
12  5-minute drill is executive positions within IBM
13  aren't broadcast, they're not on a job posting board
14  where you can go and in look at -- see what executive
15  positions are opening and pursue that, as they are for
16  non-executive positions.
17      Non-executive positions -- I don't know if
18  they still do it, but we would post all levels below
19  that so employees could go in and search if you want
20  to move in a different area, but you could take more
21  control in your career, because you target where you
22  want to go, you see the openings, and you could build
23  your skills up to be a good -- executive level it
24  wasn't like that. Executive levels were -- it was a
25  very closed list, available to very few.

Page 266

1      So the 5-minute drill was geared at helping
2  executives who were trying to fill an executive
3  position within their own organization, to be able to
4  introduce that opening into this drill with their
5  peers, and solicit candidates. So you go in there,
6  you identify that you have an opening for a job, in
7  that drill, and then your peers that are also part of
8  the invitation list would then be able to see if they
9  had a suitable candidate in their own organization,
10  and they could say, I want you to consider Joe for
11  that -- or Jane for that position. So that was one
12  purpose of it.
13      The other purpose of it also was if your --
14  if -- you're representing your organization when
15  you're in that meeting, so you're in that meeting and
16  you have someone that you're looking to place for one
17  of the reasons I said before, the contract ended and
18  someone's now available, and I'd like to place that
19  person in a position, you can go in and have -- and it
20  may not be a match for any of the jobs that are in
21  there initially, but you can have a discussion about
22  that individual. You can make your peers aware that
23  this person is available, kind background strengths
24  and weaknesses, and so forth, so when future things
25  occur they know that Jim is someone that I remember

Page 267

1    him mentioning before that we might want to consider
2    for an opening.
3         And this was done on a monthly basis.  It was
4    a very controlled environment.  There were -- there
5    was a draft of what would be discussed and sent out
6    ahead of time for the participants.  They review it,
7    concur or make changes, and it's finalized, and then
8    you have this 5-minute meeting, which generally lasts
9    30 minutes, and that audience participated in that,
10   and that's where the dynamics occurred in those
11   meetings.
12   Q    So these are held monthly?
13   A    Yes.
14   Q    And you said there were at least two discrete
15   sections in the drill, the document itself, what are
16   those?
17   A    The two things that -- really, the purpose of
18   the drills, you come in and -- wow, sticky side down.
19        The purpose of the drill was you could find
20   candidates for an open position that you have, right?
21   We have an open job, we want to go get the best person
22   for that job.  And the second part was, I now have --
23   Jim's available, let me tell you about him, and maybe
24   you want to consider him for one of your positions in
25   the future.

Page 268

1    Q    After you were promoted to the level of vice
2    president, in what way did you personally participate
3    in those 5-minute drills?
4    A    The 5-minute drills were done at various
5    organization levels.  Within the organization that I
6    was part of that Joanne Collins-Smee managed was the
7    Americas.  We were responsible for all of these
8    outsourcing deals in the Americas.  So if you look at
9    where Joanne is on the chart, she would run a drill
10   herself that only included the people directly below
11   her.  So her VPs would all participate in her drill.
12        So I would represent my area in a drill with
13   her.  So if I had an opening in my area that I wanted
14   my peers to be aware of, I would bring that opening
15   into the drill, that would be posted there, and Carol
16   or Jim would say, you know what, Jim, I have someone I
17   would like you to consider for that job.  Whether
18   they're the best, the final decision still rests with
19   whoever's doing the posting.
20        So you could bring your candidate forward, I
21   may have some of my own candidates that I'm
22   considering for the job, and then I'm able to evaluate
23   the candidates and make my own decision on whether
24   they're a right fit or who's the best one for the
25   position.  So that's one thing.

Page 269

1         I might also go in there and say, you know,
2    Frank is coming off -- his contract's ending, and I
3    want my peers to know this guy has knowledge in these
4    areas, these skills, I'd like you to consider -- and
5    you have to kind of do a selling job of the
6    individual, because they have people in their own
7    organization and they may or may not know the
8    individual.  So you kind of -- my responsibility as
9    representing my organization, that individual, is to
10   go in there and make sure they understand all about
11   that person.
12   Q    And who else in that hierarchy also runs
13   5-minute drills of their own?
14   A    Well, it gets geared up.  I mean the one that
15   we talked about, Pat Kerin, is not represented on this
16   chart, it's on the other chart, but Joanne ran one for
17   her organization, right?  Kelton ran it before her,
18   and then Joanne ran it for her organization.  And I
19   participated in that as vice president.  That was
20   mine.
21        The next tier up, there was a global -- she's
22   representing Americas.  There was a global 5-minute
23   drill also.  Again, it ran 30 minutes, but it was
24   called five minutes.  And Mr. Zapfel would invite
25   his -- well, at that point it's general manager level,

Page 270

1    but they would invite these organizations in, and
2    these organizations represented different geographies
3    that IBM had outsourcing contracts with.  So Joanne
4    had her Americas with this team.  If you looked under
5    Europe and Mark Taylor you would see a similar
6    structure under Mark for his VP.
7         So they would go in, everything would --
8    Joanne would collect the tier and bring it forward
9    into Zapfel.  So if she was looking to replace me or
10   Carol McHattie or something like that, she would bring
11   that into this tier level and say, I have this
12   opening, I'm looking for candidates, and any one of
13   these general managers can submit candidates for.
14   Q    Were the jobs listed on Mr. Zapfel's drills
15   the same as the jobs listed on Ms. Collins-Smee's
16   drills?
17   A    Well, his was aggregate of all of these, so
18   it's bigger, but, you know, Joanne should be posting
19   her drills up there, but it was really at the -- it
20   was at the discretion of the geography's GM.
21   Q    I'm not asking about the process, I'm asking
22   about the percentage.
23   A    I would say -- I think -- it's probably 10
24   percent, 15 percent.
25   Q    15 percent of what, please?

Page 271

1    A   Of the openings that she had in her area.  So
2  she's looking to fill a position, she's reporting some
3  of that up to this level, but not all of it.
4    Q   So 15 percent of the jobs listed on hers would
5  also be listed on Mr. Zapfel's?
6    A   Right.
7    Q   But basically Mr. Zapfel's are 90 percent
8  different?
9    A   Yeah.
10   Q   I wanted to -- just again, Pat Kerin's drill,
11 just so you can see where Pat Kerin is, because we're
12 going to discuss that next.
13   A   Yeah.  So we talked about Joanne runs her
14 drill with all of us, being -- Zapfel runs one with
15 his audience, and then coming down this chain more, I
16 could refer to a salesman because they're more than
17 salesmen.  But under Pat Kerin, he would run his
18 drill, and Pat Kerin had responsibility at that point
19 for the geography called Americas, similar to what
20 Joanne had, and he would run his 5-minute drill on a
21 regular basis.  So that's -- and -- he would be -- it
22 was the same thing.  Here's the openings, and then
23 where I have someone available I'm looking to place,
24 and that same process would take place on Pat Kerin's
25 drill.

Page 272

1    Q   Okay.  So let's go back to the e-mail for a
2  second in which Ms. Collins-Smee states, "I also would
3  need to get Jim on Pat Kerin's 5-minute drill."  This
4  is in her e-mail on February 22nd?
5    A   Right.
6    Q   Did Ms. Collins-Smee have you added to Mr.
7  Kerin's 5-minute drill the next month in March as she
8  said she needed to?
9    A   No, she didn't.
10   Q   How about in April, did she have you added in
11 April?
12   A   No.
13   Q   Do you know whether you were on her 5-minute
14 drill in May or June?
15   A   No, I was not on Pat Kerin's.
16   Q   Were you on Pat Kerin's drill in July, August
17 or September?
18   A   No.
19   Q   So with respect to Pat Kerin's 5-minute drill,
20 the one she said you needed to get on, when were you
21 first listed?
22   A   October of 2007.
23   Q   And what type of positions were discussed on
24 his drills?
25   A   On Pat Kerin's drill it was -- again, you're

Page 273

1  referring to kind of -- it was the PE position, which
2  was like the sales position for the outsourcing
3  contract.
4    Q   So --
5    A   I mean Pat Kerin's drill, when you look at the
6  drill, it -- we talked about three drills, and this
7  would be, like, the least competitive position for me
8  of all the drills.  I mean obviously her drill would
9  be -- I would be most competitive in that.  In
10 Zapfel's I would be competitive.
11   Q   How long -- you said these PE positions are
12 actually sales type positions.  How long had it been
13 since you'd been in a sales side position?
14   A   Yesterday I talked about being -- when I was
15 promoted to vice president I became -- they gave me
16 the Lucent contract, on the Lucent contract I had PEs
17 reporting to me, so I did have sales experience from
18 that point, but it was -- it was back in that time
19 period when I was on Lucent.
20     THE COURT:  Excuse me, Mr. Castelluccio,
21 I just want to ask you a question, because I'm not
22 sure that I heard the answer.  I see the exhibit where
23 the observation is made that you should get into Jim's
24 next 5-minute drill.
25     MR. CARTA:  Pat Kerin, Patrick Kerin.

Page 274

1      THE COURT:  Okay.  But you didn't get
2  into that drill.
3      THE WITNESS:  I did once.  I mean this is
4  February.
5      THE COURT:  No, did you get into that
6  drill?
7      THE WITNESS:  No.
8      THE COURT:  How many other drills did you
9  not get into?
10     THE WITNESS:  With respect to Mr. Kerin
11 or others?
12     THE COURT:  Well, Mr. Carta asked you if
13 you were in one drill, you said no, and he mentioned
14 another drill, and you said no.  Can you add up those
15 drills in your mind and tell me the gross number how
16 many drills did you not get into?
17     MR. CARTA:  Your Honor, that's a
18 beautiful segue.  We have the next exhibit is exactly
19 summarizing that, Exhibit 33.
20     THE COURT:  So you're way ahead of me,
21 Mr. Carta.
22     MR. CARTA:  If I was ahead of you, you
23 wouldn't need to ask.
24     THE COURT:  You're way ahead.  Okay.
25 BY MR. CARTA:

Page 275

```
1      Q   Directing your attention to Exhibit 31.
2           (Conference held at sidebar)
3           MR. CARTA:  Your Honor, we tried to do
4    this with this projection and it didn't work, you
5    can't see how many pages there are, so what I wanted
6    to do is go back to the traditional and have each
7    juror take a look at one of the exhibit, so all I'm
8    proposing to do is give the jurors an actual exhibit
9    rather than letting them look to the screen
10   projection.
11          THE COURT:  Okay.  Mr. Fasman.
12          MR. FASMAN:  I think we agreed that they
13   were not going to get any of this in the jury box.  I
14   thought we were just going to do this with present
15   it -- and present it on the screen.  They weren't
16   going to be handed individual exhibits.  I don't think
17   that that was part of the drill.  And I mean I can --
18   I could do this, too, but I don't want to.  I mean I
19   thought we were not giving this to them, they were
20   going to get the exhibits at the end of the day.  I
21   think you can go through 24, you can summarize what it
22   is.
23          THE COURT:  Obviously we have a technical
24   problem, IT problem, we're not able to get on the
25   screen all those.
```

Page 276

```
1           MR. CARTA:  Exactly.
2           MR. FASMAN:  We could go through it one
3    page at a time.
4           MR. CARTA:  One page at a time?
5           THE COURT:  Is that acceptable to you?
6           MR. FASMAN:  Sure.
7           MR. CARTA:  It's not acceptable to me.
8           THE COURT:  Listen, go hit the --
9           MR. CARTA:  They need to see this
10   document.  They need to see how many drills, and then
11   you don't see that if you do it one page at a time.
12   This is --
13          THE COURT:  You don't mind doing it one
14   page at a time?
15          MR. CARTA:  I do.
16          MR. FASMAN:  I'm fine.
17          THE COURT:  You do mind.
18          MR. CARTA:  Yes, I do.  I'd like them to
19   have copies of this document.
20          THE COURT:  How are we going to get it in
21   if we don't do it one page at a time?
22          MR. CARTA:  Just put the whole document
23   in.
24          MR. FASMAN:  We agreed that we weren't
25   going to give them during the trial, Judge.
```

Page 277

```
1           MR. CARTA:  I never agreed to that.
2           THE COURT:  We're going to go through it
3    page by page.  Make it quick.
4           MR. CARTA:  I'm not sure if I understand.
5    You're saying page by page I have to do this, just the
6    projector, or can I give this to the -- I mean this
7    is --
8           THE COURT:  Each one of these is a
9    different document?
10          MR. FASMAN:  No, it's a multi-page
11   document.
12          MR. CARTA:  This is it.  I have one for
13   each juror.
14          THE COURT:  Do you object to each juror
15   having one of these?
16          MR. FASMAN:  I do.
17          MR. CARTA:  That's what I want.  I'd like
18   to have each juror have one so they could understand
19   what's going on.
20          THE COURT:  Do you object to their being
21   given one document that's out of the old fashioned
22   way, given to the jury, told them to look at it, pass
23   it on.
24          MR. CARTA:  That's okay.
25          MR. FASMAN:  Judge, I have a real
```

Page 278

```
1    problem.  It gives it much more significance than it
2    should.  We have agreed we're not going to give them
3    any documents at all during the trial.  It's all going
4    to be official presentation.  I'm really not -- I
5    don't think it's fair to say here's one document, you
6    got to look at it.
7           MR. CARTA:  There are three -- summaries
8    of the three.  We're going to present all three in
9    this way, the traditional copy of the document that
10   they can look at.  They're going to get these
11   documents in the jury box at the end.  We've agreed to
12   that.  This is just helping them understand as they go
13   along.  It's clearly important.  The Court has already
14   asked how many, what happened, what's the sequence,
15   and that's what this document is designed to show, and
16   we shouldn't be limited to show it to them on
17   audiovisually.  I've never agreed to that.  Where did
18   I ever agree that we would?
19          THE COURT:  So it would be your intention
20   to go through each one of these?
21          MR. CARTA:  No, just say what happened in
22   March, what happened in April.
23          THE COURT:  March, April.
24          MR. FASMAN:  You can go through the page
25   on the screen.
```

Page 279

1    THE COURT: The witness will be asked
2 these questions, and assuming he does not have a
3 recollection --
4    MR. CARTA: No, he has a recollection.
5    THE COURT: Well, the document would be
6 in front of him, and he would be able to say, yeah,
7 well, yeah, I didn't get one in April. So what's
8 wrong with that? That's the old fashioned way. It's
9 the best I can come up with.
10   MR. CARTA: I'll do it that way.
11   THE COURT: So you're not going to read
12 from it, but you're going to ask him, Directing your
13 attention to --
14   MR. CARTA: I can do that. And we'll
15 scroll it up on the screen. I lose something, but I
16 can live with that.
17   THE COURT: I don't think so. This is
18 the best I can do.
19       Okay, let's go back.
20   (Conference concluded at sidebar)
21   THE COURT: All right. Let's go back to
22 work.
23   MR. CARTA: That wasn't work?
24   THE COURT: Actually it was.
25 BY MR. CARTA:

Page 280

1    Q  I think I was directing your attention to
2 Exhibit 31. Can you explain, just looking at the
3 month of March, what is in front of the jurors,
4 please?
5    A  This is Pat Kerin's drill that was in the
6 previous note. And for example, if -- this one is
7 March of 2007, so -- and then you'll see a second one
8 on page -- April of 2007 would be the second drill.
9 But the columns represent -- as I mentioned before,
10 the open positions are identified by the person in the
11 meeting, so that was the list of the open positions
12 that were on that drill.
13       The next one, which is a little confusing, it
14 says it's a slate, and that's really -- a slate is
15 built, and it's really just a list of candidates for
16 that opening position. So if you took the first one,
17 it says VP, PE, Disney. They would build a list of
18 all the candidates to be considered for that, and then
19 whoever was responsible for submitting that request to
20 fill the position would then evaluate the candidates
21 and make their decision on who they wanted for it.
22 They could pick the best candidate.
23       So that's the position, but the slate over on
24 the right, this particular one says, did Joanne
25 propose my name to be considered for that position,

Page 281

1 and you have the opportunity to --
2    MR. FASMAN: Wait, wait. I object to
3 that, Your Honor. That's not what it says.
4    THE COURT: Okay.
5    THE WITNESS: Okay.
6    THE COURT: Stop. What's the question,
7 Mr. Carta, again?
8    MR. CARTA: I asked him to explain -- to
9 review this document and to explain what it meant.
10   THE COURT: Okay. You recognize this
11 document?
12   THE WITNESS: Yes, I do, Your Honor.
13   THE COURT: Is this a list of drills?
14   THE WITNESS: Yes, it is, Your Honor.
15   THE COURT: All right. Focusing on March
16 2007, were you on any drills? Were you selected to
17 participate in any drills that were given in March
18 2007?
19   THE WITNESS: No.
20   MR. CARTA: Your Honor, I think we need
21 to focus one drill at a time in terms of -- I think we
22 need to focus on the three different people running
23 different drills, and it would get very confusing, if
24 we can confine our questions to Pat Kerin's drill,
25 please.

Page 282

1    THE COURT: Okay.
2    MR. CARTA: And I'll do that if you'd
3 like.
4    THE COURT: Okay. Listen to what your
5 lawyer asks you, just answer the question, because he
6 knows what he wants to bring out, how he wants to get
7 there, and it's more helpful to all of us if you just
8 answer his question and confine your answer to that,
9 okay?
10 BY MR. CARTA:
11   Q  Mr. Castelluccio, let me be very specific. In
12 the left-hand column are dates. What do those dates
13 relate to?
14   A  That's dates the month that the drill was
15 conducted.
16   Q  So in the top of this page, that's a summary
17 of the March 2007 Pat Kerin drill?
18   A  That's correct.
19   Q  And the second column, are those the key open
20 positions that were listed in the March 2007 Pat Kerin
21 drill?
22   A  Yes, they are.
23   Q  And the third column where it's a list of
24 notes, does that indicate whether you were added to
25 the slate of potential candidates for each of those

Page 283

1  positions?
2      A   That's what that represents.
3      Q   And you were not, is that correct?
4      A   That's correct.
5      Q   Continuing across horizontally, in the third
6  column there is a "No."  What does that indicate?
7      A   That's -- it's another part of the drill that
8  says we can have discussions about available
9  individuals, key people to discuss.
10     Q   So that "No", that doesn't relate to the VP
11 Disney position, that's a whole different question, is
12 that right?
13     A   Right.  It's a little -- that's correct.  It's
14 just a yes or no answer for that.
15     Q   So for each drill there's only one, you either
16 were or you were not listed as a key person?
17     A   That's correct.
18     Q   Okay.  So in March you were not listed --
19     A   Correct.
20     Q   -- is that right?
21         Let's look at April.  In April, starting to
22 the far right, were you listed anywhere on the April
23 Pat Kerin drill as a key person to discuss?
24     A   No.
25     Q   Which means somebody who's available, right?

Page 284

1      A   Correct.
2      Q   And with respect to the various positions
3  listed in Mr. Kerin's drill in April, were you
4  identified as a person -- were you identified in any
5  of those slates?
6      A   No.
7      Q   Turning the page, the top of the page is the
8  rest of Mr. Kerin's April drill, and below that is the
9  May drill, and the May drill there are again a list of
10 various positions that were open that slates were
11 built for.  Were you identified -- included in any of
12 the slates for any of those positions in May?
13     A   No.
14     Q   Were you listed as a person available to
15 discuss in the May Pat Kerin drill?
16     A   No.
17     Q   Turning the page, in June, is this a list of
18 the various positions that were open and for which
19 slates were built in June of 2007 on Pat Kerin's
20 drill?
21     A   Yes.
22     Q   And were you identified in any of those
23 slates?
24     A   No.
25     Q   And were you listed on Pat Kerin's 2007 June

Page 285

1  drill as a person available to move?
2      A   No.
3      Q   July, it appears we did not get that document,
4  so we don't know what happened in July.
5      A   Correct.
6      Q   August.  What happened in August?  Again, the
7  list of the various positions, and were you listed --
8  identified in any of those slates?
9      A   No.
10     Q   And with respect to whether on that particular
11 drill, were you identified as a person to discuss?
12     A   No.
13     Q   Going to the bottom of that page into the next
14 page, in the September drill, again, there was a list
15 of key open positions.  Were you identified in any of
16 those slates?
17     A   No.
18     Q   And were you identified in the September 2007
19 drill as a person to discuss as being available?
20     A   No.
21     Q   Okay.  October, you're listed there as a
22 person to discuss, is that correct?
23     A   Correct.
24     Q   And on the slate of candidates, you were never
25 added to any of those slates, is that right?

Page 286

1      A   That's correct.
2      Q   What happened after October?  Were you listed
3  as a person available in November?
4      A   No.
5      Q   And how about the slates, were you listed --
6  were you identified as being on any of the slates?
7      A   No.
8      Q   Let's go to December.  Were you identified as
9  a person who was available in December 2007?
10     A   No.
11     Q   And were you listed on any of the slates?
12     A   No.
13     Q   And January, again, were you listed on any of
14 the slates?
15     A   No.
16     Q   Were you a person who was available?
17     A   I wasn't listed, no.
18     Q   And in February were you listed as a person
19 who was available?
20     A   No.
21     Q   And were you identified for any of the slates,
22 that February list, on any of those candidates, were
23 you identified as a person who was a potential
24 candidate for any of those positions?
25     A   No.

Page 287

1    Q    March, were you listed as a candidate for any
2    of the people listed, any of the positions, the slate
3    for any of those positions?
4    A    No.
5    Q    And were you, again, listed or identified as a
6    person to discuss because you were available?
7    A    No.
8    Q    So April, were you identified on the slate of
9    candidates for anybody on Mr. Pat Kerin's drill in
10   April?
11   A    No.
12   Q    And were you identified as a key person to
13   discuss as being available in April?
14   A    No.
15   Q    And May, same question, were you on any slate?
16   A    No.
17   Q    Were you listed as somebody available?
18   A    No.
19   Q    June, were you listed on any of the slates?
20   A    No.
21   Q    And were you identified as a person who was
22   available?
23   A    No.
24   Q    When did you have your meeting, your final
25   meeting with Ms. Collins-Smee when she told you you

Page 288

1    had 30 days to get a job or we got no place for you
2    here?
3    A    It was May 20th, I believe.
4    Q    So May 20th.  April, May, you're not listed
5    for any of these positions?
6    A    Correct.
7    Q    To what extent had your review of Pat Kerin's
8    5-minute drills impacted on your decision to maintain
9    a lawsuit for age discrimination, if at all?
10        MR. FASMAN:  Your Honor, isn't that an
11   argument?  Isn't that argument?  I'm going to object
12   to the question.
13        THE COURT:  Okay.  The objection is
14   sustained.  Rephrase the question.
15        MR. CARTA:  I don't know that I need to.
16        THE COURT:  So you took this into account
17   when you decided to file a lawsuit?
18        THE WITNESS:  Oh, yes.
19        THE COURT:  Okay.  Anything else?
20        MR. CARTA:  No.  Thank you, Your Honor.
21   BY MR. CARTA:
22   Q    If an executive who is participating in any of
23   those drills, if they had someone with some specific
24   expertise that they were looking for, and let's say it
25   happened to be your skill set, how would they know you

Page 289

1    were available, if at all?
2    A    In the drill?
3    Q    Yes.  The executives who were participating in
4    Mr. Kerin's drill, how would they know?
5    A    It would have to be my manager.
6    Q    Sorry, what?
7    A    It would be my manager, or if someone knew
8    somehow that I was available.
9    Q    Okay.  I'm going to move on.
10        Did there come a time when Ms. Collins-Smee
11   raised the issue of retirement again?
12   A    Yes.
13   Q    And please explain the situation.
14   A    The second time was in November of --
15   Q    I'm sorry, this isn't with respect to you.
16   A    Oh, oh.  Yes, there was.
17   Q    Let me rephrase the question.
18   A    Yeah.
19   Q    Did Ms. Collins-Smee ever raise the issue of
20   retirement with respect to one of your co-workers?
21   A    Yes.
22   Q    And when was that?
23   A    That was a couple weeks or shortly after my
24   first session with her.
25   Q    And what do you recall?

Page 290

1    A    That was in March of 2007.
2    Q    And what do you recall?
3    A    I had received a request to come in and talk
4    about the state of Texas with her.
5    Q    And what happened?
6        Did you say state of Texas?  That's a
7    contract?
8    A    Yeah, I'm sorry, not the state in general, but
9    it was a contract that we had with the government, the
10   state of Texas government, for outsourcing.
11   Q    And what do you recall of the meeting?
12   A    I went into the meeting, and she asked about
13   Ken Wisse, who was one of the managers that reported
14   to me, about whether he could retire.
15   Q    And what was your response?
16   A    Well, she asked two questions.  She asked
17   could he retire, and then she asked what does he do,
18   and I addressed the second part of that, which was
19   what he did, what his job is and what his value is to
20   me and the organization was.
21   Q    And what did you say in terms of his role?
22   A    He was a critical resource.  He was one of the
23   key managers working for me.  He had a wealth of
24   knowledge.  He was very experienced.  He was a senior
25   individual in the organization, and he just had built

Page 291

1  this knowledge over time and was well-respected, so he
2  was a valuable asset for me.
3     Q   And how old was Mr. -- I'm sorry, I didn't
4  mean to interrupt.
5     A   No, I just said, for the organization as well,
6  not just me alone.
7     Q   How old was Mr. Wisse?
8     A   Like me, he was going to turn 60. He was a
9  few months away from his 60th birthday.
10        THE COURT:  And what was his name again,
11 sir?
12        THE WITNESS:  I'm sorry, Ken Wisse,
13 W-I-S-S-E, Your Honor.
14        THE COURT:  Thank you. And he worked for
15 you.
16        THE WITNESS:  Yes. He was one of the
17 several managers that worked for me.
18        THE COURT:  So you went to Ms.
19 Collins-Smee-Smee's office with Ken Wisse and there
20 was this discussion.
21        THE WITNESS:  Well, actually, Your Honor,
22 it was me alone with my manager, Collins-Smee. She
23 had asked me to come in and talk about the state of
24 Texas contract.
25        THE COURT:  Right, I got that. You were

Page 292

1  with Ms. Collins-Smee, and Mr. Wisse was not with you.
2        THE WITNESS:  That's correct.
3        THE COURT:  Okay. I got it.
4  BY MR. CARTA:
5     Q   Did you speak to anyone or register any
6  complaint at that point?
7     A   No, I didn't.
8     Q   Why not?
9     A   Again, Ken Wisse worked for me, and because he
10 worked for me, I felt I had -- first of all, at that
11 point -- let's see, how do I answer this. He worked
12 for me, and because he worked for me, I felt that I
13 could control more of his -- I don't know the right
14 term -- destiny or future than -- and because of it I
15 didn't see it as a threat to him at that point,
16 because there was me in between Joanne, who was asking
17 the question, and Ken Wisse himself.
18    Q   Any other reason? Why didn't you go to HR,
19 for example?
20    A   Again, this is all happening within this four,
21 six week period, the two discussions, and I really at
22 that point was not tying the two together at that
23 point. So my belief was she had asked the question,
24 and then we got into a discussion about his skills,
25 and that was kind of how we left it. There wasn't

Page 293

1  any, you know, additional discussion.
2     Q   Okay. I'm going to go back to what was
3  actually happening on the work front. And you
4  actually have talked about this at some length so we
5  can maybe go through it more quickly.
6        What was the second critical project that IBM
7  needed to perform for WellPoint?
8     A   WellPoint -- well, after we were successful
9  with -- it was the actual data center activities we
10 had moved to Richmond, Virginia.
11    Q   Was that performed in three phases?
12    A   Yeah. It was a big move, and we broke it up
13 over three phases, yes.
14    Q   And do you remember approximately when the
15 first phase was?
16    A   I believe it was in July.
17    Q   July of 2007?
18    A   Yeah, I'm sorry, 2007.
19    Q   And was it successful?
20    A   Yes, it was.
21    Q   And was that success reflected in a series of
22 e-mails?
23    A   Yes, it was.
24    Q   And let's go through these as quickly as we
25 can. Take a look at Exhibit 33, please. Identify

Page 294

1  that, please.
2     A   Sure. This is an internal e-mail from Mr.
3  Zapfel, who was Joanne Collins-Smee's manager, to
4  Keenie McDonald, and copied to Joanne Collins-Smee,
5  Mark Lautenbach and myself. And basically what he's
6  telling Keenie at this point, that I had taken him
7  through the detail of the data center move, and
8  following my review with him he called Mark Boxer and
9  left him a voicemail, told him that we were in, that
10 he had reviewed it.
11        THE COURT:  Mr. Carta, the clerk just
12 reminds me that it's ten minutes to 12. How about if
13 we take a short break, say until 12 o'clock, then I'll
14 stretch, and then we'll come back exactly 12 o'clock
15 and we'll continue until 1, at which point we'll have
16 lunch. Okay?
17        MR. CARTA:  Okay, Your Honor.
18        (Jurors excused)
19        THE COURT:  Mr. Castelluccio, you can
20 step down.
21        All right, be back at 12. Actually I'm
22 not going to go anywhere. I'm going to stay here.
23    (Recess taken from 11:52 a.m. to off 12:10 p.m.)
24        THE COURT:  Please be seated.
25        Mr. Carta, you were about to ask a

Page 295

1    question.
2         MR. CARTA: Your Honor, I'm going to
3    continue with the line of testimony for a few minutes
4    and then I'm going to finish up on the Pat Kerin drill
5    summary. Because we're waiting for that charge to be
6    typed up, or printed and given to you. Counsel have
7    agreed to that, by the way.
8         THE COURT: Okay. That's great. Try
9    your case.
10        MR. CARTA: Thank you, sir.
11   BY MR. CARTA:
12   Q   I believe this is where we were, Mr.
13   Castelluccio. Would you just review this Exhibit 33.
14   A   Yes. This is an internal IBM e-mail. It went
15   from -- Mr. Zapfel authored it, and he sent it to
16   Keenie McDonald and copied to Collins-Smee, Mark
17   Lautenbach and myself, and he -- basically what he
18   went through the data center migration with me. I
19   actually spent quite a bit of time with him going
20   through the details of the plan that we had for the
21   data center migration.
22       So he reviewed it, and his comment was that
23   "We're on track to get this behind us within the next
24   hour, roughly on track." He referenced the overall
25   timeline, that "We lost some buffer. I just called

Page 296

1    Mark Boxer --" CIO at WellPoint "-- and left him a
2    voicemail on this," and "will cover directly if and
3    when he calls back."
4    Q   Next e-mail, please. Exhibit 34. In your
5    pack what was the next thing that happened, and then
6    we'll project 35. Exhibit 34.
7    A   We actually completed the move. We were --
8    successfully completed it. I'm sorry, am I looking at
9    34?
10   Q   34. Just what happened?
11   A   Actually Mark sends out -- Mr. Boxer sends
12   out -- and again, CIO of WellPoint -- sends out an
13   internal memo to the executive team. I don't
14   recognize the names, but that must be all the senior
15   executives within those units of WellPoint. And he
16   presents status of what we were doing with the data
17   center move.
18   Q   And then passed along to Keenie McDonald in
19   the e-mail right above that?
20   A   Yes. I'm sorry. He sends a letter
21   internally, but then he also copies that and he sends
22   it to Keenie McDonald and Robert Zapfel in IBM, and
23   Keenie responds to the e-mail from Mr. Boxer.
24   Q   Okay. Now, Exhibit 35, please. Could you
25   identify the document?

Page 297

1    A   Okay. This is the -- again, this is a memo
2    from Mr. Boxer, he originates it, and it goes -- it's
3    to the IBM Richmond data center migration team, so
4    there are many, many people in IBM involved in this,
5    we had brought in to work on this. So he sends it to
6    the team that was actually doing the work. And he
7    copies Mr. Lautenbach, Mr. Mills and Mr. Zapfel who
8    were senior vice presidents in IBM, and Mr. Zapfel
9    talked -- we talked about -- and basically he says
10   "Thanks." And the highlighted ones, "It was a very
11   complex project and I am incredibly impressed by both
12   the planning and the execution from all teams." And
13   it really involved both us and WellPoint working
14   cooperatively together. "The joint effort between
15   WellPoint and IBM was impressive. You all should be
16   very proud of what was done and how it was
17   accomplished. I know this involved a level of
18   commitment and dedication that took not only long
19   hours but also intruded onto personal weekend time.
20   In everyone's career there are projects that stand out
21   for their size, impact and quality, and this should be
22   one of those projects for all of you. Take a moment
23   and reflect on what we've achieved together. We've
24   all embodied the best of what is meant to be a
25   partner. Thank you again for your dedication to the

Page 298

1    WellPoint account. It is noticed and appreciated."
2    Q   And the date of this e-mail?
3    A   July 11th, 2007.
4    Q   And what was your position at IBM at that
5    point?
6    A   On July 11th I was the senior PE on the
7    WellPoint contract for IBM.
8    Q   So at this point you had indeed stepped into
9    Mr. Morin's shoes?
10   A   That's correct. I was running this contract.
11   Q   Okay. The last e-mail I think on this topic
12   is Exhibit -- please take a look at Exhibit 36 and
13   identify what that is, please?
14   A   Yes. It's origin is -- the author of the
15   e-mail is Dave Liederbach, and again, he sends it to
16   the entire team that worked on the project. I mean
17   that's not even a full list of everyone that we had
18   involved in it. And basically what he's saying is
19   "Thank you for this incredible accomplishment."
20   Q   And is this with respect to Phase 2 of the
21   three-phase turnover?
22   A   This was July? You know, I'm not a hundred
23   percent sure, because the data center move was broken
24   into three parts, but this is one component of it.
25   Q   Okay. Take a look at Exhibit 37, please. And

Page 299

1    what's the "re" line on Exhibit 37?
2        A   I'm sorry, what was the question?
3        Q   What's the "re" line on Exhibit 37, the
4    reason?
5        A   Oh, okay.  This was Phase 2 of the data center
6    move.  So the prior memo which I couldn't recall, that
7    was actually Phase 1.  That was the major one, and
8    that was the make or break on the deal.  This is the
9    second phase of it.  Not that this was any less
10   complicated than the first, but this is Phase 2.
11       Q   And this e-mail is from Mr. Boxer again?
12       A   Yes, Mr. Boxer to my project lead, who was
13   Mark Franzese -- as I mentioned before, I brought him
14   in to lead this effort -- and to Keenie McDonald, and
15   then he copies several, myself included, and I can
16   give credit -- Julie Taylor on that was a very
17   deserving recognition.
18       Q   And what was your role at the time on the
19   WellPoint account?
20       A   I was the -- that was my contract.  I was the
21   senior PE of the contract.
22       Q   And Exhibit 38.
23           I'm sorry.  Skipping 38 and 39, what happened
24   with respect to the third phase?
25       A   The third phase was also successful.

Page 300

1        Q   And was that third phase also reflected in an
2    e-mail?
3        A   Yeah.  There are a number -- as I said before,
4    this had so much focus inside and outside IBM that
5    when we were successful, we did get a lot of
6    accolades.
7        Q   Actually take a look at Exhibit 40.  It looks
8    like that one's from Mr. Kerin.
9        A   Oh, yes.  That's Pat Kerin, we had talked
10   about before, he's an IBMer.  Again, this is an
11   internal e-mail, and he sends it to my manager, Joanne
12   Collins-Smee, and copies the rest of us with the
13   comment, "Great news, thanks for an outstanding
14   performance."
15       Q   And what was your position at this time?
16       A   I was the -- that was my contract.  I was the
17   senior PE on WellPoint.
18       Q   Let's go back in time a little bit on the
19   WellPoint contract.  We've gone all the way up to
20   September, I think.  In March of 2007, was there a --
21   what happened of significance in March of 2007 on the
22   WellPoint contract?
23       A   Oh.  March 2007, the person I had brought in
24   from the United Healthcare, Mike Morin, resigned from
25   IBM.

Page 301

1        Q   And you mentioned his name several times.
2    What role was he performing?
3        A   He was the senior DPE, but it was his contract
4    on the delivery side, not the sale side, on the
5    delivery side, to make sure we were doing everything
6    we were -- he was running the contract in delivery for
7    me.
8        Q   And can you be a little bit more explicit in
9    the scope of his responsibilities?  You're saying
10   running the contract.  Can just give a little more
11   detail, please.
12       A   Yeah.  He -- Mike, I mentioned, I brought him
13   in because of his specialty and his -- really his
14   knowledge, his skill, but he was part of the recovery
15   plan.  He was actually there running it day-to-day,
16   the contract.  He was interfacing -- his primary
17   interface was Mark Boxer, as well as the vice
18   president I mentioned before -- which gets confusing,
19   because he's an IBMer by the name of McDonald -- but
20   there's a Dave McDonald on the customer side that Mike
21   was on call daily with Dave McDonald for WellPoint,
22   vice president, as well as Mark Boxer, and really
23   dealing with every -- the day-to-day running of it.
24       Q   Did Mr. Morin send you an e-mail in February
25   in which he voiced his frustration with IBM's --

Page 302

1            MR. FASMAN:  Your Honor, objection.
2            MR. CARTA:  I'll rephrase.
3            THE COURT:  Okay.
4    BY MR. CARTA:
5        Q   Do you recall receiving an e-mail in February
6    of 2007 from Mr. Morin?
7        A   Yes, I do.
8        Q   And what do you recall?
9        A   He was -- he came -- he was -- he was not
10   upset.  He was concerned about the level of the
11   investment that we were -- that IBM was willing to
12   make to fix what was wrong on the contract.  So we had
13   gone through all these elaborate plans and size, and
14   he's trying to execute on these plans, but we can't
15   get the funding to him so he can get the right people
16   in, or enough of the right people.
17       Q   Can you identify Exhibit 43, please?  What is
18   that?
19       A   That's Mike Morin, the person we're
20   discussing, his e-mail to Keenie McDonald, who had
21   overall responsibility for IBM on the contract, and
22   myself, and then he copies -- the first two are his
23   counterpart on the sales side, and then Dave
24   Liederbach.
25       Q   Could you read the last sentence in the

Page 303

1  e-mail, please?
2      A   Yeah.  "It's time to stop the internal
3  thrashing and decide as leaders what IBM is going to
4  do with this account."
5      Q   And what did you understand Mr. Morin to mean
6  by that?
7      A   Well, we keep talking about fixes.  We know
8  what needs to be fixed, we know how to do it, and we
9  keep making promises that we'll do it, but we cannot
10 obtain the dollars, the resources in IBM to actually
11 go out and do it.
12     Q   In the e-mail he states something about the
13 bottom line, in the third paragraph.  Would you review
14 that with the jury as well, please?
15     A   Sure.  It says, "Bottom line is no funding or
16 continued funding on a piecemeal basis is a plan for
17 failure.  No one should be surprised.  My team is well
18 beyond any reasonable expectation of workload and
19 hours we have been asked to support on this account."
20     Q   And what authority did you have to direct that
21 funding be released to address these issues?
22     A   My job was to identify what we need, size what
23 we needed, how much it would cost, where we would get
24 it, and then turn it over to the sales side to get the
25 funding, to be able to -- they had to release the

Page 304

1  dollars and authorize the spend for us to go out and
2  get these, what I mentioned here, 50 people, 50
3  resources.
4      Q   And specifically who were the people who had
5  that authority?
6      A   In that time period it was Dave Liederbach.
7      Q   And who else was copied on this e-mail?
8      A   Dave Liederbach.
9      Q   Did things improve at WellPoint after Mr.
10 Morin's e-mail of February 8th?
11     A   Unfortunately, it continued.
12     Q   Take a look at Exhibit 44, please.  Please
13 identify that.
14     A   Yeah.  This is following that earlier e-mail.
15 This is an e-mail -- it was a couple days or weeks
16 later.  It's Mike Morin who's the author, and he's
17 sending it to Keenie McDonald, and he's responding to
18 an e-mail that Keenie forwarded to him where she had
19 had a conversation, I recall, with Mark Boxer on -- I
20 think it was relative to an outage.
21     Q   That's the first time I've heard the word in
22 the trial.  What is an outage?
23     A   An outage would be -- if a partner with IBM --
24 not IBM, I'm sorry -- a part of their service failed,
25 was out of service.

Page 305

1      Q   Whose service?
2      A   These are services that we provide to the
3  customer, but the equipment that is running fails and
4  it impacts the customer.  An example I've been using
5  is the claim processing.  If our systems failed, no
6  one would be able to -- you know, their clients
7  wouldn't be able to submit claims or get paid on
8  claims, and it would shut that part of the business
9  down.
10     Q   So you said you think that this might have
11 been initiated by an outage.  And Mr. Morin's e-mail
12 and response to Ms. McDonald, Keenie McDonald, can you
13 please read that?
14     A   Yes.  It's difficult for me to read this,
15 but...
16     Q   I'll read it.  "Will do, trying to keep up,
17 failing, I have not slept, eaten or showered in two
18 days, more quality of life on WP," meaning WellPoint?
19     A   Yes.
20     Q   Okay.
21         THE COURT:  And Mr. Carta, that's Exhibit
22 44?
23         MR. CARTA:  Yes, that's Exhibit 44.
24 BY MR. CARTA:
25     Q   Exhibit 45, would you please take a moment and

Page 306

1  identify that document?
2      A   The first e-mail is from Mike Morin to me, and
3  he resigns.
4      Q   Leave that on the screen for a second.
5      A   I'm sorry.  These are all in the sequence,
6  so -- I mean it's the first case about not getting
7  what he needs to fix it, financials; the second one is
8  no shower, no sleep; and then finally he made this
9  difficult, I'm sure, difficult decision.
10     Q   Okay.  And did Mr. -- I want to understand
11 exactly what Mr. Morin did.  He resigned from this
12 account?
13     A   Resigned from IBM.
14     Q   He quit his job?
15     A   Yes.
16     Q   And it says here, in the second paragraph,
17 "After careful consideration I have decided to leave
18 the IBM company effective March 30th, quote, to pursue
19 outside interests in a new phase of my working
20 career."
21         Do you know from your conversations with Mr.
22 Morin whether he had anything else lined up?
23     A   No.  He hadn't been planning this.
24         MR. FASMAN:  Judge, isn't this all
25 hearsay?

24 (Pages 303 to 306)

Page 307

```
1        MR. CARTA: You know what? I'm going to
2  get it in from Mr. Morin. I won't claim it.
3        MR. FASMAN: Thank you.
4        THE COURT: Objection is sustained. And
5  ladies and gentlemen, we'll wait until Mr. Morin gets
6  in. It's okay to read the exhibits written by him,
7  the e-mail's written by him. With regard to the
8  things that Mr. Carta wants to go into, we're going to
9  have Mr. Morin here, and Mr. Morin can tell you how he
10 felt and what the situation was. So the objection's
11 sustained.
12        MR. FASMAN: Thank you, Your Honor.
13        THE COURT: Let's move on, Mr. Carta.
14 BY MR. CARTA:
15    Q   So what ultimately happened to Mr. Morin?
16    A   We convinced him to reconsider. We would hold
17 this pending his reconsidering it.
18    Q   Hold what, his resignation?
19    A   His resignation. I told him to take time off
20 and think about it.
21    Q   And do you recall what happened after he took
22 some time off?
23    A   Yes. He came back and I put him on some
24 temporary assignments. He actually -- I put him down
25 in the state of Texas, to get him away from the
```

Page 308

```
1  healthcare part of this. He's an extremely talented
2  individual, and I put him on the state of Texas to
3  assist me with that whole new contract.
4    Q   So he quit and he didn't have another
5  position, but what did you do with him?
6    A   I gave him temporary work. I assigned him to
7  a contract. There was so much work to be done. I
8  could have put him anywhere, but I chose that account
9  because it was a start -- a new account, and with his
10 background he could help the team starting up.
11    Q   Do you know if he also had a second temporary
12 position with Bristol Myers Squibb?
13    A   He did later on.
14    Q   And after that, do you know what happened with
15 Mr. Morin?
16    A   Yes. He took a permanent job as the senior
17 DPE on -- it was right in Hartford. I believe it was
18 Hartford, an insurance -- I think it was an insurance
19 company. I don't recall.
20    Q   The Hartford Insurance Company?
21    A   Hartford Insurance, yes. Which also put him
22 close to home.
23    Q   And when you say he took that job, he remained
24 an IBM employee doing the same sort of thing he had
25 done before?
```

Page 309

```
1    A   Correct.
2    Q   What immediate step was taken to fill Mr.
3  Morin's position?
4    A   I was told that I'd be acting in that
5  position. He left -- I'm trying to think of the
6  sequence. There was a candidate identified, to be
7  considered by WellPoint.
8    Q   Ken Weiss as distinct from Ken Wisse?
9    A   Yes. Looks like McDonald -- there's two
10 McDonalds. But we know Weiss was brought forward to
11 the customer to replace Mike in that position.
12    Q   And what happened?
13    A   The customer, they interviewed him, which is
14 the normal process you go through, and it was decided
15 between the CIO and his senior vice president, David
16 McDonald, that he didn't have the qualifications for
17 the work that they wanted.
18    Q   Okay. And after Mark Boxer at WellPoint said
19 he wouldn't accept Mr. Weiss, what then happened?
20    A   Well, at that point I was told that I would be
21 a hundred percent on the account, that I would fill
22 Mike's position in the interim as a temporary.
23    Q   And I direct your attention to Exhibit 47,
24 please. What's that?
25        THE COURT: 27?
```

Page 310

```
1        MR. CARTA: 47.
2        THE WITNESS: Yes. That's, again, an
3  internal IBM e-mail that went from Joanne
4  Collins-Smee, my manager, to me and Dave Liederbach,
5  and it says, "Dave, Jim, as we discussed, Jim must
6  move to WellPoint as of Monday," and "We will need him
7  to be the acting DPE 100 percent of the time until we
8  can put a new WellPoint DPE in place -- or in on April
9  16th," which we did.
10 BY MR. CARTA:
11    Q   So at that point what was your understanding
12 with respect to the longevity of your assignment?
13    A   It was just temporary, and it looked like on
14 the 16th she would have someone full-time in the
15 position.
16    Q   The 16th of April?
17    A   I'm sorry, 16th of April, yes.
18    Q   Where were you when you received this e-mail?
19    A   I was in Austin, Texas, because it was the --
20 March 31st of that year was the night we were cutting
21 over the state of Connecticut -- I mean the state of
22 Texas contract. The state of Texas was turning over
23 their whole IT portion over to IBM as part of that
24 outsourcing contract, and that happened that evening
25 of March 31st, 2007, so on April 1st we would now --
```

Page 311

1   IBM would be running their services for them.
2       Q   And that was one of the 30 contracts on which
3   you were involved?
4       A   Yes.
5       Q   As vice president, you're still vice
6   president?
7       A   That's correct, that was my role as vice
8   president.
9       Q   And how did that switchover work, the
10  transition of all the state of Texas outsourcing IT
11  work over to IBM?
12      A   It went very well.
13      Q   Did Mr. Liederbach --
14          Please identify Exhibit 48.
15      A   Oh, I'm sorry.  I thought we were going to see
16  a visual.
17          Yeah, I was -- this was sent -- we had just --
18  the first note on this is from me to my manager, David
19  Liederbach, and Brian Whitfield, who was a vice
20  president that worked for David Liederbach.  Brian
21  Whitfield was the person I worked with on this deal.
22      Q   On what deal?
23      A   I'm sorry, state of Texas.  And I'm sending --
24  we had just concluded a meeting with the state of
25  Texas executives having switched this over and us

Page 312

1   assuming running it on April 1st, and I was sharing
2   that information that we had completed it and we were
3   done, and I forwarded it to them just to give them an
4   update.
5       Q   Exhibit 49, please.  Please identify it.  It's
6   actually an earlier e-mail, isn't it?  Focus on the
7   date for a second, please.
8       A   Yes.  This is -- what it shows here is part of
9   the planning that goes into this.  It's -- it's not a
10  trivial task.  There's a lot of -- a lot of planning
11  that goes into taking over something as complex as
12  this, because this was 30 agencies that we were taking
13  over that the state ran.  So I think this is kind of a
14  summary of what activities we had reviewed with them.
15      Q   Okay.  And Exhibit 50, please identify that.
16  This is, again, from Mr. Zapfel.  I'm sorry.  Who is
17  it from?
18      A   Well, this is -- the very -- there's a
19  sequence of notes here that kind of gradually goes up
20  the organizational ranks, but there's an earlier note
21  with what we have on the screen right now, the part
22  that we can see, is David Liederbach sending a note to
23  me, says, "Thanks, great to see Texas come online."
24  He copies myself and Joanne Collins-Smee.
25          The one above it is Joanne Collins-Smee, my

Page 313

1   manager, sending me an e-mail, copying to other
2   IBMers, and thanking me for the job, and make sure you
3   pass on the success to the transition team.
4           And then the very last e-mail on this is she
5   forwards it to Bob Zapfel, who was her manager, to
6   inform, FYI, for your information, that this had
7   occurred.
8       Q   So you just finished state of Texas, you were
9   assigned to be full-time on WellPoint, two of your
10  vice president responsibility assignments?
11      A   They were still mine.  They weren't -- I
12  wasn't relieved of any of that.  That was still my job
13  to perform.
14      Q   Were you assigned anyone to assist you, even
15  temporarily?
16      A   No assistance.
17      Q   Go to possibly a minor detail.  About that
18  time did you make a formal request for a Blackberry?
19      A   Yes, I did.
20      Q   Why?
21      A   Because at that time I knew that Mark Boxer,
22  the CIO of WellPoint, used it extensively in
23  communicating, and unless you had a Blackberry I would
24  have to rely on IBM's e-mail system to get messages
25  from Mr. Boxer, and e-mails were available on my

Page 314

1   terminal that sat in my office and you weren't always
2   in your office.  All the plans we were going through,
3   there were meetings day in and day out, so I didn't
4   have access immediately to his e-mails that he may
5   have sent to me.
6       Q   And what happened with your request for a
7   Blackberry?
8       A   It was refused.
9       Q   By whom?
10      A   Joanne Collins-Smee.
11      Q   And who had to approve that?
12      A   She did.
13      Q   Was there a reason you just couldn't go out
14  and buy your own Blackberry?
15      A   Well, I thought of that, but IBM's very strict
16  on what devices they'll allow on your internal
17  network, and for reasons they don't want you bringing
18  viruses from your iPad at home or iPhone, so they have
19  very strict procedures that you have to obtain the
20  unit through IBM, it's then loaded up with the proper
21  protective information, and then it's issued to you
22  through IBM.  So IBM procures it, do what they need to
23  do to secure it, and then they would deliver it to you
24  in your office to use.
25      Q   And what was your understanding as to what was

26 (Pages 311 to 314)

Page 315

1 going to happen to you at the conclusion of your
2 temporary assignment to the WellPoint account as DPE?
3     A   Well, my expectation was, based on what Joanne
4 had said, was I would go back to full-time.  I was
5 already full-time as vice president, but we would find
6 someone to take over the WellPoint contract, and I
7 would continue as usual as I was before all this
8 happened and Mike resigned.
9     Q   Take a look at Exhibit 51.  What is that?
10     A   This is a string of e-mails, and the part
11 where you have -- okay.
12     Q   What does it relate to?
13     A   Okay.  This is Ken Weiss -- again, not to be
14 confused with Ken Wisse -- Ken Weiss, that was the
15 person interviewed by Mark Boxer, and David McDonald,
16 who was senior VP, turned him down, and he's
17 summarizing -- Ken Weiss is now summarizing to Joanne
18 Collins-Smee his interaction with Mark Boxer, the CIO,
19 how his interview went, some of the things that were
20 discussed within that interview.
21     Q   And is the date of the interview reflected in
22 this document?
23     A   Yes.  It's on the very -- well, you can't see
24 it there.  It's on the very bottom.  I think it's the
25 first entry in this sequence.  It was April 19th.

Page 316

1     Q   Is it standard procedure at IBM for a client
2 to interview and approve or reject a proposed DPE on a
3 contract?
4     A   That was our practice that we --
5     Q   And that's reflected, in part, in this
6 document?
7     A   Yes.
8     Q   How long did you serve in the dual roles as VP
9 and DPE on the WellPoint account, vice president of
10 Public Sector and senior DPE, delivery project
11 executive, on WellPoint?
12     A   Two and a half months.
13     Q   And again, during that period were you offered
14 any assistance by Ms. Collins-Smee?
15     A   No.
16     Q   Please describe to the jurors what your work
17 experience was like during that three-month period.
18     A   It was -- it -- it was an unbelievable amount
19 of workload.  If you consider I have a full-time job
20 as vice president with 30 contracts.  Mike had just --
21 one of our top guys had just resigned because of
22 workload, on him, and now you smash those two
23 together, it was -- it was an unbearable situation.  I
24 was working non-stop from morning to night.  It was --
25 I was in the same situation Mike was in times two.  I

Page 317

1 was doing calls at 2 in the morning.  My e-mails --
2 I'd wait until I thought everyone was asleep and I'd
3 be doing my e-mails from, like, midnight until 4 in
4 the morning, and I'd catch a couple hours sleep,
5 providing there wasn't an outage on WellPoint, because
6 that would disrupt that, and you'd be back on a call
7 like that.  But it was interrupt driven with outages,
8 with normal things that I had to get done for vice
9 president role.  So that's what it was like.
10     Basically lived in my office in the basement,
11 which fortunately had a window so I knew what time of
12 day it was.  And it just -- that was it.  My wife
13 brought my meals down.  It was like she was feeding
14 the dog at some point.  And it wasn't fun.  It was
15 frustrating, because there was so much, one, to get
16 done, you knew had to get done, and you just did not
17 have the number of hours in the day to get it done.
18     Q   To what extent did you take that into account
19 when you brought your age discrimination claim?
20     MR. FASMAN:  Objection, again, Your
21 Honor.
22     THE COURT:  Leading.  Did you take it
23 into account?
24     THE WITNESS:  Absolutely, yes, Your
25 Honor.

Page 318

1     THE COURT:  To what extent?
2     THE WITNESS:  Excuse me?
3     THE COURT:  To what extent?
4     THE WITNESS:  That I was put in this
5 position because of age, and there was -- I was being
6 treated differently than where we treated someone if
7 they had both these assignments.  There would have
8 been relief for one side or the other.  And in this
9 case it was just doubled it up on me.
10     THE COURT:  Mr. Carta?
11     MR. CARTA:  Thank you.
12 BY MR. CARTA:
13     Q   I'd like to spend just less than 13 minutes
14 reviewing with you with a little more specificity what
15 else was going on at that same time period, that same
16 time period, April through June, in your role as vice
17 president of the Public Sector.  Were there
18 corporate-wide initiatives that were going on in
19 addition to the typical vice president roles?
20     A   Yes.
21     Q   And what were they?
22     A   There were two major ones.  One project or
23 initiative was called LEAN.  I don't know what it
24 stands for, but it was -- LEAN was something that ran
25 pretty much the full year, but it was happening in

Page 319

1    that period. And LEAN was a means of us finding
2    out -- using -- an outside consultant would come in
3    and we would understand how we could become more
4    efficient the way we perform our jobs, whether there
5    were things we were doing that we didn't need to do,
6    if the customer didn't value it and it wasn't much
7    help to us, but it was like, we've been doing it for
8    the last six months, so let's keep doing it. So LEAN
9    was the methodology, and there were consultants that
10   came in to work that, with us, and we were doing it in
11   our sector, Public Sector.
12       The other part -- and that was the demanding
13   thing, because there's meetings that -- you have to
14   attend meetings in your conference calls. You had to
15   meet your management team to address that. So there
16   was a tremendous amount of work in that alone.
17       On top of that the corporation for our
18   business line decided to do what's called the resource
19   action.
20       Q   Let's just hold off a second on that. Let's
21   stick with LEAN for a minute. Look at Exhibit 41,
22   please. What is Exhibit 41?
23       A   The part we're looking at -- oh, this -- let's
24   see. April 22nd, so it's in that window of time, and
25   it's from Joanne to me, and she realized she didn't

Page 320

1    have me on her distribution list, which I'm not sure
2    why, but she sends this, and she wants status on the
3    project called LEAN, where we are with LEAN.
4        Q   So in April of 2007 she's specifically seeking
5    your input on LEAN?
6        A   Yes. For my sector.
7        Q   Did she take over the LEAN project from you?
8        A   No.
9        Q   Does the client -- question withdrawn.
10           Was LEAN also applicable to WellPoint?
11       A   Yes, it was, because it was a major -- I mean
12   WellPoint had a lot of people working on it, and LEAN
13   is really addressing how you do things more
14   efficiently and reduce people, so they were a big
15   chunk of my staffing in this sector.
16       Q   Do you recall how Mr. Boxer reacted to the
17   idea of applying the LEAN initiative to his -- the
18   people that had been assigned to him, or assigned to
19   his contract?
20       A   He was very upset by that, when he found out.
21       Q   Take a look at Exhibit 42. In this e-mail --
22   what's the date of the e-mail, please?
23       A   The last one in the string is May 7th, 2007.
24       Q   And this is from?
25       A   This is from Mark Boxer and Keenie McDonald.

Page 321

1        Q   And what's the import of the e-mail?
2        A   It's Boxer is disappointed on -- on -- well,
3    essentially he's upset that he wasn't informed about
4    this initiative that was taking place within IBM, and
5    in particular on his -- how it impacted his account.
6        Q   "No one gave us a heads up." Is that what
7    you're referring to?
8        A   Yes. Then he makes a reference that "Jim --"
9    which is to me in there. His question is who would
10   have had this responsibility in communicating this to
11   him, and he's saying "Jim is invisible from what I can
12   tell."
13       Q   And that "Jim", you understand that to be a
14   reference to you, is that right?
15       A   I do, yes.
16       Q   And were you invisible on that issue?
17       A   I didn't -- the communication of what we're
18   doing inside IBM is the responsibility of one of the
19   people that addresses in here, John Shimkus and Luis
20   Fernandez. Those are the two -- the way this --
21   there's sale side and delivery side. What we're doing
22   is over in the delivery side. The communication into
23   the customer is through the sales side, and that's
24   where they -- they had the responsibility to bring
25   that message to Mark Boxer, and all the other 30

Page 322

1    clients that I -- or contracts that I had within the
2    sector. My focus was on LEAN, the project itself, the
3    initiative.
4        Q   To what extent were you supposed to be visible
5    to him on that issue?
6        A   Not at all, unless the sales side of IBM
7    thought it would be useful for me to get -- to go
8    through the details of our project plans, but that
9    decision -- it's their decision to call and invite me.
10   I don't invite myself to that.
11       Q   Were you invited to interact with Mr. Boxer on
12   that issue?
13       A   No.
14       Q   To what extent did you take this as a
15   criticism of your performance? The language is
16   dramatic, "Jim is invisible from what I can tell."
17       A   My interpretation of that is Mr. Boxer is
18   confused on who's playing what role in this, in the
19   LEAN, and I didn't -- actually when I saw this I went
20   back to Shimkus and said, You better make a call on
21   Mr. Boxer and help him understand what we're doing
22   inside IBM with LEAN. So I didn't view it as a
23   criticism of me. I think Mr. Boxer is saying, I know
24   Jim's team's working this, but I don't know whether --
25           MR. FASMAN: I don't think, Your Honor,

Page 323

1    he's competent to testify to any of that.
2            THE COURT: Sustained.
3    BY MR. CARTA:
4        Q   Let's go to the resource action.
5            MR. CARTA: Well, any of that. I think
6    he can, Your Honor, up to the point where he said what
7    he did is fine. He then started to say what he
8    thought Mr. Boxer thought. I would agree and I don't
9    claim that part of the testimony.
10           THE COURT: All right. Well, why don't
11   you re-ask the question. And listen very carefully to
12   the question that Mr. Carta asks, and he asked it in a
13   way that will make your response appropriate, legally.
14   BY MR. CARTA:
15       Q   To what extent did you take this as a
16   criticism, if at all?
17       A   I didn't.
18       Q   Why not?
19       A   Because it wasn't my responsibility to
20   communicate it to the customer.
21       Q   And what, if anything, did you do to see that
22   the correct information was indeed communicated to Mr.
23   Boxer?
24       A   I spoke to Mr. Shimkus, who's referenced here,
25   suggested that he speak to Mr. Boxer.

Page 324

1        Q   Let's move on to the second corporate
2    initiative. You talked about the LEAN initiative.
3    Let's talk about the resource action. At some time in
4    the middle of April of 2007 did IBM initiate a
5    resource action across just Ms. Collins-Smee's entire
6    group, not the whole corporation, but just her group?
7        A   Yes, they did.
8        Q   And please explain to the jurors what a
9    resource action is?
10       A   Resource action is -- is a -- is a staff
11   reduction. It's eliminating people from positions.
12   That's why it's called resource. It's a very
13   regimented process we do.
14           THE COURT: Would you speak into the
15   microphone?
16           THE WITNESS: I'm sorry, Your Honor.
17           THE COURT: Thank you.
18   BY MR. CARTA:
19       Q   And you say it's very regulated. It's
20   regulated by what laws?
21       A   There are labor laws both within the state and
22   the federal government level that requires us to --
23   that -- that we have to report this program that we're
24   doing and the results of the program.
25       Q   And to what extent are there rigid time frames

Page 325

1    within which the resource action has to be performed?
2        A   It's very rigid. I mean because of the
3    federal and state obligations and employment laws,
4    that we had to execute this on a very defined
5    calendar, dates were set before we initiated it, we
6    had to adhere to those calendar dates.
7        Q   And do you recall what the time frame was, not
8    calendar-wise but week-wise, how many weeks?
9        A   The -- it was eight weeks, plus some follow-up
10   following it, so roughly ten weeks.
11       Q   And when was that resource action begun, if
12   you recall?
13       A   As I recall, it was in the April of 2007.
14       Q   Right at the time you just got off Texas and
15   you were being put in to assist?
16       A   Right. At that point when this was initiated
17   I had LEAN, I now had this, I had full-time Public
18   Sector vice presidency, and I also had full-time
19   WellPoint responsibility.
20       Q   Take a moment and look at Exhibit 52. What is
21   that?
22           THE COURT: That's 62?
23           MR. CARTA: 52, I'm sorry, 52.
24           THE WITNESS: I'm sorry, if you could
25   scroll that so I can see who it was sent to.

Page 326

1            That's -- this is an e-mail from me with
2    a status on where we were with the resource action,
3    all the action that was taking place. There was an
4    update status, as I said to my manager, Joanne
5    Collins-Smee, and then to Dave Liederbach, and the
6    rest of the distribution list that's on there, and it
7    really shows that my target was to find 208 jobs and
8    eliminate them, and I at that point was up to 161 out
9    of the 208, still working.
10   BY MR. CARTA:
11       Q   And is this the responsibility that Ms.
12   Collins-Smee took off your shoulders during that time
13   period?
14       A   Not at all.
15       Q   I'm looking at this e-mail carefully. When
16   was that sent?
17       A   Well, it was sent at 2:52 a.m. on a Saturday
18   morning.
19       Q   And to what extent was that typical of what
20   you were doing at that time frame, in terms of your
21   workload?
22       A   With the two full-time jobs, and these two
23   LEAN and RA initiatives, it was typical. I was
24   working around the clock.
25       Q   Were you able to achieve the results required

29 (Pages 323 to 326)

A-359

Page 327

1  or requested of you in terms of the resource action?
2      A   Yes.
3      Q   Did the resource action require reduction in a
4  number of WellPoint employees, not just IBM employees,
5  but WellPoint employees?
6      A   Yes, there were reductions on the WellPoint
7  side as well.
8      Q   And what kind of time commitment would you say
9  was required on the resource action in that eight-week
10 period?
11     A   This is a major -- I mean it's one chart, but
12 it's a major, major piece of work, because you have to
13 analyze every single employee in our organization, and
14 you actually wind up ranking every single individual
15 within the organization, like to like, and then what
16 you look at is where you're going to eliminate those
17 208 resources in that list.
18     Q   To your knowledge, did anyone suggest to Ms.
19 Collins-Smee that loading you with all of these
20 responsibilities might be problematic?
21     A   Yes.
22     Q   Would you please review Exhibit 53?
23     A   This is an internal e-mail from Dave
24 Liederbach.
25     Q   From Dave Liederbach?

Page 328

1      A   Yes.
2      Q   To your immediate superior?
3      A   To Joanne Collins-Smee, my manager.
4      Q   Saying what?
5      A   Basically at the highlighted part is, he's
6  observing what's happening to me and what's going on
7  and he basically says, "Jim C --" meaning me "-- will
8  implode between the WellPoint and this RA action."
9      MR. CARTA:  Your Honor, if I may, this
10 might be a good time to break for lunch.
11     THE COURT:  Mr. Carta, yes.  I think it's
12 an appropriate time to take our lunch break.  We'll
13 resume at 2 p.m.
14     I don't know whether anybody's made any
15 suggestions to you, but if you walk out the front
16 door, and remain on this side of the street, and walk
17 down straight, one block, and then cross the street,
18 right there on the corner is a delicatessen type place
19 called Max Bibo's, which has good sandwiches and salad
20 and food for the health conscious, and food for the
21 less health conscious, and there's ample room to sit,
22 a lot of seats there.
23     Don't talk about the case.  Just have a
24 good lunch.  And come back -- we'll resume at 2
25 o'clock on the dot.

Page 329

1      MR. CARTA:  Thank you, Your Honor.
2      THE COURT:  Thank you, Mr. Carta, Mr.
3  Fasman.
4      MR. FASMAN:  Thank you.
5      THE COURT:  Ladies and gentlemen.
6      (Jurors excused)
7      THE COURT:  Is there any business for us
8  to handle?
9      MR. CARTA:  There will be as soon as we
10 come back.  I think, Your Honor, we're going to go
11 back to the summary of the Pat Kerin drill, and on the
12 bottom of that drill, the last page, has a total
13 number of positions that were open, and because we
14 hadn't agreed yet to the cautionary charge I don't go
15 to that, but I understand that's been worked out, and
16 so when we come back I'll go back to that particular
17 document, and then I assume the Court will give its
18 charge that we've agreed to.
19     THE COURT:  Okay.  Are we moving along on
20 schedule?
21     MR. CARTA:  It's looking like it'll be
22 two days, not a day and a half.
23     THE COURT:  Have a good lunch.  See you
24 at 2 clock.
25     MR. CARTA:  Thank you.

Page 330

1      (Recess taken from 1:01 p.m. to 2:15 p.m.)
2      THE COURT:  I have been advised that the
3  parties do not agree on what has been submitted to me
4  on one page of paper, a stipulated jury charge
5  regarding open Band C and D positions.  Gentlemen?
6      MR. CARTA:  Your Honor, we've agreed on
7  the language.  The number I think is the wrong amount.
8  When we did this previously I don't think we had all
9  of the 5-minute drills, and this was the number that
10 was used in our summary judgment motion four years
11 ago, three years ago, and we've re-added it.  It's not
12 hugely different, but it's 145 versus 106, and I
13 thought we should have the correct information in
14 front of the jury.
15     MR. FASMAN:  First of all, Judge, if I
16 may, first of all, this started off ten minutes ago as
17 200, then it was 176, now it's 145.  I'm not counting.
18 I don't have all of these things here.  We used 106,
19 we've been using 106 as the number of openings that
20 were available during the period he was on the bench
21 in the various 5-minute drills.  Kerin's, Zapfel and
22 Joanne Collins-Smee.  That was the number we've used
23 all along.  All of a sudden -- and we agreed on this,
24 and 106 is in there, as you see.  And now Plaintiff
25 says oh, no, there were more.  So far I don't know

Page 331

1  whether there were more, but I can't -- I'm not going
2  to count them up. We've got a jury sitting here.
3         THE COURT: Okay.
4         MR. FASMAN: Right?
5         THE COURT: Let me ask you this,
6  gentlemen: Can you take care of this problem by
7  removing the word "approximately" before the 106 and
8  substituting in its place the words "at least 106"?
9         MR. FASMAN: I think there were 106.
10 That's my understanding.
11        THE COURT: You may be right, but it's
12 not a big concession.
13        MR. CARTA: I think that's a solution. I
14 don't think it's going to -- yes, Your Honor, I would
15 accept that. I think that works.
16        THE COURT: Mr. Fasman?
17        MR. FASMAN: Your Honor -- yes, okay,
18 we'll be happy to do that. I do think that one thing
19 ought to be explained, though, Judge. And that is as
20 you saw in these drills from a different period of
21 time, in the Kerin drill, there's a number at the
22 bottom that says 204 openings, and that's an entirely
23 different period of time. That's the period from --
24 where did you start -- March 1st, '07, not to the end.
25 This deals with January to June.

Page 332

1         THE COURT: Okay.
2         MR. FASMAN: So I think somehow we ought
3  to explain to the jury that that's a different period
4  of time, that this stipulation deals with just the
5  hundred or so positions that were filled during the
6  period of time that Mr. Castelluccio was on the bench.
7         MR. CARTA: I would be prepared to put up
8  Exhibit 33, I wanted to do that anyway, and review
9  this page, because I was waiting for this to be
10 resolved, and I'll have Mr. Castelluccio explain that
11 the 204 positions that's referring to are for that
12 entire time period.
13        THE COURT: So you will clarify this?
14        MR. CARTA: Yes.
15        MR. FASMAN: I would much prefer that
16 Your Honor clarify this, because I'm afraid that Ms.
17 Collins-Smee's going to sneak into the conversation as
18 it has on multiple occasions with Mr. Castelluccio.
19        THE COURT: Mr. Carta, can you offer me
20 some words of comfort?
21        MR. CARTA: Yes, I'll direct him just to
22 answer that question very carefully.
23        THE COURT: It's very important.
24        THE WITNESS: I understand, Your Honor.
25        THE COURT: We're going to proceed in

Page 333

1  accordance with your representations, Mr. Carta. And
2  I understand your objection, it's noted, but I think
3  it's a discretionary call. I think if Mr. Carta asks
4  the right questions, the witness confines himself to
5  the answers and we don't make too much of this, it'll
6  be okay.
7         MR. FASMAN: Your Honor, that's fine.
8  You're going to read this before, is that the idea?
9         THE COURT: I'll read it when you want me
10 to. If counsel can agree. I mean I think you ought
11 to go through --
12        MR. FASMAN: Well, Judge, I would suggest
13 one other thing, and this is -- I know Mr. Carta's
14 trying his case as he sees fit, but all of the
15 evidence that we've heard so far was classified by
16 Judge Squatrito as background evidence. I mean the
17 whole removal from the WellPoint position, the removal
18 from the VP PSD, all of this stuff is background, it's
19 not inadmissible, said Judge Squatrito, but I think if
20 we went next door and said do you think it would take
21 a day and a half or two days or whatever to go through
22 the background before we finally got to the
23 termination, he'd probably say I doubt it.
24        But here's my point. I don't want the
25 jury to misunderstand what this case is about. I

Page 334

1  think at some point Your Honor ought to tell them,
2  look, these two removals have been held
3  nonjusticiable, it wasn't challenged at the time.
4  That's what Judge Squatrito held in summary judgment.
5  They're probably sitting there and saying, I got to go
6  through this guy's whole background. That's not
7  before them. So at some point I think we ought to
8  clarify that, and I would request that Your Honor do
9  so.
10        THE COURT: All right. You know the
11 appropriate point at which you say that?
12        MR. FASMAN: How about yesterday?
13        THE COURT: Mr. Carta?
14        MR. CARTA: Your Honor, I think -- my
15 recollection is that in the initial charge I think you
16 told them what was background evidence and what was
17 not. At least that's what I recall. I mean I don't
18 think we're -- we've made the case that Mr.
19 Castelluccio should be awarded damages based upon his
20 loss of those first two positions. It's background
21 evidence, and it's relevant to the pattern of conduct
22 that led up to the final termination. I'm sure that
23 IBM would love to have evidence of only what happened
24 in the last six months, I said that in my opening
25 statement, but that doesn't tell the whole story,

Page 335

1 doesn't tell the story by any stretch.
2           MR. FASMAN: Judge, I would agree with
3 that if I recalled your opening, but I don't remember
4 you saying that. I remember my saying that.
5           MR. CARTA: It's possible that --
6           MR. FASMAN: -- in my opening.
7           THE COURT: I'm going to allow you wide
8 latitude in presenting your case, the same kind of
9 wide latitude that I've allowed Mr. Carta. We have a
10 capable and attentive jury. They are paying
11 attention. Both of you gentlemen have impressed me
12 with your abilities, and I'm sure that you in your
13 arguments and your closing arguments can point out
14 what this case is about and what it's not about, and
15 I'm going to let you do that. And Mr. Carta, you
16 understand that I'm going to let Mr. Fasman do that?
17           MR. CARTA: Absolutely.
18           THE COURT: And you understand that
19 you've got to be very, very careful, because if you
20 are successful in this case, there will be an appeal,
21 and you don't want to have there to be in the record
22 any reversible error, any serious error, so protect
23 the record. Stay off the thin ice. And we're going
24 to take care of by way of jury instructions and by way
25 of closing arguments of these problems.

Page 336

1           I think the practical way of handling
2 them is like the way I suggested we handle the
3 apparent temporary disagreement with sentence one of
4 the stipulation, just putting in two words and that
5 covers it. The jury gets this. I've seen juries that
6 don't get this, and this is not one of them. This is a
7 jury that understands. It understands the testimony,
8 it's going to understand all of the witnesses, it's
9 going to understand your closing arguments, and I'm
10 going to instruct them properly on what this case is
11 about and what it's not about and what the law says.
12           So that's how I'd handle your problem.
13 It seems to me we've resolved part of the
14 disagreement, and to the extent that there's another
15 part of the disagreement, I'm going to give you
16 latitude. When we're getting there in your case
17 during your cross or during your own case in chief, I
18 expect you -- I invite you to say, Your Honor, this is
19 one of the areas where the Court represented that I
20 would have some latitude, and just let me know. I
21 want to do this once.
22           MR. FASMAN: We do, too.
23           THE COURT: But we've got to do it once
24 and get it right.
25           MR. FASMAN: Your Honor, with your

Page 337

1 permission, let me go back and read Your Honor's
2 opening comments and think about this overnight. If I
3 have a suggestion tomorrow morning I'll bring it to
4 Your Honor's attention. Okay?
5           THE COURT: Fair enough.
6           MR. FASMAN: Thank you. But we can go on
7 now, and we're not going to run out of witnesses
8 today.
9           MR. CARTA: No.
10           MR. FASMAN: Thanks, Judge.
11           THE COURT: I appreciate it, sir.
12           All right. Mr. Castelluccio, would you
13 please resume the stand.
14           (Jurors present)
15           THE COURT: Please be seated, ladies and
16 gentleman.
17           You could conclude that I don't have a
18 very good record up to this point with respect to
19 starting on time, but I swear to you, right hand to
20 God, I have been working during this period, been
21 working with counsel before you came in. We
22 transacted some legal business that I think is going
23 to work to streamline this case and make everything
24 easier and more understandable once the presentation
25 of evidence is done.

Page 338

1           I actually got a turkey sandwich, one of
2 my law clerks got a turkey sandwich for me for lunch,
3 and I gobbled it down, very quickly, so I could get
4 down here and we could resume. So I'm sorry. And I'm
5 doing my best.
6           Mr. Carta, you all set?
7           MR. CARTA: Yes, I am.
8           THE COURT: Okay. Please proceed.
9 BY MR. CARTA:
10     Q   Mr. Castelluccio, in order to prevent there
11 being any confusion about Exhibit 31 that we reviewed
12 with the jurors previously and reviewed a page at a
13 time, is this a 5-minute drill?
14     A   It's data that's been pulled off a 5-minute
15 drill.
16     Q   So this is a summary of 5-minute drills for
17 what period of time?
18     A   Summary from March 2007 through and including
19 June 2008.
20     Q   And each month there's actually a separate
21 document that has the information that's summarized
22 here, is that right?
23     A   That's correct.
24     Q   I'd like to direct your attention to the last
25 page, please. It says there "Total Open Positions

Page 339

1    Listed, 2004."  What time period does that cover?
2        A   That's all-inclusive of the March 7th entry
3    through the June 8th drill.
4            MR. FASMAN:  Your Honor, with all due
5    respect, IBM's a big company, but it's 204.
6            MR. CARTA:  What did I say?
7            MR. FASMAN:  2004.
8            THE COURT:  You misspoke on that, Mr.
9    Carta.
10           MR. CARTA:  It's the turkey sandwich.  My
11   error, I apologize.  204.
12   BY MR. CARTA:
13       Q   And what does that mean, total open positions,
14   please?
15       A   That's the number -- that's a summary of the
16   positions that were identified in each of the drills.
17       Q   So you went through and you added all the
18   positions that were identified in the left-hand
19   column?
20       A   Correct.
21       Q   So --
22           MR. CARTA:  Your Honor, this is the point
23   in which Mr. Fasman has requested that we read that.
24           THE COURT:  All right.  Thank you.
25           Ladies and gentlemen, counsel have agreed

Page 340

1    upon my reading to you a stipulation now.  A
2    stipulation is an agreement, and it's, as a matter of
3    law, it is a substitute for bringing in proof.  It can
4    be used as evidence, because it is an agreement
5    between counsel, and I'm going to read this to you.
6            You have heard testimony that there were
7    at least 106 Band C and Band D executive job openings
8    identified in certain minute drill meetings during the
9    period January 1, 2008, through June 30th, 2008.  Of
10   those approximately 106 openings, 16 of them were
11   posted and filed in Joanne Collins-Smee's
12   organization.  The remaining positions were in other
13   areas of IBM's business.  Joanne Collins-Smee could
14   have requested that Mr. Castelluccio be considered for
15   those positions.  However, the decisions about whom to
16   place in those positions were made by executives other
17   than Joanne Collins-Smee.  Mr. Castelluccio offers as
18   evidence to show the number of positions that were
19   open during the period from January 1, 2008, until
20   June 30th, 2008.  Mr. Castelluccio asserts that Ms.
21   Collins-Smee should have disclosed these positions to
22   him, given him an opportunity to apply for them, and
23   in some cases recommend him for these positions.  Mr.
24   Castelluccio does not claim that he should have been
25   hired for these positions, and you should not treat

Page 341

1    IBM's selection of someone other than Mr. Castelluccio
2    for any of these open positions as evidence of age
3    discrimination.
4            Now, gentlemen, I propose -- we haven't
5    discussed it, but I would propose that when the time
6    comes for the jury to deliberate, it would have a copy
7    of my jury charge, this stipulation I would propose be
8    marked as a court exhibit and be submitted to the jury
9    so it can read that.
10           MR. FASMAN:  That's fine with us, Your
11   Honor.
12           MR. CARTA:  Acceptable, absolutely.
13           THE COURT:  Okay.  We'll mark this as
14   Court Exhibit 1.
15           MR. FASMAN:  Thank you, Judge.
16           THE COURT:  Thank you, sir.
17   BY MR. CARTA:
18       Q   Okay, Mr. Castelluccio, I'd like to continue
19   with Exhibit 54.  Can you please identify this
20   document?
21       A   Yes.  This is -- it's an internal IBM e-mail
22   from Keenie McDonald to Bob Zapfel and Joanne
23   Collins-Smee.
24       Q   And the time frame, please?
25       A   I'm sorry.  It's May 15th, 2007.

Page 342

1        Q   So it's in that time period where you had the
2    multiple responsibilities?
3        A   The two jobs, yes.
4        Q   And it's from Keenie McDonald?
5        A   Well, yes.  The final e-mail is from Keenie to
6    Zapfel and Collins-Smee.  The originating e-mail is --
7    on the bottom is from Mark Boxer to Keenie McDonald.
8        Q   And please review the originating e-mail from
9    Mr. Boxer to Keenie McDonald.
10       A   He writes, "I was wondering if we were having
11   any luck identifying additional candidates for the
12   delivery leadership role.  Working with an interim
13   leader is not an ideal situation right now, and I
14   expect Jim may not be able to devote enough time to
15   this."
16       Q   And Ms. McDonald's response?
17       A   She doesn't respond to Mr. Boxer, but she
18   responds to Mr. Zapfel and Ms. Collins-Smee.  "Jim has
19   not been able to devote enough time at WellPoint and
20   it does show."
21       Q   And do you agree?  Is that -- do you agree
22   that you were not able to devote enough time to
23   WellPoint at that point?
24       A   Yes, that's true.
25       Q   Why is that?

Page 343

1    A   Well, I had the other 30 contracts I was
2  working with.  I had the LEAN initiative that was
3  consuming a lot of time.  I had the resource action,
4  which was at a critical point because we were reaching
5  a deadline to have all the names identified.  And I
6  was also working on the WellPoint contract as well.
7    Q   The resource action went through what time
8  period again?
9    A   It was April through -- we had to have the
10 final list of the names and the people identified by
11 the end of May, and then resolve any issues with that
12 list early part of June, but employees had to be
13 notified on June 1st of 2007, in this period.
14   Q   I'd like to do another brief summary right
15 here.  In the first half of 2007, what objectives had
16 you fulfilled as vice president of Public Sector, in
17 that capacity, vice president of Public Sector?
18   A   Well, we continued to improve on customer Sat
19 across the contracts, you know, the 30 other contracts
20 other than WellPoint.  We continued to reduce costs,
21 which improved the profit position, and we were able
22 to grow the business on the existing contracts that we
23 had.
24   Q   As Ms. Collins-Smee has suggested in her
25 e-mail of February 2007, did she ultimately replace

Page 344

1  you as vice president of Public Sector?
2    A   I'm sorry, repeat?
3    Q   Sure.
4    A   Could you restate?  Because I kind of lost it.
5    Q   Fine.  Did Ms. Collins-Smee ultimately replace
6  you as the vice president of Public Sector?
7    A   Sorry.  Yes, she did.
8    Q   And when was that?
9    A   June 5th, 2007.
10   Q   And when were you first informed of that?
11   A   June 5th, 2007.
12   Q   And so in the four-month period between
13 February of 2007 when she e-mailed Mr. Holmes stating
14 that she was going to replace you until June 4th of
15 2007, what knowledge did you have of that?  Prior to
16 that were you aware that Ms. Collins-Smee was
17 searching for another executive to replace you?
18   A   I had no knowledge of that, no.
19   Q   And by whom were you ultimately replaced?
20   A   Miguel Echavarria.
21   Q   Did you know him?
22   A   Yes.  I had worked with him in two other
23 positions at IBM, so I knew him well.  Miguel is good.
24 Also younger than me.
25   Q   How old was he at the time?

Page 345

1    A   49 years old.
2    Q   What was Mr. Echavarria's background,
3  generally?
4    A   His last assignment before he replaced me in
5  this position was he was a vice president on a
6  contract, the AT&T contract, which was an outsourcing
7  contract that we had.
8    Q   So you had all these jobs, and she replaced
9  you as VP of Public Sector.  Tell me why she wasn't
10 doing you a favor?
11   A   Well, I don't view it as a favor because she
12 intended to do this irregardless of my workload.  This
13 was underway since February from the documents that we
14 saw.  And at that point I was at the end of -- near
15 the end of the resource action.  We had notified
16 individuals, so that was pretty much complete.  So a
17 big part of the workload was over and done with.
18   Q   And what impact, if any, did that change from
19 one position to the next, what impact, if any, did
20 that have on your -- as a professional on you?
21   A   Well, it was going from what was a vice
22 president's position and being removed, being replaced
23 in that position to -- at the time it was a director's
24 position on WellPoint, so it was actually -- it's
25 viewed as, you know, you're being lowered in your

Page 346

1  position.  I don't know the right way to express that,
2  but it was a different position, a lower level
3  position.
4    Q   Did they change the grade of the band
5  position, the band grade of the DPE position once you
6  moved into that position?
7    A   Yes.
8    Q   So it matched the same grade that you were at
9  before?
10   A   Yes.
11   Q   So that it wasn't a band demotion, you didn't
12 go from a Band C to a Band D?
13   A   No, no.  But it was running 30 contracts to
14 then running a single contract.
15   Q   Was Ms. Collins-Smee also running her own
16 5-minute drill at the same time similar to what we've
17 discussed with Mr. Kerin?
18   A   Yes, she had the same 5-minute drill for her
19 organization that we had seen earlier, Pat Kerin had
20 raised.
21   Q   And who participated in her drills typically?
22   A   On her drills it was her vice presidents that
23 reported to her.
24   Q   So those were your peers in the ITDelivery
25 organization?

Page 347

1    A   Correct.  When I was the vice president in
2  Public Sector, myself and my peers of the other
3  sectors all participated in that drill.
4    Q   If you weren't listed on her drill, would the
5  other vice presidents necessarily know that you were
6  available?
7    A   No.
8    Q   Would your peers have any way to know that
9  you'd agreed to accept a Band D position, or
10 whatever -- what was going on with you?
11   A   No, they wouldn't, unless my manager informed
12 them that that was the case.
13   Q   And let me ask you, had you previously been a
14 participant in her 5-minute drill exercises?
15   A   Yes, I was.
16   Q   In what capacity?
17   A   Well, again, I was one of the VPs that owned
18 the sector, and there were four other sector owners,
19 and my role in that was if I had openings in my
20 positions, I would identify those in the 5-minute
21 drill looking for candidates from my peers and
22 elsewhere.  So I would list openings that I had in my
23 area.  It was also a chance -- an opportunity for me
24 to identify someone in my area, and make the group
25 aware that this particular individual was either

Page 348

1  available or soon to become available, and I was
2  looking to place them in a position, which may be
3  within one of the other sector areas.
4    Q   And when you were removed as vice president of
5  Public Sector, were you still able to participate in
6  the 5-minute drills?
7    A   No.
8    Q   So when you were changed from DPE of Public
9  Sector to full-time on WellPoint, you no longer have
10 access to that information, is that --
11   A   I was removed from the distribution list and I
12 was uninvited to the meetings.
13   Q   To what extent were the job openings that were
14 discussed in Ms. Collins-Smee's 5-minute drill
15 relevant to securing a new position for you?
16   A   It was, I want to say critical, because that's
17 where my expertise was.  That's where I'd been
18 performing for the last -- since I took over Lucent
19 and took over the sector.  So my specialty, if you
20 call it that, was running these accounts, and those
21 were the positions that were posted in those meetings.
22   Q   Were any of the other 5-minute drills that
23 were run as relevant to the positions you would be
24 looking for?
25   A   This one was -- of all the drills that were

Page 349

1  under three -- well, we haven't talked about the
2  second one, but there were three drills being run at
3  different layers.  This was the one that would be the
4  most effective for me in finding a position, because
5  it would be positions that my peers were filling, and
6  my peers, they knew me, they knew my performance, they
7  knew my background, in those areas, so they had
8  firsthand knowledge of my skills and abilities.
9    Q   And to what extent were you more or less
10 dependent upon Ms. Collins-Smee's advocacy on your
11 behalf in those drills?
12   A   Well, in her drill in particular, if I could
13 just be listed, identified in there as being
14 available, then I felt the knowledge my peers had of
15 me would have made it easier for me, for, you know,
16 finding a position, because they would contact me.
17   Q   Now, in your experience at IBM, were
18 executives sometimes listed as being available on a
19 5-minute drill even before they -- their position had
20 been changed?
21   A   Oh, I mean one of the benefits -- the answer
22 is yes, it's a common practice to do that, and the
23 reason you do that, and I've done it myself in these
24 drills with individuals for me, because certain --
25 you're looking to make the change, and it could be

Page 350

1  because the contract's reaching the end of term, end
2  of life, and the contract's going to, you know, end on
3  this date, so you don't want to wait until that date
4  happens and then try to find a position.  What you try
5  to do is up front start identifying and make people
6  aware that that person's going to become available and
7  start searching for that job before the termination,
8  and in many cases we'll free someone up even before
9  they end the contract to get the -- allow them to get
10 on another position.
11   Q   Based on your review of Ms. Collins-Smee's
12 5-minute drills, that IBM produced in discovery, how
13 many times did you appear on her drill in the capacity
14 as a person to move?
15   A   Once.
16   Q   And when was that?
17   A   That was in January 2008.  The January drill
18 of 2008.
19   Q   And how soon could she have added you to that
20 drill?
21   A   Well, I would say February when she made the
22 decision to replace me is -- she could have started at
23 that point putting my name out there so that I would
24 get leads for positions and be able to apply for those
25 positions.  January, February, 2007.

Page 351

```
 1      Q   So let me be sure I understand the dates.  In
 2   June 2007 she said she was replacing you as VP, and
 3   you didn't appear on hers until January?
 4      A   Of the following year.
 5      Q   Of the following year?
 6      A   Yes.
 7      Q   And you appeared in what capacity again?
 8      A   As -- trying to think what the terminology is,
 9   but it's generally someone to be placed or available.
10      Q   Let's take a look at Exhibit 57.  I'm sorry,
11   56.
12         THE COURT:  57, Mr. Carta?
13         MR. CARTA:  I'm sorry, I misspoke, 56.
14   BY MR. CARTA:
15      Q   And again, this is not an actual copy of a
16   5-minute drill, is it?
17      A   No, it isn't.  It's data that's been -- that
18   was taken from the drill, the detailed drill.
19      Q   And just review the topics.  What's the
20   information in the far left-hand corner column below
21   the word "date"?
22      A   Oh, that's the day of -- that's -- in the
23   document that had the details of the 5-minute drill,
24   that's the date that it was conducted.
25      Q   So again, that goes from March of 2007 --
```

Page 352

```
 1      A   Well, we have -- based on my exhibit, this is
 2   page 2 of the exhibit that we're looking at.
 3         Yes, that's page 1 of the exhibit.  So that
 4   begins in March of 2007.
 5      A   Correct.
 6      Q   And goes through May of 2008.  And in the next
 7   column there are lists of the -- whether there
 8   actually was a document produced in discovery, and if
 9   there was, it's a list of the people who -- the
10   positions that were open?
11      A   That's correct.
12      Q   And then in the third column, if someone was
13   selected for one of those positions, it's the identity
14   of the person who was selected and their age?
15      A   Yes, that's the actual person that filled the
16   position and how old they were when they filled that
17   position.
18      Q   And in the next column it's whether you
19   appeared on the slate of candidates for the positions
20   that are listed in column 2, is that right?
21      A   That's correct.
22      Q   And in the last column it indicates whether
23   you were listed on the document as a person to move,
24   as a person to discuss, rather?
25      A   Yes.
```

Page 353

```
 1      Q   So again, with respect to the last column,
 2   there would just be a yes or no for each separate
 3   drill?
 4      A   That's correct.
 5      Q   And where documents weren't produced it was
 6   just left blank?
 7      A   Correct.
 8      Q   So looking at page 1, with respect to Ms.
 9   Collins-Smee's June 2007 drill, you were not listed as
10   a person to discuss, and you did not appear on any of
11   her slates, is that right?
12      A   Correct.
13      Q   And with respect to September, which is on the
14   next page, the whole page is a list of various
15   positions.  Did you appear on slates for any of those
16   positions?
17      A   For each of those positions it's no.
18      Q   And with respect to the September 2007, were
19   you identified on her drill as a key person to
20   discuss?
21      A   No.
22      Q   Turning the page, the October drill of Ms.
23   Collins-Smee, again, there's a list of people or
24   positions to fill, and the identity of some people who
25   were actually chosen for those position.  Were you on
```

Page 354

```
 1   the slate of candidates for any of those positions?
 2      A   No.
 3      Q   And were you listed as a person to discuss in
 4   the October 2007 drill of Ms. Collins-Smee?
 5      A   No.
 6      Q   In November, which goes from page -- that page
 7   to the next, were you identified on the slate of
 8   candidates for any of the various jobs there?
 9      A   No.
10      Q   Were you identified as a key person to discuss
11   in November 2007?
12      A   No.
13      Q   And going on to December of 2007, they didn't
14   produce that one.
15         January of 2008, same question.  Maybe I'm
16   getting ahead.  It looks like there are three
17   positions there in January that were filled.  We'll go
18   into this in more detail.  January is when you were,
19   quote unquote, put on the bench, is that right?
20      A   That's correct.
21      Q   So January through the next several pages
22   cover the period of time when you were on the bench
23   without work?
24      A   Correct.
25      Q   Okay.  So January of 2007, this is her
```

Page 355

1  5-minute drill, and you were identified for the first
2  time as a person available?
3      A   That's correct.
4      Q   Let me stick on that idea.  Was that the only
5  time in the subsequent months, February, March, April,
6  May, where you were identified as a person available?
7      A   No, this was the only time I appeared.
8      Q   Only once?
9      A   Once.
10     Q   Okay.  And how about in the slate of
11 candidates, February, March, April, May, the slate of
12 candidates, are you listed once in that time period as
13 a person who should be considered for one of those
14 jobs that was filled?
15     A   No.  No.
16     Q   And at the last page, the bottom of the last
17 page it has the open positions listed.
18 Again, let's just be clear what that means.  Will you
19 please explain to the jurors what that means, 56?
20     A   56 is the total of the number of what we call
21 key open positions that are in that second column.
22 That's a summary of how many of those there were
23 across all of the drills in this period of time.
24     Q   And did you calculate the average age of the
25 people who were placed in jobs, the average age of the

Page 356

1  people who actually got jobs in her organization
2  during that time period?
3      A   Yes.  The average was 48.25.
4      Q   Did you take this into account when you
5  decided to bring this lawsuit?
6          MR. FASMAN:  Your Honor, objection.
7  We've gone through the same question multiple times.
8          THE COURT:  Okay, so it's asked and
9  answered.
10         MR. FASMAN:  Well, it's not asked and
11 answered.  It's asked, objected to, sustained.
12         THE COURT:  Okay.  Asked, objected to.
13 Objection's overruled.  Answer the question.
14         THE WITNESS:  Yes, I did.
15 BY MR. CARTA:
16     Q   And to what extent did you take that into
17 consideration?
18     A   The age discrimination claim, the average ages
19 was 48, I was 60, and --
20     Q   Let's take a look at 57.  We've been talking
21 about these drills, and maybe I should have done this
22 earlier, I apologize, so let's take a look at one
23 drill so the jury sees what one of these documents
24 look like, and that would be Exhibit 57.
25         First of all, whose drill is this?

Page 357

1      A   This is Joanne Collins-Smee's drill.
2      Q   For what date?
3      A   January 2008.
4      Q   And from is the one drill that you did appear
5  on?
6      A   That's correct.
7      Q   At the top is what's called "Executive
8  Diversity Representation."  What's that?
9      A   That's correct.  This was being tracked, I
10 believe, at all three drill levels, and it's really
11 the number of people that were in the positions, looks
12 like worldwide and then the Americas, then there's a
13 total number.  I'm not sure how -- we would discuss
14 that, but that was more an HR representative in the
15 meeting would present this number, number of women,
16 how many jobs, number of women in those jobs, and so
17 forth, and I think it was what percentage of the
18 population did they make up or what percentage of the
19 positions did they --
20     Q   I just want to know what it is.  What's the
21 next section, Section A, "Executive Movement," what's
22 that section?
23     A   That's the area when someone has been selected
24 and accepted for a position, so if you were brought
25 forward as a candidate to be considered for one of

Page 358

1  those open positions, and the receiving manager who
2  had that position picked the person who would fill it,
3  then it would go on to this as a record to show that
4  the first column is the individual's name, and the
5  second column, column to the right was -- would be the
6  position that they were accepted and filled.
7      Q   And Section B, "Key Open ITD America
8  Positions," what's this?
9      A   That's where we would list openings that we
10 had, either first time introducing the job as an
11 opening in there, or if we hadn't filled it from the
12 prior one, it would continue on this 5-minute drill to
13 be filled.
14     Q   So this is where you got the identity of the
15 various people that were -- that various job openings
16 that were there and whether or not you were on the
17 slate of candidates?
18     A   That's correct.
19     Q   And if you'd turn the page to page 2 of 2.  It
20 says 2 of 2 but it's a three-page document.  But
21 anyway, 2 of 2 and Section D, what section -- what's
22 that relate to?
23     A   Those are individuals -- what we had shown on
24 the report, it says -- the label is "ITD Americas
25 People to Move," and that's Band C, so that particular

Page 359

1    bucket right there is just the vice presidents.  Then
2    you would come at the meeting and identify who those
3    individuals were, and any discussion points for them.
4    So it could be either Bill will be available in three
5    months, they're available now, or in the first one, it
6    looks like that particular contract was getting
7    smaller, and they were downsizing and they needed a
8    Band D, not a Band C.
9        Q    And if we went through the other 15 or 16
10   drills of hers like this, there would be the only one
11   in which you appeared in any capacity, is that right?
12       A    That's correct.
13       Q    Once you were replaced as the vice president
14   of Public Sector, what was -- question withdrawn.  I
15   think you've answered that.
16           At some point in time -- initially you said
17   that you were assigned to the WellPoint temporarily or
18   acting a hundred percent.  At some point was that --
19   were you informed that that was your permanent
20   position?
21       A    Yes.  On June 5th when I was told I was being
22   replaced as the vice president of the Public Sector I
23   was informed that I would be full-time on -- my new --
24   well, my new job is, well, you're full-time on
25   WellPoint.

Page 360

1        Q    And you said you were informed.  By whom were
2    you informed?
3        A    Joanne Collins-Smee.  My manager.
4        Q    And were you told that you were permanent on
5    that position or full-time on that, I'm not sure I
6    understand?
7        A    I was permanent.
8        Q    And what did that mean, what does permanent
9    mean at IBM?
10       A    Well, permanent means it's -- you're -- it's a
11   longer term than a month or two.  It's -- that's your
12   new job.  You're there permanently.  You have all the
13   authority, and so forth, to execute that job, as a
14   permanent position.
15       Q    So after Mr. Morin quit and you were put in
16   that position permanently, what were your primary
17   responsibilities?
18       A    Well, it continued to be all the issues that
19   were -- still existed on the WellPoint contract.  I
20   mean that the contract had took a long time to fix.
21   It wasn't a quick fix on it.
22       Q    Around this time in June of 2007, now that you
23   were on the WellPoint contract permanently, did you
24   make a second request for a Blackberry?
25       A    Yes, I did.

Page 361

1        Q    To who?
2        A    Joanne Collins-Smee.
3        Q    With what result?
4        A    It wasn't approved.
5        Q    It was not?
6        A    Was not approved.
7        Q    Let me ask you, were you ever presented
8    formally to WellPoint as their new DPE candidate, or
9    as a DPE candidate that they would approve or reject?
10       A    No.
11       Q    Explain how that came to pass.
12       A    I'm not sure I understand.  If the question
13   is --
14       Q    Well, question withdrawn.
15           With respect to Mr. Weiss, what was the
16   process that he went through
17       A    It's a process we do when we're introduced --
18   we have someone that we're considering to be the DPE
19   on a contract.  You schedule time -- first you have a
20   discussion with the executive on the customer side,
21   tell them you have a candidate you'd like them to
22   consider for that position, and then you set up a time
23   for the interview, and the executive on the customer
24   side can decide whether they'll interview you
25   one-on-one, or if they want not only an interview with

Page 362

1    them but they may have other senior vice presidents
2    they want you to talk to, and that's what we'd go
3    through.  And I think I explained before, there's a
4    lot of pluses in going through that.
5        Q    What are the pluses of going through that?
6        A    Well, very first up front the CIO now has an
7    opportunity to meet you and talk to you, and they will
8    take you through your background, your skills, and
9    they'll consider whether that part of your experience
10   matches to their -- what they're looking and what they
11   need.  It also gives them an opportunity to discuss
12   with you their environment, and what they hope to get
13   out of IBM in the outsourcing contract with them.
14           So they go through what their key issues are,
15   their main issues, they look at you, they do an
16   assessment on your technical skills, your motivational
17   skills, so forth, and then you generally will go
18   through one or two of their other vice presidents and
19   they drill down whatever their specialty is with the
20   individual.
21       Q    And in your experience at IBM, whose
22   responsibility would it have been to have you go
23   through that kind of interview process with Mr. Boxer?
24       A    That would have been my manager, who was
25   assigning this to me, or --

38 (Pages 359 to 362)

Page 363

1    Q    And who was --
2    A    I'm sorry, Joanne Collins-Smee.  Or Keenie
3  McDonald could have done it at the request of Joanne
4  Collins-Smee.
5    Q    Well, you were already familiar with the
6  WellPoint account, weren't you?
7    A    I was.  I was familiar with it, yes, but I
8  didn't have those type of discussions with the CIO.
9    Q    And what, if anything, did you later learn
10  WellPoint was being told about your -- the nature of
11  your assignment there?
12    A    Well, unfortunately what I did find out later
13  on is, I was told I'm full-time, that's my permanent
14  job, WellPoint, but the client was told something very
15  different than that.  The client was told they're
16  continuing their search, Ken Weiss was not accepted,
17  and as a carry-on to Ken Weiss they were looking for a
18  candidate for the CIO to interview for the position.
19  And not only was it the customer, but they also told
20  some of the executives within IBM that I have to deal
21  with on a daily basis that they were looking for
22  someone in that position.
23    Q    And how did that impact, if at all, on your
24  ability to perform in that role?
25    A    Oh, it was dramatic, because this is a --

Page 364

1  we've gone through the scope of the problems on this
2  contract.  I needed to be in a position where people
3  understood that I had the authority to make decisions
4  on this, and some of the decisions wouldn't be very
5  popular with all the groups that I was dealing with,
6  but it was he's in a position, he has control, he
7  needs to execute on those.
8        If you're -- if everyone knows you're
9  temporary except you, it's -- I don't know.  My wife
10  said, you know, you were in a position like a
11  substitute schoolteacher, right?  You think you have
12  the authority, but no one's listening to you, and
13  that's essentially what it was.
14        I was -- the only reason I was getting things
15  done, I had the loyalty of the people that had worked
16  for me some time that were willing to do what I was
17  asking them to do, but if there was any opposition,
18  they knew that I was only temporary, and that they'll
19  just wait for the new person to come on board.
20    Q    From the documents obtained in discovery, do
21  you recall how many other candidates were presented to
22  Mr. Boxer after Mike Morin resigned?
23    A    I believe it was a total of five, I believe.
24    Q    And what was Ms. Collins-Smee's role in
25  selecting those other DPE candidates?

Page 365

1    A    Well, she had -- she was the one that had --
2  was identified as providing -- her role is to provide
3  the -- to select the candidates to get in front of the
4  customer and then have the customer determine whether
5  they wanted that individual or not.
6    Q    Now, I think you've indicated that the first
7  candidate was Ken Weiss, and what was his age?
8    A    He was, I believe, 48.
9    Q    So he was 12 years younger than you?
10    A    That's correct.
11    Q    Was a Robert Jones presented to WellPoint
12  after Mr. Morin's resignation as a candidate for the
13  DPE job, Robert Jones?
14    A    Yes.  I believe he's the second one that was
15  presented to them, yes.
16    Q    And Mr. Jones was five years younger than you?
17    A    Yes.
18    Q    Was a Richard DeLeo also presented to
19  WellPoint as a -- at the same time, for the same
20  position, rather?
21    A    Yes.
22    Q    As a DPE candidate?
23    A    As a DPE candidate.
24    Q    And how old was he at the time?
25    A    I believe he was in his forties.

Page 366

1    Q    49 refresh your recollection, seem right?
2         MR. FASMAN:  Objection.
3         MR. CARTA:  Withdrawn.
4  BY MR. CARTA:
5    Q    You believe he was in his forties?
6    A    Yes.
7    Q    So that was -- he was at least 11 years
8  younger than you?
9    A    That's correct.
10         MR. FASMAN:  Objection, Your Honor.
11         THE COURT:  Sustained.
12         MR. FASMAN:  Thank you.
13  BY MR. CARTA:
14    Q    Was Ray Johnson also presented to WellPoint at
15  the same time for the position of WellPoint DPE?
16    A    Not -- there was a series.  It wasn't
17  concurrent.  There was a -- it was a serial process.
18  One would get presented, rejected, the next one would
19  go in.  So he was the next one in line to be
20  presented, yes.
21    Q    Actually I didn't understand that.  Please
22  explain that.
23    A    We don't give them a list of candidates and
24  they can pick the best out of the litter.  What we do
25  is we think we have the best person, we present the

**A-369**

Page 367

1  best person in front of them. Because when you're
2  going to go through this, you kind of lose some of the
3  customer's respect if you just give them a whole
4  laundry list. So you bring your best candidate
5  forward, and if the CIO rejects that individual, you
6  then have to go and find now your second person that
7  you want to bring in that's qualified, and you do
8  that -- and you're not necessarily doing it where you
9  have a list of them, you're doing one at a time, and
10  when it's rejected, you have to go back and look for
11  another candidate that would be available that you
12  could bring in there, that would meet the requirement,
13  and you're trying to understand with each rejection
14  why they're being rejected so that the next one going
15  in has those attributes.
16      Q  And I think my question was, in the sequence
17  was a Ray Johnson, to your knowledge, also presented
18  to WellPoint as the third possible candidate?
19      A  Yes.
20      Q  And how old was he at the time?
21      A  He was in his forties, also.
22      Q  From your review of documents in discovery,
23  does it appear that Scott Anderson was also presented
24  for the position as DPE WellPoint, and that would have
25  been in May of 2007?

Page 368

1      A  Yes, that's correct.
2      Q  And how old was Mr. Anderson?
3      A  He, I think, was the youngest of the group,
4  but he was in his early forties, I believe.
5      Q  So in summary, Ms. Collins-Smee provided five
6  candidates over a period of several months, and do you
7  remember calculating their average age?
8      A  Yes, I did. I believe it was, again, like 48
9  years old.
10      Q  What knowledge did you have at that time, not
11  now after reviewing documents, but at that time what
12  knowledge did you have that IBM had presented at least
13  five other potential DPE candidates to Mr. Boxer?
14      A  What I understood at that time and my
15  understanding was that was my permanent job. I never
16  anticipated there would be a parade of people behind
17  me being interviewed for that, and I was not aware of
18  that.
19      Q  Do you know if any of those candidates we have
20  identified were accepted by WellPoint?
21      A  No, they were all rejected for one reason or
22  another.
23      Q  And do you have a basis for understanding why
24  they were rejected?
25      A  Yes. There was an e-mail that summarized that

Page 369

1  experience.
2      Q  And what was the reason they were rejected?
3      A  One of the main things was they lacked the
4  experience. I mean in running a large account like
5  that --
6          MR. FASMAN: Your Honor, the witness
7  can't testify why WellPoint rejected these people. He
8  can refer to an exhibit if he wants to, but he doesn't
9  know why WellPoint rejected these people.
10          THE COURT: The objection's noted, it's
11  sustained.
12          If you want to get at that information in
13  another way, you're free to try to do so, Mr. Carta.
14  BY MR. CARTA:
15      Q  Would you please take a look at Exhibit 60.
16      A  Yes.
17      Q  And what is this?
18      A  This is an e-mail from Mark Boxer to Robert
19  Zapfel, Mark Lautenbach and Steve Mills. He's talking
20  about -- the first part of it is about an outage.
21      Q  The first paragraph that's not highlighted?
22      A  Yes.
23      Q  And the second paragraph?
24      A  "I think we are seriously hamstrung right now
25  by the gap that exists in the permanent assignment of

Page 370

1  a new delivery executive. The preferred candidate I
2  understand is unavailable. The other two candidates
3  have come before us at WellPoint and did not match the
4  needs of our account."
5      Q  Read the last sequence of that. It's not
6  highlighted. It says, "The temporary assignment in
7  place today is less than ideal." What do you
8  understand that to mean?
9      A  He's referring to me in that situation, so...
10      Q  And what did you understand that to mean?
11      A  Well, I mean his expectation is, I'm only
12  temporary there, and he's waiting for IBM to come
13  forward with the permanent individual for the
14  position.
15      Q  I'd ask you to take a look at Exhibit 62.
16  Please identify this document, indicate who it's from
17  and who it's to and --
18      A  Yes. This is Mark Boxer sending an e-mail
19  from his BlackBerry to Keenie McDonald, and it says,
20  "If our candidate this week does not cut it, time is
21  up." This was August of 2007.
22      Q  Okay. And go back to Exhibit 61. I think
23  it's on the third page of that string of e-mails. Why
24  don't you just identify what that e-mail is on the
25  middle of the third page. It's Bates 57657.

Page 371

```
 1          MR. BAILEY: 75657.
 2          MR. CARTA: Thank you. Counsel have
 3 that? Thank you.
 4          THE WITNESS: It's the one that's on the
 5 monitor now?
 6 BY MR. CARTA:
 7    Q  I'm sorry?
 8    A  The one that's on the monitor?
 9    Q  Yes.
10    A  Okay.
11    Q  Who's it from, who's it to?
12    A  This is from Robert Zapfel, Joanne's boss, to
13 Keenie McDonald, and there's copies -- large
14 distribution list there. And the context of it is,
15 "For the record, they have turned down multiple strong
16 candidates," for the position of DPE on WellPoint.
17    Q  And who's "they"?
18    A  The client at the time, the customer, which
19 would have been Mark Boxer and his, you know,
20 executive team.
21       "In my almost 15 years in the strategic
22 outsourcing business --" which was --
23          MR. FASMAN: Judge, wait a second. He's
24 not on this e-mail.
25          THE COURT: I'm sorry?
```

Page 372

```
 1          MR. FASMAN: How can he interpret it? He
 2 can read it, but how can he testify about it?
 3          THE COURT: He can read from the exhibit.
 4          MR. FASMAN: He can read from it, but
 5 he's not --
 6          THE COURT: That's right.
 7          MR. CARTA: He's reading from it.
 8          THE COURT: That's all I understood.
 9          MR. FASMAN: He's explaining who they
10 are. He's not reading from it. He's interpolating
11 from it. If he wants to read it, he can --
12          THE COURT: Stop. That's true, you're
13 right. When something is in evidence it can be read
14 from, it can be sung from, but all you can do is read
15 it, tell us what it says, you can identify the
16 recipient if you know, you can identify the author if
17 you know, but you can't interpret what people mean.
18          MR. CARTA: Your Honor, I think that was
19 my fault for not phrasing my question carefully, and I
20 will ask Mr. Castelluccio to just read the highlighted
21 section.
22          THE WITNESS: Sure. First starting with
23 the first paragraph?
24 BY MR. CARTA:
25    Q  Please, just the highlighted section.
```

Page 373

```
 1    A  "For the record, they have turned down
 2 multiple strong candidates. In my almost 15 years in
 3 the strategic outsourcing business I can't think of a
 4 single situation where this has occurred with either
 5 executive PEs or DPEs."
 6       And then the other highlighted section, "p.s.,
 7 the team has successfully executed two very
 8 significant data center moves for WellPoint over the
 9 past 60 days."
10    Q  What two highly significant data center moves
11 had been executed in the past 60 days? I think we
12 know the answer, but --
13    A  That's the California data center being moved
14 to Richmond, Virginia.
15    Q  So on its sixth attempt to place a DPE at
16 WellPoint, was IBM finally successful after this?
17    A  Yes.
18    Q  Actually after Exhibit 62, which is the one in
19 which Mr. Boxer said time is up?
20    A  Right, that's what we had seen previously.
21 "If our candidate this week does not cut it, time is
22 up." And that's from Mr. Boxer, the CIO of WellPoint,
23 to Keenie McDonald.
24    Q  And was it at that point -- who was the person
25 who was appointed at that point?
```

Page 374

```
 1    A  That was Gordon Crawford.
 2    Q  And what's the difference in age between you
 3 and Mr. Crawford?
 4    A  We're very close in age, a couple years.
 5    Q  And when did Mr. Crawford interview and get
 6 accepted by Mr. Boxer, if you know?
 7    A  In the middle of September of 2007.
 8    Q  So that was just three weeks after Mr. Boxer
 9 gave his ultimatum, "time is up"?
10    A  Yes.
11    Q  What is your understanding, if you know, as to
12 who proposed Mr. Crawford?
13    A  Bob Zapfel.
14    Q  And what's that based on?
15    A  My discussion with Gordon Crawford when I took
16 over the position.
17    Q  When Mr. Crawford accepted the position as DPE
18 in the WellPoint contract in September, were you
19 informed by Ms. Collins-Smee?
20    A  No, I was not.
21    Q  So again, he's accepted in September. When
22 and how did you first learn that you were being
23 removed from the WellPoint account as well?
24    A  On November 21st, 2007.
25    Q  Do you have a specific recollection of the
```

41 (Pages 371 to 374)

**A-371**

Page 375

1  date?
2      A   November 21st.  I remember it well.  It was
3  the day before Thanksgiving.
4      Q   So it was two months between the time Mr.
5  Crawford actually accepted the position before you
6  were notified that you were being replaced in that
7  position?
8          MR. FASMAN:  You know, Your Honor, I'm
9  going to object.  There's no evidence of it, the
10  witness's statement that Mr. Crawford was hired in
11  mid-September, and we dispute that.
12          THE COURT:  Objection sustained.
13          Mr. Carta, you can ask the question in a
14  different way.  Ask some foundation questions.
15          MR. CARTA:  I thought he already
16  testified.
17  BY MR. CARTA:
18      Q   When was Mr. Crawford -- when did he accept
19  the position as DPE?
20      A   It was the middle of September, September
21  15th.
22      Q   And how do you know that?
23      A   In discovery we have an e-mail that explains
24  that.
25      Q   This decision that you learned of on --

Page 376

1          MR. FASMAN:  Wait, Your Honor.  Where is
2  the e-mail?  That he just mentioned?
3          THE WITNESS:  64, 63.
4          MR. CARTA:  May I have a moment, Your
5  Honor?
6          THE COURT:  Yes, sir.
7  BY MR. CARTA:
8      Q   Directing your attention to Exhibit 64.  There
9  are two e-mails on this page.  Actually there are
10  three.  Would you read from the middle e-mail from Pat
11  Kerin to Keenie McDonald dated September 7th, 2007.
12      A   Okay.  That's the one that's on the screen
13  now.  That's right.  Pat Kerin, IBM, to Keenie
14  McDonald.  And the subject -- it's also marked --
15  looks like it's marked Boxer, also, in that same
16  listing.  And it's dated Friday, September 7th, and
17  it's 2007, and DPE.
18      "Sorry, Joanne didn't get back to me until
19  late today.  Gordon said he'd take the job but wanted
20  to talk with Bob Monday."  I think -- that's not his
21  name.  That means Bob on Monday.  "I think we will
22  have this firmed up Monday."
23      Q   And the e-mail above that, would you read
24  that?  That's from Keenie to Mark Boxer?
25      A   Right.  He's asking about Gordon, who is

Page 377

1  Gordon.
2      Q   And Keenie is saying, "Pulling him is a big
3  deal.  Zapfel has known him for a long time?"
4      A   I have to see -- wait a minute.  Actually I
5  have my copy.
6      Yes, that's what it says.  "He's the candidate
7  they're pulling from another job.  He's very
8  experienced, very senior.  Pulling him is a big deal.
9  Zapfel has known it for a long time."
10      Q   Okay.  Let's go back to your being notified on
11  November 21st, 2007.  What impact did that decision
12  have on your family, you and your family?
13      A   Well, significant.  It was the day before
14  Thanksgiving.  It wasn't to be effective until January
15  1st, and I couldn't understand, first of all, why you
16  would tell someone the day before a holiday and not
17  wait until the Monday following the holiday if you had
18  to tell them at that point at all that they were being
19  replaced or taken out of their job.
20      What it did to my family is -- I didn't share
21  it with my wife when I went home.  I waited until
22  after.  Didn't talk about it.
23      Q   And do you recall when Mr. Crawford was
24  supposed to assume the position as DPE?  I think you
25  just said that, but to make it clear.

Page 378

1      A   Joanne told me when she told me the day before
2  Thanksgiving that he would be on board January 1st,
3  2008.
4      Q   And prior to the time she informed you that he
5  was taking your position, had she told you that she
6  intended to remove you from that position?
7      A   No.
8      Q   Had she informed you of any specific
9  complaints about your performance at WellPoint?
10      A   No.
11      Q   Did she -- you understood -- WellPoint was a
12  challenge?
13      A   It was more than a challenge.  It was a
14  problem.
15      Q   And you understood that there were regular
16  complaint from the client?
17      A   Oh, it was ongoing.  I mean that's why those
18  two projects were so critical.  We were just getting
19  flooded with complaints from the customer all the
20  time.  A lot of them were valid.  Some of them were
21  questionable.  And that's why those two projects had
22  to be done, and that was the focus, was getting those
23  two projects completed and on time.
24      Q   And who specifically looked to you to make
25  sure that those projects were done successfully?

Page 379

1      A   Mr. Zapfel.
2      Q   And who was it who was the second person who
3  signed off on your last IBM PBC?
4      A   It was Mr. Zapfel.
5      Q   When did you first learn of the multiple
6  complaints and their general nature concerning the
7  WellPoint account and concerns about your, quote
8  unquote, leadership?
9      A   I had no direct e-mails from anyone
10 complaining about my performance on the account. We
11 had fights over other issues, but -- it was after I
12 was gone from IBM, and we had this lawsuit, and then
13 we were being provided with documentation, and e-mails
14 contained a lot of the -- those complaints.
15     Q   Let's go back to the November 21st meeting
16 when you were first informed that you were being
17 removed as DPE at WellPoint. How did that meeting
18 come about? What was the stage?
19     A   Joanne asked me to see her, and it was Joanne
20 and myself face-to-face on that.
21     Q   And did she have anyone else present where --
22 were the two of you alone again?
23     A   It was just the two of us.
24     Q   Please describe the discussions that you had
25 at the time with Ms. Collins-Smee.

Page 380

1      A   Well, first of all, I mean when you're being
2  told the something like that, unless you've been
3  through it, you can't really grasp the magnitude of
4  it, but when she told me that, it was, "I'm replacing
5  you on the WellPoint contract," and Gordon would be
6  taking over. No explanation at all why. Which I then
7  asked -- and I -- it was, I'm telling you, and I want
8  to leave from this discussion, more or less, is the
9  way the meeting went.
10         I was asking her, well, why, you know, why did
11 this happen, what happened. I knew at that point when
12 she told me that you don't find someone the night
13 before to fill a position, so my thinking is this has
14 been planned for some time, I didn't know how long at
15 that point, and it was like, what are your plans for
16 me when you take me out of this position, where are
17 you putting me, and there was no explanation on that.
18     Q   Is that because she said she had no plans, or
19 what was her response when you said, What are your
20 plans for me?
21     A   She didn't even respond to that.
22     Q   Did she show you or refer to any e-mails where
23 there had been specific examples of complaints made
24 against you?
25     A   No, not at all. I mean we just had gone

Page 381

1  through, that year, those two big projects, which --
2  no, the answer is no. I'm sorry.
3      Q   Did she show you any e-mails from WellPoint
4  personnel?
5      A   No.
6      Q   Did she show you any e-mails that were
7  complaints from IBM employees?
8      A   No.
9      Q   Did she identify any specific managerial
10 skills or styles that you had that she felt that you
11 needed to address?
12     A   No.
13     Q   You indicated that she had not arranged for
14 you to be transferred to another position at IBM.
15 What, if anything, did she suggest with respect to any
16 open positions that you might want to consider?
17     A   There was no discussion on that.
18     Q   At any time while you worked with Ms.
19 Collins-Smee, did she provide you with a candid
20 discussion of her views of your strengths and
21 weaknesses?
22     A   No.
23     Q   Did she ask you, where do you think you can
24 make the greatest contribution at IBM?
25     A   In that meeting?

Page 382

1      Q   In any meeting.
2      A   Oh. No.
3      Q   Specifically at that meeting?
4      A   No.
5      Q   And how did you react?
6      A   Well, again, when you're told -- well, you
7  have an emotional reaction to it. An emotional,
8  physical -- I mean it's significant, what was done at
9  that point in time. And I was even more frustrated
10 because I couldn't get answers to the questions I was
11 asking. If there was a strong justification, I may
12 not agree with it, but at least it would be some
13 explanation on why this happened, and there was none
14 of that.
15     Q   Did she ever ask you where you could make the
16 greatest contribution at IBM?
17     A   No.
18     Q   At that point did she ask you for a resumé or
19 summary of your work experience so that she could help
20 you find another job?
21     A   No. There was -- no.
22     Q   At that time did she alert you to any new
23 business opportunities in her organization that you
24 could have considered, potential job openings, for
25 example?

Page 383

1        A   No, not at all.
2        Q   What, if anything, about your future at IBM
3    did she discuss with you?
4        A   The only thing she agreed to do, after -- I
5    mean it wasn't a long meeting because it was
6    one-directional, pretty much, and the only thing I
7    could get a commitment from her is her view was we
8    need to find you a job, and I went through -- again,
9    you know, I can't -- I need her help to do that.  And
10   we saw the drills.  I need your help.  And she agreed
11   at that point she would assist.
12       Q   Can you give an example -- and I think you
13   discussed this somewhat already so we don't need to
14   spend much time on it -- but of what the protocol was
15   at IBM to find somebody for another position?  I think
16   you talked about Mike Morin, for example?
17       A   Well, if you're an executive level, as I
18   mentioned before, I can't do the search myself.  I
19   don't have access to any of the open positions.  I
20   don't have what's out there or what -- and generally,
21   if you're planning this, and especially if you're
22   planning it for more than a 24 hour period, you start
23   thinking about what you're going to do with this
24   individual once you replace them in that position.  So
25   it's customary if this is going to happen, with

Page 384

1    justifiable reasons, you start -- you go in the
2    meeting with an explanation is I don't have a position
3    yet for you, per se, but I have work that you could
4    do, or I have this position, we're going to pursue
5    this position for you, or I've already identified the
6    position, and here's where I need you to go.
7        Q   So you said -- the first of your examples you
8    said, I don't have a position for you yet, but I have
9    work for you to do, talking about temporary work?
10       A   Yes.
11       Q   And that's what you did with Mike Morin --
12       A   Yes.
13       Q   -- in the case where he quit?
14       A   Well, he didn't quit because of that, but when
15   he gave me his resignation and I told him to think
16   about it and come back, when he came back after down
17   time, I did assign him temporary work.  He was a
18   valuable asset.  I didn't want him sitting idle.
19       Q   And did Ms. Collins-Smee suggest any temporary
20   assignments for you in the November conversation,
21   November 21st?
22       A   No.
23       Q   She hadn't made arrangements for any temporary
24   assignments?
25       A   No.  Nothing that she shared with me, that's

Page 385

1    for sure.
2        Q   When you asked her -- question withdrawn.
3            Did you ask her about your future at IBM?
4        A   Yeah.  The -- yes.  And the reason -- not so
5    much far into the future, but like, my future then
6    became tomorrow, right?  And that's what we had the
7    discussion about.  What are you going to do, what are
8    you, you know, what are you going to do with me.  It
9    wasn't worded that way, but it was along those lines.
10       Q   And what was her response?
11       A   She didn't offer anything in that area.  The
12   whole discussion was, Gordon's taking your position,
13   and the only thing I could come out of that meeting
14   was a commitment on her part to help me find a job.
15       Q   Was there -- what else do you recall being
16   discussed at the conclusion of that meeting?
17       A   I think I touched on all the points we went
18   through.  We went through why, the plans for me.  She
19   said we need to find you a job.  Well, that was pretty
20   obvious at that point, because she had just removed me
21   from my job, so it wasn't a discovery on that day.
22   And that she would help me find a job.
23           Oh, I'm sorry, she did say something else,
24   too, which, you know, it was bad enough she was
25   removing me from the job, but she also said, "But I

Page 386

1    need you to continue working the job until your
2    replacement comes on board," which was -- so she
3    needed me to continue and then transition the work
4    over to Gordon when he came on board.
5        Q   Was there any discussion about retirement?
6            MR. FASMAN:  Objection, Your Honor.
7            THE WITNESS:  Oh.  Yes.  There absolutely
8    was.
9            MR. FASMAN:  That's leading, Your Honor.
10   He asked them three times what was going on.
11           THE COURT:  Stop.  The objection's noted.
12   It's overruled.  Mr. Carta is going to another topic
13   which was discussed during this November 21st --
14           MR. CARTA:  Yes.
15           THE COURT:  -- meeting, between this
16   gentleman and Ms. Smee.  Ask the question again.
17   BY MR. CARTA:
18       Q   What references, if any, were there to your
19   retirement in that discussion?
20       A   She brought up for the second time that I
21   could retire.
22       Q   And what was your reaction to that?
23       A   Well, there was a physical reaction, an
24   emotional reaction, but my conversation with her is
25   that we had had that discussion, I've just gone

## Page 387

1   through two major deliverables for you, on this -- in
2   this period of time for January 1st to where we were,
3   and I said I was not -- I was not considering or
4   interested in retirement. There was no reason to
5   consider it, because I was still contributing
6   significantly to the business.
7       Q   Do you recall whether you said anything to Ms.
8   Collins-Smee at that point about your flexibility in
9   terms of future positions?
10      A   Yes. When she talked about she would assist
11  in locating a job for me, we talked about at that
12  point whether Band C or Band D, and for me I told her
13  that it wouldn't matter whether it was a vice
14  president's role or a director's role, I mean because
15  literally what she had done before was vice president
16  to WellPoint, which -- it initially was a Band D, so a
17  director's position, so I was willing to accept that.
18  I was willing to work -- I was able to move around, so
19  if the job was in California or Tennessee or whatever
20  it was, I would be available.
21      Q   So do you recall whether you discussed with
22  her your willingness to move around?
23      A   Yes, I did, and I said I would.
24      Q   Do you recall whether she offered to add you
25  to her 5-minute drill at that time, November 2007?

## Page 388

1       A   No. We didn't discuss 5-minute drills. The
2   assumption would be that it would be done.
3       Q   But as you now know, you weren't added until
4   January.
5       A   That's correct.
6       Q   The 18-month period between when you had this
7   conversation with her and were added to her drill, did
8   she ever place you on a slate of candidates? I think
9   you may have already answered this.
10      A   No.
11      Q   Have you reviewed the 5-minute drills run by
12  her just specifically during that 18-month period to
13  determine the number of positions that she filled?
14      A   Yes.
15      Q   And how many were there?
16      A   I believe there were 17 or 18 positions that
17  were filled, listed and filled.
18      Q   Just in that 18-month period?
19      A   Yes.
20      Q   Have you calculated the average age of the
21  employees who were awarded those 18 positions?
22      A   Yes, I have.
23      Q   And what is that average age?
24      A   48, the magic number.
25      Q   Let me ask you, independently of the 5-minute

## Page 389

1   drills, did Ms. Collins-Smee disclose any of those 18
2   openings to you? Did she let you know they were
3   there?
4       A   No.
5       Q   I'd like to go onto the third set of drills,
6   which would be Mr. Zapfel's drills. Did any other
7   manager run a 5-minute drill that might be relevant to
8   your locating a new position?
9       A   Yes. That was Mr. Zapfel's ITD drill. That's
10  what the heading was.
11      Q   And his was a global position?
12      A   Yes. His was -- as we saw in the chart
13  before, is Joanne was Americas, but --
14      Q   Hold on a second. Let's put up the chart
15  again. That would be 11-A, I believe.
16      A   I don't know if I need to stand.
17          All right, I'll show you -- sometimes it's
18  easier. Yes, this is the drill we're talking about.
19  There's a drill here, and a drill there. That's two
20  of the drills.
21      Q   And how is Mr. Zapfel's drill different from
22  Ms. Collins-Smee's drill?
23      A   Well, he has a worldwide view, so his scope is
24  Joanne's counterparts in each of the various
25  geographies that IBM had defined, which would be

## Page 390

1   Europe, Asia Pacific, and they had a -- Japan was
2   separate, so they had Japan.
3       Q   So in your judgment, given the different
4   scope, was it as important for you to appear on Mr.
5   Zapfel's drill as it was for you to appear on Ms.
6   Collins-Smee's drill?
7       A   Well, if I had -- Joanne's would be the first
8   drill that I should be on, because I was recognized
9   there, people knew me there, people could make their
10  own judgments on their past workings with me. When
11  you get far up to Mr. Zapfel's drill, I mean the
12  people in Japan, the people in Europe and -- they
13  didn't know me. All they would see is a name, if my
14  name was on there, but there was -- they didn't have
15  any firsthand knowledge of me.
16      Q   So in order -- what would -- question
17  withdrawn.
18          Who would have been present -- question
19  withdrawn.
20          Who would have participated in Mr. Zapfel's
21  drills who would have been in a position to be an
22  advocate on your behalf?
23      A   Well --
24      Q   If anyone?
25      A   Anyone on the red tier that's there are those

Page 391

1  that would participate in, and the one with knowledge
2  who knew who I was and my background would be only the
3  Americas, which would be Joanne Collins-Smee.
4      Q   So on Mr. Zapfel's drill you were dependent
5  upon her to be your advocate?
6      A   She'd have to be my advocate, true.
7      Q   Did you appear on any of Mr. Zapfel's drills?
8      A   Yes, I did.
9      Q   And the first one was in June of 2007?
10     A   I believe that's correct.
11     Q   So Ms. Collins-Smee determined to replace you
12  as vice president of Public Sector in February, within
13  four months before you appeared at Mr. Zapfel's drill?
14     A   Yeah, that's correct.
15     Q   And in what capacity did you appear on Mr.
16  Zapfel's drill?
17     A   I was in the category of someone to discuss, I
18  believe as key people to discuss, or a person to
19  place.
20     Q   Did you continue to appear on Mr. Zapfel's
21  5-minute drill in that capacity for every month
22  thereafter until you were terminated?
23     A   No.  Until through the June drill of 2008?
24     Q   From the June -- yeah.  I know you didn't
25  appear for the first several months, but once you

Page 392

1  appeared in June, did you appear every month
2  thereafter?
3      A   No.
4      Q   Were you ever added to a slate of candidates,
5  the second category, on any of Mr. Zapfel's drills?
6      A   Yes, I was.
7      Q   Do you recall when?
8      A   I believe it was in May 2008.
9      Q   May of 2008.  That was one month before you
10  were fired.
11     A   That's correct.
12     Q   Exhibit 66, please.
13         THE COURT:  The clerk has just reminded
14  me that it's ten minutes to 4.  You want to take our
15  3:45 break now?  Okay.  Let's take a break, until 4
16  o'clock, and we'll go by that watch, and I am going to
17  sit right here the entire break.  So stretch.
18  Hopefully there's coffee in there.
19         (Recess taken from 3:47 p.m. to 3:59 p.m.)
20         THE COURT:  Please be seated, ladies and
21  gentlemen.  We're right on time.
22         Mr. Carta, you may resume.
23  BY MR. CARTA:
24     Q   Mr. Castelluccio, let's go through Mr.
25  Zapfel's drill quickly.  This is Exhibit 66.  It's the

Page 393

1  same format as the Kerin drill where you have the four
2  separate columns.
3      A   Yes.
4      Q   And with respect to the months of March and
5  April, did you appear on Mr. Zapfel's drill either as
6  a person to discuss or in any of his -- or as a
7  person -- or slates, any of the slates of candidates?
8      A   No.
9      Q   And there wasn't a May document produced, but
10  I think in June you said you did appear as a person to
11  discuss?
12     A   Yes.
13     Q   Did you appear in June as a person on any of
14  the slates?
15     A   No.
16     Q   And with respect to July, did you appear on
17  any of the prospective slates of candidates?
18     A   No.
19     Q   And in July were you again listed, I think, as
20  a person to --
21     A   Yes.
22     Q   And in the next month, August, either a person
23  to move or on the slate of candidates?
24     A   No.
25     Q   September, a person to move or a slate of

Page 394

1  candidates?
2      A   Slate of candidates, no, and key people to
3  move, was yes.
4      Q   Do you recall whether there were different
5  documents produced with respect to September 2007,
6  different iterations of the 5-minute drill?
7      A   Two were provided.  One had me listed as
8  people to discuss and one did not.
9      Q   And you erred on the side of including
10  yourself as yourself having been included in this?
11     A   Yes.
12     Q   Do you give it the benefit of the doubt?
13     A   I couldn't verify which one was actually used,
14  so I erred on the side that I was.
15     Q   And with respect to October, did that also
16  occur with respect to October where -- in terms of
17  different documents produced, in terms of whether you
18  were listed as a key person to discuss?
19     A   Yes.
20     Q   And how about in October, were you listed on
21  any -- identified on any of the slates?
22     A   No.
23     Q   And with respect to November, were you listed
24  on any of the slates?
25     A   No.

Page 395

1    Q   But you were listed as a person to move?
2    A   Yes.
3    Q   Turning the page, December, January, February
4 and March, you were again listed as a person to move,
5 but you did not appear on any of the slates.
6    A   Correct.
7    Q   Same was true with April, is that right?
8    A   Yes.
9    Q   Listed as a person to move, but you were not
10 identified on any of the slates.
11       In May you appeared on the first and only
12 slate, is that right?
13    A   Correct.
14    Q   And you were not listed that month as a person
15 to move, is that right?
16    A   That's correct.
17    Q   We're going to come back to that in a moment,
18 but in June you were again listed as a person to move
19 and not identified on any slate of candidates?
20    A   Correct.
21    Q   So the May being listed on the slate of
22 candidates was the month before -- was actually the
23 month you were told that you had 30 days before you
24 were being separated?
25    A   Correct.

Page 396

1    Q   Exhibit 82, please.  I believe this is the
2 second page of 82.
3       MR. BAILEY:  97662.
4 BY MR. CARTA:
5    Q   Mr. Castelluccio, what is this document?
6    A   This is the minutes of the May 5-minute
7 drills.
8    Q   Okay.  We haven't talked about minutes before.
9 Please explain what they are.
10    A   They kept a record -- there was someone
11 assigned as the secretary for the meeting, and they
12 would keep minutes of what was discussed in the
13 meeting.
14    Q   Okay.  And this was produced by IBM in
15 discovery?
16    A   Yes, it was.
17    Q   And what does the -- what is indicated in the
18 note with respect to the director of "Global BTO
19 Delivery"?
20    A   It says "Lead candidate Kevin Hassett
21 approved.  Tim and Barbara both observed that current
22 ultimate potential was D; was Kevin therefore likely
23 to remain in this position for an extended period of
24 time.  As we are currently in the ER --" executive
25 resource "-- bottoms up review process, Amy will give

Page 397

1 particular attention --" I can't read "-- attention to
2 his potential.  She observed that his performance as
3 an executive would be an important reference on his
4 ultimate potential.  This will need Moffat or Daniel's
5 approval in an upcoming drill."
6    Q   Okay.  So what's the date -- these are minutes
7 from what drill?
8    A   When you scroll up, it's the May 7th --
9 subject, action notes from May 7th 5-minute drill.
10    Q   So that's the May drill, which is the one that
11 you actually appear on a slate, it's the first time
12 you appear on a slate.
13    A   That's correct.
14    Q   And it was a slate for this particular job.
15    A   That's correct.
16    Q   And that job was filled.
17    A   Yes.
18    Q   What advantage, if any, did it have for you
19 even to be listed on that slate?
20    A   It didn't.  If the position was filled,
21 there's no reason for me to be considered as a
22 candidate, or listed as a candidate.
23    Q   So in what way, if any, did Ms. Collins-Smee
24 assist you to locating a position by adding you to
25 this one and only time on Mr. Zapfel's slate of

Page 398

1 candidates?
2    A   At this point -- I'm trying to -- there was
3 no -- could you restate your question?  I'm sorry.
4    Q   Sure.  So by -- this is Mr. Zapfel's drill?
5    A   Correct.
6    Q   And who would have had you added to that
7 slate?
8    A   My management, Joanne Collins-Smee.
9    Q   And what benefit was there for having you
10 added to that slate to you?
11    A   Personally?
12    Q   Yes.
13    A   There was no benefit for me because the person
14 was already identified and they were waiting for
15 Moffat or Daniels to approve it.
16    Q   Okay.  At the conclusion of your November
17 meeting, what work were you assigned?  What happened
18 to you?
19    A   I'm sorry, at the end of?
20    Q   At the November 21st, 2007 meeting, what was
21 the result in terms of your position?
22    A   It was gone.  I was replaced, and my --
23 personally I was assigned no position, no new position
24 and no work.
25    Q   And did that have a -- was there a phrase that

Page 399

1   is used at IBM to describe that?
2       A   Yes.  It's a term that's used on the 5-minute
3   drills.  You become on the proverbial on the bench.
4       Q   So you were assigned to the bench as a result
5   of the meeting?
6       A   Yes.
7       Q   Well, you were told you were being assigned to
8   the bench, not as a result of the meeting, you were
9   told that at the meeting?
10      A   That's correct.
11      Q   What impact, if any, does it have on an
12  executive's career at IBM when he or she is assigned
13  to the bench?
14      A   Well, it's not viewed as a positive or --
15  it's -- I'm not sure how to -- first of all, in any
16  particular -- generally you weren't put on the bench,
17  you were assigned something, because there was more
18  than enough work.
19      Q   In your particular, what?  You didn't finish
20  the sentence.
21      A   In my -- strategic outsourcing me.  There was
22  more work than individuals to perform.  So being put
23  on the bench is -- has a negative tone when you're
24  coming out of the America group and you're being put
25  on the bench.

Page 400

1       Q   Are there any other negative impacts to being
2   put on the bench?
3       A   If you're on the bench without any
4   assignments, you're isolated, and by that I mean
5   you're isolated as you're losing contacts with other
6   individuals that may be potential leads for a
7   permanent position, or any position.  So you --
8       Q   So again, if a general manager at IBM was
9   looking for someone with your specific skill set, how
10  would they know about your availability?
11      A   They would have -- Joanne would have to
12  discuss it with them.  They wouldn't know.
13      Q   Now, in your experience, if you had an
14  employee with unsatisfactory performance, would they
15  be assigned to the bench?
16      A   That's not what we would put it, on Sat
17  performance.  A performer is -- that was for people
18  that were performing at an acceptable level or at the
19  expectations the company had for the job that they had
20  and you would put them on the bench.  It was for
21  redeploying people for whatever reason were now
22  available that were good solid performers.  It wasn't
23  an area you would put employees that had performance
24  problems.
25      Q   Do you recall ever assigning anyone as a

Page 401

1   manager to the bench?
2       A   Yes.
3       Q   When was that?  If you recall.
4       A   Yeah, I believe it was in the beginning of
5   2007.  I'm not a hundred percent sure of the time
6   period.
7       Q   And what was the occasion, if you can recall?
8       A   The customer had terminated -- actually the
9   company that we had the outsourcing deal with was
10  acquired by another company, and they terminated the
11  contract, so it was very abrupt, and that person was
12  available for placement.
13      Q   And did that person have any performance
14  issues?
15      A   Not at all, solid 2 performer.
16      Q   And did you personally ultimately locate a new
17  position for that person?
18      A   Yes, I did.
19      Q   And summarize what you did in order to help
20  that person find a new job?
21      A   Well, I actually used two things.  I used the
22  5-minute drill as a means to identifying to my peers
23  that he was available, and that would generate
24  sometimes a discussion about him, his particular
25  attributes -- it was a him -- and through that I was

Page 402

1   able to have other jobs for him to be considered for.
2   I also independent of that made my own call in trying
3   to place him because he was a solid worker, and we put
4   him on new deals where we had engagements going on
5   with his background and skills, and we put him in
6   there with the expectation that if one of those deals
7   should sign, he would then become the DPE in that
8   contract.
9       Q   Let's go through that a little more slowly.
10  The first thing you did was you put him on a 5-minute
11  drill?
12      A   Yes.
13      Q   And how long did you delay between the time
14  when he was off the contract and you knew that he
15  didn't have a position before you put him on a
16  5-minute drill?
17      A   Well, we knew the contract -- they have to
18  give a certain lead time to IBM when they're going to
19  terminate the contract.  Once that came in, that they
20  were terminating it, is when I put him on the drill,
21  even though he was still working the contract, to the
22  end of term.
23      Q   So it was actually -- he actually was out of
24  the position, you put him on the --
25      A   Yes.

Page 403

1    Q    And did you provide him with any temporary
2  work?
3    A    I had him working on DO teams.  He actually
4  helped me in -- on the state of Texas deal.  I put him
5  on the state of Texas, so he was down in Austin
6  helping out with that.
7    Q    So even though he was on the bench, you still
8  were using him on a temporary -- using him in a
9  position, and temporarily?
10   A    Absolutely, yes.
11   Q    And then ultimately to help him the find a job
12  you said you had him work on DO teams.  Can you
13  explain that?
14   A    Again, the sales side and the delivery side,
15  on the sales side there's a group of subject matter
16  experts that were gathered, they would be formed to go
17  out and work a particular engagement with a customer.
18  We generally at that point tried to bring in a
19  potential DPE into that role, and we'd work on a
20  negotiation, so that when it signs, they have the
21  history of what the trade-offs were.  You know, things
22  that they wanted, leads that we wouldn't.  So they
23  know what was behind the basis of the deal being
24  struck.
25   Q    And was that approach productive in terms of

Page 404

1  locating a position for that person?
2    A    Yes.
3    Q    Okay.  I want to spend the next few minutes
4  talking about the final WellPoint results.  I think
5  you reviewed several of the key milestones that your
6  team achieved.  Are there any overall assessments of
7  your team's performance that were generated at the end
8  of 2007?
9    A    Well, yes, there are a couple.  One was we
10  had -- I forget what it was called, but it was an
11  executive operating committee, I think EOC, or
12  something like that, was the title for it, and that
13  was a scheduled meeting that was part of the contract
14  that the team had, and the IBM side would meet with
15  Mark Boxer and his team, his executives on his side,
16  and would kind of recap how we performed on the
17  contract.
18   Q    Would you please identify Exhibit 67.  And in
19  particular I would ask you to look at page 3.
20   A    The date on this is February 6 because that's
21  when the meeting was actually held, but it summarizes
22  for 2007.
23   Q    What does this graph depict?
24   A    The smaller the bar, the better the situation.
25  But what it's actually showing is, when we didn't keep

Page 405

1  their systems up, for a predefined agreement, in other
2  words, if a server is supposed to be available 90
3  percent of the time, we were measured on how we did
4  against that.  If we missed it, we started -- we would
5  incur penalties.  We'd have to pay the company
6  theoretically the damage we did to their business, and
7  we'd incur penalties.
8          And what this chart represents is the bars,
9  the vertical bars are the number of outages or
10  occurrences that occurred, where we disrupted their
11  business, and the -- losing track here, but the line
12  above it is what we were paying out in damages as a
13  result of that.
14   Q    Would you look at the key below it?  You may
15  have reversed that.
16   A    I flipped it, yes, I'm sorry.  The dotted one
17  is the number of outages.  And I should also explain
18  the scale on this.  This is -- so it starts with
19  January of 2007 and it runs through December, on the
20  far right, of 2007.  So it's a full year's view.  So
21  it shows the number of outages, on the dotted line,
22  and then it shows what we were paying in more or less
23  fines or damages, as these outages occurred.  And the
24  scale to the left, for example, in January we paid
25  close to a million dollars that month for outages and

Page 406

1  damages.
2    Q    And by the end of the year you were down to,
3  what?
4    A    Well, you could see the trend on this was
5  down.  We were incrementally going across their
6  business and making improvements through 2007.  It
7  wasn't at the pace we wanted, but we were making
8  changes, so the number of outages were being reduced
9  and the fine was being reduced.  And the answer to
10  your question is, if you look at the December, we went
11  from January of close to a billion to a December of
12  200,000.
13   Q    Did you say close to a million?
14   A    The January outages cost IBM, well, somewhere
15  between 900 million and 1 billion dollars.  I'm sorry,
16  900,000 and 1 million dollars.
17   Q    And who conducts this survey?
18   A    This particular was -- we produced the charts
19  jointly working with the WellPoint executives.  So
20  that we agreed when we went into the meeting that we
21  will accept this chart, it's a reflection of what
22  actually occurred.
23   Q    May I direct your attention to Exhibit 68,
24  please?
25   A    Yes.

**A-379**

1    Q   And what is it?
2    A   68 represents it's a -- it's a customer
3  Sat survey that we perform on most of our contracts
4  with the customer.  We actually contracted through a
5  third-party, so it's neutral.  It's not IBM.  There's
6  a set of questions, set of areas that they go into,
7  and they rate -- Mr. Boxer, Mark Boxer, WellPoint,
8  would decide whether he personally wanted to take the
9  test or have one of his executives take the test, and
10  they actually rate how IBM is doing.  They give an
11  overall satisfaction on top.  They'll say, well, what
12  was your expectation of IBM and what did they achieve.
13  And every one of these I've seen, every customer's
14  expectation is a 10.  You'll be perfect.  Right?  And
15  then they give you an honest assessment on how well
16  you did.  So 10 is perfection, some number below that,
17  then it's kind of like a report card you're graded on.
18    Q   And what did the independent folks who did
19  this assessment, how did they rate IBM's performance
20  on WellPoint?
21    A   They rated us as 8 out of 10, which is a very
22  high score, and -- it's a high score in a normal
23  contract, without all the issues WellPoint had, but
24  this is exceptional when you apply it against a
25  contract of WellPoint and all the issues we had.

1    Q   Looking at the document, on the fourth line
2  from the top, it says "Reference" and over to the
3  right the answer is "Yes."  Can you explain what that
4  means?
5    A   Yes.  It's -- what we are asking this
6  customer, could we use you as a reference, when we
7  work our next deal with someone else.  It's almost
8  like an employment reference, you know, can I use, you
9  know, your business as -- your teacher as a reference.
10  So that's what this was.  And we looked for the yeses,
11  because when we're in these outsourcing negotiation
12  deals they will ask, do you have any other contracts
13  in my industry or my field, and then we say yes, and
14  their typical response is, can I talk to one of your
15  customers.  So it's very important to us in closing
16  future deals.
17    Q   Is it your position that your team resolved
18  all the problems in the nine months that you were
19  serving as DPE?
20    A   God no.  No.  What I could be proud of with
21  the team is that we identified -- we had plans in
22  place to address them, and we were working step by
23  step through their environment to improve it, and I
24  think this is a reflection of that.
25    Q   Okay.  Let's go back to Exhibit 4.  What's

1  Exhibit 4?
2    A   That's my PBC -- make sure I got the right
3  time period -- this is my PBC for my performance in
4  2007 that was conducted in 2008.
5    Q   And this was the evaluation that we talked
6  about in the very beginning of your testimony that was
7  given to you by whom?
8    A   This was Joanne Collins-Smee.
9    Q   And again, this evaluation was based upon your
10  achieving certain agreed upon targets?
11    A   Right.  There were goals which included, you
12  know, measurable targets, not -- and this is how I did
13  against those measurable targets.  And Joanne looked
14  at what I achieved versus what the set of objectives
15  were that I was to meet, and she rated me as a solid
16  contributor, which means I did everything that was
17  expected of me in that position.
18    Q   Let me just go through the process a little
19  bit.  Again, in the first step in this 2007 evaluation
20  was that you and Ms. Collins-Smee had
21  identified goals that you wanted -- that you needed to
22  achieve?
23    A   That's correct.  That's done the early part of
24  the year.
25    Q   And then the performance --

1    A   Then you execute.
2    Q   Then you execute, and then this is the final
3  step in the evaluation procedure?
4    A   Right.
5    Q   And you're compared against the goals, is that
6  right?
7    A   That's correct.
8    Q   What do you recall of the discussion, if any,
9  that led up to your getting the rating of 2?
10    A   Well, again, I submit a write-up of what I
11  accomplish, she's been observing what I've been doing,
12  and at the end of the year I send her that write-up,
13  she takes a look.  She does her own interpretation of
14  that.  That's what the manager should do, take a look
15  at the person's accomplishments that are written, and
16  then decide, you know, this numerical value how they
17  did against the objectives.  So the process was I
18  write it up, I send it to her, it's electronic, I do
19  it in an e-mail, for her to review and determine what
20  the evaluation would be.
21    Q   And did you submit to Ms. Collins-Smee a
22  summary of your accomplishments for that year?
23    A   Yes, I did.
24    Q   And do you recall any specific targets that
25  were identified that you discussed with her whether or

A-380

Page 411

1    not you met those?
2       A   Yes.  I mean one that's consistent in all of
3    the roles like I had, the senior PE, DPE on WellPoint
4    or as the sector, a lot of it has to deal with
5    managing cost, and reducing cost, to make our deals
6    more profitable.  So there was a measurement in there
7    on how I did against, you know, reducing cost in that
8    and I gave her some examples on where we had done
9    that.
10          The other element in that is customer Sat.  We
11   knew this was going to happen with WellPoint, that
12   there would be a customer satisfaction survey, and
13   based on the e-mail that was exchanged during the
14   course of the year our expectations weren't as high as
15   the 8 that they actually gave.  So although they
16   complained a lot, when they really sat down and
17   assessed our value to them, they said you're an 8 on
18   it, which was rewarding for everyone that was
19   associated with that contract.
20          So client satisfaction was another
21   measurements that was in there, and, you know, the
22   other 30 contracts when I was the sector VP we
23   excelled in, and this obviously with WellPoint we did
24   excel.
25       Q   Was there also savings in software that you

Page 412

1    pointed out?
2       A   Oh, yes.  Particularly on the WellPoint
3    account, in my second half of the year assignment.
4    One of the serious problems with the whole contract
5    was software cost was in the millions, and it was
6    going to double and triple because their business was
7    growing, and every time -- the way software companies
8    work, if you grow too much and you have to upgrade,
9    well, they whack you with another charge -- upgrade
10   charge on their software, which is in the millions.
11          In this particular calendar year I think we
12   had renegotiated with two vendors, Peer Associates,
13   and we had renegotiated with BMC.  I forget what it
14   stands for, but it's software.  And in this year alone
15   we were able to save over a million dollars in
16   software licenses, so that was renegotiated in there
17   as well.
18       Q   You were able to save over a hundred million?
19       A   It was over a million dollars.  That year
20   alone, but over the long haul it was double digits.  I
21   don't recall the exact number, but it was a big
22   number.
23       Q   And again, is the process over once you and
24   Ms. Collins-Smee decide on a rating?
25       A   No.

Page 413

1       Q   What happens then?  What's the final step?
2       A   Well, Joanne and I would agree -- you and your
3    manager would agree on the rating, right?  You both
4    have to sign it.  She gets the option of writing this
5    overall assessment piece.  She then has to forward it
6    on to her manager, who is Bob Zapfel.  He reviews it,
7    and he has to agree to it or disagree with it, and
8    sign off on it.
9       Q   And I think you testified that Mr. Zapfel and
10   you worked closely in 2007.
11       A   Yes.  More than we probably both wanted, but
12   we did.
13       Q   And he did approve the 2 rating?
14       A   Yes, he did.
15       Q   Okay.  Let's move on to another subject.
16          In early 2008 did Ms. Collins-Smee invite all
17   of her vice presidents and directors to participate in
18   a seminar in Lexington, Kentucky?
19       A   Yes, she did.
20       Q   And do you recall when that was,
21   approximately, in 2008?
22       A   I'm not sure of the exact date in February,
23   but it was, I believe it was the early part of
24   February.
25       Q   And what was the subject of the meeting?

Page 414

1       A   It was take her management team to Lexington
2    and they were going to talk about LEAN, which I had
3    talked about before, and it really was having the
4    consultant that had built the methodology, the formula
5    for how you do this work, and they also had -- it's
6    not Honda, it's --
7       Q   Toyota?
8       A   Toyota, yes, thank you.  Toyota had used LEAN
9    in their manufacturing line and that reduced a
10   significant amount of cost, so Toyota was there, and
11   the consulting group was there, and they were
12   explaining to Joanne's managers the whole concept of
13   how LEAN worked and the methodology.
14       Q   And were you invited to that?
15       A   No.
16          MR. FASMAN:  Your Honor, then I move to
17   strike.  He didn't go.  How did he know what was going
18   on at the meeting?
19          THE COURT:  Mr. Carta, ask some
20   foundation questions?
21          MR. CARTA:  Sure.
22   BY MR. CARTA:
23       Q   How did you know what was going on, what
24   happened at the seminar?
25       A   Because I talked to the administrator who was

Page 415

1  setting it up for Joanne.
2          MR. FASMAN: Objection. Hearsay,
3  incompetent to testify.
4          MR. CARTA: You know, I'll withdraw the
5  part where he testified about what actually happened
6  at the seminar.
7  BY MR. CARTA:
8      Q   Mr. Castelluccio, were you invited to the
9  seminar?
10     A   No.
11     Q   Did you request an opportunity -- were there
12  written materials that were generated in connection
13  with the seminar?
14     A   There was a book.
15     Q   There was a book. And how did you find out
16  about the book?
17     A   Through one of my peers.
18     Q   And did you make an attempt to get -- I'm
19  sorry?
20     A   A former peer.
21     Q   Did you attempt to get a copy of the book so
22  that you could stay current?
23     A   Yes, I did.
24     Q   And what happened?
25     A   Denied.

Page 416

1      Q   And who denied that?
2      A   Joanne denied it.
3      Q   And if you know, who was the oldest employee,
4  oldest vice president among the vice presidents and
5  directors that she had at that time?
6      A   I was the only 60 year-old working for her.
7      Q   Can you give us any reason why Ms.
8  Collins-Smee would not authorize you to go to
9  Lexington, Kentucky, with all of the other people on
10  your same level?
11     A   She wanted me to leave the business.
12         MR. FASMAN: Objection.
13         THE COURT: Sustained.
14         MR. FASMAN: Thank you, Judge.
15         THE COURT: The answer will be stricken.
16  BY MR. CARTA:
17     Q   Let's talk about when you were on the bench,
18  the efforts that you made to locate a new position.
19         Who was the person who was put in your place
20  as DPE on WellPoint?
21     A   Gordon Crawford.
22     Q   And shortly after Mr. Crawford replaced you as
23  DPE on WellPoint in January of 2008, what steps did
24  you take to find another position at IBM?
25     A   Well, I tried to use what resources were

Page 417

1  available to me, and call people, people that I knew
2  to see if there were any openings in their areas, or
3  could they give me leads to where I might be able to
4  go to search out a position.
5      Q   And do you know -- do you recall who the first
6  person was that you contacted?
7      A   The first one I contacted, I believe, was Alan
8  Weststeyn, who I had worked with before.
9      Q   And what did you do?
10     A   I asked about, I think -- I believe I asked
11  him about two things. Number one, I wanted him -- I
12  wanted to know if there were any positions -- if he
13  knew of any positions that would -- that were
14  available, and that I was looking for a position, so I
15  made him aware of that, and then also I asked if he
16  could do me a favor and see if I was being placed on
17  the 5-minute drills, and he had access to the Bob
18  Zapfel 5-minute drills, he could see the records from
19  it.
20     Q   Is there a contact -- excuse me. Is your
21  contact with Mr. Weststeyn reflected in an e-mail?
22     A   Yes.
23     Q   If you take a look at Exhibit 69.
24     A   Yes, that's -- actually it's from Cathy Ellis,
25  who was my secretary at the time, and she sent it to

Page 418

1  Alan Weststeyn requesting -- actually it's a
2  confirmation of a call that I would -- my request --
3  that's what the asterisk next to my name means, that I
4  initiated a request to Alan, and we had agreed that I
5  would call him at his house, his home, on that
6  particular day, 1:45.
7      Q   And at Mr. Weststeyn's suggestion did you --
8  what suggestion, if any, did Mr. Weststeyn make to
9  you -- question withdrawn. Start again.
10         Did Mr. Weststeyn make any suggestions to you?
11     A   Yes, he did.
12     Q   What was that?
13     A   He suggested there's a database that has PEs
14  and DPEs, kind of bios or profiles in them, and it's
15  also a skills assessment, there's a couple key areas,
16  key things that DPEs had to possess and PEs needed to,
17  and he wanted me to go in and make sure that was all
18  current, so he suggested I go in and make sure it was
19  all current.
20     Q   And did you do that?
21     A   Yes, I did.
22     Q   Now, this is January 2010. Mr. Crawford had
23  taken your position over effective January 1, the DPE
24  position. Were you doing any work with Mr. Crawford
25  during this time period?

Page 419

1    A   Yes.  If I could only correct -- can I correct
2   one thing you said?  I think you said -- referred to
3   the time period as January 2010.  This -- unless I
4   heard it wrong.  I'm sorry.
5    Q   No, I probably did.
6    A   It's January 10, 2008.
7    Q   Thank you.
8    A   I'm sorry.
9    Q   So January 10, 2008, what else, if anything,
10  were you doing with Mr. Crawford?
11   A   Gordon was on -- was actually there and I was
12  going through a turn-over to him of the WellPoint
13  contract, and all aspects, the people, work, so forth.
14   Q   And during what time period did that take
15  place?
16   A   That ran for a while.  I would think at least
17  through January.
18   Q   So let's go to Exhibit 70.  What's reflected
19  in Exhibit 70?
20   A   That was my e-mail on the 14th going back to
21  Alan Weststeyn who I had spoken on the phone thanking
22  him for taking the time to speak to me.
23   Q   And what was the result of the inquiry that
24  you had made to Mr. Weststeyn?
25   A   He did -- well, two things.  He gave me

Page 420

1   another name of someone to talk to, plus he also
2   validated -- I believe it was in this conversation --
3   that I was on the Zapfel 5-minute drill.
4    Q   Later in May did you follow up with Mr.
5   Weststeyn again?
6    A   Yes, I did.
7    Q   And what, if anything, did you learn at that
8   point?  Take a look at Exhibit 71.
9    A   Okay.  I went back to him as a -- kind of a
10  follow-up.  I was trying to keep in touch with him
11  just to remind him that I'm, you know, looking for
12  something.  He had steered me towards one of the
13  individuals in the bottom of the letter, Gregg
14  Mastriforte, and I just wanted to let him know that
15  I'd been working with Greg, in looking for a position,
16  and gave a little background, but I think he was
17  fairly familiar with my background, because we had
18  worked together.
19   Q   And did you let Mr. Weststeyn know that you
20  were open to -- well, what did you let him know with
21  respect to what positions you were open to?
22   A   Well, my conversation with him was, the band
23  wasn't an issue with me, a Band D or Band C which was
24  a vice president or director's role.  So he, you know,
25  he knew I was looking for either position.

Page 421

1    Q   Also in January did you contact Gregg
2   Mastriforte?
3    A   Right.  I believe it was at the recommendation
4   of Alan that I did speak to him.
5    Q   And what was Mr. Mastriforte's position at
6   that time?
7    A   He -- he was -- I'm not sure his official
8   title, but he was administering -- he was an
9   administrator for the PE DPE roles, DPE roles, in -- I
10  believe his scope was Europe.  I'm not sure whether it
11  was the whole of Europe, but it was the European area.
12   Q   And for what reason did you contact Mr.
13  Mastriforte?
14   A   I was hoping that he could help me identify a
15  position that I could then contact someone, see
16  whether I'd be a good candidate or not for that.
17   Q   And his scope was worldwide, or was he -- what
18  was his scope?
19   A   I believe it was worldwide, but we
20  specifically talked about Europe, you know, on a
21  couple -- in a couple positions.  He didn't have the
22  Americas.  I thought he did, but he didn't have the
23  Americas.
24   Q   And did you also let Mr. Mastriforte know that
25  you were available to do either a Band D or a Band C

Page 422

1   position worldwide?
2        MR. FASMAN:  Your Honor, that's leading
3   again.
4        THE COURT:  It is leading.
5        MR. CARTA:  Question withdrawn.
6   BY MR. CARTA:
7    Q   What did you let Mr. Mastriforte -- what did
8   you indicate to Mr. Mastriforte in terms of your
9   availability?
10   A   That I was available now, and I'd be available
11  for a C or D position, and it could be anywhere within
12  his geography.
13   Q   Did you exchange e-mails with Mr. Mastriforte
14  at any point?
15   A   Yes, I did.
16   Q   About a specific job?
17   A   Yes.
18   Q   Exhibit 73.  Please identify Exhibit 73.
19   A   Right.  The top half is -- the last -- it's a
20  string of e-mail, but maybe I should start at the
21  bottom.  At the bottom it's Greg writing to me.  He's
22  copying Alan because Alan was the one I had spoken to.
23  And he talks about a specific position in Wales in the
24  UK.  At the bottom half of that e-mail he describes a
25  little bit more about the job, it was a senior project

Page 423

1  exec, and he goes through the job.
2      Q   And what was the result of your enquiry with
3  Mr. Mastriforte?
4      A   I told him I was interested in pursuing the
5  position, and he went back to the unit that had the
6  opening, and -- he gave me -- I told him I was
7  interested in the job, and he was going to go off and
8  talk to the country that had the opening.
9      Q   And do you recall when that was?
10     A   I believe it was right after this e-mail.  It
11  was in that time frame.
12     Q   And this e-mail is dated?
13     A   I'm sorry.  January 17th of 2008.
14     Q   At a later date did you again contact Mr.
15  Mastriforte?  And I direct you to look at Exhibit 74.
16     A   Yes, I did.
17     Q   And when was that?
18     A   Well, the exchange -- let me see.
19         It's in March of 2008.
20     Q   And what was the result of that effort?
21     A   In this one he identified a new position that
22  was in the Netherlands, for Band D, and I did speak to
23  him about that, and I think on the top -- oh, he
24  misunderstood when I went back to him the second time,
25  he thought I was -- I was looking to place someone

Page 424

1  that was working for me, and that's the first note on
2  the top says no, it's actually a job I'm looking for.
3      Q   And what ultimately came of that position that
4  you explored?
5      A   Both European positions were filled from
6  people within the country itself.
7      Q   And early -- in January of 2008 did you also
8  contact Phil Guido?
9      A   Yes, I did.
10     Q   And is this contact also reflected in an
11  e-mail?
12     A   Yes, it is.
13     Q   Directing your attention to Exhibit 75, what's
14  that?
15     A   That's a meeting notice sent by his secretary,
16  Chris Mooney, that references a scheduled meeting in
17  3N-06, which was his office, on that particular date,
18  1/10.2008.
19     Q   What was Mr. Guido's position at that time?
20     A   He was a general manager that had a new
21  business that IBM had gone into, which was really --
22  it was like outsourcing, but it wasn't running
23  computers and whatnot, it was actually doing the
24  processing.  So an example would be claims
25  administrators, the people that were actually keying

Page 425

1  in the claims, and that whole function would be
2  outsourced to him.  So, you know, a Blue Cross Blue
3  Shield, instead of doing the entering themselves,
4  they'd have IBM do it through Phil Guido.
5      Q   And what was the reason you contacted Mr.
6  Guido?
7      A   I knew Phil from -- I don't recall
8  specifically from when.  So we would talk
9  periodically, and we ran into each other in the
10  hallway, and I spoke to him.  He says, yeah, sure come
11  down, talk to me.
12     Q   And what was your -- the result of your
13  efforts to work through Mr. Guido?
14     A   Well, we spent a long time talking -- he
15  talked about his area.  I talked about my background.
16  What he wanted to do was go to two of his direct
17  reports, I'm sure were executives that were running --
18  had built centers -- one was in Manila, I'm not sure
19  where the other place was -- talk to them whether I'd
20  be a good match for those positions.
21     Q   And did you later follow up with Mr. Guido?
22     A   Yes, I did.
23     Q   What was the result?
24     A   He said it wasn't a match.  It was -- the
25  meeting wasn't the same as the first meeting I had

Page 426

1  with him, I don't know why, but he said I wasn't a
2  match for the position.
3      Q   Did you indicate to Mr. Guido what positions
4  you were willing to accept?
5      A   Yes, I did.
6      Q   What did you indicate?
7      A   Again, it was the standard thing I was
8  beginning to -- I'm not concerned about a Band D or
9  Band C level, it could be either one of those
10  executive positions, and it could be anywhere.  I mean
11  that's why Manilla was one of the things that they had
12  talked about.
13     Q   Okay.  Around the middle of February in 2007
14  did you contact Garrett Walker?
15     A   Yes, I did.
16     Q   And who is Garrett Walker?
17     A   Garrett was a -- I'm not sure if he still is,
18  but he was a vice president in IBM's human resource
19  organization.
20     Q   And why did you select Mr. Walker in
21  particular, if you recall?
22     A   Because of the nature of what I was going to
23  discuss with him, I wanted to get someone out of the
24  organization I was from.  I wanted to deal with
25  someone that could be impartial and wouldn't be any

Page 427

1  consequences by going to him if someone found out
2  about it.
3      Q   And did you send an e-mail to Mr. Walker
4  explaining why you wanted to meet with him?
5      A   Yes, I did.
6      Q   And did you, in fact, follow up your first
7  e-mail approximately 12 days later?
8      A   Yeah.  I didn't get a response from him
9  initially, so I followed up with an e-mail, just
10 inquiring again.
11     Q   Can you please identify Exhibit 76?
12     A   Yes.  The bottom is my initial request that I
13 sent to Garrett, and the top is a follow-up to make
14 sure he received it and that he could either deny my
15 meeting or accept it and we'd meet, and I took him
16 through a very high level.  I didn't want to get too
17 much detail on this because I didn't know where it was
18 being distributed, so I tried to be kind of vague in
19 my comments there.
20     Q   And did you have any prior relationship with
21 Mr. Walker?
22     A   No.  I didn't know him at all.
23     Q   So you just reached out to him?
24     A   Yes.  I wanted the senior executive in HR,
25 senior executive that wasn't within my line or my

Page 428

1  organization.
2      Q   Can you explain the last sentence in the
3  fourth paragraph, the one talking about not being
4  considered for available positions?
5      A   Sorry, fourth?  Oh, the last sentence?
6      Q   Yes.
7      A   "I was not made aware or considered for
8  available positions within and outside the
9  organization --" in the organization I was in "-- as I
10 had requested.
11     Q   What's that a reference to?
12     A   I was really talking about Joanne Collins-Smee
13 at this point and the openings that were available,
14 and one specific one that I had seen.
15     Q   And what specific one was that?
16     A   This was a senior DPE on the Quest outsourcing
17 contract in the United States.
18     Q   Let's get to that.  Just go ahead and -- what
19 did you find out about that position?
20     A   I believe that the position is first
21 identified as being available in the -- I believe it
22 was September of 2007, or maybe it was early October,
23 but it was roughly in that time frame.  They were
24 looking to staff a new senior DPE in that role.  And
25 it was finally filled in -- I think it was January of

Page 429

1  2008.
2      Q   So by the time you were sending this e-mail to
3  Mr. Walker, what, if anything, did you know about
4  whether the position had been filled?
5      A   I knew it was filled.
6      Q   And what about the position in particular was
7  a concern?
8      A   Well, a good portion of my background and
9  expertise in IBM was a very good match for this Quest
10 contract.  I mean you couldn't find something that was
11 more close what my background was, in this.
12     Q   Let's go through.  Tell me a little bit about
13 the position.
14     A   It was a senior DPE position for Quest, which
15 was an outsourcing contract.  It had already signed,
16 so it had been in existence for a while.  Quest was a
17 provider of phone services, for lack of a better term,
18 and my background was in networking, so this was --
19 without getting too technical, but it was like
20 voiceover ID and things like that, things that were
21 language in the voice communications, data with voice
22 and movies, whatever.
23     My background was at IBM, was a network
24 engineer at one point designing networks and working
25 with the technology in networks.  I had managed

Page 430

1  networks.  So IBM's internal -- vast internal network
2  I had managed.
3      I'd also worked at Lucent when I was first
4  promoted.  Well, Lucent makes -- it's called
5  networking products, which are switches, routers,
6  CBX's, phone services, which was the very products
7  that Quest was using in their environment to sell
8  their services off.  So I looked at this, and I said I
9  would be a match for it.
10     Q   And how about geographically?
11     A   It was in -- I believe they were located in
12 Denver, Colorado, and I had worked already in
13 Colorado, so that was not an issue or concern.
14     Q   And how did you find out about the Quest
15 position, if you recall?
16     A   I believe there was an announcement -- I'm
17 struggling, Mark, right now to think what it was, but
18 I found out, I think through an e-mail or an
19 announcement notice that it existed.
20     Q   So were you ever informed that that Quest
21 position was opened before it was filled?
22     A   No.
23     Q   And in whose organization was that?  Within
24 whose organization did that position exist?
25     A   Joanne Collins-Smee.

Page 431

1  Q  Did you ever have the opportunity to explain
2  to Ms. Collins-Smee how your specific background at
3  Lucent and in network engineering made you qualified
4  for that position?
5  A  At that point I don't believe so, but it was
6  a -- I mean she was familiar with -- probably not to
7  the level of detail that I was an actual engineer
8  doing network design, and so forth, all right, but she
9  new I was on the Lucent contract and had that
10  experience.
11  Q  And do you know by whom that position was
12  ultimately filled?
13  A  Yes, I do.  It was Ed Teddick.
14  Q  What was his age about at the time?
15  A  I believe he was 50.
16  Q  So again, he was ten years younger than you?
17  A  That's correct.
18  Q  And had you worked with Ed Teddick before?
19  A  Yes.  He actually reported to me as one of my
20  managers when I was on Lucent.
21  Q  Do you dispute Mr. Teddick was qualified to do
22  the job?
23  A  Yes, he was.  I believe he -- well, I believe
24  he was, but I also believe that with my background it
25  was a stronger -- I was stronger for that position

Page 432

1  than Mr. Teddick having managed Mr. Teddick and
2  knowing his background.
3  Q  And who was the person at IBM with the final
4  authority to decide who should take the Quest job, who
5  should be offered the Quest job?
6  A  Joanne Collins-Smee.
7  Q  Let's return to your e-mail to Mr. Walker.  I
8  think that's Exhibit 76.
9  A  Yes.
10  Q  I don't see in this e-mail any explicit claim
11  of age discrimination.
12  A  I didn't want to put it in an e-mail.  First
13  of all, I wanted to get an audience with him.  I
14  didn't want to put it in an e-mail because these
15  things tend to -- even though it says personal
16  confidential, they can appear anywhere at IBM.
17  Secretaries get it.  It could be anyone reading.  You
18  know, I don't know who has access to an e-mail, and
19  so forth.  So I did not want to put that in there.
20  Q  Did you later meet with Mr. Walker?
21  A  Yes, I did.
22  Q  And approximately when did you do that?
23  A  It was in February.  I'm not sure of the -- it
24  was shortly after my follow-up e-mail with him.
25  Q  And please recount for the jurors what

Page 433

1  discussion that you had with Mr. Walker?
2  A  Well, I went through basically -- well, I went
3  through a couple things; the fact that I'd been
4  removed from two positions by Joanne, and the -- the
5  PBC and our discussion about the PBC that had just
6  taken place in January, and the treatment of me just
7  was not consistent with what had been taught to me as
8  IBM's, you know -- what's the word -- the IBM policy
9  for regarding age and age discrimination, so...
10  Q  And what were you seeking, if anything, from
11  Mr. Walker?
12  A  Well, I was -- I didn't -- I was looking for
13  his help, number one, to at least look at this and see
14  whether the way I was being treated was consistent
15  with IBM's policy on age.  I also asked about -- I
16  know he was part of one of the 5-minute drills, and I
17  wanted to get his input on job search.  But more, I
18  wanted guidance from him on what I should be doing
19  going forward.  You know, I couldn't -- well, that's
20  primarily what I had asked for.
21  Q  In your 40 years at IBM prior to that, had you
22  ever registered a complaint of any kind against a
23  co-worker?
24  A  No.
25  Q  And what advice, if any, did he give you?

Page 434

1  A  Well, again, he's a senior executive in HR,
2  I'm an executive, and, you know, and I'm going to him
3  with something.  What he had recommended that -- he
4  gave me two suggestions, and he said, I'll think of a
5  third one over the weekend and we should regroup on
6  Monday.
7  Following the weekend, which I think may have
8  been a holiday weekend, because we wound up meeting on
9  Tuesday, the first thing he suggested was go back and
10  talk to Joanne about work assignments.  He also said
11  he would follow-up and see, in fact, if I was on the
12  drills and if I wasn't, he would make sure I did get
13  placed on 5-minute drills, and the 5-minute drills he
14  was talking about was -- well, I'm not sure, but I
15  think it was Bob Zapfel's.  And then the third one he
16  would come back and think about over the weekend and
17  discuss with me.
18  Q  And what happened next?
19  A  I scheduled time to meet with Joanne.  I took
20  his advice.  I'm going back to Joanne and discuss
21  work.
22  Q  And what is Exhibit 77?
23  A  That's the meeting notes from my secretary or
24  assistant to Joanne saying Jim's requested a meeting
25  with you, and we agreed we would meet on March 7th, at

Page 435

1   1:15, to discuss.
2   Q   And where was that meeting held?
3   A   That was in -- I believe in her office.
4   Q   And do you have a specific recollection of
5 that meeting?
6   A   Yes, I do.
7   Q   Did she invite anyone else to attend the
8 meeting?
9   A   No, she did not.
10   Q   So it was just the two of you?
11   A   Yes.
12   Q   And what do you recall of the meeting?
13   A   Well, again, retirement came up, in the
14 meeting.  And I'm talking about jobs and temporary
15 assignments, and she brings up, oh, by the way, you
16 know, you could retire, or -- I'm not sure.
17 Retirement was brought up in the meeting.
18   Q   Brought up, by whom?
19   A   By Joanne.  In spite of the two previous times
20 I said I wasn't considering retirement.
21   Q   And did you discuss with her -- did you seek
22 from her assistance in locating a new position?
23   A   Yes.  We talked about a new position, and we
24 talked about in the interim, can she assign some work
25 for me to work on.  And the reason I wanted work to

Page 436

1 work on, again, it gets you out in dealing with your
2 peers or other people in the business, and it gives
3 them an opportunity for them to make their own
4 assessment of my performance, plus it gives me the
5 contact that may lead to another position, so that was
6 important, and plus for my own sanity at that point.
7   Q   And what was her response, if any, to your
8 request for temporary work?
9   A   She specifically identified an area in audits
10 that she had problems with business controls and
11 audits, and she was going to look into that, and she
12 thought that was a good match.  So I left the meeting
13 thinking that was an area that was a troubled area for
14 her, I had strong background in that area, it was my
15 corporate experience, and she was going to get back to
16 me and let me know where and what -- and my assumption
17 was where and what I would be doing this work.
18   Q   And again, do you recall whether there was any
19 discussion about your willingness to accept jobs,
20 location-wise, band-wise?
21   A   I repeated everything about, you know, Band C,
22 Band D, and anywhere I would work.
23   Q   And after meeting with Ms. Collins-Smee in
24 March, on March 7th, 2008, did you go back to Mr.
25 Walker?

Page 437

1   A   Yes, I did.
2   Q   And what did you report to him?
3   A   I reported that I had the discussion with her,
4 again she brought up retirement.  I also said that
5 she, you know -- I told him that she thought -- she
6 was going to look for this temporary work.  Not look
7 for, she was going to assign me temporary work in the
8 audits and controls area, but that she had again
9 brought up retirement, which to me was -- I explained
10 to him, was, how do I interpret that?  It has to be
11 age.
12   THE COURT:  Well, Mr. Carta, I notice
13 that it's 5 o'clock.  I think we should take our
14 break.
15   MR. CARTA:  Can I ask two more questions?
16   THE COURT:  Yes, sir, you may.
17   MR. CARTA:  Thank you.
18 BY MR. CARTA:
19   Q   Did she ever get back to you with respect to
20 that temporary work in the audit area?
21   A   No.
22   Q   Did she suggest any other temporary work for
23 you thereafter?
24   A   No.
25   MR. CARTA:  I'm done.

Page 438

1   THE COURT:  Okay.  You're done for now.
2   MR. CARTA:  For now.
3   THE COURT:  Ladies and gentlemen, we're
4 going to conclude for the day.  Have a pleasant
5 evening.  Don't talk about the case.  Drive carefully,
6 and safely, home.  Come back here tomorrow at 9:45 in
7 that room.  See you tomorrow.  Goodnight.
8   (Jurors excused)
9   THE COURT:  Okay, Mr. Castelluccio, you
10 can step down.  We'll be back here tomorrow -- I'll be
11 here at quarter to 10 in case there are things we have
12 to take up.  We'll start at 10 o'clock.
13   MR. CARTA:  Thank you, Your Honor.
14   THE COURT:  Have a good evening.
15   MR. FASMAN:  Thank you.
16   MR. CARTA:  Thank you.
17   (Court adjourned)
18
19
20
21
22
23
24
25

A-387

1          CERTIFICATE OF REPORTER
2
3          I Hereby certify that the foregoing 228 pages
4     are a complete and accurate computer-aided
5     transcription of my original stenotype notes taken in
6     the Matter of James Castelluccio VS International
7     Business Machines Corporation, which was held before
8     The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9     District Court, 450 Main Street, Hartford,
10    Connecticut, on January 14, 2014.
11
12
13          Wendy Allen, RMR, CRR
14          Notary Public
15
16
17    My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

Page 439

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JAMES CASTELLUCCIO     )
     Plaintiff     ) 3:09-cv-01145 (TPS)
                    )
VS                  ) January 15, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION   ) Federal Building
     Defendant     ) Hartford, Connecticut


VOLUME 3
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.


Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

---

Page 441

```
 1              I N D E X
 2
 3    WITNESSES:                    PAGE:
 4    James Castelluccio
         Direct Examination by Mr. Carta............  444
 5       Cross-Examination by Mr. Fasman............  538
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 440

```
 1
 2    Representing the Plaintiff
 3    Carta McAlister & Moore, P.C.
      1120 Boston Post Road
 4    Post Office Box 83
      Darien, CT  06820
 5      By:  Mark R. Carta, Esq.
            mark@cmm-law.com
 6      By:  Margaret A. Triolo, Esq.
            margaret@cmm-law.com
 7      By:  Troy Bailey, Esq.
 8
 9    Representing the Defendant
10    Paul Hastings, LLP
      75 East 55th Street
      New York, NY  10022
11      By:  Zachary Fasman, Esq.
            Zacharyfasman@paulhastings.com
12      By:  Todd C. Duffield, Esq.
            Toddduffield@paulhastings.com
13      By:  Jean-Marie Gutierrez
14
15    ALSO PRESENT:
16      Daniel Fox, Esq.
        IBM in-house counsel
17
18
19
20
21
22
23
24
25
```

---

Page 442

```
 1         THE COURT:  Okay, we're set to begin day
 2    three.  Let's get the jury.
 3         MR. CARTA:  Your Honor, we have one
 4    housekeeping thing that I would like to raise, not
 5    controversial.  To my knowledge, we've never told the
 6    jurors that these exhibits that they're seeing, that
 7    they're actually going to have copies of those in with
 8    their deliberations.  They may not realize that.
 9         THE COURT:  I'll tell them that this
10    morning.
11         MR. CARTA:  Yes, please.
12         MR. FASMAN:  That's fine, Judge.
13         (Jurors present)
14         THE COURT:  Well, there were icy roads.
15    In Glastonbury.  Schools delayed for 20 minutes or a
16    half hour picking up the school children, and that's
17    all I can say.
18         I will say this:  I was up until about
19    10:30 working on this case and looking through the
20    various exhibits.
21         So we started a little late this morning.
22         Did they have refreshments in there?
23    Good coffee?  Okay, that's good.
24         You know, if you see these big binders
25    that we all have, I have a Plaintiff's binder and the
```

Page 443

1    Defendants have some binders, and you're seeing
2    documents on these screens which are extracted from
3    the binders and put on the machine by one of the
4    technologist here, and I want you to know that you're
5    going to have -- each one of you is going to have a
6    binder, so you can look through these binders.
7          So it might be -- if there's a particular
8    exhibit, you want to write down an exhibit number,
9    such and such, and then you can locate it in the
10   binder, rather than writing down what -- trying to get
11   all what you think of Exhibit X shows. The important
12   thing is all the lawyers here have gone to great
13   lengths to put together these binders so that you can
14   have the actual evidence that you're seeing on screen.
15         I wish I told you that the very first day
16   because that might have cut down on the furious note
17   taking I see, and furious in the sense of fast.
18         All right. You ready to begin, Mr.
19   Carta?
20         MR. CARTA: Yes. Thank you, Your Honor.
21   Good morning.
22         THE COURT: Good morning, sir.
23   Mr. Castelluccio, good morning to you.
24         THE WITNESS: Morning, Your Honor.
25

Page 444

1          CONTINUED DIRECT EXAMINATION BY MR. CARTA:
2
3    Q    Good morning, Mr. Castelluccio.
4    A    Good morning.
5    Q    When we recessed last night we were talking
6    for a period of time about your attempts to find a job
7    while you were on the bench, and then we discussed at
8    some length your March 7th meeting with Ms.
9    Collins-Smee. I'd like to go back to the topic of
10   your continued attempt to find a job.
11         So after your meeting with Ms. Collins-Smee on
12   March 7th, 2008, did you continue your quest to find a
13   job at IBM?
14   A    Yes, I did.
15   Q    And in April of 2008 did you contact a Bill
16   Barnett about a possible job opening?
17   A    Yes, I did.
18   Q    And did you indicate to Mr. Barnett that you
19   were also open to either a C band or a D band
20   position?
21         MR. FASMAN: Objection, Your Honor.
22   That's leading.
23         MR. CARTA: Question withdrawn.
24   BY MR. CARTA:
25   Q    What did you indicate to Mr. Barnett with

Page 445

1    respect to what positions you might be open to?
2    A    I explained a C or a D, which was the director
3    or vice president level.
4    Q    And what was Mr. Barnett's position at the
5    time?
6    A    He had a global position. I believe his -- he
7    was vice president of global network delivery
8    services.
9    Q    And I'd like to review with you quickly a
10   series of e-mails that you exchanged with Mr. Barnett,
11   starting with Exhibit 78. Can you identify Exhibit
12   78, please.
13   A    I'll read from the screen.
14         It's an e-mail within IBM, the origin on the
15   bottom. The first e-mail of the string is from me to
16   Mr. Barnett, and then his -- then a follow-up to the
17   e-mail. And basically -- I'm sorry, I did that
18   backwards.
19         The first entry on the bottom is from Bill
20   Barnett to me as the vice president of global network
21   delivery ITD, and he's going to schedule a call with
22   me to discuss the open position, and my comment -- my
23   e-mail on top was I thanked him, and I mentioned that
24   we were scheduled to meet on Wednesday.
25   Q    And the next exhibit, Exhibit 79.

Page 446

1    A    If you start reading from the bottom, that
2    first e-mail is from me to Bill Barnett. I was
3    thanking him for the time, and that would be in
4    reference to the meeting I had with him, and I
5    mentioned that I was going to try to catch up with
6    Joanne Collins-Smee. And basically it was -- I was
7    giving a recap of my experience at the network area,
8    my skills in the network area, and some of the people
9    that he knew that I also knew in the business, which
10   was Joan Corley and AJ Suraci, and so forth. And I
11   also -- he had worked for Tony -- I believe he had
12   worked for Tony Macina at one time, and I made
13   reference to Tony and my position when I was with
14   Tony.
15   Q    And that e-mail's approximately a week later
16   from the first e-mail, April 14th?
17   A    Yes.
18   Q    And Exhibit 80, please. What's that?
19   A    Again, reading from the bottom up, it's Bill
20   Barnett to me, and basically in that bottom section he
21   talks about the -- he describes the position that he
22   was looking to fill. It's managing different areas,
23   also. Those were the managers that would report to me
24   if I had been put in that position, so several
25   managers, I think it was two or three managers that

Page 447

```
 1   would be reporting to the director's position.
 2       Q   To what extent did you hope that this would be
 3   a good match for your skill set?
 4       A   Again, my background.  And Bill was familiar
 5   with me.  I had managed IBM's internal network, which
 6   was a global network, it wasn't just a U.S. network, I
 7   had designed it, I had teams that built it and managed
 8   on an ongoing basis.  I had worked on a corporate
 9   network before that.  I had years of experience and
10   knowledge in network, and how not only to build it,
11   but how to manage a network on a day-to-day basis.
12       Q   So to what extent did you think that that
13   position was a good fit?
14       A   His description, yes.
15       Q   And what was the result of your efforts to try
16   to secure that spot?
17       A   I spoke to Bill about the position, and what I
18   discovered was that they already -- he had already had
19   a candidate for the position, and they were just
20   waiting for final approval on that candidate.
21       Q   Can you identify Exhibit 81?
22       A   Yes.  Again, this is internal IBM, Bill
23   Barnett back to me, and he talks somewhere in the
24   text, I think -- yeah, in the text he basically says
25   that he has an individual that's coming in from
```

Page 448

```
 1   outside of ITD, and he was sorry that he couldn't
 2   offer me the position.
 3       Q   At some point, actually in the next month, in
 4   May 2008 -- let me just backtrack for a second.
 5       Your meeting with Ms. Collins-Smee was in
 6   March of 2008?
 7       A   That's correct.
 8       Q   And within two months of that meeting did she
 9   announce seven promotions that she had made within her
10   group?
11       A   Yes.
12       Q   And how did you come to learn of those
13   promotions?
14       A   I had heard and I went to Miguel Echavarria
15   who had replaced me as the vice president of Public
16   Sector, and I asked him about it, and he said he would
17   forward her announcement letter to me that contained
18   all the positions.
19       Q   And how did you first learn about it so that
20   you approached Mr. Echavarria, if you recall?
21       A   I'm not a hundred -- I believe someone -- I
22   had -- I don't recall.  I'm sorry.
23       Q   Take a look at Exhibit 83, please.  Skip one
24   to 83.  And what is this document?
25       A   This is the announcement letter of all those
```

Page 449

```
 1   positions, and the part we're looking at is -- it was
 2   authored by Joanne Collins-Smee, and she sent it to
 3   all of her -- AG stands for Americas Groups.  And you
 4   look at the "to" on it, and it's ITD delivery leaders,
 5   and she copied Pat Kerin and Tim Shaughnessy on that,
 6   so it's to all of her delivery executives.
 7       Q   Were you one of her delivery executives at
 8   that time?
 9       A   Yes.
10       Q   Were you copied on that e-mail?
11       A   I was not, no.
12       Q   Okay.  And I'd like to ask you to review each
13   of those provisions -- positions one at a time,
14   starting with Mr. Grimaldi.  Please describe Mr.
15   Grimaldi's new assignment?
16       A   He was assigned as a senior project executive
17   or SPE on the state of Georgia outsourcing contract,
18   and it's in the first sentence there.
19           MR. CARTA:  Thank you.
20   BY MR. CARTA:
21       Q   Were you interviewed for this position?
22       A   No, I was not.
23       Q   Were you told that the position was available?
24       A   No, I wasn't.
25       Q   Like you, Mr. Grimaldi was VP of communication
```

Page 450

```
 1   sector similar to your role as VP of Public Sector?
 2       A   Yeah.  The roles of the vice presidents of the
 3   sectors were basically the same roles.  The difference
 4   was you had a different set of contracts that you were
 5   managing.  His were more -- not more -- his were in
 6   communications where mine was in the Public Sector.
 7       Q   And what was Mr. Grimaldi's age at the time?
 8       A   He was 50 years old.
 9       Q   And he was the one that was awarded that
10   assignment?
11       A   Yes, he was.
12       Q   With respect to the second promotion, would
13   you please describe Ms. Diggelmann's assignment?
14       A   She replaced Tony Grimaldi in his job as vice
15   president of Communications Sector.
16           MR. CARTA:  Your Honor, can I have a
17   sidebar for a second?
18           THE COURT:  Sure.
19           MR. CARTA:  We resolved it.
20   BY MR. CARTA:
21       Q   I'd like to go back to a moment to the
22   position of Mr. Grimaldi.  What qualifications, if
23   any, did you have for that particular job?
24       A   Well, he was announced as the senior PE on the
25   state of Georgia contract, which -- so it was an
```

3 (Pages 447 to 450)

Page 451

1  outsourcing contract, and that had been my position
2  for the last seven years, managing outsourcing
3  contracts. It was the state of Georgia, and I had
4  just recently within the past year had converted over
5  the state of Texas, and I managed the state of Texas
6  contract, which would be similar to the state of
7  Georgia contract.
8       The position itself was a senior PE, and the
9  PEs and the DPEs, to make the difference again, there
10 was a core set of skills that you had to possess to be
11 in those positions, and I had been a senior PE and had
12 the core set of skills when I was on the Lucent
13 Technology contract.
14     Q   And you mentioned Texas. Was that an isolated
15 situation or had you worked in other government
16 contracts?
17     A   Oh, in the Public Sector we had many
18 government contracts; Commonwealth of Pennsylvania,
19 California, Illinois we had contracts. So we had them
20 in various locations. So it was more than just the
21 state of Texas.
22     Q   Did you consider yourself highly qualified for
23 that position?
24     A   Yes.
25     Q   And again, you weren't interviewed or told

Page 452

1  that the position was available?
2       A   That's correct.
3            MR. FASMAN: Objection, Your Honor.
4            MR. CARTA: That was asked and answered.
5  I'll withdraw it. I did ask that. That was meant as
6  a recap. I'll withdraw it.
7  BY MR. CARTA:
8       Q   And in terms of PBC ratings, do you know what
9  Mr. Grimaldi's rating was, his PBC rating in 2007?
10     A   Well, I know what it was in 2008 for his
11 performance in 2007.
12     Q   Correct. And what was that?
13     A   He was a 2 performer, which is -- he was a 2
14 performer, which is, meets all objectives.
15     Q   Would you take a moment and look at Exhibit
16 84. And what is Exhibit 84?
17     A   This is Mr. Grimaldi's PBC that was done in
18 January of 2008 for his performance in 2007, as a
19 sector VP of communications.
20     Q   And was this -- would you read the second
21 paragraph of his overall -- first of all, who gave him
22 this assessment? Who was the person who rated it?
23     A   This was Joanne Collins-Smee that did it.
24     Q   So same person, same rating?
25     A   Yes, but also same day. Mine was in the

Page 453

1  morning, his was in the afternoon.
2       Q   And would you read the second paragraph,
3  please, of her overall assessment?
4       A   The highlighted piece says, "The sector had a
5  very difficult year related to service delivery
6  quality. Tony needs to assure that he focuses on
7  improving his communications between the GTS --" which
8  again is the sale side of the outsourcing
9  contracts "-- and the ITD delivery teams --" which is
10 the delivery side of the contracts "-- so that we have
11 a common understood game plan for the improvement
12 where Tony is seen as a visible leader for execution.
13 We must assure that business control obligations are
14 addressed in a timely manner on every account, no
15 overdue CIRATS --" that's a set of -- it's audit items
16 that need to be addressed, so it's a list of things
17 that were discovered on his contracts that needed
18 performance improvements on "-- and all accounts in a
19 Sat position." And that would refer to the customer
20 satisfaction surveys that we saw yesterday.
21     Q   So let's then move on to the second position.
22 With respect to -- to whom was the second position
23 awarded and what was the position?
24     A   That was -- it was awarded to Diane Digglemann
25 and the position was vice president of Communications

Page 454

1  Sector.
2       Q   What qualifications, if any, did you have to
3  at least be considered for this new assignment?
4       A   Well, I had been vice president of a sector
5  for the last year and a half and had been performing
6  at a 2 and a 2 plus level. Communications was a
7  strong strength of my background. Lucent's a good
8  example of that, but also even within IBM, I had good
9  customer Sat ratings.
10      So if that was an issue for this particular
11 position as she indicated in Tony's, Mr. Grimaldi's, I
12 had the background. We had passed audits, and we had
13 an excellent track record in that, in client
14 relationship, or customer Sat, which she indicated in
15 Mr. Grimaldi's that he needed to focus on. We had
16 just come off -- we were the top performing -- in the
17 Public Sector, my other job, the top performing sector
18 relative to customer Sat.
19      Q   Were you interviewed for this position that
20 was awarded to Ms. Digglemann?
21      A   No, I wasn't.
22      Q   Were you even told that the position was
23 available?
24      A   No, I wasn't.
25      Q   And what was Ms. Digglemann's age at the time?

4 (Pages 451 to 454)

Page 455

1 A She was 45 years old.
2 Q And it was Ms. Diggelmann who Ms. Collins-Smee
3 awarded that position, correct?
4 A That's correct.
5 Q With respect to the third promotion, please
6 describe the assignment awarded and to whom it was
7 awarded?
8 A I probably won't pronounce the name right, but
9 Reena Malangone. I'm not sure how to pronounce it,
10 but her name is there. And she became vice president
11 of SSO Americas, which is Server Systems Operations.
12 And that was the job that Diane Diggelmann had held
13 prior.
14 Q And what qualifications, if any, did you have
15 to at least be considered for this position?
16 A Well, again, it's a vice president position,
17 and I won't repeat myself, but I had been a vice
18 president as a 2 and a 2 plus. It's also server
19 management, which is managing people who manage a lot
20 of servers, a lot of hardware, and I had done that
21 previously. I mean Lucent was even larger than this
22 organization, that I had managed previously, and the
23 network area, it was as many servers in the network
24 area across IBM network. So I had experience in
25 managing people, the skills, and the services that

Page 456

1 were required in this particular area.
2 Q Were you interviewed for this position?
3 A No, I wasn't.
4 Q Were you even informed that it was available?
5 A No, I wasn't.
6 Q And what was Ms. Malangone's age at the time?
7 A I believe she was 45.
8 Q The fourth position was awarded to Tim Smith.
9 Can you describe Mr. Smith's new position?
10 A Oh, I was looking for -- in the first line on
11 it where it describes it, it said "He will report to
12 me --" meaning Joanne Collins-Smee "-- on a special
13 assignment." So that was the position.
14 Q And did that special assignment concern any
15 particular area?
16 A It was security, business controls, audits,
17 and those were the primary areas.
18 MR. FASMAN: I'm going to object, Your
19 Honor. There's no basis for that in this document.
20 Unless Mr. Carta wants to explain how he knew that, I
21 don't think --
22 THE COURT: Sustained.
23 BY MR. CARTA:
24 Q Do you have a basis for -- what basis, if any,
25 do you have for elaborating on the nature of that

Page 457

1 assignment?
2 A SARM stands for, if I can recall, security,
3 audits, reporting and management.
4 Q So --
5 A So it was security and it was audits, which is
6 business controls and --
7 MR. FASMAN: Your Honor, I still object.
8 I mean that's what he used to do, but the special
9 assignment is a special assignment.
10 THE COURT: Okay, the objection is
11 sustained. Let's move on.
12 BY MR. CARTA:
13 Q What business control experience did you have,
14 if any?
15 A Well, just the previous year we had gone
16 through, I think I mentioned yesterday, seven
17 contracts that were audited by PricewaterhouseCoopers
18 that came in and did a full corporate audit. We had
19 many internal audits, which was customary, and we had
20 just gone through the whole new procedure for doing
21 audits in IBM on one of my contracts in the Public
22 Sector position.
23 I had been part of audit teams to go and
24 actually conduct audits. I had audited the Boeing
25 contract, which was a very large contract that IBM

Page 458

1 had. So I performed not only as an auditor, but I'd
2 also had contracts that were audited.
3 Q In your career at IBM, did you ever once fail
4 an audit?
5 A No.
6 Q Were you interviewed for this position that
7 Ms. Collins-Smee awarded to Tim Smith?
8 A No.
9 Q Were you told by Ms. Collins-Smee that this
10 position was available?
11 A No.
12 Q Do you know what Tim Smith's rating was for
13 his performance in 2007?
14 A Yes, I did. He was a 2 performer.
15 Q And I direct your attention to Exhibit 155.
16 THE COURT: What was that again?
17 MR. CARTA: Exhibit 155. It's in the
18 other binder, Your Honor.
19 Your Honor, if I may approach, I have an
20 extra copy.
21 THE COURT: I have the binder here.
22 Thank you, anyway, though.
23 MR. CARTA: You're welcome.
24 BY MR. CARTA:
25 Q Would you review the highlighted portion of

Page 459

1  Mr. Smith's 2007 PBC, please?
2      A   Okay.  Again, this was conducted in 2008 for
3  2007 performance, and it's a PBC rating of a solid
4  contributor, which is the 2 rating.  In the narrative,
5  which is the optional area where his manager put in
6  comments, the comments were, "However, we do have our
7  controls posture --" I'm sorry -- "we do not have our
8  controls postures anywhere near where we need it to
9  be.  Our --" corporate -- "CHQ --" which stands for
10  corporate headquarters "-- audit score was 63 percent,
11  which is unacceptable performance for us.  Tim is
12  focused with the entire Americas group --" which was
13  the group -- the organization I was in "-- team on
14  those actions we need to take in 2008 to assure that
15  we return to a satisfactory business control
16  position."
17      Q   And in your experience in IBM, was that a
18  serious criticism when they address issues of failing
19  to maintain adequate business controls?
20      A   It's -- yes.  It's significant.  Corporate
21  audits are extremely important that you be able to
22  pass or demonstrate to the corporation that you have
23  the proper controls in place to manage the assets that
24  you've been asked by the customer to manage for them.
25      Q   And from whom did Mr. Smith receive his 2

Page 460

1  rating for his 2007 performance?
2      A   This was Joanne Collins-Smee, and it was five
3  days after I had my appraisal and Tony Grimaldi had
4  his performance.
5      Q   So the same rating, the same supervisor?
6      A   That's correct.
7      Q   How old was Mr. Smith?
8      A   He was 50 years old.
9      Q   The fifth position awarded was to James
10  Hallenbeck.  What was his new assignment?
11      A   He actually replaced Tim Smith in his
12  position.  Tim Smith was -- I'm sorry -- Jim
13  Hallenbeck took over vice president of security asset
14  and risk management, and that was the position that
15  Tim Smith had held prior.
16      Q   And what qualifications, if any, did you have
17  to at least be considered for this position?
18      A   I -- again, I had been the vice president, so
19  I had experience as vice president, and I, again, had
20  an excellent record for security and asset management.
21      Q   Did you have experience running peer audits?
22      A   Oh, yes.  We had -- we had many peer audits,
23  and actually peer audits -- which are friendly audits,
24  it's not the corporate headquarters, Pricewaterhouse
25  audit, which takes a whole different order of

Page 461

1  magnitude of importance -- but these were peer audits
2  where you -- it's considered a friendly audit.  The
3  IBM team will come in and take a look at all your
4  controls in place, and then -- and it's really to help
5  you calibrate where you are as far as being in that
6  position, and also identify areas you need to improve
7  in that area.  So we had those across our contracts,
8  and we also -- I had participated on some of those as
9  well, on other sector contracts.
10      Q   I don't know if I asked you this.  Are these
11  positions that we've been talking about, are they all
12  with -- what band are they within?
13      A   I'd have to look at -- they're -- I'm sorry,
14  they're executive positions.  They're Band Ds, which
15  were the director level, or Band Cs, which are the
16  vice presidents, and I think the ones we have just
17  gone through, without looking at the list, were all
18  Band Cs, which was the vice president level.
19      Q   Which was a level that you had been on at that
20  point in time?
21      A   Correct.
22      Q   Okay.  So were you interviewed for the
23  position that Ms. Collins-Smee filled with Mr.
24  Hallenbeck?
25      A   No, I wasn't.

Page 462

1      Q   Were you told that the position was available?
2      A   No.
3      Q   Do you know what Mr. Hallenbeck's PBC rating
4  was?
5      A   His PBC rating was 2 for that year.
6      Q   And at that time what was Mr. Hallenbeck's
7  age?
8      A   I believe he was 51.
9      Q   The sixth position --
10          MR. FASMAN:  Your Honor, unless there's a
11  PBC rating for Mr. Hallenbeck in the record, I don't
12  think it's appropriate to testify to that.  I've never
13  seen one.
14          MR. CARTA:  I have a document, Your
15  Honor.
16          THE COURT:  Mr. Carta, it's been asked
17  and answered.  Keep Mr. Fasman's objection in mind so
18  that as long as you're continuing along these you'll
19  lay the proper foundation.  Okay?
20          MR. CARTA:  Yes.
21          THE COURT:  All right.  Let's continue.
22  BY MR. CARTA:
23      Q   The sixth position, Sue Sinclair, what was her
24  new assignment?
25      A   Her new assignment was director of SARM global

Page 463

1    planning, which again, SARM stands for Security Asset
2    Risk Management, which is audits and controls.
3        Q    What qualifications, if any, did you have to
4    be considered for this position?
5        A    Again, that was asset management, risk
6    management, audits, business controls, and I had
7    demonstrated that through the audits and the results
8    in the sector I had not only as vice president of the
9    sector across those 30 contracts, but in previous
10   assignments, like on Lucent, and so forth.
11       Q    And do you know what band this was in?
12       A    This would have -- director level, so this
13   would have been a Band D.
14       Q    So that would have been a step down?
15       A    Right.
16       Q    And were you interviewed for this position?
17       A    No, I wasn't.
18       Q    Were you told by Ms. Collins-Smee that the
19   position was available?
20       A    No, I wasn't.
21       Q    And what was Sue Sinclair -- Ms. Sinclair's
22   age at the time?
23       A    I believe she was 43.  She was in her forties.
24       I'm sorry, I'm thinking of Pat Ninnie-Allen.
25   Sue Sinclair was 51, 52, in that range.

Page 465

1    I had -- one of my strengths.
2        And I had demonstrated it.  It's not just me
3    assessing it.  I demonstrated it in 30 contracts on
4    Public Sector.  The Lucent Technologies contract, the
5    multiple contracts that I had earlier in my career
6    when I was a director, United Healthcare, all of those
7    had audits.  Not only audits internal, but also they
8    had corporate audits that I had passed all of them.
9        Q    And what band was this in, if you recall?
10       A    This was a director level, so this would a
11   Band D.
12       Q    Were you interviewed by Ms. Collins-Smee for
13   this position?
14       A    No, I wasn't.
15       Q    Did Ms. Collins-Smee let you know that that
16   position was even available?
17       A    No, she didn't.
18       Q    And what was Patricia Ninnie-Allen's age at
19   that time?
20       A    I believe she was 43, early forties.
21       Q    Could she have been 49?
22       A    49, okay.  She was in her forties.  Yes,
23   49 is her age.
24       Q    Have you calculated the average age of the
25   seven executives who were newly promoted by Ms.

Page 464

1        Q    53 possibly?
2        A    That's it, 53, yes, early fifties.
3        Q    I want the record to be correct.
4        A    53 years old.
5            MR. CARTA:  I think we can stipulate she
6    was 53.  Thank you.
7    BY MR. CARTA:
8        Q    Finally, the seventh new position was awarded
9    to Patricia Ninnie-Allen.  What position was that, if
10   you know?
11       A    She actually replaced Sue Sinclair in her
12   position as director of risk management for ITD
13   delivery Americas.
14       Q    Can you describe that position, please?
15       A    These are -- the last couple positions have
16   been in the whole area of asset management controls,
17   and that's how you control a customer's equipment
18   that's turned over to you, and it's also audit
19   positions, so that they're coming in, you're managing
20   the financials properly, is your data correct that
21   you're reporting to the business, so forth.
22       Q    What qualifications, if any, did you have to
23   be considered for this job?
24       A    Well, again, it's all in the security business
25   controls, which, as I've said before, was an area that

Page 466

1    Collins-Smee in this one -- as reflected in this one
2    e-mail, one memo?
3        A    Right.  Across all these positions the average
4    was 49.
5        Q    So Ms. Collins-Smee created and filled how
6    many new positions?
7        A    I have to -- can I see the second half of
8    this, I'll count them up?  But I think it's like five
9    or seven positions that were in this report she had
10   filled.
11       Q    And at that time -- and their average age was?
12       A    49.
13       Q    And what were you doing at the time?
14       A    I was without a job, and looking for a job.
15       Q    And you were not informed of any of those
16   positions?
17           MR. FASMAN:  Your Honor, I'm going to
18   object.  This has already been in the record.
19           THE COURT:  Sustained.
20   BY MR. CARTA:
21       Q    Okay.  Let's go on to your continued efforts
22   to find a position.
23           What additional efforts, if any, do you recall
24   making in locating a position within IBM?
25       A    I continued to seek out any lead I could find

Page 467

1   or any individual that I could reach that I knew
2   that -- to find openings. So I continued to make
3   calls, I continued to search through e-mails, and I
4   believe at this point I -- at this late point I may
5   have spoken to Jack Overacre.
6       Q   And what was Mr. Overacre's position at the
7   time?
8       A   He had a role of -- it was his team that came
9   in and did the Red Team Review that we had talked
10  about on the first day. So they were a very
11  specialized group, but they were looking at how DPEs
12  were managing contracts, and they were looking for
13  providing guidance, methodology, training, and so
14  forth, that DPEs -- or how we manage commercial
15  contracts.
16      Q   Take a look at Exhibit 88, please, and
17  identify that.
18      A   Okay. This, again, is an IBM internal e-mail.
19  It was sent from me to Jack Overacre.
20      Q   And when was it sent?
21      A   What I was sending is basically my resumé, the
22  background, and I also gave him some additional
23  information on other work experience that I had had.
24      Q   And when was this?
25      A   I'm sorry. This was on May 13th, 2008.

Page 468

1       Q   And did you meet with him soon thereafter?
2       A   Yes.
3       Q   And do you know what efforts Mr. Overacre made
4   on your behalf to locate a position?
5       A   Well, Jack I had known previously, and he did
6   have a position that was open, but he also -- he had a
7   position that was open, and that's -- we got into a
8   discussion about that open position.
9       Q   We've referred to a number of e-mails that
10  identify specific contacts that you made. Are these
11  reflective of all of the efforts that you made during
12  that time period?
13      A   No.
14      Q   What other -- what else did you do?
15      Q   In my job search?
16      Q   Yes.
17      A   I continued to make calls, continued to -- I
18  mean I was searching everywhere for any lead on any
19  job at all.
20      Q   During that time period did you go on
21  vacation?
22      A   In this time frame? I don't think so.
23      Q   Did you show up to work -- for work every day?
24      A   Yes, I did.
25      Q   And just tell the jurors what you did on a

Page 469

1   daily basis so they have an understanding, please.
2       A   Well, at this point -- shortly after this -- I
3   mean it was difficult. It was difficult emotionally,
4   physically, to be in this position, because I'm seeing
5   positions being filled, after a commitment from my
6   manager that she would assist me. You know, it's
7   just -- it was difficult. I don't know how to explain
8   it. If anyone's been in a position like this you can
9   understand the emotions you go through. It's a very
10  trying time.
11      Q   What were you doing on a day-to-day basis?
12      A   I continued to look for jobs. I was trying to
13  turn over every possible rock that I could think of to
14  try to find something.
15      Q   Go back for a second. Had there been any
16  changes in management over the last several years that
17  impacted on your ability to locate a job?
18      A   Yeah, there was. There were two significant
19  changes that probably hurt me the most in my job
20  search, and that was people who were familiar with me,
21  that knew me and had recently -- had seen the product
22  of my work, and that was my former boss, Kelton Jones,
23  had retired, he was no longer available as a source to
24  go seek out, and to help me find something, and Tony
25  Macina, who I had worked for back when I was doing the

Page 470

1   Lucent contract was someone else I could have sought
2   out, and he was unavailable because he -- I believe at
3   that point he had retired, also.
4           So the two key people that -- and they were
5   important because they had a broad knowledge of the
6   IBM business in all areas that they had worked on.
7   Not only domestically in the U.S., but also globally.
8           So Tony was very -- held the job that was the
9   global job that Mr. Zapfel came in and took over. So
10  they had a lot of contacts, basically, and going to
11  them, I'm sure they would have assisted me and found
12  something.
13      Q   So the retirement of both Mr. Jones and Mr.
14  Macina occurred within how early, what's the time
15  period between when they retired and you were looking
16  for this position, or a position?
17      A   Well, Kelton retired in the prior year in -- I
18  think it was March. Around the middle of March is
19  when he left the business, in 2007. Tony I think was
20  shortly after that. Tony was longer than that. Tony
21  Macina, I'm sorry. And then he left, and I believe
22  that was also in 2007.
23      Q   So within the last year two important people
24  in your networking group had left?
25      A   Yes.

Page 471

1    Q    And how did that impact, if at all, on your
2    ability to find a job?
3    A    Well, as I said, it's significant.  They had
4    been IBMers, very successful IBMers, very
5    well-respected, so a simple call from either Tony or
6    Kelton to an area that was open would have assisted.
7              MR. FASMAN:  I'm going to object, Your
8    Honor.  Also that's pure speculation.
9              THE COURT:  Sustained.  The jury should
10   disregard that.  And every instance where I sustained
11   an objection, the jury should disregard the answer.
12   There won't be a lot of them because Mr. Carta has
13   re-asked the question in an unobjectionable way and
14   has gotten the same answer, so there's been no
15   problem, but here we'll disregard the answer.
16             You want to lay some more foundation?
17             MR. CARTA:  That's fine, Your Honor.  I
18   don't claim it.  I'm going to move on.  Thank you.
19   BY MR. CARTA:
20   Q    While relegated to the bench were you doing
21   anything in addition to looking for a position?
22   A    There were other -- I was getting calls from
23   PEs, DPEs that were running contracts and where they
24   had -- I had prior contact with them where they were
25   coming to me about questions on how I -- how they

Page 472

1    might do something.  Like how do you -- how do you run
2    a virtualization, for example, business control, how
3    do you -- what do we have to worry about in asset
4    management, things like that.  So I would get calls,
5    you know, unsolicited calls from IBMers looking for
6    some assistance.
7    Q    And what efforts, if any, did you try to make
8    to get involved in any new projects, any new up and
9    coming contracts?
10   A    Well, I had had that conversation with Joanne
11   Collins-Smee about at least temporary work, if not
12   permanent work.
13   Q    And you said you had that conversation.  What
14   conversation is that exactly?
15   A    Well, I had -- as far as temporary work, I had
16   that conversation back in March of this 2008 year.
17   Q    Did you explore any options outside of IBM
18   during that time period?
19   A    Well, I didn't pursue any outside assignments,
20   but -- outside opportunities, but I did talk -- one
21   did come to me about an outside assignment.
22   Q    And what happened with that position?
23   A    The actual call went to Andrea Roma, who I
24   knew.  She was a vice president at IBM.  And because
25   the position was in healthcare and she knew my

Page 473

1    experience was in healthcare, she sent the -- it was a
2    professional recruiter, which is not uncommon in
3    IBM -- she sent the professional recruiter to me to
4    talk about the position.
5    Q    And what happened?
6    A    I followed up to call them at that point.
7    Q    And ultimately what came of it, if anything?
8    A    It was -- first, my expectation was -- the way
9    I pursued it, my expectation was Joanne would find me
10   a job and I'd stay within IBM.  The position that he
11   was discussing with me I think was -- it was a
12   pharmaceutical -- I believe it was Pfizer,
13   pharmaceuticals.  I'm not sure if that's a hundred
14   percent correct.  But it would be a competing position
15   against IBM, so -- and there are agreements at IBM
16   that if you leave, you would be in a non-compete
17   position.  And so I thanked them for the interest and
18   whatnot, but I didn't accept the position.
19   Q    Do you recall whether you did anything else to
20   explore whether there might be other executive
21   positions open outside of IBM?
22   A    Yeah.  Later on, it was getting near the end
23   of my tour with IBM, I did.  I registered with a
24   company, probably -- I think it was NetShare, is the
25   name of the company, and I think I did that before I

Page 474

1    left IBM.
2    Q    What happened on May 20th, 2008?
3    A    Joanne asked me to meet with her.  Joanne
4    Collins-Smee, I'm sorry.
5    Q    And did you meet with her?
6    A    Yes, I did.
7    Q    And was this a meeting with just the two of
8    you alone in her office?
9    A    Yes, it was.
10   Q    Do you have a specific recollection of that
11   meeting?
12   A    Yes, I do.
13   Q    And what do you recall?
14   A    Basically told me that -- she told me that
15   they were putting together a -- what's it called -- a
16   separation package for me, and that I had 30 days to
17   find a job, or I would be dismissed from the business,
18   fired from the business.
19   Q    In that meeting was your performance discussed
20   in any way?
21   A    No, it wasn't.
22   Q    Take a look at Exhibit 92, please.  Can you
23   identify this document?
24   A    Yes.  It's an e-mail from Keith Holmes, who
25   was Joanne's HR -- we called them partner, but it was

Page 475

1  really her HR advisor -- and it was sent to Joanne
2  Collins-Smee, my manager at the time.
3          THE COURT:  It's 84, Mr. Carta?
4          MR. CARTA:  I'm sorry, 92.
5          THE COURT:  92, thank you.
6  BY MR. CARTA:
7      Q   And what is the document?  What does it
8  purport to do?
9      A   As it describes, it's talking points for when
10 you're going to separate an executive, I guess, from
11 the corporation.  So he was giving her things that
12 she -- he would -- he suggested that she would use in
13 her discussion with me when she met with me on June
14 1st -- I think it was June 1st -- or June 2nd.
15     Q   And in this talking points proposed by Mr.
16 Walker, is there any reference to your performance?
17     A   No.  I was still a 2 performer, solid
18 contributor.
19     Q   In the meeting what, if anything, was
20 discussed about your preparing a professional summary
21 of your professional experience?
22     A   In the May 20th meeting with Joanne, again,
23 when she told me that they were preparing this
24 package, that we see here, we got into a discussion
25 about -- well, positions.  She said she would help me

Page 476

1  with positions.  There had been many positions filled,
2  and all I was asking for at that point was just let me
3  compete against them, you know, let me be where -- let
4  me compete on my own merits and see whether I get it
5  or not.  Not that she had to mandate that I be put in
6  those positions.  And she said at that point, she says
7  okay, send me your resumé, and your work experience.
8      Q   And that was the first time she had requested
9  that kind of documentation from you?
10     A   Yes.  That was -- I was a couple weeks away
11 from beginning a separation package and she asked for
12 that information.
13     Q   And did you provide such a summary?
14     A   Yes, I did, immediately.  I went back to my
15 office and I sent her resumés, my resumé that I'd had.
16     Q   And direct you to look at Exhibit 89.  What is
17 that?
18     A   Well, this is, again, internal e-mail from
19 myself to Joanne.  It's -- I sent it on May 20th,
20 which is the same day as my meeting with her, and I
21 included -- she asked for my resumé, and I immediately
22 went back to my office, and as fast as I could I typed
23 this up and sent this to her.  And I -- attached to
24 this would be the resumé, and this is just some other
25 highlights that I put in there to assist her when she

Page 477

1  made her call, whether -- you know, talking -- my
2  talking points for her.
3      Q   Okay.  And looking at Exhibit 90, what's that?
4      A   The part that's highlighted on the bottom --
5  oh, okay.  She -- the section that's highlighted --
6  this, again, is an internal IBM e-mail.  It's Joanne
7  again, my manager, sending this e-mail to Mark
8  Hennessey, who was an IBMer, and she just strung along
9  my -- the information that I sent to her, she attached
10 it and she forwarded it on to Mark Hennessey and with
11 the comment that -- and it was an e-mail, it wasn't
12 even a phone call.  "Jim Castelluccio, one of our team
13 members, is available for a new position, and attached
14 below is a highlight of his accomplishments as well as
15 his resumé.  I was wondering if you had an executive
16 Band D or C position in the office that may be a match
17 for Jim.  Thank you for your consideration."
18     Q   And take a look at Exhibit 91.  Can you
19 identify that, please?
20     A   Again, it's an internal e-mail.  And she
21 basically did the same thing.  This is from Joanne
22 Collins-Smee to Elizabeth Smith, another IBMer, and
23 she attaches my e-mail that -- my resumé, my comments,
24 and she decided that an e-mail would serve the
25 purpose, and she sent this to Liz Smith, Elizabeth

Page 478

1  Smith.  "How are you?  I hope all is well.  Jim
2  Castelluccio is available for a new position, and
3  attached below is a highlight of his accomplishments
4  as well as his resumé.  I was wondering if you had any
5  executive openings in your area, Band D or C, that may
6  be a match for Jim.  Thank you very much for your
7  consideration."
8          THE COURT:  Mr. Carta, ladies and
9  gentlemen, I note that it's almost 11:15.  I have an
10 important telephone call that I have to make, so I
11 propose we take a break now until 11:30.  Okay?
12         MR. CARTA:  Very well, your Honor.
13     (Recess taken from 11:13 a.m. to 11:29 a.m.)
14         THE COURT:  Okay.  Are you ready to
15 resume your direct examination, Mr. Carta?
16         MR. CARTA:  Yes, I am.
17 BY MR. CARTA:
18     Q   Just take a half step back, Mr. Castelluccio.
19 When Ms. Collins-Smee met with you and informed you
20 that you were being terminated, and asked for the
21 summary of your experience, what was your reaction to
22 that?
23     A   Well, my reaction was, if you really need this
24 information to find me a job, then I would have
25 expected her to have asked for it back in January when

Page 479

1    I was put on the bench and she said she would assist
2    me in finding a job, so she's telling me I'm being
3    separated and now she asks for the information.
4        Q    Based upon the documents produced in evidence,
5    are you aware of any other e-mails or letters other
6    than these two that were just reviewed in which she
7    attempted to seek a position on your behalf?
8        MR. FASMAN:  Your Honor, unless this
9    witness is going to testify as an expert on the
10   production, I don't see where there's a foundation for
11   that.
12       THE COURT:  Well, Mr. Carta, can you --
13       MR. CARTA:  I believe he's -- I can lay a
14   foundation.
15   BY MR. CARTA:
16       Q    Mr. Castelluccio, have you personally read
17   every single document produced in discovery in this
18   case?
19       A    Yes, I did.
20       Q    Maybe several times?
21       A    At least several times.
22       Q    And in that examination of all of the
23   discovery documents, did you see any other document in
24   which Ms. Collins-Smee wrote a letter or an e-mail to
25   anyone on your behalf?

Page 480

1        A    There was none.  This is it.
2        Q    And when were these two e-mails sent?
3        A    I met with her on the 20th when she asked for
4    it, when she told me I was being separated, and these
5    were sent on the 21st, I believe.  I'm looking for a
6    date on the e-mail.  But it was -- yeah, this one she
7    sent -- this one she sent on the 20th, and the prior
8    one she sent the following day.
9        Q    After she'd already told you you were being
10   terminated?
11       A    These are all after she told me.
12       Q    So on June 2nd were you presented -- and
13   please just answer my questions -- were you presented
14   with a severance proposal?
15       A    Yes.
16       Q    By whom?
17       A    Keith Holmes.
18       Q    And did you discuss the contents of that
19   proposal with Mr. Holmes?
20       A    Not at that point.
21       Q    Without going into the contents of the
22   proposal, did you discuss it with him at some point in
23   time?
24       A    Yes, I did.
25       Q    And what do you recall at the second meeting?

Page 481

1        A    I had read through it, and I highlighted some
2    areas that I had questions with, and I had shown it to
3    him.
4        Q    And at either meeting did Mr. Holmes give you
5    any reason for your termination?
6        A    No.  No.
7        Q    Ultimately what did you determine to do with
8    respect to the severance package that you had been
9    offered?
10       A    There was an area that I had to -- I'm sorry.
11   I read it.
12       Q    Okay.  And what -- did it include a general
13   release?
14       A    Yes, it did.
15       Q    And what did you decide to do?
16       A    I decided not to sign the general release.
17       Q    I want to go on to what additional efforts you
18   made to locate a job while you still remained on the
19   bench.  On the same day that you met with Mr. Holmes
20   did you also contact Ron Atkins?
21       A    Yes, I did.
22       Q    By what means, if you recall?
23       A    I exchanged e-mails with him.  At one point I
24   did speak with him, also.
25       Q    Can you identify Exhibit 93, please.

Page 482

1        A    Again, an internal IBM e-mail sent from me to
2    Ron Atkins on June 10th, 2008.
3        Q    And what was Mr. Atkins' position at that
4    time?
5        A    Ron was a vice president, and he was
6    responsible for -- I believe it was the transition
7    teams or -- he had, like, a staff position that was
8    giving guidance for the delivery side, the DOT
9    players.
10       Q    So you're still looking at job -- looking for
11   a job at IBM?
12       A    Yeah.  The clock was ticking, but I was --
13   yeah, I was doing everything I could to find
14   something.  But there were limited resources.  I
15   didn't have the list of executives that were --
16   positions that were open.  That was unavailable to me
17   as restricted.
18       Q    And to whom did Mr. Atkins report?
19       A    Joanne Collins-Smee.
20       Q    And what was the result of your efforts to
21   explore other possible opportunities with Mr. Atkins?
22       A    He -- he -- he told me that -- I spoke to him
23   and he told me --
24       Q    I don't think you can say what he told you,
25   but you can say what you understood based upon your

Page 483

1    conversation.
2       A   That he couldn't fill the positions.
3       Q   At that point did you attempt to contact and
4    meet with Mr. Walker of HR again?
5       A   Yes, I did.
6       Q   Showing you Exhibit 94, can you identify that
7    document, please?
8       A   Again, internal IBM e-mail.  I authored it and
9    it was sent to Garrett Walker, who was the HR
10   executive I had contacted earlier in the year, and
11   it's dated June 13th, 2008.
12      Q   And please review your e-mail with the jury,
13   reviewing the first paragraph initially?
14      A   It says, "In our discussion earlier this year
15   I raised my concern with my manager's actions to
16   hasten my retirement.  I do appreciate the support
17   that you gave, and I did recognize that the issue was
18   with my manager."
19      Q   What do you mean by that, the issue was with
20   your manager?
21      A   Well, you have to understand, when I wrote
22   this letter, this -- this --
23      Q   Catch your breath.  It's fine.
24          Would you like a glass of water?
25      A   I have it.  I'm afraid I'll choke on it.

Page 484

1          All right.  I apologize.  This was a very
2    difficult letter to write, and what I meant by that
3    was, the treatment that I had received from Joanne in
4    the way she managed me, particularly during this
5    period, you know, from when she took me out of the
6    vice president's role to this whole six month period
7    where she said she would assist me in finding me a
8    job, and that's what I'm trying to say in this opening
9    paragraph.
10      Q   So the sentence or the phrase that "I
11   recognize the issue is with my management," my
12   management refers to whom?
13      A   My management, it's Joanne Collins-Smee.
14      Q   Can you continue on reading that, please?
15      A   "However, I'm certain, as I expressed to you,
16   that the job placement was executed in a deliberate
17   way that began at the end of the process.  I raised my
18   concerns with you that my manager's goal was to
19   eliminate my position based on my age."
20      Q   And you say, past tense, "I raised my concern
21   to you."  What's that a reference to?
22      A   My first meeting with Mr. Walker.
23      Q   Okay.  And the next paragraph, please?
24      A   "In retrospect, reading through my notes, I
25   see that I was systematically being marginalized by my

Page 485

1    manager for the purpose of terminating my employment.
2    I was excluded from information pertaining to my work.
3    I was --" again, poor words, but "-- superficial
4    assistance in job placement," that she had committed
5    she would assist, the "lower performance evaluation,"
6    she wasn't successful in doing that, but I was a 2
7    performer, "repeated reference to my age and
8    retirement."
9       Q   And did you meet with Mr. Walker thereafter?
10      A   Yes, I did.
11      Q   And in your reading did you review these
12   various points with him?
13      A   Yeah.  I was a little more coherent than I was
14   in this e-mail, but yes, I did go through it, and I
15   took him through, again, repeating what happened the
16   previous year, and what was even more damaging what
17   had happened since January of 2008.
18          MR. CARTA:  Your Honor, we're going to
19   get into an area that we've discussed before, and I
20   would like just a two minute sidebar to see if we can
21   make sure we're all on the same page.
22          THE COURT:  Okay.
23          (Conference held at sidebar)
24          MR. CARTA:  My next area is the open door
25   discussion, and I want to be sure that the questions I

Page 486

1    was going to ask are not going to open the door to
2    anything beyond what you already indicated you were
3    going to permit.
4          The question that I'm concerned about is
5    if I ask my client whether he met with Mr. Mandel,
6    what he said to Mr. Mandel, what Mr. Mandel indicated
7    specifically that Mr. Mandel -- he asked Mr. Mandel,
8    it would circle back with him to -- with anything that
9    he found out so he'd have an opportunity to respond to
10   that, and the fact that Mr. Mandel never did that, and
11   I'm concerned that if I ask those questions I might be
12   opening the door beyond what you said was permissible,
13   and I certainly don't want to do that.
14          MR. FASMAN:  Judge, if we're going to
15   talk about the open door -- he wants to say, I'm going
16   to question the whole process of the open door, but I
17   can't talk about the open door?  How it was connected?
18   You opened that door.  You can't prevent me from
19   talking about it.  You put in this complaint,
20   stipulated, it wasn't investigated.  We stipulated it
21   was Mandel that did it, and the Judge has basically
22   said, I'm not going to let you put in the report or
23   the notes, but that's all precluded.
24          MR. CARTA:  If we're going to get into
25   the --

Page 487

1    THE COURT:  You should be very careful in
2  your question.
3    MR. CARTA:  Exactly why I'm trying to
4  make sure we're on the same page.
5    THE COURT:  I know, but assuming --
6    MR. CARTA:  My concern, Your Honor, is if
7  IBM is going to be able to put in the results of the
8  investigation.
9    THE COURT:  Here's the way you're going
10 to handle it.  You're going to say IBM takes things
11 seriously, the regulations provide for the
12 investigation of employee complaints like that, his
13 complaint was reviewed by Mr. Mandel.  If you were on
14 the stand, I would ask Mr. Mandel whether he conducted
15 an investigation into the allegations of this
16 complaint, and if so, what was the purpose of your
17 investigation.  Well, to find out if the complaint was
18 sustainable.  And why did you do that?  You do that
19 because there's laws that are important and we have to
20 obey the laws and we do.  And what was involved?
21 Well, it involved interviewing witnesses, and
22 interviewing Mr. Castelluccio himself.  And then talk
23 about what -- and the purpose of this investigation
24 was to try to resolve this matter internally, if you
25 could do it.  Is that right?  Yes, it is, we hoped to

Page 488

1  be able to reach a resolution of the dispute.  I mean
2  that's why companies have these kinds of committees.
3  Did you make a good faith effort during this
4  investigation, were you trying to do -- was your
5  objective to try to resolve the dispute with Mr.
6  Castelluccio?  I suspect he'll say yes.  You will say,
7  were you successful in resolving the dispute
8  internally, and he'll say what was done in the
9  investigation, the effort you made.  What's wrong with
10 that?
11    MR. FASMAN:  But I don't want him -- so
12 Your Honor, if we're going to do that, I'm happy with
13 that.  I don't want to have Mr. Carta going into here,
14 while Mr. Mandel never got back to you and you had
15 questioned --
16    MR. CARTA:  I agree with that.
17    MR. FASMAN:  All that stuff.
18    MR. CARTA:  That's why I'm asking this.
19    MR. FASMAN:  If they go there, I have to
20 go into the details of the investigation.  I don't
21 have to do that, as Your Honor said repeatedly.  I'm
22 fine with that.
23    THE COURT:  And --
24    MR. CARTA:  That's why I'm asking.  I'm
25 not going to go into that.  I'm not asking that.  I

Page 489

1  heard what you said.
2    THE COURT:  If you ask about Mandel, and
3  this internal investigative process, the ice is
4  getting thinner, and at some point Mr. Fasman says
5  Your Honor, my position is by asking that question,
6  Mr. Carta has opened the door into areas that were
7  previously discussed, and I so want to advise the
8  Court that I'm going to go into those areas myself.
9  So don't open the door, Mark.
10    MR. CARTA:  That's why I'm asking the
11 question.
12    MR. FASMAN:  Judge, I have one other
13 question.  You brought this up, that there was
14 complaint, and I presume you're going to say there was
15 an investigation.  There was one letter from Mandel to
16 the Plaintiff that said the result of my investigation
17 is that I found you were treated fairly and best
18 wishes for the future.  I think I'm entitled to
19 introduce that.
20    MR. CARTA:  No.
21    THE COURT:  Why?
22    MR. CARTA:  Because I think at the
23 conclusion he says "I found," and you know that that's
24 not right.
25    MR. FASMAN:  No, Judge.  How can I not?

Page 490

1    MR. CARTA:  The conclusion, Judge, this
2  is what we've been fighting about the whole time, it's
3  all about the conclusion.  If they're allowed to get
4  in that there was an investigation and that they
5  concluded there was nothing wrong, that's completely
6  against what the Court ruled.
7    THE COURT:  I read Mr. Mandel's letter,
8  and it says "management treated you fairly."
9    MR. FASMAN:  Yes.
10    THE COURT:  Yes.  That's his opinion, and
11 I'm not going to admit that.
12    MR. FASMAN:  He said it to Mr.
13 Castelluccio.  How can he file a complaint, say it's
14 been investigated, and also be precluded from saying
15 did you hear back from Mr. Mandel, did he get back to
16 you at the end of the investigation?
17    MR. CARTA:  We just solved that problem.
18 I'm not going to ask about that.  He did an
19 investigation and he wasn't able to resolve it
20 internally.  That's the perfect solution.
21    THE COURT:  Mr. Fasman, you can ask that
22 question, and at the result -- at the end of this
23 investigation did you get a letter advising you of the
24 result, and he could say yeah, but that letter -- I
25 mean the letter says this was our conclusion, you were

Page 491

1    treated fairly.
2         MR. CARTA: He can't say that. That's
3    what your ruling is, right?
4         THE COURT: Yeah.
5         MR. FASMAN: Your Honor, I'm going to
6    offer it, then.
7         THE COURT: You can offer it on the
8    record, and --
9         MR. FASMAN: Okay. All right. Thanks,
10   Your Honor.
11        (Conference concluded at sidebar)
12        MR. CARTA: If I may have just a moment,
13   Your Honor.
14   BY MR. CARTA:
15        Q   My apologies.
16        Mr. Castelluccio, you'd indicated that you did
17   ultimately meet with Mr. Walker, is that correct?
18        A   That's correct.
19        Q   And at a later point in time you were indeed
20   terminated, is that right?
21        A   Yes. June 30th was my last day at IBM.
22        Q   At some point in time did you initiate a state
23   administrative lawsuit in the state of New York?
24        A   Yes, I did.
25        Q   And when was that, approximately?

Page 492

1        A   I believe it was November of -- losing track
2    of years here -- November of 2008, the same year I was
3    dismissed from IBM.
4        Q   And thereafter did you also follow up by
5    filing a -- I'm sorry -- this federal lawsuit?
6        A   Right. I'm sorry. I may have misunderstood
7    the question before that. The filing of --
8        Q   The lawsuit in the state of New York is what
9    we were talking about.
10       A   And that's the EEOC?
11       Q   Yes.
12       A   New York state.
13       Q   The New York State and the EEOC, yes, Division
14   of Human Rights.
15       A   Right. I think that was filed in November of
16   2008.
17       Q   That's correct, that's correct.
18       And in the New York action that you filed,
19   what reason did IBM give to justify your termination?
20       A   Performance.
21       Q   And if you would take a moment and look at
22   Exhibit 99. What is that?
23       A   I'm not sure Ms. King's position, but she was
24   part of the New York State division of human
25   resources. She's the one I had met with, filed the

Page 493

1    complaint, and this is the response from IBM against
2    the complaint.
3        Q   And would you read the sentence in the second
4    paragraph?
5        A   Yes. It says, "As set forth below, Mr.
6    Castelluccio was separated from IBM for legitimate
7    non-discriminatory reasons. His poor performance in
8    two vice president roles in ITD organization -- in the
9    ITD organization."
10       Q   And I'd like to have you look at Exhibit 204.
11       THE COURT: Mr. Carta, would you just
12   hold on for a second so I can finish reading this?
13       MR. CARTA: Yes, absolutely.
14       THE COURT: Thank you.
15       MR. CARTA: Your Honor, Exhibit 204 is a
16   pleading filed by IBM in this case, and in that
17   pleading it states "Plaintiff," referring to Mr.
18   Castelluccio, "was separated from IBM for legitimate
19   non-discriminatory business reasons - his poor
20   performance in two assignments in the integrated
21   technology division."
22       MR. FASMAN: I object to counsel reading
23   that unless he reads the rest of it. If Mr. Carta
24   wants to characterize our position by taking snippets
25   from it, that's wrong. Let him read the rest of it,

Page 494

1    because the rest of it makes it very clear, Your
2    Honor.
3        THE COURT: Okay.
4        MR. CARTA: Your Honor, I think counsel
5    can --
6        THE COURT: You have a right, Mr. Carta,
7    to read from -- this document is in evidence?
8        MR. CARTA: Yes.
9        THE COURT: You can read some of it, you
10   can read all of it, you can read none of it, but you
11   realize that if you don't read the whole document,
12   when Mr. Fasman gets up, he will read the whole
13   document, or he will read just those portions of the
14   document that are favorable to IBM. So it's a
15   double-edged sword.
16       Mr. Fasman, I'm going to allow you
17   gentlemen to try your case, you're good trial lawyers,
18   but what's good for the goose is good for the gander.
19   If you could read it, then Mr. Fasman can read it.
20       MR. CARTA: Fair enough.
21       THE COURT: The jury can read it.
22       MR. CARTA: The jury can read it,
23   exactly.
24       MR. FASMAN: All right, fine.
25   BY MR. CARTA:

14 (Pages 491 to 494)

Page 495

1    Q   At the time you were dismissed by Ms.
2 Collins-Smee, what reason did she give you for your
3 termination?
4    A   That I didn't have a job. That I couldn't
5 find a job.
6    Q   I'd like to direct your attention to 259.
7 It's one of the demonstrative exhibits.
8        So Mr. Castelluccio, in May when you were
9 dismissed you were told the reason you were being
10 dismissed was because of failure to find a job, is
11 that right?
12    A   That's correct.
13    Q   And then on April 15th, this document we've
14 just read, when you brought the proceeding in the
15 state of New York, they said it was for poor
16 performance, is that right?
17    A   Correct.
18    Q   And on October 15th, earlier in this lawsuit,
19 in the same lawsuit, the lawyers indicated again that
20 the reason was poor performance?
21    A   Correct.
22        MR. FASMAN: Your Honor, isn't this
23 argument? The chart shows what it shows. The jury
24 can read it.
25        THE COURT: You want to respond to that?

Page 496

1        MR. CARTA: I'm attempting to summarize
2 the document, and I guess it speaks for itself so I'll
3 move on.
4        THE COURT: Well, wait a minute. You're
5 going over 259 now, right?
6        MR. CARTA: Yes.
7        THE COURT: Okay. And 259, I gather, is
8 your recapitulation of the reasons which over the
9 period of time --
10        MR. CARTA: Correct.
11        THE COURT: -- you're articulating to
12 this witness as being the reasons why he was being let
13 go.
14        MR. CARTA: The reasons he was told,
15 that's right.
16        THE COURT: Objection's overruled. You
17 can go through it.
18        MR. CARTA: Okay.
19 BY MR. CARTA:
20    Q   Currently, Mr. Castelluccio, what is your
21 understanding of IBM's position now?
22    A   Failure to find a job.
23    Q   I'd like to move on to the final area of your
24 examination, which is your attempt to find employment
25 after you left IBM. At what point in time did you

Page 497

1 commence your -- call it your job quest?
2    A   As soon as I -- actually in the last month at
3 IBM I had initially registered with a resource
4 database. It's a professional service where they have
5 resumés and openings for positions. So that was
6 NetShare I registered in June, and then I continued
7 working with them in July, and I also at some point
8 registered with another similar service called
9 ExecuNet. But it was every day when I --
10    Q   Let's go through it one step at a time.
11    A   Sure.
12    Q   So what are the services that these
13 organizations, ExecuNet and NetShare, provide?
14    A   They were very similar, but their claim was,
15 it -- they claimed -- not claimed -- what they offered
16 was, they had exclusive listings for corporations for
17 executive positions. Their focus was executive
18 positions. So they had exclusive listings with
19 companies, where the companies would sign up with them
20 and provide ExecuNet or NetShare descriptions around
21 the opening type, you know, more or less a job opening
22 description of what they were looking for, where it
23 was located, salary, and so forth. So they had that
24 exclusive listing.
25        They had -- they also had relationships with

Page 498

1 executive resource agencies. So professional
2 organizations that were looking for finding executives
3 to offer -- satisfy a job within their client, which
4 was the corporation that they were representing.
5        They provided other services, like resumé
6 writing, reviewing resumé writing. They held seminars
7 on how do you -- you know, your elevator speech. So
8 you get five minutes to tell your interviewer what
9 your skills are, and you get -- so we went through
10 that. There were webinars on that. There were
11 seminars on what the job market was like. It was just
12 everything to do with employment, and to assist you in
13 getting a job.
14    Q   And as part of the process of working with
15 ExecuNet, did you create a profile of your experience
16 and skills?
17    A   Yes. What they asked you to do in the very
18 beginning when you buy their service, they want you to
19 put a profile in their database so they themselves can
20 search it, if they're looking for a particular type of
21 skill.
22    Q   And did you do that?
23    A   Yes, I did.
24    Q   And were there fees charged for these various
25 services?

Page 499

1    A   Yes, there are fees for both, yes.
2    Q   And which of the services did you acquire,
3  which services did you purchase specifically?
4    A   One company was NetShare, and the other
5  company was ExecuNet.
6    Q   And to what extent did they provide you with
7  access to job openings?
8    A   Well, when you register for them, which was
9  very good, is they provide you the resumés that
10  they've received recently, and you get an e-mail every
11  day with a list of what jobs are in their database
12  that they're looking to fill on behalf of the
13  corporation.
14    Q   And did you obtain any professional assistance
15  with respect to the preparation and modification of
16  your resumé?
17    A   Yeah.  Both offered a service up front.  I
18  built my resumé, and I sent it to them, and they would
19  have a professional resumé writer, I guess, I'm not
20  sure the exact term for that profession, but they
21  would review it, and they would help you rewrite it
22  and construct it, and then they did this -- I believe
23  it was either once or twice a year they would take
24  your resumé and you'd get on a phone call with them
25  and they'd walk you through your resumé and some of

Page 500

1  the things that you might want to change.  And what
2  they were really zeroing in on is that you're properly
3  representing yourself and that you're using current
4  language.  So when you're describing a skill, that
5  you're using the right language to describe that
6  skill, because technology was evolving.  They just
7  want to make sure that you were using the proper
8  language.
9    Q   Can you take a moment and look at Exhibit 100,
10  please.  Can you identify that document?
11    A   Yes.  That's the first page of my resumé.
12    Q   And what iteration or what generation of your
13  resumé is this, if you know?
14    A   There's no date.  I'm not sure.  It may be the
15  very first one I gave to them.  It looks like one of
16  my earlier ones.
17    Q   And do you recall if ExecuNet assisted you in
18  revising this?
19    A   Oh, yes, yes.  Well, not this particular one,
20  but this would be the resumé.  That was part of their
21  service.  They would modify your resumé.
22    Q   And this was what they began with and then
23  modified it from here, is that what you said?
24    A   That's what I believe.
25    Q   If you would take a look at Exhibit 101, what

Page 501

1  is that?  A four-page document.  We'll just put up the
2  first page, but it's a four-page document, is that
3  right?
4    A   Yes.
5       THE COURT:  What number is that, Mr.
6  Carta?
7       MR. CARTA:  101.
8       THE COURT:  Thank you.
9       THE WITNESS:  This is their
10  recommendation on how to structure your resumé.  I
11  believe that's -- this looks like NetShare format
12  where they want you to -- well, some of this was not
13  only wording, but appearance, because they felt that
14  your appearance is important for a recruiter to take
15  a -- you know, their attention be drawn to it, and
16  then they would read it.  So this was formatting, and
17  also content as well, you know, net out what you did.
18  They don't want to hear, you know, three paragraphs on
19  what you did.
20    Q   In addition to the advice that you got from
21  NetShare and also ExecuNet, did you retain a
22  vocational evaluator to assist you?
23    A   Yes, I did.
24    Q   And who was that?
25    A   I believe the name was Dr. Rona Wexler.  Dr.

Page 502

1  Wexler, at least.
2    Q   And what was -- describe what you did with Dr.
3  Wexler?
4    A   I actually had a meeting in New York City with
5  her.  We spent, I believe, like a half a day.  And
6  what she went through was -- she talked about -- we
7  did go through a resumé.  She talked about how I
8  should be presenting myself in interviews, how I
9  should be searching for positions, where to search, so
10  forth.  She actually reviewed what I was doing, and
11  then she commented on what I was doing at that point.
12       It got into appearance.  You know, if you go
13  into a resumé, you know, don't wear shorts and
14  sneakers, but -- I mean it was some very basic things
15  to just general market on what you do and how you work
16  with recruiters.  That was another important part of
17  this, is when you're dealing with a recruiter who's
18  looking to fill a position for a corporation, how do
19  you deal with those recruiters.
20    Q   And did you actually pay her a consultant fee?
21    A   Yes.
22    Q   And if you look at Exhibit 102, what's that?
23    A   My account number up there?  Yes, that's the
24  check I wrote to her on that day, $2,100.
25    Q   And what else did you do in pursuit of a job

Page 503

1    initially? I'm just talking about the initial phase
2    here.
3        A   Well, I used all the resources that I could
4    think of for -- you know, obviously the newspapers
5    were something, publications were something, technical
6    publications in my field.  What else?
7        Q   Did you do anything on the internet?
8        A   Oh, yeah.  The internet was -- I mean I did a
9    lot on the internet.  Obviously because it's
10   accessible, and plus, most companies, that's the
11   direction they go.  They try to eliminate print so
12   they're putting everything on the internet.  Even the
13   publications were now on the internet.
14       There were -- I call them eSeminars or web
15   seminars, where actually -- this was interesting,
16   because vendors would have web seminars on the
17   technology of the area that I was trying to move into,
18   and I would sign up for those.  Those are generally
19   free because they're trying to sell you a product.
20   And then I would sit through those webinars where they
21   talked about technology in a certain area, how do you
22   do business process re-engineering, or something of
23   that nature, and I would sit through those and sign up
24   for those, and they were free.
25       Q   Were there any benefits for applying to

Page 504

1    company websites?
2        A   I did some of that.  But it was very
3    difficult.  It was like the black hole.  When you -- a
4    lot of jobs weren't being posted.  Executive jobs
5    aren't typically posted in companies.  Non-executive
6    positions they had, but executive positions they
7    didn't have.  So there are very few that you could
8    find those.  And -- what else?  I did apply to some of
9    those, where I found an executive position in, I did
10   apply to them.
11       Q   Do you remember what services, if any, or what
12   feedback, if any, you got from some of those websites,
13   such as Pitney Bowes?
14       A   Oh, Pitney Bowes was very good and was right
15   in my neighborhood because it was in Connecticut.
16   Pitney Bowes had a profit -- they posted a position.
17   I saw an executive position on it.  I applied to it.
18   And what they did -- which was probably one of the
19   only companies that was doing it at that time -- was
20   they would -- even though I didn't get the job, they
21   kept my record on file, and as new positions came
22   up -- and I'm not sure exactly how you do it -- they
23   would scan the resumés they had on file with the
24   positions, and if there was a match, probably in some
25   keywords, they would then send me notice, there's now

Page 505

1    this position, would you like to be considered for it,
2    and I would respond to those, obviously, yes.
3        Q   You also mentioned that you read and reviewed
4    trade publications.  Can you give us some examples?
5        A   Oh, yeah.  There was one called Healthcare IT,
6    which was the old bigger magazine type.  There were
7    Web -- what's called Web, I think is the magazine.
8    There are many.
9        And the areas I was looking at is healthcare
10   field, state local government.  I was getting
11   publications from governments on, you know, what
12   policies -- not policies, but -- what's the word I'm
13   searching for here?  But, you know -- I can't think of
14   the word so I'll skip it.
15       But I was getting things from the government,
16   technology fields.  I was getting publications from
17   IBM on some of their offerings even.  So I subscribed
18   to all of these, and they would -- they started out a
19   lot of them in the mail, and then more of them that
20   came online -- which was much easier, and I'm sure my
21   mailman appreciated that -- they were more online, and
22   I would go online and -- which made it easier because
23   I could be anywhere.  I didn't have to be home, and I
24   didn't have to carry the publication with me if I was
25   going somewhere.  I could just bring my laptop with

Page 506

1    me.
2        Q   Did you subscribe to any specialty industry
3    publications?
4        A   Yeah.  That was -- I mean a lot of my
5    publications, and even my online e-mail subscriptions,
6    were with hospitals, primarily where my strength was,
7    background and experience to be competitive if there
8    was an opening.  So it was hospitals, healthcare
9    insurers, pharmaceuticals, and technology companies as
10   well, so, you know, it was all the full breadth of the
11   technology area.
12       Q   What publications did you find, if any, that were
13   additional benefits to subscribing to the industry
14   publications?
15       A   A lot of times in the publications, you know,
16   in addition to sharing the technology, you know,
17   explain what trending was happening, get some examples
18   of those trends when they had applied them.  They
19   also -- most of them had a section about job
20   opportunities, and that was one of the source I went
21   to for job opportunities and looking at that, applying
22   to those.
23       Q   Did they provide -- question withdrawn.
24       What assistance, if any, did they provide with
25   respect to keeping you current?

17 (Pages 503 to 506)

Page 507

```
 1      A   The field that -- the technology field -- and
 2   I'm not sure if it's true in any other field -- but
 3   the technology field is rapidly changing, and I was no
 4   longer working where I gained that experience on the
 5   job.  I had to find some other source to maintain my
 6   technical skills, because it was changing rapidly, and
 7   that's why I was seeking out all these webinars and
 8   these trade publications and reading through those.
 9      Q   And with respect to changing legal parameters,
10   to what extent were those addressed in the industry
11   publications?
12      A   Well, like, there were -- in the healthcare,
13   for example, one of the things I read on, read up on
14   and tried to stay current with is with the new
15   healthcare law that was out.  They were changing the
16   way doctors would indicate what treatment they gave
17   you, and any bill you get from a doctor has a number
18   on it, a funny number, and that triggers whether how
19   much coverage the insurer will provide against it.  So
20   it's a numerical description of what treatment you
21   had, and the insurers will get that numerical
22   descriptor, and it determines how much they -- well,
23   they were changing from, I think it was a generation
24   eight to a generation changing of that code.  So it
25   was expanding tremendously, and what I was trying to
```

Page 508

```
 1   stay current with, that's the type of legislation and
 2   change that was taking place that I felt I needed to
 3   stay current with, because a lot of companies were --
 4   like United Healthcare or WellPoint would be dealing
 5   with these new codes, and I wanted to get myself
 6   familiar with what had changed in, you know, that
 7   area.  That's one example.  There were changes being
 8   done in the financial area as well and how your work
 9   plans can track things as well.
10      Q   And to what extent did you also participate in
11   seminars?
12      A   A lot.  I mean, I -- I shouldn't laugh because
13   it wasn't a fun time, but I signed up for every
14   possible webinar that I could deal with in a single
15   day.  You go through -- and literally I would go
16   from -- in fact I had -- I think my wife gave me a
17   headset so I wouldn't disturb everyone.  But I would
18   go through three or four webinars a day.  And they're
19   generally like a half hour, 45 minutes, so they're not
20   real long.  But, you know, you go through, and then
21   there's some of them offer Q and A at the end where
22   you can ask your questions.
23      Q   Again, what was the benefit to doing that for
24   your job search?
25      A   Mainly for my -- keeping my skills current,
```

Page 509

```
 1   and being -- it was education.  It's like taking a
 2   class.  It also gave me leads on -- because of the
 3   questions raised the person identified what company
 4   they were with and gave leads as far as pursuing maybe
 5   an opportunity in that company.
 6      Q   I'm going to go back just for a moment to your
 7   resumé.  We identified, I think, the earliest version
 8   of that is 100.  We don't need to put it up.
 9          That initial resumé, to what extent did you
10   actually rely on that when you were using -- when you
11   were engaged in your job search?
12      A   Well, two services that I had subscribed to,
13   they had this on file, but the companies were doing
14   searches on keywords, right?  And that's how they were
15   looking for it.  But it would give a lead -- it would
16   catch the attention of a professional recruiter, and
17   then the recruiter would contact me through an e-mail
18   that they saw something of interest with me.  I'm kind
19   of paraphrasing, but they would, like, to talk to me,
20   and this was the basis for initially getting the
21   contact with the professional recruiter.  But every
22   professional recruiter I worked with was looking to
23   fill at least one position within a company, and they
24   knew, because they were -- they were contracted by the
25   company, they knew what the company was looking for,
```

Page 510

```
 1   and they would literally take my resumé and work with
 2   me to rewrite it and tailor it specifically to that
 3   company and that position.  If they felt I was
 4   qualified.
 5      Q   So that resumé, 100, was that the resumé that
 6   you were actually using when you were applying for
 7   jobs?
 8      A   No.  I mean I went through so many different
 9   resumés and formats and content.  No.
10      Q   So you were tailoring each resumé for the
11   specific job you were seeking?
12          MR. FASMAN:  Objection, Your Honor.
13          MR. CARTA:  Withdrawn.
14   BY MR. CARTA:
15      Q   What were you doing with respect to your
16   resumés, if anything, when you applied for a new job?
17      A   The professional recruiter that I was dealing
18   with, again, who was contracted by the company --
19   sometimes they could identify who the company was.
20   Most times they couldn't.  They knew specifically if
21   they had met with the customer -- the company, I
22   shouldn't say customer, the company -- they understood
23   specifically what they were looking for, the type of
24   skills, and so forth.  The executive recruiter would
25   spend time, literally sometimes went back and forth
```

Page 511

1   for several times, and some recruiters actually even
2   would rewrite my resumé for me, to tailor it
3   specifically for that job opening, not a broad one for
4   the industry, but specifically for the job that they
5   were interested in having me submitted as a candidate
6   for.
7       Q    And did you keep those specific tailored
8   resumés?
9       A    No, I didn't keep those because every time I
10  dealt with a recruiter it was changing.  So I had like
11  the basic straw structure.  I would talk to them,
12  because we would have a conversation about -- and
13  they'd ask a lot of questions about my background
14  and -- particularly looking at the area that they were
15  interested in, you know, specifically interested in,
16  and I would go through that, and then they would say,
17  okay, let's do your resumé, let's get it right, and
18  your cover letter as well, because the cover letter
19  went with it, introducing you.
20      Q    Was there an economic event during your job
21  search that impacted on your search?
22      A    Yeah.  Yes.  We all went through that.  It was
23  right after I let -- I was fired by IBM.  So I'm
24  walking out of IBM on July -- June 30th, and it was
25  shortly after that, within that quarter when the whole

Page 512

1   economy -- we went into this recession, and a dramatic
2   recession.  We all -- I'm sure every family's been
3   affected by it.  But unemployment shot up, and
4   companies were looking at their bottom lines, their
5   financial statements, as well and reevaluating what
6   direction they were going into.  And that happened --
7   I don't remember specifically, but it was July,
8   August, right after I was separated from IBM.
9       Q    And what impact did that have on your job
10  search, if any?
11      A    Well, in the beginning it didn't appear to,
12  because jobs are still -- companies are still posting
13  jobs, but when I started working with recruiters and
14  they were starting to help with the resumé and sending
15  it to you, everything began to be frozen at that
16  point.  Companies, although they had the jobs out
17  there, were told not to hire, and freeze, because the
18  company wanted to reevaluate whether they'd be
19  spending the money in that area or not.  So recruiters
20  would have to come back, say I'll keep it on record,
21  but the company's no longer searching to fill those
22  positions.
23      Q    And then what happened in 2009?
24      A    2009 -- it was like a bumpy road during this.
25  I could almost see through the jobs that were, you

Page 513

1   know, the list of job openings that were coming to me
2   how the economy was doing, more or less, and I could
3   tell you -- and they're -- what happened, I believe,
4   is in 2009, and I think it was 2009, there was a
5   change in the way you account for capital assets, when
6   you buy product, and how you write-off the asset.
7       This was something that the government had
8   initiated in that time period that said all
9   companies -- and I'm not sure whether it was you could
10  take an asset that you buy and write it off over a
11  longer period of time or write it off immediately, but
12  it was changing the way the financials of the company
13  and changing what they were deciding.
14      So in the IT world, the quickest thing to do
15  if you get an out like that, you want to refresh all
16  your technology, and when you refresh all your
17  technology, it's equipment that comes in, that runs
18  faster, smarter, and can hold more, but it can replace
19  five other boxes of the older heritage boxes, so that
20  they could bring in one box to replace five.
21      What that did to the job market was this one
22  box replacing these five is more intelligent, it could
23  determine that it's sick and notify someone, and it
24  would -- it would reduce fast.  Now you didn't have
25  five of these, you only had one.

Page 514

1       MR. FASMAN:  Your Honor, excuse me, this
2   is clearly opinion evidence with regard to a matter
3   he's not qualified as an expert.
4       THE COURT:  Mr. Carta?
5       MR. CARTA:  I think he's describing what
6   he experienced.
7       THE COURT:  Well, you know, he is giving
8   his opinion, but sometimes witnesses are allowed to
9   give their opinions even though they're not expert
10  witnesses.  For example, there was a cold and rainy
11  night, it was 10 o'clock, I mean those are instances
12  of opinions, and I think that using this example of
13  one box eliminating five boxes is that kind of opinion
14  rather than the kind of an opinion on the subject that
15  really requires expertise and would allow for someone
16  who's unfamiliar with the facts to study up on them
17  and then express an opinion.  So, you know, I'd make
18  that objection, too, if I were you, Mr. Fasman, and I
19  wouldn't be mad if a judge overruled it.
20      MR. FASMAN:  I'm good, Judge.
21      THE COURT:  Okay, Mr. Carta.
22  BY MR. CARTA:
23      Q    Mr. Castelluccio, so that we stay focused
24  here, I'm looking for you to talk about what your
25  experience was and maybe not to get sidetracked on

Page 515

1  what caused -- what you believe was causing that.
2      So in this particular case, you've described
3  what you were experiencing in 2009. And what
4  happened -- what was generally -- what generally did
5  you experience that happened in 2010?
6      A   Again, it was -- I'm making my assessment
7  based on the number of resumés that I was receiving,
8  right? And this is -- this is a day-to-day,
9  month-to-month type of view of this.
10     In 2009 the number of resumés had -- not
11 resumés, I'm sorry -- open positions that I was
12 getting from NetShare and ExecuNet was shrinking, and
13 the same thing was happening in 2010. 2010 at one
14 point had a spurt. I won't comment why I thought the
15 spurt happened, but there were more openings that were
16 identified for a period of time.
17     Q   And what happened in 2011?
18     A   I mean, through this whole period I continued
19 to -- I mean I continued to do everything I was doing
20 to find positions. Still attending seminars. The
21 jobs -- again, it was one month it would be kind of
22 high, and then they would drop off for a period of
23 time.
24     Q   What impact, if any, did you find in your job
25 search with respect to the longer you had been

Page 516

1  unemployed?
2      A   That was -- in fact, one recruiter told me
3  that -- unfortunately, as I said before, the recession
4  hit, just shortly after I left IBM, and the jobs
5  weren't there anymore. When the jobs started to pick
6  up a little bit, I was already -- at that point I was
7  two years out of working at this point, and the
8  recruiter told me, Your chances diminish the longer
9  you're unemployed.
10         MR. FASMAN: Judge, objection. It's
11 hearsay.
12         MR. CARTA: I don't claim it, Your Honor.
13         THE COURT: Ladies and gentlemen, I ask
14 you to disregard what Mr. Castelluccio just said the
15 headhunter told him. Just put that out of your mind.
16         Go ahead, Mr. Carta.
17 BY MR. CARTA:
18     Q   What did you experience yourself personally
19 the longer you were unemployed?
20     A   I was getting fewer and fewer contacts from
21 the recruiters.
22     Q   Mr. Castelluccio, I'd like you to take a
23 minute and walk the jurors through a day in the life.
24 What did you do for this entire period that you were
25 unemployed, continuing to look for a job? Just walk

Page 517

1  the jurors through a day. What was it like?
2      A   Well, my normal routine was, in the morning
3  you have your cup of coffee and toast, and then I
4  would log onto the -- onto my system, open up my
5  e-mails, where I had all of the open positions were
6  coming into, and I start one by one going through
7  them. And the descriptor you'd get in the e-mail just
8  more or less said the title of the job, and it didn't
9  have the company, and it would say something like vice
10 president healthcare claims, or something like that,
11 to use an example. I don't know if that's that actual
12 example. Then I would log onto the source where that
13 came from.
14         THE COURT: Excuse me, sir, I hate to
15 interrupt you, but could you tell us what time this
16 process -- I mean when did you wake up? I don't think
17 you told us that.
18         THE WITNESS: I'd be up at 6:30, 7,
19 because my wife was going to school to teach and she'd
20 be up at 5 in the morning so I'd feel guilty.
21         THE COURT: My heart doesn't usually
22 start beating until about 11. Okay, thank you. So
23 you'd start this process about 7 o'clock or so?
24         THE WITNESS: Yes. And two cups of
25 coffee.

Page 518

1          THE COURT: What kind of coffee?
2  Caffeinated coffee?
3          THE WITNESS: Oh, yeah, had to be
4  caffeinated.
5  BY MR. CARTA:
6      Q   So you get up and have your coffee, and then
7  what?
8      A   I'd log onto the system and, as I described
9  before, open up my e-mail, go through all of the jobs
10 that are listed there, take that job, go to the source
11 where it came from, log onto that site, and in there
12 they would have a broad description of what the job
13 is, you know, description of the job, what they're
14 looking for, the qualifications, probably, depending
15 on the job, there'd be like eight or ten bullets.
16 They'd give an idea of the salary range in most cases.
17 In some cases they didn't. But it was a whole
18 description. Oh, and work experience that you needed
19 to have for that position, and where it was physically
20 located, the job was located.
21         And I would go through that, and I'd do my own
22 assessment on whether I thought I was qualified for
23 that. And I'd build this list of all those positions
24 that were open, and then I'd start construct -- I
25 would -- sorry -- I would apply for that job through

A-408

Page 519

1    NetShare or ExecuNet. I'd send back that I'm
2    interested in this job, and I draft a brief cover
3    letter on why I thought I was a good match for this,
4    and that would go onto the executive recruiter, and
5    then I may or may not get a call on that.
6        In addition to that -- which took quite a
7    while because I was looking at every opportunity -- I
8    was getting e-mails for jobs not only from those two
9    sources, but I had subscribed to other websites
10   where -- like I think it was Healthcare IT, would send
11   me e-mails with their jobs that they were sending.
12   That wasn't as formal as the other one, but it would
13   give me enough detail. And I would go through
14   everything in my e-mail that had to do with a job.
15       There were also -- and that's -- I'm doing
16   this sitting at the kitchen counter with my laptop
17   going through that and responding to that. And then I
18   was also looking at -- because you get notifications
19   that there's a seminar on this topic coming up, not
20   from one of the recruiters, but from a technology
21   company or a healthcare company, and I'd start
22   figuring out -- you know, registering to those as
23   well, and sending in notification that I was
24   interested in those. And that would go on -- I'd --
25   because I normally had seminars booked anyhow, so I

Page 520

1    tried to select seminars that were after, like, 11
2    o'clock in the morning, because that took me that long
3    to get through all these things.
4        I'd get on the seminars. I'd do two or three
5    seminars a day. And those, like I said before,
6    generally went -- you know, some were 30 minutes, some
7    were an hour on that. And I would go through that.
8    That was the routine, every day going through that.
9    Q    And you indicated that you had the selective
10   process where you identified certain jobs that you
11   thought were appropriate and you applied just for
12   those. Was there a reason you just didn't apply for
13   everything?
14   A    Yeah. The recruiters are not happy when you
15   just broadcast your resumé out there. And that was
16   part of -- Dr. Wexler had told me that, as well as
17   recruiters had told me that. But I was looking for
18   areas where I thought I had a chance to get the job.
19   I'm not going to apply for a chemical engineer
20   somewhere. So I was trying to net it down to where
21   my -- I wanted to apply to areas that I thought I had
22   a good chance to be considered for the job.
23   Q    You mentioned that you started off signing up
24   for NetShare and ExecuNet. Did you continue that
25   through that entire -- those two subscriptions for the

Page 521

1    entire time period?
2    A    No, I didn't.
3    Q    And why not?
4    A    What I found was there was a lot of
5    duplication between the two. They did very similar
6    things. They did resumé reviews, they had job
7    postings. Some of them were -- there was an overlap.
8    And I thought the richer of the two companies that
9    offered more was ExecuNet, and, in fact, it was rated
10   higher -- whoever does the survey on these -- than
11   NetShare. They ran meetings. And it was just like
12   too much to go through at that point. Plus they
13   were -- I found that NetShare was getting fewer and
14   fewer, and ExecuNet had more, and I decided to stay
15   with ExecuNet.
16   Q    Generally this process of following up on
17   those resumés, or these alerts from the internet that
18   told you about possible positions, how long would that
19   take on average every day?
20   A    It would -- if you take one individual one,
21   you first read it, and you go to the site, you log
22   onto the site, and then you read the details on the
23   site. Then if you're going to apply for that, you
24   make up a cover letter, to go, and you send the cover
25   letter off.

Page 522

1        All the cover letter is -- at that point all
2    you're trying to do is have a -- the recruiter that
3    sits behind that, interested in you to contact you
4    directly. And I would go through that. That process,
5    writing the cover letter, tailoring it specifically to
6    that job and searching through that, boy, I don't
7    know, half hour, 20 minutes. I don't know. I got
8    very good near the end, but I mean, it took a while.
9    Q    So that's for one?
10   A    That's for one.
11   Q    And my question was a little bit broader than
12   that, although that was helpful. What time period
13   would you spend addressing that function, responding
14   to the e-mails that come in the night before?
15   A    Oh, I would do it all day long. I mean I'd
16   start in the morning, get on my seminars that I
17   register for, come back to it again and look through
18   it.
19   Q    And how many days a week did you, generally,
20   did you do that?
21   A    It was a good six days a week. But I also
22   checked in on Sunday, but generally it was six days a
23   week I was going through it, and what I didn't catch
24   on Sunday I grabbed Monday morning to go through.
25   Q    And did you find -- question withdrawn.

Page 523

1    Did you find any correlation between the
2 response that you got and how prompt you were in
3 responding?
4    A   You know -- well, my belief was, as soon as
5 you see it, the competition was so great for these
6 positions because we had gone through this recession
7 and people were laid off, the idea is if you find it
8 first, get it in first, you may then get the attention
9 of the recruiter and you might be down selected from
10 the group that they're seeing, because they were
11 receiving tons and tons of people like me trying to
12 find jobs.
13    Q   I want to talk about other sources.  In
14 addition to reviewing the ExecuNet listings on a
15 regular basis, what else did you do?  What else did
16 you look at?
17    A   Well, as I mentioned, all these trade
18 publications I went through, the things that I was
19 receiving in the mail, most of them -- well, many of
20 them had -- in the back they would have like a job
21 listing, like the newspaper would.
22    I'd be looking every day in the paper.  So the
23 local paper I had, the Wall Street Journals, New York
24 Times.
25    I'd go on the websites that were -- like

Page 524

1 job.com, those things, to look for.  Although as I
2 mentioned before, generally executive positions aren't
3 listed in those, but I would go to those, also.  I
4 don't know all the websites I went through, but they
5 were like job.com, I'd go in and do a search on those.
6    Q   And were you receiving any other computer
7 alerts?
8    A   Oh, my e-mail every day was -- it was easily
9 over a hundred messages of either technology seminars,
10 so forth.  So I -- every source I could think of I
11 registered for to get information.
12    Q   On a regular basis you indicated that you
13 would read sort of hard copy publications.  Could you
14 give some specific examples, newspapers, that sort of
15 thing?
16    A   Well, I mentioned the newspapers.
17    Q   What specific newspapers?
18    A   Wall Street Journal, New York Times, Stamford
19 Advocate.  There was another.  It wasn't a -- those
20 were the daily ones, papers.  There was also -- there
21 were weekly publications that I received.  And there
22 were some that were monthly publications that I had
23 received that I would go through.  I'm trying to think
24 of the names.  There were so many.  I mean Web Design
25 was one that I could recall right now.  It would take

Page 525

1 me a while to think of them.
2    Q   And you created a list of that, which we'll go
3 through in a moment.
4    A   Yes.
5    Q   Did you also regularly review ePublications?
6    A   Yeah, actually ePublications were helpful
7 because sometimes you could do a search on them.
8    Q   What is an ePublication?
9    A   It's -- well, it's like today now, if you get
10 any of the newspapers for now you could go to the
11 website and use their website publication.  So I would
12 get a blurb that your ePublication, you know --
13 NetWorld, for example, is one -- is available.  So
14 that you'd go to the website, you sign on and you
15 actually -- instead of having a magazine in front of
16 you, you're reading through the pages on the website.
17 They would alert you -- they would tell you the new
18 publication is out.
19    Q   Exhibit 103.
20    MR. FASMAN:  Your Honor, before we go
21 into 103 and 104 and 105 I'd like to register an
22 objection to them.  They're clearly summaries that
23 were created by the witness.  We've repeatedly asked
24 for the supporting records for these summaries.  There
25 are no supporting records, and I think that they're

Page 526

1 not proper without the supporting records.
2    THE COURT:  You have specifically
3 requested them?
4    MR. FASMAN:  Sure.
5    THE COURT:  The underlying records?
6    MR. FASMAN:  Absolutely.
7    MR. CARTA:  These are the underlying
8 records, Your Honor.
9    THE COURT:  You specifically requested of
10 Mr. Carta the underlying records from which the
11 summary was made?
12    MR. FASMAN:  Absolutely, from Mr. Carta,
13 from Mr. Castelluccio, of course.
14    THE COURT:  And you have not received
15 them?
16    MR. FASMAN:  Never have.
17    THE COURT:  Mr. Carta?
18    MR. CARTA:  These are the underlying
19 records, Your Honor.  These are records that he
20 maintained at -- there isn't any underlying record.
21 These are -- this is a summary of the work that he was
22 doing, and he would put it into this document, because
23 it was represented to him that he needed to maintain
24 contemporaneous records of what he was doing.  So this
25 is the only record that exists.  There isn't anything

Page 527

1    else behind it.
2        THE COURT:  You're telling me that this
3    is not a summary of other documents, this is a list of
4    what he did?
5        MR. CARTA:  A list of what he did, a list
6    of the jobs that he applied for, a list of the
7    publications that he read, a list of the webinars that
8    he attended, that's right.  It's a list that he
9    personally maintained and he created.
10        THE COURT:  And these were done
11   contemporaneously, or roughly contemporaneously?
12        MR. CARTA:  Yes.
13        MR. FASMAN:  Your Honor, I'm sorry,
14   Judge, they're not contemporaneous, and we can go
15   into that on cross.  My point is this:  There are
16   multiple entries in here, for example, for trips to
17   New York or Philadelphia where I said, don't you have
18   a record of this trip, and it was no, I don't have
19   those records, I don't have records of any of this.
20   There are no records.  There are no records at all.
21   This is Mr. Castelluccio's spreadsheet that's
22   unsupported by any document that was turned over to
23   us.  We just were given these spreadsheets and told,
24   well, this is a record that I put together.  And I can
25   go into some of this on cross-examination, but I

Page 528

1    really think it's improper.
2        THE COURT:  Okay.  I'm ready to rule.
3    The objection is noted.  It's overruled.  I think your
4    objection really goes to the weight rather than the
5    admissibility of this document, and you can
6    cross-examine to your heart's content.
7        MR. FASMAN:  All right, Judge.  Thank
8    you, Your Honor.
9        THE COURT:  You're welcome.
10   BY MR. CARTA:
11    Q  I'll give these to you all at the same time,
12   but we'll go through them one at a time.
13      I'll give you Exhibit 103.  What is that,
14   please?
15    A  That's what's on the monitor.  This is a list
16   of jobs that I applied to, or applied for, and I put
17   as much description in this that was available to me
18   at the time, as I mentioned before.  Maybe I should
19   set the structure.  But that's essentially what this
20   is.  This is a list of the jobs that I applied to over
21   this period of time.
22    Q  And that's just the first page that's being
23   projected up on the screen?
24    A  Yes.
25    Q  How many pages is that list?

Page 529

1    A  Ten pages.
2    Q  And just explain to the jurors how you created
3   that list.
4    A  This -- when I applied to a job, I noted the
5   date that I applied to the job, what the job -- level
6   description of what the job was, if there was a salary
7   range that was in the job, for lack of a better term,
8   posting, I indicated on this, if the company was
9   known, and the agency that I may have worked with.
10    Q  And when did you make those entries?
11    A  These entries were made, like the same day
12   that I was applying, or within a short period of time
13   that I was applying.  Because there's e-mails -- I
14   mean I may not have made the entry at the exact point
15   I sent it, but I had the e-mail in my mail folder that
16   said I applied to that job, and that's how I
17   constructed this.
18    Q  And what is Exhibit 104?
19    A  Oh, this is that what this is.
20    Q  That's 103.  I'm asking you about 104.
21    A  Okay.  Yeah, this was a list of -- I talked
22   before about all the webinars, web seminars that I
23   participated in or registered for.  As I said before,
24   they were pretty much free.  And the date that I did
25   that, the day of the seminar, which is the first

Page 530

1    column, whether it was a face-to-face meeting or
2    whether it was a web seminar which I would have done
3    from home from my terminal.  And then I put kind of a
4    high level description of what the class was about,
5    the webinar was about.  And then who was sponsor of
6    that webinar, if they noted who the sponsor was.
7    Q  And again, this is a document that you
8   created?
9    A  Yeah, it is.
10    Q  It's a spreadsheet that you set up?
11    A  Yes.
12    Q  And you made your entries when?
13    A  Around the time I took -- either on the same
14   day I took the seminar or shortly around that time.
15    Q  And the final exhibit, 105, what is that?
16      I'm sorry, I didn't ask you, how many pages is
17   104?  Because the jurors are only seeing the first
18   page.
19    A  Yeah.  It's -- this -- I did a lot of these
20   webinars.  You know what?  The pages aren't numbered.
21   One, two, three, four, five, six, seven, eight, nine
22   pages.
23    Q  Okay.  105, please?
24    A  These were the -- as I talked about before,
25   other sources that I sought out in looking for a job.

Page 531

1    So for example, Ziff -- which was sold, I think, last
2    year -- but Ziff Davis Enterprise, the first entry, I
3    was registered with them, or I went to their site, and
4    they -- generally their function or their -- what they
5    offered on their site was CIO insight, which is, you
6    know, kind of news flashes on different issues that
7    CIOs would be dealing with. They had some quick facts
8    in there about what's changing in the CIO area, and
9    they also had a section called eCareers.
10       And that's pretty much true -- you can see
11   there's a lot of publications in here that were
12   ePublications. Oh, Network World was a big -- number
13   ten was a big publication that I worked with. So they
14   were sources -- CIO CSO Magazine, number 23, they
15   actually had meetings that they offered people who
16   participated in that. So these are just a, you know,
17   a list of other sources that I went through. And I
18   actively used them. I was getting e-mail from all of
19   them.
20       Q   Mr. Castelluccio, as a result of all these
21   efforts were you ever able to locate a job?
22       A   No, I was not.
23           THE COURT: Mr. Carta, I'm sorry, I
24   didn't hear that question.
25           MR. CARTA: As a result of those efforts

Page 532

1    were you able to locate a new position.
2            THE COURT: Okay. Thank you.
3    BY MR. CARTA:
4        Q   And I think you may have testified about this
5    before, but you continued to look for a position until
6    approximately when?
7        A   2013, last year. I think it was the first
8    half of last year that I went through. I still look
9    at some of these things, but...
10       Q   When would you say that your job quest
11   discontinued as a full-time occupation?
12       A   It was the early part, I believe, 2013, if I
13   could recall correctly.
14       Q   When did you turn -- you had a birthday in
15   2013?
16       A   I hope so. Yes, I did.
17       Q   And what age did you turn?
18       A   Last year, 65.
19       Q   So you ceased sometime on or about your 66th
20   birthday?
21       A   65th, last year, 65th birthday.
22       Q   Okay. I'd like to look at Exhibit 118.
23           Mr. Castelluccio, is this a chronology of
24   events that you think it would be helpful for the jury
25   to have in one single document for their future

Page 533

1    reference?
2            MR. FASMAN: Hang on one second, Mr.
3    Carta.
4            I don't think you can introduce this
5    through Mr. Castelluccio.
6            THE COURT: I'm sorry?
7            MR. FASMAN: I don't think he can
8    introduce this through Mr. Castelluccio. There are
9    multiple things on this that he did not testify to.
10   There are multiple issues -- this is a summary. You
11   can use it in closing if you want in your closing. We
12   have one of these, too. We have a chronology, too.
13   But Mr. Castelluccio's not a competent witness to
14   testify --
15           MR. CARTA: I wasn't going to walk him
16   through. I was just going to have it identified,
17   because it's already in evidence. I was just going to
18   have him identify what it is so that the jurors know
19   that they could go to look for it when they've got
20   their binders, that there was something in there that
21   might save them time.
22           THE COURT: Actually, Mr. Carta, you can
23   tell the jury what it is. You don't have to have the
24   witness --
25           MR. FASMAN: I would prefer that it not

Page 534

1    be up, either, because it contains materials -- it
2    contains entries that are not in evidence yet. I
3    agree, both sides have chronologies here, the jury
4    will get chronologies from both sides that differ, but
5    I don't think that this is something that needs to be
6    presented before Mr. Castelluccio, nor from my point
7    do I think he's competent to testify to.
8            MR. CARTA: Your Honor, I won't pursue
9    these with Mr. Castelluccio. I'll just identify them
10   for the jurors so they know what they are and they're
11   in the file. That's all I intend to do.
12           THE COURT: Okay. I'm inclined to agree
13   with Mr. Fasman on this. I think that, you know, when
14   the time comes for them to go to the jury, they will
15   go to the jury. Counsel on both sides, there have
16   been agreements, and probably the best way to do it is
17   just Mr. Fasman take care of it for his client, and
18   you do it for Mr. Castelluccio.
19           MR. CARTA: That's fine.
20           THE COURT: So the objection's sustained.
21           MR. FASMAN: Thank you, Your Honor.
22   BY MR. CARTA:
23       Q   I'd like to ask you a few final questions, Mr.
24   Castelluccio, before I ask you to -- before
25   cross-examination begins.

Page 535

```
1     In the 17-month period in which Ms.
2   Collins-Smee was your manager, did she ever discuss
3   with you where she thought you could make the greatest
4   contribution?
5     A   No.
6     Q   When she removed you as vice president of
7   Public Sector, did she ask you about your career at
8   IBM, what you wanted in your future, in your career?
9     A   No.
10    Q   Did she assign you -- when she assigned you to
11  the WellPoint account, to follow in Mr. Morin's steps,
12  did she ask you again about your future at IBM?
13    A   No.
14    Q   And when she removed you from WellPoint and
15  put you on the bench, did she give any indication, ask
16  you anything about your future?
17    A   No.
18    Q   At any point in time do you recall her
19  discussing with you your future work at IBM?
20    A   Long-term work?  No.
21        MR. CARTA:  No further questions.
22        THE COURT:  Have you completed your
23  direct examination?
24        MR. CARTA:  Yes.
25        THE COURT:  All right.  Now, ladies and
```

Page 536

```
1   gentlemen, this was the direct examination of the
2   Plaintiff by Plaintiff's counsel, and he has finished
3   his direct examination, and what he's doing is he's
4   now going to tender the witness to Mr. Fasman, and
5   while Mr. Carta did a direct examination, Mr. Fasman
6   is going to be doing a cross-examination.  And you'll
7   notice that there are differences, there are
8   differences in the kind of approach that lawyers take
9   when they do a direct examination and when they do a
10  cross-examination.
11        Someone great, but not great enough for
12  me to be able to remember his name, once told me that
13  the lawyer that's conducting the direct examination is
14  the impressionist, he's the Monet, whereas the lawyer
15  conducting the cross-examination is a pointillist,
16  like Seurat.  And maybe, you know, your observation
17  will confirm this.
18        But in any event, thank you, Mr. Carta,
19  Mr. Fasman.
20        You know, it's seven minutes to 1.
21        MR. FASMAN:  I'm going to have an
22  extended cross, Judge.
23        THE COURT:  Well, you can have all the
24  time that you need, but I'm just wondering, I would
25  contemplate taking a lunch break from 1 to 2, which is
```

Page 537

```
1   the time that we normally have one.  It's 11 minutes
2   to 1.  Do you want to begin now?  I'll let you.  Or if
3   you want to wait until we get back from lunch, I'll do
4   that, too.  I'll leave it to you.
5         MR. FASMAN:  Let's take a break and I'll
6   begin right after lunch, Judge.
7         THE COURT:  Okay.  We're going to begin
8   the cross-examination of the Plaintiff right after
9   lunch, ladies and gentlemen.  Don't deliberate, don't
10  talk about the case.  Get a turkey sandwich, gobble it
11  down.
12        Did anyone go to Max Bibo's?
13        A JUROR:  We went the wrong way.
14        THE COURT:  You have to go out the door
15  and go left, out the front door.
16        A JUROR:  We went right.
17        THE COURT:  Have a pleasant lunch.
18        THE JURORS:  Thank you.
19    (Recess taken from 12:54 p.m. to 2:14 p.m.)
20        THE COURT:  I've got an excuse.  Didn't
21  get back and start exactly at 2 o'clock, but, in the
22  meantime, we fixed a key problem.  We think that we're
23  going to start getting warmer.  Now my biggest concern
24  is people are going to start taking clothes off.  This
25  is the government.  So you cannot be as cold as you
```

Page 538

```
1   were before.  Gradually I think we'll warm up.
2         Okay, let's get back to business.  We're
3   now going to hear cross-examination of Mr.
4   Castelluccio.
5         Counselor?
6         MR. FASMAN:  Good afternoon, ladies and
7   gentlemen.  I was getting pretty comfortable sitting
8   back there for a couple of days.
9
10        CROSS-EXAMINATION BY MR. FASMAN:
11
12    Q   All set?
13    A   Yes.
14    Q   All right.
15        Mr. Castelluccio, when you got on the witness
16  stand, you swore an oath to tell the whole truth --
17  the truth, the whole truth and nothing but the truth,
18  didn't you?
19    A   Yes.
20    Q   Let's go to the whole truth now.  Okay?
21        I want to talk first about the PBC rating that
22  Joanne Collins-Smee gave you in 2008 for the year
23  2007.  You actually -- your initial complaint to
24  Garrett Walker was about that PBC, right?  It was a
25  contested PBC, isn't that correct?
```

Page 539

1    A    No, it wasn't contested.
2         MR. FASMAN: Let's put the -- put our
3    Exhibit 76 up on the screen, would you please, Ms.
4    Gutierrez? And why don't you see if you can enlarge
5    that up, please. I'm not sure I can read that
6    entirely, but --
7    BY MR. FASMAN:
8    Q    This is your note to Mr. Walker, your initial
9    complaint to him, right?
10   A    Yes.
11   Q    And it says --
12        MR. FASMAN: Can you see that, ladies and
13   gentlemen?
14        THE JURORS: No.
15   BY MR. FASMAN:
16   Q    Well, maybe Mr. Castelluccio, maybe you want
17   to read the highlighted portion.
18        THE COURT: What exhibit is this, Mr.
19   Fasman?
20        MR. FASMAN: This is my Exhibit 76.
21        I'm sorry, Plaintiff's Exhibit 76.
22   BY MR. FASMAN:
23   Q    You want to read the highlighted portion just
24   as you did for Mr. Carta, sir?
25   A    Yes. "I completed a contested PBC evaluation

Page 540

1    on January 31st, 2008. My original evaluation two
2    days before dropped my performance rating. This
3    evaluation was overly general."
4    Q    Maybe you could slow down just a bit. Thank
5    you. Go ahead.
6    A    "This evaluation was overly general, did not
7    address the specific points of my work, and omitted
8    accomplishments under my leadership. After a
9    subsequent phone conversation and my three-page
10   document relating to my year's work the rating was
11   changed.
12        "I am not challenging the new rating, however,
13   I am concerned with the circumstances that led to the
14   unfounded initial evaluation. It was apparent to me
15   that my prior write-up and my contribution and results
16   was not read. My performance was dropped without any
17   supporting data."
18   Q    All right. So Ms. Collins-Smee and you spoke,
19   and she said that she was going to give you a 3
20   rating, right?
21   A    No.
22   Q    There was no conversation between the two of
23   you where she said, I'm going to give -- that she was
24   going to give you a 3?
25   A    That's correct.

Page 541

1    Q    Well, I asked you that in your deposition, the
2    first deposition. Remember the first deposition in
3    this case?
4    A    Yes.
5    Q    In Mr. Carta's office?
6    A    Yes.
7    Q    And in fact, I asked you about just that, and
8    you said that you were having this conversation with
9    her in a Dunkin Donuts in Boomtown, New Jersey, right?
10   Remember that?
11   A    I was on the phone. Yes, I was there. She
12   wasn't.
13   Q    Yes, I gathered that. And she did not state
14   during that conversation that she was going to give
15   you a 3 rating?
16   A    That was not what -- that was not her
17   statement.
18   Q    Really. Well, let me ask if you can --
19        MR. FASMAN: Ms. Gutierrez, can you put
20   up the paragraph of the parties' pretrial stipulation,
21   please.
22        MR. CARTA: What exhibit is that, please?
23        MR. FASMAN: This is paragraph -- I'm
24   sorry, this is hard to see. This is from the parties'
25   pretrial stipulations of fact, and it is paragraphs 15

Page 542

1    and 16.
2    BY MR. FASMAN:
3    Q    You're familiar with the pretrial
4    stipulations, aren't you, sir?
5    A    Well, I've heard of it. I mean I assume -- I
6    shouldn't assume anything.
7    Q    Well, if you haven't --
8    A    The legal term is --
9    Q    I think I can represent to the Court, and I
10   think that counsel would agree with me, that we put
11   together a series of stipulations of fact that both
12   parties agreed to in this case.
13        So perhaps you could read in paragraph 21, the
14   first sentence says -- I'll read it. "In January 2008
15   Ms. Collins-Smee informed Mr. Castelluccio that she
16   intended to write his performance for the 2007 year as
17   a 3, which is defined by IBM as, quote, among the
18   lowest contributors, needs to improve."
19        Right? That's the first sentence. Is that
20   what it says?
21   A    Yes.
22   Q    And are you saying that you never spoke to her
23   about that?
24   A    No, this wording is correct on this document.
25   Q    And, in fact, you and she discussed it, didn't

Page 543

1  you?
2      A   Yes.  My issue with the previous statement was
3  the language that you used.
4      Q   And what was wrong with my language, Mr.
5  Castelluccio?
6      A   It -- when you asked me the question on
7  whether she stated she was going to give me a 3, that
8  was not what she had said to me at that time.
9      Q   So what did she say to you?
10     A   I'm thinking of giving you a 3.
11     Q   I see, I see.  And did she explain why she was
12 thinking of giving you a 3?
13     A   That was it, the opening comment was, I'm
14 thinking of giving you a 3.
15     Q   I see.  And, in fact, you went to Mr. Walker
16 to complain about just that, right?
17     A   That was one of the things, yes, I went to him
18 with.
19     Q   Well, I think the jury just saw you talked
20 about a contested PBC evaluation, and how your rating
21 was lowered, right?  That's what you said to Mr.
22 Walker.  That's what the nature of your initial
23 complaint was, right?
24     A   That's initially what I had written in the
25 letter, which wasn't -- yes, that's what I wrote in a

Page 544

1  letter, but that was my -- not my full discussion with
2  him.
3      Q   That was your -- that was what that said.  So
4  let me ask if I can also put up -- this is Defendant's
5  Exhibit 197, please.  This is -- these are your
6  notes -- this is the e-mail to Mr. Walker on top and
7  then your notes of your discussion with Mr. Walker
8  below, right?  You recognize this exhibit, don't you?
9      A   I can't read it, but --
10     Q   You know, they're in the binders if you want
11 to take a look.  This is 197, sir.
12         MR. DUFFIELD:  Your Honor, might we be
13 able to move the TV closer to the jury so they can see
14 the screen a little better?
15         THE COURT:  Sure.  Ladies and gentlemen
16 of the jury, would you like to have the screen a
17 little bit closer to you?
18         THE JURORS:  Yes.
19         THE COURT:  I think I'm going to move
20 down there myself and sit in that chair so I can see
21 it, too.  It's too small.
22         MR. FASMAN:  I'm sorry, Your Honor.
23         THE COURT:  It's not your fault, it's the
24 equipment, but down here I'll be able to see exactly
25 what it is you're talking about.

Page 545

1  BY MR. FASMAN:
2      Q   Now, Mr. Castelluccio, you would agree with me
3  that a 3 rating, among the lowest contributors, needs
4  to improve, was not a very good rating, right?
5      A   Correct.
6      Q   In fact, it's a very bad rating for a vice
7  president, isn't it?
8      A   I think for anyone, yes.
9      Q   And so you're point to Mr. Walker was about
10 her, as you say, thinking of giving you this
11 evaluation, right?
12     A   There was no formal evaluation with me as a 3.
13 Her opening comment to me is, I'm thinking of giving
14 you the 3, and then we went through my
15 accomplishments.
16     Q   Right.  Well, underneath in your notes about
17 this there's a sentence, and we've highlighted that
18 sentence, that says, "We discussed my concern with age
19 being a factor in her actions, or that I represented
20 the old regimen of Macina Jones."  Do you see that?
21     A   Yes, I do.
22     Q   Now, you were fairly closely tied to, as I
23 think you testified this morning, to Tony Macina and
24 Kelton Jones, right?
25     A   Well, I had worked for them.  Kelton was my

Page 546

1  manager before Joanne came in, and Tony I'd worked for
2  previously when I was on Lucent.
3      Q   Right.  And so you discussed with Mr. Walker
4  that it could have been your age, or could have been
5  your association with the prior management of the
6  ITDelivery area, right?
7      A   I'm sorry, could you repeat the second part of
8  that?
9      Q   Sure.  You said it could have been your age,
10 or it could have been your association with the prior
11 management of the ITDelivery area, that is, Tony
12 Macina and Kelton Jones.
13     A   That's correct.
14     Q   And you said that to him.
15     A   Yes, I did.
16     Q   And you believed that at the time.
17     A   Well, yes.  I was -- I raised the question to
18 him about that.
19     Q   Now, let me also say that -- you testified at
20 length about those seven positions that Ms.
21 Collins-Smee filled during the time you were on the
22 bench.  Remember Diane Diggelmann and Tony Grimaldi
23 and those folks?
24     A   Yes.
25     Q   If she actually believed that you deserved a 3

27 (Pages 543 to 546)

Page 547

1  rating, at the time, certainly that would have had an
2  impact on whether she wanted to continue, or to have
3  you fill one of those positions?
4          MR. CARTA: I'm going to object, Your
5  Honor. Assuming facts not in evidence. There's no
6  evidence she believed he should have a 3. The
7  evidence is to the contrary.
8          Should I be louder in my objection?
9          THE COURT: Mr. Carta?
10         MR. CARTA: Yes, Your Honor. I objected,
11 and I'll raise my voice so the Judge can hear me.
12 Your Honor, I'm objecting because the question assumes
13 something that's not in evidence. It assumes Ms.
14 Collins-Smee believed he should have a 3. There's no
15 evidence that says she believed he should have a 3.
16 The evidence is the contrary, she made a final
17 decision that he should have a 2.
18         MR. FASMAN: I'll tell you what, Judge,
19 I'll withdraw it and we'll get it from Ms.
20 Collins-Smee, okay?
21         THE COURT: Okay.
22 BY MR. FASMAN:
23    Q   I want to go back. You know, we spent two and
24 a half days talking about a lot of different things,
25 but I want to go back to age discrimination. How

Page 548

1  about if we go back to that.
2          I'd like to start with some of the comments
3  that you testified about in your direct testimony in
4  support of this alleged 17-month conspiracy to
5  terminate you. First of all, you agree with me that
6  Joanne Collins-Smee never said to you that you were
7  too old to do the job, right?
8     A   That's correct.
9     Q   And she never said you should retire, correct?
10    A   Directly, no, she did not say that.
11    Q   And aside from the one comment you related
12 about Mr. Wisse, she never made any comments about
13 other employees that would have led you to believe
14 that she was biased against them because of their age,
15 isn't that right?
16    A   I wouldn't be aware of whether she said -- my
17 only two experiences were my meetings with her
18 personally.
19    Q   Right. Now, with regard to Mr. Wisse, he was
20 not terminated, right?
21    A   That's correct.
22    Q   He continued to work, right?
23    A   Yes.
24    Q   And it's true, isn't it, that no one else at
25 IBM made any comments to you that evidenced any sort

Page 549

1  of age bias, right? No one aside from Ms.
2  Collins-Smee.
3     A   That's correct.
4     Q   And that includes Mr. Liederbach, right?
5     A   Correct.
6     Q   Keenie McDonald?
7     A   Correct.
8     Q   Bob Zapfel?
9     A   Correct.
10    Q   Keith Holmes?
11    A   Correct.
12    Q   Garrett Walker?
13    A   I had discussions with Garrett Walker.
14    Q   But he didn't himself indicate any age bias,
15 right? He didn't say, I don't like older people.
16    A   Oh, no, that's correct.
17    Q   John Shimkus?
18    A   Correct.
19    Q   Luis Fernandez, right?
20    A   Correct.
21    Q   Miguel Echavarria?
22    A   Correct.
23    Q   And all the people you talked about today that
24 you went to and talked to about jobs, Alan Weststeyn,
25 Gregg Mastiforte, Phil Guido, Bill Barnett, Jack

Page 550

1  Overacre, of all those people, none of those people
2  ever made a comment to you that indicated any age
3  bias, correct?
4     A   That's correct.
5     Q   So let's go back to the three conversations
6  you had where you say you had with Ms. Collins-Smee
7  about the possibility of retirement.
8          First of all, she didn't bring this up
9  constantly, did she?
10    A   The meetings I had with her one-on-one, those
11 three specific occurrences, absolutely.
12    Q   Right, those three specific occurrences. And
13 they, according to you, they occurred in February
14 2007?
15    A   February 22nd.
16    Q   November --
17    A   21st.
18    Q   -- 2007, and then sometime in March 2008,
19 right?
20    A   That's correct.
21    Q   Now, you would agree with me that it is not
22 improper for an IBM supervisor to have a conversation
23 about retirement with an individual, that's not
24 forbidden under IBM policy, is it?
25    A   If it's in a threatening way it is. If it's

Page 551

1    initiated by the employee it isn't.
2        Q   Well, I asked you that in your deposition,
3    your first deposition.  Remember what I asked you?  I
4    asked you just that.  Do you remember what your answer
5    was?
6        A   Probably said something very similar to that.
7        Q   Well, let's see what your answer was.
8            MR. FASMAN:  Your Honor, we videotaped
9    the first session of Mr. Castelluccio's deposition so
10   we're going to do a little TV.
11           THE COURT:  Okay.
12           MR. FASMAN:  So Ms. Gutierrez, could we
13   have depo clip number 5, please.
14           (Videotaped deposition excerpt)
15       Q   If an individual who was performing poorly
16   also was eligible to retire, in your view would it be
17   improper to say to the individual, you know, one
18   option open to you is to retire if you choose to do
19   so?
20           MR. CARTA:  Objection as to form.  You
21   may answer.
22           THE WITNESS:  It's fair if you've -- I
23   think it was -- again, I didn't understand it myself
24   because I didn't have to go through this, so I'm
25   trying to recall guidelines that we get from our HR

Page 552

1    organizations, but I believe the guidelines -- again,
2    that would have to be validated -- but my recollection
3    of the guidelines was if you appraise someone poor on
4    this, you know, the term we use, measure of mile, and
5    they're not improving, one of the things you could
6    discuss with the individual is that, you know, you do
7    have the opportunity, you can -- you're eligible for
8    retirement and you could, as one of your options,
9    retire.
10           (Videotaped deposition excerpt concluded)
11   BY MR. FASMAN:
12       Q   So as one of your options, you could retire,
13   and that would be permissible?
14       A   In a situation that was described there, you
15   had a poor performer who's on a measured mile to be
16   terminated from the business.
17       Q   Well, let's just go to the February 2007
18   meeting, if we can.  Okay?  All right?
19       A   Yes.
20       Q   Now, you said several times, indeed you just
21   said, that the meeting took place on February 22nd,
22   2007.  You have a very specific date, didn't you?
23   Right?
24       A   Yes.
25       Q   Now, in your complaint -- Joanne Collins-Smee

Page 553

1    became your supervisor on February 1st, 2007, right?
2        A   I believe that's her official start date.
3        Q   And in your complaint --
4            MR. FASMAN:  And Mr. Carta, I'm reading
5    the complaint, paragraph 17, page 5.
6            Do we have that?
7            MS. GUTIERREZ:  Yes.
8            MR. FASMAN:  Do we have it visible?
9    BY MR. FASMAN:
10       Q   The complaint -- this is your complaint filed
11   by your counsel, says, "Within one week of Ms.
12   Collins-Smee's commencement as Mr. Castelluccio's
13   supervisor Ms. Collins-Smee held a meeting with Mr.
14   Castelluccio where she asked him how old he was and
15   suggested he was old enough to bridge to retirement at
16   that time."  Do you see that?
17       A   Yes.
18       Q   So within a week, not February 22nd, which is
19   three weeks later.
20           Let me go back to something else, and maybe
21   this will refresh your recollection.
22           MR. FASMAN:  Can we put up Defendant's
23   Exhibit 27 so that we can see that?
24   BY MR. FASMAN:
25       Q   Defendant's Exhibit 27 is an e-mail.  Can you

Page 554

1    see that, sir?
2        A   Yes, I do.
3        Q   So this is an e-mail sent to you from Ms.
4    Collins-Smee to you and Lorraine Serra.  Lorraine
5    Serra was her administrative assistant, isn't she?
6    Wasn't she?
7        A   Yes, I believe so.
8        Q   Saying -- and this is on 2/12/2007.  That
9    says, "Jim, please get with Lorraine to get us
10   together for half an hour on Monday to discuss
11   WellPoint.  Thanks."  Right?
12       A   That's what it says.
13       Q   Okay.  And your first discussion with her, you
14   ended up talking about WellPoint, correct?
15       A   On February 22nd, I did talk to her about
16   WellPoint.
17       Q   Well, let me ask you this:  I will
18   represent -- I looked this up last night -- the 12th
19   of February in 2007 was Monday, and this is sent at 3
20   o'clock in the morning.  Right?  That's what it says.
21   It says 3 o'clock in the morning.
22       A   Okay.
23       Q   So presumably with a new supervisor who says
24   let's get together and talk about WellPoint, which is
25   an important account, and says get with Lorraine and

Page 555

1   get on my calendar for Monday, which would be this
2   day, presumably you met with her on WellPoint on this
3   day.
4           MR. CARTA: Objection, speculative.
5           THE WITNESS: I don't know that.
6   BY MR. FASMAN:
7       Q   You don't know that? Okay. Well, it would be
8   logical to assume that if she wanted a meeting with
9   you that day, you would have had one, right?
10          MR. CARTA: Asked and answered.
11          THE COURT: Overruled.
12          THE WITNESS: It would -- I don't -- it
13  would depend on her calendar, not my calendar.
14  BY MR. FASMAN:
15      Q   Well, she was the one who said go get with
16  Lorraine --
17      A   Yes.
18      Q   -- and get on my calendar, I want to talk to
19  you about this.
20      A   Yes.
21      Q   So you might have been wrong on the date,
22  February 22nd.
23      A   I -- I don't believe so.
24      Q   Well, your complaint certainly says something
25  different, doesn't it? Your complaint says within a

Page 556

1   week, this says something different, but you're
2   convinced on February 22nd, right?
3       A   When I was referring to the 22nd from the 12th
4   to the 22nd, this was my first session with her.
5       Q   I see. So let's go back. Let the jury sort
6   this out. You folks can figure this out.
7           But you testified yesterday under oath that
8   she asked you your age and said you're old enough to
9   retire. That's what you testified to, but that's not
10  really what she said, was it?
11      A   I believe yesterday I also said what she
12  actually said in the meeting.
13      Q   I asked you exactly what she said in your
14  first deposition, didn't I?
15      A   I don't recall, but I would assume so.
16      Q   Well, I asked you exactly what she said.
17          MR. FASMAN: Can we have clip number 1.
18          (Videotaped deposition excerpt)
19      A   I just said what she said.
20      Q   Well, I'm trying to --
21      A   "You're old enough," and she stopped.
22      Q   And then what exactly --
23      A   Then "You're old enough to bridge to
24  retirement, right?"
25      Q   And your response was, I have no desire?

Page 557

1       A   Well, my initial reaction was, a pause, there
2   was a noticeable pause in there, because it was such a
3   shocking statement to be made, and then I said I have
4   no desire, I was very strong, I have no desire to
5   retire, okay.
6       Q   And then what, if anything, did she say?
7       A   Then we got into about WellPoint, and the
8   issues that are on the WellPoint contract. It was
9   like okay, we did that, we got past that, now we go
10  into the WellPoint.
11          (Videotaped deposition excerpt concluded)
12  BY MR. FASMAN:
13      Q   Prior to that you also testified, did you not,
14  that she said -- the two words that came out of her
15  mouth were "how old," and then she stopped.
16      A   She said "How old are --" and it stopped.
17      Q   That's not what you testified to in your
18  deposition, is it?
19          Let me see if I can find it.
20          Maybe we'll come back to that.
21          But then you had a constructive discussion
22  with her on WellPoint, right?
23          And I think you testified yesterday that you
24  considered this a lapse in judgment on her part and
25  you just moved on and -- right?

Page 558

1       A   Correct.
2       Q   And that was February -- we think it's
3   February 12th, but whatever it was, it was February,
4   and nothing for eight months later, right? She
5   doesn't say another word to you about this.
6       A   That's correct. That's correct. I'm trying
7   to think. Yes.
8       Q   Now, your office -- hang on one second.
9           Let me -- if you -- if you would -- let's do
10  it this way. Here's your testimony, and let me just
11  read it to you. This is page -- page 25, line 6. My
12  question to you, Mr. Castelluccio:
13          "Do you remember what she -- exactly what she
14  said?
15          "A: There was no response to that.
16          "Before the first --" question again: "Before
17  the first comment that she made.
18          Answer: Yeah, I just said what she said, how
19  old, and she stopped."
20          So let's go back now and talk about what
21  happened during this period of time. Your office was
22  right down the hall from her, right?
23      A   Yes.
24      Q   And you worked with each other on a fairly
25  frequent basis?

Page 559

```
1       A   No.
2       Q   Did you do the resource action together?
3       A   I -- for my -- I did my role for the Public
4   Sector as my peers did, and Joanne was -- we were
5   feeding her the results of our activity that we were
6   doing on resource.  So she was collecting numbers.  If
7   you were given a target of 208, we're already reaching
8   208, and we'd have to report to her on how we were
9   doing working with the employees that worked with us.
10      Q   I'm not getting into the details of that.  I'm
11  just mentioning, you were down the hall from her, you
12  were in communication with her throughout this entire
13  period of time, is that right?
14      A   On the phone, because she traveled
15  extensively.
16      Q   Right.  But you spoke to her, and she never in
17  all that eight months, no matter how many times you
18  talked to her, she never brought up anything about
19  retirement or age again, right?
20      A   That's correct.
21      Q   Okay.  Now, then in November 2007 she told you
22  Gordon Crawford would be taking over as DPE at
23  WellPoint, right?
24      A   I'm sorry, the date?
25      Q   November 2007.
```

Page 560

```
1       A   Yes.
2       Q   Right?  And you said to her, words to the
3   effect of, Well, where does that leave me?  Something
4   like that.  Right?
5       A   Yes.
6       Q   And then I think you added yesterday's
7   testimony at the end, she had mentioned something
8   about retiring, right?
9       A   Well, she did, yes.
10      Q   And you can't recall exactly what she said,
11  isn't that correct?
12      A   She brought up my retirement.  The exact
13  wording she used, I don't know the full sentence that
14  she used, but she said retirement, and it was me that
15  she was talking about retiring.
16      Q   In fact, what she said was, when you said,
17  Where does that leave me?  She said, Do you want to
18  find another job, or are you interested in retirement?
19  And you said, I'm not interested.  And she said, I'm
20  all in, let's go.
21      A   That's not what she said.
22      Q   What did she say?
23      A   She said -- after I said I was, again, not
24  interested in retiring, then she said, We need to find
25  you a job.
```

Page 561

```
1       Q   And then she said she would assist you.
2       A   And I told her that I needed assistance, and
3   after I had this conversation with her, her answer
4   was, Yes, I'll help you.
5       Q   Okay.  So then you continued working with her
6   and seeing her, your office is still down the hall,
7   right?
8       A   It's misleading to say that, because she
9   traveled extensively.  She was very rarely in the
10  office, and I very rarely saw her, whether it was
11  walking to get coffee or whatnot.  So it's misleading
12  to say that.
13      Q   But you and she continued to have business
14  interchanges --
15      A   I worked for her.
16      Q   -- over the telephone.
17      A   I worked for her.
18      Q   You worked for her, right?
19          And on WellPoint in particular, there was all
20  kinds of stuff going on in WellPoint at this time,
21  right?
22      A   Yes, along with the other 30 contracts that I
23  had.
24      Q   Right.  So in this entire time, in November,
25  according to you, and then through the holidays,
```

Page 562

```
1   through the spring, you come back and see her in
2   March, and she raises retirement again sometime in
3   March, like five months later, four months later,
4   whatever it is, right?
5       A   It was November 21st.  We had the holiday, so
6   most people were off that period.
7       Q   I think you said March the 8th.
8       A   I requested a meeting with her in March, and I
9   met with her.
10      Q   And you can't recall exactly what she said
11  about that retirement at that time, whether -- can
12  you?
13      A   She brought up my retirement, that I was -- I
14  could retire.
15      Q   You could retire.  But do you remember, I
16  asked you exactly what she said during your
17  deposition?  Do you remember what your answer was?
18      A   No, I don't recall.
19          MR. FASMAN:  Let's do video clip 45.  Do
20  you want lines?
21          MR. CARTA:  Thank you, yes.
22          MR. FASMAN:  This is page 85, line 23 to
23  86, 8.
24          (Videotaped deposition excerpt)
25      Q   And I think -- my recollection is that then
```

Page 563

1   she said if we don't find something meaningful for
2   you, you should look at retirement again.
3       Q   You should look at retirement.
4       A   I'm not sure if "should" is the right word,
5   but she brought up retirement again. I don't know. I
6   mean it could have been you must look at -- to be
7   honest, I don't recall what term she used with that.
8       (Videotaped deposition excerpt concluded)
9   BY MR. FASMAN:
10      Q   Okay. So it's three conversations. Two of
11  them you can't recall what term she used. And you
12  agree that she never said -- she never said, Jim, I
13  want you to retire.
14      A   No, she never said that.
15      Q   Now, let's go back to the February 2007
16  meeting where she almost asked you your age. You
17  said -- you testified in your deposition that you were
18  shocked by that. Do you remember?
19      A   Yes. I mean shocked -- yes, I did.
20      Q   You testified that that was ingrained in your
21  memory. Remember that?
22      A   No, I don't remember it, no.
23      Q   Let's see if I can find your ingrained
24  comment.
25          MR. FASMAN: This is page 23, counsel.

Page 564

1   I'm reading his answer, 23, line 5.
2   BY MR. FASMAN:
3       Q   In which you answered my question as to what
4   happened, where you said, "I sat down, and it's still
5   like ingrained in my brain, the first thing that she
6   said to me was, she said the word old, and she
7   stopped, and when she said how old and she stopped, I
8   think that what triggered in her mind is things had
9   been drilled into managers," and then you go on to
10  something else.
11          Ingrained in your mind. Those two comments.
12          Now, if they were so shocking to you, why
13  didn't you go to human resources?
14      A   I said that at the point. She's my manager,
15  it's my first meeting with her, she brings up my age
16  and retirement, and I discussed it with her, the
17  retirement component of that, and I believe that based
18  on IBM's policy as far as using age as a factor in
19  determining someone's performance or how you treat
20  them is unacceptable.
21      Q   It is unacceptable, so why don't you go to
22  human resources and say this is shocking behavior by
23  my new supervisor?
24      A   This is my new manager. I'm not going to get
25  into a confrontation with her in the very first

Page 565

1   session, because my belief was if it persisted for --
2   if she kept bringing up age and age, age, age, every
3   other week, then I would do that, but at that point in
4   time it was -- she brought it up, I just -- I -- she
5   brought up retirement and we had our discussion about
6   retirement, and we continued on. I went back to my
7   job and I continued on my job.
8       Q   Well, you knew how to file a complaint if you
9   wanted to, right? No question about that.
10      A   Well, there is a question about that because
11  I've never filed one so I've never been through the
12  procedure, but --
13      Q   But you had conducted yourself -- you had
14  conducted open door investigations --
15      A   Yes.
16      Q   -- on your own, right?
17      A   Yes.
18      Q   So you knew how those worked.
19      A   I mean I don't -- yes.
20      Q   And those are begun, right, with an internal
21  complaint of mistreatment of some sort?
22      A   That's usually what initiates them, yes.
23      Q   And you went to Garrett Walker months and
24  months later on an informal basis and said listen, I'd
25  like your advice and counsel on this, "this" being the

Page 566

1   PBC that we saw.
2       A   Well, "informal" implies that it was -- I mean
3   if -- it was formal in the sense that I had picked
4   someone who did not have any relationship with me in
5   my job or really had a knowledge of me at that point,
6   and I selected them, so I'm not sure whether informal
7   is the right word for that.
8       Q   Well, but at least you went to someone in
9   human resources and said, I'm troubled by this, this
10  is a problem, help me out.
11      A   Yes. I explained the situation. I wanted
12  their comments.
13      Q   Now, over that 18-month period, or however
14  long you worked for Joanne Collins-Smee, with regard
15  to retirement comments, the ones that you mentioned,
16  the next two, why didn't you say to her, you know, why
17  don't you stop asking me about retirement?
18      A   Well, in the November session I had with her
19  we did talk -- I mean she brought up retirement again,
20  and I said, We have already covered that and I'm not
21  interested -- nothing's changed, I'm not interested in
22  retirement.
23      Q   And she said, Okay, let's get you a job,
24  right?
25      A   Well, it wasn't -- she didn't -- no. I had to

A-420

Page 567

1  ask her to help me get the job. She didn't volunteer
2  that.
3    Q   All right. We'll hear another side of that.
4       Let's go back to Mr. Macina and Mr. Jones for
5  a minute, and then I want to change topics. With
6  regard to Mr. Macina and Mr. Jones, you were pretty
7  closely associated with them, weren't you?
8    A   Well, I don't know what you mean by -- I
9  worked for them.
10   Q   Right. They were friends of yours.
11   A   No, they weren't friends of mine. I worked
12 for them. I knew them through business, that's all.
13   Q   I see. You were not friendly with Mr. Jones?
14   A   Well, I liked him. I mean I didn't socialize
15 with him. I didn't --
16   Q   All right. Business friends, fair enough?
17   A   Business relationship, yes.
18   Q   Now, both Mr. Macina and Mr. Jones were --
19 they were running the delivery side of the house,
20 right?
21   A   Yes, in different capacities.
22   Q   Right, yes. Mr. Jones was running the
23 Americas, Mr. Macina was running the world. He was
24 above him. Now, they were both terminated in -- or
25 asked to leave IBM in January 2007, weren't they?

Page 568

1    A   Well, I don't know whether they were
2  terminated or asked to leave, but they both left in
3  that time frame.
4    Q   I see. In fact, their departure was announced
5  at a public meeting in Orlando, wasn't it?
6    A   Yeah, I think it was -- yes.
7    Q   And you were there?
8    A   Yes.
9    Q   You remember who announced it?
10   A   I think there was an initial announcement by a
11 gentleman by the name of Mr. Moffat, and Mr. Zapfel
12 followed up after that.
13   Q   Okay. Now, Ms. Collins-Smee and Mr. Zapfel
14 were recruited to replace the two of them.
15   A   Well, replace them, yes.
16   Q   Right. Mr. Zapfel replacing Mr. Macina, Ms.
17 Collins-Smee replacing Kelton Jones, right?
18   A   Yes.
19   Q   And during the conference in Disney World, was
20 there a discussion of how the delivery operation at
21 IBM had to change?
22       MR. CARTA:  Between whom?
23 BY MR. FASMAN:
24   Q   Was there a discussion, a public discussion,
25 of how the delivery operation at IBM had to change?

Page 569

1    A   Hadn't changed?
2    A   Had to change.
3    A   Had to change.
4    Q   With Mr. -- with the new leadership.
5    A   I don't recall that.
6    Q   All right. Now, let's go back to when you did
7  actually file an internal complaint of age
8  discrimination. This is back in June 2008. Remember
9  we saw your complaint up there?
10   A   Yes.
11   Q   Do you remember?
12      Now, the complaint was filed immediately after
13 you retained counsel, wasn't it?
14   A   The July -- I'm sorry, the June date I was
15 still working for IBM. And I'm sorry, what was your
16 question?
17   Q   This was filed within two days after you
18 retained counsel to advise you on the terms of the
19 release.
20   A   I spoke to a lawyer, I believe in the June
21 time frame, but it was recommended by IBM when they
22 give you a separation package that they actually
23 encourage you to talk to a lawyer, take a look at the
24 language, whatever, the terms of it, so forth.
25   Q   Yeah, no, that's absolutely right, there was a

Page 570

1  release of claims, and IBM's part of the release of
2  claims said you should review this, as Mr. Carta said,
3  you should review this with counsel, right?
4    A   I didn't -- I didn't understand -- I didn't
5  interpret it that way when I received the formal
6  document from IBM for retirement. In it, it had
7  recommended -- it didn't make specific reference to
8  the release term because at that point I didn't know
9  what that was, per se. It said, We recommend, or
10 encourage you, I don't know if they recommend, but
11 they encourage you that you should consult with a
12 lawyer about the terms and the write-up and whatever
13 is specified in the agreement.
14   Q   And do you remember who counsel was that you
15 consulted with?
16   A   I don't remember. I think he was someone
17 local.
18   Q   I see. And two days afterwards you filed this
19 complaint of age discrimination, right?
20   A   That's correct, but it was independent of that
21 conversation I had with that law firm.
22   Q   I see. Now, was your complaint of age
23 discrimination investigated?
24   A   I'm sorry, when you say filed?
25   Q   You made an internal complaint through Garrett

33 (Pages 567 to 570)

Page 571

1   Walker. We already saw that.
2       A   Oh. I scheduled a meeting with Garrett Walker
3   as a follow-up to the earlier session, and I brought
4   him up to date what had happened, where we were from
5   where I had previously met with him earlier on that
6   year.
7       Q   So the complaint that you brought to Mr.
8   Walker, that was investigated, wasn't it?
9           MR. CARTA: Objection, Your Honor. The
10  word "investigated," and I think counsel knows why.
11          THE COURT: Okay. You made a complaint
12  to the company, and the company looked into it, is
13  that correct?
14          THE WITNESS: Yes. Yes, Your Honor.
15  BY MR. FASMAN:
16      Q   And who did it? Who looked into it?
17      A   Well, the HR department.
18      Q   Russ Mandel, right?
19      A   Yes.
20      Q   Pursuant to a procedure that you knew called
21  an open door appeal procedure, correct?
22          MR. CARTA: Objection. How is he going
23  to know what procedure was being followed?
24          MR. FASMAN: He just said that he
25  conducted open door procedures.

Page 572

1           THE COURT: You have to let counsel ask
2   the question before you can object to it.
3           MR. FASMAN: I'm sorry, Judge.
4           THE COURT: We have to let counsel ask
5   the question before there's an objection.
6           MR. CARTA: My apologies.
7           THE COURT: If there's an objection, we
8   have to allow the objecting lawyer to state the basis
9   of it. Here there was an objection, you got around
10  it, and the question pending right now is what?
11          MR. FASMAN: Is he conducted it pursuant
12  to the open door appeals process.
13          THE COURT: Do you know the answer to
14  that?
15          THE WITNESS: Yes, I -- do I know for
16  sure? No.
17  BY MR. FASMAN:
18      Q   But that's what he told you.
19      A   Garrett Walker?
20      Q   Russ Mandel.
21      A   Russ Mandel.
22      I guess I would have to -- I would have to
23  interpret there is a --
24      Q   Wait a second, wait a second. Russ Mandel,
25  you know him, don't you?

Page 573

1       A   I know him through work, yes. I know the
2   name.
3       Q   And you know that he runs IBM's internal
4   appeals process, don't you?
5       A   I don't know, no, I don't know that.
6       Q   You don't know that. But you did speak to him
7   in terms of this complaint that you filed.
8       A   You keep saying filed, but --
9       Q   Registered. You like registered better?
10  That's fine. That's okay with me.
11      A   Well, it was a meeting. In the meeting we
12  discussed, so --
13      Q   Right. In fact, you had a series of
14  conversations with Mr. Mandel about this, right?
15      A   I had some conversations with Mr. Mandel.
16      Q   And there was correspondence back and forth,
17  right, between the two of you?
18      A   There was -- yes, there was exchanges.
19      Q   Okay. And the purpose of this investigation
20  was to find out what was -- whether you had been
21  treated fairly, correct?
22      A   Yes.
23      Q   I'll tell you what, I'll withdraw that. We'll
24  let Mr. Mandel talk about that.
25      If Mr. Mandel found in your favor, was it your

Page 574

1   understanding that he had the authority to reinstate
2   you?
3       A   No, that wasn't my understanding at all. At
4   least in my past dealings with him on the situations I
5   described.
6       Q   Did he tell you that he had the authority to
7   reinstate you?
8       A   No, he didn't.
9       Q   What happened as a result of the complaint?
10          MR. CARTA: I'm sorry, I didn't hear the
11  question, Your Honor.
12  BY MR. FASMAN:
13      Q   What happened as a result of the complaint?
14          MR. CARTA: I'm going to object to that.
15          THE COURT: On what grounds?
16          MR. CARTA: May we do a sidebar, please?
17          THE COURT: Well, as a result of the
18  filing of the complaint, IBM looked into it, it had
19  Mr. Mandel look into it. And is it Mr. Mandel's job
20  to look into such complaints?
21          MR. FASMAN: Yes, sir.
22          THE COURT: He's part of the HR
23  department?
24          MR. FASMAN: He run it, he runs this
25  portion.

Page 575

1      THE COURT: Okay, let me just ask the
2   witness one question. You don't have any reason to
3   believe, do you, that this process of looking into
4   your allegations was not done pursuant to regulations.
5      THE WITNESS: Oh, I do, Your Honor.
6      THE COURT: You do, you have reason to
7   believe that it was not -- that regulation was not
8   followed, you have evidence.
9      THE WITNESS: I have experience.
10     THE COURT: Okay. You think that it was
11  irregular, it was conducted irregularly.
12     THE WITNESS: Yes. I think the --
13     THE COURT: No.
14     MR. CARTA: Just yes or no.
15     THE WITNESS: Yes. Yes, Your Honor.
16     THE COURT: So next question, Mr. Fasman.
17  BY MR. FASMAN:
18   Q   Why?
19   A   I'm sorry, why?
20   Q   Why? Why do you take that position?
21     MR. CARTA: Your Honor, I'm going to have
22  to object. He is absolutely opening the door to
23  something we've already had a ruling on. The witness
24  has got to answer that question in the only way he can
25  answer. I don't think the Court wanted speaking

Page 576

1   objections, but --
2      THE COURT: Well, in our pretrial
3   meetings it became apparent that there were certain
4   things that would have to come from Mr. Mandel, with
5   respect to what he did, and then this witness was not
6   the witness who would be in a position to know what
7   Mr. Mandel did.
8      MR. FASMAN: Well, no, I agree a hundred
9   percent, Your Honor. The only thing I'm bringing up
10  is Your Honor asked the question of him whether he
11  thought it was conducted properly, and he said no,
12  which is surprising to me, so I was trying to get on
13  the record why he felt that way.
14     THE COURT: Mr. Carta?
15     MR. CARTA: Your Honor, Mr. Fasman is
16  using his own questions to open the door to an area
17  that we have decided --
18     MR. FASMAN: Can we do this at a sidebar?
19     MR. CARTA: I've asked for a sidebar.
20     (Conference held at sidebar)
21     MR. CARTA: Your Honor, there's no reason
22  that can't be done through Mr. Mandel. He's running
23  the risk of having the witness start to testify about
24  why he thinks that it was a sham, and my witness will
25  have opened the door, I have no choice but to object.

Page 577

1   If he starts talking about how it was a sham, when you
2   ask him why, it's necessary to tell you it wasn't done
3   according to procedure, never got back to him, and as
4   to what happened, all of the -- we've put in our
5   brief, there's no reason for this witness to be asked
6   that question. It's just to open the door.
7      MR. FASMAN: Well, I didn't ask him if --
8      THE COURT: I may have opened the door
9   that --
10     MR. CARTA: You were following up on his
11  question.
12     THE COURT: Okay.
13     MR. CARTA: You were absolutely following
14  up.
15     THE COURT: Wait. It was not my
16  intention to open the door, and if I did open the
17  door, I'm closing the door, and we're just going to
18  move on, and we're going to get to the point, and
19  you're going to ask him, what was done and --
20     MR. CARTA: I'm not asking him anything
21  about the open door. I made a strategic decision not
22  to ask him a single question about the open door
23  procedure, so there could be no argument whatsoever
24  that I opened that line of inquiry.
25     MR. FASMAN: Let me just say one other

Page 578

1   thing, Your Honor. This morning Mark read from an
2   exhibit, Plaintiff's Exhibit 204, he read half of our
3   position with regard to why he was terminated and
4   whole notion of poor performance versus it's being on
5   the bench. The paragraph he read from has extensive
6   references to the open door, and I think I'm entitled
7   to get right into that. I mean you were warned not to
8   do something like that, and you took 204 -- we can
9   look at that, but I mean it's in the same paragraph,
10  Your Honor.
11     THE COURT: Okay, you know, the emphasis
12  that you're giving to the term "open door" is just way
13  out of proportion to what we're doing here. That's a
14  term that is apparently unique to IBM.
15     MR. FASMAN: Yes.
16     THE COURT: And it means something. I
17  don't know what it means. It means something to IBM.
18  To me it's just like, open door.
19     The important thing is that he advised
20  IBM of the complaint and IBM acted, conducted an
21  investigation, and the reason it conducted the
22  investigation was it has a policy of investigating
23  allegations, it is very aware of its obligations under
24  federal law, and it wants to settle problems
25  internally, so that's why Mandel conducted the

Page 579

1    investigation. Now, I mean --
2          MR. FASMAN: How about if I withdraw the
3    question?
4          THE COURT: So to ask this man, he's
5    going to endorse Mandel's investigation, of course,
6    because he -- I mean he disagrees with the outcome.
7    The best thing we can do, Mr. Mandel can come in and
8    talk.
9          MR. FASMAN: That's fine.
10         THE COURT: You'll do that?
11         MR. FASMAN: I'll do that through him,
12   yes.
13         THE COURT: Okay, so we resolved the
14   problem, okay.
15         (Conference concluded at sidebar)
16         MR. FASMAN: Okay, I'll withdraw the
17   question. We'll keep on going.
18   BY MR. FASMAN:
19     Q   Let me ask you one other thing: Were you ever
20   advised by Mr. Mandel what the result of his
21   investigation was?
22     A   Yes.
23     Q   And you were advised in writing, weren't you?
24     A   Yes.
25         MR. FASMAN: Your Honor I'd like to

Page 580

1    introduce Exhibit number 155, which is a letter from
2    Mr. Mandel to Mr. Castelluccio.
3          MR. CARTA: Objection.
4          MR. FASMAN: We discussed this off the
5    record, but I think the jury should see it.
6          THE COURT: Let me look at this again.
7    This is in your book, Mr. Carta?
8          MR. CARTA: I don't believe so.
9          MR. FASMAN: No.
10         MR. CARTA: Your Honor, this is what we
11   ruled on before. He's just making his proffer.
12         THE COURT: This is the same problem,
13   raises the same problem about which we've had so much
14   discussion. You're offering this as an exhibit?
15         MR. FASMAN: I am.
16         MR. CARTA: I'm objecting.
17         THE COURT: You're objecting to it. The
18   objection is sustained.
19         Mr. Fasman, you know, you can go around
20   it, ask some questions. It's just that -- well, I'll
21   stop there.
22         MR. FASMAN: Okay, thank you.
23   BY MR. FASMAN:
24     Q   Mr. Castelluccio, you did receive a written
25   response from Mr. Mandel, right?

Page 581

1      A   Yes.
2          MR. FASMAN: And Your Honor's ruled
3    that's not admissible?
4          THE COURT: Yeah, I have.
5          You are aware that this investigation was
6    undertaken by Mr. Mandel?
7          THE WITNESS: Yes, Your Honor.
8          THE COURT: All right. And this was
9    part, was it not, of an attempt to see if you and IBM
10   could resolve the dispute between you?
11         THE WITNESS: Yes, Your Honor.
12         THE COURT: Okay. So your allegations
13   were brought to IBM's attention, that there was some
14   problem, and that a senior executive was unhappy and
15   thought that he had been discriminated against?
16         THE WITNESS: Yes, Your Honor.
17         THE COURT: And one would expect a
18   company like IBM to have an HR department and a policy
19   regarding investigating these complaints, correct?
20         THE WITNESS: Yes, Your Honor.
21         THE COURT: And as far as you know, this
22   investigation was undertaken, and the goal was to see
23   if your allegations could be dealt with in a way that
24   was acceptable to you and acceptable to IBM without
25   the need for further proceedings outside of the

Page 582

1    corporation?
2          THE WITNESS: Yes, Your Honor.
3          THE COURT: Okay. Mr. Fasman?
4          MR. FASMAN: Thank you, Judge.
5    BY MR. FASMAN:
6      Q   Let's shift gears for a moment and talk about
7    some business issues.
8          You would agree with me that IBM -- in the
9    outsourcing business IBM was in a very competitive
10   market, right?
11     A   Yes.
12     Q   And customer satisfaction was very important,
13   correct?
14     A   Yes.
15     Q   And that was also an important portion of your
16   job, both as a vice president of the Public Sector
17   division and also as the WellPoint DPE, right?
18     A   Correct.
19     Q   Now, as the vice president of the Public
20   Sector division -- we don't need to put the charts
21   back up there, but as the vice president of the Public
22   Sector division, the person who was on the GTS side,
23   that is the sales side for the Public Sector, was Dave
24   Liederbach, right?
25     A   In the beginning he was, yes.

Page 583

1    Q   Well, he was throughout your tenure, as the
2  vice president.
3    A   Could you restate?
4    Q   I'm just getting at a simple point.  You're
5  the delivery side, when you're the vice president of
6  the Public Sector division.
7    A   Yes.
8    Q   You're the delivery aspect of it.  Dave
9  Liederbach is in charge of the sales side of the
10  process, right?
11    A   Not -- how can I explain this?  He did not
12  have -- initially when I was in the position he was in
13  a different role.  So when I became vice president of
14  Public Sector, and responsible for those 30 contracts,
15  Dave was responsible on the sell side for some less
16  than those 30, a smaller percentage.
17    Q   I see what you're saying.  But then he became
18  the -- basically responsible for the same contracts
19  that you were responsible for delivery on.
20    A   He had -- yes.  When I -- when we both started
21  out he had responsibility for a subset of what I had
22  responsibility for, on the sale side.
23    Q   Right.  But his Public Sector contracts were
24  ones that you and your organization serviced.
25    A   Oh.  Yes, yes.

Page 584

1    Q   That's all I'm trying to get at.
2    A   Okay.
3    Q   Now, he was sort of your internal customer.
4    A   Not internal customer.  We were peers.
5    Q   Okay, you were peers.  You were aware that he
6  was not -- that he had made complaints about your job
7  performance, aren't you?
8    A   Well, I mean we had discussions, yes, about
9  various things.  I complained about his group, he
10  complained about my group, if that's what you mean.
11    Q   What I mean is -- you said you read every
12  single document that was produced, right, in this
13  litigation?
14    A   Yes.
15        MR. FASMAN:  Put up number -- our exhibit
16  number 12, please.
17  BY MR. FASMAN:
18    Q   Can you read the highlighted portion for the
19  jury?
20    A   "The attached is one of a stream of notes that
21  I get from my executives with concerns on
22  responsiveness or follow-up --"
23    Q   I'll read it.
24    A   I'll finish it.
25        THE COURT:  Stop.  He will read it.

Page 585

1        THE WITNESS:  Sorry.
2  BY MR. FASMAN:
3    Q   So this is from Dave Liederbach to Kelton
4  Jones, and it's dated April 30th, 2006.  And it
5  says -- and I'm going to read not just the highlighted
6  portion because it's short.
7        "Kelton, please do not forward.  The attached
8  is one of a stream of notes that I get from my
9  executives with concerns on responsiveness or
10  follow-up from Jim.  I'm experiencing the same issues.
11  Be them e-mails --" that's not quite right is it "--
12  or calls to his cellphone.  I have raised this to
13  Jim's attention in the recent past.  If there are
14  issues outside of work I need to understand that would
15  explain the situation let's talk.  Otherwise I believe
16  we need to consider an immediate change in his
17  execution or a change in leadership.  I will call you
18  on Monday to get your insights.  Thank you.  Kelton."
19        This is 4/30/2006.  So he says -- Liederbach
20  says, "I've raised this to Jim's attention in the
21  recent past."  Did you have a discussion with him
22  prior to this?
23        MR. CARTA:  Objection, Your Honor.
24  BY MR. FASMAN:
25    Q   About your responsiveness?

Page 586

1        MR. CARTA:  Objection, Your Honor.  If
2  this is being offered to show what Mr. Liederbach said
3  to him, I don't understand it.  It says right on its
4  face, "Please do not forward," and there's no copy of
5  this to him.
6        THE COURT:  Well, you know, I don't know,
7  but I think Mr. Fasman is offering this as evidence
8  that there were problems between -- that other
9  executives in IBM, people other than Ms. Collins-Smee,
10  had some problems with Mr. Castelluccio's performance.
11  I think that's what he's offering it for.  Am I --
12        MR. FASMAN:  No, that's right.
13        THE COURT:  -- picking up on that?
14        MR. CARTA:  I thought it was to show that
15  Mr. Castelluccio had knowledge of this, and it says on
16  its face, "Please do not forward."
17        MR. FASMAN:  No, I asked Mr. Castelluccio
18  specifically whether he saw it in the production.
19        THE COURT:  Gotcha.
20        MR. FASMAN:  I didn't ask him that.
21  BY MR. FASMAN:
22    Q   But he does say, "I have raised this --" the
23  second to last line, second paragraph, says, "I have
24  raised this to Jim's attention.  His --" and I think
25  he meant "-- in the recent past."

Page 587

1    And that happened. You remember that.
2    A  Yes. Dave and I had a meeting.
3    Q  Prior to this?
4    A  No, following this.
5    Q  Following this. So you don't remember him
6  raising this to your attention in the recent past?
7    A  Well, the attachment that's there from Chris
8  Nicholetti, the second part of that is incomplete, and
9  I believe selectively incomplete.
10    Q  I was just asking you one question. Could you
11  answer my question?
12    A  I'm sorry.
13    Q  Thank you. So you can't recollect any
14  discussion between you and Mr. Liederbach on those
15  issues prior to this?
16    A  Oh, prior to this?
17    Q  Yes.
18    A  Dave and I talked, we talked frequently, so
19  there -- I mean I recall one specific incident about a
20  cellphone, I was in a zone that was not working, and I
21  called him back after that, and that's I think the one
22  example, or the one and only issue on this.
23    Q  Well, we'll have Mr. Liederbach on the stand.
24  But at least you saw that, then you did have a
25  discussion with him after this --

Page 588

1    A  Oh, yes.
2    Q  -- about concerns.
3    So let's --
4    A  Sure.
5        MR. FASMAN: Let's put up on the screen
6  Exhibit 13, if you will. This is two weeks later, May
7  9th, 2006.
8        Ladies and gentlemen, you'll have these,
9  you'll be able to look at them in the jury room, so I
10  apologize for these being quite as small as they are.
11  BY MR. FASMAN:
12    Q  But it's another one from Liederbach to Kelton
13  Jones, and he says, on May 9th, "Kelton, Jim and I
14  spoke for an hour yesterday as a follow-up to your and
15  my discussion. I shared examples of my concerns. To
16  Jim's credit, we spent little time rationalizing the
17  past and committed to the following:"
18        First bullet: "Communications between our
19  executive teams will improve."
20        Second bullet: "Commitments on service
21  delivery resource changes and all key business
22  decisions will be executed as discussed and within
23  time frames."
24        Third bullet: "Client centric and proactive
25  leadership behaviors are required of all executives

Page 589

1  and senior managers within our teams."
2        And then he says at the bottom, "I've added
3  bi-weekly meeting with Jim on service delivery
4  performance and cost management."
5        So you did have a discussion with Mr.
6  Liederbach in '06 about these issues.
7    A  Well, yes. We met in his office. We went
8  through what his concerns were, I went through from
9  the delivery side some of the issues that we had, and
10  that first bullet which you didn't highlight was a
11  good part of our discussion.
12    Q  What were his concerns?
13    A  WellPoint was a big concern. WellPoint had
14  suddenly been exposed as a troubled contract at that
15  point. That was one issue. The attachment that was
16  with his letter before where I think it was --
17    Q  I don't think I've asked you about that.
18    A  Well, okay. But you said what was his
19  concern. He brought that up as an example, and I
20  said, "Did you see Mr. Nicholetti's response to your
21  question?" And he -- at that point I think his answer
22  was "No." And I said I did respond to him, and, you
23  know, Nicholetti was satisfied with what was going on,
24  so forth.
25    Q  But his -- one of his concerns was response

Page 590

1  times, right?
2    A  Yeah, that's what he -- and we discussed that.
3    Q  Now, you're also aware -- I mean WellPoint was
4  such a big account, as you said yesterday, that it had
5  actually a managing director, it had Keenie McDonald
6  as managing director, right?
7    A  That's correct.
8    Q  And are you aware from your reading of the
9  documents in this case that Ms. McDonald also had
10  questions about your performance in 2006?
11    A  Yes. I mean it was a troubled account.
12  There's no avoiding discussions. We're never going to
13  agree on things.
14    Q  It's not just a question of a troubled
15  account.
16        Let's put Exhibit 15 up, please.
17        This one is from Keenie McDonald to Dave
18  Liederbach. It's dated 9/27/2006, before Ms.
19  Collins-Smee shows up. And I'm going to read just the
20  start of it, where she says, "Dave, I'm sending this
21  to you only. I feel like you and I are getting no
22  help from Jim to improve delivery and to take cost
23  out. Luis and John do not feel our team gets any help
24  value from Jim and we need it."
25        Do you see that?

Page 591

1    A   Yes.
2    Q   And that's before Ms. Collins-Smee ever shows
3    up.
4        Now, let me also --
5    A   I'm sorry, that --
6    Q   Sorry.
7    A   This is dated 9/27/2006?
8    Q   Six, right.
9    A   You're right, yes.
10   Q   So let me also ask you if you recall her
11   getting -- making complaints to you during this period
12   of time.
13   A   Keenie --
14   Q   Yes.
15   A   -- McDonald? I'm sure she did. I mean it
16   was -- she was running the troubled contract, so I'm
17   sure there were.
18       And if we could expand on what's below it,
19   this note from Keenie appears to be an attachment
20   there which I can't read, but --
21   Q   All right, let's talk about ones directly to
22   you.
23       Can you put up Exhibit number 17, please.
24       So this one is from her to you, and it's dated
25   two days later, I guess. One's 9/27, this is 9/29.

Page 592

1    It's from her to you, and it says -- I'm going to read
2    it because it's too small. I apologize again.
3        "Jim, I know you have talked to Luis and John.
4    We absolutely must get on with moving e-mail to a
5    competency. I have been with IBM for 28 years and on
6    a customer call today was more embarrassed than I have
7    ever been. The customer literally said he has no
8    confidence in what we tell him re e-mail because we've
9    missed every commitment we have made. Please get on
10   with the actions per your call with John and Luis."
11       That's what she said, this is about e-mail
12   competency.
13   A   And the customer had every right to make that
14   statement because that environment was a disaster.
15   Q   Well, but that's a note to you saying let's
16   get on with the competency, right?
17   A   And it was in full progress, and she was
18   either -- she wasn't reading project plans or -- there
19   was -- there were detailed project plans that were
20   underway, took a lot of planning to do to move into
21   the competencies. We were executing on those much
22   earlier than this 9/29 date. People had been moved in
23   in --
24   Q   She, at least, didn't feel that way, right?
25   A   But she -- she -- if she had looked at the

Page 593

1    project plans, she would have known exactly where we
2    were. She could have complained that we've only done
3    30 percent, we've only done 60 percent, but I could
4    have addressed that with her. This is a result of an
5    outage which was a valid customer complaint, as I
6    talked about before, because they were happening
7    across the environment. Mike Morin was running this
8    contract, and I'm sure Mike can talk to this
9    specifically.
10   Q   Can I ask you -- I mean I asked a very
11   specific question, and this is an age discrimination
12   case, right? We're talking about what her opinion was
13   at that time. She could have been wrong or right.
14   But you said she never made a comment -- that comment
15   that she had any age bias. She could have been a
16   hundred percent wrong, right?
17   A   Then I'm misinterpreting, because I'm not
18   interpreting this as an age discussion. This is an
19   outage discussion.
20   Q   Yes, exactly right. That's the point I was
21   trying to make. It's an outage discussion, but it was
22   a complaint that she made about you.
23   A   Not understanding, right. I didn't --
24   Q   It's not age discrimination to be wrong, is
25   it?

Page 594

1    A   Excuse me?
2    Q   We'll argue that -- I'll argue the law later.
3        Let's talk for a moment about how it came
4    about that you ended up leaving, being removed from
5    the vice president of the Public Sector division.
6        Let's look, if we may, at our Exhibit 36,
7    please.
8        And ladies and gentlemen, you've seen this
9    before.
10       But you only read the highlighted part that he
11   highlighted, so this is the other highlight. This is
12   the one from Ms. Collins-Smee to Keith Holmes. It's
13   dated 2/28/2007. And it says, "Keith, we need to
14   replace Jim Castelluccio. I will fill you in
15   tomorrow. Dave L --" presumably Liederbach "-- has
16   requested this, and asked months ago from Kelton but
17   no action. I spoke to Jim C today. He understands
18   and also wants to move. He knew for a while that it
19   was not working. Can you please pull a slate for
20   Jim's replacement. I also need to get Jim on Pat
21   Kerin's 5-minute drill. He'd like to move into a PE
22   or a C Band DPE role. Only a few of those, very
23   limited possibility here. Thanks." Right?
24       Now, you saw that. I mean you've seen this in
25   this case. And I think you testified that you never

Page 595

1 had a conversation with her in which you said you
2 understood and wanted to move and knew that for a
3 while that it was -- it wasn't working. Isn't that
4 your testimony?
5 A That's correct.
6 Q So that's a total fabrication on her part.
7 A She's talking about speaking with Dave L,
8 so --
9 Q I'm talking about the one sentence that says
10 "I spoke to Jim C today."
11 A Oh.
12 Q "He understands and also wants to move. He
13 knew for a while that it was not working."
14 A Correct.
15 Q That's a total fabrication on her part,
16 totally untrue.
17 A It not an accurate statement.
18 Q So do you have any idea why she would make up
19 something like that in an e-mail to her HR partner?
20 A I believe it's based on her conversation with
21 Dave.
22 Q No, this says "I spoke to Jim C today."
23 A I know.
24 Q So that's a lie.
25 A She didn't.

Page 596

1 Q She didn't. So why would she make that up?
2 What conceivable reason would she have for doing that?
3 A I don't know.
4 Q You have no idea.
5 A No.
6 Q Now, you do agree that some of this e-mail
7 is -- should be relied upon, right? When she says, "I
8 also need to get Jim on Pat Kerin's 5-minute drill --"
9 we went through that whole stuff you showed the jury,
10 Pat Kerin's 5-minute drill, forever. So part of this
11 is accurate, but that part's totally inaccurate, and
12 fabricated, is that what you're saying?
13 A Yes.
14 Q Yes, okay.
15 Well, I still don't understand why she would
16 do something like that. You didn't have an individual
17 employment contract, did you?
18 A I don't know what an individual employment
19 contract is.
20 Q If you don't know what it is, you don't have
21 one. But she could have just fired you outright,
22 right? You don't have a union contract.
23 A Well, if she fired me outright at this point,
24 I think -- everything IBM preaches in their policies
25 and practices and all would have been a -- she would

Page 597

1 have violated every HR principle within IBM. So yeah,
2 I guess she could have told me I was fired at that
3 point, but --
4 Q So but instead she's writing to her HR partner
5 and totally making up a conversation with you, for
6 whatever reason. It's hard to understand.
7 MR. FASMAN: Your Honor, this would be a
8 fine place for me to break, if you want to break, or I
9 could keep going. Whatever Your Honor wants, whatever
10 the jury wants is okay.
11 THE COURT: Ladies and gentlemen, we're
12 going to take a 15 minute break, or keep going?
13 We'll be back, and I guarantee you we'll
14 be back at quarter to 4 because I'm going to sit right
15 here.
16 (Jurors excused)
17 MR. FASMAN: I'll try to move it along,
18 Judge.
19 THE COURT: You take your time. I've set
20 aside time to make sure that Mr. Carta and you have a
21 full and fair trial. I'm going to do the best I can
22 on these issues, but I don't want you to think or Mark
23 to think that somebody's here with a stopwatch. I get
24 paid to do this, I get paid handsomely. I like my job
25 and, you know, my day is your day. And Mark, same

Page 598

1 goes for you.
2 MR. CARTA: Thank you, Your Honor.
3 MR. FASMAN: Thank you, Your Honor.
4 THE COURT: You're welcome.
5 (Recess taken from 3:31 p.m. to 3:47 p.m.)
6 BY MR. FASMAN:
7 Q Mr. Castelluccio, let me just ask you a couple
8 of more questions about this. There's no question, is
9 there, that IBM executives were moved off of
10 particular accounts due to client complaints, right?
11 A Well, when you say "no question," I mean each
12 individual request is individually evaluated and a
13 decision is made on IBM's part. It's not an
14 automatic.
15 Q Right. But you yourself did this, right? I
16 mean when you were the vice president of the PSD you
17 did this yourself, didn't you?
18 A Did I do that? I certainly would have the
19 opportunity to do that and evaluate a customer's
20 request.
21 Q Let me ask you -- let's -- I asked you that in
22 your deposition, and maybe you don't recall testifying
23 to this.
24 A Not as I'm sitting here right now, but I'm
25 sure --

40 (Pages 595 to 598)

Page 599

1    MR. FASMAN:  So maybe you could play depo
2  clip number 24.
3        (Videotaped deposition excerpt)
4    Q   Can you give us an example of the situation
5  where you transferred someone from one account to
6  another because of a customer complaint?
7    A   Mark Franzese.  Case in point.
8    Q   What happened?
9    A   Mark was on an account in the midwest, I think
10  it was in Chicago and I don't -- I can't recall the
11  account.  The customer came in and says, Get rid of
12  Mark, he's a screw-up, I don't want him on the account
13  anymore.  The customer also went to the PE on the
14  account and says, Get rid of Mark.
15        I had worked with Mark years prior to that.  I
16  knew Mark was not a screw-up, and I know sometimes you
17  get into these situations where you become the, you
18  know, the one that they blame for all the problems in
19  the universe, and that's -- Mark was in a situation he
20  could not succeed in, wasn't going to come out of
21  that.
22        I needed help on WellPoint.  I reached out to
23  Mark and says Mark, why don't you come over here, I
24  know what you're capable of doing, let me tell you
25  about this account, because this is a troubled

Page 600

1  account, it's not like you're typical, so I thought
2  I'd give him a heads up.  So I took Mark out of that
3  account and I put him on WellPoint.  Now, the customer
4  there, on the original job, they wanted him fired,
5  they wanted him gone from IBM, he was no value to IBM
6  at all.  He comes to WellPoint, they love him on
7  WellPoint.
8        (Videotaped deposition excerpt concluded)
9    Q   So --
10    A   Absolutely.
11    Q   People get pulled off of accounts, people get
12  put into other positions, right?
13    A   Right.  As I said before, each situation's
14  evaluated.  In some cases you don't agree with them.
15    Q   And if there's no position for that person to
16  fill, they go on the bench.
17    A   Well, I guess theoretically, we're talking
18  theoretically, if there was no position on delivery
19  side you might have to do that, but there were so many
20  opportunities, so many positions, I can't recall of a
21  situation where we did that and we did not have a home
22  for the individual.
23    Q   I see.  When you were replaced by Mr.
24  Echavarria, you were backfilled to WellPoint.
25    A   Correct.

Page 601

1    Q   You took over for Mike Morin, right?
2    A   Who had resigned, yes.
3    Q   And then later when Mr. Crawford replaced you
4  at WellPoint and you were given six months to find a
5  new position, right?
6    A   Yes.
7    Q   Okay.  Now, as I understand it, you testified
8  yesterday that you were not informed that you were
9  being replaced as the vice president of the Public
10  Sector division until June 2007 when Miguel Echavarria
11  took over, isn't that what you testified?
12    A   That's correct.  June 5th or 7th.
13    Q   Okay.  So let me ask you, if you would take a
14  look at our Exhibit 45, which I hope we're putting up
15  on the screen.
16        This is an e-mail from -- the bottom one is an
17  e-mail from Ms. Collins-Smee on March 31st to you and
18  Dave Liederbach that says, "Dave, Jim.  As we've
19  discussed, Jim must move to WellPoint.  As of Monday
20  we need him to be the acting DPE a hundred percent of
21  the time until we put the new WellPoint DPE in on
22  April 16th."  Right?
23    A   Yes.
24    Q   Okay.  And then you did take over at WellPoint
25  for some period of time, right?

Page 602

1    A   Well, this e-mail, I mean it -- it's saying
2  I'll be acting DPE, which is a temporary role.
3    Q   Correct.
4    A   On WellPoint, yes.
5    Q   But didn't you ask her what was going on?  Did
6  you have a conversation with Ms. Collins-Smee when you
7  got this?
8    A   When this e-mail came out, no, because I knew
9  Mike had resigned, so Mike resigned, the position's
10  open, my view at that point is -- how do I say it -- I
11  was still vice president of Public Sector.  This was
12  an add-on to that role, and it was an acting role.  It
13  was a -- not acting -- it was a temporary role.
14    Q   Of course there were rumors about your being
15  replaced as the vice president of the Public Sector
16  division, weren't there?
17    A   Well, if there was work going on in the
18  background, I would assume that was probably true.
19    Q   You knew there were rumors going on that
20  someone was going to replace you, didn't you?
21    A   No.  I don't recall any rumors.
22    Q   You didn't know that?  Well, let's see, I
23  asked you that during your deposition.  Do you
24  remember what you testified?
25        Let's put up clip number 55, if you would, and

Page 603

1    give counsel the page and line.
2         MR. CARTA: I would just like to be able
3    to read the question first to make sure that that was
4    the question that was asked.
5         MR. FASMAN: Absolutely.
6         MS. GUTIERREZ: I don't have the page and
7    line.
8         MR. FASMAN: Do I have it there?
9         MR. CARTA: I think the question was,
10   "Did you know there were rumors?"
11        MR. FASMAN: Yes. Well, let's go back
12   and -- let's -- let me go to something else.
13   BY MR. FASMAN:
14   Q   When you were asked to get involved with
15   WellPoint both initially --
16        MR. FASMAN: All right, page and line.
17   Clip 55 is 163, 11, through 164, 9.
18        MR. CARTA: I don't know what you mean
19   by --
20        MR. FASMAN: Page 163, 11, through 164, 9
21   of his deposition.
22        (Videotaped deposition excerpt)
23   Q   Did Ms. Collins-Smee ever tell you that she
24   was going to hire Mr. Echavarria to replace you in the
25   Public Sector?

Page 604

1    A   No, she did not. Well she told me when she
2    did it.
3    Q   She told you when she did it. When was that?
4    A   When she -- just before the announcement. I
5    think it was around the June time frame or something
6    like that.
7    Q   You had no idea up until that point that she
8    was looking for someone to replace you?
9    A   There were some rumors flying around. I was
10   so heads down what was going on, it was like one of
11   those things I need to schedule time with her, but I
12   didn't because we had two major things going on in the
13   business at the time, that just took more than my 40
14   hours a day time.
15        (Videotaped deposition excerpt concluded)
16   Q   So you knew there must have been something up,
17   right?
18   A   Well, based on that -- I don't recall. As I'm
19   sitting here now, I don't recall rumors.
20   Q   All right. When she asked you to get involved
21   with WellPoint, you didn't turn it down, did you?
22   A   And we're referring to the temporary acting
23   role?
24   Q   Let's start with the temporary acting role.
25   A   I'm sorry. And the question, did I --

Page 605

1    Q   You didn't turn it down, right? You didn't
2    say to her, I'm not --
3    A   I was not given the option.
4    Q   -- I'm not getting involved with WellPoint at
5    all.
6    A   I didn't have an option, and I think my
7    responsibility to the business was to continue working
8    that contract as best I could with as much time as I
9    could afford to put on it.
10   Q   Did you tell her -- did you say, listen, I
11   can't do both of these job at once?
12   A   No. I don't -- I didn't have that
13   conversation with her.
14   Q   Did you ask her for help when -- you testified
15   yesterday at great length as to how overwhelming this
16   was. Did you go back and say listen, I need help on
17   this stuff?
18   A   Well, initially when I was temporary, the help
19   was going to be her getting the full-time DPE for that
20   position.
21   Q   Let's go to when you were permanent, then.
22   Let's go to when you were actually doing this, and you
23   testified all of these problems that you were having
24   and e-mails at 3 in the morning. Why didn't you go to
25   her and say, I can't do this, I need some help?

Page 606

1    A   I wasn't -- when I became permanent on that
2    contract, is when she replaced me as the sector VP, is
3    when she told me I was permanent on WellPoint. Up to
4    that point what I had been -- I was in the acting role
5    or temporary role and she was looking for a
6    replacement for full-time.
7    Q   Let's go back to that time. Take it when you
8    were interim. Why didn't you go to her and say, I
9    cannot do this, I'm going 200 miles an hour, on
10   everything you want me to do?
11   A   Well, I mean, that's -- I was an executive.
12   I'm not going to go back to her, say please give me
13   help on this. I mean --
14   Q   Why not? Why didn't you go --
15   A   Because I was getting the work done. The work
16   was getting done. I knew it was temporary. It's
17   like, I'll ride the wave, or whatever. The storm I
18   guess is the better name, not the wave. Wave is a fun
19   thing. I'll ride the storm until she fills the
20   position, and it should be soon. She'll be able to --
21   it's a big company, a lot of people. You can find a
22   lot of talented people to fill that position.
23   Q   I see. But you didn't go to her, you didn't
24   go to Bob Zapfel and say Bob, I'm killing myself.
25   A   No. No, that's not the type of discussion I

Page 607

1 would have with Bob Zapfel.
2    Q   How about Keenie McDonald, why didn't you go
3 to Keenie and say listen, there's no way I can do
4 justice to both of these accounts, why don't you get
5 me some help somewhere?
6    A   Because Keenie wouldn't know where to go for
7 that help, number one, because she was from a totally
8 foreign -- she wasn't familiar with our business.  She
9 didn't know outsourcing.  This is her first time ever
10 stepping into the outsourcing business.  So she didn't
11 have a concept of even how the outsourcing -- how we
12 delivered it, what the relationship worked, so she
13 couldn't provide any assistant there.  She was aware,
14 though, that I was performing both roles, and she saw
15 the load on me, but it didn't matter.  She was focused
16 on WellPoint.
17    Q   I see.  And so the answer is, you didn't go
18 and seek help from anybody else.
19    A   Well, no.  I -- I mean -- you mentioned some
20 names.  I did go get help.  I mean, I got help
21 because -- Diane Diggelmann's area, I need a
22 specialist on this particular area because it's
23 consuming too much of her time and causing too much
24 problems.  So I did seek help.  Not at the executive
25 level where I'm looking for an executive to come in

Page 608

1 and -- I was asking within maybe a tier below that to
2 get people in to complement the work that was going on
3 and relieve me of some of those things, because it
4 was --
5    Q   I see.
6        Let's go back to when you were assigned as an
7 interim on WellPoint.  If you had been in Ms.
8 Collins-Smee's position, Mike Morin had resigned, you
9 needed somebody to fill that position, wouldn't you be
10 the logical person to fill that position?
11    A   If you're asking me my opinion on that, given
12 that she was taking -- she already decided that she
13 was taking me out of the vice president's role, which
14 I'm assuming she was taking me out of that for
15 performance, not for any other reason.  I mean she
16 didn't see any reason -- it's not working out for him,
17 this is your biggest troubled account, in that area,
18 so if she thinks I'm incompetent in executing as a
19 vice president level, why would she even consider to
20 put me in as a -- in that role as the -- that
21 position.
22    Q   You were --
23    A   I would not have done that, if that was my
24 deal.
25    Q   I see.

Page 609

1    A   That was the question.
2    Q   You did have a reputation, according to you,
3 of somebody who could fix troubled accounts, right?
4    A   That's correct.
5    Q   In fact -- can we put Exhibit 108 up, please.
6        I think we saw this one a little while ago.
7 This is your note to Jack Overacre back in May of 2008
8 looking for a position.  And the last bullet is what I
9 wanted to point you to.
10       "While in the N-sdc Kelton assigned troubled
11 accounts to me in which I had to investigate their
12 problems/cause and develop a recovery plan.  In most
13 cases I continued on managing the recovery, i.e.,
14 United Healthcare.  This became my brand and led to my
15 promotion to VP and assignment to the Lucent
16 Technology -- to the Lucent Technologies.  I've used
17 this knowledge/skill throughout my other assignment,
18 particularly in the sector position."
19       That is Covance and WellPoint contracts.
20       So you were somebody who had a reputation as
21 able to fix troubled accounts.
22    A   Correct.
23    Q   Right?  And as someone who could fix troubled
24 accounts, you would be the logical person to go to.
25       You don't have to answer that?

Page 610

1        Now, as I understand it, you also thought that
2 you were the permanent DPE on WellPoint until November
3 2007 when you were, according to you, surprised by Ms.
4 Collins-Smee telling you Gordon Crawford would be
5 taking that position, right?
6    A   Correct.
7    Q   That's your testimony.
8        Now, on June 5th when she told you that Mr.
9 Echavarria was replacing you as the vice president of
10 the Public Sector, she told you that you were
11 full-time on --
12       She told you when this happened that you were
13 going to be full-time on WellPoint, right?
14    A   I'm sorry, when what happened?
15    Q   When she told you that Mr. Echavarria was
16 coming in and to take over the vice president PSD
17 position, she told you you'd be full-time.
18    A   Correct.
19    Q   But surely you knew that IBM was continuing to
20 present candidates too WellPoint, don't you?
21    A   No.
22    Q   You didn't know this at all?
23    A   No.
24    Q   Well, let's take a look at some of these --
25 that a few e-mails.  Let's try Exhibit 49, please.

Page 611

1    This is an e-mail dated May 8th, 2007, and the
2  bottom line -- the bottom one is from Keenie McDonald
3  to Joanne Collins-Smee, and you were copied on this,
4  saying -- her last line is, "We need a couple more DPE
5  candidates to have the customer interview ASAP.
6  Please get this moving."
7    Do you see that?
8  A  Yes, I see it.
9  Q  And then there's something above that as well.
10   So this is in May.
11   And then if you'll put number 51 up, please.
12  A  I'm sorry, can I -- I can't --
13  Q  You saw that e-mail, right?
14  A  Well, I wanted to see the date on it.
15  Q  I'm sorry.  The date on that was May 8th,
16  2007.
17  A  Right.  So at this point she hasn't told me
18  I'm full-time or it's my permanent job.  This is while
19  I'm acting in a temporary role on WellPoint.
20  Q  That's true, but you knew that IBM was looking
21  for additional DPE candidates, right?
22  A  I was assisting with that.  I was -- believe
23  me, I wanted to get a permanent person in on WellPoint
24  because I'm running two jobs and dying running the two
25  jobs.

Page 612

1  Q  All right.
2  A  So I was -- Joanne had the lead on that,
3  but -- and there really wasn't any time for me to even
4  devote any search for her.  So that -- that was
5  accurate, and I was aware that that was going on, and
6  if I could have made it happen, I would have made it
7  happen immediately.
8  Q  Let's look, then, at number 55.
9    Number 55, this is dated -- this is from
10  McDonald to you and Collins-Smee and Dave Liederbach.
11  And the highlighted portion says -- and I'm going to
12  read just the highlighted portion.  "The customer
13  feels that we have very little delivery leadership and
14  oversight.  I have no --" I'll read a little bit more
15  for context.  "I have no intention of making another
16  commitment to Boxer that we do not keep.  So here's my
17  question.  Can I tell Boxer that effective June 1st
18  Jim will have completed all his transition activities
19  and he's full-time acting DPE for WellPoint as we
20  continue to work through the permanent backfill?  I
21  know you know we need a permanent person in place
22  ASAP."
23    That's to you, right?
24  A  I don't know.
25    MR. CARTA:  Your Honor, may we have the

Page 613

1  date of that?
2    MR. FASMAN:  I read it, 5/24/2007.
3    MR. CARTA:  Sorry, I just didn't hear
4  that.
5    MR. FASMAN:  5/24/2007.
6    THE WITNESS:  Okay.  Again, this --
7  BY MR. FASMAN:
8  Q  This is a week before.
9  A  I'm struggling -- I'm trying to understand
10  what -- okay, this is Keenie to me, when -- yeah, when
11  they refer to -- I'm not sure whether they're talking
12  about the candidate that was selected to fill this,
13  and whether that candidate --
14  Q  I think the jury's seen it.  This just goes --
15  this goes, again, to the point that you testified to
16  that you had no idea that you were not permanent.
17  So let's --
18    MR. CARTA:  Objection, Your Honor.  The
19  question was, did he have an idea after he'd been told
20  he was permanent.  This was before he was told he was
21  permanent.
22    MR. FASMAN:  Absolutely.  So let's go to
23  that.  Let's put up Exhibit 61.
24  BY MR. FASMAN:
25  Q  61 is an e-mail dated July 16th, after you

Page 614

1  were told you were permanent, July 16th, 2007, from
2  Mark Franzese, who you pulled over into the WellPoint
3  contract, to Shimkus, Fernandez, Keenie McDonald, and
4  to you.
5    And it says, and I quote, "Last week Dave
6  McDonald --" who is one of the WellPoint people "--
7  asked me to take Mike Morin's job."  And then he says,
8  "After thinking about it, I've decided not to do
9  that."  And in the highlighted portion it says, "I
10  called Dave --" McDonald, presumably "-- this morning
11  to explain to him, and he was very supportive and
12  fully agrees with the above.  So he will interview
13  Bobby Jones tomorrow."
14    So how could you think that you were permanent
15  forever if there continued to interview candidates in
16  July, how could be surprised that there was a
17  candidate that was presented thereafter?
18  A  Sir, first of all, it's authored -- the person
19  who sent this was Mark Franzese.  Mark reported to me.
20  Right?  I was his manager.  Mark Franzese, he was the
21  one we had the video clip on, that I had brought him
22  in.  If you know Mark -- well, I mean, I could talk
23  about the personality of Mark.  I just totally ignored
24  this message because it's Mark.  Mark was never set up
25  to be interviewed for a position.  I never submitted

Page 615

1  him as a candidate for that role.  So this is Mark
2  Franzese's own dialogue with Dave McDonald on that
3  point.
4      Q   So this is his fantasy, where he -- but he
5  says -- and this is pretty clear -- he says, "So
6  he --" Dave "-- will interview Bobby Jones tomorrow."
7  That's one of the candidates that was presented during
8  this period of time.  You know that.
9      A   I know now.  I know after.
10     Q   Yeah.
11     A   I knew after I was gone from the business,
12  that Bob -- not Bob -- someone Jones was presented.  I
13  didn't know whether Bobby Jones was a Dave McDonald
14  employee that he was looking at or Bobby Jones was an
15  IBMer that he was interviewing.  I wasn't -- I didn't
16  tie the two together.
17     But quite frankly, when Mark sent me this, I
18  had a good laugh when I read the first part of that,
19  and I didn't pay attention to the rest of it because
20  Mark worked for me and no one put him up to be
21  interviewed, and this was --
22     Q   So let me ask you this:  Did you ever talk to
23  Keenie McDonald about whether you were permanent or
24  acting after June 1st?
25     A   It wasn't her decision.  It was Joanne

Page 616

1  Collins-Smee told me, so I didn't have to validate
2  what Jones --
3      Q   Not what I asked you.  Did you ever discuss
4  that issue with Ms. McDonald?
5      A   No, not that I remember.
6      Q   So can we put up number 64, please.
7      This one is from Keenie McDonald to Mark
8  Boxer, and it's dated 8/28/2007, and the highlighted
9  portion -- I won't read the rest of it, but the
10  highlighted portion says, "Jim C knows he's not going
11  to be our permanent DPE and we need to move on."
12     A   That is totally false.  That statement.
13     Q   Just like Ms. Collins-Smee's was false.
14     A   No.  Ms. Collins-Smee told me I was permanent
15  in the position.  I'm not going to -- she knows, so I
16  couldn't argue this with her and call her up and
17  explain it.  This --
18     Q   So she made this up.  She must have made it
19  up.
20     A   May I explain it?
21     Q   You can try.
22     A   Mark Boxer, the customer, Keenie McDonald,
23  Joanne Collins-Smee and Dave Liederbach and any other
24  executive, John Shimkus and Luis Fernandez, all were
25  told I was temporary in this position as they paraded

Page 617

1  the candidates in behind me.  I was told, however,
2  that I was permanent in the position, not knowing that
3  the customer, Mark Boxer, had been told I was
4  temporary.
5      Q   Now, if you thought you were permanent in the
6  position when you got this e-mail from Mark Franzese,
7  why didn't you go to him and say gee, what is going on
8  here, Mark?  He's your friend.  He's --
9      A   I explained that.  Mark worked for me.  I knew
10  Mark well, and I knew Mark's personality.  Mark
11  Franzese -- and I told you I got a good laugh at the
12  first part of it, and I never read the entire thing,
13  nor could I interpret from that e-mail that Bob Jones
14  was an IBMer because I didn't know Bob Jones.  I
15  didn't have a clue who he was.
16     Q   Did you ask Boxer about it?  Did you say, Am I
17  permanent or temporary?
18     A   Why would I call Mark Boxer, the CIO, and ask
19  him about my status within IBM?
20     Q   Well, did you go back to Joanne Collins-Smee
21  when you got this and said why are these --
22     A   I didn't get this, that we're looking at right
23  now on the monitor, I did not receive that note.
24     Q   I see.
25     A   The previous note I did see, and I dismissed

Page 618

1  it.  There was no need to go back to Mark because I
2  didn't put Mark up as a candidate.
3      Q   Let's go back.  You testified yesterday that
4  you were never formally presented to WellPoint as a
5  candidate for the DPE position, right?
6      A   Correct.
7      Q   Now, you had known these people for years,
8  right?
9      A   What people?
10     Q   Mark Boxer and Dave McDonald.
11     A   I was not -- I was -- I don't know how to
12  explain it.  I was running a sector with 30 contracts.
13  I did not have the day-to-day relationship with Mark
14  Boxer any more than I had the day-to-day relationship
15  with the CIO at Johnson & Johnson.
16     Q   But you didn't need somebody to come in and
17  introduce you to Mark Boxer or Dave McDonald.  I mean
18  presumably when you were the WellPoint DPE, either
19  interim or on what you say was a permanent basis,
20  presumably you had a lot of interchange with him.
21     A   No, that's not why we had the interview.  We
22  had the interview so that it's a one-on-one with Mr.
23  Boxer, the CIO, and he can go -- he can make a
24  determination or agreement with IBM that Jim is
25  qualified and Jim I want on my contract to run the

Page 619

```
1    contract. He's being told I'm temporary, so for him
2    there was no need for him to come forward and make
3    that request.
4        Q   I see.
5        Did you -- but you knew these -- the point I'm
6    making is, you knew these people, you worked with
7    them.
8            MR. CARTA: Objection. When?
9            MR. FASMAN: When he was at -- when he
10   was on the DPE role, let's say after June 1st.
11   BY MR. FASMAN:
12       Q   You knew these folks.
13       A   Of course I knew the folks.
14       Q   Okay. Now, I believe you testified yesterday
15   that Mr. Crawford was selected as the DPE to replace
16   you at WellPoint sometime in September, right?
17       A   Right.
18       Q   You called out a particular exhibit and said
19   this exhibit supports that. Now, that --
20       Can we put up -- I think it's Plaintiff's
21   Exhibit 64. The middle of the e-mail from Mr. Boxer.
22       Now, this is the one that you relied on to say
23   that he was selected at that time, but of course Mr.
24   Boxer on the date in question writes back to Ms.
25   McDonald, says, "Keenie, who's Gordon?"
```

Page 620

```
1        This is Mr. Boxer who has rejected candidate
2    after candidate after candidate, right?
3        A   That's correct.
4        Q   He's never met him. How can he have been
5    selected on that day that you testified?
6        A   I think our reference -- I think we had a
7    different e-mail that we used that talked -- if my
8    memory serves me right, that was like a 9/15 e-mail
9    that talked about him.
10       Q   Believe me, I wrote it down. This is what you
11   said supported it.
12       A   I can't see the bottom of this, so I don't
13   know what else is on this e-mail.
14       Q   Take a look.
15       A   I'll take it for what it says. I'm not going
16   to debate it. I mean if we're arguing about a week,
17   okay, this says that on September 9th, Boxer's saying
18   who is this guy Gordon, right? So --
19       Q   So when -- you don't know when he met Mr.
20   Crawford, do you?
21       A   I'm sure in discovery somewhere we saw some
22   document that says --
23       Q   You don't know sitting there.
24       A   No, I don't recall at this point, that's
25   correct.
```

Page 621

```
1        Q   And he had to come over from England because
2    he was in England, wasn't he?
3        A   He was, yes. I don't know whether he came
4    over from England. I mean came over to take the job
5    or to meet with me?
6        Q   To meet with Mr. Boxer.
7        A   No, I don't know.
8        Q   So you don't know that.
9        You know Gordon Crawford, don't you?
10       A   Oh, yes.
11       Q   And you had worked with him before?
12       A   We were peers. I mean I ran a sector and I
13   ran a sector.
14       Q   And I think you said he was close to your age.
15   In fact, he was --
16       A   Yes. He was like a year or two younger.
17       Q   He's a year younger. We stipulated to that.
18   He was 59 when you were 60, right?
19       A   Yes, I'll assume that.
20       Q   I think counsel would stipulate to that.
21       Do you know if he succeeded on this very
22   difficult WellPoint contract after you left?
23       A   I'm sure he did. Gordon is a very qualified
24   individual.
25       Q   Okay. Let me ask you a couple of questions in
```

Page 622

```
1    a different area. You heard the phrase "Your career
2    is your responsibility" at IBM, haven't you?
3        A   Yes, I have.
4        Q   What does it mean?
5        A   Well, for -- we looked at one point in IBM
6    where a manager employee would build development plans
7    that would identify someone with a need to develop
8    skills, pursue those skills, and so forth. That
9    expression said, we're going to put more of that
10   responsibility rather than on the manager employee in
11   building your skills up for a future position, we'll
12   give that responsibility to the employee, and that's
13   where --
14       Q   Right.
15       A   It's your career, but it's really -- it was --
16   it was put in place for -- and we did job postings
17   with it, so they were coupled together.
18       Q   Can you confine yourself to my questions?
19           MR. CARTA: Excuse me, Your Honor. I
20   think the witness didn't have a chance to complete his
21   answer.
22           THE COURT: Okay.
23           MR. CARTA: It was an open-ended
24   question.
25           THE COURT: We have to be careful of that
```

Page 623

1  we allow the witness to complete his answer, but I'd
2  like you to just confine yourself to answering Mr.
3  Fasman's question, okay?
4      THE WITNESS: Yes, Your Honor.
5      THE COURT: If it's susceptible to a yes
6  or no.
7      MR. CARTA: The question was, what does
8  that mean, what does that slogan mean. I think he was
9  still responding.
10      THE COURT: All right. Had you finished
11  answering the question, Mr. Fasman?
12      MR. FASMAN: I'm finished with my
13  question, yes.
14      THE COURT: Okay. Had he --
15      MR. FASMAN: I think he answered. I'll
16  try and confine myself to more pointed questions so
17  that maybe we can get -- maybe we can come up with
18  some time limits. Let's keep going.
19  BY MR. FASMAN:
20      Q   You were replaced by Mr. Crawford on the
21  WellPoint account on January 1st, 2008, right?
22      A   Correct.
23      Q   And you were given six months at full salary
24  and full benefits thereafter.
25      A   That's correct.

Page 624

1      Q   And your responsibility was to find a new
2  position for yourself within the organization,
3  correct?
4      A   Correct.
5      Q   It's also -- and I believe you testified that
6  you never took a day off during this period of time.
7      A   I -- I -- you know, that's quite a while ago.
8  And there's -- my vacation records weren't produced.
9  So I'm sure for Easter I took time off. I'm sure for
10  my anniversary in June I may have taken some time off.
11      Q   Isn't it true you took more time off during
12  this period of time than you ever had before in your
13  career?
14      A   No, that's -- well --
15      Q   Do you remember I asked you --
16      A   It seemed like it, but it's --
17      Q   I asked you that in your deposition.
18      A   That's -- I had nothing -- I mean that was
19  what I was saying, but I didn't have vacation records
20  from IBM to say I did.
21      Q   Put deposition clip 30 up there, please.
22      MR. DUFFIELD: Page 263, line 13, through
23  page 264, line 9.
24      (Videotaped deposition excerpt)
25      Q   During that six month period between January

Page 625

1  and the end of June, 2008, aside from the WellPoint
2  work that you did, what else did you do, other than
3  search for a new position?
4      A   Oh, very frustrating period for me. But as I
5  said, I had ad hoc calls for assistance on various
6  accounts. I called some people and to see if I could
7  be of assistance to them, and in some cases I did do
8  that, so I was doing my make-do work during at that
9  period of time. I mean that's my terminology. It's,
10  you know, it's...
11      Q   Did you take personal time?
12      A   I probably took more time off in that period,
13  I would suspect, than I have at any time else in my
14  career.
15      Q   Did you take vacation time?
16      A   I would suspect, yeah.
17      Q   And you continued to draw your full salary at
18  IBM, right?
19      A   We get paid for our vacation, so yes.
20      (Videotaped deposition excerpt concluded)
21  BY MR. FASMAN:
22      Q   Okay. You testified yesterday that you
23  couldn't find positions -- executive level positions
24  because they weren't posted, that was your testimony,
25  but surely you knew a bunch of folks in the

Page 626

1  organization who were in charge of new positions,
2  other than Ms. Collins-Smee, right?
3      A   I knew some people, yes. Well, let me -- I
4  did not know people that had -- well, first of all, I
5  didn't know what positions were being pursued, so in
6  that respect I did not know the people that owned
7  those positions to be able to call them.
8      Q   Well, you certainly knew Bob Zapfel. You
9  testified yesterday about how many interchanges you
10  had with him. You testified that he had your
11  cellphone, that you spoke on WellPoint, that you spoke
12  on these deals. We saw e-mails from Zapfel to you
13  talking about what a good job you'd done. You
14  certainly knew him, right?
15      A   Yes. I wouldn't -- yes.
16      Q   You knew him.
17      A   I knew him, the answer is, yes.
18      Q   And you knew that there was a Zapfel drill?
19      A   Right.
20      Q   He's the guy who's in charge of worldwide
21  outsourcing, worldwide delivery, right?
22      A   Correct.
23      Q   Did you call him?
24      A   No, I did not.
25      Q   Why not?

47 (Pages 623 to 626)

Page 627

```
 1      A   Because in that drill that he runs would be
 2  Joanne Collins-Smee who would have visibility to
 3  everything that's being looked for, in that drill.
 4      Q   So in that drill, in the Zapfel drill, even
 5  though you were on the bench, you were looking for
 6  positions, you didn't contact Mr. Zapfel, who you knew
 7  well, in order to see if he could help find a new
 8  position for you?
 9      A   I would answer that, I did not know him well.
10  I mean he was new in his position, also.  So I did not
11  have, you know, years of experience in dealing with
12  him, so I didn't know him well.
13      Q   He was as new in the position as Joanne
14  Collins-Smee, right?
15      A   That's correct.
16      Q   They came in together.
17      A   Yes.
18      Q   Now, in terms of searching for other
19  positions, you had traveled all over the country,
20  hadn't you?
21      A   Yes.
22      Q   And certainly there were people there you
23  could call, couldn't you?
24      A   And I did make some of those calls.
25      Q   I see.  Now, you also testified that in the
```

Page 628

```
 1  ITD drill, Joanne Collins-Smee's drill, that you
 2  depended only on her and that the other vice
 3  presidents wouldn't know anything about you, when you
 4  were no longer there, is that a fair statement?
 5      A   Correct.
 6      Q   The other vice presidents, you had sat in
 7  those 5-minute drills for some period of time, right?
 8      A   That's correct.
 9      Q   The other vice presidents surely would have
10  looked out when you didn't show up and Miguel
11  Echavarria came in and said, I'm the vice president of
12  the Public Sector, right?
13          MR. CARTA:  Objection.
14          THE COURT:  Fair cross-examination.
15  Answer the question.
16          THE WITNESS:  I don't know what they said
17  when I -- I wasn't there with them, so I have no idea
18  what was discussed, and what they thought or felt.
19  BY MR. FASMAN:
20      Q   I see.  But certainly you can presume -- or I
21  guess the jury can presume that somebody would have
22  looked up and seen you weren't there and somebody else
23  was there, right?
24      A   Well, it was a phone call, so I mean -- I --
25  sure, if they were specifically looking for me, and I
```

Page 629

```
 1  wasn't answering, that I was attending, then yes, they
 2  would know that I'm not there.
 3      Q   So in terms of your presentation to each of
 4  them, you could certainly have contacted each of them
 5  and said, listen, here's what's happened, and I'm
 6  looking for a position.
 7      A   I didn't have that day-to-day type -- I mean
 8  they were busy running their sectors.  And besides, it
 9  was -- Joanne had the ultimate decision.  The person I
10  had to rely on was Joanne, so --
11      Q   Okay.  Let me ask you to take a look at one
12  other exhibit.  This is Exhibit number 102.  This is
13  one of the e-mails that -- it's the top one.  This is
14  one of the exhibits where you wrote to -- this is to
15  Al Weststeyn, you'll recall.
16      A   Yes.
17      Q   And in it -- I'm just going to read the
18  highlighted portion.  This is in the job search issue.
19  And the highlighted portion goes, "I'm also on
20  Zapfel's drill, but the U.S. PE DPE opportunities have
21  been in Public Sector, and since the whole WellPoint
22  contract exposure a year ago, you might remember being
23  included in the overall review with Dave Dawkens
24  Kelton, et al, Liederbach and I do not have the
25  warmest relationship."
```

Page 630

```
 1      What does that mean?
 2      A   It had to do with the WellPoint contract,
 3  obviously, not the other 30 that we were involved in.
 4  I had refused to sign off on a Phase 4 financial
 5  outlook for WellPoint, and that was in the fall of --
 6  or the spring of 2006, and it caused a problem,
 7  because the process is I have to sign off on it, and
 8  it's something that Dave then takes forward in the
 9  business that says, here's what we're agreeing is
10  going to happen financially to this contract.
11      And my fear was -- and maybe I was
12  overreacting, but we have to follow Sarbanes-Oxley
13  rules.  I can't agree to something that I know was not
14  an accurate representation of what the financials were
15  going to be on a contract, and I refused to sign it,
16  and from that point on there was a -- we had a lot of
17  debates -- I don't know how to explain it, but we
18  didn't agree going forward after that.
19      And this particular meeting that's referenced
20  here, it's Dave Liederbach, it's Mike Dawkens, it's
21  Kelton, there are all these -- it was a shouting match
22  on that call, that's referenced here.
23      Q   Well, in -- most of the DPE PE positions were
24  in the Public Sector where Liederbach was the
25  internal -- I don't want to call him an internal
```

Page 631

1    client, but was certainly a very important person on
2    the account.
3        A    I didn't know that for sure when I wrote that.
4    I didn't know, because I didn't have view into what
5    was available there. Right? The only ones I knew of
6    were the ones that I had heard of.
7        Q    All right. Let's go on to something else.
8        The 5-minute drills, because we spent a lot of
9    time on that, although -- we'll talk about that. The
10   5-minute drills?
11       Do you know how people are put on the drills?
12   How is that done?
13       A    Well, I can speak from my experience. If I
14   had an opening in my area, I would submit to the
15   person who managed documents, for lack of a better
16   term, I would submit that says I had this opening
17   coming up and I'd like that position identified in the
18   next 5-minute drill.
19       Q    And the person to whom you'd submit this would
20   be the human resources person for the particular
21   portion of the organization, right?
22       A    Yes. I think in the beginning it wasn't, but
23   I think it was more of a staff level person that was
24   doing it, but I think during Joanne's -- I'm trying to
25   think. It was probably Keith Holmes at that point

Page 632

1    that was doing it, but I'm not a hundred percent sure.
2        Q    So Keith Holmes on her drill, and whoever was
3    the HR person for Pat Kerin, and whoever was the HR
4    person for Bob Zapfel.
5        A    Again, I could only speak to the one drill I'm
6    familiar with, which is Joanne's drill, because I've
7    submitted things. I never submitted anything to
8    Zapfel or Pat Kerin's. I don't know who ran that for
9    them.
10       Q    Do you know how slates are made up?
11       A    Slates?
12       Q    Slates of candidates. You talked -- there was
13   testimony yesterday extensively about the slates of
14   candidates. You know who makes them up?
15       A    Yeah. It's -- can be created -- there's a
16   couple ways of creating it.
17       Q    And isn't it really the administrative
18   assistants who work for the human resources person who
19   makes them up?
20       A    Not at -- well, the actual constructing and
21   putting the names against the job? Whoever
22   administers that document that's circulated ahead of
23   time, if it was the HR person that did that, then I'd
24   say yes, it was that HR person.
25       Q    All right. Let's -- we'll get some more

Page 633

1    detail on this from the people who actually do them.
2        The fact that you're not on a 5-minute drill
3    doesn't mean that you can't be considered, right? You
4    can be brought up by somebody who's in the drill
5    process.
6        A    Absolutely, yes.
7        Q    So on the Zapfel drill, you said -- I believe
8    you testified -- I believe I have this correct -- that
9    on the Zapfel drill you had to be represented by your
10   manager, Joanne Collins-Smee, yet Mr. Zapfel could
11   have brought you up, couldn't he?
12       A    He would -- could he? Yes. Would he? I
13   don't think so. That's not the custom and practice.
14   He's facilitating it, but he's expecting the people,
15   his managers, who were the Joanne Collins-Smees and --
16       Q    But you weren't in his drills, right?
17       A    Me physically present?
18       Q    Yes.
19       A    No.
20       Q    And you weren't in Pat Kerin's drills, right?
21       A    That's correct.
22       Q    And after you were no longer -- when you were
23   on the bench you weren't in Joanne Collins-Smee's
24   drills?
25       A    That's correct.

Page 634

1        Q    So you don't know what she said about you in
2    any of those situations.
3        A    Other than what's -- whether I appeared on a
4    slate, or if I appeared in the minutes of the meeting.
5        Q    You don't know if she recommended you for any
6    particular position or how many times.
7        A    I wasn't there.
8        Q    You weren't present, right?
9        A    Right.
10       Q    Now, you also knew Pat Kerin, right?
11       A    Well, I've sat in meetings with him, yes, I
12   knew who he was.
13       Q    You didn't go to him and say, listen, Pat, I'm
14   looking for a position, put me on your drill.
15       A    No, but Joanne could have done that.
16       Q    Well, she could have, but you could have gone
17   to him, right?
18       A    Could have gone to anyone at IBM.
19       Q    I'm talking specifically about Kerin and
20   Zapfel.
21       A    Right.
22       Q    And I think we already -- you already
23   testified that your office was just down the hall from
24   Joanne Collins-Smee.
25       A    Correct.

Page 635

1    Q   How many times did you talk to her about
2  putting you on drills?
3    A   I don't know whether we had specific -- it was
4  more getting a job.  I was more -- I didn't care what
5  drill I was on or whatever means she used to find a
6  job for me.  It was, I need a job.
7    Q   How many times did you talk to her about that?
8  You said that you went back, spoke to her in March.
9    A   Well, yeah, I -- we spoke in November.  Now, I
10  had full-time jobs up to that point, so in November
11  when I no longer had a full-time job we had that
12  discussion.  We had that discussion -- I --
13  specifically at the recommendation of the HR
14  executive, I went back to her in March and had that
15  conversation with her.  I had that conversation with
16  her again a few months later in May when I met with
17  her.
18    Q   Aside from those conversations, you didn't go
19  down the hall and bring her a cup of coffee and donut,
20  say what's going on with my job search, every day?
21    A   Is that meant to be humorous?
22    Q   I think it is.  You didn't do that.
23    A   She wasn't in her -- she had an office down
24  the hall, but I -- she didn't work there.  She was on
25  the road all the time.  I had 30 accounts in my

Page 636

1  sector.  If you multiply that times all the other
2  sectors, I don't know what the -- 200 accounts she was
3  running around to --
4    Q   So she was very busy, right?
5    A   Yes, she was very busy.  We were all very
6  busy.
7    Q   Well, you weren't at that point.  You didn't
8  have -- you were at that point on the bench.
9    A   That's true, I didn't have a job.
10    Q   Now, there was no rule, was there, that she
11  come to you with every time she made a recommendation
12  on your behalf in the 5-minute drills, was there?
13    A   No, there's no rule for that, but it would
14  have been -- well, she didn't discuss any effort.  I
15  mean, there's no rule for that, but if someone's in
16  that position, I would keep them informed as their
17  manager on what I'm doing to try to assist them in
18  finding a job.  And even if I said I made an attempt
19  here, they didn't want you, I'm sorry, you know, we'll
20  try somewhere else.  There was none of that.  It was
21  like, she didn't want to deal with me.  She -- well --
22    Q   How many people was she indirectly
23  supervising?  The whole ITD, the whole delivery area
24  in the United States, right?
25    A   Yes.

Page 637

1    Q   20,000 people or more.
2    A   It was about that.
3    Q   200 contracts, would you say?
4    A   Yes, about 200 contracts, yes.
5    Q   You were on the bench, so to speak, for six
6  months, right?
7    A   Yes.
8    Q   You would agree with me that six months was a
9  reasonable time to find a new position, wouldn't you?
10    A   Not in the situation I was in, no.  The answer
11  is no.
12    Q   How long should you have been on the bench?
13    A   It's not a question of length of time.  It's a
14  question of having access to the information that
15  would allow me to facilitate me finding a job.
16    Q   I see.  So she was supposed to inform you of
17  all the positions that were open?
18    A   Well, one simple path would have been give me
19  the minutes but -- not the minutes, but the listings
20  that are being discussed in the 5-minute drill, and
21  I'll do my own -- whatever the word is.  I'll go talk
22  to those individual.  Just give me the list.  You
23  don't have to do anything more other than support me,
24  if I find something, someone's interest in me.  I
25  wasn't getting the list.

Page 638

1    Q   Did you ask her for it?  Did you ask Keith
2  Holmes for it?
3    A   No, I didn't ask Keith Holmes because I wasn't
4  dealing with Keith Holmes.  It was Joanne I was
5  dealing with.
6    Q   Did you ask her for them?
7    A   Did I ask her specifically for --
8    Q   Yeah.  Did you ask her -- did you say, it
9  would be easier if you gave me the list of positions?
10    A   No.  We weren't talking jobs.  She could have
11  said, I'll give you the list and you can go with it.
12    Q   She could have said, and you could have asked
13  her, too, right?
14    A   That's true, yes.
15    Q   And the reason -- well, I'll ask something
16  else.
17       You don't know of anyone who got more than six
18  months on the bench, do you?
19    A   When we were -- when I was going through the
20  information that was provided by IBM I know there was
21  another individual, and I can't remember his name
22  right now, but I think he had at least five months on
23  the bench, and then he --
24    Q   I asked you -- do you remember at your
25  deposition I asked you specifically whether you knew

Page 639

1  of anyone who got more than six months on the bench?
2  Right? Do you remember?
3      A   That's right, and I believe we did not have
4  all of the documents provided by IBM.
5          MR. FASMAN: Can you play depo clip
6  number 33, please, for the jury.
7          MR. DUFFIELD: Page 291, line 10, through
8  292, line 4.
9          (Videotaped deposition excerpt)
10     Q   Let me ask you one other question. Are you
11 aware of any other IBM executive who was kept on the
12 payroll at the full salary for more than six months in
13 an effort to locate another position?
14     A   Other executives at IBM. I have to think
15 about that one. I can't recall a name right now,
16 because we just wouldn't do it. It just didn't make
17 sense.
18         (Videotaped deposition excerpt concluded)
19     Q   We wouldn't do it. It wouldn't make sense.
20     Let's -- let me ask you --
21         MR. CARTA: Could we have the complete
22 answer to that question? That was cut off in the
23 middle of an answer. Can we see what the rest of the
24 answer was?
25         THE COURT: If we have it, if it's

Page 640

1  available.
2          MR. CARTA: I'm sorry?
3          THE COURT: If we have it.
4          MR. CARTA: If I could get the line and
5  reference, so I can turn to it. I don't know whether
6  that was a complete answer or not. Maybe it was.
7          MR. DUFFIELD: I read you the page
8  numbers, I was wrong. Page 33.
9          MR. CARTA: I flipped to the page and I
10 didn't see it.
11         MR. FASMAN: What's the page?
12         MR. DUFFIELD: What I read earlier was
13 291, but that's the wrong clip.
14         MS. GUTIERREZ: It's 273, line 4 through
15 11.
16         MR. FASMAN: The reason we cut it off
17 there, it seems to be an extended discussion, as
18 you've heard.
19         MR. CARTA: Your Honor, I would like the
20 jury to hear the entire answer to the question.
21         MR. FASMAN: Sure. I'll be happy to read
22 it. It just -- the answer was, "I have to think about
23 that. I can't recall the name right now. We just
24 wouldn't do it. It wouldn't make sense. You'd find,
25 again, someone with an acceptable performance, we

Page 641

1  would find a position for them, if not at least
2  someone with that talent that has been demonstrated
3  you can find make do work for them, works for them
4  during that period of time which would give them the
5  exposure for other areas that may lead to
6  opportunities. That is really my arguments or my
7  comments with Garrett was. Even in the open door
8  investigation I was not afforded that opportunity. It
9  was like let's start excluding Jim from meetings.
10 This is Joanne's thinking. She would have to answer
11 that. It is kind of my interpretation, let's start
12 excluding Jim from meetings so he can't get that
13 exposure. Let's not give him -- let me not give him
14 any assignment where he could excel in. Even if you
15 take her, assume her premise on this thing, she didn't
16 think I was a good performer, if you put me in
17 another -- in other -- another assignments, I can
18 excel in, maybe she hit on my strength and it is
19 something of value to the company and afford me the
20 opportunity. That wasn't happening. It is just like
21 exclude him, exclude him, exclude him."
22         And then I said let's take a break for a
23 couple of minutes.
24         That's why we didn't put the rest of it
25 in.

Page 642

1  BY MR. FASMAN:
2      Q   Now, during the six month period you were on
3  the bench you were willing to take a D Band job,
4  right?
5      A   Yes.
6      Q   And presumably a Band D executive would make
7  less money than you did as a Band C.
8      A   There's overlaps between a Band D and a Band
9  C, I'm sure, in salary. So they overlap at some
10 point. So I don't know where I sat, whether I was at
11 the low end of the Band C level, or they stuck me
12 somewhere in the middle of the C level or not. So yes
13 and no, is the answer. It depends on where you fit in
14 these bands, in the salary ranges within the bands.
15     Q   Now, in addition to the band, the alphabetical
16 bands, there were numerical bands at IBM, right? I
17 think we --
18     A   Yes.
19     Q   One through ten, from the lowest to the
20 highest, right?
21     A   I'm not sure of the full range, but yes, there
22 were numerical.
23     Q   And those jobs unlike executive jobs are
24 posted, aren't they?
25     A   Yes.

Page 643

```
1     Q    Any IBMer can find them on IBM's internal
2   website, can't they?
3     A    Yes.
4     Q    And any IBMer can apply for them, can't they?
5     A    Well --
6     Q    You could have done this --
7     A    They could apply, yes.
8     Q    You could have done this yourself.
9     A    Yes.
10    Q    And you didn't need Joanne Collins-Smee to
11  apply for a Band 9 or 10 job, right?
12    A    Excuse me?
13    Q    You didn't need Joanne Collins-Smee to apply
14  for a Band 9 or a Band 10 job, right?
15    A    No.
16    Q    You never applied -- and you never did apply
17  for one, did you?
18    A    No, I didn't.
19    Q    Now, did you ever inquire what your salary
20  would have been for a numerically banded job coming
21  from an executive position?
22    A    Well, no, I didn't ask about that, but I did
23  have, you know, I did have band 10s in the
24  organization, band 8s, 7s, and whatnot.
25    Q    But you didn't know whether IBM had a policy
```

Page 644

```
1   for executives who wanted to bid down?
2     A    That wanted to?
3     Q    Bid down, bid off of a -- who lost a position,
4   from an alphabetical band who said I'd like to stay
5   with IBM and I'll just bid on a --
6     A    Band below that, no, I wasn't familiar with
7   that.
8     Q    You didn't even inquire about it, right?
9     A    I didn't see the need to.
10    Q    Do you have -- well, if you had bid down and
11  gotten a Band 10 job, you would have kept your IBM
12  benefits, right?
13    A    Assuming I got the position?
14    Q    Yes.
15    A    That I was still in, yes.
16    Q    No shortage of Band 10 positions, right?
17    A    Well, there are no shortage of Band C
18  positions either.
19    Q    Well, if you weren't finding a Band C
20  position, or a Band D position, where you were, you
21  could always have taken this as an alternative,
22  couldn't you?
23    A    We're making the assumption that someone would
24  be willing to take someone who was a vice president at
25  a Band 10 position. If I was the hiring manager at a
```

Page 645

```
1   Band 10, I'd have serious question why someone who's a
2   vice president would be stepping all the way back to a
3   Band 10.
4         And I don't mean to be derogatory or be
5   negative about a Band 10 because that's -- people work
6   their way up. I personally would not -- I would not
7   hire that unless there was some really good
8   explanation of why someone who was a vice president,
9   is a 2 performer, is now being presented to me as a
10  Band 10.
11    Q    Maybe they lost their job. Maybe the contract
12  expired.
13    A    And I would raise the question -- there's new
14  contracts being signed every day. Why wasn't that
15  individual put on that new contract?
16    Q    Did you ever meet anyone who did that, who bid
17  down from an alphabetical band to a numerical band?
18    A    Not that I can recall.
19    Q    Well, we'll meet some who did that.
20        We were talking about your BlackBerry
21  yesterday. You a testified that Joanne Collins-Smee
22  turned down two requests for you for -- that you made
23  for a BlackBerry, but you never spoke to her about
24  this.
25    A    You deal through her secretary. I spoke to
```

Page 646

```
1   her secretary, Lorraine --
2     Q    Serra?
3     A    Serra, yes.
4     Q    Right.
5     A    Who would handle that for her, and if I left a
6   voicemail with Joanne, she would have given it to
7   Lorraine to handle.
8     Q    Right. So you never even spoke to Joanne.
9   You have no idea what she did with this, or if she
10  even saw it.
11    A    Well, she had to see it because the way the
12  system is set up, it's all electronic. You go in, you
13  request it, and it automatically goes to, I don't
14  know, like an HR system says your boss is Joanne, and
15  it immediately goes to Joanne's inbox to approve or
16  disapprove or do nothing.
17    Q    So you're assuming that that's what happened
18  and that she disapproved it, but you don't have any --
19  you don't know that for a fact, right?
20    A    Well, I did not get any error message back
21  from the website that says there's been a malfunction
22  and this has not been forwarded to the recipient,
23  right? Which could happen. So the fact that it went
24  and confirmation's been sent says to me it went to
25  Joanne's inbox.
```

Page 647

1    Q   But you never spoke to her about it, you spoke
2  to her administrative assistant.
3    A   That's correct, who spoke to Joanne.
4    Q   How do you know that she spoke to Joanne?
5    A   She came back to me, and she said Joanne has
6  it, I brought it up.
7    Q   Why didn't you -- if you wanted a BlackBerry,
8  why didn't you ask Miguel Echavarria for one?
9    A   Because the way the process is set up, your
10  manager has to approve it.  He wasn't my manager.
11    Q   Well, he was the VP of the Public Sector
12  division, and you were working on one of the accounts
13  in the Public Sector, right?
14    A   Reporting to Joanne.
15    Q   Reporting to Joanne Collins-Smee?
16    A   Right.
17    Q   As you say.  But you yourself, when you were
18  the vice president of the Public Sector division, you
19  approved Mike Morin getting one when he was on
20  WellPoint.
21    A   Because I was --
22    Q   Right?
23    A   I was his manager.
24    Q   Right.  But same positions.  You were the vice
25  president of the Public Sector.  Mike was on

Page 648

1  WellPoint, you approved him, then you were on
2  WellPoint, Miguel is the vice president, and you
3  didn't ask him to approve one for you.
4    A   The approval is your manager, not a title.
5  And my manager was Joanne Collins-Smee.  It
6  automatically went to Joanne Collins-Smee.  There's no
7  override.
8    Q   When you didn't hear back from Ms.
9  Collins-Smee you didn't go back to Mr. Echavarria and
10  say listen, I didn't hear back from Joanne, how about
11  looking into this for me.
12    A   I didn't go back to him, because Joanne had
13  it.  I was enquiring it from Joanne's office.
14    Q   Okay.  Now, you spoke -- you testified earlier
15  about all these seven positions.  This was Exhibit
16  107, I believe.  These are people you talked about
17  before, and I'm sure the jury remembers, Tony Grimaldi
18  and Diane Diggelmann, Reena Malangone and Tim Smith.
19  Do you know whether any of these people were
20  interviewed by Joanne Collins-Smee?
21    A   No, I don't, but she knew -- I mean Tony
22  reported to her before, so I'm not sure why she would
23  have even conducted an interview for that.  She just
24  pointed him to that position.  But she may have had
25  other candidates that she looked at, so --

Page 649

1    Q   Right.  And I think you said that you were
2  never given the chance to interview, but she knew you.
3    A   That's right.
4    Q   Right?  She had her own opinion of your
5  competency, right?  She didn't have to interview you.
6    A   Right.  She could have very easily have put me
7  in any one of these positions since I was already in
8  her organization, they were already paying me, I was
9  already a 2 performer like three of the people on this
10  thing, so it would have been very easy to say, you
11  know, Tony, stay in your position, I'm going to put
12  Jim on that contract.
13    Q   Okay.  So did you know these individuals,
14  these seven individuals?
15    A   I knew some of them.
16    Q   Were they competent to do the jobs they were
17  chosen for?
18    A   They were all competent.
19    Q   Do you know how long these people had been at
20  IBM?  To go back and look at their work history?
21    A   Based on their age, I know they'd been there a
22  shorter time than I'd been.  I can't imagine
23  someone -- well, I can't say that because I don't
24  know, so --
25    Q   Did you know whether they had all been there

Page 650

1  for 20 years or more?
2    A   Well, Tony Grimaldi, for example, was 50, so I
3  would suspect that he was probably there 20 years.
4    Q   You don't know.
5    A   But I don't know, that's correct.
6    Q   And you didn't go through all the PBC's of all
7  of these peoples to see their job history, right?
8    A   I'm trying to think whether in discovery we
9  had been given the history on Tony Grimaldi and Tim
10  Smith, but I don't recall at this point, so I have to
11  say I don't know.
12    Q   So is it your contention that you were more
13  qualified than each of these people?
14    A   I would say I'm equally qualified of these
15  individuals, and I think in some of them -- although I
16  would defer that judgment to someone else, that could
17  put a side by side and make an opinion on that.  And
18  yes, several of these I -- I feel I was at least equal
19  to them in experience and background, and PBC
20  performances, and, you know, I don't know what else to
21  say.  I mean I had one in the past on the largest
22  commercial account, state of Georgia, I just came off
23  the state of Texas, I ran something that was ten times
24  that size.
25    Q   Of course the state of Georgia was in the

Page 651

1    Public Sector, right?
2        A    Yes.
3        Q    And that would have put you right back with
4    Dave Liederbach.
5        A    Right.
6        Q    Who you said you didn't have the warmest
7    relationship with.
8        A    Yes, but I mean, we're professionals and, you
9    get, it was a bad time, but you get past the bad time.
10       Q    So -- all right, I think we'll go on to
11   something else.
12           Prior to filing this complaint in June, you
13   had looked at jobs outside of IBM, hadn't you?
14       A    Yeah.  Not many, but I had, yes.
15       Q    There was a Thompson Reuters opportunity in
16   February, right?
17       A    That time period, yes, there was.
18       Q    And let's see if we can't put that up.  91, I
19   think.
20           So this is the Thompson Reuters opportunity in
21   February, right, that you pursued?
22       A    Yeah.  They had contacted me and I followed up
23   with them.
24       Q    And the other one was through a company -- 94,
25   please.

Page 652

1            This was the Hewlett Packard opportunity that
2    came up in February, right?  And I think you said you
3    had an interview for this.
4        A    Right.  This is the one that had come into IBM
5    to someone else and she forwarded it to me and said
6    this is more up your alley, why don't you take a look
7    at it.
8        Q    Okay.
9        A    But this was normal activity in our jobs, we
10   were getting these.
11       Q    Right.  But it wasn't normal to go back and
12   get into a telephone interview about it, was it?
13       A    It wasn't abnormal.
14       Q    Okay.  All right.
15           Let me go back, before I make the next point,
16   you said you were given a 30-day notice in a meeting
17   with Joanne Collins-Smee, right?
18       A    Correct.
19       Q    And she told you that there would be --
20   that -- well, let me ask you this:  Did you meet with
21   her on May 30th, or June 2nd?
22       A    Yeah, I think -- well, they have to be very
23   careful at that, because -- but -- I met with her on
24   May 20th of 2008, when she informed me that they were
25   preparing a package, and she formally told me on -- I

Page 653

1    think it was June 2nd.  For some reason that date
2    sticks in my head.  I think that's when she actually
3    met with me and went through the formal discussion of
4    the package.
5        Q    Why would she meet twice with you?  Do you
6    have any idea?
7        A    I don't know.  I don't know why she would.
8        Q    But you did meet with her and she did give you
9    a 30-day notice on June 2nd, right?
10       A    Well, she says the package is being put
11   together for you, a separation package is being put
12   together for you, which meant it must have been
13   underway for some time, and that you'll have 30 days
14   to find a job.
15       Q    Let's go back and talk about something else.
16   Now, on May 20th, 2008, the day you say you met with
17   her, you re-contacted both of the people you'd been
18   dealing with on the Thompson Reuters thing, and the
19   Hewlett Packard thing, didn't you?
20       A    I had been in touch with them, but I don't
21   recall the actual calender on my discussions with
22   them.
23       Q    Let's take a look at -- put up Defendant's
24   Exhibit 110, please.
25           This is to somebody named Phil Schneidermeyer,

Page 654

1    right?
2        A    Yes.
3        Q    And he's from the recruitment firm Heidrick &
4    Struggles, wasn't he?
5        A    That's correct.
6        Q    And this is dated May 20th, 2008, right?
7        A    That's correct.
8        Q    At 12:30.
9        A    Yes.
10       Q    What time did you meet with Joanne
11   Collins-Smee?
12       A    It was that day, but I don't recall the time.
13       Q    So here's something that to Mr. Schneidermeyer
14   saying, "Here's my resumé.  I finally have time to
15   pursue our prior discussion.  I'll be available to
16   discuss any possible opportunities."
17           So let's go over, then, to the next one, which
18   is 111, same date, from you to Janis, who is a fellow
19   named Larry Janis from a recruiting group call ISSG,
20   right?
21       A    Correct.
22       Q    And you had been in touch with him on the
23   Hewlett Packard thing first, right?
24       A    Yes.
25       Q    And you say the same -- about roughly the same

Page 655

1    thing. We'd spoken about HP and Pfizer. And this is
2    May 20th, right?
3        A   Yes.
4        Q   Right?
5        A   Yes, it is.
6        Q   So you were out seeking other positions.
7            Now, and this is before you had even been
8    offered a package by IBM.
9        A   I had sat through five months of not a single
10   lead from Joanne to be considered, so at this point, I
11   had an obligation to my family to do something in case
12   I did get separated from IBM, and that's why I
13   followed up on things like this.
14       Q   Mr. Castelluccio --
15       A   Sorry.
16       Q   -- it was just an easy question.
17       A   All right. But it was a hard answer.
18       Q   That's not a hard answer. It was an easy
19   question and answer, I thought.
20       A   I apologize.
21       Q   I'm sorry, too.
22           All right. So prior to the time -- you filed
23   an age discrimination complaint on June 13th, I
24   believe we said, the internal complaint with Mr.
25   Walker. We can --

Page 656

1        A   It was June. I'll accept that.
2        Q   So prior to that time, you'd been cashing out
3    your stock options, hadn't you?
4        A   Yes.
5        Q   So let's take a look at Exhibit 167, please.
6    It's up there. Can you enlarge it at all? I hope the
7    jury can see that.
8            Stock options are a form of executive
9    compensation, right?
10       A   That's correct.
11       Q   And they're -- the deal with stock options, I
12   believe -- and I hope I'm not telling you something
13   you don't know, or that you do know -- stock options,
14   you get a stock option from a company, at a certain
15   price, it's called a strike price, and then you get to
16   buy a share of stock at the market price some time
17   later.
18       A   Correct.
19       Q   Right? So it's good if it goes up. So if you
20   get a stock option for X dollars and the stock goes up
21   50 bucks, you're in good shape.
22       A   Right.
23       Q   If it goes down, not so good.
24           So you had received stock options in the past
25   over a fairly long period of time, which we'll see in

Page 657

1    a minute, but in '07 you started cashing them out,
2    right?
3            The stock option exercise activity is on the
4    right, and it has exercise activity.
5            And ladies and gentlemen you can follow along
6    there.
7            It says 10/15/07, 4/24/07. These are
8    different stock grants that you got in the past,
9    right?
10       A   Yes.
11       Q   And so you cashed these out. By my
12   computation, about 8,300 shares, or something, in '07,
13   right?
14       A   Let me get the number, but -- all right,
15   whatever.
16       Q   Whatever the number is.
17           And this is -- you started -- this is before
18   you'd ever been put on the bench or anything happened,
19   right?
20       A   '07, yeah, yes.
21       Q   Right. Now -- and then you cashed more out in
22   '08. You cashed a bunch out on 3/12/08, and then a
23   whole bunch on May 8th, '08, right?
24       A   Correct.
25       Q   Before you'd been given any 30-day notice at

Page 658

1    all.
2        A   That's correct.
3        Q   So let's -- can you put that demonstrative up,
4    please?
5            I think this is just a graphic. It'll be
6    easier to see.
7            And I think what you'll see is there were a
8    lot cashed out in '08, right?
9        A   Yes.
10       Q   And a lot in '07.
11           And you didn't receive any -- the blue portion
12   shows when you received them, right?
13       A   Well, that's what you're saying, yes.
14       Q   It says granted, and I will -- I'll take
15   responsibility if it's not accurate. We've gone
16   through this, I think, with counsel.
17           But you didn't get any -- you were not granted
18   any stock options in '05, '06, '07 or '08, right?
19       A   That's not correct.
20       Q   Well, your counsel's seen this, and in '05,
21   '06, '07, '08, there's nothing there.
22       A   Joanne gave me stocks in 2007.
23       Q   Well, we've gone through --
24       A   RSU's. I mean -- yeah, I think that's what
25   they're called, RSU stocks. You may be reflecting

Page 659

1   here one type of stock option.  There are different
2   stock plans.
3      Q   I see.
4         Kelton Jones didn't give you any stock options
5   in '05 and '06, did he?
6      A   I don't recall.
7      Q   I see.
8         But he was giving you 2 plus ratings and 2
9   rating, as you testified, but he didn't give you any
10   options in '05 and '06, did he?
11      A   I don't -- I don't want to agree with that
12   because I -- I -- very uncomfortable with this chart.
13   I don't know.
14      Q   I see.  Okay.
15         THE COURT:  Mr. Fasman, I note that it's
16   5 o'clock, and apparently you're going on to another
17   topic.
18         MR. FASMAN:  This is a good time to stop,
19   Judge, that's fine with me, sure, of course.
20         THE COURT:  So ladies and gentlemen, call
21   it a day, 5 o'clock.  Be in your room at 9:45, and
22   hopefully there's coffee and some kind of refreshments
23   in there.
24         Don't deliberate.  Don't talk about the
25   case.  Be careful going home and coming back.  And

Page 660

1   we'll see you tomorrow.  Have a good night.  Thank
2   you.
3         (Court adjourned)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 661

1         CERTIFICATE OF REPORTER
2
3      I Hereby certify that the foregoing 222 pages
4   are a complete and accurate computer-aided
5   transcription of my original stenotype notes taken in
6   the Matter of James Castelluccio VS International
7   Business Machines Corporation, which was held before
8   The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9   District Court, 450 Main Street, Hartford,
10   Connecticut, on January 15, 2014.
11
12
13         Wendy Allen, RMR, CRR
14         Notary Public
15
16
17   My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

Page 661

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO     )
    Plaintiff      ) 3:09-cv-01145 (TPS)
                 )
VS              ) January 16, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION  ) Federal Building
    Defendant     ) Hartford, Connecticut

VOLUME 4
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.

Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

Page 663

1          I N D E X
2
3  WITNESSES:              PAGE:
4  James Castelluccio
      Cross-Examination by Mr. Fasman............ 671
5     Redirect Examination by Mr. Carta........... 698
      Recross Examination by Mr. Fasman........... 711
6  Michael Morin
      Direct Examination by Mr. Carta............ 714
7     Cross-Examination by Mr. Duffield.......... 784
8  Joanne Collins-Smee
      Direct Examination by Mr. Carta............ 789
9     Cross-Examination by Mr. Fasman............ 850

WITNESSES:              PAGE:
James Castelluccio
    Cross-Examination by Mr. Fasman............ 671
    Redirect Examination by Mr. Carta........... 698
    Recross Examination by Mr. Fasman........... 711
Michael Morin
    Direct Examination by Mr. Carta............ 714
    Cross-Examination by Mr. Duffield.......... 784
Joanne Collins-Smee
    Direct Examination by Mr. Carta............ 789
    Cross-Examination by Mr. Fasman............ 850

Page 662

Representing the Plaintiff
Carta McAlister & Moore, P.C.
1120 Boston Post Road
Post Office Box 83
Darien, CT  06820
    By:  Mark R. Carta, Esq.
        mark@cmm-law.com
    By:  Margaret A. Triolo, Esq.
        margaret@cmm-law.com
    By:  Troy Bailey, Esq.

Representing the Defendant

Paul Hastings, LLP
75 East 55th Street
New York, NY  10022
    By:  Zachary Fasman, Esq.
        Zacharyfasman@paulhastings.com
    By:  Todd C. Duffield, Esq.
        Toddduffield@paulhastings.com
    By:  Jean-Marie Gutierrez

ALSO PRESENT:

Daniel Fox, Esq.
IBM in-house counsel

Page 664

1          THE COURT:  I was advised by the clerk
2  that one of the jurors has requested permission to be
3  able to leave at 4 o'clock on Friday because there is
4  a wedding that she is participating in.  Now, between
5  you and me, I would have thought that that was the
6  kind of thing that would cause a person to raise his
7  or her hand, say well, look, you know, I just want to
8  let you know I've got -- I'm a participating in a
9  wedding on Friday.  And if she had done that, I think
10  I would have just knocked her out, I would have
11  excused her, but she didn't think it was important
12  enough then.
13          So I just want to tell you that, if you
14  have any thoughts or ideas, number one.  We like to
15  accommodate people if we can.  We don't want to have a
16  witness who's angry at everybody because she wasn't
17  allowed to go to a wedding.  On the other hand, we've
18  got to get along, it's important business, and she was
19  selected.  So let's just think about it.  We don't
20  have to make a decision right now, but I'd like to
21  hear what you think about it.
22          MR. FASMAN:  To accommodate her could we
23  begin earlier tomorrow?  We're here.  We'd be willing
24  to do that.  I mean the problem as I see it, and I'm
25  sure Mr. Carta agrees, is that we have two

Page 665

1  disappearing witnesses. We have Mr. Jones, who came
2  up here, and Ms. Collins-Smee, who's a critical
3  witness, who's going to disappear.
4       MR. CARTA: That's right. We have two
5  witnesses who are only available the next two days.
6       THE COURT: So you're suggesting we start
7  early tomorrow? Maybe like what time?
8       MR. FASMAN: Well, it's really up to Your
9  Honor. Your Honor's coming in from home. We are
10 here. We're staying in downtown. 9 o'clock would be
11 fine with us.
12      MR. CARTA: It would be okay with me.
13      THE COURT: You know something? I'll
14 regret this, I will regret this, but if 9 o'clock is
15 okay with you, if that's okay with the other side,
16 somehow I will be here at 9 o'clock, but it's really
17 tough. It's just those first few steps getting out of
18 bed, and you have this voice in the back of your head
19 saying, you got to go to work, you got to go to work,
20 and pop up comes, you don't have to go to work, you
21 could have retired two and a half years ago, you don't
22 have to, you say no, you got a trial going on here,
23 it's important to a lot of people.
24      I'll be here at 9 o'clock. How in God's
25 name I'll do it, I think I'll probably have to set my

Page 666

1  alarm for 4 a.m., but I'll be here. Now, let's hope
2  that it's okay for all of these people.
3       And what I'll say, if the woman asks the
4  clerk, is that the Judge has discussed it with
5  counsel, we'll all try to do our best to accommodate
6  you.
7       There's another alternative and that is
8  we let her go, right? Because we don't have to have
9  eight. Another alternative would be that we could let
10 her go from the jury, and we would have seven jurors,
11 because you don't have to have eight, you got have
12 six, but we always pick eight, and if all eight sit
13 through the trial, all eight participate, but if one
14 goes, as long as we got six, we keep going. That
15 might make her feel badly, but who knows what she'll
16 decide.
17      So we can think about that. We'll figure
18 it out.
19      MR. FASMAN: Your Honor, I had one other
20 thing to bring up before the jury comes in.
21      THE COURT: Yes, sir.
22      MR. FASMAN: I mentioned the other day
23 that I would look to -- that I would look at your
24 opening statement. There was no reference to this
25 being background evidence. And we put this together

Page 667

1  last night. Mr. Carta and Ms. Triola have copies of
2  this, and I gave a prior draft to your law clerks
3  which I thought was too legal and too -- said things
4  like as a matter of law, so we tried to boil it down
5  so it was understandable.
6       But I do think we have one issue, really,
7  in this case. Judge Squatrito said it's just a
8  termination. This stuff is -- all what we heard is
9  background. And the jury's been sitting here for two
10 days. Not that it's not important background, or part
11 of Mr. Carta's case, but I think if I were a juror I
12 would sit there and I would say well, wait a minute,
13 why didn't somebody tell me this, during the trial, I
14 didn't understand that to be the case. Even though I
15 said it in my opening. So that's why we put this
16 together.
17      MR. CARTA: Your Honor, that was just
18 handed to me five minutes ago. I just haven't had a
19 chance to look at it. I would like an opportunity to
20 review it.
21      My recollection is that Judge Squatrito's
22 case did not say exactly that, did not say it was just
23 background evidence, it said it was admissible as
24 background evidence, and from which an inference of
25 discrimination could be drawn. There's one sentence

Page 668

1  in here that --
2       MR. FASMAN: I don't think that's right.
3  We can look at that.
4       MR. CARTA: So we'll try to work
5  something else out, but I haven't had a chance to even
6  look at it.
7       THE COURT: Let me tell you, as I read
8  this, and I haven't had a chance to read it really
9  carefully yet, you're not stating or attempting to
10 state a cause of action as a result of his removal as
11 president of the Public Sector, and you're not stating
12 a cause of action with regard to his removal from a
13 position of senior DPE. You just have that in there
14 as background evidence. So the jury will know that
15 this man had a series of important jobs. They're not
16 making a claim with respect to those two, and no cause
17 of action is alleged with respect to those two, and no
18 relief can be given as a result of those two. They're
19 not being litigated. What's being litigated now is
20 whether this man was terminated on account of his age,
21 and whether age was a substantial factor in his
22 termination.
23      MR. FASMAN: We don't agree with that
24 last one, but close. It's but for, actually.
25      THE COURT: I mean isn't that

2 (Pages 665 to 668)

Page 669

1  interesting.  There's a now deceased judge who was
2  absolutely brilliant in this district, Judge Joseph
3  Blumenfeld.  He died about 1980, '81, '82.  But I can
4  remember, you know, having a conversation with him
5  about the difference between the but for and
6  substantial factor, and he had gotten into this kind
7  of friendly war with a district judge in some other
8  district in the midwest, and he, Judge Blumenfeld, was
9  going back and saying, now just tell me what exactly
10  is the difference between these two things, the but
11  for and the substantial factor, and I think you can
12  make an argument that there is a difference.
13          MR. FASMAN:  I think you can make an
14  argument, one, that there's a difference, but I also
15  have my insistence on but-fors from Gross versus FBL,
16  which is a Supreme Court case that says it's but-for
17  under the Age Act.  It says it.
18          THE COURT:  We had that case in 1980.
19          MR. FASMAN:  I know.  I know.
20          THE COURT:  So that's why.
21          MR. FASMAN:  I understand.  But the
22  Supreme Court said in Gross versus FBL, and there's no
23  question about that, it's but for causation.
24          THE COURT:  But for.  I think you're
25  right.

Page 670

1          But look, let's get on -- you don't want
2  me to read this now, do you?
3          MR. FASMAN:  I'd like you to read it at
4  some point during the day so that the jury gets a
5  picture of what is going on here, so that they're not
6  misled.  Please feel free to read it, and we'll talk
7  about it.  That's fine with me.
8          (Jurors present)
9          THE COURT:  Mr. Castelluccio, could you
10  please resume the stand.
11          THE WITNESS:  Yes, Your Honor.
12          THE COURT:  Good morning, ladies and
13  gentlemen.
14          THE JURORS:  Morning.
15          THE COURT:  You heard that gavel go down
16  at 10 o'clock on the dot, and we had some legal
17  discussion for about 15 minutes, and we're all set to
18  go, so please sit down, relax, enjoy yourself.
19          Have coffee in there?
20          THE JURORS:  Yes.
21          THE COURT:  Good morning, Mr. Fasman.
22          MR. FASMAN:  Morning, Your Honor.
23          Your Honor, ladies and gentlemen.
24          I see someone taped the podium in place
25  today, so we won't have a repeat of yesterday.  I

Page 671

1  think we've solved some of our technical issues here.
2
3      CONTINUED CROSS-EXAMINATION BY MR. FASMAN:
4
5      Q  Mr. Castelluccio, good morning, sir.
6      A  Good morning.
7      Q  So we were talking when 5 o'clock hit
8  yesterday, we were talking about stock options.
9          And could you put number 167 up there, please,
10  again?
11          Now, Mr. Castelluccio, you exercised all of
12  your -- all the stock options you had, didn't you?
13      A  No.
14      Q  You did not?
15      A  No.
16      Q  What other stock options did you have, sir?
17      A  I still had some shares.
18      Q  You still have some shares?
19      A  Yes.
20      Q  And where did you get them?
21      A  From IBM.
22      Q  When?
23      A  I don't recall when.
24      Q  And are they still live?
25      A  Yes.

Page 672

1      Q  Oh, good.
2          These are the options that you exercised in
3  '07 and '08, and prior to that time, correct, sir?
4      A  It looks like it, yes.  I'm not sure -- I
5  can't validate every transaction.  I assume that's --
6      Q  These are our records of your stock option
7  exercise activity by year, and it's dated 11/18/09, so
8  this is our official record of this.
9          And I notice -- you seem to have some
10  recollection of other shares, but we saw no shares
11  given to you in '05, '06, '07 or '08.  These are
12  exercise dates on the right and award dates on the
13  left.  On the second page -- there were a few more on
14  the second page that were from '00.  But we'll go back
15  into that.
16          Can we have the chart that I had there, too,
17  just so the jury can see the chart?
18          So these are the shares you cashed out on the
19  right in '07 and '08 and a few in '09, you cash out,
20  and I think that from the prior chart we also had
21  these were cashed out in '08 in March, and then in May
22  8th, which was prior to the time that you met with Ms.
23  Collins-Smee and she said there was being a package
24  prepared for you.
25          Now, I asked you during your deposition -- let

Page 673

1  me rephrase that.
2      Why did you cash out the shares in '08 on the
3  dates that you did?
4      A   I recall one specific reason, one block that
5  was sold, but I -- without going back and looking at
6  what I did with the funds as a result of the cashout,
7  I wouldn't know what the earlier one was.  There are
8  two, as you mentioned, March and May.
9      Q   And May.
10     A   I understand the May one.
11     Q   What was the reason in May?
12     A   In May I had contacted IBM's -- not
13  administrator, but he was the IBM advisor for
14  executive compensation, and I asked him a question
15  regarding the shares that I had at that point in time.
16     Q   And who was this person, sir?
17     A   I -- I don't recall who it is.
18     Q   And you actually asked that person whether or
19  not what would happen to your shares if you left the
20  business.
21     A   Correct.
22     Q   And by leaving the business, you meant going
23  somewhere else.
24     A   Well, leaving the business.  Yeah, going
25  somewhere else, wherever that may be.

Page 674

1      Q   Right.  If you went to another company, for
2  example.
3      A   Or was fired.
4      Q   Yeah, well --
5      A   Yes.
6      Q   And shortly after you cashed out these shares,
7  that's when you got back in touch with Heidrick &
8  Struggles and with the recruiter that had you
9  interviewing for Johnson & Johnson earlier in the
10  year.  We saw that.  On the 20th you sent out e-mails
11  to --
12     A   There's no connection between the two.
13     Q   Well, the options in question, the ones that
14  you cashed out weren't expiring.  You could have kept
15  them, couldn't you?
16     A   That's correct.
17     Q   And if you'd gone to a competitor, what would
18  have happened to the shares?
19     A   Well, my question was, to the IBM employee,
20  stock option administrator, whatever he was, advisor,
21  was if I left IBM, what would happen to the shares,
22  and my question was specifically about not that I had
23  another job I was going to, but if I were to be fired,
24  what happens to these shares.
25     Q   And what did he tell you?

Page 675

1      A   He told me you would lose them.
2      Q   I see.  But this was before you were given a
3  30-day notice or anything.  You were still on the
4  bench.
5      A   I was still five months into where I wasn't
6  being supported by my manager, and I wasn't naive
7  enough to think that the potential was growing
8  increasingly possible that she would fire me.
9      Q   Of course if you had chosen to bid on a Band
10  10 job and receive a Band 10 job, these wouldn't have
11  gone away.
12     A   We discussed that yesterday.
13     Q   That's true, right?
14     A   If I could have been a Band 4, Band 3, yes.
15     Q   Right, that's true, too.
16     A   Right.
17     Q   But Band 10 was much closer to your
18  compensation level.
19     A   Not really.
20     Q   We'll go back to this.  Let's just -- if I can
21  have number 169 up, and particularly pages 2 and 3 of
22  that.
23         How much money did you receive for cashing out
24  these options, sir?  This is '07.  And the option
25  cashout there we've highlighted in yellow.

Page 676

1      A   Yes.  Those were shares I earned, so I'm not
2  sure --
3      Q   And let's look at '08, then, please.
4         And you've got -- there's more on the next
5  page.
6         So -- yes.  Those are shares that you were
7  awarded earlier in your career.
8      A   In my career, yes.
9      Q   Okay.  And so those were your earnings from
10  cashing out those options at that time.
11         In addition, since you retired you've been
12  receiving a retirement benefit from IBM, haven't you?
13     A   Pension?  Yes.
14     Q   Yes.  And do you recall how much the pension
15  is on an annual basis, sir?
16     A   I believe it's 78,000 or something like that.
17     Q   Right.  So -- and that you've been getting
18  ever since you left.
19     A   Yes.  I needed that.  Yes.
20     Q   Okay.  So I want to shift gears now and talk
21  about a couple of other issues.
22         Your counsel is pressing, and you're pressing
23  claims for emotional distress in this case, and during
24  your first deposition you may recall we asked you
25  about that, and you said that your symptoms included

Page 677

1    mood swings, sleepless nights, things like to that.
2    Do you remember that?
3        A   Yes, I do.
4        Q   So maybe we can play that, play the
5    deposition.
6            MR. CARTA:  Objection, Your Honor.  He'd
7    admitted that that's what he said.  These are supposed
8    to be for --
9            MR. FASMAN:  All right, that's fine.  Let
10   me ask it another way.
11   BY MR. FASMAN:
12       Q   Do you recall exactly what you said about
13   that?
14       A   No, I don't remember.
15       Q   Okay, then let's play the deposition.
16           MR. CARTA:  Objection.
17           THE COURT:  Mr. Fasman has exhausted his
18   present recollection, and he's now entitled to play
19   the tape to see if that refreshes his recollection.
20           MR. CARTA:  I'm sorry, Your Honor, I
21   couldn't hear you.
22           THE COURT:  Maybe if I turn on my
23   microphone.
24           Mr. Fasman has exhausted the witness's
25   present recollection as to exactly what was said that

Page 678

1    day.  Now he is attempting to refresh Mr.
2    Castelluccio's recollection by playing the tape.  He's
3    entitled to.
4            MR. CARTA:  Fair enough, yes.
5            (Videotaped deposition excerpt)
6        Q   Is there anything else besides what we talked
7    about, including these mood swings that you
8    experienced?
9        A   An example --
10       Q   I'm asking you because it's your claim, severe
11   emotional distress, I'm trying to understand what that
12   is.
13       A   Weight loss.  I probably lost hair.  I didn't
14   have a lot to begin with.  I'm sure I lost more.  You
15   know, I don't know.
16       Q   Okay, and --
17       A   I didn't have a dog, couldn't take it out on
18   the dog, no dog to kick.  I was dealing with it
19   internally.  I'm kind of a, you know -- I don't -- I
20   didn't want to burden my family with a lot of this,
21   right?  So I'm not -- I probably should have been
22   talking to my wife more about this, but I wasn't,
23   because I just, you know, it was what it was, so it's
24   like trying to work my way through it.
25           (Videotaped deposition excerpt concluded)

Page 679

1        Q   Now, Mr. Castelluccio, did you see any medical
2    provider for care for this?
3        A   No.
4        Q   You saw no therapist, correct?
5        A   Correct.
6        Q   No psychiatrist?
7        A   Correct.
8        Q   No psychologist?
9        A   Correct.
10       Q   No counselor?
11       A   Correct.  Other than my wife, correct.
12       Q   Right?
13           Now, you didn't take any medication at all for
14   this.
15       A   Well, not for depression or something like
16   that, but -- no.  I mean Tylenol, Extra Strength
17   Tylenol.
18       Q   Okay.  But you got no treatment for this
19   emotional distress.
20           I wanted to ask one more question along these
21   medical lines as we're talking about it, and that is,
22   you were paying -- after you left IBM, you were paying
23   for -- you ended up paying for your own health
24   insurance, correct?
25       A   Yes, correct.

Page 680

1        Q   And I believe you testified during your
2    deposition that it was six or seven hundred dollars a
3    month.  Do you recall that?
4        A   I don't recall what the number was.
5        Q   If you don't recall, let's -- if you can play
6    clip number 57, and that is page 381.
7            (Videotaped deposition excerpt)
8        Q   And what are you paying currently for medical
9    insurance right now?
10       A   I'm not sure of the exact amount, but it's
11   probably like 6, 700 a month, times 12, it's whatever
12   that comes to.
13           (Videotaped deposition excerpt concluded)
14       Q   Okay.  I just wanted to get that on the
15   record.
16           Now, let's talk now about the various things
17   that you say you did in terms of trying to find a job
18   after you left IBM.  And I'd particularly like to
19   direct your attention -- I think I'm going to use the
20   Plaintiff's exhibits here.  These we saw yesterday.
21   Let's start with number 103, if we can.
22           Now, this is a document that was presented to
23   us -- and I'll represent this for the record -- when
24   we deposed you for a third time in May 2013, this
25   year, and that's when we first saw this.

Page 681

1    Now, you testified during your deposition,
2  didn't you, that you started maintaining this list in
3  the spring of 2010, isn't that right?
4    A   I -- if I said that, I don't recall.  I mean
5  I -- these are valid --
6    Q   I'm just asking you the question, did you
7  testify to that effect or not?
8    A   I don't recall.  I don't know, to be honest.
9  I don't recall.
10   Q   Well, let's -- I don't have this on videotape,
11 unfortunately, but maybe we can put up T-552.  Do we
12 have that?
13     And this says -- and the jury can read it.
14 This is your testimony.  The question was -- I'll read
15 the whole highlighted clip.
16     "Again, this is from a home computer where you
17 maintain this.
18     "Yes, yes.
19     "When did you start maintaining this
20 information, sir?
21     Answer:  "It was after the last episode of --
22     "Of your continuing deposition?"
23     And your answer was, "Yes, yes.  I'm sorry, I
24 shouldn't have said it that way."
25     And I said, "That's okay.  So sometime in the

Page 682

1  spring of 2010, correct?"
2      And you said, "Yes."
3      So I guess the obvious question is, if you
4  started to maintain this in the spring of 2010 -- can
5  we bring number 183 -- 103 back up, please?
6      You can't possibly have made contemporaneous
7  entries for the events in 2008.  As you testified
8  yesterday, you maintained these contemporaneously, but
9  if you started maintaining it in 2010 you couldn't
10 possibly have done that.
11   A   Actually, as I said, I maintained this on my
12 computer.  This list was built -- constructed based on
13 information I had on my computer.  So -- the actual
14 job applications.  So it wasn't -- on a spreadsheet I
15 had a record of the interviews, and my answer to that
16 question was, the spreadsheet -- which I thought were
17 were referring to -- was built after 2010 period,
18 because I realized after that I had to maintain more
19 accurate records because of the deposition.
20   Q   Look, the jury heard the testimony yesterday,
21 and I'm sure, ladies and gentlemen, you remember the
22 testimony was that he made these entries
23 contemporaneously on the document, and you can't make
24 contemporaneous entries on a document that you start
25 keeping in 2010.  I think that's pretty clear.

Page 683

1      MR. CARTA:  Your Honor, that's argument
2  and testifying.
3      MR. FASMAN:  I'll withdraw that.
4  BY MR. FASMAN:
5    Q   Take a look at number 104, please.  Can you
6  put that up?  Just the first page or two.  I want to
7  talk about that in a moment.
8      Now, these are all web seminars and meetings
9  you say you went to in 2009, correct?
10   A   Correct.
11   Q   And these also are from 2009?
12   A   Correct.
13   Q   Okay.  Now, let me ask you while that's still
14 up there.  So these were before you were keeping these
15 records, this particular record.
16   A   This is before I started to put the
17 information I had into this format, not before I was
18 keeping the records, so --
19   Q   I'm going to let you explain to the jury what
20 records you had, because we asked about -- I asked
21 about that.  But let me ask you the questions and then
22 you can answer, and if Mr. Carta wants to ask you more
23 he can.
24     Now, as I said, we deposed you three times.
25 Your first deposition was in January 2010, at Mr.

Page 684

1  Carta's office.  Do you remember that?
2    A   Yes.
3    Q   Now, for that deposition you gave us only one
4  document that showed what jobs you had applied for,
5  and this we have marked as Exhibit 151.  And maybe you
6  can put that up.
7      And I believe you testified that with regard
8  to this document, you didn't create it, and you didn't
9  even know where it came from.
10   A   Well, if I could see the whole document.
11   Q   Sure.  It's in the book.
12   A   I don't have my book.
13   Q   The black notebook there?
14   A   Oh, your book?
15   Q   Yes, number 151.
16     Do you have it there, sir?
17   A   Yeah.  It's a spring of -- it's multiple pages
18 with multiple jobs and comments, like KPMG, best
19 regards.  This one, because it has a job ID number on
20 it, that 247952, I would suspect this was -- oh, it
21 was from ExecuNet.
22   Q   Right.
23   A   There's an indication it's from ExecuNet.
24   Q   But my point is just this:  Ladies and
25 gentlemen, this is a -- how long is this?  Seven

Page 685

1 pages? A seven-page long document. We asked you to
2 give us all of your records on jobs you had applied
3 for by January 2010, and this is what you gave us at
4 the first deposition.
5 A What I had, yes.
6 Q Right. Now, during that deposition you
7 testified that you dealt principally with NetShare and
8 ExecuNet, right?
9 A They were, yeah, the predominant ones, because
10 they were -- yes.
11 Q And to apply for a job with ExecuNet -- I
12 don't remember NetShare -- but to apply for a job with
13 ExecuNet you go through what their listings were, see
14 if there was a job in which -- for which you were
15 interested. As you said, you drafted a letter, and
16 then clicked on it, and they sent that out. That's
17 how you made an application through ExecuNet.
18 A Right, but they sent me -- every day I would
19 get a report from them of the job.
20 Q Right, all online. Same thing with NetShare.
21 A Yeah, NetShare was the same way. They're both
22 online services.
23 Q All right. So let's go forward a little bit.
24 A few months later there was a second deposition in
25 April 2010. Do you remember that?

Page 686

1 A I know there was a second one. I'm not sure
2 that's the date.
3 Q Yeah, there was a second one. And by that
4 time we had asked for -- and you had provided to us
5 more information about your job search, and you did
6 that -- and I'll represent this for the record --
7 through a set of responses to interrogatories.
8 MR. FASMAN: And Your Honor, without
9 going in detail, interrogatories, we ask questions of
10 the other side and they answer the questions in
11 writing and then they assert that they're true and
12 then you go forward and do whatever you do with them.
13 BY MR. FASMAN:
14 Q So your set of Plaintiff's first set of
15 interrogatories we've got as Exhibit 219. And these
16 you signed under penalty of perjury. And if you'd put
17 up number 219 at page 11. Do we have that up there?
18 So these were true and accurate. Signed under
19 penalties of perjury, what you have to do to send
20 interrogatory responses back.
21 So I want to go back a few pages. Now, go
22 back to pages 8 through 10 are the portions of this
23 document that you gave us, and I don't know that we're
24 going to go through all of them, but there's one from
25 Thompson Reuters on page 8, and then on the top of the

Page 687

1 second page there's one on page 9, and then a whole
2 slug of ExecuNet, a few more underneath a whole slug
3 of job applications and some other stuff on page 10.
4 Is that all up there? Ladies and gentlemen of the
5 jury have seen it? Okay.
6 Now, those are the answers to the
7 interrogatories, and you gave us about 60 pages of
8 documents which were from ExecuNet and a couple of
9 others. I'm not going to put those out here, but
10 those were your reference. If you want to look at
11 them, they're Exhibit Number 199 in our booklets that
12 you'll have.
13 And this answer and the slug of documents you
14 gave us were at that time, to the best of your
15 knowledge, all of the records of the positions you had
16 applied for, right?
17 A The records I gave you were what I was able to
18 retrieve from ExecuNet. You go in and do a query on
19 ExecuNet, and you get -- where I was able to, I pulled
20 confirmations of job -- that I had applied for the
21 job.
22 Q Mr. Castelluccio, I asked you not once, not
23 twice, but three times in your deposition whether we
24 now had all of your records of the positions you
25 applied for. This was in April of 2010. Do you

Page 688

1 remember my asking you that three different times?
2 A I had a response to the confirmation that
3 these are the documents that confirm what I'm telling
4 you I have. I explained during that deposition that
5 that was the case, that I couldn't --
6 Q All right. Let's put up -- as long as we get
7 that kind of answer, let's put up first of all clip
8 number T-31, which is volume 2 of your deposition,
9 pages 31, 23 to 33, 6. One page at a time so the jury
10 can see it.
11 Okay?
12 A Yes. It says it's for those that I could
13 retrieve.
14 Q Right, exactly. I'm just asking what records
15 you had at the time and what records you gave us.
16 This is in 2010. And then I ask you a second time.
17 You want to put up clip number -- because I
18 didn't want to -- we didn't want to come back and have
19 a third deposition on this, so we asked, "Is this to
20 the best of your knowledge a complete listing, is that
21 a fair statement?
22 "This is the list we have, both in the answers
23 to interrogatories.
24 Next page, please?
25 "I don't recall any other positions, but --"

Page 689

1      Okay.  And then can we have one more clip,
2  which is T-78, please, which is another question along
3  these lines.
4      And it says, "You don't have -- personally you
5  don't have any records of the positions that you
6  applied for at ExecuNet.  This list -- this list is
7  what was produced."
8      Keep going, please.
9      And the last question, "Are you satisfied you
10 performed a comprehensive and thorough search for
11 these documents?"
12     You answered, "Yes."
13     Now I go back and look at Exhibit 104 -- well,
14 let me ask you another question.
15     During your second deposition I asked you
16 something else, too.  I asked you whether you'd been
17 to any networking events or any meetings conducted by
18 NetShare.  Do you remember that?
19 A   Vaguely.
20 Q   And you remember your answer was "one".
21 A   Okay.
22 Q   Do you remember that?  I don't want to testify
23 for you.  If you don't remember it, put up clip number
24 40, please.
25 A   I certainly remember the first one, that's for

Page 690

1  sure, because it was a new experience, and we kind
2  of -- that leaves an impression with you the first
3  time.
4  Q   Right.  You said that you had gone to one.
5      MR. CARTA:  Your Honor, there's no
6  contrary testimony here.  This says he attended at
7  least one.  This is supposed to be for impeachment.
8  This isn't a way to shovel in new testimony.
9      MR. FASMAN:  It is impeaching.  It's
10 impeaching this entire document, Mr. Carta.
11     MR. CARTA:  The question was, "How many
12 did you go to?"  He said, "I recall one."  The
13 testimony that we just read says, "I went to at least
14 one."  That's not impeachment.  That's exactly the
15 same thing he just said.
16     MR. FASMAN:  Fine.  Let me ask another
17 question.
18 BY MR. FASMAN:
19 Q   I also asked you with regard to ExecuNet how
20 many meetings you had gone to.  Do you remember me
21 asking you that?
22     Let's ask it.  At the time of this
23 deposition -- let me ask it this way.  At the time of
24 this deposition, this is May 2010.
25 A   Right, four years ago, yes.

Page 691

1  Q   Four years ago.  How many of these meetings,
2  these meetings conducted by ExecuNet, had you been to
3  in 2009 and 2010?
4  A   I don't recall sitting here now.  I do recall
5  attending them.  The first one certainly made an
6  impression on me.  I could probably describe the room
7  and the people and the discussion and who ran the
8  facilities.  I don't remember her name, but I could
9  tell you what she looked like.
10 Q   Okay, that's fine.
11     So let me then ask you in terms of
12 impeachment, because it's really going to this, do you
13 remember my asking you how many ExecuNet meetings you
14 had been to in 2010 and 2009?
15 A   I don't recall that.
16 Q   All right.  Well, let's show the jury what
17 your response was.  This is T-72.
18 A   Okay.  That's a recollection of mine at the
19 time, after eight hours of deposition.
20 Q   Four years ago.  You said you couldn't
21 remember now.
22 A   I know I attended Exec --
23 Q   Well, I just asked you, and this is what you
24 answered four years ago under oath, right?
25 A   Right, in my eighth hour of deposition.  Or

Page 692

1  tenth hour, whatever it was.
2  Q   And I -- you testified you hadn't been to any
3  in 2010 and you'd been to four in 2009.
4      Now, I look at this extensive list, number
5  104.
6  A   I could describe the Stamford one.  It's in my
7  neighborhood.  I could tell you where it was.
8  Q   I'm not saying you didn't go to that.  What
9  I'm saying is that you've got a list of hundreds of
10 these.
11 A   There are not hundreds in there.  These are
12 webinars and these are meetings.  If you want to take
13 a meeting, the New York City CIO Prospective Forum.
14 Q   Let's talk about New York City, because I
15 asked you about that, too, in your third deposition.
16 The New York City, this is --
17 A   Number 29.
18 Q   103.  Line -- do you have that up there?
19     I'm sorry, this is -- yeah, that's right.
20 There are two of them there.
21 A   Right.
22 Q   Line 105 and 107.  Philadelphia CIO
23 Prospective, and the New York CIO Prospective.  I
24 asked you about those, too, in your third deposition,
25 right?  What I asked you was whether you had any

Page 693

1    records that showed that you had been to those.  Do
2    you remember your answer?
3        A    Records?
4        Q    Yes, records that showed you'd been to those.
5        A    No, I don't remember my answer.
6        Q    Well, your answer -- well, let's put up T-560.
7             There are no records, is what you said.  But
8    go ahead and put it up so the jury can see what he
9    actually answered.
10            MR. CARTA:  Your Honor, that doesn't say
11   no records.  I object.  Again, this is not
12   impeachment.
13            MR. FASMAN:  Maybe we have the wrong
14   clip.  Go further down, please.  Why don't you go
15   further down, then, and get the right portion of this,
16   please.
17            THE WITNESS:  You want me to respond to
18   that?
19            MR. FASMAN:  Not yet.
20   BY MR. FASMAN:
21       Q    All right.  So you have -- you had -- I asked
22   you specifically whether you had records for these,
23   attending these events, and you said that you didn't
24   during your deposition, so the jury can draw their own
25   conclusion for that.

Page 694

1             Let me go back to one thing, so that we have a
2    clear understanding here.  On Exhibit 103, please.
3    The jobs with numbers, the column that says ExecuNet
4    job number.
5        A    Yes.
6        Q    Those are all listings from ExecuNet that you
7    applied for.
8        A    The number on the left, that would -- the
9    source of that would be ExecuNet.
10       Q    Right, yes, right.  And the other is, many of
11   these you're talking about recruiters, a lot of the
12   recruiters that you list in this document were people
13   who you referred to through ExecuNet.
14       A    Not referred to, but I mean, the recruiters, I
15   made contact with them as a result of applying for one
16   of these jobs in ExecuNet, and they happened to be the
17   one who was trying to find -- fill that opening for
18   some corporation behind them.
19       Q    Now, you testified about all the various
20   things that you did to find a job.  The one thing you
21   didn't testify to was your going back to the contacts
22   that you've made over 40 years of working at IBM.  Did
23   you go back to United Healthcare and look for a job
24   there?
25       A    I had been away from United Healthcare for so

Page 695

1    long, the one contact that I had was an ex-IBMer, and
2    he was no longer working for United Healthcare.
3        Q    You know, Mr. Castelluccio, I asked you what
4    time it is, you're telling me how to make a watch.  I
5    just asked you a simple question.  Maybe we can answer
6    the question and then the jury can decide the case and
7    go back to their lives.  I'm just asking you something
8    very simple.
9             MR. CARTA:  Your Honor, I'm going to
10   object to that kind of comment.
11            MR. FASMAN:  I withdraw it.  I'm sorry.
12   BY MR. FASMAN:
13       Q    Did you go back to WellPoint and seek work
14   from them?
15       A    Well, first, I thought I was in a non-compete
16   position when I left IBM -- right or wrong, that was
17   my understanding -- which would have prevented me from
18   going to WellPoint to seek a job, so I never pursued
19   that avenue.
20       Q    You were wrong, though, you had no non-compete
21   with IBM, did you?
22       A    I said when I left IBM I believed -- right or
23   wrong, I said -- that I was under this non-compete
24   clause which said I could not go back to those
25   contacts that I had built up in my most recent

Page 696

1    positions because it would be a competitive position.
2        Q    Did you ask anyone at IBM whether you had a
3    noncompete?
4        A    Did I go back to IBM with that?  No, I didn't
5    see a need to, because I thought I was operating under
6    that restriction.
7        Q    And how long did you think you were operating
8    under that restriction?
9        A    Well, it didn't matter after a while
10   because -- I don't know, I think it was for -- I think
11   it was like the first year, was my understanding, you
12   can't compete against.
13       Q    Well, if you wanted the job, why didn't you at
14   least go back to IBM and say, Am I prevented from
15   doing this?  You had all kinds of sources, didn't you,
16   at IBM?
17       A    For?
18       Q    To ask that question.
19       A    I could have asked any question.  I don't know
20   whether I'd get a response, but --
21       Q    You could have called Mr. Holmes, Keith
22   Holmes.  You knew him.  You could have called Mr.
23   Morin, who's going to testify --
24       A    I was searching for jobs using the best
25   resources I had available.

Page 697

1      Q   One of the best resources -- wasn't the best
2   resource available your Rolodex?
3      A   I'm sorry, with who?
4      Q   Your Rolodex, your list of contacts?  My God,
5   you were -- you told the jury that you had had
6   literally hundreds of contacts or hundreds of
7   contracts with which you dealt in the IT area over a
8   40-year career.
9      A   That's correct.  I did not say hundreds.  I
10  keep referring to 30 and single individual ones.
11     Q   30 Public Sector contracts, but you had a long
12  career prior to that time.
13     A   It wouldn't have been hundreds.
14     Q   Whatever.
15     A   The point is, some of this is seven years old,
16  ten years old, and I did not maintain a, you know,
17  records of who I had dealt with at that time, and I
18  had no way of contacting, other than doing a search
19  for them.
20         This I found useful because I was getting
21  success initially with the recruiters calling me up,
22  so I continued to pursue this, because I was at least
23  getting feedback from someone, and they were actually
24  assisting me in identifying new locations, so I
25  continued to pursue this.

Page 698

1      Q   Let me ask you one final question.  How many
2   face-to-face interviews did you procure using NetShare
3   and ExecuNet?
4      A   I was hoping for at least one, and
5   unfortunately I did not get one.  And a lot of things
6   are -- I had phone calls.
7      Q   No face-to-face --
8      A   No face-to-face.
9      Q   No face-to-face interviews.
10     A   That's correct.
11     Q   Over five years of using these services.
12     A   In this work environment, it was very
13  difficult.
14         MR. FASMAN:  That's all I have, Your
15  Honor.
16         THE COURT:  Okay.  Thank you, Mr. Fasman.
17  Mr. Carta.
18         MR. CARTA:  Thank you, Your Honor.
19         THE COURT:  Redirect confined to the
20  scope of cross.
21         MR. CARTA:  Appreciate that.
22
23         REDIRECT EXAMINATION BY MR. CARTA:
24
25     Q   Mr. Castelluccio, do you remember whether

Page 699

1   these are the documents that you produced at your
2   second deposition?
3      A   Yes.  I realized after the first one I needed
4   to do a better job of recordkeeping for the sole
5   purpose of being able to produce this.
6      Q   And how did you get those documents?  How were
7   those documents obtained?
8      A   For every job I applied for you get a
9   confirmation back from ExecuNet that we received --
10  I'm not sure exactly.  You apply for the job, they
11  sent you confirmation back that they are going to
12  forward -- they received your information and they're
13  forwarding it on to the recruiter, and it's an e-mail
14  that comes back in this format, and that's -- each
15  page of this represents confirmations I got back for
16  jobs that helped construct that list.
17     Q   And each time you got an e-mail confirmation,
18  did you actually save that then and there?
19     A   In the beginning I didn't because I didn't see
20  any purpose for it.
21     Q   I'm sorry?
22     A   In the beginning I did not because I didn't
23  see any purpose for it, because I was interested in
24  getting a job, not doing bookkeeping.
25     Q   And then after it became apparent to you from

Page 700

1   your first deposition that you needed to keep better
2   records --
3         MR. FASMAN:  Judge, I'm sorry, that has
4   to be leading.
5         MR. CARTA:  I'm repeating what he just
6   said.
7         THE WITNESS:  That's exactly what I said.
8   I realized after that first session when I'm saying I
9   don't recall, I don't recall, I figured I'd better
10  start doing a better job of recordkeeping, and I
11  started saving these.  And even these is not a
12  complete list, because there's some I'm sure I
13  deleted.  But every one of these is a confirmation
14  that I applied for a job, and whether I got a call
15  from them or not, it doesn't say.  That was up to the
16  recruiter.  So this pile is what made up that list.
17     Q   Mr. Fasman asked you how many networking
18  events you attended, and you said, in your deposition,
19  that you could specifically recall one.  Would you
20  take a look at Exhibit 103 and see if you can count up
21  the number of networking events you attended.
22     A   Can I just do the first page or -- I mean,
23  one, two, three, four -- it's hard to go through all
24  this, but -- that's five, six, seven, eight, nine,
25  ten, 11, 12, 13, 14.  Do I have to go through the

Page 701

1    whole list?
2    Q    Just the first page.
3    A    Okay.
4    Q    Please.
5    A    On the first page, let's see.  Actually the
6    first page is not a good example because it appears
7    one, two, three, you know, that just had to be that
8    that was the situation in July.  Most conferences
9    aren't conducted in July.  They're in -- but as you
10   continue on, where I was counting I was up to the
11   second page when I was up to the number.  So there's a
12   number of these.
13        And the CIO meeting was a regular schedule, it
14   was like quarterly, and I would go to that, and it was
15   always held -- I always picked the ones that I could
16   commute to with minimum expense, and it was New York
17   City.  I did go to one in Philadelphia.  It was at --
18   I don't know -- on Market Street.  It was a Holiday
19   Inn there.  They had a conference from there.  These
20   were held in hotels in New York City.  Some of them,
21   CIO in New York City, was the same hotel, and if I
22   went back and researched I could tell you the hotel.
23   I can describe the lobby, the escalator to go up to
24   where the meeting was and where the bathrooms were.
25        Q    What records did you keep of these seminars

Page 702

1    that you attended, these network seminars that you
2    attended?
3    A    You know, I would bring back -- the record
4    was, in some cases I would bring back whatever they
5    distributed, you know, like -- they usually covered a
6    topic, and I would -- they usually give you the
7    handouts.  They also give you free things, too,
8    because they're trying to sell things to you, and I
9    would bring that back, and that was my record.  And I
10   had, you know, you had to wear an identification card
11   and whatnot, and I started collecting those, and I
12   threw them out eventually because it was frustrating.
13        Q    And did you make a date -- note of the date
14   that you attended those?
15        A    In most cases I did, but not in all cases.  I
16   mean it was kind of hit and miss.  In the very
17   beginning I was -- because I didn't see any need to.
18   I attended the event and that was it.
19        Q    At one point you decided it was important to
20   start keeping better records of your attempts to find
21   a job, and what did you do at that point?  For
22   example, if you went to Philadelphia to go to a
23   networking event.
24        A    I started -- when I started to keep -- or the
25   spreadsheets you're seeing today, so I would just make

Page 703

1    a single entry with it.  I wouldn't keep like -- and
2    these were the free seminars, so it's not like you
3    would have a record where you paid 40 dollars to
4    enter.  I looked for free ones that I talked myself
5    into a lot of times.  Right?  And all I would have, if
6    it's New York City, would be my train fare, that
7    ticket.  I didn't hold onto that, my roundtrip ticket.
8    I used it and disposed of it.  But I would make an
9    entry -- based on the first thing we just went through
10   and that line of questioning, I started to keep a
11   record, and the record wasn't advancing me finding
12   something, it was just bookkeeping.
13        Q    And when would you, like, make the record?
14   Let's say you went to a seminar in New York.  When
15   would you make the entry into this spreadsheet?
16        A    The first available time I had, that I'd pull
17   up the spreadsheet, I would put it in there.
18        My wife wanted the black and white cookies in
19   New York and I was forced to bring her back the black
20   and white cookies every time I went there.
21        Q    Mr. Castelluccio, did you do everything that
22   you could think to do to find a job?
23        A    I tried everything.  You know, unless --
24   unless you've been in this position, you really can't
25   appreciate what -- and the -- the -- environment

Page 704

1    at that time was a disaster for the economy, and it
2    was like a double whammy on me at that point, and it
3    was -- I was pursuing every avenue I could.  And I'm
4    sure there were others I could have explored and I
5    didn't, I don't know, but I was doing everything I
6    could think of to do, and I was working with
7    recruiters who were assisting me.  I don't know what
8    else I could have done.  All I wanted to do was get in
9    front of someone and say, here's my ability, they
10   could look at me, they could figure they don't, you
11   know, like my glasses or something like that, they
12   could rule me out, but I was just trying to get a
13   face-to-face interview.
14        Q    Okay.  May I see Exhibit 244, please.
15        This graph purports to show two things, one of
16   which is when you exercised your options, and the
17   other is -- purports to show the actual award of stock
18   options to you, is that right?
19        A    That's what it supposed to purport, yes.
20        Q    Is this a complete -- does this show all of
21   the equity awarded to you by IBM?
22        A    No, it doesn't, and I -- I know one specific
23   example that I could recall where it's not indicated
24   on this thing, so it's a misrepresentation, and if
25   I -- should I --

Page 705

1    Q   This graph suggests that at a certain point in
2   2004 you no longer received stock options. Do you
3   recall whether at some point in time, not when
4   necessarily, but do you recall at some point in time
5   that IBM changed the way it was awarding equity to its
6   executives and stopped giving stock options?
7    A   Yeah. Again, I don't know the details of it,
8   but we were getting stocks issued as ISO stocks that
9   were non-qualified stock. There was a period we went
10  through Q stocks, and the program was changing, and
11  eventually it -- when I left it was at -- I think they
12  were called RSUs, retention stock units, I think is
13  what it was called.
14   Q   And this shows -- this graph shows that you
15  got no equity awards, no stock options in 2008, is
16  that accurate?
17   A   Yeah. I can't speak for all of this because I
18  just don't have my records in front of me, but I know
19  specifically in -- let me think of the right date
20  here.
21   Q   2007?
22   A   In 2007 I was issued retention stock units,
23  and they were stock options that you could cash in a
24  quarter of them the first year, and they were really
25  given to you for retention purposes, to keep through

Page 706

1   the business.
2    Q   May I see Exhibit D-197, please.
3    A   That's the wrong one.
4    Q   I'm sorry, 173.
5        Do you recognize this document?
6    A   Yes.
7    Q   What is it?
8    A   This is the stock, the RSUs, the retention --
9   I believe it's retention stock units, that I was
10  issued on May 8th, 2007, which is not on the bar
11  chart, 174 shares.
12   Q   So there's no reflection of this equity award
13  anywhere on the graph that --
14   A   That's correct.
15   Q   -- IBM has put on.
16   A   Right. And that's why it's -- and I don't
17  know about the other years, because I don't -- this
18  one I recall because it was most recent, but --
19   Q   And this one you were able to find?
20   A   Right.
21   Q   Okay. May I see Exhibit D-197, please.
22       Do you recall Mr. Fasman asking you questions
23  about this document?
24   A   Yes.
25   Q   He specifically asked you about the notes of

Page 707

1   your meeting with Mr. Walker, on the bottom of the
2   page.
3    A   Correct.
4    Q   And there was a highlighted sentence --
5   there's a sentence that was highlighted. Do you
6   recall that?
7    A   I believe he highlighted -- I recall -- I'm
8   not a hundred percent sure, but I think it was that
9   item in there, in the last paragraph. It's a poorly
10  written comment. "We discussed my concern with age
11  being a factor in my actions, or that I'd represented
12  the old regime of Messina/Jones."
13   Q   In view of everything that you know now, what
14  do you believe was Ms. Collins-Smee's motive and why?
15   A   Well --
16   Q   You identified two motives here. What do you
17  believe?
18       MR. FASMAN: I'm going to object, Your
19  Honor. That's way beyond the scope.
20       MR. CARTA: Focused on the same sentence
21  he was asked about on direct examination.
22       THE COURT: What sentence, again, is
23  that? I'm trying to find it.
24       MR. CARTA: I'm sorry, I meant to have
25  this highlighted.

Page 708

1        THE COURT: Just tell me whereabouts it
2   is.
3        THE WITNESS: It's after the numbers,
4   Your Honor. After the numbers it says -- "I" is the
5   first, and it's the next one with the "we" in front of
6   it.
7        THE COURT: Okay.
8        MR. CARTA: "We discussed my concern with
9   age being a factor in her actions, or that I'd
10  represented the old regime of Messina/Jones."
11       That's the sentence, Your Honor. He was
12  questioned about that not only on this document but on
13  that specific sentence.
14       THE COURT: Well, you know, I think it's
15  a close call, but the objection is overruled. You may
16  ask the question. And as I understand, the question
17  is what do you think her motive was? Was that --
18       MR. CARTA: In response to those two
19  concerns that you have, what do you believe her
20  motive -- focusing on those two concerns, Your Honor.
21       THE COURT: You can answer that question,
22  but please, just answer the question.
23       THE WITNESS: All right. Messina/Jones I
24  ruled out because Tony Grimaldi was part of that
25  regimen. Tony Grimaldi was handled very differently

12 (Pages 705 to 708)

Page 709

1    than I was, so that couldn't be the reason. So the
2    reason was age. I was the only 60 year-old that was
3    treated that way.
4    BY MR. CARTA:
5    Q   And was Mr. Grimaldi actually one of the
6    people who was promoted by Ms. Collins-Smee in 2008 on
7    the memo of the seven people who were promoted?
8    A   Yes.
9    Q   So in view of all of the facts you -- at this
10   time -- question withdrawn.
11       At this point in time, early on, you weren't
12   sure what the cause was, but in view of all of the
13   facts, you now believe the cause was not because you
14   were part of a regime, is that right?
15       MR. FASMAN: Your Honor.
16       MR. CARTA: I'll withdraw it.
17       THE COURT: Okay.
18   BY MR. CARTA:
19   Q   Let me ask you about the emotional distress
20   claim. What effect, if any, did your dismissal after
21   40 years at IBM have on your family?
22   A   Oh, God. My wife and I dealt with this. We
23   kept the kids out of it. It was -- stop here for a
24   minute, get a grip.
25       It was very difficult. It was -- I mean every

Page 710

1    day when I left, it's like, I should have done
2    something else, so I was punishing myself every day.
3    It's --
4    Q   When you say you should have done something
5    else, please explain to me what you mean. What is it
6    that you should have --
7    A   I don't know. It's like, how could this have
8    happened, given IBM's practices and policies, I'm a 60
9    year-old being treated this way, and everything that
10   we've gone through, it's like, well, how could I --
11   should I have done something different, was there some
12   other area I could have gone, I mean to get someone's
13   attention to it. So it was frustrating. I mean even
14   today, when this is, what, six years later we've been
15   going through this, it's still not peaceful. It
16   continues on. And physically, and mentally, it's -- I
17   mean anyone in this position, under these
18   circumstances, it's hard. It's, you know, it's not
19   as -- I can't compare it to like someone who has a
20   terminal illness, but it is horrible. It's day in,
21   day out. It's the sleepless nights. It's on your
22   mind. You take the kids to a baseball little league
23   game and it's still there. You don't --
24   Q   If you had not been fired by IBM, how long
25   would you have stayed working for them?

Page 711

1        MR. FASMAN: Beyond the scope, Your
2    Honor.
3        THE COURT: I'm sorry, Mr. Carta, what
4    was the question again?
5        MR. CARTA: If you had not been fired by
6    IBM, how long would you have stayed there.
7        MR. FASMAN: I didn't touch that.
8        THE COURT: Overruled. I think you're
9    right, it was outside the scope.
10       MR. FASMAN: And he asked that. It was
11   asked and answered yesterday. The witness was asked
12   how long he would have stayed when he stopped his job
13   search, and the jury heard it.
14       THE COURT: My recollection is he said he
15   wanted to stay until 65.
16       MR. FASMAN: Correct.
17       THE COURT: Okay. We all got that. You
18   still want to ask?
19       MR. CARTA: That's fine. No further
20   questions.
21       THE COURT: Okay.
22       MR. FASMAN: One or two more questions,
23   Judge.
24       THE COURT: Take your time, whatever you
25   need, Mr. Fasman.

Page 712

1        MR. FASMAN: Thank you, Judge. I
2    appreciate it.
3
4        RECROSS EXAMINATION BY MR. FASMAN:
5
6    Q   The 174 shares of restricted stock that Mr.
7    Carta showed you, do you remember why you got those?
8    You did get them, and they weren't on the chart. Do
9    you remember why you got them?
10   A   As part of my compensation package.
11   Q   It's a vacation buyout package, wasn't it?
12   A   No.
13   Q   Oh, it wasn't? All right. We'll present
14   testimony there was a vacation buyout, you had
15   accumulated vacation and bought it out with stock.
16   A   No, you're wrong.
17       MR. CARTA: Objection, Your Honor. He's
18   just arguing with the witness.
19       MR. FASMAN: That's fine. I'll withdraw
20   the question and we'll put somebody on the witness
21   stand to testify to that.
22       THE WITNESS: The stock was --
23       THE COURT: The question was withdrawn.
24       MR. FASMAN: I'm done.
25       THE COURT: Okay. It appears to me that

Page 713

1  we have concluded the direct and cross and redirect
2  and recross of you, Mr. Castelluccio, so you may step
3  down.
4          THE WITNESS:  Thank you, Your Honor.
5          THE COURT:  You know, it's 11:15.  I
6  think that this probably is a good time to take a
7  break.  11:15 to 11:30.  And we're going to resume at
8  exactly 11:30.  And I'm not leaving this seat.
9       (Recess taken from 11:16 a.m. to 11:34 a.m.)
10         THE COURT:  Mr. Carta, are you going to
11 call another witness?
12         MR. CARTA:  Yes, Your Honor.  With your
13 permission I'd like to call Mike Morin to the stand.
14         THE COURT:  Mr. Morin, would you come
15 forward, please.
16         I don't know, ladies and gentlemen,
17 whether Mr. Carta is going to be putting up things on
18 the screen, but I just wanted to let you four jurors
19 know that it's okay if you move down to the four
20 chairs that are closest to that television monitor.
21 That might give you a better view.  And if you four
22 ladies at the end want to scooch down, if you think
23 you can get a better view, feel free to do that, then
24 all of you do it, three of you, two of you, one of
25 you, and when you're not looking at the paper any

Page 714

1  longer, come back.
2       (Michael Morin, sworn by the clerk)
3          THE CLERK:  Please state your name.
4          THE WITNESS:  Michael Morin.
5          THE CLERK:  Your city and state?
6          THE WITNESS:  Enfield, Connecticut.
7
8
9
10         DIRECT EXAMINATION BY MR. CARTA:
11
12 Q   Good morning, Mr. Morin.
13 A   Morning.
14 Q   You came down from Enfield this morning?
15 A   Yes, I did.
16 Q   And you're here voluntarily?
17 A   Yes.
18 Q   And for how many years did you work for IBM?
19 A   A little over 15.
20 Q   And are you currently retired?
21 A   Yes.
22 Q   And by whom were you employed immediately
23 before you retired?
24 A   IBM.
25 Q   And when did you retire from IBM?

Page 715

1  A   September 30th, 2011.
2  Q   At the time of your retirement from IBM where
3  were you working and what position?
4  A   I was working as a senior delivery project
5  executive on The Hartford account.
6  Q   And project executive, delivery project
7  executive has been referred to as DPE?
8  A   That's correct.
9  Q   That's the acronym?
10 A   Yes.
11 Q   And how many people were you managing at The
12 Hartford at that time, worldwide?
13 A   I was accountable for about 500 folks
14 worldwide.  And, you know, you say managing, a senior
15 delivery project executive is accountable for all the
16 delivery services provided for on a contract.  The
17 resources can come from around the globe.  In this
18 case among those folks were hires that we had acquired
19 from Hartford, which were included as part of that.
20 Others were from our delivery centers in India, a
21 couple locations in India, and we also use a mix of
22 subcontractors.  So with that position, there's an
23 accountability for the work that all those individuals
24 perform, and their managers effectively work as a
25 manager for the DPEs that are responsible for the

Page 716

1  client.
2  Q   And I'd like to take two minutes and review
3  with the jury your educational background.
4  A   Sure.
5  Q   Did you get a bachelor's of science?
6  A   I have an associate degree from Manchester
7  Community College and a bachelor's degree from Eastern
8  Connecticut University.
9  Q   And what was your career history before
10 joining IBM?
11 A   I spent 26 years, just under 26 years at
12 United Technologies working for Pratt & Whitney
13 division in East Hartford, and I had a variety -- I
14 started there with entry level positions.  I earned my
15 education later in life through company-sponsored
16 programs at United Technologies.
17 Q   And when did you leave United Technologies?
18 A   1996, January 16th or 15th.
19 Q   And you left voluntarily?
20 A   I don't know if you want me to elaborate on
21 that.  Again, I was -- I had a career opportunity to
22 join IBM voluntarily, and looking at the career
23 opportunities that were left at East Hartford in the
24 IT business, they were in the process of outsourcing
25 those jobs, and I wanted to go work for the best

Page 717

```
1    company that I thought would give me an opportunity to
2    practice my skills, and I had an opportunity to go
3    work for IBM.
4        Q    And I'd like to quickly review with you your
5    employment history at IBM.  What was your first
6    position there?
7        A    When I first joined IBM, the United Healthcare
8    had been signed, I guess I think in the fall of that
9    year prior, and they were in the transition period.  I
10   was brought in and kind of a temporary position
11   initially as a project manager working as a manager of
12   IBS, the central operations, and immediately started
13   engaging in working on the United Healthcare contract
14   which had services being provided.
15       Q    And how long were you in the initial position?
16       A    Probably a few months.  I think it was in
17   December of that year, or something, the fall, where I
18   was contacted by Jim to go meet with him in Somers,
19   New York about a possible different position working
20   directly for Jim delivering service for the United
21   Healthcare contract.
22       Q    You say "Jim."  You're referring to Mr.
23   Castelluccio, Jim Castelluccio?
24       A    I'm sorry.
25       Q    That's okay.
```

Page 718

```
1            And what was your next position?
2        A    So I think after working for Jim as a manager
3    for delivery and operations I became a DPE on the
4    contract, and worked in that role for probably two or
5    three years, then became a senior DPE, which was an
6    executive position at IBM, and then subsequently
7    senior DPE, was kind of a new position, combined
8    position, if you will.  I had responsibility for both
9    the industry side of the contract as well as the
10   sector side.  So I was working actually as part of
11   Dave Liederbach's organization with kind of a dotted
12   line to Dave, a direct line through the delivery side
13   at that time, that may have been Bob Budnick, I'm not
14   sure who the VP was at that point, but I had, you
15   know, again, all of the delivery responsibility for
16   United Healthcare, as well as the project side, which
17   was more of the sales side.
18       Q    Initially you were hired to work as a DPE by
19   Mr. Castelluccio, is that right?
20       A    That's correct.
21       Q    And at some point in time -- that was on
22   United Healthcare account?
23       A    Um-hmm.
24       Q    And at some point in time did he leave the
25   United Healthcare account?
```

Page 719

```
1        A    He did.
2        Q    And do you remember where he went, what his
3    next position was?
4        A    I'm not sure.  It might have been to Lucent or
5    one of those contracts.  I thought it was another
6    contract.
7        Q    While you were on the United Healthcare
8    account, how many employees there did you oversee in
9    your role as senior DPE and PE?
10       A    I'd say somewhere in the neighborhood of 300
11   or so.  I don't remember exactly the number.  I mean,
12   you know, numbers and people are very dynamic.  Those
13   things can change weekly, if not monthly.  So, you
14   know, I would say it's in that range.  If you ask me
15   for a specific, I can't say.
16       Q    And how long did you work in that position?
17       A    I was involved in United Healthcare contract
18   for ten years until it was terminated, and then
19   ultimately went on to work on the WellPoint contract.
20   So that was up through 2006, I believe.  February, end
21   of 2005, beginning of 2006.
22       Q    And do you recall what PBC -- let me go back a
23   little bit -- what PBC ratings you got while you were
24   serving in the role as senior DPE on the United
25   Healthcare account?
```

Page 720

```
1        A    They were 1s.
2        Q    All 1s?
3        A    All 1s.
4        Q    And then you were in the position as senior
5    PE, DPE for that specific position was three years?
6        A    Um-hmm.
7        Q    And what PBC ratings did you get in that
8    three-year period?
9        A    We're talking United Healthcare still?
10       Q    Yes, still at United Healthcare, yes.
11       A    1s.
12       Q    All 1s each year?
13       A    Yes.
14       Q    And then eventually you joined the WellPoint
15   account.
16       A    Um-hum.
17       Q    Do you recall how you came to work at
18   WellPoint?
19       A    Well, as I had mentioned earlier, the United
20   Healthcare contract was terminating.  They were taking
21   that work back in-house after a ten-year period.  So
22   in 2005 we started what we called the transition year
23   to move that work back to their location, in Plymouth,
24   Minnesota.  Members of my team that were working on
25   those activities were winding down, and I think it was
```

Page 721

1  about that time Jim asked me if I could help out, get
2  involved with the WellPoint contract.
3       Coming to the end of the United Healthcare I
4  needed another job to do.  Based on my experience with
5  United, some of the early challenges that that
6  contract had, where it was having issues with
7  profitability, performance, et cetera, we had turned
8  that around.  He asked me if I would help him with the
9  WellPoint contract.
10     Q    And when did that occur?
11     A    I want to say it was in the latter part of
12  2005.  Certainly early 2006 I was pretty much fully
13  engaged in the WellPoint contract.
14     Q    And what specific position did Mr.
15  Castelluccio recruit you for?
16     A    I believe initially the discussions were about
17  working along with Dave Cartez, who was the DPE at the
18  time on the contract, was to come in and look at
19  transition and transformation activities, and just to
20  help understand what was happening with that
21  environment.  It didn't end up happening that way.  I
22  think when I was first introduced to the client that
23  was the concept that they were talking about.  Shortly
24  after I started working with the client, then I had --
25  Dave moved on to a different position or disappeared

Page 722

1  and I ended up doing the senior DPE role on WellPoint.
2       Q    Prior to accepting the position, did you meet
3  with Mr. Cartez to learn about the WellPoint account?
4       A    Yeah.  There were certainly lots of people
5  involved in the WellPoint contract and what was
6  happening there, and certainly I worked closely with
7  Dave to understand what he was working on, what his
8  issues and challenges they were having, what they were
9  planning to do next.  Worked pretty closely with the
10  senior PE as well, Marian Ostrowski, who was the DPE
11  that subsequently left and was replaced by some other
12  folks I'm sure we'll talk about here.
13      Q    And what was your understanding of the state
14  of WellPoint when you first agreed to come over and
15  work on that account?
16      A    So, I mean, often times when you sign large
17  contracts, when they come to us initially, they're in
18  a state of disarray.  WellPoint was particularly
19  challenged for a variety of reasons.  As I learned to
20  understand after accepting the assignment, there
21  wasn't what we call the due diligence done on that
22  contract.  Apparently during the contract process we
23  were not allowed to do that.
24       The CIO and the VPs that did that work on the
25  WellPoint side had left by the time I arrived, so that

Page 723

1  the people who sponsored it within WellPoint were
2  gone, new players were coming in.  There were service
3  delivery quality problems, there were resource
4  problems, there were significant cost challenges on
5  the contract.
6       And again, it was trying to get our hands
7  around what did we inherit, what were the most
8  critical issues we could work on.  We were paying
9  penalties because we weren't meeting the service
10  levels that were committed to on the contract.  So
11  there were any number of aspects where this was a
12  significantly troubled contract.  It had senior
13  executive visibility.
14      Q    What does that mean, senior visibility at IBM?
15      A    So, you know, I can remember --
16      Q    Just specifically try to focus your answer on
17  that question.  What do you mean by senior visibility?
18      A    Dave Liederbach, Kelton Jones, Tony Macina,
19  all the senior executives that I knew from my
20  experience in working in IBM at that time were
21  directly involved in discussions about what was
22  happening on this contract.
23      Q    And why did you agree to take on the challenge
24  of performing the role of senior DPE on WellPoint?
25      A    Obviously I was going to need a job, and

Page 724

1  secondly, because I'd worked in difficult environments
2  previously.  United Healthcare, if you go back to that
3  for a minute, while when I first became part of that
4  team, I was working with a PE at the time by the name
5  of Christine Shuster, and that contract was projected
6  to lose money, and it was in a state of disarray, and
7  they were drawing on my experience from 26 years at
8  United Technologies, dealing with commercial
9  environments, airline, customers and suppliers from
10  around the globe, to help stabilize that.
11      Quite honestly, a lot of resources in IBM that
12  were part of the local services at the time, actually
13  ISSC, didn't have that kind of experience, so they
14  were learning of my knowledge, and apparently liked
15  what I was doing, and liked what I was able to do, and
16  thought I might be able to do something similar.
17      Q    Was there a procedure at IBM in place at that
18  time for introducing a potential DPE candidate to a
19  client such as WellPoint?
20      A    I mean it's standard practice that you have to
21  be interviewed by the CIOs or VPs.  Those were the
22  primary contact, typically.  Certainly someone who
23  sponsored the contract at WellPoint would have been
24  typical to interview with, talk to, et cetera.
25      Q    And was that procedure followed when you were

16 (Pages 721 to 724)

Page 725

1  brought over to WellPoint?
2      A   I think my first contacts were internal at
3  IBM, but remember I had a long-term relationship with
4  Dave Liederbach, so I was accepted, I'm sure, by IBM
5  without question.  And then that went to a gentleman
6  by the name of Dave McDonald.  There was also another
7  VP who was at WellPoint at the time, his name was
8  Terry Burnett, and he was actually a direct report to
9  Mark Boxer for a short period of time.  I had worked
10  with Terry Burnett at United Healthcare for a while.
11      Q   So you went through an interview process
12  before you actually were accepted by WellPoint?
13      A   I would say yes.  I mean I don't recall it was
14  a formal interview.  I think they were, you know -- I
15  think Terry knew me from United Healthcare.  I didn't
16  really know Mark Boxer at the time.  I think Dave
17  Liederbach knew me.  I spoke with Dave McDonald, had
18  dinner one evening with him in West Hartford, and, you
19  know, so it was acceptable to them.
20      Q   Did you also bring with you any other key
21  performers from the United Healthcare account?
22      A   Initially no, but the plan was that we would
23  take key members of my team who were firming up the
24  United Healthcare contract, so eventually Regina
25  Urkuart, Jim Halloran, and there were a couple other

Page 726

1  people, Julie Taylor.  Mark Franzese Jim had
2  previously asked to get engaged as well, and we
3  ultimately formed a new team to deliver services on
4  the contract.
5      Q   And just very quickly, what were the specific
6  functions of those people in the transition?  Let's
7  take them one at a time.  You said brought over Regina
8  Urkuart.  What was her function?
9      A   Regina's background was mainframe services, so
10  she would handle all aspects that had to do with
11  mainframe delivery.
12      Q   And John Halloran?
13      A   John was doing what we called availability
14  service, change management, problem management, price
15  management, situation, critical response.
16      Q   And Julie Taylor?
17      A   Julie was a project manager, a program
18  manager, actually working on the transition
19  activities.
20      Q   And Mark Franzese?
21      A   Mark came in as a transition manager to work
22  on specific projects to help assimilate some of the
23  consolidation of the WellPoint data centers from
24  various locations into the receiving locations.
25      Q   And those four people reported up to you?

Page 727

1      A   I think eventually they did.  Pretty sure that
2  the way that the work was structured in that sequence
3  of events, they were initially reporting to Dave
4  Cartez.  When Dave left they ended up reporting to me.
5      Q   And you were reporting to whom?
6      A   To Jim.
7      Q   And what was his position at the time?
8      A   Vice president of the Public Sector.
9      Q   What was your understanding as in terms of, if
10  any, with respect to what other contracts or how many
11  other contracts Mr. Castelluccio was responsible for
12  at the same time?
13      A   So the Public Sector had both healthcare
14  contracts and government contracts.  I don't know the
15  numbers.  I mean probably two, three dozen, somewhere
16  in there.
17      Q   And so this was the second time that you had
18  worked with Mr. Castelluccio --
19      A   That's correct.
20      Q   -- at WellPoint?
21          And in what ways -- you touched on this, but
22  in what ways was the United Healthcare account similar
23  to the WellPoint account?
24      A   I would just say, you know, from the scope of
25  services, there were a lot of similarity on the

Page 728

1  mainframe side.  Certainly some technical challenges,
2  et cetera, similar.
3          WellPoint was also different in that it had a
4  lot more mid-range servers and platforms in that
5  environment as opposed to the United Health group
6  contract.  But otherwise, I mean, you know, the same
7  types of organization, same types of resources being
8  applied, same times of challenges, same processes,
9  tools, technologies.
10      Q   How about the state of account?  Was there a
11  difference between the state of the WellPoint when you
12  first came there versus when you left United
13  Healthcare?
14      A   Sure.  I mean United Healthcare was a very
15  profitable contract for many years after we turned it
16  around.  It was certainly a very stable contract.  We
17  weren't dealing with daily outages or hourly outages,
18  it was much different than what we were experiencing.
19      Q   You talked about outages.  Let's spend a
20  minute -- what's an outage?
21      A   So any time -- as you can imagine, right, we
22  were providing all -- we were accountable for all the
23  IT services that WellPoint had.  So if any one of
24  their major applications had an issue or a problem, it
25  would result in something that potentially could

Page 729

1   impact their -- so if they were trying to process
2   claims, if a claim application went down, they would
3   not be able to pay those claims.
4        So that immediately gets visibility in most
5   corporations, and they expect that we're going to
6   respond, react appropriately, make sure that we're
7   bringing the right people and resources to get those
8   situations resolved as quickly as we can.
9        Q    So an outage is a break in the service?
10       A    Correct.
11       Q    Or is it a reduction in the level of service,
12  is that also considered an outage?
13       A    It could be both of those.  I mean we would do
14  designations of, you know, what's a performance impact
15  versus what's a complete outage.
16       Q    When IBM was taking over the WellPoint
17  account, what different environments did it need to
18  integrate, if any?
19       A    So as part of what the -- what was agreed to
20  in the contract?
21       Q    Yes.
22       A    So they were required to merge multiple
23  locations; California, Missouri, Georgia -- I think
24  there were four -- that they were going to take those
25  locations, merge them into a centralized facility.

Page 730

1   Initially it was going to be Southbury and Lexington,
2   I believe, and then the client came to us sometime
3   later in that process and decided they didn't want to
4   do that, they wanted to change that and they wanted to
5   move those data centers that they had in these other
6   facilities into one of their Richmond locations,
7   Richmond, Virginia.
8        Q    And that was going to be the one command
9   center, the Richmond center?
10       A    Yeah.  So Lexington was going to actually have
11  folks from the IBM perspective that would oversee
12  the operations and monitor the equipment.  We'd also be
13  located in Richmond, at the customer site.  And then
14  the -- I think the Southbury site -- and Lexington was
15  going to be a backup and disaster recovery type site.
16       Q    As part of the contract with WellPoint, did
17  IBM assume responsibility for a number of the
18  WellPoint employees?
19       A    They did.  I think there were about -- I don't
20  know.  I remember seeing something that said there
21  were roughly 390 re-badged employees that came over as
22  part of the contract.
23       Q    What does that mean, re-badge?
24       A    It's fairly common when IBM writes a contract
25  that some number of personnel are going to be affected

Page 731

1   by that change, and as part of that the clients are
2   typically negotiating, let's say we want you to take
3   on these individuals, these job roles, as part of that
4   agreement, and that's, you know, really unique by each
5   contract, it can write those terms and conditions
6   and --
7        Q    And specifically what was your role as DPE in
8   terms of integrating the former WellPoint contracts as
9   part of the IBM team?
10       A    So again, WellPoint started out as what we
11  call the vertical organization, which meant that most
12  of those resources came over, reported to folks that
13  ultimately were part of my team, right?  Or my
14  organization.  So there were both, you know, the team
15  members, their supervisor, managers, if you will,
16  first and second line position, that reported up
17  through this organization and ultimately up through to
18  Jim.  There were also resources that were part of the
19  competency, because I believe we had to augment that
20  staff to be able to deliver service we had.
21       Q    How many employees were you responsible for
22  overseeing in this position as senior DPE on the
23  WellPoint account?
24       A    I'm going to say at least 500, maybe more,
25  might have been 550 at times.  Again, those numbers

Page 732

1   changed.  That became a very significant point of
2   contention because it had such a detrimental effect on
3   the profit and loss on the contract.  The contract had
4   exceeded the cost case.
5        There were other issues behind the scenes
6   where, again, because there wasn't appropriate due
7   diligence on the contract, that cost case, at least
8   early indications we had from some of the reviews that
9   were done, missed somewhere in the neighborhood of 127
10  potential resources that should have been applied on
11  that but were not because the due diligence wasn't
12  performed.
13       Q    Okay.  What task did you focus on as senior
14  DPE initially early on on that WellPoint?
15       A    So I think the, you know, the first area
16  literally are just trying to survive everything,
17  right?  You know, it wasn't like the rest of the work
18  was very extended hours.  Try and understand what the
19  conditions are on the environment, trying to
20  understand who the key players are, what their roles
21  are, what are the most significant issues we're
22  having, what can we do to bring some stability to
23  that, get this environment under control.
24       At the same time you're trying to do the
25  typical things you would do as a manager.  So you have

18 (Pages 729 to 732)

Page 733

1 new employees in the field. You're going to try to
2 educate them on IBM processes. These were inherited
3 managers. WellPoint was made up of a lot of different
4 companies, that were Anthem Blue Cross Blue Shield
5 companies from around the country, and each of those
6 was managed as its own little separate entity, so
7 there was really no commonality with HR policies,
8 practices, et cetera.
9     So we would do educational forums for them,
10 working with IBM managers and the managers that we
11 inherited. We'd meet with them face-to-face, we'd do
12 calls, tell them what IBM was about, what's happening
13 on the contract, where we're headed, what our plans
14 are.
15     So I mean there's a whole myriad of activities
16 that we do to try to educate and integrate these folks
17 into, quote, the big IBM machine, and make sure that
18 they have the support they need every day to do their
19 job, how to work procedurally, what the processes are.
20 Again, all of this is very formal.
21     Q   Did you have any other responsibilities at the
22 same time other than serving as senior DPE at
23 WellPoint?
24     A   No. I think there was minimal activity left
25 on shutting down the United Health group contract,

Page 734

1 just the PE perspective, but that was really, you
2 know, kind of closing out, so there wasn't a lot
3 there. It was primarily fully dedicated to WellPoint.
4     Q   And what kind of commitment were you required
5 to make in that role time-wise?
6     A   I have to laugh. I mean, you know, unless you
7 live the life of a DPE and a PE, some folks have
8 referred to it as the worst job in the IBM company.
9 The reason I say that is because you have to have
10 passion for the business, you have to care about
11 people and your clients and your customers. And
12 personally, my integrity is everything. And I'm sure
13 later on we're going to talk about why I decided to
14 resign from that company, but it has a lot to do with
15 that. When I make a commitment to the client, and my
16 people on my team, I need to be able to execute and do
17 my job.
18     Q   Okay. So my question was what type of time
19 commitment was involved for you when you were serving
20 the --
21     A   I had to work seven days a week, 24 hours a
22 day. I would do whatever it would take to try to
23 satisfy the client and my team.
24     Q   Are you familiar with the various reviews that
25 were conducted early on with respect to WellPoint?

Page 735

1     A   So I will say, my experience at WellPoint,
2 there were countless reviews. There were three
3 probably that were most significant. There was the
4 engagement contract review that Jim had asked to get
5 done sometime early on in the contract. That's what
6 revealed to us that, again, there were these many
7 misses about the scope of work, the number of people
8 that we need to do successfully, you know, why that
9 happened. I mean all of those things were very
10 understood -- that I understand could have led into
11 some of the significant financial challenges that this
12 contract was having.
13     There were financial reviews. Again, as they
14 were tallied up, what was not included in the scope
15 of that contract, it would quickly get turned into a
16 dollar statement about what does that mean to us going
17 forward in the business. And again, that's a normal
18 activity for the PEs and DPEs, right? Because a DPE,
19 you're responsible for the cost, which is basically
20 all the labor, the hardware, the software, the tools
21 that are used to deliver a contract.
22     So we would have help from financial analysts
23 on the cost side. The project office would have equal
24 representation, FAs from the business side, looking at
25 the P&L on the contract.

Page 736

1     And then ultimately there was this Red Team
2 Review, which basically took all these different
3 pieces of information, packaged it all up where they
4 were presented to the senior executives in IBM. So
5 those three reviews basically all said the same thing.
6 Talked about things that we needed to do, to bring the
7 stability to be able to execute successfully on the
8 contract.
9     Q   And who initiated the Red Team Review, if you
10 know?
11     A   I think it was Jim through Kelton and Tony
12 Macina. I can't be a hundred percent sure, but they
13 were the executive sponsors in that space. And I
14 believe it was Jeff Overacre and Lynne Small who from
15 their team came in and were subject matter experts.
16 They had done this on other contracts, and they have a
17 process where they could come in and kind of take a
18 look at the engagement process, the contract, then
19 come and talk to -- interview, DPEs and talk about
20 what we're experiencing, what we're seeing, what we
21 learned. And again, it's very important in a contract
22 where you don't have good due diligence.
23     Q   At my request did you review the Red Team
24 Review summary?
25     A   I did.

Page 737

1    Q   And I'd like to ask you to spend ten minutes
2  walking the jurors through some of the more
3  significant points, specifically the customer
4  environment and key value propositions which appear on
5  page 6.
6          MR. DUFFIELD: Your Honor, I'd like to
7  object. We've gone through this already with Mr.
8  Castelluccio, and we've now been on the record again
9  for another half hour. We've learned nothing new from
10 Mr. Morin, and I think this is just duplicative and
11 unnecessary to the jury to be hearing this all over
12 again.
13         THE COURT: Mr. Carta?
14         MR. CARTA: We didn't go through the Red
15 Team Review in any detail, and I'm only going to spend
16 ten minutes on it. What Mr. Castelluccio talked about
17 was the other annual evaluation conducted by Mr.
18 Zapfel, the Zapfel review. We didn't go into any
19 specific on the Red Team Review.
20         THE COURT: So you are representing that
21 you're not going to be re-plowing the same ground that
22 we've plowed.
23         MR. CARTA: There's some overlap, but I
24 think these two pages in particular are different.
25         THE COURT: Okay. You think it's

Page 738

1  necessary to give the jury --
2          MR. CARTA: I do.
3          THE COURT: -- the background?
4          MR. CARTA: I think it's worth ten
5  minutes, yes.
6          THE COURT: Are we going to get on soon
7  to the truly relevant period that we're talking about?
8          MR. CARTA: Yes, we are, Your Honor, but
9  this is relevant because Mr. Castelluccio was put into
10 the same position as Mr. Morin, and it's really
11 critical that they understand what the context of that
12 environment and what situation Mr. Morin was in, so it
13 is relevant beyond just the time frame.
14         THE COURT: Okay. Well, as background I
15 suppose it is. So counsel, your objection's noted.
16         MR. DUFFIELD: I would just add that Mr.
17 Castelluccio testified to this already, and it's not
18 disputed. No one's disputing the state of the
19 WellPoint account at all.
20         THE COURT: That's true. You did not
21 dispute it yesterday. The testimony was that the
22 WellPoint contract, the WellPoint account was a
23 disaster, it was causing WellPoint to lose millions --
24 excuse me -- causing IBM to lose millions, and nobody
25 seemed to know exactly what was wrong, and no one

Page 739

1  seemed to know exactly what to do to fix it. So the
2  perception, view of some of the other executives was
3  that IBM needed to turn its attention to this and
4  devote to it the resources that you believe was
5  necessary to turn it around, and everybody was working
6  on it. Ultimately, ultimately you found that it was
7  just -- there were so many problems with it, that you
8  essentially resigned because of it.
9          THE WITNESS: So I would agree with what
10 Your Honor said. With one exception. I think we
11 clearly identified what needed to happen to turn the
12 contract around, and I will tell you the reason I
13 resigned if you want me to answer that.
14         MR. CARTA: I'd like to get to that in
15 due course.
16         THE COURT: Let Mr. Carta decide when he
17 wants -- we know a lot about WellPoint, and I'm
18 assuming that what you're going to bring in about
19 WellPoint is a different perspective. Might be the
20 same conclusion, but different perspective than what
21 we heard yesterday. We heard a great deal about
22 WellPoint yesterday. It was bared.
23         THE COURT: If we agree that WellPoint
24 was an absolute disaster, I'll skip discussion of the
25 Red Team Review.

Page 740

1          MR. DUFFIELD: We're not going to
2  stipulate it was an absolute disaster. It was a
3  troubled account.
4          MR. CARTA: Your Honor, it wasn't just a
5  troubled account.
6  BY MR. CARTA:
7    Q   Had you ever worked on an account with the
8  magnitude of problems that were at WellPoint?
9    A   No.
10   Q   Had you ever seen an account with the
11 magnitude of problems at WellPoint?
12   A   No.
13         MR. CARTA: I'll skip the Red Team Review
14 discussion, Your Honor. That is what it is.
15         THE COURT: Okay. Go ahead.
16 BY MR. CARTA:
17   Q   Mr. Morin, you've indicated that you've
18 disagreed in one regard with the summary in that there
19 was a plan to solve this situation at WellPoint.
20   A   That's correct.
21   Q   And that was the staffing and restructuring
22 plan?
23   A   I know that there's a document that talked
24 about a staffing restructuring. The answer is yes,
25 and there were many such plans. They all had very

Page 741

1  similar threads.  But the bottom line is -- right?
2  There were contractual issues, there were labor
3  issues, there were transition activities and projects
4  that needed to be completed.  So this wasn't going to
5  be a quick fix, and we needed commitment from the
6  entire business to be able to go execute on those
7  corrective actions, and honestly that's where it fell
8  apart, because we couldn't get a commitment from the
9  top of the business to do this.
10          THE COURT:  Mr. Morin, could you kind of
11  bring that microphone a little closer to you.  That's
12  good.
13  BY MR. CARTA:
14      Q   I'm just going to ask if you can identify
15  Exhibit 19 as the plan that you participated in
16  putting together with Mr. Castelluccio to turn around
17  the account?
18      A   I see a cover page.
19      Q   Do you recall if I also asked you to --
20  provided you with a copy of this and asked you to
21  review it?
22      A   Yes.
23      Q   And is this the plan that you were involved
24  with Mr. Castelluccio in creating?
25      A   No.  I mean this is a summary document, right?

Page 742

1  There is a lot of work that goes on beyond the scenes
2  as you develop these.  But the answer is, yes.
3      Q   Let me ask you a little more specifically with
4  respect to your interaction.  What employees at
5  WellPoint did you interact with in your role as DPE?
6      A   Typically David McDonald, and his direct
7  reports, which were a series of directors; Mark Boxer,
8  and a number of Mark Boxer's direct reports as well;
9  other CIOs throughout the country.
10      Q   Did you have day-to-day contact with Mark
11  Boxer in the 18-month period you served in the
12  capacity --
13      A   I would get calls from Mark whenever there was
14  any kind of an incident on the environment, or if he
15  had any questions about some activity that was
16  happening there.  He'd call my home phone, office,
17  he'd call my cellphone.  Mark's not a bashful guy.
18          Dave McDonald I had regular daily interaction
19  with, the team members on his teams, because they had
20  multiple daily status calls with WellPoint.  And, you
21  know, Mark could be on an incident call, for example,
22  if he thought it was enough of an issue for his
23  business, he could be on that call, he would hear me
24  on that call, I could hear him on that call, set up a
25  separate bridge line outside that call to talk to each

Page 743

1  other about specific activities.
2      Q   And when you say an incident call, would you
3  please describe what that is?
4      A   So again, that's a response to something, an
5  exception, if you will, happening in the environment
6  where service is not performing to expectation, and
7  they're looking to IBM to help get that resolved.
8      Q   Is that also referred to as an outage call?
9      A   That's correct.
10      Q   And how long would some of those calls go?
11      A   It could go on for days in extreme cases.
12  They could wrap around the clock.  They could go on
13  for a couple shifts at a time.  Depended on what the
14  event was.
15      Q   The conference call could go for more than 24
16  hours?
17      A   Absolutely.
18      Q   And sometime were there multiple calls going
19  on at the same time?
20      A   Yes.  Again, you know, the issues that were
21  occurring there, in the organizations that we were
22  providing service to, each facility was almost like
23  another company, so it wasn't uncommon that something
24  could break in California, something could break in
25  Georgia, something could break in North Haven,

Page 744

1  Connecticut, and you could be on a call trying to talk
2  to the client to explain what was going on.
3      Q   Was it physically possible to be on all of
4  those calls at once?
5      A   No, but I had two phone lines in my house and
6  a cellphone, and there were many times where all three
7  were working.
8      Q   And with respect to Dave McDonald, I think you
9  said you saw him -- you worked with him on a
10  day-to-day basis, daily basis?
11      A   Correct.
12      Q   And Mark Boxer, did you also have weekly
13  meetings with Mr. Boxer?
14      A   We did.  Actually Dave Liederbach and I
15  traveled down to North Haven almost every Friday and
16  do a meeting with Mark and his team, Keenie McDonald.
17  It's hard to recall the sequence of all events.  John
18  Shimkus, Keenie, there were a number of players that
19  would attend those things.
20      Q   Based on your regular interactions with Mr.
21  Boxer at WellPoint, did he have an understanding of
22  who had authority to bring the necessary resources to
23  bear from IBM?
24      A   I think he did.  I think he understood that,
25  you know, Dave Liederbach was in control of the whole

Page 745

1    contract.
2        Q   Did Mr. Boxer ever indicate to you that he
3    expected Mr. Castelluccio to obtain the necessary
4    resources to solve the problems of WellPoint?
5        A   No.  I mean I think he would -- I think,
6    again, these discussions he was talking to Dave
7    Liederbach, Dave was the head of that life sciences
8    industry, whatever it was called at the time, and, you
9    know, he knew that he had a general manager from the
10   IBM corporation there, so when he spoke he was
11   speaking to this group that I was part of, and he
12   expected that his requests would get the appropriate
13   attention.
14       Q   And was his focus on Mr. Castelluccio as the
15   person who needed to provide him with the resources?
16       A   No.  I mean Jim wasn't at most of those
17   meetings, that I recall, wasn't any part of the
18   meeting.  I was there representing that organization.
19       Q   That was your job?
20       A   That was my job.
21       Q   And what was your understanding with respect
22   to why Mr. Boxer was frustrated with IBM at that time
23   period?
24       A   I think, again --
25           MR. DUFFIELD:  Objection, Your Honor.  He

Page 746

1    needs a foundation for having an understanding.
2            THE COURT:  Lay some foundation, Mr.
3    Carta.
4    BY MR. CARTA:
5        Q   Did you discuss with Mr. Boxer on a regular
6    basis what his frustrations were?
7        A   Yes.
8        Q   And was he in any way shy about sharing with
9    you his frustrations?
10       A   Certainly not.
11       Q   What was your understanding of Mr. Boxer's
12   frustrations?
13       A   Well, I think his -- one of his biggest
14   frustrations was just understanding the IBM
15   organization.  I can remember going there with org
16   charts trying to help him understand how this, you
17   know, delivery organization and project office
18   organization delivered services and who was ultimately
19   accountable for making sure he could get -- I think
20   the term Mark used was he wanted one that he could
21   choke, right, when he had an issue.
22           So again, that's how Keenie McDonald got
23   involved.  She came on as managing director.  Dave had
24   been operating in -- I mean certainly general managers
25   don't typically meet with a client every week on a

Page 747

1    contract.  It was because there were such issues on
2    this contract and because Boxer was so unhappy about
3    what was going on, he committed to his organization I
4    think his whole, you know, introduction to the
5    organization when he came in to his role as CIO -- I
6    think it was CIO and COO, you can check that -- that
7    he was going to fix the IBM relationship.  That was a
8    public statement that he made to the entire
9    organization at WellPoint.
10       Q   And what frustrations, if any, did he express
11   with respect to the allocation of resources to the
12   WellPoint account, "he" being Mr. Boxer?
13       A   I don't -- you know, I think, again, he was
14   frustrated because on these events and situations he'd
15   become aware of, he didn't believe we had the right
16   skills working on the contract.  That's kind of a
17   short way to say it.
18       Q   Exhibit 43.  Take a moment and review this
19   document, tell us what it is.
20           MR. DUFFIELD:  Sorry, the exhibit number?
21           MR. CARTA:  I'm sorry, 43.
22           THE WITNESS:  You want me to read it or
23   just talk about it?
24   BY MR. CARTA:
25       Q   I'd like you to review the first three

Page 748

1    paragraphs, but you don't need to actually read it.
2        A   I'm looking at the date.  It's February 2007.
3        Q   Yes.
4        A   I mean, I just will be very frank with you,
5    right?  My frustration with this contract continued to
6    grow over time.  I was reaching the end of my rope
7    doing this.  I was not going to continue to keep doing
8    this.  Dave Liederbach, Keenie McDonald and every
9    other executive I could talk to in this company knew
10   what was wrong with it, what needed to be done to
11   correct it, and get it back on track, and they refused
12   to do it, but every day they would send me e-mails and
13   call me and ask me what I was going to do to fix what
14   was broken today, and I reached the point where I
15   wasn't going to keep doing it.  So I started trying to
16   tell people, look, don't waste my time.  If you're so
17   hung up about the profit and loss on this contract,
18   you can do yourself a favor, save my salary, I don't
19   need to be here, because you don't listen to anything
20   I tell you anyway.  I mean clearly I had reached the
21   end of my rope.  This was very well understood.  There
22   were many, many months.  And we would just spend
23   countless hours going around the same issues, having
24   executive meetings that would lead to no change.  And
25   I wasn't going to keep doing it.

**A-466**

Page 749

1    So this was just a culmination of this. I
2 don't know what preceded this, there's probably
3 something else that came before it, because typically
4 these were written in response to some other note I
5 got from Mark Boxer, Keenie, John Shimkus, Luis
6 Fernandez, complaining about something of some issue
7 that day.
8    Q   And with respect to the number of full-time
9 employees that were needed, do you have an indication
10 in this e-mail how many more people you thought were
11 needed?
12    A   So at this time -- and again, you know, these
13 things were all kind of taken out of context, so to
14 speak, because there's bunches of these that come
15 across the desk in the course of a day, and this one
16 in particular says, you know, we needed roughly 50
17 people, but we were down to an exercise where I was
18 reviewing on a weekly basis with Dave Liederbach,
19 could I get another half a person, part of a person or
20 one person, because this issue happened in the
21 environment and we need to plug a gap here, and it was
22 at that level this thing was being managed, not at the
23 macro level where it really needed to be focused on.
24    Q   And how did the lack of staff impact the
25 people that worked for you at all?

Page 750

1    A   Well, at the end of the day, there were only a
2 handful of us that were trying to keep this thing
3 together supporting our teams. So again, our style
4 was to work around the clock if we had to, do what we
5 could to manage this.
6    I mean part of this 50 was to get
7 representation going across all the shifts, right?
8 You know, WellPoint started on the east coast and ran
9 through normal business day on the west coast, so my
10 staff had to cover all of those directly, and then add
11 to that critical situations that would occur that
12 would wrap around the clock. So there were many
13 occasions where, yeah, we were going 24 hours a day on
14 this thing.
15    Q   And what impact did that have, if any, on your
16 staff, people that reported to you?
17    A   I mean look, these --
18    MR. DUFFIELD:  Your Honor, objection.
19 What does any of this have to do with Mr.
20 Castelluccio's termination in 2008? I fail to see the
21 relevance of any of this line of questioning.
22    THE COURT:  Let me ask Mr. Carta. You
23 heard counsel's question. Can you answer it?
24    MR. CARTA:  Sure. Again, I think I have
25 tried to answer it, and I think I have. These -- this

Page 751

1 is exactly the same situation that Mr. Castelluccio
2 was put, and I think it's -- which is an impossible
3 situation, and I think it's really important for the
4 jury to understand that.
5    MR. DUFFIELD:  These questions have to do
6 with the impact of the situation on his staff.
7    MR. CARTA:  The staff that he was --
8    MR. DUFFIELD:  Not him as the DPE or not
9 on Mr. Castelluccio or not related to concerns of Mr.
10 Castelluccio's performance or anything to do with his
11 termination in 2008?
12    THE COURT:  Mr. Carta, you think this is
13 necessary to give the jury a full background?
14    MR. CARTA:  I do, yes.
15    THE COURT:  Based on that representation,
16 the objection's overruled. Go ahead.
17 BY MR. CARTA:
18    Q   What was happening to your staff?
19    A   So, you know, there were a number of
20 resignations that occurred on the contract. So I
21 think at one time, you know, we would try to keep
22 track of those things just to see what was happening,
23 and then you'd have to get resources back to fill
24 those positions. I think the total sometime in early
25 '07, late '06, was as many as 70 folks had left the

Page 752

1 contracts.
2    Q   Sorry, how many?
3    A   70.
4    Q   And how was this impacting on your ability to
5 get new people to join the account to fill the spots
6 of the old spots?
7    A   Well, you know, again, the answer to that
8 question changes based on points in time. You know,
9 IBM has many policies and practices that they
10 implement, right? So there would be resource freezes,
11 there would be resource actions. So just because
12 somebody left doesn't mean that you could
13 automatically get backfill, right? Often times it was
14 left up to the remaining members of the team to make
15 up the gap that was created until such time as you
16 could secure a resource to backfill the position.
17    Q   Would you please read the last paragraph of
18 your e-mail?
19    A   "It's time to stop the internal thrashing and
20 decide as leaders what IBM is going to do with this
21 account."
22    Q   Okay, let's go on to Exhibit 106. And would
23 you please read the first paragraph.
24    A   "Another week of 24 hours days on WellPoint
25 I'm not sure where we are with getting some relief for

23  (Pages 749 to 752)

Page 753

1    the leadership team, but I can tell you most of my
2    folks have worked several 24 hour shifts this week."
3        Q   What do you mean by "relief for the leadership
4    team," what's that phrase a reference to?
5        A   You know, again, the demands of this thing
6    were so great, right, that you physically couldn't
7    keep up with what you were being asked to do.  And we
8    had identified positions as part of some of these
9    get-well plans, stability plans, et cetera, that would
10   have brought relief, because we would have had
11   coverage, off shift, weekends, et cetera, so that
12   these folks wouldn't all be working ridiculous hours
13   that they were being asked to work.
14       Q   In your e-mail you made reference to a
15   discussion that you had with Mr. Liederbach.  Do you
16   recall that discussion?
17       A   You're referring to the last section here,
18   says "I spoke to Dave Liederbach Friday."
19       Q   Yes.
20       A   "My opinion is that we will not be making any
21   significant changes in resources or investments to
22   support the environment."
23           Could you just back that up so I could see the
24   date of that?
25           February.

Page 754

1        So I'm sure this was coming out of a meeting
2    probably with Mark Boxer and company.  We typically
3    went down there every Friday into North Haven in his
4    office, and, you know, Dave and I would have some
5    pretty candid conversations afterwards.  So I think
6    Dave was under a lot of pressure from the business on
7    the financial performance.  I think he was not
8    convinced that we didn't have enough resources, or
9    that somehow or other we could do this without adding
10   20 more or 30 more or 50 more, and he was holding the
11   line on resources.  He wasn't going to allow us to
12   just go out and make significant changes to get this
13   thing turned around.
14       Q   Exhibit 107.  Mr. Morin, this is a string of
15   actually 11 e-mails, if you count them from the bottom
16   up, and it's dated February 13.  Can you identify that
17   this relates to the WellPoint account?
18       A   I guess -- I'm sure it did.  Can you scroll up
19   or down so I can see the rest of it?  Because I'm
20   looking at the top right here.
21           All right.
22       Q   So by way of example, this relates to a
23   connectivity issue.  Do you recall that, or do you
24   recall that kind of problem?
25       A   Yeah.  I think this, again, there's probably

Page 755

1    more at the bottom of this, but this was part of the
2    project activity, getting the Lexington command center
3    operational, and the technical teams were struggling
4    getting network connectivity between Lexington and the
5    site, the Richmond site, and often times that occurred
6    because there were different security protocols
7    between the two organizations that had to be
8    reconciled, and this problem was -- I think it came
9    from a project manager, might have been Julie Taylor,
10   just bringing it to my attention to ask to get some
11   help.  I sent it off to Jim, as a FYI, and his
12   counterpart, who was a VP in the network organization,
13   to try to bring some additional attention and focus.
14       Q   Who was responsible for addressing this issue?
15       A   It would have been the network team.  I mean
16   again, we were asking the network team to help us get
17   this closed, and there were members of the network
18   team working with the project team, but again, because
19   this was lagging, it wasn't uncommon for a project
20   manager to reach out to a DPE, say hey, I've got this
21   issue, got a little bit of time, maybe get me some
22   additional help with it.  You'd typically send notes
23   to VPs in the IBM organization just to give them a
24   heads up and say, talk to some of your folks about
25   this, and it's the normal way of doing business.

Page 756

1        Q   You said that the person responsible was the
2    network team.
3        A   Um-hmm.
4        Q   Who here is a part of the network team?  Who's
5    being referenced here?
6        A   I think it's Albano.
7        Q   Albano?
8        A   Albano.
9        Q   So he was the one who needed to address this
10   issue?
11       A   Yeah.  He's the vice president of networking.
12   He was one of Jim's peers.  And we all worked up
13   through Kelton, so they knew when they got a note
14   from, you know, the DPE, if you will -- and, you know,
15   understand, too, that WellPoint had lots of visibility
16   throughout the entire organization.  Everybody in the
17   organization knew about the WellPoint contract, the
18   challenges it was having, and they were all doing what
19   they could to bring additional attention and focus to
20   this.
21       Q   Okay.  Stepping back from this particular
22   incident, what did this connectivity issue relate to?
23   What was the big -- this was part of what project?
24       A   It was part of, again, getting that command
25   center active in Richmond so we could start moving

Page 757

1    data centers into the Richmond facility.
2      Q   And ultimately was a command center
3   successfully set up?
4      A   Yes.
5      Q   And was it set up in a timely fashion?
6      A   Yes. I mean, again, that's not unusual,
7   that's not unusual to get an escalation because a
8   project may look like it's -- you know, if there were
9   particular activity that was going to be a problem,
10   the project manager would give you a heads up on that
11   so it didn't become an impact to the overall schedule.
12      Q   Exhibit 108. This is an e-mail dated February
13   16th, 2007. Were you copied on this e-mail?
14      A   Looks like I was, yes.
15      Q   And would you just take a minute and review --
16   actually it's two e-mails. Review them, please.
17      A   Okay.
18      Q   And what did you understand by the reference
19   being to the, quote, our delivery team, who was that
20   referring to?
21      A   My organization.
22      Q   The whole 500, 600 people?
23      A   Right.
24      Q   And did you agree with her assessment that
25   there was additional training that was needed?

Page 758

1      A   Sure. I mean that was part of what we were
2   doing, is the overall transition activity, right?
3      Q   Anything unusual about that at this stage of
4   the contract?
5      A   No. I mean, you know, again, these were
6   probably generated from conversations that Luis or
7   whoever -- I think it was Luis that initiated this,
8   right -- had with the client, might have been some
9   item that came up at a point in time.
10      Q   And Mr. McDonald seemed to be indicating,
11   quote, we absolutely need a strategy for location of
12   our people in the management team. Was there such a
13   strategy?
14      A   Well, there were -- again, we had put together
15   numerous get-well plans, stability plans. Those were
16   reviewed weekly, actually; Dave Liederbach, Keenie was
17   part of those discussions. So I think they were aware
18   that those activities were there, right? I don't know
19   why they would say we need a strategy. We had plenty
20   of strategy. What we didn't do was execute them.
21      Q   Was there also ongoing issues about placing
22   certain personnel?
23      A   You know, I know at one point Mark Boxer
24   thought it would be a good idea if I go to California.
25   I was actually out in California for a number of

Page 759

1   weeks.
2      Q   So that's really relocating someone?
3      A   Yeah. I mean I wasn't permanently relocated.
4   He wanted me to go out there, get closer to the staff
5   on the ground.
6      Q   Let's look at Exhibit 109. This is an e-mail
7   dated February 23rd, and it's mailed from Mr.
8   Liederbach to Ms. Collins-Smee, and I believe the
9   e-mail concerns the replacement of Joe Carrubba. What
10   do you recall about that?
11      A   There was a number of discussions over a
12   period of a few weeks where -- I think it was John
13   Shimkus had asked -- Luis had asked to have Joe taken
14   off, moved off the contract. I think that was brought
15   to his attention by a gentleman by the name of Mike
16   DeLeo at WellPoint, who was a director of mid-range
17   service. I think Mike was in North Haven.
18      And, you know, again, Joe was a very
19   competent, capable service manager, delivery manager,
20   if you will, in the mid-range tower, had been since
21   the beginning of the contract, but there was a
22   personality conflict between Mike and Joe. And Joe's
23   not the most, I'll call it individual you've
24   ever encountered, but he was very technically
25   competent, very good at what he did, very good for the

Page 760

1   contract and the business. But again, sometimes you
2   run into personality issues and you have to make
3   changes at the request of the client.
4      At the time this was being requested, we
5   didn't have resources to swap out or find a
6   replacement, and if we were going to take him out we
7   were going to run into more challenges and issues
8   trying to fill the gap that was created by him not
9   being there. So, you know, I think we had made that
10   known. I think we were looking for the resources, but
11   again, on the rest of the organization there weren't
12   resources available.
13      Q   Do you recall whether Mr. Castelluccio
14   received criticism because he didn't pull Mr. Carrubba
15   off the job immediately?
16      A   I think, again, in these e-mails you'll
17   probably find somewhere they're saying they talked to
18   Jim and I for a period of weeks about this, and I
19   think I gave them the same response that I just
20   provided you, right? There was not another available
21   resource. So, but again, you know, from their
22   perspective in talking to a client, this was the
23   biggest issue of the day that they could focus their
24   attention on.
25      Q   Weren't there other equally competent managers

Page 761

1    at IBM who could have replaced Mr. Carrubba?
2        A   If they were, they weren't available to Jim or
3    I that I'm aware of.
4        Q   At some point did you actually -- were you
5    able to find a replacement and move Mr. Carrubba?
6        A   I believe Joe was still on the contract when I
7    resigned.
8        Q   Exhibit 110.  Were you copied on this e-mail?
9        A   Yes.
10       Q   And this is a chain of eight different
11   e-mails?
12       A   Yes.
13       Q   And it concerns SARs.  What are SARs?
14       A   That's an internal acronym to -- it's a
15   staffing request.
16       Q   Request for additional staff?
17       A   Request for additional staff.
18       Q   Have you had a chance earlier to review this
19   entire e-mail?
20       A   Yes.
21       Q   So starting from the bottom, what was -- what
22   initiated the e-mail?
23       A   You know, not looking at the whole document,
24   but I can tell you it's a string of e-mails coming
25   from a resource manager, on competency.  I believe

Page 762

1    this one had nine positions on it, and I believe they
2    were for resources to work in the Lexington command
3    center operations environment.
4        And again, how this works is it comes from a
5    line organization.  A staffing request gets approved,
6    goes through the system.  So at some point in time
7    this would have come to me through the internal system
8    at IBM, would have approved it, would have gone
9    through channels, would have had to get Dave's
10   approval, Dave Liederbach's approval to get this into
11   the system.  With that it was done, flowed through the
12   system, had been out there for a number of weeks, if
13   not longer, and ultimately I think it came back from
14   Regina that after these period of weeks had elapsed,
15   it was still being held up.  I think there's a note
16   attached here from a resource manager in competency
17   saying that hey, you know, I know you requested this,
18   you have approvals, but Joanne Collins-Smee put all of
19   these on hold, you can't staff any of them.
20       I went back to Keenie and Dave, or whoever,
21   and said hey, okay, you know, these are still held,
22   what's going on.  I think you see a couple of the
23   e-mails in here that said they were approved, by Dave
24   and others, and then Joanne acknowledges that to Jim,
25   that hey -- or me, that hey, I approved this on

Page 763

1    Friday.  So even though it had be approved weeks
2    previously, it had gotten held up in this general
3    freeze that was applied to the entire organization,
4    not allowing resources.
5        Q   And who applied that general freeze?
6        A   Joanne.  I can see that she approved it
7    Friday.
8        Q   And had you experienced that before where --
9    question withdrawn.
10       Had you experienced that before?
11       A   I would say at times at IBM, again, as
12   resource actions are planned and terminations from
13   other organizations, all hiring tickets will get
14   frozen, but typically there's a way through that
15   process.  And this, in this case, right, you know,
16   this was a bit of a surprise, right, that we didn't
17   know that this freeze was out there, if you will.
18       Q   In your experience previously had a DPE
19   working with a PE been able to get personnel that they
20   needed?
21       A   So the normal process on accounts is the PE
22   and the DPE can acquire resources and do approvals for
23   staffing, and those would be granted.  As years went
24   along in the IBM company you lost all that capability.
25   At this time none of us had that capability.

Page 764

1        Q   And who had -- in this particular instance,
2    who had put the freeze on?
3        A   Joanne.
4        Q   And there was a delay between the time that
5    other approvals were obtained and she ultimately did
6    give her approval.  What time period would you
7    attribute, based on reading this, what portion of the
8    delay would you attribute to her freeze that she put
9    on that you didn't know about?
10       A   I guess by the looks of this, it might have
11   been a few weeks.
12       Q   And just the whole process of how long did it
13   take from when somebody made the request until
14   actually getting the ultimate approval, what was the
15   time frame in this particular instance?
16       A   I'd have to go back and look at it.  I think
17   it started maybe a month and a half earlier, or
18   something.
19       Q   And then once you get the approval, just so
20   the jurors understand the process, once you get the
21   time, then what happens?
22       A   I'm sorry, I shouldn't laugh.  I wish I could
23   give you a straight answer on that.  It can be
24   different at any point in time.  I mean again, there's
25   a lot of checks and balances in the IBM company.  We

Page 765

1  follow standard process, but there are always
2  exceptions that get imposed, right?  So depending on
3  the year, the month that these were asked for, it
4  could go through the system right away, or it could
5  sit there for weeks.
6      Q   Once the approvals were obtained, what was the
7  next step?  You got an approval, I can get someone.
8      A   It would give someone an authorization to go
9  to a partner company -- typically these were not the
10 higher regs.  These were tickets for the
11 subcontractors in most cases.  So we'd be able to
12 get -- you know, the manager that was actually doing
13 the hiring could go to a subcontracting agency or
14 outside agency and get resumés to look at and then
15 begin the hiring process.
16     Q   So that was just the preliminary step to get
17 the approval, and then you had to go find the person
18 to fill the position?
19     A   Correct, correct.
20     Q   Exhibit 44.  This is an e-mail dated March
21 9th.  It's from you to Keenie McDonald.  Do you
22 recognize this document?
23     A   I do.
24     Q   Please review the first e-mail in the chain
25 and explain what's going on.

Page 766

1      A   Could you let me see the first e-mail?  I'm
2  looking at the middle of the document here.
3      So this, I believe, was a FileNet issue.
4  Yeah.  So, again, just another example of another
5  event that occurred on the environment where the
6  FileNet environment was impacted.  It's a document
7  processing facility.  Obviously it wasn't working, and
8  I think the initial discussions here suggests that the
9  DBA did something incorrectly that may have caused the
10 problem, and then there's a series of notes that
11 follow.
12     Again, I think this gives you some indication
13 that in the March time frame, right, now, Mark Boxer
14 has got Mark Zapfel, Mark Lindquist, Steve Mills,
15 Diane Diggelmann.  So I was given lots a help, if you
16 will, at this time frame, which was really helpful,
17 right?  Because what I get is more questions, from our
18 own team, how could this be, what are you going to do
19 to fix it, why isn't it fixed yet, and ultimately this
20 is where I said I've had enough of this, you know, you
21 can go get somebody else to play these games.
22     Q   Would you please read the fourth e-mail.  I
23 think it's the last one, the very top.  Is that yours?
24     A   This is mine.  "Will do, trying to keep up,
25 failing, have not slept, eaten or showered in two

Page 767

1  days, more quality of life on WellPoint."
2      Q   Was that an exaggeration?
3      A   No.  I think it was just venting my
4  frustration to what has been going on for many, many
5  months on this contract.
6      Q   And how would you characterize not just your
7  commitment level, but the commitment level of
8  everybody that was there on the WellPoint account?
9      A   You know, my team would do whatever I asked
10 them to do, and personally, I would try to be there
11 every minute that I was asking them to make these
12 kinds of sacrifices.
13     Q   Was everyone or just some people performing
14 substantial overtime?
15     A   No, not everyone.  I mean I think, again,
16 we're trying to protect the whole organization of
17 people here, right?  So our technical resources -- and
18 again, there were hundreds, right?  So a lot of
19 different areas could have challenges or issues.
20     But when you get on one of these events and
21 one of these client calls, you don't want Mark Boxer
22 shredding some technical resource that's trying to do
23 his job on a public forum, because these are
24 conference calls, right, where we have large number of
25 clients and large numbers of executives from our

Page 768

1  organization, and I had executives all out there on
2  these conference calls, so you imagine the scrutiny
3  that every word, every conversation gets when you're
4  operating in that kind of environment.  And I mean,
5  very intimidating to people, right?  You know, very
6  stressful for people.  It was difficult enough to let
7  a technician try to do their job on a technical
8  problem, but placing them in this kind of environment
9  under a microscope continuously is just devastating.
10 Some people just can't handle that pressure.
11     Q   Let's look at Exhibit 45.  At some point in
12 time did you finally resign?
13     A   I did.
14     Q   And when was that?
15     A   March 20th.
16     Q   And how long had you been working on WellPoint
17 at that time?
18     A   I think, you know, on a full-time basis about
19 15 months.  I started part-time activities a few
20 months before that, so...
21     Q   And please summarize your assessment as of the
22 time you resigned.
23     It's not in the e-mail.
24     A   I mean, again, it wasn't that WellPoint
25 couldn't have been corrected.  It was because we

Page 769

```
 1    couldn't get the executives that had the authority to
 2    make the changes needed to make a commitment. So all
 3    I was saying was, look, if you don't want to make the
 4    changes and you don't want to spend the money, we're
 5    going to keep losing tens of millions of dollars,
 6    let's go to the client and tell them we don't want to
 7    do it, let's do something, because this is just
 8    insanity, continuing to do the same thing day after
 9    day, knowing that it's not going to ultimately make a
10    difference, right? Why would you do that? And I had
11    reached a point where I said, you know what, I'm not
12    going to do this anymore.
13       Q   In your e-mail you say that you're thinking
14    about pursuing outside interests in a new phase of
15    your work career. Did you have another job lined up?
16       A   No.
17       Q   Had you begun to look for another position at
18    the time you resigned from --
19       A   No. I didn't really have any spare time in
20    the last year or plus that I was working on this
21    contract to think about looking for another job.
22       Q   So you voluntarily ended your 11-year career
23    at IBM?
24       A   I did.
25       Q   Before you left, with whom did you discuss the
```

Page 770

```
 1    reasons for your resignation?
 2       A   I think when I sent my e-mail to Jim it
 3    probably came as somewhat of a surprise. I'm sure it
 4    got shipped around the organization. I don't know who
 5    saw it all. I know Keenie may have called me that day
 6    or the next day to talk a little bit about it, and,
 7    you know, she was part of the same group of executives
 8    that I was working with, and she was more successful
 9    in getting the changes we needed than anybody else who
10    was working on this thing, right?
11       Q   Do you recall whether you had a meeting with
12    Keenie McDonald?
13       A   Well, I believe it was a telephone call.
14       Q   And do you recall generally what you told her?
15       A   Yeah. I mean it was a rehash of what had been
16    discussed for, like I said, months, almost over a
17    year.
18       Q   Exhibit 111, please. This is an e-mail dated
19    March 21st, 2007. What does this relate to?
20       A   So it looks look Keenie sent a note to Bob
21    Zapfel and Joanne Collins-Smee -- I had never seen
22    this one prior to you showing it to me -- about my
23    resignation and what --
24           MR. DUFFIELD: Your Honor, I'm going to
25    object. If he's not seen this document, he's not
```

Page 771

```
 1    copied on it, I don't know if he can testify about it.
 2           MR. CARTA: It's not important. 112.
 3           THE COURT: So I gather --
 4           MR. CARTA: Withdraw that, yes.
 5    BY MR. CARTA:
 6       Q   So at some point did you, in fact, meet with
 7    Mr. Zapfel?
 8       A   I did.
 9           MR. DUFFIELD: Your Honor, same objection
10    to this document. He's not copied on it in any of the
11    strings, so I'm not sure what he can --
12           THE COURT: What document are you talking
13    about now?
14           MR. DUFFIELD: Exhibit 112 on the screen.
15           THE COURT: I didn't know that we had
16    moved to 112 yet.
17           MR. DUFFIELD: Mr. Carta just asked it be
18    put on the screen.
19           MR. CARTA: Your Honor, my understanding
20    is these were all in evidence already. I don't
21    understand the nature of the objection. I mean if
22    it's in evidence, he can refer to it. It's a business
23    record. We've stipulated to that.
24           THE COURT: That's true. Objection's
25    overruled.
```

Page 772

```
 1    BY MR. CARTA:
 2       Q   After meeting with you did Ms. Collins-Smee
 3    send an e-mail to Mr. Zapfel?
 4       A   Looks like she did, yes.
 5       Q   Let me withdraw it.
 6           Did you first meet with Ms. Collins-Smee?
 7       A   Yes.
 8       Q   And did you discuss with her --
 9           MR. CARTA: Your Honor, I'm a little bit
10    at a loss because I don't have a screen up here, so
11    I'm not sure, and I can't see that far.
12           THE COURT: You can walk up.
13           MR. CARTA: Thank you.
14           THE COURT: Closer than that, Mr. Carta.
15           MR. CARTA: Your Honor, I'd like to go --
16    I think the one I wanted was 111. Let me take a look,
17    please.
18           THE COURT: Sure.
19           MR. CARTA: It's the second page of 112,
20    Your Honor.
21    BY MR. CARTA:
22       Q   After you met with Ms. McDonald, did you meet
23    with Keenie -- did you meet with Ms. Collins-Smee?
24       A   Yes.
25       Q   And in her e-mail, which is Exhibit 112, she
```

Page 773

```
 1    indicates that you gave her some great insights.  Do
 2    you recall what insights you shared with her?
 3        A    Sure.  I mean, the same thing that I've been
 4    talking to everybody I could talk to about for the
 5    last 12 months, right?  About what we understood about
 6    the WellPoint contract, what was wrong with it, what
 7    needed to change, what additional resources, the plans
 8    we had identified.  And I think at that point the
 9    point I was making was look, you don't have to believe
10    me, just go back and look at the formal reviews you
11    had conducted by all the experts in their
12    organization, peers of mine, you know, other vice
13    presidents of organizations that do this stuff for a
14    living.  They all concluded the same thing, and all
15    concluded what needed to be done, and what it was
16    going to take to get there.
17        Q    When you talked to Ms. McDonald about these
18    big changes, did you say anything -- I'm sorry,
19    question withdrawn.
20            When you spoke to Joanne Collins-Smee about
21    these, quote, big changes, did you say anything to her
22    that Mr. Castelluccio's leadership was a part of the
23    problem at WellPoint?
24        A    No.  I -- you know, it doesn't even make sense
25    to me, right?  Jim was in this from the get-go with
```

Page 774

```
 1    me, and he was on the same calls, you know, on these
 2    executive reviews trying to get these resources.  It
 3    didn't matter who was asking for them, right?  There
 4    was only one person that was going to change that.
 5        Q    What was the last thing that you said?  I'm
 6    sorry.
 7        A    I said there was one person that could have
 8    changed that.  That would have been Dave Liederbach.
 9        Q    And the e-mail also expresses a concern that
10    Mr. Boxer might have offered you a job at WellPoint.
11    Did that happen?
12        A    So, we had a lot of conversations, a lot of
13    hours spent with clients.  I think there's any number
14    of clients that I worked with in the past that I could
15    easily have gotten employment for.  Boxer I believe
16    had a lot of respect for me, and he had lot of
17    conversations.  I would not have accepted a position.
18    That's what I told Joanne, and that's what I told Bob
19    Zapfel, because my personal accountability, integrity,
20    wouldn't let me do it, and I didn't think it would be
21    the right thing for the IBM company.
22        Q    At some point later on in your career did he,
23    in fact, offer you a job?
24        A    Sure.
25        Q    After speaking with Ms. Collins-Smee, did you
```

Page 775

```
 1    then speak to her boss, Mr. Zapfel?
 2        A    I did.
 3        Q    And what do you recall of that meeting?
 4        A    It was pretty much the same discussion that I
 5    had with Joanne.  I mean I think after talking with
 6    both of them, Joanne's discussion back to me was, you
 7    know, we really don't want you to leave, we need your
 8    skills here, I want you to take some time to think
 9    about this.  She says, you know, we've talked about
10    Zapfel, I'd like you to review with him some of the
11    things you talked to me about.  So I did.  And I
12    didn't know either Bob or Joanne prior to announcing
13    my resignation to speak of.  I had some initial
14    contact with Joanne about the WellPoint contract, just
15    taking her through some of the challenges, reviews, et
16    cetera.
17            And then, you know, Bob said look, based on
18    everything I know and everything I've heard, I don't
19    think this is a good reason for you to leave the IBM
20    company, why don't you take some time away from this
21    thing, we'll find you something else to do in the
22    organization, give you some relief for a period of
23    time, and he says, I'll hold your resignation, and he
24    says, if later on you want to go ahead and do this, he
25    said, I'll accept it.
```

Page 776

```
 1            So I agreed for a period of time to just take
 2    some time to decompress and think about that decision
 3    a little bit.  And I think it was a few weeks later I
 4    started getting some calls from Jim about possibly
 5    working on the state of Texas engagement or some other
 6    activities.
 7        Q    We'll come back to that.
 8            Did you also explain to Mr. Zapfel your
 9    assessment of the problems at WellPoint?
10        A    I did, and he was somewhat familiar.  I think
11    he had previously reviewed one of the Red Team
12    Reviews, so he had asked me if I would send him -- if
13    I had it would it send him a copy of it, which I did.
14        Q    And is that Exhibit 1 -- put up 142, please.
15            Is that a copy of an e-mail pursuant to which
16    you sent Mr. Zapfel a copy of the Red Team Reviews he
17    had requested?
18        A    Right.  It is.
19        Q    And the point of sending him that specific
20    document was what?
21        A    I wanted him just, again, to take a look at
22    what I had been saying and what his other -- the rest
23    of his executive organization identified as the
24    problems and challenges on this contract and what
25    needed to be done to correct it.
```

Page 777

1    Q   And the date of that Red Team Review, do you
2  recall that?
3    A   It was sometime in 2006, early --
4    Q   November 2006?
5    A   I think it was before then, actually.
6       Says June.
7    Q   June 2006.  Okay.
8       I'd like to quickly ask you a couple questions
9  about your resignation, or what happened to you after
10 your resignation, and then we'll be almost done.
11      Could you please explain what IBM did in
12 response to your resignation?  I think you indicated
13 that initially they declined to accept it.
14   A   Correct.
15   Q   And then later you received a call from Mr.
16 Castelluccio about some temporary work.
17   A   Correct.  There was some conversation with
18 Joanne that, you know, again, maybe there was
19 something different I could do.  She said she
20 understood what it was like working on WellPoint.  She
21 called it like a dog's years, 18 months on that thing
22 was like seven years worth of a dog's.
23   Q   I'm sorry, Ms. Collins-Smee said to you what?
24   A   It was like 18 months or 15 months on
25 WellPoint was like a dog's year, you know, which meant

Page 778

1  seven human years, seven years in a dog's life.  I
2  think she was just trying to be empathetic to my
3  situation, what I had experienced.
4    Q   She fully understood from your discussion what
5  it was like to be in that position?
6    A   I'm sure she did.
7    Q   You made it clear that she did, is that right?
8    A   Yes.
9    Q   And you said Mr. Castelluccio contacted you
10 and asked you to come do some temporary work.
11 Initially what temporary work did you contact him to
12 do?
13   A   I think the first one was working on the state
14 of Texas contract.
15   Q   For how long did you perform in the role --
16   A   I think there were a number of months in the
17 summer of 2007 when I did that.
18   Q   And thereafter was there other temporary work
19 that you did immediately after?
20   A   Dave Liederbach and a number of his folks -- I
21 think.
22      Chris Nicholetti was a vice president that
23 worked for him, Brian Morgan was his engagement focal
24 point -- asked me to go work on a Bristol Myers Squibb
25 engagement as the subject matter expert.

Page 779

1    Q   And how long did that temporary engagement
2  last?
3    A   I think that -- I was involved -- it may have
4  overlapped with some of the state of Texas activities.
5  I don't remember exactly.  I want to say the middle of
6  June time frame, maybe, of '07 through August
7  September.
8       Because the way engagements work is there's a
9  number of iterations you go through.  I participated
10 in oral presentations to the client there, did
11 contract reviews, worked with the engagement teams on
12 sizing, costing, et cetera, and those meetings were in
13 New Jersey.
14   Q   And do you recall who helped you find this
15 temporary work?
16   A   It was Jim.  He was still my manager at the
17 time.
18   Q   And after you went through the period of
19 working on a temporary operation, was IBM able to find
20 you a permanent placement?
21   A   Ultimately I got a call -- again, in the
22 organization I think folks knew me from the years I
23 had spent there, and I got a call from one of the
24 directors in the organization who had
25 responsibility -- it was another industry.  It was the

Page 780

1  financial services sector.  And they had what they
2  thought would be an opening at The Hartford account,
3  knew that I lived in the northern Connecticut area and
4  thought it might be a good fit from a location
5  perspective, and thought that it might be agreeable to
6  the client for me to work there.
7    Q   And what process, if any, did you go to get
8  accepted as the DPE for The Hartford Insurance
9  Company?
10   A   So there were a number of interviews I did
11 with the vice president and project executive of the
12 contract, Kurt Anderson, and then ultimately Kurt
13 wanted me to meet with a number of executive VPs and
14 CIOs at The Hartford.  So Honda, her boss Bob Ingram,
15 Elaine Martinelli, who was a CIO there.  I did three
16 interviews with them.  I was acceptable to them, was a
17 candidate and worked there for -- from that time inn
18 2007 until I left in 2011.
19   Q   What is your response to the assertion that by
20 later assigning Mr. Castelluccio to the role of DPE at
21 WellPoint IBM was providing him with an opportunity to
22 demonstrate his troubleshooting skills?
23   A   You know, I don't even understand that
24 statement, to be honest with you.  I mean I think when
25 you first mentioned it to me, my reaction was, that's

Page 781

1  almost laughable, but -- I don't know what else to say
2  about it.  It just seems ludicrous.
3      Q    Seems what?
4      A    Seems ludicrous.
5      Q    And why is that?
6      A    Well, I mean, I knew Jim as the vice president
7  of Public Sector, so I had no idea that they were
8  going to ask him to take on a DPE role on WellPoint.
9      Q    From your vantage point as the DPE on
10 WellPoint, to what extent was Mr. Castelluccio
11 responsive in his role as vice president with respect
12 to the WellPoint account?
13     A    I think he was very responsive.  I mean he did
14 his level best to try to help get that thing under
15 control and bring in additional resources, reviews,
16 trying to get the right executive support and
17 sponsorship for the things that we had asked for to
18 try to get it turned around.
19     Q    Was he there when you needed him?
20     A    Absolutely.
21     Q    And was he often on urgent outage calls?
22     A    I would say, you know, again, we have the
23 ability to tap in electronically, same times chats, et
24 cetera, to anybody that we need.  I think Jim had a
25 lot of confidence and respect for me, as I did for

Page 782

1  him.  He -- I think he relied on the fact that if I
2  thought I needed him for something, I'd reach out to
3  him, and if I didn't and he didn't hear from me, he
4  didn't necessarily have to be engaged.  But again, any
5  time I felt like I needed him, I could absolutely get
6  hold of Jim and get what I needed.
7      Q    Do you feel that there was a, quote unquote,
8  choke point in the process?
9      A    Yeah.  I mean, look, all of this comes back
10 to, you know, the signing executive of the contract
11 was Dave, and he had ultimate control over this thing.
12     Q    At any point in time did you hear Mr. Boxer
13 request that Mr. Castelluccio be removed from his
14 oversight role as vice president of the Public Sector?
15     A    Not that I'm aware of.
16     Q    And you were working with him on a regular
17 basis?
18     A    Regular basis.
19     Q    At any point in time did you hear Dave
20 McDonald at WellPoint request that Mr. Castelluccio be
21 removed from his position as vice president of the
22 Public Sector?
23     A    No.  Again, I don't think that they had lots
24 of contact with Jim Castelluccio to warrant that kind
25 of a statement.  I mean that's just my opinion.

Page 783

1      Q    Based upon your interaction with Mr. Boxer,
2  did he ever express to you frustration with Mr.
3  Castelluccio's purported lack of leadership on the
4  WellPoint account?
5      A    No.
6      Q    And Dave McDonald, same question, based upon
7  your regular, I think you said daily interaction with
8  him, did he ever express to you frustration with Mr.
9  Castelluccio's lack of leadership on the WellPoint
10 account?
11     A    No.
12     Q    From your vantage point, to what extent were
13 IBM's problems at the WellPoint account attributable
14 to Mr. Castelluccio's lack of leadership?
15     A    None.
16     Q    Could any one person fix the problem there?
17     A    The only guy that could make a difference
18 would be Dave if he implemented some of the changes
19 that we needed to do.  I don't know how many ways I
20 could say it.  Just countless times we asked for
21 resources and changes, and we couldn't get those.
22     Q    You testified that you worked closely with Mr.
23 Castelluccio over two different positions for
24 approximately six years.
25     A    Correct.

Page 784

1      Q    And this included the entire 18 or 17-month
2  period he was -- you were the DPE on WellPoint?
3      A    Yes.
4      Q    Based upon your direct experience working with
5  him and reporting to him, how would you describe his
6  leadership skills?
7      A    Look, I would work for Jim again if I had the
8  opportunity, right?  I hold myself accountable to high
9  standards.  Jim was always a guy with high integrity,
10 honesty, forthrightness.  I mean, you know, working in
11 the IBM company is a challenge.  The thing that I
12 think kept us all going is that we had a lot of good
13 people to work with, and Jim was one of those.  So
14 I -- I don't know what else I could say.
15     Q    You don't need to say anything else.  I have
16 no further questions.
17          THE COURT:  All right.  Thank you, sir.
18 It appears that you have concluded just at 1 o'clock,
19 which is the lunch hour.
20          Let's go to lunch.  Let's be back at 2.
21 Don't talk about the case.  Have a good lunch, and
22 we'll see you at 2 o'clock.  I know because I'll be
23 here at 2.
24     (Recess taken from 1:05 p.m. to 2:07 p.m.)
25          THE COURT:  We ready to resume the

Page 785

1   cross-examination, counselor?
2       MR. DUFFIELD: Yes, Your Honor.
3       THE COURT: Okay. Go ahead.
4
5       CROSS-EXAMINATION BY MR. DUFFIELD:
6
7   Q   Good afternoon, Mr. Morin.
8   A   Afternoon.
9   Q   My name is Todd Duffield. I'm one of the
10  attorneys representing IBM in this matter.
11      We've never met before, correct?
12  A   Correct.
13  Q   I can safely say on behalf of both parties we
14  appreciate your time here today. Thank you for that.
15      You were not involved in the decision to
16  terminate Jim Castelluccio from IBM, correct?
17  A   No knowledge of it.
18  Q   No personal knowledge of it whatsoever?
19  A   No.
20  Q   Did you ever discuss with Dave Liederbach Mr.
21  Castelluccio's performance in the vice president of
22  Public Sector role?
23  A   No.
24  Q   Did you know that in 2006 Mr. Liederbach had
25  requested of Mr. Castelluccio's manager, Kelton Jones,

Page 786

1   that he be removed from the vice president role?
2   A   No.
3   Q   You didn't know that in 2007 when
4   Joanne-Collins Smee took over as general manager of
5   ITD Americas that Mr. Liederbach renewed that request
6   to her, correct?
7   A   I did not know that.
8   Q   Do you have any personal knowledge of -- well,
9   when you were removed, when you left the DPE role from
10  WellPoint, you know Mr. Castelluccio assumed that
11  role, correct?
12  A   You know, honestly I didn't have a lot of
13  visibility to what happened. There were a number of
14  weeks that I was not really engaged in any activity,
15  and then, you know, when I came back I didn't know
16  really that there was any change with Jim, to be
17  honest with you.
18  Q   But at some point you learned that he assumed
19  that role as the DPE of WellPoint?
20  A   Actually I didn't know that. As far as I
21  know, up until the time I left IBM he was still the VP
22  of the Public Sector. I don't recall in notices that
23  I ever saw that said differently.
24      I should correct that, right? Because I knew
25  at one point Miguel Echavarria came in, but I didn't

Page 787

1   know what had technically happened with Jim relative
2   to job positions, demotions or anything.
3   Q   When you say Miguel Echavarria came in, to
4   what role are you referring?
5   A   As far as I know he was VP of Public Sector.
6   Because I started dealing with him I think in the
7   August 2007 time frame.
8   Q   You testified before lunch about your
9   resignation in March of 2007?
10  A   Correct.
11  Q   And I believe you testified that you met with
12  Keenie McDonald?
13  A   I had a telephone conversation, as I recall.
14  Q   And with Joanne Collins-Smee, you met with her
15  as well?
16  A   Joanne was a face-to-face meeting.
17  Face-to-face with Mark the Zapfel.
18  Q   And what did Ms. Collins-Smee say to you to
19  convince you to stay at IBM?
20  A   I think she talked about, you know, she was
21  going to be making changes, the organization needed
22  people of my skills, thought that I should, you
23  know -- she says, I get what you've been going through
24  on WellPoint, you know, we make a change there, you
25  don't have to do that, we'll find you something else

Page 788

1   to do, or something to that extent.
2   Q   Did she mention your age in that conversation?
3   A   Not at all.
4   Q   How old were you at the time?
5   A   Well, I'm 62 right now, so if you do the math,
6   I must have been in my late fifties or something
7   there, so...
8   Q   IBM has a policy against age discrimination,
9   doesn't it?
10  A   Yes, it does.
11  Q   And it's just not tolerated there, correct?
12  A   Correct.
13      MR. DUFFIELD: No further questions, Your
14  Honor. Thank you.
15      MR. CARTA: No follow-up questions, Your
16  Honor.
17      THE COURT: Thank you for being with us,
18  Mr. Morin. It appears that you can be excused.
19      THE WITNESS: Thank you very much, Your
20  Honor.
21      MR. CARTA: Your Honor, as my next
22  witness I'd like to call Joanne Collins-Smee to the
23  stand.
24      THE COURT: Ms. Collins-Smee, you have
25  been called by Mr. Carta as a witness, and the witness

Page 789

```
1    booth is right here.  You can move that microphone
2    around.  I would appreciate it if you would adjust it
3    so that I can hear what you say.
4              THE WITNESS:  How's that?
5         (Joanne Collins-Smee, sworn by the clerk)
6              THE CLERK:  Please state your name, spell
7    your last name for the record.
8              THE WITNESS:  My name is Joanne
9    Collins-Smee, C-O-L-L-I-N-S, hyphen, S-M-E-E.
10             THE CLERK:  Please state your city and
11   state, where you live.
12             THE WITNESS:  Greenwich, Connecticut.
13
14        DIRECT EXAMINATION BY MR. CARTA:
15
16   Q    Good afternoon, Ms. Collins-Smee.  As I
17   believe you know, I represent Mr. Castelluccio.
18   A    Yes, Mr. Carta.
19   Q    When did you first become general manager of
20   IT services at IBM?
21   A    The beginning of February of '07.
22   Q    And that group was what's been referred to at
23   IBM as the ITD Americas group?
24   A    Yes.
25   Q    Had you had prior experience in the delivery
```

Page 790

```
1    area?
2    A    I had managed -- I had been the general
3    manager of the Industrial Sector for DTS, so I knew
4    delivery, yes.
5    Q    So in the Industrial Sector position you were
6    a consumer of delivery services?
7    A    Yes.
8    Q    Had you ever actually managed people
9    performing the delivery services before you were put
10   into this role?
11   A    Oh, yes.  I have a big background in
12   technology management.
13   Q    Specifically what?
14   A    I managed end user services, I managed network
15   services, I managed programming.
16   Q    And on a direct basis -- I'm sorry, go ahead.
17   A    Sorry.  And I managed infrastructure support.
18   Q    And if we could put up the organizational
19   chart just for a second, I just wanted to make sure
20   we're all on the same page.
21        You were, as I think you've said, ITD
22   Americas, and immediately above you was Mr. Zapfel, is
23   that right?
24   A    Yes.
25   Q    And Mr. Zapfel was your boss?
```

Page 791

```
1    A    Yes.
2    Q    And Mr. Zapfel saw the delivery of all
3    information technology services throughout the
4    organization, is that right?
5    A    Yes.
6    Q    And you were focused on the delivery within
7    the Americas?
8    A    Yes.
9    Q    And what did the Americas include?
10   A    It included North America accounts, as well
11   as -- well, U.S. and North America, U.S. and Canada,
12   excuse me, which is basically North America.
13   Q    And immediately before your becoming the
14   general manager of ITD Americas who held that
15   position?
16   A    Kelton Jones.
17   Q    And do you recall how many executives reported
18   directly to you in February of 2007?
19   A    Between ten and 20.
20   Q    And among those executives am I correct that
21   there were at that time five vice presidents?
22   A    I think there were more than that.
23   Q    How many in February of 2007?
24   A    I would say probably ten vice presidents.
25             MR. CARTA:  Deposition transcript page
```

Page 792

```
1    25, lines 3 through 10.
2    BY MR. CARTA:
3    Q    Ms. Collins-Smee, do you recall my conducting
4    your deposition in Manhattan at your lawyer's office?
5    A    Yes.
6    Q    And that was in February of 2010?
7    A    I don't remember the date, but I remember the
8    deposition.
9    Q    And do you recall that I asked you:  "And were
10   those people that you were managing in 2007, was their
11   title VP of a particular sector?"
12        And you said:  "No, not all of them."
13        And I asked you:  "How many were vice
14   president of sectors?"
15        And you said:  "Then?"
16        And then I said:  "Yes."
17        And you said:  "I think five."
18        Do you recall that testimony?
19   A    The question that you asked me was how many of
20   my direct reports were vice presidents.
21   Q    Yes.
22   A    They weren't all VPs of sectors.  We also had
23   vice presidents of technical competency areas.
24   Q    Okay.  And so the total number of people then
25   reporting directly to you in February of 2007 was how
```

33  (Pages 789 to 792)

Page 793

```
 1   many?
 2       A   Between ten and 20. I'm not certain.
 3       Q   And among that group there were five vice
 4   presidents, however?
 5       A   There were --
 6       Q   Five sector vice presidents?
 7       A   I think there were six. Five or six.
 8       Q   And one of those was the VP of Public Sector
 9   which is Mr. Castelluccio, is that right?
10       A   Yes.
11       Q   And Mr. Castelluccio's area included
12   healthcare and pharmaceutical companies, is that
13   right?
14       A   Yes.
15       Q   And it also included all state, local and
16   federal government contracts?
17       A   Yes.
18       Q   And do you remember if that number of
19   contracts at that time was approximately 30?
20       A   Approximately.
21       Q   And at the time you first became the head of
22   ITD Americas, had Mr. Castelluccio already been
23   serving in the role of vice president of Public Sector
24   for two years?
25       A   Approximately.
```

Page 794

```
 1       Q   Do you recall?
 2       A   I don't, no.
 3       Q   Don't recall one way or the other?
 4       A   18 months, two years, in that range, I would
 5   say.
 6       Q   And is it true that when you took over that
 7   position, that you had access to Mr. Castelluccio's
 8   2007 PBC evaluation?
 9       A   I would have access to all the HR records,
10   yes.
11       Q   And were you aware at the time you met with
12   Mr. Castelluccio that he had previously just received
13   a 2 rating from Kelton Jones?
14       A   No.
15       Q   And you weren't aware of that because you had
16   not gone back to look at his prior PBC, is that
17   correct?
18       A   Correct.
19       Q   And prior to meeting Mr. Castelluccio, do you
20   recall speaking -- question withdrawn.
21           Prior to becoming Mr. Castelluccio's
22   supervisor, do you recall speaking with Kelton Jones
23   about Mr. Castelluccio's performance?
24       A   Prior?
25       Q   Prior to becoming his supervisor.
```

Page 795

```
 1       A   No.
 2       Q   And am I correct that Mr. Kelton Jones
 3   overlapped with you for a period of approximately
 4   three months, he didn't leave until sometime in March?
 5       A   No. I took over in the beginning of February.
 6   He was not in the role when I took over.
 7       Q   Poorly asked question. He was in the
 8   building, though. He was accessible to you. I'm not
 9   saying you shared the role. I understood you took the
10   roll over. But he was accessible to you, was he not?
11       A   I don't think it was three months. I thought
12   it was more like a month that he was there after I
13   took over.
14       Q   So it's your best recollection he was there
15   for over 30 days?
16       A   Approximately.
17       Q   And you certainly could have consulted with
18   him if you had chosen to, could you not?
19       A   Yes.
20       Q   And do you recall that Mr. Jones actually
21   affirmatively attempted to speak to you on several
22   occasions in early 2007, before he left?
23       A   I had arranged meetings.
24       Q   You had arranged meetings?
25       A   Yes.
```

Page 796

```
 1       Q   And did you meet with him?
 2       A   We spoke on the phone.
 3       Q   Before he left?
 4       A   I think it was before he left. We definitely
 5   spoke on the phone.
 6       Q   And did you speak on the phone with him about
 7   specifically Mr. Castelluccio?
 8       A   It was one of the items we discussed.
 9       Q   And what were the other items that you
10   discussed?
11       A   Overall portfolio, were there any other issues
12   that I needed to understand or be aware of.
13       Q   And you were certain that you spoke to Mr.
14   Kelton Jones before he left IBM and between the time
15   that -- question withdrawn.
16           Between the time you became the head of ITD
17   Americas and the time he actually left IBM, you're
18   confident that you spoke to him about Mr.
19   Castelluccio?
20       A   We spoke.
21       Q   And you also spoke to him generally about the
22   transition of his business, of the position that he
23   held over you, is that your testimony?
24       A   Yes.
25       Q   No doubt in your mind about that?
```

Page 797

```
1      A   Yes.
2      Q   There is doubt in your mind?
3      A   No.  Excuse me.
4          MR. FASMAN:  Objection, Your Honor.
5   She's testified, she said it.  Can we go on?
6          THE COURT:  There's no doubt in your mind
7   about that, is there?
8          THE WITNESS:  I spoke to him, yes.
9   BY MR. CARTA:
10     Q   I'd like to ask you questions -- a few
11  questions about your first meeting with Mr.
12  Castelluccio as his general manager.  Did you have --
13  do you have a specific recollection of where that
14  meeting was held?
15     A   It was held in my office.
16     Q   And at the time of your deposition do you
17  recall telling me that you could not remember where
18  the meeting was held?
19     A   Yes, I remember telling you that.
20     Q   But now you remember?
21     A   I do.
22     Q   And do you recall who initiated the meeting?
23     A   I did.
24     Q   And do you recall telling me at the time of
25  your deposition that you had no idea who initiated the
```

Page 798

```
1   meeting?
2      A   Yes, but subsequent to the deposition --
3      Q   Just answer my question, please.
4      A   Yes.
5      Q   Do you recall at the time of your deposition I
6   asked you whether you'd reviewed any materials in
7   advance of your meeting for Mr. Castelluccio and you
8   indicated that you had no recollection of reviewing
9   any materials, do you recall that?
10     A   Yes.
11     Q   And is that still your testimony, that you
12  have no recollection of reviewing any materials before
13  you met with Mr. Castelluccio?
14     A   No, I know now I did review materials before I
15  met with him.
16     Q   So now you recall that you reviewed materials
17  in connection with meeting Mr. Castelluccio?
18     A   Yes.
19     Q   Am I correct that at the time of your
20  deposition you told me you had no specific
21  recollection of your first meeting with Mr.
22  Castelluccio in 2007, do you recall telling me that?
23         MR. FASMAN:  Asked and answered, Your
24  Honor.
25         THE COURT:  Overruled.  You may answer
```

Page 799

```
1   the question.
2          THE WITNESS:  So as I said, yes, I
3   remember saying that to you.
4   BY MR. CARTA:
5      Q   You do recall that?
6      A   Yes.
7      Q   And do you now have a specific recollection of
8   the meeting?
9      A   Yes.
10     Q   And what is your specific recollection of the
11  meeting now?
12     A   That we discussed the WellPoint account,
13  because I had gotten feedback that there were
14  significant issues.  That's what I remember.
15     Q   Do you recall anything else about the meeting,
16  other than that it was in your office and that you had
17  a general discussion about WellPoint?
18     A   No.
19     Q   Nothing else, that's exactly what you
20  remember?
21     A   Yes.
22     Q   At the time I took your deposition, do you
23  recall that your testimony was given under oath?
24     A   Yes.
25     Q   And at the very beginning of the deposition do
```

Page 800

```
1   you recall that I asked you not to guess or speculate?
2      A   Yes.
3      Q   And do you recall that I explained if you
4   answered a question, that it must be based upon your
5   own personal knowledge?
6      A   Yes.
7      Q   And do you recall that we agreed that we
8   would only answer questions based upon your own
9   personal knowledge and only if you fully understood
10  the questions, do you recall we agreed to that?
11     A   Yes.
12     Q   Can you also confirm that you later had an
13  opportunity to review the entire transcript of your
14  deposition and to correct any errors that were in it?
15  Do you remember filling out an errata sheet?
16     A   I don't.
17     Q   Do you recall signing the deposition under
18  oath, swearing to its accuracy?
19     A   That day?
20     Q   No, at a later time.
21     A   Subsequently?
22     Q   After you had a chance to read it.
23     A   Yes, yes.
24     Q   So you did have a chance to review the
25  transcript, read it -- you did read it, I assume, yes?
```

Page 801

```
 1       A   Yes.
 2       Q   And you swore to the accuracy of its contents,
 3   isn't that right?
 4       A   Yes.
 5       Q   And at that time you had no recollection at
 6   all, but you do now, of the meeting with Mr.
 7   Castelluccio?
 8       A   Yes.
 9       Q   I'd like to queue up Exhibit 29, please.
10          Showing you Exhibit 29, do you recognize this
11   as an e-mail that you authored?
12       A   I do.
13       Q   Do you believe that you sent this e-mail on
14   February 28th, 2007?
15       A   Yes.
16       Q   I just want to make sure I understand the
17   situation.  At the time you sent this e-mail --
18   question withdrawn.
19          Had you previously ever worked with Mr.
20   Castelluccio prior to the time that you became his
21   boss as head of ITD Americas
22       A   No.
23       Q   So at the time you sent this e-mail, on
24   February 28th, you did not know his performance rating
25   from a month before, is that right?
```

Page 802

```
 1       A   Correct.
 2       Q   And you had not at that point spoken to his
 3   general manager, is that correct?
 4       A   His general manager?
 5       Q   Kelton Jones.
 6       A   I'm not sure if I spoke to -- I would think I
 7   spoke to Kelton by this point, but I'm not positive.
 8       Q   You're not positive whether you spoke to him,
 9   or you're not positive you spoke to him before this?
10       A   I'm positive I spoke to Kelton.  I don't know
11   the time frame, was it before or after this e-mail.
12       Q   And it appears that you sent this e-mail to
13   Mr. Holmes.  What was Mr. Holmes's role at the time?
14       A   Keith Holmes was my human resources leader for
15   our organization.
16       Q   And in your e-mail you say, "Can you please
17   pull me a slate."  What does that mean?
18       A   It is saying that Jim Castelluccio was going
19   to be leaving that role, and I needed to get a
20   replacement candidates for that role, to the VP of
21   Public Sector.
22       Q   And what does "a slate of candidates" mean?
23       A   It means people that HR would actually look
24   through the databases to see if people had criteria to
25   actually fill that role.  That's what a slate is.
```

Page 803

```
 1       Q   And that was to fill the role that you were
 2   removing Mr. Castelluccio from?
 3       A   Correct.
 4       Q   And on what 5-minute drill were you proposing
 5   to have that slate added to?
 6       A   I was saying that Jim should get added to Pat
 7   Kerin's drill.
 8       Q   But with respect to the slate of candidates --
 9   we'll get to that in a second.
10       A   Okay.
11       Q   With respect to the slate of candidates that
12   you were asking Mr. Holmes to pull, that you were
13   directing Mr. Holmes to pull, that was a slate of
14   candidates that was going to be put on your drill, is
15   that right?
16       A   Yes.
17       Q   And what's the process?  You asked him to pull
18   a slate, and then he did what you directed him to in
19   terms of establishing a slate, is that right?
20       A   He actually wouldn't pull the slate himself.
21   There's someone else in HR that that's their
22   responsibility, to pull the slates for all
23   organizations.  So he would work with that person to
24   pull the slate.
25       Q   And you would direct him to pull the slate,
```

Page 804

```
 1   though, right, done at your initiative?
 2       A   I asked him, yes.
 3       Q   And in other e-mails I've seen where you have
 4   suggested that someone be added to a slate, is that
 5   correct?
 6       A   Yes.
 7       Q   And certainly on drills that are drills within
 8   your organization, it's your prerogative to have
 9   people added to the slate, isn't that correct?
10       A   Yes.  Yes.
11       Q   Do you recall following up with Mr. Holmes one
12   week later to confirm that -- actually to inquire
13   whether or not he had pulled the slate for you?
14       A   I do.
15       Q   May I see Exhibit 138, please.
16          If you would take a moment and just review
17   that e-mail, I'd appreciate it.
18          MR. FASMAN:  Mr. Carta, does the witness
19   have a binder?  There is a maroon binder --
20   BY MR. CARTA:
21       Q   Ms. Collins-Smee, would you prefer to have a
22   binder, or would you prefer to read from, the screen?
23       A   I'd like a binder.
24          Mr. Carta, what tab?
25       Q   138.
```

Page 805

1    And do you recall that you pursued Mr. Holmes
2  when you found out that he was -- well, you inquired
3  of Mr. Holmes, and you found out that he had not
4  pulled the slate for your proposed March 5-minute
5  drill.
6    A   Yes.
7    Q   And just explain to the jurors how that came
8  to pass.  You saw a proposed 5-minute drill, your
9  proposed March 5-minute drill.  Is that what this is
10  referencing?
11    A   No.  This is my boss, who is Robert Zapfel at
12  that time, it was his 5-minute drill, and I noticed
13  that the role with Jim weren't included on that
14  5-minute drill, so I was asking Keith, who is my HR
15  leader, why didn't we have Jim on the drill, and why
16  wasn't the role for VP of face-to-face interviews put
17  on the drill.  And his response -- Mr. Carta, do you
18  want me to go through his response here?
19    Q   I need a copy of it myself.  Just excuse me
20  for a second.
21      My question was -- just a second, please.
22      Your initial inquiry you're saying is to ask
23  whether the position from which you were removing Mr.
24  Castelluccio, whether that had been placed on Bob
25  Zapfel's drill and not on your drill?

Page 806

1    A   This was related to Bob Zapfel's drill, yes.
2    Q   And what's the basis of that?  What makes you
3  think that?
4    A   Because what was attached here below was a
5  copy of Bob Zapfel -- the actual drill.  It's a drill
6  agenda, actually.  So it was what was published for
7  the discussion, and Keith told me it wasn't, because
8  the time frame, it was earlier that they had pulled
9  the drill, and that I could speak to Jim's
10  availability and the role during the meeting.
11    Q   And was Mr. Castelluccio put on the drill of
12  Mr. Zapfel in the next month?
13    A   Was he -- I'm sorry.
14    Q   Was he listed as a person to move?
15    A   The next month we had put him already acting
16  on the WellPoint account, so he wasn't put on the
17  drill at that point.
18    Q   And the question is -- so the answer is no, he
19  was not put on Mr. Zapfel's drill despite the fact
20  that this is a reference to Mr. Zapfel's drill in
21  Exhibit 138, is that right?
22    A   We may have -- we discussed him this first
23  time.  He was not put on the drill the subsequent
24  month because by then he was acting at WellPoint.
25    Q   And why wasn't he on the drill in March?

Page 807

1    A   I don't know.
2    Q   And let's go back to Pat Kerin's drill.  You
3  state in this e-mail, "I need to get Jim on Pat
4  Kerin's drill."  Those are your words, "I need to,"
5  isn't that correct?
6    A   Yes.
7    Q   And you said "I need to" because that was your
8  responsibility as his manager, isn't that correct?
9    A   Yes.
10    Q   It was your responsibility to make sure he got
11  on a drill?
12    A   Yes.
13    Q   And that's what you're referring to here, that
14  it was his response -- your responsibility to put him
15  on Pat Kerin's drill?
16    A   Excuse me, Mr. Carta, can I make a
17  clarification?
18    Q   You may.
19    A   My responsibility was to ask Keith, who works
20  with HR, to actually put those roles on the drill if
21  it's appropriate to make that request through to HR.
22    Q   And as you did here, when you see that someone
23  or some position is not being listed, you have the
24  opportunity to follow up to make sure that indeed they
25  are on the drill, isn't that correct?  Yes or no.  Is

Page 808

1  it correct you had the opportunity to follow up to
2  make sure that they're on the drill?
3    A   For which drills?
4    Q   First of all we'll talk about your drill.
5    A   Yes.
6    Q   You certainly had the opportunity to follow up
7  to make sure that a position is listed on your drill?
8    A   If it was appropriate to be on the drill.
9    Q   Right.  And you have the opportunity to make
10  sure that a slate of candidates is identified and put
11  on the drill as you did here, isn't that correct, with
12  respect to your drill?
13    A   Yes.  Excuse me, we discussed them during the
14  5-minute drill.
15    Q   I understand.  And you certainly had the
16  opportunity, according to this, to follow up and make
17  sure that somebody's placed -- a slate of candidates
18  is placed on Mr. Zapfel's drill, isn't that correct?
19    A   Yes.
20    Q   So it's within your authority to request and
21  to be sure that someone is added to at least your
22  drill, and certainly Mr. Zapfel's drill, is that
23  correct?
24    A   If --
25    Q   You have the authority to do that?

Page 809

```
1      A   I have authority to request it to be done.
2      Q   And if it's not done, you can follow-up with
3   HR to make sure they do it because they're reporting
4   to you, in part, isn't that right?
5      A   Yes.
6      Q   And despite your statement that you need to
7   get Mr. Castelluccio on Pat Kerin's drill, he did not
8   appear on any drill until October of 2007, isn't that
9   correct; any of Pat Kerin's drill until October of
10  2007?
11     A   I'm aware of that now, yes.
12     Q   But you weren't aware of it then?
13     A   No.  I don't sit in Pat Kerin's 5-minute
14  drills.
15     Q   And did you attempt to find out whether or not
16  he was on those drills?
17     A   I assumed he was.
18     Q   You just assumed he was?
19     A   Yes.
20     Q   And in the case of the position that you were
21  removing Mr. Castelluccio from, in that case you
22  didn't assume it was going to be on Mr. Zapfel's
23  drill, did you, you followed up to make sure that the
24  slate of candidates was identified on his drill, isn't
25  that right?
```

Page 810

```
1      A   Yes.
2      Q   As an IBM manager, isn't it true that you
3   received training about discrimination laws?
4      A   Absolutely.
5      Q   This training includes education about age
6   discrimination as well, doesn't it?
7      A   Yes.
8      Q   And, in fact, my understanding is that you get
9   this training on a regular basis as a manager?
10     A   Yes.
11     Q   At least annually, is that fair to say?
12     A   Yes.
13     Q   And you certainly were aware that it's not
14  appropriate to ask an employee, especially an employee
15  that reports directly to you, what his or her age is,
16  isn't that correct?
17     A   Absolutely.
18     Q   You would never do that, would you?
19     A   Never.
20     Q   Would you also agree that you were trained not
21  to base an employee's -- an employment decision on a
22  person's age?
23     A   Correct.
24     Q   And you'd never do that, either, would you?
25     A   No.
```

Page 811

```
1      Q   So you'd never do that because you knew it was
2   illegal?
3      A   Because I knew it's not the right thing to do.
4      Q   Well, you also knew it was illegal, did you
5   not, to base an employment decision with respect to
6   someone who reported -- question withdrawn.
7          Did you know it was illegal to base an
8   employment decision on -- with respect to someone who
9   reported directly to you, to base that decision on
10  their age.
11     A   Yes.
12     Q   And did you also understand that it's not
13  appropriate to raise with one of your employees the
14  subject of their retirement after they have made it
15  perfectly clear to you that they have no interest in
16  retiring?
17     A   Would you repeat that question?
18     Q   I would be pleased to, yes.
19          Did you also understand that it was not
20  appropriate to raise with one of your employees the
21  subject of their retirement after they had made it
22  absolutely clear to you that they were very interested
23  in continuing to work?
24     A   It would depend on the amount of time it had
25  been.
```

Page 812

```
1      Q   What does that mean, it would depend on the
2   amount of time it had been?
3      A   Sir, you just asked if I -- I just want to
4   make sure I understand the question.
5      Q   Please, I want you to be sure you understand
6   my questions.
7      A   Did I think it was appropriate to bring up
8   retirement after someone had said they didn't want to
9   retire?
10     Q   After they'd made it -- I'm making it easier
11  for you -- after they had made it perfectly clear to
12  you they had no interest in retiring, do you think it
13  would be appropriate in those circumstances to ask
14  them about retirement?
15          MR. FASMAN:  Objection.  It's
16  hypothetical.
17          THE COURT:  Overruled.
18          THE WITNESS:  I'm sorry, I didn't
19  understand.  Overruled means?
20          THE COURT:  You can answer the question.
21          THE WITNESS:  Thank you.  Sorry.
22          It didn't occur.
23  BY MR. CARTA:
24     Q   I appreciate that you're trying to help, but
25  that's not answering my question so I will ask you to
```

Page 813

1  try to answer the question, so I'll ask it one more
2  time.
3      Is it true that you understood that it was not
4  appropriate for you as an IBM executive to raise the
5  issue of an employee -- with an employee who was --
6  who had made it perfectly -- raise the issue of their
7  retirement once they had made it perfectly clear to
8  you that they had no interest in retiring and wanted
9  to work?
10     A   So this is a hypothetical, and if that
11 occurred, I think it would depend on the
12 circumstances, meaning, was it a very long period of
13 time between the first discussion and the subsequent
14 one.
15     Q   So it's your opinion that even after someone
16 has made it clear that you -- that they have no
17 interest in retirement, you can raise that subject
18 with them again?
19         MR. FASMAN:  Asked and answered.
20         THE COURT:  Overruled.
21 BY MR. CARTA:
22     Q   I just want to understand.
23     A   Again, it did not happen, but if there was --
24 with a hypothetical, if it was a long period of time
25 and circumstances had changed.

Page 814

1      Q   So let me understand, then.  I'm going to ask
2  you the reverse.  It's your opinion that it is okay to
3  ask an employee who's made it perfectly clear to you
4  that he does not want to retire, he wants to continue
5  to work, in your opinion it's okay to ask that
6  employee repeatedly if they want to retire, is that
7  your testimony?
8      A   No.
9      Q   It's not your testimony?
10     A   No.
11     Q   So you agree, then, that it's not appropriate
12 once an employee has made it clear to you that they
13 don't want to retire?
14     A   Yes.
15         MR. FASMAN:  Your Honor, I think the
16 question is the same question six times now.
17         THE COURT:  Well, we just got a clear yes
18 from the witness.
19         MR. FASMAN:  Okay.
20         MR. CARTA:  I'm sorry?  I actually didn't
21 hear the answer because of the echo from the back of
22 the room.  I'm sorry, I did not hear the answer.
23         THE COURT:  The question was good, the
24 witness understood it, she answered, yes.  So it's
25 been asked and answered.

Page 815

1          MR. CARTA:  I literally did not hear the
2  answer.  My apologies.  I'll move on.
3          THE COURT:  That's all right.
4  BY MR. CARTA:
5      Q   Is it fair to say that IBM holds itself out as
6  an employer who bases -- that bases its employment
7  decisions on merit, employee's performance?
8      A   Yes.
9      Q   And that's something that if you work for IBM,
10 you buy into that culture, is that a fair statement?
11     A   Yes.
12     Q   And that's something that's encouraged as an
13 incentive for employees to work harder?
14     A   Yes.
15     Q   And in fact, IBM benefits substantially from
16 that, because they have a work force of hard-working
17 employees, isn't that correct?
18     A   Yes.
19     Q   Who all operate under the basis that if I work
20 hard, I'm going to be treated fairly and I'm going to
21 excel here, isn't that correct?
22     A   Yes.
23     Q   And the PBC evaluation procedure, we talked
24 about that at length, I think we discussed it at
25 length at your deposition, as I recall, you would

Page 816

1  agree that that's a critical component in the whole
2  culture at IBM of treating employees fairly?
3      A   It's one of the components.
4      Q   Just one of them, or a critical component?
5      A   It's an important component.
6      Q   It's an important component.  And it's
7  important because the evaluation process is touted --
8  it's represented as being an objective process, isn't
9  that right?
10     A   Yes.
11     Q   And in fact, it is objective, isn't it?
12     A   Yes.
13     Q   In the beginning of the year you sit down with
14 your employee, and you agree on certain targets,
15 sometimes very specific mathematical targets, isn't
16 that correct?
17     A   Yes.
18     Q   And the manager doesn't just hand those down,
19 you sit down with the employee and the two of you
20 agree on what would be -- what's a fair legitimate
21 objective, isn't that correct?
22     A   At an executive level it's much more cut and
23 dried than that rather than a discussion.  It's these
24 are your targets, this is your availability time, this
25 is what we need to be done.

39 (Pages 813 to 816)

Page 817

1    Q   And the executive level, it's because you're
2  being told from on high, these are the milestones that
3  you need to meet, isn't that right?
4    A   Yes.
5    Q   But still there's an agreement, there's a
6  process where you, for example, would agree with Mr.
7  Castelluccio, these are the targets that you need to
8  make, right?
9    A   Yes.
10   Q   In the beginning of the year.  And then
11 there's a performance phase, the second phase, right?
12 And then the final phase is you sit down and there's
13 an assessment of, okay, let's look at it, did you do
14 what you agreed -- what we agreed that you were going
15 to do, isn't that correct?
16   A   Yes.
17   Q   And the integrity of the whole system is based
18 on accuracy and the legitimacy of that PBC rating,
19 isn't it?
20   A   Could you repeat that question?
21   Q   Sure.  It's probably overly grandiose.  Let me
22 try to be more straightforward.
23       From an employee's point of view, they really
24 rely on that PBC rating, don't they?  It's important
25 for their compensation, isn't that right?

Page 818

1    A   Yes.
2    Q   It's important for their career, isn't that
3  right?
4    A   Yes.
5    Q   And it's important for their reputation, isn't
6  that correct?
7    A   Yes.
8    Q   We'll come back to that in a little bit.  I
9  want to ask you a few questions about WellPoint.  Am I
10 correct that at the time you first came into the
11 position as general manager of ITD Americas, that you
12 had not heard anything in advance about WellPoint?
13   A   Correct.
14   Q   Didn't know anything about it, it was all new
15 to you?
16   A   Other than the company, but yes, I wasn't
17 aware of it.
18   Q   Bit of a shock, no doubt, to learn what was
19 going on there.
20   A   I don't think it was a shock, but -- I was
21 educated that I was in the role.
22   Q   Do you agree that you had identified as early
23 as March of 2007 very early on that WellPoint was one
24 of your top 20 troubled accounts?
25   A   Yes.

Page 819

1    Q   And in your deposition do you recall that you
2  agreed that WellPoint was among maybe either the 1 to
3  5 percent of the most financially troubled accounts at
4  IBM, in terms of projected losses?
5    A   In that year, I think was the delineator I put
6  around that.
7    Q   Fine, in that year.
8    A   Yes.
9    Q   One to 5 percent, in that range?
10   A   It was a guesstimate.
11   Q   It was your best opinion.  Have you changed
12 that opinion since then?
13   A   Excuse me, it was from my portfolio.
14   Q   From your portfolio, right.
15   A   Yes.
16   Q   And would you agree that the role of the DPE
17 in an account like WellPoint is a pivotal role?
18   A   Yes.
19   Q   And just so that we're sure that we're all
20 using the same terminology, how do you define an
21 outage?
22   A   An outage is when the IT system goes down, so
23 either the hardware goes down or the network goes
24 down, but the end user experiences an interrupt in
25 service.

Page 820

1    Q   And do you have an understanding of the
2  general procedure for addressing outages?
3    A   Yes.
4    Q   And what's that procedure?
5    A   It depends on the account, the specific
6  procedure.
7    Q   Well, we'll talk about WellPoint, that's fine.
8    A   So it would generally be a call out, that
9  there's an incident, it gets logged, and then a team
10 of people gather to decide how to address the
11 situation and how to remedy it.
12   Q   And that would be an outage phone call?
13   A   There was a series of phone calls, technical
14 bridges, e-mail, chat forums.  It depended.  It was a
15 myriad of ways.
16   Q   And the objective of all of that was, those
17 resources, is to try to solve the problem, fix --
18   A   Urgently.
19   Q   Urgently.  And you're aware that sometimes on
20 the WellPoint account those calls would run for hours?
21   A   Yes.
22   Q   And, in fact, sometimes for days, is that
23 correct?
24   A   In the beginning of the account, yes.
25   Q   And would you agree with me that sometimes

Page 821

1    those outage calls, there were multiple calls going
2    out at the same time? I'm just talking about the
3    WellPoint account.
4        A   I don't know how frequent that was, but there
5    were multiple calls simultaneously.
6        Q   You just don't know?
7        A   No.
8        Q   And I asked you this in your deposition, and
9    you indicated to me that in your professional
10   managerial judgment, IBM's DPE on the WellPoint
11   account was responsible for being on a majority of the
12   outage calls, do you remember giving me that
13   testimony?
14       A   Yes.
15       Q   And in addition, it was your opinion as
16   general manager of ITD Americas that it was the
17   responsibility of the DPE on the WellPoint account to
18   also understand and to address the larger strategic
19   issues, so that there wouldn't be so many outage
20   calls, do you remember saying that?
21       A   Correct. Yes.
22       Q   So in your considered judgment, the DPE on
23   WellPoint in 2007 simply had to balance both, they had
24   to balance being on a majority of the outage calls,
25   and they had to balance figuring out what the problems

Page 822

1    were and strategically solving those problems, is that
2    correct?
3        A   Yes. There was a large team of people that
4    they were leading, so yes, they would have managed
5    different people to do different activities, would be
6    the point.
7        Q   Well, maybe I misunderstood you. I thought
8    you said specifically that you expected the DPE to be
9    on a majority of the outage calls.
10       A   Yes.
11       Q   You're not saying he or she should delegate
12   that responsibility to somebody else, you're saying
13   they should be on it, is that right?
14       A   Yes, yes.
15       Q   And in addition to being on a majority of the
16   calls, I think you testified that they're supposed to
17   be also solving the strategic problems that results in
18   that.
19       A   Yes.
20       Q   In those outages.
21           Was David Cartez able to accomplish that, if
22   you know?
23       A   I don't know that name.
24       Q   He preceded Mr. Morin. He preceded Mike
25   Morin.

Page 823

1        A   I don't know.
2        Q   Was Mike Morin able to accomplish both of
3    those objectives?
4        A   Mike Morin was a fabulous DPE.
5        Q   We can agree on that. Now if you'd answer my
6    question.
7        A   Okay. He was able.
8        Q   Was he able to accomplish both of those
9    objectives? Was he able to do what you said the DPEs
10   were supposed to do, which was handle the strategic
11   aspect of it, make sure there were no problems, and be
12   on a majority of the calls, was Mike Morin successful
13   in accomplishing both of those objectives?
14       A   He did --
15       Q   Yes or no?
16       A   Yes.
17       Q   He was?
18       A   Yes.
19       Q   And it forced him to resign, isn't that
20   correct?
21       A   Yes.
22       Q   And did Mr. Morin have any other
23   responsibilities other than being DPE at the time he
24   was in that capacity?
25       A   No.

Page 824

1        Q   That was his job, that was it, right?
2        A   Yes.
3        Q   And you spoke with him and he told you that
4    that job was taking him from 4 in the morning until
5    late hours in the night, isn't that correct?
6        A   Yes.
7        Q   You were well aware of that?
8        A   Yes.
9        Q   At the time he resigned he made that clear to
10   you.
11       A   Yes.
12       Q   I had a bunch of questions I was going to ask
13   you about Mr. Morin, but since we can agree to that I
14   can move this along.
15           With respect to Mr. Morin, didn't you feel
16   that it was critical -- question withdrawn.
17           With respect to Mr. Morin, didn't you think
18   that it was important for IBM to keep him as an
19   employee?
20       A   Yes.
21       Q   Because actually, I think you said you need
22   his skill set.
23       A   Yes.
24       Q   And isn't it true that Mr. Zapfel also held
25   that same belief?

**A-485**

1    A   Yes.
2    Q   And that Mr. Zapfel actually held his
3  resignation, and declined to accept it initially?
4    A   Yes.
5    Q   And do you recall that after a period of time
6  Mike Morin agreed to return to work at IBM?
7    A   Yes.
8    Q   And at the time returned, did he have a
9  full-time position arranged for him?
10   A   There were several accounts that wanted Mike
11 Morin.  They knew he had left WellPoint.  So there
12 were several accounts.
13   Q   Let me try to be more clear.  At the time he
14 returned, was there a full-time position available for
15 Mr. Morin?
16   A   I believe so.
17   Q   So there was a full-time position for him, but
18 you sent him to -- or he worked on the state of Texas
19 on a part-time basis even though there was a full-time
20 position ready for him?
21   A   Yeah, I'm not -- I don't remember what he did
22 before The Hartford.
23   Q   Well, maybe I can refresh your recollection.
24 I believe there was not a full-time position available
25 for Mr. Morin, and he testified earlier that --

1         MR. FASMAN:  Your Honor, I mean, if Mr.
2  Carta's going to testify I think maybe he should swear
3  himself in.
4         THE COURT:  That's an objection, right?
5         MR. FASMAN:  It was an objection, yes.
6         THE COURT:  Sustained.
7         MR. FASMAN:  Thank you.  I'm sorry, Your
8  Honor.
9  BY MR. CARTA:
10   Q   Do you recall that Mr. Morin first came back
11 on a temporary basis and worked at the state of Texas?
12   A   I don't remember that.
13   Q   Do you recall that Mr. Morin then worked at
14 Bristol Myers Squibb for a period of time on a
15 temporary basis?
16   A   I don't remember that.
17   Q   You don't recall that.
18        And do you recall that after he held those two
19 positions there was finally a full-time position
20 available and he was able to interview and obtain a
21 position at The Hartford, do you recall that?
22        MR. FASMAN:  Objection.  Again, same
23 basis.
24        MR. CARTA:  I was asking a question,
25 asking if she recalled.

1         THE COURT:  Do you recall?
2         THE WITNESS:  I don't.
3  BY MR. CARTA:
4    Q   At some point in time Mr. Morin was indeed
5  offered the position as the DPE on The Hartford
6  account, isn't that right?
7    A   Yes.
8    Q   And do you remember the lapse of time between
9  when he resigned and when he actually took over that
10 position?
11   A   No.
12   Q   And do you recall whether Mr. Morin went
13 through a process of being vetted and interviewed by
14 The Hartford?
15   A   After he was chosen internally in IBM --
16   Q   Yes.
17   A   -- by the GTS leader, as well as the delivery
18 leader, he was then introduced to the client for
19 interviewing, but not until that selection was done by
20 IBM first.
21   Q   Okay, I understand.  So the predicate to being
22 introduced to a client is that you get the internal
23 approval first, is that right?
24   A   Yes.
25   Q   And once you got the internal approval, the

1  procedure is you then interview, you then have the
2  client introduced or presented to the client, you have
3  your employee, rather, introduced and presented to the
4  client, is that the procedure?
5    A   Yes.
6    Q   And the purpose of that procedure is so that
7  there can be -- first of all, so that the client has
8  an opportunity to accept or reject the proposed
9  employee, is that right?
10   A   Yes.
11   Q   And it also has the purpose of making sure
12 that the IBM DPE and the client are on the same page,
13 they have a full understanding of what work needs to
14 be done?
15   A   Yes.
16   Q   And what the priorities are.  They can talk
17 without e-mails and face-to-face and say this is
18 what's really important to me and this is what I can
19 do for you, is that fair?
20   A   Yes.
21   Q   And you would agree that that's an important
22 part of the process for DPE to commence their work for
23 an IBM outsourcing client?
24   A   One thing, most of that discussion on priority
25 and what the client's looking for is after they get on

Page 829

1  the account.
2      Q   But there still is the dialogue with respect
3  to what the priorities are and whether or not the
4  client is convinced that this is the right person for
5  the job, that's an important part of it, is it not?
6      A   It depends.
7      Q   Okay.  What does it depend on?
8      A   There's an interview process, and how in-depth
9  that is depends on the client.  Sometimes it's a
10 handshake, sometimes it's a very in-depth interview.
11     Q   But the client is always given an opportunity
12 to participate in that kind of a vetting process,
13 isn't that true?
14     A   Usually.
15     Q   I mean that's the standard procedure.
16 Maybe --
17     A   True.
18     Q   Ms. Collins-Smee, you don't deny that Mr.
19 Castelluccio had the title of vice president of Public
20 Sector from April 1st until June of 2007, do you?
21     A   No.  I told --
22     Q   That's fine.  And you don't deny that at that
23 time period --
24     A   I'm sorry, I might have misspoke.  I'm saying
25 he did not have the title after he was taken out of

Page 830

1  that role.  I think it was the end of February.
2      Q   He was taken out of the role of VP of Public
3  Sector in February?
4      A   That's when I told him we were going to have
5  to move him.
6      Q   It's your testimony that you told Mr.
7  Castelluccio in February that he was no longer going
8  to be VP of Public Sector?
9      A   That's what that note -- that prior note with
10 Keith Holmes talked about.
11     Q   My question was really quite different.  My
12 question had to do with how long he had the title of
13 VP of Public Sector.  And if I wasn't clear, let me
14 try to rephrase.
15         Isn't it true that Mr. Castelluccio had the
16 title of VP of Public Sector through April 1st through
17 and including June of 2007?
18     A   He may have had it in the system, the HR
19 system, but he was not acting in that role through
20 that whole time period.
21     Q   When is it your testimony that he ceased
22 acting as vice president of Public Sector?
23     A   When we put him full-time, a hundred percent
24 of the time on the WellPoint account.
25     Q   And exactly when was that?

Page 831

1      A   I think it was the end of March, after Mike
2  Morin resigned.
3      Q   So it's your testimony that Mr. Castelluccio
4  was made full-time as of April 1st on the WellPoint
5  account and relieved of all other vice president
6  responsibilities, is that your testimony?
7      A   Yes.
8      Q   So you didn't work with him on the resource
9  action after April 1st, is that your testimony?
10     A   The resource action, he had minimal
11 involvement in the resource action.
12     Q   Was the resource action involvement, that was
13 a VP responsibility, was it not?
14     A   It was my responsibility, actually.
15     Q   It was your responsibility to oversee it, but
16 the vice presidents below you all had responsibilities
17 in connection with that, did they not?
18     A   Down at the account level.  So there was many,
19 many people working on that.
20     Q   Absolutely.  And one of the people that was
21 working on it was Mr. Castelluccio, isn't that
22 correct?
23     A   His only responsibility there was to actually
24 consolidate data from his accounts.  I was running the
25 resource action across all of the areas.

Page 832

1      Q   And is it your testimony that with respect to
2  the LEAN initiative, that as vice president he had no
3  responsibilities with respect to -- question
4  withdrawn.
5          Is it your testimony that in the time frame of
6  April 1st through the end of June, that he had no
7  responsibilities with respect to the LEAN initiative?
8      A   He didn't himself, no.
9      Q   Ms. Collins-Smee, my understanding is that you
10 maintain that Mr. Liederbach had indicated to you that
11 he was not happy with Mr. Castelluccio's performance,
12 is that right?
13     A   Correct.
14     Q   And that also Keenie McDonald was also unhappy
15 with Mr. Castelluccio's performance in his role as VP
16 of Public Sector, is that right?
17     A   Correct.
18     Q   And when you assigned Mr. Castelluccio to be
19 DPE on the WellPoint account, that was Keenie
20 McDonald's account, was it not?
21     A   Yes.
22     Q   And wasn't that exactly the same account that
23 David Liederbach had complained about with respect to
24 Mr. Castelluccio?
25     A   There were many accounts that were under Mr.

Page 833

1   Castelluccio's portfolio as a VP of Public Sector.
2       Q   We can agree on that.  About 30, and I think
3   we've been there.
4       A   Okay.
5       Q   Let's go back to my question.  My question is,
6   isn't it true that Mr. Liederbach had specifically
7   complained, according to you, about Mr. Castelluccio's
8   role on WellPoint?
9       A   Yes.
10      Q   And that was the account that you assigned him
11  to?
12      A   Yes.
13      Q   And I assume -- if you can answer this yes or
14  no I'd appreciate it.  I assume you did get the e-mail
15  from Mr. Liederbach in which he said, Mr. Castelluccio
16  will implode between the pressure of being the DPE on
17  the WellPoint account, and the RA, meaning the
18  resource action; you got that e-mail, did you not?
19          MR. FASMAN:  I think, Your Honor, if Mr.
20  Carta's referring to a specific e-mail, shouldn't the
21  witness have it in front of her?
22          MR. CARTA:  If she remembers it -- if she
23  doesn't remember --
24          MR. FASMAN:  Rather than just saying you
25  got an e-mail, so that it's clear and she knows what's

Page 834

1   going on.
2           THE COURT:  Mr. Carta has the right to
3   determine the extent of her recollection, and if she
4   recalls it, you can ask her what she recalls.  If she
5   doesn't recall it, then we can slip down a little and
6   perhaps follow the procedure which you suggested, that
7   he show her a document and ask her if it refreshes her
8   recollection.  So right now at this level the question
9   is not objectionable.
10          MR. FASMAN:  All right, I'll withdraw it.
11  Thank you, Your Honor.
12          THE COURT:  Okay.  You don't have to
13  withdraw it.
14          MR. FASMAN:  I was trying to make it
15  easy.
16          THE COURT:  It was easy.
17          Do you have the question in mind, ma'am?
18          THE WITNESS:  I do.  Thank you, Your
19  Honor.  I remember the e-mail.
20  BY MR. CARTA:
21      Q   And in that e-mail Mr. Liederbach seems to be
22  under the impression that Mr. Castelluccio was
23  responsible for the resource action.  Do you recall
24  that?
25      A   I don't know why he would say that.

Page 835

1       Q   You just don't know why he would say that.
2       A   Because he -- all his team were involved in
3   the resource action as well.
4       Q   So you have no idea why Mr. Liederbach
5   indicated in his own e-mail that Mr. Castelluccio
6   would be implode under the pressure of the DPE job and
7   the RA job which you said Mr. Castelluccio had nothing
8   to do with, is that your testimony?
9       A   Yes.
10      Q   You just don't understand it.
11      A   Yes.
12      Q   Do you recall the steps leading up to your
13  2007 PCB -- Mr. Castelluccio and I have been going
14  back and forth about two years, that I can't seem to
15  get that right.  We made a bet.  I just lost my bet.
16          Do you recall the steps leading up to the 2007
17  PBC evaluation of Mr. Castelluccio?
18      A   Yes.
19      Q   And did he provide you in advance with a
20  written summary of his accomplishments?
21      A   That's part of the process.
22      Q   That's part of the process.  And it's an
23  important part of the process, wouldn't you agree?
24      A   Yes.
25      Q   And do you recall whether you read his

Page 836

1   accomplishment summary before you first spoke to him?
2       A   Yes.
3       Q   And did you?
4       A   Yes.
5       Q   You had read it?
6       A   Yes.
7       Q   He had the impression that you hadn't read it,
8   but he had read it?
9       A   Yes.
10      Q   Isn't it true that after speaking with Mr.
11  Castelluccio you requested that he further elaborate
12  on that summary of his accomplishments?
13      A   That was because he didn't agree with the
14  rating.
15      Q   Just answer my question, if you will.  Your
16  lawyer is going to have plenty of opportunity to ask
17  you follow-up questions.
18          So isn't it true that after speaking with him
19  you asked him to elaborate on his summary?
20      A   No.  He volunteered to provide additional
21  information related to his performance.
22      Q   Fair enough.  So he volunteered to do that.
23          And then you reviewed his more elaborate
24  summary, is that correct?
25      A   And we had several conversations.

Page 837

1    Q   You had several conversations?
2    A   Yes.
3    Q   How many, do you recall?
4    A   Maybe two, maybe three.
5    Q   Two or three conversations.  Is that in
6  addition to the first one?  I just want to make
7  sure --
8    A   It might be inclusive, three all together.
9    Q   I want to understand the process.  In the
10 beginning you agreed on these certain objective
11 criteria, you then formed, and then he sent you a
12 summary of his accomplishments, you had a
13 conversation, he, according to you, volunteered to
14 provide you with something more elaborate?
15   A   Yes.
16   Q   And you actually read his first evaluation,
17 and then I assume you read the more elaborate
18 evaluation --
19   A   Yes.
20   Q   -- is that right?
21       And then you had --
22   A   Discussions.
23   Q   -- two or three conversations.
24       Were there any other participants in that
25 conversation, those conversations, any other

Page 838

1  participants?  Was it just the two of you?
2    A   It was the two of us, and then I spoke to my
3  boss.
4    Q   But the conversations that you had just with
5  Mr. Castelluccio?
6    A   It was just he and I.
7    Q   Would you take a look at Exhibit 4.  It might
8  not be in that one.  Is there a 4?
9    A   It's not.
10   Q   Okay, let me get it for you.
11   A   Okay, I'm there.
12   Q   Would you turn to the back of that and tell me
13 whether or not you signed Exhibit 4?
14   A   We don't actually sign them.  It's an
15 electronic signature.
16   Q   So you didn't physically sign it, but you did
17 the E-equivalent, which means you approved it by way
18 of electronic signature?
19   A   Yes.
20   Q   And isn't it true that in that Exhibit 4 you
21 rated Mr. Castelluccio a 2, solid performer?  Yes or
22 no?
23   A   Yes.
24   Q   And isn't it true that as his direct
25 supervisor you were the one who was responsible for

Page 839

1  that determination?
2    A   There was input.
3    Q   I understand that.
4    A   Obviously.
5    Q   My question was, who was responsible for
6  making that determination?  Who had the ultimate
7  responsibility?
8    A   Yes.
9    Q   You, thank you.
10       And isn't it also true that Mr. Zapfel, your
11 boss, also signed off and affirmed that determination?
12   A   Yes.
13   Q   Directing your attention to the section titled
14 "Overall Assessment."  That's right below, I believe,
15 the rating.
16       There you go, thank you.
17       Am I correct in understanding the IBM
18 procedure that you don't have to fill out the overall
19 assessment section because that's not obligatory, is
20 that right?
21   A   I always do.  I usually do.
22   Q   You typically do, but it's not required?
23   A   No, but everyone does it.  It's not required,
24 but I've never seen one without it.
25   Q   And no one directs you what to write in there,

Page 840

1  that's your own --
2    A   Yes.
3    Q   -- text.
4        And those are words that you wrote.
5    A   Yes.
6    Q   And you completed this 2007 evaluation when?
7  Do you remember?
8    A   It was probably the end of January.  There's a
9  date, usually.  1/24.
10   Q   Am I correct that's before you had any idea
11 that Mr. Castelluccio was going to be pursuing an age
12 discrimination case against you?
13   A   Absolutely.
14   Q   Okay.  Let's look at Exhibit 89, please.  Do
15 you happen to recognize Exhibit 89?
16   A   Yes.
17   Q   This is a summary of accomplishments that Mr.
18 Castelluccio prepared to assist you in helping him
19 find a job, is that right?
20   A   Yes.
21   Q   And he provided that to you when you requested
22 it in May of 2008, is that right?
23   A   Yes.
24   Q   And by the end of June he'd been fired, is
25 that right?  He was actually fired in May and given 30

Page 841

1   days and left as of the end of June, is that a fair
2   statement?
3       A   Yes.
4       Q   Showing you Exhibit 90, and 91, please take a
5   look at that and let me know if you recognize those
6   two e-mails?
7       A   90, yes.  And you want me to look at 91?
8       Q   Yes, please.
9       A   Yes.
10      Q   Exhibit 90 appears to be an e-mail that you
11  sent to Mark Hennessy in Chicago, is that correct?
12      A   Yes.
13      Q   And you attached to that Exhibit 89, which was
14  the summary of Mr. Castelluccio's accomplishments and
15  experience.
16      A   Yes.
17      Q   And how did you know Mr. Hennessy?
18      A   Mr. Hennessy was the CIO of IBM, and he had --
19  he was not in services, he was in another area that
20  there could have been opportunities for Jim.  When I
21  met with him I had asked, "What are you doing in your
22  job search?  Have you reached out to him?"  He said
23  "No."  I said, "I will send an e-mail, get the
24  information."
25          And the same with the next one, which is Liz

Page 842

1   Smith, which was in another part of the business that
2   had a lot of technical jobs, and I thought she might
3   be able to have something in her area, and he had not
4   spoken to her either, so...
5       Q   And how well did you know Mark Hennessy, if
6   at all?
7       A   A bit.
8       Q   You knew him well enough to pick up the phone
9   and call him?
10      A   Yeah.
11      Q   And how about Liz Smith?
12      A   Liz, yes.
13      Q   You knew Liz pretty well?
14      A   Yes.
15      Q   And certainly well enough to pick up the phone
16  and call her?
17      A   I did speak to Liz about Jim.
18      Q   And did you call her before you sent your
19  e-mail, which is Exhibit 91, if you recall?
20      A   I think I called her to follow up, I'm not
21  sure, but I know we spoke about Jim.
22      Q   Am I correct that you do not have any other
23  documents, be they letters or e-mails, in which you
24  contact your peers about Mr. Castelluccio's
25  availability for work, is it these two e-mails are it,

Page 843

1   is that correct?
2       A   Yes, but this does not reflect any of, you
3   know, any phone calls or any other --
4       Q   I understand that you now claim that there
5   were other things that you did in which there's no
6   evidence.  My question is, was there any documentary
7   evidence other than these two e-mails that reflects
8   your attempts to assist Mr. Castelluccio in finding a
9   position?
10          MR. FASMAN:  I'm going to object.  Just
11  for clarity, you mean that she wrote?
12          MR. CARTA:  That she authored, yes.
13          MR. FASMAN:  Okay, I think that's fine.
14          THE WITNESS:  Not that I'm aware of.
15  BY MR. CARTA:
16      Q   Exhibit 82, please.
17      A   Excuse me?  I'm sorry, I didn't hear which one
18  you said.
19      Q   I think I'm going to come back to 82 in just a
20  moment.  May I have Exhibit 4, please.
21          Ms. Collins-Smee, I think you testified a few
22  moments ago that Mr. Castelluccio was no longer the VP
23  after April 1st, is that correct?
24      A   Yes.
25      Q   And you see in the overall assessment that you

Page 844

1   wrote, that you say, in the second half of the year,
2   "He was acting PE on the WellPoint account," do you
3   see that?
4       A   I see that.
5       Q   So which is true, what you wrote at the time,
6   that he spent half of the year as -- on WellPoint and
7   half of the year as VP of Public Sector, or what
8   you're telling the jury now?
9       A   It's what I'm telling now.  I probably
10  estimated here rather than saying as of.
11      Q   So your estimate is off by a margin of 50
12  percent.  You said he started in April, here you're
13  saying it was half a year.  Is that what you want the
14  jury to understand?
15      A   I'm saying in the end of March he went to the
16  WellPoint account, and that was his area of
17  responsibility.
18      Q   No, you said he was no longer VP of Public
19  Sector as of April 1st.
20      A   Right.
21      Q   That's not what that says.  That says he was
22  no longer VP of Public Sector halfway through the
23  year.
24      A   Right.  So I'm off by three months here.
25  Instead of specifying April.

Page 845

1    Q   Exhibit 82, please.  I'm not a hundred percent
2  clear on all the players here, so I'm going to ask you
3  some preliminary questions because I'm not sure I get
4  it, so you take your time and look that over.  I think
5  it's a couple pages of e-mails.  Maybe it's two pages.
6  Take a moment, please.  There seems to be an e-mail
7  and then there's an attachment to it.
8         Who is Constance Murphy?
9    A   I'm sorry, I'm still reading, sorry.
10   Q   Oh, sure, please.
11   A   Okay.
12   Q   Who's Constance Murphy?
13   A   Connie Murphy was the person that actually
14  pulled a lot of these slates.  She worked in HR and
15  she was in executive resources.
16   Q   And executive resources, this is an e-mail
17  that she sent to Garrett Walker, who was also in HR at
18  IBM?
19   A   Yes, Garrett was in HR.
20   Q   And this e-mail is dated May 9th, 2008, is
21  that right?
22   A   Yes.
23   Q   So we're talking about just the end of the
24  time period that Mr. Castelluccio's been on the bench
25  for five months and is about ready to be terminated,

Page 846

1  is that right?
2    A   Yes.
3    Q   And the "re" line indicates that -- in the
4  e-mail says that it's action notes from May 75-minute
5  drill, is that right?
6    A   Yes.
7    Q   And what's that a reference to?  Could you
8  just explain that to the jurors, please?
9    A   This was Bob Zapfel, who was my boss, this was
10  his 5-minute drill on open jobs and positions that
11  were available and candidates for the roles.
12   Q   And what's the phrase "action notes," what's
13  that a reference to, if you could help me understand
14  that?
15   A   I assume it's notes from the drill.
16   Q   And that's what's attached, is it not?
17   A   Yes.
18   Q   And how does that work?  Just tell me how that
19  works.  Did Connie Murphy take those notes?
20   A   Apparently.
21   Q   And does she take those notes
22  contemporaneously?  Is she there on the phone taking
23  down what people say?  Is that her job?
24   A   Notes weren't always taken, but if there was a
25  lot to discuss, she would, and a lot of follow-ups.

Page 847

1    Q   Does it appear to you from looking at the
2  attachment that that's what happened here, she was
3  taking notes at Mr. Zapfel's drill?
4    A   Yes.
5    Q   And these are the notes that she would have
6  taken during that May 7th drill of Mr. Zapfel?
7    A   Yes, I assume so.
8    Q   I see in the notes that there are initials JCS
9  appear a number of times.  Is that a reference to you?
10   A   Yes.
11   Q   Around two-thirds down the page, there are
12  notes that relates to the position of Director of
13  Network Services Integration.  Do you see that?
14   A   Yes.
15   Q   And the lead candidate for that position is
16  Anne Chen, is that correct?
17   A   Yes.
18   Q   And those participants in the drill actually
19  approve Anne Chen in the drill, isn't that right?
20   A   Yes.
21   Q   So as of that time, Anne Chen is given that
22  job, is that right?
23   A   After the drill, yes.
24   Q   But the determination is made at that drill
25  that she's going to have that job, is that right?

Page 848

1    A   It was their candidate for that drill.
2    Q   And according to Constance Murphy's notes, you
3  asked Mr. Castelluccio's name to be added to the slate of
4  candidates for that position for the record, is that
5  correct?
6    A   We had a very vigorous conversation about Jim
7  and possibly working -- taking that role.
8    Q   And you were asking that his name be put down
9  for the record.  What record are you talking about?
10   A   The record that I felt he needed to be
11  considered for this role, and we had a discussion
12  about him, and he was not chosen for the role, and I
13  had --
14   Q   And this is the record that's being maintained
15  a month before he's fired, you're having him put down
16  for the record one month before he's fired?
17   A   The point was that we had a vigorous
18  conversation that I wanted to make sure was reflected,
19  that he should be considered for that role, because he
20  had network experience.
21   Q   And in fact, the decision had already been
22  made to put Anne Chen in that position.
23   A   That's not accurate.
24   Q   You said that a moment ago.
25   A   No, excuse me.

Page 849

1    Q   I'm not going to argue with you, ma'am.
2    You've already testified that at that meeting the
3    final decision was made for Anne Chen to be chosen,
4    isn't that right?
5            MR. FASMAN:  Can my witness at least
6    finish your question?
7            MR. CARTA:  When I finish my question,
8    she can answer, when I finish my question, absolutely.
9            THE WITNESS:  So can I answer?
10           THE COURT:  You can ask your question,
11   Mr. Carta.
12           MR. CARTA:  I have finished my question.
13   I don't think I've had an answer to the question, but
14   I think I finished it.
15           THE WITNESS:  We had a discussion about
16   the candidates for the role, we had a discussion
17   amongst all the people that were on the call.  At the
18   end of that discussion it was decided that Anne Chen
19   would be selected, and that was Joe Dzaluk's decision
20   to make.  It was his area.
21   Q   So the answer is yes, Anne Chen was chosen as
22   a result of that discussion?
23   A   Yes.  As a result of.
24   Q   And it was your request that a reference be
25   put in to Mr. Castelluccio for the record, is that

Page 850

1    correct?  Connie --
2    A   We had discussed Jim, and Jim was not chosen.
3            MR. CARTA:  I have no further questions
4    of this witness.
5            THE COURT:  Have you concluded, Mr.
6    Carta?
7            MR. CARTA:  Yes.
8            MR. FASMAN:  Your Honor, some fairly
9    extensive examination of this witness.  It's 3:30.
10   Shall we take a break.
11           THE COURT:  You want to take a break?
12           MR. FASMAN:  I would think so.
13           THE COURT:  Okay, let's take a break
14   until 3:45, 15 minute break.
15           MR. FASMAN:  Thank you, Your Honor.
16   (Recess taken from 3:30 p.m. to 3:45 p.m.)
17           THE COURT:  Mr. Fasman?
18           MR. FASMAN:  Thank you, Your Honor.
19           Good afternoon, ladies and gentlemen.
20
21           CROSS-EXAMINATION BY MR. FASMAN:
22
23   Q   Ms. Collins-Smee, I have a few questions to
24   ask.
25           Let me start out by asking you an

Page 851

1    inappropriate question.  When were you born?
2    A   August 13th, 1956.
3    Q   And that makes you?
4    A   57.
5    Q   So at the time of these events, you were 50?
6    A   50.
7    Q   Where were you born?
8    A   The Bronx, in New York.
9            THE COURT:  Did you say August 15th?
10           THE WITNESS:  August 13th.
11           THE COURT:  Because I was born in August,
12   too, but not in 1956.
13   BY MR. FASMAN:
14   Q   So you were born in the Bronx.  Would you
15   describe for the jury your educational background
16   after high school, please?
17   A   I went to my bachelor's for special education,
18   and then I did a master's degree in special education,
19   at Columbia, with a focus on testing, and then I went
20   to New York University for an MBA.
21   Q   Did you work anywhere before coming to IBM?
22   A   Yes.
23   Q   Where did you work?
24   A   I worked at Flower and Fifth Avenue Hospital.
25   Q   What's that?

Page 852

1    A   It's a hospital in New York for severely
2    handicapped children.
3    Q   And where else?  Anywhere else that you
4    worked?
5    A   Yes.  Then I worked at the Kennedy Center in
6    Bridgeport, Connecticut, which was -- which is a
7    workshop setting for developmentally delayed adults.
8    Q   And how long did you work in those two jobs?
9    A   About two years in each role.
10   Q   How did you get from there to IBM in a
11   different career?
12   A   When I was doing my -- when I was at the
13   Kennedy Center, I decided I wanted to start doing
14   hospital administration or administration in a
15   facility like the Kennedy Center, so I decided to go
16   back for my master's in business administration, and
17   when I was there I used technology a lot, and fell in
18   love with basically information technology, and joined
19   IBM as an intern while I was doing my MBA.
20   Q   And when was this?
21   A   '84, the end of '84.
22   Q   And when did you join IBM not as an intern,
23   but as an employee?
24   A   I was hired as a regular in '85.
25   Q   And what was your first job?

Page 853

1     A    Customer service representative.
2     Q    And what does that mean?
3     A    It meant that I was training IBMers on using
4   PCs, which were just coming out then, and our e-mail
5   systems, which were just coming out.
6     Q    How long did you stay in that first role?
7     A    About two years.
8     Q    You were not in management at the time?
9     A    No.
10    Q    Can you give the jury a brief overview of
11  your -- the various steps of your career at IBM,
12  thereafter?
13    A    Okay. I started as a manager of the help
14  desk, which is where the trouble calls would come
15  into, but it was just for-ish, so it was internal IBM,
16  and that was what we called first line manager, so I
17  had employees reporting to me but no managers. Then I
18  had another stint as managing a network control
19  center, same thing, a group of employees, tech
20  employees, but no managers.
21         And then I moved up to middle management,
22  second line, which meant I had managers reporting to
23  me, and I did a couple of those roles across IBM in
24  technical areas, just in support of IBM, so in the
25  network area, in the programming, in customer support,

Page 854

1   in infrastructure support.
2          And then I worked on what we call an
3   engagement, which is -- this is when we had started in
4   the outsourcing business, and I worked on the first
5   very large outsourcing arrangement that we had with
6   AT&T, so it was about a two-year assignment to win the
7   deal with AT&T, and we called that an engagement, and
8   I was the delivery leader, so I was responsible for
9   the technical solution, and working with the client on
10  is this something they would want to do.
11         Once we won the deal, so this was after two
12  years, we won the deal, the client asked that I be the
13  delivery exec. So we've been talking about the DPE.
14  So I stayed at AT&T and ran that account from a
15  delivery perspective for two years. And that was
16  based in New Jersey.
17         And then I was asked to go to Australia,
18  Melbourne, Australia, where I ran the Telstra account.
19  Telstra was --
20    Q    What's Telstra? That's what I was going to
21  ask you.
22    A    I'm sorry.
23    Q    That's okay.
24    A    Telstra is a large telecommunications company
25  in Australia that serviced Australia, New Zealand, and

Page 855

1   parts of Asia, and I was responsible for the total
2   account, so that was the sales on the account, as well
3   as the delivery for infrastructure as well as
4   programming.
5          And then I came back to the states and I was
6   responsible for a new initiative that we had, which
7   was setting up our global delivery centers around the
8   world, in India, Latin America, and China. I did that
9   for about two years. And then moved to become the
10  general manager of the Industrial Sector, in Global
11  Technology Services.
12    Q    And in that position, the general manager of
13  the Industrial Sector, that's in this general area
14  that we've been talking about, I think, right?
15    A    Yes.
16    Q    Do we have that demonstrative?
17         So I hope the jury can see this. I'm not sure
18  I can, so I'm going to walk over here.
19         The Industrial Sector is on the right, the
20  bottom right of this chart, right? And this is -- do
21  you want to explain what that is?
22    A    Can I?
23    Q    Yes, of course.
24    A    Okay. So in IBM, if you look at the boxes
25  that come out under it, we sell services, we sell

Page 856

1   hardware and software, but our discussions are all
2   related to services, so we'll go a little further down
3   there, on the section. The breakaway to the right,
4   Global Business Services, is all consulting services,
5   and software development services.
6          We're not talking about that right now, we're
7   talking about Global Technology Services, which is the
8   other breakaway, which is basically infrastructure
9   support for clients, running data centers, running
10  networks, help desks, anything to do with the systems
11  for large Fortune 500 and Public Sector accounts.
12         And then we're organized into -- within Global
13  Technology Services, there's salesmen and women,
14  there's also delivery teams. So Global Technology
15  Delivery was the area that I had responsibilities in
16  the Americas. And we're all organized by sectors,
17  which are represented at the bottom here.
18    Q    When you were the general manager of the
19  Industrial Sector, you were in the GTS side, right?
20    A    Yes.
21    Q    In the sales side?
22    A    In the sales, yes.
23    Q    And that's the side that -- so the jury
24  understands, that's the side that Mr. Liederbach was
25  in?

Page 857

1    A  Yes.  He was a peer of mine.
2    Q  But he was not industrial, he was on the --
3    A  He was public.
4    Q  And then what happened, after you served --
5  how long did you serve as the general manager of the
6  Industrial Sector?
7    A  About two years.
8    Q  And what happened, where did you go then?
9    A  I was told my new role was running delivery
10  for all of the sectors for the Americas.
11    Q  And this was the role that -- where you became
12  involved in supervising Mr. Castelluccio, right?
13    A  Yes.
14    Q  And how long did you serve in that role?
15    A  About four years.
16    Q  And where are you now?
17    A  Now I'm in Global Business Services, which is
18  the consulting side of the house.
19    Q  And what is your job now?
20    A  My job is I'm the general manager of globally
21  integrated capabilities, which is a mouthful.
22    Q  What does that mean?
23    A  It means I'm responsible for our software
24  delivery centers around the world that do application
25  development, support, maintenance, new installations

Page 858

1  related to software development and application
2  development.
3    Q  How many people overall are in that area?
4    A  That are in my team?
5    Q  In your area.
6    A  90,000.
7    Q  And when you were the general manager of ITD
8  Americas, how many people, roughly, were there in this
9  whole area?
10    A  Do you mean reporting to me?
11    Q  Yes.
12    A  About 20,000.
13    Q  And is it fair to say you had overall in the
14  Americas, Canada and the United States, you had
15  overall supervision of all the contracts?
16    A  Yes.
17    Q  Delivery on all the outsourcing contracts?
18    A  Yes.
19    Q  I'm going to ask you a few questions about
20  when you were the general manager of the Industrial
21  Sector, before you went to become the general manager
22  of ITD Americas.  Were you a vice president at that
23  time?
24    A  No, I was a general manager.
25    Q  And who did you report to?

Page 859

1    A  To Bob Zapfel.
2    Q  And who was Mr. Zapfel?  Well, Mr. Zapfel
3  we've heard about, but what was his position?
4    A  His position at that point was the head of
5  Global Technology Services America, which was all of
6  the sales teams responsible for all the accounts.
7    Q  So all of the sectors on the bottom of that
8  chart?
9    A  All of the sectors.
10    Q  And how many accounts did you deal with?
11    A  In the Industrial Sector I had 30 to 50.
12    Q  And what kinds of companies were they?
13    A  They were big auto, manufacturing, clients.
14  So you'd think about your major companies and
15  industrial manufacturing companies, they were our
16  clients.
17    Q  And what was your role with these companies?
18    A  I spent -- my responsibility was overall
19  satisfaction of the outsourcing services we were
20  providing for those clients.  I was responsible also
21  for making sure that our teams were providing the
22  right level of service to those clients and that they
23  were pleased with what IBM was providing.  I was also
24  responsible for all of the profit and loss and revenue
25  on those accounts.

Page 860

1    Q  Now, in that position did you have any
2  interaction with the delivery side of the house?
3    A  Oh, yes.
4    Q  Tell us about the nature of that interaction.
5    A  Well, the delivery teams were providing
6  services to us for our clients in that sector, so when
7  we had major milestones, projects on accounts, I would
8  be involved, or if there were problems, I would be
9  involved.
10    Q  Who is Kelton Jones?
11    A  He was my predecessor in the delivery role in
12  the Americas.
13    Q  Did he have a role -- when you were in the
14  Industrial Sector, did he have a role in delivery?
15    A  He was -- he led delivery for me.
16    Q  Now, during the time you were in the
17  Industrial Sector did you have any dealings with him?
18    A  Yes.
19    Q  What types of dealings, how frequent, what
20  were they?
21    A  It depended on the situation.  If we had
22  problems, I talked to him very regularly regarding
23  remediating problems.
24    Q  You were a consumer of services?
25    A  Yes.

Page 861

1    Q    And were you, generally speaking, were you
2  satisfied with the delivery services you were getting?
3    A    No.
4    Q    Why not?
5    A    Because we had significant outages for
6  clients, we had data retention issues, and our
7  clients, some of our clients were unhappy with us.
8    Q    How would you characterize your business
9  relationship with Mr. Jones?
10    A    It was -- we were -- when we spoke, we usually
11  had issues that we were grappling with.
12    Q    All right, let's leave it there.
13        You ended up replacing him, then?
14    A    Yes.
15    Q    And how did that come about?
16    A    My boss told me I had a new job.
17    Q    Who's your boss?
18    A    Starting the next day, Robert Zapfel.
19    Q    You said starting the next day?
20    A    Yes.
21    Q    So this would have been in the end of January,
22  2007?
23    A    Yes.
24    Q    Was this a promotion for you?
25    A    No, it was lateral.

Page 862

1    Q    Did you know someone named Tony Macina at IBM?
2    A    Yes.
3    Q    Who was he?
4    A    He was Kelton's boss, so he ran delivery for
5  worldwide.
6    Q    I see.  And he was replaced about the same
7  time, right?
8    A    Same day.
9    Q    Same day?
10    A    Yes.
11    Q    And who replaced him?
12    A    My old boss, Bob Zapfel.
13    Q    So it was you and Zapfel in for Macina and
14  Jones?
15    A    Yes.
16    Q    Did Mr. Macina or Mr. Jones remain at IBM when
17  you and Mr. Zapfel replaced them?
18    A    A short period of time, maybe a month or so, I
19  would assume.  I don't know.
20    Q    Now, the internal clients, then you became --
21  you were in charge of the delivery, to the various
22  sectors, right?
23    A    Yes.
24    Q    You went from being a client to a deliverer,
25  or a service provider?

Page 863

1    A    Yes.
2    Q    How many people reported to you as general
3  manager of ITD Americas, direct reports?
4    A    Direct, between ten and 20.  I'm not certain
5  exactly how many.
6    Q    All right.  And I think you've already talked
7  about how many indirectly.
8        When you came on board at ITD, in your new
9  role, did you have any understanding about making
10  changes in the organization?
11    A    Yes.
12    Q    What understanding did you have and where did
13  you get it?
14    A    Mike Daniels, who ran Global Technology
15  Services for the corporation, was very clear with me
16  and with Bob Zapfel that we were to be focused on our
17  clients.
18        MR. CARTA:  Objection, Your Honor.
19        THE COURT:  There's an objection, Mr.
20  Carta?
21        MR. CARTA:  She's taking about what
22  someone else told her.  Hearsay.  She's testifying
23  about apparently what Mr. Daniels told her.
24        THE COURT:  Are you offering it for
25  hearsay use, or is it just --

Page 864

1        MR. FASMAN:  Maybe I'll rephrase it.
2  BY MR. FASMAN:
3    Q    What was your understanding, not what he told
4  you, but what was your understanding?
5    A    That we were to become much more client
6  focused, and responsive to our client needs.
7    Q    And what did you understand that to mean?
8    A    It meant we had to provide better service to
9  our client, be much more responsive, visible.
10    Q    And you mean on the delivery side?
11    A    Yes.
12    Q    Prior to that time what was going on in
13  delivery, why change that?
14    A    Delivery had been more focused on what I'll
15  call back room, that they would not necessarily be --
16  feel that their responsibilities were to the clients,
17  rather to technology.
18    Q    So how would that have changed or related to
19  how someone like Mr. Castelluccio would do his job?
20    A    Well, before we came I think there was a
21  recognition that if you, you know, if you worked hard,
22  that was okay, not necessarily getting the results
23  that the clients needed, and we were focused on we
24  need to make sure that we're doing everything humanly
25  possible to satisfy the clients.

Page 865

1    Q   Mr. Carta asked you about your deposition, and
2  he asked you, I think, why you know what you know now
3  as opposed to when you were deposed.  Did you refresh
4  your recollection?
5    A   I did.  I've read all of the exhibits since
6  the deposition.
7    Q   And you have a different recollection now than
8  you did then?
9    A   Yes.
10   Q   Let me ask you, when you first met with Mr.
11 Castelluccio after you took over as general manager of
12 ITD Americas, when was that?
13   A   It was the first week, I want to say maybe the
14 second week of February, so February 11th, that week.
15   Q   And what did you meet about?
16   A   WellPoint.
17   Q   Let me ask you -- ask my -- Ms. Gutierrez to
18 put up Defendant's Exhibit 27, if I might.
19       This is an e-mail from you to Mr.
20 Castelluccio, and who's Lorraine Serra?
21   A   She was my assistant at that time.
22   Q   And what date is this?
23   A   February 12th.
24   Q   And I think I've already said that that was a
25 Monday.

Page 866

1        What time did you send this?
2    A   3 a.m., 3:06.
3    Q   Middle of the night e-mail?
4    A   Yes.
5    Q   Is that your method of doing business?
6    A   Well, it was a busy time.
7    Q   And why did you want to meet with Mr.
8  Castelluccio about WellPoint?
9    A   Because I was alerted to a situation that we
10 had on the account that was a very significant
11 situation, and I wanted to get with Jim to understand
12 what was going on the account.
13   Q   So did you meet with him this day or another
14 day?
15   A   We met another day that week.
16   Q   Do you remember where you met?
17   A   My office.
18   Q   Do you remember who was present?
19   A   Just Jim and myself.
20   Q   And I think you said you discussed WellPoint
21 with him?
22   A   Yes.
23   Q   As you know, Mr. Castelluccio claims that
24 during the very first meeting you had with him, your
25 first words to him were "How old."  Did you say that

Page 867

1  to him?
2    A   Absolutely not.
3    Q   Did you ask Mr. Castelluccio how old he was in
4  that meeting at all?
5    A   Never.
6    Q   Did you ever at any subsequent conversation
7  ask Mr. Castelluccio how old he was?
8    A   Never.
9    Q   Did you care?
10   A   Absolutely not.
11   Q   Did you mention retirement to him in that
12 meeting?
13   A   Absolutely not.
14   Q   Did you ever ask any other employee at IBM how
15 old they are?
16   A   Never.
17   Q   Did you ask Mr. Castelluccio at any time how
18 old Ken Wisse was?
19   A   Never.
20   Q   Did you ever mention Mr. Wisse's possible
21 retirement to Mr. Castelluccio?
22   A   No.
23   Q   Do you have a view as to whether it's
24 appropriate for -- to ask an employee's age under IBM
25 policy?

Page 868

1    A   It's completely inappropriate.
2    Q   Is it possible you asked him how old he was
3  and you just forgot?
4    A   No.
5    Q   How many people have you directly managed at
6  IBM in your career?
7    A   Since I've been in management, 28 years, 600,
8  700 people directly.
9    Q   Have you ever asked any of them how old they
10 were?
11   A   Never.
12   Q   Have you ever been accused of employment
13 discrimination?
14   A   Never.
15   Q   Now, before you assumed the role as general
16 manager of ITD Americas, did you know Mr.
17 Castelluccio?
18   A   I knew his name.
19   Q   Had you worked with him before?
20   A   No.
21   Q   When you took over in the general manager
22 position, did you speak with anyone about Mr.
23 Castelluccio's performance?
24   A   Before I took over?
25   Q   When you took over, I believe is what I meant

Page 869

1    to say, if I didn't.
2        A    When I took over I got -- yes, several.
3        Q    Who did you speak to?
4        A    Dave Liederbach contacted me, and Keenie
5    McDonald contacted me.
6        Q    Let's talk about Mr. Liederbach first. When
7    did you first speak with Mr. Liederbach about Mr.
8    Castelluccio?
9        A    He might have called the day I was announced.
10       Q    Did he reach out to you or you --
11       A    Yes.
12       Q    -- to him?
13       A    He reached out to me.
14       Q    Can you tell the jury as best you can recall
15   what your initial discussion with Mr. Liederbach was
16   about?
17       A    Dave Liederbach had told me that he was very
18   unhappy with Jim Castelluccio's performance, and that
19   he was not exerting leadership, that he was
20   unresponsive, that he didn't answer e-mails, he didn't
21   return phone calls, and that there were client
22   complaints, and that his direct reports -- that Dave
23   had a lot of complaints from his direct reports, and
24   that he had been talking to my predecessor, Kelton
25   Jones, about this for quite a while, months and

Page 870

1    months, and Kelton had not done anything substantive.
2        Q    Did he send you any documents?
3        A    Yes, he did.
4        Q    Let's take a look at Defendant's Exhibit 28,
5    please, to start. This is from Mr. Liederbach to you
6    on the 11th of February, right?
7        A    Yes.
8        Q    And 8:01 p.m. Can you read the highlighted
9    part?
10       A    Dave sent it to me, and says, "In the short
11   term I would appreciate your help getting an executive
12   transition manager on WellPoint. It has been open for
13   months, and in the interest of straight talk, Jim
14   Castelluccio and Kelton have not come up with a
15   qualified candidate."
16       Q    What's an executive transition manager?
17       A    On accounts you have lots of IT projects when
18   you're transitioning an account into IBM, a lot of big
19   complicated technology programs, like moving data
20   centers or installing new hardware, something like
21   that, so the transition manager would lead those
22   projects.
23       Q    And is this a significant position?
24       A    Yes.
25       Q    Now, you say in the top -- what did you

Page 871

1    respond to him?
2        A    I responded, "Of course, we will discuss
3    tomorrow. Lorraine --" who is my assistant "-- can
4    you please work with Cathy --" who is his
5    assistant "-- to get us together in the a.m."
6        Q    Okay. Now, did you meet with Mr. Liederbach
7    to discuss these issues?
8        A    Yes.
9        Q    Did you meet -- did you discuss these issues
10   with him on the telephone as well?
11       A    I don't know if this meeting was on the phone
12   or in person. He actually sat down the hall from me.
13       Q    And you had worked with him in the past?
14       A    Yes. He was a peer when I was the general
15   manager of the Industrial Sector.
16       Q    Let's take a look -- if we can turn over to
17   Defendant's Exhibit 29, please.
18           So Defendant's Exhibit 29, can you tell us
19   what it is, please?
20       A    Can you give me one minute?
21       Q    Of course.
22       A    So do you want me to start at the beginning
23   with the note?
24       Q    I want you to tell me what it is, first.
25       A    So it's problems that were occurring in the

Page 872

1    Public Sector area, some of which predated me, the
2    notes.
3        Q    This is an e-mail you received from Mr.
4    Liederbach?
5        A    Yes.
6        Q    And if you would read the highlighted portion.
7    Do you see that?
8        A    This is from Dave to me, and it was on
9    February 13th -- this was an e-mail from Dave to me on
10   February 13th. "Joanne, the attached note and the
11   other item re-escalated in the WellPoint note from
12   Keenie are examples of where Jim does not respond or
13   lead. I would like to quickly make a change."
14       Q    All right. Now, if you'd turn to -- below
15   that is a -- is his note to Mr. Jones, right?
16       A    Yes.
17       Q    What's the date on that?
18       A    That is May 9th, 2006.
19       Q    And if you turn the page, you'll see another
20   note from Mr. Liederbach to Mr. Jones as well, saying
21   "Do not forward," correct?
22       A    Yes.
23       Q    And I think the ladies and gentlemen of the
24   jury have seen this already, but this is dated --
25   what's the date on this?

Page 873

1    A   This is dated April 30th, 2006.
2    Q   And this is Mr. Liederbach to Mr. Jones?
3    A   Yes.
4    Q   And saying what?
5    A   Saying, "Kelton, the attached is one of a
6   stream of notes that I get from my executives with
7   concerns on responsiveness on follow-up from Jim.  I'm
8   experiencing the same issues, be them e-mails or calls
9   to his cell.  I've raised this to Jim's attention in
10  the recent past."
11   Q   Then keep going.
12   A   "I believe we need to consider an immediate
13  change in his execution or a change in leadership."
14   Q   Now, if you track backwards two pages to
15  pages -- well, the page I have is the one that's
16  marked 96131.
17   A   Yes.
18   Q   And I think we've got it on the screen.
19      The bottom note is from Mr. Fernandez to Mr.
20  Castelluccio, right?
21   A   Yes.
22   Q   And what does he say?
23   A   This is in September of '06.  He's saying,
24  "Jim, we need your personal involvement to address the
25  cost and service delivery issues at WellPoint."

Page 874

1    Q   And what's the one -- the e-mail immediately
2   above in the highlighted portion?
3    A   It is from Luis Fernandez to Dave Liederbach
4   saying -- and this is now February 13th, '07.  "Dave,
5   please see my note from September to Jim Castelluccio.
6   I sent this note plus several follow-on notes and
7   phone calls.  No action was taken.  We've discussed
8   this problem previously."
9    Q   All right.  Were you aware that, when you took
10  over the position, that Mr. Liederbach had asked for a
11  change from Mr. Jones?
12   A   Not until Jim -- or Dave called me right after
13  I was announced.
14   Q   What was your reaction when you read this?
15   A   I was shocked.
16   Q   Why?
17   A   That an executive doesn't respond to notes or
18  phone calls, and doesn't answer concerns related to
19  his accounts.
20   Q   Was that acceptable to you?
21   A   No.
22   Q   Mr. Liederbach, did you and he discuss this
23  e-mail after he sent it to you?
24   A   I'm not sure about this exact e-mail, but he
25  had sent several.

Page 875

1    Q   All right, let's look.  There's at least --
2   there's at least one more.  Let's try Defendant's
3   Exhibit 34, please.
4       So this is about what, Ms. Collins-Smee?
5    A   This is now February 21, Dave sending a note
6   to me, "The attached note -- Joanne, the attached note
7   outlines required leadership change that has been
8   escalating and agreed to by Jim but not executed, and
9   now again has raised -- been raised by the client."
10   Q   And this is, if you look backwards, this is
11  with regard to whom?
12   A   It's regarding one of the clients at Anthem
13  wanted an employee, Joe Carrubba removed, and that had
14  not been done.
15   Q   Take a look at the second page in the
16  highlighted portion that I'd like to put on the
17  screen, that's up there.
18      This is an e-mail from John Shimkus.  Who is
19  John Shimkus?
20   A   John Shimkus was a vice president that
21  reported to Dave.
22   Q   And did he have a role at WellPoint?
23   A   Yes.  He was one of the two vice president
24  project executives that they had on WellPoint.
25   Q   And who was the other?

Page 876

1    A   The other was Luis Fernandez.
2    Q   And this in the highlighted -- read the
3   highlighted portion for the jury, if you wouldn't
4   mind.
5    A   "Dave, I need your help in getting --" this,
6   I'm sorry, was on February 21.  "Dave, I need your
7   help in getting Joe Carrubba moved off the account.
8   See attached e-mail from the client.  Keenie, Luis and
9   I have made this demand to Jim Castelluccio and Mike
10  Morin for months.  Jim, Mike, Luis and I met in
11  Orlando on January 10th and Jim agreed to make the
12  change.  Nothing has happened.  Luis and I just got
13  off a call this afternoon initiated by the customer
14  where they expressed the need to move Joe."
15   Q   Now, when a customer expresses a need to move
16  a resource, what is IBM's usual practice?
17   A   We discuss it with the client, and we would
18  adhere to the client's wishes.
19   Q   Let me ask you then to turn over -- or let me
20  ask Jean-Marie, would you put up Defendant's Exhibit
21  40.
22      Do you have that?
23   A   Yes, I do.
24   Q   This is how much later?
25   A   Weeks later, several weeks later.

Page 877

1    Q   And Mr. Carrubba is still hanging around?
2    A   Yes.  I sent a note to Jim, "Where are we with
3  the Carrubba replacement?  Dave is very concerned it's
4  not been done.  We need to get a replacement for him
5  ASAP."
6    Q   Did he eventually get replaced?
7    A   Eventually.
8    Q   How much later?
9    A   I think it was another few weeks.
10   Q   Okay.  Was that type of thing concerning to
11 you?
12   A   Yes.
13   Q   Why?
14   A   Because it was very upsetting to the client,
15 and it looks like we were disregarding their request.
16 We were disregarding their request.
17   Q   Now, did you discuss these issues with Mr.
18 Liederbach during your first month?
19   A   Yes.
20   Q   How many times?
21   A   Lots.
22   Q   What do you mean by "lots"?
23   A   20.  He sat down the hall.  He called a lot,
24 yes.
25   Q   Did you ever discuss any of these issues with

Page 878

1  Mr. Castelluccio?
2    A   Yes, lots.
3    Q   What do you mean by "lots" there?
4    A   Jim also sat down the hall.
5    Q   You manage by sending e-mails?
6    A   No.  I manage by walking around.
7    Q   And if there was an issue, if there was an
8  issue would it be -- and you were in the office, would
9  it be your practice to walk down the hall?
10   A   Absolutely.
11   Q   And was that the case throughout your service
12 as general manager of ITD Americas?
13   A   Absolutely.
14   Q   Now, you mentioned that you also spoke with
15 Keenie McDonald, right?
16   A   Yes.
17   Q   Before you assumed the position as general
18 manager of ITD Americas, did you know Keenie McDonald?
19   A   No.  I knew her name.
20   Q   And what was -- when you did take on this
21 role, what was your business relationship with her?
22   A   Do you want me to discuss Keenie's role?
23   Q   Yeah, sure.
24   A   So Keenie was the managing director at
25 WellPoint.  The top 30 accounts at IBM, they're our

Page 879

1  biggest clients, have a very senior IBMer called the
2  managing director, and those people are responsible
3  for hardware, software and services for that client.
4  So Keenie McDonald was the managing director on the
5  WellPoint account.
6    Q   And when Mr. Castelluccio was in the vice
7  president of the Public Sector division role, would he
8  have had any contact or business relationship with Ms.
9  McDonald?
10   A   Yes.
11   Q   What would that have been?
12   A   Well, his people were supporting the WellPoint
13 account, so it was one of the accounts in his
14 portfolio.
15   Q   Now, you mentioned you spoke to Ms. McDonald
16 during that first month you were on the job.  Did she
17 reach out to you or was it vice versa?
18   A   Oh, she reached out to me.
19   Q   And when was the first time she did that?
20   A   She also was immediately after I was
21 announced, I heard from Keenie.
22   Q   And did she send you any e-mails?
23   A   Yes.
24   Q   Jean-Marie, can you put number 32 up, please.
25     Now, these are e-mails.  What's the date on

Page 880

1  these?
2    A   Keenie sent the mail on 2/16, and I responded
3  the same day, February 16th.
4    Q   February 16th.  And read the highlighted
5  portion of Ms. McDonald's e-mail to you.
6    A   "Joanne, forgive me for copying you on so many
7  e-mails.  I'm doing it because Jim Castelluccio and
8  our delivery team have a track record of not executing
9  even when they commit to do it.  I'm looking forward
10 to not feeling like I have to follow up with them on
11 almost every single detail and not copying you.
12 Thanks again for your help."
13   Q   And on top you say -- what's your response to
14 her?
15   A   I say, "Keenie, I am just as frustrated as you
16 are right now.  I'm seeing your concern in spades.  I
17 wish I could turn this around immediately, but I have
18 a huge ship to turn.
19   Q   So this was the middle of the month, February
20 16th, right?
21   A   Yes.
22   Q   You didn't replace -- you didn't decide to
23 replace Mr. Castelluccio until the end of the month.
24   A   Yes.
25   Q   Why did you wait?

Page 881

1    A   I told both Keenie and Dave Liederbach, I
2    needed a month to assess for myself what Jim was doing
3    and what he wasn't doing before I would make a big
4    change like that.
5    Q   And you ultimately did at the end of the
6    month?
7    A   Yes.
8    Q   Why did you make that decision?
9    A   Because I was having difficulties with him,
10   and he was not exerting leadership. He was not
11   responding to me, and --
12   Q   What do you mean, he wasn't responding to you?
13   A   He would not return phone calls. He would be
14   very delayed in his response on e-mails. He was not
15   exerting leadership with the team.
16   Q   What difference does it make if he's a day
17   late or two days late on returning a phone call?
18   A   We are very focused in IBM on being
19   responsive, being responsive to our clients first and
20   foremost, but respectfully to your colleagues as well.
21   Q   And if you don't want to answer an e-mail for
22   a couple of days, is that a problem?
23   A   Yes.
24   Q   Why?
25   A   Because someone needs an answer to something.

Page 882

1    That's why they sent you an e-mail.
2    Q   So you decided to replace him, right?
3    A   Yes.
4    Q   Let's take a look at an exhibit we've already
5    seen, but if you put up again, Defendant's Exhibit 36,
6    please.
7        Do you recognize that?
8    A   Yes.
9    Q   That's an e-mail from you to Keith Holmes?
10   A   Yes.
11   Q   And I think you've already testified that
12   Keith was your human resources partner?
13   A   Yes.
14   Q   Why did you send the document to him?
15   A   To tell Keith that we were replacing Jim
16   Castelluccio, that Dave requested it, Kelton took no
17   action, we were doing it, and that I spoke to Jim
18   Castelluccio that day, that he understands, he also
19   wants to move, he knew for a while it was not working.
20   Q   Now, did you, in fact, meet with Mr.
21   Castelluccio that day?
22   A   Yes.
23   Q   Where did you meet with him?
24   A   My office.
25   Q   And what did you say to him and what did he

Page 883

1    say to you?
2    A   I said, "Jim, we've had constant complaints
3    and issues since I walked in the door here. We are
4    going to have to make a change." And his response
5    was, "Yes, I knew it was difficult, it's not been
6    working out." Basically he knew it was coming.
7    Q   Had you talked -- spoken to him about these
8    issues prior that time?
9    A   Absolutely.
10   Q   During the first month you were there?
11   A   Absolutely.
12   Q   What did you say to him?
13   A   Any time I got an e-mail or a phone call, I
14   would track him down to say what's going on, what are
15   we doing about this.
16   Q   Now, are you absolutely certain you spoke to
17   him that day?
18   A   Absolutely.
19   Q   And you're absolutely certain that he said
20   what's reflected here?
21   A   Yes.
22   Q   Now, you asked Mr. Holmes to pull a slate for
23   Jim's replacement.
24   Q   And we've already heard that Miguel Echavarria

Page 884

1    was ultimately selected --
2    A   Yes.
3    Q   -- for his replacement. And that is
4    Defendant's Exhibit 44, please.
5        This is about a month later.
6    A   Yes.
7    Q   I think the highlighted portion the jury's
8    already seen.
9        Why was Mr. Echavarria selected?
10   A   He was -- had an excellent track record as the
11   DPE on the AT&T account. He was highly technical, had
12   great client focused skills, and was accepted by Dave
13   and Bob Zapfel.
14   Q   And when did he take over?
15   A   He came into the position beginning of June.
16   Q   Now, going back to the prior e-mail,
17   Defendant's Exhibit 36, you talk about getting Mr.
18   Castelluccio on Pat Kerin's 5-minute drill, and you
19   testified about that with regard to Mr. Carta --
20   A   Yes.
21   Q   -- a few minutes ago.
22       Why did you want to put him on Pat Kerin's
23   drill?
24   A   Because I thought there may be some potential
25   roles as a project executive.

Page 885

1    Q   How does somebody get placed on a drill, other
2  than your drill?  If you wanted to put somebody on Pat
3  Kerin's drill, how do you go about doing that?
4    A   I would ask HR to have him included.
5    Q   And who's HR for you?
6    A   Keith Holmes was HR for me.
7    Q   Now, did you -- at the time did you
8  participate in Pat Kerin's drills?
9    A   No.
10   Q   Did you have the authority to demand that
11 somebody be placed on Pat's drill?
12   A   No.
13   Q   Mr. Carta said that -- or asked you why you
14 followed up with Mr. Holmes about the open position,
15 that is vice president of the Public Sector, not being
16 on Zapfel's drill, but you didn't follow up on Pat
17 Kerin's drill.  Why was that?
18   A   Because we needed to get that position filled
19 imminently, the VP of Public Sector.
20   Q   Why didn't you follow up on the Kerin drill to
21 see if Jim was on it?
22   A   I assumed he was.
23   Q   And you assumed Mr. Holmes had handled that?
24   A   Yes.
25   Q   And you were not on the drill, right?

Page 886

1    A   No.
2    Q   During your discussions with Mr. Castelluccio
3  about moving out of the vice president Public Sector
4  VP PSD on the 28th of February, did you discuss his
5  age?
6    A   Never.
7    Q   Did you mention his age?
8    A   No.
9    Q   Did you mention anything about retirement?
10   A   No.
11   Q   Did you tell him he could bridge to
12 retirement?
13   A   No.
14   Q   Did any of that ever come up in this
15 conversation?
16   A   No.
17   Q   Did he say he thought you were doing this
18 because of his age?
19   A   No.
20   Q   Let's go to Exhibit 44, please.
21       What is Exhibit Number 44, please?
22   A   This is telling Keith Holmes, our director of
23 HR, that Dave Liederbach and I have agreed on the
24 candidate for the delivery VP of Public Sector, that
25 it would be Miguel, and I was asking that it was put

Page 887

1  on Bob Zapfel's drill to get Bob Zapfel's approval.
2    Q   Why did he have to go on that, on Zapfel's
3  drill?
4    A   Because I can't put someone in the role with
5  just my authority.  I needed my boss's authority, Bob
6  Zapfel.
7    Q   I should ask, did Mr. Zapfel know that you
8  were removing Mr. Castelluccio as vice president of
9  the Public Sector?
10   A   Absolutely.
11   Q   Did you discuss it with him?
12   A   Yes.
13   Q   How many times?
14   A   Several.
15   Q   And what was his -- what were his -- what was
16 his position, not his comments to you?
17   A   That he agreed.
18   Q   I think is jury's already seen this, but
19 you're talking then because Mr. Morin had resigned as
20 the DPE at WellPoint, you're talking about a backfill
21 for him?
22   A   Yes.
23   Q   And it was supposed to be Ken Weiss, right?
24   A   Yes.
25   Q   What happened to Mr. Weiss's candidacy?

Page 888

1    A   The client did not accept him.
2    Q   So let's go over the next one in sequence.
3  Well, let me -- before going there, because Mr. Morin
4  testified today, he testified that you were very
5  supportive of his coming back or staying at IBM, I
6  guess, is that correct?
7    A   Yes.
8    Q   Why?
9    A   Because he was a phenomenal employee.
10   Q   Why was he phenomenal?
11   A   He was completely client focused, he was a
12 great leader to the team, he was passionate about
13 doing the right thing for the client.  He was an
14 incredible IBMer.
15   Q   And when you reached out to him, did you know
16 how old he was?
17   A   No.
18   Q   He did say that he was in his mid-fifties.
19 Did that make any difference to you?
20   A   No.
21   Q   Okay.  Let's go now to number 45, please.
22       What is this?
23   A   So this is March 31, a note from me to Jim
24 Castelluccio and Dave Liederbach.  "Dave/Jim, as we
25 discussed, Jim must move to WellPoint as of Monday.

57 (Pages 885 to 888)

Page 889

1  We need him to be the acting DPE 100 percent of the
2  time until we put the new WellPoint DPE in on April
3  16th."
4      That was when I assumed Ken Weiss was going to
5  get the role.
6      Q   This says -- the note says "As we discussed."
7  Who did you discuss this with?
8      A   Both Dave and Jim.
9      Q   What did you mean by "acting DPE 100 percent
10 of the time"?
11     A   It meant he was taking that, and I was taking
12 the rest of anything that would come out from the
13 Public Sector. Dave Liederbach and his PEs understood
14 that Jim was to be a hundred percent on WellPoint, so
15 they would either direct issues to me that were on the
16 rest of the portfolio, or handle them themselves.
17     Q   And did you have that discussion with Mr.
18 Castelluccio?
19     A   Um-hmm.
20     Q   You did?
21     A   Yes.
22     Q   When?
23     A   When I asked him to move into this role,
24 because we needed him to go there.
25     Q   Well, you had had concerns with him.

Page 890

1      A   Yes.
2      Q   Why put him in a role like this? You knew
3  this was a tough role.
4      A   Yes.
5      Q   Why did you put him in there?
6      A   Because I felt with a much narrower scope,
7  that the vice president of Public Sector was a large
8  scope, with many accounts, and I felt that if we
9  narrowed his focus to only one account, that he would
10 be much more successful than he had been in the VP of
11 Public Sector.
12     In addition, he knew a tremendous amount about
13 the WellPoint account because it was in his portfolio,
14 so he should have been able to shine in terms of total
15 focus on that one account. That was my reasoning and
16 rationale. And Dave and Keenie agreed with that.
17     Q   I was going to ask you, did you discuss that
18 with Mr. Liederbach?
19     A   Yes.
20     Q   And Ms. McDonald?
21     A   Yes.
22     Q   And they both agreed with that?
23     A   Yes.
24     Q   At the time you made this decision, were you
25 aware that Mr. Castelluccio had worked on troubled

Page 891

1  accounts?
2      A   Oh, yes. I mean to get to a vice president in
3  delivery, you've worked on many troubled accounts
4  through your career.
5      Q   When you assigned him to this project, or this
6  position, did he tell you that it was just too hard
7  for him?
8      A   No.
9      Q   That he thought you were being unfair by
10 asking him to step into the position?
11     A   No.
12     Q   Now, Mr. Castelluccio's testified that he had
13 full responsibility for the vice president of the
14 Public Sector division at the same time he had the
15 WellPoint account. Is that true?
16     A   No.
17     Q   Why not?
18     A   Because he did not have any of those
19 responsibilities.
20     Q   And did you tell him that?
21     A   Yes.
22     Q   So how would this work? There are 30
23 contracts in the Public Sector. How does this work?
24 If he's not there supervising the delivery, who does
25 it?

Page 892

1      A   So there's lots of -- there's a delivery
2  leader on every single account, and there's a Dave
3  Liederbach, project executive, on every single
4  account, so they were handling things, bringing things
5  to Dave's attention, or mine if it required it, in
6  that time period.
7      Q   I see.
8      To your knowledge, what work did Mr.
9  Castelluccio do as the vice president of the Public
10 Sector once you shifted him to the WellPoint account?
11     A   The only responsibility he had was related to
12 consolidating data that would have been done at the
13 account level, to give to me as we were running the
14 resource action.
15     Q   Well, let's talk -- before we go to the
16 resource action, tell the jury what the LEAN
17 initiative was. What are we talking about there?
18     A   LEAN was an initiative we were running
19 worldwide across all our accounts, and it was
20 basically a --
21     Q   Can you talk into the microphone?
22     A   Sorry. It was a technology efficiency study,
23 and it was done -- we had outside experts come in to
24 look at how we would actually get better performance
25 for our services, and they look at more efficient ways

Page 893

1  to do work, and have less outages.  If we had to do
2  something for a client, if it took five days, we
3  wanted to be able to do it in four.
4      So it was an overall efficiency plan, and it
5  was called LEAN, and we had a group of experts at the
6  worldwide level, and I had a group at the Americas
7  level, that were called black belts, and they would
8  come in and basically LEAN out -- we called it an
9  account.  They'd put in new processes and really help
10  try to find productivity.
11  Q  And just find a more efficient way to do
12  business?
13  A  Yes.
14  Q  Now, we saw an e-mail earlier, and I think the
15  jury will remember, of your consulting with Mr.
16  Castelluccio on one aspect of LEAN.  Do you know that
17  e-mail?
18  A  Yes.
19  Q  What involvement, or what was that e-mail and
20  what was -- what were you asking him on that project?
21  A  My ask was, Jim, are there any accounts --
22  this was a few weeks after he was a hundred percent on
23  WellPoint -- are there any accounts that we shouldn't
24  LEAN.  That was it.
25  Q  What do you mean by that?

Page 894

1  A  Meaning we have our band of experts that are
2  coming in to LEAN out all these accounts, are there
3  any accounts that I should direct the team to stay
4  away from.  So I expected a quick e-mail response to
5  that.
6  Q  Did you get one?
7  A  I don't remember.
8  Q  So the LEAN process was run by an entirely
9  different organization.
10  A  Yes.
11  Q  These are efficiency experts you just --
12  A  Yes.
13  Q  -- parachute --
14  A  Drop in, yup.
15  Q  Say, do it better.
16  A  Yes.
17  Q  And how were their recommendations
18  implemented?
19  A  They would -- we would adjust processes, do
20  different reporting, and what used to take ten people
21  may only take nine, after that work was done, and
22  instead of it taking ten days, now it would only take
23  nine days.
24  Q  Okay.  And this was implemented by management
25  after the whole study.

Page 895

1  A  Yes.
2  Q  Okay.  So we've also heard about the resource
3  action, correct?
4  A  Yes.
5  Q  And the resource action involved how large a
6  group?  It wasn't just the Public Sector, right?
7  A  Oh, no.  It was across -- it was worldwide,
8  actually.
9  Q  And in terms of the resource action, you're
10  really talking about eliminating jobs or shipping them
11  offshore, something like that?
12  A  Yes.
13  Q  And what was your role in this?
14  A  I was responsible for this for delivery for
15  the Americas.
16  Q  And I think you talked about consolidating,
17  that you expected Mr. Castelluccio to have
18  consolidated data, from who?
19  A  So once an account was LEANed, and you knew
20  that you didn't need one person on that account, the
21  account would have to say, which person would be
22  resource-actioned.  So it was gathering that data, of
23  who were the individuals that would be placed on the
24  resource action list.  So consolidating that
25  information and then submitting it to me and HR, and

Page 896

1  then it went through a series of studies after that.
2  Q  And was it your understanding that Mr.
3  Castelluccio was going to pick out the individuals
4  throughout the Public Sector in doing this?
5  A  No.  It was at the account level that it was
6  done, and it was done with GTS, so that PE on an
7  account was very involved in deciding who were the one
8  or two people.
9  Q  I see.  During this period of time, until Mr.
10  Echavarria took over on June 1st, did Mr. Castelluccio
11  ever come to you and say, I have too much work?
12  A  Never.
13  Q  Did -- if he had said that, what would you
14  have done?
15  A  I would have provided him assistance.
16  Q  Okay.  So let's go back to WellPoint, because
17  we've heard about WellPoint for a long time.  What did
18  you do when Ken Weiss fell through?
19  A  I gulped.
20  Q  Why?
21  A  Because we thought he was going to be accepted
22  by the client.
23  Q  Let me ask you -- ask Ms. Guttierez to put up
24  number 52, please.
25      So you needed somebody else, right?

Page 897

1      A   Yes.
2      Q   Do you know why he was rejected, Ken Weiss was
3  rejected by the client?
4      A   I think the client felt he had mostly IBM
5  experience, and he wanted more commercial client
6  experience.
7      Q   And "the client" being Mr. Boxer?
8      A   Yes.
9      Q   So there's a highlighted portion of number 52.
10  And it talks about -- it's from you to -- the
11  highlighted is from you to Ms. McDonald, right?
12      A   Yes.
13      Q   And in it you talk about finding new
14  candidates for the position, right?
15      A   Yes.
16      Q   And were you involved in that process?
17      A   Yes.
18      Q   And I think the jury's heard how many
19  candidates there were, but maybe we can put out number
20  53.
21          And ladies and gentlemen, this is like -- how
22  long is this?  Ten pages?  Everything you wanted to
23  know about four or five people who were up for this
24  thing.
25          Let me just direct you, though, to the top,

Page 898

1  which is an e-mail from Mr. Echavarria to Dave
2  Liederbach, which talks about the PBC ratings for the
3  various candidates.  Do you see that?
4      A   Yes.
5      Q   And these are all 2 pluses, right?
6      A   Yes.
7      Q   And he says, "Dave, I communicated with Joanne
8  last night and I'm working and waiting on Keith Holmes
9  on a slate and how to get the promotion completed."
10          Did you, in fact, have a conversation with
11  Miguel about this?
12      A   Yes.
13      Q   And what was your -- what was the
14  conversation?  Did he call you, you call him?  Who
15  said what?
16      A   We had many conversations before he was there
17  in June, so I'm not sure who called who for this, but
18  this was looking at who were other possible candidates
19  to take the WellPoint DPE role.
20      Q   I see.  And this is -- Miguel is getting
21  involved -- is doing the work, right, of the vice
22  president of the face-to-face interviews at the time?
23      A   Yes.
24      Q   This is his -- and this is before he comes on?
25      A   This is before he was, this is before Jim,

Page 899

1  right.  This is the middle of May.
2      Q   So I think we've heard that these various
3  people were all submitted to Mr. Boxer, or a bunch of
4  these people were submitted to Mr. Boxer, right?  Was
5  Mr. Castelluccio considered?
6      A   Yes.
7      Q   For a permanent position?
8      A   Yes.
9      Q   How did that work?
10      A   In fact, I had a conversation with him that if
11  he performed and really exerted leadership on the
12  account, he could stay being the DPE.
13      Q   How could anyone fix this account?
14      A   With the right leadership and the right focus,
15  and it was done by his successor.
16      Q   Who was his successor?
17      A   Gordon Crawford.
18      Q   Gordon Crawford.  Well, we're going to get to
19  Mr. Crawford and how he came about.
20          What's IBM's current relationship with
21  WellPoint?
22      A   It is one of our flagship accounts.
23      Q   And it continues to be an IBM client?
24      A   It is one of our largest IBM clients.  We
25  recently triple -- signed for tripling the revenue

Page 900

1  there.  It is a massive account since these original
2  days, very satisfied client.
3      Q   And a very satisfied client.  And who was
4  responsible, in your opinion, for doing that?
5      A   There were many people that were involved,
6  obviously, but the leadership that Gordon brought when
7  he came to the account pulled the team together in a
8  great way.  Mike Morin, Mike Morin had done a
9  tremendous amount of the foundation work, and it was
10  bringing it to that next level.
11      Q   I see.  And how about Mark Franzese?
12      A   Oh, Mark Franzese was brilliant.  He was the
13  man that ran all the data center migrations.  He
14  received a large award, actually, for doing that, the
15  Richmond data center migrations.  He was well-loved by
16  the client.  Yes, he was very involved in getting this
17  account improved.
18      Q   Let's go back to a couple of other issues
19  before we get there.  Can you put up number 66 for us,
20  please.
21          And I want to ask you about -- this is an
22  e-mail from September, from Ms. McDonald to Mr. Zapfel
23  and you and other folks about what's going on at
24  WellPoint.  "WellPoint help needed."  I presume there
25  would have been a bunch of these, with that title, but

Page 901

1    take a look on the highlighted portion for us, and if
2    you read that into the record and tell the jury what
3    your understanding of this was.
4        A    Okay.  This is in September.  Keenie is
5    writing to Bob Zapfel, me and Dave Liederbach on the
6    copy, along with some very other senior IBMers; the
7    head of software group, Steve Mills; the head of sales
8    for the Americas, Mark Lautenbach.
9        And here she's saying, "We need a new DPE
10   because our current player is not providing delivery
11   leadership.  Having Mark Franzese as the DPE on the
12   data center moves and transformation initiatives is
13   definitely paying off.  His --" Mark's "-- leadership
14   and team have delivered very successful results in the
15   two data center moves, as you point out."
16       Q    And the next sentence there, you're talking
17   about -- or she's talking about, "We don't have much
18   time to react and win the GBS opportunities."  What
19   does that mean?
20       A    It means that WellPoint -- we had a lot of
21   consulting and application development work that the
22   client would not give us until we fixed this issue
23   with the infrastructure delivery and the strategic
24   outsourcing contract.  Remember, Keenie was
25   responsibility for all IBM revenue, and they were

Page 902

1    shutting off opportunities for us because we were
2    falling down here.
3        Q    So there were more -- there was more work,
4    more things to proceed on?
5        A    Yes.
6        Q    So how did Mr. Crawford get into the picture
7    in the first place?
8        A    We were looking for a candidate who could lead
9    the team and get results.  Gordon was put up as a
10   candidate.  He was in Europe at the time.
11       Q    And do you know what he was doing there?
12       A    He was running -- I think he was running
13   delivery for a large part of Europe.
14       Q    We'll get him here and talk to him.
15       If we can put up, please, number 72.
16       This is a 5-minute drill from October.
17       Before we get into this 5-minute drill, let me
18   ask you a question or two.  Did Mr. Crawford come over
19   from wherever he was overseas to interview with Mr.
20   Boxer?
21       A    Yes.
22       Q    Do you remember when that was?
23       A    The end of September.
24       Q    Were you involved in that at all?
25       A    Yes.

Page 903

1        Q    And what was your involvement?
2        A    Offering, you know, talking to Mark Boxer
3    about candidates, and what was the background on
4    Gordon.
5        Q    Did you meet Gordon on that trip over?
6        A    No, I don't think I did.
7        Q    Okay.  And was Ms. McDonald involved in
8    getting him over?
9        A    Yes, and she met him.  I know she was with him
10   during that trip.  I may have been.  I'm not sure if I
11   was at that meeting with Gordon and the client, but
12   Keenie definitely was.  That would have been her role.
13       Q    Now, here if you turn to the second page, on
14   key positions, there is key positions.  It says vice
15   president ITDelivery, UKISA.  Do you see that?
16       A    Yes.
17       Q    What is that?
18       A    That's UKISA, the U.K. -- oh my goodness, I'm
19   drawing a blank.  U.K., Ireland -- sorry.
20       Q    South Africa?
21       A    South Africa?  Yes, yes, yes, that's it.  I'm
22   sorry, yes.  U.K., Ireland, South Africa.  Thank you.
23       Q    And the incumbent to that job is Mr. Crawford?
24       A    Yes.
25       Q    So that's where he was?

Page 904

1        A    Yes.
2        Q    And the note says, "Gordon's assignment ends
3    in October," right?
4        A    Yes.
5        Q    Now, if you go a few pages back on page 4,
6    this is October 2nd, right?  These are the notes, or
7    the ITD drill.  This is your drill, right?  Or is it?
8        A    I'm not sure.  No.
9        Q    So whose drill?
10       A    This would be Bob Zapfel's drill, because it
11   has these other regions in it.
12       Q    Okay, that's fine.  And there is in the middle
13   of the page, it says, "Senior DPE of WellPoint," and
14   it says the executive sponsor is you, and it lists the
15   incumbent as Mike Morin.  Why would that be?
16       A    That was an error.  It should have said Jim.
17       Q    And it says lead candidate is Gordon Crawford,
18   correct?
19       A    Yes.
20       Q    So he hadn't been selected at that point,
21   right?
22       A    No.
23       Q    And do you remember discussion of him at this
24   drill?
25       A    Yes.

Page 905

1    Q   What was the nature of the discussion?
2    A   There was a lot of discussion that he was not
3  available.  It said October, but there were mitigating
4  client circumstances, and the team wanted him to stay
5  in Europe until at least January.
6    Q   And why was that a concern?  What's the
7  difference?
8    A   Because the client, Mark Boxer and his team,
9  wanted somebody urgently.
10   Q   Now, if you turn over to page 5, there's Mr.
11 Castelluccio's name as in the key people to move
12 category, right?
13   A   Yes.
14   Q   Now, do you remember discussing Mr.
15 Castelluccio in various 5-minute drills?
16   A   Yes.
17   Q   How frequently would you do that, whether he
18 was on the document or not?
19   A   Probably all the drills I would bring up.
20   Q   Why?
21   A   Because he was there, and we needed a role for
22 him.
23   Q   Did you have any incentive to find him a
24 position?
25   A   After he was not on WellPoint, he was on my

Page 906

1  budget, his salary was coming out of our budget, and
2  he didn't -- had not a role, so.
3    Q   It was in your interest to place him?
4    A   Yes.
5    Q   Why?  Financially?
6    A   Financially.
7    Q   When you talked about him in various 5-minute
8  drills, do you have any idea how frequently you did
9  that?
10   A   Often.  Probably any of the drills, when we
11 were talking about people to move, even if his name
12 wasn't there, I would discuss Jim.
13   Q   And did you -- during those discussions, did
14 you ever say anything negative about him?
15   A   No.
16   Q   Did you say anything that would have indicated
17 to other executives that they shouldn't consider him
18 for positions?
19   A   No.
20   Q   Did you recommend him for positions?
21   A   Yes.
22   Q   Did you do this as much -- did you do this
23 with him as frequently as you did for any other
24 executive?
25   A   Absolutely.

Page 907

1    Q   Was Mr. Holmes in most of these meetings with
2  you?
3    A   Yes.
4    Q   During the time that Mr. Castelluccio was
5  acting as a WellPoint acting DPE, were there
6  continuing problems with WellPoint?
7    A   Yes.
8    Q   And let me ask you to take a look, if I may,
9  at Exhibit 57, please.
10       Do you have that there?
11   A   Yes.
12   Q   Now, Exhibit Number 57 is from Keenie McDonald
13 to Zapfel and you and Mr. Liederbach, right?
14   A   Yes.
15   Q   Read the text of her e-mail into the record,
16 please.
17   A   This was June 1.  "Bob and Joanne, we have to
18 get a strong DPE on WellPoint ASAP.  This temporary
19 approach with Jim Castelluccio is not working.  On two
20 separate calls this morning, one with Dave Boxer and
21 one with Dave McDonald -- one with Mark Boxer and one
22 with Dave McDonald, they both jumped on me regarding
23 our lack of delivery leadership and Jim's lack of real
24 involvement.  Dave McDonald literally said, 'I don't
25 even waste my time trying to contact Jim anymore.'  Is

Page 908

1  there anything I can do to help move this along?  This
2  has gone on too long."
3    Q   Did you discuss those complaints with Mr.
4  Castelluccio?
5    A   Yes.
6    Q   And when did you do so?
7    A   My track record is pretty immediate.  When I
8  get a problem, I deal with the problem.
9    Q   And do you remember what you did about this
10 problem, raised in this?
11   A   I'm sure I went to Jim to discuss it.
12   Q   Now, you mentioned that Mr. Morin was
13 successful at doing both re-engineering -- I think you
14 testified to this.
15   A   Yes.
16   Q   Re-engineering WellPoint and being on --
17   A   Yes.
18   Q   -- the majority of SWAT calls?
19   A   Yes.
20   Q   How do you do that?
21   A   You do that through leadership of your team,
22 because there's a large team that work with you, and
23 you are -- you do it through being responsive to what
24 the client wants, and being responsive to your
25 colleagues that have input and advice as well.

Page 909

1    Q    And Mr. Crawford was able to do this?
2    A    Yes.
3    Q    And you thought Mr. Morin was able to do this?
4    A    Yes.
5    Q    All right.  Now, given the complaints that
6    were going on, why did you leave Mr. Castelluccio on
7    the account?
8    A    I had to.
9    Q    What do you mean?
10   A    I needed -- IBM, we needed an executive in
11   that role.
12   Q    I see.  So let me ask you, if you would, to
13   take a look at Defendant's Exhibit 77, please.
14        Do you have that there?
15   A    Yes.
16   Q    What's the date of this, from Liederbach to
17   you and Mr. Fernandez?
18   A    November 6th.
19   Q    And what's Mr. Liederbach asking for?
20   A    He's asking that we get Gordon there, what's
21   his commit date, can it be approved, I want to talk to
22   you today, live.
23   Q    Because he felt he needed help, right?
24   A    Yes.
25   Q    Turn over to number 80, please.

Page 910

1        MR. FASMAN:  And Your Honor, I think
2    given the time, I'm happy to end on -- after this
3    discussion, okay?
4        THE COURT:  Okay, finish the document.
5        MR. FASMAN:  Yes, yes, thank you.
6    BY MR. FASMAN:
7    Q    So a couple of other questions on that.  So
8    what's number 80?
9    A    Okay.  So this was in -- on November 6th, that
10   this was Gordon spoke to Boxer, this was telling Pat
11   Kerin and Dave Liederbach, and during the call told
12   him and got agreement that he could start at WellPoint
13   on January 2nd.  That was the first time we got
14   agreement from the client, that he would wait and that
15   Gordon would be acceptable for January 2nd.
16   Q    So this is the first time that -- well, let's
17   ask it this way:  Is this the first time that you felt
18   certain that Mr. Crawford was the person?
19   A    Yes.
20       MR. FASMAN:  Your Honor, I'm fine right
21   there.
22       THE COURT:  Okay.  Ladies and gentlemen
23   of the jury, the witching hour of 5 o'clock has
24   arrived.  It's time to leave.  So we'll see you
25   tomorrow.  Have a pleasant evening.  Don't deliberate

Page 911

1    and talk about the case, but come back here tomorrow
2    at 9:45, same room.  We'll start precisely at 10
3    o'clock, I promise.
4        (Jurors excused)
5        THE COURT:  We've a busy day ahead of us
6    tomorrow.
7        MR. FASMAN:  Are we going to knock off at
8    4?
9        THE COURT:  Yes.
10       All right.  Well, be safe.  I'll see you
11   tomorrow.
12       MR. FASMAN:  Thank you, Your Honor.
13       THE WITNESS:  Thank you, Your Honor.
14       (Court adjourned)
15
16
17
18
19
20
21
22
23
24
25

Page 912

1        CERTIFICATE OF REPORTER
2
3        I Hereby certify that the foregoing 251 pages
4    are a complete and accurate computer-aided
5    transcription of my original stenotype notes taken in
6    the Matter of James Castelluccio VS International
7    Business Machines Corporation, which was held before
8    The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9    District Court, 450 Main Street, Hartford,
10   Connecticut, on January 16, 2014.
11
12
13       Wendy Allen, RMR, CRR
14       Notary Public
15
16
17   My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

Page 912

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO     )
    Plaintiff     ) 3:09-cv-01145 (TPS)
                   )
VS                 ) January 17, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION  ) Federal Building
    Defendant     ) Hartford, Connecticut


VOLUME 5
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.


Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

---

Page 914

1      I N D E X
2
3   WITNESSES:              PAGE:

    Joanne Collins-Smee
4     Cross-Examination by Mr. Fasman............ 927
      Redirect Examination by Mr. Carta.......... 966
5     Recross Examination by Mr. Fasman......... 1020
    Kelton Jones
6     Direct Examination by Mr. Carta............ 1026
      Cross-Examination by Mr. Fasman............ 1099
7     Redirect Examination by Mr. Carta.......... 1112
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 913

1
2      Representing the Plaintiff
3      Carta McAlister & Moore, P.C.
       1120 Boston Post Road
4      Post Office Box 83
       Darien, CT  06820
5        By:  Mark R. Carta, Esq.
            mark@cmm-law.com
6        By:  Margaret A. Triolo, Esq.
            margaret@cmm-law.com
7      By:  Troy Bailey, Esq.
8
9      Representing the Defendant

10     Paul Hastings, LLP
       75 East 55th Street
       New York, NY  10022
11       By:  Zachary Fasman, Esq.
            Zacharyfasman@paulhastings.com
12       By:  Todd C. Duffield, Esq.
            Toddduffield@paulhastings.com
13       By:  Jean-Marie Gutierrez
14
15     ALSO PRESENT:
16     Daniel Fox, Esq.
       IBM in-house counsel
17
18
19
20
21
22
23
24
25

---

Page 915

1      THE COURT:  Good morning.  This is day
2   five.
3          I want to remind counsel that we need a
4   verdict form.  You were supposed to get it I think
5   Monday or Tuesday, or whatever.  We were supposed to
6   get it Monday or Tuesday, or whatever, but we'll have
7   to wait for everybody Tuesday morning.
8          MR. CARTA:  Your Honor, we prepared it
9   and sent it to counsel.  They drafted it and we made
10  edits and when did we send the edits back.  Within a
11  couple days we sent an edit back, and I guess we
12  haven't been able to agree.  Is that where we are?
13         MR. DUFFIELD:  We sent further edits back
14  to you but you said --
15         MR. CARTA:  So I guess what we could do
16  is present to you the two versions that we have.
17         THE COURT:  No.  I want you to go back
18  and forth.  I want you to come up with a verdict form
19  so that down the road we don't have somebody say, you
20  know, it was such a terrible verdict form what we came
21  up with.  I want it to be your verdict form.  You can
22  do this.  I mean you just have to agree on the
23  phraseology and the questions.
24         MR. FASMAN:  We'll do what we can.
25         MR. CARTA:  Since we're stopping early

Page 916

1  maybe we can start at 4 clock and buckle down and see
2  if we can finish that.
3          THE COURT: That's a good idea, Mr.
4  Carta.
5          Are we ready to resume?
6          MR. FASMAN: Your Honor, I have one
7  housekeeping matter. As I raised to the Court and
8  your clerks, I submitted a proposed jury charge
9  regarding background evidence, and I really do think,
10 given the amount that we've heard, that the jury ought
11 to be told what this case is about.
12         THE COURT: Absolutely.
13         MR. FASMAN: And I know Your Honor has
14 our form. You guys -- I believe Michael and Jake both
15 have our form. Mr. Carta has this as well. He has
16 proposed a number of changes which we don't think are
17 acceptable or appropriate. This is the first time I
18 saw them, about ten minutes ago. But I really do
19 think this is an appropriate charge, and if I were
20 sitting on the jury, and at the end of the day you
21 told them, remember all this other stuff, those two
22 things, the removals are non-judiciable, I would sit
23 as a juror and say, why didn't somebody tell me this
24 earlier. So it's a confusion issue from our point of
25 view, and I think it's appropriate.

Page 917

1          MR. CARTA: May I be heard, Your Honor?
2          THE COURT: Yes.
3          MR. CARTA: There were two points, and I
4  think I agree a hundred percent on the first and not
5  at all on the second.
6          The first point is letting the jurors
7  know that the removal from the two positions is not
8  the basis for Mr. Castelluccio's age discrimination.
9  Absolutely agree with that. I have not changed the
10 proposed jury charge with respect to that aspect of
11 it.
12         What is legally wrong and in the proposal
13 is to relegate the background, the other evidence, to,
14 quote unquote, mere background evidence. And I have a
15 page from Judge Squatrito's decision in which he
16 specifically says that the evidence is supposed to be
17 considered, and it provides an inference, a basis for
18 an inference of discrimination.
19         And that's the law. It's not mere
20 background evidence. Otherwise this wouldn't be
21 permitted. The reason it's permitted is because an
22 inference of discrimination can be drawn from that.
23         MR. FASMAN: That's not what he said.
24 That's a different portion of the opinion. It's an
25 entirely different portion of the opinion. He said

Page 918

1  it's admissible as background evidence. Those are his
2  words, not mine. And Mr. Carta's reading from an
3  entirely different portion of the opinion.
4          MR. CARTA: Your Honor, that's just not
5  true. I would invite the Court to take a look at the
6  opinion on page 10 and 11, and the conclusion is that
7  it's admissible as -- from which a juror can draw an
8  inference of discrimination.
9          And the problem I have with the proposal
10 is it repeats several times the idea that it's mere
11 background evidence. That's not the law. Miller
12 versus Hartford Insurance Company, District of
13 Connecticut decision, quoting the Second Circuit
14 decision, makes it clear, in fact an inference can be
15 drawn from that evidence. And it would be wrong to
16 charge it otherwise, I believe.
17         MR. FASMAN: Judge, let me just pull up
18 Judge Squatrito's opinion. For some reason I can't
19 find it. Let me see if I can find it.
20         THE COURT: Jake, is this what you gave
21 me?
22         THE LAW CLERK: I believe that's IBM's
23 proposed instruction.
24         MR. CARTA: Your Honor, I would be
25 pleased to hand up to the Court pages 10 and 11, but

Page 919

1  if the Court already has the entire decision, that
2  would be not necessary. May I approach with my
3  suggestions?
4          THE COURT: Yes.
5          MR. FASMAN: Your Honor, if I may, can I
6  read one sentence we're pointing to in the Judge's
7  opinion, please?
8          THE COURT: Yes.
9          MR. FASMAN: This is where the Court says
10 that these are time barred claims, and they can't be
11 presented, they weren't challenged properly, and
12 here's what Judge Squatrito says, and I quote,
13         "The Court does agree with Castelluccio,
14 however, that it may, quote, properly admit background
15 evidence predating onset of the limitations period as
16 to the termination claim which is within the
17 limitation period."
18         That's what the Court said. Background
19 evidence. That's the term that we want to use. And
20 he quotes from Chin versus Board Authority. I believe
21 that's the Second Circuit case. I mean I'm describing
22 this as the Judge described it, not as Mr. Carta and
23 another portion of the opinion.
24         MR. CARTA: "Another portion" is the next
25 sentence in the opinion, Your Honor.

Page 920

1     MR. FASMAN:  It's not the next sentence.
2     THE COURT:  What's the next sentence?
3     MR. FASMAN:  "The Court further concludes
4  that the evidence before it --" talking about the
5  evidence before it at the time with all of this
6  stuff "-- could support a finding that this adverse
7  employment action occurred under circumstances giving
8  rise to an inference of indictment."
9          It goes on to quote Miller versus
10  Hartford and the various other cases.  But it
11  describes it as background evidence.  That's what I
12  wanted to do.
13     THE COURT:  This is what the issue is.
14  The issue is whether these two incidents which
15  themselves are not litigable, because they are
16  background evidence, can they support a retrospective
17  inference of discrimination.  That's the issue.
18  They're circumstantial evidence.  That's all they are,
19  is circumstantial evidence.  And someone at some point
20  submitted a proposal -- I thought it was your first
21  proposal that was faxed to me.
22     MR. FASMAN:  No, that was --
23     THE COURT:  Somebody's proposal said we
24  can only consider direct evidence.
25     MR. FASMAN:  No, no, we pulled that back.

Page 921

1  Somebody else wrote that in my office and I saw it and
2  I tore it up.  Don't bother with that one.
3     THE COURT:  Okay.  Let me just read the
4  proposal Mr. Carta has handed up.
5          Okay.  Look, I don't like the wording of
6  either one of these, but I agree with what Mr. Carta
7  says.  In substance.  In principle.
8          I think what we ought to do, in the
9  second paragraph, is say that the two prior positions
10  and the removal from the two prior positions are not
11  being litigated here.  They've come into evidence as
12  background information, and they're circumstantial
13  evidence, and you can give them -- you are free to
14  infer -- you're free to draw inferences from that.
15          That's what I want to say.
16     MR. FASMAN:  How about you're free to
17  give them what weight you want?
18     THE COURT:  Whatever weight you think
19  they deserve.  Is that more --
20     MR. CARTA:  I think the notion that they
21  should be able to infer discriminatory intent from
22  that, I think that that's the law.  I think just to
23  say circumstantial evidence, we as lawyers understand
24  what that means.  That's -- I don't think that that is
25  really helpful for a juror, Your Honor.

Page 922

1     MR. FASMAN:  Your Honor, the only thing I
2  would add is that I think that issue might be cleared
3  up in jury instructions when they get the case, if
4  they get the case.  And I think -- my goal here is
5  just to say look, it's background evidence, you should
6  take it as background evidence.  If you want to say
7  give it what weight you desire, that's fine, and then
8  we can clear the rest of it up later.  I don't want to
9  get into a pre-charge charge.
10     MR. CARTA:  I kind of think that's where
11  we are.
12     THE COURT:  Yeah.  We all agree on the
13  first one, the first paragraph, and we all know what
14  the issue is with respect to the other, and the
15  other is, look, you heard this, and you can give it
16  whatever weight or no weight or, you know, it's up to
17  you.  It's in there for whatever weight, if any, you
18  decide to give to it.  You may infer -- if you believe
19  it, you may infer discriminatory intent.  If you think
20  it's not relevant, then you can give it no weight at
21  all.
22     MR. CARTA:  Your Honor, that's acceptable
23  to me.  So long as they understand that they can infer
24  discriminatory intent from it, I think that's
25  perfectly all right, I think that's the law, and leave

Page 923

1  it up to them what they want to do with it.
2     THE COURT:  Well, let me think about
3  that, because Judge Squatrito has said that that's
4  just background evidence.  It's part of what in law
5  school a long time ago they used to say was the res
6  gestae, you know, it's part of wallpaper.
7          I mean they've heard evidence of it.
8  Those instances are not being litigated here, and
9  they're not being asked to base their decision on that
10  evidence.  That evidence is simply there as
11  background, and they can give it whatever weight they
12  think it deserves.
13     MR. CARTA:  Your Honor, I think it's
14  wrong to suggest that they can't base their -- I think
15  the point is that that's not what's being litigated,
16  and I agree that those two terminations are not what's
17  being litigated, but that's -- the jump that IBM is
18  asking the Court to make is then wrong, which is that
19  because that evidence is not an independent basis for
20  establishing wrongful termination, then that evidence
21  is merely background evidence and does not go to
22  proving discriminatory intent, and I think that's
23  wrong.  I think the law is that that evidence is
24  relevant from which they can make an inference of
25  illegal discrimination.

Page 924

1      MR. FASMAN: Your Honor, I would only
2  encourage Your Honor to look at the case we've cited
3  in the footnote, which is United Airlines versus
4  Evans, which is one of the first continuing violation
5  cases, where the Supreme Court says -- and this is
6  language that's been quoted about a million times --
7  that an employee's challenge may not be predicated on
8  a past event which has no present legal significance
9  even if the past event might at one time have
10  justified a valid claim against the employer. That's
11  old --
12      THE COURT: That's the issue.
13      MR. FASMAN: Yeah, exactly.
14      THE COURT: Well, exactly. The issue is,
15  does this evidence have present legal significance.
16  Carta says yeah.
17      MR. FASMAN: No, no, past event.
18      THE COURT: You say no.
19      MR. FASMAN: Past event, which is
20  unchallenged. That's the whole point of UAL versus
21  Evans. The Court said past event that has not been as
22  no legal significance. That's the whole purpose.
23      MR. CARTA: Present legal significance, I
24  understand that to mean, Your Honor, to be fair, with
25  respect to another violation, and we're not claiming

Page 925

1  that that's another violation.
2      THE COURT: Okay. You know what I'm
3  going to do? I'm going to look at the case, look at it,
4  have my law clerks look at them over the weekend. I
5  want you to try to come up with something that is
6  right. I understand what the issue is, but I don't
7  believe that lawyers of your caliber are incapable of
8  coming up with language that would satisfy your
9  concern, your concern as well, and will put those past
10  events in exactly the perspective that they should be
11  in. So the jury can give them whatever weight it
12  thinks they're entitled to, and may draw inferences
13  from it if they choose to.
14      MR. CARTA: We'll add that to our 4
15  o'clock powwow, Your Honor.
16      THE COURT: That's good.
17      MR. FASMAN: Could we get -- the first
18  time I saw Mr. Carta's changes to this were about ten
19  minutes ago. I hadn't looked at it before. And he
20  and Ms. Triolo wrote on that charge. Can we get a
21  copy of what they put there, and maybe the clerks can
22  get a copy?
23      MR. CARTA: Actually that's my copy, Your
24  Honor, so that would be great, if we both had copies.
25  Thank you. Thank you, Judge.

Page 926

1      THE COURT: See, these people on the
2  jury, I told them we were going to start at 10 o'clock
3  and here it is 20 after 10. They're going to think
4  I'm a slacker.
5      MR. FASMAN: Blame me, that's fine.
6      THE COURT: A slacker.
7      MR. FASMAN: No, you can blame me.
8      THE COURT: I will.
9      MR. FASMAN: Good. Fine.
10      THE COURT: I don't want to blame you.
11      MR. FASMAN: It's okay.
12      THE COURT: Let's see, who could I blame
13  here?
14      MR. FASMAN: I'm here.
15      THE COURT: Let's find someone that had
16  nothing to do with it, and -- I'll take the blame.
17  I'll take the heat. That's what I'm supposed to do.
18      (Jurors present)
19      THE COURT: Please be seated.
20      You heard the gavel go down at exactly 10
21  o'clock, and at exactly 10 o'clock we were in here
22  arguing, but we were working up in my chambers much
23  before that, and we've got a couple of legal issues
24  that we have to iron out, and we're going to do that,
25  the lawyers in this case are going to do that at a

Page 927

1  powwow, in the words of Mr. Fasman, at 4 o'clock.
2  Because we have to have this legal powwow at 4
3  o'clock, we think that that's a good reason in view of
4  your hard conscientious work at this point to let you
5  go early. We'll adjourn court at 4 o'clock today. So
6  you have an hour off, you've been such a good and
7  attentive jury.
8      THE JURORS: Thank you.
9      THE COURT: I don't know what you want to
10  do with that hour. I'm not going to tell you to go
11  back to work. If he wasn't going to make you go back
12  to work I'm not going to make you do that. When he
13  asks you what Judge's name is, say Judge Benjamin
14  Cardozo.
15      Okay. Are we ready to begin, Mr. Fasman?
16      MR. FASMAN: I am, Your Honor. Thank
17  you.
18      Morning, ladies and gentlemen.
19      THE JURORS: Morning.
20
21  CONTINUED CROSS-EXAMINATION BY MR. FASMAN:
22
23  Q  So let's go back to where we were yesterday
24  when the clock struck 5, which was on Exhibit --
25  Defendant's Exhibit number 80, which was dealing with

4 (Pages 924 to 927)

Page 928

1    Mr. Crawford and his selection. I'm just doing
2    this -- I think we went over this quickly, but I want
3    to go back to it.
4        This is the -- this was the e-mail, Ms.
5    Collins-Smee, I think you were testifying about when
6    we stopped. And the bottom part of the e-mail talks
7    about when he would be able to report, correct?
8    A   Yes.
9    Q   And what significance did that have to you?
10   A   Because that was firm acceptance by the
11   clients of Gordon starting January 2nd was acceptable
12   to the client. So it was a go.
13   Q   This was when you found out it was a go?
14   A   Yes.
15   Q   Who told Mr. Castelluccio that Mr. Crawford
16   would be replacing him on the WellPoint account?
17   A   I did.
18   Q   And when did you do that?
19   A   November 21st.
20   Q   And did you do it in person or by telephone?
21   A   In my office.
22   Q   And what did you tell him?
23   A   I told him that Gordon Crawford was selected
24   as the new vice president DPE for WellPoint, and that
25   he was going to come in as of January 2nd. I also

Page 929

1    told him at that point I did not have another role for
2    him, and I asked him, did he want to look for another
3    role, or was he interested in retiring, and he said he
4    absolutely wanted to look for a new role, and I said
5    okay, we're all in, Jim, we're going to look for
6    another role for you.
7    Q   How long was the conversation?
8    A   15 minutes.
9    Q   Do you remember the rest of the discussion?
10   A   No.
11   Q   Mr. Castelluccio testified that you came in,
12   told him that Mr. Crawford was replacing him as DPE on
13   WellPoint, and he asked you where does that leave me,
14   and you refused to answer any questions of his. Is
15   that true or not?
16   A   No.
17   Q   If he asked you a question, did you ever
18   refuse to answer?
19   A   Never.
20   Q   So what -- during the discussion, how did the
21   subject of his retirement come up, or possible
22   retirement come up?
23   A   I asked him, do you want to look for other
24   roles, or are you interested in retirement, since he
25   was retirement eligible.

Page 930

1    Q   Was this the first time you had discussed
2    retirement with him?
3    A   Absolutely.
4    Q   You had never mentioned it to him before?
5    A   Never.
6    Q   Now, Mr. Carta yesterday was talking about a
7    hypothetical. I'm not sure I can remember it
8    entirely, but I believe it was if someone had said
9    they didn't want to retire and was it right for you to
10   bring it up a second time. Do you remember that
11   hypothetical?
12   A   Yes.
13   Q   Is that this situation?
14   A   No.
15   Q   Why not?
16   A   Because this was the first time that I brought
17   up retirement with Jim.
18   Q   Did you tell Mr. Castelluccio you thought he
19   should retire?
20   A   No.
21   Q   Did you tell him you thought he was too old to
22   do the job?
23   A   Absolutely not.
24   Q   What did he say?
25   A   He said he wanted to look for another job, and

Page 931

1    that we would look for another role.
2    Q   Did he say he felt that you were forcing him
3    to retire?
4    A   No.
5    Q   Did he say it was unfair?
6    A   No.
7    Q   Who ultimately was involved on the IBM side in
8    selecting Gordon Crawford?
9    A   Myself, Dave Liederbach, Keenie McDonald, Bob
10   Zapfel, who was my boss, as well as the client, Mark
11   Boxer, and Dave McDonald.
12   Q   And why was Mr. Crawford selected?
13   A   Because he had significant experience leading
14   large teams, delivery teams, had tremendous client
15   relationships, and he had a stellar track record.
16   Q   Did you know how old he was when he was
17   selected?
18   A   No.
19   Q   Did you care?
20   A   Of course not.
21   Q   He was successful with WellPoint, wasn't he?
22   A   He was phenomenal, yes.
23   Q   What's the IBM Chairman's Award?
24   A   The Chairman's Award is a very rare award
25   that's given in IBM. They don't give it every year.

Page 932

1    They may give it every other year.  And it's to a team
2    of IBMers that support a client that have gone above
3    and beyond and have done significant accomplishments
4    for the client.
5    Q    And how many accounts get this in a given
6    year?
7    A    Maybe one, but some years we don't give any.
8    Q    Did WellPoint ever win that award?
9    A    Yes.
10    Q    And was that when Mr. Crawford was the DPE?
11    A    Yes.
12    Q    All right.  We'll have Mr. Crawford here so
13    you can meet him.
14         Let's go to Mr. Castelluccio's performance
15    review in 2008 for 2007.  Did you prepare his
16    performance review in 2008, January 2008 for the prior
17    year?
18    A    Yes.
19    Q    What did you initially rate him?
20    A    A 3.
21    Q    What is a 3 rating?  Do you recall?
22    A    Needs improvement.
23    Q    Among the lowest contributors, I think is the
24    right word?
25    A    Yes.

Page 933

1    Q    Why did you rate him a 3 initially?
2    A    Because it was year where he had poor
3    performance, there were significant issues, lots of
4    complaints about his performance, and I felt a 3 was
5    appropriate.
6    Q    Now, did you discuss that rating with Mr.
7    Zapfel?
8    A    Yes.
9    Q    Without telling us, because it's hearsay, what
10    he said, what was the conclusion of your discussion
11    with Bob Zapfel about that?
12    A    He agreed, because he had been involved in a
13    lot of the situations as well.
14    Q    Now, did you discuss that rating with Mr.
15    Castelluccio?
16    A    Yes.
17    Q    Is that a normal part of the PBC process?
18    A    Yes.  It was the review of the rating I was
19    giving him.
20    Q    And did you discuss it with him in person or
21    on the telephone?
22    A    On the phone.
23    Q    And tell the jury, if you would, what you
24    recall from that discussion, what did you say to him
25    and what did he say to you?

Page 934

1    A    I gave Jim a 3 performance rating, which is a
2    very poor performance rating in an executive level,
3    and he was unhappy with the performance rating, and I
4    explained why I gave it to him, and he disagreed, and
5    he said that I wasn't considering things that he had
6    done during that time, so we talked, and I said okay,
7    get me what else that you think that I'm missing that
8    we should be considering, I want to make sure I give
9    you enough credit for everything you think you
10    deserve, and he sent me information, and I went
11    through that, and we had all told on the evaluation
12    two or three conversations.
13    Q    Let me ask, can you put up Defendant's Exhibit
14    88, which is the performance evaluation.
15         I know this is hard to read.  It's about five
16    pages long, isn't it?
17    A    Yes.  Can I --
18    Q    Yes.
19    A    The beginning part is stuff that the employee
20    would put in.
21    Q    That's what I was getting to.
22    A    Okay.
23    Q    The only portion of this -- these are all --
24    this is all filled out -- most of this form, most of
25    the five pages Mr. Castelluccio would have filled out,

Page 935

1    right?
2    A    Yes.
3    Q    So you filled out only one part, which I
4    believe is on page 4.  This is --
5         I think you need to catch a little bit more,
6    which is the numerical.
7         Okay.  So that's what you ended up giving him,
8    correct?
9    A    I ended up changing my evaluation to a 2 from
10    a 3.
11    Q    Did you discuss that change with Mr. Zapfel?
12    A    I did.
13    Q    What was his take on that?
14    A    We had a --
15         MR. CARTA:  Your Honor, I just want to
16    caution the witness not to testify about Mr. Zapfel.
17    I thought she was going to indicate what he had said.
18         THE WITNESS:  I got approval to change
19    his rating from a 3 to a 2.
20    BY MR. FASMAN:
21    Q    Would you say that he was happy about that?
22    A    We had discussion about it.
23    Q    What was the -- now, you said that Mr. -- what
24    was the nature of the discussion, without telling us
25    in terms what Mr. Zapfel said?

6  (Pages 932 to 935)

Page 936

1    A   Mr. Zapfel knew that I had -- we had a lot of
2  issues throughout the year, and knew that I was giving
3  him a 3, and then to change it, so we had a discussion
4  about it, and he eventually agreed with me to make it
5  a 2.
6    Q   Now, why did you do that?
7    A   I did it because it was the end of January,
8  Jim was looking for a new role, and knew that if I
9  gave him the 3 he would not be able to get a new role
10 within IBM.
11   Q   And are the PBC ratings on the 5-minute
12 drills?
13   A   Yes.
14   Q   And a 3 rating would have been, in your
15 opinion, a problem in terms of getting a new role?
16   A   Yes.
17   Q   Why?
18   A   Because it's very rare for an executive to get
19 a 3 appraisal rating, because it's -- it's a very bad
20 appraisal rating.
21   Q   Now, how is a 2 appraisal rating for a vice
22 president?
23   A   A 2 appraisal rating is not a good appraisal
24 rating.  In fact, that's a poor appraisal rating as
25 well.

Page 937

1    Q   Why is that?
2    A   Because the rating system is 1, which is the
3  highest level, then you have a 2 plus, then you have a
4  2, then you have a 3.  So a 2 at a vice president
5  level is not a good appraisal rating either.
6    Q   And is that because of the level of the job?
7    A   It's a lot harder at a vice president level,
8  there's a lot more responsibilities, but it's also
9  assumed that you have a level of performance that is,
10 you know, that you're always on the top of your game
11 at a vice president level.
12   Q   Now, I notice in your write-up of Mr.
13 Castelluccio there's no mention of the problems on
14 WellPoint and the various complaints we've seen.  Why
15 not?
16   A   This was a very -- this was a very generous
17 overall assessment that went along with the 2 rating.
18   Q   Were you ever counseled or reprimanded as a
19 result of this?
20   A   Yes, I was.
21   Q   Tell the jury what happened.
22   A   So Jim did an open door investigation on me,
23 and this appraisal rating was a component of that, and
24 what came back as a result of that investigation was
25 that I should not have changed the appraisal rating, I

Page 938

1  should not have improved the appraisal operating from
2  a 3 to a 2, I should have left it at a 3, which was my
3  original discussions with him, and --
4    Q   Did someone speak to you, your boss at the
5  time speak to you?
6    A   Yes.
7    Q   Who was your boss at the time?
8    A   Bob Zapfel.  Oh, I'm sorry, Tim Shaunessy was
9  my boss at that time.
10   Q   And what did he tell you the -- and when did
11 this occur and what did he tell you?
12   A   This was in August, I think when the open door
13 investigation was completed.
14       MR. CARTA:  Objection.  Hearsay, "What
15 did he tell you?"
16       THE COURT:  I'm sorry, I didn't get the
17 question.
18       MR. CARTA:  Objection as to the question,
19 "What did he tell you?"  That's clearly hearsay.
20       THE COURT:  Well, we don't know that
21 because we don't know what it's being -- whether it's
22 being offered for a hearsay use.  Are you offering
23 this for --
24       MR. FASMAN:  Well, first of all, I don't
25 think it's hearsay.  I mean she's relating a

Page 939

1  conversation that she had with her boss.  I don't see
2  how that's hearsay.
3        THE COURT:  Well, what she said is not
4  hearsay, but I guess Mr. Carta's objecting to what the
5  law says is hearsay.  Are you offering what the boss
6  said for the truth of what the boss said, or are
7  you --
8        MR. FASMAN:  No.
9        THE COURT:  -- or are you offering it
10 simply to show the boss's attitude?
11       MR. FASMAN:  Yes.  Thank you, Your Honor.
12       MR. CARTA:  If that's the proffer, then
13 there's no objection.
14       THE COURT:  Okay.  Now, if something's
15 hearsay, then it's offered to prove it's untrue, but
16 if there's an independently relevant reason for the
17 offering of the declarant's statement, it's not
18 hearsay.
19       Go ahead.
20 BY MR. FASMAN:
21   Q   So what did Mr. Shaunessy say to you?
22   A   I was reprimanded, that I should not have
23 changed the appraisal rating from a 3 to a 2.
24   Q   Can we put up number 156, please.
25       And that is -- what is this, Ms. Collins-Smee?

Page 940

1    A   This is my boss at that time, Tim Shaunessy,
2    who took over from Bob Zapfel, and he's sending it to
3    Russ Mandel, who was the -- head of investigations in
4    Global Technology Services, and the e-mail is from my
5    boss, Tim, to Russ, saying "Russ, I approved.  I have
6    counseled Joanne on this issue.  Please let me know if
7    you need anything further."
8    Q   And what is the date on this?
9    A   8/28/08.
10   Q   All right, that's fine.
11       Let's go on to something else, if that's okay.
12   And that is, what happened when Mr. Castelluccio was
13   without a position, after he was replaced by Mr.
14   Crawford at the beginning of January, 2008?  I think
15   the term that was used was on the bench, but whatever
16   term is used, is there any hard and fast time limit on
17   that process?
18   A   At an executive level?
19   Q   Yes.
20   A   No.
21   Q   What's the normal time that somebody's on the
22   bench, if there is a normal time?
23   A   Two months, maybe three.
24   Q   And how long was Mr. Castelluccio in this
25   position?

Page 941

1    A   He was looking for a role on the bench for six
2    months.
3    Q   We've discussed some 5-minute drills
4    previously that happened when Mr. Castelluccio was on
5    the bench.  He was on your ITD drill as of January
6    1st, 2008, right?
7    A   Yes.
8    Q   Why was he not on the drill previously?
9    A   It's not normal practice to have one of the
10   colleagues on a team on the 5-minute drill.
11   Q   What do you mean by that?
12   A   One of my direct reports to be on the 5-minute
13   drill.
14   Q   So these were people who sat on the -- who had
15   previously sat on the drill with him?
16   A   Yes.
17   Q   And that's generally not done?
18   A   Generally not done.
19   Q   But he was on the Zapfel drill earlier in
20   2007, I think we agreed June, right?
21   A   Yes.
22   Q   And you were on some of the Zapfel drills, all
23   of them?
24   A   If I wasn't with a client or on a plane, I was
25   on them.

Page 942

1    Q   Now, your organization, did you have a --
2    during 2007, when you were head of GTS, ITD Americas,
3    did you have a 5-minute drill every month?
4    A   No.
5    Q   How frequently did you have 5-minute drills?
6    A   It would depend if we had open roles.  So in a
7    year, I might have five 5-minute drills.
8    Q   On the drills, particularly the Zapfel -- I
9    think you said you didn't participate in the Pat Kerin
10   drill.
11   A   No.
12   Q   On the Zapfel drills, did you speak about Mr.
13   Castelluccio?
14   A   Yes.
15   Q   How frequently?
16   A   If there was ever a role that I thought he
17   could fit, I was discussing him.
18   Q   Now, did you say -- do you recall saying
19   anything negative about Mr. Castelluccio at any of
20   those 5-minute drills?
21   A   No.
22   Q   Did you say anything that in your opinion
23   would have made it harder for him to get a job from
24   the people that were on the drill?
25   A   No.

Page 943

1    Q   If you thought his performance was as poor as
2    you say it was, how could you recommend him?
3    A   Because several of the jobs were at a lower
4    band, a director band, and I thought with his
5    technical competence and background, that he could
6    perform those roles, they were a lot smaller, but that
7    he could be competitive for those roles.
8    Q   Did you have -- do you have any control over
9    whether another senior executive selected Mr.
10   Castelluccio for an open job?
11   A   No.
12   Q   What could you do on his behalf?
13   A   I could discuss him in the 5-minute drills,
14   but I -- it was their choice in the end of the day.
15   Q   Let me ask if we can put up -- I think we've
16   seen this, we'll go through this briefly -- number
17   114, please.
18       This was, I believe, put up yesterday, and
19   this is -- what is this, Ms. Collins-Smee?
20   A   This is a note that I sent to Mark Hennessey,
21   who was the CIO of IBM at that time.
22   Q   And why did you send it to Mr. Hennessey?
23   A   Because in my discussions with Jim, that day
24   we were discussing his -- who he'd spoken to, who he
25   hadn't, he said he hadn't spoken to Mark.  Mark had

Page 944

1  lots of IT jobs in his area. He was a CIO, another
2  part of the business. And I said, Let me reach out to
3  him. Send me your resumé, I'll reach out to Mark."
4      Q  So just so everybody's on the same page, we
5  should have done this a long time ago, you want to
6  tell us what CIO means?
7      A  I'm sorry.
8      Q  That's okay. Nobody defined it yet, so go
9  ahead and define it.
10     A  That's chief information officer of IBM. So
11 he would be responsible for internal IBM systems,
12 processes that we use for technology. Just within
13 IBM, not for our external clients.
14     Q  So when we've heard about Mark Boxer being the
15 CIO at WellPoint, that's a similar role for him?
16     A  Same job that Mark Boxer had, but he had it
17 for IBM, yes.
18     Q  And then I think we looked quickly at
19 Defendant's Exhibit 115, too, yesterday. You want to
20 put that up?
21         This is a series of e-mails from you to Liz
22 Smith. Who is Ms. Smith?
23     A  Liz Smith had another large organization in
24 services. Again, not part of our GTS organization.
25 And she was somebody else that I asked Jim if he had

Page 945

1  spoken to Liz Smith in his networking, and he said he
2  hadn't. So I offered that Liz Smith had lots of
3  roles, let me see if there was a role for him. And
4  again, that's part of where I asked him to get me his
5  latest resumé. I also spoke to Liz about Jim.
6      Q  Now, you sent this to her on the 20th?
7      A  Yes.
8      Q  Of May?
9      A  Yes.
10     Q  And she writes back to you, just above that?
11     A  I don't see that.
12     Q  That's okay, we'll go up to that.
13         And then you write back to her on the 22nd. I
14 wonder if we can put up just the very top of the page.
15 I guess the top of the page disappeared. The top of
16 page 2.
17         Ms. Collins-Smee, can you read that?
18     A  Yes.
19     Q  Maybe you can tell us what that says?
20     A  So I was thanking Liz for her consideration of
21 Jim. My point, I know it's rough all over, this was
22 '08 and we were doing reductions, was my reference
23 there, but I want to make sure that I'm scouring all
24 possibilities for him.
25     Q  Now, who's Connie Murphy?

Page 946

1      A  Connie Murphy is the -- she's in HR, and she's
2  the executive resources person that would pull all the
3  slates and organize all the 5-minute drills.
4      Q  Did you have any -- did she have a supporting
5  role to you?
6      A  Yes.
7      Q  What was that?
8      A  She supported Keith Holmes in HR and me for
9  executive resources for our team.
10     Q  So your team had -- Mr. Holmes was the
11 principal HR person?
12     A  Yes.
13     Q  And then she was somebody who worked on his
14 team?
15     A  She actually worked on a different team at
16 IBM, but she supported him, yes.
17     Q  Did you ever have a conversation with Ms.
18 Murphy asking her to help find positions for Mr.
19 Castelluccio?
20     A  Yes.
21     Q  How many?
22     A  Several.
23     Q  When?
24     A  During the year.
25     Q  Let me put up, if we can, would you put up

Page 947

1  Defendant's Exhibit 128, please.
2          What is this document?
3      A  This is a document, April 1st, from Connie to
4  Bill Barnett, who ran the network area for us in GTS,
5  Bill didn't work for me.
6      Q  What do you mean "who ran the network area"?
7      A  We had a team of people that were network
8  experts, and he worked in that team.
9      Q  And was he a colleague of yours?
10     A  Yes.
11     Q  And would you read to the jury what her
12 message is to Mr. Barnett?
13     A  "Hi, Bill. Jim is available and Joanne
14 Collins-Smee recommends him as a candidate for your
15 open director's position. Please let me know if
16 you're interested. Contact should be through Joanne
17 initially."
18     Q  And then the next few pages of this are
19 various materials dealing with Mr. Castelluccio,
20 right?
21         If it's easier for you, by the way, to look at
22 it in the book, of course. This is number 128. I
23 don't know if -- the book goes up to some number. I
24 think we've two binders.
25     A  128 is not this one, though.

9 (Pages 944 to 947)

Page 948

1      Q   I have this as Defendant's 128.
2          Well, that's all right.  It's on the screen.
3   We'll find it.  There might be a problem with the
4   notebook.  But that's what this one is, is Defendant's
5   128.
6          Did you ever hear back on this?
7      A   I spoke to Connie, and I think I spoke to Bill
8   directly.
9      Q   Let me ask that you turn over and we put up on
10  the screen Defendant's Exhibit 124, please.
11         If you go all the way to the back of this,
12  this is a note from Connie Murphy to Jack Overacre.
13  Can we go all the way to the back?
14         And this is dated May 14, correct?
15     A   Yes.
16     Q   Before you had any discussion with Mr.
17  Castelluccio about 30 days or anything like that?
18     A   Yes.
19     Q   And what's the -- what does Ms. Murphy say to
20  Mr. Overacre?
21     A   Connie asked Jack if Jim Castelluccio had been
22  interviewed by Jack for a director's role in his area,
23  the Global Interlock Process.  Larry, who is part of
24  the 5-minute drill, believed he was, as Jack discussed
25  Jim as one of the candidates.  I asked Connie, saying

Page 949

1   that Joanne asked that we ensure Jim was interviewed
2   and received feedback about his candidacy.
3      Q   Without going into all four pages of this
4   document of the back and forth between Mr. Overacre
5   and Ms. Murphy, is it your understanding that he was
6   interviewed?
7      A   Yes.
8      Q   So let's leave it at that.  And ladies and
9   gentlemen, if you're interested, at some point, you'll
10  get number 124 and you can read the back and forth on
11  that issue.
12         But there was another one.  This issue, this
13  Mr. Overacre issue was also came up in Plaintiff's
14  Exhibit 82, which was on the screen yesterday and
15  which the jury saw.  So can we put that up there?
16         Now, I think, there are two portions that I'd
17  like to direct your attention to.  These were Ms.
18  Murphy's notes of a 5-minute drill meeting.
19     A   Of Bob Zapfel.
20     Q   Zapfel's meeting, okay.
21         And we're looking at page 2 of Plaintiff's
22  Exhibit number 82, correct?
23     A   Yes.
24     Q   Now, there are two positions that I'd like to
25  direct your attention to.  This is -- one of them is

Page 950

1   the Director Global Interlock Process, right?
2      A   Yes.
3      Q   Is that what we just saw?
4      A   Yes.
5      Q   Now, her notes are dated 5/9/2008.  But tell
6   us what -- what's up here.  Read both sentences and
7   tell us what happened, as best you can.
8      A   I asked Jim be interviewed, and Larry, who was
9   Jack Overacre's boss, who was one of my colleagues,
10  said he believed he was, and I wanted to ensure that
11  he was interviewed and that we received feedback about
12  his candidacy.
13     Q   Why was it important for him to receive
14  feedback about his candidacy?
15     A   Because we wanted to see how he was doing in
16  the interviews and make sure that Jim knew if there
17  was anything else he needed to work on.
18     Q   And that relates to this Defendant's Exhibit
19  128 that we just looked at, right?
20     A   Yes.
21     Q   All right.  The next one is for a Director of
22  Network Services Integration, and I don't know how to
23  pronounce the name.
24     A   Joe Dzulak.
25     Q   Joe Dzulak, okay.  Why don't you explain what

Page 951

1   this entry is and what the discussion about this role
2   and Mr. Castelluccio was at the 5-minute drill
3   meeting?
4      A   So this was a network role that was a smaller
5   role, so it was a lower banded role, but still an
6   executive role, a director role, and I thought with
7   Jim's background, that he would be an excellent
8   candidate for this role, and I had a back and forth
9   with Joe Dzulak about why not Jim.  He was very firm
10  on his candidate, which is Ann Chin.  Again, we had a
11  lot of discussion about this, and he selected Ann Chin
12  for the role.
13     Q   And so why did you want his -- Mr.
14  Castelluccio's name added for the record?
15     A   Because I thought that Jim could have
16  performed this role.
17     Q   Why would Connie write, "for the record," in
18  quotes?  Do you know?
19     A   Because I was vehement that Jim should be
20  considered for this role.
21     Q   Let's talk about what ultimately happened.
22  How long did Mr. Castelluccio have to find another
23  position within IBM?
24     A   Six months.
25     Q   And as far as you know, is that more or less

Page 952

1  time than other executives had been given at IBM?
2     A   Much more.
3     Q   Now, during the time -- during this six month
4  period, did you have much contact with Mr.
5  Castelluccio?
6     A   Not much.
7     Q   Did he come to the office every day?
8     A   No.
9     Q   How far away was your office from his?
10    A   Couple of doors down.
11    Q   Did you travel much during that period?
12    A   I did.
13    Q   If you were in the office, would you have
14  known that he was there?
15    A   Oh, yes.
16    Q   Why?
17    A   Because I'm always up and around and out, and
18  it's just -- was right down the hall, so...
19    Q   Okay.  He complained that you didn't give him
20  any work assignments during this period of time.  Is
21  that something you would do with a vice president?
22    A   No.
23    Q   Why not?
24    A   Because he did not have a role.  We were
25  looking for a role.  He should have been focused a

Page 953

1  hundred percent of the time on looking for a new role.
2  At a vice president level, there's a role to fill.  We
3  don't give busy work.  It's all about looking a
4  hundred percent of the time for the next job.
5     Q   He testified that he came to you sometime in
6  March and asked you to assign him work.  Do you
7  remember a conversation in March?
8     A   Do I remember that conversation?
9     Q   Yes.
10    A   No.
11    Q   If there was -- well, let's put it this way.
12  Do you remember telling him in March that he was
13  eligible to retire?
14    A   No.
15    Q   Are you certain you didn't say that to him?
16    A   Certain.
17    Q   Did Mr. Castelluccio ever tell you that he
18  thought you weren't doing enough for him in his job
19  search?
20    A   No.
21    Q   Did he ever ask you to -- did you ever refuse
22  to do something that he asked you to do in his job
23  search?
24    A   Never.
25    Q   I want to go to Defendant's Exhibit 107, which

Page 954

1  the jury has seen previously.  The these are the seven
2  positions that were filled in your organization.  Do
3  you remember looking at this document?
4     A   Yes.
5     Q   Now, these jobs were within your organization?
6     A   Yes.
7     Q   Did you have final authority for the decisions
8  that were being made?
9     A   I would make a recommendation to my boss, and
10  he would have final signoff.
11    Q   Who was your boss?
12    A   At that point, Tim Shaunessy was there, in
13  May.
14    Q   So let's take a look at each of these
15  positions and the people who were put in the
16  positions, and let's go down one by one and maybe you
17  can tell us what the position was, what the person was
18  being shifted to.
19        Tony Grimaldi, Plaintiff went into this.
20        I guess before I do that, were you looking for
21  a qualified person, the best qualified person?  What
22  were you looking for?
23    A   I was looking for the best person for every
24  job, the best -- excuse me -- best qualified person.
25    Q   So these are changes that occurred within your

Page 955

1  organization.  Let's take a look -- the first mention
2  is Tony Grimaldi, and he's being shifted to where,
3  from where to where?
4     A   He was running the Communications Sector,
5  which was a large portfolio of accounts, and he was
6  moving to run -- to be the senior PE for the state of
7  Georgia.  Senior project exec.
8     Q   Why was he moved there?
9     A   He was several years in the communication
10  sector role, and there was an issue with his GTS
11  colleague in terms of continuing leadership, delivery
12  leadership on the communication sector, so we were --
13    Q   There was some friction between the two of
14  them?
15    A   Yes.
16    Q   And so he was put on the state of Georgia
17  contract.  Is that within the public sector division?
18    A   It is.
19    Q   Was Mr. Castelluccio considered for that
20  position?
21    A   Well, that state of Georgia was in Dave
22  Liederbach's portfolio.
23    Q   And did that affect --
24    A   That was a big factor, yes.  We could not --
25  Dave would not accept that.

Page 956

1    Q   So Diane Diggelmann is the next one.  What was
2    happening with Diane?  Where was she going?
3    A   So Diane was a solid 1 performer, which is our
4    top rated employee.  She managed a very large team in
5    System Server Operations, which is our hardware area,
6    so managing servers and data center components, and
7    she was going to replace -- and she had excellent
8    client skills, so she was going to replace Tony as the
9    VP of the communication sector.
10   Q   And this is, just so the jury remembers, this
11   is one of the sectors on the bottom?
12   A   Communications, industrial, yes.
13   Q   So she was going to get that team?
14   A   Yes.
15   Q   And then the next name on the list -- was Mr.
16   Castelluccio considered for that position?
17   A   I did not consider him because that was a
18   portfolio, a vice president portfolio like the first
19   role that I had to take him out of, so I felt that
20   role would be too big for him.
21   Q   The next name on the list is Reena Malangone,
22   right?
23   A   Yes.
24   Q   Tell us what she -- who she was and what she
25   was brought in to do?

Page 957

1    A   Reena was brought in to replace Diane as the
2    VP of System Server Operations.  So Diane went to the
3    Communications Sector VP.  Reena was coming in from
4    our hardware division.  I showed you all yesterday, we
5    sell services, hardware and software.  We were
6    recruiting her from the hardware division.  She was a
7    very, very highly rated, highly technical person that
8    her last assignment was in the lab, the hardware lab
9    in India developing new componentry for the hardware,
10   and systems, so we wanted her in this role because she
11   would be working with the teams introducing new
12   technology as well as new processes.  So it was a big
13   find for us, and she moved in behind Diane running
14   this part of our business.
15   Q   Now, do you remember her PBC rating?
16   A   I don't.
17   Q   Did you consider her a highly qualified
18   person?
19   A   Yes.
20   Q   And did she have technical skills that were
21   needed at the time?
22   A   Oh, yes, absolutely.  She'd just come from the
23   hardware lab, hardware laboratory, which is where we
24   develop new componentry.
25   Q   Was she, in your view, better qualified than

Page 958

1    Mr. Castelluccio?
2    A   Yes.
3    Q   Why?
4    A   Because she had this direct experience from
5    the hardware lab, and we were bringing her in to
6    manage this component of the business.
7    Q   The next name on the list is Tim Smith, and it
8    says that "Tim Smith will continue to report to me on
9    a special assignment," which sounds a little bit like
10   the CIA, so maybe you ought to tell us what the
11   special assignment was and what was going on there?
12   A   We were not ready to announce yet that there
13   was a new area being created for end user support.
14   Those are the men and women that would answer any
15   trouble calls from all of our commercial clients, and
16   they were put in all of those groups together under
17   new leadership and taking them out of their current
18   organizations.  So there was a lot of changes related
19   to that, and it was not ready in time for this
20   announcement.  Tim was going to report to somebody
21   else outside my team and it wasn't ready yet for me to
22   be able to say that.
23   Q   Do you know if Mr. Castelluccio was considered
24   for that assignment?
25   A   Yes, he was considered.

Page 959

1    Q   And how do you know that?
2    A   Because we discussed this when we were going
3    through candidates for Tim's job.
4    Q   And why was he not chosen for that job?
5    A   Tim Smith was considered to be a stronger
6    candidate, had experience in end user area, and was
7    considered to have excellent leadership skills.
8    Q   And the next page on this, if we can, who's
9    Jim Hallenbeck, or what was happening to him?
10   A   Jim Hallenbeck was coming -- again, a new
11   recruit, if you would, from another part of IBM.  And
12   I'm sorry, when I say new recruit, he had over 20
13   years in the business, as did each of the people that
14   I just spoke about.  He had 20 years in the IBM
15   business over that.  But he was coming from a section
16   of the business, and he was in a sales role that was
17   not his area of expertise, and, quite frankly, wasn't
18   doing well in that area, in the sales role, and he was
19   highly recommended to me and my boss from a man named
20   Tim Caroll, who was -- had worked with Jim.  Jim had
21   run his business area, business controls, risk
22   controls, financial operations.  We had a lot of
23   respect for Tim Caroll, and we knew that Jim
24   Hallenbeck had really helped other -- his area of the
25   business.  So he was interviewed, we brought him on,

Page 960

1    and he was able to turn a very difficult area for us
2    in business controls to get significant improvements
3    for us.
4        Q    And was Mr. Castelluccio considered for that
5    position?
6        A    Yes.
7        Q    And why was Hallenbeck chosen instead of him?
8        A    Because Hallenbeck had significant experience
9    in all of the control areas, demonstrated consistent
10   experience.
11       Q    How about Sue Sinclair, what was her
12   background and why was -- what role was she filling?
13       A    So this is still in this risk area that has to
14   do with business controls.  Sue Sinclair was very deep
15   in risk and risk management.  She was moved to take a
16   global job outside of our organization.  She was a
17   director.  She was moved to a global role.
18       Q    And did you --
19       A    Doing the same thing on a larger scale.
20       Q    And did you have a decision on -- was it your
21   decision to place her in the bigger role?
22       A    No.
23       Q    Whose was it?
24       A    It was Fernand Sanchez, who led this across
25   the globe for us.

Page 961

1        Q    And finally Patricia Ninnie-Allen, what
2    happened with her?
3        A    Patricia Ninnie-Allen backfilled -- took Sue
4    Sinclair's job.  Patricia Ninnie-Allen was doing this
5    same job in another part of the business, in GTS
6    proper, and we moved her in -- and she had a
7    phenomenal track record, she was a stellar performer,
8    so we moved her in to do the same job for us in
9    delivery.
10       Q    So was it your -- was Mr. Castelluccio
11   considered for that position?
12       A    He was.
13       Q    And why choose her instead of him?
14       A    Because she had a demonstrated track record in
15   doing the exact same job successfully, and we wanted
16   her to replicate that in the delivery organization.
17       Q    Now, were all of these -- you were not the
18   sole decision-maker, right?
19       A    No.  My boss had to agree.
20       Q    And that's Mr. Shaunessy?
21       A    At that point, yes.
22       Q    And did he agree?
23       A    Yes.
24       Q    Was it your conclusion that these individuals
25   were better qualified than Mr. Castelluccio for these

Page 962

1    positions?
2        A    Yes.
3        Q    Let's go on to another subject.
4             How many executives have you terminated during
5    your career at IBM?
6        A    One.
7        Q    Mr. Castelluccio?
8        A    Yes.
9        Q    When did you first discuss the possibility
10   that Mr. Castelluccio would be terminated, with him,
11   with Mr. Castelluccio?
12       A    May 20th.
13       Q    Was it in person or on the telephone?
14       A    It was in person.
15       Q    Where did the discussion occur?
16       A    In my office.
17       Q    Would you tell the jury what you recall about
18   that discussion?
19       A    I recall telling him that we had looked -- he
20   had looked for months and months to find a new role,
21   and that I was giving him the package, and that he
22   only had -- after he got the package, which was going
23   to come that following week, he only had one more
24   month to look for another role.
25       Q    What do you mean, "the package"?

Page 963

1        A    The package was --
2        Q    Without telling the jury in detail what the
3    package was, what do you mean just generally?
4        A    It's a monetary package that talks about his
5    years of service, the fact that he was retirement
6    eligible, and would get this sum of money if he didn't
7    find a role in the next month.
8        Q    And why did you have that discussion with him?
9    You didn't give him any documents, that is whatever
10   the package is?
11       A    That day, no.
12       Q    Why did you have that discussion with him on
13   the 20th?
14       A    Because it was a courtesy, and I wanted to
15   make sure he knew that we -- our days were ticking
16   down.  It had been five months that he had been
17   looking for a role, we couldn't do this forever, and I
18   was going to give him the package the following week,
19   and then he would have 30 days more to look for
20   another role.
21       Q    Did you discuss retirement with him in that
22   meeting?
23       A    I told him that the package would include his
24   retirement financials.
25       Q    And why was -- why did you bring this up with

Page 964

1  him at that meeting?
2      A   The 5/20 meeting?
3      Q   Yes.
4      A   Because it was a component of the package for
5  him.
6      Q   Did you meet later with him to talk about this
7  again?
8      A   I think Keith actually handed him the package.
9  I can't remember.
10     Q   When you spoke to Mr. Castelluccio in May, did
11 you tell him that he was too old to continue working
12 at IBM?
13     A   No.
14     Q   Did you believe he was too old to continue
15 working at IBM?
16     A   Absolutely not.
17     Q   Did you tell him that you wanted him to
18 retire?
19     A   No.
20     Q   What did he say back to you?
21     A   He said he still wanted to look for a role.
22 In fact, that's when I sent those other -- those two
23 e-mails to Mark Hennessey and to Liz, because he said
24 he hadn't contacted them during his five months
25 looking for a role.

Page 965

1      Q   When was the decision to terminate Mr.
2  Castelluccio made?
3      A   A couple of days before I spoke to him.
4      Q   Who made it?
5      A   Myself and my boss.
6      Q   And who was your boss at the time?
7      A   Tim Shaunessy.
8      Q   And did Mr. Castelluccio, when you met to
9  speak with him, did he ask you to reconsider the
10 decision?
11     A   No.
12     Q   Did he ask for more time?
13     A   No.
14     Q   Do you remember anything else about that
15 conversation on the 20th?
16     A   It was still on looking for a role, and what
17 else could he do to secure a new role.
18     Q   I just want to ask you two more questions
19 about the open door process. You mentioned the open
20 door. Have you ever been involved in an open door
21 investigation of anything that you did?
22     A   Never.
23     Q   During the open door investigation were you
24 interviewed by Russ Mandel?
25     A   Yes, I was.

Page 966

1      Q   And without getting into the details of that,
2  you were reprimanded as a result?
3      A   Yes.
4          MR. FASMAN:  All right, Your Honor, I
5  think I'm done with my questioning right now of Ms.
6  Collins-Smee.
7          THE COURT:  Okay.  Thank you, Mr. Fasman.
8          MR. FASMAN:  Thank you, Judge.
9          THE COURT:  Mr. Carta.
10         MR. CARTA:  Yes, Your Honor.  We're going
11 to break at 11:15, is that right?  I would like to
12 start.
13         THE COURT:  We could break at 11:15 or
14 break at 11:30.  I think probably 11:30 would be
15 better.
16         MR. CARTA:  Okay, fine.
17
18         REDIRECT EXAMINATION BY MR. CARTA:
19
20     Q   Ms. Collins-Smee, I just heard you testify,
21 and I think, I hope I got this right, that you were
22 always looking for the best person for each job, is
23 that right?
24     A   Yes.
25     Q   And you made that statement in response to

Page 967

1  your review of the various promotions that you made in
2  May of 2008, is that right, that was the context?
3      A   They weren't promotions.  They were filling
4  roles.
5      Q   New positions?
6      A   Yes.
7      Q   Is it fair to say that you wouldn't put a
8  person in a position unless you were confident that
9  they had strong abilities?
10     A   Yes.
11     Q   And you believed -- I think you just testified
12 and explained to the jurors that all of the people
13 that you put into those positions you felt were strong
14 performers?
15     A   Yes.
16     Q   Excellent performers, is that fair to say?
17     A   They may not have been excellent in their
18 prior role; for example, Jim Hallenbeck, where his
19 prior role was in sales, and that wasn't his
20 experience.
21     Q   But you considered them to be strong
22 contributors to IBM, isn't that correct?
23     A   Yes.
24     Q   Now, you've also testified a few moments ago
25 that in your view, despite the way 2 performances are

14 (Pages 964 to 967)

Page 968

1    rated by IBM, in your view, for an executive that's a
2    poor rating, is that right?
3        A   It's not a very good rating, yes.
4        Q   And it's not a rating a strong performer would
5    get, would it?  You wouldn't give a strong performer a
6    2 rating, would you?
7        A   It depended on the year.  Remember, you get a
8    performance rating every year.  You may be a strong
9    performer, but not be a good performer that year.
10       Q   And you wouldn't take someone who had poor
11   performance in one year and elevate them to another
12   position, would you?
13       A   Yes.
14       Q   You would?
15       A   Yes.
16       Q   In what context?
17       A   If it was a different role, if it was a
18   smaller role, if it was with a different client, yes.
19       Q   Let me be more specific.
20           May I have Exhibit 83 up, please?
21           MR. FASMAN:  I'm sorry, what was the
22   number?
23           MR. CARTA:  83.
24   BY MR. CARTA:
25       Q   Now, I've just heard you explain to the jurors

Page 969

1    that what strong candidates these various people are
2    that you've listed on Exhibit 83.  Let's start with
3    Mr. Grimaldi.  I believe he's the first one.
4            Isn't it a fact that in 2007, according to Mr.
5    Castelluccio, within hours of when you rated him a 2
6    you also gave Mr. Grimaldi a 2?
7            And I direct your attention to Exhibit 84 in
8    case that would help you refresh your recollection.
9        A   Yes.
10       Q   You gave Mr. Grimaldi a 2, is that correct?
11       A   Yes.
12       Q   Still think that's a poor rating for an
13   executive?
14       A   Yes.
15       Q   Let's look at Mr. Hallenbeck, going back to
16   Exhibit 83.
17           Isn't it also true that at the same time you
18   gave Mr. Castelluccio a 2 you also -- you, not someone
19   else -- you also granted Mr. Hallenbeck a 2, isn't
20   that correct?
21       A   No.
22       Q   It's not?
23       A   It was his other boss who had him that year.
24       Q   Patrick O'Donnell?
25       A   Yes.

Page 970

1        Q   And you were aware that Patrick O'Donnell had
2    given Mr. Hallenbeck a 2 rating at the time you made
3    this promotion, isn't that correct?
4        A   Yes, for his performance in sales.
5        Q   Well, there are only seven position.  Let's
6    look at another one.
7            Tim Smith.  You were just touting his
8    expertise and his ability to take this new role on.
9    Isn't it true that in the same year you gave Mr.
10   Castelluccio a 2 rating, you also rated Tim Smith with
11   a 2, isn't that correct?
12       A   Yes.
13       Q   And yet it's still your position that despite
14   the way IBM defines 2, and despite the fact that you
15   gave these people promotions, a 2 is a poor rating for
16   an executive; is that still your position?
17       A   Yes.  And Tim had significant --
18       Q   No question is pending.
19           MR. FASMAN:  I think the witness was in
20   the middle of an answer, Your Honor.  I listened to
21   Mr. Castelluccio answer my questions for five minutes,
22   I thought.  Doesn't she get a chance to explain her
23   answer?
24           THE COURT:  Yeah, Mr. Carta, I think the
25   witness was still in the process of elaborating on her

Page 971

1    answer.
2            MR. CARTA:  Fair enough.
3            THE COURT:  So can we let her continue?
4            MR. CARTA:  By all means.
5            THE COURT:  Because I think it would only
6    be fair, especially in light of the great latitude we
7    gave Mr. Castelluccio.
8            So ma'am, do you have the question in
9    mind and remember where you were?  And if you want to
10   continue with your answer, please do so.
11           THE WITNESS:  The point I was going to
12   make was that Tim Smith, even though the area we had
13   significant audit concerns, he had made significant
14   strategic improvements with the team during the year,
15   and he had laid the foundation for much more success
16   the following year.  So our audit results were poor,
17   but he had made significant improvements to the whole
18   area for us.
19   BY MR. CARTA:
20       Q   Didn't you write in his overall assessment,
21   "We have --" that would be Exhibit 155 -- "We do not
22   have our control posture anywhere where we need it.
23   Our CHQ audit score was 63, which is unacceptable
24   performance for us."  Do you recall writing that?
25       A   Yes.  However, if you look at the prior

Page 972

1  paragraph, it talks about the sizeable improvements
2  that we had in other parts of that business, and that
3  was due to Tim's leading the team and putting in new
4  processes.
5      Q   Do you recall -- question withdrawn.
6          Is it still your position that a 2 rating for
7  an executive is a poor rating?
8      A   Yes.
9      Q   Do you recall explaining to the jurors how
10 satisfied you were with the performance of Miguel
11 Echavarria?
12     A   Yes.
13     Q   And you were touting him as an exceptional
14 performer, were you not?
15     A   He's very good, very good.
16     Q   Very competent executive?
17     A   Yes.
18     Q   And he was the one to come in and take Mr.
19 Castelluccio's position as vice president of public
20 sector, isn't that true?
21     A   Yes.
22     Q   Isn't it true in 2009 you rated Mr. Echavarria
23 with a 2 rating?
24     A   I don't know.
25     Q   Exhibit 171. I'm sorry, Defendant's Exhibit

Page 973

1  171.
2      A   This is -- hang on. So this is '09.
3      Q   Yes. And this was a rating that you made,
4  this isn't someone else's rating.
5      A   I have to read through it, I'm sorry.
6      Q   By all means. I'm sorry.
7      A   Okay. Yes.
8      Q   So the answer is yes, you also rated Mr.
9  Miguel Echavarria with a 2 rating, isn't that correct?
10     A   Yes. And I talked about in my assessment here
11 the reason for that, which was the control posture in
12 that area was not where it needed to be. So again,
13 Miguel had made significant improvements, which I talk
14 about here, in terms of the stability of the public
15 sector account, but we had results which were still
16 unacceptable in the controls area.
17     Q   Were any of these people -- I'm sorry.
18     A   And you can see Miguel made a comment here,
19 which is that he has my commitment -- I had his
20 commitment to improve and to make sure that we
21 received overall delivery excellence in the following
22 area.
23     Q   Were any of these people relegated to the
24 bench?
25     A   Relegated?

Page 974

1      Q   Pulled off the position and put on the bench,
2  by you.
3      A   I don't know what you're saying. While
4  they're in those jobs?
5      Q   At any point.
6      A   Not that I'm aware of.
7      Q   You certainly never did that. These people
8  that you gave 2 ratings to, you never pulled them out
9  of their job and put them on the bench, is that
10 correct?
11     A   They weren't -- if you were failing in your
12 role, I would have to take them out. They were not
13 failing in their roles.
14     Q   They were not failing. They had the same
15 rating Mr. Castelluccio did, a 2 rating, isn't that
16 correct?
17     A   It's a very broad spectrum, and I should have
18 left the 3 appraisal rating, which we established
19 before.
20     Q   I'm not going to argue with you. You rated
21 him a 2, after several discussions with him, after
22 conversations with Mr. Zapfel, isn't that correct?
23     A   Yes.
24     Q   And in fact, in the end, Mr. Zapfel agreed to
25 the 2 rating, isn't that a fact?

Page 975

1      A   Yes.
2      Q   And I think you already testified that Mr.
3  Zapfel had interacted at some length with Mr.
4  Castelluccio that same year, isn't that correct?
5      A   Yes.
6      Q   I want to go back to this so-called reprimand.
7  You've indicated that at some point Mr. Shaunessy had
8  a discussion with you and that you were reprimanded,
9  is that your testimony?
10     A   Yes.
11     Q   And let's try to understand when that
12 happened. Was that after Mr. Castelluccio had gone to
13 Mr. Walker a second time and complained about age
14 discrimination?
15     A   I don't know what you're referencing, but when
16 I was reprimanded was in August, the end of August,
17 August 28th, after the open door investigation by Russ
18 Mandel was completed. That's when Tim Shaunessy spoke
19 to me.
20     Q   Okay, August 28th, thank you for the date.
21         So the jurors may have it in their notes, if
22 not we'll have documents that show that Mr.
23 Castelluccio's second meeting with Mr. Walker was in
24 May of 2008. And in June 2008 hadn't Mr. Castelluccio
25 also refused to accept the severance package that had

Page 976

1    been offered him and to give IBM a general release?
2    A   I'm sorry, what's the question?
3    Q   In June of 2008, Mr. Castelluccio was offered
4    a severance package, correct?
5    A   Yes.
6    Q   And in that severance package was a release,
7    releasing IBM from any possible claims, isn't that
8    correct?
9    A   Yes.
10   Q   And as of that time, Mr. Castelluccio had
11   indicated he was not going to release any claims he
12   had against IBM, isn't that correct?
13   A   I assume that was part of the open door
14   investigation.
15   Q   And it was after that that Mr. Shaunessy spoke
16   to you, according to you, and reprimanded you, is that
17   correct?
18   A   It was after the open door investigation run
19   by Russ, that's when that was completed, and the IBM
20   findings were in, that's when I was reprimanded about
21   changing -- improving the 3 rating to the 2 rating.
22   Q   And Mr. Castelluccio was long gone at this
23   point, he wasn't even at IBM any longer, is that
24   right?
25   A   He had left the end of June.

Page 977

1    Q   Was Mr. Zapfel reprimanded?
2    A   I don't know.
3    Q   I'm confused, because I thought it was Mr.
4    Zapfel's job to make sure that all of the PBC ratings
5    were fair and equal across the board.  That was his
6    function.  That's what I've understood.
7    MR. FASMAN:  I'm sorry, but is that a
8    question?  Is Mr. Carta testifying?
9    THE COURT:  No, it's a question.
10   THE WITNESS:  I was the one that changed
11   the appraisal operating, I was the one responsible, so
12   I was the one that was reprimanded.
13   BY MR. CARTA:
14   Q   And you were responsible for giving him the 2,
15   isn't that correct?
16   A   I was responsible -- I was reprimanded for
17   changing -- improving his appraisal rating.
18   Q   I understand that.
19   A   From a 3 to a 2.
20   Q   Let me go back to Mr. Zapfel.  I want to know
21   if Mr. Zapfel was reprimanded?
22   MR. FASMAN:  Asked and answered.  She
23   said she didn't know.
24   THE WITNESS:  I don't know.
25   BY MR. CARTA:

Page 978

1    Q   And then the next question was, was Mr.
2    Zapfel -- wasn't it his responsibility as a second
3    line manager to make sure that all of the ratings that
4    came up from the people who reported to him, that they
5    were all fair and equitable, and that he was distanced
6    from the direct relationship between a manager and
7    their subordinate and that he was supposed to have an
8    objective overview, and that was part of his job,
9    isn't that correct?
10   MR. FASMAN:  Your Honor, I object to the
11   form of the question.  First, it sounded like
12   testimony, but second of all, I can't -- I don't know
13   what the answer to that would be.  It sounded like a
14   paragraph long.
15   MR. CARTA:  I don't think it was asking
16   him the question.  I think if the witness doesn't
17   understand the question, she's more than welcome to
18   ask me to restate it.
19   THE WITNESS:  I was responsible for the
20   appraisal rating.
21   BY MR. CARTA:
22   Q   Did Mr. Zapfel have any responsibility as a
23   second line manager?
24   A   To sign off, yes.
25   Q   And in your opinion, that's just a rubber

Page 979

1    stamp.  He has no function to perform in his review of
2    a subordinate's PBC rating.
3    A   It's not a rubber stamp.
4    Q   It's not a rubber stamp, you'd agree with
5    that?
6    A   No.
7    Q   Very well.  So you don't know whether Mr.
8    Zapfel was reprimanded, but you do know that in the
9    final analysis Mr. Zapfel approved the 2 rating, isn't
10   that true?
11   A   Yes.
12   MR. CARTA:  Your Honor, I'm going to be
13   getting into a line of documents.  Would you mind
14   taking a break right now?
15   THE COURT:  Okay, I think that's a good
16   idea.  Let's be back at 20 minutes before 12.  And I'm
17   going to sit right here, to make sure.  20 minutes of
18   12.
19   (Recess taken from 11:25 a.m. to 11:38 a.m.)
20   THE COURT:  We're on time, for the
21   record.
22   And you may continue, Mr. Carta.
23   MR. CARTA:  Thank you, Your Honor.
24   THE WITNESS:  Excuse me, what page?
25   BY MR. CARTA:

Page 980

```
 1      Q   It's a two-page document.  Let me start off --
 2      A   Excuse me, Mr. Carta.  What tab?
 3      Q   In a moment we'll get to Exhibit 50 of
 4   Plaintiff's Exhibits.
 5      A   Okay.  Just one second.  Excuse me.
 6          Thank you.
 7      Q   I just want to make sure I understood your
 8   testimony.
 9          MR. FASMAN:  Wait.  Can she turn to the
10   exhibit?
11          MR. CARTA:  No.  Yes, you can, but the
12   question doesn't relate to the exhibit.
13          MR. FASMAN:  Oh, I'm sorry.
14          MR. CARTA:  Just trying to get things set
15   up.
16   BY MR. CARTA:
17      Q   Is it your sworn testimony that as of April
18   1st, Mr. Castelluccio was assigned 100 percent to
19   WellPoint?
20      A   Full-time to WellPoint, yes.
21      Q   And full-time means that he was no longer
22   performing the functions of vice president, isn't that
23   correct?
24      A   Yes.  I mentioned that I might ask him a
25   question or two, and he consolidated the LEAN data.
```

Page 981

```
 1   With the exception of that.
 2      Q   And I think it's your testimony that the other
 3   29 or thereabout accounts that he had been managing,
 4   those were just left to manage themselves?
 5          MR. FASMAN:  That's not -- I'm going to
 6   object.  That wasn't her testimony.
 7          MR. CARTA:  It's cross-examination, Your
 8   Honor.  That was the import of what she said.
 9          THE WITNESS:  No.  What I said was that
10   there was a project executive and a DPE on all those
11   accounts, and they would know to come to either up
12   through Dave Liederbach or myself if there were
13   issues.
14   BY MR. CARTA:
15      Q   But there were no new people assigned to those
16   other 29 or thereabout accounts.  I mean there wasn't
17   additional work, there wasn't additional personnel
18   assigned to take over the work that Mr. Castelluccio
19   had been performing before, was there?
20      A   Not that I remember.
21      Q   And you would remember if there was, wouldn't
22   you?
23      A   I would think, but I don't remember that.
24      Q   Okay.  So let's look at Exhibit 50.  Take a
25   moment, review it.  It's just a two-page document.
```

Page 982

```
 1          On April -- in fact at the end of March,
 2   leading up to April, Mr. Castelluccio was actually in
 3   the state of Texas, do you recall that?
 4      A   Excuse me?  I'm sorry, could you repeat the
 5   question?
 6      Q   Yes.  Do you recall that up through the end of
 7   March and beginning of April Mr. Castelluccio was
 8   actually in Texas because there was the turn-over of
 9   the --
10      A   There was a cut-over, yes.
11      Q   And the cut-over was April 1st, do you recall
12   that?
13      A   I knew it was right around there.
14      Q   And he was actually in Texas at the time,
15   wasn't he?
16      A   As he would be.
17      Q   Right.  And that was the time when you told
18   him, hereinafter you're full-time on WellPoint.
19      A   Yes.
20      Q   And in this e-mail you're asking Mr.
21   Castelluccio for a follow-up, isn't that right?
22      A   Well, this was -- it looks like a couple of --
23   you know, 41 is the note from Jim saying the cut-over
24   happened, and then thank you.  So it wasn't follow-up.
25      Q   And the top one is your e-mail to Mr.
```

Page 983

```
 1   Castelluccio saying, "Please keep us posted on
 2   progress and let us know what you need, if anything,
 3   from me."  And that related to state of Texas, didn't
 4   it?
 5      A   That day, yes.
 6      Q   And -- oh, you're saying that this just
 7   related to work that he needed to continue to do that
 8   day?
 9      A   This was the cut-over.  I had told him the
10   28th, which was two days before -- he was there for
11   the cut-over.  He was handing this over explaining
12   what happened during the cut-over.
13      Q   And you're asking him to continue to keep you
14   posted on what happens after the cut-over.  A cut-over
15   is just a dramatic event, then there's quite a bit to
16   be done after that, isn't that correct?
17      A   Not necessarily.
18      Q   In this particular case there was more to be
19   done after the mere cut-over, wasn't there?
20      A   And there's many people there assigned to work
21   that.
22      Q   And you're asking him to keep you apprised of
23   the progress as that contract continues to go forward,
24   isn't that true?  You're saying this request for
25   additional information was just limited to just that
```

Page 984

1  day, just tell me what's going to happen tomorrow,
2  that's all?
3     A   That immediate -- yes.  There's often big
4  issues right at the cut-over, the hours, the day, the
5  two days after.
6     Q   And he was responsible for maintaining -- for
7  solving any of those problems, wasn't he?
8     A   Well, actually Dave Liederbach, Brian
9  Whitfield were running most of that work.
10    Q   They were running the delivery part of it?
11    A   They were running the overall management, and
12 we had a large delivery team that were there on the
13 ground.  I can't remember the DPE's name of the
14 contract, but he would have been there as well
15 supervising delivery.
16    Q   Let's roll forward a little bit in time.  May
17 I see Exhibit 146, Plaintiff's Exhibit 146, please?
18    A   So that's the other book?
19    Q   No.
20    A   Oh, okay.
21    Q   146, I think it might be toward the back.
22 It's a multi-page document, so I want you to take your
23 time and review it.
24       My first question, to try to help you, will be
25 on the e-mail that's in the middle of the second to

Page 985

1  last page.  But take your time.
2     A   Okay.
3     Q   Let's just set the time frame.  This is May
4  22nd, 2007, so it's approximately two months after the
5  earlier April 1st e-mail.
6     A   Yes.
7     Q   And this also concerns the state of Texas,
8  does it not?
9     A   It's related to the resource action across all
10 of the accounts.
11    Q   It is in part related to the resource action.
12 It's also -- if you look at the e-mail, as I said, on
13 the second to the last page, from Mr. Castelluccio to
14 your HR executive, Mr. Holmes, it also concerns the
15 deployment of 12 additional persons with respect to
16 the RA, but it also concerns the deployment of 11
17 additional people as well, doesn't it?
18    A   The redeploys were components of the RA.  They
19 were actually shifting roles.  So redeployment meant
20 taking them off one account or one area of the
21 business and redeploying them into the other.  So they
22 were a componentvity of the resource action.
23    Q   So if it all involves the resource action,
24 that's fine, but we're talking about two different
25 moves, one of which is 12 people who were, it says,

Page 986

1  not involved in the resource action.  Do you see that?
2  It's on your screen.
3     A   Yes.  Excuse me, sir, it says "not involving
4  resource action selected employees," which would mean
5  that they haven't been selected for a resource action,
6  but their roles will be changed as a result of the
7  resource action, we would redeploy them to another
8  account that may need their services.
9     Q   Very well.  And the sentence below that says
10 that there are 11 people who are also looking to be
11 redeployed to the Texas account, is that right?
12    A   RA, selected, meaning they were selected to be
13 on the resource action.
14    Q   Correct.  So we're basically talking about a
15 request to take 23 people involved in some
16 relationship to the resource action and put them on
17 the Texas account, isn't that what that generally is
18 about?
19    A   It's to move them within the Texas account,
20 yes.
21    Q   And if you would take a look at the e-mail on
22 the bottom of the first page, this is from Charles
23 Carpenter to Brian Whitfield.  I think you just
24 mentioned that he works with Mr. Liederbach.  He was
25 one of Mr. Liederbach's vice presidents, is that

Page 987

1  right?
2     A   Yes.  He ran -- the state of Texas was in his
3  area.
4     Q   He was a vice president in charge of, among
5  other things, the state of Texas government contracts,
6  is that right?
7     A   Yes.
8     Q   And would you read the highlighted section on
9  the bottom of that page?
10    A   What's highlighted here is to Jim, 5/21, Brian
11 Whitfield.
12    Q   It seems as if I stole the highlighted one.
13 My error.  I'll read it.
14       This is Mr. Carpenter in May saying to Brian
15 Whitfield.  "The word I am getting from ITD is that
16 Jim is having no luck getting Joanne's attention on
17 this.  She has postponed and rescheduled each of the
18 meetings to date, and the people are scheduled to
19 depart next week."
20       Depart next week means they're not going to be
21 available for the state of Texas job anymore, is that
22 it?
23       MR. FASMAN:  Your Honor, I don't believe
24 my witness, Ms. Collins-Smee, is on this, and Mr.
25 Carta appears to be asking her to comment on what Mr.

Page 988

1    Carpenter meant in an e-mail to Brian Whitfield that
2    she was not included on. I don't think there's any
3    foundation that she could -- that's been established
4    that could allow her to comment on what he was saying.
5            THE COURT: Well, I agree to the extent
6    that there's no foundation. This is like a --
7    something coming out of the blue. So you could ask
8    some foundation questions, which I'm sure you'll be
9    able to do, but right now, I mean it appears that
10   there's something up there that's critical of Ms.
11   Collins-Smee, and you're asking her about it, to
12   affirm or disaffirm, or agree or disagree, whatever,
13   but you got to ask some foundation questions.
14   BY MR. CARTA:
15       Q   Ms. Collins-Smee, do you recall there being a
16   concern about getting people on the state of Texas
17   account because there was, quote unquote, some loss of
18   some momentum in turning that account around in May of
19   2008?
20       A   Excuse me, is the question related to this
21   e-mail, or do you want me to forget about the e-mail
22   now?
23       Q   Well, it's more general. We're building up a
24   foundation for the --
25       A   Okay.

Page 989

1        Q   I just want to know what you recall of this
2    situation, if anything?
3        A   We were having a resource action across the
4    entire area.
5        Q   I understand. And do you recall that there
6    was a concern about getting approval for certain --
7    having a certain group of people, people that we just
8    talked about in the earlier e-mail, being redeployed
9    to the state of Texas?
10       A   The state of Texas was a brand new contract
11   that had just come in, so there was always in the
12   beginning requests, and the requests related to the
13   resource action were getting talent that would be
14   freed up through the resource action in another area,
15   putting them on a variety of accounts. We did that
16   across the whole business.
17       Q   But I'm specifically asking you about the
18   state of Texas.
19       A   State of Texas because it was a brand new
20   account would have absolutely had requests for
21   additional resources.
22       Q   And those requests would have come to you?
23       A   They would have went through a process with
24   HR, and come to me, yes.
25       Q   And do you recall whether there were specific

Page 990

1    requests made of you to obtain additional employees
2    for the state of Texas?
3        A   Yes.
4        Q   And looking now back at that e-mail, do you
5    recognize this as part of that process where you were
6    being asked to make the approval, approve redeployment
7    of specifically 23 employees?
8        A   We met several times a week on this, so I
9    don't agree -- I don't recognize this e-mail. I
10   didn't get it before. But I don't agree that Jim
11   could not get my attention on this. We had a
12   conference call very regularly about status.
13       Q   So you do recall there being regular
14   communications with Mr. Castelluccio concerning the
15   need to get certain new -- certain employees
16   redeployed to the state of Texas?
17       A   No, no, no. I'm sorry.
18       Q   You have no recollection of discussing with
19   Mr. Castelluccio the need to redeploy staff to the
20   state of Texas job in May of 2008?
21       A   As I said, we were running a resource action.
22   There were conference calls that I had with a variety
23   of people regularly. I was available to discuss any
24   situations on any accounts. So I was talking to many,
25   many people during that time, and available for any

Page 991

1    discussions regarding redeployments, but there was a
2    process that we ran that eventually came to me.
3        Q   Okay. And but with respect to this specific
4    redeployment, you're saying that you don't have a
5    recollection of the request being made to you?
6        A   I would assume there were requests. There
7    were requests on every account to do some level --
8        Q   I'm not asking you about every account, I'm
9    asking you about this account specifically.
10       A   I would assume state of Texas, yes.
11       Q   And let's move up to the e-mail above it.
12   This is also from Brian Whitfield to Mr. Castelluccio.
13           And it says, "Jim, please let me know how we
14   can push this through. As you know, we are struggling
15   to keep up in Texas and recently shifted some momentum
16   to our side, momentum we cannot afford to lose?"
17           Again, Mr. Whitfield was the vice president
18   for Mr. Liederbach on the state of Texas, correct?
19       A   Yes.
20       Q   And he was communicating to Mr. Castelluccio
21   in his role as vice president of public sector, isn't
22   that correct?
23           MR. FASMAN: Objection. I don't know how
24   this witness, again, can testify about an e-mail she's
25   not on, and being sent from Mr. Whitfield to Mr.

Page 992

```
1    Castelluccio.
2         THE COURT:  Well, overruled.  I mean this
3    is an intelligent witness, and she can say she doesn't
4    know if she doesn't know.  Mr. Carta's question was,
5    doesn't it seem that this is a communication going
6    backward.  You can answer that question if you're able
7    to.  If you don't know, just say you don't know.
8         THE WITNESS:  Okay.  Could you repeat
9    that, please?
10   BY MR. CARTA:
11        Q   I asked you if this was a communication from
12   Brian Whitfield, who was vice president in connection
13   with the state of Texas, and whether that was a
14   communication as you see to Mr. Castelluccio, and I'm
15   asking you wasn't this sent to him in his capacity as
16   vice president of public sector?
17        A   I don't know.  I don't know.
18        Q   You don't know.
19        A   I would assume it's because Jim was still
20   rolling up the RA request for me, the resource action,
21   as I mentioned.  That was the only responsibility he
22   still had from the vice president role.
23        Q   Well, Mr. Whitfield says, "Please let me know
24   how we can push this through."
25        "This through" was the -- this was the request
```

Page 993

```
1    of the 23 new redeployed employees, was it not?
2         A   It was related to the resource action.
3         Q   But it was a request for additional employees
4    on the state of Texas, isn't that correct?
5         A   Yes.
6         Q   And this is Mr. Whitfield's e-mail to Mr.
7    Castelluccio asking if he can -- Mr. Castelluccio can
8    help get those new employees pushed through, isn't
9    that right?
10        A   That's what the e-mail says.
11        Q   And the next e-mail is Mr. Castelluccio's
12   e-mail to whom, the one on the top?
13        A   To Keith Holmes.
14        Q   And Keith Holmes was your?
15        A   HR leader.
16        Q   Exactly.  And Mr. Castelluccio is asking your
17   HR person, if he has a decision yet on the request,
18   isn't that correct?
19        A   Yes.
20        Q   And that involves state of Texas and the RA
21   action, and that's May 22nd, 2007, isn't that right?
22        A   It's the resource action, state of Texas being
23   one of those accounts.
24        Q   May I have Exhibit 155, please.
25        MR. FASMAN:  I'm sorry, Mr. Carta.
```

Page 994

```
1         MR. CARTA:  I'm sorry, Plaintiff's 155.
2         MR. FASMAN:  155, thank you.
3         MR. CARTA:  You're welcome.
4         MR. DUFFIELD:  Mark, is that 55 or 155?
5         MR. CARTA:  I'm sorry, 55.
6         THE WITNESS:  Okay.
7    BY MR. CARTA:
8         Q   Can we agree this was an e-mail you were
9    copied on?
10        A   Yes.
11        Q   And it was sent, again, by your HR
12   professional?
13        A   Yes.
14        Q   And it was sent on May 30th of 2007?
15        A   Yes.
16        Q   Two months after you maintain Mr. Castelluccio
17   no longer had any responsibilities other than
18   WellPoint, is that correct?
19        A   Other than consolidating the resource action
20   across the public sector.
21        Q   And this e-mail is from your HR professional
22   to Mr. Castelluccio and also to Brian Morgan.  I
23   understand Mr. Morgan was a director in Mr.
24   Liederbach's organization.  Do you know if that's
25   correct?
```

Page 995

```
1         A   I think so.
2         Q   And the topic is public sector impact
3    information.  Do you see that, the "re" line?
4         A   Yes.
5         Q   And it indicates -- or Mr. Holmes is asking
6    Jim and Brian, so it's asking Mr. Castelluccio and
7    someone from Mr. Liederbach's organization, "I'm
8    providing the attached list of employees in the May 30
9    resource action for work on public sector accounts to
10   help you with your impact assessment and mitigation
11   planning."
12        What phase of the resource action is the
13   impact assessment?
14        A   It's the information is consolidated
15   throughout the resource action.
16        Q   But isn't it an assessment that's conducted
17   after the resource action is conducted to understand
18   the impact of the jobs that are being taken out?
19        A   No.  It's actually done throughout the
20   resource action looking at roles that can be changed,
21   and it looks at people that were doing roles, and
22   looking at their names, getting an understanding of
23   what was going to change, to be able to support that.
24        Q   And how about mitigation planning, you're
25   saying that that mitigation planning is also something
```

Page 996

1    that's done before the resource action is over?
2      A   It's done during, as you're doing the
3    planning, yes.
4      Q   So when your professional, Mr. Holmes,
5    indicates to Jim and Brian that he's providing them
6    information to help them "with your impact and
7    mitigation planning," it's your position that that was
8    already done, is that what I understand you to say?
9      A   It is done -- it's a cyclical process where
10   employees are looked at, and there's many iterations
11   of the risk and the associated mitigation.
12     Q   I'm kind of simple and I just don't know that
13   I get this.  It sounds to me like it's something that
14   has to be done in the future, but you're saying the
15   impact assessment and mitigation planning had already
16   been done and he's providing him with information for
17   that?
18     A   It's done throughout the process.  So if HR
19   makes adjustments to the list of employees, they would
20   then go back and adjust again the resource actions and
21   the mitigations.
22     Q   So this information is being provided to them
23   so that they can complete the impact assessment in
24   mitigation planning, isn't that correct?
25     A   If there was any adjustments that would need

Page 997

1    to be made.
2      Q   And that's part of the assessment that the
3    person running this resource action and responsible
4    would have to do, make an assessment of whether there
5    were further adjustments that need to be made, isn't
6    that correct?
7      A   And it was done at the account level where
8    there's an understanding of people and processes for
9    each of those accounts.
10     Q   But your e-mail from your professional is
11   sent, again, to Mr. Castelluccio on May 30th, isn't
12   that correct?
13     A   Yes.
14     Q   And this, again, concerns the resource action?
15     A   Yes.
16     Q   Exhibit 55, please.  Defendant's 55.
17         Do you recognize this as an e-mail from Keenie
18   McDonald that was sent to you?
19     A   Yes.
20     Q   And it was sent, again, in May of 2007?
21     A   Yes.
22     Q   Approximately two months after Mr.
23   Castelluccio was supposedly a hundred percent on
24   WellPoint, is that correct?
25     A   Yes.

Page 998

1      Q   And it was sent also to Dave Liederbach.
2      A   Yes.
3      Q   And again, Keenie McDonald was the person who
4    had overall responsibility for WellPoint, right?
5      A   Yes.
6      Q   She knew more about what was going on in
7    WellPoint than any other single executive at IBM, from
8    all different angles, isn't that correct?
9      A   Yes.
10     Q   That was her job.
11     A   Yes.
12     Q   And in her e-mail she says to you and to Mr.
13   Castelluccio and to Mr. Liederbach, "Jim has not been
14   full-time on WellPoint."  Isn't that correct?
15     A   That's what the e-mail says.
16     Q   Yes, that's what the contemporaneous document
17   says.
18         "Can I tell Boxer that effective June 1 Jim
19   will have completed all his transition activities and
20   his full-time -- and is full-time acting DPE for
21   WellPoint as we continue to work through the permanent
22   backfill?"
23         Do you remember Ms. McDonald saying that to
24   you, in an e-mail?
25     A   I can see the e-mail.

Page 999

1      Q   Are you aware of any written response to this
2    e-mail?
3      A   I probably -- I'm not sure.  I may have called
4    her.
5      Q   I'm asking if you're aware of any written
6    response to this e-mail?
7      A   I might have sent a response related to when
8    Miguel was coming in place.
9      Q   And that would have been it?
10     A   I think so.
11     Q   So the fact that she's indicating that Jim was
12   not full-time on WellPoint didn't warrant a response
13   because everybody understood that Jim was not
14   full-time on WellPoint as of May 24th, 2007, isn't
15   that correct?
16         MR. FASMAN:  Your Honor, I'm going to
17   object.
18         THE WITNESS:  No.
19         MR. FASMAN:  That's an improper question.
20         THE COURT:  Why?
21         MR. FASMAN:  It's argument.
22         THE COURT:  Overruled.
23         THE WITNESS:  I think I probably spoke to
24   her, because I was -- I'm sure I was surprised why
25   wasn't she seeing Jim all the time, why didn't she

Page 1000

1   feel he was full-time on WellPoint.
2   BY MR. CARTA:
3       Q   You just said that the only response that you
4   would have made, and the jurors heard it, was that you
5   would have responded about Miguel, isn't that correct?
6       A   No.  Excuse me.  What I said -- what I thought
7   I said was, I probably called her to discuss the
8   e-mail, and if I sent an e-mail, it might have been
9   what date Miguel was coming.
10      Q   But you have no documentation to support that.
11      A   Not that I'm aware of.
12      Q   Let me just talk for a moment about the last
13  phrase there.  "We continue to work through the
14  permanent backfill."  Backfill, in IBM parlance, that
15  means somebody to take a new job, right?
16      A   Yes.
17      Q   And the backfill that we're talking about here
18  is the backfill from Mike Morin, isn't that correct?
19      A   That you're talking about --
20      Q   That Ms. McDonald is talking about.  She's
21  talking about backfilling the DPE position at
22  WellPoint, isn't that correct?
23      A   Yes.
24      Q   "As we continue to work through the permanent
25  backfill."

Page 1001

1       A   Oh, excuse me.  I don't know as I'm reading
2   this if that's what she's referencing.  Or if she's
3   referencing when is Miguel coming.  I don't know what
4   she meant there.
5       Q   I think the language is very clear.
6           Ms. Collins-Smee -- may I have Plaintiff's
7   Exhibit 55?  I'm sorry, 65.
8           It's strongly encouraged at IBM -- I'm sorry.
9       A   Do you want me to read all this?
10      Q   No.  Maybe we can avoid reading any of it if
11  we can come to an agreement.
12          Isn't it true that at IBM it's strongly
13  encouraged, in fact there's documents that recommend
14  that managers maintain contemporaneous notes, with
15  respect to employee conduct?
16      A   No.
17      Q   Okay, then we do need to go to the document.
18      A   What is the date on this document?
19      Q   This was produced by IBM in response to our --
20  well, I think Mr. Fasman will agree, this was produced
21  by IBM in response to our request for its guidelines
22  with respect to its PBC process.  That's what we asked
23  for, so I assume that's what we got.
24          MR. FASMAN:  I don't know, but it clearly
25  is an IBM document, and it looks like it says minor

Page 1002

1   updates 11/07 on the first page, but I can't say I'm
2   an expert on this document, either.  It's quite long.
3   Can my witness take a look at it?
4           MR. CARTA:  Sure.  I didn't -- Your
5   Honor, I actually hadn't seen it, but it indicates it
6   was updated as of November '07.
7           THE COURT:  So this is 55?
8           MR. CARTA:  65.
9           THE COURT:  65?
10          MR. CARTA:  Yes.
11  BY MR. CARTA:
12      Q   If it helps, Ms. Collins-Smee, my questions
13  are going to relate to the portions of this document
14  which relate to a manager's responsibility to maintain
15  notes.
16      A   I know, but can I finish reviewing this?
17      Q   Take whatever time you want.  I was just
18  trying to be helpful.
19      A   I think I know what this is.  This is a new
20  manager training on PBCs, but it looks dated.
21      Q   And this would be applicable to any of the
22  managers with respect to what they're supposed to do
23  in connection with the PBCs, isn't that correct?
24      A   For employees.
25      Q   For employees.  So -- it indicates on 3 of

Page 1003

1   14 that these are the guidelines for providing
2   feedback and performing your function as a manager,
3   isn't that right?
4       A   That's what this document says.  I'm not
5   familiar with it until now.
6       Q   And on page 4 it specifically says that one of
7   the things a manager's supposed to do is maintain
8   notes on both positive and negative instances of
9   employee performances, and the reason for that is so
10  that you are prepared to provide specific examples
11  rather than talk in generalities, isn't that correct?
12      A   That's what this document says.
13      Q   And you keep saying that.  I'm perplexed.  I
14  mean are you saying that the only time you've ever
15  heard at IBM that it's important to maintain notes
16  when you're talking about employee performance is in
17  this document, you've never heard that before?
18      A   There are many, many ways that we have of
19  collecting the information, so keeping notes is not
20  something that we instruct people to do.  I'm
21  surprised to see that here, quite frankly.
22      Q   So it's your testimony that you as an IBM
23  manager are not encouraged to maintain notes with
24  respect to employee performance?
25      A   You would have -- you would have lots of

Page 1004

1 documentation and lots of your own experiences with
2 that employee through the year.
3     Q   Okay. I don't mean to be argumentative, but
4 if you could answer my question. Are you or are you
5 not encouraged as an IBM executive to maintain notes
6 about the performance of the people that reported
7 directly to you?
8     A   Are you saying written, handwritten notes?
9     Q   Any document in writing.
10    A   You have various -- you have various things.
11 You have performance results that I look at, you have
12 client issues that I look at. So there are many
13 different pieces of information that you look at, and
14 that as you're reviewing, going to give a performance
15 rating. There's a tremendous amount of objective data
16 that I can pull up on the machine to look at, as well
17 as recollection of issues, et cetera.
18    Q   Let me try it one more time, same question.
19 Is it your testimony that managers at IBM are not
20 encouraged to maintain contemporaneous notes with
21 respect to their employees performance, yes or no?
22    A   When you say notes, I'm saying information. I
23 have information, we have information to make our
24 assessment on.
25        Am I encouraged to write notes? It's whatever

Page 1005

1 you need as a manager to do your assessment.
2     Q   So it's your opinion that that's not
3 important, there's no managerial initiative or mandate
4 to maintain contemporaneous notes, that's your
5 testimony?
6        MR. FASMAN:  Objection, Your Honor. It's
7 at least two questions. It's not important, you're
8 not encouraged. I mean I think she's entitled to the
9 courtesy of one question.
10       THE COURT:  Mr. Carta, make it one
11 question.
12       MR. CARTA:  Yes.
13 BY MR. CARTA:
14    Q   I understand that you have stated that there
15 are a variety of different ways of looking at
16 objective criteria in order to evaluate an employee.
17 I'm asking you specifically, at IBM isn't it true that
18 managers are encouraged to take contemporaneous notes
19 of their employee's performance?
20    A   I have not seen this document before. This
21 document says that. And I think it's for new
22 managers. I have not seen this document, so --
23       MR. CARTA:  Your Honor, may I ask the
24 witness be directed to answer the question? I don't
25 want to beat up, but I've asked the same question

Page 1006

1 three or four times.
2        MR. FASMAN:  And I think the witness has
3 answered. Hasn't she, Judge?
4        THE COURT:  Ms. Collins-Smee, you have to
5 listen really carefully to the question, answer the
6 question. If it's susceptible of a yes or no answer
7 you have to give a yes or no answer. So I think you
8 responded, it was a leading response to the question.
9        So Mr. Carta, could you ask the question
10 again.
11       MR. CARTA:  I'll do my best.
12       THE WITNESS:  Your Honor, excuse me, can
13 I ask a clarifying question here?
14       When you say notes, are you saying
15 handwritten write-down notes?
16 BY MR. CARTA:
17    Q   You can type them. Do you keep any
18 contemporaneous written -- question withdrawn.
19       Isn't it true that IBM encourages its managers
20 to keep contemporaneous written documentation of their
21 employee's performance?
22    A   No.
23    Q   So is that the reason that you have no notes
24 of the times that you maintain Mr. Castelluccio's
25 performance was unsatisfactory?

Page 1007

1     A   I don't keep written notes, as I said.
2     Q   And is that the reason that the times you
3 claim that you spoke to Mr. Castelluccio to address
4 your concerns about him, is that the reason that you
5 have no notes that reflect that?
6     A   I don't keep notes.
7     Q   And if his overall satisfaction was truly --
8 overall performance was truly unsatisfactory, is that
9 the reason that you didn't provide him with an interim
10 review?
11    A   What was the question?
12    Q   If, in fact, Mr. Castelluccio's performance as
13 you now maintain was truly unsatisfactory, is that the
14 reason that you did not provide him with an interim
15 review?
16    A   We had many conversations about his poor
17 performance, many conversations, which would
18 constitute an interim review.
19    Q   So it's your position that interim reviews are
20 oral discussions and that there's nothing reduced to
21 writing with respect to those documents as well, is
22 that your testimony?
23    A   I did not write down every time I spoke to Jim
24 about a concern with his performance.
25    Q   No one would expect that, that you did it

Page 1008

1 every time. Can you show me one document in which you
2 did it?
3    A  Each time I got a complaint -- we went through
4 many of them over the last couple of days -- I would
5 talk to Jim.
6    Q  So you could not show me one document in which
7 you spoke to Mr. -- in which you indicated that you
8 had spoken to Mr. Castelluccio about what you now
9 claim to be his inadequate performance, isn't that
10 correct?
11    A  Right.
12    Q  At your deposition I asked you to tell me
13 everything that you could recall about the first time
14 you and Mr. Castelluccio met, and do you recall
15 telling me, quote, I don't remember.
16    A  Do you want to show me the deposition?  I
17 don't know --
18    Q  Sure.  Page 41.
19    A  Tab 41?
20    Q  No, it's separate.
21       THE COURT:  The record should reflect the
22 witness --
23       MR. FASMAN:  I think she asked for a copy
24 of her deposition and I think she's entitled to it.
25       MR. CARTA:  I'm entitled to read it to

Page 1009

1 her.
2       MR. FASMAN:  I think she's entitled,
3 right?
4       THE COURT:  I think Mr. Carta can use
5 that document to test her present recollection, do you
6 have a recollection.
7       MR. FASMAN:  I'm sorry, I couldn't hear
8 you, Judge.  You were saying something.
9       THE COURT:  I was, and it was probably
10 profound.
11       MR. FASMAN:  I'm sorry I missed it.
12       THE COURT:  Now I'm hoping I can just get
13 merely adequate.
14       I think Mr. Carta has a right to attempt
15 to test the witness's present recollection by using
16 the transcript, and by saying, in effect, that do you
17 recall a deposition where you testified under oath and
18 the question was put to you, question, answer, so on,
19 do you recall that, and if does, then she does.
20 If she doesn't, I'm not sure, Mr. Carta will show her
21 the document to refresh her recollection.  But you can
22 answer -- you can ask the question, question, do you
23 recall at a deposition, question; and answer, answer,
24 and then your objection might be appropriate, but, you
25 know, you don't have to do it yet.

Page 1010

1       MR. FASMAN:  Okay.  All I was suggesting
2 is that if the witness asked for a copy of the
3 deposition, to see -- if she wishes to see it, I think
4 she's entitled to it, if, in fact, we get to that
5 point, but I'll withdraw my objection right now.
6       THE COURT:  Let me ask you, Ms.
7 Collins-Smee, do you recall testifying in a
8 deposition, in this case?
9       THE WITNESS:  Do I recall being at the
10 deposition?
11       THE COURT:  Yes.
12       THE WITNESS:  Yes.
13       THE COURT:  And testifying?
14       THE WITNESS:  Yes.
15       THE COURT:  And Mr. Carta asking you
16 questions, you giving answers?
17       THE WITNESS:  Yes, Your Honor.
18       THE COURT:  Do you recall being asked
19 about --
20       MR. CARTA:  That was like a lateral.
21 BY MR. CARTA:
22    Q  Do you recall at the time of your deposition I
23 asked you, quote, as you sit here now, would you tell
24 me everything that you can recall about the first time
25 you met with Mr. Castelluccio after you became GM, if

Page 1011

1 anything?  And your answering, quote, I don't
2 remember.  Do you recall that exchange?
3    A  Yes.
4    Q  And I think you testified when Mr. Fasman was
5 asking you questions that you read all the exhibits,
6 and now you have a recollection, is that your
7 testimony?
8    A  Yes.
9    Q  And can you identify what specific exhibit you
10 reviewed that refreshed your recollection with respect
11 to what you said to Mr. Castelluccio at your meeting?
12    A  When I was deposed I did not prepare for the
13 deposition.  Since the deposition I have read through
14 every -- every single document that has been produced
15 here, and more importantly, I have racked my brain and
16 been reviewing what I've read, and I'm very clear on
17 my memory now, as a result of reviewing and racking my
18 brain over the last several years.
19    Q  So it's your testimony that your memory now in
20 2013 -- 2014.  When did that happen?  My goodness --
21 in 2014 is better than it was in February of 2010?
22    A  Yes, because I've reviewed all the
23 documentation.
24    Q  Okay.  And that's what you want the jury to
25 believe.  But just help me with my question, what

Page 1012

```
1   document did you review that helped you remember what
2   you said to Mr. Castelluccio in your first meeting
3   with him?
4      A   It was all of the documents, and all of the
5   incidents that were reviewed. I went back and -- I'm
6   very clear on that, and the date of that meeting was
7   related to WellPoint, and I absolutely remember that
8   meeting.
9      Q   And you now remember that there was no
10  discussion about age whatsoever. What document did
11  you review that refreshed your recollection that there
12  was no discussion about age at the time you met with
13  Mr. Castelluccio?
14     A   I wouldn't need to review a document to say
15  that. I said I would absolutely never discuss an
16  employee's age.
17     Q   So you can't identify any specific document
18  that refreshed your recollection about that aspect of
19  your conversation either, is that fair?
20     A   I would never discuss age, and that was also
21  discussed in the deposition, that I would never bring
22  up anyone's age.
23     Q   And you said that you were absolutely certain
24  about when the meeting took place, where it took
25  place, what you said, and what he said, isn't that
```

Page 1013

```
1   your testimony, when Mr. Fasman was asking you
2   questions?
3      A   I remember we talked about WellPoint, yes, and
4   it was in my office.
5      Q   What else do you remember? As you sit here
6   now, what else do you remember?
7      A   That's all I remember.
8      Q   That's all you remember?
9      A   Yes.
10     Q   I want you to tell me everything that you
11  remember about that conversation, so there's -- you're
12  saying that's all you remember, is that you talked
13  about WellPoint and it was in your office?
14     A   Talking about the notes that I had gotten
15  concerning his performance related to WellPoint, and
16  the fact that there was no leadership on the account,
17  I wanted to understand his perspective and understand
18  what was happening on the account at that point.
19     Q   And do you recall him saying anything to you?
20     A   Yeah, discussing WellPoint and his position
21  on -- there were issues related to the account.
22     Q   Do you recall him saying anything else?
23     A   No.
24     Q   You sure you don't recall him saying anything
25  else?
```

Page 1014

```
1      A   No.
2      Q   You're not sure or you are sure?
3      A   I don't remember him saying anything else.
4      Q   You're sure of that, you're sure you don't
5   remember anything else?
6          MR. FASMAN: I think at some point, Your
7   Honor --
8          THE COURT: This is asked and answered.
9          MR. FASMAN: Asked and answered.
10  BY MR. CARTA:
11     Q   So you don't remember him saying anything
12  about, I know this isn't working out, and by the way,
13  I'd like to move to a PE role, right? Or are you
14  going to change your testimony on that now, too?
15         MR. FASMAN: Objection. That's arguing
16  with the witness.
17         THE COURT: Okay. We'll re-ask that
18  question, leaving off the floor or and just ask the
19  question, without the "or," unless you want the
20  question just to stand.
21         MR. CARTA: I haven't asked for this yet,
22  and I know it's difficult, but would you mind reading
23  the question back?
24         (Question read by court reporter)
25         MR. CARTA: I withdraw the "or are you
```

Page 1015

```
1   going to change your testimony now" part.
2          MR. FASMAN: Can we have the question
3   then?
4          MR. CARTA: Let the witness hear it
5   again. I want to be sure she understand the question.
6          (Question read by court reporter)
7          THE WITNESS: That discussion was later
8   in the month. It was not during that first meeting.
9          THE COURT: So that's a no?
10         THE WITNESS: Yes, Your Honor.
11         THE COURT: That first meeting.
12  BY MR. CARTA:
13     Q   And that first meeting was the meeting that
14  gave rise to the e-mail that you sent to Mr. Holmes,
15  isn't that correct?
16     A   No. The first meeting was early in February
17  when we met related to the WellPoint account, one of
18  our first meetings.
19     Q   So what do you recall of the meeting that was
20  the day before or a couple days before you sent the
21  e-mail to Mr. Holmes, Exhibit 4?
22         MR. FASMAN: Exhibit 4 in which book?
23         THE COURT: Plaintiff's book.
24  BY MR. CARTA:
25     Q   Actually maybe it's not Exhibit 4. Hold on.
```

26 (Pages 1012 to 1015)

Page 1016

1      Exhibit 29. So is it your testimony that this
2 Exhibit 29 was not sent after your first meeting with
3 Mr. Castelluccio?
4      A  I had met with Jim before this, several times,
5 and spoken several times. No, this was not our first
6 meeting.
7           MR. CARTA: I have no further questions.
8           THE COURT: Thank you, Mr. Carta.
9           Mr. Fasman? Do you want to take the
10 lunch break?
11          MR. FASMAN: Maybe we could do that.
12          THE COURT: Okay. Ladies and gentlemen,
13 how about that? We'll pretend it's 12:30 and we'll be
14 back at 1:30, and I'll try to be here at 1:30. 1:30.
15          Don't deliberate, don't discuss the case,
16 don't discuss anything about it, just have a good
17 lunch, be safe, watch the traffic, come on back later.
18          (Jurors excused)
19          MR. CARTA: Your Honor, can we talk about
20 scheduling for a second?
21          THE COURT: Yes.
22          MR. CARTA: The good news is that I think
23 we're going to finish both Ms. Collins-Smee so she can
24 get off to India and Mr. Kelton Jones, who's sitting
25 in the back of the courtroom who flew up for this.

Page 1017

1           THE COURT: That's great.
2           MR. CARTA: My concern is I don't know
3 whether I should be calling Dr. Crakes to be here at 3
4 o'clock. If we're going to go to 5, we definitely
5 have time, and I don't want to -- the Court's been
6 very clear we don't have want to have blocks open.
7           THE COURT: We're not going to 5 today.
8           MR. CARTA: I know, we're only going to
9 4.
10          THE COURT: So you're talking about
11 Tuesday next week?
12          MR. CARTA: Well, I think it would be --
13 as a courtesy to him, I'd prefer him to come first
14 thing on Tuesday, but I could have him here at 3
15 clock. He's available to come at 3 o'clock. I don't
16 know whether we're going to get to him or not.
17          THE COURT: I don't know. Mr. Fasman's
18 going to finish with Ms. Collins-Smee.
19          MR. FASMAN: Very brief, Judge.
20          THE COURT: I think it would be brief.
21 And then she may leave, right?
22          MR. CARTA: Yes.
23          THE COURT: And at that point I
24          MR. CARTA: I'm going to call Mr. Kelton
25 Jones, and he'll testify about maybe two hours,

Page 1018

1 something like that, and then cross.
2           THE COURT: And then cross. I think I'd
3 do whatever I can, you know, you gentlemen are
4 actually controlling the speed of the proceedings, but
5 if you think you can get him in a position to be here,
6 that's fine, but we did commit to 4 o'clock.
7           MR. CARTA: Yeah, I think what I would
8 like is not to have him come today.
9           THE COURT: Okay. I think that's better.
10          MR. CARTA: Okay. I just didn't want the
11 Court to suddenly look at me at 3 clock and say,
12 where's your next witness.
13          THE COURT: I won't do that to you,
14 because this 4 o'clock request just was supposed to
15 get us off early today.
16          MR. CARTA: He'll be here Tuesday 10
17 o'clock, bright and sharp.
18          THE COURT: That's fine with me.
19          MR. FASMAN: Your Honor, the only thing
20 that I would ask, he's not an occurrence witness, he's
21 a damages expert.
22          MR. CARTA: Correct.
23          MR. FASMAN: We're going to make a motion
24 for a directed verdict, and I don't want that to be
25 delayed. I'd like to make -- I'd like to be able to

Page 1019

1 make that at the end of Mr. Jones' testimony this
2 afternoon, and have -- I have also a brief memorandum
3 of law that I'd like to give Your Honor to consider
4 over the weekend.
5           THE COURT: Okay. And I don't think his
6 damage expert would be an impediment to that. You
7 may do that, assuming you have the same right to make
8 a Rule 50 motion by having combined your direct and
9 cross of Ms. Collins-Smee. You've put on evidence in
10 your own case. I don't think there's case law out
11 there saying when one does that one forfeits the Rule
12 50.
13          MR. FASMAN: No, I don't know that that's
14 true, but obviously if Your Honor knows that's true,
15 that's fine.
16          THE COURT: I don't know anything.
17          MR. FASMAN: These guys know.
18          THE COURT: I am less of a fool than most
19 in that I know that I know nothing.
20          You will make your Rule 50, and we'll
21 allow you to make it. Please don't make it long
22 because you know what I'm going to do with it, I'm
23 going to take it under advisement, because they made
24 it really clear that it doesn't, you know, think
25 that's a verdict to make a Rule 50 motion. Okay?

Page 1020

1   Have a good lunch.
2         MR. FASMAN:  Thank you.
3         THE COURT:  We'll conclude with the
4   witness, and we'll see you at 1:30.
5         MR. FASMAN:  Thank you, Your Honor.
6         THE COURT:  You're welcome.
7         (Recess taken from 12:43 p.m. to 1:37 p.m.)
8         THE COURT:  All right, we're ready to
9   resume.
10        MR. FASMAN:  Your Honor, thank you.
11        Ladies and gentlemen.
12
13        RECROSS EXAMINATION BY MR. FASMAN:
14
15   Q   Ms. Collins-Smee, just a few questions.
16        First of all, if you had it to do over again,
17   would you write Mr. Castelluccio a 2 for 2007?
18   A   No.
19   Q   With regard to the open door, you mentioned
20   that you were reprimanded for changing his evaluation.
21   Were you reprimanded for anything else in connection
22   with the open door?
23   A   No.
24        MR. CARTA:  Objection, Your Honor.
25        THE COURT:  Basis?

Page 1021

1         MR. CARTA:  I believe the conclusions of
2   the open door were -- sidebar.
3         THE COURT:  Is this what we talked about?
4         MR. CARTA:  Yes, it is, it's what we
5   talked about before.
6         THE COURT:  Wait a minute.  Exactly what
7   was the question?
8         MR. FASMAN:  Was she reprimanded for
9   anything else as a result of the open door.
10        THE COURT:  Okay.  You can answer that.
11        THE WITNESS:  No.
12   BY MR. FASMAN:
13   Q   So let's -- let me go back to one exhibit.
14   Can we put up 55?  Plaintiff's.
15        Hang on a second, I'll give you my copy.
16   A   I have it.
17   Q   Here you go.
18        You testified about this one.  This was, I
19   believe, in connection with the resource action you
20   were talking about.
21   A   Yes.
22   Q   And this was -- you talked about mitigation
23   planning and various other aspects of that.
24        I just wanted to ask whether Mr.
25   Castelluccio's involvement as represented by that

Page 1022

1   document is consistent with your testimony as to his
2   role in the resource action?
3   A   Yes.
4   Q   Tell the jury how that -- or explain your
5   answer to the jury, would you?
6   A   Because this mitigation of the resource action
7   and analysis of who would be on it was done at the
8   account level, which is on every single account
9   there's a project executive and a DPE, a delivery
10   executive, so they would do the analysis, and then
11   come up with names.  That was an iterative process
12   that then got fed up to HR.  HR would do some
13   analysis, and then it would go back down.  So it was
14   consolidating the data up from the accounts, and then
15   HR would give input, and it would go back down to the
16   accounts, to re-look at certain areas.
17   Q   So Mr. Castelluccio was collecting stuff that
18   was provided by the bottom?
19   A   Yes.
20   Q   Like, give an example.
21   A   An account.
22   Q   So like NYU -- I don't know if that was an
23   account.
24   A   I think it was, actually.
25   Q   But the people at NYU would say if we

Page 1023

1   eliminate these jobs, this will happen and that will
2   happen?
3   A   Yes.
4   Q   And that would all funnel through him, and
5   he'd funnel it up to human resources?
6   A   And there would be adjustments made in terms
7   of other technical areas that needed to be addressed.
8   Q   And if human resources said let's eliminate
9   these three people, it would go down, and the people
10   at NYU would have a heart attack and say, we can't do
11   that.
12   A   Yes.
13   Q   And it would go back up.
14   A   Discussion again, and then back up again and
15   further adjustments.
16   Q   That's called mitigation.
17   A   Yes.
18   Q   Okay.  That's what I wanted to make clear.
19        Mr. Carta asked you about interim performance
20   reviews.  Is there any question in your mind that Mr.
21   Castelluccio knew what problems were occurring in his
22   performance in 2007?
23   A   Yes, he knew what the problems were related to
24   his performance.
25   Q   Why do you say that?

Page 1024

```
 1      A   Because we had many conversations.
 2      Q   Now, Mr. Carta also asked you why you didn't
 3  keep notes of every one of those conversations.
 4      A   It isn't my practice.
 5      Q   When you went to refresh your recollection in
 6  this case, what did you do?
 7      A   I read through every document that was
 8  submitted here.
 9      Q   And how many notebooks, five notebooks?
10      A   Yes.
11      Q   Or more?
12      A   Yes.
13      Q   And they did refresh your recollection?
14      A   Absolutely.
15      Q   Okay.
16          MR. FASMAN:  Your Honor, I have no
17  further questions of this witness.
18          THE COURT:  Thank you, sir.
19          Mr. Carta?
20          MR. CARTA:  I have nothing of this
21  witness.  Thank you, Your Honor.
22          THE COURT:  Ms. Collins-Smee, thank you
23  so much for being with us.  And you are now going to
24  India?
25          THE WITNESS:  Yes.
```

Page 1025

```
 1          THE COURT:  Hey, terribly exciting.  Have
 2  you been there before?
 3          THE WITNESS:  Yes, I have.
 4          THE COURT:  Maybe it's not that exciting.
 5          THE WITNESS:  Thank you, Your Honor.
 6          THE COURT:  Who are you going to call
 7  now, Mark?
 8          MR. CARTA:  Kelton Jones.
 9          THE COURT:  Mr. Kelton Jones, would you
10  please come forward, sir.  I understand you've come a
11  long way to be with us.
12          THE WITNESS:  I've come a little ways.
13          THE COURT:  Came from Texas, Austin,
14  right?
15          THE WITNESS:  Austin, Texas.
16          THE COURT:  You were up here yesterday?
17          THE WITNESS:  I was up here yesterday.
18          THE COURT:  Did you get a chance to see
19  our city?
20          THE WITNESS:  I lived up here for five or
21  six years down in Ridgefield, so I'm pretty familiar.
22  I worked and managed IBM delivery center out of
23  Southbridge for years.
24          THE COURT:  I understand Austin's a
25  really beautiful city.
```

Page 1026

```
 1          THE WITNESS:  It is a great city.  You
 2  visit, pack your stuff, because you're going to want
 3  to stay.
 4          THE COURT:  Is that right?  Wow.  You'd
 5  be a good representative for the city.
 6          THE WITNESS:  I'm a Texan, though, so...
 7          THE COURT:  Okay.  Would you please be
 8  sworn in as our witness in this case.
 9          (Kelton Jones, sworn by the clerk)
10          THE CLERK:  Please state your name, spell
11  your last name for the record.
12          THE WITNESS:  Arthur Kelton Jones,
13  J-O-N-E-S.
14          THE CLERK:  Your city and state?
15          THE WITNESS:  I live in Jonestown, Texas,
16  outside of Austin.
17
18          DIRECT EXAMINATION BY MR. CARTA:
19
20      Q   Good afternoon, Mr. Jones.
21      By whom were you first contacted in connection
22  with this lawsuit?
23      A   IBM legal, and their legal counsel.
24      Q   And when was that?
25      A   That was November 2009.
```

Page 1027

```
 1      Q   And what was the result of that contact?
 2      A   IBM indicated to me that Joe Castelluccio
 3  was -- filed a lawsuit against IBM and there might be
 4  a possibility that he and his counsel might call me
 5  for testimony, and they were offering me legal
 6  counsel.
 7      Q   And was that before you'd even spoken to Mr.
 8  Castelluccio?
 9      A   Yes, it is.
10      Q   And when was it that you first spoke to Mr.
11  Castelluccio?
12      A   That would be October of 2010.
13      Q   Approximately a year later?
14      A   Approximately.
15      Q   And between the time you left IBM in early
16  2007 and October of 2010, when Mr. Castelluccio
17  contacted you, did you speak to him even once?
18      A   No.
19      Q   Do you have a social relationship -- have you
20  ever had a social relationship with Mr. Castelluccio
21  outside the office?
22      A   No.
23      Q   And you're appearing today voluntarily, is
24  that right?
25      A   Yes, after, you know -- when IBM approached me
```

Page 1028

1   and offered me legal representation, they indicated
2   that should I need it and it was a conflict of
3   interest, then I would have to get additional counsel
4   outside of IBM. Thinking about that, I couldn't
5   figure out why I would need legal counsel, so at that
6   time when I turned their offer for free legal counsel
7   down, I determined that if I was called to testify by
8   either side, I would do so. Didn't seem like I should
9   go through a subpoena process.
10      Q   And for how many years were you employed at
11  IBM?
12      A   From November '78 through the end of March
13  2007, so that would be approximately 28 years and a
14  few months.
15      Q   And at the time you left in early 2007, what
16  was your position at IBM?
17      A   I was the senior vice president of ITDelivery.
18      Q   And that was the head of the ITDelivery
19  organization, IT Americas?
20      A   IT Americas, yes, sir.
21      Q   And what band was that?
22      A   I was a vice president, Band D level.
23      Q   And can you describe very generally in what
24  business the ITDelivery group was engaged?
25      A   ITDelivery performs the delivery aspect for

Page 1029

1   information systems outsourcing, contracts that IBM
2   executes for customers.
3       Q   And what was the geographic scope of your
4   responsibilities?
5       A   It was denoted as the Americas, but I was
6   responsible for the U.S. delivery component, Latin
7   American delivery component and Canada delivery
8   component.
9       Q   And how many people were employed in the
10  organization that you ran at the time?
11      A   In the U.S., it was approximately 20,000,
12  about 16,000 IBMers and 4,000 contractors,
13  supplementals, and within another probably four or
14  500, maybe a thousand each in Canada and Latin
15  America.
16      Q   So in total, somewhere between 20 and 25,000?
17      A   That would be correct.
18      Q   Can you give a rough approximation of costs
19  that you were responsible for, that the money that you
20  were managing in your position as head of ITD
21  delivery?
22          MR. FASMAN: Your Honor, I'd just like to
23  register an objection here. We've heard an awful lot
24  of background evidence in this case. Mr. Jones left
25  IBM before Joanne Collins-Smee took over, and it's

Page 1030

1   interesting, what the costs were and how many
2   employees were back in '06 and '07, so I don't see
3   how that's going to help the jury resolve the issues
4   in this case.
5           THE COURT: Mr. Carta, you're going to
6   not go deeply.
7           MR. CARTA: It's the last question on
8   background, Your Honor, other than education and --
9           THE COURT: Okay. You may answer the
10  question, sir, if you have it in mind.
11          THE WITNESS: In the U.S., approximately
12  four and a half to five billion dollars, U.S. and
13  Canada -- Canada and LA would have another four.
14  That's for the commercial content. There was an IBM
15  content, also, that's not included in those numbers.
16  BY MR. CARTA:
17      Q   And that would be the --
18      A   I mean internal. I managed the work, but it
19  was internal ITDelivery for the IBMer.
20      Q   And just quickly, because the jurors have
21  heard this so much, what was Mr. Castelluccio's
22  position relative to yours?
23      A   He was one of my sector delivery vice
24  presidents. He had an organization aligned to public
25  sector and followed the DPEs in the delivery on our

Page 1031

1   contracts in the public sector reported up to him.
2       Q   And he was one of six VPs?
3       A   Yeah. There were six U.S. VPs, a Canada VP
4   and a Latin America VP.
5       Q   And the specific kinds of contracts he was
6   managing in the public sector?
7       A   It would be infrastructure IT outsourcing
8   contracts.
9       Q   Before we get into the specifics of your
10  background and the PBCs, I'd like to ask you some
11  questions about Mr. Castelluccio's performance. How
12  well did Mr. Castelluccio perform for you?
13      A   He had a very good track record of
14  performance.
15      Q   And in your experience how would you
16  characterize his leadership skills?
17      A   He had very strong leadership skills.
18      Q   And what -- how would you characterize his
19  technical background?
20      A   He was very, very good technically. He came
21  out of a network, pretty strong network, security
22  background. He was familiar with all of the
23  competency, the server operation, the different
24  aspects of ITDelivery. He had a pretty strong program
25  management background and successfully managed a bunch

Page 1032

1  of individual contracts that included matrixing the
2  delivery out of the other part of the delivery
3  organization, as well as managing those aspects
4  directly in line to some of the contracts that he
5  managed.
6      Q   And you managed them in his role as VP of
7  public sector for two years, is that right?
8      A   That's correct.
9      Q   And what, if anything, did you observe with
10  respect to his ability to address customer
11  satisfaction?
12      A   He had a pretty good ability to identify
13  specifically with the technical level of the customer.
14  They could gain confidence in his role and his ability
15  to perform. There were several occasions where he
16  turned around troubled contracts. He had very, very
17  strong customer relationships.
18      Q   And finally, would you describe what you
19  observed in the two years that he worked directly for
20  you, what his leadership style was?
21      A   Jim is a, you know, a detail technical guy,
22  very good detail program management. Like I said, he
23  was very -- had a lot of detailed understanding what
24  it took to run a major IT operation. Under the
25  coverage he also was very strong in business controls,

Page 1033

1  but he also had a very low key management execution
2  style. He was very good at managing through his
3  organization. He worked with the organization for
4  people working for him to go put plans in place and
5  execute them and then kind of, you know, step back and
6  let them lead. He's not the kind of guy you'd see
7  going down the hall waving their hands saying, you
8  know, look what I've done. So he's kind of a very
9  good manager, but low key background kind of style.
10      Q   Let me ask you a few questions just quickly
11  about your educational background. What is your
12  educational background?
13      A   I got a Bachelor of Science in engineering
14  physics.
15      Q   Engineering physics?
16      A   Engineering physics, from Texas Tech in 1969.
17  I got a mechanical engineering degree from the
18  University of Houston in 1975.
19      Q   And what was your career prior to joining IBM?
20      A   In 1969 out of school I joined McDonnell
21  Douglas Astronautics Company. They were working in
22  the Johnson Space Center in Houston. I went to work
23  doing guidance navigation. I did crew training for
24  Apollo lunar missions. After that I did studies
25  design systems analysis leading to the development of

Page 1034

1  the Shuttle vehicle. And then prior to initial
2  flights I did guidance, navigation analysis for the
3  upcoming initial flights.
4      Q   Let me just go back for a second on the
5  Apollo. Were you involved directly in any of the
6  Apollo missions?
7      A   I started with Apollo 13, was the first
8  mission I was assigned to. Again, I participated in
9  every mission, most of the missions, or all of the
10  Apollo missions that followed until we evolved to
11  where we were really focused on advanced vehicles,
12  which was the Space Shuttle.
13      Q   And then you were involved in the design of
14  the Space Shuttle?
15      A   The early design and planning studies looking
16  at, you know, what concept would we have.
17      Q   And for how long were you with McDonnell
18  Douglas?
19      A   I was with McDonnell Douglas from '69 until
20  November of '78, and I decided to leave and go work
21  for IBM.
22      Q   And for the next 15 years between 1978 and
23  1993, how did you work, what was your position?
24      A   When I left FSD I went to work for IBM Federal
25  Systems Division. They had a contract with NASA.

Page 1035

1  They were located -- the unit I was working with was
2  located in Houston at the Johnson Space Center. IBM
3  FSD was providing the overnight computer and overnight
4  software.
5      So I joined a unit that was responsible for
6  doing the final performance verification testing on
7  the flight software prior to flight, and I did that
8  for a bunch of the initial flights all the way up
9  through, you know, certain flights.
10      And then I took over a business unit in FSD
11  there in Houston, managing the ground institutional IT
12  systems for Johnson Space Center, and I was
13  managing -- we started marketing IT infrastructure
14  service contracts across NASA, so it was akin to the
15  outsourcing business IBM eventually got into. We were
16  basically marketing outsourcing contracts.
17      Q   So that was the beginning of the whole
18  outsourcing business for IBM?
19      A   It was in the federal arena. In late '93,
20  that's when IBM was positioning to do -- they were
21  fixing to sell Federal Systems Division. I think that
22  transaction actually closed in early 1994, just prior
23  to late '93. This would have been in the early
24  nineties, maybe '91. IBM had established a wholly
25  owned subsidiary called Integrative System Services

Page 1036

1    Corporation. It was a wholly owned unit that was set
2    up to put up particular -- an accelerated technology
3    on putting IBM back into the IT services business.
4         And in late 1993 I left FSD just before the
5    sale occurred and moved into ISSC as project executive
6    on one of the early -- a component of one of the early
7    outsourcing contracts. It was an outsourcing
8    customer. This component was called QualEx. We
9    managed with the customer to get it from a very
10   troubled state, took a small group of people from FSD
11   up to go fix that contract, so ISSC startup was really
12   the start of the outsourcing business.
13        Q   And did ISSC later become a division of IBM?
14        A   Yes. There were some legal implications
15   associated with IBM doing service contracting tying
16   back to the technology, and providing overt software,
17   so ISSC entity was kind of a temporary entity they put
18   in place. It eventually became IBM Global Services.
19        Q   The organization that was in existence when
20   you ultimately left IBM?
21        A   Right. All we did, you know, changed the
22   badge, handed one badge in. We never left. I worked
23   really outside of IBM. It was, you know, kind of an
24   arm's-length construct. It was -- we were set up for
25   some specific reasons.

Page 1037

1         Q   And what was Mr. Macina's role in the startup
2    of the entire outsourcing business at IBM?
3         A   As I finished working on the -- as we were
4    straightening out the QualEx contract, I was a project
5    exec reporting to one of the initial marketing sales
6    guys, I started acquiring other contracts to go
7    address issues with. Tony Macina was a peer to this
8    individual. They were both working for the president
9    of this ISSC organization. And we were starting to
10   evolve how the whole organization should be structured
11   to address -- go to market, in the outsourcing
12   business, as well as how we should conduct delivery.
13        Then there was some thriving business concerns
14   with respect to how do we aggressively pursue new
15   business, very aggressive bidding, and aggressively
16   address, you know, our problems, at the same time
17   mitigate issues and risks associated with taking over
18   a customer's IT infrastructure and possibly causing
19   problems.
20        So they came up with, Tony Macina and the
21   other executives, and I spent time in these early
22   contracts working with them to understand how can we
23   improve the delivery linkage into the PE, because I
24   was frustrated as a PE running contracts with how I
25   did delivery.

Page 1038

1         Q   PE is a professional --
2         A   It was a project exec. They handle the
3    contracts today. So to maintain what the business was
4    required as an aggressive bidding, aggressive action
5    on maintaining customer Sat and driving Sat with the
6    customer, as well as client ownership. You wanted the
7    people that already knew the customers, had client
8    relationships, to own these contracts. These are the
9    project execs, and the business really wanted them to
10   continue to lean into driving the business. But they
11   wanted an organizational structure that would also be
12   resistant to letting us go too far and getting the
13   customer in trouble as well as IBM in trouble. That's
14   when we came up with the delivery PE structure.
15        So I was involved in defining the delivery PE
16   structure and parallel delivery organization structure
17   that would report up to the business parallel with the
18   account management structure, and that's what was
19   going on in that time frame with Tony.
20        Q   So let's just talk about position. At some
21   point you moved to Southbury, Connecticut?
22        A   Yes, I did. I moved from that work, which was
23   done out at the Raleigh Durham area, to St. Louis,
24   where I ran part of the delivery center, and then I
25   went to Southbury to run the northeast delivery

Page 1039

1    center.
2         Q   And when was that, approximately? Do you
3    recall?
4         A   It would have been in 1998.
5         Q   And at that point were you made responsible
6    for ITDelivery in the entire northeast?
7         A   I was running the -- we had -- at that time we
8    had four centers, four major centers; the northeast,
9    the south, the west, which was Boulder, and the
10   central, which was St. Louis, and I was responsible
11   for the northeast delivery center.
12        Q   And was Mr. Macina's job to roll all those
13   together into one organization?
14        A   Yes. At that time we all reported to him, and
15   he was integrating the delivery and driving the
16   organizational structure and bringing it into the
17   account execution.
18        Q   And at that point what became your role?
19        A   Well, at the same point in time we were
20   starting to build the outsourcing business in both
21   Europe and Asia, so Tony started spending a fair
22   amount of time working with the other geographies, how
23   to leverage our delivery capability over into those
24   geographies, because U.S. was ahead.
25        As that evolved he formally took the role of

32 (Pages 1036 to 1039)

Page 1040

1  local delivery, reported into him from all the
2  geographies, and I took over -- that's when I took
3  over -- it was about 2001 -- I took over the role as
4  the Americas delivery executive.
5      Q   So you officially became the head of ITD
6  Americas in 2001?
7      A   Yes, that's correct.
8      Q   And during what time period did you run ITD
9  Americas?
10     A   From 2001 until I left, would be March 2007.
11     Q   And in March of 2007 you left IBM why?
12     A   I retired.
13     Q   Was that a voluntary retirement?
14     A   It was -- technically I was fired.  Need a
15  little background.  Technically I was fired, but I
16  retired.  But I viewed the whole process as a very
17  positive thing.  And we were under a lot of stress in
18  2006.  We had -- you know, we were all reporting to an
19  individual by the name of Robert Moffat, Bob Moffat.
20  He was a senior vice president of IBM.
21      It was well known, and he reminded us, that if
22  he didn't make his financial commitments to Sam
23  Palmisano, the CEO of IBM, that he would be fired.
24  And we got reminded of that pretty often.  But Bob and
25  I had a pretty good degree of respect.  There were

Page 1041

1  clearly areas that we may have disagreed on, but we
2  understood each other.  As we went through 2006, we
3  weren't going to make the Americas financials.  I was
4  measured financially on the cost of SO delivery, but
5  also the IBM cost structure.
6      Q   SO is?
7      A   It's the ITDelivery, strategic outsourcing,
8  the ITDelivery part of the contracts.  So they were
9  measured on the cost, and if we sold a deal, any risk
10  in getting to the profit was typically put on
11  delivery.  So we were -- as we were driving to
12  profitability, we were leaning into contracts, bidding
13  very aggressively, we challenged delivery to take cost
14  out to get to IBM's financial P&L, and that's where
15  this dual organization came in, because at the end of
16  the day, while we had constructed the PE and the DPE,
17  both were measured on customer Sat, IBM financials,
18  contract performance, the schedules, service level
19  agreements, and business controls.
20      The PE was by intention and design focused at
21  driving aggressively to sell the deals, driving for
22  customer Sat, and to try to get profitability into the
23  contract.  Delivery was measured on all the same
24  things, but it was this checks and balances for
25  delivery at the end of the day had to stand tall.  So

Page 1042

1  if the guys responsible for the delivery didn't
2  believe we could execute with fewer people or lower
3  cost, they were supposed to stand and not let IBM or
4  the customer get into a customer where the customer
5  could fail the business or we could be hurt, and the
6  back pool of that would be a failure on IBM.
7      So but because of the financials and our
8  measurements were, ITDelivery was not going to make
9  their cost, and Mr. Moffat knew that, and so right
10  before the final business unit review with him in late
11  December I got a note to call his office, and I called
12  him, and it was like the day before the final review
13  he wanted to discuss the financials, because he knew
14  we weren't going to make it, and it was a -- the
15  server operations was the largest component of our
16  delivery, and most of the costs flowed through that,
17  and so there's a lot of dialogue and notes in the
18  system about server operations not meeting the costs,
19  and I had an executive running that, a very good
20  executive, a very talented individual, and so there
21  were a lot of reasons behind that, a lot of contract
22  reasons, customer reasons, a lot of reasons we weren't
23  getting to the numbers.
24      So I sat down and I -- I didn't sit down
25  because this was over the phone.  And I talked him

Page 1043

1  through the story, and he listened, and he was
2  interested.  He says, okay, I'm going to ask you a
3  question tomorrow; who's responsible for missing the
4  financials?  And I told him, I will tell you that I
5  am, Americas reports to me, okay, I'm responsible.
6  And the phone call ended.
7      Next day at the business unit review we went
8  through the normal geography report, he went through
9  that, said okay, who's responsible for missing this,
10  and I told him I was.  So at that time with the
11  history I expected to be fired, but he didn't give
12  me -- so I knew -- it was a little later than that.
13  January 12th I got a call from Tony that he indicated
14  that Bob had talked to him and he would fire me at the
15  end of March.
16      So I kind of volunteered.  He may have fired
17  me anyway.  I was pleased with the outcome because he
18  did not, you know, fire the executive, and I didn't
19  want to be fired.  I really left my organization, and
20  I got a chance to talk to him in the meeting where he
21  announced Joanne as my replacement about the
22  challenges in changes and events, and that major
23  changes are times for taking steps into success, and
24  so it was left with, this is one of those times.
25      And I started Apollo 13, took him through my

33 (Pages 1040 to 1043)

Page 1044

1  career to show, you know, that that's when
2  organizations step up to leadership, and that's when
3  individuals step up to leadership. So I fully
4  expected this to be the start of another good part of
5  my life, and it, you know, it's turned out very
6  positively.
7       So, you know, I've, you know, I have no issues
8  with what happened or that whole process. I consider
9  myself an IBMer probably for life.
10  Q   Okay. So you said that Ms. Collins-Smee was
11  then announced as your replacement?
12  A   Yes.
13  Q   And that was when?
14  A   That was the end of -- in a meeting right
15  toward the end of January. It wasn't exactly, but it
16  was within a few days.
17  Q   And was there a period of time in your -- she
18  had the position so your employment didn't overlap,
19  but you were both in the same building at the same
20  time?
21  A   Not in the same building. I was still
22  employed. Our offices weren't in the same location.
23  But she took over the end of January, first of
24  February, and I was still, you know, with IBM through
25  the end of March. So those two months.

Page 1045

1       Q   I think you've already talked about the -- do
2  you recall during that time period whether you
3  attempted to set up a meeting with Ms. Collins-Smee to
4  transition your responsibilities to her?
5  A   Yes. I contacted her secretary to set up a
6  sequence of meetings. I prepared, you know, some
7  short presentations to take her through a whole series
8  of things dealing with the delivery organization, a
9  very big organization, a lot of moving parts. One of
10  them would have been to go over the personnel and a
11  sequence of others to go over other things that were
12  going on in the organization. I put copies of their
13  PBCs and notes on strengths and weaknesses that I was
14  going to go on and other dynamics in the organization,
15  that I would discuss with her.
16  Q   So you prepared for a meeting to transition
17  your responsibilities. And what happened?
18  A   We come time for the first meeting and I got a
19  notice that she was tied up, she wasn't going to make
20  it, and so I was going to try to reschedule that
21  meeting, and I was told she didn't have time for those
22  meetings, and so, you know, and she didn't have time
23  for any of the meetings, so I never tried to
24  reschedule them. My sense was --
25  Q   I'm not asking you for that. I just want to

Page 1046

1  know what happened.
2       So you tried to meet with her, and you never
3  did?
4  A   That's true.
5  Q   Did she attempt to schedule meetings with you?
6  A   No.
7  Q   Are you absolutely certain that you never met
8  with her to transition your business to her?
9  A   Absolutely.
10  Q   No doubt in your mind?
11  A   No.
12  Q   You absolutely certain that she never tried to
13  meet with you?
14  A   Certain.
15  Q   And are you certain that you just never had an
16  opportunity to transition the business?
17  A   Certain.
18  Q   And after she became VP of -- after she became
19  head of ITD Americas did you discuss personnel with
20  her?
21  A   No.
22  Q   Did you ever?
23  A   I planned to go through that, all the
24  personnel discussions in this meeting.
25  Q   And you'd prepared that discussion, isn't that

Page 1047

1  correct?
2  A   Yes.
3  Q   And did you ever discuss Mr. Castelluccio with
4  her after the point in time when she became head of
5  ITD Americas?
6  A   No.
7  Q   Are you absolutely certain of that?
8       MR. FASMAN: Asked and answered.
9       THE COURT: All right, I'll let the
10  answer stand.
11  BY MR. CARTA:
12  Q   I had some questions about the DPE role and I
13  think you've already answered those, and I think the
14  jurors have heard more than enough about that, but let
15  me go to one point that relates to that, which is the
16  process for introducing a DPE into a client.
17       Would you just review for the Court and the
18  jury, what the procedure was at IBM for introducing a
19  DPE to a client, or presenting a DPE?
20  A   Typically you want the client to buy into this
21  is the right individual, so the process typically
22  would be, you'd look at the candidate, I'd pick the
23  candidate you want to be the DPE, and then you would
24  introduce that individual to the client, and the
25  client basically interviews the individual for the

Page 1048

1  job.
2    Q  And what's the point of that?
3    A  Well, it's to get the client to buy in that
4  this is the right guy to go, you know, drive this
5  delivery for my business.
6    Q  And typically does that include an interview?
7    A  Yes, it did.
8    Q  And this is the process that occurs after IBM
9  has already selected a particular person to perform
10  that function, is that right?
11    A  Yes.
12    Q  The first thing is IBM will select a candidate
13  and then IBM will present the candidate to the
14  customer, is that the process?
15    A  Yes.
16    Q  Would you as head of ITD Americas and one of
17  the creators of the business, would you have ever
18  unilaterally assigned a DPE to an account without
19  going through that process of introducing the DPE to
20  the client to get their consent?
21        MR. FASMAN:  Objection, Your Honor.  This
22  refers to a time period before Ms. Collins-Smee was
23  there.  I think it's completely irrelevant.
24        MR. CARTA:  2007.
25        THE COURT:  Objection's noted.  It's

Page 1049

1  overruled.  It's harmless background information, by
2  its continuity and understanding of all the rest of
3  the technical information that you've seen.
4        MR. CARTA:  Actually, Your Honor, I don't
5  mean it as harmless information at all.  There's a
6  specific procedure that IBM --
7        MR. FASMAN:  Your Honor, if I may, I
8  don't think this needs to be argued.
9        MR. CARTA:  Your Honor, I'm just
10  concerned about the characterization that this is just
11  harmless background information.
12        THE COURT:  No, no, it's important
13  background information, in allowing this witness to
14  answer it is going to edify us.  It's not going to
15  harm anybody, it's going to make us better understand
16  what we heard.  Would you agree with that?
17        MR. CARTA:  Yes, sir.
18        THE COURT:  Okay.  Do you have the
19  question in mind, sir?
20        THE WITNESS:  So you asked if in my role
21  as the ITD executive would I have ever introduced the
22  DPE, or put a DPE on a contract without introducing
23  them to the client.
24  BY MR. CARTA:
25    Q  To get their buy-in yes.

Page 1050

1    A  To get the client to buy in.
2        There's probably an exception situation where
3  if you didn't intend for the individual to be a
4  permanent DPE, if you had a crisis situation where you
5  needed an individual, you know, to go work the
6  contract and you were working -- you were betting the
7  actual individual would eventually take it over
8  permanently, you would probably identify the
9  individual, the customer would know this is not
10  necessarily -- this isn't going to necessarily be your
11  DPE and the person is there temporarily to go, you
12  know, manage our delivery and execute until we get the
13  right guy in front of you for you to buy off.  That's
14  a scenario that I could see possibly doing that.
15    Q  But not in a situation when you intended to
16  have that person be permanently DPE?
17    A  No.  Typically we wanted the customer's
18  buy-in.
19    Q  When did you first -- I want to ask you a
20  series of questions now about Mr. Castelluccio, in a
21  little more detail.  When did you and Mr. Castelluccio
22  first begin to work together?
23    A  I've worked with and around Jim for most of
24  that period in my roles as different delivery centers,
25  because he worked in the delivery structure network

Page 1051

1  area, so he worked in various capacities within the
2  delivery structure for many years, and so I knew
3  him -- I knew of him when he was in the network
4  competency, I knew of him when he was managing
5  individual contracts, before he was working for me
6  managing individual contracts.  So I don't remember, I
7  couldn't calculate the exact number of years, but it's
8  quite a few years.
9    Q  And when did he begin working for you
10  directly?
11    A  That would have been in the 2005 time frame.
12    Q  And that time frame between 2005 and 2006 he
13  worked as your VP of public sector?
14    A  Yes, he did.
15    Q  And what role, if any, did you have in
16  selecting him for that position?
17    A  Most of the individuals, the top candidates,
18  were the sector VP.  You've got an executive here
19  who's managing delivery PEs that needs to be cognizant
20  of the kinds of issues and problems that you're
21  dealing with in delivery.
22        Because they come from all directions.  They
23  come from the customer, they come from the sector
24  side, the PE side of the business, and they come --
25  you know, so you got to understand what are the

Page 1052

1    issues, what are the types of things that you need to
2    go do.
3        So the kind of a person you want to have is
4    somebody that has been in that quagmire, you know,
5    people that have managed those contracts, that know
6    the kind of issues that customer is going to have,
7    know the kind of issues that we have reaching back
8    into delivery. Because one of the roles of the DPEs
9    is not just to manage the execution, but to reach back
10   into the matrix and pull out the right skills, so if
11   you need people to go do this, you'll get them.
12       And if you're going to manage people trying to
13   do that, the best candidates to go do that are people
14   that have lived through it and been very successful in
15   managing those contracts and through a lot of issues.
16   So Jim had that pedigree. He had, you know, multiple
17   situations where he managed difficult contracts to,
18   you know, to satisfaction, a very satisfied state,
19   even reference states. So he was -- at the time we
20   filled that slot he was the best guy to put in that
21   job.
22       Q    And in 2005 what were the results of his
23   efforts at NYU and Mount Sinai Hospital? That would
24   be the beginning of when he first took on the VP
25   public sector.

Page 1053

1        A    Those were problem contract issues. We had
2    significant issues there. In working with the
3    customer, with the account team, he was able -- he
4    was able working with them to turn the contracts
5    around, very good contracts. I think they both
6    renewed contracts. So it was very positive.
7        Q    When he took over they were critical, in a
8    critical situation?
9        A    Very troubled, yeah.
10       Q    And in the end do you recall whether they
11   actually renewed their contracts?
12       A    I think they both did.
13       Q    Were there any audits of significance that
14   took place while Mr. Castelluccio was working for you
15   over which he had responsibility?
16       A    There were audits -- we had major audits in
17   every sector. You know, that's one of the reasons
18   originally we didn't have audit business controls and
19   audit as a special review process, but what happened
20   was we elevated the high level contract analysis and
21   assessment.
22       The roll up to the executives in terms of the
23   status of the contracts came in both -- in three
24   categories, plus the fourth, so business controls was
25   a main focus in the business. It was a main focus for

Page 1054

1    delivery because it -- it's one of the first areas
2    contracts break, the first area where you see problems
3    with trying to cut cost too much or cut too much labor
4    out.
5        And Jim, you know, because of his past, he
6    came from the competencies network structure, he had a
7    very strong background in business controls and
8    dealing with the servers, so his performance on the
9    contracts -- all of the contracts had audits, you
10   know, our customers had audits, we had audits,
11   everybody, you know, just tons of audits, but Jim
12   typically had a very positive audit background in
13   terms of his contracts.
14       Q    How would you characterize his skills in that
15   area, specifically in the audit area?
16       A    He was very knowledgeable.
17       Q    Exhibit 13, please. Plaintiff's 13. Just
18   give us a second to get that, sir, so it's big enough
19   for you to read.
20       A    I got it.
21       Q    This is Mr. Castelluccio's 2005 PBC, the first
22   evaluation that you gave him, and if you'd just take a
23   minute and look at that, please.
24       A    I have a copy of it here.
25       Q    You should be able to see it in front of you.

Page 1055

1        A    How about I move the page forward?
2        Q    And what rating did you give Mr. Castelluccio?
3        A    2 plus.
4        Q    And how is that defined?
5        A    Above average contributor.
6        Q    Did you also write an overall assessment?
7        A    Yes, I did.
8        Q    And would you please read the first three
9    sentences of that overall assessment?
10       A    "Jim provided strong leadership to his team
11   and led them in a very strong delivery performance for
12   the Public Sector across 2005. Jim provided key
13   leadership and support of critical situation
14   management within the sector accounts and key
15   leadership in driving balance and cost management and
16   delivery execution across the accounts. Jim led his
17   team in helping the sector achieve their profit plans.
18   He had and his team met or exceeded his spend targets
19   in every quarter."
20       Q    And how did Mr. Castelluccio and his team
21   perform financially in 2005 compared with the other
22   five sectors, other sectors of vice presidents?
23       A    I believe Public Sector was the best
24   performing sector of all the sectors.
25       Q    In 2005 the best performing sector of all the

Page 1056

1    sectors?
2        A   I believe that's true.
3        Q   And can you explain how customer satisfaction
4    surveys are conducted and their importance in
5    assessing the VP's performance?
6        A   You're talking about the client customer Sat.
7        Q   Correct, client customer Sat.
8        A   They're conducted externally with the client.
9    They go through and ask them a set of questions about
10   various topics.  There's an expected score, the
11   customer gives it a score.  It nets out to a number
12   that's from one to ten.
13       The customer Sat score is -- how you achieve
14   that on the account is only one of those four things
15   that are evaluated.  Those are all -- for all the
16   accounts would be aggregated up, and that would be the
17   assessment that, you know, would be applied to, like,
18   the sector.
19       Q   How did Mr. Castelluccio perform in 2005 with
20   respect to the customer Sat performance, or aspect of
21   the performance?
22       A   I remember it was very good.  The whole sector
23   did pretty well.  It says here nine -- 11 accounts
24   achieved a perfect 10.
25       Q   11 accounts achieved a perfect 10.

Page 1057

1        Did you have anyone else performing at that
2    level among your other vice presidents?
3        A   I don't believe any of the other sectors were
4    at that level for 2005.
5        Q   And in your overall assessment, did you offer
6    any constructive criticism?
7        A   Yes.  I always offer constructive criticism.
8        Q   And what specifically did you suggest that
9    would be helpful for Mr. Castelluccio to focus on?
10       I think it's towards the end of your overall
11   assessment.
12       A   Yes.  "Continue developing knowledge of the --
13   continue developing breadth of knowledge of the
14   Public/Federal Sector opportunities through
15   participation in engagements and service delivery
16   activities, interaction with industry counterparts and
17   external reading and information reviews."  Is that
18   the section?
19       Q   Yes.
20       And did you have any concerns about his
21   leadership abilities?
22       A   No.
23       Q   Before asking you about his next PBC, the
24   2006, I'd like to ask you a series of questions about
25   the PBC procedures just generally.  And we've heard

Page 1058

1    quite a bit about that.
2        In the entire 28 years that you had worked at
3    IBM, was the PBC procedure in place?
4        A   Yes.
5        Q   And to whom is that procedure applicable?
6        A   It's between managers and employees.
7        Q   But who is subject to being evaluated pursuant
8    to the PBC procedure?
9        A   All employees.
10       Q   All employees.  Chairman of the board all the
11   way down, is that right?
12       A   I don't know about the chairman of the board.
13       Q   Okay.
14       A   Certainly at my level and around.
15       Q   And that absolutely includes all executives.
16       A   Yes.  At least to the level that I've seen.
17       Q   From the B level down for certain.
18       A   Yes.
19       Q   And I think we've gone through the process,
20   initially objective criteria established for
21   evaluating an employee, and then at the end of the
22   year there's an assessment of how the employee
23   performed, and this culminates in a rating, is that
24   right?
25       MR. FASMAN:  Your Honor, first of all,

Page 1059

1    it's leading.  But second, more to the point, Mr.
2    Carta asked the witness whether this process was in
3    place for the entire 28 years.  I think given that, we
4    ought to figure out exactly what period of time he's
5    talking about, because I'm sure it changed in almost
6    30 years.
7        THE COURT:  Can you narrow it to a point
8    in time, Mr. Carta?
9        MR. CARTA:  I'll try to make it more
10   clear.
11   BY MR. CARTA:
12       Q   In the 28 years that you were employed at IBM,
13   there was a PBC process in place, isn't that right?
14       A   There was an evaluation process in place
15   through all those years.
16       Q   And the relevant time frame, which is really
17   what's important here, let's say 2000 on through 2007,
18   this particular PBC process was in place, the one that
19   we're -- that one that manifests itself in the
20   evaluation that you have in front of you?
21       A   Yes.  I'm not sure if the particular forms
22   changed, but the basic process, I believe, would have
23   been in place from 2000 on.
24       Q   And is it also true -- and how would you
25   characterize that process, the whole PBC process,

Page 1060

1  characterize it as formal, informal?
2      A  I would characterize it as formal.
3      Q  And what impact does a PBC rating have on an
4  employee's compensation?
5      A  It has -- even at the lower levels, the PBC
6  effects the amount of their compensation.  Currently,
7  at least when I left, it affected all the employees
8  down.  Once you get to the executive level your PBC
9  will affect -- your salary typically has a component
10 that is based and a component that is incentive, and
11 tied to your PBC levels you get PBC rankings for all
12 individuals.
13     Then after the first of the year we would go
14 through what's called an ICF, and what would happen is
15 based on your PBC spreads with your people, you would
16 go through and assign an index number, which would
17 basically say their incentive part, and the indexes
18 would tie.  Ones would be a better number, two pluses
19 would get higher ICS than 2, et cetera.  So the higher
20 your PBC, typically the higher your index score.  And
21 this score would be a multiplier that would apply to
22 the incentive portion of your compensation.
23     So if you -- if 40 percent of your overall
24 compensation was incentives, and you got a 1, you
25 would get one times that component.  If you got a 1.5,

Page 1061

1  you'd get one and a half times that component at that
2  point.  So you get point seven times that incentive
3  component.  So it tied very closely to, you know, an
4  uplift or on how many incentive you got.
5      Q  So that an executive rating actually
6  translated directly into dollars?
7      A  The ICF would translate, but directly -- it
8  applied, yes, because you could have -- within the two
9  you might have people with different ranges of these
10 index ICFs.
11     Q  Okay.  What is your understanding of the
12 purpose of the second level manager's approval of a
13 PBC?
14     A  Number one, it's to review it for consistency.
15 Since one of your charges is to make sure that people
16 are treated fairly, you'd like to understand that
17 people evaluating people over here, it's equitable to
18 what is occurring with people over here.
19     So you would look at, you know, the PBCs
20 coming in from the managers below you to ensure that
21 they're equitable in terms of how people are being
22 evaluated.  And secondarily it provides you, you know,
23 kind of the latest insight into how the person is
24 performing.  So it would give you, you know, a view of
25 the direct reports to your managers in terms of how

Page 1062

1  they're performing, as well as providing this
2  consistency validation.
3      Q  As part of the PBC process, if an employee's
4  performance is on the decline, is there a step that a
5  manager can take?
6      A  Well, my experience, here's what we try to
7  practice in my organization, is if an employee's
8  performance is declining, you would go through
9  probably a much more structured review, evaluation
10 process.
11     Q  Is that called the interim review?
12     A  Yes, it would be an interim review.  And if
13 it's declining, generally that would be more
14 structured the more severe the decline.  If things
15 like that were happening, I typically would want my
16 manager to let me know they were happening.  I would
17 be aware of the interim reviews, and I would want to
18 know what came out of the interim reviews.
19     We have a large organization, and it takes a
20 very structured discipline process to manage large
21 numbers of people, and so we kind of instilled the
22 structure across the management team.
23     So you want to know two things when you go
24 through that.  You want to know that the employee is
25 aware of what the issues are, and has the opportunity

Page 1063

1  to fix them, because, you know, best interests of the
2  company, if the employee gets better, and you don't
3  want issues at the end that say, you know, things
4  didn't happen, so there's an inherent management
5  responsibility to the individual and to the company,
6  but, you know, there's a need to be, I would say more
7  robust if there's a decline in what the individual is
8  performing.
9      Q  And are these interim reviews often in
10 writing?  Where there's declining performance.
11     A  If there's a significant decline in
12 performance, they, you know, in my organization they
13 would typically be expected to be in writing, you
14 know.  And it's important.  It's a summary of what
15 you're going to say, what you said and the reaction of
16 the employee, because I would -- typically if we have
17 that situation going on, where I'm expecting something
18 significant to happen, you know, I typically would
19 have -- I would have meetings with my manager to
20 review that progress.
21     Q  And the point of having it in writing is so
22 that the employee understand what the expectations are
23 and then you can measure to see if they've --
24     A  Well, it's not --
25         MR. FASMAN:  Objection, Your Honor.

Page 1064

1    THE COURT:  What's the basis?
2    MR. FASMAN:  Leading.
3    MR. CARTA:  I'll withdraw it.
4    MR. FASMAN:  Mr. Carta testifying.
5  BY MR. CARTA:
6    Q    What is the point of having it in writing?
7    A    The point is to, first off, to ensure that,
8  you know, what you told the employee, the employee
9  understands, this is what they understood, you know,
10  especially if you have subsequent ones, and it's to --
11  so it's gives you a baseline to go from in terms of
12  what's going on.  And you want to be apprised of the
13  situation, but you want them hopefully, you know, it's
14  quantitative enough that they can do something about
15  it.
16    And at the same time it's subject matter
17  material that you can use if things don't go well.  I
18  mean it's, you know, this is a, you know, you
19  typically -- they typically wind up rolling into a
20  performance evaluation at the end of the year.
21    Q    And are these reviews applicable to executives
22  under the PBC process?
23    A    They were applied to executives in my
24  organization.
25    Q    And in your organization were they also

Page 1065

1  applicable to vice presidents?
2    A    Yes.
3    Q    And in your experience, at IBM, have you seen
4  vice presidents receive interim reviews?
5    A    Yes.
6    Q    Have you ever seen anything while you were at
7  IBM that indicated that interim reviews were not
8  applicable to vice presidents?
9    A    You mean like a document?
10    Q    Yes.
11    A    No, sir.
12    Q    I'd like to ask you a couple questions about
13  discrimination and training.
14    While the manager at IBM, did you receive
15  training on legal prohibitions against age
16  discrimination?
17    A    Yes.
18    Q    And what did you learn from this training
19  about the appropriateness of asking an employee their
20  age?
21    MR. FASMAN:  Your Honor, I'm going to
22  object.  We've gone through this, and there's no
23  dispute about this.
24    THE COURT:  Sustained.
25  BY MR. CARTA:

Page 1066

1    Q    Based on your training, would you initiate a
2  discussion with an employee about their retirement?
3    MR. FASMAN:  Irrelevant, objection.
4    THE COURT:  Overruled.  You may answer,
5  sir.
6    THE WITNESS:  No, sir.
7  BY MR. CARTA:
8    Q    You would not?
9    A    I would not.
10    Q    Based on your training, what do you understand
11  about the legality of basing an employee's decision on
12  their age?
13    A    It's illegal.
14    Q    I'd like to ask you a few questions about
15  5-minute drills.  In your organization, how frequently
16  were 5-minute drills conducted?
17    A    Generally monthly.  There would be exceptions
18  where we might have one on the spot.  If we had a
19  critical situation that we needed, you know, an
20  assignment made, we might fire it up.  Might be one
21  position we would send out with the information, pull
22  everything together to make a decision.
23    Q    Again, in ITD Americas, what was the purpose
24  of the 5-minute drill procedure?
25    A    It was generally to make everybody available

Page 1067

1  that the peer group managers there -- everybody was
2  aware of what job opportunities were there, and what
3  individuals were available for your assignments, and
4  what the candidates were for the particular job
5  opportunities that were coming up.
6    Q    Are executive jobs posted at IBM?
7    A    No.
8    Q    Is the information that's circulated in a
9  5-minute drill, is that considered confidential?
10    A    Yes, it is.
11    Q    And as the head of ITD Americas, did you
12  manage your own 5-minute drills?
13    A    Yes.
14    Q    With the assistance of HR?
15    A    Yes.
16    Q    And who controlled what jobs would be
17  discussed on the drills?
18    A    I did.
19    Q    And generally what type of positions were
20  filled on the ITD Americas 5-minute drill?
21    A    The jobs that were filled?
22    Q    Yes.
23    A    Those were filled just off of that drill that
24  I would have final authority, which would be those
25  within my organization.

Page 1068

1    Q   And those would be the ones that you would
2  have final authority to say yea or nay, so and so
3  should take this position?
4    A   Yes.
5    Q   Did you also participate in anyone else's
6  5-minute drills while you were the head of ITD
7  Americas?
8    A   Yes.  I participated in Bob Zapfel, he was the
9  general manager of the sectors, and Tony Macina, he
10  was Global Delivery.
11    Q   On which 5-minute drills are most of the jobs
12  for which Mr. Castelluccio were most qualified and
13  which of the 5-minute drills would those jobs appear?
14    A   The DPE PE related kind of jobs would have
15  appeared -- the DPE jobs would have appeared on Bob
16  Zapfel's drill.  If you were going to put somebody in
17  a DPE or in a sector VP role, sector delivery VP role,
18  you would want concurrence with that sector's general
19  manager for the DPE position, and as well as the
20  sector delivery job.
21        They would also appear on my ITD job, my IT
22  role, to make sure that everybody was aware of what
23  DPE roles were out there.  The competency types of
24  jobs that Mr. Castelluccio would be a candidate for
25  would appear most prominently on the ITD 5-minute

Page 1069

1  drill, as well as Mr. Macina's Global Delivery.
2    Q   And can you just explain to the jurors how
3  slates of candidates were developed in the ITD
4  Americas 5-minute drill?
5    A   I can tell you mine.
6    Q   Yes.
7    A   You would get HR to pull a slate of people,
8  because generally the jobs -- the opportunities would
9  be appearing on 5-minute drills.  Other people, other
10  peer managers, might have candidates, so you might get
11  somebody from another one of the organizations might
12  call and say I'd like -- I think such and such might
13  be a good candidate for the job.  So they could be
14  added.  I could add them.  So the managers themselves
15  would have candidates, and HR would have candidates,
16  also.  So there was kind of a cooperative
17  collaboration to get the candidate list together.
18    Q   And what authority or -- what authority did
19  you have to have names added to slates of candidates,
20  for consideration?
21    A   I could add them any time I wanted to.
22    Q   You could add them any time you wanted to?
23    A   For the jobs.
24    Q   On your drill?
25    A   Certainly.

Page 1070

1    Q   And at your request would a candidate also be
2  added to Mr. Zapfel's drill?
3    A   For the -- in particular for the DPE jobs.  So
4  that there were sector -- my organizational sector
5  delivery VP roles, I would add candidates to that
6  list.  If there was a senior DPE that was going to
7  be on Bob Zapfel's drill, that opportunity was there, I
8  could add candidates to that drill.  I mean it was
9  effectively my job that was being reviewed at his
10  level.
11    Q   In your experience, who would a 5-minute
12  drill, the actual conference call itself, who is
13  expected to be the advocate for a particular
14  candidate, if anyone?
15    A   If the candidate's manager or my manager is
16  there, that's most likely to be the advocate.  There
17  might be another sponsor, somebody coming in from a
18  sister organization as a candidate, and they, you
19  know, may or may not be an advocate for that
20  candidate, but generally it would be the line manager
21  that person reports to.
22    Q   Who may or may not be an advocate?  I don't
23  know if I understand.
24    A   There might be situations where somebody might
25  be on a slate, a candidate list that's -- they don't

Page 1071

1  have a manager present.  That person may be even
2  outside that immediate organization.  There may not be
3  anybody present that's the line manager.  Generally it
4  would be somebody present that put the name in.  So it
5  might be HR, might be personnel organization, or it
6  might be a line manager that's in that 5-minute drill
7  who's kind of a sponsor of somebody from some
8  different organization.  All I'm saying is it's not
9  always -- the advocate is not always the direct line
10  manager in the room that owns the person.
11    Q   Okay.  That's in a situation where the main
12  line manager wasn't there, is that the hypothetical
13  you were just discussing?
14    A   Yes.
15    Q   So let me ask you more clearly, in a case when
16  you have an employee who reports to you who you're
17  trying to find a job for and you're in the drill, what
18  is your understanding of what your role is?
19    A   Well, my role would be that, I have first --
20  if I'm first on the drill, I'm probably the one that's
21  advocating that person for the job.
22    Q   And whose responsibility would you say it was
23  if you're in the room?
24    A   Mine.
25    Q   If an executive doesn't have an advocate, how,

Page 1072

1  if at all, would that impact on their ability to get a
2  job?
3             MR. FASMAN:  I'm going to object, Your
4  Honor.  I mean this is --
5             THE COURT:  Very speculative, right?
6             MR. FASMAN:  It's speculative.  It's a
7  period of time that's well before the res gestae in
8  the case.
9             MR. CARTA:  Your Honor, this is -- I'll
10 rephrase.
11 BY MR. CARTA:
12    Q   In 2007 with respect to the same drill that --
13 in the same organization that Ms. Collins-Smee took
14 over from you, let's be very specific, in 2007, the
15 year before, in your experience, if there was not an
16 advocate for a candidate, what impact would that have
17 on their ability to get a job?
18             MR. FASMAN:  Your Honor, he was not there
19 in 2007.  He wasn't in the role.
20 BY MR. CARTA:
21    Q   I'm sorry, 2006.  No, 2007.  You were in there
22 in 2007?
23    A   I left March of 2007.
24    Q   Okay, I'm sorry, 2006.  In 2006, the year
25 2006, with respect to the ITD Americas, what in your

Page 1073

1  experience would be the impact an advocate -- if a
2  line manager did not advocate on behalf of someone
3  they were looking for have a job?
4    A   If there was somebody on the list that's a
5  candidate, that didn't have an advocate, it's likely
6  they're not going to get the job.  You're discussing
7  pros and cons to try to select the best person for the
8  job.  If nobody's speaking for an individual actively,
9  it's not likely that they would get the job.  Now, in
10 my organization I knew a lot of the people, but, you
11 know, but we typically had fairly, you know, open
12 dialogue about individuals and pros and cons and what
13 have you.
14    Q   If you're a manager looking to place a
15 candidate, what else would you typically do, if
16 anything, besides adding a candidate to a 5-minute
17 drill, in 2006 in the ITD Americas organization?
18    A   If you had a candidate for a particular job,
19 and you're looking to move them to another job
20 opening, you typically would, you know, you typically
21 would talk to the receiving organizational structure.
22       I think an example is even DPEs, you're going
23 to -- if you're really advocating for a person to be a
24 particular DPE on a particular contract, you would
25 talk to the sector general manager that owned that

Page 1074

1  contract.
2    Q   The business line?
3    A   And typically some of this is done in the back
4  side, you know, it's not necessarily all done in the
5  room in the 5-minute drill, you know, you wind up
6  having a discussion about, you know, so and so going
7  to show up on a 5-minute drill, I really think this
8  would be a good candidate for you, so a little bit of
9  advocacy outside the 5-minute drill as well as
10 advocacy -- I don't know if that's something -- is
11 that what you're --
12    Q   Well, I'm asking you what you would do
13 typically if you're looking to place someone?
14    A   That's what I would do.
15    Q   If you determined to move an executive, when
16 would you identify that executive as a person to move
17 on a 5-minute drill?  Again, all these questions are
18 focused on 2006 and in your organization.
19    A   We would build a candidate list for -- to
20 replace them in their job, and start building, you
21 know, an opportunity list of jobs that they would be
22 going to, and then you would -- I would kind of vet
23 those up through the 5-minute drills pretty much in
24 parallel, because what you need to really have closure
25 is as minimal a gap as you can from somebody who

Page 1075

1  leaves a job until somebody goes into the job.  So but
2  generally, because the 5-minute drills have been
3  putting these jobs in, you have a pretty good view of
4  the jobs and the opportunities, so it's not
5  necessarily hard to close on any VP goes to B, VP goes
6  to Y.
7    Q   My question was really when, timing, when you
8  decide an executive is to be moved, when would you
9  start putting them in the 5-minute drill?
10    A   As soon as possible.
11    Q   Can you think of any occasion when you put
12 somebody in a 5-minute drill even before they've been
13 pulled out of a position?
14    A   I could envision it.
15    Q   And what would be the occasion?
16    A   If you can't move a person because the
17 triviality of what they're managing, but I didn't want
18 visibility into who are the candidates, how am I going
19 to get somebody to backfill this person with minimal
20 time as possible, you've got to start that process
21 before necessarily the individual, you know, you take
22 the individual out.  And, you know, which even means,
23 you know, starting to look at where the next -- you
24 could start looking at where the next job opportunity
25 is.

41 (Pages 1072 to 1075)

Page 1076

1    Q   May I have Exhibit 29, Plaintiff's 29.
2        THE COURT: Mr. Carta, remember we have
3    to leave time for Mr. Fasman's cross-examination, that
4    is unless the witness is going to come back on Monday.
5        MR. CARTA: Tuesday, yes.
6        THE COURT: Excuse me, Tuesday.
7        MR. CARTA: I will try to move more
8    quickly.  I appreciate it, Your Honor.
9        THE COURT: You're having an opportunity
10   that you need to conduct the examination that you're
11   conducting, fairness requires that Mr. Fasman have an
12   opportunity to do a fair amount of cross-examination.
13   You don't have to worry about redirect.  Direct and
14   cross, absolutely critical.  So we got to make sure we
15   don't run the clock on Mr. Fasman.
16       MR. FASMAN: It's my understanding this
17   witness is not coming back?
18       THE COURT: No, I said -- the witness is
19   here from Texas, he was here yesterday, and we don't
20   want to have him -- to inflict Hartford on this
21   gentleman for a long weekend, because there's not an
22   awful lot to do.  Seems like a nice gentleman.
23   BY MR. CARTA:
24       Q   Mr. Jones, would you just take a moment and
25   look at the e-mail, please.  And in this e-mail Ms.

Page 1077

1    Collins-Smee announced that she's decided to move Mr.
2    Castelluccio.
3        A   Say again, she announced that she plans to
4    move him?
5        Q   Yes.
6        A   Yes.
7        Q   And she indicates that, quote, I need to get
8    Jim on Pat Kerin's drill.
9            Would you agree that that was her
10   responsibility, to get him on a drill?
11       A   Yes.
12       Q   And when should she have put him on the drill
13   under these circumstances?
14           MR. FASMAN: I'm going to object, Your
15   Honor.  When should she have put him on the drill?  I
16   mean I guess the --
17           MR. CARTA: I'll withdraw the question.
18   He already said as soon as possible.  I'll try to move
19   faster.
20   BY MR. CARTA:
21       Q   Let's go through Mr. Castelluccio's 2006
22   evaluation.  In the second year there were some
23   significant challenges in Mr. Castelluccio's position
24   as VP of Public Sector, is that right?
25       A   Yes.

Page 1078

1    Q   And in particular WellPoint?
2        A   Yes.
3        Q   And what was the -- just quickly, what was the
4    magnitude of the problem at WellPoint based on your
5    experience compared to what you've seen at other
6    contracts at IBM?
7        A   It was probably the worst contract situation
8    I'd ever seen.  Certainly one of the worst.  May have
9    been the worst.
10       Q   Was there a short-term solution to the
11   problems at WellPoint?
12       A   By short-term if you mean less than a year or
13   so, I don't think so.  I think it would take
14   multiple -- I think it took multiple years to fix that
15   contract.
16       Q   And to what extent were additional resources
17   needed to solve the problems at WellPoint?
18           MR. FASMAN: Is this, Your Honor, is this
19   relating to 2006?
20           MR. CARTA: To what he was observing in
21   the division, yes, same contract.
22           THE COURT: It does.
23           MR. FASMAN: I'll withdraw it.
24           THE WITNESS: To the degree it needed
25   added resources, we had taken over the customer skill

Page 1079

1    base, with the planned move to the competencies.
2    Eventually I think we did reduce the staff
3    significantly from what was there, but there were
4    skilled shortages in the customer skills, so there
5    were resources needed to pull in technical skills.
6        But if I remember, the midyear review we
7    went through trying to get the contract on a plan.  We
8    put -- we wound up with a very aggressive plan from,
9    like, mid-'06 on to pull the contract out.  Both sides
10   were extremely aggressive.  They had -- delivery had
11   to go execute actions that the account team had to go
12   execute.
13       You know, we had very difficult -- the
14   customer account team had a very complex set of issues
15   to deal with to try to get additional revenue to pay
16   for things that the customer -- we had to get a very
17   aggressive staffing transfer plan that included
18   transferring the people to the competencies, running
19   LEAN, a process to streamline the right structure,
20   too, then aggressively moving to GR, looking to the --
21   almost trying to do all of those in parallel.
22       So there were key people that Jim and the
23   DPE on WellPoint really needed additional key
24   resources out of the competency structure to go help
25   lead that labor action plan.  I think that's a summary

Page 1080

1 of it.
2 BY MR. CARTA:
3 Q    At the time you were there who had authority
4 to approve the monies to free up those additional
5 skilled people?
6 A    Because of the constraints on this particular
7 contract, the financial pressures that was on any
8 additional resources or staffing required PE and
9 sector GM.
10 Q    And who was that in particular at that time?
11 A    The GM was Dave Liederbach.
12 Q    And in the middle of 2006 did you become aware
13 that Mr. Liederbach was not pleased with the
14 relationship he had with Mr. Castelluccio in
15 connection with the WellPoint contract?
16 A    Yes.  I think he and I had discussions about
17 Dave.  This was probably -- I think this occurred in
18 Bob Zapfel's business unit review.  It probably would
19 have occurred late first, early second quarter.  And
20 he talked through some of the issues.  I talked to
21 him.  I talked to Jim about it.  I think Dave sent me
22 notes on some of the communications issues he was
23 having.  Some of his account team, WellPoint's team,
24 were trying to get in touch with Jim.  Jim's response
25 back wasn't as timely as Dave or the account team

Page 1081

1 expected.
2         And ultimately Dave and I, you know, Dave
3 wound up talking -- we agreed that he would talk to
4 Jim, they'd see if they could work out something that
5 would solve the issues.  They attempted to go do that.
6 Then I think, you know, they spent a few months trying
7 to do that.
8         I think probably in the fourth quarter I
9 talked to Dave again, it was not working out, and I
10 told Dave at that time that I would move Jim out, if
11 we could get somebody else to go in there, but because
12 of the intensity of what was going on in the fourth
13 quarter, closing the fourth quarter and closing the
14 year, that I wouldn't be able to do that until after
15 the first of the year.
16 Q    And did you agree to move Mr. Castelluccio
17 because there were problems in his performance?
18 A    You know, I was -- you know, I was very
19 familiar with what Jim was doing, and, you know, some
20 of these issues -- most of the issues weren't as much
21 an issue of delivery performance.  I mean think about
22 the discussion about somebody's got to -- if
23 somebody's trying to get you to go do things, stand
24 tall, you can only do so much.  I didn't see them as
25 performance.  I saw them as Jim doing his job.

Page 1082

1         There were -- there was a -- I did have
2 working -- clear working relationship issues between
3 some of the account team and Jim, and I don't know how
4 it was formed.  You know, everybody in that
5 environment was being pounded on pretty severely.  And
6 so I was not moving Jim -- you know, this would have
7 been me, you know, moving you, you know, to go find
8 another job, you know, really as a courtesy to Dave,
9 but also if the relationships aren't working, you've
10 got to fix them.  You've got to get the right people
11 in.  These things are too hard to do if you're not
12 a team working together.  So that's the context that I
13 was going to be moving Jim out.
14 Q    And what was your plan for Mr. Castelluccio?
15 A    I was looking at -- I would move him to one of
16 two areas; either find a large contract that he would
17 be the senior DPE on, he had done those jobs multiple
18 times in the past, very successful; or a VP role in
19 the competency structure, you know, a role seen as
20 global structure.
21 Q    You say competency, you've made reference to
22 that several times.  Can you explain that to the jury
23 quickly?
24 A    The delivery organization itself other than
25 the delivery PEs had account teams that were aligned

Page 1083

1 with the sectors at the customer.  The competency
2 structure -- if you looked at all of the delivery that
3 you're pulling out of this giant matrix -- you had
4 server system operations, all the people working on
5 server ops -- if you looked at them in an
6 organization, you know, people, you know, people
7 working help desk, mid-range servers, large servers.
8 So those are competencies, and we drove those to try
9 to drive, you know, optimization best practices, you
10 know, and so that's, you know -- the leader function
11 under server system operations was by far the largest
12 competency.
13 Q    And before you retired what steps did you take
14 to place Mr. Castelluccio in a new position?
15 A    I started -- I had started looking at the
16 impact -- because of the prior recruits I knew who the
17 candidates were.  We've got development plans in place
18 for multiple individuals that are projected at certain
19 levels, and you look at -- these are key roles.  I had
20 a list of those individuals that would have been
21 candidates for Jim's job, and then I would have looked
22 at -- you know, I knew what, you know, DPE jobs were
23 open, and I knew the kind of jobs that Macina was
24 looking at in terms of the global organization.  So
25 I'd started building on that a list of people to

Page 1084

1    replace him in the sector job and here's the job
2    opportunities that he could go into.
3        Q    So you'd specifically at that point in the end
4    of 2006 looked at what are the job opportunities that
5    were available for Mr. Castelluccio?
6        A    That probably happened in January.
7        Q    In January of 2007?
8        A    In January of 2007.  I was too wrapped up in
9    '06 to do that.
10       Q    And at that time were there many opportunities
11   for an executive of Mr. Castelluccio's experience and
12   skill?
13       A    There were multiple, but -- I mean, there's
14   not a huge number, but there were jobs.
15       Q    What concerns, if any, did you have at that
16   time whether -- about whether there was work for Mr.
17   Castelluccio to perform in a new role?
18       A    You know, I didn't see a problem, that there
19   would be a problem with me finding him a new job over
20   the next -- certainly over the next quarter.
21       Q    Over the next quarter?
22       A    Yeah.  Like through March, you know, one or
23   two or three months.  I would -- you know, I don't
24   think I would have had any doubt that I would have
25   been able to have found him a job by that time.

Page 1085

1        Q    And would you have employed the use of the
2    5-minute drill procedure to assist in that process?
3        A    Yes.
4        Q    And what drills would you have put him on?
5        A    My drill, Zapfel's drill, Macina's drill.
6        Q    And in addition to putting him on drills, what
7    else would you have done, if anything?
8        A    Probably would have gone and talked to people
9    about, you know, in particular, you know, where I
10   thought he was going to be a good fit, I would have
11   been, you know, talking to them about those jobs.
12       Q    And if you'd moved Mr. Castelluccio out of the
13   position as VP of Public Sector, to what extent did
14   you believe it was your responsibility as manager to
15   locate a new position for him?
16           MR. FASMAN:  Your Honor, I have to
17   object.  I mean this is far afield.  What we're
18   litigating is his termination in June 2008.  You're
19   asking a witness who left at the beginning of 2007
20   before Ms. Collins-Smee ever showed up questions about
21   what he might have done or would have done had he
22   remained.  The fact is, he didn't remain.  And at some
23   point -- I think we've been very patient in terms of
24   background information, but at some point this gets so
25   far afield that I think it's not relevant.

Page 1086

1            THE COURT:  Mr. Carta?
2            MR. CARTA:  I can't imagine anything that
3    would be more relevant.
4            THE COURT:  Okay, ask your question.
5            MR. CARTA:  I think I did.
6    BY MR. CARTA:
7        Q    If you had moved Mr. Castelluccio out of this
8    position as VP of Public Sector, to what extent did
9    you believe that it was your responsibility to find
10   him a new job?
11       A    Yes, it would be my responsibility to find him
12   a job.
13       Q    Do you feel that's your own personal
14   conviction, or is that a function of your managerial
15   responsibilities to IBM?
16       A    I think it was both.
17       Q    And I think you may have answered this, but
18   based on your assessment of what was available at that
19   time, what was your expectation as to how long it
20   would take you to actually find him another position?
21           MR. FASMAN:  Asked and answered.
22           THE COURT:  Sustained.
23   BY MR. CARTA:
24       Q    If there had been any unforeseen delays in
25   finding Mr. Castelluccio a position, was there work

Page 1087

1    available for him to perform on a temporary basis?
2            MR. FASMAN:  Can I know when?
3    BY MR. CARTA:
4        Q    You said 2007, January 2007 is when you did
5    assessment?
6            MR. FASMAN:  I think it's speculation.
7            THE COURT:  You're asking if there would
8    have been work for Mr. Castelluccio to perform during
9    the period Mr. Castelluccio was on the bench, but
10   we've established this gentleman left his position
11   before that.
12           MR. CARTA:  I'll rephrase.
13   BY MR. CARTA:
14       Q    At any point in time when you were running the
15   ITD Americas organization, was there a lack of work
16   for people with Mr. Castelluccio's skill set?
17       A    No.
18       Q    In your experience when there's not an
19   immediate position open, are executives sometimes
20   given temporary work to stay busy?
21       A    I wouldn't characterize it as "to stay busy."
22       Q    How would you characterize it?
23       A    Well, there were critical things going on in
24   that large an organization that could always use top
25   talent to go try to address the issues, even

Page 1088

1  temporarily.
2      Q   And toward the end of 2006 did you go through
3  a PBC evaluation process with Mr. Castelluccio?
4      A   Yes.
5      Q   And you rated him a 2?
6      A   Yes.
7      Q   And a 2 rating, I think you may have been in
8  the courtroom when Ms. Collins-Smee indicated that she
9  thought a 2 rating was a poor rating for an executive.
10  Do you agree with that?
11      A   A 2 is an acceptable rating.  I mean I have
12  regularly had executives move up and down the scale.
13  I mean when you've got evaluations that tie to how you
14  perform on financials, how you performed on certain
15  things that are quantitative, it's not uncommon to
16  have, you know, a situation where somebody has a high
17  performing in one instance -- or a got a situation,
18  you know, you have a customer situation, the WellPoint
19  situation as an example, where, you know, there was a
20  drastic financial situation.  I think the contract was
21  projected to lose 40 million dollars in the first
22  year.
23          The plans they put in place in midyear
24  expected the delivery side as well as the account
25  management team to be extremely complex things.  The

Page 1089

1  outlook was to get that back to where we only lose 25
2  million, and that was kind of like a superhuman, you
3  know -- 25 million loss was not the plan for that
4  contract.  That's not what anybody's -- but that still
5  represented -- so they achieved -- they got to the end
6  of 2006 executing these plans, some things a little
7  out of sync, but both together got there and I believe
8  the losses were on the order of 25 million.
9          So in that situation people are performing
10  pretty good, but they didn't make the numbers.  So if
11  in previous years when you made numbers they were 2
12  plus, you come down you have, difficulty making
13  numbers, you're a 2.  Okay?
14          You know, I was not the easiest manager in the
15  world.  I mean I really was pretty -- I mean I think I
16  was fair, but I was pretty hard-nosed.  So when you
17  performed, you got good ratings.  If you didn't
18  perform, you didn't get them.
19          So there's -- there was always an up and down
20  style.  In 2006 I think every executive, most of the
21  executives in my organization went down in the
22  ratings, and as a whole I'm sure the whole thing went
23  down.
24      Q   Let me ask you the question again.  What do
25  you consider a 2 rating to be?

Page 1090

1      A   It's acceptable.
2      Q   For an executive?
3      A   Yes.
4      Q   Given Mr. Liederbach's relationship with Mr.
5  Castelluccio, would you have put him in as DPE on the
6  WellPoint account?
7      A   Jim and his organization, in particular the
8  accounts he worked on, were having -- they had issues,
9  and teamwork issues.  And so no, I mean I would have
10  found another top talent individual -- you got a
11  situation where people don't necessarily trust what
12  each other is doing.  That account needed all hands on
13  deck team together to go execute.  So, you know, I
14  would have found somebody other than Jim.  I mean I
15  would assume that Dave would not have wanted him on
16  that.
17          MR. FASMAN:  No basis, Your Honor.
18          MR. CARTA:  I don't claim that.
19          THE COURT:  All right.  Next question,
20  Mr. Carta.
21  BY MR. CARTA:
22      Q   Why didn't you move Mr. Castelluccio earlier
23  out of the position as VP of Public Sector?
24      A   You mean in 2006?
25      Q   Yes.

Page 1091

1      A   I couldn't.  I mean, by the fourth quarter
2  when it was clear that, you know, he and Dave were not
3  going to able to address the issues that they had, you
4  know, in the fourth quarter I couldn't get it done
5  with everything else that was going on in the business
6  to try to close the quarter, close the year.
7      Q   Did you perceive Mr. Castelluccio as having
8  leadership deficiencies in his role as VP of Public
9  Sector?
10      A   No.
11      Q   So the reason you agreed to move him, in sum,
12  what would you say was the reasons that you had
13  discussed and agreed to move Mr. Castelluccio?
14      A   They had working relationship issues between
15  he and WellPoint's account team.
16      Q   And would you have moved him out of that
17  position without having another position for him to
18  move into immediately, or within the near time frame?
19      A   Yes.  I mean it wouldn't have taken me --
20  moving him out would not -- I did not anticipate that
21  would have been a problem.  So I could have moved him
22  out and then shortly after found a competent position.
23          MR. CARTA:  I'm trying to see what
24  questions I can skip, Your Honor.
25  BY MR. CARTA:

Page 1092

1    Q   Do you recall whether there were any customer
2  complaints made to you about Mr. Castelluccio's
3  performance while he was VP of Public Sector?
4    A   Not offhand, I don't remember any.
5    Q   Do you remember whether there were any issues
6  with any of the other accounts other than the
7  WellPoint account?
8    A   You mean general account issues, or issues
9  with Mr. Castelluccio.
10   Q   I'm sorry, thank you.  Were you getting
11 criticisms with respect to Mr. Castelluccio's
12 performance on any of the other accounts in 2005 or
13 2006 with respect to Mr. Castelluccio?
14   A   I think Dave mentioned there were others, but
15 I only heard specifically of those on WellPoint.
16   Q   Only heard of what?
17   A   I only heard of specific ones on WellPoint.
18   Q   And were any complaints made directly to you?
19 That's really my question.
20   A   No.
21   Q   From a customer?
22   A   No.
23   Q   No customer complaints?
24   A   No.
25   Q   Based upon your assessment of Mr.

Page 1093

1  Castelluccio's past performance, especially as he
2  turned around United Healthcare, do you have an
3  opinion whether or not he would have been able to turn
4  WellPoint around had he been given the necessary
5  resources.
6        MR. FASMAN:  Your Honor, objection.
7        THE COURT:  Sustained.
8  BY MR. CARTA:
9    Q   Let me ask you a question or two about the
10 bench before I close up.
11       Did you ever assign anybody to the bench while
12 you were head of ITD delivery?
13   A   I don't identify with a bench.  I mean there
14 certainly in the delivery -- in the -- in the IBM
15 global services in a consulting area where consultants
16 are contracted and they're off contracts and they're
17 in application development periods in organizations or
18 contracted delivery things and they come off, there's
19 a smaller bench compared to consulting, but our
20 ITDelivery organization, we ran that over a hundred
21 percent utilization, you know, the model labor was
22 modelled that the average employee would put in over
23 18 percent overtime.  And we had significant
24 challenges a lot of places trying to drive technology
25 and improvements that there was -- there were lists of

Page 1094

1  things that we needed to work with.
2        So the notion of a bench -- you know, there
3  wasn't something formally a bench.  It wasn't -- while
4  I was there, there wasn't anything where you just go
5  to a position and somebody was retiring.  Certainly -- I mean say
6  somebody was retiring.  You'd make the transition of
7  all the work and they've got a month or so to go, they
8  may not have anything to do, or -- but generally on an
9  ongoing basis, you know, I didn't operate with the
10 notion that there's a bench.
11   Q   You didn't operate with a bench, that wasn't
12 part of what you had at ITD Americas when you were
13 there?
14   A   No.
15   Q   And why not?
16   A   We had too much work to do.
17   Q   You had too much work to do.  No need for a
18 bench.
19   A   Well, we would have taken it out.  The
20 financial structure that drives competitiveness
21 dictated there was no unutilized resources.  I mean we
22 drove the organization extremely hard.  We modeled the
23 legwork at 18 percent overtime.  We exceeded that by 2
24 or 3 percent in 2006.  I think we were close to 20
25 percent.  And so the way we would have worked is, you

Page 1095

1  know, we were trying to take all slack out of the
2  system so the model that we were managing wouldn't
3  have allowed for people sitting around not doing
4  anything.
5    Q   Plaintiff's 83.  Mr. Jones, I'd like to go
6  through very quickly some positions that were filled
7  while Mr. Castelluccio was sitting on the bench and
8  just ask you -- I think you've seen this.  It's
9  Exhibit 83.  You have it in front of you?
10   A   Which one is it?
11   Q   83.
12       MR. FASMAN:  Your Honor, these are
13 positions that were filled in 2008, in May 2008.  This
14 witness left in January of 2007.
15       THE COURT:  I'm aware of that.  I haven't
16 heard the question yet.
17       MR. FASMAN:  Sorry.
18 BY MR. CARTA:
19   Q   What qualifications did Mr. Castelluccio have
20 to perform the job as SPE for the state of Georgia
21 position awarded to Mr. Grimaldi?
22       MR. FASMAN:  Objection.  I'm going to
23 renew my objection.  These are people -- at the very
24 least these people had another year and a half worth
25 of performance experience as compared to when Mr.

Page 1096

```
 1    Jones was in the division.  There's no foundation that
 2    he knew what their then current performance was, nor
 3    can he testify as to what Mr. Castelluccio's
 4    performance was after he left.  So these positions are
 5    filled.
 6            MR. CARTA:  Your Honor, my question was
 7    what qualifications did Mr. Castelluccio have for the
 8    job.
 9            THE COURT:  For the job, the state of
10    Georgia job.
11            MR. CARTA:  Yes.
12            THE COURT:  Do you know whether this
13    person was familiar with the Georgia job.
14            MR. CARTA:  I can lay a foundation.
15    BY MR. CARTA:
16     Q    Were you familiar with the state of Georgia
17    position?
18     A    I'm familiar with the sister DPE position,
19    would be the same general position that would apply to
20    any senior DPE.  The specifics contract to contract,
21    state, telecommunications, finance sector, are there.
22    The sector specifics are there, but the general
23    position of the senior DPE are the same.
24     Q    And what qualifications did Mr. Castelluccio
25    have to perform the role of a VP of a particular
```

Page 1097

```
 1    sector?
 2            MR. FASMAN:  Your Honor, if we're -- if
 3    he's testifying as to what qualifications Mr.
 4    Castelluccio had at the end of 2006 for a position
 5    that's filled a year and a half later without regard
 6    to Mr. Castelluccio's performance in 2007 and the
 7    first part of 2008, it's not relevant testimony.  It
 8    has to be part of that.
 9            MR. CARTA:  Your Honor, Mr.
10    Castelluccio's qualifications were built up over a
11    period of 40 years.  I don't think his qualifications
12    changed in what happened over a 12 month period.
13            THE COURT:  Well, I think the witness
14    testified that he had qualifications to be -- at least
15    during the period when this gentleman was there, I
16    believe he testified that Mr. Castelluccio had the
17    qualifications, but how can he testify as to what Mr.
18    Castelluccio's qualifications were with regard to a
19    particular set of problems and a particular job in
20    2008 when he left in 2006?
21            MR. CARTA:  Because --
22            MR. FASMAN:  Might I also add, Your
23    Honor, that Ms. Collins-Smee testified extensively
24    about the changes made in the delivery organization
25    after she and Bob Zapfel took over, too.
```

Page 1098

```
 1            THE COURT:  The objection is sustained.
 2    We're going to have to do -- Mr. Carta, we have some
 3    alternatives, and some are pleasant -- none of them
 4    are pleasant.  One of them is we can allow one juror
 5    to leave at 4 o'clock and continue on with the
 6    remaining seven jurors.  That's one.  The second is I
 7    can strike all of this witness's testimony on direct
 8    as hearsay if Mr. Fasman hasn't had an opportunity,
 9    fair opportunity to cross-examine him.  Number three,
10    I can declare a mistrial.  Those are the
11    circumstances.  Now, right now Mr. Fasman would have
12    about 35 minutes to conduct a cross-examination.
13            MR. CARTA:  May I ask one more question?
14    Then I'll sit down.
15    BY MR. CARTA:
16     Q    I'd like you to listen to the question and
17    just answer it yes or no, if you may.
18            Would it have enhanced Mr. Castelluccio's
19    chance of getting a job if he had explored a level 10
20    executive position?
21     A    I can't answer that yes or no, because I
22    wouldn't have done that.  You know, in my experience
23    we would never put an executive to look at a job at a
24    Band 10 level.
25     Q    Would that have helped him?  Would that have
```

Page 1099

```
 1    provided him with more job opportunities?
 2     A    I would have to say, you know, I can't answer
 3    that.  If I had to answer it, I would say no.
 4            MR. CARTA:  No further questions.
 5            THE COURT:  Mr. Fasman.
 6            MR. FASMAN:  Your Honor, thank you.
 7            Ladies and gentlemen, afternoon.  I'll
 8    try and be as brief as I can.
 9
10            CROSS-EXAMINATION BY MR. FASMAN:
11
12     Q    Mr. Jones, how are you?
13     A    I'm good.
14     Q    Good.
15            Now, in your experience at IBM, different
16    managers do things differently, right?
17     A    Yes.
18     Q    Different managers ran 5-minute drills
19    differently?
20     A    Yes.
21     Q    And different managers assigned work
22    differently, isn't that right?
23     A    Yes.
24     Q    You did things your way, other people did
25    things their way?
```

Page 1100

1    A   Yes.
2    Q   And there was a fair amount of latitude there?
3    A   Yes.
4    Q   Okay.  Now, with regard to the testimony that
5    you gave about your replacement of Mr. Castelluccio as
6    vice president of the public sector division, due to
7    the incompatibility with Mr. Liederbach's team or Mr.
8    Liederbach, did you discuss that with Mr.
9    Castelluccio?
10   A   I probably might -- I don't remember exactly,
11   but my recollection would be I would have discussed
12   that with him at a minimum during his PBC review in
13   late January.
14   Q   In January of '08?
15   A   In January of '07.
16   Q   Of '07?
17   A   Of '07.
18   Q   I see.  That's right.  Sorry.
19   A   Late January when I went over his PBC with
20   him.
21   Q   Right.  You wouldn't just come up to him and
22   take him out if you knew that this was going to
23   happen.  You said that when you received complaints in
24   from Mr. Liederbach, you allowed them, Mr. Liederbach
25   and Mr. Castelluccio, to try to talk this out.

Page 1101

1    A   Yeah.  When Dave and I discussed it, he
2    characterized what was happening.  He then sent me
3    some notes that were example notes from his execs as
4    representative of some of the -- you know, they were
5    communication linkages, right?  Somebody asking for
6    something that might be a memo, and then a response
7    back from Dave.
8        So I talked to Dave about that, and he and I
9    agreed that he would talk to Jim, and they could see,
10   you know -- you know, talk to Jim about these issues
11   and -- I think they even looked at putting steps in
12   place to improve that process.  And they tried it for,
13   you know, a couple, three months.  I don't exact -- I
14   don't remember exactly how long.
15       But, you know, I would remember sometime in
16   the fourth quarter I -- you know, Dave and I let Bob
17   Zapfel's review meeting, and it still wasn't working,
18   so I think in that time frame I agreed with Dave that,
19   you know, I would move him out, but that because of
20   the, you know, kind of the crisis associated with
21   getting through the fourth quarter and end of the
22   year, I couldn't do that until after the first of the
23   year.
24   Q   And that's not unusual, right?  I mean that's
25   happened before, right?

Page 1102

1    A   That happened before.
2    Q   And it happens in various situations where
3    there's an incompatibility between, for example, the
4    PEs and the DPEs, right?
5    A   Yes.
6    Q   Now, you said that you would not have assigned
7    him to WellPoint given Liederbach's, you know, the
8    problems that he had with Dave Liederbach, but if
9    Mr. Liederbach agreed to have him go to WellPoint,
10   that would be a different matter, right?
11       MR. CARTA:  Objection.  There's no
12   foundation for that question.  Purely hypothetical.
13       THE COURT:  Mr. Fasman?
14       MR. FASMAN:  Ms. Collins-Smee testified
15   that she did discuss that with Mr. Liederbach and with
16   Ms. McDonald.
17       THE COURT:  Okay, objection's overruled.
18   BY MR. FASMAN:
19   Q   Sir?
20   A   Yes.
21   Q   "Yes" meaning?
22   A   I would have assigned it.
23   Q   Let's get this straight.
24   A   Yes.
25   Q   If he says yes --

Page 1103

1    A   If he said yes, he would have supported it, I
2    would do that.
3    Q   You said you could have gotten him -- you
4    could have found a job for Mr. Castelluccio in the
5    first quarter, maybe the second quarter, whatever.
6    A   No.  My expectation was -- I mean I was very
7    familiar with everything that's going on, so my
8    expectation wasn't that it would take me a long time
9    to get him a job.  Nor in backfill, right?  I had a
10   list of people that would be able to do that job, that
11   are waiting in the wings kind of to do that job.
12   Q   To be VP DST.
13   A   Yeah, public sector, a VP.
14   Q   Are you surprised it took six months to get --
15   or five months to get Mr. Echavarria in there?
16   A   Yes.
17   Q   Could employees be on 5-minute drills too
18   long?
19   A   I've never thought about a time frame.
20   Q   What if you're on 5-minute drills for 11
21   months?
22   A   I'm sure people start to wonder why this
23   person can't get a job.
24   Q   Okay.
25       Now, you talked about interim reviews.  Was it

48 (Pages 1100 to 1103)

Page 1104

1  your testimony that every time you had a performance
2  problem with a vice president you did a formal interim
3  review for that person?
4      A   We did structured reviews.  I mean this would
5  be a set down review.  Typically what would happen is
6  I'd have a set of notes that would say, I'm going to
7  have talking points, and so, you know, I would make
8  sure, if I'm conducting the review -- and this is what
9  I liked my managers to do as well, is you have talking
10  points to make sure you talk to the issues, and then
11  there would be a summary of their response after that,
12  you know.
13          And for my managers, you know, they typically
14  would review that with me, because if somebody's
15  complaining, there's more -- typically more you should
16  be doing in terms of managing to help the employee get
17  better, but managing the implications if it doesn't
18  get better.
19      Q   Right.
20      A   And you know, I have -- I've had that, those
21  situations, before.
22      Q   And that's the way you did it.
23      A   That's the way I did it.
24      Q   Right.  And the purpose of doing that was to
25  make sure the employee knew what the problems were.

Page 1105

1      A   One of the purposes.
2      Q   Pardon me?
3      A   Part of the purpose.
4      Q   What's the other part of the purpose?
5      A   The other purpose is to make sure you have,
6  you know, kind of a quantified understanding of what
7  has transpired, because if things continue to go
8  wrong, if the employee opened doors or situations
9  occurred, you would like to have more than he said/she
10  said.
11      Q   Um-hmm.
12      A   And, in fact, most of the open doors that I've
13  ever gone through, there was always, you know, an
14  advice and counsel to make these as crisp as possible
15  for everybody's benefit, the employee's benefit, as
16  well as IBM's benefit, is that there's a level of, you
17  know, quantification that you can point to, even to
18  documentation of the review, here's what was
19  discussed, here's the employee's responses, and it's
20  even better if you've reviewed those with your
21  manager.
22      Q   Right.
23      A   So there's -- you get -- there's a lot of
24  foundation when you get to a bad situation that
25  indicates, you know, what has transpired.

Page 1106

1      Q   Okay.  That sounds pretty military.  Is that
2  part of your background?
3      A   No.  Actually it's not that hard to go do, and
4  the impact of not doing it can be much more onerous
5  and time-consuming.
6      Q   You say that PBC rating of 2 for an executive
7  is acceptable.
8      A   No.
9      Q   I'm sorry?
10      A   Oh, it's acceptable, not -- I thought you said
11  exceptional.
12      Q   No, it's acceptable, not what you'd want.
13      A   It's not, you know, it's not what any one of
14  them would want, but in the IBM construct, it's -- you
15  know, you're not fixing to get fired.  I mean if it's
16  a 3, that's serious bad.
17      Q   That's bad, right?
18      A   And even if it's a 2 and partial 2, you get to
19  a 2 a lot of ways.
20      Q   Right.  You can go up or down.
21      A   Up here, down here, 2, but this last part is
22  bad.
23      Q   And Mr. Castelluccio with you went down, went
24  from 2 plus to 2.
25      A   And that's, you know, primarily in the

Page 1107

1  financial results.  I mean if you look at the
2  expectation of the financial results in '06, it's
3  driven, you know, in large part by, you know,
4  contracts like WellPoint.  Even though they didn't
5  make their plan, or the numbers originally assigned to
6  them, you know, there's -- there's probably not
7  anybody, given the complicated situation of WellPoint,
8  from the beginning, the customers, all of that coming
9  into '06, it could have executed the plan to get back
10  to the target plan on the financials by the end of
11  '06.
12      Q   Well, let me ask you a couple of other
13  questions.  You left in the early part of 2007?
14      A   End of March.
15      Q   End of March.  You didn't supervise Mr.
16  Castelluccio after February 1st.
17      A   No.
18      Q   You have no knowledge of his job performance
19  from February 1st on through the rest of the next
20  year.
21      A   None.
22      Q   You have no firsthand knowledge of the
23  circumstances of his termination.
24      A   None.
25      Q   You have no firsthand knowledge of his

A-556

Page 1108

1  continuing relationship with Liederbach or Keenie
2  McDonald or anybody else, right?
3      A   None.
4      Q   Okay.  And you were not in any 5-minute drills
5  where Joanne Collins-Smee was.
6      A   Not -- I was in all of the business -- Bob
7  Zapfel's business unit reviews where she was a sector.
8      Q   Sector, right.
9      A   General manager for Industrial Sector, I was
10 in most of those 5-minute drills.  That was before she
11 took over my job.
12     Q   Let me refine that.  After she took over your
13 job you were in no 5-minute drills with her.
14     A   No.
15     Q   And you don't know what she did to advocate on
16 behalf of Mr. Castelluccio in terms of finding him a
17 new job.
18     A   No.
19     Q   You said that you didn't use the bench?
20     A   Yes.
21     Q   You did?
22     A   I didn't use the bench.
23     Q   If she chose to use the bench, was that her
24 prerogative as a manager?
25     A   I assume so.

Page 1109

1      Q   You said you would not initiate a conversation
2  about retirement with an employee?
3      A   That is true.
4      Q   Never?
5      A   Initiate it?
6      Q   Yes.
7      A   No.
8      Q   Would you sit down with someone who was
9  performing poorly and say, listen, this is not working
10 out, should we find you a new job, would you like to
11 consider retirement, you're retirement eligible?
12     A   I would not do that.
13     Q   You would never mention it?
14     A   No, because of the implication.  I mean this
15 is a -- this is an individual, in particular an
16 individual with declining performance, which can lead
17 to, you know, not necessarily good things for the
18 employee.  Those are times to be even extra special
19 careful about how you're discussing things with an
20 employee.
21     Q   I see.
22     A   So I wold have been -- you know, I don't
23 think -- I wouldn't do it at any time simply because
24 of the kind of the implications associated with that,
25 but certainly not in a situation where, you know, I

Page 1110

1  might possibly be heading the way to a termination or
2  something.
3      Q   I see.  You said the PBC process was in place
4  for 28 years?
5      A   No.  I said the evaluation process that would
6  have been similar to this specific one, you know,
7  there was an evaluation feedback process that has
8  evolved through my IBM career, and I didn't know that
9  it was called PBC in the earliest years, but there was
10 a structured evaluation employee feedback process that
11 existed, as far as I can remember, the whole time, but
12 it's changed.  It's changed a lot through that
13 process.
14     Q   That's what I was going to ask you.  It's
15 changed a lot over the years.
16     A   Yes.
17     Q   It used to be -- instead of numbers, there
18 used to be --
19     A   It's changed.
20     Q   -- extraordinary, achieve commitments, or
21 whatever it was, and then there were fairly
22 significant differences over the years, right?
23     A   Yes.
24     Q   Let me ask you, do you remember giving stock
25 options to your executives in '05 and '06?

Page 1111

1      A   Yes.  I mean I remember the process that they
2  went through, so there would have been stock options
3  given to execs in '05 and '06.
4      Q   Do you remember not giving any to Mr.
5  Castelluccio?
6      A   I don't have any knowledge of who got what.  I
7  can, you know -- those with higher PBCs, with higher
8  ICFs, like I said earlier, even within an ICF range,
9  or even within a PBC range, you might have incentives,
10 and people at the higher level got stock options and
11 the lower ones did not.  So I don't know who got --
12 you know, but the higher performers, you know, they
13 would have got them.
14     Q   Would it surprise you if I told you that you
15 didn't give Mr. Castelluccio any options in those two
16 years?
17         MR. CARTA:  He's already said he doesn't
18 have a recollection, Your Honor.
19         THE COURT:  Would it surprise you?
20         THE WITNESS:  For '06?
21 BY MR. FASMAN:
22     Q   Yes, sir.
23     A   In '06 all of my executives stats came down.
24 I don't think I had a single 1 VP level, and maybe two
25 or three 1s at the director level.  So everything

Page 1112

1 was -- in incentives was pushed extremely down.  It
2 wasn't -- it wouldn't surprise me if a lot of people
3 that got options in '05 didn't get them in '06.
4     Q   Well, let me --
5     A   Simply because of the push-down.  So I would
6 say it doesn't surprise me.
7     Q   Okay.
8         MR. FASMAN:  Your Honor, can I have about
9 two minutes to make sure that I didn't miss something
10 that my colleagues wanted me to ask?
11        THE COURT:  Sure.
12        MR. FASMAN:  Thank you.
13        Your Honor, I don't have any further
14 questions.  Thank you for the brief break.
15        Mr. Jones, thank you.  Nice to see you.
16 Thank you.
17        THE COURT:  Okay.  Thank you, Mr. Fasman.
18        Mr. Carta, you may conduct a brief
19 redirect, bearing in mind that your redirect must be
20 confined to the scope of the cross, and that you must
21 allow enough time for me to allow Mr. Fasman to
22 conduct a recross of the redirect.  Okay?
23
24        REDIRECT EXAMINATION BY MR. CARTA:
25

Page 1113

1     Q   Mr. Jones, did Mr. Castelluccio's performance,
2 his actual performance, did it decline between 2005
3 and 2006?
4     A   His total performance?
5     Q   Yes.
6     A   As reflected in the composite of everything
7 he's evaluated on, including financials, yes, that's
8 why he got a 2 instead of a 2 plus.
9     Q   And how about -- when you say "everything he's
10 evaluated on," you're talking about the meeting the
11 financial targets?
12     A   Yeah, all of those parameters, business
13 controls, business skill, contract execution, business
14 financials, customer Sat, you have to -- all of them
15 are taken in context together in the context of the
16 environment they're working in.
17     Q   And I think you said no one in the division
18 got particularly high evaluations, is that right?
19     A   Well, they, you know -- I don't think I had
20 any VPs that had 1s, and I don't think I had but maybe
21 two to four 1s in my whole executives.  So all of the
22 directors, I might have had two to four, is what I
23 would guess, but certainly no more than that, and it
24 was because we missed on the financials, you know, so
25 bad across the board.

Page 1114

1     Q   So I think -- what was the reason for the
2 difference between Mr. Castelluccio's 2 plus rating in
3 2005 and his 2 rating in 2006?
4     A   Primarily the financials.
5     Q   And the financials, when you say the
6 financials, please explain.
7     A   The sector in 2005?
8     Q   The sector meaning the whole --
9     A   The whole portfolio -- which is what he's
10 evaluated against.  He's not evaluated against a
11 single contract, it's the composite of the contract.
12 In '05 the whole sector was the highest performing
13 sector of all the sectors, on the financials.  In 2006
14 it was, I think, second from the bottom.  I mean it
15 was close to the bottom.  Industrial may have been
16 below it.  They were both right at the bottom.  Maybe
17 one right above the other one, but they were both, you
18 know -- so the financials in terms of overall
19 performance at a sector level were significantly
20 degraded from 2005, and that's the major factor.
21     Q   So the major factor was that they were making
22 less money on the contracts that he was supervising,
23 is that a simple way to say it?
24     A   That's true.
25         MR. CARTA:  May I have a moment, Your

Page 1115

1 Honor?
2         THE COURT:  Yes.
3         THE WITNESS:  Relative to target.
4         MR. CARTA:  No further questions.
5         THE COURT:  Mr. Fasman.
6         MR. FASMAN:  Your Honor, I'm fine.
7 That fine.
8         THE COURT:  Okay, Mr. Jones.  Thank you
9 so much for being here.  I appreciate the fact that
10 you came such a long way, and I apologize that you had
11 to stay overnight, but we did our best.
12         THE WITNESS:  I lived up here.  This is a
13 nice place.  To visit.
14         THE COURT:  Okay, ladies and gentlemen,
15 it's quarter to 4.  Do you have another witness you
16 want to call, Mr. Carta?
17         MR. CARTA:  No.  As we said before, I
18 told my witness not to come because we knew there
19 wouldn't be enough time.
20         THE COURT:  Okay.  So we'll have your
21 first witness Tuesday morning?
22         MR. CARTA:  Tuesday at 10, that's right.
23         THE COURT:  Tuesday at 10.
24         MR. CARTA:  Dr. Crakes will be here.
25         THE COURT:  I probably will be here

Page 1116

1    Monday, and when I find that the garage is vacant, I
2    will realize I didn't have come to work.  And then I
3    will realize that my wife was pushing me out of the
4    house quickly because she just wanted to get me out of
5    her hair.
6         Anyhow, I thank counsel for the really
7    fine job they've done, and I thank you, ladies and
8    gentlemen of the jury, for your attentiveness.  I've
9    been doing this a long, long time, and I don't think I
10   have ever had a more attentive jury.  You're taking
11   notes, you're listening to the witnesses, and watching
12   the lawyers, and you're following the questions, and I
13   know that you just know what the issues are, and you
14   understand.  That makes me feel really good, and
15   should make the parties in this case feel really good,
16   too, because this is an important case to Mr.
17   Castelluccio, it's an important case to IBM.
18        So I want you not to discuss the case
19   with anybody.  Don't begin deliberating.  Keep an open
20   mind.  You haven't heard all the evidence.  Be safe
21   when you go home.  Don't talk about the case over the
22   weekend.  Come back on Tuesday, 9:35 in that room,
23   same room.  I hope we'll have the same -- probably
24   will have the same donuts.  Might be the same coffee,
25   too.  I hope there's fresh coffee and good donuts

Page 1117

1    there.  And with that, I think we should adjourn for
2    the day.  It's ten minutes to 4.  It's been a hard
3    day.  Counsel in agreement?
4         MR. CARTA:  Yes.
5         MR. FASMAN:  Yes, sir.
6         THE COURT:  Okay.  Thanks, ladies and
7    gentlemen.
8         THE JURORS:  Thank you.
9         (Jurors excused)
10        THE COURT:  Okay.  You can leave your
11   things here over the weekend.  I guess the court will
12   be locked, courtroom will be locked.  So we'll see you
13   back here Tuesday morning.  You're not staying up
14   here, you're going home, right?
15        MR. FASMAN:  Well, I'm staying up here.
16   But can I bring one matter up?
17        THE COURT:  Sure.
18        MR. FASMAN:  Your Honor, I'd like to -- I
19   mentioned this during your colloquy earlier.  I'd like
20   to move for under Rule 50 for a directed verdict.  I
21   don't think that the Plaintiff has shown evidence of
22   age discrimination sufficient to allow the jury to
23   conclude that Mr. Castelluccio's termination in June
24   2008 was attributable to age.  Rather than go through
25   my argument extensively, we've prepared a brief,

Page 1118

1    ten-page memorandum in support, and I would only ask
2    Your Honor to review it over the weekend.  I'd be
3    happy to give courtesy copies to Mr. Carta, and as
4    many as Your Honor would wish.  The grounds are set
5    forth in this document.  And I would just ask that
6    Your Honor read it, consider it over the weekend.
7         THE COURT:  Thank you, Mr. Fasman.  I
8    promise you, I will read your memorandum, I will
9    consider your motion, we'll make copies for my law
10   clerks, and I'll see to that it they do the same.  I
11   do have to tell you, though, that back when the
12   government could afford to print slip opinions, the
13   paper, slip opinions about three-by-six or so.
14        MR. FASMAN:  I do recall.
15        THE COURT:  We don't do those anymore,
16   but I consciously read all of the slip opinions that
17   had to do with things that I do, and I was impressed
18   by the frequency with which the Second Circuit Court
19   of Appeals reversed district judges and magistrate
20   judges who granted Rule 50 motions, and essentially
21   came out and said, with what appeared to be an element
22   of exasperation, we don't know how many times we have
23   to tell trial judges that the preferred way to handle
24   a Rule 50 is to take it under advisement and perhaps
25   the jury's verdict will render the Court ruling

Page 1119

1    unnecessary.  I don't know that I would do that.  I
2    don't know that I would subscribe to that.  I don't
3    know that I would sign such an opinion if I were on
4    the Second Circuit, because I think the rule's
5    there -- the rule is there for a purpose.  But I'm not
6    on the Second Circuit, and you've seen over the last
7    weeks several reasons why, I'm sure, and I am never
8    going to be on the Second Circuit.  But I respect
9    them, I respect the Court of Appeals.  Nevertheless,
10   I'm going to read your motion.
11        MR. FASMAN:  Thank you, Your Honor.
12        THE COURT:  And I'm going to do what I
13   think is appropriate.
14        MR. FASMAN:  I was going to say, I'm sure
15   Your Honor will read the motion and do what you think
16   is appropriate with it, and that's all anyone, any
17   litigant would ask for, Judge.
18        I have five of these.  How would you like
19   me to --
20        THE COURT:  If Michael could have one,
21   Jake could have one.  Actually just give three to them
22   and they'll give one to me.
23        MR. FASMAN:  And I'll give a copy to Mr.
24   Carta.
25        THE COURT:  You staying up here?  You

52 (Pages 1116 to 1119)

A-559

Page 1120

1   have plans for the weekend?
2           MR. FASMAN:  Actually my sister-in-law's
3   having her 60th birthday up in Old Saybrook and I'm
4   going up there to go.
5           THE COURT:  Old Saybrook is down there,
6   it's not up there.
7           MR. FASMAN:  Down there, wherever it is,
8   that's where I'm going, and I'm going to go let my
9   sister-in-law and her kids buy me dinner.
10          THE COURT:  That's good.  Whereabouts you
11  going for dinner?
12          MR. FASMAN:  I don't know.  That's one
13  your wife buys you a watch that works, my wife plans
14  dinners.
15          THE COURT:  Okay.  Well, you have a good
16  weekend and have a safe trip back to your homes.  You
17  as well.  See you Tuesday.
18              (Court adjourned)
19
20
21
22
23
24
25

Page 1121

1   CERTIFICATE OF REPORTER
2
3        I Hereby certify that the foregoing 210 pages
4   are a complete and accurate computer-aided
5   transcription of my original stenotype notes taken in
6   the Matter of James Castelluccio VS International
7   Business Machines Corporation, which was held before
8   The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9   District Court, 450 Main Street, Hartford,
10  Connecticut, on January 17, 2014.
11
12
13          Wendy Allen, RMR, CRR
14          Notary Public
15
16
17  My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

# CERTIFICATE OF SERVICE

I, TRACI L. LOVITT, hereby certify that on March 13, 2015, I filed an electronic copy of the foregoing JOINT APPENDIX VOLUME on the Court's CM/ECF system, which caused it to be served on all counsel of record.

Dated:      March 13, 2015

<u>/ s / Traci L. Lovitt</u>
Traci L. Lovitt, Esq.
Jones Day
100 High Street
Boston, Massachusetts 02110
(617) 960-3939
*Attorney for Defendant-*
*Appellant IBM*