# 14-2854-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆━◆

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

—against—

INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),

*Defendant-Appellant.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**JOINT APPENDIX
VOLUME III OF VI
(Pages A-560 to A-854)**

ZACHARY D. FASMAN, ESQ.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

TRACI L. LOVITT, ESQ.
JONES DAY
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

WILLIS J. GOLDSMITH, ESQ.
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant IBM*

(*Counsel continued on inside cover*)

MARK RAYMOND CARTA, ESQ.
MARGARET ANN TRIOLO, ESQ.
CARTA, MCALISTER
  & MOORE, LLC
1120 Boston Post Road
Darien, Connecticut 06820
(203) 202-3103

*Attorneys for Plaintiff-Appellee*
  *James Castelluccio*

# TABLE OF CONTENTS

PAGE

## Volume I of VI

*Castelluccio v. International Business Machines Corp.*,
Case No. 09-cv-1145 (TPS) (D. Conn.) Docket Sheet . . . . . . . . . . . . . . . . A-1

Complaint, dated July 20, 2009 (Docket No. 1) . . . . . . . . . . . . . . . . . . . . . . . . A-33

Affirmation of Zachary D. Fasman in Support of IBM's Motion for
Summary Judgment, dated September 20, 2010
(Docket No. 47-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-53

Exhibit 4 to the Affirmation of Zachary D. Fasman —
Excerpts from the Deposition of Joanne Collins-Smee
(Docket No. 47-5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-56

IBM's Memorandum of Law in Support of its Motion for Summary
Judgment, dated September 20, 2010 (Docket No. 49) . . . . . . . . . . . . . A-107

IBM's Memorandum of Law in Support of Motion to File
Confidential Documents Under Seal, dated September 20, 2010
(Docket No. 53) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-154

Plaintiff's Memorandum of Law in Support of Opposition to
Defendant's Motion for Summary Judgment,
dated November 15, 2010 (Docket No. 70) . . . . . . . . . . . . . . . . . . . . . . . A-160

Memorandum of Decision and Order denying Defendant's Motion for
Summary Judgment, dated August 21, 2012 (Docket. No. 108) . . . . . A-213

Parties' Joint Trial Memorandum, dated September 13, 2013
(Docket No. 133) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-229

Exhibit C to Affirmation of Mark R. Carta in Support of
Castelluccio's Motion to Preclude, dated November 22, 2013 —
Open Door Report (Docket No. 156-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-250

ii

PAGE

Exhibit G to Affirmation of Mark R. Carta in Support of
    Castelluccio's Motion to Preclude, dated November 22, 2013 —
    Email from R. Mandel to K. Holmes dated June 20, 2008
    (Docket No. 156-7) ............................................... A-255

Ruling on Plaintiff's Motion to Preclude Evidence,
    dated December 23, 2013 (Docket No. 163) ....................... A-258

Defendant's Memorandum of Law in Support of its Motion for
    Judgment as a Matter of Law, dated January 17, 2014, with
    Exhibit (Docket No. 179) ....................................... A-265

**Volume II of VI**

Transcript of Trial, dated January 13, 2014 (Docket No. 175) .......... A-277

Transcript of Trial, dated January 14, 2014 (Docket No. 176) .......... A-330

Transcript of Trial, dated January 15, 2014 (Docket No. 177) .......... A-388

Transcript of Trial, dated January 16, 2014 (Docket No. 178) .......... A-444

Transcript of Trial, dated January 17, 2014 (Docket No. 182) .......... A-507

**Volume III of VI**

Transcript of Trial, dated January 21, 2014 (Docket No. 183) .......... A-560

Transcript of Trial, dated January 22, 2014 (Docket No. 184) .......... A-603

Transcript of Trial, dated January 23, 2014 (Docket No. 185) .......... A-658

Transcript of Trial, dated January 24, 2014 (Docket No. 186) .......... A-710

Plaintiff's Trial Exhibit 1—
    The IBM Personal Business Commitments Program,
    dated February 17, 2004 ....................................... A-720

iii

PAGE

Plaintiff's Trial Exhibit 4—
    Castelluccio's Personal Business Commitment, Assessment
    Period: 1/1/2007 to 12/31/2007 .................................... A-733

Plaintiff's Trial Exhibit 14—
    Castelluccio's Personal Business Commitment, Assessment
    Period: 1/1/2006 to 12/19/2006 .................................... A-734

Plaintiff's Trial Exhibit 16—
    WellPoint Contract Overview, Bob Zapfel Review,
    dated June 2, 2006 ............................................... A-739

Plaintiff's Trial Exhibit 17—
    WellPoint Red Team Review, dated June 21, 2006 ................. A-789

Plaintiff's Trial Exhibit 29—
    Email dated February 28, 2007 from J. Collins-Smee to K.
    Holmes Re: Need to Replace J. Castelluccio ....................... A-834

Plaintiff's Trial Exhibit 31—
    P. Kerine Five Minute Drill Summary ............................. A-835

Plaintiff's Trial Exhibit 53—
    Email dated April 27, 2007 from D. Liederbach to
    J. Collins-Smee Re: Miguel ...................................... A-844

Plaintiff's Trial Exhibit 56—
    J. Collins-Smee Five Minute Drill Summary ...................... A-846

Plaintiff's Trial Exhibit 60—
    Email dated August 9, 2007 from M. Boxer to R. Zapfel,
    M. Lautenbach and S. Mills Re: Production Issue .................. A-852

Plaintiff's Trial Exhibit 62—
    Email dated August 22, 2007 from K. McDonald to M. Boxer ...... A-853

iv

PAGE

Plaintiff's Trial Exhibit 64—
    Email dated September 8, 2007 from K. McDonald to M. Boxer
    Re: DPE ..................................................... A-854

**Volume IV of VI**

Plaintiff's Trial Exhibit 66—
    R. Zapfel's Five Minute Drill Summary........................... A-855

Plaintiff's Trial Exhibit 67—
    WellPoint Executive Operating Committee Meeting Report –
    Fourth Quarter Review.......................................... A-861

Plaintiff's Trial Exhibit 68—
    WellPoint Client Satisfaction Survey, dated February 14, 2008..... A-865

Plaintiff's Trial Exhibit 69—
    Meeting Notice dated January 10, 2008 to A. Weststeyn
    Re: J. Castelluccio Career Opportunities ........................... A-870

Plaintiff's Trial Exhibit 70—
    Email dated January 14, 2008 from J. Castelluccio to
    A. Weststeyn Re: Our phone conversation......................... A-871

Plaintiff's Trial Exhibit 71—
    Email dated May 1, 2008 from A. Weststeyn to J. Castelluccio
    Re: Job Opportunities........................................... A-872

Plaintiff's Trial Exhibit 72—
    Email dated May 4, 2008 from J. Castelluccio to A. Weststeyn
    Re: Job Search ................................................ A-873

Plaintiff's Trial Exhibit 73—
    Email dated January 18, 2008 from J. Castelluccio to
    G. Mastriforte Re: UK's DVLA Sr. PE Opportunity ............... A-875

v

PAGE

Plaintiff's Trial Exhibit 74—
　　Email dated March 28, 2008 from J. Castelluccio to
　　G. Mastriforte Re: Sr. PE Opportunities........................... A-877

Plaintiff's Trial Exhibit 75—
　　Meeting Notice dated January 9, 2008 to J. Castelluccio
　　Re: Personal Phil Guido........................................... A-878

Plaintiff's Trial Exhibit 76—
　　Email dated February 27, 2008 from Castelluccio to G. Walker
　　Re: Personal and Confidential .................................... A-879

Plaintiff's Trial Exhibit 78—
　　Email dated April 7, 2008 from J. Castelluccio to
　　M. Barnett Re: Your call ......................................... A-880

Plaintiff's Trial Exhibit 79—
　　Email dated April 14, 2008 from M. Barnett to J. Castelluccio
　　Re: Our Discussion Yesterday ..................................... A-881

Plaintiff's Trial Exhibit 80—
　　Email dated April 23, 2008 from J. Castelluccio to B. Barnett
　　Re: For our discussion ........................................... A-882

Plaintiff's Trial Exhibit 81—
　　Email dated May 20, 2008 from B. Barnett to J. Castelluccio
　　Re: Network Position ............................................. A-884

Plaintiff's Trial Exhibit 82—
　　Email dated May 9, 2008 from C. Murphy to G. Walker
　　Re: Actions/Notes from May 7 Five Minute Drill................... A-885

Plaintiff's Trial Exhibit 83—
　　Email dated May 13, 2008 from M. Echavarria to ME Directs,
　　forwarding J. Collins-Smee email Re: Organizational changes...... A-888

vi

PAGE

Plaintiff's Trial Exhibit 88—
    Email dated May 13, 2008 from J. Castelluccio to J. Overacre
    Re: Attached is my resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-890

Plaintiff's Trial Exhibit 90—
    Email dated May 21, 2008 from J. Collins-Smee to
    J. Castelluccio Re: Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-891

Plaintiff's Trial Exhibit 91—
    Email dated May 20, 2008 from J. Collins-Smee to
    J. Castelluccio Re: Resume . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-893

Plaintiff's Trial Exhibit 92—
    Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
    Re: J. Castelluccio – Executive Separation Talking Points . . . . . . . . . A-895

Plaintiff's Trial Exhibit 93—
    Email dated June 10, 2008 from J. Castelluccio to R. Atkins
    Re: Our phone conversation of a week ago . . . . . . . . . . . . . . . . . . . . . . . . . A-897

Plaintiff's Trial Exhibit 99—
    Letter dated April 15, 2009 from J. White to M. King
    Re: Castelluccio NYSDHR/EEOC Charge . . . . . . . . . . . . . . . . . . . . . . . . . A-898

Plaintiff's Trial Exhibit 204—
    Report of Parties 26(F) Planning Conference,
    dated October 5, 2009 (Docket No. 18) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-905

Plaintiff's Trial Exhibit 259—
    Plaintiff's Demonstrative Exhibit – IBM's Reasons for
    Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-928

Defendant's Trial Exhibit 12—
    Email chain dated April 25, 2006 from D. Liederbach to K. Jones
    Re: WLP Resource Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-929

vii

PAGE

Defendant's Trial Exhibit 13—
 Email dated May 9, 2006 from D. Liederbach to K. Jones Re:
 Personal and Confidential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-931

Defendant's Trial Exhibit 28—
 Email chain dated January 26, 2007 from J. Collins-Smee to D.
 Liederbach cc: C. Adler; L. Serra Re: Wellpoint Labor
 Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-932

Defendant's Trial Exhibit 29—
 Email chain dated September 20, 2006 from D. Liederbach to J.
 Collins-Smee Re: Service Delivery at WellPoint – Urgent . . . . . . . . . A-937

Defendant's Trial Exhibit 32—
 Email chain dated February 16, 2007 from J. Collins-Smee to K.
 McDonald Re: my barrage of emails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-942

Defendant's Trial Exhibit 34—
 Email chain dated February 18, 2007 from D. Liederbach to J.
 Collins-Smee cc: C. Adler Re: Request for Meeting . . . . . . . . . . . . . . . A-943

Defendant's Trial Exhibit 36—
 Email dated February 28, 2007 from J. Collins-Smee to
 K. Holmes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-946

Defendant's Trial Exhibit 45—
 Email chain dated March 31, 2007 from J. Collins-Smee to D.
 Liederbach; J. Castelluccio Re: Wellpoint – Monday . . . . . . . . . . . . . . A-947

Defendant's Trial Exhibit 48—
 Email chain dated May 4, 2007 M. Boxer to K. McDonald . . . . . . . . . A-948

Defendant's Trial Exhibit 52—
 Email dated May 15, 2007 from K. McDonald to J. Collins-
 Smee cc: D. Liederbach; E. McCabe; J. Shimkus; R. Zapfel Re:
 Delivery Leadership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-950

viii

PAGE

Defendant's Trial Exhibit 54—
  Email chain dated May 22, 2007 from M. Boxer to K. McDonald... A-952

Defendant's Trial Exhibit 109—
  IBM's U.S. Concerns and Appeals Program (Open Door,
  Panel Review & Confidentially Speaking)......................... A-954

Defendant's Trial Exhibit 117—
  Email dated May 30, 2008 from K. Holmes to J. Collins-Smee
  Re: J. Castelluccio Executive Separation Talking Points ........... A-965

Defendant's Trial Exhibit 124—
  Email chain dated May 14, 2008 from R. Mandel to K. Moran
  Re: Dir Global Interlock Process – Actions Pending for Daniels
  approval ....................................................... A-967

Defendant's Trial Exhibit 128—
  Email chain dated April 1, 2008 from R. Mandel to K. Moran Re:
  Candidate for Network Services Integration Position, with
  attachment ..................................................... A-971

Defendant's Trial Exhibit 135—
  Email chain dated May 20, 2008 from G. Walker to R. Mandel
  Re: JG Castelluccio Resume..................................... A-976

Defendant's Trial Exhibit 136—
  Email chain dated May 20, 2008 from G. Walker to R. Mandel
  Re: JG Castelluccio Resume..................................... A-979

Court Exhibit 1—
  Jury Instruction Regarding Positions Open while Castelluccio
  on the Bench ................................................... A-981

Court Exhibit 2—
  Letter from Jury ............................................... A-982

IBM's Marked Witness List, dated January 24, 2014
  (Docket No. 188) ............................................... A-984

ix

PAGE

Castelluccio's Marked Witness List, dated January 24, 2014
(Docket No. 189) .............................................................. A-985

Court Exhibit List, dated January 24, 2014 (Docket No. 190) ........... A-986

Charge to the Jury, dated January 24, 2014 (Docket No. 194) ........... A-987

Judgment entered in favor of James Castelluccio against IBM,
dated January 28, 2014 (Docket No. 195) ........................ A-1004

**Volume V of VI**

Affidavit of Mark R. Carta in Support of Plaintiff's Motion for
Attorneys' Fees, Prejudgment Interest, Costs and Compensation
for Increased Tax Liability, dated February 11, 2014
(Docket. No. 199) ............................................................ A-1005

Exhibit 4 to Affidavit of Mark R. Carta—
Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
(Docket. No. 199-4) ........................................................ A-1031

Exhibit 3 to Affidavit of Mark R. Carta—
Rucci, Burnham & Carta, LLP Invoice, dated August 29, 2008
(Docket. No. 199-10) ...................................................... A-1102

Exhibit 4 to Affidavit of Mark R. Carta—
Carta, McAlister & Moore LLC Invoice, dated April 2, 2012
(Docket. No. 199-11) ...................................................... A-1201

**Volume VI of VI**

Defendant's Renewed Motion for Judgment as Matter of Law,
or, in the Alternative, for New Trial/Remittiture,
dated February 25, 2014 (Docket No. 202) ........................ A-1272

Declaration of Zachary D. Fasman, dated April 3, 2014
(Docket. No. 223) ............................................................ A-1325

x

PAGE

Exhibit 6 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Summary Judgment
(Docket No. 223-6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1334

Exhibit 8 to Declaration of Zachary D. Fasman—
IBM designations of time entries regarding Trial Preparation
(Docket No. 223-8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1341

Plaintiff's Reply to IBM's Opposition to Plaintiff's Motion for
Attorneys' Fees, dated April 17, 2014 (Docket No. 229) . . . . . . . . . . A-1366

Affidavit of Mark R. Carta in Support of Plaintiff's
Supplemental Motion for Attorneys' Fees,
dated June 2, 2014 (Docket. No. 232) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1390

Declaration of Zachary D. Fasman, dated June 23, 2014,
with Exhibit A (Docket. No. 235) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1395

Opinion and Order, dated July 23, 2014, denying Motion for
Judgment as a Matter of Law, denying Oral Motion for Judgment
as a Matter of Law, denying Renewed Motion for Judgment as a
Matter of Law, and denying Motion for New Trial or Remittitur
(Docket No. 236) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1414

Ruling on Plaintiff's Motion for Attorneys' Fees,
dated July 23, 2014 (Docket No. 237) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1449

Final Judgment entered in favor of James Castelluccio against IBM,
dated July 28, 2014 (Docket No. 240) . . . . . . . . . . . . . . . . . . . . . . . . . . A-1472

IBM's Notice of Appeal, dated August 11, 2014
(Docket No. 241) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1473

Page 1121

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO      )
     Plaintiff      ) 3:09-cv-01145 (TPS)
                    )
VS              ) January 21, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION   ) Federal Building
     Defendant      ) Hartford, Connecticut


VOLUME 6
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.

Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

---

Page 1122

```
 1
 2     Representing the Plaintiff
 3     Carta McAlister & Moore, P.C.
       1120 Boston Post Road
 4     Post Office Box 83
       Darien, CT  06820
 5        By:  Mark R. Carta, Esq.
             mark@cmm-law.com
 6        By:  Margaret A. Triolo, Esq.
             margaret@cmm-law.com
 7     By:  Troy Bailey, Esq.
 8
 9     Representing the Defendant

10     Paul Hastings, LLP
       75 East 55th Street
11     New York, NY  10022
          By:  Zachary Fasman, Esq.
12            Zacharyfasman@paulhastings.com
          By:  Todd C. Duffield, Esq.
13            Toddduffield@paulhastings.com
       By:  Jean-Marie Gutierrez
14
15     ALSO PRESENT:

16     Daniel Fox, Esq.
       IBM in-house counsel
17
18
19
20
21
22
23
24
25
```

---

Page 1123

```
 1              I N D E X
 2
       WITNESSES:                    PAGE:
 3
       Gary Crakes
 4        Direct Examination by Mr. Carta............. 1129
          Cross-Examination by Mr. Fasman............ 1141
 5        Redirect Examination by Mr. Carta.......... 1160
          Recross Examination by Mr. Fasman.......... 1162
 6     Dave Liederbach
          Direct Examination by Mr. Duffield......... 1165
 7        Cross-Examination by Mr. Carta............. 1194
          Redirect Examination by Mr. Duffield....... 1231
 8     Keenie McDonald
          Direct Examination by Mr. Duffield......... 1237
 9        Cross-Examination by Mr. Carta............. 1260
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 1124

```
 1          THE COURT:  We're going to have some snow
 2     today, I understand.  Anybody have any instant
 3     up-to-the-minute weather reports?  I hear it's
 4     supposed to start in the afternoon and by 5 o'clock
 5     it's supposed to be pretty bad, during the commuting
 6     hour, so I think we're probably well advised to see
 7     how bad it gets today and be prepared if we have to
 8     let the jury go.  One of the district judges, I guess
 9     it would be Judge Hall, one of the district judges
10     closes the courtroom or the courthouse, then we can't
11     be sitting here.
12          So, Mr. Carta, my recollection is that we
13     finished with Kelton Jones last time.
14          MR. CARTA:  Yes.
15          THE COURT:  And are you going to call any
16     more witnesses?
17          MR. CARTA:  Yes, Your Honor.  I'd like to
18     call my economist, Dr. Gary Crakes, as my final
19     witness.
20          THE COURT:  Okay.
21          MR. CARTA:  Your Honor, I do have one
22     motion to make as well.  And it's a motion for
23     sequestration.  And I would note that when Mr.
24     Castelluccio testified none of my other witnesses were
25     in the courtroom.  Also when Mr. Morin testified none
```

Page 1125

1  of the witnesses were here, and at the time that
2  Kelton Jones testified, Mr. Morin was not here as
3  well. So I think it's consistent with what we've
4  done.
5       I will admit that there was a brief
6  conversation between Mr. Fasman and I in the beginning
7  about whether we were going to have such an order in
8  place. In my mind it was kind of left open. But in
9  any event, I at this point would like it, because as I
10  prepared my cross-examinations for his various
11  witnesses it became apparent to me that there were
12  going to be instances where there was an issue in my
13  mind about what their testimony -- it would be
14  inconsistent, and I think that's a Rule 615.
15       THE COURT: Yes.
16       MR. FASMAN: Your Honor, I'm well aware
17  of the rule. Mr. Carta and I discussed it at the
18  start of this case. He objected. I said I did want
19  to sequester all witnesses, he objected to it, and I
20  said I don't care. If you want the witnesses in,
21  that's fine with me. It was not left open. I did not
22  make that motion. And you saw Mr. Morin sit in
23  chambers when Ms. Collins-Smee testified, Kelton Jones
24  while Ms. Collins-Smee testified, she was called as
25  his witness, and this was not invoked previously.

Page 1126

1       I understand the rule, I know what the
2  rule is, and I know when it can be invoked, but
3  frankly, I think it is improper to do this kind of
4  stuff. In more than 40 years of trying cases I've
5  never had counsel on the other side say this, where we
6  agreed that we wouldn't sequester and then turn around
7  at the start of my case and sequester witnesses. It's
8  at least bad form. I'm not going to go any further.
9       MR. CARTA: Your Honor, it's simply not
10  true that we agreed. Counsel raised the issue with me
11  and I said I really hadn't thought about it, and
12  that's how I recall it being left.
13       MR. FASMAN: No, you opposed it. You
14  said, I'm opposed to it, and I said, okay, fine.
15       THE COURT: Okay. If you had agreed with
16  Mr. Fasman that there would be sequestration, I would
17  deny your request in keeping with your agreement. You
18  say there was no agreement, he says there was an
19  agreement. So that really helps me a lot.
20       MR. FASMAN: Well, Judge, I can only tell
21  you -- you can put me under oath if you want, but I
22  will tell you that as an officer of the court, I said
23  it to Mr. Carta. I said, Mr. Carta, sequestration?
24  And he said, I'm opposed to it. I said, fine, I'm not
25  going to move for it. That's exactly what happened.

Page 1127

1       MR. CARTA: Your Honor, I don't disagree
2  with that. I think that that's an accurate
3  representation. I think I said I haven't given it any
4  thought, let me think about it, I guess I'm opposed to
5  it. I don't believe I entered into any agreement.
6  I'm confident I didn't enter into any agreement. I do
7  remember Mr. Fasman saying something to the effect,
8  okay, well, I'm not going to press the issue. I do
9  recall that.
10       MR. FASMAN: And if he was opposed to it,
11  he said, I'm opposed to it, and that's why I didn't do
12  it, Judge.
13       THE COURT: It seems to me that enough
14  was said between you gentlemen for a reasonable
15  fact-finder to find that you, Mr. Fasman, believed
16  that the issue had been resolved as you had
17  represented it, and we proceeded in that way during
18  this trial up to this point. So I think this is a
19  good faith misunderstanding, and in order to keep it a
20  good faith misunderstanding I'm not going to sequester
21  anybody.
22       MR. FASMAN: Thank you, Your Honor.
23       THE COURT: All right.
24       MR. CARTA: So I'm ready, Your Honor.
25       THE COURT: Yes, sir.

Page 1128

1       (Jurors present)
2       THE COURT: Good morning, ladies and
3  gentlemen. Please be seated. I hope you had a nice
4  weekend
5       THE JURORS: Very nice.
6       THE COURT: Now, it seems that the
7  weatherman is telling us that we might have a
8  snowstorm and it might come crashing down on us
9  beginning this afternoon and make it very, very
10  difficult at commuting time, and there's one thing
11  nobody in this courtroom wants is for you, for any of
12  us, to injure ourselves or get into an automobile
13  accident, possibly injure somebody else, at the very
14  least have a huge deductible getting your car fixed.
15       So I'm going to keep my ear to the
16  ground, and Michael and Jacob will be doing the same
17  thing, and if it starts getting bad, it looks like
18  it's going to build up, I would rather let you go and
19  have a situation where the snowstorm is not as bad as
20  we thought it was than to keep you here and then, you
21  know, find out it's the great blizzard of 2014, we
22  have to get dogs and dog sleds. Because nobody wants
23  that.
24       So I'm glad you had a good weekend.
25  Everyone's here, everyone is here who needs to be

2 (Pages 1125 to 1128)

## Page 1129

1  here, and Mr. Carta is going to call his first
2  witness.
3          Let me tell you that while you were
4  waiting here, we resolved four questions of law that I
5  think are just going to streamline the case.
6          So Mr. Carta, good morning, sir, and take
7  it away.
8          MR. CARTA:  Thank you, Your Honor.  With
9  the Court's permission I'd like to call Dr. Gary
10 Crakes to the stand.
11         (Gary Crakes, sworn by the clerk)
12         THE CLERK:  Please state your name, spell
13 your last name for the record.
14         THE WITNESS:  Gary Crakes, C-R-A-K-E-S.
15         THE CLERK:  Your business address?
16         THE WITNESS:  860 Ward Lane, Cheshire
17 Connecticut, 06410.
18
19         DIRECT EXAMINATION BY MR. CARTA:
20
21 Q   Good morning, Dr. Crakes.
22 A   Good morning.
23 Q   What is your present position?
24 A   I'm a professor emeritus of economics at
25 Southern Connecticut State University in New Haven.

## Page 1130

1  Q   Are you also a principal in a consulting firm
2  known as Maher and Crakes?
3  A   Maher, Crakes and Associates, yes.
4  Q   And in what business does Maher Crakes engage?
5  A   Performing appraisals of economic loss for
6  matters in litigation.
7  Q   And for how long have you been a professor at
8  Southington University?
9  A   I began my work at Southern Connecticut on a
10 full-time basis in 1980 as an assistant professor,
11 1985 became associate professor, 1989 full professor,
12 and professor emeritus in 2011.
13 Q   What are your present duties in that capacity?
14 A   At the present time I continue to teach on a
15 part-time basis, teaching one large lecture hall class
16 in the principles of macroeconomics.
17 Q   Professor Crakes, would you describe just
18 generally for the jurors your educational background?
19 A   Yes.  I received a bachelor's degree in
20 economics from Central Connecticut State College in
21 1975, a master's degree in economics from University
22 of Connecticut in 1976, and a Ph.D. in economics from
23 the University of Connecticut in 1984.
24 Q   Have you received any fellowships for your
25 studies and research?

## Page 1131

1  A   Yes, I have.
2  Q   And what are they?
3  A   I received a University of Connecticut
4  predoctoral fellowship to provide financial support
5  for your first year of doctoral studies, University of
6  Connecticut dissertation fellowship to provide support
7  for any doctoral dissertation research, and a national
8  competition, a Richard D. Erwin fellowship also to
9  provide support for research.
10 Q   What awards, if any, have you received in
11 connection with your teaching?
12 A   I received the University's teacher of the
13 year award in 1987, and school of business teacher
14 award in 1998.
15 Q   What honors, if any, have you received for
16 your services as an economic expert?
17 A   I was honored for pro bono volunteer
18 appraisals of economic loss that I performed on behalf
19 of families of the victims of the terrorist attack on
20 the World Trade Center through the Victims
21 Compensation Fund run by the U.S. Department of
22 Justice.
23 Q   Are you a member of any relevant professional
24 organizations?
25 A   Yes.

## Page 1132

1  Q   Would you name a few of them, please?
2  A   I'm a member of the American Economic
3  Association, the Eastern Economic Association, the
4  National Association of Business Economics, the
5  National Association of Forensic Economics, the
6  American Academy of Economic and Financial Experts,
7  and an international honor society in economics,
8  Omicron Delta Epsilon.
9          MR. FASMAN:  For the record, Your Honor,
10 we're not challenging Dr. Crakes' credentials to
11 testify as an expert.
12         THE COURT:  Is it stipulated that he is
13 indeed an expert?
14         MR. FASMAN:  In his field, yes.
15         THE COURT:  In his field.  Okay, thank
16 you.
17 BY MR. CARTA:
18 Q   Let me just ask one final preliminary
19 question, then.  Dr. Crakes, have you testified in
20 courts concerning economic loss in employment cases
21 previously?
22 A   Yes, I have.
23 Q   And what courts?
24 A   Federal and state courts in Connecticut, and
25 New York.

3 (Pages 1129 to 1132)

Page 1133

1    Q    Did I ask you to prepare an appraisal of the
2    economic loss suffered by James Castelluccio as a
3    result of IBM's age discrimination?
4    A    Yes.
5    Q    And did you perform such an analysis?
6    A    Yes, I did.
7    Q    And do you have an opinion of probable
8    economic loss sustained by Mr. Castelluccio?
9    A    Yes.
10   Q    Would you spend a few minutes and explain to
11   the jury how you arrived at that opinion, starting
12   with the sources of the data that you reviewed?
13   A    Yes.  I reviewed information concerning the
14   income tax returns of Mr. Castelluccio, as well as the
15   personnel records from IBM, particularly associated
16   with his levels and forms of compensation for years
17   prior to his termination from that employment.
18   Q    And generally in doing your analysis did you
19   make a number of assumptions?
20   A    Yes, I did.
21   Q    And what were those assumptions specifically?
22   A    I calculated the economic loss for Mr.
23   Castelluccio from the day of his termination of July
24   1st, 2008, to March 2nd of 2013, a period of 4.67
25   years.  The components of economic loss that I

Page 1134

1    included in my analysis were his loss of salary, his
2    loss of incentive compensation, his loss of the
3    employer's contribution to the 401(k) plan, and his
4    loss of health benefits.
5    Q    And let's go through those various components.
6    How did you calculate his lost salary?
7    A    The loss of his salary was based upon his
8    annual salary at the time of his termination of
9    $204,000 per year.  I applied that to the 4.6 years to
10   March 2nd of 2013 with no additional increases, just
11   by multiplying that $204,000 over that period of time,
12   and arrived at a loss of salary for Mr. Castelluccio
13   of $952,680.
14   Q    And how did you calculate his incentive
15   compensation, the loss of his incentive compensation?
16   A    His incentive compensation varied from year to
17   year.  His salary increased from year to year, but the
18   incentive comp varied, so I felt it was reasonable to
19   consider over the last four years of his employment,
20   full years of employment with IBM his average annual
21   incentive compensation.  That average annual value was
22   $47,165 over that four-year period, and I again
23   applied it for the 4.67 years to the point of March
24   2nd of 2013 from the date of his termination, and the
25   value of that incentive compensation over that 4.67

Page 1135

1    years was $220,261.
2    Q    And did you also take into consideration IBM's
3    401(k) contribution that it had previously made on his
4    behalf?
5    A    Yes.
6    Q    And how did you work that into your analyses?
7    A    My understanding was that the employer's
8    contribution to the 401(k) plan was equal to 10
9    percent of salary and incentive compensation, so I
10   added the salary incentive compensation together,
11   multiplied that by 10 percent, and arrived at a value
12   for the employer's contribution to the 401(k) over
13   that 4.67 year period of $117,294.
14   Q    And how did you calculate the economic loss
15   associated with his health benefits?  Go through that
16   slowly so it's easy to follow, please.
17   A    The health benefit value was based upon what
18   Mr. Castelluccio was contributing for his health
19   insurance at the time of his termination from IBM, and
20   the difference between that value and what he then had
21   to contribute on his own behalf to maintain health
22   insurance subsequent to the termination of his
23   employment.  I took the difference between those
24   values and again applied it for the 4.67 years in the
25   past, and arrived at a value for the loss of health

Page 1136

1    benefits of $54,807.
2    Q    Now, you've referred several times about using
3    a time period of 4.67 years.  Can you just explain how
4    you arrived at that number?
5    A    Yes.  The 4.67 years is from the date of
6    termination of June 30th, 2008, to the point where Mr.
7    Castelluccio would be 66 years of age, which would be
8    March 2nd of 2013.  So the entire loss in this matter
9    is in the past now since of course we have gone beyond
10   March 2nd of 2013.
11       The value for escalating his loss of earnings,
12   his economic loss for that 4.67 year period, to age 66
13   is based upon what I understood Mr. Castelluccio's
14   intentions and recognized that by reviewing -- I
15   recognized that by reviewing tables on work life
16   expectancy for a man of his age at the time of his
17   termination and years to final separation from the
18   labor force, that those values would be somewhere
19   between ages 68 and 69, therefore I felt it was
20   reasonable to calculate his economic loss to age 66 or
21   to March 2nd of 2013.
22   Q    So you didn't actually use the estimates
23   contained in the standard charts which would have said
24   68?
25   A    Between age of 68 and 69.  No, I did not.  But

Page 1137

1  I did review those as being supportive of the
2  calculation that I was making.
3      Q   You used the date of March 2013?
4      A   March 2nd of 2013, yes.
5      Q   In your analysis, what assumptions, if any,
6  did you make with respect to Mr. Castelluccio's future
7  receipt of stock options or restricted stock units?
8          MR. FASMAN:  I'm going to object to that,
9  Your Honor.  This witness has been held to be
10 incompetent to testify about stock options.  He did
11 not make an appropriate investigation.  We've had a
12 Daubert ruling on this, and this witness cannot
13 testify to that.  I'm going to object to any testimony
14 about stock options.
15         THE COURT:  Mr. Carta?
16         MR. CARTA:  Your Honor, the ruling was
17 that he could testify to the value.  The testimony is
18 that he didn't take any stock options or restricted
19 stock units into consideration.  They're not part of
20 his analysis.
21         THE COURT:  Well, I guess we don't have
22 anything to complain about.  I would sustain Mr.
23 Fasman's objection, but you can ask the question
24 anyway.  The answer's going to be no.
25 BY MR. CARTA:

Page 1138

1      Q   You didn't incorporate -- in doing your
2  analysis you didn't add to the economic loss anything
3  associated with stock options, isn't that right?
4      A   That's correct.
5      Q   Based upon the materials that you used and
6  reviewed in your conversations with Mr. Castelluccio
7  as well as your professional expertise, what in your
8  opinion is the total economic loss sustained by Mr.
9  Castelluccio as a result of his termination by IBM in
10 June of 2008?
11     A   The total economic loss for the period of time
12 from his termination to age 66, March 2nd, 2013, is
13 $1,345,042.
14     Q   And how -- when you made that calculation, is
15 there a difference -- is there a difference between
16 the loss in any particular year?
17     A   No.
18     Q   So the loss that you have calculated is
19 actually the same for each of the 4.67 years?
20     A   Yes, it is.
21     Q   And did you do a calculation as to how much
22 the annual loss was for Mr. Castelluccio?
23     A   For all four components, the annual loss is
24 approximately $288,000.
25     Q   And the total economic loss can be calculated

Page 1139

1  by taking that annual loss and multiplying it by the
2  4.67 years, is that right?
3      A   Yes.
4      Q   Does your calculation take into consideration
5  the tax impact of Mr. Castelluccio recovering this sum
6  of money all in one year?
7      A   No.
8      Q   You didn't do any discount for that?
9      A   I did not add any value for that additional
10 tax liability, no, I did not.
11     Q   In your calculation of Mr. Castelluccio's
12 economic loss, did you deduct monies that he received
13 from his pension?
14     A   No.
15     Q   Why not?
16     A   The calculation of economic loss is based upon
17 the loss to Mr. Castelluccio subsequent to his
18 termination.  Any pension benefits that he has
19 received from that point of termination would be based
20 upon his employment and efforts prior to that
21 termination itself.  So I do not subtract any value
22 for pension benefits associated with the work that he
23 had performed up to the point of his termination.
24     Q   In earlier estimates that you had done in this
25 case, how had you treated the pension deduction?

Page 1140

1      A   At one point there was one analysis I
2  performed where I did subtract the pension benefit.
3      Q   And were there other analyses where you did
4  not?
5      A   Yes.
6      Q   Have you charged Mr. Castelluccio for your
7  time in performing your analysis?
8      A   Yes, I did.
9      Q   And what is your -- what was your fee for this
10 time?
11     A   The fee for the initial -- for my time
12 associated with the initial appraisal of economic loss
13 was $3,200.  I then made a set of revised calculations
14 for which there was an additional charge for my time
15 of $1,700.
16     Q   So the total of that was $4,900, is that
17 correct?
18     A   That's correct.
19     Q   And are you also charging for your time to
20 testify here in court today?
21     A   Yes.
22     Q   And what is your fee for that time?
23     A   The fee for my time associated with appearance
24 for testimony at trial is $1,100.
25     Q   And the fee that you previously had charged,

## Page 1141

1  the $4,900, has Mr. Castelluccio paid you that sum in
2  full?
3      A   Yes.
4      Q   So the total fee is $6,000, is that correct,
5  for your time?
6      A   Yes.
7          MR. CARTA:  I have no further questions.
8  Thank you, Dr. Crakes.
9          THE WITNESS:  Thank you.
10         MR. FASMAN:  Good morning, ladies and
11  gentlemen.
12
13         CROSS-EXAMINATION BY MR. FASMAN:
14
15     Q   Just Dr. Crakes, Dr. Crakes, Professor?
16     A   I'll answer to just about anything.
17     Q   There you go.
18     Dr. Crakes, in your direct testimony you
19  mentioned that you had relied on certain assumptions
20  in creating the document that we saw, correct?
21     A   Yes.
22     Q   And if the assumptions are not valid -- you
23  would agree with me that if your expert opinion relies
24  on assumptions and the assumptions are not valid, then
25  your expert opinion is not valid?

## Page 1142

1      A   Certainly alternative assumptions will
2  generate alternative results, yes.
3      Q   Yes, that's exactly what you testified to in
4  your deposition.
5          And if your opinion relies upon facts provided
6  by counsel, and those facts are not accurate, then
7  your opinion would not be accurate?
8      A   It is based upon accuracy of the information
9  provided to me, that's correct.
10     Q   Now, let's go back and talk about the
11  information that you actually relied on in this case.
12         You received certain information from Mr.
13  Carta's office, isn't that correct, sir?
14     A   Yes, I did.
15     Q   And aside from the information you received
16  from Mr. Carta's office, you made no independent
17  investigation about IBM's policies and practices, did
18  you?
19     A   No, I did not.
20     Q   So you have no idea how IBM evaluates job
21  performance?
22     A   No, I do not.
23     Q   You have no idea whether or how job
24  performance at IBM affects compensation?
25     A   That's correct.

## Page 1143

1      Q   And you made no independent inquiry into Mr.
2  Castelluccio's job performance, isn't that right?
3      A   That's correct.
4      Q   And you have no idea how IBM actually
5  determines bonus or incentive compensation, do you?
6      A   No, I do not.
7      Q   And you have no idea of IBM's contributions to
8  401(k) plans aside from what you found in Mr.
9  Castelluccio's records, right?
10     A   That's correct.
11     Q   And so if IBM wages or incentive payments were
12  frozen at any point during the period from 2008 until
13  now, you wouldn't know that?
14     A   I wouldn't know that, but it would be
15  consistent with my analysis because my analysis is
16  based on applying those constant values over that 4.6
17  year period.
18     Q   Now, on the stock option question, I just want
19  to go back to it for a minute, you were held by the
20  Court -- isn't this accurate, you were held by the
21  Court to have not made a sufficient investigation in
22  order to allow you to testify about options, correct?
23     A   I'm not making any assessment of the Court's
24  decision.  What I am aware of is that I was informed
25  that I would not be calculating the loss of stock

## Page 1144

1  options or any type of stock awards.
2      Q   Okay.  I want to ask you about some of these
3  assumptions that you received from Mr. Carta's office,
4  and if we can go to Defendant's Exhibit 213, please.
5          Defendant's Exhibit 213, Dr. Crakes -- and I
6  believe my binders up there?  There are some black
7  binders up there, sir, if you want to see the hard
8  copy, or if you want to read it on screen.
9      A   I believe I can read it on the screen.
10     Q   All right, thank you, Dr. Crakes.
11         Now, these are your notes from certain
12  communications with a Ms. Sherman who used to work for
13  Mr. Carta's office, is that right?
14     A   That's correct.
15     Q   And I believe you testified with regard to
16  this information that these were all voicemails you
17  exchanged with Ms. Sherman, that you actually never
18  spoke to her about this, correct?
19     A   I think with respect to those particular notes
20  on that page.
21     Q   Yes.
22     A   That's what it indicates at the top.
23     Q   Yes.  So let me take you down -- and this was
24  something dated March 12th, 2010, the notes in
25  questions, and this is your handwriting, correct?

Page 1145

1    A   Yes, it is.
2    Q   All right.  So let me take you down to the
3  point where it says age, 66.  Your question appears to
4  be -- your question's on the right, right?  Intentions
5  with regard to retirement, correct?
6    A   With respect to retirement, yes.
7    Q   And I gathered that the answer from Ms.
8  Sherman was age 66?
9    A   Yes.
10    Q   Okay.  So she told you that Mr. Castelluccio's
11  intentions were to work until age 66?
12    A   That's correct.
13    Q   And that's why you used that figure, correct?
14    A   Well, as I indicated, I did consult
15  statistical tables as well and felt that 66 was
16  conservative given what those statistical tables would
17  indicate.
18    Q   Now, you were not in court the other day when
19  Mr. Castelluccio testified that he intended actually
20  to retire at age 65, were you?
21    A   No, I was not.
22    Q   So if he intended to retire at age 65, not 66,
23  your calculation wouldn't be correct?
24    A   Again, if there was an alternative assumption,
25  there would be an alternative result, that's correct.

Page 1146

1    Q   And you've done how many of these economic
2  loss reports, hundreds?
3    A   Over the last 32 years, approximately
4  somewhere around 2,800.
5    Q   And isn't it true that the majority of the
6  time when you do -- when you project retirement age,
7  the majority of cases you use age 65, right?
8    A   Depends on the circumstances of the case.
9  That would certainly be true for younger workers.
10  When I'm making a calculation for someone of Mr.
11  Castelluccio's age at the time of termination, I most
12  likely will go beyond 65.
13    Q   Well, let me ask you if you recall that I
14  asked you that question during your deposition, do you
15  recall that, sir?
16    A   I do.  It was in the Morey case, I believe.
17    Q   Actually I asked you what percentage of the
18  time do you use 65 and what percentage of the time do
19  you use 66.  Do you remember my asking you that?
20    A   Yes, I do.
21    Q   Do you remember what your answer was?
22    A   I think my answer was the majority of the time
23  I use age 65, but I think I also indicated that it
24  depends on the circumstances of the case, and for
25  workers who are older it would not be unusual to go up

Page 1147

1  to 60 or beyond.
2    Q   Let me read your answer, maybe it'll refresh
3  your recollection.
4        "I would say in the majority of the time I
5  would use age 65 because I'm not dealing in the
6  majority of cases with someone who's 61 years of age."
7    A   I think that's what I just indicated.
8    Q   There was a subsequent question that I asked
9  you, which was, "Can you identify any of the expert
10  reports in the long list that you gave to us, had for
11  us, where you used 66, other than this case?"  Do you
12  remember my question?
13    A   I do, and I recall saying that no, I could not
14  recall from looking at that list, that's correct.
15    Q   That's right.  You said -- and I'm going to
16  read it.  This is line 14 page 128, Mr. Carta.
17        "I have some cases where I will use both 65
18  and 70.  I don't recall if there are any where I
19  specifically used 66."
20        So but your study to the extent it's based on
21  age 66 was based on what Ms. Sherman told you as to
22  what Mr. Castelluccio's intentions were, correct?
23    A   In my consultation of the statistical tables
24  for work life expectancy and years to final separation
25  from the labor force, which were both beyond age 66,

Page 1148

1  that's why I felt it was not unreasonable in this case
2  to make a calculation to that age.
3    Q   But this is all based on -- I understand what
4  you're saying about the labor force and all of that
5  stuff, but you didn't use 68, you used 66, and you
6  used 66 because that's what she originally told you to
7  do, all of your studies in this case have been based
8  on that number.
9    A   All of my calculations have been based on age
10  66 for the reasons I think I've indicated a number of
11  times now.
12    Q   Right.  Now, Mr. Carta asked you about pension
13  reductions, and you said that in a prior study that
14  you did you took pensions off, right, you deducted the
15  value of the pensions?
16    A   Yes, I think I indicated that.
17    Q   Right.  So indeed here are your notes from a
18  prior study.  Can you put 215 on the board?
19        So number 215 are your notes of the study when
20  I deposed you.  These were the notes that you gave to
21  us, and this shows that the value of the pension
22  benefit as you calculated it there for 4.67 years was
23  $336,000, or whatever it was, and you took that away
24  from the damage award, from his recovery, right?
25    A   In one of the analyses I performed, that's

Page 1149

1  correct.
2      Q   And if the Court were to find that pension
3  benefits had to be deducted, from any recovery of back
4  pay, you would agree that you would have to take the
5  pension benefits that Mr. Castelluccio received off of
6  any recovery, correct?
7      A   Certainly if I were instructed to do so by the
8  Court, that would be correct.
9      Q   And he could not be -- you would agree with me
10 that as a matter of logic, he couldn't both be working
11 and receive wages and be retired and receiving
12 retirement benefits, right?  That doesn't happen.
13     A   Well, not from the same employer, but I also
14 did not calculate the value of any reduced pension
15 benefit that Mr. Castelluccio has experienced because
16 of his earlier retirement.  The pension benefit that
17 he would have received at age 66 is greater than what
18 he received actually at age 61.
19     Q   Can you try to answer my question, sir?
20     A   I thought I was.  I'm sorry.
21     Q   That's all right.  I just asked you whether it
22 was logical that he could both be working and retired,
23 and I think -- I'll withdraw it.  I think we all know
24 the answer to that.  He can't be both working and
25 earning wages as you would have him receiving back pay

Page 1150

1  for and receive retirement benefits at the same time.
2  You can't do both.
3      A   Not from the same employer, that's true.
4      Q   And let's just go ahead -- now, let's talk a
5  little bit about incentive earnings, which you
6  calculated.  Incentive earnings means bonus, right?
7      A   It's what's referred to as incentive
8  compensation.
9      Q   Right.  And I think you already testified that
10 you made no inquiry into how IBM calculates this, and
11 into actual fluctuations and incentive pay you just
12 took his incentive pay for that last four years of
13 employment, divided it by 4, and projected it into the
14 future, correct?
15     A   For the past period until March 2nd of 2013,
16 yes.
17     Q   So if we were doing an actual accurate study,
18 instead of a mathematical study, wouldn't the jury
19 need to know what incentive payments were at IBM
20 during the period from Mr. Castelluccio's termination
21 until 2013?
22     A   Well, I did review information on that for his
23 successor as well.  That incentive compensation was
24 greater than what I employed in my analysis.
25     Q   I see.  But you didn't base your study on his

Page 1151

1  successor, right?
2      A   No, I did not.  I'm just indicating that I did
3  have some information with respect to what that
4  incentive compensation was for his successor, which
5  was greater than what I'd estimated for Mr.
6  Castelluccio.
7      Q   Correct.  But his successor was -- his
8  successor, you mean Miguel Echavarria, right?
9      A   I believe so, yes.
10     Q   And he was -- he replaced Mr. Castelluccio
11 back in 2007, right?
12     A   I don't know the exact point at which that
13 occurred.
14     Q   You don't know the exact point at which that
15 occurred.
16         You don't know, do you, when Mr.
17 Castelluccio -- well, let's put it this way:  You
18 don't know Mr. Castelluccio's job performance in 2007
19 and 2008, right?
20     A   That's correct.
21     Q   And you don't know Mr. Echavarria's job
22 performance in 2007, 2008, 2009, 2010?
23     A   That's correct.
24     Q   Okay.  So you would agree that the jury, if
25 they were actually going to try to come up with an

Page 1152

1  actual number that Mr. Castelluccio might have
2  received, would need further information, wouldn't
3  you?
4      A   The information that was available was what he
5  actually had experienced.  I did rely on that.
6      Q   I understand that.
7          Now, let's look for a moment -- would you put
8  number 223 up, please?
9          Now, these are your notes again?
10     A   Yes, they are.
11     Q   Salary plus incentive pay during this period
12 of time?
13     A   That's correct.
14     Q   And the incentive pay we've highlighted, and
15 that varied year to year, didn't it?
16     A   Yes, it did.
17     Q   Substantially, almost -- not quite doubled
18 from '05 to '06, but it almost doubled, right?
19     A   It was a large increase from '05 to '06, yes.
20     Q   And a decrease from '04 to '05?
21     A   That's correct.
22     Q   So your assumption is that this pattern would
23 have just gone on and on just like this?
24     A   I relied on taking the average of those
25 values.

Page 1153

```
 1      Q   Okay.  And let's put up 218, please.
 2          And so that would have affected his income as
 3  well, right?  These are your notes from his income.
 4  And particularly the last two years, those are options
 5  he cashed out, I think, that pop those up.
 6          But the point is that this varied year to
 7  year, the earlier years it's lower, the later years
 8  it's higher, right?
 9      A   Well, his incentive compensation actually was,
10  as I think you indicated, did fluctuate from year to
11  year, which is why I took the average.
12      Q   Now, your figure for health insurance, you
13  testified that you took IBM's cost of the health
14  insurance?
15      A   No, the cost to Mr. Castelluccio.
16      Q   I see.
17      A   Of his health insurance with IBM.
18      Q   So this was money that he paid to IBM for his
19  health insurance?
20      A   That he contributed toward his health
21  insurance, yes.
22      Q   I see.  And subtracted out what he contributed
23  when he was unemployed?
24      A   The value of what he had to contribute
25  subsequent to his termination, I subtracted from that
```

Page 1154

```
 1  what he actually was paying while he was employed by
 2  IBM.
 3      Q   And what was the figure that you subtracted
 4  out, sir?
 5      A   If I could just have a moment to look at my
 6  notes.
 7      Q   Sure.
 8      A   The value that I subtracted was $478.
 9      Q   $478 a month?
10      A   That's correct.
11      Q   Now, if he testified that he was, in fact,
12  paying 6 or $700 a month, that would make a difference
13  in your calculations, wouldn't it?
14      A   That would be correct, yes.
15      Q   Okay.  But you are not aware that he --
16  whether he testified to that or not, are you?
17      A   I don't know.
18      Q   Now, the one thing that you didn't discuss in
19  your study here is alternative employment.
20  Alternative employment, you agree with me, that
21  mitigation of damages, that is -- means that if there
22  are any alternative earnings, that would need to be
23  subtracted from any recovery?
24      A   Yes.
25      Q   And in fact, if you go back -- can we put up
```

Page 1155

```
 1  number 213 again, please?
 2          And you asked Ms. Sherman about that, you said
 3  earnings, alternative employment, correct?
 4      A   Yes, I did.
 5      Q   And she said -- apparently she said no, right?
 6      A   That's correct.
 7      Q   So you didn't deduct any alternative earnings
 8  that Mr. Castelluccio -- and this is in 2010, right,
 9  she said this to you?
10      A   Yes.
11      Q   So you didn't deduct any alternative earnings
12  from this sum because Ms. Sherman told you not to do
13  it?
14      A   Well, I think I had inquired as to whether or
15  not there had been any earnings from alternative
16  employment, and at that point in time Ms. Sherman said
17  to me that there had not.  Subsequent to that I was
18  requested to make an assumption that there would not
19  be.
20      Q   I see.
21      A   Over the future time period.
22      Q   I see.  But so you never -- you've never taken
23  anything off for alternative employment, mitigation of
24  damages, right?
25      A   It's my understanding Mr. Castelluccio has not
```

Page 1156

```
 1  been able to experience any alternative employment.
 2      Q   Well, let me go back to, in a more abstract
 3  fashion.  If Mr. Castelluccio had -- when he was
 4  unemployed, if he had gotten another job of any sort,
 5  you would have deducted that, those earnings, wouldn't
 6  you?
 7      A   Yes, I would have.
 8      Q   So if he went to work at a 7-Eleven or if he
 9  went to work as a volunteer at a hospital and received
10  minor sum --
11          MR. CARTA:  Objection.
12          THE COURT:  Sir, the basis?
13          MR. CARTA:  The hypothetical is outside
14  what's permissible.  There's no law that says someone
15  has to become a clerk when they've been an executive.
16  In fact, the law is very clear.  So the hypothetical
17  is irrelevant and not probative of anything.
18          THE COURT:  Okay.  Well, it's fair
19  cross-examination.  Go ahead, Mr. Fasman.
20  BY MR. FASMAN:
21      Q   I was just asking if he had acquired outside
22  income from any source, wherever he worked, whether it
23  was a volunteer with a small stipend or working
24  at whatever gas station, whatever you like, that would
25  have to be deducted, right?
```

Page 1157

1    A   Any earnings from alternative employment would
2    have to be subtracted, yes.
3    Q   And you would agree with me that in most
4    employment cases there's an estimate of what would
5    have been earned by the plaintiff versus what the
6    alternative earnings would be, right?
7          MR. CARTA:  Objection.
8          MR. FASMAN:  I'll withdraw that.  Let me
9    be a little clearer.
10         THE COURT:  Okay.
11   BY MR. FASMAN:
12   Q   So you did not take out alternative earnings
13   in this case initially because of what Ms. Sherman
14   told you, right?
15   A   Up until that time there had not been any, and
16   I was requested to assume there would not be.
17   Q   And then later you didn't take anything off
18   because you were told he did not have any alternative
19   earnings, right?
20   A   Yes.  And of course as of today he has not, so
21   since all the losses in the past --
22   Q   Hang on one second, Dr. Crakes.  You're not an
23   expert in employee placement, are you?
24   A   No, I'm not.
25   Q   You're not an expert in recruitment.

Page 1158

1    A   That's correct.
2    Q   You're not an expert -- you never testified on
3    either subject, correct?
4    A   That's correct.
5    Q   You don't know what a reasonable job search
6    is, you couldn't testify to that, could you?
7    A   No, I could not.
8    Q   And if the jury were to find that Mr.
9    Castelluccio did not conduct a reasonable job search,
10   you would have no basis upon which to say that that --
11   that sums he could have earned through a reasonable
12   job search would not be deducted from his back pay,
13   right?
14   A   I'm not qualified to make any determination as
15   to the nature of a reasonable job search.
16   Q   And you made no study of whether he did a
17   reasonable job search or not, that's not your
18   expertise, right?
19   A   That's correct.
20   Q   Now, if I told you that he could have looked
21   for a position with IBM at a numerical band and
22   suffered a small decrease in salary, that would be
23   alternative earnings that the jury would have to
24   deduct, right?
25         MR. CARTA:  Objection, Your Honor.  The

Page 1159

1    witness -- outside the scope of direct.  It's also --
2    the witness indicated repeatedly that this is not his
3    area of expertise.
4          THE COURT:  Well, now, it seems to me Mr.
5    Fasman is identifying wages of salary which would
6    accompany a Band 10 position and simply asking the
7    Doctor whether such wages from the same employer would
8    be deducted from his calculation.
9          MR. FASMAN:  I think the answer is pretty
10   obvious, but I would like an answer.
11         THE COURT:  I think it's pretty obvious,
12   too.  We'll see.  Doctor?
13         THE WITNESS:  I would have made no such
14   deduction.
15   BY MR. FASMAN:
16   Q   But if he were able to obtain such a job, you
17   would think the deduction would be proper, right?
18   A   If he had obtained such a position, I would
19   have subtracted the earnings associated with it.
20   Q   Okay.  A couple more questions only, Dr.
21   Crakes.  On Exhibit 222, 222 is a list of all the
22   cases in which you testified, and we won't -- it's
23   about ten pages long.  I can't remember.  This is the
24   list you gave us at the time of your deposition, and I
25   saw another one the other day that added a lot of

Page 1160

1    cases to it.  You're a busy man, obviously.
2    A   Well, four years have elapsed.
3    Q   So there you go.  But on this list that you
4    gave us, on all of these cases, only two of them were
5    employment cases, right?  That's what you testified.
6    A   That's my recollection, yes.
7    Q   And of all of -- on all of these cases, this
8    ten-page list, only two of them -- or all but two or
9    three were on behalf of the plaintiff, right?  You
10   testified on behalf of the plaintiff in all but two or
11   three.
12   A   That's correct.
13   Q   And in your inquiries in this case about the
14   facts of this case, you didn't even inquire as to
15   whether this was an age discrimination case, did you?
16   A   I don't believe I did.
17         MR. FASMAN:  I have no further questions
18   of this witness, Your Honor.
19         THE COURT:  Sir, Mr. Carta.
20         MR. CARTA:  Yes, I think I have two.
21
22         REDIRECT EXAMINATION BY MR. CARTA:
23
24   Q   Dr. Crakes, have you spoken directly to Mr.
25   Castelluccio about when he intended to cease work if

Page 1161

1  he had not been terminated by IBM?
2      A   Yes.
3      Q   And what did he tell you?
4          MR. FASMAN:  Objection, hearsay.
5          THE COURT:  Pardon me?
6          MR. FASMAN:  Objection, hearsay.
7          MR. CARTA:  Your Honor, it's information
8  relied on by an expert.  It's absolutely admissible.
9          THE COURT:  I'll allow it.
10         THE WITNESS:  He indicated to me that he
11  intended to work to age 66.
12  BY MR. CARTA:
13     Q   And was that the basis of the final
14  calculation that you presented to the jury?
15     A   Well, I compared that to what the tables,
16  again, demonstrated for work life expectancy in years
17  of final separation from the labor source for a man of
18  Mr. Castelluccio's age and education, which would have
19  been something between ages 68 and 69, and I felt it
20  was therefore reasonable to make a calculation to age
21  66.
22     Q   Okay.  Mr. Fasman asked you a series of
23  questions about your internal calculations before Mr.
24  Castelluccio had reached the March 2013 time and what
25  assumptions you made about whether or not he was or

Page 1162

1  was not going to get gainful employment.  In terms of
2  your final analysis, and the final calculation that
3  you presented to the jury, what was the basis of your
4  conclusion not to deduct anything in this instance for
5  income earned by Mr. Castelluccio in the 4.67 years?
6      A   Because he has not had any.
7      Q   The fact that he didn't have any income?
8      A   That's correct.
9      Q   Didn't have anything to do with what my former
10  associate had indicated might have happened, right?
11     A   That's correct.  He had not experienced any
12  earnings over that period of time.
13     Q   It had to do with what actually happened?
14     A   Yes.
15         MR. CARTA:  No further questions.
16         MR. FASMAN:  Your Honor, one or two?
17
18         RECROSS EXAMINATION BY MR. FASMAN:
19
20     Q   Dr. Crakes, when did you have this
21  conversation with Mr. Castelluccio when he told you
22  that he was going to retire at age 66?
23     A   I believe there were a couple of occasions
24  when I met with Mr. Castelluccio at Attorney Carta's
25  office, and that he had indicated to me at those

Page 1163

1  times.
2      Q   When?
3      A   Once about perhaps a year, year and a half
4  ago, and then just a few weeks ago.
5      Q   I see.  So he told you one thing and he
6  testified here to something entirely different, under
7  oath.
8          He wasn't under oath when he talked to you,
9  was he?
10     A   No, I usually don't do that to people.
11     Q   I know.  Thanks, Dr. Crakes.
12         MR. CARTA:  No further questions.
13         THE COURT:  Mr. Carta?
14         MR. CARTA:  No further questions.
15         THE COURT:  Doctor, thanks very much for
16  being with us.  You may step down.
17         THE WITNESS:  Thank you, Your Honor.
18         MR. CARTA:  Your Honor, Dr. Crakes was my
19  final witness, and I rest.
20         THE COURT:  I'm sorry?
21         MR. CARTA:  Dr. Crakes was my final
22  witness, and I rest.
23         THE COURT:  Okay.  The record should
24  reflect that the Plaintiffs have rested.
25         Are you ready to go forward?

Page 1164

1          MR. FASMAN:  Yes, we are, Your Honor.
2          THE COURT:  Okay.  I've read your Rule 50
3  motions, I read the opposition, and I'm going to hold
4  a decision on that under advisement, which again after
5  checking I believe is the preferred practice in the
6  Second Circuit.
7          So call your first witness, sir.
8          MR. FASMAN:  Thank you, Your Honor.  Mr.
9  Duffield will inquire initially.
10         MR. DUFFIELD:  We call Dave Liederbach.
11         THE COURT:  Good morning, Mr. Liederbach.
12         THE WITNESS:  Good morning, Judge.
13  (David Liederbach, sworn by the clerk)
14         THE CLERK:  Please state your name, spell
15  your last name for the record.
16         THE WITNESS:  Dave Liederbach, spelled
17  L-I-E-D-E-R-B-A-C-H.
18         THE COURT:  What does that mean in
19  German?
20         THE WITNESS:  Singing brook, song brook.
21         THE COURT:  Lieder is song.  What is the
22  bach?
23         THE WITNESS:  I'm going to have to call
24  on my father for that.
25         THE COURT:  Okay.  Excuse me, I didn't

Page 1165

1    mean to interrupt.
2        MR. DUFFIELD:  No problem.
3        THE CLERK:  Your business address,
4    please?
5        THE WITNESS:  590 Madison Avenue, New
6    York New York.
7
8        DIRECT EXAMINATION BY MR. DUFFIELD:
9
10   Q    Good morning, Mr. Liederbach.
11   A    Good morning.
12   Q    Would you please introduce yourself to the
13   jury, tell them how old you are, how long you've been
14   with IBM and what your current position is, please?
15   A    My name's Dave Liederbach.  I am 51 years old.
16   I worked for IBM company for 29 years.  My current
17   title is vice president of growth and integration.
18   Q    Did you attend college after high school, Mr.
19   Liederbach?
20   A    Yes, I did.  I had an undergraduate degree
21   from the University of Michigan in chemical
22   engineering.  I have a master's in business
23   administration from Case Western Reserve University in
24   Cleveland, Ohio.
25   Q    And did you have any employment before working

Page 1166

1    for IBM?
2    A    I did not.
3    Q    And when did you join IBM?
4    A    July 2nd, 1984.
5    Q    And could you briefly walk us through your
6    employment history at IBM up to your current position?
7    A    I spent about ten years in sales and sales
8    management positions, followed by about five or six
9    years in our software business where I had marketing
10   and product management responsibility, followed by
11   about ten years in a range of different positions in
12   our services business, which brings me to my current
13   responsibilities now.
14   Q    And have you ever heard the phrase, "Your
15   career is your responsibility," at IBM?
16   A    Yes, I have.
17   Q    And what does that mean?
18   A    It means that it is the obligation of the
19   employee to keep their skills adequate, to serve their
20   responsibilities inside of IBM and the marketplace,
21   and it's their responsibility to document their career
22   direction.
23   Q    I'd like to direct your attention now to the
24   period of time when you were serving as the general
25   manager of the public sector in GTS.  Do you remember

Page 1167

1    what period of time frame you served in that role?
2    A    2006 through 2009.
3    Q    And would you please explain for the jury what
4    your responsibilities were as a general manager of
5    public sector?
6    A    Public sector in our definition includes
7    healthcare clients, life sciences or pharmaceutical
8    clients, education, and different parts of the
9    government, predominantly state government and local
10   government, and I had responsibility for the account
11   management.  That means delivering a service and
12   satisfaction to an existing set of clients, and sales
13   responsibility for acquiring new clients to the
14   services that we provide.
15   Q    And did you have people reporting directly to
16   you?
17   A    Yes, I did.
18   Q    Approximately how many people?
19   A    Approximately ten people reporting directly to
20   me.
21   Q    And what kind of positions did they hold?
22   A    Typically it was vice president level or
23   director level positions.
24   Q    And when you came into the role as general
25   manager of public sector, was Mr. Castelluccio already

Page 1168

1    in his role as VP of delivery for public sector?
2    A    Correct.
3    Q    Had you worked with him prior to this time?
4    A    No.
5    Q    Mr. Castelluccio has testified that the two of
6    you worked together in your various roles in the
7    public sector.  Can you explain what kind of
8    interaction you would have had with him?
9    A    So Jim had responsibility for service delivery
10   to the clients that I had overall client relationship
11   and business management responsibility for.  So it was
12   a very close business relationship where I have a high
13   degree of dependency on Jim and his team and the
14   services they provide to my clients.
15   Q    And in your role as the vice president of
16   public sector, did you have an opportunity to observe
17   Mr. Castelluccio's performance in his role?
18   A    Yes.
19   Q    And what did you observe?
20   A    Shortly into our tenure together, based on
21   escalations that had come from my management team to
22   me, and direct observations, there was a set of
23   performance concerns associated with Jim
24   Castelluccio's performance.
25   Q    Can you elaborate on what those performance

12 (Pages 1165 to 1168)

## Page 1169

1    concerns were?
2      A   They were in the area of responsiveness and
3    communication to my management team that was dependant
4    on either he or his employee base to serve our
5    clients.  It also included areas where we had
6    performance issues of employees.  Either they weren't
7    performing the job that they were assigned, and/or the
8    individual was deemed by the client to be ineffective
9    in the job role.  And in our business your job is to
10   satisfy clients, and you need to response quickly to
11   these changes, and that was not occurring.
12     Q   So you mentioned one of the concerns you had
13   was communication, Mr. Castelluccio's communication
14   with your direct reports and with the client.  Can you
15   elaborate on that a little bit, tell us what you mean,
16   what the issues were?
17     A   Communications, you know, would include
18   responding to agreements that were made between
19   business parties.  It would include responding to
20   telephone calls inquiring about progress on those
21   activities, or e-mail or other forms of communication.
22     Q   Kelton Jones was here on Friday and testified,
23   and testified that you had raised some of these
24   concerns with him in 2006.  Do you remember having
25   conversations with Mr. Jones about his issues?

## Page 1170

1      A   Yes.
2      Q   What did you say to him?  Do you remember?
3      A   First, I documented based on input sent to me
4    from my employees that they had a set of concerns in
5    the areas that I just described.  I took that
6    communication and added my own direct personal
7    experience, and sent an e-mail to Kelton Jones for his
8    edification, and then we agreed to a follow-up phone
9    call discussion to go into the details of that
10   performance.
11     Q   If you would please turn to Defendant's
12   Exhibit 12.  You should have two black binders up
13   there.  Maybe at your feet.  And the first one.
14     A   I'm sorry, Exhibit 12?
15     Q   12, yes.  Take a minute to familiarize
16   yourself with it.  Let me know when you're ready.
17     A   Okay.
18     Q   If you'll turn to the second page of the
19   e-mail string, the first e-mail is from a Chris
20   Nicoletti to Jim Castelluccio on April 25th, 2006.
21   Who was Chris Nicoletti?
22     A   Chris Nicoletti reported to me as a set of
23   vice presidents that worked for me.  Chris was
24   responsible for the healthcare and life science
25   clients within our organization.

## Page 1171

1      Q   And if you want to look on the screen there to
2    your right, and read for the jury the highlighted
3    portions of Mr. Nicoletti's e-mail.
4      A   "Jim, I want to confirm that we are still on
5    track to reduce the resources --" an acronym that
6    stands for WellPoint "-- in the June resource action
7    in line with what we all agreed to in the Palisades
8    meeting."  Second line.  "I assume we are still on
9    track to remove approximately 60 resources at the end
10   of June.  Please confirm."
11     Q   So the reduction of resources on the WellPoint
12   account, was that something that fell within Mr.
13   Castelluccio's job responsibilities?
14     A   Correct.
15     Q   If you'll turn back to the first page, there's
16   a follow-up e-mail from Mr. Nicoletti to Mr.
17   Castelluccio.  This one is now dated April 28th, three
18   days later, and Mr. Nicoletti says to Mr.
19   Castelluccio, "I never received a response to this
20   request."  Do you see that?
21     A   I do.
22     Q   And is that acceptable, to go without a
23   response for three days on an issue like this?
24     A   No.  I would consider a 24-hour response to be
25   an adequate response for a business issue of this

## Page 1172

1    size.
2      Q   So a delay of three days, is that significant
3    in your mind?
4      A   Correct.
5      Q   Why?
6      A   As the e-mails indicate, this is an
7    escalation, and then in Chris's first note he's
8    escalating the situation because he hasn't heard back,
9    now three days later he's raising it again to Jim's
10   attention, and there are client service and business
11   issues at hand if these items aren't addressed.
12     Q   Is this the only example of this kind of issue
13   being escalated to your attention?
14     A   No, it's not.
15     Q   If you go to the top e-mail, you then forward
16   this on to Kelton Jones a couple days later, and you
17   start by saying, "Kelton, please do not forward."
18          Why did you not want Mr. Jones to forward this
19   e-mail?
20     A   My intention on doing that was to give Kelton
21   and I the opportunity to have a full discussion and
22   make sure I had complete context from Kelton's
23   perspective on this escalation and was it possible
24   that there were other conditions or factors that were
25   preventing what I consider adequate response to the

## Page 1173

1    request.
2        Q   So before anyone else knew about this issue,
3    you wanted to discuss it with Mr. Castelluccio's
4    manager and see the full context before escalating it
5    further, correct?
6        A   Correct.
7        Q   If you'll read the first paragraph of your
8    e-mail to Mr. Jones for us.  It should be highlighted
9    on the screen.
10       A   "The attached is one of a stream of notes that
11   I get from my executives with concerns on
12   responsiveness or follow-up from Jim.  I'm
13   experiencing the same issues, be them --" excuse my
14   typing at the time "-- e-mails or calls to his
15   cellphone.  I have raised this to Jim's attention in
16   the recent past."
17       Q   Do you have a recollection of discussing these
18   issues with Mr. Castelluccio?
19       A   I do prior to this note.
20       Q   And what did you say to Mr. Castelluccio?
21       A   Very consistent with what's captured in this
22   e-mail, that there were a set of significant business
23   issues that needed attention, and that my management
24   team was not getting response to those requests.
25       Q   And what was Mr. Castelluccio's response?

## Page 1174

1        A   I don't recall the specific response, but I
2    don't remember contention or debate on the discussion.
3        Q   Would you read the next paragraph, please?
4        A   "If there are issues outside of work that I
5    need to understand that would explain the situation,
6    let's talk.  Otherwise, I believe we need to consider
7    an immediate change in his execution or a change in
8    leadership.  I will call Monday to get your insights."
9        Q   All right.  Do you remember if Mr. Jones
10   raised any outside issues with you that would have
11   affected Mr. Castelluccio's ability to be responsive
12   to your managers?
13       A   He did not.
14       Q   And in the second sentence you say you need to
15   consider an immediate change in execution or change in
16   leadership.  What did you mean by that, change in
17   leadership?
18       A   The first condition was to work with Jim to
19   correct the performance concerns.  The second
20   alternative was to change the leader or change the
21   position that Jim was in.
22       Q   So remove Mr. Castelluccio from the DPE role?
23       A   Correct.
24       Q   And then you ended with, "I will call on
25   Monday."

## Page 1175

1        Do you remember having a conversation with Mr.
2    Jones about this?
3        A   Yes, I do.
4        Q   If you would turn to Exhibit 13.  That would
5    be the next document in your binder.  This is now
6    about a week later, an e-mail from you to Mr. Jones on
7    May 5th, 2006.  If you would read the first paragraph,
8    please.
9        A   "Jim and I spoke for an hour yesterday as a
10   follow-up to your and my discussion.  I shared
11   examples of my concerns.  To Jim's credit, we spent
12   little time rationalizing the past and committed to
13   the following."
14       Q   So that sounds consistent with what you were
15   just telling us.
16       I'd like to now walk through these bullet
17   points slowly.  The first one you have "Communications
18   between our executive teams will improve."  What was
19   your discussion with Mr. Castelluccio about this
20   bullet point?
21       A   Just very straightforward, that if there were
22   business issues, either on service performance or HR
23   personnel related concerns or service quality concerns
24   that my team was raising to Jim, that there would be
25   response and communication on those items.

## Page 1176

1        Q   And Mr. Castelluccio committed to you that he
2    would work on that?
3        A   Correct.
4        Q   The next bullet point, "Commitments on service
5    delivery, resource changes and all key business
6    decisions will be executed as discussed and within
7    time frames."  What did you mean by that?
8        A   So these are the core elements of the job and
9    where both myself at this point in time and my
10   management team is dependent on Jim and his management
11   team.  So executing service delivery to our clients,
12   making changes to resources, either improving skills
13   or changing skills, and then business decisions, it
14   could mean commitment to a date to deliver a project
15   to a client, it could be adjustments and resource
16   levels on a client, and it was commitment to execute
17   to the agreements that were made between our teams.
18       Q   So basically do what you say you're going to
19   do?
20       A   Correct.
21       Q   And Mr. Castelluccio committed that he would
22   start doing this?
23       A   Yes.
24       Q   And the third bullet point, "Client centric
25   and proactive leadership behaviors are required of all

Page 1177

1   executives and senior managers within our teams."
2   What did you and Mr. Castelluccio discuss with regard
3   to this bullet point?
4       A   So the term "client centric," we're in a
5   business to serve clients, and so it is a professional
6   behavior that says you're operating on behalf of the
7   client, and then secondly, the proactive leadership,
8   it's not just enough to do what you are told to do, at
9   the level of executives that we are in these
10  positions, you're accountable to anticipate needs and
11  changes based on your own capability.
12      Q   And again, Mr. Castelluccio committed to you
13  that he would focus on this performance issue?
14      A   Correct.
15      Q   At the end of your e-mail you say, "I have
16  added a bi-weekly meeting with Jim on service delivery
17  performance and cost management." Did you, in fact,
18  set up these bi-weekly meetings with Mr. Castelluccio?
19      A   Yes. My office did.
20      Q   And for how long did those meetings continue?
21      A   I don't have precision on that, but I would
22  say several months.
23      Q   And how long were the meetings?
24      A   We would spend 45 minutes to an hour.
25      Q   And anyone in there other than just the two of

Page 1178

1   you?
2       A   For these meetings, some of them were
3   one-on-one, other situations I would expect parts of
4   our management team would be involved in the
5   conversation.
6       Q   And did you see improvement in Mr.
7   Castelluccio's performance?
8       A   There was not material improvement.
9           THE COURT:  Sir, can you tell me how long
10  these meetings lasted, over what period?  I didn't
11  hear it.
12          THE WITNESS:  Judge, I apologize, I don't
13  have a precise duration, but my recollection would be
14  several months.
15  BY MR. DUFFIELD:
16      Q   If you would turn to Defendant's Exhibit
17  number 15.  The bottom e-mail is from Luis Fernandez
18  to Jim Castelluccio.  It's dated September 20th, 2006.
19  So the earlier e-mails we just looked at were the
20  April-May time frame.  We're now in September of 2006.
21  Can you please explain to the jury the nature of Mr.
22  Fernandez's e-mail to Mr. Castelluccio?  What was the
23  issue they were discussing?
24      A   So Luis Fernandez was what was called the
25  project executive on this client, and he is

Page 1179

1   escalating, as written in the set of bullets deeper in
2   the e-mail, six or seven issues or conditions that he
3   needed Jim -- Jim's team to address to improve the
4   situation with this client.
5       Q   And the top e-mail, Keenie McDonald forwards
6   it to you, and would you please read her e-mail to
7   you.
8       A   "Dave, I am sending this to you only.  I feel
9   like you and I are getting no help from Jim to improve
10  delivery and to take out cost.  Luis and John do not
11  feel our team gets any help/value from Jim, and we
12  need it."
13      Q   Did you share Ms. McDonald's feeling that you
14  weren't getting the help from Mr. Castelluccio on
15  delivery?
16      A   Yes.
17      Q   And why did you feel that way?
18      A   Again, to repeat the points that I made
19  earlier, we had issues in terms of communication
20  between management, we had failure to execute on
21  service delivery, people or resource decisions, and
22  part of the cost or financial management parts of the
23  contract.
24      Q   And how did these issues affect IBM's
25  relationship with your clients and your customers?

Page 1180

1       A   Failure to address these result in both a
2   dissatisfied client and a bad financial condition
3   ultimately for both parties, client and IBM.
4       Q   So these are serious issues for you to be
5   dealing with?
6       A   Yes.
7       Q   Let's fast forward.  If you'd turn to
8   Defendant's Exhibit 21.  And we're going to move ahead
9   in time.  This is now January of 2007, and the bottom
10  of the page is an e-mail from Keenie McDonald to you
11  and John Shimkus.  Who is John Shimkus?
12      A   John Shimkus was a vice president of services
13  that was reporting to me dedicated to the WellPoint
14  account.
15      Q   And the subject line of Ms. McDonald's e-mail
16  says "transition exec."  What was a transition exec?
17      A   So within the overall responsibility that we
18  had of delivering a service to this client there's a
19  position called a transition exec.  Typically they are
20  involved in either moving the location that we are
21  delivering the service from one location to another,
22  or if we are significantly changing the way that we
23  are delivering that service, we will put the
24  transition exec in place to manage that part of the
25  relationship.

Page 1181

1    Q   Would you please read for us Ms. McDonald's
2    e-mail to you?
3    A   "Dave, please help push this. We need this
4    guy to start on Monday. What do you and/or I need to
5    do to make this happen, literally starting Monday. We
6    continue to lose valuable time. See --" ST is an
7    abbreviation for same time in communication
8    technology "-- below from John. Thanks."
9       And then there's a message that is Shimkus at
10   IBM, that's John Shimkus, "Castelluccio was working an
11   issue on plan type for Michael Jones. This is a big
12   issue for Mike Jones so Jim needs to solve it before
13   we can close on him and get him started. I pinged Jim
14   for status but no response."
15   Q   So "same time", that's like instant messaging?
16   A   Correct.
17   Q   So that was another way that you would
18   communicate amongst yourselves at IBM?
19   A   Correct.
20   Q   And as you're reading this e-mail from Ms.
21   McDonald, it looks like this is an urgent issue, is
22   that correct?
23   A   Correct. He was fulfilling or putting a
24   leader in for the transition exec.
25   Q   And your response to Ms. McDonald at the top

Page 1182

1    of the page, you say, "I'm tracking down Jim to get
2    this closed."
3       Did you see it as your responsibility to track
4    down Mr. Castelluccio to make sure he was doing his
5    job?
6    A   It's not the type of thing that I would say is
7    my core responsibility. We have professional
8    accountability to each other to get things done, but
9    in this condition it was being escalated to me to
10   address.
11   Q   And it was being escalated to you because why?
12   A   It was not being addressed in a timely manner.
13   Q   Do you remember Joanne Collins-Smee replacing
14   Kelton Jones as the general manager of ITD Americas?
15   A   Yes, I do.
16   Q   And do you have a recollection of the time
17   frame of when that happened?
18   A   Approximately February 2007.
19   Q   And how did you learn about that change in
20   leadership?
21   A   I suspect my boss at the time, Bob Zapfel,
22   communicated the change to me.
23   Q   Had you worked with Ms. Collins-Smee before?
24   A   I had not.
25   Q   And did you have an opportunity to speak with

Page 1183

1    her around the time she took over in this new role?
2    A   I did.
3    Q   Did you reach out to her or did she reach out
4    to you?
5    A   I reached out to her.
6    Q   And do you remember if you met in person or
7    over the phone?
8    A   I think the communication started via e-mail,
9    and then was followed up by face-to-face meetings.
10   Q   And what did you guys talk about?
11   A   Basically I needed to take her through the
12   status of our business, the pendencies I had on her
13   and her team to perform to serve our clients, and then
14   I escalated what were some of the most challenged or
15   difficult issues we were dealing with at that point in
16   time.
17   Q   And thinking back to that time frame of
18   February 2007, what were the challenging issues you
19   were facing?
20   A   There were a set of contracts that were not
21   performing, WellPoint being one of them.
22   Q   And did you have any discussion about
23   personnel issues?
24   A   Yes. During that initial conversation I
25   shared with Joanne that I had a long-standing

Page 1184

1    escalation into her predecessor, Kelton Jones, that
2    there were performance concerns in Jim Castelluccio's
3    ability to manage in the position that he was in.
4    Q   Did you express to Ms. Collins-Smee that you
5    wanted to have Mr. Castelluccio replaced as the VP of
6    public sector?
7    A   Correct.
8    Q   What was her response?
9    A   She committed to look into the situation, and
10   get her own assessment and determination on whether
11   change was warranted.
12   Q   Would you turn to Defendant's Exhibit number
13   28. I want to focus on the second e-mail in the
14   string on the first page. It's an e-mail from you to
15   Ms. Collins-Smee on February 11th. Do you remember if
16   you sent this e-mail before or after you had spoken
17   with Ms. Collins-Smee?
18   A   My belief is this is my initial communication
19   to Joanne.
20   Q   And could you please read your e-mail, the
21   first two paragraphs?
22   A   "WellPoint is my largest most important and
23   most challenged client/contract. In the near future I
24   would like to take you through our opportunities and
25   challenges. In the short-term I would appreciate your

16 (Pages 1181 to 1184)

## Page 1185

1   help getting an executive transition manager on
2   WellPoint.  It has been open for months, and in the
3   interest of straight talk Jim Castelluccio and Kelton
4   have not come up with a quality candidate."
5       Q   Is this executive transition manager issue the
6   same one that we saw in the prior e-mails from
7   January?
8       A   Yes, it is.
9       Q   So it still isn't filled, almost three weeks
10  later?
11      A   Correct.
12      Q   And in that second paragraph you say "In the
13  interest of straight talk Jim Castelluccio and Kelton
14  have not come up with quality candidate."  What did
15  you mean by "in the interest of straight talk"?
16      A   Just to be very clear and blunt about the
17  challenge of the situation.
18      Q   If you'll turn to the next exhibit, Exhibit 29
19  this is also a fairly lengthy e-mail, not really a
20  string, multiple e-mails attached together.  I'm going
21  to focus on the first page, but take your time and
22  make sure you are familiar with it.
23      A   Okay.
24      Q   So this e-mail is -- the top e-mail is from
25  you to Ms. Collins-Smee.  It's dated February 13th.

## Page 1186

1   And would you please read the highlighted portion on
2   the screen there of your first paragraph?
3       A   "Joanne, the attached note and the other item
4   re-escalated in the WLM --" should have been WLP, an
5   acronym for WellPoint "-- from Keenie are examples of
6   where Jim does not respond or lead.  I would like to
7   quickly make a change."
8       Q   So what did you mean by "I would like to
9   quickly make a change"?
10      A   This is a continued dialogue on my part to
11  communicate at this point to Jim's current manager,
12  Joanne, that I thought a change in leadership was
13  required.
14      Q   And she had agreed to review his performance,
15  talk with him and defer on the decision at that point,
16  correct?
17      A   Correct.
18      Q   And during the month of February did you have
19  any other discussions with Ms. Collins-Smee about Mr.
20  Castelluccio?
21      A   I'm sure I did.
22      Q   And do you remember generally the nature of
23  those discussions?
24      A   They were continued discussions on the themes
25  that we have exchanged here on performance issues, on

## Page 1187

1   WellPoint, and on the critical need to improve our
2   service delivery and to improve our leadership on the
3   account.
4       Q   So at some point Mr. Castelluccio was removed
5   from the vice president of public sector delivery
6   role.  Do you recall that occurring?
7       A   I do.
8       Q   And how did you become aware of it?
9       A   Communication from Joanne.
10      Q   And did you agree with her pulling him off
11  that role?
12      A   I did.
13      Q   We've heard testimony already in this case
14  that Miguel Echavarria ultimately took over the vice
15  president role around June of 2007.  Do you remember
16  Miguel coming in to take over that role?
17      A   I do.
18      Q   And how did Miguel do as the vice president of
19  public sector delivery?
20      A   Over the course of the year he improved
21  performance, was much more communicative with my
22  management team, and helped address some of the
23  performance and HR concerns or personnel concerns that
24  I had previously escalated.
25      Q   We've also heard quite a bit of testimony from

## Page 1188

1   several witnesses that Mr. Castelluccio was eventually
2   assigned to serve as the senior DPE on the WellPoint
3   account.  Do you remember that happening?
4       A   Yes, I do.
5       Q   Would you turn to Defendant's Exhibit 45 for
6   me.  The bottom of this first page, the only page,
7   there's an e-mail from Ms. Collins-Smee dated March
8   31st, 2007.  It's sent to Mr. Castelluccio and to you,
9   and she says, "Dave, Jim.  As we discussed, Jim must
10  move to WellPoint as of Monday.  We need him to be the
11  acting DPE 100 percent of the time until we put the
12  new WellPoint DPE in on April 16th."
13      Were you involved in the decision to move Mr.
14  Castelluccio to the DPE role at WellPoint?
15      A   Yes.
16      Q   And what was the rationale for making this
17  assignment?
18      A   A couple of factors.  One, reducing the scope
19  of responsibility for Jim to a single client gave him
20  a better opportunity to perform and use his talents
21  and experience in that job.  Secondly, because he had
22  experience and familiarity with WellPoint from his, at
23  that point in time current role, it would accelerate
24  the potential for positive impact on the client
25  situation.

Page 1189

1    Q   So did you agree with the decision to assign
2    Mr. Castelluccio to the WellPoint account?
3    A   Yes, I did.
4    Q   So the question that I'm sure many of the
5    jurors are wondering is, if you had had all these
6    concerns with Mr. Castelluccio for the last year, year
7    and a half, in his communication on issues,
8    responsiveness, failure to keep commitments, why would
9    you agree to put him on your largest and most troubled
10   account?
11   A   Again, by reducing the scope of the job and
12   focusing an individual, in this case Jim, on a more
13   specific responsibility, we felt it gave him the
14   opportunity to demonstrate and leverage the skills and
15   experience that he had throughout his IBM career.
16   Q   Focusing back on the e-mail from Ms.
17   Collins-Smee, she says that he will be the acting DPE
18   100 percent of the time.  What did you understand that
19   to mean?
20   A   The term "acting" implies that it is an
21   interim position.  The reference to 100 percent
22   implies the individual is dedicated to that
23   responsibility through that period.
24   Q   Do you know if Mr. Castelluccio had any other
25   responsibilities in addition to servicing the

Page 1190

1    WellPoint account at this time?
2    A   At this point in time and thereafter Joanne
3    had assumed the broader responsibilities and taken
4    those on directly, and Jim's direction and
5    responsibility was exclusive to WellPoint.
6    Q   So when issues arose on some of the other
7    public sector accounts, not the WellPoint account, but
8    other accounts, would you reach out to Jim
9    Castelluccio on those accounts?
10   A   No.
11   Q   Who would you reach out to?
12   A   To Joanne.
13   Q   And what about your managers, your vice
14   presidents, would they have reached out to Jim
15   Castelluccio?
16   A   I can't comment on everything that they did.
17   I can only say that if they escalated things to me,
18   those were directed to Joanne.
19   Q   Turn to Defendant's Exhibit 57.  This is a
20   June 1, 2007 e-mail from Ms. McDonald to Robert
21   Zapfel, Joanne Collins-Smee and to you.  Would you
22   please read the highlighted portion of the e-mail to
23   the jury.
24   A   "This temporary approach with Jim Castelluccio
25   is not working.  On two separate calls this morning,

Page 1191

1    one with Boxer and one with Dave McDonald, they both
2    jumped on me re our lack of delivery leadership and
3    Jim's lack of real involvement.  Dave McDonald
4    literally said, I don't even waste my time trying to
5    contact Jim anymore."
6    Q   Who was Boxer?
7    A   Mark Boxer was the CIO for WellPoint.
8    Q   And Dave McDonald?
9    A   Dave McDonald was the VP of infrastructure
10   reporting to Mark Boxer.
11   Q   What was your reaction to receiving an e-mail
12   like this from Ms. McDonald saying that Mr. Boxer and
13   Mr. McDonald are jumping on her because of the lack of
14   delivery leadership and Jim's lack of real
15   involvement?
16   A   It was evidence or symptomatic of some of the
17   same performance concerns that I had experienced, and
18   indicated that the communications was not happening
19   between Jim and the client, and that they had
20   determined that there was not benefit to working
21   through Jim at this point in time.
22   Q   And so despite the fact that IBM had narrowed
23   Mr. Castelluccio's focus to just one account,
24   WellPoint, you continued to see the same issues that
25   you had been seeing the last year and a half with

Page 1192

1    regard to his performance?
2    A   Correct.
3    Q   And do you know if these performance issues
4    were ever addressed with Mr. Castelluccio?
5    A   I can't comment from this point forward, only
6    the prior.
7    Q   You had addressed them with him before, but
8    when he was serving as the DPE at WellPoint you didn't
9    have any specific conversations with him where you
10   raised these issues?
11   A   I did not.
12   Q   At some point we know that Mr. Castelluccio
13   was removed from the DPE role at WellPoint and Gordon
14   Crawford came in.  Do you remember that happening?
15   A   I do.
16   Q   Had you worked with Mr. Crawford before?
17   A   I had not.
18   Q   Did you interview him for this position?
19   A   I did.
20   Q   And did you know how old he was at the time?
21   A   I did not.
22   Q   Would it have mattered?
23   A   It would have not.
24   Q   Why was Mr. Crawford selected to serve as the
25   DPE on WellPoint?

Page 1193

1    A    He had a strong track record on service
2    delivery management, and managing large and complex
3    contracts and programs similar to the contract and
4    attributes that we had at WellPoint.
5    Q    And how did he do when he took over as the DPE
6    at WellPoint?
7    A    He performed very well.  The client
8    satisfaction significantly improved.  The quality of
9    service significantly improved, and the business or
10   financial management of the contract significantly
11   improved.
12   Q    When Mr. Crawford came in and took over the
13   DPE role, Mr. Castelluccio then was told to focus on
14   finding another job or another project at IBM and he
15   had six months to do so.  Did he come to you at any
16   point during that six months and ask you if you had
17   any job lead for him or any projects he could work on?
18   A    Not to my recollection.
19         MR. DUFFIELD:  No further questions, Your
20   Honor.
21         THE COURT:  Mr. Carta?
22         MR. CARTA:  Would this be a time to take
23   a break?
24         THE COURT:  Well, ladies and gentlemen,
25   maybe we should take a break now until about five

Page 1194

1    minutes before 12.  We'll take a break until about 12,
2    12:05.
3         (Jurors excused)
4         THE COURT:  See you here at 12:05.
5         MR. DUFFIELD:  Or five minutes to 12 I
6    thought you said.
7         (Recess taken from 11:44 a.m. to 11:59 a.m.)
8         THE COURT:  Mr. Carta.
9         MR. CARTA:  Thank you.
10
11         CROSS-EXAMINATION BY MR. CARTA:
12
13   Q    Almost good afternoon, Mr. Liederbach.
14   A    Good afternoon.
15   Q    I'm Mark Carta and I represent James
16   Castelluccio.
17        I'd like to ask some preliminary questions
18   about your role in connection with the WellPoint
19   account.  The WellPoint account went into effect in
20   July of 2005, is that right?
21   A    That's right.
22   Q    Contract went into effect?
23   A    Correct.
24   Q    And am I correct that you were the IBM
25   executive who led them in the engagement team to land

Page 1195

1    that business?
2    A    There were a series of executives involved
3    with the engagement.  I was one of them.
4    Q    Were you the lead on that team?
5    A    Could you be more specific?
6    Q    Well, describe to the jurors what your role
7    was.
8    A    So at that point in time I was the vice
9    president of a set of industries, which healthcare was
10   one of them.  WellPoint, the contract was pursued and
11   closed during that point in time.  I had
12   responsibility for sales and account management, and I
13   had a team of executives that ran the sales function
14   under my direction.
15   Q    So you were the principal salesperson
16   responsible for bringing in the WellPoint account?
17   A    There is a principal salesperson that led the
18   sale.  That executive worked for me.
19   Q    And that executive reported up to you?
20   A    Correct.
21   Q    So that was your responsibility, what he did?
22   A    Correct.
23   Q    Was it a he or she?
24   A    It was a she.
25   Q    So you were also responsible for overseeing

Page 1196

1    the pricing on the WellPoint contract, isn't that
2    correct?
3    A    That's correct.
4    Q    And you were responsible for working with the
5    legal team in terms of the legal terms in the contract
6    that was signed between IBM and WellPoint?
7    A    Correct.
8    Q    And isn't it true that the profitability of
9    the WellPoint contract directly impacted your career
10   at IBM?
11   A    Correct.
12   Q    In fact, I think a moment ago you introduced
13   an exhibit that said WellPoint was your largest most
14   important account.  Do you remember that exhibit?
15   A    I do.
16   Q    And that was something that you pointed out to
17   Ms. Collins-Smee, is that correct?
18   A    That's correct.
19   Q    Exhibit 21.
20        Would you please take a moment and review this
21   e-mail exchange.
22   A    I'm sorry, it's Exhibit 21?
23   Q    Yes.  It should be -- I'm not sure what binder
24   you have in front of you.  It's Plaintiff's 21.  It's
25   on the screen, but I'll get you a hard copy.

Page 1197

```
1      A   Thank you.
2      Q   Mr. Liederbach, what was Mr. Boxer's role,
3   again, at WellPoint?
4      A   He was the CIO for WellPoint.
5      Q   So he was in charge of all of their computer
6   operation, all of their information technology?
7      A   Correct.
8      Q   And isn't it true that Mr. Boxer insisted that
9   you be removed from the WellPoint account?
10     A   Correct.
11     Q   And in this instance when he learned that you
12  had possibly been in the background, he demanded of
13  Keenie McDonald that you have no involvement
14  whatsoever with the account, isn't that correct?
15     A   Are you referencing to the document?
16     Q   Yes, I am.
17     A   Yes.
18     Q   That is correct.
19         Do you have a single e-mail in which Mr. Boxer
20  states that he doesn't want Mr. Castelluccio working
21  on the WellPoint account directly or indirectly?
22     A   Do I have an e-mail like that?  I do not.
23     Q   Are you aware of such an e-mail where Mr.
24  Boxer takes an unequivocal position he doesn't want
25  Mr. Castelluccio working on this account the way he
```

Page 1198

```
1   did with you?
2      A   I have not.
3      Q   You're not aware of any such document?
4      A   Correct.
5      Q   Ms. Collins-Smee testified that Mike Morin was
6   one of the two key IBM executives to help turn around
7   the WellPoint account.  Do you agree with that?
8      A   Could you rephrase it?
9      Q   Sure.  You know Mike Morin was the second DPE
10  on the WellPoint account?
11     A   Yes.
12     Q   Dave Cartez being the first?
13     A   Correct.
14     Q   And Ms. Collins-Smee testified that Mike Morin
15  was one of the, in her opinion, two key employees to
16  turn around the WellPoint account from its early --
17         MR. DUFFIELD:  Objection, Your Honor.  I
18  think he's mischaracterizing Ms. Collins-Smee's
19  testimony.  I don't remember her testifying to that.
20         THE COURT:  All right, you know, we have
21  an intelligent witness, and I think he's able to
22  respond to the question.  If it's mischaracterized I
23  think he'll say so.
24         You may proceed.
25  BY MR. CARTA:
```

Page 1199

```
1      Q   Would you like me to repeat the question?
2      A   Please.
3      Q   Sure.  My recollection is that Ms.
4   Collins-Smee identified two IBM employees that she
5   thought were pivotal in turning around the IBM
6   account, and the first one I remember her identifying
7   is Mike Morin, and I'm asking you if you would agree
8   with that assessment?
9      A   I would not agree with that assessment as
10  stated.
11     Q   And why not?
12     A   Because at that point in time when Mike was on
13  the account we still had material client satisfaction,
14  service delivery, business management issues on the
15  WellPoint account, so I would not characterize it as
16  he turned around the account.
17     Q   I didn't mean to attribute it all to him.  I
18  was just -- did you believe that Mike Morin performed
19  successfully on the WellPoint account?
20     A   In light of what I just said about the
21  condition of the account, I would not say Mike was
22  successful on the WellPoint account.  Again, pointing
23  to, we had service delivery issues, we had client
24  satisfaction issues, we had financial performance
25  issues during his tenure.
```

Page 1200

```
1      Q   So in your opinion he was not successful on
2   the account.
3          You talked for a moment earlier about the
4   transition management, who was the overall transition
5   manager, and I think there was some e-mails relating
6   to Mr. Jones, Mike Jones?
7      A   Correct.
8          I'm listening, I apologize.  Are you directing
9   me somewhere.
10     Q   Yes.  I'm just asking if you remember
11  testifying about the fact that Mr. Jones had been
12  identified as a possible person to perform the role of
13  a transition manager on the overall -- on the
14  WellPoint account?
15     A   Yes, sir, I recall that.
16     Q   And one of the e-mails that you were just
17  asked about indicated that Mr. Jones ultimately did
18  not accept the position.
19     A   Correct.
20     Q   And Mr. Jones was from outside the delivery
21  organization, if you recall, is that correct?
22     A   To be candid, I don't remember where he was
23  from.  I do remember him being a candidate.
24     Q   Do you remember that Mr. Castelluccio was able
25  to get the approval from Mr. Jones to come in to work
```

Page 1201

1  on WellPoint from the outside organization in which he
2  was involved?
3      A   I do remember that he was a candidate.  I
4  apologize, I don't remember where he was, where his
5  current position was, when you say outside the
6  organization.
7      Q   And do you recall that at some point in time
8  Mr. Jones, Mike Jones, just decided he plain didn't
9  want to be involved in WellPoint and didn't want the
10  job, do you recall that?
11     A   I don't recall that.  I do recall that he was
12  a candidate.  I do recall that there was what was
13  discussed a plan type, which is a form of compensation
14  payment structure that he had indicated he wanted.  I
15  don't recall what was the reason that Mike Jones
16  ultimately wasn't selected or didn't become the
17  transition manager.
18     Q   You would agree with me that if an employee
19  just decided unilaterally that he did not want to
20  become involved in WellPoint, that Mr. Castelluccio
21  had no way to force him to become involved in
22  WellPoint, isn't that correct?
23     A   Yeah, I agree, he does not have the ability to
24  force an employee into a job.
25     Q   And let's stay on the transition manager

Page 1202

1  position.  That position was ultimately filled by Mark
2  Franzese, isn't that correct?
3      A   Correct.
4      Q   And I hope I'm pronouncing it correct.  Is
5  that correct?
6      A   Mark Franzese.
7      Q   Franzese, thank you.
8          And Mr. Franzese was the second person that --
9  my recollection is that he was the second person Ms.
10  Collins-Smee identified as being pivotal in turning
11  around WellPoint.  Would you agree with that
12  assessment?
13     A   I do agree that Mark was pivotal in turning
14  around the contract.
15     Q   And you know, don't you, that both Mark
16  Franzese and Mike Morin were brought into the
17  WellPoint account by Mr. Castelluccio when he was VP
18  of public sector, isn't that right?
19     A   Yes.
20     Q   And do you recall a Julie Taylor?
21     A   The name -- I recall the name.  I can't speak
22  to her specific responsibility.
23     Q   Would it refresh your recollection if I
24  indicated that she worked with Mark Franzese on the
25  transition on the WellPoint account?

Page 1203

1      A   Again, there was a lot of people on the
2  account, so I -- I know Julie's name.  I don't know
3  her specific role.
4      Q   And do you recall that Julie's performance on
5  the WellPoint account was -- she made an important
6  contribution?
7      A   Again, to be straight with you, I don't recall
8  her specific role, so I can't testify to the fact that
9  she was a contributor.
10     Q   And how about John Halloran, do you recall
11  that John Halloran ran the day-to-day management on
12  the WellPoint account?
13     A   Again, I know the name.  As I think you're
14  aware, I had responsibility for 50 clients and a whole
15  bunch of sales pursuits.  This is one contract among
16  the broader responsibility, so I am not familiar with
17  every employee in the contract itself.
18     Q   I completely understand.
19         Do you happen to remember John Halloran as the
20  person who was running the day-to-day management on
21  the WellPoint account?
22     A   So I remember the name, I know he worked on
23  the account.  I'm not familiar with his specific role
24  or performance.
25     Q   Do you have a recollection of whether Mr.

Page 1204

1  Castelluccio brought in both Mr. Halloran as well as
2  Julie Taylor, do you have a recollection of that?
3      A   I did not.
4      Q   And how about Regina Urkuart, U-R-K-U-A-R-T, I
5  think is how you pronounce her name.  Didn't she run
6  the mainframe towers on the WellPoint account?
7      A   I do remember Regina.  I do remember her role
8  on the mainframe tower.
9      Q   And you remember she performed quite
10  admirably, don't you?
11     A   I agree she was a strong contributor.
12     Q   And she was also brought on the WellPoint
13  account by Mr. Castelluccio, isn't that correct?
14     A   It was under his responsibility, so I will
15  agree that he would have brought her in.
16     Q   And he did that in his capacity as vice
17  president of public sector?
18     A   I don't know the timing of whether it was vice
19  president of public sector or it's when he was the
20  vice president on WellPoint.
21     Q   Okay.  But there's no question that he brought
22  her in?
23     A   I'm not the right person to answer that
24  question, sir.  Because his -- I don't have visibility
25  on all of Jim's personnel selections.

21 (Pages 1201 to 1204)

Page 1205

```
 1      Q   But earlier you were raising an issue about
 2  the failure to fill the role with Mike Jones, weren't
 3  you?
 4      A   Correct.
 5      Q   As part of your direct examination?
 6      A   Correct.
 7      Q   But you don't really know what was going on at
 8  that level across the board, do you?
 9      A   I'm familiar with the situation with Mike
10  Jones.
11      Q   That one situation you're familiar with?
12      A   Correct.
13      Q   And in that one situation Mike Jones
14  ultimately said he didn't want the job and he was --
15  and Mr. Castelluccio brought in Mark Franzese who you
16  admitted did an admirable job?
17      A   I agree, Mark did an admirable job.
18      Q   And that's one of the major responsibilities
19  of a vice president, isn't it, to seek out the most
20  skilled talent within IBM and to bring them on to a
21  job like WellPoint where there are real problems?
22      A   Correct, resource management is a critical
23  role.
24      Q   There is a series of e-mails that you went
25  through with counsel concerning lack of
```

Page 1206

```
 1  responsiveness.  Let's start with Exhibit 210.
 2      A   I apologize, my document only goes up to 113.
 3          Yes, sir.
 4      Q   In this e-mail you identify -- can you
 5  identify this as an e-mail that you sent to Kelton
 6  Jones on April 30th, 2006?
 7      A   Yes, it is.
 8      Q   And in your e-mail you indicate to Mr. Jones
 9  that you've attached another e-mail from Chris
10  Nicoletti.  You were just talking about earlier part
11  of this document from Chris Nicoletti, right?
12      A   Correct.
13      Q   And you used Mr. Nicoletti's complaint to you
14  as an example of Mr. Castelluccio's responsiveness,
15  isn't that correct?
16      A   Correct.
17      Q   And that was the point of this e-mail to
18  Kelton Jones, to point out to him that as an example
19  of where Mr. Castelluccio had not been responsible.
20  Do you think that's the point of the this e-mail?
21      A   It was an example, yes.
22      Q   And it was the example that you chose as your
23  first example when you were presenting direct evidence
24  to the jury, isn't that right, a complaint from Mr.
25  Nicoletti?
```

Page 1207

```
 1      A   Yes, it was one that was initially raised.
 2      Q   And the beginning of this e-mail, as you noted
 3  earlier, says, "Please do not forward."
 4          Am I right that your concern was that Mr.
 5  Jones was going to forward this to Mr. Castelluccio so
 6  that Mr. Castelluccio would then have an opportunity
 7  to explain what had happened, is that why you said
 8  "Please do not forward"?
 9      A   The reason why I said "do not forward" was
10  because I wanted to have the conversation directly
11  with Kelton to understand his point of view on Jim's
12  performance and whether there were situations as
13  referenced in the e-mail that might be outside of the
14  scope of work that were impacting performance.  So it
15  was out of respect for Jim that Kelton and I had a
16  chance to speak.  I didn't -- you asked the question,
17  was I concerned he would forward it to Jim.  The
18  answer is no, I didn't have a concern of it being
19  forwarded to Jim.  Ultimately Jim and I discussed the
20  situation.
21      Q   When you say "Please do not forward," you're
22  asking Mr. Jones not to forward it to Mr.
23  Castelluccio, isn't that correct?
24      A   That's not correct.
25      Q   Who?
```

Page 1208

```
 1      A   It was a general statement, don't forward the
 2  e-mail until I have a chance to talk to Kelton Jones
 3  so I had complete context for the situation.
 4      Q   Oh, I'm sorry, I'm perplexed.  Please do not
 5  forward to whom?  What was your request?  Are you
 6  saying -- what was your request, please do not forward
 7  to whom?
 8      A   Please do not forward.
 9      Q   To whom?
10      A   Anyone.
11      Q   To anyone.
12      A   Correct.
13      Q   Anyone certainly including Mr. Castelluccio?
14      A   Anyone.
15      Q   And it's your testimony that you asked him not
16  to forward it to Mr. Castelluccio out of respect for
17  Mr. Castelluccio, is that what you just said?
18      A   The reason why I asked for the e-mail not to
19  be forwarded was to give me the opportunity to talk to
20  Kelton Jones to understand the full context of the
21  situation with Jim.
22      Q   And you believe that Mr. Jones and you would
23  not have been able to have an opportunity to have a
24  candid and frank discussion if he had had a chance to
25  talk to Mr. Castelluccio first, is that your position?
```

Page 1209

1    A   No, it's not my position.
2    Q   Well, how does not forwarding this to Mr.
3  Castelluccio help you have a candid and frank
4  discussion with Mr. Jones?
5    A   I apologize.  My statement was I had requested
6  the e-mail not be forwarded to anybody until he and I
7  had a chance to speak.  My intention on that was to
8  ensure I had full context from his manager of what was
9  the current professional situation with Jim and if
10  there were extenuating circumstances outside of work
11  that I wasn't aware of.
12    Q   Help me understand that if Mr. Jones had
13  forwarded this to Mr. Castelluccio, how that would
14  have prevented you from having a candid discussion
15  with Mr. Jones?  I'm just not following that.
16    A   I apologize, I'm not following the question.
17  I just asked that it not be forwarded.  It's not more
18  simple or complicated than that.  I asked that it not
19  be forwarded.
20    Q   And I think the reason you said that you asked
21  it not be forwarded is so that you could have a candid
22  conversation, my word, candid conversation with Mr.
23  Jones, is that right?
24    A   I asked that the e-mail not be forwarded so
25  that he and I could speak.  And I apologize if I'm not

Page 1210

1  giving you your answer, but it's...
2    Q   And this e-mail, again, is April 30, 2006?
3    A   Correct.
4    Q   Exhibit 127, please.  Exhibit 127, can you
5  identify this as an e-mail you received from Mr.
6  Nicoletti later on the same day, April 30, 2006.
7       Have you had a chance to look at it?
8    A   Yes.
9    Q   And this is an e-mail that Mr. Nicoletti sent
10  to you the same day, April 30, 2006, isn't that right?
11    A   That's correct.
12    Q   And in his e-mail Mr. Nicoletti updates you on
13  the fact that he, in fact, did receive a response from
14  Mr. Castelluccio.  Do you see that?
15    A   Yes.
16    Q   And am I correct that Mr. Nicoletti's e-mail,
17  Mr. Nicoletti e-mailed Mr. Castelluccio on April 28th,
18  2006, at 9:00 p.m.?  I think if you look down at the
19  bottom of that page you'll see that.
20    A   Correct.
21    Q   And Mr. Castelluccio's response is the next
22  day, April 29th, before noon, is that correct?
23    A   Correct.
24    Q   So you said earlier that you think it's
25  appropriate to respond to an e-mail within 24 hours.

Page 1211

1    In fact Mr. Nicoletti e-mailed Mr. Castelluccio at
2  9:00 p.m. in the evening, and before noon the next day
3  Mr. Castelluccio sent this response, isn't that
4  correct?
5    A   The escalation from Chris to Jim was on April
6  25th at 6:53 p.m.
7    Q   That was the first e-mail, but this was the
8  one that you cited when you talked to Mr. Jones about
9  how Mr. Castelluccio was not responsive, isn't that
10  correct?
11    A   No, it's not correct.  It is the collection of
12  the e-mail.  It's the escalation starting on April
13  25th and the response coming the 30th.
14    Q   And this was one of those, right?
15    A   I'm sorry?
16    Q   Mr. Nicoletti's e-mail of April 28th was one
17  of those e-mails?
18    A   Yes, but it is referring to the initial
19  escalation that is on the page behind what you are
20  asking me to look at.  If you want to scroll down, you
21  scroll down what's on the screen, you'll see the
22  initial escalation is April 25th at 6:53 p.m.
23    Q   I'd like to focus on Mr. Castelluccio's
24  response before noon on the next day.  Mr.
25  Castelluccio says, "Chris, responding to Mr.

Page 1212

1  Nicoletti.  I apologize for not responding as
2  promised.  It was shortly after my discussion with
3  Dave T that we experienced a major outage at WellPoint
4  California site."  Is that right, the WellPoint CA
5  site is California site?
6    A   Right.
7    Q   "That tied me up for the next few days.  In
8  fact we are on weekend status calls with the client as
9  we implement our recovery plan.  I did ask for an
10  update from my team on the RA and will review it this
11  weekend and respond."
12       Do you see that was Mr. Castelluccio's
13  explanation of where he was?
14    A   Yes.
15    Q   He was tied up in a major outage with respect
16  to the California location from WellPoint, isn't that
17  right?
18    A   Correct.
19    Q   And this response that you get -- and I think
20  to be fair, I think that came in later on the same day
21  as you e-mailed Mr. Jones, but did you correct your
22  impression that you left with Mr. Jones that, in fact,
23  Mr. Castelluccio did respond and that he responded
24  explaining what he was doing and where he was?
25    A   The conversation was -- with Kelton was on a

23 (Pages 1209 to 1212)

Page 1213

1   broader set of circumstances in terms of
2   responsiveness with the escalation of Chris being one
3   of those. The escalation started as documented in the
4   e-mail that you've asked me to look at on the 25th of
5   April.
6       Q   So let me try my question again. Did you
7   clarify for Mr. Jones that hours after you'd sent him
8   this as an example of Mr. Castelluccio's not
9   responsiveness, Mr. Nicoletti actually told you that,
10  in fact, Jim had responded and gave an explanation of
11  what he was doing? Yes or no, did you give Mr. Jones
12  that additional information?
13      A   I don't recall whether I would have or not.
14      Q   Is there any e-mail that indicated that you
15  did, that you're aware of?
16      A   Not to my knowledge.
17      Q   Exhibit 133, please.
18          And I think you've also cited this on your
19  direct examination. Is this an e-mail that you sent
20  to Joanne Collins-Smee in February of 2007?
21      A   Yes, it is.
22      Q   And am I correct that in your e-mail to Ms.
23  Collins-Smee, again you use as an example, quote,
24  where Jim does not respond or lead, the original
25  e-mail from Mr. Nicoletti.

Page 1214

1       A   Correct.
2       Q   And did you disclose to Ms. Collins-Smee
3   months later when you knew what had happened, did you
4   disclose to her that Mr. Castelluccio had, in fact,
5   responded almost immediately to Mr. Nicoletti's April
6   28th e-mail?
7       A   I doubt I would have with the reason being the
8   escalation was on April 25th. To get a response on
9   the 30th, even if it was associated with the second
10  escalation, would not have changed my opinion in terms
11  of responsiveness.
12      Q   So it's your opinion that even his response on
13  the 28th in your judgment was inadequate?
14      A   Correct.
15      Q   And it was so inadequate that you didn't feel
16  the correct thing to do was to point -- to tell the
17  whole story to Ms. Collins-Smee, isn't that correct?
18      A   I'm sorry, your question is?
19      Q   Sure. You did not trouble yourself to point
20  out to Ms. Collins-Smee that, in fact, Mr.
21  Castelluccio had responded on the 29th to the last
22  e-mail in the chain from Mr. Nicoletti, isn't that
23  correct?
24      A   Correct, I did not.
25      Q   Let's go back to Exhibit 210. I think that

Page 1215

1   was where we started a moment ago. And if you look at
2   the e-mail on page 2 from Mr. Nicoletti -- again, Mr.
3   Nicoletti was working for you, he's one of your
4   executives?
5       A   That's correct.
6       Q   And Mr. Nicoletti is asking Jim, quote, I want
7   to confirm that we are still on track to reduce the
8   resources on WellPoint in the June resource action in
9   line with what we agreed to in the Palisades meeting.
10  Do you see that?
11      A   I do.
12      Q   And this is the resource action that was going
13  on in the April through June time frame, isn't that
14  correct?
15      A   That's correct.
16      Q   And your executive is asking Jim specifically,
17  if you go down to the next paragraph, about six,
18  quote, resources that are supposed to be taken out by
19  June, is that right?
20      A   I apologize, which paragraph?
21      Q   I'm sorry, the highlighted sentence in the
22  second paragraph, sir.
23      A   Correct.
24      Q   And what is this resources? We're talking
25  about people, right?

Page 1216

1       A   Correct.
2       Q   So at this point in time the resource action
3   was still ongoing and Mr. Castelluccio is being asked
4   to reduce the number of people on the WellPoint
5   account by 60, am I reading this correctly?
6       A   Yes, you are.
7       Q   And this was sent to Mr. Castelluccio in his
8   capacity as vice president of public sector, wasn't
9   he?
10      A   That's correct.
11      Q   I'm not good at dates, but what's the date of
12  this? This is April 25th, is that right, April 25th,
13  2006?
14      A   Yes, that's the date on it.
15      Q   And what was the date that Ms. Collins-Smee
16  and you testified that Mr. Castelluccio was supposed
17  to be a hundred percent on WellPoint, April 1st?
18      A   I believe this is 2006. I believe what you're
19  referring to is 2007, a year later.
20      Q   Okay, you could be right.
21          Okay, let's look at Exhibit 53. I think it's
22  in the other book. Take a second. Take your time.
23          Can you confirm this is an exchange of e-mails
24  between you and Ms. Collins-Smee?
25      A   Correct.

24 (Pages 1213 to 1216)

Page 1217

1    Q   You sent this e-mail?
2    A   Yes, sir.
3    Q   And one of the things you ask Ms. Collins-Smee
4  is when Mr. Echavarria can start as VP of public
5  sector.
6    A   Correct.
7    Q   And your e-mail is dated May 27th, 2007?
8    A   I believe it's April 27th, 2007.
9    Q   I'm sorry, did I misspeak?  I meant to say
10  April.
11       And she respond that he will not be available
12  for approximately another month, not until the end of
13  May, is that right?
14   A   Correct.
15   Q   And if you recall, Mr. Echavarria did not
16  start full-time as vice president of public sector
17  until June, is that right?
18   A   I don't recall the specific date.
19   Q   And here she indicates that Miguel will not be
20  able -- or will be yours by the end of May.  Was that
21  approximately what happened, as best you can recall?
22   A   I know that was her commitment, and I know
23  Miguel took over the position shortly thereafter.  I
24  don't recall the exact date.
25   Q   I'd like to go back to Exhibit 133 for a

Page 1218

1  moment.  Again, Exhibit 133, and when you find it, I'd
2  like to direct your attention to the fourth page.
3    A   Yes, sir.
4    Q   Who is Mr. Fernandez?
5    A   Luis Fernandez was the project executive on
6  the account.  He had responsibility dedicated to
7  WellPoint for the service performance and client
8  satisfaction on the contract.
9    Q   And again, he reported directly to you?
10   A   Correct.
11   Q   And in this e-mail to you he indicates that no
12  action has been taken with respect to having a plan in
13  place to address various points he discusses, is that
14  correct?
15   A   Yes.
16   Q   Exhibit 19, please.
17   A   19?
18   Q   This e-mail is dated September 20th, is that
19  right, the e-mail of Exhibit 133?
20   A   I'm sorry, it's off the screen.
21   Q   I'm sorry, it's February 13th, 2007, the
22  e-mail from Mr. Fernandez to you, which is in the
23  fourth page of Exhibit 133.
24   A   Yes, sir.
25   Q   Okay.  So Exhibit 19, do you recognize this

Page 1219

1  document?
2    A   One second, I got to go back to that.
3    Q   Sure.
4    A   Yes, sir.
5    Q   My question is, are you familiar with this
6  document generally?
7    A   No, I'm not familiar with this document
8  generally.
9    Q   Have you seen it before?
10   A   Not to my recollection.
11   Q   Mr. Castelluccio testified that this was, in
12  fact, the plan that he and a team put together for
13  addressing the problems identified in the Red Team
14  Review.  Does that refresh your recollection at all as
15  to -- with respect to this document?
16   A   Not necessarily.  It's the level of detail
17  that I don't recall being engaged in directly, that
18  being the review and discussion of this document.
19   Q   So that level of detail was -- you were above
20  that level of detail?
21   A   It's not the type of document or meeting that
22  I would be in.
23   Q   That you would be what, I'm sorry?
24   A   That I would participate in.
25   Q   Let's look at page 4 of that document, please.

Page 1220

1       You may or may not know this.  Do you have any
2  recollection of whether the focus team that was put
3  together to address the specific problems of
4  WellPoint, whether that was headed by Mr.
5  Castelluccio?
6    A   I would expect that Jim was involved in it.
7    Q   And in fact you would expect that he would
8  have head it, wouldn't you have?
9    A   Correct.
10   Q   And do you know that Mr. Fernandez, the one
11  who was complaining that there was no plan in his
12  earlier e-mail, that, in fact, he was directly
13  involved in putting together that plan as well, right?
14   A   Luis would have been involved in the plan as
15  well, yes.
16   Q   And any plan like this that was put together
17  where he was part of the focus group, he would have
18  participated in helping come up with the solutions to
19  the problems that WellPoint was facing, isn't that
20  fair?
21   A   I would expect that, yes.
22   Q   My understanding is that there are specific
23  procedures at WellPoint -- I'm sorry -- at IBM for
24  having additional resources approved on an account.
25  Can you go through the procedures that were in place

Page 1221

1  for having additional resources approved on the
2  WellPoint account?
3      A   With any contract there would be a financial
4  budget for the cost on that contract, an amount of
5  resource or people that were associated with the
6  contract, and there are varying levels of approval on
7  managing and changing those numbers.
8      Q   And is it fair to say that anything that --
9  any additional expenditures that were not already
10  approved in the budget on WellPoint had to be approved
11  by you?
12     A   Not necessarily, but I would have visibility
13  to significant changes.
14     Q   I don't know what that means, visibility.
15  That means you saw it?  I don't understand.
16     A   That I would in a financial review, business
17  review of the contract, I would be made aware of
18  significant changes.
19     Q   You'd be made aware of it.  Is it your
20  testimony that you were not the person who needed to
21  approve, let's say, additional personnel being
22  assigned to WellPoint to solve the problems there?
23     A   It's a level -- if it was a lower cost or
24  smaller number of people, I might not be needed to
25  approve it.  You would have that authority delegated

Page 1222

1  to the project executive.  If it was a material
2  change, then I would be brought into the discussion.
3  In either scenario I'm accountable.
4      Q   In either scenario you're ultimately
5  responsible for the additional resources that are
6  assigned to WellPoint, is that correct?
7      A   Correct.
8      Q   And if a request for additional resources,
9  people, was more than -- how many would you be the one
10  who would need to ultimately approve it?
11     A   It was not necessarily a specific standard.
12  It would be situationally dependent both on the
13  contract, and at different points in the year there's
14  different levels.
15     Q   And in the WellPoint contract specifically,
16  and let's say specifically 2006, isn't it fair to say
17  that if someone wanted as many as three or four or
18  five additional employees, that you would be
19  responsible for whether or not that approval was
20  granted?
21     A   For something of that small size, I doubt that
22  approval would come to me.
23     Q   And who, in your testimony, who had authority
24  to approve that kind of additional resources?
25     A   Somewhere between the project executive and

Page 1223

1  the delivery project executive.
2      Q   So that was a decision that could be made by
3  the DPE and the PE independently, that's your
4  testimony?
5      A   Correct.
6      Q   In 2006 the accounts for which Mr.
7  Castelluccio was responsible were accounts of which
8  you also had responsibilities, is that right?
9      A   Correct.
10     Q   You had the client relationship, and he had
11  the delivery responsibility?
12     A   Correct.
13     Q   And do you recall that in 2006 -- well,
14  question withdrawn.
15         Isn't it true that IBM has assessments
16  performed of client satisfaction for their contracts
17  on an annual basis?
18     A   That is correct.
19     Q   And that was true in 2006, isn't that correct?
20     A   Correct.
21     Q   And they're called CERS, C-E-R-S, is that
22  right?
23     A   Correct.
24     Q   And what does that stand for?
25     A   I apologize, I believe -- I know it is client

Page 1224

1  relationship surveillance.  I don't know what the E
2  stands for.
3      Q   And these are surveys that are conducted by
4  the clients themselves, right?
5      A   No.
6      Q   These are independent -- explain how the
7  surveys are conducted, please.
8      A   There's a third-party that will interview the
9  client, and collect the information, and then it is
10  provided to the IBM team.
11     Q   And as I understand it, there are two
12  important parts of the CERS surveys, one of which is
13  client satisfaction score, which is 1 to 10, is that
14  right?
15     A   Correct.
16     Q   And 10 is a perfect score?
17     A   That's correct.
18     Q   And the other is whether or not the client is
19  willing to agree to be a reference, is that right?
20     A   Correct.
21     Q   And those are the two high profile most
22  important parts of this service, isn't that right?
23     A   Those are certainly two very important
24  elements of the survey.
25     Q   And in 2006 on the contracts that Mr.

Page 1225

1    Castelluccio worked on, do you remember how many 10
2    scores were received from contracts on which he and
3    you both were working?
4       A  I do not recall.
5       Q  Do you remember if he had a perfect 10 score
6    from BMS?  That was one of the contracts, right?
7       A  Bristol Myers Squibb was a contract, yes.
8       Q  And do you recall whether in 2006 Bristol
9    Myers Squibb gave --
10      A  I do not recall the specific numbers by
11   client.
12      Q  And how about Horizon, was that one of the
13   contracts at the time?
14      A  Yes, it was.
15      Q  And do you recall whether they also gave a 10
16   perfect score?
17      A  Again, I don't have the specific numbers for
18   each client.
19      Q  And do you recall about Pacific Care, was that
20   one of the contracts at the same time?
21      A  Yes, it was.
22      Q  And do you recall what score they gave?
23      A  I do not.
24      Q  And how about Sanofi Novartis AV?
25      A  Sanofi Novartis.

Page 1226

1       Q  That was one of the contracts as well, wasn't
2    it?
3       A  Correct.
4       Q  And do you recall whether they gave a 10, a
5    perfect 10 score?
6       A  I, again, from 2006 I do not have each score
7    for each client.
8       Q  And how about the Commonwealth of
9    Pennsylvania, was that one of the contracts?
10      A  Yes, it was.
11      Q  State of Arizona, was that one of the
12   contracts, Department of Transportation, State of
13   Arizona?
14      A  Yes.
15      Q  And also the State of California, that was one
16   of the contracts?
17      A  Correct.
18      Q  And also -- there was actually several
19   contracts in the State of California at that time,
20   weren't there, 2006?
21      A  Yes.  There was two.
22      Q  And there was one contract for the State of
23   Maryland?
24      A  Correct.
25      Q  And there was a contract with State of

Page 1227

1    Michigan Unemployment Offices.  Do you remember that?
2       A  Yes.
3       Q  And was there a contract with the State of New
4    York?
5       A  Yes.
6       Q  And there was a contract with the State of
7    Washington?
8       A  Yes.
9       Q  And you don't recall that all of those
10   contracts gave a perfect score of 10 in terms of
11   client satisfaction?
12      A  Again, I don't remember the scores for each
13   client in 2006.
14      Q  Do you remember that there were an additional
15   three contracts that gave a score of 9 out of 10 in
16   terms of client satisfaction, Nasco, Novartis and the
17   State of Michigan, do you remember that?
18      A  Same response.
19      Q  Again, that's just a level of detail that you
20   weren't focused on?
21      A  No, that's not what I said at all.  Client
22   satisfaction is very important.
23      Q  In fact, it's critical, that's the acid test
24   of how the client feels, isn't that correct?
25      A  It is a very important element.

Page 1228

1       Q  And do you have any recollection of the number
2    of the 30 contracts that Mr. Castelluccio and you
3    worked on, a number of those clients who said yes, we
4    would be pleased to give IBM a reference?
5       A  I don't have a specific number on reference
6    ability.
7       Q  And WellPoint was one of the 30 contracts on
8    which Mr. Castelluccio worked, isn't that correct?
9       A  That's correct.
10      Q  We've seen a number of documents that indicate
11   that IBM considered at least four other DPE candidates
12   for the WellPoint contract before Mr. Boxer finally
13   accepted Gordon Echavarria.  Do you recall that?
14      A  Yes, I do.
15      Q  Do you recall that -- and this process began
16   after Mike Morin resigned and around very late March,
17   early April, 2007, is that right?
18      A  Correct.
19      Q  And so starting at that point, first Ken Weiss
20   was presented and rejected, is that right?
21      A  Yes, that's correct.
22      Q  And then Robert Jones was also identified as a
23   possible candidate, interviewed by WellPoint, and also
24   rejected.
25      A  I believe that's correct.

| Page 1229 | Page 1231 |
|---|---|

**Page 1229**

1    Q    And then a Richard DeLeo was identified as a
2    potential DPE candidate on WellPoint, and ultimately
3    he also did not serve in that role, isn't that right?
4    A    I know he didn't serve in the role. I don't
5    know the reason.
6    Q    And Ray Johnson was the fourth person -- I'm
7    sorry -- yes, the fourth person who was also
8    identified as a possible candidate, interviewed with
9    WellPoint, and was rejected by Mr. Boxer and Mr.
10   McDonald, is that right?
11   A    I believe so, yes.
12   Q    And then the last candidate in that time frame
13   was Scott Anderson, and he also was identified as a
14   potential candidate, introduced to Mr. Boxer, and Mr.
15   McDonald, and rejected again, isn't that correct?
16   A    I don't remember Scott Anderson.
17   Q    And this process, again, started sometime in
18   late May, early April, and ran through until Gordon
19   Crawford accepted the position, isn't that right?
20   A    Correct.
21   Q    And Mr. Crawford accepted the position when?
22   Do you recall?
23   A    I believe the beginning of 2008.
24   Q    That's when he actually started. When did he
25   accept the position?

**Page 1230**

1    A    It would have been in the fourth quarter of
2    2007.
3    Q    So in the fourth quarter. So you're basically
4    talking these parade of candidates went through
5    starting in April through sometime in the fourth
6    quarter, is that right?
7    A    Correct.
8    Q    Can you identify a specific month in this time
9    period from April to November in which IBM ceased
10   looking for a replacement for Mike Morin?
11   A    I don't recall that period that they ceased
12   looking for a replacement.
13   Q    Throughout that period they continued to try
14   to find a replacement for Mike Morin, isn't that
15   correct?
16   A    That would be correct.
17        MR. CARTA: May I have just a moment?
18   I have no further questions, Your Honor.
19        THE COURT: Okay.
20        MR. DUFFIELD: If I could have one minute
21   to review my notes.
22        Thank you, Your Honor.
23
24
25

**Page 1231**

1        REDIRECT EXAMINATION BY MR. DUFFIELD:
2
3    Q    If you'll turn to Defendant's Exhibit 12.
4    This is the e-mail now we've seen a couple of times
5    that you sent to Mr. Jones forwarding Chris
6    Nicoletti's e-mail to you. You referred a couple
7    times to these e-mails from your direct reports as
8    escalations. Can you explain what an escalation is?
9    What you mean by that?
10   A    So an escalation would mean that a
11   responsibility or task that was not being completed by
12   that level of either professional or management, the
13   next layer of management looks at the situation and
14   determines they need to raise it to their management
15   or boss because it's causing a performance issue or
16   concern.
17   Q    Thank you. So on this e-mail you sent to Mr.
18   Jones, after you ask him not to forward it, you then
19   say, "The attached is one of a stream of notes that I
20   get from my executives --" plural "-- with
21   concerns --" plural "-- on responsiveness or follow-up
22   from Jim."
23        So is this the only time anyone had ever
24   raised an issue with you about his responsiveness?
25   A    No, it's not.

**Page 1232**

1    Q    And this was just an example to Mr. Jones?
2    A    That is correct.
3    Q    And you spoke to Mr. Jones about this and
4    other issues, correct?
5    A    That is correct.
6    Q    And you had spoken to Mr. Castelluccio about
7    this and other issues?
8    A    Correct.
9    Q    If you'd turn to Defendant's Exhibit 29. This
10   is the e-mail that you sent to Ms. Collins-Smee in the
11   middle of February of 2007, and you've attached a
12   number of e-mails, and Mr. Carta walked you through a
13   couple of them from Mr. Nicoletti, Mr. Fernandez.
14   Now, are you saying, or were you saying at the time
15   that all of these underlying e-mails were still
16   outstanding issues that hadn't been resolved yet?
17   A    No, I was not. I was providing context and
18   the specific situations that had occurred over the
19   past year.
20   Q    And again, you had a discussion with Ms.
21   Collins-Smee about these issues and the other issues
22   you had observed with Mr. Castelluccio, correct?
23   A    That's correct.
24   Q    When Mr. Nicoletti or Mr. Fernandez raised
25   these issues with you, did they ever mention Mr.

Page 1233

1  Castelluccio's age?
2      A   No, they did not.
3      Q   Do you believe that they were raising these
4  issues because they had some bias against him because
5  of his age?
6      A   No, I did not.
7      Q   When you raised those issues with Mr. Jones,
8  did you do so because of Mr. Castelluccio's age?
9      A   No, I did not.
10     Q   When you raised it with Ms. Collins-Smee, was
11 that because of Mr. Castelluccio's age?
12     A   No, it was not.
13     Q   Were you aware of Mr. Castelluccio's age?
14     A   No, I was not.
15     Q   Would it have mattered?
16     A   No, it would not have.
17         MR. DUFFIELD:  No further questions, Your
18 Honor.
19         THE COURT:  Thank you.  Nothing further
20 with this witness?
21         MR. CARTA:  I have nothing else, Your
22 Honor.  Thank you.
23         THE COURT:  You may step down.  Thanks
24 very much.
25         Well, about one minute to 1, maybe we

Page 1234

1  should take our lunch break now.  Be back at 2.
2          MR. DUFFIELD:  Very good.
3          MR. FASMAN:  Thank you, Your Honor.
4          (Jurors excused)
5          (Recess taken from 12:50 p.m. to 2:11 p.m.)
6          THE COURT:  It's terrible out there.  I
7  understand one of the jurors expressed concern to the
8  clerk about what time, if any, we're going to be
9  wrapping things up for today.  I've been told that
10 Judge Chatigny had a trial going on today but at
11 noontime he let the jury go, and I can't think of a
12 better Judge to follow than Judge Chatigny.  But I
13 don't want to seriously eat into your plans or your
14 timetable.  Anybody want to share any thoughts on this
15 regard with me?
16         MR. FASMAN:  Your Honor, we have two
17 witnesses here this afternoon.  One of them is Ms.
18 McDonald, and we would very much like to get her on
19 and off the stand.  I believe her testimony will be
20 relatively brief, and we can conclude.  I don't
21 think -- Mr. Duffield's going to inquire.  I can't
22 believe that her direct is going to go more than 35 or
23 40 minutes, and I don't think there could be extensive
24 cross.  Mr. Holmes is here as well.  He might be a
25 little longer.  But we really do want to get Ms.

Page 1235

1  McDonald on and off the stand.  She has a bunch of
2  meetings this week.  I'm not quite sure how you're
3  going to get out of here, but she does have to testify
4  this afternoon, if that's okay with Your Honor.
5          THE COURT:  That's Keenie?
6          MR. DUFFIELD:  Yes.
7          THE COURT:  I feel like I'm a family
8  here.
9          MR. FASMAN:  We've been here for a long
10 time, Your Honor.
11         THE COURT:  I know.  Okay, well, let's
12 call Ms. McDonald.
13         MR. FASMAN:  Okay.
14         THE COURT:  Any objection?
15         MR. CARTA:  No, Your Honor.  I think that
16 makes sense, and I would defer to counsel.  I
17 understand what a challenge it can be to schedule
18 witnesses, so by all means.
19         THE COURT:  But at one point we got to
20 realize that we got to let the jury go early, because
21 it's going to start building up, they've got to clean
22 their cars, and we don't want any juror getting into
23 an accident.
24         MR. FASMAN:  I agree with that.
25         THE COURT:  And tomorrow -- it's supposed

Page 1236

1  to be between five and nine inches of snow.  If that's
2  true, then we'll be coming in later tomorrow, and
3  probably later like 11:30 or so, because that will
4  mean that I won't actually have to get up, and I will
5  actually have to do the snowblowing.
6          MR. FASMAN:  Don't you have clerks?  They
7  don't have to blow up the snow, but they could pick
8  you up, right?
9          THE COURT:  Probably could, but I don't
10 think I would go that far.
11         MR. FASMAN:  I had a good relationship
12 with them up until now.
13         THE COURT:  They already mow my lawn.
14         No, I mean for people who deal with
15 abstractions all the time, it's really gratifying to
16 lift up the garage door and have them lift it up and
17 see this lawn of snow.  I have this really big
18 snowblower, and I look at my wife and I say, I really
19 am a man, I'm not a wimp, don't push the electric
20 starter on that snowblower, I go in and throw this
21 thing of snow like 60 feet.  About an hour later I
22 have moved 72 tons of snow, and I walk in my wife
23 looks at me, my hero, I can now go Macy's where
24 they're having a sale, you know?
25         Okay.  Well, we'll have to talk about

Page 1237

1 that. I'm thinking like if I can just get my car out,
2 and get my wife's car out, that ought to be go enough
3 for 45 minutes, maybe 11 o'clock, something like that.
4        (Jurors present)
5        THE COURT: Welcome back, ladies and
6 gentlemen. Sit down. Let's move on.
7        MR. DUFFIELD: Call Keenie McDonald to
8 the stand, please.
9        THE COURT: Ms. McDonald, would you come
10 forward, please, ma'am.
11        (Keenie McDonald, sworn by the clerk)
12        THE CLERK: Please state your name, spell
13 your last name for the record.
14        THE WITNESS: Keenie McDonald,
15 M-C-D-O-N-A-L-D.
16        THE CLERK: Your business address?
17        THE WITNESS: 7 Georgetown North in
18 Greenwich, Connecticut.
19
20        DIRECT EXAMINATION BY MR. DUFFIELD:
21
22    Q   Good afternoon, Ms. McDonald.
23        When did you first begin working for IBM?
24    A   June 1978.
25    Q   And do you still work there?

Page 1238

1    A   Yes.
2    Q   And what is your current role?
3    A   I'm IBM's managing director responsible for
4 WellPoint.
5    Q   And can you briefly, briefly describe your
6 employment history at IBM.
7    A   I started as a trainee in June of 1978, moved
8 around an awful lot, did a lot of different jobs, and
9 ended up in the northeast in 1998, and did some jobs
10 at corporate headquarters, then I went to Boulder,
11 Colorado for a couple of years, and I came back to
12 live in Connecticut, and in 2006 was responsible for
13 WellPoint.
14    Q   Can you explain to the jury why you moved into
15 that managing director at WellPoint role, or the
16 circumstances?
17    A   IBM and WellPoint had entered into a large
18 outsourcing relationship, and it was having a lot of
19 challenges, and they wanted to have a senior level IBM
20 executive assigned to the account to help work through
21 the relationship issues and other challenges that we
22 were having, and I wanted to get back to the
23 northeast, because although Boulder is a great place
24 to live, I actually like it better up here.
25    Q   What were your responsibilities as the

Page 1239

1 managing director on the WellPoint account?
2    A   As managing director, which I still am today,
3 I have responsibility for all the activities at IBM
4 and WellPoint.
5    Q   Who were your primary contacts at WellPoint
6 that you would have interacted with on a regular
7 basis?
8    A   At the point in time we're talking about it
9 was Mark Boxer and Dave McDonald.
10    Q   And who is Mark Boxer?
11    A   He was the chief operating officer.
12    Q   And Dave McDonald?
13    A   He was the vice president of infrastructure,
14 IT infrastructure.
15    Q   And when you took over as the managing
16 director of WellPoint, was Jim Castelluccio working on
17 that account?
18    A   He was involved with that account. He was
19 the -- responsible for all the public sector accounts
20 for outsourcing, and WellPoint was one of those.
21    Q   And had you worked with Mr. Castelluccio
22 before this time?
23    A   No.
24    Q   Would you describe for the jury what your
25 experience was working with Mr. Castelluccio when he

Page 1240

1 was in that vice president role?
2    A   I don't recall interacting a lot with Jim when
3 he was in that role.
4    Q   Let's turn to a document. We'll try and
5 streamline this a little bit. If you'll turn to
6 Defendant's Exhibit 15 in that binder right in front
7 of you.
8    A   Okay.
9    Q   So the bottom of these two e-mails, we're
10 going to start at the bottom of the first page, is a
11 November -- or September 20th, 2006 e-mail from Luis
12 Fernandez to Mr. Castelluccio. You're copied on it.
13    A   Okay.
14    Q   And the first line, I'll read it for you,
15 says, "We need your personal involvement to address
16 the cost and service delivery issues at WellPoint."
17        Were those issues that fell within Mr.
18 Castelluccio's responsibility as the VP on the
19 account?
20    A   Yes, they did.
21    Q   And going to the top of the e-mail, would you
22 please read your e-mail to Dave Liederbach.
23    A   My e-mail to Dave: "Dave, I'm sending this to
24 you only. I feel like you and I are getting no help
25 from Jim to improve delivery and to take cost out.

Page 1241

```
1    Luis and John do not feel our team gets any help value
2    from Jim and need it."
3         Q    And why did you feel like you were getting no
4    help from Jim to improve delivery?
5         A    Part of Jim's responsibility as the head of
6    public sector outsourcing delivery team would be to
7    provide assistance when the team asks for it.  And
8    John Shimkus and Luis, you can see from this e-mail,
9    were requesting some help from Jim.  I think we had a
10   history with Jim, the team did, of asking for help and
11   getting no response, not getting the help needed and
12   the attention from Jim that they needed, so I sent the
13   note to Dave requesting his involvement and attention.
14        Q    And had you had any discussions with Mr.
15   Liederbach about these issues prior to this e-mail?
16        A    I'm sure I had.
17        Q    And subsequent to the e-mail as well?
18        A    Yes, most definitely.
19        Q    Did you ever have discussions with Mr.
20   Castelluccio about these issues?
21        A    I had discussions with Jim for sure when he
22   became the DPE, acting DPE at WellPoint.  I don't
23   recall specific conversations with Jim when he was in
24   the vice president role.
25        Q    And we'll get to his role as the DPE in just a
```

Page 1242

```
1    second.
2         A    Okay.
3         Q    If you'll turn to the next exhibit in that
4    binder.  It should be Defendant's Exhibit 16.
5         A    Okay.
6         Q    And I'll direct your attention to the middle
7    of the page.  Again, Luis Fernandez e-mailing you on
8    September 27th, 2006.
9         A    Okay.
10        Q    And if you could read the highlighted portion
11   of his e-mail for the jury.
12        A    "My concern with Jim is he is not stepping up
13   to either the financial nor service quality
14   challenges, in my opinion anyway, thanks."
15        Q    And had you had discussions with Mr. Fernandez
16   about Jim not stepping it up to the financial or
17   service call?
18        A    Yes.
19        Q    And what were the nature of those
20   conversations?
21        A    Luis would express on frequent occasions his
22   frustration with going to Jim, asking for help,
23   getting commitments that weren't followed through on
24   or followed up on, no response, just not getting the
25   kind of help and support that the team felt we needed.
```

Page 1243

```
1         Q    And did you agree with his opinion of Mr.
2    Castelluccio's performance?
3         A    Yes.
4         Q    If you'll turn to the next exhibit, which is
5    Defendant's Exhibit 17, this is an e-mail sent the
6    next day.  So the prior e-mail was on September 28th,
7    this is now September 29th, and you send it to Mr.
8    Castelluccio.  Would you please read your e-mail for
9    us.
10        A    "Jim, I know you've talked to Luis and John.
11   We absolutely must get on with moving e-mail to a
12   competency.  I've been with IBM for 28 years and on a
13   customer call today was more embarrassed than I have
14   ever been.  A customer literally said that he has no
15   confidence in what we tell him regarding e-mail
16   because we've missed every commitment we have made.
17   Please get on the actions per your call with John and
18   Luis."
19        Q    Now, is it your -- did you believe that all of
20   these problems with competency in the e-mail with
21   WellPoint were Jim Castelluccio's fault?
22        A    No.
23        Q    This e-mail's only directed to him.  Why are
24   you raising this issue with just him?
25        A    Jim's job as the vice president was
```

Page 1244

```
1    responsible for the delivery for public sector
2    accounts.  Again, WellPoint was part of the public
3    sector accounts.  Jim was -- his job was to help us
4    get these issues resolved and get the delivery
5    assistance and support we needed.
6         Q    And did you feel like you were getting that
7    support from him?
8         A    No, we did not feel we were getting that
9    support.
10        Q    If you'd turn to Defendant's Exhibit 32.
11        A    Okay.
12        Q    The bottom e-mail is from you to Ms.
13   Collins-Smee.  It's dated February 16, 2007.  Subject
14   line is "My barrage of e-mails."  Do you remember
15   sending a lot of e-mails to Ms. Collins-Smee around
16   the February 2007 time frame that she took over as the
17   general manager?
18        A    I sent Joanne a ton of e-mails.
19        Q    Would you please read this e-mail to the jury.
20        A    "Joanne, forgive me for copying you on so many
21   e-mails.  I'm doing it because Jim Castelluccio and
22   our delivery team have a track record of not executing
23   even when they commit to do.  I'm looking forward to
24   not feeling like I have to follow up with them on
25   almost every single detail on not copying you.  Thanks
```

Page 1245

1    again for your help."
2        Q   And again, the issues were not limited to Mr.
3    Castelluccio, they involved the entire WellPoint
4    account and other delivery issues, correct?
5        A   That's correct.
6        Q   But you single out Mr. Castelluccio in your
7    e-mail to Joanne because he was the delivery leader on
8    the account?
9        A   He was -- his job was to help us get our
10   delivery issues resolved and addressed, and we weren't
11   getting satisfaction.  We weren't getting the help
12   that we needed.  Again, he was not the problem, but he
13   was there to provide help and assistance so that we
14   got the problems resolved.  We were not getting the
15   help and assistance we needed.
16       Q   In addition to the barrage of the e-mails that
17   you sent Ms. Collins-Smee, do you remember speaking to
18   her personally about these issues as well?
19       A   I talked to Joanne a number of times.
20       Q   Did you ask her to make a change with the
21   leadership on the WellPoint account?
22       A   Yes.  As time went on, yes.
23       Q   And we've heard testimony that eventually Ms.
24   Collins-Smee did remove him from the vice president
25   position, and that at the end of March Mike Morin

Page 1246

1    resigned as the DPE on the WellPoint account and Mr.
2    Castelluccio was brought in.  Do you remember that
3    happening?
4        A   Yes.
5        Q   And were you involved in that decision to
6    assign Mr. Castelluccio as the DPE at WellPoint?
7        A   Yes.  They had my approval to do so.
8        Q   And what was the rationale with putting him on
9    the account in that role?
10       A   Jim had a lot of experience.  He should have
11   been able to perform that role very effectively.  And
12   the hope was, my hope was, you know, with one account
13   Jim would be able to perform the DPE responsibilities
14   and we'd get WellPoint in good shape.  That was my
15   hope.
16       Q   And did you have any communications with
17   WellPoint about moving Mr. Castelluccio to this role?
18       A   Yes.  I let hem know we'd be doing that.
19   When Mike resigned I let WellPoint know.
20       Q   And what was their response?
21       A   I don't recall their response specifically,
22   but they were fine with it.  I mean they didn't --
23   they were sorry to see Mr. Morin leave, but they had
24   no problem with Jim coming in and giving it his best
25   shot.

Page 1247

1        Q   And how did he perform?
2        A   Very poorly.  I'm sad to say.
3        Q   Why do you say that?
4        A   Why do I say he performed poorly?
5        Q   Yes.  Sorry.
6        A   His pattern of not responding to requests in a
7    timely manner continued.  We would ask Jim for
8    something, you'd have to follow up repeatedly to make
9    sure you got an answer.  We would have a series of
10   issues in the IT environment at WellPoint that we were
11   responsible for, and we had SWAT calls -- they're
12   called SWAT calls -- with the client to resolve the
13   problems, and Jim often times would not show up on the
14   SWAT calls, and we needed him on those calls.  It was
15   very obvious to the client that our delivery leader
16   wasn't on the SWAT call, or wasn't on a lot of SWAT
17   calls.
18       Q   Can you explain to the jury what a SWAT call
19   is?
20       A   A SWAT call is when we're having a problem,
21   the IT environment is down, it's not working properly,
22   we would all get on a big conference call with a
23   number of people to talk.  We're having these issues,
24   let's try to troubleshoot, understand what the issues
25   are, and then fix the issues so we get the client back

Page 1248

1    up and running.
2        Q   And why was it important to have Mr.
3    Castelluccio on those calls?
4        A   Particularly when he was assigned, you know,
5    as the DPE for WellPoint, we needed him on those calls
6    because he was the delivery leader, and his job -- I
7    mean they were certainly used to Mike Morin being on
8    the calls, I was on the calls, a number of WellPoint
9    executive team leaders would also be on the calls, and
10   we needed Jim's leadership on those calls and
11   involvement so the client would know we're all in.
12       Q   Did you ever address these issues with Mr.
13   Castelluccio?
14       A   I had some conversations with Jim, yes.  Yes,
15   he knew.
16       Q   What did you say to him?
17       A   I let him know that the client was concerned
18   that he was not on the SWAT calls and that we needed
19   him on the calls.  I let him know that the client was
20   concerned about the lack of delivery leadership, and
21   that Jim's not visible to the client, and we needed
22   him.
23       Q   And what was Mr. Castelluccio's response to
24   you?
25       A   It's been a long time ago, obviously.  I

Page 1249

1    recall on one occasion when I spoke with Jim about his
2    being on SWAT calls, Jim said he was -- he would try
3    to be on the calls, he was dealing with some resource
4    action, and I thought he would start showing up and
5    being on the calls.
6        Q    Did you see any improvement with him being on
7    more calls after you raised this with him?
8        A    I did not see improvement.  I did not see
9    improvement.
10       Q    If you would turn to Defendant's Exhibit 48.
11       A    Okay.
12       Q    Just take a second and look through this
13   e-mail and I'll ask you a few questions.
14       A    Okay.
15       Q    Okay.  I'll focus on the top e-mail from Mark
16   Boxer to you dated May 7th, 2007.  If you could read
17   the highlighted portions of that e-mail to the jury,
18   please.
19       A    "I'm disappointed that given how many issues
20   we have had no one gave us a heads up on total or
21   areas.  Who would have had responsibility - Jim is
22   invisible from what I can tell."
23       Q    And what are the issues that she's talking
24   about in this e-mail?
25       A    We had some resource actions where we took

Page 1250

1    some people that had been assigned to the account off
2    of the account.
3        Q    And would that have been Mr. Castelluccio's
4    responsibility to communicate that to Mr. Boxer or to
5    WellPoint?
6        A    Jim's responsibility, my responsibility, you
7    know, several of us could have taken the lead to have
8    the conversation with him, but you would expect that
9    the delivery leader is talking to the client about
10   changes in the delivery team, why we're making the
11   changes, and the fact that what's associated with
12   those changes.  So you would expect that Jim -- I
13   would expect that Jim or any delivery leader would
14   have a direct line going with the client about changes
15   in the team.
16       Q    Now, this e-mail is dated May 7, 2007.  We
17   heard testimony from Mr. Castelluccio that during this
18   time he believed that he was still wearing two hats.
19   He was still serving in the VP role as well as
20   managing the WellPoint account.  Did he ever raise
21   that concern with you, that he had too much on his
22   plate and couldn't be on all of these SWAT calls or
23   couldn't maintain communication with the client?
24       A    The only time I can remember -- I remember one
25   conversation with Jim, again, when I talked to him

Page 1251

1    about being on if SWAT calls, and he said he's
2    involved in some resource actions.  I don't recall Jim
3    telling me he had too much to do to be on -- to do his
4    job properly for WellPoint.  I don't recall that.
5        Q    Did he ever ask you for help?
6        A    No.  I would have remembered, because I was
7    looking for help everywhere at this point in time.
8        Q    If you will turn to Defendant's Exhibit 49.
9        A    Okay.
10       Q    So this is an e-mail string under the same
11   time, beginning of May.  I'll direct your attention to
12   the bottom of the page, your e-mail to Ms.
13   Collins-Smee to Mr. Castelluccio, John Shimkus, you
14   copied Luis Fernandez and Dave Liederbach, and the
15   subject line is "Help Needed ASAP."  In the middle of
16   that paragraph there's a dash that says "Jim said."
17   Would you please read that sentence?
18       A    "Jim said he would get the names from delivery
19   of the 16 or so people who are backfilling people that
20   the competencies let go as bottom performers but we
21   all agreed we need to replace them."
22       Q    So what's the issue there?  What are you
23   asking for for Mr. Castelluccio?
24       A    I'm asking for a series of names of people
25   that were going to backfill.

Page 1252

1        Q    And the e-mail right above that one, Ms.
2    Collins-Smee forwards the e-mail to Mr. Castelluccio
3    the same day and says, "Jim, please respond to Keenie
4    and copy me.  Where are we on the items that Keenie
5    indicates you have been addressing?  Thanks."
6            If you now turn the page to Defendant's
7    Exhibit 50.  This e-mail is two days later.  It's a
8    continuation of the string.  You send it to Jim
9    Castelluccio and Ms. Collins-Smee.  And would you
10   please read the first sentence of your e-mail.
11       A    "Jim and Joanne, I have not heard anything
12   from Jim on the names that are backfills.  We have to
13   have this done immediately."
14       Q    So two days later you still hadn't heard from
15   Jim despite you reaching out to him and Ms.
16   Collins-Smee reaching out to him, correct?
17       A    Correct.
18       Q    Was this typical?
19       A    Yes.  There was a lot of follow-up with regard
20   to Jim, unfortunately.
21       Q    If you turn to Defendant's Exhibit 52.
22       A    Okay.
23       Q    Directing your attention to the bottom of that
24   first page, you send an e-mail to Bob Zapfel and Ms.
25   Collins-Smee, and at the last half of your e-mail you

Page 1253

1  say, "We have had some visual delivery issue where
2  Mike Morin would have been front and center. The
3  absence of delivery leadership is very noticeable."
4      What were you referring to there?
5  A  When we had a SWAT call -- again, when Mike
6  Morin was our delivery project executive. Mike would
7  be on the SWAT calls, I would be on the SWAT calls. I
8  mean, I was on SWAT calls, the client was on SWAT
9  calls, and Jim all too often was not on them.
10  Q  And why are you directing your e-mail to Bob
11  Zapfel? What was his role?
12  A  Bob at the time -- I think both Joanne and
13  Dave Liederbach reported in to Bob, so I'm just going
14  up the chain of command because I'm not getting the
15  response that I'm looking for in terms of support from
16  my client.
17  Q  So you've addressed the issue with Mr.
18  Castelluccio, and you see no improvement. You then
19  have escalated the issue to his manager, Joanne
20  Collins-Smee, still not getting the responsiveness you
21  need from Ms. Castelluccio. Now you've gone one more
22  level of management to Mr. Zapfel.
23  A  That's correct.
24  Q  If you'll turn to Defendant's Exhibit 54.
25  A  Okay.

Page 1254

1  Q  This is a short e-mail, one-liner, from Mr.
2  Boxer to you, the end of May 2007, and if you could
3  read the e-mail and explain it to the jury, please.
4  A  "Keenie, how about Jim - is he committed to
5  acting like an interim head - he is MIA."
6      Again, this a note to me wondering where
7  Jim was, not seeing the leadership out of Jim that he
8  would expect a delivery project exec to show.
9  Q  And if you'd turn to Defendant's Exhibit 56.
10  A  Okay.
11  Q  The bottom e-mail is from Mark Boxer, the same
12  day as the prior e-mail we just looked at, May 23rd,
13  2007, and he says, "Keenie, got your voicemail. I'm
14  in meetings in Indiana. If he is 70 percent why is he
15  never on a call?"
16      You then respond -- or you forward that e-mail
17  to Jim Castelluccio, and say, "Jim, we need to talk
18  about your involvement on the SWAT calls. Please see
19  below."
20      Did you have a conversation with Mr.
21  Castelluccio at this time about his involvement in
22  SWAT calls?
23  A  I'm sure I did. I mean I'm sure I did. I
24  definitely talked to Jim about the fact that the
25  client -- it was just so noticeable that Jim was not

Page 1255

1  on the calls, and we needed him there.
2  Q  Now, we've heard testimony that in June of
3  2007 Miguel Echavarria took over as the vice president
4  of the public sector for delivery, and at that point
5  Jim was undisputedly focused exclusively on the DPE
6  for WellPoint role. Did you see any marked
7  improvement with his performance and his
8  responsiveness after June?
9  A  I didn't.
10  Q  And did you discuss it with Mr. Castelluccio
11  after June of 2007?
12  A  I have to believe I did, because that's an
13  important role. It was the most important role
14  probably for us at WellPoint, so I have to believe I
15  did.
16  Q  If you'll turn to Defendant's Exhibit 57.
17  This is an e-mail dated June 1st, 2007, from you to
18  Mr. Zapfel, Ms. Collins-Smee and Dave Liederbach.
19  We've seen this document already with some other
20  references. You're referencing some phone calls you
21  had with Mr. Boxer and Mr. McDonald.
22      About a third of the way down the e-mail you
23  say, "Dave McDonald literally said, I don't even waste
24  my time trying to contact Jim anymore."
25      What was your reaction when Mr. McDonald told

Page 1256

1  you that?
2  A  You know, when your client tells you that
3  there's one of your colleagues at IBM who's supposed
4  to be adding value, who's supposed to be doing a job
5  and the client tells you they don't even waste their
6  time trying to contact Jim anymore, it's extraordinarily
7  disappointing, it's embarrassing, it's detrimental to
8  the relationship. We're not doing our job for the
9  client.
10  Q  If you'll turn to Defendant's Exhibit 64.
11      So this is an e-mail from you to Mark Boxer.
12  It's in August 2007. So again, so we keep it in
13  context, Mr. Castelluccio now has been serving as the
14  DPE of WellPoint for at least five months, but for
15  three months exclusively on the WellPoint account.
16  Had you seen any changes in his responsiveness or his
17  participation involvement with delivery leadership at
18  that point?
19  A  No. I -- no.
20  Q  Let me direct your attention to the last
21  sentence of the first paragraph. Can you read that to
22  the jury, please?
23  A  "Jim C knows he's not going to be our
24  permanent DPE and will need to move on."
25  Q  How do you know that Jim knew he wasn't going

Page 1257

1  to be the permanent DPE in August?
2      A  Too many complaints.  I mean I had lodged too
3  many complaints with his management chain, the
4  customer had lodged too many complaints with IBM in
5  general.  Jim had to know, it wasn't working.
6      Q  Had you spoken to Jim about these issues?
7      A  I'd spoken to Jim about issues, our delivery
8  performance, in terms of the client's not happy, we're
9  not showing the leadership that we need to be.  I
10  don't recall, it's been a long time, but most
11  definitely Jim and I talked about the fact that this
12  isn't working, this isn't working.
13      Q  All right.  If you will turn now to
14  Defendant's Exhibit 66.  This is a quite a lengthy
15  e-mail string in September of 2007, and I'm going to
16  direct your attention to the second page.  The top
17  e-mail there is from you again to Bob Zapfel dated
18  September 2nd, 2007, and if you can on the screen read
19  for the jury the highlighted portions.
20      A  "The permanent delivery project exec for
21  WellPoint has been open since April 1st.  The acting
22  DPE is not providing the delivery leadership needed
23  internally over WellPoint.  We need a delivery
24  leader on WellPoint immediately to help us identify
25  and draw up actions needed to achieve stability and to

Page 1258

1  avoid important business losses."
2      Q  What was Mr. Castelluccio's role or
3  responsibility with regard to stability issues?
4      A  As the delivery leader they were substantial.
5  I mean our delivery team working with WellPoint had
6  responsibility to provide a stable IT environment to
7  the client.  That was our job.
8      Q  And your concern was that Mr. Castelluccio
9  wasn't meeting those issues, or dealing with those
10  issues?
11      A  That was my concern.  That was my concern.
12      Q  Had you discussed that with the client?
13      A  Yes.  The client -- in some of the prior
14  e-mails, I mean the client would say on SWAT calls he
15  was not there.  Dave McDonald stopped calling.  Yes, I
16  had lots of conversations.  The client was very
17  unhappy.
18      Q  We know that eventually Mr. Castelluccio was
19  moved out of the DPE role and Gordon Crawford was
20  brought in.  Were you involved in the decision to
21  select and assign Mr. Crawford to the DPE role?
22      A  Yes.
23      Q  And why was Mr. Crawford selected?
24      A  He had a very good background, very good set
25  of experience, very skilled.

Page 1259

1      Q  And how did he do when he took over?
2      A  He was fantastic.  He was amazing.
3      Q  Can you give us examples of why he was so
4  great?
5      A  He took his responsibility very seriously.  He
6  engaged directly with the client.  He joined the SWAT
7  calls.  He was very proactive.  You could ask for in
8  one time to do something and he would follow through,
9  you never had to follow up.  He brought creative,
10  thoughtful, proactive ideas to us that we needed.  He
11  was outstanding.
12      Q  Now, did Mr. Crawford do anything that Mr.
13  Castelluccio couldn't have done when he was in that
14  role?
15      A  I don't think so.  I think Jim had the
16  experience and the skills.  If he had wanted to do it
17  I think he could have done it, and I frankly, to be
18  really honest with you, I hoped that he would.  In an
19  ideal world what would have happened is Jim would have
20  assumed the role as acting DPE and would have fixed
21  everything or help us -- help us fix everything, and
22  we would have had lot fewer problems, a lot happier
23  client, and he could have been the permanent DPE as
24  far as I'm concerned.
25      Q  Thank you very much.

Page 1260

1          MR. DUFFIELD:  I have no further
2  questions.
3          THE COURT:  Mr. Carta.
4
5          CROSS-EXAMINATION BY MR. CARTA:
6
7      Q  Good afternoon, Ms. McDonald.  I'm Mark Carta,
8  and I represent Mr. Castelluccio.
9      A  Good afternoon.
10      Q  Let me just ask you, you just put up
11  Defendant's Exhibit 48.  And you have identified
12  yourself as the person who was overall responsible for
13  the WellPoint account.
14      A  Yes.
15      Q  It was your client relationship.
16      A  Yes.
17      Q  And that was your only client, just WellPoint.
18      A  That's right.
19      Q  And you were supposed to manage everything
20  that related to WellPoint, isn't that right?
21      A  Yes.
22      Q  And how regularly did you speak to Mr. Boxer?
23      A  Very.
24      Q  Give me some idea.  At least weekly, almost
25  daily?

35 (Pages 1257 to 1260)

Page 1261

```
1         A   At least weekly.  Multiple times a week, I
2    would assume.  Not daily probably, but Mark and I
3    spoke a lot.
4         Q   And one of his concerns was that he thought
5    IBM needed to provide more staffing, isn't that
6    correct?
7         A   I don't recall him saying he needed more
8    staff.
9         Q   Isn't it true that he felt that IBM needed to
10   put the resources that were required on the WellPoint
11   account in order to resolve the problems that were
12   emerging?
13        A   Yes.
14        Q   And one of those resources was qualified,
15   competent staff?
16        A   Yes.
17        Q   And isn't it true that at one point, and
18   that's what's reflected on this Exhibit 48, IBM was
19   actually pulling staff off of the WellPoint account?
20        A   We did staff changes on the account.
21        Q   But that's what Mr. Boxer is talking about
22   here, isn't it, that he's surprised that no one told
23   him that you're pulling staff off of the WellPoint
24   account?
25        A   He was disappointed and he was surprised that
```

Page 1262

```
1    he didn't have more notice that we were making staff
2    changes to the account.
3         Q   Right.  And you were the one who was in charge
4    of the account, and you met with him you said almost
5    daily, and you didn't tell him that they were pulling
6    people off the account, isn't that correct?
7         A   I don't recall if I talked with Mark about the
8    LEAN actions or not.  Clearly I had an exchange with
9    him, but he -- I don't recall whether I talked with
10   him ahead of time or not.
11        Q   But in this e-mail he's saying to you he's
12   disappointed that you hadn't talked to him ahead of
13   time isn't that true?
14        A   He's saying he's disappointed that given how
15   many issues we've had, no one gave them a heads up,
16   gave us a heads up on total areas, and Shimkus called
17   Dave, that would have been Dave McDonald, with a
18   generic message that said LEAN is coming.
19        Q   And isn't it true that you just said a few
20   moments ago you certainly could have given him a heads
21   up?
22        A   Yes.
23        Q   And in this case you didn't give him a heads
24   up about this.
25        A   Evidently not.
```

Page 1263

```
1         Q   And he was disappointed, isn't that fair?
2         A   It seems so.
3         Q   Let me see Exhibit 130, Plaintiff's 130.
4         A   Is that in the binder?
5             MR. DUFFIELD:  No, it'll be the maroon
6    binders.
7             THE WITNESS:  Okay, let me grab that.
8             MR. CARTA:  Do you have it?
9             THE WITNESS:  Yes, it's on the table.
10   130?
11            MR. CARTA:  Yes, please.
12            THE WITNESS:  Okay.
13            You've killed a lot of trees here.  I got
14   to go to binder 2.
15            Okay.
16   BY MR. CARTA:
17        Q   So these are two e-mails.  One's from Ms.
18   Collins-Smee at the top to Mr. Zapfel, and then
19   there's one in the middle of the page from you to Mr.
20   Shimkus, right?
21            MR. DUFFIELD:  Your Honor, if she needs
22   time to read the document, she should familiarize
23   herself with it.
24            MR. CARTA:  I'm sorry.
25            THE WITNESS:  That's okay.
```

Page 1264

```
1    BY MR. CARTA:
2         Q   I'm going to ask you about the middle one, to
3    help you focus.
4         A   Let me get the context, if you don't mind.
5         Q   Please do.
6         A   Thank you.
7             THE COURT:  Is that Exhibit 130, Mark?
8             MR. CARTA:  Yes, 130.
9             THE WITNESS:  Okay, thank you.
10   BY MR. CARTA:
11        Q   If you look at the e-mail that you sent to Mr.
12   Shimkus, that is dated February 2007.
13        A   Yes, February 11, 2007.
14        Q   And who was the DPE on the WellPoint account
15   at that point?  Mike Morin, wasn't he?
16        A   Yes.  Mike resigned in March.
17        Q   The end of March?
18        A   Yes.
19        Q   So Mr. -- at this point in time Mike Morin was
20   the person who you said was the most important person
21   on the account, right?
22        A   He was a very important person on the account.
23        Q   Well, I'm sorry, I thought just a few minutes
24   ago you said to the jury that the DPE on the WellPoint
25   was the most important role on WellPoint.  Didn't you
```

Page 1265

1  just say that?
2      A   Yes, I did, I did.
3      Q   So at this point Mr. Morin was the most
4  important person on the WellPoint account?
5      A   That role was the most important role on the
6  account, absolutely, at that point in time.
7      Q   And would you please read the first two
8  sentences of your e-mail to Mr. Zapfel.
9      A   "Bob, please call Mark today.  Mark and his
10 leadership team have lost confidence in more than our
11 storage team.  They've lost confidence in IBM's
12 ability to support WellPoint."
13     Q   So let's back up a little bit, because you
14 read the whole thing.  This initially has to do with
15 the storage area issue, doesn't it, the SAN issue?
16     A   It started -- yes.
17     Q   And the initial problem was trying to resolve
18 that storage issue, wasn't it?
19     A   Yes.
20     Q   And you went on to say, however, that the
21 problem was way more than just the storage team, the
22 problem at this time when Mr. Morin was still there
23 was that IBM -- rather that WellPoint had lost
24 confidence in IBM's ability to support all of
25 WellPoint, isn't that correct?

Page 1266

1      A   That's what I say in this e-mail, that's
2  correct.
3      Q   And that was your assessment at the time, that
4  WellPoint had lost confidence in IBM's ability to do
5  the job?
6      A   Yes.
7      Q   Before Mr. Castelluccio was DPE?
8      A   That's right.
9      Q   I'd like to spend no more than a minute or two
10 on the Red Team Review.  We've all heard about this a
11 great deal, but I do have one or two questions.
12         MR. DUFFIELD:  Your Honor, I'm going to
13 object.  This is, one, completely irrelevant; two,
14 it's beyond the scope of the direct examination, and
15 we've heard lots of testimony about this review
16 already.
17         THE COURT:  I don't know what the
18 question is.  I haven't heard the question.
19         MR. CARTA:  I'm going to ask --
20         THE COURT:  Just ask the question.
21 BY MR. CARTA:
22     Q   Are you familiar with the Red Team Review?
23     A   I recall having multiple Red Team Reviews at
24 WellPoint over the years.
25     Q   Do you recall one dated June 21st, 2006, which

Page 1267

1  was issued right after Bob Zapfel's report?
2      A   I don't recall one of June of 2006.  I got on
3  the account July of 2006.
4      Q   And when you got on the account, I assume that
5  you read what you could to find out what the scope of
6  the problems were, isn't that right?
7      A   I'm sure I did.
8      Q   And you read that the WellPoint account was in
9  dire financial straits?
10     A   I knew we had very serious problems when I
11 accepted the job in July of 2006.  I knew that we had
12 a number of delivery problems and that we had
13 financial problems with the contract.  I knew both of
14 those things, and part of my job was to help get
15 everything back on track.
16     Q   I'd like to ask you if you recognize the
17 specific problems that are identified on page 16 of
18 the Red Team Review because they relate to the SWAT
19 team calls that you were talking about earlier?
20         MR. DUFFIELD:  Your Honor, objection.
21 She already testified she didn't see this document.
22         THE WITNESS:  I don't recall seeing it.
23 I don't have it in front of me.
24         MR. CARTA:  Your Honor, she doesn't need
25 to have seen the document.  The document identifies

Page 1268

1  the causes of the SWAT teams, and I want to just go
2  through those with her.
3         THE COURT:  There's no question pending,
4  though.
5  BY MR. CARTA:
6      Q   Can I have that exhibit, please?
7         MR. DUFFIELD:  Mr. Carta, what exhibit is
8  it?
9         MR. CARTA:  It's the Red Team Review.
10        MR. DUFFIELD:  But what exhibit number?
11        MR. CARTA:  Plaintiff's 17.
12        MR. DUFFIELD:  Thank you.
13        THE WITNESS:  So look at number 17?
14        MR. CARTA:  Yes.
15        THE WITNESS:  Okay.
16 BY MR. CARTA:
17     Q   All I'm going to do is ask you about this
18 page, but if you want to look at the whole document,
19 please feel free.
20     A   I'm fine.  17?
21     Q   I'm sorry, page 16.
22     A   Okay.  I don't think my pages are numbered.
23     Q   It's down in this area here.  It's hard to
24 see.
25     A   I see, thank you.  Okay.

Page 1269

1    Q    You see in the Red Team Review identified five
2    different areas where there had been no due diligence
3    performed in connection with the WellPoint contract?
4    A    I see what the chart says.
5    Q    Right. And one of those areas is Middleware
6    support. What's Middleware support?
7    A    Middleware is software that -- it's software.
8    Q    And was the Middleware support area one of the
9    areas where there were what you called SWAT team
10   calls?
11   A    I'm sure there were SWAT calls around
12   Middleware. I don't recall specifically SWAT calls
13   about it, but I'm sure there were.
14   Q    And DBA support, what's that area?
15   A    Database administration support.
16   Q    And did that also include storage?
17   A    Database support, I wouldn't consider that
18   storage, no. I wouldn't consider that storage.
19   Q    And was this other area where there was no due
20   diligence performed, was that also an area where there
21   were SWAT calls resulting from problems in that area?
22   A    I don't remember specific SWAT calls about DBA
23   support, or Middle -- I don't remember specific SWAT
24   calls about any of these areas, per se.
25   Q    Well, let's look at the Lotus notes and

Page 1270

1    exchange. That has to do with the e-mail system,
2    right?
3    A    Yes.
4    Q    And that was probably the largest source of
5    outage calls or SWAT calls, wasn't it, failures in the
6    e-mail system?
7    A    I wouldn't say it was the largest. It would
8    be one of the most visible because everybody uses
9    e-mail, but I don't know that it was the largest.
10   Q    Not in terms of largest in terms of number,
11   but the highest profile.
12   A    It was very high profile.
13   Q    And again, that's an area where the Red Team
14   Review that there had been no due diligence performed,
15   right?
16   A    That's what this chart says.
17        And by the way, I don't recognize the two
18   people, Robert Gonzales and Lynn Small, I've never
19   heard of either of them, who were the names on the
20   front of the report.
21   Q    And do you see right below there where it says
22   "Summary, Additional 127 FTPs"? What's FTP stand for?
23   Full-time equivalents?
24   A    I would say FTE would be full-time equivalent.
25   That's why I'm staring at it. FTP I'm not familiar

Page 1271

1    with. FTE is full-time equivalent. This says FTP.
2    Q    Full-time persons?
3    A    Probably. I guess that's what that means.
4    Q    The estimate was that in order to solve these
5    problems, they needed another 127 full-time persons,
6    isn't that right?
7    A    Again, I wasn't involved. I was not on the
8    account when this report was done, and I truly don't
9    recall ever seeing this because I don't remember
10   either of these names.
11   Q    And there were no -- nothing like 127 new
12   people assigned to the account after this, were there?
13   A    I don't know.
14   Q    You don't know?
15   A    I don't know.
16   Q    Would you take a moment and look at
17   Plaintiff's 111.
18   A    Okay. Give me one moment, please.
19   Q    Certainly.
20   A    Okay.
21   Q    And this e-mail is dated March 21, 2007?
22   A    Yes.
23   Q    And that would be the day after Mike Morin
24   resigned, is that correct?
25   A    He formally resigned yesterday, so, yes.

Page 1272

1    Q    And this is an e-mail that you sent to Mr.
2    Zapfel and Joanne Collins-Smee, is that right?
3    A    Yes.
4    Q    And in your e-mail you state to Ms.
5    Collins-Smee and to Mr. Zapfel, "I suggest you both
6    have ELs." What's EL stand for?
7    A    It's EI, and EI is -- it's executive
8    interview. It means have a meeting, have a one-on-one
9    type of discussion.
10   Q    So like an exit interview in this case?
11   A    An executive interview is not what I consider
12   an exit interview, but I wanted them both to talk to
13   Mike and hopefully persuade him to stay with IBM.
14   Mike was a very valued employee of IBM's.
15   Q    So "I suggest you both have executive
16   interviews with him --" being Mike Morin "-- as soon
17   as possible," right?
18   A    Um-hmm.
19   Q    "His reason is work life --" I'm sorry, I'm
20   going to skip a sentence.
21        "He will provide you with a very clear view of
22   the serious delivery issues that he does not think we
23   are addressing at WellPoint. He spent an hour doing a
24   core dump with me."
25        What's a -- what do you mean by "a core dump"?

Page 1273

1     A   It's like everything that's in your head goes
2  out.  It's a dump.
3     Q   "He says he feels that our delivery
4  organization is a disgrace and that we are not
5  addressing the issues and he cannot continue to
6  represent delivery to our customer."
7        Do you remember him saying that to you?
8     A   I remember Mike -- I don't remember the exact
9  statement, but I remember Mike was very tired, very
10 discouraged.  It was a very tough account.  We were
11 all tired.  Mike had been there longer than me, for
12 example.  So I can remember Mike -- he was very tired,
13 very discharged.
14    Q   And do you remember him giving you a core dump
15 and explaining to you why he thought there were
16 serious delivery deficiencies?
17    A   I remember talking to Mike, and I remember he
18 was very emotional.  He was at wits end, and he was
19 tired.  He was tired.  It was a tough -- it was a very
20 tough account.
21    Q   And you're suggesting that Mr. Zapfel and
22 Joanne Collins-Smee talk to him because he spent so
23 much time explaining to you what he saw the problems
24 were, and you wanted to also make sure that they heard
25 his assessment of the problems, isn't that correct?

Page 1274

1     A   I definitely wanted them to talk with him.
2  And I wanted them to talk to him for multiple reasons.
3  I wanted us to try to keep Mike in IBM.  Again, Mike
4  is a very valid and very fine employee.  And I for
5  sure wanted them to hear his view of our problems so
6  they could continue to help.
7     Q   Precisely.  So that one of the reasons was you
8  wanted to be sure that they heard his view of what was
9  going on?
10    A   Yes.
11    Q   And that was a view that you agreed with,
12 wasn't it?
13    A   I certainly agreed that we had problems that
14 we needed to address.  I would not say that I agreed
15 with every solution that Mike felt was appropriate.  I
16 don't -- I did not say that, no.
17    Q   You agreed with the fact that there had been a
18 lack of seriously addressing the needed -- need for
19 additional resources.  Did he explain that to you?
20 Question withdrawn.
21        Did Mr. --
22    A   Mike and I had a difference of opinion on that
23 topic for sure.  I don't know precisely how many
24 resources we did or didn't need, but I know one thing,
25 that we were not doing well enough, and this is a role

Page 1275

1  that Gordon made and brought enormous value to.  We
2  would get on SWAT call after SWAT call and it was
3  exhausting, and we would work very hard to get the
4  client back up and running.  But we didn't focus
5  enough under Mike Morin's leadership, in my view, on
6  solving the root cause problem, so we had fewer SWAT
7  calls to get on.  I was interested in let's solve the
8  underlying problems so we have fewer of these outages
9  so we have fewer SWAT calls to get on.  So I was on
10 let's get to the root cause and fix the problem,
11 Mike's view was let's keep throwing people at it.  He
12 and I did not agree.  We could have thrown tons of
13 people at it, but if we didn't identify and fix the
14 problems, no matter how many people we had, we had too
15 many problems.
16    Q   So you were pleased with the fact that Mike
17 Morin was on a lot of the SWAT calls, all the major
18 calls.
19    A   Mike showed enormous commitment to the client,
20 and he showed a great deal of leadership on those SWAT
21 calls.  He was -- he was calm, cool, collected, and
22 helped get us back up.  Yes, I was very pleased that
23 he did that.
24    Q   So try to answer my questions if you can so we
25 can move along.

Page 1276

1     A   Sure.  I will.
2     Q   Thank you.  So you were pleased with the role
3  he played in terms of SWAT calls?
4     A   Yes.
5     Q   But you were displeased with his ability to
6  identify root causes and come up with solutions to
7  those problems, isn't that correct?
8     A   I wouldn't say I was displeased.  What I would
9  say is I felt like we needed more focus on solving the
10 root cause problems than -- and Mike was more focused
11 on throwing people at it.  So he and I had a
12 difference of opinion.
13    Q   So it was sort of a question of priorities.
14 You felt that what was needed at this point was
15 finding reasons to stop the SWAT calls rather than
16 just being on them, isn't that correct?
17    A   I wanted to stop -- I wanted to solve the
18 problem so we had less outages, and less outages would
19 mean fewer SWAT calls.  It's more about the outages
20 than it was the SWAT calls.
21    Q   And that was your assessment of what needed to
22 be done and what Mike Morin failed to do, is that
23 fair?
24    A   Mike -- I think Mike did some of it, but I
25 don't think Mike did enough of it, and I think when

Page 1277

1    Gordon got on the account, he did a great job.
2    Q    Very good.
3    A    He took time, but he did a great job.
4    Q    I'm sorry?
5    A    He took time, but he did a great job.
6    Q    Let's go to Exhibit 56.
7    A    Okay.
8    Q    This is a -- I'm sorry, Defendant's 56, so
9    it's the other book.
10   A    Okay.
11   Q    This is an e-mail exchange between you and Mr.
12   Boxer on May 23rd and 24th, is that right?
13   A    Yes.
14   Q    That's about a month -- actually about two
15   months after Mike Morin resigned?
16   A    Okay.
17   Q    And in Mr. Boxer's e-mail he refers to a voice
18   message that you left him, is that correct?
19   A    Yes.
20   Q    And isn't it true that in your voice message
21   you indicated to Mr. Boxer that Mr. Castelluccio was
22   assigned to WellPoint 70 percent of the time, isn't
23   that true?
24   A    His e-mail to me says, "Keenie, got your
25   voicemail.  In meetings in Indiana.  If he is 70

Page 1278

1    percent why is he never on the call?"
2        I don't remember the specific message I left
3    Mark, but that's what his e-mail to me says.
4    Q    You agree that his e-mail indicates that you
5    had said to him in a voicemail that Mr. Castelluccio
6    was on that account 70 percent of the time, right?
7    A    I don't remember if I told him -- I don't know
8    if I told him that in that voicemail or if he and I
9    had a prior conversation about that, but in this note,
10   he indicates that Jim is on 70 percent.
11   Q    And that that was the information he got you,
12   isn't that correct?
13   A    Probably, yes.
14   Q    Exhibit 55, please.
15   A    Okay.
16   Q    Defendant's 55.  Same notebook.
17   A    Okay.
18   Q    Can you identify this as an e-mail that you
19   sent the same day, May 24th, to Mr. Castelluccio and
20   Ms. Collins-Smee to Mr. Liederbach?
21   A    I did.
22   Q    And in it you indicate that, "I've talked with
23   you all about the fact I committed to Boxer a while
24   ago that Jim would be full-time on WellPoint," and
25   then the highlighted section is, "You'll see Jim has

Page 1279

1    not been full-time on WellPoint," and then you go on
2    to ask, "Can I tell Boxer that effective June 1 Jim
3    will have completed all his transition activities and
4    he is full-time acting DPE for WellPoint as we
5    continue to work through the permanent backfill?"
6        That's the e-mail you wrote, is that correct?
7    A    That's correct.
8    Q    And this is in May of 2007, right?
9    A    May 24th.
10   Q    And when you say "as we work through the
11   permanent backfill," you're talking about a permanent
12   person to take Mr. Morin's position, isn't that
13   correct?
14   A    Yes.
15   Q    So in May of 2007 your e-mail indicates that
16   you were looking for someone permanent to take Mr.
17   Morin's position, isn't that right?
18   A    Yes.
19   Q    Defendant's Exhibit 57, please.
20       I think this actually an e-mail that you had
21   in your direct examination, but take a moment and
22   review it, please.
23   A    Okay.
24       Okay.
25   Q    And this is an e-mail that you sent, correct?

Page 1280

1    A    Yes, it is.
2    Q    And you sent it to Mr. Zapfel, Ms.
3    Collins-Smee and to Mr. Liederbach, correct?
4    A    Yes.
5    Q    And again, in this e-mail you say, "This
6    temporary approach with Jim Castelluccio is not
7    working," isn't that correct?
8    A    Yes.
9    Q    Defendant's Exhibit 62, please.
10       Again, I'd just ask you to take whatever time
11   you need to review those two e-mails.
12   A    Okay.
13       THE COURT:  I suppose this is as good a
14   time as any to let you know that I've been informed
15   that Chief Judge Hall has closed the courts at 3:30,
16   effective 3:30.
17       MR. CARTA:  I think I can move it along,
18   Your Honor.
19       THE COURT:  Okay.  As long as we can get
20   a cross, and a redirect is not as important, but we've
21   got to have time for the cross.
22   BY MR. CARTA:
23   Q    So have you had chance to look at Exhibit 62?
24   A    I have.
25   Q    Thank you.  And this e-mail, they're both

**A-600**

Page 1281

1 actually dated August of 2007.
2    A   Yes.
3    Q   So this was a full five months after Mr. Morin
4 resigned, correct?
5    A   Yes.
6    Q   And these e-mails both address the problem
7 with IBM's, quote, storage space at WellPoint.
8    A   Yes.
9    Q   And what is meant by storage space?  What's
10 the issue there?
11    A   Storage is where you keep all of the
12 information.  It's the disk drives and tape, where we
13 keep all the information.
14    Q   And in the bottom there's an e-mail from Mr.
15 Boxer to -- well, it's copied to you, right?
16    A   Yes, copied to me.
17    Q   And in that e-mail Mr. Boxer states, quote, I
18 think we are seriously hamstrung right now by the gap
19 that exists in a permanent assignment of the new
20 delivery executive, isn't that correct?
21    A   He says that.
22    Q   And at that point Mr. Boxer had already
23 rejected, if you recall, a number of proposed
24 candidates, isn't that right?
25    A   Mark had looked at some candidates and had

Page 1282

1 rejected some candidates, yes.
2    Q   Do you remember if he rejected Ken Weiss?
3    A   He did.
4    Q   And Robert Jones?
5    A   I don't remember the name Robert Jones.  I
6 remember Ken Weiss.
7    Q   Do you remember Rick DeLeo?
8    A   I remember that name.
9    Q   Exhibit 62.  Defendant's Exhibit 62.
10    A   I think that was 62.
11    Q   I'm sorry, this is actually Plaintiff's 62.
12    A   Okay.
13       Okay.
14    Q   Can you identify this as an exchange of
15 e-mails between you and Mr. Boxer on August 21st and
16 August 22nd?
17    A   Yes.  Mark sent me a note on the 21st and I
18 sent him one the next day, the 22nd.
19    Q   And in his e-mail, this e-mail concerns
20 specifically a reference to Ray.  Was that Ray
21 Johnson, who's also one of the candidates that Mr.
22 Boxer ultimately rejected?
23    A   I don't see a reference to Ray.
24    Q   At the top, "Please call me tomorrow, ask you
25 talk to Ray and we'll discuss, be open-minded, he is

Page 1283

1 good, experienced."
2    A   Okay.
3    Q   Does this refresh your recollection that at
4 this point you were encouraging Mr. Boxer to consider
5 Ray Johnson as yet another candidate for the permanent
6 DPE position on WellPoint?
7    A   I was encouraging him to be open-minded when
8 he talked to Ray, yes, about the job.
9    Q   And Mr. Boxer -- you were responding to Mr.
10 Boxer's statement, and I quote, if our candidate this
11 week does not cut it, time is up.  Do you remember
12 receiving that?
13    A   I don't remember receiving it, but I certainly
14 did get it.
15    Q   I'm sorry, what?
16    A   Yes.
17    Q   You certainly did receive it?
18    A   I certainly did receive it, yes.
19    Q   And you not only got it in terms of got the
20 e-mail, but you got the message, too, didn't you, that
21 he was at wits end and he wanted a permanent person
22 assigned yesterday?
23    A   He wanted a new DPE, permanent DPE assigned to
24 the account, yes.
25    Q   And ultimately am I correct that Mr. Boxer

Page 1284

1 rejected Ray Johnson?
2    A   He did, yes.
3    Q   Plaintiff's Exhibit 61.
4    A   Okay.
5    Q   This is a string of e-mails extending from
6 August 31st to September 4th, and if you'd just take a
7 moment and review it quickly.  This is my last e-mail.
8    A   This is a long one.
9    Q   Yeah.
10    A   Okay.
11    Q   And if you would look at your e-mail which is
12 on the bottom of the third page, there's a highlighted
13 sentence there.  It's an e-mail dated 9/2/2007 from
14 yourself to Mr. Zapfel.
15    A   Um-hmm.
16    Q   And in that you -- in that e-mail you state,
17 "The permanent delivery project executive, DPE, role
18 for WellPoint has been open since April 1st," isn't
19 that correct?
20    A   Yes.
21    Q   And I'll read a little further.  "Mark Boxer
22 has taken a position that WellPoint will not do any
23 business with any part of IBM until WellPoint has a
24 top notch DPE."
25       Do you remember Mr. Boxer taking that

**A-601**

Page 1285

```
1    position?
2        A   I do.
3        Q   And on the next page, in your e-mail to Mr.
4    Zapfel you state, "Bob, I think the only way we are
5    going to get Boxer comfortable with a DPE is for the
6    person to have your personal seal of approval, someone
7    you have worked with or personally interviewed to
8    determine is the one for the job."
9        Do you remember indicating that to Mr. Zapfel?
10       A   I do.
11       Q   And am I correct that Gordon Crawford was
12   presented by Mr. Zapfel to Boxer as someone with his
13   personal stamp of approval?
14       A   He was.
15       Q   He was.  And Mr. Zapfel was the one to
16   introduce Mr. Crawford directly to Mr. Boxer, isn't
17   that correct?
18       A   I think Joanne and I did.
19       Q   And Mr. Zapfel was the one who indicated that
20   this was the person who -- I realize our time is up,
21   but this is the person who I personally stand behind,
22   isn't that right?
23       A   He did stand behind him.
24       Q   And he was Mr. Crawford's advocate to Mr.
25   Boxer, isn't that right?
```

Page 1286

```
1        A   He was.  He had also been Rick DeLeo's
2    advocate, and the advocate of so many other candidates
3    that we had put up in front of Mark that Mark
4    rejected.  I mean, so, yes, Gordon had Bob Zapfel's
5    permanent blessing, and so did some of the other ones
6    that Mark rejected.
7        Q   But at this particular time this was critical
8    that a person be presented, according to you, you're
9    asking Mr. Zapfel to give his personal stamp of
10   approval, and that's what he did with respect to Mr.
11   Crawford, right?
12       A   He did.
13            MR. CARTA:  No further questions.
14            THE COURT:  Thank you, Mr. Carta.
15   Counsel?
16            MR. DUFFIELD:  No further questions, Your
17   Honor.
18            THE COURT:  All right, Ms. McDonald,
19   thank you so much for being with us here this
20   afternoon.  You have a distance to fly?
21            THE WITNESS:  I don't.  I'm going to
22   blast right out of here.  I hope everybody has a safe
23   drive home.
24            THE COURT:  I think the roads are going
25   to start getting slippery.
```

Page 1287

```
1            THE WITNESS:  When I was coming up they
2    were, so be careful.
3            THE COURT:  Okay, gentlemen, court is
4    closed officially by the Chief Judge, 3:30, nothing we
5    can do it about.  Let's shoot for starting at 11
6    o'clock tomorrow.  That's an hour delay.  That'll give
7    us time.  If it has to be even later, the clerk and my
8    law clerks, some of whom or one of them or all of
9    them, will let the jury know and we'll let counsel
10   know.
11           MR. FASMAN:  We'll hear from the court
12   then?
13           THE COURT:  Yes.
14           MR. FASMAN:  If it's later than 11.
15           THE COURT:  Yeah, if we move it to 11:30
16   or 12, we'll let you know.
17           MR. FASMAN:  Okay.
18           THE COURT:  But it's 11 o'clock now.  Be
19   safe driving, wherever it is you're driving, and we'll
20   stand adjourned for the day.
21           MR. FASMAN:  Thank you, Your Honor.
22           MR. CARTA:  Thank you.
23           THE COURT:  Thanks, ladies and gentlemen.
24   Don't talk about the case, don't deliberate, keep an
25   open mind, have some fun, frolic in the snow tomorrow,
```

Page 1288

```
1    make snowmen.
2            (Jurors excused)
3            THE COURT:  Okay, see you tomorrow.
4            MR. FASMAN:  Thank you, Your Honor.
5            THE COURT:  You're welcome.
6            (Court adjourned)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

42 (Pages 1285 to 1288)

Page 1289

1      CERTIFICATE OF REPORTER
2
3          I Hereby certify that the foregoing 168 pages
4      are a complete and accurate computer-aided
5      transcription of my original stenotype notes taken in
6      the Matter of James Castelluccio VS International
7      Business Machines Corporation, which was held before
8      The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9      District Court, 450 Main Street, Hartford,
10     Connecticut, on January 21, 2014.
11
12
13         Wendy Allen, RMR, CRR
14         Notary Public
15
16
17     My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

Page 1289

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JAMES CASTELLUCCIO    )
    Plaintiff    ) 3:09-cv-01145 (TPS)
                  )
VS              ) January 22, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION  ) Federal Building
    Defendant     ) Hartford, Connecticut


VOLUME 7
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.


Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

---

Page 1290

Representing the Plaintiff

Carta McAlister & Moore, P.C.
1120 Boston Post Road
Post Office Box 83
Darien, CT  06820
   By:  Mark R. Carta, Esq.
        mark@cmm-law.com
   By:  Margaret A. Triolo, Esq.
        margaret@cmm-law.com
   By:  Troy Bailey, Esq.

Representing the Defendant

Paul Hastings, LLP
75 East 55th Street
New York, NY  10022
   By:  Zachary Fasman, Esq.
        Zacharyfasman@paulhastings.com
   By:  Todd C. Duffield, Esq.
        Toddduffield@paulhastings.com
   By:  Jean-Marie Gutierrez

ALSO PRESENT:

Daniel Fox, Esq.
IBM in-house counsel

---

Page 1291

I N D E X

WITNESSES:                    PAGE:

Keith Holmes
    Direct Examination by Mr. Fasman........... 1299
    Cross-Examination by Mr. Carta............. 1354
    Redirect Examination by Mr. Fasman......... 1394
    Recross Examination by Mr. Carta........... 1400
    Redirect Examination by Mr. Fasman........ 1400
Gordon Crawford
    Direct Examination by Mr. Fasman........... 1402
    Cross-Examination by Mr. Carta............. 1433
Russ Mandel
    Direct Examination by Mr. Fasman........... 1440

---

Page 1292

1    THE COURT:  Are we ready to proceed?
2    MR. CARTA:  I have one housekeeping
3 matter.  Before Mr. Mandel testifies, I'd like to be
4 sure that we're all on the same page.  I believe
5 Mr. Fasman's already made his offer of proof, and I
6 don't want to be put in a position where I'm objecting
7 to questions that the Court has already ruled cannot
8 be asked in front of the jury.
9    MR. FASMAN:  Your Honor, I'm happy to
10 take it up on a sidebar before we get to Mr. Mandel on
11 the stand.
12    THE COURT:  Okay.
13    MR. FASMAN:  Let's do that afterwards or
14 we can do it now.
15    (Conference held at sidebar)
16    MR. FASMAN:  I think I have to establish
17 that it's a business record.  I have to ask him
18 whether he maintained records, whether the records are
19 kept in the ordinary normal course of business -- the
20 report, et cetera, just in case.  I don't want to end
21 up -- if the jury rules against us and I go off on
22 appeal, I don't want to have anybody say we didn't
23 establish it was admissible anyhow.
24    MR. CARTA:  I'll stipulate his documents
25 were business records.  So I don't think we need to

Page 1293

1    ask questions on that. I'll stipulate to that.
2         THE COURT: So in other words, we need to
3    ask these four foundation questions. Here's the way I
4    have envisioned it, the way I would like to see this
5    go down. He's part of HR department, and part of his
6    duties are to investigate allegations of
7    discrimination.
8         MR. FASMAN: Correct, sir.
9         THE COURT: He was made aware of the
10   Plaintiff's allegation of discrimination, and in the
11   normal course of his activities, he conducted an
12   investigation. He did it because IBM believes in
13   obeying the law, and he wanted to give forewarning and
14   fair treatment to the allegations that were made.
15        He conducted an investigation over a number of
16   days. I don't know how many people he had with him or
17   whether he did it himself or with other people. He
18   interviewed people, and then his investigation was
19   concluded.
20        And at the conclusion of his investigation, he
21   had discussions -- or IBM management had a discussion
22   with Mr. Castelluccio to see if the problem could be
23   worked out internally.
24        MR. FASMAN: He didn't actually do that.
25   We didn't do that. We reported to him what the

Page 1294

1    findings were.
2         THE COURT: Okay. One of the -- see, I
3    don't want to have you get into what the findings
4    were.
5         MR. FASMAN: No, no. All I said, Judge,
6    was, all we did was tell Mr. Castelluccio.
7         THE COURT: Okay. Mr. Castelluccio
8    conducted his investigation.
9         MR. CARTA: Mr. Mandel --
10        MR. FASMAN: Mandel.
11        MR. CARTA: -- conducted.
12        THE COURT: Yes. Conducted the
13   investigation. And the purpose of this was because
14   IBM believes in the law and attempts to follow the
15   law, but also it regards Mr. Castelluccio as a
16   valuable employee. He worked there for 40 years, an
17   IBMer, as we've heard people say, and they wanted to
18   give his allegation the serious treatment that they
19   deserve. When it was concluded, he met with
20   Mr. Castelluccio.
21        MR. CARTA: But he didn't.
22        THE COURT: He didn't.
23        MR. FASMAN: They spoke on the phone, and
24   then there was a one-sentence letter that I think
25   you've seen.

Page 1295

1         THE COURT: Okay. When it was over, he
2    communicated with Mr. Castelluccio in an attempt to
3    see if the matter could be resolved within IBM.
4         MR. FASMAN: I don't think I would go
5    there, but that's okay. I think he just reported his
6    findings.
7         THE COURT: To see if the matter could be
8    resolved.
9         MR. CARTA: I don't think that actually
10   happened.
11        MR. FASMAN: I don't think -- there was
12   no attempt at resolution.
13        THE COURT: There was no attempt?
14        MR. FASMAN: No. He just did the
15   investigation and reported the findings and said --
16        THE COURT: So you don't envision it
17   going down the way I am.
18        MR. FASMAN: Not quite.
19        MR. CARTA: I think it just ends there.
20        MR. FASMAN: That's right.
21        MR. CARTA: It ends with the fact that he
22   conducted the investigation. I mean, Your Honor, I'm
23   just -- I want to be perfectly clear on this. I would
24   be forced to move for a mistrial if we get into
25   anything that relates to the conclusions.

Page 1296

1         Mr. Castelluccio was not asked any questions
2    and I've not asked any of the other witnesses
3    questions about their role in the investigation. So I
4    just want it to be perfectly clear that was all --
5    based upon my understanding, that we were not going to
6    get into the conclusions of the investigation. And it
7    sounds to me like it's a nonissue.
8         MR. FASMAN: No. It's a nonissue, but
9    the one exception is I am going to ask Mr. Mandel
10   about his interview with Mr. Castelluccio, because in
11   there, there's an admission against interest.
12        THE COURT: Doesn't have to be against
13   his interest.
14        MR. FASMAN: It's not hearsay. It's not
15   going to go into any detail.
16        THE COURT: You can ask him anything
17   unless it's privileged. If he said something, it's an
18   admission.
19        MR. FASMAN: Yes.
20        THE COURT: So everything's gone right,
21   and --
22        MR. CARTA: That's why I wanted to raise
23   the issue outside the presence of the jury.
24        MR. FASMAN: No problem. The only other
25   thing I would say, Judge, can I ask him how many

Page 1297

1  people he interviewed?
2      MR. CARTA: Your Honor, that suggests
3  that he actually did conduct interviews that were
4  balanced, and I don't think that that's the case. I
5  think we heard that he only asked questions about
6  performance. He never asked any questions about age
7  discrimination.
8      MR. FASMAN: Your Honor, I mean --
9      THE COURT: I think we're going into the
10 subject of the investigation. I don't want to do
11 that. That's thin ice. It's enough that we talk
12 about he investigated Mr. Castelluccio's allegations
13 that he was being discriminated against because of his
14 age, and he interviewed -- he conducted that
15 investigation, and no other investigation, it involved
16 his talking to 12 people.
17     MR. FASMAN: Twenty.
18     MR. CARTA: Twenty-one.
19     MR. FASMAN: Twenty-one.
20     THE COURT: Twenty-one. Okay.
21     MR. FASMAN: That's as far as I'm going
22 to go.
23     THE COURT: I think that's all right.
24     MR. FASMAN: Okay. Good. I just want to
25 make sure.

Page 1298

1      (Conference concluded at sidebar)
2      (Jurors present)
3      THE COURT: Good morning.
4      THE JURORS: Good morning.
5      THE COURT: Please be seated. You know
6  we were in here at 11 o'clock, and we took care of
7  some legal issues and saved us some time. And I'm
8  glad to see that you all made it in safely.
9      Okay. Let's begin, Mr. Fasman.
10     MR. FASMAN: Your Honor, thank you.
11 Good morning, everyone.
12     THE JURORS: Morning.
13     MR. FASMAN: IBM calls Keith Holmes as
14 our next witness.
15     (Keith Holmes, sworn by the clerk)
16     THE CLERK: Please state your name, and
17 spell your last name for the record.
18     THE WITNESS: My name is Keith Holmes.
19 My last name is spelled H-O-L-M-E-S.
20     THE CLERK: Your business address?
21     THE WITNESS: Is One New Orchard Road,
22 Armonk, New York, IBM Corporation.
23
24
25

Page 1299

1      DIRECT EXAMINATION BY MR. FASMAN:
2
3   Q  Mr. Holmes, good morning.
4   A  Good morning.
5   Q  Are you employed by IBM?
6   A  Yes, I am.
7   Q  And what's your current position, sir?
8   A  I'm a human resources partner for the Global
9  Technology Services division.
10  Q  And how long have you held that job, sir?
11  A  I've held that job for roughly four years.
12  Q  And how long overall have you worked for IBM?
13  A  Fourteen years. I'm in my 15th year with IBM.
14  Q  Can you please describe your educational
15 background after high school, sir?
16  A  Yes. I graduated from Brown University with
17 degrees in economics and international relations.
18 Several years after that -- after five years working
19 professionally, I returned to school full-time and got
20 an MBA from Yale University. And then a few years
21 later, 2005, I earned a master's degree in human
22 resources management from Rutgers.
23  Q  And were you employed prior to working for
24 IBM?
25  A  Yes, I was.

Page 1300

1   Q  Can you briefly summarize for the jury what
2  your jobs were prior to working for IBM, sir?
3   A  Yes. My first job out of college was to
4  volunteer with the YMCA in Ghana, West Africa.
5      After about a year doing that, I returned to
6  the U.S. and took a job in banking with Bankers Trust.
7  I worked there for a couple years, then moved to
8  another bank, Broadway Bank, for a couple years. Then
9  my next job after business school was also in banking,
10 with Bankers Trust.
11     Following that, I moved to American Express,
12 where I worked for seven years in different sales and
13 marketing jobs. And after American Express, I was in
14 consulting for a couple years and then I moved to IBM.
15  Q  And so 14 years -- that would be, what, 19 --
16  A  1999.
17  Q  -- '99 you came to IBM. And maybe you can
18 briefly summarize -- because I know IBMers seem to
19 move around every two years or so, so maybe you could
20 briefly summarize for the jury, without going into
21 every single move, just generally what you've done at
22 IBM during the course of your career, sir.
23  A  Okay. I joined IBM in the human resources
24 function where I was working with putting together
25 sales compensation plans. I did that for several

Page 1301

1  years.  Then I took my first IBM HR partner job.  Did
2  that for a couple years, had an assignment in
3  headquarters doing human resource strategy.  Then I
4  was the HR director for Integrated Technology Delivery
5  for several years, and then I moved into my current
6  job about four years ago.
7      Q   All right.
8      A   Half dozen assignments in that time.
9      Q   When you say "HR partner," that's a little
10  IBM-speak.  Could you tell the jury and for the record
11  state what an HR partner is or does?
12      A   Yes.
13      Q   Or both?
14      A   Yes.  A HR partner is a human resources
15  generalist.  I work with the management team for the
16  different organizations to help them with everything
17  having to do with their people from hiring people to
18  training and developing people; to compensation; to
19  assessment; to coaching and performance management
20  through to separation, whether that's retirement,
21  resignation, or other.
22      Q   Now, I'd like to direct your attention to the
23  time when you were serving as a human resources
24  partner for ITD Americas.  What period of time were
25  you in that job?

Page 1302

1      A   That was from October 2007 to midyear 2009.
2      Q   Was it --
3      A   Or 2006 -- October 2006.  I'm sorry.
4      Q   And who was the general manager of ITD
5  Americas when you took over?
6      A   That was Kelton Jones.
7      Q   And you described your partnering duties.
8  Were those the duties that you performed on behalf
9  of -- in supporting the ITD Americas organization?
10      A   Yes.  It was an HR generalist job.
11      Q   And how long was Mr. Jones the manager of
12  ITDelivery in the Americas while you were employed?
13      A   Roughly, four months.
14      Q   And then I think we've heard that
15  Joanne Collins-Smee took over in February of 2007,
16  right?
17      A   Right.  That's correct.
18      Q   And you were her HR partner thereafter, right?
19      A   Yes.  She came in, and I continued to support
20  her in the same role.
21      Q   So in your role working with Ms. Collins-Smee,
22  how frequently would you have contact with her?
23      A   It varied.  Initially, it was probably
24  multiple times a week.  But over time, as she and I
25  got involved in more things and worked on more things

Page 1303

1  together, I sometimes talked to her daily or multiple
2  times a day.
3      Q   Were your offices close to each other?
4      A   Yes.  We were in the same building on the same
5  floor, probably ten offices apart.
6      Q   In this position, when you were an HR partner
7  in this job, did you have a team of people reporting
8  to you?
9      A   Yes.  Well, for some part of the time.  There
10  were a group of HR partners that reported to me, and
11  it ranged from, I guess, a low of eight people to a
12  high of a dozen direct reports in that job.
13          MR. FASMAN:  Can we put up number 36,
14  please?
15          MR. CARTA:  Defendant's?
16          MR. FASMAN:  Yes.
17  BY MR. FASMAN:
18      Q   Mr. Holmes, there are booklets there if you'd
19  like to see it in hard copy, but you can read off the
20  screen as well.  This is Defendant's Exhibit Number
21  36.
22          Do you recognize this document, sir?
23      A   Yes, I do.
24      Q   And what is it?
25      A   It's an e-mail from Joanne Collins-Smee to me

Page 1304

1  from late February 2007.
2      Q   Now, the e-mail is dated February 28th, 2007,
3  apparently almost 4 in the morning.  And I call your
4  attention to the highlighted portion, which says --
5  well, let me go back for a minute, okay?  Let's go
6  back to the first sentence, not the highlighted
7  portion.
8          "Dave L has requested this" -- this is the
9  replacement of Mr. Castelluccio -- "I will fill you in
10  tomorrow - Dave L has requested this, had asked months
11  ago from Kelton but, no action."
12          Were you aware that he had requested a change
13  in management from Mr. Jones?
14      A   No, I was not aware of that.
15      Q   Now, the next -- let's go to the next
16  sentence:  "I spoke to Jim C today - he understands
17  and also wants to move, he knew for a while that it
18  was not working."
19          Now, did you discuss this e-mail with
20  Ms. Collins-Smee?
21      A   Yes.
22      Q   Presumably not at 4 in the morning.
23      A   No.  But --
24      Q   Do you remember discussing it with her?
25      A   Yes, I do.  Because of the content of the

## Page 1305

1  e-mail, I made it a point to connect with her quickly.
2  I think it was the next business day. And we did talk
3  about the e-mail and the content.
4      Q  Do you remember discussing the highlighted
5  sentence with her, that she spoke to Mr. Castelluccio?
6  Did that subject come up in your discussion with her?
7      A  Yes. That was part of the conversation.
8  "I'll fill you in tomorrow," that was one of the
9  things we talked about. She shared some of the
10  background. She told me about the conversations she
11  had had with Dave and talked about what we would do
12  next.
13      Q  Did she talk about her conversation with
14  Mr. Castelluccio?
15      A  Yes, she did.
16      Q  Tell the jury what you recall about that
17  portion of the conversation.
18      A  Well, she essentially just restated and
19  clarified what's in the memo, that she had had a
20  conversation with Jim following up her conversation
21  with Dave, and that was the impression that she got,
22  was that he understood and that he, too, felt that
23  there were issues and was ready for a change.
24      Q  Now, in this e-mail, she asked you to pull a
25  slate for Jim's replacement. Can you explain to the

## Page 1306

1  jury how you would go about pulling a slate for his
2  replacement?
3      A  Well, a slate is essentially a list of folks
4  that we would identify as candidates to go into a job.
5  And so I would start by working with a person who had
6  access to a database whose job it was to do this kind
7  of work. And so we would build a profile -- a list of
8  the skills and the experience we thought was necessary
9  for the job. That person would put that into her
10  database, and it would pull a list of people.
11      Once we had that initial database pulled, we
12  would look through it. We would make some judgment as
13  to which of those names that were just pulled by the
14  computer really made sense. Then we would narrow that
15  down, sort it -- essentially, sort it into what we
16  thought were the strong candidates from that list and
17  what were weaker candidates. And then we'd share it
18  with the person who was actually going to hire for the
19  job.
20      Q  And the hiring manager would have some say on
21  who was appropriately on the list or not?
22      A  Yes. Absolutely. Once we pulled the slate,
23  the hiring manager could take people off because he or
24  she felt that they weren't appropriate or they could
25  add people to it. So they could refine it, and get

## Page 1307

1  a -- the purpose of the slate was to identify
2  candidates that they would eventually interview and
3  presumably pull someone or hire someone from that
4  list.
5      Q  So the actual pull of candidate names ends up,
6  I presume, with a fairly substantial list.
7      A  It can, yes. I have seen first pulls from the
8  database that were 25, 30 names, which is more than
9  anybody would really want to have to deal with.
10      Q  And are those people considered for positions?
11      A  They can be. Again, the list of -- from that
12  list of 30, some of them would simply be eliminated by
13  me or by the person pulling the list just for obvious
14  reasons: if they didn't fit, if they didn't have --
15  if they weren't at the right band level for the job,
16  or for other reasons where the computer pulled them
17  but they weren't a good match.
18      But essentially, everyone who was on the list
19  that we shared with the manager got the manager's
20  review, which I think is, in fact, consideration in
21  the process.
22      Q  Now, we've -- the jury has heard a lot about
23  5-minute drills, but I don't think there's been one in
24  front of the ladies and gentlemen of the jury. So
25  maybe we could take just a quick look at Defendant's

## Page 1308

1  Exhibit Number 78.
2      I don't know if you can see this. You'll have
3  it in your exhibit books at the end.
4      But Mr. Holmes, do you have that in front of
5  you?
6      A  Yes, I do.
7      Q  Why don't you -- let's talk about what's on
8  this document. This is the -- a confidential ITD
9  5-minute drill from November 6th, 2007.
10      What portion of the organization is this from,
11  sir?
12      A  This is essentially the global organization
13  that -- this 5-minute drill would have been run by
14  Bob Zapfel, who was the general manager for Global
15  ITDelivery at the time.
16      Q  And he was above Joanne Collins-Smee?
17      A  He was, yes. He was Joanne's manager.
18      Q  So this is his drill. Let's go down to the
19  first portion of this above the highlighted portion.
20  The first portion is on diversity. Why is that in
21  there, sir?
22      A  The purpose of a 5-minute drill is to really
23  look at, talk about, and make decisions about an
24  executive team. So we would look at movement in and
25  out. We'd also look at the demographics, the makeup.

5 (Pages 1305 to 1308)

Page 1309

```
1        And in this case, the portion you're pointing
2   to, the "Executive Diversity," we also paid attention
3   to that dimension of the team.  We looked at
4   women-versus-men representation, the population of
5   women versus men, and we also looked at minority
6   executive representation.
7        Q   Now, below that is a section called "Announced
8   Moves"?
9        A   Yes.
10       Q   Would you tell the jury what is that?
11       A   Well, that is a listing of those decisions
12  that had been approved in a prior 5-minute drill that
13  had been then announced and made official.  It was
14  published online or through e-mails -- announced that
15  the person was in the job, and the person officially
16  moved in, assumed the responsibility, and started
17  the job.
18       Q   Okay.  And there are a bunch of names on that,
19  some of whom we've heard about.  And under that is
20  another section called "Unannounced Moves."
21           And I wonder if you could tell the jury what
22  the "Unannounced Moves" are?  What are those?  You can
23  see Mr. Crawford's first name there.  Maybe you
24  could tell us what that's about.
25       A   "Unannounced Moves" were decisions that had
```

Page 1310

```
1   been approved and agreed for the person to move into
2   the job, but it had not become official.  There hadn't
3   been memos sent or announcements published online, and
4   the person was not actively, officially in the job
5   yet.
6        Q   So in other words, just to use Mr. Crawford as
7   an example, the unannounced move, he's being -- is
8   it -- well, why don't you explain what that entry is?
9   Rather than having me explain it, why don't you
10  explain what that entry is?
11       A   Yes.  What this indicates is that
12  Gordon Crawford had been approved to take over as the
13  senior DPE for WellPoint, but that that move had not
14  been officially announced, and Gordon had not
15  officially moved to that job yet.
16       Q   Why would that have been?  Do you know?
17       A   Yes.  In this case, it was because Gordon was
18  still engaged in his prior job and wasn't available to
19  move.  Everyone had agreed he was the guy, he was
20  going to take the job, but he simply couldn't come
21  from the U.K. where he was out of the job he was in
22  and assume this position yet.
23       Q   Let's go down if we can to page 4 of this
24  document, please, and the section that's highlighted,
25  "Key People to Move."
```

Page 1311

```
1        A   Yes.
2        Q   Then you've got a bunch of different people
3   here, and it goes on, on the next page.  But let's
4   just look at this one.  There are about how many?  Ten
5   people on this list in pages 4 and 5, I think?
6        A   Yes.
7        Q   Let's just look -- what function does this
8   serve, the "Key People to Move" portions, in there?
9        A   The "Key People to Move" portion of this drill
10  is intended to keep folks aware of people who are
11  available for a job, about to become available for a
12  job, and should be kept in mind when people are
13  looking to fill jobs.  This is essentially the folks
14  who were on deck for a new assignment.
15       Q   Okay.  And Mr. Castelluccio's name is
16  highlighted, correct?
17       A   Yes, that is correct.
18       Q   And are there also -- there's also a column
19  entitled PBC Information?
20       A   Yes.
21       Q   And what's that?
22       A   That is just a data point on what is the
23  person's current performance assessment, and it gives
24  the PBC assessment.  In this case, it's a 2.  And it
25  gives the date that that assessment was given, and
```

Page 1312

```
1   that was in December of 2006.
2        Q   And this is November 2007?
3        A   November 2007.  So that would be if
4   Mr. Castelluccio -- actually all these executives'
5   current PBC of record at that time.
6        Q   Okay.  Now, this is Mr. Zapfel's drill.  What
7   role did you play -- well, let's not go there quite
8   yet.
9            Did you prepare this?  Would you prepare this
10  agenda for Mr. Zapfel's drills?
11       A   No, I would not.
12       Q   Who would?
13       A   This would have been put together by my
14  manager, Steve Jarrett, and the executive resources
15  program manager who worked with Steve and me.  That
16  would have been Molly Schleis, I think, at the time.
17       Q   Now, we've heard about various levels of
18  drills.  Ms. Collins-Smee had a drill, right?
19       A   Um-hmm.
20       Q   And what role would you have with regard to
21  her drills?
22       A   Oh, with that drill, I would essentially
23  organize it and I would facilitate it.  I would have
24  put together this -- a document similar to this for
25  Joanne's drill.  I would have sent that out to the
```

Page 1313

1  team before the drill started.
2      I would have made notes of the discussion,
3  which I would then send out to the team. And I would,
4  sort of -- I would update it so that things that were
5  agreed would either move to announce or unannounced in
6  the next go around. And I essentially prepared for
7  and ran the drill at Joanne Collins-Smee.
8      Q  We heard testimony about Pat Kerin's drill.
9  Who is Pat Kerin?
10     A  Pat Kerin, at that time, was the general
11  manager for GTS Americas.
12     Q  And GTS was?
13     A  Global Technology Services. Sorry.
14     Q  And is that the sales side?
15     A  Yes. His team was essentially the sales and
16  relationship management side of Global Technology
17  Services. ITDelivery was the delivery and execution
18  side.
19     Q  Now, in her February 28th e-mail to you,
20  Ms. Collins-Smee says, "I also need to get Jim on
21  Pat Kerin's 5-minute drill. He would like to move
22  into a" -- she says "into a PE or a C band DPE role."
23  And that's to you.
24      At the time that this e-mail was written, who
25  was in charge of putting Mr. Kerin's drill together?

Page 1314

1      A  That would have been -- I believe that would
2  have been Patricia Lewis at the time. She was the
3  human resources vice president for Pat Kerin, and she
4  would have worked with Greg Burnett, who was the
5  executive resources person.
6      Q  How would you go about getting someone on
7  Pat Kerin's drill?
8      A  Well, I would ask -- I would reach out to
9  them. I would tell them, you know, what we wanted to
10  add to their drill, and tell them why, and provide the
11  information that they would need to put together the
12  chart for the discussion material for whichever part
13  of the drill it was, whether it was a specific job or
14  a key person to discuss.
15     Q  Did you do so in this instance with regard to
16  Mr. Castelluccio?
17     A  Yes. Yes, I did.
18     Q  What did you do?
19     A  I reached out to Patricia. I reached out to
20  Greg and asked them if we could include Jim on the
21  drill.
22     Q  And did you do that through a telephone
23  conversation?
24     A  Yes. Yes. It would have been a phone
25  conversation, or they were on the same floor in the

Page 1315

1  same building. I might have actually asked them
2  face-to-face.
3      Q  Now, Mr. Castelluccio was not placed on the
4  Pat Kerin drill at that time, correct?
5      A  That's correct.
6      Q  Did you know that at the time?
7      A  I did not realize that. I didn't participate
8  in that drill. I didn't see the drill.
9      Q  Do you have any idea why he wasn't placed on
10  the drill?
11     A  No. I don't know why they decided not to do
12  that.
13     Q  He was placed on the drill later --
14  Pat Kerin's drill later in the year, I think, November
15  or December. How did that come about?
16     A  That would have come about through a similar
17  request. I would have reached out to them and said,
18  Can you put Jim on the drill? Are you bringing in
19  people from outside? And this time I was successful
20  in getting him to include him.
21     Q  Now, I think he was -- Mr. Castelluccio was
22  placed on the Zapfel drill -- Bob Zapfel's drill,
23  which we see up there, back in June 2007. Did you
24  have a role in that?
25     A  Yes. It was the same role. I would reach out

Page 1316

1  to the folks who ran that drill and ask them to
2  include Jim, provide the information, and they
3  included him.
4      Q  Okay. And he was not placed on
5  Ms. Collins-Smee's drill until January, as I recall,
6  2008. Why was that?
7      A  That was a judgment. We didn't think it was
8  appropriate to have Jim on a drill with folks who
9  were, for the most part, his peers. Then as we got
10  later into the process, we thought that it would be
11  more to his benefit to include him. And so we took
12  the step to include him as a key person and to include
13  him in slates when we had openings.
14     Q  Now, let me ask if we can turn to Defendant's
15  Exhibit 44, please.
16      Do you recognize this document, sir?
17     A  Yes, I do.
18     Q  And what is it?
19     A  It's an e-mail from Joanne Collins-Smee to me
20  from March 2007. It's referring to a couple of
21  topics -- couple of items she wanted to have included
22  in the next Bob Zapfel 5-minute drill.
23     Q  And one of them is Mr. Echavarria?
24     A  Yes, that is correct.
25     Q  And why did she have to have Mr. Echavarria on

Page 1317

1   Mr. Zapfel's drill?
2       A   Because this was a vice president-level job,
3   and those required Bob Zapfel's review and approval,
4   and the 5-minute drill was the way to get that.
5       Q   Now, at the time this was happening at the end
6   of March, this is before Mr. Morin resigns.  Assuming
7   no other immediate assignments were available for
8   Mr. Castelluccio, what would have happened to him once
9   a replacement came?
10      A   Once someone was named to the WellPoint
11  account, he would have gone into a situation we refer
12  to as being on the bench.
13      Q   I think you may have misspoken.  Once he was
14  replaced by Mr. Echavarria.
15      A   Oh, I'm sorry.  Can you state the question
16  again?
17      Q   Sure.  We're talking about the same thing, I
18  believe.  If he was replaced in the vice president
19  role and assuming nothing else was available, what
20  happens to him?
21      A   Oh, okay.  Yes.  So the -- assuming -- in any
22  situation where an executive has been taken out of a
23  role and a replacement has been named, that executive
24  is what we call "put on the bench."  That means that
25  they don't have a specific assignment, but they are

Page 1318

1   still a member of the team and just in transition, but
2   without a specific role.
3       Q   Have you ever heard the term, "Your career is
4   your responsibility," at IBM?
5       A   Yes.  I've heard that many times.
6       Q   Frequently?
7       A   Yes.
8       Q   So what does that term mean for an executive
9   who's on the bench?
10      A   It means -- well, for everyone, it means that
11  when you're in transition, whether it's by choice or
12  something happens in the organization, it's your
13  responsibility to make the effort to find your next
14  job, to -- it also means that it's your responsibility
15  to build a track record and a reputation and a network
16  that's going to help you do that.  That's the sort of
17  bigger picture meaning of it.
18      Q   So it's on the record, when an executive is in
19  transition, they continue to get paid their salary?
20      A   Yes, they continue to get paid their salary.
21      Q   And they're continued to be covered by IBM
22  benefit plans?
23      A   Yes.  There's no change to benefit plans.
24      Q   So how would an executive go about finding a
25  position?  What would they do?

Page 1319

1       A   There's a few things they could do.  They
2   could network.  They could reach out to other
3   executives who would be hiring managers for jobs for
4   which they need a candidate.  They could just on their
5   own do research or keep track of executive movement to
6   see what job might be opening or who in the network
7   might be moving into a position where they could hire
8   them.  Or they could reach out to folks for updates on
9   activity like 5-minute drills; what was discussed,
10  what was available, where might they have opportunity.
11      Q   Would it be appropriate -- let me just give
12  you an example.  Would it be appropriate if someone
13  knew Bob Zapfel -- everyone knew he was running a
14  drill, right?
15      A   Right.
16      Q   Would it be appropriate to approach Mr. Zapfel
17  and say, I'm without a role.  What do you think?  Can
18  you help me?
19      A   Yes.  That would be absolutely appropriate.
20      Q   How about Mr. Kerin?  If you knew he was
21  running a drill?
22      A   Yes.
23      Q   Nothing inappropriate about that, right?
24      A   No.  People frequently do that.
25      Q   So does IBM's internal website have some form

Page 1320

1   of communication about executive movement?
2       A   Often.  It's not universal, but executive
3   appointments or announcements are often published on
4   the IBM website.  There -- these days in blogs or in
5   web posts called "executive corners," the
6   communications team just puts together a brief blurb
7   and it's announced to folks at IBM.
8       Q   So if somebody saw that Gordon Crawford moved
9   from here to there, would that -- could that provide
10  information for an executive looking for a position?
11      A   Yes, it could.  Absolutely.  And I know many
12  situations where something gets announced and the
13  e-mails and phone calls start pretty quickly.
14      Q   Well, what kinds of e-mails, and why would
15  they start?  Why don't you tell the jury how that
16  happens?
17      A   Because people would be interested in moving
18  into that job.  When a new executive is announced,
19  sometimes people reach out to that executive and
20  congratulate him or her.  And then the other piece of
21  the e-mail will be, so does your boss have anybody in
22  mind for your backfill?
23          Or people who knew I was the HR leader for an
24  organization that had had an executive move might
25  actually contact me, particularly if they knew me, to

## Page 1321

1  see if I had any suggestions or insight about whether
2  they could apply or whether they could be considered.
3      Q   I want to switch gears and talk about
4  something else, and that is what might happen if an
5  executive who was having trouble finding a position
6  chose to look at a non-executive position?  Are you
7  familiar with that happening?
8      A   Yes.
9      Q   So generally, how would that work?
10     A   Well, anyone who wants to apply for a
11 non-executive job can go online to see which jobs are
12 available.  There's a web job board called "The Global
13 Opportunity Marketplace," which is -- I guess it's
14 IBM's version of monster.com or some other job board.
15         You can go in, and you can search for a job by
16 band, by title, by skill, or even by hiring manager to
17 see what's available.  And then you could either apply
18 to the manager offline, call the manager, or you could
19 apply for the job directly online.
20     Q   So you could search for Band 10 New York
21 delivery, right?
22     A   Yes, you could.  You could put in that set of
23 criteria, and it would pull a list of jobs.
24     Q   And these are all -- these are publicly
25 posted -- within IBM, not publicly, I mean.

## Page 1322

1      A   Yes.
2      Q   I can't get them, right?
3      A   Anyone with an IBM online ID and a password
4  could go in and check.
5      Q   And I think we've established -- but band --
6  non-executive jobs are banded from 1 to 10?
7      A   That's correct, yes.
8      Q   And 10 being the highest?
9      A   Yes.
10     Q   And is there a salary range within these
11 various bands?  How does that work?  How are the
12 salaries set?
13     A   Actually a band is, in fact, associated with
14 salary range.  A band is a salary band, and there's a
15 range of salaries, or minimum and a maximum, for each
16 job group, each band at IBM.
17     Q   And so this would be sorted by job and band.
18 Is that what you're saying?
19     A   The jobs -- in the jobs that were posted, yes.
20 You could -- you wouldn't sort it by salary; it would
21 be sorted by band.
22     Q   No.  I think I'm asking -- I may not have been
23 clear.  So there would be -- on a Band 10 job, there
24 might be varying salaries based upon the nature --
25     A   Oh, yes.

## Page 1323

1      Q   -- of the job?  That's what I was trying to
2  ask you.
3      A   Yes.  So for a Band 10 delivery project
4  executive, there would be one salary range.  For a
5  Band 10 human resources person, there would be a
6  different salary range.  For a Band 10 marketing
7  person, there would be yet another salary.
8      Q   Could a Band 10 position have significant
9  responsibilities?
10     A   Yes.  Definitely.  There are Band 10 jobs --
11 if you look across IBM, Band 10 in certain parts of
12 the world could be a country manager.  Somebody in
13 Eastern Europe -- some Eastern European country may,
14 in fact, be managed by a Band 10.
15     Q   Are Band 10 employees eligible for bonuses?
16     A   Yes.
17     Q   Do they continue to receive their IBM
18 benefits?
19     A   Yes.
20     Q   And does IBM have a policy that governs
21 compensation when an executive -- an A, B, C, or D
22 executive moves into a numerically banded job?  Is
23 there a policy on that?
24     A   IBM has a policy that applies to any movement
25 from a higher to a lower band, including executives

## Page 1324

1  moving into non-executive roles.
2      Q   Tell the jury what that policy is, please.
3      A   Well, that policy is that the adjustment, the
4  reduction in their salary, can be no more than
5  10 percent of the salary.  But what we try to do
6  generally is keep someone's salary within the range
7  for that job, but sometimes someone in a higher band
8  will have a higher salary.
9          So just a simple example, if someone was in a
10 job that paid $120,000, they moved into a job where
11 the maximum was 100,000, the biggest reduction to
12 their salary would be 12,000, which is the 10 percent
13 limit.  So someone could be in a job where a maximum
14 is a hundred, but they would make 108 simply because
15 of this policy of not reducing salary by more than
16 10 percent.
17     Q   And could they move -- make that move without
18 suffering a reduction in salary?
19     A   They could because of the broad ranges for
20 salaries.  You could have someone at a higher band
21 whose salary would fit into the range for a lower
22 band.
23     Q   And could someone who was bidding down into a
24 Band 10 bid back up or somehow get up back into the
25 executive ranks at some point?

Page 1325

1    A   Yes.  If that person were still viewed as
2    having the skills and the experience to be an
3    executive, they could remain in the pool of talent
4    from which we hired executives.  It's called "The
5    Executive Resources Program."  And that would keep
6    them in the database.  They could be pulled into a
7    slate.  They could be interviewed for a job, and if
8    they were right -- the right candidate, they could, in
9    fact, return to an executive job.
10   Q   You seem to know a lot about this process.
11   Did you go through this process?
12   A   Yes.  I personally went through a job change
13   that involved me going from an executive job, when I
14   was the director of human resources for ITDelivery,
15   into a non-executive job through restructuring.
16   Q   And so tell the jury how you went about that,
17   and what happened.
18   A   Well, I was informed that the job I was in was
19   being eliminated, and I was given the choice of
20   finding another job within IBM or accepting a
21   separation package.  I chose to network with folks
22   that I knew, identify a job -- a Band 10 job, with a
23   colleague who knew my skills and thought I was good
24   for the job.
25       And she offered me the job after going through

Page 1326

1    the process that was -- that we saw with the 5-minute
2    drill since human resources jobs, even non-executive
3    jobs, go through a 5-minute drill.  I was taken in as
4    the lead candidate.  The team agreed it was a good
5    fit, it made sense, and I was offered the job and
6    moved into it.  And I've been in that role in some
7    form for the last several years.
8    Q   And are you a Band 10?
9    A   Yes, I am.
10   Q   What happened to your salary when you made the
11   move?  Did you suffer a reduction in salary?
12   A   Nothing.  My salary at that time as a Band D
13   was within the range for a Band 10.  So there was no
14   adjustment.
15   Q   So let's switch to another topic.  I think we
16   established that Mr. Morin, who we heard from on the
17   stand, resigned at the end of March 2007.  And I think
18   we were talking about his backfill.
19           MR. FASMAN:  Can we put up number 45,
20   Jean?
21   BY MR. FASMAN:
22   Q   Have you had a chance to look at that,
23   Mr. Holmes?
24   A   Yes, I have.
25   Q   What is it?

Page 1327

1    A   It is a series of e-mails between
2    Joanne Collins-Smee, Dave Liederbach, and
3    Jim Castelluccio.
4    Q   Were you aware at about this time that
5    Mr. Castelluccio was being moved to WellPoint?
6    A   Yes.  I was aware that that was the plan.
7    Q   How did you become aware?
8    A   Through conversations with Joanne.
9    Q   Did you discuss it with her once, more than
10   once?
11   A   Probably multiple times.
12   Q   In person?  On the telephone?
13   A   A combination.  But I do recall we had a
14   number of face-to-face conversations, because again,
15   this was a member of her senior team, an important
16   change we were going through.  So we would have been
17   in contact.
18   Q   Did you have an understanding of the rationale
19   for this move?
20   A   As I understood it, because of the change in
21   the vice president of public sector, Jim was
22   available.  And there was a need for a senior DPE --
23   executive DPE on WellPoint.  And it was an available
24   person and an open opportunity, and it was just a
25   match.  That was my understanding.

Page 1328

1    Q   What was your understanding, if you had one,
2    as to whether this was temporary or permanent?
3    A   My understanding was it was temporary and
4    could become permanent.  It was -- again, my
5    understanding was that Jim would be assigned, and if
6    he could perform and deliver in the role, he would
7    essentially be able to earn it as a permanent
8    assignment.
9    Q   Did you consider this move some kind of
10   punishment?
11   A   No.  I considered this move as an opportunity.
12   Q   Now, I think we've established previously that
13   Mr. Castelluccio was ultimately replaced by
14   Gordon Crawford.
15       As much as I would love to go through every
16   one of the 5-minute drills that he was on, I'm not
17   going to do that.  But they are the following
18   exhibits, and I'd like to just read them so that we
19   have them, the jurors will have them in their
20   notebooks when we're done.  I think that's what we
21   agreed.  So these are Exhibits 58, 60, 67, 72, 70 --
22   these are all Defendant's Exhibits -- 78, 81, 83, 84,
23   90, 93, 97, 98, 101, 103, and 119.
24       And those are right, correct?
25       So, Mr. Holmes, did you attend 5-minute

Page 1329

```
1    drills -- I think you've talked a little bit about
2    this -- did you attend 5-minute drills as part of your
3    job?
4         A    Yes, I did.  I attended a couple of different
5    5-minute drills.
6         Q    Tell the jury what 5-minute drills you
7    attended and what your role was in these various
8    drills.
9             I mean, you've explained what you did in Ms.
10   Collins-Smee's drill, right?
11        A    Yes.
12        Q    You ran that one?
13        A    Yes.  I organized and facilitated and led that
14   drill discussion.  I also attended the 5-minute drill
15   that was run by Bob Zapfel.  Those were the two
16   levels -- the -- leaders change over time -- but those
17   were the ones where I was actively, consistently
18   involved.
19        Q    Were those drills that Ms. Collins-Smee
20   attended as well?
21        A    Yes.  The ITD America drill was her drill, and
22   she was there almost all the time.  There might have
23   been one occasion where she wasn't present, and we
24   proceeded.  And she was also a participant in the
25   Bob Zapfel drill as one of his direct reports.  And
```

Page 1330

```
1    she was always invited and usually attended and
2    actively engaged.
3         Q    Just to clarify, the ITD America's drill, Ms.
4    Collins-Smee's drill, that was held every month?
5         A    Yes.  It was standard to hold it monthly.
6    There may have been months where because of scheduling
7    it was cancelled, or because there was no new activity
8    we might have skipped it.  But it was a standard
9    monthly meeting.
10        Q    Now, let's talk about the Zapfel drills.  Did
11   you and she attend those meetings together?
12        A    Sometimes.  If we were both in Somers on the
13   day at the time of the drill, we might attend together
14   or we might dial in and take the call together.
15        Q    Now, do you recall -- on the Zapfel drill, do
16   you recall Ms. Collins-Smee bringing Mr. Castelluccio
17   up at any time?
18        A    Yes.  He was -- since he was often shown in
19   those drills as a key person to discuss, when we got
20   to that portion of the conversation, they would look
21   to Joanne since she was -- I believe from experience
22   and what I saw here, she was always listed as the
23   executive sponsor.  So as we got to that part of the
24   discussion, the team would look to Joanne for any
25   updates or if they had questions or if they had ideas
```

Page 1331

```
1    relating to Jim and opportunity.
2         Q    And how about on various other -- strike that.
3             What would she say about him?
4         A    It varied.  I mean, if it was -- early on, it
5    was to make it -- you know, to inform folks that he
6    was available to -- you know, to promote him to people
7    as someone they should look at.
8             In different discussions, as we went through
9    to look at specific jobs, there were occasions where
10   she would suggest he be added to a list for
11   consideration or when it was part of the discussion as
12   we moved through time, because there were a number of
13   drills.
14            Sometimes it would just be to answer questions
15   that people might have had about Jim and his
16   availability and what he was interested in -- just to
17   provide an update.  But it ranged from answering
18   questions through active promotion of him as a
19   candidate.
20        Q    Do you recall her saying anything that would
21   have made it more difficult for him to get a job?
22        A    No, I do not.
23        Q    When you say "active promotion," what types of
24   things would she say?
25        A    She would say, I really think you could
```

Page 1332

```
1    consider Jim for this job, because of X, Y, Z.  She
2    would talk about his experience.  She would talk about
3    his skill sets.  She would talk about the job.  And
4    based on her knowledge of the job, the client, Jim,
5    all the factors, she would try to make the case that
6    he should be considered, at least.
7         Q    How many -- just generally speaking, how many
8    times do you recall her doing that; that is,
9    recommending him for a position whether he was on the
10   slate or not?
11        A    More than a couple, less than a dozen.  Again,
12   it was multiple drills and many jobs.  I can't --
13        Q    Okay.  Is it possible for a candidate to be on
14   too many drills?
15        A    Yeah.  It is, in my experience.
16        Q    And why don't you tell the jury why you say
17   that?
18        A    Well, sometimes if a person -- because again,
19   these are regular discussions with the same audience.
20   And if somebody comes into a drill often, folks might
21   start to just sort of ignore it or stop paying
22   attention.  They might stop asking questions.  They
23   might -- you know, my own point of view, my own sort
24   of reading of people is they just get tired of it.
25            And sometimes people just decide -- will
```

**A-614**

1    decide tactically to put someone -- you know, if
2    you're brought in as a key person to discuss and
3    you're on the slate, but you don't get the job,
4    they'll just pull that person off of a drill for a
5    while to let folks, I guess, clear their pallet, clean
6    their pallet on it, because, you know, again, you
7    don't want them to turn off to the person as a
8    candidate.
9        Q    All right.  Now, let's go to another subject,
10   and that is Mr. Castelluccio's termination.  At some
11   point, a decision was reached as to -- that
12   Mr. Castelluccio's time on the bench would have to
13   end.  Who made that decision?
14       A    Joanne Collins-Smee made that decision.
15       Q    Had you discussed that issue with her before
16   she made that decision?
17       A    Yes.  Over the course of months before that,
18   we had talked about it in a number of conversations, a
19   couple of different contexts.
20       Q    Can you tell the jury what the nature of those
21   discussions was?
22       A    Well, as we went through different
23   assignments -- or as Jim went through different
24   assignments, as we went through different efforts and
25   5-minute drills and reaching out to people about

1    opportunities for Jim and weren't getting results, we
2    had the conversation about what was reasonable.  How
3    long could we afford to stay in this mode of having a
4    VP level executive on the bench; afford in terms of
5    just their salary and the expense, but also afford in
6    terms of, you know, appearances and impact on the rest
7    of the team; what was reasonable?  And we had a couple
8    different conversations, had -- maybe had a few
9    different opinions on it over time.  But it did come
10   to a point where we agreed that we couldn't stay in
11   the mode and had to make a decision.
12       Q    So ultimately, she decided six months on the
13   bench was enough.  Did you think that was
14   unreasonable?
15       A    I did not think that was unreasonable.
16       Q    What did you think of it?
17       A    Actually, I thought it was generous.
18       Q    And why?
19       A    Because in my experience that -- for someone
20   to be on the bench without a clear assignment for six
21   months was unusual.  It was more typically half that
22   time.
23       Q    Okay.  Let me ask you to turn to Defendant's
24   Exhibit 117, please.
25            Do you recognize this document, sir?

1        A    Yes, I do.
2        Q    What is it?
3        A    It is an e-mail that I sent to
4    Joanne Collins-Smee with some talking points and some
5    information about documents that would need to be
6    shared with Jim as part of a discussion about his
7    being offered a separation package if he couldn't find
8    a new role by the end of June 2008.
9        Q    Now, it appears there was a separation package
10   attached to this, sir?
11       A    Yes.
12       Q    Are you familiar with the separation packet?
13       A    Yes, I am.
14       Q    And did it contain a general release of
15   claims?  I think we heard that already.
16       A    Yes.
17       Q    And in connection with a general release of
18   claims, does it also advise the employee to consult a
19   lawyer?
20       A    Yes, it does.
21       Q    Do you know why that's the case?
22       A    I understand that's because of EEO regulations.
23       Q    And did this package include that portion?
24       A    Yes, it did.
25       Q    I wonder if we could turn, then, to the next

1    exhibit, which is Defendant's Exhibit 118, please.
2            And what is this document, sir?
3        A    This is an e-mail that I sent to
4    Jim Castelluccio, copying Joanne Collins-Smee, which
5    contained copies of -- soft copies of the documents
6    associated with his offer of a separation package.  I
7    sent this as a follow-up to Joanne's meeting with Jim
8    to make sure he had the documents and to let him know
9    that he should review them and that I would be
10   available to answer any questions that he had on them.
11       Q    Now, these -- are you familiar with these --
12   what the documents referenced here?
13       A    Yes, I am.
14       Q    Are any of them a noncompetition agreement?
15       A    No, they aren't.
16       Q    Would any of them be a barrier to
17   Mr. Castelluccio calling prior contacts that he met at
18   IBM and seeking work?
19       A    No, they would not.
20       Q    Did you have a discussion with
21   Mr. Castelluccio about these documents?
22       A    Yes, I did.  We met probably a few days after
23   I sent this e-mail.
24       Q    And what was the nature of that discussion?
25       A    Well, that was a discussion -- there were a

Page 1337

```
 1   couple parts to it -- three actually.  One was just to
 2   check in with Jim, following up the conversation with
 3   Joanne, and we talked about his situation and what
 4   that meant.  And then we went through the documents
 5   themselves, particularly the executive separation
 6   agreement, and we talked through it, walked through
 7   it, shared a couple of questions.
 8        I agreed that -- I either answered the
 9   questions where I knew it, or I agreed to follow up
10   and get him answers about the document itself.  And
11   then we just closed the meeting talking about --
12   again, telling him to reach out to me if he had
13   questions and confirming the timeline for him to make
14   a decision, and/or, you know, you can find a job, make
15   a decision.
16        Q   Did he say anything about Mr. Liederbach in
17   this discussion with you?
18        A   That was part of the -- yeah, part of the sort
19   of discussion about the situation.  When I met with
20   Jim, he shared with me that he thought some of this
21   was -- a lot of this was tied to the fact that he and
22   Dave Liederbach hadn't seen eye to eye or just had
23   different personalities and it hadn't worked out.  And
24   that was a reference to Dave Liederbach in that
25   conversation.
```

Page 1338

```
 1        Q   I have just a couple more questions on various
 2   different exhibits.
 3        Can we turn to Plaintiff's Number 65, please?
 4            MR. FASMAN:  This is our copy, if it's
 5   okay.
 6            THE COURT:  Yes.
 7   BY MR. FASMAN:
 8        Q   Aside from the page that I just tore, it has
 9   no notes or other markings on it.
10        Mr. Holmes, do you know what that is?
11        A   Yes.  This is what's referred to as a quick
12   view --
13        Q   What's that?
14        A   -- document.
15        It's a training information piece that's put
16   together for managers on different topics, to share
17   best practices, tell them tips and tricks and pitfalls
18   in doing different things in managing their people.
19        Q   Is this a policy guidance document?
20        A   No, this is not.
21        Q   How does it differ from that?
22        A   What this is -- again, this is a manager
23   guide.  It's primarily intended for new managers who
24   want to understand how-tos and for experienced
25   managers who want to keep up on current practices or
```

Page 1339

```
 1   refresh on how something is done.
 2        A   A policy document would be a mandatory
 3   document stating a specific approach and requirement
 4   for managers to follow.  This is guidance and advice,
 5   which is different, I think.
 6        Q   So who are -- do you recognize the name -- the
 7   highlighted portion, who are these people who put it
 8   together?
 9        A   I recognize several of the names.  They are
10   human resources generalists.  There are a couple of
11   folks who are involved in the employee relations
12   part -- organization within human resources.  And
13   there's actually a couple of folks from other
14   disciplines here.  There's a member of the legal
15   team, but these are HR people, lawyers who essentially
16   did this apparently as a project.
17        Q   So let's turn to page 3, if you would, please,
18   because we've heard about this document previously.
19   Turn to page 3, and the top highlighted portion says:
20   "What are general guidelines for providing feedback,"
21   right?
22        A   Yes.
23        Q   And what's your understanding of general
24   guidelines for providing the feedback?
25        A   General guidelines for providing feedback are
```

Page 1340

```
 1   recommended approaches to delivering feedback to
 2   employees.
 3        Q   So let me direct your attention, like, to the
 4   third bullet down, "Establish the right environment."
 5        Is it mandatory that a manager must establish
 6   the right environment for providing feedback?
 7        A   It's not mandatory; it's recommended.
 8        Q   How about the next one?  "Giving feedback with
 9   care and attention"?
10        A   Again, not mandatory, not always done, but
11   highly advised.
12        Q   And how about -- I don't know -- take the next
13   one down:  "Listen to and engage the employee"?
14        A   Again, this is -- this would be the best
15   practice.  This would be what good managers do if they
16   want to do everything right, but it's not mandatory.
17        Q   And how about the next page?  The portion that
18   we've heard about before, top of page 4, "Maintain
19   notes"?
20        A   No, again, that's -- no, that's not mandatory.
21   It is good practice, particularly for managers with a
22   lot of people who have a lot going on, but it's not
23   mandatory.
24        Q   And if the manager didn't do that, would that
25   prove that they're engaged in age discrimination?
```

**A-616**

Page 1341

1      A   I don't think so.
2      Q   Let me ask you if you would, please -- I'll
3  take that back and I'll give you another one.  And
4  this is Plaintiff's 204.  Let me ask you, Mr. Holmes,
5  this is another one we have previously seen.  This is
6  a document that Mr. Carta examined on, and if I could
7  ask you to please turn to page 7 of this document.
8  That's the highlighted portion.
9          Do you see that, sir?
10     A   Yes, I do.
11     Q   Now, I believe Mr. Carta had one of his
12 witnesses read just the first highlighted sentence.
13 Why don't you read them together into the record,
14 please?
15     A   "Plaintiff was separated from IBM for
16 legitimate non-discriminatory business reasons, his
17 poor performance in two assignments in the Integrated
18 Technology Delivery organization.  Even after being
19 removed from his last role, IBM still provided him
20 more than six months at full pay to obtain another
21 position within the Company, and assisted him in doing
22 so, before he was ultimately separated in June 2008."
23     Q   So are those two reasons related in some way?
24     A   I'm sorry?
25     Q   Performance and not finding a job, are they

Page 1342

1  related in Mr. Castelluccio's case?
2      A   Indirectly.
3      Q   What do you mean by that?
4      A   In that as I said earlier, part of finding a
5  job is a track record and a reputation.  And if you
6  are not performing in the role that you have, it is
7  more difficult to find another job.
8      Q   Are these two statements both true, to the
9  best of your knowledge?
10     A   Yes.  To the best of my -- yes, they are.
11     Q   Two more issues I'd like to take up with you.
12 One, at my request, IBM prepared a list of
13 Ms. Collins-Smee's Band C and Band D executive reports
14 during, I think it's 2008 to 2011.  And I forwarded
15 that to you, sir, did I not?
16     A   Yes, you did.
17     Q   And did you have a chance to review it?
18     A   Yes, I did.
19     Q   And to the best of your knowledge, is it true
20 and accurate?
21     A   Yes, it is.
22         MR. FASMAN:  Can we put the demonstrative
23 up from the chart, please?
24 BY MR. FASMAN:
25     Q   Have you reviewed this chart as well, sir?

Page 1343

1      A   Yes, I have.
2      Q   And to the best of your knowledge, based on
3  your review of records, is this also accurate, sir?
4      A   Yes.
5      Q   And maybe you can explain to the jury what
6  this shows, sir?
7      A   What this shows is a comparison of the average
8  ages for executive -- that's Band C vice president
9  level executives and Band D director level executives.
10 And it just looks at that movement over time.  And
11 essentially what you see is that both those
12 populations have average ages throughout the period
13 from 2007 to 2011 ranging from the early 50s through
14 the early 60s.
15     Q   One more thing I'd like to ask you about, and
16 that is Plaintiff's Exhibit Number 173.
17         Mr. Holmes, do you know what that is?
18     A   Yes.  It's an executive compensation
19 statement.
20         MR. FASMAN:  I think this one was
21 introduced earlier, Your Honor.  It was to show that
22 Mr. Castelluccio had received 174 shares of stock in
23 2007 -- or stock options in 2007.
24 BY MR. FASMAN:
25     Q   There's a reference on here -- and did you

Page 1344

1  review this at my request?
2      A   Yes, I did.
3      Q   And there's a reference on here.  On page 2,
4  is it?  In fact, there's several of them.  "Buy-First
5  Stock Options."  Do you see that?
6      A   Yes, I do.
7      Q   What's the nature of that program, sir?
8      A   Buy-First is a program that allows executives
9  to buy IBM stock options by electing -- well, by
10 investing a part of their bonus.  They have the option
11 to invest 5, 10, or 15 percent of their annual bonus
12 in IBM options.
13     Q   So this would be a voluntary choice by the
14 employee?
15     A   Yes.  The employee would have to elect to make
16 this investment.
17     Q   And this does not represent a normal grant of
18 stock options to the employee for excellent
19 performance, right?
20     A   Right.  This would not be part of what -- this
21 would not be part of the compensation cycle or award
22 cycle.
23         MR. FASMAN:  The only other thing I would
24 add -- I'm about to tender the witness, but I believe
25 that when Mr. Castelluccio was testifying, Your Honor,

## Page 1345

```
1    I misspoke.  And I thought these shares were for a
2    vacation buyback, and that is not right.  That is what
3    I thought at the time, but I knew it wasn't a grant.
4    But this explains what they were.  So I apologize, and
5    I apologize to the jury if I said something that was
6    misleading.
7              THE COURT:  Thank you.
8              MR. FASMAN:  I'm done with Mr. Holmes for
9    the moment.
10             THE COURT:  Okay.  Mr. Carta?
11
12             CROSS-EXAMINATION BY MR. CARTA:
13
14    Q    Good afternoon, Mr. Holmes.
15    A    Good afternoon.
16    Q    I think you know that I'm Mark Carta, and I
17   represent Mr. Castelluccio.
18    A    Yes.
19    Q    You recall that I deposed you some time ago?
20    A    Yes.
21    Q    Let me start off with a question about the
22   executive movement being posted on the website.
23       Do you know when they first began posting
24   executive movement on the website?
25    A    I don't know when they first began.  I believe
```

## Page 1346

```
1    it's been a practice as long as I've been at IBM.
2    Q    Isn't it true that that practice that you've
3    discussed about executive information being available
4    on the website, that that practice was not in place in
5    2007?
6    A    No, that's not true.
7    Q    And was it -- is it your testimony that it was
8    in place also in 2008?
9    A    Yes.
10    Q    Okay.  Let me ask you some questions about
11   what you maintain that you did.  You maintain that at
12   one point you were out of a position and that you
13   agreed to step from -- what was your band at that
14   point?  You were a step --
15    A    It was a Band D.
16    Q    You were in a Band D?
17    A    Yes.
18    Q    And you accepted a position in a Band 10 --
19    A    Yes.
20    Q    -- is that right?
21       Okay.  Was that something that you had seen
22   commonly done before?
23    A    Yes.
24    Q    And that's different, would you agree, than
25   stepping from a Band B position, which is a second
```

## Page 1347

```
1    level executive, down to a Band 10?  Wouldn't you
2    agree with that?
3    A    I'm sorry.  Did you say "B"?
4    Q    I'm sorry.  A Band C.  I misspoke.  A Band C
5    through a Band D all the way down to a Band 10.
6       Those are different situations entirely,
7    wouldn't you agree?
8    A    Yes, I would agree.  That is a different
9    situation.
10    Q    Entirely different, do you agree with that?
11    A    No.  It's an executive going to a
12   non-executive job.  So there is a similarity.  It's a
13   very different circumstance personally.
14    Q    Wouldn't you agree that's an extraordinary
15   situation for an executive to move from a Band C
16   position all the way down to a Band 10 position?
17    A    Yes, I would agree with that.  It would be
18   extraordinary.
19    Q    It would be extraordinary.  And, in fact, did
20   you and Ms. Collins-Smee ever discuss whether that was
21   something -- question withdrawn.
22       Let me just put some of this in context.  You
23   were the HR executive for the ITDelivery department, I
24   think you said, starting in October of 2006?
25    A    Yes, that's correct.
```

## Page 1348

```
1    Q    And at that point in time, Mr. Kelton Jones
2    was the head of ITDelivery?
3    A    Yes.  He was the general manager for
4    ITDelivery Americas.
5    Q    And so for that first six-month period until
6    he was replaced by Collins-Smee, you were working for
7    Mr. Jones, is that right?
8    A    Yes, that's right.
9    Q    And in that time period, did you see
10   Mr. Kelton Jones ever put anybody on the bench?
11    A    I don't recall.
12    Q    And do you recall -- or were you with him long
13   enough to testify -- that it was his practice, if he
14   was going to move an executive out of a position, to
15   do that in parallel with backfilling that position so
16   that the position -- the executive he was pulling out
17   of a position would move directly into a new position?
18   Did you observe that that's how he performed when he
19   moved executives from one position to another?
20             MR. FASMAN:  Your Honor, I just have to
21   object to the form of the question.  It seemed like at
22   least two, and both of them were somewhat lengthy.
23             THE COURT:  The objection's noted, but
24   it's overruled.  I think the witness is following the
25   question.  You can answer that, sir.
```

Page 1349

1    THE WITNESS: I don't recall, honestly.
2  It's -- I don't know whether that was how Kelton
3  executed. I hadn't thought back to his approach to
4  moving executives for the four months that I worked
5  for him.
6  BY MR. CARTA:
7    Q   Do you recall any instance in which he pulled
8  someone out of a position before he had a -- question
9  withdrawn.
10    Do you recall any situation where he pulled an
11  executive out of a position without having a position
12  for that executive to move into?
13    A   No. I don't recall anything like that.
14    Q   Okay. So after working with Mr. Jones for a
15  period of time, you then ran the 5-minute drills for
16  Ms. Collins-Smee, is that right?
17    A   Yes.
18    Q   And were the procedures for running the
19  5-minute drills essentially consistent between the way
20  they were run by Mr. Jones and the way they were run
21  by Ms. Collins-Smee?
22    A   Yes. Essentially.
23    Q   And in both instances, Mr. Jones and
24  Ms. Collins-Smee had the ability to have people added
25  to the slates if they chose to, isn't that right?

Page 1350

1    A   In their 5-minute drills?
2    Q   In their 5-minute drills.
3    A   Yes.
4    Q   That was entirely up to them, isn't that
5  correct?
6    A   Yes.
7    Q   If somebody else asked for somebody to be
8  added to a 5-minute drill and they didn't want that
9  person added, they could not have that person added on
10  their 5-minute drill, isn't that right?
11    A   Yes, that's right.
12    Q   And if they wanted to have somebody on a
13  slate, they could have that person on as many slates
14  as they wanted to, couldn't they?
15    A   Yes, they could.
16    Q   Now, just to recap, the positions that were
17  being filled on the ITD Americas drill, those were
18  positions for people in the ITDelivery outsourcing
19  business, isn't that correct?
20    A   Yes.
21    Q   That was the nature of the business. That was
22  the nature of the positions that were being filled on
23  that drill.
24    A   Right. That was the scope of the drill.
25    Q   And that was exactly the same scope as the

Page 1351

1  kind of -- question withdrawn.
2    Those are the positions that Mr. Castelluccio
3  had performed in for the prior ten years, isn't that
4  correct?
5    A   It would have been in the same organization,
6  though. The jobs had evolved over ten years. But
7  yes, that is correct.
8    Q   So the positions that were discussed and
9  reviewed on the executive 5-minute drill run by
10  Ms. Collins-Smee, those are the very positions for
11  which Mr. Castelluccio was most qualified, isn't that
12  true?
13    A   That's an opinion. I wouldn't agree with it,
14  though.
15    Q   Were there other positions that -- let me
16  rephrase it.
17    The positions on Ms. Collins-Smee's 5-minute
18  drill, those were exactly the same positions as
19  Mr. Castelluccio's skill set -- were consistent with
20  Mr. Castelluccio's skill set, isn't that correct?
21    A   Were the same or consistent? You asked two
22  questions.
23    Q   Okay. I'll be more clear.
24    Isn't it true that positions that were
25  reviewed and discussed on Ms. Collins-Smee's 5-minute

Page 1352

1  drill, that those were the positions for which
2  Mr. Castelluccio had the best -- was best suited in
3  terms of his skills?
4    A   That's -- again, it's an opinion. There were
5  other jobs in other parts of the business for which he
6  might have also been suited because of his experience
7  and his band level and the timing and the
8  organization. And the purpose of the 5-minute drill
9  is to put the best person into a job. So that's --
10  again, that's an opinion.
11    Q   I'm asking you your opinion. Isn't it true --
12  I'm not asking you if there were other positions that
13  were available outside that 5-minute drill. I'm not
14  asking that. That's what you said, but that's not
15  what I'm asking.
16    I'm asking simply isn't it true that the
17  position -- you're familiar with the positions that
18  were being discussed on Ms. Collins-Smee's 5-minute
19  drill, right?
20    A   Yes.
21    Q   You created the drill, right?
22    A   Yes.
23    Q   And you would create the slate of candidates,
24  as she asked you to, isn't that right?
25    A   Yes.

Page 1353

1    Q   So you're specifically familiar with the kinds
2  of positions that were there, isn't that right?
3    A   That is right.
4    Q   And those are the kinds of positions that
5  Mr. Castelluccio had the skills and background to
6  perform, isn't that correct?
7    A   That is correct, yes.
8    Q   And do you recall that Miguel Echavarria
9  replaced Mr. Castelluccio as VP of public sector?
10    A   Yes, I do recall that.
11    Q   And he assumed that position in June of 2007,
12  is that correct?
13    A   Yes, that is correct.
14    Q   So am I correct that, prior to the time that
15  Mr. Echavarria became VP of public sector, that
16  position was filled by Mr. Castelluccio?
17    A   Yes, that is correct.
18    Q   And do you recall that in his role as VP of
19  public sector, Mr. Castelluccio had participated in
20  the 5-minute drill process when he was in that role?
21  When he was one of the VPs for Ms. Collins-Smee, he
22  participated in the 5-minute drill process, isn't that
23  right?
24    A   Right.
25    Q   All the VPs did.

Page 1354

1    A   Yes.  All of her direct reports -- all the VPs
2  and some directors.
3    Q   And isn't it true that once Mr. Echavarria
4  took his place as VP, that Mr. Castelluccio was no
5  longer a participant in her 5-minute drills?
6    A   That is true, yes.
7    Q   And that would have occurred in June of 2007,
8  is that correct?
9    A   Thereabouts.  Yeah.
10    Q   So prior to June of 2007, he was a regular
11  participant in drills, and after that he was excluded
12  from those drills, isn't that correct, as a
13  participant?
14    A   Yes.  He was no longer qualified to attend the
15  drill.  He was no longer a VP direct report.
16    Q   Would you agree that if Ms. Collins-Smee had
17  identified Mr. Castelluccio as a person to move on one
18  of her drills before June at a time when he was
19  participating, then he would have seen from the drill
20  that she intended to remove him from the position of
21  VP of public sector?
22    A   That would have been a reasonable inference if
23  that had happened, yes.
24    Q   So if he was a participant prior to that, he
25  would have seen that she had intended to move him,

Page 1355

1  isn't that correct?
2    A   No.  Because she wouldn't have done that.  We
3  wouldn't have put him on the drill that he attended as
4  a key person to move, and we wouldn't have put his job
5  into a discussion on the drill that he attended.  That
6  would just be horribly bad management and HR practice.
7    Q   That's not my question.
8    A   Then I misunderstood it.
9    Q   That's okay.  My question is:  If he had
10  not -- since he was not a participant in her drills
11  after June, if his name had been listed, he would have
12  no way of -- I'm sorry -- if the position had been
13  listed, then he would have known that his position was
14  being -- was open and that he was being removed from
15  that position.  That's all my question is.
16        MR. FASMAN:  I'm going to object.
17        THE WITNESS:  I'm sorry.
18        MR. FASMAN:  It's a hypothetical.  I
19  don't think --
20        THE WITNESS:  If he was no longer on the
21  drill, he wouldn't have seen anything happen in the
22  drill and he would have no knowledge.  It's sort of an
23  impossible question.  If he can't see it, then he
24  can't see it to know.
25  BY MR. CARTA:

Page 1356

1    Q   That's exactly my point, and maybe my phrase
2  was inartfully asked.  If he wasn't there, then there
3  would be no way for him to know, isn't that correct?
4    A   If he wasn't --
5    Q   If he wasn't a participant in the drill.
6    A   If he wasn't a participant in the drill, he
7  would not see what was in the drill.
8        MR. CARTA:  Exhibit 29, please.
9        MR. FASMAN:  Is that Plaintiff's?
10        MR. CARTA:  Plaintiff's, yes.
11  BY MR. CARTA:
12    Q   I think you testified a few moments ago that
13  you received this e-mail on or about February 28th, is
14  that right?
15    A   Yes, that's right.
16    Q   And at the time you received this e-mail,
17  isn't it true, as you told me in your deposition, that
18  Ms. Collins-Smee did not explain how she had come to
19  the decision to replace Mr. Castelluccio?  Do you
20  remember telling me that at the time of your
21  deposition?
22    A   Yes.
23    Q   And isn't it also true that at the time of
24  your deposition you told me that she did not identify
25  you -- for you any alleged deficiencies in

17 (Pages 1353 to 1356)

Page 1357

1  Mr. Castelluccio's performance at the time he received
2  this?
3      A   Yes.
4      Q   And when you gave me those answers, you were
5  under oath, isn't that correct?
6      A   Yes.
7      Q   And you told me the truth, I assume?
8      A   Yes.
9      Q   Those were truthful answers?
10     A   Yes.
11     Q   Do you recall whether you added anything to
12 Ms. Collins-Smee -- to Mr. Castelluccio's personnel
13 file after you received this e-mail?
14     A   I did not, no.
15     Q   Did you bring this to the attention of
16 Mr. Castelluccio?  Did you speak to him about it at
17 that time?
18     A   I did not, no.
19         MR. CARTA:  Exhibit 138 -- Plaintiff's
20 138.
21         MR. FASMAN:  I wonder if I can have a set
22 of exhibits for Mr. Holmes.
23         THE WITNESS:  This book only runs to --
24 BY MR. CARTA:
25     Q   Take a moment and review the e-mail dated

Page 1358

1  March 5, 2007.
2      A   Yes.  I see, yes.
3      Q   And is this an e-mail that Ms. Collins-Smee
4  sent to you?
5      A   Yes, it is.
6      Q   And you received it on or about March 5th,
7  2007?
8      A   Yes, that's correct.
9      Q   And that was just a few days after she had
10 made the decision to remove Mr. Castelluccio, isn't
11 that right, from his position of VP of public sector?
12     A   Yes.  About a week.
13     Q   And she specifically asked you to add
14 Ken Wisse to her slate of candidates, isn't that
15 right?
16     A   Yes.
17     Q   And that was a routine procedure.  Again, when
18 she wanted to have somebody added to her slate of
19 candidates, she would specifically request that and it
20 would be added.
21     A   Yes.  That's -- yes.  On the slate, you would
22 start with a list generated by the system.  We'd
23 refine it, and then she as a hiring manager could
24 refine it again.
25     Q   And this concerns creating a slate of

Page 1359

1  candidates for the VP of public sector position, isn't
2  that right?
3      A   Yes, that is right.
4      Q   And the e-mail -- if you look at the second
5  page, it seems as if -- am I correct that she was sent
6  a draft of the -- of her 5-minute drill for this
7  month, which would have been March?  And she contacted
8  you because she saw that there was no slate of
9  candidates for the VP of public sector position, isn't
10 that right?
11     A   No, that's not right.
12     Q   What was the point of her contacting you, as
13 you understand it?
14     A   The premise is not correct.  This is an e-mail
15 about the Bob Zapfel 5-minute drill.
16     Q   Oh, okay.  This was Mr. Zapfel's drill?
17     A   Yes.  The initial note was sent by
18 Steve Jarrett.  He was the vice president of HR, and
19 this -- as I described my role in Joanne's 5-minute
20 drill, Steve did the same for Bob Zapfel.
21         Steve put together the materials, sent it out
22 to people early.  Joanne saw Bob Zapfel's drill
23 document, and it didn't include Jim's position.  And
24 so she was inquiring about why it wasn't in Zapfel's
25 drill and what we would do to address that.

Page 1360

1      Q   And she was asking you to be sure that that
2  position was listed on Mr. Zapfel's drill, isn't that
3  correct?
4      A   Again, no.  She asked me why it wasn't, and
5  she -- I told her that, while it wasn't officially in
6  the document, she could bring it up in the
7  conversation.  And so I recommended that approach.
8         So we didn't miss that drill discussion, but
9  we wouldn't -- I think ultimately we wouldn't have the
10 details to put on a piece of paper to include it in
11 the outline that we saw earlier.
12     Q   And so she's immediately following up to make
13 sure that Mr. -- that the VP position is listed on
14 Mr. Zapfel's drill.  That's what this is.
15     A   That's what this is, yes.
16     Q   And did she follow up with you at the same
17 time or on or about the same time to be sure that
18 Mr. Castelluccio was listed on any of the drills?
19     A   I don't recall.
20     Q   You don't recall.
21     A   I don't know if she followed up with me about
22 this drill, which would have been her second drill
23 with Zapfel, to include Jim as a key person in the
24 same drill that this was going on.  I know he was in a
25 number of follow-up drills.

Page 1361

1      Q   Do you recall at the time of your deposition
2  you indicated that Mr. Castelluccio did not appear on
3  any of Ms. Collins-Smee's 5-minute drills as a key
4  person to discuss?  Do you recall telling me that?
5      A   Yes, I do.
6      Q   And, in fact, to be fair, that's not right.
7  He was listed as a person to move on one.  Do you now
8  know that?
9      A   Actually, I have seen documents that show him
10  listed, but this was at the time that he was -- I
11  believe the time that he was on the bench towards the
12  end of his time at IBM.
13      Q   Right.  And that was the one and only time,
14  isn't that correct?
15      A   I believe so, yes.
16      Q   With respect to her drill?
17      A   Yes.
18      Q   Do you recall at the time of your deposition
19  you indicated that, with respect to Ms. Collins-Smee's
20  own 5-minute drills, that she, quote, rarely discussed
21  him on her drills.  Do you recall that testimony?
22      A   Yes.
23      Q   And that's consistent with your recollection
24  that, with respect to her drills, she rarely discussed
25  Mr. Castelluccio, isn't that true?

Page 1362

1      A   That's true, yes.  There were rarely jobs --
2      Q   No question pending.
3      A   -- that lined up with -- yes, that's true.
4  She rarely mentioned him on her drill.
5      Q   And isn't it true that Mr. Castelluccio never
6  appeared on a slate of candidates on any of
7  Ms. Collins-Smee's drills?
8      A   Yes, that's true.
9      Q   So she rarely mentioned him, and he was never
10  on a slate of candidates.
11         And on one occasion when he was on the bench,
12  she listed him as a person to move, isn't that
13  correct?
14      A   Yes.
15      Q   Do you recall at the time of your deposition
16  that you told me that you had a recollection of two
17  different conversations in which you discussed
18  retirement -- I'm sorry -- Mr. Castelluccio's
19  retirement directly with Ms. Collins-Smee?  Do you
20  remember that testimony?
21      A   Yes.
22      Q   And I think you said that the second of the
23  two conversations was on or about the time you were
24  preparing the talking points that we just went over,
25  isn't that right?

Page 1363

1      A   Right.
2      Q   And the prior discussion that you had with
3  her, I believe you testified that she raised the issue
4  of Mr. Castelluccio's retirement with you, isn't that
5  right?
6      A   Yes.  It was a topic that came up in the
7  conversation, yes.
8      Q   And that was a conversation that just the two
9  of you had, there was no one else present, isn't that
10  right?
11      A   That's right, yes.
12      Q   Do you recall in that conversation whether
13  Ms. Collins-Smee shared with you the fact that
14  Mr. Castelluccio had already made it clear to her that
15  he had no interest whatsoever in retiring?
16      A   In which conversation?
17      Q   In the second conversation when she raised the
18  issue of his retirement.
19      A   I don't recall that being that emphatic, "he
20  had no interest," no.  No, I don't recall that.  It
21  was a conversation about -- again, we were getting
22  toward the decision about what next, and that was one
23  of several options.  It would have -- it wouldn't have
24  made sense to not even consider it.
25      Q   Do you recall whether Ms. Collins-Smee shared

Page 1364

1  with you the fact that Mr. Castelluccio had indicated
2  to her that he had no interest in retirement?  Do you
3  recall telling me that before -- in your deposition,
4  that you don't recall her saying anything about his
5  interest in retiring?
6      A   That was like three different statements of
7  the same question, which --
8      Q   You had this second discussion with --
9  actually, yeah, the second discussion with
10  Ms. Collins-Smee.  Do you remember when that took
11  place?  At the time of your deposition, you had no
12  idea when it took place.  Now do you have any idea
13  when it took place?
14      A   The second conversation was as we were -- as
15  we were in probably April, May of 2008.
16      Q   In 2008.  So that was in connection with the
17  preparation of -- was that before or after the
18  discussion that had to do with the talking points?
19      A   This was around the same time.  Might have
20  even been in the same conversation.
21      Q   At the time of your deposition, you told me
22  you recalled two distinct instances in which you -- in
23  which Ms. Collins-Smee raised the issue of
24  Mr. Castelluccio's retirement.  Do you recall that?
25      A   I do.

Page 1365

1    Q   And at the time of your deposition, you
2    indicated you did not recall when the first of those
3    two conversations took place.  Do you recall that?
4    A   I do, yes.
5    Q   You were sure that the second one took place
6    on or about the time you were discussing talking
7    points.  Do you remember that?
8    A   Yes.
9    Q   But you don't have any recollection of when
10   the first conversation took place other than the fact
11   that it was the two of you alone and that she raised
12   it, isn't that correct?
13           MR. FASMAN:  I believe you said that "you
14   don't have any."  Are you talking about the time of
15   the deposition or not?
16           MR. CARTA:  I'm talking about what he
17   said at the time of the deposition.
18           MR. FASMAN:  All right.  Thank you.
19           THE WITNESS:  Oh, yes.  I did say that,
20   yes, at the time of the deposition.
21   BY MR. CARTA:
22   Q   I'm going to move on to a couple of questions
23   about being on the bench.
24       Am I correct that being on the bench refers to
25   the status of an executive who doesn't have a defined

Page 1366

1    full-time position?
2    A   Yes, that is correct.
3    Q   And do you recall explaining to me at the time
4    of your deposition that it was typical -- that it was
5    typical for an executive who is assigned to the bench
6    for a period of time to have work assigned to them
7    while they were on the bench?  Do you recall that
8    testimony?
9    A   Yes, I do recall that testimony.
10   Q   And, in fact, that is consistent with your
11   experience, that someone who is on the bench would
12   have the opportunity to have work assigned to them
13   while they were on the bench, isn't that correct?
14   A   Yes.  That he would have the opportunity to
15   have work assigned if there was work to assign.
16   Q   I'm going to go back to this issue of
17   Mr. Castelluccio's openness to whatever position he
18   could get.
19       In your capacity as the HR director for IT, do
20   you recall learning that, in fact, Mr. Castelluccio
21   had made it clear that he was willing to step down
22   from a Band C position to a Band D position?
23   A   Yes.  I was aware of that.
24   Q   And he made that clear very early on, that he
25   would be willing to take that move if that would help

Page 1367

1    him find a position, isn't that correct?
2    A   That he made it -- I don't know if he did that
3    very early on.
4    Q   You don't have a recollection of when he did
5    it, but --
6    A   No, I don't.
7    Q   But you're sure that he made that clear?
8    A   Yeah.  I -- from conversations and from the
9    evidence I saw when I saw a document of the 5-minute
10   drill about him being open to Band C or Band D jobs.
11   Q   And isn't it your understanding that he did
12   that in order to optimize his chances for getting a
13   position at IBM so he could continue his career there?
14   A   Yes.  That would be my understanding.  That's
15   why anyone would do it, I think.
16   Q   Right.  And is there any doubt in your mind
17   that he had communicated that willingness to move from
18   a band -- move down a band to Ms. Collins-Smee?  She
19   was aware of that, wasn't she?
20   A   Yes.  She wrote it in the 5-minute drill.  She
21   told me.  She told others, yes.  There's no doubt in
22   my mind she was aware of that.
23   Q   And were you also aware that Mr. Castelluccio
24   indicated that he would be willing to relocate if
25   that's what it took to get a job?

Page 1368

1    A   I didn't know that, no.
2    Q   Do you remember discussions about
3    Mr. Castelluccio's willingness to move outside of the
4    umbrella of the Americas, ITD Americas, in order to
5    find a job if that's what was necessary?
6    A   Yeah.  I recall that being part of the
7    conversation.
8    Q   And you recall that being part of the
9    conversation because Mr. Castelluccio had indicated
10   his willingness to do that, isn't that right, to move
11   beyond just ITD Americas group if that's what it took?
12   A   He didn't indicate it to me.  I just know as
13   part of my conversations about Jim and movement that
14   that was an option.  He and I -- I don't think we ever
15   talked about those specifics.
16   Q   So you didn't know it from a specific
17   conversation with him, but you knew it from what you
18   observed concerning his openness on the 5-minute
19   drills --
20   A   Yes.
21   Q   -- in terms of positions?
22   A   Yeah.  That was part of the profile.  That was
23   part of the info.
24   Q   Exhibit 224, Plaintiff's 224, please.
25   A   I'm sorry.  Which number?

Page 1369

1    Q   224.  I think you've got that, but if not, let
2  me know.
3    A   Again, I need one more book.  I need Volume 3
4  of 3.
5    Q   Mr. Holmes, do you recognize this as one of
6  Bob Moffat's drills?
7    A   Actually, I think this, too, is a Bob Zapfel
8  drill.
9    Q   If you look at the top, it says "IO"?
10    A   Yeah.  It says IO 5-minute drill for ITD.  So
11  IO was the Bob Zapfel -- the senior vice president
12  organization.  ITD was underneath it.  That was the
13  Bob Zapfel drill.
14        And as I just looked at the number of
15  executives in the jobs and the level of jobs that are
16  included, it does appear to me to be a Bob Zapfel
17  drill, because it's got band -- it's got
18  director-level jobs in it.  And I don't think
19  director-level jobs would have been reviewed by
20  Moffat.
21    Q   Okay.  Fine.  It was one of Mr. Zapfel's
22  drills?
23    A   Yes.
24    Q   And it was a drill that was dated and
25  conducted on around April 5, 2007?

Page 1370

1    A   Yes.
2    Q   I'd like to direct -- so April 5, 2007, that
3  was -- we'll get to that.
4        Directing your attention to page 3, please.
5    A   Page 3?  Yes.
6    Q   Do you see that on this drill, a position is
7  listed as open -- the VP of public sector position is
8  open, and Mr. Castelluccio is reported as being the
9  incumbent?
10    A   Yes.
11    Q   That means that he's currently in that
12  position, is that right?
13    A   Yes.
14    Q   And what's in the Boxer immediately to the
15  right of that?  What are those notes?
16    A   Those appear to be discussion notes from the
17  actual exchange on the 5-minute drill call.
18    Q   The discussion notes -- and that was the
19  standard procedure, was it not, that -- for somebody
20  to take notes of what was being discussed on the
21  drill?
22    A   Yes, that was standard.  Typical.
23    Q   So you see in the discussion notes it says:
24  "Joanne would like to get Miguel in this role in the
25  next 30 days."

Page 1371

1    Q   Do you see that?
2    A   Yes, I see that.
3    Q   And that's consistent with what you testified
4  before, which was that Ms. Collins-Smee was anxious to
5  have that role filled as soon as possible, is that
6  correct?
7    A   That's correct, yes.
8    Q   And do you see the other highlighted sentence?
9  It's probably up on your screen.  "We don't have a
10  role for Jim yet.  He's going to help on WellPoint."
11    Q   Do you see that?
12    A   Yes, I do.
13    Q   Now, as I understand it -- question withdrawn.
14        Do you agree with me -- take a moment and read
15  the entire notes, please.
16        Would you agree with me that there's nothing
17  there whatsoever that states that the role of
18  permanent DPE on the WellPoint account is being
19  assigned to Mr. Castelluccio?
20    A   I would agree that there's nothing there that
21  states this is -- that WellPoint would be a permanent
22  role.
23    Q   Thank you.  Would you look at page 7 and 8 for
24  a moment, please?
25    A   I'm sorry?

Page 1372

1    Q   Would you turn to page 7 and 8?
2        On the bottom of page 7, it talks about key
3  people to move.
4        Do you see that?
5    A   Yes, I do.
6    Q   And do you see where it says "Executive
7  Sponsor"?
8    A   Yes, I do.
9    Q   And what is the role?  What is the function of
10  an "executive sponsor"?
11    A   The function of the executive sponsor is to
12  discuss, clarify, provide information about the people
13  listed against his or her name in the course of a
14  5-minute drill discussion.
15    Q   And do you recall at the time of your
16  deposition you stated to me executive sponsor was the
17  person participating in the call to whom the group
18  would look to discuss the person to move?  Do you
19  recall giving me that testimony?
20    A   Yes.
21    Q   And that's correct, that the executive sponsor
22  would be the one that everyone else in the group would
23  rely on to be an advocate for the person who was
24  identified in the Key People to Move section?
25        MR. FASMAN:  Objection.  That's not what

Page 1373

```
1    he testified to.
2         MR. CARTA:  I'm asking him.
3         THE WITNESS:  I'm sorry.  Again, please?
4    BY MR. CARTA:
5    Q    Sure.  Isn't it true that the executive
6    sponsor would be the person that everybody else on the
7    drill would look to, to be the advocate for the person
8    who was listed in the Key People to Move section?
9    A    No.  They would be the person they would look
10   to, to answer questions or to provide information.
11   Anybody could be an advocate on the call.
12   Q    Who would be the person who had -- well, let's
13   look at what you said.
14        Do you recall telling me at the time of your
15   deposition that if an executive sponsor does not
16   advocate for an employee, that that will negatively
17   impact on the employee's ability to find a position at
18   IBM?
19   A    Are you asking me if I said that?
20   Q    If that's what you indicated to me, yes.
21   A    Oh, if that's what I indicated?
22   Q    Yes.
23   A    Oh, okay.  Yes, I indicated that.  I did not
24   say that.
25        THE COURT:  Ladies and gentlemen, I'm
```

Page 1374

```
1    noticing it's 12 o'clock.
2         THE JURORS:  1 o'clock.
3         THE COURT:  Excuse me, 1 o'clock.  Would
4    you be able to have your lunch break in 45 minutes
5    rather than the customary hour long?  So we'll take
6    our lunch break from now to 1:45.  Thank you.
7         (Jurors excused)
8         THE COURT:  I've been advised by the
9    clerk that a juror -- and I don't know who that juror
10   is -- but a juror wanted to inform the Court that she
11   has a business trip scheduled for Monday and has plane
12   tickets in connection with that.  So we have to finish
13   this case this week, because we can't go over to
14   Monday.  So I think you ought to know that.
15        MR. FASMAN:  Again, that's fine with us.
16   We have two brief witnesses this afternoon.  At least
17   the direct's brief.  And then we'll have Dr. Sodikoff
18   here tomorrow morning, and we're done.
19        THE COURT:  Okay.
20        MR. FASMAN:  I don't know whether there's
21   going to be a rebuttal case or not.
22        THE COURT:  Fine.  Just wanted to keep
23   you abreast of what I know about the case, and I think
24   you should know about it, too.
25        MR. FASMAN:  Thank you, Your Honor.
```

Page 1375

```
1         THE COURT:  You're welcome.
2         Gentlemen, and ladies, have a good pleasant
3    lunch.  I know it's really, really cold out there.
4    See you at 1:45.
5         (Recess taken from 1:03 p.m. to 1:53 p.m.)
6         THE COURT:  Please be seated.  I hope you
7    had a nice lunch, had enough time to get it and
8    consume it and enjoy it.
9         Mr. Carta, ready to resume?
10        MR. CARTA:  Thank you, Your Honor.
11   BY MR. CARTA:
12   Q    Welcome back, Mr. Holmes.
13        Let me pick up where I left off.  I was asking
14   you a question about your prior testimony.
15        Do you recall at the time of your deposition I
16   asked you this question:  "In your experience, if an
17   executive" -- I'm sorry -- page 136, line 6 through
18   10.  That won't be among the documents.
19        "In your experience, if an executive sponsor
20   doesn't advocate for an employee, does that impact on
21   the employee's finding a new position at IBM"?
22        And you're answering "Yes."
23   A    Yes.
24   Q    Do you recall that?
25   A    Yes.
```

Page 1376

```
1    Q    I'd like to turn to page 4 of Exhibit 244,
2    please.  That's an exhibit we had up on the screen a
3    moment ago.  And if you would just confirm that what
4    we're looking for is one of the positions that's
5    listed under Key Positions.  I think that's on the
6    prior page -- two pages.
7    A    I'm sorry.  What was the --
8    Q    Sure.  If you look at Exhibit 244.
9    A    Looks like I've got something different.  I'll
10   just look at the screen.
11        It's in your binder?
12   Q    Yes.  It's one of the maroon binders, 244.
13   I'm going to ask you several questions from it, so it
14   would be helpful if you did have it in front of you.
15   A    234 was it, maybe?
16   Q    No.  I believe it's 244.
17        MS. TRIOLO:  124?
18        THE WITNESS:  224.
19   BY MR. CARTA:
20   Q    224.  I'm sorry.
21   A    Okay.  Yes.  Page 4?  Yes, I have it.
22   Q    And if you look on page 1 -- on page 2,
23   rather, it lists key positions.  Do you see that at
24   the bottom of the page?
25   A    Yes.
```

22 (Pages 1373 to 1376)

Page 1377

1    Q   And then in the Key Positions area, if you
2  flip to page 4, there's a discussion about the senior
3  DPE position at WellPoint.
4    A   Yes.
5    Q   Do you see that?
6    A   Yes.
7    Q   And I think you've identified this as
8  Mr. Zapfel's drill of April of 2007.
9    A   Yes, I did.
10   Q   So this would be the month after Mr. Morin had
11  resigned, right?
12   A   Yes.
13   Q   Okay.  And if you take a moment and review the
14  comment section, in particular Mr. Zapfel's comments,
15  and just let me know when you've had a chance to do
16  that.
17   A   Okay.  Yes.
18   Q   And isn't it true that in that section
19  Mr. Zapfel expressed concern about assigning Ken Wisse
20  to this account if he's going to be asked to split his
21  time?
22   A   Yes.  That's what it says here.
23       MR. FASMAN:  There's no foundation for
24  this.  It's not clear that he was there.  It says what
25  it says.

Page 1378

1        THE COURT:  Okay.  Well --
2  BY MR. CARTA:
3    Q   Based upon your understanding of the way these
4  notes work, is it your understanding that this
5  comment, where it says "Zapfel" is actually a
6  statement made by Mr. Zapfel?
7    A   Yes.  That's my understanding of what's in the
8  document here.
9    Q   Exactly.  And with respect to Mr. Zapfel's
10  concern, as I read this, he's concerned that Mr. Wisse
11  might be splitting his time 80 percent on WellPoint
12  and 20 percent on Nissan.  Is that the division that
13  he's concerned about?
14   A   Yeah.  That's -- well, that's what I would
15  infer from the statement about him being 20 percent on
16  Nissan.
17   Q   And Mr. Zapfel goes on the state, quote, we
18  might have customer issues if Ken is split between two
19  accounts.  Isn't that correct?
20   A   Yes.
21   Q   And you'd agree with Mr. Zapfel that customer
22  issues could be expected if you assign somebody on a
23  non-full-time basis to the position of DPE on
24  WellPoint at that point in time, you'd agree with
25  Mr. Zapfel, wouldn't you?

Page 1379

1    A   That's not what this says.  He said might
2  happen, but didn't say he would expect it.
3    Q   So it's your testimony that he may have them
4  or he may not have them, and that's what Zapfel's
5  saying, just hypothetical.
6    A   Yes.
7    Q   You don't think that Mr. Zapfel is expressing
8  a concern that there would be potential problems with
9  having somebody on the WellPoint account not
10  full-time.
11       MR. FASMAN:  Your Honor, the document
12  says what it says.  There's no evidence the witness
13  was there.  There's no evidence the witness heard
14  Mr. Zapfel.  Mr. Carta's arguing about what a document
15  says with the witness.
16       MR. CARTA:  I think it's a legitimate
17  question, Your Honor.
18       THE COURT:  The document does say that.
19  At least it suggests concerns over that problem.
20       MR. CARTA:  Okay.  I'll move on.  Very
21  well.
22       THE COURT:  Do you agree with that?  If
23  you want to probe that and go into the reasons why
24  Mr. Zapfel might have those feelings, you're free to
25  do that, if that was what you were doing and that was

Page 1380

1  where you were going.  But I think the document's
2  pretty clear on its face, that he was concerned that
3  WellPoint would have to know this.
4        THE WITNESS:  Right.
5  BY MR. CARTA:
6    Q   If you would take a look at pages 7 through 8,
7  please, on the same drill.  And I'd like to direct
8  your attention to the Key People to Move section of
9  this drill, please.
10   A   Okay.
11   Q   And there appear to be five different people
12  listed as key people to move.
13       And my question is:  Is Ms. Collins-Smee the
14  executive sponsor for four of those five people?
15   A   Yes.
16   Q   And although Ms. Collins-Smee is seeking in
17  this 5-minute drill final approval for Mr. Echavarria,
18  which we discussed already to replace
19  Mr. Castelluccio, did he appear anywhere among the
20  list of key people to move on this -- key people to
21  move on this list?
22   A   He does not appear on this list, no.
23   Q   So four of the five are people that she's
24  listed, but she doesn't list Mr. Castelluccio on this,
25  isn't that correct?

Page 1381

1    A   Yes, that is correct.
2    Q   Okay. I'd like to have you go back to page 1,
3  and we're going to talk again about the key positions
4  available. If you'd just take a minute -- as I
5  counted it up, I believe there are a total of 11 key
6  positions identified. And that goes from page 1
7  through page 7. Some of them have slates, some of
8  them don't.
9    A   I count ten, but...
10   Q   Okay. I believe one of those positions is
11 actually the senior DPE position, and we've already
12 seen that he's not -- Mr. Castelluccio is not
13 identified on that slate of candidates. And I think
14 another of those positions looks like it's actually
15 just for approval.
16       If you look at the top of page 6, it says:
17 "Director Unix Intel." So this wouldn't have been a
18 position that had a slate because this was here just
19 for approval, isn't that right?
20   A   It's not clear from what's here.
21   Q   Okay. Well, we'll count that in. We'll take
22 from the list of ten -- we'll take out the DPE
23 position because we already know he's not at that time
24 considered a candidate. He's not on the slate.
25       But with respect to the other nine positions,

Page 1382

1  isn't it correct that he's not on the slate for any of
2  those other nine positions?
3    A   Yeah. I don't see him on any of the slates
4  for the key positions.
5    Q   And he's clearly not on the slate of
6  candidates for the senior DPE position, right, in
7  April of 2007?
8    A   Which senior DPE position?
9    Q   That's on page 4.
10   A   Oh, okay. Senior DPE, no, he's not listed.
11   Q   And this is the position that Ms. Collins-Smee
12 has testified that she actually placed him on as of
13 April 1st, isn't that correct?
14       MR. FASMAN: I would object.
15 How would he know that?
16       THE COURT: Sustained.
17 BY MR. CARTA:
18   Q   Mr. Holmes, are you aware of the fact that
19 Ms. Collins-Smee testified that she assigned
20 Mr. Castelluccio full-time to the DPE WellPoint
21 position as of April 1st? Are you aware of that?
22       MR. FASMAN: Same objection.
23       THE COURT: Overruled. Do you know?
24 It's yes or no.
25       THE WITNESS: I don't know what she

Page 1383

1  testified to.
2  BY MR. CARTA:
3    Q   Okay. But you agree that there's no reference
4  to him on page 4 where the position is being discussed
5  on Mr. Zapfel's 5-minute drill; and there actually is
6  a slate of candidates, including a lead candidate, and
7  two other candidates, isn't that correct? No
8  reference to him whatsoever on this document -- on
9  this part of the document?
10   A   I don't see -- yes, I don't see any reference.
11 I agree there's no reference to Jim on page 4 of this
12 document.
13   Q   Plaintiff's 90. If you'd just take a moment
14 and see if you recognize this e-mail. It's an e-mail
15 sent by Ms. Collins-Smee -- it's actually a series of
16 e-mails. If you look towards the bottom of the page
17 where there's an e-mail from Ms. Collins-Smee to a
18 Mark Hennessy. Do you see that?
19   A   Yes, I do. Now I see it.
20   Q   I'm sorry, Mr. Holmes. I didn't hear your
21 answer. You said now you see it?
22   A   Yes. There are a couple in the string. So
23 yes.
24       MR. CARTA: And may I have Exhibit 91 up,
25 please? Plaintiff's 91?

Page 1384

1  BY MR. CARTA:
2    Q   Again, there's two e-mails here, but if you
3  look in the middle, it's another e-mail from
4  Ms. Collins-Smee. In this case, it's to
5  Elizabeth Smith, and the subject is GW Castelluccio
6  resumé. Do you see that?
7    A   Yes. JG Castelluccio resumé.
8    Q   JG, yes, correct.
9    A   Yes, I see that.
10   Q   And basically, the text of the two e-mails is
11 almost exactly the same. It's indicating she's
12 attached a copy of the highlight of Mr. Castelluccio's
13 accomplishments. Do you see that?
14   A   No.
15   Q   "Jim Castelluccio is available for a new
16 position and attached below is a highlight of his
17 accomplishments."
18   A   Oh, yes, yes. I see that, yes. I didn't see
19 the attachment. I do see that it's mentioned.
20   Q   As you sit here now, are you aware of any
21 other similar written communications sent by
22 Ms. Collins-Smee on behalf of Mr. Castelluccio?
23   A   There may have been, or at least these two may
24 be the ones that I remember her sending. I don't
25 remember the exact number. I know she sent several.

24  (Pages 1381 to 1384)

Page 1385

1    Q   And are you aware of any others besides these
2  two?
3    A   Again, I don't know -- not specifically.  I
4  don't know if these are the two I recall seeing or,
5  you know, I can't say -- no.  I don't know that these
6  are the only ones.
7    Q   You don't have any specific recollection of
8  any others, isn't that fair to say?
9    A   That's fair to say, yes, I have no specific
10  recollection.
11    Q   And these are dated, I think the same day, May
12  21, 2008?
13        MR. FASMAN:  Objection.  I don't think
14  they are.
15        THE WITNESS:  Yeah.  This one's the 20th.
16  BY MR. CARTA:
17    Q   I'm sorry.  One's the 21st.  I was reading the
18  top e-mail.  One's the 21st from Mr. Hennessy, and the
19  other is -- I apologize.  The other is the 20th to
20  Elizabeth Smith.
21    A   Um-hmm.
22    Q   And at this point in time, Mr. Castelluccio
23  had been on the bench for a full five months, isn't
24  that correct?
25    A   Yes.

Page 1386

1    Q   And these are the only ones that you're aware
2  of, isn't that correct?
3    A   No.  There was a -- I recall her sending
4  similar e-mails earlier in the year at the time that
5  he first went on the bench.  But I don't know if they
6  were to the same people or to others.
7    Q   Have you seen them in the process of getting
8  up to speed for this lawsuit?  Have you seen any other
9  e-mails?
10    A   I have not, no.
11    Q   Have you had complete access to any
12  information that you wanted in order to prepare for
13  today's testimony in connection with the issues in
14  this lawsuit?
15    A   I had access to what was given to me.
16    Q   And based upon what was given to you, you're
17  not aware of any other e-mails, is that right?
18    A   I have not seen any other e-mails.
19        MR. CARTA:  I'm not sure what exhibit
20  number this is.  Is this your exhibit?
21        MR. FASMAN:  Yeah.  It's a demonstrative.
22  I don't know if we put a number on it.
23  BY MR. CARTA:
24    Q   Now, as I understand it, Mr. Fasman said that
25  you assisted him in preparing this document.  Did I

Page 1387

1  get that correctly?
2    A   No.
3    Q   What was your role in preparing this document?
4    A   I had no role in preparing it.
5    Q   Did Mr. Fasman review it with you?
6    A   Yes.
7    Q   I thought that's what he had said.
8        Okay.  So let's look at the time frame, for
9  starters.  That concerns 2007 to 2011, is that right?
10    A   Right.
11    Q   And Mr. Castelluccio left or was fired midway
12  through 2008, is that right?
13    A   He left midway through 2008.
14    Q   He left.  You're saying he wasn't fired?
15    A   I'm answering one of your questions.  You said
16  he left or he was fired.  I answered that he left.
17    Q   Okay.  So you'd agree, then, that more than
18  half of this graph has nothing to do with the time
19  period in which Mr. Castelluccio was employed by IBM?
20        MR. FASMAN:  Objection, argument.
21        THE COURT:  Overruled.
22        THE WITNESS:  Three of the five years are
23  post his time there, so I would agree.
24  BY MR. CARTA:
25    Q   Three and a half of the years are post his

Page 1388

1  time period, isn't that correct?
2    A   Yes, that's correct.
3    Q   And where it says -- on the blue color where
4  it says Band D, see that?
5    A   Yes.
6    Q   And let's just look at one of the few parts of
7  the graph that's at all relevant.
8        2008, what's that "N 1" mean?
9    A   One person was the population.
10    Q   So this portion of the graph is based on one
11  data point?  One data point?  One person, is that
12  right?
13    A   That is right.
14    Q   And is that -- do you know who that one person
15  is?
16    A   I don't recall specifically, no.
17    Q   Could that be Mr. Crawford?  Mr. Crawford
18  replaced Mr. Castelluccio in the position as DPE.
19    A   I don't think so, because -- no, it couldn't
20  be.
21    Q   Why?  Was he not a Band D?
22    A   He was not a Band D.
23    Q   So Mr. Crawford's numbers, then, would have
24  been in the Band C?
25    A   Right.

Page 1389

1    Q   And how many data points is that based on? I
2 can't see from here.
3    A   "N" equals nine.
4    Q   So those are nine. And with respect to 2007,
5 that average calculation for number of people in
6 Band D is based upon just three people, isn't that
7 right?
8    A   That is right.
9    Q   So in terms of the information on this graph,
10 with respect to what it shows with respect to Band D,
11 you're talking about a total -- well, actually,
12 withdrawn.
13       Do you happen to know whether the Band D
14 person in 2008 was also one of the three people
15 considered in the graph for 2007?
16    A   No, I don't know.
17    Q   You don't know. Could be one of the same
18 people, right?
19    A   Could be.
20    Q   So either -- with respect to the information
21 communicated by this graph, we're talking about either
22 a total of three or possibly four people, isn't that
23 right?
24    A   Yes.
25    Q   I've talked about the fact that the graph goes

Page 1390

1 down to 2011. Since you had some involvement with
2 this graph, do you know any reason why the graph
3 doesn't address averages for 2005 or 2006?
4    A   I do not.
5    Q   Did you ask?
6    A   I did not.
7    Q   You just accepted what they showed you, right?
8       MR. FASMAN: Your Honor, I mean, 2005 --
9 this is titled "Average Age of Band C and D Employees
10 Who Reported to Collins-Smee." The testimony was
11 pretty clear that she came in, in February 1, 2007.
12       MR. CARTA: It doesn't say -- Your Honor,
13 it doesn't say with respect to what position.
14       THE COURT: Maybe if you ask the question
15 again.
16       MR. CARTA: I think he's actually
17 answered the question. I'll move on. His answer is
18 he doesn't know why it doesn't address earlier years,
19 and that's fine.
20       THE COURT: Is that indeed your answer?
21       THE WITNESS: As I look at the chart now,
22 I see that I understand the reason it doesn't, because
23 this is people who reported to Joanne Collins-Smee,
24 and she was not in the job before 2007.
25 BY MR. CARTA:

Page 1391

1    Q   People were reporting to Ms. Collins-Smee
2 certainly in 2005 and 2006, but just in a different
3 capacity, isn't that right?
4    A   None of the people in this data set.
5    Q   Okay. That wasn't my question. My question
6 was, weren't people directly reporting to
7 Ms. Collins-Smee in 2005 and 2006?
8    A   Yes.
9    Q   You've testified that in your judgment it's
10 possible to be on too many drills. Do you remember
11 saying that to the jurors?
12    A   Yes, I do remember that.
13    Q   And I believe that you testified that people
14 might stop asking and get bored with the fact that
15 somebody is on a drill repeatedly. Is that a fair
16 summary of what you said?
17    A   Yes.
18    Q   If you were an employee about to be terminated
19 for not having a job, is that a chance you'd be
20 willing to take, being on more than a certain number
21 of drills?
22    A   That's a hypothetical.
23    Q   I'm asking you in your judgment -- we've heard
24 about your judgment in terms of accepting a Level 10
25 position. I want to know what you'd do. Would you

Page 1392

1 prefer to have been on no drill -- question withdrawn.
2       Would you prefer not to have continued to be
3 on a drill and not have a job rather than have what
4 you said was possible overexposure?
5    A   No, I would not.
6    Q   You'd rather be on the drill, wouldn't you?
7    A   No. I didn't say I would not rather be on the
8 drill.
9    Q   You'd rather not have a job? That's your
10 testimony?
11    A   That's not the choice. You don't lose a job
12 because you're not on the drill. I would prefer to
13 have the audience paying attention to and supporting
14 my candidacy rather than have them say, Why do you
15 keep bringing up this guy? Or if there wasn't a real
16 job, it's not helpful.
17    Q   Okay. That's not my --
18    A   I understand why people make those choices,
19 and I would respect and understand if somebody made
20 that choice on my behalf.
21    Q   That really wasn't my question, so I'll ask
22 again.
23       If you were in a position where you were going
24 to be losing your job and the choice was either
25 between losing your job and --

Page 1393

1    Well, let me ask you:  Did you ever ask
2  Mr. Castelluccio whether he was concerned about being
3  overexposed on the 5-minute drills?
4    A  No.
5    Q  To your knowledge, did Ms. Collins-Smee ever
6  ask him, Jim, we know that you're getting close to the
7  end here.  We might not want to overexpose you.  Is it
8  okay if we keep you on the 5-minute drill?
9    Do you know if she ever had a conversation
10  with him that was like that?
11    A  I don't see why she would, because as he was
12  getting close to the end, he was on 5-minute drills.
13    Q  Not on her drill.  Not on her drill, isn't
14  that right?  You've admitted that.
15    A  As I recall, he did show up on at least one of
16  her drills towards the time that --
17    Q  That's correct.  One out of all of her drills,
18  which you said were held on a regular basis, isn't
19  that right?
20    A  That is right.
21    Q  And in that one drill, he appeared as a person
22  who was available, correct?
23    A  I don't recall.  I'd have to see the document.
24    Q  Do you recall whether he was ever listed on
25  any of her drills as a -- on a slate of candidates?

Page 1394

1    A  I don't recall that he was, no.
2    MR. CARTA:  No further questions.
3    THE COURT:  Mr. Fasman?
4    MR. FASMAN:  Thank you, Your Honor.
5
6    REDIRECT EXAMINATION BY MR. FASMAN:
7
8    Q  Good afternoon.  Mr. Holmes, just a few quick
9  questions.
10    5-minute drills, just so it's clear, are not
11  the piece of paper, right?  It's the meeting.
12    A  Right.  The 5-minute drill is a discussion.
13  It's just -- the drill document is to drive the agenda
14  and capture notes.
15    Q  Okay.  At my request, there was some questions
16  about a Band C-level executive getting down to a
17  Band 10 move, and I think you said it was
18  extraordinary.  What did you mean by that?
19    A  I meant the literal meaning of extraordinary.
20  It was out of the ordinary.  It was -- I had seen it
21  or even heard of it so rarely that it would be out of
22  the ordinary.  It would be unusual.
23    Q  Nothing would prevent it, though, right?
24    A  No, nothing would prevent it.
25    Q  And if you wanted to go from C to D, right?

Page 1395

1    That's one step.  D to Band 10 is another step, right?
2    A  Right.
3    Q  At my request, did you take a look at the top
4  of the salary range for Band 10 positions in 2009?
5    A  Yes, I did.
6    Q  What was the top of the salary range for
7  Band 10?
8    MR. CARTA:  Objection, Your Honor.  2009?
9    MR. FASMAN:  Yes, I asked him for --
10  well, let's ask it this way.
11  BY MR. FASMAN:
12    Q  Did you look for 2008?
13    A  I could not -- yes, I looked for 2008.  I
14  could not find that data.
15    MR. FASMAN:  I think we should be able to
16  at least give the jury an idea of what the salary
17  range would have been or the top of the range.
18    MR. CARTA:  Your Honor, 2009 compensation
19  is completely irrelevant.  We're talking about many
20  years from Mr. Castelluccio's termination.  His last
21  salary was pegged at 2007.
22    THE COURT:  I'll allow it.
23  BY MR. FASMAN:
24    Q  What's the number?
25    A  The highest salary range for a Band 10 in 2009

Page 1396

1  was $395,000.
2    Q  Okay.  You mentioned -- there were a number of
3  hypothetical questions about adding Mr. Castelluccio
4  to Ms. Collins-Smee's drill, and about one of them,
5  you said it would be horribly bad human resources
6  practice.  Do you remember that?
7    A  Yes, I do remember that.
8    Q  What was it that would be horribly bad human
9  resources practice in terms of bringing him into a
10  drill?
11    A  As I recall, the question was about bringing
12  the vice president of public sector job into the drill
13  for Joanne and her direct reports.
14    The purpose -- or people should participate in
15  the 5-minute drill who have either a decision-making
16  responsibility or a need to know the information
17  that's being discussed.  And it would be, in my
18  opinion, very bad business practice to bring in a job
19  that is a peer job where the people on the call have
20  no need to know it's open, and they have no vote in
21  who gets it.
22    It would have been an addition with no value,
23  and it would be counter to everything I've ever seen
24  people do in drills.  You bring information into a
25  drill at the level where the folks in the discussion

A-630

Page 1397

1  can make a decision.
2      Q   And the discussion with regard to that
3  position -- the VP PSD position, for example, that
4  would be discussed -- that level would be discussed on
5  a different drill, right?
6      A   Right.  A job at that level -- a VP level job
7  in Joanne Collins-Smee's organization would have been
8  discussed and viewed in the Bob Zapfel drill and
9  potentially even in the Bob Moffat drill, which is two
10  levels above, because it was a vice president job.
11  That's where the discussion and decisions were
12  happening.
13      Q   And is that the reason why it was more
14  appropriate to put him on the Zapfel drill?
15      A   Absolutely.  That was where it belonged.
16  That's where the decision makers and the appropriate
17  group of people to review it -- that's where they
18  convened their 5-minute drill on.
19      Q   Because the people who chose people at that
20  level -- that is a vice presidential level -- would
21  not be the vice president under Joanne Collins-Smee,
22  right?
23      A   Correct.  Those would be the peers to this
24  job.  The people who should be reviewing that would be
25  vice presidents reporting to Bob Zapfel and general

Page 1398

1  managers reporting to Bob Zapfel.
2      Q   And IBM is democratic, but not that
3  democratic, right?
4      A   Right.  You don't get to vote on who's going
5  to fill a job at your peer level.
6      Q   So the public sector -- well, I think I made
7  the point.
8          You started to explain, I think, in response
9  to Mr. Carta that -- the comment that
10  Joanne Collins-Smee rarely discussed Jim Castelluccio
11  in her drills.  Do you remember that?
12      A   Yes.
13      Q   What was your explanation that you wanted to
14  give there?
15      A   Well, she would rarely discuss them in a
16  drill, again, because, well, for much of the time that
17  we were talking about, the drills we were looking at,
18  he was assigned to another role.  Then when he was on
19  the bench, the judgment was made that he really wasn't
20  a fit for the jobs that were being discussed and that
21  was the call that was made.
22          And he was on the Zapfel drill, which was
23  giving him the sort of visibility as a key person to
24  discuss, and I think, in at least one instance, as a
25  candidate on the slate.  That was the right forum for

Page 1399

1  that discussion.
2      Q   Now, there was some comments made about
3  actively advocating.  Did she actively advocate for
4  him in the 5-minute drill?
5      A   She did.  On occasion, she did actively
6  advocate.
7          MR. FASMAN:  Your Honor, excuse me for
8  one second.  I have a very, very bad habit of speaking
9  too quickly.  My compatriots at my table noted that
10  you guys were trying to take down all of the 5-minute
11  drill numbers, and I was going too fast.  I have a son
12  who does a bunch of public speaking, and I would tell
13  him to slow down, too.  But I know where he gets it
14  from.
15          Let me read the numbers to you again.  And
16  I'll do it more slowly so you have that.  They are
17  Exhibits -- Defendant's Exhibits 58, 60, 67, 70, 72,
18  78, 81, 83, 84, 90, 93, 97, 98, 101, 103, and 119.
19  Thanks.  Sorry.
20          That's all I have, Judge.
21          THE COURT:  All right.  Mr. Carta?
22          MR. CARTA:  Quickly.
23
24
25

Page 1400

1          RECROSS-EXAMINATION BY MR. CARTA:
2
3      Q   Mr. Holmes, you weren't here for this, but
4  Mr. Castelluccio testified that approximately
5  20 percent of the jobs that were listed on
6  Ms. Collins-Smee's 5-minute drills were also listed up
7  on Mr. Zapfel's drills.  Do you have a reason to
8  contest that analysis?
9      A   I do not.
10          MR. CARTA:  No further questions.
11          MR. FASMAN:  One question, Your Honor.
12
13          REDIRECT EXAMINATION BY MR. FASMAN:
14
15      Q   I forgot ask this.  On the chart of the ages
16  of the various --
17          MR. CARTA:  Scope.
18  BY MR. FASMAN:
19      Q   -- representatives?
20          MR. FASMAN:  Sorry?
21          MR. CARTA:  Objection.  Scope.
22          THE COURT:  I thought we were giving each
23  other a lot of latitude on this.
24          MR. FASMAN:  It's just one question, and
25  I forgot to ask.

Page 1401

```
1           THE COURT:  Go ahead and ask it.
2   BY MR. FASMAN:
3       Q   You said that there was -- there were
4   questions about who was on that -- in the materials
5   you looked at, were those people who reported to
6   Joanne Collins-Smee in the ITD Americas position?
7       A   Yes.  Those were ITD Americas personnel.
8   That's my comment about people in the data set.
9           MR. FASMAN:  Okay.  Thank you.  I'm
10  sorry, Your Honor.
11          MR. CARTA:  No further questions.
12          THE COURT:  Mr. Holmes, thanks so much for
13  being with us today.
14          THE WITNESS:  You're welcome.
15          THE COURT:  You may step down.
16          MR. FASMAN:  Your Honor, IBM would call
17  Gordon Crawford to the stand.
18          THE COURT:  Mr. Crawford?
19          (Gordon Crawford, sworn by the clerk)
20          THE CLERK:  Please state your name, spell
21  your last name for the record.
22          THE WITNESS:  Albert Gordon Crawford,
23  C-R-A-W-F-O-R-D.
24          THE CLERK:  Your business address?
25          THE WITNESS:  11712 Man of War Trail,
```

Page 1402

```
1   Raleigh, North Carolina, 27613.
2
3           DIRECT EXAMINATION BY MR. FASMAN:
4
5       Q   Mr. Crawford, good afternoon.
6       A   Good afternoon.
7       Q   How are you?
8       A   Fine, sir.
9       Q   Thank you for coming and joining us.
10          Where do you live, Mr. Crawford?
11      A   I do live at that Raleigh address.
12      Q   And what year were you born, sir?
13      A   1948.
14      Q   Are you currently employed?
15      A   I retired from IBM on December 31st this year.
16      Q   Congratulations.
17          How old were you at the time you retired?
18      A   65, on the way to 66.
19      Q   So let me ask, if you would, to put up
20  Defendant's Exhibit 186, which is your resume; and
21  it's four pages long.  So maybe we won't go through
22  the whole thing, but let's start with this.
23          Is this resume true and accurate to the best
24  of your knowledge?
25      A   Yes, it is.
```

Page 1403

```
1       Q   And when did you prepare it?
2       A   I prepared this resume as part of the
3   selection review for my consideration for the DPE
4   position at WellPoint.
5       Q   So this would have been a few years ago,
6   right?
7       A   That's correct.
8       Q   Do you have it there, sir?
9       A   Was it 186?
10      Q   It's 186 in the black binders.
11      A   Yes, I have it here.
12      Q   Mr. Crawford, would you describe your
13  educational background after high school, sir?
14      A   Yes.  I attended North Carolina State
15  University in Raleigh, with a BA in history.
16  Graduated in 1969.
17      Q   And were you ever in the military, sir?
18      A   Yes.  For those of you who have memories old
19  enough to remember, there was a small war going on at
20  the time.  I was subject to the draft.  I enlisted in
21  the U.S. Navy immediately upon my graduation, and
22  simultaneously made application for OCS flight school.
23          Was fortunate enough to be accepted,
24  commissioned, and made a flight officer.  And
25  subsequently spent a number of years on active duty
```

Page 1404

```
1   and stayed with the Navy until retirement.  Rose to
2   the rank of lieutenant commander with a specialty in
3   intelligence and particular focus on technology
4   developments in other areas of the world.
5       Q   When you saw active duty, were you a fighter
6   pilot?
7       A   "Back seat driver" is what we referred to it,
8   sir.
9       Q   What does that mean, sir?
10      A   It was officially called a radar intercept
11  officer.  The guy who would give -- the guy in back in
12  the planes I was in -- there was a front-seat pilot,
13  and my responsibility was weapons delivery systems and
14  tracking targets.
15      Q   And you served in active duty in Vietnam?
16      A   I served in active duty on Yankee Station off
17  the coast of Vietnam.
18          THE COURT:  You flew over Vietnam?
19          THE WITNESS:  Yes, sir.
20          THE COURT:  North Vietnam?
21          THE WITNESS:  Yes, sir.
22  BY MR. FASMAN:
23      Q   Mr. Crawford, can you briefly describe your
24  employment history prior to coming to IBM, sir?
25      A   Yes, sir.  I divide my employment history into
```

Page 1405

1    three phases, actually.  The first 14, 15 years I
2    spent as a consultant, largely doing large-scale
3    systems development for various consulting firms which
4    are listed here, specialty in manufacturing systems
5    and large-scale systems design.
6         At about the 13 year mark, I was fortunate
7    enough to land a job with a consulting firm that
8    ultimately wound up with me consulting with the
9    management consulting firm now known as Deloitte &
10   Touche, but in those days, known as Touche Ross.
11        And from that position, I went with a Canadian
12   firm, Northern Telecom, headquartered in Toronto but
13   also based in my hometown of Raleigh, where I focused
14   on large-scale systems design, development of system
15   strategies, and ultimately became a member of Nortel's
16   mergers and acquisitions team as we focused on new
17   technologies that we were going to be acquiring.
18        I was at Nortel.  I was a member of the team
19   that was responsible for determining whether Nortel
20   was going to outsource its computer systems to IBM or
21   one of IBM's competitors.
22        I wound up getting job offers from two of
23   those competitors, including IBM.  And I joined IBM in
24   April of 1996.
25        Q   And how about your career with IBM?  Knowing

Page 1406

1    that IBMers tend to move around, give us a brief
2    history of your employment background with IBM.
3         A   Brief history?  I was hired in to run a very
4    large account deal similar to what we're referring to
5    here at WellPoint.  Ultimately moved from that
6    position to taking on a role for the -- what we call
7    the Service Delivery Center South, which was the south
8    geography and a group of accounts and clients in that
9    region.
10        Was fortunate enough to be selected to
11   participate in a deal team that was working on what
12   was then the largest deal that IBM had ever done.  And
13   we ultimately closed that deal, and I became the vice
14   president of delivery for IBM's relationship with
15   AT&T.
16        Served in that position for a couple of years.
17   Ultimately took responsibility for IBM's e-business
18   hosting environment for all of North America.  Went to
19   the U.K. in 2006 and '7 -- and that is pertinent
20   here -- to run IBM's commercial relationship with our
21   customers in the U.K., Ireland, and South Africa.
22        Was asked to come back to run the WellPoint
23   deal.  And following the WellPoint deal, after two and
24   a half years at WellPoint, was offered the opportunity
25   to go back offshore and ran the IBM operations for

Page 1407

1    Australia and New Zealand for two years and five
2    months.
3         Returned from Australia in April of 2013.
4    Took on another troubled-account situation to manage.
5    And my wife decided it was time for us to go to play
6    with the grandkids.  Submitted my resignation and
7    retired three weeks ago.
8         Q   All right, sir.  Let's go back and talk about
9    the DPE at WellPoint position.  I think you just said
10   that you were handling the U.K. -- is it U.K.,
11   Ireland, and South Africa?
12        A   U.K., Ireland, and South Africa, yes, sir.
13        Q   What was your role there?
14        A   I had 80 commercial customers across the U.K.,
15   Ireland, and South Africa.  We were delivering a
16   number of services out of India to those customers.
17   And I had responsibility for profit and loss,
18   operational reporting, service level attainment,
19   customer interface for those accounts.
20        Q   And how was the position at WellPoint -- how
21   did the position at WellPoint first come to your
22   attention?
23        A   As we discussed earlier, managing one's career
24   at IBM was a joint responsibility with hopefully your
25   mentor and yourself.  My assignment in the U.K. and

Page 1408

1    Ireland was coming to an end -- or scheduled to come
2    to an end in January of 2008.
3         My career mentor was Mr. Bob Zapfel, whose
4    name you heard here.  And in July of 2007, I contacted
5    Bob to say, "I need you to remember I'm out here.  I'm
6    scheduled to come home.  I do want to come home and
7    would like to be considered for roles that you see
8    appearing on the drills over the next several months."
9         Bob immediately indicated that there were
10   several positions that he could envision for me,
11   suggested that I directly contact Joanne Collins-Smee,
12   that he was aware that she had one particular account
13   that had become a bit problematic, and he thought I
14   might be a fit for that job.
15        Q   Now, when you had this discussion with
16   Mr. Zapfel, did he mention who was filling the role as
17   DPE at WellPoint?
18        A   No, he did not.
19        Q   Did he mention WellPoint at all?
20        A   Yes, he did.  He mentioned WellPoint very
21   explicitly.  He mentioned that it was a very
22   challenging and -- let's just say challenging account.
23   It was taking a lot of executive energy, including
24   his, and that he'd like to have someone go in and fix
25   it.

A-633

Page 1409

1    Q   So what did you do to follow up? Because you
2  obviously followed up because you ended up with it.
3  But what happened?
4    A   I did follow up with Joanne Collins-Smee and
5  Keenie McDonald, conducted a telephone interview, and
6  determined that it would be appropriate to have a
7  face-to-face interview back in the U.S. We scheduled
8  such an interview. I believe I actually had a
9  telephone conversation with the PE, Mr. Luis
10  Fernandez, prior to my returning to the States.
11        I returned to the States, my recollection
12  is -- I believe late September of 2007. Had a meeting
13  with the senior executives at WellPoint, including
14  Mr. Mark Boxer, who was the chief operations officer;
15  a VP named Lori Beer, who was the head of applications
16  development; and the VP of infrastructure services,
17  Mr. Dave McDonald. That was, in fact, a face-to-face
18  interview in North Haven. And subsequently we got the
19  feedback that I had been an acceptable interview for
20  them, and they wanted to move forward.
21        MR. FASMAN: Let me ask if we can put
22  Defendant's Exhibit 73 on the board, please. And
23  let's go back to the second page, please.
24  BY MR. FASMAN:
25    Q   Now, this is a -- this actually is a note --

Page 1410

1  an e-mail. It starts out with an e-mail from
2  Ms. Keenie McDonald to you, correct?
3    A   That is correct.
4    Q   And it's on 9/30/2007 at 6:30 at night?
5    A   Yes.
6    Q   Does this give you a time frame for when you
7  came over and made this trip?
8    A   Yes. My recollection is it had been a couple
9  of days earlier. I think it was September 27th and
10  28th that I returned.
11    Q   All right. And if we go, then, to the front
12  page and particularly the highlighted section.
13    A   Yes.
14    Q   Why did you write this? This is you to
15  Ms. McDonald?
16    A   That's correct. By the time we got to the
17  States the first week in October, by the time that I
18  had written this note or was in the process of writing
19  this note, the feedback I had gotten was that Keenie
20  and Joanne were prepared to move forward with my
21  candidacy for the customer, and they wanted me to
22  start getting involved as soon as possible.
23        This was my commitment to them to begin making
24  contact with Miguel Echavarria, the newly appointed VP
25  for the sector. The gentleman, Jack Overacre, who's

Page 1411

1  referred to there, is a gentleman who is one of our
2  ombudsmen in IBM for troubled accounts. And they had
3  asked me to make sure that I was keeping Jack apprised
4  of any and all dialogues that were going on.
5    Q   All right. And the paragraph before that that
6  begins with the name Mark Taylor --
7        MR. FASMAN: Can you pull that up,
8  please?
9  BY MR. FASMAN:
10    Q   This talks about Mark Taylor and Bruce Russ.
11  Who are they?
12    A   Mark Taylor was the general manager -- is the
13  general manager for IBM Europe. He was my direct
14  reporting boss while I was based in the U.K. and
15  Ireland. And Bruce was the general manager for sales
16  for U.K., Ireland, and South Africa.
17        So it was Bruce's accounts that I was
18  servicing and doing so under Mark. My communication
19  here is to make sure that my immediate direct
20  reporting boss and effectively my customer,
21  Bruce Ross, are being kept apprised of what's
22  happening and what a possible exit strategy is for me
23  by the end of 2007.
24    Q   But you couldn't leave until -- they wanted
25  you to go through the fourth quarter.

Page 1412

1    A   They definitely wanted me to get through the
2  fourth quarter, complete the objectives for the year.
3    Q   When were you first announced as WellPoint's
4  DPE as the incoming?
5    A   I believe that took place in November. I
6  don't recall the exact date. But by early to
7  mid-November, it was acknowledged that Jim was going
8  to be moving on and that I would be coming in
9  effective the first of the year, first of 2008.
10    Q   When you were first announced sometime in
11  November, did you have occasion to speak to
12  Mr. Castelluccio?
13    A   My recollection is that it took a week to ten
14  days or so for Jim and I to actually connect, to work
15  out our calendars and make an arrangement to have a
16  chat about what he had been facing and how we were
17  going to do it. But certainly within a matter of a
18  week to ten days, I think we had a first conversation.
19    Q   And what do you recall, if anything, about
20  that conversation?
21    A   Jim was very forthright in his discussion of
22  the challenges that had been being faced at WellPoint.
23  I had the sense that he was still in the shock phase
24  of realizing that he was being replaced. But Jim and
25  I had worked together for a number of years, and our

Page 1413

1　commitment to each other was that it would be as
2　smooth as possible.
3　　　Q　Let me ask you, then, to go up and look at the
4　top of Item 73.
5　　　A　Okay.
6　　　Q　This is Ms. McDonald to you and
7　Ms. Collins-Smee?
8　　　A　Yes. That was a response to whether or not
9　Keenie and Joanne, either collectively or
10　individually, wanted to have a status check weekly on
11　the status of WellPoint.
12　　　Q　And I think on the prior one -- in fact, the
13　first one, I think Ms. McDonald says, "I'm very eager
14　to get you here and started. We need you."
15　　　A　That is correct.
16　　　Q　Did you discuss that with her?
17　　　A　Yes. Actually, both Keenie and Joanne
18　attempted to see if there were a way I could be
19　extricated from the U.K. prior to my target end of
20　December 31st. And Mark Taylor and Bruce Ross both
21　indicated no. He's here until the end of the year.
22　Got to get the end-of-year objectives done.
23　　　Q　So let me ask -- let me turn to Defendant's
24　Exhibit 75, which is a series of e-mails as well from
25　Ms. McDonald to you and back and forth. Take a look

Page 1414

1　at that.
2　　　Do you recognize that, sir?
3　　　A　Yes, I do, sir.
4　　　Q　Now, at the bottom of the page, Ms. McDonald
5　says that Dave -- and I quote, "Dave McDonald would
6　like to set up 30-minute weekly calls with you and
7　Luis."
8　　　You had met -- and I presume that's
9　Luis Fernandez?
10　　　A　That is correct.
11　　　Q　And you had met Mr. McDonald?
12　　　A　Yes.
13　　　Q　What was his role again at WellPoint?
14　　　A　Mr. McDonald -- there were two VPs under the
15　chief operating officer, Mark Boxer. One was
16　Lori Beer, the head of applications development. The
17　other was Dave McDonald, who was the head of
18　infrastructure services.
19　　　And that's tech-speak for mainframes,
20　midrange, desktops, data, all of that stuff that has
21　to work in the background. Dave was the primary
22　customer for our IBM contract.
23　　　Q　All right. Now, this talks about weekly
24　calls, and were those calls, in fact, set up?
25　　　A　Yes. Luis and I set up calls with Dave fairly

Page 1415

1　quickly and began to bring other members of the staff
2　into it. And over time, these calls turned into a
3　meeting that took place every Friday morning with
4　Boxer and McDonald.
5　　　Q　Dave McDonald?
6　　　A　Dave McDonald -- actually, Keenie McDonald
7　would be on this as well, Lori Beer, and our
8　infrastructure support teams for an hour to an hour
9　and a half.
10　　　And the agenda every Friday morning was to go
11　through what took place this week; did we have a
12　significant outage or event or breakage? What did we
13　do to fix it? What the plan is going to be. And
14　this, in itself, became a part of the time pass, if
15　you will. We were doing these while I was still in
16　the U.K., and I was dialing in on U.S. outages.
17　　　Q　And just to make this clear, these meetings
18　continued after you were boots on the ground in the
19　United States, right?
20　　　A　Yes, sir.
21　　　Q　And they continued every Friday?
22　　　A　Every Friday morning.
23　　　Q　Okay.
24　　　A　Over time, after about eight to nine months,
25　we began to achieve more of our objectives and things

Page 1416

1　began to stabilize a bit. And at that point,
2　Mr. Boxer began to withdraw from attending those. He
3　would attend maybe every other week or every third
4　week. And it became much more what we would consider
5　in IBM our traditional operation meeting.
6　　　Q　Let me ask you to take a look at Defendant's
7　Exhibit 79, please. This, again, is a brief one about
8　these telephone calls.
9　　　Do you recognize this, sir?
10　　　A　Yes, I do.
11　　　Q　Take your time.
12　　　A　Yes, I recognize this.
13　　　Q　Are these the same calls with McDonald and
14　Lori Beer and Fernandez that you mentioned a few
15　moments ago?
16　　　A　What was happening here, we were having the
17　standing Friday meetings, but Dave McDonald had
18　actually asked for perhaps another meeting, a separate
19　30-minute meeting, to make sure that we were digging
20　deep into some of the technical issues. And yes, we
21　did have those calls set up as well.
22　　　Q　This says -- this is from Ms. McDonald to
23　Fernandez and you, and it says, "Mark continues to be
24　very disappointed in our delivery leadership."
25　　　Did she explain -- did you ever discuss that

Page 1417

```
1    with her?
2       A   Yes.  During the November, December time frame
3    of 2007, the WellPoint account had a couple of fairly
4    significant outages.  One involved database corruption
5    and took an extremely long period of time to rebuild
6    and recover from.  And Mr. Boxer and Mr. McDonald were
7    convinced that IBM could have and should have done a
8    better, faster job in getting them back up in
9    operation.  And that -- I think that was the proximate
10   cause for this.
11      Q   Okay.  So when did you start on WellPoint
12   full-time?
13      A   January 3rd, 2008.
14      Q   Now, was Mr. Castelluccio still working on the
15   account when you took over as DPE?
16      A   Jim was, yes, working in the background,
17   helping me with the transition.  There had been a
18   report, an audit report, done in the fourth quarter of
19   2007.  And there were a number of operational issues
20   identified as part of those -- that operations report
21   of things that needed to be corrected.  And Jim was
22   actively engaged in working with and actually helping
23   me get my hands around those and helping us get those
24   resolved.
25      Q   And did you, in fact, meet with him on one or
```

Page 1418

```
1    more occasions to discuss those issues?
2       A   My recollection is that our conversations took
3    place by telephone.  I do not recall a face-to-face
4    with Jim during that period of time.
5       Q   During that period of time when you were
6    speaking to him, did he attempt to give you a
7    blueprint of what he thought needed to be done on the
8    WellPoint account?
9       A   I'm hesitating because of the word "blueprint."
10      Q   Try Red Team Review.  Try any of those IBM
11   terms.
12      A   Jim had a great deal of knowledge of things
13   that needed to be addressed, not only those that had
14   been identified by the Red Team Review, the audit
15   review, but his own particular perceptions of what the
16   weak spots were in the account and things that needed
17   to be addressed.
18      Q   Did he share with you -- there was a document
19   that's been referred to in this trial multiple times,
20   a Red Team -- or an overall plan from 2006.
21      A   2006?
22          MR. FASMAN:  Can you see if you can find
23   that for us?
24   BY MR. FASMAN:
25      Q   I'll continue questioning, but I'll see if
```

Page 1419

```
1    you -- did you read the various Red Team Reviews and
2    the audits and all that stuff?
3       A   Yes, I did.
4       Q   Now, how many times did you communicate with
5    Mr. Castelluccio at or about this time in terms of the
6    transition?
7       A   I would say our transition conversations
8    numbered in six to eight conference calls,
9    conversations around specific topics over a period of
10   about six to eight weeks.
11      Q   Now, can you describe the state of affairs on
12   the WellPoint account when you took over?
13          Let me see if I can ask you to take a look at
14   Plaintiff's Exhibit number 19.
15          MR. FASMAN:  Can you put that up for a
16   moment?  It's up.
17   BY MR. FASMAN:
18      Q   Let me make this easy for you.
19      A   Okay.  Thank you.
20      Q   Do you recognize that?
21      A   I believe this document was passed to me as
22   part of the hand-off of Beer's -- the history on the
23   account.  I do not have any recollection of having
24   reviewed this or discussed this in detail with Jim or
25   Mark or Jack Overacre.
```

Page 1420

```
1       Q   All right.  Let me ask you -- let me go back
2    to the more general question that I asked you, which
3    was:  What was the state of affairs on the WellPoint
4    account when you took over in 2008?
5       A   By any characterization that I'm used to in
6    managing my IBM accounts worldwide, it was classified
7    as a troubled account.
8       Q   And what were -- and I take it, as DPE, you
9    were supposed to do what you could to fix that?
10      A   Yes, sir.
11      Q   So let me ask you about various different
12   areas in which we've heard testimony about.
13          What's a Crit Sit or a SWAT call?  What are
14   those?
15      A   Critical -- Crit Sit is a critical situation.
16   We typically call those when a customer has a banking
17   system, or Qantas's airline reservation system, or
18   some such thing as that, goes out, the customer's
19   business is impacted.
20          IBM is providing that service in that
21   business.  It's up to team IBM and the customer to get
22   that business back in operation.  So Crit Sits are our
23   most intense moments of fixing things.
24      Q   Did you make any changes with regard to how
25   Crit Sit calls were handled when you came in as DPE?
```

33 (Pages 1417 to 1420)

A-636

Page 1421

1    A   Yes, sir.  The Friday morning meetings with
2   Boxer, McDonald, and Beer would typically start with
3   the focus on Crit Sits that had occurred in the last
4   week.  And WellPoint had a policy.
5        They had a very sophisticated IT organization,
6   a very knowledgeable organization.  And
7   Mr. Dave McDonald had a series of SWAT calls; that is,
8   open communication call lines, open at all times, 24
9   hours a day.  That number varied somewhere between six
10  and ten open phone lines at any hour of the day.  If a
11  Crit Sit was called, if there was an outage, the
12  WellPoint executives, the IBM executives would get a
13  page:  SWAT-5, this number, be there in 15 minutes.
14       One of the things that we had to do to
15  demonstrate to the customer that we were taking those
16  Crit Sits seriously was get faster at our responses in
17  mobilizing the team.  So in the first week in January,
18  normally a person who runs an account in this fashion,
19  as a standard DPE policy would be, if it's a Crit Sit,
20  wake me up.  Let me know.  You guys handle it.  That's
21  the way that -- wake me up at the two-hour mark.
22       My direction to my team and to them was I
23  wanted every member of my team on that call at the
24  30-minute mark.  No matter what hour of the day or
25  night, I wanted to be paged.  I wanted them to be

Page 1422

1   paged.  And we would be on the SWAT calls, because the
2   customer was going to be on the SWAT calls, and their
3   expectation was we would be as well.
4        Q   So you were on all of those calls?
5        A   Yes, sir.
6        Q   How were your sleep patterns during that time?
7        A   As I've indicated to some folks, one of the
8   things I was not prepared for was the physical demands
9   that this account represented.  It was quite frequent
10  that we would have two or three simultaneous SWAT
11  calls going at all hours of the day or night.  From
12  January 3rd to Easter 2008, I personally did not have
13  three consecutive nights of sleep without being on an
14  all-nighter.  So that's neither here nor there, but
15  it's -- it was the intensity of the account.
16       Q   So I presume that didn't -- that situation
17  didn't continue.
18       Did you make any process changes to alleviate
19  that situation?  And if you did, tell the jury what
20  you did.
21       A   I made two fundamental changes; one
22  organizationally, and one process.
23       Without too much detail, one of the things
24  that can cause the wheels to come off in an account
25  such as any of the ones that we run is the amount of

Page 1423

1   change that goes into the environment, and
2   particularly in the unanticipated change.  In this
3   account there were record-setting numbers of the
4   amount of change taking place.
5        Q   What do you mean by that?
6        A   3,400 changes per month was the average in
7   2007 and 2008.
8        Q   And what do you mean by "changes"?  Tell the
9   jury what you're talking about.
10       A   I need to have a new disk drive installed on
11  my Dell computer here, or I need to reconfigure the
12  network for the mainframe to bring in access to
13  another environment or another situation.
14       The problem that WellPoint, in my view, was
15  suffering from was a lack of discipline in those
16  changes such that, even with the extraordinarily high
17  volumes, 25 percent of those volumes were going in on
18  Friday afternoons with emergency changes not reviewed
19  by the management teams, not reviewed in a way that
20  would allow you to understand what this was going to
21  do to your neighbor and your neighbor's neighbor in
22  the environment.  So step number one was to analyze
23  and determine what was causing the changes -- basic
24  Pareto diagrams.
25       And then we put in a two-phase approach to a

Page 1424

1   change advisory board.  Instead of doing a board on
2   the Friday morning and rubber-stamping all of these
3   changes going in, we began to have a review on
4   Tuesdays and a review on Fridays.  And subsequently,
5   over time, we got that to be the Tuesday and Friday
6   reviews were not for this week, but for the week out.
7        So we were communicating better to all of the
8   customer constituents what was going to happen, what
9   the potential impact was, and making sure that all
10  hands were on deck if and when that change went
11  through.
12       The second key change that I made -- as we had
13  done the analytics on what was causing our problems,
14  we determined that data, the disk drives, where the
15  data resides was the big problem area where we were
16  having outages.  We had the mainframe team managing
17  their data and their data groups.  We had the unit's
18  midrange teams managing their data and their data
19  pools.
20       Unfortunately, in a company like this, those
21  data pools cross, clash, cross speed; and I was
22  fortunate enough to be able to go and get a very
23  skilled resource who I named as the head of all data
24  with particular focus on data change.
25       Q   And this is -- when you say a "skilled

Page 1425

1  resource," an executive?
2      A   This was a Band 10 data expert out of one of
3  IBM's other accounts.  I knew this individual, and I
4  handpicked -- drafted him for the job.
5      Q   And so what was he able to do?  How did his
6  coming in change things?
7      A   This was a longer road.  The gentleman's name
8  was Mike Favetta.  Mike set out on a path to begin to
9  change and meld those mainframe and midrange data
10  sources together and did so over about an 8- to
11  12-month period.
12         The combination of reduced critical changes,
13  reduced urgent changes, and stabilization in the data
14  environment managed to significantly improve our
15  service-level agreements, what we call SLAs, and
16  significantly reduce our penalties paid to the
17  customer in 2008.
18      Q   Now, we've heard from various folks that the
19  fix for WellPoint was adding hundreds of bodies.  Did
20  you add hundreds of bodies?
21      A   No, sir.
22      Q   Aside from the storage executive, did you add
23  anybody, any bodies?
24      A   We would add bodies as necessary to backfill
25  bodies that were leaving or might be going to another

Page 1426

1  account, but we did not have a wholesale go hire 20,
2  go hire 50, go hire 150.
3      Q   How did your team function as time went on?
4  What types of things happened with your WellPoint
5  team?
6      A   Well, I think one of the things that happened
7  was -- my personal opinion was we became cohesive.
8  There's nothing like making sure that everybody's on a
9  call at 3 a.m. in the morning and that the boss is
10  going to be there and they're going to be there.  A
11  few of those would kind of increase the intensity
12  level.
13      Q   Cure you or kill you, huh?
14      A   It had an effect of inculcating the intensity
15  that was going to be required to be successful here,
16  and I think we got there.  I had four very, very
17  strong individuals who stepped up to the plate and
18  drove that success.
19      Q   And how about customer satisfaction?  What
20  happened with the customer?  Let's say in the first
21  year or so that you were WellPoint DPE, what happened?
22      A   It improved marginally in the first six
23  months.  They were in the "wait and see, show me"
24  mode.  By the end of the first year, we were seeing
25  significant improvements.  By the end of the second

Page 1427

1  year, we had achieved a point of satisfaction where
2  the customer agreed with us that there were some
3  pieces of the contract that were working and some that
4  were not and that it was going to be in WellPoint's
5  best interest and IBM's best interest to begin a
6  renegotiation and redefinition of the contract.
7      Q   And, in fact, that's 2009?
8      A   Yes, that was 2009.
9      Q   And, in fact, the WellPoint-IBM contract was
10  renegotiated in 2009, wasn't it?
11      A   Yes, sir.  2009, 2010.
12      Q   And were you involved?
13      A   Yes, sir.
14      Q   And did IBM's relationship with WellPoint
15  expand as a result of this contract?
16      A   Yes, it did.  As we began to be more
17  successful in the day-to-day operations, we began to
18  have more opportunity to discuss next opportunities.
19         At that time, computer analytics or analysis
20  of what's going on in the medical profession -- drug
21  interactions, treatment options -- we began to have
22  some significant conversations at the highest level
23  with WellPoint about what IBM might do there, as well.
24         For those of you who have followed our
25  product, Watson, on Jeopardy and those things,

Page 1428

1  WellPoint became the first place where we were able to
2  actively propose Watson as a technology for medical
3  diagnostics.
4      Q   You better tell everybody what Watson is.
5      A   I'm sorry.  For those who do not know, Watson
6  was an R&D development by IBM's research labs where we
7  taught the computer to think.  We taught the computer
8  to play Jeopardy.  We made Jeopardy in, I think it was
9  2012, nationally televised broadcast with three prior
10  Jeopardy grand slam winners and one big blue computer
11  doing -- translating the language of the question and
12  then beating the best in class.  It was a
13  demonstration on how you teach a computer to think and
14  analyze and understand the human voice in all of its
15  contexts.
16         The way WellPoint wanted to use it was as an
17  interface to doctors and researchers to say, Gordon
18  has a polyp on his left elbow, he suffered a fracture
19  there three years ago, what are the most likely
20  scenarios for what that could mean, and to use it in
21  medical diagnostics.
22      Q   And did that, in fact, happen?
23      A   Yes.
24      Q   Is there -- are you familiar with something
25  called the Chairman's Award?

Page 1429

1    A    Yes, sir.
2    Q    And tell the jury what that is, please.
3    A    The chairman -- former chairman instituted a
4    Chairman's Award for the team that achieved -- that
5    achieves the best results in customer service and
6    dramatic turnaround, the overall best of IBM for what
7    we do.
8    Q    And did WellPoint win that in one year?
9    A    Yes, sir.
10    Q    What year, sir?
11    A    I believe that was 2010.
12    Q    Let me ask you just one more series of
13    questions.
14        Did you attend a kickoff meeting for the
15    delivery operation in early 2007 at Disney World?
16    A    Yes, sir.
17    Q    What was the purpose of the meeting?
18    A    In those days, when we could afford it, we
19    would typically have an annual kickoff session.  And
20    in 2007 -- in December of 2006, it was announced that
21    IBM's global service delivery organization was going
22    to be reporting to the worldwide general manager for
23    manufacturing, a gentleman named Bob Moffat.
24    Mr. Moffat called for a kickoff session for our IBM
25    global services team -- two and a half days, as I

Page 1430

1    recall, at Disney World, end of January.
2    Q    Not too bad.
3    A    Not too bad.
4    Q    How many people were in attendance?
5    A    Approximately 400, maybe a few more.
6    Q    During the meeting, do you recall discussion
7    of the continued employment of Mr. Jones,
8    Kelton Jones, and Tony Macina?
9    A    Yes, sir.  There was a very dramatic moment at
10    the kickoff meeting.  Unanticipated, I think, by
11    probably everyone in the room, perhaps save two, that
12    Mr. Macina, who had served for a number of years as
13    our worldwide general manager, and Mr. Jones, whom I
14    think the court has met, were going to be replaced and
15    that there would be a new regime taking place.
16        Mr. Bob Zapfel, whose name you have heard, was
17    introduced to the team as the new worldwide leader
18    for -- Mr. Moffat was the worldwide leader.
19    Mr. Zapfel was going to be the North American leader,
20    and fundamentally that there was going to be a change
21    in direction in the global service delivery
22    operations.
23    Q    And what was your reaction when you heard
24    this?
25    A    I think most of us who had spent many years in

Page 1431

1    delivery were shocked, surprised.  Some were even more
2    stunned.  But it was -- it represented a dramatic
3    departure and dramatic turn in where our delivery
4    direction was going to be going.
5    Q    And what was the nature of the change in how
6    delivery was supposed to operate as explained at this
7    meeting?
8    A    I would characterize our operations prior to
9    2007 as the DPE, first and foremost, was to take care
10    of his or her customer, assured the customer
11    satisfaction, meet your financial goals and
12    objectives, but assure delivery.
13        The message that came at us in the 2007
14    announcements was that you are going to continue to be
15    focused on delivery assurance, but we're on a forced
16    march for cost take out and operational efficiency,
17    and you are going to be expected to do more with less.
18    Q    And without getting into attorney-client
19    privileged conversations, you explained that to me
20    earlier in Navy terms and I thought that was
21    particularly useful.  You want to tell the jury what
22    you said?
23    A    Well, as I indicated, in some accounts -- in
24    some leadership of various accounts, it's typical to
25    say, in order to do more, I need more resources.  I

Page 1432

1    need more people.
2        In the Navy roles that I've had, both
3    shipboard and airborne, the commander of the
4    particular forces that I worked for tells me how many
5    people I get.  That's how many people you get to run
6    your boat.  You figure it out.
7        And I think the interpretation that I had of
8    what was going to be required for not only WellPoint,
9    but any move going forward, was I've been dealt a hand
10    of cards.  I've been dealt 480 people.  I'm not going
11    to get 580 people or even, you know, X number more.
12    I've got to figure out what I'm going to do with the
13    hand I've been dealt.
14    Q    And is that consistent with what you did at
15    WellPoint?
16    A    Yes, sir.
17        MR. FASMAN:  Mr. Crawford, I have no
18    further questions.  Thank you for coming up here in a
19    snowstorm yesterday.
20        THE WITNESS:  Yes, sir.
21        THE COURT:  Mr. Carta, will you be
22    examining the witness?
23        MR. CARTA:  I will, Your Honor, yes.
24        THE COURT:  Well, I notice it's 20 after
25    3.  Would you like to take a break until 3:30?

Page 1433

1    THE JURORS: Yes.
2    THE COURT: I'm going to stay here to
3 make sure I'm here when everyone else is here.
4    (Jurors excused)
5    THE COURT: Mr. Crawford, you may step
6 down. Watch the first step.
7    THE WITNESS: Will do.
8    (Recess taken from 3:23 p.m. to 3:34 p.m.)
9    THE COURT: Please be seated, ladies and
10 gentleman.
11    Mr. Carta, you were about to begin your
12 examination.
13    MR. CARTA: Thank you, Your Honor. This
14 will be very short.
15
16    CROSS-EXAMINATION BY MR. CARTA:
17
18    Q   Good afternoon, Mr. Crawford.
19    A   Good afternoon, sir.
20    Q   As I believe you know, I represent
21 Mr. Castelluccio.
22    A   Right.
23    Q   I just want to spend five minutes, just making
24 sure that I've understood everything that you've said.
25    Mr. Castelluccio, fully cooperative with you

Page 1434

1 when you came in to take over the WellPoint DPE
2 position in terms of transitioning the business to
3 you?
4    A   Absolutely.
5    Q   And he provided you with whatever
6 documentation you asked for, and he had some plans
7 that he presented to you that he said were the plans
8 that he was using to try to turn the account around.
9    MR. FASMAN: Your Honor, that's like
10 three questions.
11    THE COURT: I think the witness is pretty
12 sharp and...
13    MR. FASMAN: Sharp or not, I thought you
14 were supposed to answer one at a time.
15    THE COURT: He's a fighter jet pilot. I
16 think he can answer three questions.
17    THE WITNESS: Yes. Jim provided me the
18 input that he had on the audit reports that had been
19 completed in the fourth quarter and the action items
20 associated with that. And we discussed the history of
21 the account in 2007 and the challenges he had faced.
22 BY MR. CARTA:
23    Q   And you found him, I think you said,
24 knowledgeable about the problems at WellPoint?
25    A   Yes, sir.

Page 1435

1    Q   And he shared with you what insights he had
2 and what suggestions he could propose in terms of
3 continuing to improve the situation at WellPoint.
4    A   We spent most of the time discussing the
5 challenges that he had faced. We didn't spend -- my
6 recollection is we didn't spend a lot of time talking
7 about the plans going forward.
8    Q   And I think you said that the baton pass, to
9 use your analogy, was as smooth as possible. Is that
10 a fair assessment?
11    A   Yes, sir.
12    Q   You've also talked about the situation that
13 you found yourself in when you first took over the
14 account. And I think you said that it took a good six
15 months for the customer satisfaction situation to
16 start to change?
17    A   Yes, sir.
18    Q   And I think you were touting a Mike Fabia --
19    A   Favetta.
20    Q   Thank you -- as having done a superb job of
21 melding something. You were too technical for me
22 there. What was he melding?
23    A   Mike was responsible for taking our data
24 strategy -- our disk hardware and our database
25 management systems -- which previously had been run by

Page 1436

1 two separate and distinct groups -- effectively,
2 logically pulling those apart and creating a mechanism
3 by which the mainframe people could get access to the
4 data that they needed. The midrange could get access
5 to the data that they needed and that we could grow
6 that data environment in a way so it would not
7 negatively impact either one of those groups and
8 therefore create change problems.
9    Q   And, Mr. Crawford, I think I heard you say
10 that, even a skilled person like Favetta took, I think
11 you said eight to nine months to effectuate those
12 changes, is that right?
13    A   That's correct.
14    Q   So would you agree with me that there were no
15 quick fixes on the WellPoint account?
16    A   No, sir. I would not agree with you on that.
17 There were a couple of things that were relatively
18 quick fixes.
19    The reduction conviction of the customer --
20 communication to the customer to change their change
21 process and their volume of change and their
22 discipline around change, in my estimation, was our
23 first big win. And that came within probably six
24 weeks.
25    Q   And that was -- I'm not sure I understand you.

Page 1437

```
1    Let me see -- and that was a change that the customer
2    needed to make?
3       A   Yes, actually.  It was a combination of
4    changes that the customer and IBM needed to make.  The
5    change advisory board that I alluded to was one that
6    consisted of customer technical representatives, their
7    IT organization, customer business representatives,
8    the pharmaceutical teams, the insurance processing
9    teams, and the IBM teams that were responsible for
10   technology to all come together to understand this is
11   what we're going to do on this change this weekend,
12   forward.
13          It's going involve you.  Mr. Carta, it's going
14   to involve you.  It's going to involve this person and
15   this person, and you could potentially be impacted.
16   So let's get all of that out on the table so that we
17   know if something goes casters up -- our term -- at
18   3 a.m. in the morning, we need to call a SWAT call.
19   This is what we're going to be doing.
20      Q   So that was one thing that you implemented --
21   were able to implement immediately?
22      A   Yes, sir.
23      Q   And the other things, as you've said, took
24   some period of time to change, isn't that right?
25      A   That's correct.
```

Page 1438

```
1       Q   In July of 2007, wasn't there something else
2    that happened?  Didn't Mark Boxer leave WellPoint?
3       A   No, sir.  I believe Mr. Boxer left in -- at
4    the end of the first quarter of 2009, I think.  To my
5    recollection, Mr. Boxer was there as the chief
6    operating officer when I took over, and I didn't start
7    until January 2008.
8          My recollection was he had a three-quarter or
9    possibly four-quarter tenure.  And then he missed some
10   fairly significant numbers for the corporation and was
11   asked to leave.  I can't give you a specific date, but
12   I do believe it was post-2008.
13      Q   So sometime after that, Mr. Boxer left?
14      A   That is correct.
15      Q   And I believe you testified that, from January
16   2007, when you first were working on the account
17   full-time.
18      A   2008.
19      Q   I'm sorry, 2008 -- through Easter of 2008,
20   that you did not get three consecutive full nights of
21   sleep, is that right?
22      A   That's correct.
23      Q   And am I correct that, during that time
24   period, beginning in January through Easter of 2008,
25   that the WellPoint assignment as DPE was your entire
```

Page 1439

```
1    responsibility?
2       A   That is correct.
3             MR. CARTA:  No further questions.
4             MR. FASMAN:  Your Honor, I don't have any
5    further questions.  Thank you.
6             THE COURT:  Well, thank you very much,
7    Mr. Crawford.
8             THE WITNESS:  Thank you, sir.
9             THE COURT:  You may step down.
10            MR. FASMAN:  Your Honor, IBM calls to the
11   stand Russell Mandel.
12            THE COURT:  Mr. Mandel, please come
13   forward.
14         (Russell Mandel, sworn by the clerk)
15            THE CLERK:  Please state your name, and
16   spell your last name for the record.
17            THE WITNESS:  Hello.  My name is
18   Russell Mandel, and my last name is spelled
19   M-A-N-D-E-L.
20            THE CLERK:  Your business address?
21            THE WITNESS:  150 Kettletown Road,
22   Southbury, Connecticut.
23
24
25
```

Page 1440

```
1          DIRECT EXAMINATION BY MR. FASMAN:
2
3       Q   Mr. Mandel, good afternoon.  How are you?
4       A   Fine, thank you.
5       Q   Good.
6          You are employed by IBM?
7       A   Yes.
8       Q   Tell the jury your current title, sir.
9       A   I'm the program director for the Global
10   Concerns & Appeals Program.
11      Q   Can you talk into the microphone.
12          What was that again?
13      A   I'm the global program director for concerns
14   and appeals.
15      Q   We'll talk about that in a minute.
16          How long have you worked for IBM?
17      A   Thirty-seven years.
18      Q   And how old are you?
19      A   I'm 68.
20      Q   Can you briefly summarize your -- let's start
21   with your educational background after high school.
22   Can you tell the jury about your educational
23   background, please?
24      A   Certainly.  I got a bachelor's of science
25   degree from City College.  From there, I got an MBA
```

Page 1441

1  from Baruch College. Then I went to NYU, where I got
2  an additional masters and a Ph.D. in industrial
3  organization.
4      Q   Now, can you summarize your job history prior
5  to IBM, sir?
6      A   When I first got out of college, I taught for
7  four years at a grammar school. Then I had a -- then
8  I started going back full-time, which means I had a
9  variety of different part-time jobs, including
10  teaching assistant and getting grants and that kind of
11  stuff and did some consulting as well.
12     Q   How did you come to IBM? How did you come to
13  be employed by IBM originally, is what I meant to say?
14     A   I heard about an opportunity at IBM, and so I
15  applied for the job.
16     Q   And can you summarize briefly -- briefly
17  because, of course, every IBMer has multiple jobs --
18  but briefly, give the jury an idea of what your career
19  path has been at IBM.
20     A   Sure. When I first started, for the first six
21  years, I did customer satisfaction, market research,
22  and competitive analysis for IBM. Then I went on a
23  two-year chair assignment to the corporate
24  headquarters organization to do personnel research.
25         When I left that, I joined the business

Page 1442

1  systems side of the organization. That was people
2  that were going to be moving to Southbury. They were
3  located in two different locations: one in Norwalk,
4  one in Westchester.
5          And I started off as the employee relations
6  diversity manager for the first two, two and a half
7  years. And then in the last two and a half years, I
8  was the HR manager for the site.
9          After that, the next 15 years, I was the -- I
10  became the ER advisor for the various configurations
11  that we had at IBM global services.
12     Q   What do you mean by "ER"?
13     A   Employee relations.
14     Q   Thank you.
15     A   Its various iterations, and part of that
16  responsibility was both doing the open doors during
17  those 15 years and coordinating open doors.
18  Supervising people doing that is really what
19  coordination is all about.
20         Then I went on to be a program manager at
21  the -- in the Corporate Concerns & Appeals Program.
22  That was until October -- I think November of 2008, in
23  which I was -- I became then the program director
24  position, which I currently hold.
25     Q   All right. The concerns -- you call it the

Page 1443

1  Concerns & Appeals Program, right?
2      A   Yes.
3      Q   And that's the official title?
4      A   Yes.
5          MR. FASMAN: Can we put up the first page
6  of -- this is Defendant's Exhibit 109.
7  BY MR. FASMAN:
8      Q   And that is the program you were talking
9  about, sir?
10     A   Yes.
11     Q   This is 11 pages long, and it is single
12  spaced. And it's 10 until 4; so we're not going do
13  that. But let me ask you generally about this, and
14  certainly the jurors can look at this.
15         MR. FASMAN: You can look at this when it
16  gets to your notebooks if you're so inclined.
17  BY MR. FASMAN:
18     Q   The booklet here, IBM U.S.'s Concerns &
19  Appeals Program, is this made available to employees?
20     A   Yes.
21     Q   And what's the overall purpose?
22         Well, let me ask you this: There are a
23  several different internal appeals processes.
24     A   Yes.
25     Q   And can you tell the jury what those are?

Page 1444

1  There's three major ones.
2      A   Certainly. There's the Open Door, there's
3  Panel Review, and there's another program called
4  Confidentially Speaking.
5      Q   All right. We're going to talk about the Open
6  Door.
7          Can you tell the jury and tell the Court, just
8  generally speaking, what the other two are?
9      A   Certainly. The Confidentially Speaking
10  program provides an opportunity for employees to make
11  comment and ask questions about a variety of different
12  IBM policies and practices. It also provides an
13  opportunity for them to bring forward complaints or
14  bring forward issues that are violations by IBM
15  misconduct guidelines.
16         The Panel Review looks into decisions made by
17  management. It's basically a panel made up of
18  managers and non-managers in terms of assessing
19  whether or not the person was treated fairly by the
20  manager mentioned.
21     Q   And the panel-review process -- is that
22  available to executives?
23     A   No, it is not.
24     Q   How does that work, by the way? How does the
25  panel-review process work? What happens?

Page 1445

1    A   The panel is made up of -- assuming it's a
2    non-manager employee -- is made up of three
3    non-managers and two managers.  In terms of
4    preparation of their presentations, both the employee
5    who's making the complaint and the manager they are
6    making the complaint about prepare a presentation to
7    the panel.  And the -- and there's a coordinator in HR
8    who actually coordinates these -- this activity.
9        There's also a certain number of witnesses
10   that are called to speak in front of the panel.  And
11   eventually there's a vote on the panel, and it
12   basically is a majority rules content.
13       Q   And they have the authority to take action?
14       A   They have the opportunity.  What they really
15   do is they decide whether or not he was treated
16   fairly.  Any disciplinary action that might occur
17   afterwards would occur based on the HR person running
18   it.
19       Q   Okay.  Let's go and talk about the open-door
20   process, which is on pages 5 and 6 of this document.
21           MR. FASMAN:  Maybe we could put up
22   page 5, please.
23   BY MR. FASMAN:
24       Q   Mr. Mandel, speaking generally, what's the
25   purpose -- why does IBM have an open-door process at

Page 1446

1    all?
2        A   Well, at the very least, to make sure that
3    managers operate in a legal -- in an appropriate legal
4    framework, but also to go beyond and make sure that
5    they're acting in a fair and equitable manner in
6    actions taken with employees.
7        Q   And does the open-door process address
8    employment discrimination?
9        A   Yes.
10       Q   In what fashion, sir?
11       A   We investigate individual examples of
12   discrimination provided by the employee.
13       Q   Who can begin an open-door investigation?
14       A   Any employee and also former employees within
15   90 days of their leaving the company.
16       Q   And is there a time limit within which you
17   have to file an open-door complaint?
18       A   The same 90 days.
19       Q   And is there a typical length of how long it
20   takes to do an investigation?
21       A   Generally, they take on the average between 30
22   and 60 business days.
23       Q   Now, turning over to page 6.  Section 2.6 of
24   this document discusses the role of an investigator of
25   an open door.  Are you familiar with this?

Page 1447

1        A   Yes.
2        Q   Have you ever served as an open-door
3    investigator?
4        A   Yes.
5        Q   How many times during the course of your
6    career?
7        A   Hundreds.
8        Q   And how are investigators selected for a
9    particular open door, sir?
10       A   Currently investigators are a part of the case
11   management team.  And so right now, the way they're
12   being done is, depending on the strategy of the
13   person, people are selected to do them are employees.
14   In terms of executive open doors, they're done by
15   myself.  I actually also do open doors brought by
16   human resources people as well.
17       Q   And what's the role of the investigator, just
18   generally speaking?
19       A   To basically look into and find -- do an
20   impartial, fair investigation into whether or not the
21   employee was treated fairly in a specific instance.
22   If we find that they were treated unfairly, to rectify
23   those situations; if we find management error, to put
24   in place disciplinary actions.
25       Q   In your current position, do you review the

Page 1448

1    work of other open-door investigators?
2        A   Yes, I do.
3        Q   And would you explain to the jury and the
4    Court how that works?
5        A   Two different ways.  The first way is that if
6    an employee is dissatisfied with the investigation
7    that was done by one of the case managers, there's a
8    final review point.  And those are brought so they can
9    bring it forward eventually to myself, and I will
10   review the previous investigation.
11          The other way is, around the world as we do
12   those, I try to do some auditing.  And I do
13   spot-checking of the individual investigations and
14   review the reports that were done to make sure that
15   I -- that we're actually following our own processes
16   and being fair to the employees being investigated in
17   terms of investigations.
18       Q   So you're the -- are you the point of appeal
19   if someone doesn't like how an open door comes out?
20       A   Yes.
21       Q   And is there any further appeal from you?
22       A   No.
23       Q   Okay.  Section 2.7, if we could highlight that
24   portion, describes the investigation in general terms,
25   correct?

Page 1449

```
1        Why don't you tell us what generally is an
2    investigator expected to do?  When the investigation
3    begins, what happens?
4        A    The first step is normally to speak with the
5    employee, and that's usually followed immediately by
6    speaking with the manager involved.
7        Q    And then what happens?
8        A    And then based on that, the person proceeds
9    with an investigation:  interviewing people, reviewing
10   documents, and other material.
11       Q    Who was responsible for interviewing
12   Mr. Castelluccio's complaint?
13       A    Me.
14       Q    You were.
15            MR. FASMAN:  And let me ask if we could
16   put up Defendant's Exhibit 122, please.
17   BY MR. FASMAN:
18       Q    Would you rather have that in hard copy?
19       A    It wouldn't hurt my feelings.  I'm a little
20   challenged on the eyes here, yes.
21       Q    The hard copy should be in the black notebook.
22   We're looking at number 122.  You have two of those,
23   of course.  Take your time.
24       A    Thank you.
25       Q    Do you have that, sir?
```

Page 1450

```
1        A    Yes, I do.
2        Q    Now, this is -- let me ask you to identify it
3    for the jury and for the Court.
4        A    This is a note stream between
5    Jim Castelluccio, Garrett Walker, Garrett to myself,
6    and my forwarding it to Kristen Moran.
7        Q    And so I believe the back page, page 2, is a
8    complaint that Mr. Castelluccio forwards to Mr. Walker
9    and then Mr. Walker forwards to you, sir?
10       A    Yes.
11       Q    Who's Kristen Moran, by the way?
12       A    She was my assistant at the time.
13       Q    And you tell her, "Please set up 30 minutes
14   with Jim next week, and put this in a red file"?
15       A    Yes.
16       Q    What does that mean?
17       A    Basically, I wanted to meet with Jim to hear
18   his side of the complaint.  And the red file is how I
19   identify open doors in my file folders so I know which
20   ones are the open doors.
21       Q    And did you, in fact, meet with
22   Mr. Castelluccio?
23       A    Yes, I did.
24       Q    And when was this, sir?
25       A    I believe it was the following week.  I think
```

Page 1451

```
1    it was the 23rd.
2        Q    Now, during the -- do you remember that
3    meeting with him?
4        A    Vaguely.
5        Q    During the initial interview with
6    Mr. Castelluccio, did he state that the first words
7    out of Ms. Collins-Smee's mouth when she first met him
8    were "How old"?
9        A    No.
10       Q    Are you certain of that?
11       A    Yes.
12       Q    Did you make notes of that meeting?
13       A    Yes, I did.
14       Q    And did you, at my request, review those
15   notes?
16       A    Yes, I did.
17       Q    Did they reflect such a comment by
18   Mr. Castelluccio to you?
19       A    No.
20       Q    Did you review the report that you prepared,
21   sir?
22       A    Yes, I did.
23       Q    And does your report contain any reference to
24   such a comment being related to you by Mr. Castelluccio?
25       A    No, it does not.
```

Page 1452

```
1        Q    If he had said something like that, would that
2    have come to your attention?
3        A    Yes.
4        Q    All right.  What was the nature of the
5    complaint that Mr. Castelluccio related to you when
6    you spoke to him?
7        A    Essentially, he said that he was
8    constructively discharged as a result of age
9    discrimination.  And he provided me general examples
10   of that, one of which had to do with his performance
11   assessment.  Associated with that was his removal from
12   the two jobs.
13            His second example was that Joanne
14   Collins-Smee was insufficiently active in helping him
15   find another position; and thirdly, she asked at one
16   point whether or not he was old enough to retire.
17       Q    And did he say that -- this was one time that
18   he was old enough to retire?
19       A    Yes.
20       Q    Now, I don't want you to get into what your
21   conclusions were in any way, shape, or form, but I do
22   want to know how many people you interviewed during
23   the process of conducting this open-door investigation.
24       A    Including Jim, 21.
25       Q    Twenty-one people during what period of time,
```

Page 1453

1  sir?
2      A   The investigation -- I did over, about -- from
3  a calendar perspective, about a month and a half,
4  maybe five weeks, something in that area.
5      Q   All right.  During the investigation, did you
6  receive any information with regard to employee
7  placement; that is, Ms. Collins-Smee's efforts to
8  place Mr. Castelluccio in a different position?
9      A   Yes, I did.
10     Q   So I think we've seen some of these.
11         MR. FASMAN:  But let me ask
12  Ms. Gutierrez, could you put up number 124?
13         MR. CARTA:  Defendant's 124.
14         THE WITNESS:  I can refer to that in the
15  book.  The printing there is a little small.
16  BY MR. FASMAN:
17     Q   Of course.  Go ahead.
18         Can you tell us what this is, sir?
19     A   I'm looking through it.  Hold on.
20     Q   Okay.  Take your time.
21     A   It's a note stream between Connie Murphy and
22  Jack Overacre and eventually sent to me by Connie.
23     Q   And the first e-mail there by Ms. Murphy on
24  the back page --
25     A   Yes.

Page 1454

1      Q   -- is dated 5/14/2008, isn't it?
2      A   Yes, it is.
3      Q   And can you summarize it for the jury?
4      A   Yes.  It basically says that this is notes
5  from the Zapfel 5-minute drill on a position that Jack
6  had open.  And it says that Joanne Collins-Smee asked
7  that Jim had been interviewed by Jack.  So that's
8  pretty much a summary of it.
9      Q   And then the remaining portions of this are
10  various e-mails back and forth about what happened?
11     A   Yes.
12     Q   All right.
13         MR. FASMAN:  Let me ask, Jean, would you
14  put up Defendant's 128, please?
15  BY MR. FASMAN:
16     Q   Do you have that there, sir?
17     A   Yes, I do.
18     Q   Maybe you can read it over and tell the jury
19  what this one is.
20     A   Connie forwarding a resumé -- Jim
21  Castelluccio's resumé, indicating that Jim is
22  available for positions, and Joanne Collins-Smee
23  recommends him as a candidate for your open director
24  slot, and it's written to Bill Barnett.
25     Q   And what's the date?

Page 1455

1      A   The date of that is April 1st, 2008.
2      Q   All right.  Now, I think we've seen the other
3  two, but I may as well -- we may as well note these --
4  135.
5      A   Yes, I see it.
6      Q   Can you tell us what this one is, sir?
7      A   Yes.  This is a -- Joanne Collins-Smee, again,
8  quoting Jim's resumé to Liz Smith in this case,
9  indicating that Jim is available for a new position
10  and wondering if she had -- Liz had any executive
11  positions open, either a Band D or a C position, that
12  might be a match for Jim's skills.  And Liz responds
13  back.  Seems to be that she does not.  She's actually
14  cutting back on execs on her team.
15     Q   This is a set of e-mails, though, that was
16  forwarded to you as part of your investigation?
17     A   Yes, it was.
18     Q   And who forwards it to you?
19     A   Garrett Walker.
20     Q   Let's take a look at 136, as well, please.
21     A   Sure.  I have it.
22     Q   And this also was forwarded to you by
23  Mr. Walker?
24     A   Yes, it was.
25     Q   And what is this one, sir?

Page 1456

1      A   This is Joanne Collins-Smee forwarding Jim's
2  resumé to Mark Hennessy, who is the chief division
3  officer for IBM at the time, indicating, again, that
4  he's one of her team members, and he's available for
5  new positions and, again, says, "I was wondering if
6  you had any executive openings in the C or D level in
7  CIO's office that might be a match for Jim."
8      Q   All right.  So let's talk about more generally
9  rather than on these specific things.  If it took you
10  six to eight weeks to finish this investigation and it
11  was begun in mid-June, it was not done by the time
12  Mr. Castelluccio ended up leaving IBM, correct?
13     A   Yes.
14     Q   So did you communicate with anyone about what
15  happens in that situation?
16     A   Yes, I did.
17     Q   And with whom did you communicate and what did
18  you tell them?
19     A   I communicated with Keith Holmes, Jim, and
20  Joanne Collins-Smee.
21     Q   And what did you tell them?
22     A   Essentially --
23         MR. CARTA:  Objection, Your Honor.  What
24  did he tell them?
25         MR. FASMAN:  Yes.

Page 1457

```
1        THE COURT: I'm sorry, Mr. Carta.
2        MR. CARTA: Yeah. I'm not sure about
3   "What did he tell them." That's an awfully open-ended
4   question under the circumstances.
5        THE COURT: Can you narrow it down?
6   BY MR. FASMAN:
7    Q   Yes. What did you tell them about the
8   situation with Mr. Castelluccio apparently leaving on
9   June 30th, and you, then, at some subsequent time,
10  concluding your investigation?
11       MR. CARTA: I'm going to object.
12       MR. FASMAN: Just limit it to that.
13       MR. CARTA: I'm going to keep my
14  objection, Your Honor.
15       THE COURT: Are we getting on to thin ice
16  now?
17       MR. FASMAN: No.
18       THE COURT: Are you sure?
19       MR. FASMAN: Yes.
20       THE COURT: Okay. The objection's
21  overruled.
22  BY MR. FASMAN:
23   Q   Just what -- let me put it this way: Why
24  don't you tell us what you told them about that set of
25  circumstances, with him leaving and you continuing to
```

Page 1458

```
1   investigate, without revealing anything about your
2   findings at all?
3    A   Certainly. If I found that in Jim's favor, we
4   would bring him back to the business; and if not, he
5   would -- the package that he had been offered would
6   still be available to him, because the last date that
7   the package would be available would have been June
8   30th. And it wouldn't be fair for him not to have
9   that package available to him; so therefore, he would
10  have 48 hours to review the package if I did not find
11  in his favor.
12   Q   However, in your long career --
13       MR. CARTA: I'm going to move to strike.
14  I think that that was more than thin ice.
15       THE COURT: Mr. Fasman?
16       MR. FASMAN: I don't think it was. It's
17  a very basic concept. He didn't finish his
18  investigation and that's --
19       THE COURT: You want me to have that read
20  back, Mr. Carta?
21       MR. CARTA: No. I think everybody heard
22  it.
23       THE COURT: Well, I think everybody heard
24  it but me. The witness was facing away from me and
25  the microphone. Let's ask the jury to excuse us for
```

Page 1459

```
1   five minutes so this can be read back to me, because
2   apparently there's some legal question that is
3   implicated here. So would you just hold on for five
4   or ten minutes or so, please?
5        (Jurors excused)
6        THE COURT: I'm going to ask you, would
7   you please read back Mr. Fasman's last question and
8   the witness's answer?
9        (Question and answer read back by reporter.)
10       MR. CARTA: Your Honor, "If I did not
11  find in his favor, then we would bring him back."
12       THE COURT: That's it. That's just
13  exactly what -- I mean, he told you the results of his
14  investigation.
15       MR. CARTA: Exactly.
16       MR. FASMAN: I'm sorry?
17       THE COURT: You told, through this
18  witness -- this witness testified as to the results of
19  his investigation.
20       MR. FASMAN: I don't think he did. He
21  didn't testify at all.
22       THE COURT: Stop. Mr. Castelluccio is no
23  longer working for IBM.
24       MR. FASMAN: Correct.
25       THE COURT: He was not brought back --
```

Page 1460

```
1        MR. FASMAN: Correct.
2        THE COURT: -- to IBM. The witness
3   testified that, if the investigation turned out to be
4   meritorious, Mr. Castelluccio would be brought back to
5   IBM. He's not back at IBM; ergo, this gentleman found
6   that it was a non-meritorious claim, which is exactly
7   what we all agreed was not going to be done. It's not
8   going to be brought to the jury's attention.
9        MR. FASMAN: I thought that what I was
10  saying was did you have the power to reinstate him.
11  That's all I wanted to get on the record.
12       THE COURT: You didn't ask him that. You
13  asked him what you asked him, and he answered what he
14  answered. And Mr. Castelluccio's non-employment by
15  IBM is the necessary conclusion of the witness's
16  testimony. The investigation found that it was not
17  meritorious.
18       MR. FASMAN: Then, Your Honor, I suppose
19  you should strike all of this.
20       THE COURT: Well, I'm going to ask the
21  jury to disregard. The problem with my asking the
22  jury to disregard the fact that Mr. Castelluccio's no
23  longer with IBM is worse than asking the jury to
24  disregard Mr. Mandel's testimony that Mr. Castelluccio
25  would be invited back in the event Mr. Mandel's
```

A-646

Page 1461

1    investigation was substantiated or actually
2    substantiated Mr. Castelluccio's complaint.
3         So do you have more that you want to go
4    into with this witness?
5         MR. FASMAN:  Not really.  I mean, what I
6    would -- the only other questions I had were:  How do
7    you normally communicate the results of an
8    investigation?  Did you communicate the results with
9    Mr. Castelluccio, period.  Two more questions.
10        THE COURT:  All right.  Well, you know, I
11   don't think that this is really harmful.  I mean, it
12   would be better if it weren't said, because it would
13   be clearly in keeping with an agreement.
14        I don't believe that Mr. Fasman
15   intentionally has sabotaged our agreement.  I believe
16   it was just one of these things that came out.  I
17   don't think it was emphasized to the jury.  I don't
18   think the jury picked up on it.
19        I think more harm would be done by my
20   going into detail about this testimony.  But I think
21   you should just conclude with this witness.  The
22   question is, how do we conclude with this witness
23   without making it obvious.
24        Mr. Carta, any ideas?
25        MR. CARTA:  I'm sorry, Your Honor?

Page 1462

1         THE COURT:  Any ideas?
2         MR. CARTA:  Well, first of all, Your
3    Honor, I'm going to request that, at minimum, a charge
4    that testimony about any internal investigation and
5    the results of any internal investigation should not
6    weigh on the jury's decision.  It's their
7    responsibility and opportunity to find facts
8    themselves.  I think, at minimum, we would be entitled
9    to that.
10        THE COURT:  Well, you are and you'll get
11   that.
12        MR. FASMAN:  And we have no objection to
13   that.
14        THE COURT:  Okay.  You are and you will
15   get that.
16        And, Michael, take down Mr. Carta's
17   words.  We'll make sure that any charge at the
18   appropriate space.
19        What I propose to do is bring the jury
20   back in, and then ask Mr. Mandel:  So you conducted an
21   internal investigation?  And he's going to say yes.
22   And were you satisfied with the results of the
23   investigation?
24        MR. FASMAN:  Fine.
25        MR. CARTA:  I think any reference to

Page 1463

1    results, Your Honor, just makes me anxious.
2         THE COURT:  You know something?  I can
3    see why.
4         You conducted the investigation.  Thank
5    you very -- you conducted the investigation because
6    you had a procedure.  You conducted the investigation
7    because you take claims of this nature seriously.
8         MR. CARTA:  I don't have a problem with
9    that as a final question.
10        MR. FASMAN:  Fine.
11        THE COURT:  Okay.  That's what we're
12   going to do.
13        MR. CARTA:  I'm not in any way waiving
14   whatever rights I may have by virtue of the question.
15   I have my own feelings about whether it was
16   intentional or not.
17        THE COURT:  Okay.
18        MR. CARTA:  Well, we filed a motion.
19   We've had three sidebars.  I raised the question after
20   the question was asked.  I mean, I could not have done
21   anything more to prevent this very thing from
22   happening.
23        MR. FASMAN:  Your Honor, it certainly was
24   not intentional.  It was only meant to do the
25   following, that is, to say that IBM takes this

Page 1464

1    seriously.  And they empower him to bring people back,
2    to reinstate people.  He has the power to do it.
3         And if I did something wrong, it
4    certainly was not intentional.  I was very clear.  I
5    said I do not want you to reveal anything about the
6    conclusion of your investigation.  I was very clear
7    about that.
8         THE COURT:  Well, it was also part of the
9    agreement that the jury was not going to be told that
10   this gentleman had the power to bring him back,
11   because that indicates that, by his not exercising
12   that power and by Mr. Castelluccio no longer being at
13   IBM, Mr. Mandel found that it wasn't necessary to
14   exercise that power because the allegations were not
15   meritorious.
16        Now, listen, this is what I'm going to
17   do.  I'm going to tell the jury that we've had some
18   legal talk, and I'm going to say, I just want to ask
19   you a couple questions, Mr. Mandel.  You conducted an
20   investigation, and you conducted it because IBM takes
21   these allegations of this nature seriously.  Yes.
22   Thank you very much.
23        MR. FASMAN:  Fine.
24        THE COURT:  He's going to step down.
25        Now, Mr. Carta, it was not my intention

Page 1465

1   to deprive you of your right to an opportunity to
2   argue that Mr. Fasman intentionally sandbagged you.
3   It was not my intention to deprive you of the power to
4   make any argument that you want to make in that
5   regard. And I know that you'll do what you believe is
6   the right thing to do.
7         And now I've got to do what I believe is
8   the right thing to do. I was here. I heard it, and I
9   don't think it was any big deal to the jury what they
10  heard. It wasn't put across in a way to really call
11  dramatic attention to it, part one. And part two, I
12  do not believe that Mr. Fasman sandbagged
13  intentionally you or the Court. You're free to argue
14  otherwise, but this is just my belief.
15        MR. FASMAN: Judge, if I may say so in my
16  own defense, I've been trying cases for 40 years.
17  I've always protected the record. I've always tried
18  to make sure that I complied with every order from
19  every judge that I've ever gotten, and this is
20  certainly one of those.
21        If I thought that Your Honor was going to
22  have this reaction to what I couched as a simple
23  question, which is -- I didn't realize that this was
24  going to transgress on our agreements. Mr. Carta
25  knows that there are documents in the file.

Page 1466

1         THE COURT: You really aren't talking
2   about my reaction, you're talking about Mr. Carta's
3   reaction.
4         MR. FASMAN: Well, either one.
5         THE COURT: Wait a minute. Somebody
6   reading the words could think that this is a situation
7   where a judge is acting or behaving in a
8   disproportionate manner or acting angrily or is
9   reproving you, which I'm not doing.
10        MR. FASMAN: Okay, I'm sorry. I'll take
11  my foot out of my mouth. I seem to be putting it
12  there frequently this afternoon.
13        THE COURT: I'll agree with you on that.
14        MR. FASMAN: I didn't mean to imply
15  otherwise.
16        THE COURT: Let's get the jury in. And
17  then we'll take care of it.
18        Mark, you do what you got to do.
19        MR. CARTA: Well, I clearly can't do
20  anything without consulting with my client, and I need
21  to do that.
22        THE COURT: Okay.
23        MR. CARTA: Your Honor, before the jury
24  comes in, there is one suggestion of Ms. Triolo I want
25  to ask the Court. What if we struck all of his

Page 1467

1   testimony and you just -- and the testimony was just
2   limited to your question that -- which is that he had
3   an investigation, he conducted the investigation, and
4   the reason he conducted the investigation was that he
5   wanted to make a good-faith effort to determine
6   whether there had been age discrimination.
7         That's what they -- that's the proof that
8   they have been sort of dancing around, which is to
9   show that there was no willfulness.
10        THE COURT: Well, that's okay. But then
11  I'm making it my question, and I could very easily
12  botch the question. I don't want to do that. I don't
13  want to be the cause of any consternation on the part
14  of either the Plaintiff or IBM.
15        We'll handle it, and you do what you have
16  to do after consulting with Mr. Castelluccio? Mr.
17  Castelluccio, I'm sorry, sir.
18        (Jurors present)
19        THE COURT: Gentleman and ladies, welcome
20  back in. Please sit down.
21        We had some legal argument, and there was
22  some question about the Court's prior rulings, and I
23  think the best way to handle this is the way I'm going
24  to handle this. I'm going to handle it this way.
25        Mr. Mandel, I can't believe you're older

Page 1468

1   than I am.
2         THE WITNESS: Thank you.
3         THE COURT: I mean that's dark hair.
4         Okay. We'll get on to the matter at
5   hand.
6         It's your job at IBM to investigate
7   allegations of this nature, correct?
8         THE WITNESS: Yes.
9         THE COURT: And you did that. You
10  conducted an investigation.
11        THE WITNESS: Yes.
12        THE COURT: And you and IBM conduct
13  investigations like that -- like this one because you
14  know and believe that the law with respect to
15  discrimination is important, serious, and it should be
16  obeyed.
17        THE WITNESS: Yes.
18        THE COURT: All right. I don't think the
19  Court has any more questions.
20        MR. FASMAN: I have no further questions
21  for this witness.
22        THE COURT: Mr. Carta?
23        MR. CARTA: I have no questions of this
24  witness. Thank you, Your Honor.
25        THE COURT: Thank you so much for being

Page 1469

1    here, sir.  It's only zero out.
2         THE WITNESS:  Okay.
3         MR. FASMAN:  Your Honor, we have one more
4    witness who unfortunately is coming from Long Island
5    and who got snowed in last night.  What we do have,
6    though, are deposition designations that the parties
7    have agreed upon to be read into the record.  And if
8    we have half an hour, we can probably put those in so
9    the jury can have them before them.
10        THE COURT:  Will your witness be able to
11   be here tomorrow?
12        MR. FASMAN:  First thing in the morning,
13   yes.
14        THE COURT:  Mr. Carta?
15        MR. CARTA:  That's perfectly all right,
16   Your Honor.
17        THE COURT:  Tomorrow?
18        MR. CARTA:  Yes.
19        THE COURT:  Who's the witness?
20        MR. FASMAN:  It's Charles Sodikoff, who's
21   an expert on recruiting.
22        THE COURT:  Okay.
23        MR. CARTA:  He should be very brief and
24   then we'll be done.
25        THE COURT:  Okay.  So this is what's

Page 1470

1    going to happen tomorrow.
2         Are you going to put on a rebuttal case,
3    Mr. Carta?
4         MR. CARTA:  No.
5         THE COURT:  We're going to have this
6    gentleman testify in person.  After he testifies,
7    we'll have a break during which we'll have a charging
8    conference with me and the law clerks and Wendy in my
9    library and you'll be given a copy of the charge
10   tonight.
11        MR. CARTA:  Thank you.
12        MR. FASMAN:  Thank you.
13        THE COURT:  And I want you to look it
14   over, not for stylistic changes, but I want to make
15   sure that the law -- correct law is in there, and it's
16   correctly stated, and it's stated in a way that makes
17   it easiest for the jury to understand it and apply it
18   to the facts that they find.
19        After the charge conference, we're going
20   to come back and there will be closing arguments.  And
21   as is the custom in this district, Mr. Carta will go
22   first.  Mr. Fasman will then give his closing
23   argument, and Mr. Carta will then have a rebuttal
24   opportunity.
25        Then I'm going to deliver the charge.

Page 1471

1         And once counsel have reviewed the
2    exhibits and are in agreement as to which ones should
3    be sent into the jury room or how many should be sent
4    into the jury room, we will do that.  And after the
5    jury is charged and has the exhibits, it will begin
6    deliberating.  And I think that's the itinerary for
7    tomorrow.  Okay?
8         All right.  Ladies and gentlemen, my
9    gosh, two days in a row I'm getting to let you go
10   early.
11        MR. CARTA:  No, Your Honor.  We were
12   going to read those excerpts.
13        THE COURT:  You wanted to?
14        MR. FASMAN:  Yes, I think so.  Right?
15   Yes.
16        THE COURT:  You wanted to read the
17   excerpts in lieu of having the person come in
18   tomorrow?
19        MR. CARTA:  No.
20        MR. FASMAN:  No.  We wanted to read, Your
21   Honor -- we agreed that there were certain
22   depositions -- portions of depositions that we thought
23   were relevant for the jury, but we didn't want to have
24   another six or eight witnesses.  So we've cut out and
25   agreed upon a series of deposition excerpts that were

Page 1472

1    taken in this case -- sworn testimony taken in this
2    case that we agreed between us ought to be read to the
3    jury.
4         MR. CARTA:  That's correct.
5         MR. FASMAN:  And we would propose right
6    now that we read them, question, answer, question,
7    answer.  And the actors, I gather, in this drama are
8    my partner, Mr. Duffield, and Ms. Triolo, depending on
9    the gender of the person who's answering and asking
10   the questions.  So if that's okay.
11        THE COURT:  Yes, that's fine with me.  I
12   was thinking we were talking about reading those in
13   lieu of having the witness come here.
14        MR. FASMAN:  No.  We'll have our live
15   witness here tomorrow morning first thing.
16        THE COURT:  All right.  So we get to hear
17   some reading.  How do you want to do this?  Do you
18   want to have your --
19        MS. TRIOLO:  The stand?  You're going to
20   have to --
21        THE COURT:  Somebody will be doing
22   reading from the witness stand.  Make sure I
23   understand -- I know the jury will understand.  Make
24   sure I understand who this is, and who you are
25   reading.

## Page 1473

1  MR. DUFFIELD: Certainly. All right.
2  The role of Barbara Brickmeier will be played by
3  Ms. Triolo, and I will be playing the role of
4  Mr. Fasman, the younger version -- much younger
5  version.
6  I don't know if it's helpful for the
7  record for us to read the pages or just to run through
8  the testimony. How do you usually like this done?
9  THE COURT: I usually don't like this at
10 all. But question and answer, whichever way you
11 prefer.
12 MR. DUFFIELD: So we're going to start on
13 page 9.
14 MS. TRIOLO: Yes.
15 MR. DUFFIELD: All right.
16 (Deposition testimony read)
17 Q  "Where did you graduate from high school?
18 A  "Oceanside High -- Oceanside High School.
19 Q  "And what did you do upon graduation?
20 A  "I went to school at Long Island University.
21 Q  "Did you graduate from Long Island University?
22 A  "Yes, I did.
23 Q  "What year?
24 A  "1977.
25 Q  "With what degree, if any?

## Page 1474

1  A  "Bachelor's degree in English.
2  Q  "Did you pursue any formal education beyond
3  that?
4  A  "Yes.
5  Q  "What?
6  A  "I went to graduate school and obtained an
7  MBA -- Masters of Business Administration.
8  Q  "Where did you get your MBA?
9  A  "Adelphi University.
10 Q  "Where is that?
11 A  "Long Island.
12 Q  "What year did you graduate from Adelphi with
13 your MBA?
14 A  "I'm not a hundred percent certain, because I
15 went nights. I believe it was 1982, give or take a
16 year or so.
17 Q  "So currently what's your official title?
18 A  "My official title is vice president services
19 delivery and HR delivery.
20 Q  "You said that you are vice president services
21 delivery and HR delivery. Delivery for whom?
22 A  "Services delivery -- it's the business unit
23 called Global Technology Services, and there's a
24 delivery component at that business unit.
25 Q  "You provide HR services for your customers?

## Page 1475

1  A  "My specific job is I'm responsible for HR for
2  that business unit globally. My primary client is an
3  SVP.
4  Q  "What's an SVP?
5  A  "A senior vice president.
6  Q  "Who specifically?
7  A  "His name is Timothy Shaughnessy.
8  Q  "Can you describe in detail what your
9  responsibilities are in that position?
10 A  "I provided advice to Mr. Shaughnessy on all
11 HR-related matters for the business unit that he is
12 responsible for. And I have some direct reports who
13 also report direct reports into Mr. Shaughnessy. My
14 ultimate responsibility is for all HR-related matters
15 for that business unit. All employees worldwide, I am
16 responsible for the HR.
17 Q  "Do any written policies or procedures exist
18 for reassigning executive-level employees?
19 A  "No.
20 Q  "Are there standard practices that have been
21 in place -- that are in place?
22 A  "There are approaches that are in place, and
23 practices that could vary depending on the business
24 unit.
25 Q  "With respect to the current practices, can

## Page 1476

1  you give me a summary of what current practices are in
2  place for assisting an employee -- an executive-level
3  employee to find a new position within IBM?
4  A  "Well, when executives are available for jobs,
5  their names typically and commonly would be on drills.
6  And a 'drill' is a periodic process where we look at
7  jobs that are open and employees who might be
8  available. And then those employees are discussed for
9  suitability for their roles.
10 "And this would be employees who are available
11 because they don't have a current position or
12 employees who have this skill and expertise and
13 experience who might already have a position.
14 Q  "You're talking about the 5-minute drill
15 process?
16 A  "That's right.
17 Q  "When did you first become involved in the
18 5-minute drill process?
19 A  "In April of 2008, in my current job.
20 Q  "Specifically, what is your involvement since
21 that time? What has been your involvement?
22 A  "I am responsible for the 5-minute drill for
23 Tim Shaughnessy.
24 Q  "At what level, if there's a general
25 procedure, does someone run their own 5-minute drill?

Page 1477

1    A   "My manager or executive can run a 5-minute
2  drill.  Our policy is for executives -- all executives
3  to run drills to fill their positions.  Anybody below
4  an executive does not have to.  It's up to them
5  whether they want to fill jobs that way.
6    Q   "When you say executive, what does that
7  include?  What levels?
8    A   "It correlates to a banding structure, and
9  it's Band D and above.
10    Q   "And do executives run their 5-minute drills
11  in a uniform way?
12    A   "Executives typically run it in a uniform way,
13  because there's a prescribed way to do it.
14    Q   "What's the prescribed way to do that?
15    A   "That, depending upon the type of jobs that
16  executive determines are appropriate for their drill,
17  then whatever time the drill is -- I'm sorry --
18  whatever the time period is for the drill -- typically
19  they're every four weeks, but it could vary.
20    "The direct reports to that executive would
21  submit in advance the jobs that they have open or
22  anticipate having open.  And they would also -- if
23  they have a slate of candidates that they have a
24  preferred candidate, that would be presented.  In some
25  cases, there are no candidates and it's open for

Page 1478

1  discussion.  And that's what's discussed at the
2  meeting.
3    Q   "Okay.  What other steps or procedures are
4  available to, let's say, a general manager in addition
5  to the use of a 5-minute drill to assist an executive
6  to relocate or find a new assignment?
7    A   "For the general manager to assist somebody?
8    Q   "Uh-huh.
9    A   "If the employee who is looking for a job
10  wants to or desires to ask for assistance in finding a
11  job, then the general manager can agree to do that.
12    Q   "If the general manager agrees to do that,
13  what steps are available to a general manager for
14  assisting an executive to find a new position?
15    A   "A general manager or any employee could agree
16  to let that employee who's looking for a job know of
17  any opportunities that come up.  That general manager
18  could agree to put the employee on a 5-minute drill as
19  somebody who's looking for an assignment or could
20  agree to serve as a reference for that employee, when
21  that employee interviews for a job and would like to
22  call upon the general manager to provide personal
23  experience.
24    Q   "Anything else that a general manager can do
25  to assist an executive to find a new position?

Page 1479

1    A   "These are the top ones that come to my mind.
2    Q   "Do you know anything about the history of the
3  5-minute drills?  When they first started to become a
4  matter of standard procedure?
5    A   "I do not know the exact date when they
6  started, but they've been in existence for a very long
7  time.
8    Q   "By 'very long time,' do you mean three years?
9  a decade?  What you mean by 'very long time'?
10    A   "I joined IBM in 1996, and my recollection is
11  that they would have been around even at that time,
12  but I cannot say with certainty.  But they've been
13  around a long time.
14    Q   "Do you know when they became regular in ITD
15  Americas group?
16    A   "I cannot say.
17    Q   "Do you know if in 2007, 2008, Joanne
18  Collins-Smee was running a 5-minute drill?
19    A   "I have no personal knowledge of that.
20    Q   "But Mr. Moffat was for some period of time?
21    A   "Yes.
22    Q   "And Mr. Zapfel was?
23    A   "I have no recollection.  My assumption is
24  that he would because it's standard practice.
25    Q   "I want to just ask a couple of questions

Page 1480

1  about a person in a Band C role.  A person such as
2  Mr. Castelluccio who is in a Band C role in the ITD
3  Delivery division who was looking for a job, what
4  5-minute drills would you expect to have him appear
5  on?
6    A   "My expectation is that he would appear on
7  managers' 5-minute drills.
8    Q   "That would be Joanne Collins-Smee?
9    A   "Joanne Collins-Smee, as a person who is
10  looking for a position at a Band C level.  It would be
11  very typical for her to present that at her boss's
12  5-minute drill.
13    "At that time, I believe her boss was
14  Bob Zapfel.  It's even possible that Bob could have
15  presented that on Moffat's drill, but I'm not sure.
16    Q   "But the one you think would be most likely
17  would be Joanne Smee's own 5-minute drill?
18    A   "Yes.
19    Q   "Why is that?  Why do you think that would be
20  the typical one for him to appear on?
21    A   "Because the protocol and the process is that
22  executive positions which we need to fill and people
23  who could be candidates for these jobs or any job,
24  whether they were unassigned and they were personally
25  looking for the next assignment, that those names

Page 1481

1  would be presented as people to discuss or people
2  looking for jobs.  This is typical protocol
3  particularly for a Band C executive.
4    Q   "At what point in this process would you
5  expect Mr. Castelluccio to be listed on the 5-minute
6  drill?
7    A   "In general, people can -- executives can be
8  put on the 5-minute drill for a variety of reasons.
9  Either we know they're going to come off an assignment
10  and we're thinking ahead -- this could a temporary
11  role.
12    Q   "What could be a temporary role?
13    A   "This type of position.
14    Q   "I'm not sure what you're referring to.
15    A   "Just generically, you asked me a question
16  about people being on the 5-minute drill.  And jobs
17  could be on the drill if we anticipate needing someone
18  to fill a particular job for a variety of reasons, or
19  individual names of executives could be on the
20  5-minute drill as we need to place this person.
21    "And we could put it on now anticipating a
22  placement in six months; or we could put it on now
23  because we anticipate a placement in four weeks; or we
24  could put it on because it's a temporary job, and we
25  know it's going to be having a beginning and an end

Page 1482

1  like a project; or we may know the account is going to
2  come to an end.
3    "So there are almost an infinite number of
4  reasons why someone could be on a drill.  And the
5  timing could be coincident with and corresponding to
6  what the business event is and the circumstances with
7  that employee.
8    Q   "Typically, in your experience -- because I
9  know you ran Shaughnessy's and you ran most of the's
10  for a while -- typically, would someone be put on a
11  5-minute drill on or before the time they were,
12  quote/unquote 'put on the bench'?
13    A   "Typically if they were on the bench, meaning
14  unsigned and they're not doing any productive work,
15  they would be on the drill.
16    Q   "And in the case of somebody in
17  Mr. Castelluccio's position, if you know, what drills
18  would be appropriate drills for him to appear on?
19    A   "I don't know what happened specifically in
20  his situation.  I've had other executives who have
21  been on the bench, and sometimes they go on the drill
22  right away.  Other times, they might wait a month or
23  two depending on the timing.
24    And then they could also stay on the drill for
25  a couple of months and then come off if there's no

Page 1483

1  productive reason for them to be on the drill
2  anymore -- because there's no expression of interest
3  and no jobs that are coming up.
4    Q   "In your experience, why has there been some
5  occasions when there was a delay of a month or two, I
6  think you said?
7    A   "Again, just a matter of timing, figuring out
8  perhaps what that person wants to do, figuring out
9  what opportunities might be appropriate.  But it could
10  be a -- sometimes it's just timing of when the drills
11  occur and maybe how much we have to discuss at that
12  drill.  Maybe we'll say we'll table it to the next
13  drill because there's too much on that meeting's
14  agenda.
15    Q   "That would account for a delay of a month,
16  for example?
17    A   "It could, theoretically, sure.
18    Q   "What methods of finding work for such a
19  person are available?
20    A   "Well, in some cases -- ultimately, it's the
21  person's responsibility to find another job or things
22  to do.  But often, in some cases working with their
23  management team, there could be projects.
24    "As I said earlier, there could be accounts
25  that need help and we will assign a talented executive

Page 1484

1  to do those types of meaningful work.  There has to be
2  a business need, and if there's a match of skill and
3  experience and the job that needs to get done, then it
4  works out.
5    Q   "Are there procedures for that --
6    A   "No.
7    Q   "-- other than the 5-minute drill?  I assume
8  the 5-minute drill would be a way to get somebody
9  who's on the bench work?
10    A   "It's a way.  But the 5-minute-drill objective
11  is to fill regular jobs, not temporary roles.  I mean,
12  there could be temporary roles that are 6, 12 months
13  in duration, but that's very atypical.
14    "Special projects or tasks would be known in
15  the individual business unit.  So to a GM or somebody
16  reporting to that GM and in the natural course of
17  discussion, it would come up that we need something to
18  get done.
19    Q   "In a situation where a GM has a talent of a
20  vice president available for several months, is it
21  fair to say that the GM is responsible for trying to
22  help that VP find additional work?
23    A   "I would say that it's not a fact.  It's the
24  employee's responsibility since they're being paid by
25  IBM to make sure that they have work.

49 (Pages 1481 to 1484)

Page 1485

1    Q    "My question was -- have I heard you correct
2  to say that the GM has no responsibility to assist a
3  VP to find work when the VP is on the bench?
4    A    "I would not say that that's true.
5    Q    "Why not?
6    A    "Because we spent considerable amount of time
7  talking about the 5-minute drill, and it's our
8  protocol for executives who are without job to be
9  brought on the 5-minute drill.  That is the primary
10  responsibility of the manager, to make that person
11  visible to others."
12            MR. DUFFIELD:  Now, I'll move to
13  Patricia O'Malley.
14            MR. CARTA:  I definitely heard a ring
15  that some of the questions were mine.
16            MR. DUFFIELD:  Mr. Carta had deposed
17  Ms. Brickmeier; so I was acting as Mr. Carta.
18            So now we are in the deposition of
19  Patricia O'Malley, which was also taken by Mr. Carta.
20            (Deposition testimony read)
21    Q    "Okay.  I'd like to talk a little bit about
22  your background.  Can you tell me about your formal
23  education beyond high school?
24    A    "Sure.  I have a bachelor's degree in business
25  and a master's degree in industrial labor relations.

Page 1486

1    Q    "And what year did you receive those two
2  degrees and from which institutions?
3    A    "My bachelor's degree was from the State
4  University of New York at Oneonta in 1979, and my
5  masters in industrial labor relations was Cornell
6  University in 1981.
7    Q    "Okay.  So since 1981, you've been with IBM?
8    A    "Yes.
9    Q    "And the next role after that?
10    A    "Is my current role, which is employee and
11  labor relations leader for the U.S.
12    Q    "So as employee and labor relations leader for
13  the U.S., you're responsible for all business units
14  within the U.S., is that correct?
15    A    "Yes.
16    Q    "And how long have you been in that role?
17    A    "Three years.
18    Q    "So since around 2007, you began in that role?
19    A    "Yes.
20    Q    "Do you know approximately when in 2007?
21    A    "Approximately, February.
22    Q    "Have you ever had any interaction with
23  Mr. Castelluccio?
24    A    "Yes.
25    Q    "Okay.  Can you describe that?

Page 1487

1    A    "I supported him as an HR partner at the time
2  that I supported that service organization.
3    Q    "And which service organization was that?
4    A    "At the time, it was probably called -- it was
5  "SO.'  I don't exactly know what our official title
6  was.  It was an SO type of organization services.
7    Q    "What year approximately was that?  Do you
8  recall?
9    A    "I'd say it was around 2002, maybe,
10  approximately.
11    Q    "Is it proper protocol for a manager to ask an
12  employee his or her age?
13    A    "It would have to depend on the reason they
14  were asking.  Probably if they had a reason to know.
15    Q    "And what would be a reason to know?
16    A    "Sometimes we have students working for us,
17  and we may have an event that we serve alcohol, and we
18  need to know if the individual is of age in that state
19  and we can serve alcohol.  So that might be an
20  instance where we would have to ask the individual.
21    Q    "Would it be appropriate for a manager to ask
22  an employee who's clearly over 40 his or her age?
23    A    "I don't know of any situation where they need
24  to know.  Is it possible they need to know?  I don't
25  know, but I can't I think of a reason they would need

Page 1488

1  to know.
2    Q    "So if they don't need to know, would it be
3  appropriate for them to ask the employee his or her
4  age?
5    A    "If they don't need to know, then they
6  shouldn't ask the employee their age.
7    Q    "Is it appropriate for a manager to instigate
8  a conversation with an employee to ask them if they're
9  interested in retiring?
10    A    "As part of career development, that would not
11  be unusual.  If an employee's retiring, then we need
12  to get backfills or, you know, understand what their
13  careers are and what we're going to do.  So it
14  wouldn't be unusual in a career discussion to ask
15  about retirement plans.
16    Q    "If an employee indicated to his manager that
17  he was not interested in retiring, would it be
18  appropriate for the manager to bring up the issue
19  again in a subsequent career conversation?
20    A    "It would depend on circumstances.
21    Q    "Under what circumstances would that be
22  appropriate?
23    A    "If things had changed, if something has
24  changed either in a person's personal life or in
25  business, then it may be appropriate.

Page 1489

1    Q    "And do all full-time IBM employees
2    participate in an annual PBC?
3    A    "Yes.
4    Q    "And is the process the same for all
5    employees?
6    A    "The process that's documented is the same for
7    all employees, yes.
8    Q    "From the lowest-level employee to someone in
9    upper management, they would go through the same
10   process?
11   A    "Setting the goals, documenting the results,
12   and ratings and assessments, yes.
13   Q    "And so you've anticipated my next question.
14   So it's a three-step process, correct?
15   A    "Correct:
16   Q    "So the first step is setting the goals for
17   the year?
18   A    "Correct.
19   Q    "Does the individual employee's manager sign
20   off on the goals?
21   A    "Yes.
22   Q    "Who sets the goals initially?  Is that the
23   employee or the manager?
24   A    "The employee would set the goals.  It would
25   have to be reviewed by the manager, and hopefully get

Page 1490

1    an agreement -- ideally agreement for goals.  But the
2    manager, in the end, is responsible for the goals.
3    Q    "Are the goals reviewed by the manager's
4    manager?
5    A    "They can be, but not required.
6    Q    "Are the goals intended to be reasonable goals
7    to attain within the year, or are they reaches?
8    A    "That's a perspective issue.
9    Q    "Okay.
10   A    "So, you know, that's based on someone's
11   perspective.  They're based on the -- what the goal of
12   the business is -- what goals the business needs to
13   meet.  That's how they're supposed to be written.
14   Q    "Would it be appropriate for a manager to sign
15   off or suggest goals that the manager knew it wouldn't
16   be possible for the employee to meet within the year?
17   A    "That the employee knew it wasn't possible?
18   Q    "I'm sorry.  That the manager knew it wouldn't
19   be possible for the employee to meet within the year.
20   A    "Well, the goals would be based on the
21   business objectives.  So we would set the goals based
22   on whatever the business needed.  The manager could be
23   concerned that the business objectives are tough in a
24   given year, but the goals are typically set on the
25   business objectives of that year.

Page 1491

1    Q    "So this would be if someone was -- had
2    received a 3 rating on their PBC the prior year, they
3    would need to have an internal review during the
4    current year?
5    A    "Right.  To provide, you know, feedback on the
6    current year.
7    Q    "So if an employee received a 2 rating the
8    prior year, they could go through the entire eleven
9    months without any feedback or check-in from their
10   manager?
11   A    "Correct.
12   Q    "If the manager became aware -- and I'd like
13   to stick with the two-employee situation.
14   A    "Okay.
15   Q    "If a manager became aware of a declining
16   performance during the eleven-month period, would they
17   be expected to bring that to the employee's attention?
18   A    "Yes.  They should address performance issues
19   with an employee during the year.
20   Q    "And at the bottom of the page you see it
21   says, 'What are the guidelines for an informal,
22   interim performance review?'
23        "Do you see that section?
24   A    "Yes, I do.
25   Q    "Does this section apply to only PBC 3 and

Page 1492

1    lower employees, or does it this apply to all
2    employees?
3    A    "The section says that managers should do an
4    interim review for any employee previously rated among
5    the lowest contributors.  So the PBC 3s -- so it
6    explains that they must do it for PBC 3, and that it's
7    recommended to do it for others.
8    Q    "So it would be considered a best practice to
9    have an interim review with an employee regardless of
10   their prior year's PBC rating?
11   A    "I think what the document says is it's
12   recommended that at least one informal review during
13   the year is recommended.
14   Q    "And are managers expected to provide more
15   frequent feedback to employees that they feel are
16   underperforming?
17   A    "It would depend on the situation.  If a
18   manager has major concerns about an employee that's
19   impacting customers or others, that they would at
20   least provide -- try to correct those situations.
21   Q    "Okay.  And, again, this is starting with the
22   premise this employee does not receive a 3 or lower
23   the prior year.
24   A    "Okay.
25   Q    "But they are performing their day-to-day

## Page 1493

1 duties and not performing as well as the manager would
2 like.
3     "Would the manager speak to them at some point
4 during the year?
5     A  "What we would expect is that whatever the
6 business impact that doesn't happen -- so if something
7 doesn't happen that should happen, that they discuss
8 at the time that something, you know, doesn't happen.
9 You said that -- you had stated that the manager sees
10 something.  So it's what did the manager see, and then
11 they would discuss that.
12     Q  "But you would expect that the manager would
13 raise that at the time with the employee.  They
14 wouldn't wait until the next PBC cycle?
15     A  "If it was a major concern for them, yes.
16     Q  "So if it was a concern, but not major, they
17 wouldn't raise it with the employee?
18     A  "They may or may not.  If it's not a big
19 concern, they may or may not.
20     Q  "As far as the performance plan for the given
21 year, what are you referencing?
22     A  "PBC goals.
23     Q  "Okay.
24     A  "PBC goals is what they -- they should have
25 PBC goals every year.

## Page 1494

1     Q  "Correct.
2     A  "So they would have their plan, which is their
3 PBC goals.
4     Q  "Is it likely that a solid performing
5 executive would be terminated solely for not finding
6 another job within IBM?
7     A  "If there are no other jobs that they have --
8 you know, that they have -- that they are the most
9 competitive candidate for, yes.
10     Q  "Let me direct attention back to your
11 testimony with regard to the impact of the PBC rating
12 upon incentive compensation decisions.
13     "Do you remember that testimony?
14     A  "Yes.
15     Q  "Can you tell me, if an employee receives a
16 particular PBC rating, does that entitle him or her to
17 an annual incentive award in any given year?
18     A  "No.
19     Q  "And what relationship is there between a
20 particular PBC rating such as 2-PBC rating and annual
21 incentive award of whatever sort?
22     A  "Okay.  If someone's on the annual incentive
23 plan, the PBC would be taken into consideration as
24 one -- as one factor in making that decision.  But
25 every year that program is different, and the PBC is

## Page 1495

1 one factor.
2     Q  "Are there some years where there are no
3 annual incentive awards given out?
4     A  "It probably has happened that we've given no
5 annual incentive.  Again, that's based on IBM's
6 overall business report.
7     Q  "So a person with a history of -- 2 PBCs --
8 is it accurate to say that their annual incentive
9 award could vary?  You can answer that.  Sorry.
10     A  "The PBC rating is one impact.  So two
11 performers could get different annual incentive
12 payments.
13     Q  "And how about a single 2 performer year to
14 year?
15     A  "Oh, a single 2 performer year to year would
16 see differences in their incentive payments."
17     MR. DUFFIELD:  We have one more, which is
18 Garrett Walker.  We'll trade roles.
19     (Deposition testimony read)
20     "Where did you go after high school?
21     A  "To Saint Anselm College.
22     Q  "Ansel?
23     A  "Anselm.
24     Q  "Can you spell that for us, please?
25     A  "A-N-S-E-L-M.

## Page 1496

1     Q  "And where is that?
2     A  "Manchester, New Hampshire.
3     Q  "How long were you at Saint Anselm?
4     A  "Four years.
5     Q  "What year did you graduate?
6     A  "1987.
7     Q  "And then what happened?
8     A  "I left to join IBM.
9     Q  "What year was that?
10     A  "2001.
11     Q  "And what was your next position?
12     A  "Vice president, talent, deployment, and
13 mobility.
14     Q  "And how long did you hold that position?
15     A  "That's my current position.
16     Q  "What was your position at the time you had
17 occasion to first meet Mr. Castelluccio?
18     A  "Vice president, human resources, ITDelivery.
19     Q  "And that's a position you just held for four
20 and a half months?
21     A  "Approximately four and a half months, yeah.
22     Q  "Would you like to provide me a little detail
23 with what your responsibilities were in that position?
24     A  "Yeah.  I was the HR partner for the general
25 manager of ITDelivery Worldwide.

## Page 1497

1  Q  "And who was the general manager?
2  A  "Bob Zapfel. So I was his HR support.
3  Q  "Would you agree that you had been in the
4  position of VP HR ITDelivery for 30 to 45 days at the
5  time Mr. Castelluccio e-mailed you Exhibit 2?
6  A  "Yes, I would agree.
7  Q  "I would like you to think back and share with
8  me your best recollection of the meeting that you had
9  with Mr. Castelluccio.
10  A  "It was a long time ago. I don't recall the
11  specifics of the conversation. I remember it was
12  generally a pleasant discussion. It was introductory.
13  There was discussion along, you know -- sort of
14  Mr. Castelluccio described his career at IBM.
15      "I recall he was interested or conveyed
16  interest in pursuing a new job with IBM -- different
17  opportunity. I recall providing coaching on how that
18  works within IBM -- more of a refresher for an
19  executive -- but as you're thinking about that, I do
20  remember saying, you know, we have a number of
21  different ways that you pursue looking for a new
22  opportunity, that you talk with your manager. You
23  talk about where you want to go next.
24      "We have processes that support that such as
25  the 5-minute drill; that, you know, an employee, you

## Page 1498

1  know, has the primary responsibility to find that next
2  job. But part of finding that next job, besides the
3  sort of traditional processes that we have, you also
4  need your network, which, you know -- generally, I
5  recall discussing, because the network that you create
6  during your career allows you to really reach out and
7  find opportunities that others may be aware of because
8  they're outside of the immediate sphere.
9      "And that's generally the conversation we had
10  with, you know -- at least that's what I remember.
11  Q  "Do you have any recollection of him
12  indicating to you that he was concerned about her
13  discriminating against him on the basis of age?
14  A  "I can say I did not hear in that conversation
15  a specific allegation that said "age discrimination,"
16  because at this point, I would have ended the meeting
17  and called employee relations about facts on the table
18  and followed a process that ER runs.
19  Q  "Do you recall any references to him feeling
20  he was being constructively discharged?
21  A  "No. I didn't hear that term in the meeting,
22  because if I heard that term, I would have ended the
23  meeting immediately and called employee relations and
24  gotten directly involved in that. That's a very clear
25  term that, if I would have been -- that if it had been

## Page 1499

1  use in the meeting, I would have called an end to that
2  discussion and gotten the right people in the room.
3  Q  "Do you have a specific recollection of not
4  hearing something? Do you have a specific
5  recollection of -- no specific recollection, but a
6  specific recollection of not hearing? I'm perplexed
7  by that. Maybe I just misunderstood your answer.
8  A  "I don't recall the specifics of the
9  discussion, which is what I stated.
10  Q  "Right.
11  A  "However, I did not hear "constructive
12  discharge" or specific allegations of age
13  discrimination, because I'm sensitive to that and
14  would have called in ER immediately if I heard that.
15  Q  "And when you say you would have "called in ER
16  immediately," you're basing that conclusion on what?
17  What's the basis of that conclusion that you would
18  have taken those steps?
19  A  "Because any specifics like that, he would
20  have triggered that. That's exactly what I would do
21  if I heard that.
22  Q  "Then my next question is: So that's what you
23  would have done, because that's your standard
24  practice?
25  A  "Yes.

## Page 1500

1  Q  "I would like to ask you a series of questions
2  about the so-called 5-minute drills. What's the
3  purpose?
4  A  "5-minute drills are part of a formal process
5  that IBM uses to fill open key positions in the
6  business.
7  Q  "And do you know how long they've been in use?
8  A  "I do not know.
9  Q  "Were they in use in the period of time that
10  you were VP HR at ITDelivery?
11  A  "Yes.
12  Q  "Can you explain the circulation method? I
13  mean, are they pieces of paper that get sent around?
14  Are they electronic -- just the procedure for
15  circulating the 5-minute drills.
16  A  "5-minute drills are confidential in nature.
17  So the distribution is limited.
18  Q  "Do you know if an employee can have
19  themselves added on to the slate, or do they have to
20  act through a participant?
21  A  "An employee alone cannot choose to be
22  included on a short-listed slate.
23  Q  "The support of your immediate supervisor is
24  very important if you want to take advantage of the
25  5-minute drill. Is that a fair statement?

## Page 1501

1    A    "I would say that's one of the major support
2    structures.
3    Q    "In Mr. Zapfel's drills was Joanne Collins-Smee
4    a participant as one of those -- as one of his direct
5    reports?
6    A    "Yes.
7    Q    "Do you recall -- and was she there to
8    represent ITD Americas?
9    A    "Yes.
10   Q    "I want to be sure I understand this.  The
11   paper process -- the paper part of the ITD drill, the
12   5-minute drill, is the slate of potential candidates
13   circulated before the actual meeting?
14   A    "The drill document is sent out by BTL prior
15   to the meeting, but very close to the start because of
16   the time zones.  So the final document that runs, that
17   we use to talk to the meeting, is sent out generally
18   less than 24 hours before the meeting, just so that
19   everyone around the world have something to work with.
20   Q    "Everyone around the world.  Do people
21   participate from a distance in the meeting?  I mean,
22   do some people participate through phones or other
23   means other than actually being present?
24   A    "Yes.
25   Q    "Do you recall whether Ms. Collins-Smee

## Page 1502

1    participated by being present or through some other
2    means at Zapfel's 5-minute drills?
3    "Sorry.  Next question, yes, in the drills,
4    when you said you were there, and you kicked it off?
5    A    "Joanne was either present in person, if she
6    was in that -- in the U.S., if you will, and by phone
7    if she was traveling in Latin America or elsewhere.
8    Q    "But she was a regular participant.  That's
9    what I hear you saying.
10   A    "Yes.  It was expected that everyone
11   participate who's a direct report.  It was very rare
12   not have full participation.
13   Q    "So it's fair to say, then, that a
14   supervisor's support is important -- so an important
15   avenue for getting someone on the slate of candidates?
16   A    "Yes.
17   Q    "Is it fair to say a supervisor's support is
18   also critical for getting you from the list of
19   candidates to the short list of candidates?
20   A    "No.
21   Q    "And why not?
22   A    "Because the opinions -- the views of
23   collective leadership team have a lot of influence on
24   where someone's placed.
25   Q    "The distinction I would like you to apply to

## Page 1503

1    my question is, if someone is permanently assigned to
2    a job, that's one set of circumstances.
3    "If somebody is temporarily assigned to a job,
4    based upon your own personal observation, was it IBM's
5    practice to disclose the fact that it was simply a
6    temporary assignment to that employee?
7    A    "Generally, yes.  If they knew it was a
8    temporary position.
9    Q    "So whenever possible, before IBM, in your
10   experience, would pull an executive off a position,
11   they would have a new position for that executive to
12   move into?  That's what I heard you say.  I want to
13   make sure I understood it.
14   A    "If it was possible to do that, yes.
15   Q    "In your experience when IBM is unable to put
16   an executive into a new position, isn't it customary
17   to try to find that employee additional work, even if
18   they can't find him an additional full-time position?
19   A    "If an executive is moved and there's no
20   immediate position ready for them, they are given
21   temporary work or special projects generally."
22   MR. DUFFIELD:  Those are all the
23   deposition designations.
24   THE COURT:  Okay.  Thank you.  So we have
25   concluded the evidentiary portion of this trial from

## Page 1504

1    this point.
2    MR. FASMAN:  No.  We have our one witness
3    tomorrow morning, Judge.
4    THE COURT:  That's right.
5    All right, ladies and gentleman, get to
6    let you go on time.  Thanks very much for your hard
7    work and your attention that you've given to this
8    case.  I really appreciate it.  I know everybody out
9    there does as well.  I think we've done a good job
10   doing what we're supposed to do.  And so I thank you
11   for it.  You're excused.  Don't deliberate about the
12   case.  Don't reach any conclusions.  Keep an open
13   mind.
14   Watch your step, it's slippery out there,
15   and we'll see you tomorrow at 10 o'clock.  And we will
16   be working before 10 o'clock, I promise you.  Thanks
17   ladies and gentlemen.  Ladies and gentleman.  Have a
18   good evening.
19   (Jurors excused)
20   THE COURT:  Okay.  Here's the limiting
21   instruction that I'm inclined to give.  I think it
22   accomplishes the task.
23   Ladies and gentlemen, you heard testimony
24   about IBM's performing an internal investigation
25   called an "open-door review" with respect to

Page 1505

1    Mr. Castelluccio's allegation of age discrimination.
2    You may consider this testimony as evidence that IBM
3    takes such allegations seriously.  You should not
4    consider it for any other purpose.
5            That agreeable?
6            MR. FASMAN:  Your Honor, I think that
7    that's very helpful.  Yes, Your Honor.
8            THE COURT:  Okay, I think it's the best
9    we can do.  And I don't think it -- you know, I really
10   don't think it was consequential or will be
11   consequential, but you can take your respective
12   positions, Mike or Jake.
13           So we'll finish tomorrow.  We'll charge
14   tomorrow, we think.
15           MR. FASMAN:  Thank you, Your Honor.
16           THE COURT:  Let's hope there are no
17   blizzards or things like that.  Have a good evening.
18           Wendy, thank you so much.
19               (Court adjourned)
20
21
22
23
24
25

Page 1506

1            CERTIFICATE OF REPORTER
2
3        I Hereby certify that the foregoing 217 pages
4    are a complete and accurate computer-aided
5    transcription of my original stenotype notes taken in
6    the Matter of James Castelluccio VS International
7    Business Machines Corporation, which was held before
8    The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9    District Court, 450 Main Street, Hartford,
10   Connecticut, on January 22, 2014.
11
12
13       Wendy Allen, RMR, CRR
14       Notary Public
15
16
17   My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

## Page 1506

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JAMES CASTELLUCCIO    )
    Plaintiff      ) 3:09-cv-01145 (TPS)
                    )
VS              ) January 23, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION  ) Federal Building
    Defendant     ) Hartford, Connecticut



VOLUME 8
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.








Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

## Page 1507

Representing the Plaintiff
Carta McAlister & Moore, P.C.
1120 Boston Post Road
Post Office Boxer 83
Darien, CT  06820
  By:  Mark R. Carta, Esq.
       mark@cmm-law.com
  By:  Margaret A. Triolo, Esq.
       margaret@cmm-law.com
  By:  Troy Bailey, Esq.

Representing the Defendant

Paul Hastings, LLP
75 East 55th Street
New York, NY  10022
  By:  Zachary Fasman, Esq.
       Zacharyfasman@paulhastings.com
  By:  Todd C. Duffield, Esq.
       Toddduffield@paulhastings.com
  By:  Jean-Marie Gutierrez

ALSO PRESENT:

Daniel Fox, Esq.
IBM in-house counsel

## Page 1508

I N D E X

WITNESSES:                    PAGE:

Charles Sodikoff
    Direct Examination by Mr. Duffield......... 1511
    Cross-Examination by Mr. Carta............. 1537
    Redirect Examination by Mr. Carta.......... 1547

## Page 1509

1      THE COURT:  Any housekeeping matters to
2  take up before we call the jury?
3      MR. CARTA:  Your Honor, just a minor,
4  that Judge Squatrito has already ruled with respect to
5  the scope of Dr. Sodikoff's testimony, and it's pretty
6  clear what he can testify about and what he could not
7  testify about.  I assume the Court's had a chance to
8  look at that.
9      THE COURT:  Yes.  Well, we're going to
10  have a charging conference after we've given you
11  copies of the charge, and we're going to give you
12  copies of the charge and we're going to go over it
13  line by line, and I think at that time if somebody has
14  a problem, that's when we get to make sure the charge
15  is right.  I want to make sure the Court gets the law
16  right, because we want to do this only once.
17      MR. CARTA:  Your Honor, thank you, and
18  your clerks for getting us the charge last night.  It
19  did help to have a chance to review it.  I appreciate
20  that.
21      THE COURT:  You had it last night?  Good.
22      MR. FASMAN:  Yes.  We were fine.  We got
23  it, too.  No problem.  Although I was interested to
24  see the Court's using WordPerfect.  That was a bit of
25  a curve, but we dealt with it.

Page 1510

```
 1        MR. CARTA:  We dealt with it.  Not a
 2  problem.
 3        THE COURT:  You wouldn't believe the
 4  headaches that are caused by that, where nobody uses
 5  WordPerfect, everybody uses MS Word.  People like me
 6  who learn the computer from the government, I don't
 7  have a clue what to do with MS Word, but I'm pretty
 8  good in WordPerfect.
 9        MR. FASMAN:  It's fine, we can translate
10  them back and forth, not a problem for us.
11        THE COURT:  I understand that now the
12  federal government is phasing in MS Word, and --
13        MR. CARTA:  Let's hope it doesn't cause
14  any outages.
15        THE COURT:  So that's kind of a -- that's
16  a Microsoft battle, MS Word, huh?
17        Okay, let's get the jury, then.
18        (Jurors present)
19        THE COURT:  Good morning, gentleman and
20  ladies.  This is Thursday, a day to be happy because
21  tomorrow's Friday.  So please be seated.  And I have
22  talked with counsel, and we're ready to begin.
23        MR. DUFFIELD:  Morning.  We call as our
24  final witness Dr. Charles Sodikoff.
25        (Charles Sodikoff, sworn by the clerk)
```

Page 1511

```
 1        THE CLERK:  Please state your name, spell
 2  your last name for the record.
 3        THE WITNESS:  Charles L. Sodikoff,
 4  S-O-D-I-K-O-F-F.
 5        THE CLERK:  Your business address,
 6  please?
 7        THE WITNESS:  1320 Sandra Lane, and
 8  that's North Merrick, New York, 11566.
 9
10        DIRECT EXAMINATION BY MR. DUFFIELD:
11
12   Q   Good morning, Dr. Sodikoff.
13   A   Morning.
14   Q   Would you please tell the jury what profession
15  you're in?
16   A   Yes.  I'm a consultant industrial organization
17  psychologist, and my specialty is in career
18  management.
19   Q   And would you explain to the jury your
20  educational background?
21   A   Yes.  I have a bachelor's degree in psychology
22  from Brooklyn College in New York, I have a master's
23  degree in psychology from Long Island University, and
24  I have a Ph.D. in industrial organizational psychology
25  from Wayne State University in Detroit.
```

Page 1512

```
 1   Q   Do you hold any licenses?
 2   A   I'm a licensed psychologist in the state of
 3  New York.
 4   Q   Could you briefly describe your professional
 5  background, professional experience?
 6   A   Yes.  After getting my Ph.D. --
 7        MR. CARTA:  Your Honor, I would be
 8  willing to stipulate to Dr. Sodikoff's professional
 9  qualifications.
10        THE COURT:  So there's a stipulation that
11  this gentleman is an expert and may be questioned as
12  such?
13        MR. CARTA:  In the area of career
14  management, that's correct.
15        MR. DUFFIELD:  Okay, great.
16  BY MR. DUFFIELD:
17   Q   I still think it would be helpful to have you
18  walk through just very briefly some of your work
19  experience, and then we'll get into your testimony.
20   A   I started my career after my graduate degree
21  at Metropolitan Life Insurance Company, where I was in
22  the area called sales personnel research and was
23  basically on the hiring side of psychology, and we
24  were doing testing, and also doing attitude surveys of
25  the field force of Metropolitan Life.
```

Page 1513

```
 1   Q   And what did you do after Met Life?
 2   A   After Met Life I went to a consulting firm
 3  called PA Consulting Service.  They're British-based
 4  and worldwide.  At that time they were the largest
 5  consulting firm based outside the United States.
 6   Q   What kind of consulting were you doing with
 7  them?
 8   A   I was working on an assessment tool or test
 9  called the P-A-P-I, or the PAPI, and it was -- I was
10  asked to do a validation study to demonstrate that
11  tests could be used in the selection and hiring of
12  people.
13   Q   Would you describe for the jury your
14  experience at Drake Beam and Morin?
15   A   Drake Beam Morin was an outplacement firm.  If
16  you're not familiar with outplacement, outplacement is
17  when somebody has been terminated, the company
18  actually pays an organization, an outplacement firm to
19  assist -- to help -- the firm assists individuals to
20  look for jobs, or move on in their career.  And so I
21  was a psychologist for that firm, which meant I did
22  assessments of -- psychological assessments to help
23  them understand the strengths and their areas of
24  weaknesses and where to go.  And then I handled a
25  whole caseload of candidates who were job searching,
```

**Page 1514**

1    which meant I worked with them from the time that they
2    actually had been terminated until the time that they
3    moved on, and I helped them, in fact, even negotiate
4    their next job.
5        Q    All right.  Thank you very much.
6            And you've provided expert opinions in cases
7    like this in the past, is that correct?
8        A    Yes.
9        Q    Approximately how many times have you provided
10   expert opinions?
11       A    Well, I've actually testified in court about
12   13 times, and I've dealt with giving my opinion in
13   different courts in well over a hundred cases.
14       Q    Thank you.  And what were you asked to do in
15   this case?
16       A    In this case I was asked to -- first to lay
17   out what the standards were for what a diligent and
18   reasonable job search was, and then I was asked to
19   look at Mr. Castelluccio's job search efforts and
20   compare that to the standards.
21       Q    And were you provided materials to review?
22       A    Yes.  I was provided all the documents that
23   Mr. Castelluccio provided regarding his job search.  I
24   was provided information from an organization called
25   ExecuSearch, which Mr. Castelluccio used in his

**Page 1515**

1    search.  I looked at the complaint.  I looked at Mr.
2    Castelluccio's deposition.  And I also looked at
3    statistical information from the Bureau of Labor and
4    Statistics.
5        Q    Before we talk specifically about what Mr.
6    Castelluccio did, are there standards or generally
7    expected characteristics of a reasonable and diligent
8    job search?
9        A    Yes.
10       Q    Could you tell us what those are, briefly?
11       A    Sure.  In my many years in the field of
12   outplacement, supporting people in their job search,
13   I've actually had the opportunity to read the manuals
14   and look at the manuals in effect, actually have input
15   into the manuals of the outplacement firms who were
16   the job search experts in term of what the standards
17   are for making diligent efforts to find a job, and
18   there was basically -- I could sum them up in five
19   standards.
20           Number one is the sustained effort.  That
21   means you need to treat your job search as a full-time
22   job, and that's what you're doing right now if you're
23   unemployed, you're looking for a job, and it's
24   full-time.
25           Number two is, you're using or you're looking

**Page 1516**

1    for, identifying all potential sources of job leads.
2    You want to get -- obviously when you're doing a job
3    search you want to hear about as many opportunities as
4    possible, and there are many different ways of
5    identifying opportunities, and you want to use all of
6    the ones -- especially the ones that are reasonable
7    for the level and the type of job you're looking for.
8            Number three is you want to use all potential
9    sources of support.  There's a lot of support out
10   there to help you in your job search, and you want to
11   utilize as much of that support as possible.
12           Number four, very important, is you want to
13   take an organized approach.  Because it's a full-time
14   job, because you're doing a lot of networking
15   conversations, keeping in contact with a lot of
16   people, because you're sending out a lot of paper and
17   you're collecting a lot of paper, talking to a lot of
18   people, you need to have a very organized approach so
19   you know who you've been speaking to and what you said
20   and what your next steps are, et cetera.  Unless
21   you're really organized, it will fall apart.
22           And lastly, you need a very -- you need a good
23   marketing tool, because you're marketing yourself, so
24   you need a good resumé, you need good cover letters,
25   things that are designed to help people understand

**Page 1517**

1    what you do and how you might fit in in their job,
2    their need.
3        Q    And does a diligent and reasonable job search
4    require all five of those things, or are some more
5    important than others?
6        A    Well, yes, they require all five of those, but
7    certainly some of that is more important than others.
8    I would say the three most important is you're making
9    sustained effort, that you're really treating it as a
10   full-time job.
11           Number two is the idea that you're uncovering
12   all -- as many job leads as possible, so you're using
13   all potential sources of job leads that are
14   appropriate and that fit into the time that you have
15   in your search.
16           And number three I think is very, very
17   important, that you have an organized approach and
18   that you're keeping track of everything that's going
19   on.
20       Q    Let's spend a few minutes and talk about those
21   in a little more detail.
22           What do you mean by a sustained effort?
23       A    Well, as I said, a sustained effort means that
24   you're looking every day, you know, that it's your
25   job, that's your full-time job, so -- and so that it

3 (Pages 1514 to 1517)

Page 1518

1    doesn't mean that you're going on the internet one day
2    and sending out a couple of possible things that you
3    see or not, and then waiting a week, and next week you
4    go back on the internet, some months you don't do any
5    work at all. It means you're doing it every day as a
6    full-time job.
7       Q    This morning you mentioned to me an analogy
8    about a salesperson. Can you share that analogy with
9    the jury, please?
10      A    Sure. It's -- well, first of all, every
11   candidate that I meet in a job search, I have to tell
12   them the bad news. The bad news is whether they
13   wanted to or not, they're now in a sales role. They
14   are a salesperson, because they also happen to be the
15   product, and they are selling themselves, so you have
16   to go out there and sell, and it's --
17      If anybody was asked to -- you know, you hire
18   a salesperson. If that salesperson basically went on
19   the computer, sent out an e-mail with a brochure, sat
20   around waiting to get a phone call, next week sent out
21   a couple more, waited around to get a phone call, you
22   know, the follow-up, et cetera, it's a very passive
23   kind of search, and a job activity. And also, I mean,
24   you know, after a while you realize this person's not
25   bringing enough business in and you probably don't

Page 1519

1    want to have that person employed as your salesperson.
2       Well, you're in a sales job, you have to treat
3    it like a sales job, and you have to work with it
4    every day. And basically also you got to get out
5    there and meet and talk to people. You can't just sit
6    behind a computer and do a search.
7       Q    So that was a sustained effort.
8       The second characteristic you identified was
9    active utilization of all potential sources of job
10   leads. What does that mean?
11      A    Well, there are many different ways which you
12   can uncover job opportunities, and you need to be
13   actively using those, and there are obviously certain
14   levels and certain positions, different ones more
15   productive than others, and so you need to be spending
16   that full-time job sourcing out job opportunities and
17   pursuing them.
18      Q    So for someone like Mr. Castelluccio, who is a
19   senior level executive, what are some of the best
20   sources of uncovering jobs?
21      A    No question that the two most critical sources
22   at executive levels are to be in contact with as
23   many -- getting your resumé in front of as many
24   executive recruiters as possible, and even more
25   important, far more important, is you're out there

Page 1520

1    talking with people and networking and spreading out a
2    wide net of conversations where you're gathering a lot
3    of information, gathering names of other people, and
4    you're uncovering job opportunities out there. That's
5    where executives get jobs.
6       Q    Can you explain what the executive recruiter
7    is and what they do?
8       A    Sure. First let me tell you what the
9    executive recruiter is not. The executive recruiter
10   is not an agent. They don't work for you, they work
11   for a company. They're basically the outsource
12   recruiting arm of a company. I hire an executive
13   recruiter to find me candidates for jobs that I need
14   to fill.
15      So when one says they're using or they're
16   dealing with executive recruiters, they're not working
17   for you. You're not hiring that executive recruiter
18   to be your agent to find you a job. So there's every
19   reason, then, that you want to get your resumé in
20   front of as many executive recruiters as possible,
21   because they may have a match.
22      The key to it is that executive recruiters --
23   many executive recruiters are on a retainer, so that
24   they have the exclusive search. They're the ones that
25   know this possible search. So just by contacting them

Page 1521

1    you never know what kind of search that they have on
2    their plate.
3       The point is, you don't want to spend a lot of
4    time with them. You want them to see your resumé, you
5    want them to look at your resumé, does it match a job
6    they have open. If it does, they'll contact you. If
7    it doesn't, you'll move on. So it doesn't take a lot
8    of time to contact executive recruiters. It just
9    needs to be done.
10      Q    And how do you know which executive recruiters
11   to contact?
12      A    There is a directory of executive recruiters
13   that gives you all the information, what kind of
14   functional area they specialize, what kind of industry
15   they specialize. That directory of executive
16   recruiters is available online. I think you can
17   purchase it online for about 60 dollars, but it's also
18   available in every local library that has a career
19   center. You go into the career center, you'll see
20   there's a book called the Directory of Executive
21   Recruiters. It's updated every year, and it has all
22   that information, contact information.
23      Q    And are there executive recruiters that
24   specialize specifically in the IT industry?
25      A    Yes, there are. There are hundreds.

4 (Pages 1518 to 1521)

Page 1522

1    Q    You also mentioned networking.  What is
2  networking and why is that important?
3    A    Let me start off with what networking is not.
4  People have a misconception.  Networking is not
5  calling up a friend asking if they know of a job or
6  have a job for you.  The odds of that are going to be
7  very small, unlikely, and they're going to say no,
8  sorry, but I'll keep an eye out for you.  That's not
9  networking.
10      Networking is contacting people you know or
11  started out with, people that you know, and asking to
12  spend some time with them, not a lot of time, maybe 15
13  minutes at a time, to get information about what's
14  going on in the industry, that you're interested in.
15  They know stuff that you don't know that would be very
16  helpful for you.  Most importantly, they know other
17  people that you might talk to.
18      And you have to remind them, I'm not asking
19  you for names of people who have a job, and you
20  probably don't know that, but you know a lot of people
21  who know other people, et cetera, know opportunities,
22  so if you could pass along three, four names, two
23  names to me, I'll contact them, let them know that you
24  suggested I speak to them, and they will, in fact,
25  spend time, 15 minutes maybe or so, giving me more

Page 1523

1  information about what's going on, passing along some
2  more names, and what I'm doing is spreading out a very
3  wide net -- that's why it's called networking -- of
4  conversations, and within that net you start capturing
5  opportunities, you start seeing jobs.
6      And the impact of networking is, it gives you
7  an opportunity to get in to speak to a manager
8  directly, as opposed to sending your resumé that goes
9  to human resources and human resources doesn't really
10  know the job, they have a bunch of specs they're
11  looking at and they'll see if they match up.  But if
12  you're in front of a hiring manager, I don't care what
13  your specs are, you've got what I need.  So it gives
14  you all the advantages in the world in terms of a job
15  search of getting in front of people through the
16  network.
17    Q    How effective are online or website job
18  postings?
19    A    They're useful, because they do have they're,
20  you know, they advertise and they have opportunities.
21  There's -- and so sure, if you have time in your
22  search, if you're doing a networking and you're
23  doing -- you're contacting executive recruiters and
24  you have more time, which you probably will, then get
25  online and use these job -- identify job leads through

Page 1524

1  them.
2      And there are quite a number.  There are ones
3  that specialize, and there are ones that specialize in
4  executive levels, and the there are ones that
5  specialize in IT industry.  For example, diesdot-com
6  specializes in IT.  And basically, you know, they're
7  very -- they're part of the process.
8    Q    So you've been talking about the utilization
9  of potential job leads.  The third characteristic you
10  identified was using all potential sources of support.
11  What do you mean by that?
12    A    Well, you know, there's a lot of help out
13  there for people who are in job search.  Even local
14  communities have support group networks, church groups
15  and religious affiliated groups have support groups,
16  where people get together and support each other and
17  share ideas and learn about how to do their job search
18  and bounce ideas about how things are going and get
19  more networking names.  So there's all kind of support
20  like that.
21      There are other supports like, for example,
22  schools you went to, your alumni, you can go back to
23  often alumni career support that you could go and use.
24  Even the unemployment office these days have gotten
25  much more sophisticated in supporting people in their

Page 1525

1  job search and providing information about how to go
2  about doing a job search and providing more
3  information.
4      And one of the -- one of the supports that, in
5  fact, Mr. Castelluccio did use was an ExecuSearch, and
6  that is basically a pay service where people --
7  executive level individuals can get together and you
8  can utilize some of that, so there's some of that
9  available.  And there are other supports out there.
10    Q    The fourth characteristic was an organized
11  approach.
12    A    Correct.
13    Q    Can you describe that for us?
14    A    Well, the point I was trying to make, and I
15  think it's important, is because you're working at a
16  full-time job in terms of looking for a job, you have
17  an awful lot of information you can -- you've been
18  gathering information, gathering names, gathering
19  phone numbers, you've been sending out your resumé to
20  places, you've been -- you know, so you need to keep
21  notes.  You need to keep it under control.
22      What I'm looking for is do you have notes of
23  conversations, do you have a calendar that says when
24  your meetings took place and when you have future
25  meetings coming up.  All these things need to be under

Page 1526

1 control. If you have a file either computer, in the
2 computer or handwritten file, all the contacts that
3 you've been making.
4 Q And the last one was a well-constructed resumé
5 or cover letter. Can you explain what you were
6 looking for there?
7 A Your resumé is your advertisement. And by the
8 way, your advertisement doesn't get you a job, but it
9 does get you interviews, and that's what the purpose
10 of a resumé is. So it's got to be attractive, it's
11 got to be readable, it's got to make -- get to the
12 point of what you're trying to -- what you have to
13 sell, what your product is, and it's got to be
14 persuasive for people to say, okay, I'm interested in
15 speaking with you. And in addition to the resumé
16 usually there's a cover letter that even helps further
17 pinpoint where you match up with an individual.
18 Q Okay, thank you very much.
19 I'd now like to shift to Mr. Castelluccio's
20 job search.
21 A Sure.
22 Q How did his job search compare to the
23 standards you just described?
24 A Okay. Well, may I go one by one through that?
25 Q Please.

Page 1527

1 A Question of sustained effort. Clearly, of all
2 the documents I saw in terms of depositions, et
3 cetera, he was not making a sustained effort. You
4 know, for example, I looked over -- if you take a 21
5 month period that provided information on past the
6 time he was terminated, I'm not talking about pre, I'm
7 talking about past the time he was terminated, the
8 data that I got, the documents indicated that there
9 were 25 opportunities uncovered. They weren't even
10 necessarily places where he applied, but 25
11 opportunities that were uncovered in a 12 month
12 period, which is about one a month, which is very
13 slight.
14 Well, in addition to that, when we got
15 information from ExecuNet, they said that they sent
16 him 28 e-mails of opportunities to which he applied to
17 nine. So even though I got documents that said he had
18 25, it would seem to indicate he didn't even apply to
19 those 25, but he had received information about. He
20 relied mostly on ExecuSearch website, and again,
21 e-mails from ExecuSearch, and was very limited in
22 terms of that.
23 Oh, and one other thing is if you look over --
24 and I organized all the documents that I received and
25 numbered them, put them in place. Of the 21 months

Page 1528

1 that he had covered in that period of time, there were
2 13 months that there was no activity at all. It just
3 was not a sustained effort.
4 Q And did you do your own independent job search
5 to see what kind of IT executive positions were
6 available?
7 A Yes. In April of 2010 I said, well, you know,
8 are there jobs out there, and so I went online and did
9 a search, and about a three-hour search, and I looked
10 at a number of different job leads. And remember,
11 this is a limited source of job opportunities, and I
12 was able to uncover 36, I believe, job opportunities
13 that were appropriate for Mr. Castelluccio to send his
14 resumé, and it would have been very appropriate to
15 send those. So I could find 36 opportunities in a
16 three-hour search on a single day. There were
17 obviously from my professional opinion, you know,
18 obviously hundreds of opportunities out there that he
19 could have been following up on.
20 Q Did Mr. Castelluccio use all potential sources
21 of job leads?
22 A In terms of all potential sources of job
23 leads, he basically looked -- as I said, his -- it was
24 very clear that his primary source of job leads was
25 ExecuSearch, which is -- I mean it was a good source,

Page 1529

1 there was nothing wrong with doing that, but he wasn't
2 out networking. He wasn't out there. He didn't
3 contact directly executive recruiters. He spoke to
4 some executive recruiters who contacted him, but he
5 didn't reach out to other executive recruiters. It
6 was very little activity as far as uncovering sources
7 of jobs.
8 Q What about using sources of support, what did
9 you see there?
10 A He went to -- the only thing I could identify
11 in terms of support was that he had gone to some
12 seminars, group meetings, I should say, from
13 ExecuSearch, and it was interesting because he said I
14 think in his deposition that he had gotten a list of
15 names of people from those meetings, but there was no
16 evidence that he followed up on any of those names
17 that he'd gotten, so he hadn't really used that to
18 network with.
19 And then he did say he -- he also said that he
20 listened to some webinars, but it wasn't even clear
21 that -- they may have been technical webinars. I'm
22 not sure what those webinars were.
23 Q Could you tell whether Mr. Castelluccio
24 effectively used his network?
25 A Well, I saw no evidence that he really was

Page 1530

```
 1   networking.
 2       Q   What kind of network would you expect a
 3   40-year IT executive from IBM to have?
 4       A   I would expect that person to have quite a
 5   wide network of people that they had met during their
 6   career.  I say to every candidate, networking are
 7   people who know you and like you, network are people
 8   who know you and don't hate you, anybody that's
 9   willing to talk to you.  So it's a very wide network
10   of people that you could start with, and that's just
11   starting, because then what you're doing is generating
12   names from your network to speak to other people in
13   the process, and so I would have to assume he had an
14   excellent network.
15       Q   Did Mr. Castelluccio use an organized approach
16   to his job search?
17       A   Again, I didn't see any evidence of an
18   organized approach.  I didn't see any notes from
19   meetings or notes from discussions.  I didn't see any
20   calendar of activity and meetings.  And certainly when
21   I got to the pile of papers that indicated that he had
22   had contact about job opportunities, even some of
23   that, as I understand it, was -- he hadn't retained it
24   anywhere and had to go back and search from
25   ExecuSearch, pull them out from ExecuSearch.  So he
```

Page 1531

```
 1   really wasn't keeping notes of all activity.  I have
 2   to say from what I could see there wasn't that much
 3   activity to keep notes on, but that's --
 4       Q   Did you have an opportunity to review any of
 5   Mr. Castelluccio's resumés?
 6       A   I did.
 7       Q   There should be a couple black binders, maybe
 8   at your feet.  One of them should have Defendant's
 9   Exhibit 188 and 189.
10       A   Sorry?
11       Q   188 and 189, the second binder.
12           Are these the two resumés that were provided
13   to you?
14       A   Yes.
15           MR. DUFFIELD:  Ladies and gentlemen,
16   you'll have copies of those in your binder when you go
17   to deliberate, so we're not going to spend a lot of
18   time -- you don't need to strain to see them.
19   BY MR. DUFFIELD:
20       Q   But Dr. Sodikoff, did you have any concerns
21   with either these two resumés for Mr. Castelluccio
22   that he provided?
23       A   I don't want to be overly critical of the
24   resumé because it does contain a lot of information on
25   there, which is fine.  I just thought there were -- I
```

Page 1532

```
 1   just thought there were two areas that were a bit
 2   concerning, is if you look at the resumé, it may be
 3   because the way this is printed out, but it's in small
 4   type.  It's a little hard to read and very condensed
 5   with a lot of information.
 6           And remember, your resumé is an ad, so if you
 7   think of -- if you're looking through a newspaper and
 8   you're looking through a magazine, or let's just say
 9   you're looking -- if you see an ad full of text and a
10   lot of information, et cetera, you know, you're not
11   going to go past that, because you don't want to spend
12   the time reading all that, whereas when you see
13   something you stop and look at that it attaches your
14   eye, catches your attention, and you spend some time
15   with it.
16           This a little overly-cluttered and a little
17   burdensome, in a sense, for the reader, and I'm not
18   sure that they would read it all.  So that's one
19   thing.  And again, I don't want to over-criticize
20   that, but it was just one thing to say.
21           And the other is, I think far more important,
22   is there are a bunch of red flags in here because
23   there's missing stuff.  There's like dates, you know,
24   when did he do these things, when did he work and
25   what -- and that's what I'm expecting, when I'm
```

Page 1533

```
 1   looking at a resumé.  I'm looking to say okay, when
 2   did you work, what were the dates.  And you really
 3   have to search within the body of this, all the
 4   text, to find some dates that -- and it still doesn't
 5   explain when and the times and when you were doing
 6   what you were doing.  So I think that's a problem.
 7           And the other red flag is, education seems to
 8   be avoided.  So there's some stuff in there, but it's
 9   not clear what it is, and so that's a red flag.  I
10   mean why don't you just tell me what your educational
11   background is rather than make me try to figure out
12   and kind of guess what it is.  You want to make it
13   much clearer.
14       Q   What if the person didn't attend college, how
15   do they deal with that?
16       A   Pardon me?
17       Q   What if they didn't attend college, how do you
18   deal with that on a resumé?
19       A   First, as I understand, Mr. Castelluccio
20   attended some college, and so you can put down what,
21   you know, education, course work that you had and
22   different schools.  You don't have to say you
23   graduated, because you didn't.  You don't have a
24   degree.
25           And then you also have -- over the 40-year
```

Page 1534

1  course of his career I'm sure he had a lot of
2  professional education coming from an organization
3  like IBM, both internal and external, inside the
4  organization and outside, and you can list all that
5  work.
6      You know, when someone gets to a 40-year
7  career, and I'm looking to hire a senior executive
8  with a 40-year career, the chances of my being worried
9  about what your education was 40 years ago is very
10 small compared to what I think you know and understand
11 and what you've been doing in the 40 years on the job.
12 Q   As you know, when Mr. Castelluccio left IBM in
13 the middle of 2008, the economy was on the fritz.  How
14 would the economic downturn have affected his job
15 search or ability to find a job?
16 A   Well, as everyone knows, this was a serious --
17 has been a serious economic downturn, and it has
18 affected job search, affected jobs.  But there is kind
19 of a mythology out there that that means nobody's
20 getting jobs.  People are getting jobs.  It's just
21 taking longer for them to find jobs.  That's kind of
22 why you're seeing the unemployment rate dropping down
23 now, back to where it was.  But people are getting
24 jobs.  It's just taking them longer.  And in fact, it
25 may be two times -- may be sometimes two and a half,

Page 1535

1  three times as long as it might have taken in 2008 or
2  seven to get the job.
3      But I did look at the information, Bureau of
4  Labor Statistics, and I looked in the age category,
5  Mr. Castelluccio's age category, which was 55 to 64,
6  and I looked to see how long it would take to get a
7  job.  In 2008 it was taking about 22 weeks to find a
8  job, and in 2009 it was taking about 30 weeks, and in
9  2010 it bumped up to about 41 weeks.
10         MR. CARTA:  Your Honor, I'm going to
11 object.  There's already been a ruling that the
12 conclusions about time periods are unreliable.  Judge
13 Squatrito specifically said the sources of information
14 that this expert was relying upon didn't pass the
15 Daubert test because they were not based upon
16 comparable positions.  The Court may remember that
17 part of Judge Squatrito's opinion.
18         THE COURT:  I do recall it.  Counselor?
19         MR. DUFFIELD:  His testimony isn't --
20 he's not testifying about how long he should have
21 taken to find a job or how long it would have taken
22 him.  He's talking about statistics out there about
23 the age range.
24         THE COURT:  Okay.  Let's go on to a
25 different subject.

Page 1536

1         MR. DUFFIELD:  All right.
2  BY MR. DUFFIELD:
3  Q   How does a candidate's age, particularly in
4  the IT industry, affect job prospects in today's
5  market?
6  A   Well, let's talk about -- age is a factor.
7  I've been in this career for 30 years or so, more, and
8  it impacts, but the impact is -- means that the search
9  for someone at hire, add on -- depending on the
10 economic conditions, add on maybe four to eight to ten
11 weeks of extra search time.
12     But people in that age group get jobs, and
13 it's clear over and over again, people get jobs.  It
14 just may take them a little longer.  It's specifically
15 in IT there is, you know, it's fair to say that in IT,
16 which is high technology, that people are concerned
17 whether you're up-to-date, whether you're keeping up,
18 that you're not working with old equipment and
19 technology and therefore you don't -- you're not
20 appropriate for modern IT work.
21     However, at high executive levels where you're
22 not doing the technical work, what you're doing is
23 running, managing an area, you're given a project and
24 you're seeing the project through from the beginning
25 until the end, and you're managing that whole project,

Page 1537

1  it's -- the relevance in terms of whether you're --
2  you've been in IT for 40 years or you've been in IT
3  for 20 years is not important.  If you've got evidence
4  that you can still -- you've been working and doing
5  project work that's successful, up until the current
6  time, then you're demonstrating that you have the
7  goods to do the job, and it really is irrelevant as to
8  what your age is.
9  Q   And, in fact, someone who had been in the
10 industry for 40 years, that would be a plus for them,
11 would it not, in finding a job?
12 A   Certainly it is, especially in IBM, you know,
13 which is a very prestigious organization.  You've got
14 to think that that's a big plus.
15 Q   Thank you very much.
16         MR. DUFFIELD:  I have no further
17 questions.
18         THE COURT:  Mr. Carta?
19         MR. CARTA:  Thank you, Your Honor.
20
21         CROSS-EXAMINATION BY MR. CARTA:
22
23 Q   Good morning, Mr. Sodikoff.  How are you?
24 A   Good morning.  How are you?
25 Q   Well, thank you.

Page 1538

1       Let's start off with the resumé. That seems
2  like a reasonably good place to start. You reviewed
3  just the two resumés that were exhibits, isn't that
4  correct?
5       A   I believe so, yes.
6       Q   With respect to Mr. Castelluccio?
7       A   I believe so, yes.
8       Q   And wouldn't you agree that the best resumé is
9  one specifically tailored for a specific job?
10      A   I think it's a very good idea to -- if you can
11 tailor your resumé to a specific job, that could make
12 the point better, yes.
13      Q   And you spoke very highly of outplacement
14 executives, and would you agree that it's a good
15 practice to speak with an outplacement executive who
16 has the job, as you explained to the jurors, and work
17 with them to revise and tailor your resumé as
18 suggested by an outplacement expert for the job he or
19 she has?
20      A   I just want to be clear. Are you saying it's
21 a good idea to get advice from someone's who's an
22 outplacement or career management in terms of how to
23 put together your resumé, is that what you're asking?
24      Q   No.
25      A   Okay.

Page 1539

1       Q   I can see where it was unclear. Let me try
2  again. Thanks.
3       If an outplacement executive has been hired by
4  your company to fill a specific position, that's their
5  job, isn't it?
6       A   No. So we need to make -- you're talking
7  about executive recruiter? Or you're talking about.
8       Q   I'm sorry, you're right. I think I misused
9  the phrase. Executive recruiter. Let's talk about an
10 executive recruiter who has a specific job and he's
11 been hired by a company to fill that job.
12      A   Correct.
13      Q   Wouldn't you agree that the best strategy is
14 to work with that executive recruiter in order to
15 tailor your resumé for that specific job?
16      A   Well, the executive recruiter needs to see
17 your resumé. So the point being is you got to have
18 the resumé before you met with the executive recruiter
19 to take his advice.
20      What happens sometimes is an executive
21 recruiter -- you'd like to -- he likes your -- he
22 likes you, he thinks he'd like to present you to his
23 organization, and so that executive recruiter may say,
24 okay, but your resumé isn't good, so I want to help
25 you adjust the resumé so we can get -- we can present

Page 1540

1  it to the company in a way that they will get better
2  information. So that's certainly possible.
3       Q   And wouldn't you agree that when you get that
4  kind of feedback from an executive recruiter, that
5  that's an ideal way to then tailor your resumé for the
6  specific job that he or she has?
7       A   Well, I would agree that if I'm looking to
8  hire you, and I'm the executive recruiter, and I'm
9  telling you, put your resumé together this way because
10 I want to present it to my client this way, that
11 that's a smart thing to do, yes.
12      Q   Absolutely, very smart thing to do.
13      And you haven't seen a single one of the
14 resumés that Mr. Castelluccio tailored for specific
15 jobs working through an executive recruiter, have you?
16      A   Well, it's a different use of the resumé, so
17 no, I have not.
18      Q   You just saw the two that were exhibits,
19 that's right, didn't we already establish that?
20      A   Those are the ones that were being sent to the
21 executive recruiter in the first place, isn't that
22 what you're saying?
23      Q   No. I'm asking if you've seen anything other
24 than the two exhibits that you've just talked about?
25      A   No, I haven't seen other than.

Page 1541

1       Q   You've seen no others, right?
2       A   I don't believe so. I mean, you know, I'd
3  have to go back to the pile of paper that I had
4  received originally and see if there was something in
5  there like that, but I don't recall that.
6       Q   Okay. Do you recall that I conducted your
7  deposition in September of 2010?
8       A   Pardon?
9       Q   Do you recall that I conducted your deposition
10 in 2010?
11      A   Yes.
12      Q   September of 2010?
13      A   Yes.
14      Q   And that was, goodness, quite some time ago.
15      At the time of your deposition do you recall
16 that we discussed an analysis that you had done based
17 upon the first 21 months of Mr. Castelluccio's job
18 search?
19      A   Post termination?
20      Q   Yes.
21      A   Yes.
22      Q   And the reference you've made to your review
23 of materials for a 21-month period, that's the same 21
24 month period that you were referring to back in
25 September of 2010, isn't it?

9 (Pages 1538 to 1541)

Page 1542

```
1       A   Yes.
2       Q   So has IBM shown you the additional materials
3   that Mr. Castelluccio has produced with respect to his
4   job search since the time of your deposition, since
5   September of 2010?
6       A   Since 2010?  No.
7       Q   So you're not aware, for example, of Exhibit
8   105?
9           I'm not sure what book you have in front of
10  you.  Is that Defendant's or Plaintiff's?  Let me get
11  you the correct one.
12          I'll show them to you.  That might be faster.
13          Have you seen this list of additional job
14  search resources?  Has IBM shown that to you?  I'm
15  just looking for a yes or no.  I want to know if
16  you've had an opportunity --
17      A   May I look at it?
18      Q   Please, by all means, yes.
19      A   Thank you.
20          I'm not a hundred percent sure, but I think
21  maybe earlier this year I was sent a copy of this.
22      Q   Okay.  And do you recall whether you evaluated
23  this in connection with your -- question withdrawn.
24          When you were testifying earlier about Mr.
25  Castelluccio's research, it was based upon the
```

Page 1543

```
1   materials that you'd received previously, it didn't
2   include these materials, did it?
3           MR. DUFFIELD:  Your Honor.
4           THE WITNESS:  This was not included in
5   the original materials.
6   BY MR. DUFFIELD:
7       Q   And with respect to Exhibit --
8           MR. DUFFIELD:  Your Honor, could I ask
9   Mr. Carta to come back here so I can hear him?  It's
10  hard for me to hear you with your back to us.
11          MR. CARTA:  I'm sorry.  Let me just leave
12  these up here then.
13          MR. DUFFIELD:  Great.
14  BY MR. CARTA:
15      Q   This is Exhibit 104 and Exhibit 103.
16          And again, my question is a simple yes or no.
17  When you did your analysis with respect to Mr.
18  Castelluccio's first 21 months, you weren't taking
19  into consideration the information that's contained in
20  these documents, isn't that correct?
21      A   Well, I don't think that's correct, because
22  I'm looking at this here now and it's dated 2008
23  through 2010, after my report, and I don't know if
24  there was duplicated information or whether that was
25  not in the information.  I'd have to check my records
```

Page 1544

```
1   and the data to see whether I'm looking at the same
2   thing.
3       Q   Let me rephrase my question more carefully.
4           Isn't it true that analysis that you did
5   previously did not include all of this information?
6       A   Obviously not.
7       Q   Yeah, obviously not.
8           And when I say "all of this information," at
9   this point I'm referring to all three exhibits that I
10  just presented you with, sir.
11          I'm sorry, your answer?
12      A   Was there a question?
13      Q   Yes.  The question was, am I right that your
14  analysis did not include all of the information
15  contained in the three exhibits that I've just
16  presented to you?
17      A   My analysis did not include all of this
18  information.
19      Q   And in fact --
20      A   Yeah, this first information you gave me
21  doesn't have any dates on it, so I don't -- I wouldn't
22  know.
23      Q   But your analysis, the one that you spoken to
24  the jury about, that's based -- with respect to Mr.
25  Castelluccio's search, that's based upon documents
```

Page 1545

```
1   that were given to you before your deposition in 2010,
2   is that correct?
3       A   Yes.
4           MR. CARTA:  May I have a moment, Your
5   Honor?
6           THE COURT:  Yes.
7   BY MR. CARTA:
8       Q   Dr. Sodikoff, I think you said you're a career
9   management -- that that's your area of expertise?
10      A   Career management, yes.
11      Q   And you're not an economist.  You're not an
12  economist, isn't that right?
13      A   No, I'm not.
14      Q   And you're not qualified to perform an
15  economic analysis of Mr. Castelluccio's economic loss,
16  isn't that correct?
17      A   Correct.
18      Q   And the entire point of your testimony
19  concerns your opinion concerning the nature and degree
20  of the efforts you maintain that typify an average job
21  search, is that what you've been testifying about?
22      A   I'm sorry, I didn't understand the question.
23      Q   Fair enough.
24          As I understand it, just so that I understand
25  you, the point of your testimony is that it concerns
```

Page 1546

1    your opinion about the nature and extent of Mr.
2    Castelluccio's efforts to find a job?
3        A    Well, I laid out what the standards are for a
4    diligent job search, and then I compared Mr.
5    Castelluccio's efforts to that, yes.
6        Q    And that's based upon information that has not
7    been updated since September, since before September
8    of 2010, isn't that correct?
9        A    Well, it's based on information that pertains
10   to six -- at least six months of search prior to his
11   termination and 21 months of search post his
12   termination, which is a long period of time.
13       Q    Okay.
14       A    And it's based on that information.
15       Q    So the answer to my question is yes, it
16   includes information -- it includes no information
17   after the time of your deposition in September of
18   2010, right?
19       A    It contains no information after my deposition
20   or my report at deposition indicating what a job
21   search -- what a diligent job search looks like, yes.
22       Q    Thank you very much, sir.
23
24
25

Page 1547

1            REDIRECT EXAMINATION BY MR. DUFFIELD:
2
3        Q    Dr. Sodikoff, do you remember me reaching out
4    to you about a year and a half ago, approximately,
5    with some additional documents that Mr. Castelluccio
6    had just recently provided us?
7        A    I do have a vague memory of that, yes.
8        Q    And did you review those documents?
9        A    I looked at them, yeah.
10       Q    Do you remember them being a quite heavy stack
11   of ExecuNet searches?
12       A    I don't have a -- it was while ago.
13       Q    Did we ask you to do an additional report
14   based on that new evidence?
15       A    No.
16       Q    But you've had a chance to review that, and
17   does it change your opinion about the reasonableness
18   of the search that Mr. Castelluccio conducted?
19       A    It didn't change my opinion, no, absolutely
20   not.
21       Q    And as part of your review of documents, you
22   asked for everything that we had received from Mr.
23   Castelluccio by way of his resumé, for example?
24       A    Yes.
25       Q    And the two documents that I showed you were

Page 1548

1    the only two resumés that we provided you?
2        A    I actually don't recall that, in fact, those
3    were the only two.
4        Q    I'll represent to the Court those were the
5    only two that we provided to you.  They were the only
6    ones provided to us.
7            So my final question is, did Mr. Castelluccio
8    provide any resumés that were tailored to a specific
9    job?
10       A    No.
11           MR. DUFFIELD:  No further questions, Your
12   Honor.
13           THE COURT:  Mr. Carta?
14           MR. CARTA:  No questions, Your Honor.
15           THE COURT:  Okay.  Thank you, sir.  You
16   may step down.
17           THE WITNESS:  Thank you.
18           MR. FASMAN:  Your Honor, Dr. Sodikoff was
19   our last witness and the Defendant rests.
20           THE COURT:  Okay.  And there's rebuttal?
21           MR. CARTA:  No rebuttal, Your Honor.
22           THE COURT:  All right.  Well, ladies and
23   gentlemen, the lawyers and I have to meet in my
24   chambers and we have to go over what's known as the
25   jury charge, the jury instructions, and that's a

Page 1549

1    statement of the law that I have to give you so you
2    can apply that law to the facts that you find, and
3    that's going to take a little while.  After the jury
4    charge, counsel will come back, and they're going to
5    make their closing arguments.
6            I'm trying to estimate.  If the weather
7    were nicer I'd be able to suggest that you take a walk
8    in the beautiful park that we have down here, maybe go
9    over to the Wadsworth Museum, which is really great.
10   I don't know that it's open on Thursdays.  Maybe it
11   is.  It's kind of expensive to get in there, though.
12   I think the last time I went there I went with law
13   clerk and we were going to have lunch and the
14   gentleman at the desk said, well, that'll be 32
15   dollars, and I said, wait a minute, we weren't going
16   to spend that much for lunch and now you're saying 16
17   dollars a piece to get in?  It was a lot of money, so
18   we wound up going to a hotdog stand.
19           The weather is so intemperate.  I think
20   the best thing for me to do is have you go back to the
21   jury room.  If you brought a paperback or something,
22   or if you're one of these people who go walking around
23   you see in malls getting exercise -- my wife is trying
24   to get me to do all the time.  All I can do is promise
25   you that we will be working as quickly as we can to do

Page 1550

1  what we have to do, so we can get you back here. But
2  don't go home. Don't go on an extended shopping
3  spree. We'll take a recess now, and we'll reconvene
4  when we're ready to have the lawyers present their
5  closing arguments.
6          (Jurors excused)
7          THE COURT: I don't know what you ladies
8  and gentlemen are going to want to do. The lawyers
9  are going to be coming back to the charging
10  conference, and if there's anybody else -- there's not
11  an awful lot to do around here, especially when the
12  weather is as frigid as it is. But let me see counsel
13  down in my chambers and we'll talk about the jury
14  charge. Stand in recess.
15          (Recess)
16          THE COURT: Okay, let's go over this.
17  The way we usually do it, we go page by page, read
18  page 1, you say okay, okay, page 2. It's not really
19  that long, 18, 20 pages. The numbers are off.
20          MR. FASMAN: I've got 17.
21          THE COURT: 17.
22          MR. CARTA: Your Honor, I have a small,
23  small nitpick in the second paragraph, and it's just
24  the use of the word "bias". I think that that is the
25  standard language, "sympathy as well as bias have no

Page 1551

1  place in the case." Just because it's an age case and
2  we talk a whole lot about bias and we talked about it
3  the whole time, I just would prefer it just say
4  "sympathy has no place in the case." I think that's
5  the point.
6          THE COURT: I have no problem with it.
7  Do you have any problem with it?
8          MR. FASMAN: This is a standard
9  instruction. I think that "bias" should be in there,
10  but if he wants to strike it out --
11          THE COURT: How about "bigotry"?
12          MR. FASMAN: No.
13          THE COURT: That's a little too harsh.
14          MR. CARTA: I think it has to do with
15  sympathy here, that's the concept.
16          THE COURT: We should have it on the
17  record, the record should reflect that we're all here
18  in my library, and we're going over the jury charge,
19  and we have the three lawyers from IBM, Plaintiff's
20  two lawyers, my lawyer clerk, Wendy, who's the
21  stenographer taking everything down, and we are doing
22  the jury charge, and Mark Carta has just suggested
23  that "bias" is objectionable to him. Attorney Zack
24  Fasman has said that, you know, it's standard
25  language, so he doesn't think there's any problem with

Page 1552

1  it, but I'll take out "bias," so just say "sympathy".
2          MR. CARTA: "Has."
3          THE COURT: "Has," okay.
4          MR. FASMAN: Then there's the second
5  reference to that in that same paragraph, Judge, where
6  it says -- same sentence, where it says "sympathy or
7  bias" below. I presume you want that out, too.
8          MR. CARTA: Yes, please.
9          MR. FASMAN: All right.
10          MR. CARTA: Thank you.
11          MR. FASMAN: I don't think we had any
12  changes on 2.
13          MR. DUFFIELD: No.
14          THE COURT: I have read this so many
15  times.
16          MR. FASMAN: Sitting here saying what are
17  you going to say about this that hasn't already been
18  said?
19          THE COURT: Well, every now and then
20  someone comes up with an argument or a point and say,
21  well, okay, not a big deal.
22          MR. DUFFIELD: I don't think we had any
23  comments on the third page, either.
24          MR. FASMAN: No.
25          THE COURT: It's pretty much all

Page 1553

1  boilerplate up to -- but you should read it because we
2  might have something in there. I think we start
3  getting to the ducks on page 7. But I encourage you
4  to read page 4, 5 and 6 carefully just in case there's
5  something in this that you find objectionable.
6          MR. FASMAN: We read them last night.
7  We're fine with those. We were fine all the way up to
8  page 7. We don't have any changes.
9          THE COURT: Okay.
10          MR. CARTA: I'm a little step behind,
11  just need to catch up.
12          I always wonder with the word
13  "preponderates". Is that really a word?
14          THE COURT: You know, I don't know. Once
15  there was somebody in the legal profession who's
16  literate, I don't mean literate, I mean literate, so I
17  think we've been going on faith.
18          THE LAW CLERK: I don't think spell check
19  picked it up.
20          THE COURT: Just as an aside, if you ever
21  want to do research, go into Westlaw and search for,
22  in opinions, opinions of United States Supreme Court,
23  search for S-U-P-E-R-C-E-D-E-D, superseded spelled
24  with a C, and there are dozens of them. There are
25  dozens of them. I didn't realize it was spelled with

12 (Pages 1550 to 1553)

Page 1554

1    an S until I was the early years in this job, but it's
2    S. But seems like it should be a C.
3           MR. FASMAN: So if I may, Judge, on 7, 8
4    and 9, I thought that the burden of proof instruction
5    was actually very well done. Don't get rid of these
6    guys. I thought it was fine.
7           I'm not sure where to raise these things,
8    but I had two questions on burden of proof. One of
9    them was subjective belief. We had a request to
10   charge number 4 on Plaintiff's subjective belief, and
11   the reason we brought that up is -- and we may have
12   over-phrased it or mis-phrased it, but Mr.
13   Castelluccio, remember he challenged those seven
14   positions, and he said, you know, I was equally
15   qualified for those seven positions, but the only
16   evidence that was presented on that was his subjective
17   belief, and I think the jury ought to be told that the
18   Plaintiff's subjective belief or the subjective belief
19   of co-workers is not proof of discrimination. I think
20   the law is pretty clear on that.
21          So I mean it's really a question of do we
22   want to tell them that, and I think we do, because
23   this has been raised as an issue, and Mr. Castelluccio
24   said oh, these people were not as good. Collins
25   testified that she picked the people she wanted

Page 1555

1    because she thought they were better qualified. But I
2    think we want to instruct the jury.
3           MR. CARTA: Your Honor I would just
4    comment on underlying assumption, that that was the
5    only testimony on that point. I do believe Kelton
6    Jones testified that up is -- and I mean I could say that,
7    positions, but you recall his testimony was that
8    somebody of Mr. Castelluccio's skill set and
9    background could perform any vice president position.
10          MR. FASMAN: But then, Judge, he tried to
11   get in -- Mark tried to get into each individual
12   position, and I raised the point, and you sustained my
13   objection that he wasn't there for that period of time
14   these positions were filled in May of -- the
15   announcement's made 2008 and he left in January 2007,
16   and you did sustain that objection.
17          I don't care whether, you know, if you
18   want to contend this, but I think the jury ought to be
19   told that subjective beliefs -- there ought to be
20   something on subjective belief.
21          MS. TRIOLO: Which charge is that?
22          MR. FASMAN: Our post trial number 4.
23          MS. TRIOLO: I'm looking at the charge on
24   your joint trial memo.
25          MR. FASMAN: No, it's a separate set, and

Page 1556

1    I sent them to you, too, a post trial.
2           MS. TRIOLO: When did you send it?
3           MR. FASMAN: On Sunday, Monday?
4           THE COURT: Okay. If this were testimony
5    and the jury was there and Mark or you asked Mr.
6    Castelluccio whether he was qualified to perform this
7    particular job, he'd be able to give his opinion, and
8    during closing argument you'd be able to say, well,
9    you know, that's his opinion.
10          I mean Smith believes that he's qualified
11   to sit on the Supreme Court. I mean I could say that,
12   and then afterwards would say yeah, really, and those
13   who didn't agree with me would say, well, you know,
14   no, he's not, he has no appellate experience, he
15   has --
16          So I think -- I mean he certainly has a
17   right to testify and to offer his opinion, and his
18   opinion is evidence. Your objection really goes to
19   the weight, if any, that the jury's going to attach to
20   that.
21          MR. FASMAN: Correct, exactly.
22          THE COURT: And I think that's the way it
23   ought to be addressed, rather than saying you cannot
24   consider his subjective belief, because they can
25   consider his subjective belief because his subjective

Page 1557

1    belief is evidence, evidence in the form of testimony,
2    which is evidence.
3           Now, you would object, and I'd say, well,
4    the objection's overruled, it goes to weight, not
5    admissibility. And if you think that that's something
6    you want to address in your closing argument, I think
7    that there's nothing to preclude you from saying, and
8    ladies and gentlemen, remember when Mr. Castelluccio
9    said he was the best qualified or well qualified for
10   all of these seven positions, you have to remember
11   that that's his subjective belief, and the fact that
12   he believes it doesn't necessarily mean that it's so.
13   A lot of people believe they're qualified to do many
14   things, but that's just their opinion. I mean I think
15   that's the way to handle that.
16          MR. FASMAN: Well, Judge, I would just
17   say that we've cited a couple of cases on Plaintiff's
18   subjective belief, and I think the law's pretty
19   clear -- and I'm happy to argue it that way, but I
20   think the law is pretty clear that the Plaintiff's
21   subjective belief is not enough, is insufficient to
22   show pretext, and that's what these cases say, and
23   particularly D-Conn. They're both from this district.
24          THE COURT: Can you get anything,
25   anyplace more authoritative than that?

**A-671**

Page 1558

1    MR. FASMAN:  No.  I was trying to get one
2 of your opinions, couldn't find it.  I was searching.
3    THE COURT:  I'm included in Westlaw
4 publishing company, that's from Smith, and they just,
5 goes right down to the oil burners.
6    Well, you know, what would you add to
7 this charge and where would you add it?
8    MR. FASMAN:  I guess what I would say
9 is --
10    MR. CARTA:  Your Honor, apparently -- I'm
11 not assessing fault at all, but apparently we don't
12 have this, so if you have an extra copy, that would be
13 a big help.
14    MS. TRIOLO:  Thank you.  Sorry about
15 that.
16    THE COURT:  The charging conference is
17 really easy when you don't give the parties the
18 charge.
19    MR. CARTA:  I'm not blaming them.  It
20 seems to me if counsel represents he sent it, I
21 completely believe that.
22    MR. FASMAN:  We did.
23    MR. DUFFIELD:  It should be in the
24 pretrial as well, but it's a different number
25 probably.

Page 1559

1    MS. TRIOLO:  Why did you supplement it if
2 it was already in here?
3    MR. FASMAN:  We took out some of the
4 pretrial.
5    No, with the expert one in the charge and
6 I changed a couple of them and added a few, added a
7 couple of them.  But these were sent to you when I
8 delivered them to chambers, too.  They were sent the
9 night before.
10    MS. TRIOLO:  There might have been
11 something else.  There was a draft charge that you
12 were discussing with the Court and we hadn't seen that
13 either, so I think some things are.
14    THE LAW CLERK:  I know Mike and I were
15 given a copy from Mr. Fasman, but apart from that I
16 don't know if anyone else got a copy.
17    MR. DUFFIELD:  Did you find it?
18    MS. TRIOLO:  Yes, I did.  Thank you.
19    MR. CARTA:  So just so the record is
20 clear, yes, in fact we do have it.  We received it.
21    MS. TRIOLO:  No, this is from their joint
22 trial memorandum.  They're saying it's the same as
23 what was here.  This was filed in September.
24    MR. CARTA:  Okay.
25    MR. FASMAN:  I guess I would put it --

Page 1560

1 you've got it on --
2    THE COURT:  I think he's making a copy
3 for them.
4    MR. FASMAN:  So Your Honor, I would put a
5 sentence on the bottom of 8 that goes onto the top of
6 9, which says "The Plaintiff may prove through direct
7 evidence or through circumstantial evidence --" I
8 guess I would put it at the top there "-- Plaintiff's
9 subjective beliefs nor co-workers is proof of
10 discrimination."
11    MR. CARTA:  Which one is this?
12    MR. FASMAN:  4.
13    MR. CARTA:  4, thank you.
14    THE COURT:  So you put it right -- put a
15 sentence before "discrimination" and the substance of
16 that sentence would be "Plaintiff's subjective belief
17 he has been discriminated against alone is
18 insufficient," basically it?
19    MR. FASMAN:  Yes, something like that.
20 "Plaintiff's subjective belief that he should not have
21 been terminated, nor the subjective belief of
22 co-workers, is proof of discrimination."  That would,
23 I think, satisfy.
24    MS. TRIOLO:  "Alone" is significant,
25 though.

Page 1561

1    MR. CARTA:  I thought the Judge's
2 phrasing was balanced.
3    THE COURT:  You can't have people
4 speculating and giving their opinions.
5    MR. CARTA:  Can you help, again, you're
6 saying the sentence that ends paragraph 8 goes over to
7 page 9?
8    MR. FASMAN:  Yeah, right before the word
9 "discrimination".
10    MR. CARTA:  I see.  So at the top of page
11 9.
12    THE COURT:  Well, I haven't finished it
13 yet.  Maybe I have -- is it okay to add a sentence at
14 the top of page 9 before "discrimination", before the
15 word "discrimination," and the sentence would be,
16 "Plaintiff's subjective belief alone is not
17 sufficient," and you would want "nor is the," you
18 know, "nor is the subjective belief of --"
19    MR. FASMAN:  "Nor the subjective belief
20 of co-workers."
21    MR. CARTA:  I'm sorry, subjective belief
22 of?
23    MR. FASMAN:  Co-workers.
24    MR. CARTA:  I'm not understanding the
25 sentence.

14  (Pages 1558 to 1561)

Page 1562

1  MR. FASMAN:  Is not proof of
2  discrimination.
3  MR. CARTA:  Would you just read the whole
4  sentence to me?
5  THE COURT:  It would be "Plaintiff's
6  subjective belief alone is not sufficient, and" I
7  guess Zack is suggesting we add, "nor is subjective
8  belief of co-workers."
9  MR. DUFFIELD:  The second sentence in the
10  second paragraph.
11  MR. CARTA:  I don't see the support for
12  that.  Footnote 4 talks about evidence of plaintiff's
13  belief, claimant's subjective belief.  I don't see
14  anything there that would support expanding that to
15  co-workers in the authority that you've cited.  I
16  think the Judge addressed the precedent that you
17  identified.
18  THE COURT:  Yeah, you know, I think I've
19  kept it tight, and I think that to expand it to other
20  people is just, you know, it's just asking for
21  trouble.  I think your request, Mr. Fasman, is a good
22  one, and we've come up with language that pretty much
23  covers your objections initially made.  Actually it's
24  my language where I modified your language, and I
25  inserted "alone," and I don't think we want to start

Page 1563

1  talking about other witnesses, because I think it's
2  just asking for trouble.
3  MR. FASMAN:  So what is your sentence
4  then?
5  THE COURT:  It says "Plaintiff's
6  subjective belief alone is not sufficient."
7  MR. FASMAN:  "To prove discrimination."
8  THE COURT:  "To prove discrimination."
9  MR. FASMAN:  Good, okay, we're fine with
10  that.
11  MR. CARTA:  I am as well.
12  THE COURT:  All right.  That actually
13  makes it nicer, because it flows right into the next
14  sentence.
15  MS. TRIOLO:  Your Honor, may I raise a
16  point on page 8 at the bottom of the page?
17  THE COURT:  Sure.
18  MS. TRIOLO:  The sentence that says "The
19  Plaintiff must prove by a preponderance of the
20  evidence that the Defendant would not have terminated
21  him had he been younger than 40 and everything else
22  remain the same."
23  The ADA protects employees from treatment
24  based on age, and protected group is 40, but the
25  plaintiff doesn't have to show that had he been 39

Page 1564

1  things would have been different.  And I think that's
2  what this implies.
3  MR. FASMAN:  I'm fine to strike 40,
4  Judge.  I don't have any trouble with that.
5  THE COURT:  What sentence is that?
6  MR. FASMAN:  That's right here.
7  MS. TRIOLO:  Fourth from the bottom.
8  THE LAW CLERK:  Sorry, what page?
9  MR. CARTA:  8.
10  THE COURT:  So we're striking out "The
11  Plaintiff must prove by a preponderance of evidence
12  that the Defendant would not have terminated him had
13  he been younger than 40 and everything else had
14  remained the same."
15  MS. TRIOLO:  I don't think -- we don't
16  need the whole sentence.
17  THE COURT:  I think Mr. Fasman said he
18  has no objection.
19  MR. FASMAN:  No, I think we need the
20  sentence, but I don't think we need to have "40".
21  MR. DUFFIELD:  Right.
22  MR. FASMAN:  That's clearly a right
23  instruction under the Age Act.
24  THE COURT:  But we've got that in a
25  couple other places --

Page 1565

1  MS. TRIOLO:  That's what I thought.
2  THE COURT:  -- in here, so let's revisit
3  this after we -- so --
4  MR. FASMAN:  There are 40 -- references
5  to 40 throughout, which is the classic charge under
6  the ADA, but I do think -- I mean I am pretty strongly
7  of the opinion that he's got to prove by a
8  preponderance that we wouldn't have terminated had he
9  been younger, had everything else been the same and he
10  had been younger.  I don't care if you want to take
11  out the "40", but I think that that's the burden.
12  MS. TRIOLO:  I think it's said elsewhere,
13  though, but --
14  THE COURT:  Would not have terminated him
15  but for his age.
16  MS. TRIOLO:  Which we say right above it.
17  THE COURT:  We do say that.
18  MR. FASMAN:  But this is the classic
19  charge.
20  MS. TRIOLO:  Well, not the "younger than
21  40" part.
22  MR. FASMAN:  It's younger -- actually
23  "younger than 40" is the classic charge, but if you
24  want to take out --
25  THE COURT:  Does it say "younger than

Page 1566

1  40"?
2         MS. TRIOLO:  I've seen it in some Seventh
3  Circuit cases.  I didn't see it elsewhere.  And I've
4  seen it also criticized as being misleading because
5  it -- it's based on age, not that you're older than
6  40, but that it's based on age.  You can be 55, you
7  can be 42, you don't have to show that you're younger
8  than 40, that it would have been different had you
9  been younger than 40, just that your treatment was
10 based on age.
11        MR. FASMAN:  Right, that's why I said
12 that 40, that's the criticism in the case law.
13        MS. TRIOLO:  Right.
14        MR. FASMAN:  The use of the 40, but not
15 the actual concept that says that the plaintiff has to
16 prove.
17        MS. TRIOLO:  Right, I don't think we're
18 arguing that.
19        MR. FASMAN:  No.
20        MS. TRIOLO:  I think we're saying it was
21 already said in that paragraph.
22        MR. FASMAN:  But that sentence, that's
23 the classic sentence in there, and that is the burden.
24        THE COURT:  When I read that I thought
25 that was kind of awkward.  And I still do think it's

Page 1567

1  awkward.  But you say that's the --
2         MR. FASMAN:  That's the classic one in
3  every case.
4         MR. CARTA:  Your Honor, if you go up two
5  sentences it's very clear, it's right there.
6         THE COURT:  "In other words, you must
7  prove that age was the but-for cause of the
8  termination rather than just a contributing or
9  motivating factor."
10        MR. CARTA:  And the sentence even both
11 that.
12        THE COURT:  "Plaintiff must prove by a
13 preponderance of evidence that Defendant would not
14 have terminated him."
15        MR. CARTA:  Above that, "In order for
16 Plaintiff to succeed on his ADA claim he must prove by
17 a preponderance of evidence that the Defendant
18 terminated his employment because of his age.  In
19 other words, he must prove that age was, the, quote,
20 but-for, end quote, cause of the termination rather
21 than just a contributing motivating factor."
22        MR. FOX:  The reason for 40, you use 40
23 probably as the standard so you're not terminating
24 them for being too young, right?
25        MR. FASMAN:  I agree that these are all

Page 1568

1  alternative phrases, but this is the classic one.  I
2  know that there are -- these are -- all three of these
3  are from cases.
4         THE COURT:  Well, if you can represent
5  that on the basis of your experience in this area this
6  is what the case law -- I mean not the 40 part?
7         MR. FASMAN:  No, we can strike out 40,
8  I'm fine, but I think the sentence should be in there.
9         THE COURT:  So what do we strike out?
10        MR. DUFFIELD:  The words "than 40."
11        MS. TRIOLO:  So the sentence would read,
12 "The Plaintiff must prove by a preponderance of
13 evidence that the Defendant would not have terminated
14 him had he been younger and everything else had
15 remained the same."  So we strike two words.
16        THE COURT:  Just "than 40."
17        MR. FASMAN:  Yes.
18        THE COURT:  I'm going to do that.  I
19 think the sentence is, you know, it's about the third
20 time in the same paragraph that we've said the same
21 thing, only this is -- seems to be rather awkward with
22 the word, or the words, rather, "than 40" included.
23 And I remember looking at that and thinking about it,
24 and then going on.
25        Okay.  So, your request is granted and

Page 1569

1  we've taken out "than 40".
2         MS. TRIOLO:  Thank you.
3         MR. FASMAN:  Judge, I had two more things
4  I wanted to bring to your attention.  And they're both
5  based on things that happened during the case.
6         One of them is the question of stray
7  remarks.  You may recall that at the start of the case
8  I objected to the entry of Joanne Collins-Smee's
9  comments, and I said -- about retirement, and I said
10 there was stray remarks, and you said yeah, but that's
11 for the jury to determine, I'm not going to rule them
12 out, and I said fine.
13        That is what happened, and that's how it
14 came in, and I'm fine with that, but I think that it's
15 quite common in cases like this to have an instruction
16 on stray remarks, and particularly -- and here's the
17 one that I -- you know, we could do a whole nine yards
18 on stray remarks, but here's the one that I'm
19 concerned about.
20        I don't want the jury to be of the
21 misimpression that any discussion of retirement is
22 somehow unlawful, and they haven't read Raskin versus
23 Wyatt, and the law in this circuit is very, very clear
24 that inquiries about retirement are not evidence of
25 age discrimination, and I think unless we tell them

Page 1570

1    that, particularly because Kelton Jones said, well, I
2    would never inquire into retirement, I think they have
3    to be told. They're not going to know this. So we
4    can talk about stray remarks, or whatever, but I think
5    that's the nut of what I'd love to -- what I think is
6    required and what I think IBM wants in the
7    instructions. And it could be as simple as a sentence
8    which we have, inquires about retirement are not
9    evidence of age discrimination, and I'll expand on it
10   in my argument.
11          THE COURT: Mere inquiries about
12   retirement do not alone constitute age discrimination.
13          MS. TRIOLO: Your Honor, we don't feel
14   that they are stray remarks.
15          THE COURT: Here's the thing here. If
16   there were a case where we had a witness saying, you
17   know, I did say that, I did say, you know, that, but
18   obviously I think at this point you could say wait a
19   minute, over a long period of time this raising of
20   this subject, I mean that's a stray remark. Here the
21   testimony of Ms. Collins-Smee is, did you say that,
22   and she wasn't just no, it was absolutely not, I
23   didn't say it, and to each question put to her I think
24   by Mark and by you, Zack, she unequivocally denied
25   making those statements. So now I'm telling the jury,

Page 1571

1    but if you find that she did make the statements, they
2    are stray remarks.
3           MR. FASMAN: No, no, no, no. I took
4    that -- you know, we did not do that, but they're not
5    proof, and you said it when you rephrased it, they're
6    not -- standing alone they're not proof of age
7    discrimination.
8           I mean the two sentences -- let me read
9    you the two sentences that are the heart of this. I'm
10   not going to argue about --
11          MR. CARTA: Where are they again?
12          MR. DUFFIELD: Stray marks, 1. It's on
13   phage 6.
14          MR. FASMAN: I hope these are the same
15   ones, but here's the concept. "Inquiries about
16   retirement --" and I, you know, this is our phrasing.
17   We can fiddle with this. "Inquiries about retirement
18   are not evidence of age discrimination. You may not
19   rely upon them as proof of age discrimination. It is
20   not improper for an employer or supervisor to inquire
21   as to its employee's plans for the future," period. I
22   mean I think that's as neutral as I can get it.
23          MS. TRIOLO: I think it's overly broad.
24   I'm fairly certain in the Tomassi case they found the
25   references to retirement were a basis for the

Page 1572

1    discrimination claim.
2           MR. FASMAN: Because they were done
3    multiple times.
4           MS. TRIOLO: Right. So we'd have to give
5    the jury an additional instruction to let them know
6    how they can take on additional meaning in certain
7    circumstances. We can't have a broad sweeping
8    statement that says that they're not evidence of
9    discrimination.
10          MR. CARTA: That's the problem, once you
11   start fiddling, you can throw things out of balance.
12          MR. FASMAN: Well, no question, but I
13   think that unless we tell them that it's not improper
14   for an employer to inquire about retirement -- that's
15   really the concept -- unless we tell them that, I
16   don't want them sitting there and saying, any talk
17   about retirement is unlawful.
18          MR. CARTA: But that's not true. In some
19   circumstances it is improper.
20          MR. FASMAN: You didn't hear what I said.
21   I said any, I don't want them to think that any
22   discussion of retirement is unlawful. That's the
23   concept.
24          MR. CARTA: You mean the concept that not
25   all references to retirement.

Page 1573

1           MR. FASMAN: Or inquiries.
2           MS. TRIOLO: So in certain circumstances
3    it could be and in others it might not.
4           MR. FASMAN: Well --
5           MR. CARTA: That's balanced. Not all
6    inquiries. Is that the word you wanted, not all
7    inquiries?
8           MR. FASMAN: About its employee's plans
9    for retirement.
10          MR. FOX: Not all references to
11   retirement.
12          MR. FASMAN: Or not all references to
13   retirement, whatever.
14          MR. CARTA: I think that makes sense.
15   Necessarily, what would you say, are necessarily
16   evidence of discrimination.
17          MR. FASMAN: Okay.
18          MR. CARTA: Are necessarily evidence of
19   age discrimination.
20          MR. FASMAN: Okay.
21          THE COURT: Did you say are not
22   necessarily evidence?
23          MR. FASMAN: Of age discrimination.
24          MR. CARTA: And then the jury decides
25   whether this is a reference that qualifies or not.

Page 1574

1    MS. TRIOLO:  Do you know where we're
2  putting it?
3           THE COURT:  Wait a minute, I've got this
4  right down under "other instructions."  I'm going to
5  add -- written here is, "An inquiry about retirement
6  is not necessarily evidence of age discrimination."
7  That's not the exact words of either side, but it's
8  pretty close to it.  "An inquiry about retirement is
9  not necessarily evidence of age discrimination."
10          MR. FASMAN:  We can live with that.
11          MR. CARTA:  Yes, Your Honor.  And where
12 are we putting that?
13          THE COURT:  Page 9.
14          MR. CARTA:  The first sentence under
15 "other instructions"?
16          THE COURT:  No.
17          MS. TRIOLO:  Right above it.
18          MR. CARTA:  Oh, above it.
19          THE COURT:  So you got some more tabs
20 there?
21          MR. FASMAN:  I have one more, Judge.  I
22 have a couple more, but I think, you know, in the
23 spirit of getting this done, here's the other subject
24 I would bring up with Your Honor, and that is, Mark
25 and Margaret have made and have actually shown the

Page 1575

1  jury -- they made the argument, we had shifting
2  reasons for this decision, and they've shown the jury
3  a demonstrative along these lines.
4           There's case law -- and I've cited it in
5  our proposed instruction, which is number 10, post
6  trial instruction number 10 -- that says that where
7  the reasons are related and they're true, it's not
8  evidence of employment discrimination.  So I tried to
9  phrase something that was more or less neutral.
10          I'm afraid that if we don't tell them,
11 it's really a qualification on that, you know, you've
12 made -- you made the point, and it's a fair point,
13 that if there are multiple reasons, you can infer
14 discrimination, but I think there's a qualification to
15 that, which says that if they're true, and they're
16 related, that's not the case.
17          Those are the cases that we've cited, and
18 we've cited three from the Second Circuit on that
19 point.
20          MS. TRIOLO:  I think the difference is
21 that we're talking about conflicting reasons as
22 opposed to multiple reasons.  We're saying that yours
23 were different at different times, which would give
24 rise to drawing an inference of discrimination,
25 whereas if they are multiple and true, then I agree

Page 1576

1  with you.
2           MR. FASMAN:  Well, they are multiple and
3  true because -- they're multiple and true because we
4  pulled him out of those positions for performance, we
5  put him on the bench and then he never found a job,
6  and those are both true and they're both related,
7  they're both related in the sequence of events here.
8           MR. CARTA:  Keith Holmes said they were
9  not related.
10          MR. FASMAN:  Well, you can argue that.
11          MR. DUFFIELD:  I think the charge --
12          MR. FASMAN:  He said they were indirectly
13 related.  I was surprised.
14          MR. CARTA:  I could tell you were
15 surprised.  We've all been there.  What, didn't I meet
16 with you?  I saw that, thought oh boy, I've had that
17 happen to me.
18          MR. DUFFIELD:  It's very balanced, and it
19 does say when an employer offers multiple reasons for
20 the same action, a jury is entitled to infer that
21 neither reason is accurate and the true reason is
22 discrimination, which is your position, and then ours
23 is, however, where the true reasons are factually true
24 or where the true reasons are related --
25          MR. FASMAN:  It would not be true.

Page 1577

1           MR. DUFFIELD:  -- it would not be true.
2           THE COURT:  Okay, I've read 13, and I
3  have no problem whatsoever with 13.  The only thing I
4  would do, I would add the word "simply" in the last
5  sentence.  "If you find that this is the case, you
6  should not infer discriminatory intent simply because
7  the employer has come for forward with two related
8  reasons."
9           MR. FASMAN:  We're fine with that.
10          MR. CARTA:  You're looking at 13?
11          MR. DUFFIELD:  Page 13.
12          MS. TRIOLO:  Oh, okay.
13          THE COURT:  Page 13.
14          MR. CARTA:  I see it.  So you're adding
15 something here.
16          THE COURT:  Just inserting the word
17 "simply".
18          MR. CARTA:  Where are we starting?
19          MR. FASMAN:  The top, the whole thing.
20          MS. TRIOLO:  Can I suggest that -- see
21 the first sentence with "Plaintiff claims that IBM has
22 offered two different reasons for termination."  Can
23 we repeat "different" instead of "multiple" in the
24 second sentence?  "When an employer offers different
25 reasons for the same actions a jury is entitled to

Page 1578

1  infer."
2         THE COURT:  I think that makes sense.
3         MR. FASMAN:  Fine.
4         THE COURT:  It's the same, yes, makes it
5  more readable.
6         MR. FASMAN:  Okay.
7         THE COURT:  All right.  So this --
8         MS. TRIOLO:  "Multiple" becomes
9  "different".
10         THE COURT:  Okay.  Mike, Jake, do you
11  know where we're going to put this?
12         THE LAW CLERK:  I think we could just put
13  the instruction on page 13, just somewhere under the
14  "other instructions" heading.
15         THE COURT:  Both sides okay with that?
16         MR. DUFFIELD:  Yes.
17         MR. CARTA:  I'm sorry, I was reading.
18         THE LAW CLERK:  The instruction that we
19  just went over on page 13 in IBM's proposed
20  instructions, I think Mike and I are inclined to just
21  put it anywhere under the "other instructions" heading
22  of the instructions that we've prepared.
23         THE COURT:  Where's the other
24  instructions?
25         MS. TRIOLO:  Starts on page 9.

Page 1579

1         THE LAW CLERK:  Starts on page 9.
2         THE COURT:  Okay.  I would suggest that
3  we put this in on page 11.  By creating -- I mean just
4  duplicating with the words we have here, above
5  "finally," and then, you know...
6         Okay.  Do you have that, Mike?
7         THE LAW CLERK:  Yes, and we'll make a new
8  paragraph for the open door investigation instruction.
9         THE COURT:  Okay.
10         MS. TRIOLO:  On page 10, do we all agree
11  that "approximately" should be "at least" consistent
12  with the charges we've read to the jury?  Didn't we
13  change it at the last minute?
14         MR. FASMAN:  Yes.
15         THE COURT:  Page 10, the second --
16         MS. TRIOLO:  The second paragraph at page
17  10.
18         MR. CARTA:  "They were at least."
19         THE COURT:  Yes, "at least 116, 106."
20         MR. FASMAN:  Yes.
21         THE COURT:  Whereabouts is that?
22         MS. TRIOLO:  The end of the first
23  sentence of the second paragraph.
24         THE COURT:  Okay.  Thank you.
25         Now, Zack, do you have any more tabs?

Page 1580

1         MR. FASMAN:  I was reading.  I'm trying
2  to figure that out, Judge.  I got -- I have one on
3  mitigation, but I'm not sure why I put it there.  I
4  think it's okay.  Todd, do you want to see to this?
5         MR. DUFFIELD:  Sure.  The charge that we
6  propose on alternative employment, that he has a duty
7  to seek -- to secure alternative employment, page 24,
8  and it's charge number 17.
9         The crux is that if jury finds Mr.
10  Castelluccio did not conduct a reasonable job search
11  or conduct a search and did not go to all lengths
12  reasonably calculated to lead to a secure a new job,
13  then they must deny him recovery for those damages
14  that he could have avoided if he had gone to the
15  appropriate lengths.
16         THE COURT:  And you propose to --
17         MR. FASMAN:  Well, you have a sentence in
18  this on --
19         MR. CARTA:  I think that's covered.
20         MR. FASMAN:  -- page 13, that says "This
21  includes the obligation to seek and accept other
22  suitable positions which may have been available and
23  which, using reasonable efforts, he could have
24  discovered."
25         Is there some phrase you would add to

Page 1581

1  that?  I'm fine with that sentence.  That's why I was
2  trying to figure out why I had the flag there.
3         MR. DUFFIELD:  Maybe I read through this
4  too quickly, maybe.  This might cover it.
5         MR. FASMAN:  Yeah, I think we're fine
6  with that, Judge.  I think let's -- we'll withdraw
7  that.  That's fine.
8         MR. CARTA:  Did we have a discussion
9  about the word "suitable"?
10         MS. TRIOLO:  I don't think so.
11         MR. CARTA:  I think you mentioned you
12  wanted to clarify that.
13         MS. TRIOLO:  "To the extent the plaintiff
14  is not required to accept a position that's not
15  comparable to his current position or to accept a
16  demotion," so we just wanted to make sure that that
17  was clear.
18         I mean, you know, we've heard a lot of
19  evidence about Band 10 positions, and we feel that the
20  jury might imply that he was obligated to take that if
21  it were available to him, but the law on mitigation is
22  otherwise, it is not obligated to accept, or accept a
23  lower less suitable position or something that's a
24  demotion.
25         THE COURT:  Do you have alternative

Page 1582

1  phraseology?
2          MS. TRIOLO:  Well, we could add language
3  that says that the plaintiff is not required to accept
4  a position -- I can pull it from the case.
5          THE COURT:  This man was desperate.
6          MR. CARTA:  Sure was.
7          THE COURT:  This man was -- he was
8  willing to go to Manila.  Manila is noted for a lot of
9  things, one of which is spiders that are about this
10  big, so when we go to Japan, spend a few days in
11  Manila, forget it.
12          MR. FASMAN:  I've been there.  Birds
13  birds birds.
14          MS. TRIOLO:  Your Honor, Brewer proposes
15  along these lines, the Sharkey case, the language that
16  talks about the plaintiff's obligation with regard to
17  alternate positions.
18          MR. FASMAN:  Going into another line of
19  work.  I think the "suitable positions" is fine.  I
20  mean you could argue it.  You could stand up and say
21  the law is that he's not required to go into an
22  alternative form of work, et cetera.  Suitable seems
23  to me to get there for both of us.
24          THE COURT:  You know, that's interesting.
25  I mean I have no problem with that, but there are a

Page 1583

1  lot of people out there who are unemployed, and who
2  would take anything to bring a paycheck home, to feed
3  the kids, to pay the mortgage, and they would happily
4  take a job that's demeaning.  Now, do you want to have
5  your client saying, you know, I want a comparable job,
6  but I don't want to do anything demeaning?  Do you
7  want to have demeaning come out of his mouth?  I mean
8  nobody -- that didn't come up at all.
9          MS. TRIOLO:  No.
10          THE COURT:  I mean you see them on --
11          MR. FOX:  I'm a Band 10.  Whether this is
12  demeaning I don't know, but I think not.
13          THE COURT:  Look, I heard Mr. Crawford
14  say that a Band 10 tops out at 350, 385.
15          MR. DUFFIELD:  395.
16          MR. FASMAN:  That was Mr. Holmes.  That's
17  the point.  I mean, you know, we can argue about
18  whether it's suitable, but I don't want to get into,
19  well, this is a demotion.  It is what it is.
20          MR. CARTA:  I mean I hear the wisdom of
21  what the Judge is suggesting, which is that it could
22  be a double-edged sword, and I probably wouldn't be
23  concerned about it, but for the fact that there was so
24  much stress on the idea that he should consider a 10
25  position.  I mean I think the jurors need to

Page 1584

1  understand a little bit more about what the court --
2  what the Second Circuit has defined as a suitable
3  position.
4          THE COURT:  Why don't we take "demeaning"
5  out of there.
6          MR. CARTA:  That's what we're trying to
7  write right now, and Margaret could read it to you in
8  a second.
9          MS. TRIOLO:  I'm wondering whether --
10  "Plaintiff need not accept employment that is not
11  comparable to his previous position."  We can keep it
12  at that or --
13          THE COURT:  What about "reasonably
14  comparable"?
15          MR. CARTA:  I think that's even simpler.
16  Read that again.
17          MS. TRIOLO:  "Plaintiff need not accept
18  employment that is not comparable to his previous
19  position."
20          MR. FASMAN:  I'd like "reasonably
21  comparable."
22          MS. TRIOLO:  The case law says "not
23  comparable," but --
24          MR. CARTA:  Listen, the jury's not going
25  to distinguish the difference between reasonably

Page 1585

1  comparable and comparable.  I think reasonably
2  comparable is a fair compromise.  I think that's fine.
3          MR. FASMAN:  But this would be in
4  addition to this sentence, right?
5          MS. TRIOLO:  Yes.  So we could put it
6  right before "unlike" -- I'm not going to have the
7  right page.
8          MR. FASMAN:  13, right above the bold
9  "defendant's burden," there's a sentence that begins
10  with "unlike."  So before that.  So let's see what we
11  have here.  "This includes the obligation to seek and
12  accept other suitable positions which may have been
13  available and which, using reasonable efforts, he
14  could have discovered," and then we would insert --
15  void the word "unlike."
16          MS. TRIOLO:  "Plaintiff need not accept."
17          THE COURT:  It should say "A plaintiff
18  need not accept.
19          MS. TRIOLO:  "Employment that is not
20  reasonably comparable to his previous position."
21          THE COURT:  So that gives you the
22  alternative employment instruction, and we've got a
23  few tweaks here to make it more palatable.
24          MR. CARTA:  Your Honor, I have one more
25  issue to raise, and it's a difficult issue.  Counsel

Page 1586

1    and I really have worked to try to get this resolved.
2    It has to do with the deductibility of pensions.
3            And ultimately it comes down to a
4    question, I think, of who has the burden of proof. I
5    have seen cases go both ways on whether pension should
6    be deducted. I think that the authority in the Second
7    Circuit does lean towards having them be deducted, but
8    if you read those cases, what you see is that what
9    they're deducting is the incremental benefit -- I
10   think that's the word -- benefit to the employer -- to
11   the employee by virtue of the fact that they're let go
12   earlier.
13           So that there's some delta, there's some
14   difference between what they would have got had they
15   worked to the end and what they actually got, and
16   that's sort of considered a windfall, because why
17   should they get more than they otherwise would have,
18   and it's that delta, that difference that's deducted.
19           In this particular case there isn't any
20   evidence of the delta. I can explain the practical
21   reason for that, is because we couldn't find that out.
22   I'm not blaming anybody for it, but we couldn't find
23   that out. That's information that's uniquely within
24   IBM's scope of knowledge.
25           And I think what we're talking about is a

Page 1587

1    mitigating factor, in the same way that they just put
2    on the testimony of Dr. Sodikoff, which is that money
3    should be deducted because he didn't work hard enough
4    to find a job, this is a mitigating factor. It's a
5    setoff. It's he lost X dollars but there's a setoff
6    of Y dollars.
7            And my sense is that the burden is on the
8    Defendant to establish what those Y dollars are. I
9    will be completely honest with you, and I explained
10   this to counsel, I haven't found any law that says
11   that. Every case that I read -- and I was up very
12   late one night reading everything I could put my hands
13   on -- says -- just says there was a difference -- it
14   says there's a difference between what the person got
15   and what they would have gotten, and we're going to
16   deduct that. It doesn't say who put that evidence in.
17           So I can't represent to the Court that
18   yes, here's a case that says that it's their burden,
19   but it seems to me extremely logical that if it's an
20   element of a setoff, that -- I'm not even sure it was
21   pled, to tell you the truth. We looked through the
22   special defenses, and although there were, I don't
23   know, 23 special defenses, or something, I didn't see
24   anything like that. But regardless, assuming it was
25   pled, I do think the burden is on them.

Page 1588

1            So I mean, I have an alternate suggestion
2    in terms of how to phrase this, but I do think it's
3    not a question of word-smithing. It's really a
4    question of law. And I wish I had a more decisive
5    authority I could point the Court to, but I've given
6    you what I think is the correct position.
7            MR. FASMAN: Your Honor, if I may, the
8    cases that we sent to you say very clearly that if you
9    are terminated and you receive back pay, pensions come
10   off, because you can't work and receive a pension. It
11   doesn't make the employee whole, it's a double-dip.
12   That's very clear.
13           What Mr. Carta talking about is something
14   entirely different, and it's not a setoff. We don't
15   have to prove it. It's just logical. Economic
16   damages don't include money he wouldn't have gotten,
17   just as, you know, alternative employment, if he went
18   out and worked somewhere else, you take that off, too.
19           MR. CARTA: But there's no -- I'm sorry,
20   Zack.
21           MR. FASMAN: But there's, you know, the
22   second question that Mr. Carta raised that we haven't
23   been able to agree on is something slightly different,
24   which is, what if he had continued in employment until
25   65 or 66, whether his pension would be higher, and

Page 1589

1    that's a different question. That's a question that I
2    think is a damage question. That's like saying he
3    would have gotten extra fringe benefits, he would have
4    gotten another three weeks of vacation, or what have
5    you, or he would have gotten some more money. That's
6    a damage issue. And Dr. Crakes even testified that he
7    didn't calculate that. But that's something that was,
8    it seems to me, that had to be pled and proven as to
9    this being uniquely in IBM's knowledge.
10           I went back and -- you're more than
11   welcome to these. I have a 30(b)6 notice from Ms.
12   Sherman that has ten paragraphs, none about pensions.
13   And we had multiple 30(b)6 depositions. I have a 65
14   page or a 68 paragraph request for production of
15   documents. We produced a hundred some thousand pages
16   of documents. I mean this isn't uniquely in our
17   bailiwick. He could have asked for them along with
18   everything else. I mean you got the kitchen sink. So
19   that's our position on this, Judge.
20           THE COURT: Well, you know what I'm
21   thinking. First of all, do I know the answer? No, I
22   don't. But what I think we're doing is on this
23   particular facet of the issue, I think we're drifting
24   into equity. I mean we've got questions of law that
25   have to be decided, but, you know, what is a setoff?

Page 1590

1  Is a setoff an action in law, or is it an order by the
2  Court to disgorge, or is this something that could be
3  handled by the Court post verdict? That's question
4  number one.
5          Question number two, is this something
6  that could be answered by a -- could be resolved by
7  asking a question, a written question of the jury, on
8  the verdict form?
9          MR. CARTA: I think that's what actually
10 helps me understand that there was this difference of
11 opinion. Is that the Hagelthorn?
12         THE LAW CLERK: It's Sharkey.
13         MR. FASMAN: What is Sharkey saying?
14         THE LAW CLERK: I believe it says that --
15 you know, I'll give everybody copies, although now I
16 don't have a copy, but the highlighted, I think on the
17 left column may answer the Judge's first question.
18         THE COURT: Yeah, it's appropriate for a
19 jury.
20         MR. FASMAN: Well, that's right. I think
21 that's, you know -- I mean I think the law is
22 that pension benefits received ought to be deducted,
23 and if there's proof of lost pension benefits, and
24 there isn't in this case, because your guy didn't
25 calculate them, then he can't recover them. I mean I

Page 1591

1  think it's very simple. I think that's what Sharkey
2  says, actually.
3          MR. CARTA: It doesn't address the legal
4  issue. It talks about the fact that it might in some
5  instances be handled by handing it to the jury.
6          Judge, I mean I think your suggestion
7  makes some sense. Rather than telling the jurors
8  point blank that they have to deduct the amount of the
9  pension, it sounds to me like that's a legal issue and
10 we can brief it, and who has the burden.
11         MR. FASMAN: I think that's contrary to
12 Second Circuit.
13         THE COURT: Again, we want to finish this
14 case. I mean much as I like you guys, son of a gun,
15 you know, I had not read this, I had not read this and
16 I -- oh, Sharkey.
17         MR. CARTA: I mean the testimony, I
18 believe, of the expert, and what my client has told
19 me, is that there is a loss to him by virtue of the
20 fact that the payments he received when he was fired
21 are less per month, per year, than if he had worked to
22 the end.
23         MR. FASMAN: What your expert testified
24 to, here's his transcript, he said -- I asked him,
25 "You couldn't receive wages and pensions from the same

Page 1592

1  employer, right, at the same time?" And he said,
2  "Well, no, not from the same employer, but I did not
3  calculate the value of any reduced pension benefit
4  that Mr. Castelluccio experienced because of his
5  earlier retirement. The pension benefit that he would
6  have received at age 66 is greater than what he would
7  have received at age 61."
8          He said he didn't calculate it. And then
9  in my typical fashion I said, "Can you try to answer
10 my question?"
11         But I mean, he said he didn't calculate
12 it.
13         MR. CARTA: But he also said he believed
14 it was greater. That's the only testimony in the
15 record, is that he believed it was greater, which is
16 what I understand as well.
17         MR. FASMAN: The pension benefit, yeah,
18 well, if he worked to age 66. My answer to that is, I
19 would presume under a pension plan if he had another
20 five years in different stuff he might get another
21 benefit, but you didn't plead it, he didn't prove it.
22         THE COURT: Given this record you could
23 not say for certain whether the jury did or did not
24 include the value of Sharkey's lost pension benefits
25 in making its award. Was there any evidence

Page 1593

1  introduced by either side of the value of Sharkey's
2  lost pension benefits? I don't recall any.
3          MR. CARTA: No, there wasn't, because,
4  again, my belief is that that's a setoff that has to
5  be established by IBM. I mean they chose not to call
6  an economist. I still don't understand that, but that
7  was their choice. I mean they could have called an
8  economist to offer contrary opinion to our economist,
9  but it's not our economist's job to prove what setoffs
10 were possible.
11         THE COURT: Okay. The Court goes on, "On
12 remand the district court should make a determination
13 whether the jury's award included the value of lost
14 pension benefits."
15         Can we solve this by asking a simple
16 question on the verdict form, in an appropriate place,
17 does this award include the value of lost pension
18 benefits? Yes, no. No.
19         MR. FASMAN: Don't do that. One, it's
20 confusing, but second of all, it needed to be -- there
21 needed to be evidence on that, and there was no
22 evidence presented on that by their expert. We were
23 not required to present evidence of his lost fringe
24 benefits. I mean that's throwing it entirely on us.
25 I mean I didn't prove lost wages, lost anything. I

Page 1594

1  don't have to do that. And then, I mean, if you don't
2  plead it, you don't prove it, your expert doesn't
3  testify on it -- he had ample opportunity to do
4  that -- then it shouldn't go to the jury.
5       But the pension benefits should be
6  deducted on a double-dip theory, and we ought to tell
7  the jury that. We should deduct -- from any award you
8  should deduct the pension benefits that he received.
9  That's all. That's a separate question from the
10  lost --
11       MR. DUFFIELD: It's two separate issues.
12  One issue is does the value of the pension that he
13  did, in fact, receive get deducted from any back pay
14  award, and I think both parties agree that it does.
15  The issue is, the second issue, which is, if he would
16  have received more pension benefit because he had
17  stayed working for five or six years, what's the value
18  of that difference, and should he get a credit for
19  that difference, because he didn't receive it, and
20  that I think is your burden to prove if you claim
21  that's part of his damages, that he should have gotten
22  a greater pension that he did, in fact, receive,
23  that's your burden to prove what that difference is.
24       MR. FASMAN: I agree with that.
25       MR. DUFFIELD: The evidence of pension is

Page 1595

1  Mr. Castelluccio testified that he's receiving $78,000
2  a year.
3       MR. CARTA: And I think you crossed Dr.
4  Crakes on an earlier calculation of his pension, and
5  put in a number of the total amount of pension. I
6  mean --
7       MR. DUFFIELD: Correct.
8       MR. CARTA: You did cross that issue, and
9  didn't get into the question of whether that was the
10  total incremental increase or whether that was just
11  the total amount.
12       MR. FASMAN: I just took his calculation,
13  which did not include -- in any of his studies he
14  didn't calculate lost pension benefits. He didn't try
15  to do it. That's -- if -- I mean I can't disprove --
16  I'm not going to go out and disprove when the --
17       MR. DUFFIELD: Fringe benefits.
18       MR. CARTA: I think it's set off.
19       THE COURT: There was no evidence of
20  that, of the amount of lost pension benefits
21  introduced.
22       MR. FASMAN: No, correct.
23       THE COURT: So a question to the jury is
24  really unfair, because they don't have any evidence
25  that they could have considered. It would be

Page 1596

1  confusing to them.
2       MR. CARTA: I agree.
3       THE COURT: Can we deal with this on a --
4  can we deal with this on a post verdict basis? I mean
5  it makes sense for us to deal with this on a post
6  verdict basis, because there might be a Defendant's
7  verdict, in which case we don't have to deal with it
8  at all. If there's a Plaintiff's verdict, then by
9  agreement the Court is -- you are allowing the Court
10  rather than a jury to resolve this, which Sharkey
11  seems to say is okay.
12       MR. CARTA: I think it's --
13       MR. DUFFIELD: If you play that out,
14  though, this is what's going to happen. They get a
15  Plaintiff's verdict for X amount of dollars, and then
16  you're going to have us brief the issue of what the
17  difference in the pension is, so we're having to brief
18  that he should get more money because he would have
19  gotten higher pension. That doesn't make sense. Why
20  would we be arguing that he should get more money? It
21  should be their burden to prove it. If it's their
22  burden, they should have done it during the case, and
23  they didn't present evidence on it. They shouldn't
24  get a second crack on it.
25       MR. FASMAN: That's how I come out on it.

Page 1597

1  I think the overall question on pension deduction is
2  one that's very clear and that we should go forward
3  with, tell the jury, you know, you should deduct the
4  pension benefits, and then maybe Your Honor is right,
5  maybe we should meet -- we should see and then try to
6  resolve it. If you think that that's the law, we'll
7  brief that -- even though there's no proof in the
8  record -- I mean I think the right result is to say
9  there's no proof in the record, shouldn't go anywhere.
10       MR. CARTA: I'm not suggesting open up
11  the record because I absolutely agree that it's done,
12  we've been there. But I think there is this issue,
13  and Sharkey seems to suggest that, in fact, it is an
14  issue the Court can deal with, and I always think it
15  make sense not to jump hurdles that you don't need to
16  jump.
17       MR. DUFFIELD: So I'm still struggling
18  what's going to happen post verdict. We're going to
19  brief the issue of whose burden it is, and if the
20  Judge finds that it was our burden --
21       MR. CARTA: Yes.
22       MR. DUFFIELD: -- then what happens? We
23  didn't present evidence on it, so how does it affect
24  the verdict?
25       MR. CARTA: Then if the jury awarded the

Page 1598

```
1    pension, then he's entitled to keep it.  If it turns
2    out that it was our burden, then the Judge would
3    deduct it.
4           MR. FASMAN:  No, no.
5           MR. DUFFIELD:  So if you deduct the full
6    78,000 now even the incremental would have been only
7    $3,000, possibly, each year?  That seems like a pretty
8    big hammer from such a little issue.
9           THE COURT:  If we just avoid mentioning
10   this to the jury, we got a 50/50 chance that
11   everything's going to be all right, because --
12          MR. FOX:  All right for some, depending
13   on which side of the table you're sitting on.
14          THE COURT:  It's only if we have a
15   Plaintiff's verdict that we've got to take and get
16   into this.  And I mean how can we ask the jury if they
17   have subtracted Plaintiff's benefit when all of us
18   here acknowledge that there was no evidence of
19   Plaintiff's benefit, pension benefits introduced?
20          MR. DUFFIELD:  There was evidence of the
21   Plaintiff's pension benefits.
22          THE COURT:  Okay.  What benefits are you
23   talking about deducting.
24          THE LAW CLERK:  The delta.
25          MR. DUFFIELD:  The delta.
```

Page 1599

```
1           MR. FASMAN:  I think the law is clear,
2    you got to take off his pension benefits from any back
3    pay award.  You can't double-dip.  And that was
4    78,000.
5           THE COURT:  That was the amount, 78,000?
6           MR. DUFFIELD:  That's what Mr.
7    Castelluccio testified to.
8           MR. CARTA:  I'm sorry, my mind wandered
9    for a second.  What did you say?
10          MR. DUFFIELD:  Mr. Castelluccio testified
11   that the pension benefit he has been receiving is
12   $78,000 a year.
13          MR. CARTA:  Yes, right.
14          THE COURT:  Every year.
15          MR. DUFFIELD:  Correct, since he retired,
16   June of --
17          THE COURT:  And it's your position that's
18   what he's going to get forever.
19          MR. FASMAN:  Sure.
20          THE COURT:  And there's no delta.
21          MR. FASMAN:  Well, the only delta would
22   come if the Plaintiffs prevail and the jury were to
23   find that he should have been employed to age 65 or
24   66, whenever it was that he was going to retire.  Then
25   presumably under our plan by working that extra period
```

Page 1600

```
1    of time he would be entitled to some increment in his
2    pension benefit.  That's all we're talking about, and
3    that's what -- that's where the disagreement is.
4           MR. FOX:  There's no evidence that that
5    is actually the case under our plans before the Court.
6           MR. FASMAN:  Correct, and there's no
7    evidence that that is the case.  That was my whole
8    point.  That Dr. Crakes didn't calculate that.  It's
9    not -- I mean if there's no evidence, it's not our
10   burden.  Mr. Carta wants to say it's our burden on
11   some setoff theory, but the fact is, the guy was
12   receiving and has been receiving 78 grand a year and
13   will forever.
14          MR. CARTA:  Let's step back.  I didn't
15   put on any evidence of his pension benefits in Dr.
16   Crakes's testimony, right?  I mean that was not part
17   of my case.  You brought that up as a mitigating
18   factor as a setoff.  And my feeling is that that was
19   your obligation to go forward on that.
20          MR. FASMAN:  And I proved that he was
21   getting, by his own admission, $78,000 a year.  Crakes
22   took that off in his prior study.  And I think the law
23   is clear from the cases that we provided to the Court
24   that if you're getting -- you can't both work and be
25   retired, and if you're going to give him back wages,
```

Page 1601

```
1    deductions from the back wages include pension
2    benefits he wouldn't have gotten otherwise.  I think
3    the rest is all double-dipping.
4           MR. CARTA:  Again, just to repeat
5    myself --
6           MR. FASMAN:  He can't keep his pension
7    benefits and get $300,000 a year in lost wages.  That
8    basically says all right, so we're going to gift you
9    300 grand and you can keep the pension benefit, it's
10   380, but --
11          MR. CARTA:  The pension benefits is
12   something he earned.  I mean he worked there for 40
13   years.  That's something he earned totally
14   independently.  And again, I think you're right, not
15   that all pensions get deducted, but that the
16   difference between what he would have gotten and what
17   he ultimately got, that's what's deductible.
18          MR. FASMAN:  That's not that the law
19   says.
20          MR. DUFFIELD:  That's not what the law
21   says.
22          MR. FASMAN:  That's not what the cases
23   say.
24          MR. CARTA:  Hagelthorn.
25          MS. TRIOLO:  Hagelthorn.
```

Page 1602

1    MR. CARTA: Hagelthorn is the Second
2    Circuit case that discusses this, and the Court may
3    remember it was a lump sum payment that the person
4    received and the Court said, well, he got a lump sum
5    payment of X plus Y dollars because he was forced out
6    sooner, he would have only got Y dollars if he had
7    gone to the end, and therefore the delta is what's
8    deductible. And the case is very clear on it. It's
9    just the delta that gets deducted, not the whole
10   pension. And I've seen other cases cite that decision
11   as if it were all the pension, I've seen those cases,
12   but the law --
13       MR. FASMAN: Wait, this is just not
14   right. This has been the law in the Second Circuit
15   forever.
16       MR. CARTA: Read the case.
17       MR. FASMAN: Whittlesea versus Union
18   Carbide. It's always the same. Pensions are deducted
19   from back pay awards because otherwise it's
20   double-dipping. I mean I, you know, I wrote a brief
21   memo like a page memo and I Xeroxed the cases for the
22   Court. I mean they're very, very clear. The Second
23   Circuit -- even Mr. Carta said, well, I admit that the
24   law in this Circuit tends towards that. It doesn't
25   tend toward that. It is -- that's the law in this

Page 1603

1    Circuit, you deduct pensions. There are other
2    circumstance that do other things, but the law here is
3    very clear.
4        THE COURT: Well, that's my understanding
5    of the law, in this Circuit, and I think there's a
6    common sense rationale behind it.
7        Jake and Mike, have you read these
8    cases --
9        THE LAW CLERK: Yes.
10       THE COURT: -- that Zack is talking
11   about?
12       THE LAW CLERK: Yes. My understanding
13   was -- I have not read Hagelthorn, and I'm happy to
14   get you a copy, Judge, if you want to.
15       MR. CARTA: I would ask for that, because
16   I think that is the leading case, and I think that
17   case makes it most clear that it's the difference,
18   it's the difference that is deductible, it's not the
19   entire pension.
20       MR. FASMAN: Can we get a copy of it?
21   H-E-G-E-L-T-H-O-R-N, I believe.
22       THE LAW CLERK: Second Circuit.
23       MR. CARTA: Wait a second.
24       MS. TRIOLO: Do you have a copy?
25       MR. CARTA: Yes.

Page 1604

1        THE LAW CLERK: I can make copies if it's
2    easier.
3        MR. FASMAN: Just give us the cite, we'll
4    get copies.
5        MR. CARTA: It's 710, F2d, 76.
6        MR. FASMAN: What's the date?
7        MR. CARTA: 1983, Second Circuit.
8    Hagelthorn versus Kennecott Corporation.
9        THE COURT: Who ordered it?
10       MR. CARTA: Judge Lumbard.
11       MR. FOX: Judge, we're talking about two
12   facets. We're talking about whether or not we get to
13   offset the pension that was paid to him, and whether
14   or not the amount that he would have gotten had he
15   stayed employed should be deducted from that. But in
16   this case, although we are -- we've been discussing
17   this under the assumption that had he stayed until 65
18   he would have gotten more, there is no evidence in the
19   record to that effect regarding IBM's pension plan.
20   So we are operating under an assumption that he would
21   have gotten more, and it's very likely, we're all
22   familiar with it, we assume that's the case, but
23   there's no evidence in the record as to what IBM's
24   pension plan was and that he would have gotten more,
25   nor is there any evidence as to what that amount would

Page 1605

1    be. So it's two --
2        THE COURT: What you just said is true.
3    I mean I find that that is true. Where does that take
4    us?
5        MR. FOX: I don't think there's evidence
6    to support subtracting any amount from the pension
7    benefit that has been identified that he received that
8    should be offset against the back pay award.
9        MR. FASMAN: And I have to say I think
10   Mr. Fox is right, this was all -- I mean it's not as
11   if we were stingy in our discovery. Plaintiff had
12   ample opportunity to prove this. They had an expert.
13   If the expert wanted to prove this he had ample
14   opportunity.
15       MR. FOX: The place to start looking is
16   our pension documents and what does the plan provide
17   and payout offerings. That stuff is available to
18   employees. He could have called the service there and
19   gotten that.
20       MR. CARTA: Your Honor, again, I don't
21   think that that's the point. I mean we're repeating
22   our positions, and I don't know that that advances the
23   ball in particular, but --
24       MR. FASMAN: That's the cases I cited.
25   They're not all from '83. I don't have it all in

Page 1606

1  front of me, but they're not all after '83, but there
2  are certainly a number of them after '83.
3          MR. CARTA:  Your Honor, the discussion
4  appears starting on the bottom of page 8, I believe.
5          MR. FASMAN:  Can we get a copy of that
6  before -- the Judge doesn't have it.
7          THE COURT:  Where is that?
8          MR. CARTA:  Starts under the heading of
9  "setoff," it goes up.
10         THE COURT:  Okay, I've got it right here.
11  I think Mike is making copies for you right now, and
12  I'm just going to --
13         MR. CARTA:  May I be excused for a
14  second?
15         THE COURT:  Sure.
16         MS. TRIOLO:  Can I ask two things that
17  are easy things?
18         THE COURT:  So we have evidence in the
19  record that he received $73,000 a year in his pension?
20         MR. FASMAN:  $78,000.  Every year it's
21  been the same.  It's constant.
22         MR. FASMAN:  That's what he testified.
23         MR. CARTA:  And the testimony of the
24  expert who said that he believes it would have been --
25  he would be receiving more than that in an annual

Page 1607

1  basis if he had worked until the end of his 65th year.
2          MR. FOX:  That was not specific to the
3  IBM pension plan, which he didn't review in making his
4  calculation.
5          MR. FASMAN:  Right.  He said it was
6  speculation, and he said "I didn't calculate this."
7  What he said was "I didn't calculate this."  It was a
8  parenthetical, "I also did not calculate the value of
9  any reduced pension benefit that Mr. Castelluccio has
10  experienced because of his earlier retirement.  The
11  pension benefit that he would have received at age 66
12  is greater than what he would have received at age
13  61."  But he never got the pension plan.  He never did
14  any of this.
15         MR. CARTA:  But he did testify that not
16  any pension plan, but specifically his belief was that
17  IBM's pension plan.  I mean that's what I heard you
18  just say.
19         MR. FASMAN:  I will read it again.  "I
20  also did not calculate the value of any reduced
21  pension plan that Mr. Castelluccio has experienced
22  because of his earlier retirement, the pension benefit
23  that he would have received at age 66 is greater than
24  what he actually received at age 61."  But there's no
25  evidence --

Page 1608

1          MR. CARTA:  I'm not saying he calculated
2  it.  I never said that.
3          MR. FASMAN:  But there's no evidence that
4  he reviewed the pension plan.  He admitted he did not.
5  He admitted he made no inquiry.  You didn't get the
6  pension plan to him.  There's no evidence on this.  He
7  never inquired about on it, and he never calculated
8  it.
9          MR. CARTA:  Again, we're just repeating
10  positions, but I think that's a setoff, and I think
11  the burden is on IBM to establish what should be set
12  off against damages.  I mean it would be like if I
13  didn't put in any evidence on the pension, you could
14  say the whole calculation should be thrown out.
15  That's not my burden to establish setoffs, and you're
16  claiming the pension is a setoff.
17         MR. FOX:  If you didn't put in evidence
18  on another element of damages, then it wouldn't be.
19  That's an element of damages that we're talking about.
20         MR. CARTA:  No, it's a setoff.
21         MR. FASMAN:  He's calling it a setoff.
22         MR. DUFFIELD:  But you're relying on the
23  Hagelthorn case for your position that it's our burden
24  to prove the setoff.
25         MR. CARTA:  I am not, no.  I think I said

Page 1609

1  before I haven't found anything that addresses this.
2  I think I said that before.
3          MR. FASMAN:  And what's very clear,
4  crystal clear from these cases, it would have to be
5  deducted.
6          MR. DUFFIELD:  Because in Hagelthorn the
7  issue was that the lump sum payment resulted in him
8  getting more pension had he stayed, so there the
9  company was arguing that he had been paid more, so
10  there would be a setoff, because they were asking for
11  money back, which is the opposite of what you're
12  saying.  You're saying he should be getting more money
13  because he would have earned more.
14         MR. CARTA:  I'm saying that the setoff
15  should be less than the full amount that you've asked
16  to be set off, and that the --
17         MR. FASMAN:  We did not ask for anything
18  to be set off.  It's a matter of law in this Circuit,
19  pension benefits come off of back pay.  It's not a
20  setoff.  And it doesn't matter if we had the burden or
21  not the burden.  The record's clear that he's
22  receiving a pension benefit of $78,000 a year.  He
23  can't double-dip and take them both, if he wins.
24         MR. CARTA:  I don't see it as
25  double-dipping.  It is what he was entitled to.  And

Page 1610

1    again, Hagelthorn makes it clear that it's not all --
2    it's whatever incremental benefit he got.
3         MR. FASMAN: This is a totally unique
4    situation with a lump sum payment. That's not this
5    one.
6         MR. CARTA: I think that makes it more
7    clear what the difference is, is what's being
8    deducted. That's where he has a right to set off for.
9         MR. DUFFIELD: But you agree that he
10   wouldn't have been entitled to that $78,000 for the
11   last four years if he was still working at IBM,
12   correct?
13        MR. CARTA: Correct.
14        MR. FASMAN: Right, so --
15        MR. CARTA: But when he did retire he
16   then would have been entitled to more than the 78.
17        MR. FASMAN: How do you know?
18        MR. FOX: That's the assumption, but
19   there's no evidence of that.
20        MR. FASMAN: How do you know? You don't
21   know.
22        MR. CARTA: That's what my client has
23   told me, and I don't recall what investigation Dr.
24   Crakes did into that, I really don't recall, but I
25   do --

Page 1611

1         MR. FASMAN: He did none that I can tell.
2    He did absolutely none. He took what you provided to
3    him and made --
4         MR. CARTA: We're dodging the issue. I
5    think you know that it's true that if you retire later
6    you get more on a monthly basis.
7         MR. FOX: I have not read the pension
8    plan. I would think that would be the case, but I
9    have not read it, because IBM's pension eligibility is
10   a matter of years of service with IBM, and age.
11        MR. CARTA: Right.
12        MR. FOX: And I don't know if that tops
13   out at some point. I don't know how that would impact
14   the pension payment. He started working at IBM at a
15   very young age. He had a lot of time served.
16        MR. CARTA: Sure, yes.
17        MR. FOX: So I don't know if at some
18   point it tops out as to what the benefit will be. I
19   don't know the plan.
20        MR. CARTA: That's fair. Again, I think,
21   since we don't know, I think the easiest thing to do
22   is just let the Court address this after we've got a
23   jury verdict and move forward.
24        MR. FASMAN: Not without an instruction
25   that tells the jury that they've got to deduct the

Page 1612

1    pension from the back pay award. That's the law in
2    this Circuit.
3         THE COURT: Well, I don't think that this
4    decision is particularly illuminating. I mean it
5    leaves us with Judge Lumbard dealing with rulings and
6    orders and a judgment entered by Judge Kerse after the
7    jury came in.
8         The way I look at this, this is a legal
9    issue that I think we are wasting our time trying to
10   settle in the abstract. There's a 50/50 chance that
11   we won't have to address this at all. For me to give
12   the charge as it stands, is -- unfortunately that
13   leaves us in a position where we have an award, and we
14   really don't know whether the $73,000 going forward
15   and back is included in that award.
16        MR. FASMAN: We've actually -- I think
17   the answer is that we would know if we instructed them
18   as Your Honor's instructs, say these deductions
19   include pension benefits he received from IBM from the
20   date of the termination until the date he would have
21   retired and any wages you find he would have received
22   from other employment. I think that's your charge. I
23   think that's right.
24        MR. DUFFIELD: Page 13 of your charge.
25        MR. FASMAN: That's your charge, and

Page 1613

1    that's what --
2         THE COURT: I know what I say in my
3    charge. Should it be in my charge? You know, I think
4    it has to be, because that would leave us in a
5    position of, you know, we'd be totally in the dark.
6    If it's wrong, you will by then have had an
7    opportunity to solve the issue with respect to the
8    supplemental --
9         MR. DUFFIELD: Incremental difference.
10        THE COURT: Yes, the increases alleged,
11   if there would be an increase, we don't know that.
12        MR. FASMAN: We don't know that.
13        THE COURT: Okay. I'm satisfied with my
14   charge.
15        MR. CARTA: Your Honor, there are a
16   couple other things that we wanted to take up with you
17   as well. Most of them are fairly minor.
18        MS. TRIOLO: Quick and easy. Bottom of
19   page 12, where Your Honor details the damages,
20   includes base salary, raises, profit sharing. Any
21   objection to adding 401(k), which is in Dr. Crakes's?
22        MR. FASMAN: No.
23        MS. TRIOLO: Okay, so maybe right after
24   bonuses.
25        MR. FOX: 401(k) contribution.

27 (Pages 1610 to 1613)

Page 1614

1    MR. CARTA: Contribution, yes.
2    THE COURT: Okay.
3    MS. TRIOLO: Then on page 13, right above
4 where liquidated damages starts, Todd, you and I had
5 gone back on the verdict form with regard to the
6 burden for mitigation and the two-part analysis that
7 cases give, and the way this stated now is
8 inconsistent with what we have in the verdict form.
9    THE COURT: Inconsistency between the
10 charge and the verdict form.
11    MS. TRIOLO: I'd like it to say -- the
12 cases, Your Honor, are clear that the defendant has a
13 two-part burden in proving mitigation. The first is
14 to show that suitable work existed, and the second is
15 to show that the employee did not make reasonable
16 efforts to obtain it. So we've addressed that in the
17 verdict form by making it a two-step process.
18    You pointed out that case that has an
19 exception, so that if, in fact, the defendant has
20 proven to the jury that the defendant made no efforts,
21 then the defendant does not have to go to the second
22 step to show that there were positions out there, but
23 it is a two-step process, and I think we should be
24 consistent with the verdict form in the charge.
25    MR. DUFFIELD: I don't think this is

Page 1615

1 inconsistent with the verdict form because what he's
2 instructing them is that it's our burden to prove that
3 he failed to mitigate damages.
4    MR. FASMAN: Yes.
5    MR. DUFFIELD: When they get the verdict
6 form it walks them through that two-step process.
7    MS. TRIOLO: They've never been
8 instructed that the defendant needs to establish that
9 suitable work existed and is part of the defendant's
10 burden.
11    MR. FASMAN: That's in the verdict form,
12 isn't it?
13    MR. DUFFIELD: Right.
14    MS. TRIOLO: Why wouldn't they be the
15 same? Why wouldn't the charge be the same as the
16 verdict form? I think we're in agreement that both of
17 those elements are part of the defendant's burden.
18    MR. DUFFIELD: So you want to explain the
19 exception as well?
20    MS. TRIOLO: Well, we can revisit.
21    MR. DUFFIELD: The way the verdict form
22 is written, if they find he didn't exercise, they
23 don't get to the suitable issue. So that means --
24 which is why I think keeping it simple like this and
25 letting them walk through the verdict form is going to

Page 1616

1 be the least confusing for them.
2    MR. FASMAN: I agree.
3    THE COURT: I agree, too.
4    MR. DUFFIELD: Because I think the
5 questions make them do more analysis.
6    MR. CARTA: I think you just resolved
7 that issue. Do you have one more?
8    MS. TRIOLO: Yes.
9    THE LAW CLERK: What just happened?
10    MR. DUFFIELD: No change.
11    THE LAW CLERK: Okay.
12    MS. TRIOLO: So the bottom of page 15.
13 So we're saying for willfulness, "It is not enough for
14 the plaintiff to show that the defendant knew the ADEA
15 existed and might apply to its actions." We agree
16 with that. The last sentence on the bottom of page
17 15, "It is not enough --" sorry, I have the wrong
18 version. It's in liquidated damages, on page 14, and
19 so second to last paragraph.
20    THE COURT: "It is not enough."
21    MS. TRIOLO: There you go. So "It is not
22 enough for the plaintiff to show that defendant knew
23 that the ADEA existed and might apply to its actions,
24 or that it knew it was against the law to discharge an
25 employee because of his age." I think that is enough

Page 1617

1 for willfulness, to show that the defendant knew it
2 was against the law to discharge an employee because
3 of his age.
4    MR. FASMAN: No, this is clear, it's got
5 to be charged. Every employer -- if you were right
6 every employer who said yes, I understand that there
7 was an ADEA, and I understand it was unlawful to
8 terminate someone because of their age, every employer
9 would be engaged in a willful violation. That's never
10 been the law. The law is you have to show that the
11 defendant knew it was violating ADEA or showed
12 reckless disregard.
13    MS. TRIOLO: So how is "knew it was
14 violating the ADEA" different from --
15    MR. FASMAN: It's when an employer says I
16 don't care, I don't care, I don't care, I'm firing
17 you.
18    MS. TRIOLO: That's reckless disregard,
19 right?
20    MR. FASMAN: I'm firing you and I know
21 that I'm the firing you because of your age, and I
22 don't care.
23    MR. DUFFIELD: The difference, Margaret,
24 is this language says that it knew it was against the
25 law, and what is required is that they knew it was

Page 1618

1   against the law and they knew that they were violating
2   the law.
3            MR. FASMAN:  Right, it's a two --
4            MS. TRIOLO:  Okay, I'm with you, okay.
5            THE COURT:  It's the willful.
6            MR. FASMAN:  It doesn't prove willfulness
7   because IBM knows it's against the law to fire
8   somebody because of their age.
9            THE COURT:  So we got an agreement on
10  this jury charge subject to the things that --
11           THE LAW CLERK:  Could I ask one question?
12  There was a 401(k) reference on page 13.  Can you tell
13  me exactly if -- I'm sorry, 12 -- exactly where it's
14  going to fit?
15           MR. DUFFIELD:  After "bonuses," so any
16  pay raises, profit sharing 401(k) contributions.
17           THE LAW CLERK:  Gotcha.
18           THE COURT:  You got your changes on your
19  thing?
20           THE LAW CLERK:  Yes.
21           THE COURT:  You can go -- one of you
22  should do it, not two.  You should go by what you have
23  on your paper, but you should then go through what I
24  have in my paper.  To the extent there's any
25  differences you use my language, because we've kind of

Page 1619

1   hammered while you guys were out of the room, modified
2   sentences and had dangling modifiers, participles.
3   Okay.  So take this.
4            THE LAW CLERK:  Now we have the verdict
5   form to go through.
6            MR. FASMAN:  I think we got this.
7            MS. TRIOLO:  We probably are there, only
8   one issue.
9            MR. DUFFIELD:  Only one additional issue
10  that you raised, Mike, last night in your e-mail, I
11  think I've got a proposal how to resolve that.
12           THE LAW CLERK:  Did the question make
13  sense that I was posing?
14           MR. DUFFIELD:  I don't think it's as
15  confusing as you did, but we definitely can be
16  clearer.
17           THE LAW CLERK:  We were just talking
18  earlier.
19           MS. TRIOLO:  How am I not getting these
20  e-mails?  I didn't get that one either.
21           MR. DUFFIELD:  You sent us the jury
22  charge last night.
23           MS. TRIOLO:  I saw his to you saying does
24  anyone have the jury charge and yours back to him and
25  then I didn't see -- there was one back again?

Page 1620

1            MR. DUFFIELD:  He did respond back and
2   say he had one concern with the way the jury charge
3   reads, that questions 2 and 5 could be confusing, if
4   they deduct the pension amount, but then later are
5   being asked what amount have we proven should be
6   deducted for the back pay, they may double deduct.  So
7   what I'm going to suggest is for question 5 we add, at
8   the end of it, "as a result of plaintiff's failure to
9   make reasonable efforts to seek employment."
10           THE LAW CLERK:  100 percent what we were
11  just talking about before.
12           MR. DUFFIELD:  So now question 5 when
13  they get it will read "What amount, if any, has IBM
14  proven by a preponderance of the evidence should be
15  deducted from the amount of back pay and benefits owed
16  to Mr. Castelluccio as a result of plaintiff's failure
17  to make reasonable efforts to seek employment."  So as
18  not to have them double count the deduction of the
19  pension benefits he's receiving.
20           MS. TRIOLO:  Okay.
21           THE LAW CLERK:  "As a result of
22  plaintiff's failure to --"
23           MR. DUFFIELD:  Failure to seek -- just
24  employment or alternative employment?  What do you
25  think, Margaret?

Page 1621

1            MS. TRIOLO:  I think employment says it,
2   seek reasonable employment.  Or should it be
3   reasonable efforts?
4            MR. DUFFIELD:  Reasonable efforts.
5            MR. FASMAN:  Because if he, in fact, did
6   get a job at 7-Eleven.
7            THE LAW CLERK:  "As a result of
8   plaintiff's failure to use reasonable efforts."
9            MR. DUFFIELD:  Yes.
10           THE LAW CLERK:  "To use reasonable
11  efforts to seek employment."  And I think that deals
12  with the concern that I had, that I wasn't clear that
13  number 5 did not relate to number 2.
14           MR. FASMAN:  Right.
15           THE LAW CLERK:  In any way.
16           MR. FASMAN:  I think that's right.
17           THE LAW CLERK:  Can I add one more
18  thought?  I have not run this by the Judge, I'm just
19  throwing it out there.  And then I can leave.
20           On question number 2, which is two parts,
21  just the thought of whether you wanted to essentially
22  make it into 2-A and 2-B, essentially asking the jury
23  to show their work.  I don't know if that's helpful or
24  more confusing or any of the above.
25           THE COURT:  Remember algebra?

Page 1622

```
 1          THE LAW CLERK:  Yes.
 2          THE COURT:  Remember sitting next to the
 3    smartest girl in the class?  Remember when the
 4    question was asked --
 5          THE LAW CLERK:  That was me.  Not the
 6    girl.
 7          THE COURT:  The professor always wanted
 8    to see how you balance the equation.  I don't know.
 9          THE LAW CLERK:  The question, it's
10    obviously about whether they're going to take off the
11    money for the pensions, and if we don't know whether
12    they did it or not -- that's one other question, we
13    haven't figured out whether or not they should, it
14    sounds like, but we might well know if they did it, so
15    that if we find out that they shouldn't have, we would
16    at least know that it happened.  That's just one
17    thought on that.  We'll be clear what they did, at
18    least.
19          MR. CARTA:  I understand the point.  It
20    would show better their thinking process.  I don't
21    know whether that's --
22          MS. TRIOLO:  So make this, Do you find it
23    should be deducted, and then what are you deducting?
24          THE LAW CLERK:  Show your math, if you're
25    deducting 78,000, or whatever, per year, which I think
```

Page 1623

```
 1    was something around, I think was 300,000, I think was
 2    testified, somewhere around 300,000, that it would be
 3    obvious that they awarded 1 million for salary, and
 4    took out 300 for the pension benefits already paid by
 5    IBM.  It would be clear that they followed the
 6    instructions to do so.  Whether or not ultimately one
 7    side is right or wrong on whether or not they should
 8    have, we would know what they did, and if they
 9    shouldn't have, we could immediately knock it off and
10    say, you know it was a million.
11          MR. DUFFIELD:  You could just put
12    under -- after the language that's in 2, have
13    subparagraph A that just says "amount of back pay and
14    benefits equals," and then "amount" and a line, and
15    then B, "amount of retirement pay and benefits to be
16    deducted," and a line, and they're going to fill those
17    two numbers in.
18          MR. FASMAN:  That works.
19          THE LAW CLERK:  I wrote A minus B equals
20    C on my.  But I'll defer, obviously, to all the other
21    people in the room.
22          MR. FASMAN:  That's fine.
23          MR. DUFFIELD:  That's fine.
24          MR. CARTA:  That's fine.
25          MR. FASMAN:  It's okay with you, Judge?
```

Page 1624

```
 1          THE CLERK:  Or anybody that would be
 2    INVOLVED IN a post trial brief.
 3          THE COURT:  Whatever you want to do.
 4          MR. DUFFIELD:  I think what you
 5    suggested, Mike, makes sense.
 6          THE COURT:  Okay.  You got that down?
 7          THE LAW CLERK:  Yeah.  And is everybody
 8    okay with the wording that is used in this, if I just
 9    break it up?  Into essentially two parts?
10          MR. FASMAN:  I thought you were going to
11    put --
12          MR. DUFFIELD:  I think you leave the
13    language the way it is.
14          THE LAW CLERK:  Because there is specific
15    language in the paragraph, use those words, break it
16    up into two.
17          MR. FASMAN:  Yes.
18          THE LAW CLERK:  2-A and 2-B, essentially.
19    I can move it around the page and see.  Why don't I do
20    that right now and we'll just --
21          THE COURT:  Do it right now.
22          MR. CARTA:  Your Honor, will we have a
23    chance to grab a quick lunch before we do closings?
24          THE COURT:  Definitely.  I have never put
25    limits on the amount of time for either opening
```

Page 1625

```
 1    statements or closing arguments.  I've never done
 2    that.  Don't think I ever will.  It's funny that the
 3    only time when I have seen closing arguments go just
 4    way over the top is when I'm judging one of these
 5    things at a law school.
 6          MR. FASMAN:  The worst.
 7          MR. CARTA:  Looks fine to me.
 8          MR. DUFFIELD:  It's fine.
 9          THE LAW CLERK:  Maybe subtracting the
10    amount, subtracting the amount listed in 2-B?  From
11    2-A?
12          MR. CARTA:  Right.
13          THE LAW CLERK:  Subtracting the amount
14    listed in 2-A.
15          MR. CARTA:  Identified in.
16          THE LAW CLERK:  Identified in 2.
17          MR. FOX:  You have written in 2-A.
18          THE LAW CLERK:  Subtracting the amount
19    you have written in.
20          MR. DUFFIELD:  2-B from 2-A.
21          THE LAW CLERK:  You have written in 2-B
22    from 2-A.
23          MR. DUFFIELD:  Yes.
24          THE COURT:  Okay.  You going to make that
25    correction?
```

Page 1626

1    THE LAW CLERK:  Yes.
2    THE COURT:  All right.  No need for me to
3  have this.  Make the correction, and this is just --
4    MR. DUFFIELD:  If the jury has already
5  received lunch and is eating, I wonder if we might do
6  a shortened lunch period, get back to them more
7  quickly.
8    MR. CARTA:  45 minutes.
9    THE COURT:  After?
10    MR. FASMAN:  Quarter past two, Judge.
11    THE COURT:  Quarter after 2, that'll be
12  good.
13    (Recess)
14    THE COURT:  Okay, we're ready for closing
15  arrangements, Mr. Carta?
16    MR. CARTA:  Yes, we are, Your Honor.
17    THE COURT:  Good afternoon, ladies and
18  gentlemen of the jury.  I bet you think we forgot you.
19    THE JURORS:  Almost.
20    THE COURT:  We didn't.  We were really,
21  really working, and I think we made a lot of progress.
22  Please sit down.  Did you have a good lunch?
23    THE JURORS:  Excellent, thank you.
24    THE COURT:  We're now at the stage of the
25  trial where the lawyers are going to be making closing

Page 1627

1  arguments.  As is my policy, I do not require lawyers
2  to ask permission to walk around or to walk to the
3  jury box, you may have standing permission to do that, and
4  I really don't have anything more to say except that
5  first Plaintiff's counsel gives his closing argument,
6  then Defense counsel does, and then we go back and
7  Plaintiff's counsel has an opportunity for short
8  rebuttal closing.
9    So without further ado, Mr. Carta, go
10  ahead.
11    MR. CARTA:  First, thanks for your time
12  and attention.  Mr. Castelluccio and I appreciate the
13  personal sacrifice that you've all made to sit through
14  a two-week trial.  It's admirable.  I believe what the
15  Judge stated earlier was that you're the most
16  attentive jury any of us have ever worked with.
17    My closing statement will have three
18  parts.  The very first part is to address what I think
19  is maybe the most critical issue, which is
20  credibility.  In particular, who do you believe
21  between Mr. Castelluccio and Ms. Collins-Smee.  And
22  I'll spend some time on that because I think that's
23  central to the entire case.
24    Secondly, I'm going to talk about the
25  specific evidence that we think we've established of

Page 1628

1  age discrimination, the facts from which you can draw
2  an inference.  The Judge will tell you later about
3  inferences that can be drawn from circumstantial
4  evidence, and these are the facts from which you can
5  draw an inference of age discrimination, and I'll try
6  to pull those together with making as few references
7  to WellPoint as I possibly can.
8    And finally, I want to respond to what we
9  anticipate will be some of IBM's major arguments, so
10  that you'll have some sense of what we believe is
11  legitimate explanation for some of the points that
12  they're going to make.
13    As I explained in my opening statement,
14  this is not a simple case.  You've heard testimony
15  from multiple witnesses, you've seen enumerable
16  documents, and now you have the task of considering
17  all of the evidence and answering one primary
18  question, did IBM terminate Mr. Castelluccio because
19  of his age.  It comes down to that.
20    Judge Smith will instruct you that it's
21  up to you to determine the credibility of the
22  witnesses who testified.  It's never easy or pleasant
23  to pass judgment on someone's credibility.  But at the
24  heart of your deliberations is your determination of
25  who do you believe.

Page 1629

1    When confronted with inconsistent
2  accounts of events it's natural to try to reconcile
3  and see if there's some way that they both can be
4  true.  However, here, the stark contrast between the
5  testimony of Mr. Castelluccio on the one hand and Ms.
6  Collins-Smee on the other compels you to make a
7  choice.
8    Let's go through some of the
9  contradictions that you've heard.
10    Mr. Castelluccio testified that in his
11  first face-to-face meeting with Ms. Collins-Smee she
12  asked him about his age and then asked whether he was
13  old enough to retire.  When asked about the same
14  meeting, Ms. Collins-Smee denied that she had asked
15  Mr. Castelluccio about his age and denied that she
16  asked him whether he was old enough to retire.
17    Black and white.
18    There are other stark contrasts in the
19  testimony concerning this meeting.  Mr. Castelluccio
20  testified that Ms. Collins-Smee did not tell him that
21  she planned to remove him from his position as VP of
22  public sector in February of 2007.  He explained that
23  he never would and never did involuntarily agree to be
24  taken out of his position as VP of public sector, a
25  position he had performed successfully for two years.

Page 1630

1   Why would he?
2           And at her deposition, in February of
3   2010, in her lawyer's office, while under oath, Ms.
4   Collins-Smee represented that she could not recall her
5   meeting with Mr. Castelluccio.  After the deposition
6   she read it and swore again that what she'd said in
7   the deposition was the truth.
8           Ms. Collins-Smee now tells you, four
9   years later, that at their meeting she told Mr.
10  Castelluccio that he was not working out as VP of
11  public sector, and that he had agreed and said that he
12  would be pleased to move out of the PE role, removed
13  out of his current role into the role of a PE, a role
14  that he had never performed; well, hadn't performed in
15  years.
16          And how did she justify this newfound
17  memory?  She did not identify any discussion with
18  anyone else or any document which would warrant sudden
19  recall of what happened in a meeting in which only she
20  and Mr. Castelluccio were present.  I believe her
21  testimony is, I read every single document that was
22  produced, and somehow that made me remember.
23          Another contradiction appears between the
24  testimony of Mr. Jones and Ms. Collins-Smee.  Kelton
25  Jones testified that he was positive that he never met

Page 1631

1   with Ms. Collins-Smee to transition his
2   responsibilities of head -- as head of IT delivery.
3   Mr. Jones also testified that he never discussed Mr.
4   Castelluccio with Ms. Collins-Smee after she was
5   appointed as head of ITD Americas.  To the contrary,
6   he specifically recalled that despite his attempts to
7   meet with Ms. Collins-Smee, she cancelled their
8   meetings.
9           In contrast, Ms. Collins-Smee testified
10  that after becoming head of ITD Americas she set up a
11  transitional meeting with Mr. Jones.  She further
12  claimed that she and Mr. Jones discussed Mr.
13  Castelluccio in this transition meeting, and when
14  pressed on this point, she swore she was absolutely
15  certain that that's what had happened.
16          Again, black and white.
17          Yet another contradiction concerns Mr.
18  Wisse.  Mr. Castelluccio testified that Ms.
19  Collins-Smee asked him whether Mr. Wisse was old
20  enough to retire, whereas Ms. Collins-Smee swore that
21  she never asked Mr. -- about Mr. Wisse, whether he was
22  old enough to retire, when she spoke to Mr.
23  Castelluccio.
24          Again, black or white.
25          Kelton Jones testified that he had

Page 1632

1   never -- that he would never have assigned Mr.
2   Castelluccio as DPE of the WellPoint account.
3   Particularly given his relationship, Mr.
4   Castelluccio's relationship with Mr. Liederbach.
5           Ms. Collins-Smee actually admitted
6   indirectly that she agreed with Mr. Jones's
7   assessment.  Do you recall when Ms. Collins-Smee
8   explained why she chose the seven younger
9   representatives get those jobs in 2008, in May of
10  2008?  Unrehearsed, one of her answers was, Well, the
11  state of Georgia job, I wouldn't have considered Mr.
12  Castelluccio for that, of course I would not have
13  considered him for that, because that was one of
14  Mr. Liederbach's accounts.  Exactly.
15          Mr. Castelluccio testified that he had
16  the responsibilities of a VP of public sector, and as
17  DPE of the WellPoint account, until Mr. Echavarria
18  replaced him in June of 2007.
19          Ms. Collins-Smee claimed that Mr.
20  Castelluccio was assigned full-time on the WellPoint
21  account as of April 1, 2007, and that he had no other
22  responsibilities.
23          Black and white.
24          Mr. Castelluccio testified that he
25  continued to be responsible for the resource action

Page 1633

1   until June of 2007.  And I want to direct you to a few
2   specific exhibits which support Mr. Castelluccio's
3   position and contradict the testimony that you heard
4   from Ms. Collins-Smee, specifically Plaintiff's
5   Exhibit 50, Exhibit 146, also Plaintiff's Exhibit 55,
6   Plaintiff's Exhibit 133, and that's specifically at
7   page 3, and Defendant's Exhibit 55.
8           You will recall that Keenie McDonald
9   testified that she was aware Mr. Castelluccio was busy
10  because he was involved in the resource action.  She
11  sat there and specifically mentioned he was too busy,
12  was busy because he was also involved in the resource
13  action.  And of course Mr. Liederbach authored an
14  e-mail stating that between WellPoint and Mr.
15  Castelluccio's involvement in the resource action, Jim
16  would be likely to, quote, implode.  Recall Exhibit
17  53.
18          One of the more remarkable things in this
19  trial is IBM has never even attempted, attempted to
20  explain away Mr. Liederbach's statement.  Why in the
21  world would Mr. Liederbach be concerned about Mr.
22  Castelluccio's involvement in the resource action if
23  it's true, as Ms. Collins-Smee said, he had no
24  involvement in that?  Or minimal involvement?
25          In contrast, Ms. Collins-Smee claimed

Page 1634

1   that she relieved Mr. Castelluccio of all his
2   responsibilities for the resource action as of April
3   1, 2007.
4        Mr. Castelluccio testified that that LEAN
5   initiative that you heard about was among the vice
6   president of public sector responsibilities and that
7   he had to continue to discharge those responsibilities
8   even after he was assigned as DPE to WellPoint,
9   whereas Ms. Collins-Smee claimed Mr. Castelluccio had
10  no responsibilities for the LEAN initiative
11  whatsoever.
12       Kelton Jones testified that it was an IBM
13  manager's responsibility to make sure that his or her
14  executives were kept busy, productive and working. He
15  explained that if a manager removed an executive from
16  a position, it was the manager's responsibility both
17  to the executive and to IBM to be sure he was
18  advocating on behalf of that manager and working to
19  get him a new position.
20       On the other hand, Ms. Collins-Smee
21  claimed she had no responsibility to locate a new
22  position for an executive whom she pulled off another
23  position. She argued that the efforts that she made
24  were purely voluntary. Dramatic contrast between Mr.
25  Jones, who had absolutely no motive to say anything

Page 1635

1   but the absolute truth, and Ms. Collins-Smee.
2       Mr. Castelluccio testified that it was
3   standard practice to assign temporary work to an
4   executive who was not otherwise fully occupied, and
5   not assigned to a full-time position. He explained
6   that it made good sense for IBM to keep an executive
7   productive, and it made good sense for the executive
8   to keep his skills sharp and to stay involved.
9       Kelton Jones agreed. Kelton Jones
10  explained that it was appropriate to assign an
11  executive temporary work if there was a lapse between
12  two full-time assignments.
13       An excellent example of the appropriate
14  procedure that should have been followed is Mike
15  Morin, and I think I mentioned this in my opening.
16  Remember what happened to Mr. Morin? He quit, and
17  they gave him two temporary jobs to keep him busy and
18  then finally put him on his permanent DEP on The
19  Hartford account. Temporary work was a regular part
20  of operations at IBM
21       You also heard Keith Holmes,
22  Collins-Smee's own human resource expert, and he
23  admitted on the stand yesterday that it was typical
24  for an executive on the bench to have temporary work
25  assigned to them. Ms. Collins-Smee claimed that IBM

Page 1636

1   executives are not assigned temporary work while they
2   were on the bench.
3       Black and white.
4       Ms. Collins-Smee testified that she made
5   a consistent good faith effort to find Mr.
6   Castelluccio a new position. However, her own
7   documents make it clear that her efforts were almost
8   exclusively made in the same month that she fired Mr.
9   Castelluccio, and her efforts were limited to two
10  half-hearted e-mails, and in her own words were
11  motivated by her desire to, quote, make a record.
12       Ask yourself, why did Ms. Collins-Smee
13  feel in May of 2008 she needed to make a record? What
14  was it she was hiding?
15       Finally, IBM's PBC manual, which is
16  Exhibit 1, clearly identifies and defines a number 2
17  rating. It's defined as, quote, a solid contributor,
18  quote, consistently meets job responsibilities, is
19  reliable in doing job, demonstrates appropriate level
20  of knowledge, skill, effectiveness and initiative.
21       Ms. Collins-Smee argued to you that a 2
22  rating was a poor rating for an executive. Not only
23  has she provided you with nothing to support her
24  claim, but her own conduct, her own conduct
25  contradicts this assertion.

Page 1637

1       You may recall that she testified that
2   she wanted to fill seven executive positions she had
3   available in May of 2008, and she stated she wanted to
4   fill them with the most qualified candidates.
5   Nevertheless, she had already assessed three of those
6   executives as 2 performers. In fact, made those
7   assessments on the very same day that she had assessed
8   Mr. Castelluccio as a 2 performer.
9       So what is it? Were they the most
10  qualified candidates, or were they poor performing
11  executives? You can't have it both ways.
12       As I mentioned in my opening, Ms.
13  Collins-Smee would try her best to distance herself
14  from the hard truth that she and Mr. Zapfel, she and
15  Mr. Zapfel, had rated Mr. Castelluccio with a 2 on the
16  PBC evaluation form in 2007.
17       Let me move on to a discussion about some
18  of the indicia of age discrimination. You may recall
19  that Mr. Fasman repeatedly emphasized that there was
20  no expressed statement of age bias. No one at IBM had
21  said Mr. Castelluccio was long in the tooth, no one
22  said he was an old man, or came out and told him that
23  he was too old to work. Do you remember that was sort
24  of a pattern after many of the witnesses?
25       His two points seemed to be, first, that

Page 1638

1    others at IBM did not have an age bias, and second,
2    that there was no smoking gun in this case.
3            This type of argument is called a straw
4    man.  The idea is that someone makes an exaggerated
5    argument about the other parties' position, and then
6    knocks it down like a straw man as if they've
7    accomplished something.
8            Mr. Castelluccio is not and has never
9    claimed that everyone at IBM is biased against 60
10   year-old employees.  Mr. Castelluccio's claim is
11   simply that Ms. Collins-Smee demonstrated a
12   discernible pattern of age discrimination against him.
13           You may also remember that in my opening
14   I alerted you to the fact that you were not likely to
15   see any smoking guns.  The reality is that in age
16   discrimination cases, especially ones that go to
17   trial, there's rarely a smoking gun.
18           Judge Smith will likely instruct you, age
19   discrimination cases are often proven by
20   circumstantial evidence since an employer who
21   discriminates is likely -- is unlikely to leave an
22   open trail.
23           I also suggested to you in my opening
24   that often age discrimination cases is only revealed
25   when an employer's conduct is scrutinized over a

Page 1639

1    period of time.
2            Ms. Collins-Smee's age bias against Mr.
3    Castelluccio can be inferred from the ways in which
4    she treated him differently than she treated younger
5    employees.  Let's review some of the evidence from
6    which you can infer Ms. Collins-Smee's age bias
7    against Mr. Castelluccio.
8            Ms. Collins-Smee's age bias can be
9    inferred from her decision to remove Mr. Castelluccio,
10   the oldest vice president reporting to her, from his
11   position as VP of public sector.  You recall that she
12   stressed the fact that this was an independent
13   decision that she made only a month after observing
14   Mr. Castelluccio, a decision which ignored that he had
15   successfully performed in this job for two full years,
16   a decision which, at best, was based on complaints
17   about only one of his 30 accounts, and that was the
18   account which had been in a crisis mode since it first
19   started.
20           In deciding whether the decision to
21   remove Mr. Castelluccio as vice president, in deciding
22   whether that suggests age bias against Mr.
23   Castelluccio, please keep in mind that her e-mail
24   makes it clear that she decided to replace him in
25   February of 2006, but she did not tell him until she

Page 1640

1    had a younger replacement lined up, four months later.
2            One of the exhibits that you'll find in
3    your notebooks, and it's in the front of the notebook,
4    is an exhibit called Critical Time Lapses.  Just take
5    a look at this when you get to deliberate, and it will
6    show you the number of times Ms. Collins-Smee made
7    decisions that were critical, critical to Mr.
8    Castelluccio's career and livelihood and delayed
9    telling him.
10           We wanted it to be in the front of the
11   notebook so it's easy and you don't have to go hunting
12   for them.  I say "we," my good hard-working crew.
13           More importantly even than her decision
14   to remove Mr. Castelluccio from his position is the
15   fact that there was no evidence that she had taken any
16   steps to arrange for a position for him to continue
17   his career.  She ultimately stuck him in the role as
18   VP of public sector, but think about it, what steps
19   had she taken before that to arrange a position for
20   him?  None.
21           Ms. Collins-Smee's conduct contrasts
22   sharply with Kelton Jones' plan.  As Mr. Jones came
23   and explained to you, he had planned to simultaneously
24   move Mr. Castelluccio into a new position while
25   putting a new executive into the VP position, a plan

Page 1641

1    that Mr. Jones was confident that he could execute at
2    the most within two or three months.
3            Although IBM attempted to insinuate that
4    Mr. Jones' plan was based on outdated information, you
5    can recall that Mr. Jones determined that he could
6    easily find a new position for Mr. Castelluccio within
7    two or three months, and he based that assessment on
8    an availability of positions within the organization
9    that he ran in the first quarter of 2007.  It wasn't
10   running it in the first quarter of 2007, but he was
11   there, and that's when he made the assessment.
12           Later in the same year Mr. Castelluccio
13   was removed from his position as VP of public sector,
14   that was in June of 2007, and then later informed that
15   he was going to be removed from the DPE position, and
16   that was in November of 2007.  So Mr. Jones' awareness
17   of what the availability was I do think is timely.
18   That's for you to decide.
19           Ms. Collins-Smee's age bias against Mr.
20   Castelluccio can also be inferred from her failure to
21   place Mr. Castelluccio on Pat Kerin's 5-minute drill.
22   A failure to do what she herself said she needed to
23   do.
24           You'll remember the exhibit in which she
25   sent an e-mail to Mr. Holmes and she said, We need to

34 (Pages 1638 to 1641)

Page 1642

1   get Jim on Pat Kerin's 5-minute drill. She now said
2   she didn't have any responsibility, but the
3   contemporaneous document speaks volumes. We need to
4   get Jim Castelluccio on Pat Kerin's drill.
5       What happened? He didn't appear on Pat
6   Kerin's drill for months and months and months. And
7   that failure left Mr. Castelluccio without any job
8   prospects when she later removed him from the position
9   of DPE of WellPoint.
10      Ms. Collins-Smee's age bias against Mr.
11  Castelluccio can also be inferred from the three
12  references to Mr. Castelluccio's retirement she made
13  despite his clear communication that he was not
14  interested in retiring. To her credit she didn't deny
15  that he had made it clear to her in their first
16  conversation on the subject that he had no interest in
17  retirement.
18      Consider what you would think if you were
19  60 and you told your boss that you had no interest in
20  retiring and wanted to continue to work but
21  nevertheless your boss raised the subject on two
22  occasions about whether or not you wanted to retire.
23      Ms. Collins-Smee's age bias against Mr.
24  Castelluccio can also be inferred from her decision to
25  assign Mr. Castelluccio as DPE on the WellPoint

Page 1643

1   account. It is beyond dispute that the WellPoint
2   account was a disaster at the time.
3       It is also undisputed that Mike Morin, an
4   extraordinary performer by everyone's assessment, was
5   forced to tender his resignation after months, months
6   of working seven days a week, sometimes 24 hours a
7   day.
8       You will also recall that even Gordon
9   Crawford, a winner of IBM's acclaimed Chairman's
10  Award, explained that he worked from January of 2008
11  to Easter of 2009 without getting three consecutive
12  nights of sleep when he was WellPoint's DPE. And Mr.
13  Morin, unlike Mr. Castelluccio, had no other
14  responsibilities, nor did Mr. Crawford have any other
15  responsibilities when he was in that position.
16      Again, in the front of your notebook you
17  will see a document that says Plaintiff's 119, but
18  it's entitled Mr. Castelluccio's Responsibilities in
19  the Second Half of 2007, and it tries to show you in a
20  graphic format -- probably not nearly as sexy as the
21  exhibits you'll see later -- but it tries to show you
22  in a graphic format all of the responsibilities that
23  Mr. Castelluccio had in the second quarter of 2007.
24      Ms. Collins-Smee's ulterior motive to
25  force Mr. Castelluccio to retire is most clearly

Page 1644

1   apparent from the fact that she not only assigned him
2   to Mr. Morin's responsibilities, but also kept him in
3   the position as VP of public sector for four months,
4   where he continued to be responsible for both the LEAN
5   initiative and the time-consuming resource action.
6       The impossible situation in which Ms.
7   Collins-Smee placed Mr. Castelluccio was made worse by
8   the untrue statement to Mr. Castelluccio that he was
9   permanently on the WellPoint account as DPE. She told
10  him that, while at the same time her colleagues -- she
11  told her colleagues and the client himself, both Dave
12  McDonald and Mark Boxer, that he was temporary, and
13  continued to interview younger individuals for the
14  same position.
15      Ms. Collins-Smee's age bias against Mr.
16  Castelluccio can also be inferred from her decision to
17  remove Mr. Castelluccio from his position as DPE on
18  the WellPoint account. The evidence showed that
19  WellPoint accepted Mr. Crawford in mid-September of
20  2007, but she did not disclose to Mr. Castelluccio
21  that he had -- that he was being replaced at WellPoint
22  until the day before Thanksgiving in November.
23      Further, when she removed him, she had
24  taken no steps to relocate another -- to locate
25  another position for him. Again, pulled him out of a

Page 1645

1   position with no thought about what was going to
2   happen with his future.
3       She does not even add him to her 5-minute
4   drill until January, and then only in the capacity as
5   a person to move. As Keith Holmes was honest enough
6   to admit, she never added him to her slate of
7   candidates, and, quote, rarely discussed him on her
8   5-minute drills.
9       Mr. Fasman identified a total of 15
10  drills in which there's reference to Mr. Castelluccio.
11  Please take a look at the three 5-minute drill
12  summaries that we have prepared. They're going to be
13  in front of your notebook. You've seen one page up on
14  the screen from these, but they're multi-page
15  documents, and they go through -- in one column you'll
16  see the date of the drill, the actual document of the
17  drill, and the next column it shows you the key open
18  positions, and then it'll show you whether Mr.
19  Castelluccio was identified as someone on the slate of
20  candidates, and then on the far right column it
21  indicates yes or no, whether or not he was listed for
22  that one month as a key person to discuss.
23      So here, for example, you can see that
24  there are three drills, and two of the drills he was
25  not listed as a person to discuss, and in the third

Page 1646

1    drill he was.  Again, these will be in the front of
2    your notebooks.
3          As IBM will undoubtedly point out, Mr.
4    Castelluccio appeared most frequently on Mr. Zapfel's
5    drill.  But let's take a close look at that.
6          Starting with the March 2007 drill in
7    which his position as VP of public sector was listed,
8    going all the way through June of 2008, which was the
9    last month Mr. Castelluccio worked at IBM, there were
10   15 monthly drills on which Mr. Castelluccio should
11   have appeared at least as a key person to discuss.  15
12   opportunities to list him.  He appeared on as many as
13   11 of those drills, and in a limited capacity as
14   someone to -- as a person who's available.
15         And I'm giving IBM the benefit of the
16   doubt here.  Many of the drills -- two of the drills,
17   actually, the September and October drill, have
18   multiple versions, and I think those are among the
19   exhibits, in which in one of the drills, he does
20   appear in the September drill, and there was another
21   September drill where he doesn't appear, and then the
22   October drill there's one version where he does appear
23   and one where he does not appear.  So I've given him
24   credit when I say that on those 15 drills he appeared
25   on 11.  It's possible it was only nine.

Page 1647

1          However, if you look beyond the simple
2    listing of his name as a person who was available and
3    you look to the slate of candidates, that's the key
4    point, that's where you get your job.  You have to be
5    identified and connected with a specific opening, and
6    having someone advocate for you for that opening.
7          If you look at that, a completely
8    different picture emerges.  Even on Mr. Zapfel's
9    drill.  In the same time period, this is the time
10   period beginning in March all the way through June of
11   2008, there were 102 openings, open positions, and 102
12   slates of candidates set forth on Mr. Zapfel's drill.
13   Mr. Castelluccio was added to one of those 102 slates.
14         And if you may recall Mr. Castelluccio's
15   testimony, I walked him through this, even that one
16   opportunity, when you look at the notes, that position
17   had already been taken by the time he was added to the
18   slate.
19         Mr. Castelluccio is not claiming that he
20   should have been hired for each of the positions on
21   Mr. Zapfel's drill.  That's not the point.  But an
22   inference of discrimination can be drawn from the fact
23   that he was not even considered for these positions.
24         A review of Ms. Collins-Smee's own drill
25   is even more telling.  Again, we have one summary for

Page 1648

1    each of the three relevant drills, Mr. Zapfel's, Pat
2    Kerin's, a separate document, and then Ms.
3    Collins-Smee's.  So let's talk about Ms.
4    Collins-Smee's own 5-minute drills.
5          IBM produced documents showing Ms.
6    Collins-Smee conducted ten 5-minute drills between
7    June 2007 and May of 2008.  In these drills Ms.
8    Collins-Smee only identified Mr. Castelluccio once as
9    a key person to discuss.  In this time period Ms.
10   Collins-Smee listed 56 open positions that Mr.
11   Castelluccio was not added to a single one of the 56
12   slates on Ms. Collins-Smee's own 5-minute drills.
13         This is important, as we tried to stress
14   earlier, because, as Mr. Castelluccio said, as Mr.
15   Jones said, and even as Mr. Holmes agreed, the key
16   positions for Mr. Castelluccio given his skills and
17   expertise were being filled on Ms. Collins-Smee's
18   drill.
19         So let's talk about Pat Kerin's drill.
20   With respect to Mr. Kerin's drill, between March 2007
21   and June of 2008 there were 15 different drills.  Mr.
22   Castelluccio appeared as a key person to discuss on
23   only one of those drills.  This one time was in
24   October of 2007, seven months after Ms. Collins-Smee
25   decided to move Mr. Castelluccio as VP of public

Page 1649

1    sector, and seven months after she told Mr. Holmes,
2    let's put Jim on Pat Kerin's drill.  During this time
3    period, just on Mr. Kerin's drill, there were 204 open
4    positions that were listed.  Mr. Castelluccio was not
5    included in one of those 204 slates.
6          So for those of us who like numbers,
7    here's a wrap-up.  In summary, between the three
8    different drills run by the three relevant executives
9    there were a total of 40 monthly drills and over 360
10   open positions.  Of the 40 different drills Mr.
11   Castelluccio appeared as a person to move on a total
12   of 13 of those 40 drills.  Similarly, with respect to
13   the three different drills, Mr. Castelluccio was added
14   to only one, only one of the 360 slates of candidates.
15   Hard to believe that he had an advocate speaking on
16   his behalf.  The documents sure don't support that.
17         The most compelling evidence of Ms.
18   Collins-Smee's age bias is her treatment of Mr.
19   Castelluccio after she stuck him on the bench and set
20   him up to be fired.  Why?  Because he had no job.  So
21   let's just focus on that time period, just the time
22   period before his termination when he was put on the
23   bench.
24         Ms. Collins-Smee's assignment of Mr.
25   Castelluccio to the bench in and of itself is evidence

A-694

Page 1650

1  of age bias when there was an abundance of work. Ms.
2  Collins-Smee's failure to provide Mr. Castelluccio
3  with temporary work while he was on the bench, despite
4  the testimony that you heard that that was standard
5  protocol.
6        Ms. Collins-Smee's age bias can also be
7  inferred from her failure to inform Mr. Castelluccio
8  of at least 106 positions that were available during
9  that one window between January and May of 2008 on the
10 three different drills. And I believe we've already
11 given you a document to that effect.
12       Ms. Collins-Smee's failure to inform Mr.
13 Castelluccio of the seven job openings that she filled
14 within her own organization by younger executives in
15 May of 2008, the same month she told him there's no
16 work for you, you're going to be fired within the
17 next -- fired as of 30 days.
18       Other indicia of discrimination that
19 occurred during that window of time is Ms.
20 Collins-Smee's failure to advocate for a job opening
21 at Quest. You heard Mr. Castelluccio describe how
22 that was an ideal position for him.
23       And that statement was also supported by
24 the testimony of Kelton Jones who testified that Mr.
25 Castelluccio had the wherewithal, the skills and the

Page 1651

1  experience to be a VP in any situation within the IT
2  delivery organization.
3        Ms. Collins-Smee's age bias again can
4  be -- was evidenced by her exclusion of Mr.
5  Castelluccio from professional development
6  opportunities. You may remember Mr. Castelluccio
7  talking about how he wanted to go to a seminar in
8  Lexington, Kentucky. Not only did she send an e-mail
9  to everybody else but him, but when he asked for the
10 materials, she denied him the chance to even review
11 the material so he could stay current.
12       And also little things, like the fact
13 that he twice requested a BlackBerry because Mark
14 Boxer was a Blackberry type person, and if you had
15 somebody like that you know there's a mode you have to
16 communicate with that person, and you've heard a lot
17 of stories about how important it was to be in touch
18 with Mr. Boxer. A simple thing like a BlackBerry, he
19 asked for it twice, and she refused to give him
20 approval for it.
21       Age bias can also be inferred from her
22 failure to advocate for Mr. Castelluccio outside the
23 5-minute drill. You heard testimony from a number of
24 witnesses about how important it was for a manager to
25 advocate not just within a 5-minute drill, but also

Page 1652

1  outside the 5-minute drill.
2        And finally, you can draw an inference of
3  discrimination from IBM's shifting explanations as to
4  why it terminated Mr. Castelluccio. At one point it's
5  poor performance, then they have a 2 rating to deal
6  with, so maybe it's just a failure to find a job, and
7  they shift back and forth.
8        Let me go to the final third of my
9  discussion with you and address some of the
10 contentions that we anticipate IBM is going to be
11 making.
12       In the face of this weighty evidence IBM
13 argues that Mr. Castelluccio was not terminated
14 because of his age. IBM claims now that Mr.
15 Castelluccio was terminated because he could simply
16 not find a job. Not our problem, he couldn't find a
17 job. Are you convinced that that's the real reason?
18 In view of the evidence, does that really make sense?
19 You just heard me go through the number of openings.
20       Mr. Castelluccio was a 40-year veteran
21 who had multiple positions within IBM. Mr. Messina
22 wrote in Mr. Castelluccio's PBC that Jim has done an
23 extraordinary job managing the Lucent contract. IBM's
24 single largest account at the time. It was a monster.
25 It was a huge professional coupe. Mr. Messina

Page 1653

1  described Jim as, quote, one of the best DPEs in the
2  business.
3        Mr. Jones described Mr. Castelluccio's
4  strong leadership abilities in his PBC, and in his
5  testimony here, he explained that Mr. Castelluccio had
6  a very high skill level and was capable of performing
7  any DPE level position in the IT delivery business.
8        Mr. Morin. Mr. Morin also described Mr.
9  Castelluccio as a strong leader, a person who knew how
10 to get things done, a strategist, and a person of real
11 personal integrity.
12       Even Gordon Crawford commended or
13 commented positively on Mr. Castelluccio's
14 professionalism and his technical background.
15       The 5-minute drills that were conducted
16 during the time that Mr. Castelluccio was on the bench
17 showed that at least 106 Band C and Band D positions
18 were available during the six month period that he was
19 on the bench. 106. He was looking for one.
20       Kelton Jones testified that immediately
21 before he left he had reviewed possible positions for
22 Mr. Castelluccio and planned to move him into a new
23 position in parallel with him leaving the DPE
24 position. He was going to backfill that position and
25 move Mr. Castelluccio into another position.

Page 1654

1  Mr. Jones was confident that even if the
2  rotation didn't move as he planned simultaneously,
3  that within two to three months at the most he would
4  have an appropriate VP position for Mr. Castelluccio.
5  He testified about how he would use his 5-minute drill
6  to accomplish that. Something Ms. Collins-Smee
7  absolutely did not do. Again, he was rarely discussed
8  in her 5-minute drills.
9  Ms. Collins-Smee placed seven younger
10 executives into positions for which Mr. Castelluccio
11 had the necessary skills and expertise. You also
12 heard testimony about how much work there was at IBM
13 during this time period. Ms. Collins-Smee was sending
14 e-mails at 3 in the morning. Mr. Morin went days
15 without showering or eating.
16 Mr. Jones testified that in all the years
17 he had worked at IBM's IT delivery business, he had
18 never operated with a bench. He said to me, What
19 bench? We didn't have a bench. What we had was too
20 much work. I couldn't have people on the bench. I
21 needed them to work. All our people were overworked.
22 It is hard to believe that there was no
23 position at IBM for Mr. Castelluccio. A preponderance
24 of the evidence indicates that there was plenty of
25 work. The problem wasn't work. The problem was with

Page 1655

1  Ms. Collins-Smee's failure to discharge her duties to
2  assist Mr. Castelluccio in getting placed in a new
3  position. And why? Because she believed he was too
4  old to work.
5  IBM claims that Mr. Castelluccio was a
6  poor performer in two different roles. You heard
7  extensive testimony about -- from IBM about Mr.
8  Castelluccio's performance. Although IBM is no longer
9  claiming that Mr. Castelluccio was terminated because
10 of his performance, you recall that that's what they
11 said in the past.
12 IBM never contested that as VP of public
13 sector Mr. Castelluccio was responsible for 30
14 different contracts. Think about this. I don't
15 recall any testimony or documents that indicated
16 performance concerns on any of the other contracts. I
17 might have missed something, but I was listening for
18 that. I don't recall any other complaints.
19 To the contrary, Mr. Jones testified that
20 Mr. Castelluccio had the highest customer satisfaction
21 ratings of all of his VPs. If I recall correctly,
22 even Mr. Liederbach, who was responsible, you may
23 remember, he was responsible for the same group of
24 contracts, even Mr. Liederbach did not testify about
25 problems with Mr. Castelluccio's other contracts.

Page 1656

1  And what about the WellPoint contract?
2  You heard multiple witnesses testify, using almost
3  identical words, hmm, that Mr. Castelluccio was
4  assigned to WellPoint with the hope and intention that
5  he would be permanent. They said essentially it was
6  one account as opposed to 30, had less
7  responsibilities for making easier for him. But let's
8  not forget that this was the WellPoint account. Mr.
9  Morin resigned under the pressure of the work there,
10 and according to Keenie McDonald he hadn't been
11 successful.
12 Another interesting contradiction with
13 respect to Ms. Collins-Smee, you remember she said he
14 had been successful. Keenie McDonald, the person on
15 the account, said he wasn't. Hmm.
16 All the witnesses confirmed Mr. Morin's
17 testimony that the account was among the worst, if not
18 the worst they'd ever seen. Does it make sense that
19 this is where Mr. Castelluccio was put so that he
20 could improve? If Ms. Collins-Smee thought that Mr.
21 Castelluccio's performance was declining, would she
22 ever have assigned him to what Mr. Liederbach called,
23 quote, the most important role on the WellPoint
24 account, an account which he described as his largest
25 and most important account?

Page 1657

1  I anticipate that IBM will argue that it
2  would make no sense for them to assign Mr.
3  Castelluccio to the WellPoint account with the
4  expectation that he would fail. Why assign someone to
5  an account where they're going to fail? The client is
6  too important. IBM will say, why run the risk of
7  further straining the already stressed relationship
8  with WellPoint.
9  There's a good answer to this question.
10 All the evidence supports that answer. The answer is,
11 Ms. Collins-Smee threw Mr. Castelluccio into the
12 breach when Mike Morin quit fully expecting Mr.
13 Castelluccio to choose to retire. She believed that
14 Mr. Castelluccio would follow Mr. Morin's lead and
15 quit rather than deal with the embarrassment of what
16 was essentially a demotion and the prospect of
17 shouldering the work on WellPoint account. I would
18 have quit. A workload you heard both Mr. Morin and
19 Mr. Crawford describe to you.
20 And what is the best evidence of this
21 fact? Look at the parade of candidates Ms.
22 Collins-Smee marched past Mr. Boxer. It's
23 particularly important to recall Mr. Liederbach's
24 testimony, his admission that Ms. Collins-Smee never
25 stopped looking for someone else to fill Mike Morin's

## Page 1658

1  shoes. Is that the conduct of someone who's planning
2  to put you in a role permanently, who kept coming back
3  more and more with younger candidates?
4        Two things went wrong with Ms.
5  Collins-Smee's plan to force Mr. Castelluccio to
6  retire. First, Mr. Castelluccio to his credit kept
7  trying to manage through the crisis at WellPoint
8  rather than resigning. You've heard the phrase "an
9  IBMer." If there was ever an IBMer, that's Mr.
10  Castelluccio. He decided he's going to tough it out.
11        Second, Mr. Boxer kept rejecting the
12  younger inexperienced candidates presented to him.
13  Ms. Collins-Smee hadn't anticipated that. As a
14  result, Ms. Collins-Smee left Mr. Castelluccio in the
15  hot seat until Mr. Zapfel located Mr. Crawford.
16        When IBM argues that its assignment of
17  Mr. Crawford as WellPoint's DPE is proof that Ms.
18  Collins-Smee did not have an age bias, please keep two
19  things in mind. First, it was Mr. Zapfel who was
20  instrumental in bringing in Mr. Crawford. You will
21  recall that Mr. Zapfel -- I'm sorry -- that Mr.
22  Crawford described Mr. Zapfel as, quote, his mentor.
23  I got in touch with my mentor, Mr. Zapfel. You will
24  also recall that Keenie McDonald admitted that Mark
25  Boxer would only accept a candidate that had

## Page 1659

1  Mr. Zapfel's personal stamp of approval.
2        The other thing to keep in mind is that
3  all of this only occurred after at least five of Ms.
4  Collins-Smee's younger candidates had been rejected by
5  WellPoint.
6        Please ask yourself how Mr. Castelluccio
7  could have been expected to succeed while he was also
8  required to continue his responsibilities for four
9  months as VP of public sector. Mr. Morin couldn't
10  succeed working 24 hours a day on the WellPoint
11  account. How is it possible to have expected Mr.
12  Castelluccio to stay in that position and succeed?
13        Again, I draw your attention to the
14  document that shows the overlapping responsibilities
15  at the same time.
16        Also please keep in mind the benefits of
17  all the work that had been performed before Mr.
18  Crawford came into the picture. Even with respect to
19  all that work that had been performed by the first
20  DPE, then by Mr. Morin, and then by Mr. Castelluccio.
21  It still took Mr. Crawford, an obviously
22  extraordinarily able man, it still took him at least
23  six to eight months to begin to achieve measurable
24  improvements. Six to eight months. Is there any time
25  period where Mr. Castelluccio was given six to eight

## Page 1660

1  months to turn around IBM? You remember the parade of
2  candidates kept coming in, the whole time.
3        Does it make sense that Ms. Collins-Smee
4  put Mr. Castelluccio on an account that Dave
5  Lniederbach oversaw? You heard Mr. Jones' testimony
6  and opinion about that. He knew that there had been a
7  conflict between the two. In fact, she testified that
8  she didn't even consider putting Mr. Castelluccio on
9  the state of Georgia account for that same reason, the
10  point I've alluded to earlier. Yet she did assign him
11  to the WellPoint account, which was Mr. Liederbach's
12  most important and largest account. That's what she
13  says.
14        You also heard repeated testimony about
15  the standard procedure at IBM for presenting a DPE
16  candidate to a client. A procedure Ms. Collins-Smee
17  failed to follow in Mr. Castelluccio's case.
18        Lastly, if Mr. Castelluccio was really
19  put on the account to prove himself, why did IBM
20  continuously send other executives to interview with
21  Mr. Boxer. If they had thought things would work out,
22  well, now that Mr. Castelluccio was on the account,
23  why would they keep going back to Mr. Boxer time and
24  again and just frustrate him by sending him candidates
25  to interview? Makes no sense.

## Page 1661

1        Mr. Castelluccio testified that he
2  enjoyed working at IBM, and that he intended to remain
3  there through the age of 65 until his 66th birthday in
4  March of 2013. He made every effort he could to
5  locate a position while he was on the bench. He
6  reached out to contacts. He sent his resumé, and he
7  repeatedly asked Ms. Collins-Smee to follow through on
8  her commitment to assist him. He was willing to
9  accept the position at a lower executive level, and
10  even to relocate to wherever it took. Even Manila,
11  with spiders.
12        But, as Kelton Jones testified, and as
13  Keith Holmes affirmed, without the support of his
14  manager, Ms. Collins-Smee, whose responsibility it
15  truly was to help him, he had little chance of
16  success.
17        Let's just talk for a moment about this
18  Band 10 position issue. IBM has suggested that Mr.
19  Castelluccio should have applied for a position below
20  an executive level, a Band 10 job. You may remember
21  that there's Band 1 to 10, then there's the executive
22  levels, which go from D all the way up to A, and Mr.
23  Castelluccio had worked his way up over 40 years to
24  the D Band, and up to the C Band.
25        Kelton Jones responded to the suggestion

Page 1662

1  of Mr. Castelluccio taking that sort of a jump,
2  suggesting that in his experience at IBM there would
3  never have been a C executive looking at a Band 10
4  job.
5        Mr. Castelluccio also testified that if
6  he as a manager had seen someone at a VP level come to
7  him and say he was willing to take a Band 10 position
8  over which Mr. Castelluccio had authority, he would
9  have serious, serious doubt about the executive's
10 credentials and about his ability to perform.  It's
11 just something that wasn't done.  Even Mr. Holmes
12 admitted that such a step would be extraordinary.
13       Let me just talk for a moment more about
14 Mr. Castelluccio's post-employment attempts to find a
15 job.  Mr. Castelluccio told you about his efforts to
16 find a job after being terminated by IBM.  He devoted
17 five days a week, all day to this search.  He
18 consulted experts, had people work with his resumé,
19 refined his resumé, tailored his resumé.  He attended
20 seminars.  He read magazines.  He read whatever it
21 took to stay current in his technical areas, and he
22 attended networking events.  He made a particular
23 effort to keep his skill set current because that's
24 critical in the IT area.  He testified on -- and
25 believe him or not, but he testified how he did

Page 1663

1  everything he could to find a job.
2        While you're deliberating, you'll have an
3  opportunity to review the three spreadsheets that he
4  prepared detailing these efforts.  Those were the
5  spreadsheets that I asked Dr. Sodikoff about earlier
6  today.  You'll remember Dr. Sodikoff had not even seen
7  the spreadsheets, or if he had, he hadn't studied
8  them, and his background on the efforts that had been
9  made by Mr. Castelluccio was entirely incomplete.
10       It's up to you to decide whether Mr.
11 Castellucio made a reasonable effort to find a job.
12 I believe even applying the standards set forth by Dr.
13 Sodikoff, that Mr. Castelluccio made a sustained
14 effort.  He participated in networking, and he made
15 full use of multiple different resources.  He also
16 employed a strategy with respect to his resumé that I
17 believe Dr. Sodikoff agreed was a sound approach.
18       The last exhibit that -- exhibits,
19 rather, that I'd like to make reference to are two
20 chronologies.  They will also be in the front of your
21 book.  There is a lot of information, and again, I
22 appreciate the fact that you have been incredibly
23 attentive, but these chronologies are intended to try
24 to help you keep things in sequence.  And I understand
25 that IBM has prepared a similar chronology and that's

Page 1664

1  useful for you as well.
2        I've reserved a few minutes in case I
3  want to come back and respond to IBM's closing, and at
4  that point I'll also address the question of Mr.
5  Castelluccio's damages.  Again, we sincerely thank
6  each of you for your attentiveness.
7        THE COURT:  Thank you, Mr. Carta.
8        Mr. Fasman?
9        MR. FASMAN:  Thank you, Your Honor.
10 Ladies and gentlemen.  Gentleman, right?  That's how
11 we're doing it?
12       I too wanted to express my gratitude, the
13 gratitude of my team at counsel table and also IBM for
14 your attentiveness.  It's tough to take two weeks off
15 from your normal work and your normal routines, and
16 this has been a big sacrifice, and it's always
17 gratifying to see that people are willing to do it,
18 and it's also interesting, you guys are the most
19 attentive jury I've ever seen, too.  You guys are
20 taking notes to the end.  This is great.  You must all
21 have been A students at some point.  But it's great.
22       So I'm tempted to stand up here and say
23 okay, you know what I'm going to say, sit down, but I
24 think that won't be done.  But we do, all kidding
25 aside, we do appreciate it, and it's really gratifying

Page 1665

1  as a lawyer to see that.
2        Mr. Carta mentioned a chronology that
3  he's going to have in his book.  We've prepared two
4  chronologies and I think a chart.  We'll put that up
5  in a moment, but you'll have those in the book to try
6  to help you put together the timetable, although I
7  suspect that you guys already have your timetables
8  worked out, and I'll walk through that in a few
9  minutes.
10       But I want to start with something I said
11 in my opening statement.  In my opening statement I
12 said two things.  This is an age discrimination case
13 in which Mr. Castelluccio has to prove to you that his
14 termination on June 30th, 2008 was due to his age.
15 And I asked you to listen very carefully throughout
16 the case for any evidence of age discrimination.  And
17 I said, I didn't think you'd hear any, and that you
18 would ultimately find that was the case.
19       It's now the end of the trial, and I ask
20 you what you have heard.  You certainly have heard a
21 lot about WellPoint and the problems we had with that
22 account.  I'm sure you're sick of hearing about that.
23 You've heard every IBM acronym there is.
24       You've also heard a lot about events that
25 happened a long time ago before the termination that

Page 1666

1  Mr. Castelluccio claims are unfair, are contrary to
2  IBM policy. Mr. Carta was up here and said you can
3  infer age discrimination from everything that Mr.
4  Castelluccio disagrees with or thinks was wrong. But
5  did you hear anything that linked any of those acts to
6  his age? And that's the question you've got to, if
7  you're the going to rule for him, find all of this
8  happened to him because of his age.
9        In Mr. Carta's opening statement he said,
10  at the start of this case, and I agree with him here,
11  that this case is about motive. Why was he treated in
12  this fashion? And the question you will have to
13  answer in a few minutes is whether Mr. Castelluccio
14  has proven to you that he was terminated because of
15  his age. That's the question. Not whether he was
16  treated in accordance with IBM policy or treated
17  fairly in the abstract.
18        Now, was there any proof that Mr.
19  Castelluccio was terminated because he was 60 years
20  old? Isn't that a little hard to believe when his
21  replacement on the WellPoint account, Gordon Crawford,
22  who you met yesterday, was 59? Why would IBM fire
23  somebody who was 60 and bring in his replacement,
24  somebody who's 59? That just doesn't make any sense.
25        Make no mistake, Gordon Crawford, who you

Page 1667

1  met, this was not a cosmetic hire. Gordon Crawford
2  was the real deal. He fixed WellPoint. He made it
3  into a premier IBM client. You heard him, you saw
4  him, and you can judge for yourself his qualifications
5  and his credibility. He was a highly qualified
6  executive who did for IBM and WellPoint what Mr.
7  Castelluccio could not and did not do.
8        Now, I said in my opening statement that
9  IBM was not Facebook. We've been around for a hundred
10  years, and it was not in the midst of a youth
11  movement, and you've seen that.
12        Let me ask -- Jean, can you -- so we put
13  this chart up yesterday, I think, through Mr. Holmes,
14  and this will be in your notebook, too. You'll see
15  this.
16        But if we were engaged -- if Joanne
17  Collins-Smee was engaged in a youth movement, these
18  would be entirely different. Wouldn't they? If she's
19  trying to get rid of the older people and bring in the
20  younger people, you would see by 2011 that she had
21  more younger people. Well, she didn't. She didn't.
22        These are the executives, the Band C and
23  Band D executives who reported to her in ITD Americas
24  just in this time frame, and these people were the
25  same age. If we're engaged in age discrimination,

Page 1668

1  you'd see something there.
2        It's also highly significant that Ms.
3  Collins-Smee reached out to Mike Morin, who as you
4  heard resigned from DPE at WellPoint, but who was a
5  great employee. She reached out and tried get Mike to
6  stay with IBM, was ultimately successful, along with
7  other people, and more power to her, and to him. He
8  had a wonderful career.
9        When she reached out to him he was 56
10  years old. Why is she reaching out to somebody who's
11  56, firing somebody who's 60, and she's engaged in age
12  discrimination with regard to the 60 year-old but not
13  to Mike, who's 56? I mean this makes no sense.
14        And I'm sure that you saw also in terms
15  of IBM's age discrimination record that Mr. Mandel,
16  who conducted the open door in this case, was 68 years
17  old. So I guess the answer is if IBM engaged in age
18  discrimination, we're not doing much of a job of it.
19        Mr. Carta claimed in his opening
20  statement that Ms. Collins-Smee was engaged in a
21  17-month long campaign to rid IBM of Mr. Castelluccio
22  because he was 60 years old. What evidence is there
23  of that, of this 17-month long campaign? The alleged
24  comments about retirement that Mr. Castelluccio claims
25  Ms. Collins-Smee made to him on three isolated

Page 1669

1  occasions between February 2007 and June 2008, a
2  period of just less than 18 months? Is that their
3  entire proof of age discrimination? Those three
4  comments?
5        Mr. Carta would like you to believe, in
6  fact, that everything she did, everything she said,
7  you could infer age discrimination from this treatment
8  that Mr. Castelluccio didn't like, you can infer age
9  discrimination treatment from the things that Mr.
10  Castelluccio didn't like. But how do you link it to
11  age? How do you link it to age? There's no linkage
12  to age. There's no mention of age, other than those
13  three comments.
14        Ms. Collins-Smee, you heard her testify
15  at length, entirely denies making the comments Mr.
16  Castelluccio claims. And she testified, and I think
17  with complete credibility, that she brought up
18  retirement with Mr. Castelluccio in November 2007,
19  when she told him Gordon Crawford was going to replace
20  him on WellPoint, and she said, What do you want to
21  do? Do you want to find another job? You're eligible
22  for retirement. What's your pleasure? And he said, I
23  want to continue working. She didn't have a position
24  for him at the time, but she said okay, we're all in,
25  let's go find a job. That was that. And she did just

41 (Pages 1666 to 1669)

Page 1670

1 that.
2        And she testified she mentioned
3 retirement in May 2008, when she said, Look, it's been
4 five months, you've been on the bench for five months,
5 I don't have a position for you, and in 30 days if we
6 don't find a position for you, we'll have to terminate
7 you, and you're retirement eligible. And that was it.
8 That's it. She admitted both of those comments.
9        There's nothing wrong with that. She
10 certainly never asked him how old he was. The first
11 time he and she met, as he alleges, the first word out
12 of her mouth were "How old." Well, that's just
13 preposterous, and the proof of that is that he never
14 even mentioned that to Mr. Mandel in the open door.
15 You heard Mr. Mandel on the stand yesterday. I asked
16 him, Did he mention that to you? No, he did not.
17        Take a look at his notes that -- Mr.
18 Castelluccio's own notes from the Garrett Walker
19 conversations, which are in your materials. I think
20 our Exhibit 36, if I'm not mistaken. He doesn't
21 mention that. He doesn't say, Her first words to me
22 were how old are you.
23        She didn't say that. She didn't mention
24 retirement on multiple occasions. Those events simply
25 did not happen.

Page 1671

1        And I want to remind you that in 29 years
2 at IBM Joanne Collins-Smee had never been accused --
3 has never been accused of discrimination other than
4 this time. She'd never been the subject of an open
5 door investigation, and she, in fact, she had never
6 before terminated an executive.
7        Now, Mr. Carta was right, there are a
8 number of direct conflicts between what Mr.
9 Castelluccio said and what Ms. Collins-Smee testified
10 to. But the number of times that Mr. Castelluccio
11 didn't tell you the truth are legion. Let me just
12 give you a few examples.
13        He claimed -- and you'll see it on his
14 exhibit that Mr. Carta mentioned -- he claimed he had
15 no idea that he was going to be replaced as the vice
16 president of the public sector division until she came
17 over and said, in June, Miguel Echavarria's going to
18 replace you.
19        Now, Mr. Castelluccio's own witness,
20 Kelton Jones, his prior supervisor, said, testified,
21 that he intended to replace him as the vice president
22 of the public sector, and that he told Mr.
23 Castelluccio that he was going to do it during Mr.
24 Castelluccio's PBC discussion in January 2007. And
25 here's what he said, and I'm going to read it exactly.

Page 1672

1        Mr. Jones testified as follows: Quote, I
2 don't remember exactly, but my recollection would be
3 that I discussed that with him at a minimum during his
4 PBC review in late January.
5        So how does he not know that he's going
6 to be replaced as the vice president of the public
7 sector when his supervisor, prior supervisor said I'm
8 going to do this?
9        Mr. Castelluccio claims he never had a
10 conversation with Ms. Collins-Smee where he
11 acknowledged that his VP PSD position was not working
12 out and he wanted to move. Remember, you saw that
13 e-mail multiple, multiple times where she sends an
14 e-mail to Keith Holmes and says, I talked to Jim, and
15 he understands, and he knew it was working out and he
16 wants to move.
17        Now, even though Kelton Jones testified,
18 I told him that, and I told him that I was going to
19 move him, Mr. Castelluccio accused Ms. Collins-Smee of
20 entirely fabricating this e-mail about a conversation.
21 We never had this conversation. But I asked him, why
22 would she write that e-mail to Keith Holmes about this
23 conversation? Why would she do something so bizarre
24 and crazy? She doesn't have to do that. He had no
25 answer to that.

Page 1673

1        Mr. Castelluccio claimed he never knew
2 that IBM was looking for a permanent DPE on WellPoint
3 after he was in that position on a full-time basis in
4 June. But remember, I showed him an exhibit, a note
5 from his friend, Mark Franzese, who e-mails him, among
6 other people, and says, Listen, folks -- which is in
7 July, July 16th. Mr. Franzese -- this is our Exhibit
8 Number 61.
9        And he says, Everybody, I interviewed for
10 Mike Morin's job at the request of the client, and the
11 client -- and I didn't take it, and the client was
12 going to interview Bob Jones, another IBMer.
13        When I asked Mr. Castelluccio about that,
14 I said, So what about this? He said, Oh, you know,
15 Mark Franzese, he was just running around, and I don't
16 know who Bobbie Jones was, and I discounted whatever
17 Mark said.
18        I mean, there were a litany of excuses,
19 but the fact is, he well knew that people were coming
20 in and interviewing for that position.
21        As to Ms. McDonald, he accused her of
22 fabricating conversations with him as well. You saw
23 there was an exhibit where Ms. McDonald said, Jim,
24 this is not working out. Or it's the one to Boxer
25 where she said, I spoke to Jim, it's not working out,

## Page 1674

1  he knows it, and he knows he's temporary. Why she
2  would fabricate that in an e-mail to Mark Boxer, I
3  don't know.
4       He testified twice to you under oath that
5  all of the entries on his spreadsheet, the one that
6  Mr. Carta wants you to look at, the ones of all the
7  things that he did to find a new job, were entered
8  contemporaneously with the events, but when I asked
9  him, when did you start keeping this Excel
10  spreadsheet, he said, as he testified in his
11  deposition, I started keeping that in the spring of
12  2010.
13       Of course when you go and look at it, as
14  I showed you on the screen, and as you'll see when you
15  look at it, there are hundreds of events from 2008 and
16  2009. How you can contemporaneously keep records of
17  things that happened two years earlier is a little bit
18  difficult to understand.
19       And, perhaps most important, he
20  conveniently forgot to tell you during his direct
21  examination that Joanne Collins-Smee initially gave
22  him a 3 rating on his PBC in 2008, even though that
23  was the basis of his initial complaint to Garrett
24  Walker. And you can look, that's Defendant's Exhibit
25  76.

## Page 1675

1       And more important, he did that after
2  swearing in his oath to tell you the truth, the whole
3  truth, and nothing but the truth. He had to get up
4  here and say, let's talk about your PBC rating, you
5  didn't even mention the 3 that Joanne Collins-Smee
6  intended to give you.
7       Now, you're the judges of the facts, but
8  I would ask you to bear in mind, and I think Judge
9  Smith will so instruct you, that where a witness is
10  sworn to tell the truth, the whole truth and nothing
11  but the truth and they violate their oath of office,
12  their oath, their version of events can't be believed.
13       Now, I want to clarify a couple of legal
14  issues right at this point. The first thing is the
15  law does not forbid a discussion of retirement. It's
16  not age discrimination to inquire about plans for
17  retirement. Congress when it passed the Age
18  Discrimination and Employment Act back in 1967 did not
19  outlaw all discussion of age or retirement. The law
20  prevents companies from terminating people on the
21  basis of age, not from mentioning age or retirement.
22       And you heard Mr. Castelluccio himself
23  admit in a video deposition clip that I played that it
24  was appropriate in his view for an IBM manager to
25  mention retirement as a possible option for someone

## Page 1676

1  who was not working out. And that's all Ms.
2  Collins-Smee ever did.
3       She never said, You should retire. He
4  didn't say -- he never testified that she pressured
5  him to retire; that she said, Jim, I think you're too
6  old, you need to retire. She just said retirement's
7  an option. Is that something you want to pursue?
8       Second, comments that are not close in
9  time to the event in question -- and here the
10  termination occurred in June 2008 -- are mere stray
11  remarks which don't prove anything. Comments made 17
12  months before the event, like Mr. Castelluccio alleges
13  about this how old comment, which we deny that she
14  never made, they don't prove -- they prove absolutely
15  nothing. They can't affect everything that was done
16  thereafter. That's not the way it works.
17       So let's -- I want to return now to the
18  termination for a few minutes. And here the facts are
19  pretty much undisputed. Mr. Castelluccio was removed
20  from the WellPoint account because of client
21  complaints. You've certainly seen and heard multiple
22  examples of that. And there were no open positions
23  for him at that time. He sought other work. Ms.
24  Collins-Smee tried to help him, changing his PBC
25  rating when she shouldn't have done so, but he didn't

## Page 1677

1  find anything.
2       He was given six full months, full
3  salary, to find something else, and he couldn't turn
4  anything up. He was given more time than anyone else
5  to find a position. He identified no one who got more
6  time, no one who was younger who got more time, and
7  even he said in a video clip that I played for you
8  that IBM would not go beyond six months of someone on
9  the bench. He said it wouldn't make sense. Ms.
10  And as you heard, he entirely refused to
11  even consider a non-executive position. You heard him
12  testify when I asked him about it. He sarcastically
13  suggested that perhaps he should have taken a Band 4
14  position. He never even asked about that alternative,
15  which as you heard from Keith Holmes was very viable
16  if you wanted to remain with IBM, and that entire
17  sequence of events is simply not susceptible to being
18  age discrimination.
19       Now, Mr. Carta just was talking about Mr.
20  Castelluccio's removal from the PSD VP job in February
21  2007. I thought they had stopped pressing that claim,
22  but I guess not. The reason it makes no sense is that
23  Kelton Jones said he was going to pull him out of that
24  job anyhow, and for the same reasons Joanne
25  Collins-Smee pulled him out of that job, that he was

A-701

Page 1678

1  not responsive, and he couldn't work with David
2  Liederbach in the GTS team and function in that role.
3       I mean Kelton Jones got on the stand -- I
4  was honestly a little surprised to hear him say it --
5  but he said look, I was going to do the same thing. I
6  told Jim about it. Why were you going to do it? Same
7  reason. So how can what Ms. Collins-Smee does when
8  she does the exact same thing be age discrimination
9  where Kelton Jones said I was going to do this anyhow,
10 except that I got fired in the interim.
11      You've also seen Mr. Liederbach, Ms.
12 McDonald, they were both pressing for this action in
13 2006 before Joanne Collins-Smee ever showed up. And
14 how any of this becomes age bias on her part is beyond
15 me.
16      So where's the evidence of this 17-month
17 long campaign? Where is it? She did nothing but what
18 a responsible manager should have done in removing him
19 from these two positions.
20      And I'd like to underline two issues
21 here, because they may be important for your
22 deliberations. The first is this:
23      Prior to the trial the Court held that
24 Mr. Castelluccio didn't challenge his removal from the
25 two prior positions, the VP PSD position and the

Page 1679

1  WellPoint position. He didn't challenge them in the
2  complaint. And I said this to you in the opening
3  statement, I'm not sure that it registered at the
4  time, but those removals actually are not before you.
5  The evidence about them is background. You can't
6  render a verdict in his favor on those things because
7  they are not in the case.
8       So all of that evidence you heard about
9  WellPoint, and I'm sure you're delighted to hear this
10 right now, about WellPoint, is background evidence in
11 this case. And you can place whatever weight on it
12 you deem appropriate, which means you can disregard it
13 if you choose to do so.
14      But we believe the evidence that you
15 heard about how he was treated and the removals from
16 these positions showed that he was -- that IBM acted
17 properly. But the issue -- the only issue before you
18 is his termination in June 2008.
19      And second, as you will hear in a few
20 minutes, it's not enough for Mr. Castelluccio to prove
21 that he was somehow treated unfairly. That's not the
22 case. But it's important to remember that Congress
23 didn't outlaw all unfair treatment, it outlawed age
24 discrimination. You can only rule for Mr.
25 Castelluccio and you can only award him damages if

Page 1680

1  he's proved to you that his termination was
2  attributable to his age, that he would not have been
3  terminated had he been younger.
4       Now, I've been trying cases in front of
5  juries for a long time, and I know jurors want to do
6  the fair thing, and we don't suggest that you do
7  anything that is unfair. We think that the record
8  shows that Mr. Castelluccio was treated fairly,
9  justly, and generously by IBM. But Mr. Castelluccio
10 and Mr. Carta tried this not as an age discrimination
11 case, but as if this were a union grievance, that
12 everything that happened to him was wrong; it's wrong,
13 therefore you can infer age discrimination. That's
14 not the way it works. You have to prove age
15 discrimination. You have to prove not that something
16 was wrong, but it was caused by Mr. Castelluccio's
17 age.
18      And they tried this case in an effort to
19 appeal to your sympathy. Instead of proving that he
20 was terminated because he was 60 years old, they tried
21 to get you to feel sympathy for him. Mr. Castelluccio
22 wept on the stand by my count four different times.
23 But sympathy doesn't prove age discrimination. And
24 the Judge will instruct you about sympathy and what --
25 and its role in this case, which is zero. But please

Page 1681

1  listen carefully to what Judge Smith has to say about
2  this in a few minutes.
3       The bottom line is this: IBM has the
4  right to run its business as it sees fit as long as it
5  doesn't discriminate. It has the right to change its
6  delivery systems. It has the right to replace Tony
7  Messina and Kelton Jones with Bob Zapfel and Joanne
8  Collins-Smee, and it has the right to expect Jim
9  Castelluccio to do his job as instructed, not the way
10 he wants to do his job. It had the right to replace
11 him as it did, and it had the right to terminate him.
12      And you swore an oath at the start of
13 this case to apply the law as given to you. That law
14 requires you to answer one question and one question
15 only, and that is, has Mr. Castelluccio proven to you
16 that he was terminated because of his age, and unless
17 you answer that question in the affirmative, if the
18 answer to that question is no, then this case is over.
19      Now, I want to talk for a few minutes
20 about their claim -- Mr. Castelluccio's claim that
21 Joanne Collins-Smee didn't do enough to find Mr.
22 Castelluccio a new position. You saw that she put him
23 on various drills. She recommended him for a variety
24 of positions. She gave him a 2 that she shouldn't
25 have given him to get him a job. One of our charts

Page 1682

1  shows how frequently he was on these drills.
2         You'll have these in your materials, and
3  I hope you can see this, but all of these green -- the
4  green references are all to the drills that he was on.
5         Now, were there other drills?
6         Can you see that? You want me to bring
7  it over? You'll see this in the jury room and you'll
8  have that identical chart in the notebook.
9         But the point is this: Yes, there were a
10 lot of drills that were Pat Kerin's drills, that's
11 right. There were Joanne Collins-Smee's drills.
12 There were Zapfel drills. He's put on these drills
13 beginning in June 2007, and he's kept on these drills
14 throughout. I mean it's not like he wasn't on any of
15 these drills.
16        Did she do anything for him less than she
17 did for a younger employee? No. Is there any proof
18 that he was treated differently because of his age?
19 No. Why would you believe that any of this had to do
20 with the notion that he was 60 years old? Those three
21 comments, that he alleges she made, is that it? Is
22 that the basis? That infects everything she ever did
23 thereafter, that's what they want you to believe.
24 Everything that followed from Mr. -- as soon as she
25 mentioned retirement, it's all -- everything she did

Page 1683

1  wrong is due to his age. That's not the law.
2         In looking at this issue, and the
3  question of the 5-minute drills -- I'm sure you heard
4  enough of that, too -- but in looking at this issue I
5  want to remind you of the one phrase that IBMers know
6  as soon as they get there, which is, "Your career is
7  your responsibility," Mr. Castelluccio was
8  ultimately responsible for finding his own position
9  within IBM.
10        He wants you to believe that his failure
11 was not his fault, but look at the record. We
12 found -- we were able to locate six e-mails that he
13 sent in the six months that he was on the bench
14 looking for another position. Six, in six months.
15 They are -- I'll say this slowly -- Plaintiff's
16 Exhibits 71, 73, 74, 88, 110, and 111. That's six
17 from him.
18        You've seen four e-mails from Joanne
19 Collins-Smee, or Connie Murphy at her instruction.
20 Those are Defendant's Exhibit 116, 124, 128, and
21 Plaintiff's Exhibit 90. Along with testimony from
22 Joanne Collins-Smee and Keith Holmes that she sought
23 out additional positions for him during multiple
24 5-minute drills, and you saw evidence that she did
25 that in the exhibits that you saw before you.

Page 1684

1         So he sends out six e-mails, she sends
2  out four, she makes more inquiries. They're about
3  even. The difference is he's on the bench and has no
4  job responsibilities, she's supervising 20,000 people
5  and handling every strategic outsourcing contract in
6  the United States and Canada at the same time.
7         And I would urge you to take his claim --
8  to take Mr. Castelluccio's claim that he reported to
9  work every day and knocked on doors every day with a
10 large grain of salt. Ms. Collins-Smee denied this.
11 And you saw the video clip that I played from his
12 deposition where I said, What did you do during this
13 period of time? And he said, It was a difficult time,
14 and I took more personal time off during that six
15 months than I ever took before in my career.
16        Finally, recall what Mr. Castelluccio has
17 said about these drills. He claimed he had to depend
18 on Ms. Collins-Smee, seeking to convince you that the
19 failure to find a job was her fault, not his. But
20 remember, I asked him why he had to depend only on her
21 when he knew Bob Zapfel so well. Remember he was
22 talking about, he was on the phone with Zapfel, Zapfel
23 had his cell phone number, I work with him, blah blah
24 blah.
25        And Keith Holmes testified yesterday, I

Page 1685

1  asked him, Was it appropriate for somebody in Mr.
2  Castelluccio's position to approach Bob Zapfel if he
3  knew him? And Keith said, Of course, people do it all
4  the time. Did Mr. Castelluccio do this? No, he did
5  not.
6         Now, before I asked the question of Mr.
7  Castelluccio, he had told you about how -- what good
8  friends he and Zapfel were, but I asked him then,
9  Well, why didn't you contact Bob Zapfel when you were
10 looking for a job? Why didn't you do that? And he
11 said, only, that Bob Zapfel was not his manager,
12 Joanne Collins-Smee was his manager, and he used that
13 same phrase several times.
14        But does that answer anything? You know
15 Zapfel was conducting these drills, and he's
16 apparently friendly, and he doesn't call him up?
17        Remember what Gordon Crawford testified
18 yesterday? He said -- he testified that his deal in
19 England was ending, and who did he call? He called
20 Bob Zapfel, and he sat down with him and he said, Bob,
21 my deal in England is ending, I need to find a new
22 role, help me find a new role. And he ended up at
23 WellPoint. I'm just going to leave it right there.
24        There was a little bit of discussion, and
25 you'll see in Mr. Carta's exhibits, IBM's allegedly

Page 1686

1  offering shifting reasons for the terminations. Look,
2  I think you've heard plenty. Both of those reasons
3  are absolutely clear. For poor performance he was
4  pulled off of those two positions. For poor
5  performance he was put on the bench. He was told he
6  needed to find another job. He didn't find another
7  job after six months. IBM said we can't carry you
8  forever. Thanks very much, but we can't go -- this
9  can't go on. They're both true. They're both
10  accurate. They're both related, and there's nothing
11  wrong with that situation.
12       Now, you also heard Mr. Castelluccio
13  claim that Ms. Collins-Smee should have hired him for
14  one of those seven positions. You saw the e-mail with
15  the seven positions while he was on the bench. But
16  she also testified that she wanted to hire the best
17  people, and explained to you in detail why she told --
18  she chose the people that she did. They were all 20
19  plus year veterans of IBM, and all had recent subject
20  matter expertise for the jobs into which they were
21  hired.
22       And it's very significant that Mr.
23  Castelluccio didn't say he was better qualified than
24  any of them. When I asked him, I said, Were you
25  better qualified than these people? No, I was equally

Page 1687

1  qualified with them.
2       When a plaintiff claims discrimination
3  based on comparing qualifications, they have to prove
4  that they were better qualified, that no one
5  exercising a judgment -- no reasonable person would
6  have chosen the person instead of them. He hasn't
7  even made that claim.
8       Mr. Carta also mentioned that he was sent
9  to WellPoint in an effort -- he was set up to fail
10  there. He was not set up to fail there. He was an
11  expert in troubled accounts by his own admission. He
12  was very experienced. And you heard everybody, you
13  heard Liederbach, you heard Keenie McDonald, you heard
14  Keith Holmes, you heard Joanne Collins-Smee all say
15  the same thing. We sent him there, we thought he
16  could handle one account instead of 30 in the
17  portfolio, and they would have applauded if he had
18  done what Gordon Crawford did. They were looking for
19  somebody to solve that account. He didn't do it. So
20  they got somebody else in there, 59 year-old Gordon
21  Crawford and he did it.
22       So I want to emphasize one more thing
23  about these qualification issues. And it goes
24  throughout this case. Mr. Carta has said, Mr.
25  Castelluccio was rated a 2. He was a solid performer,

Page 1688

1  period. Joanne Collins-Smee rated him a 2. That's
2  it. But the fact is whether he was rated a 2, a 1, a
3  3 or a 4, he was pulled off of two accounts in 2007
4  for poor performance. IBM didn't have to ignore those
5  events, no matter what his ratings were.
6       Mr. Carta -- this sounds a little bit
7  like the Wizard of Oz, where the wizard is there
8  working the levers and saying don't look at the man
9  behind the curtain. Right? Don't look at that stuff.
10  Don't look at what actually happened. It's a 2.
11  That's the rating. You don't have to think about it,
12  and don't worry about all this other stuff that
13  actually happened. He was a solid contributor.
14  That's it. While it's said you can call a lion a
15  leopard, but the leopard still has spots. And here
16  Mr. Castelluccio had very serious performance problems
17  in 2006 and 2007, and no PBC rating obliged IBM to
18  ignore those problems.
19       So the evidence, the facts in this case
20  show no age discrimination, and we ask you to render a
21  verdict in IBM's favor.
22       Now, I have to shift over and say a few
23  words about damages. My answer on damages, my short
24  answer to you, and my request to you, is don't worry
25  about them. There's no evidence of age

Page 1689

1  discrimination, there's no damages. But I have to
2  address this issue in any event. And I do it out of
3  an abundance of caution.
4       So first let me state the obvious, and I
5  hope you guys all know this, but I've actually
6  interviewed a couple of jurors after a trial who said
7  gee, I wish you'd said that during trial. You can't
8  render a verdict for Mr. Castelluccio, you can't give
9  him damages unless you find age discrimination. Can't
10  be based on sympathy. You have to find a violation of
11  the law before you ever get to damages. And if I just
12  said something you know, I apologize.
13       Now, Mr. Castelluccio's proof of damages
14  rests upon his expert witness, Dr. Crakes. You heard
15  Dr. Crakes on the stand the other day. I thought that
16  his testimony was entirely without foundation and was
17  absolutely incredible. He made numerous mistakes.
18  Let's talk about them.
19       He used the wrong age. It was based on
20  age 66. Mr. Castelluccio testified before you on two
21  occasions, I intended to retire at age 65. That's a
22  big deal. That's a big deal.
23       You'll also recall that Dr. Crakes
24  said -- I asked him during his deposition, and he
25  acknowledged in his testimony, I said how many times

Page 1690

1  have you used 65 or 66 or 70 in your other studies?
2  He's done thousands of these studies. He said, I
3  actually never used 66 before, I used 65, sometimes I
4  use 70.
5        And the report's just in error. I mean
6  it is just in error. And it's not a rounding error.
7  I mean it's hundreds of thousands of dollars. I think
8  Mr. Carta said it was about $290,000 a year. That's
9  not a rounding number. That's big deal stuff.
10        What else did he do wrong? He didn't
11  deduct Mr. Castelluccio's pension payments from the
12  back pay award. Judge Smith will instruct you in a
13  few minutes that pension payments have to be taken off
14  an award. The reason for that's pretty simple. You
15  can't both work and collect a pension. Right? So if
16  the thought is he should have been working, you have
17  to give back the pension payment. It's double-dipping
18  otherwise. Okay?
19        And I asked Dr. Crakes, I said, You did
20  this in a prior study in this case? And he said Yes,
21  I did. And I asked him why he didn't in this case,
22  and here's his answer. He said, "The calculation of
23  economic loss is based upon the loss to Mr.
24  Castelluccio subsequent to his termination. Any
25  pension benefits that he's received from that point of

Page 1691

1  termination would be based on his employment and
2  efforts prior to that termination itself, so I did not
3  subtract any value for pension benefits associated
4  with the work that I performed up to the point of his
5  termination."
6        I don't know, maybe you got that, but I
7  didn't, and I've read it a whole bunch of times. I
8  don't know what he said there.
9        But this, too, this is not a rounding
10  error, either. I mean Mr. Castelluccio testified his
11  pension is equal to $78,000 a year, and under Mr.
12  Crakes' -- Dr. Crakes' study, if you used 4.67 years,
13  which takes him to age 66, which is wrong anyhow, but
14  multiplying that out, it's over $360,000. That's a
15  lot of money for an expert to be off.
16        What else did Dr. Crakes do wrong? He
17  admitted he didn't make any investigation of the facts
18  of this case. Remember I asked him, I said, Do you
19  know how IBM evaluates performance? Do you know how
20  it awards bonus? Do you even know what kind of case
21  this is? He said, No, I don't know it's an age
22  discrimination case. I know it's an employment case.
23        He simply relied upon instructions he
24  received from Mr. Carta's office. He never did any
25  independent verification. For all he knew, Jim

Page 1692

1  Castelluccio could have been playing in the NBA. He
2  had no idea what the actual facts were.
3        But most importantly, what he also didn't
4  do was account for alternative earnings, for
5  mitigation of damages. And I asked him, Do you do
6  this in every employment case? And he said Yes.
7        Mitigation in damages works like this.
8  It's a simple concept of law. If you hire somebody to
9  paint your house, they don't show up, you can't let
10  your house fall apart and then sue the painter who
11  didn't show up for the value of the house. You got to
12  get somebody else in to paint your house so it doesn't
13  fall down, and then you sue the painter not for the
14  value of the house, but for what you paid to the
15  second painter. That's called mitigation of damages.
16        In the employment setting what that means
17  is that if you're terminated and you're seeking to
18  recover back wages, you have to do everything that you
19  can to get another job, and that minimizes your
20  damages. That's how that works in the employment
21  sector. And it's something that's done in every case.
22        I asked Dr. Crakes why he didn't consider
23  that issue, and he said, Well, Mr. Carta's associate,
24  back in 2010, told me not to consider that issue. But
25  he had no factual basis for ignoring alternative

Page 1693

1  earnings.
2        He's not an expert in recruiting like Dr.
3  Sodikoff is. He's not in a position to say, well, I
4  thought he couldn't get a job until he was 66 or 65,
5  or whatever. There's no basis for doing that in this
6  case.
7        And there is no basis for concluding that
8  someone with Mr. Castelluccio's career wouldn't be
9  able to find a job if he had gone about it in the
10  right way. You heard from Dr. Sodikoff this morning.
11  He testified that Mr. Castelluccio was doing this in
12  the entirely wrong way. He was depending exclusively
13  on ExecuNet, or almost exclusively on ExecuNet and
14  NetShare. That wasn't sufficient for finding a job.
15  That's -- in the corporate world, that's the
16  equivalent of looking through want ads.
17        And I asked Mr. Castelluccio at his
18  deposition, and he testified on the stand, I said, How
19  many interviews, face-to-face interviews in five years
20  did you get through using ExecuNet? And do you
21  remember what he said? None. He was hoping for one.
22  He got none.
23        Now, there's something wrong with a job
24  search that produces no interviews in five years. And
25  in a tough economy, in 2008 we all know this was a

Page 1694

1    tough economy, you can't just sit at home and do
2    internet searches and expect to get a job. You all
3    know what you have to do. You have to get out there.
4    You have to work at it.
5          You heard Dr. Sodikoff testify this
6    morning, there are five steps to this. It's a job.
7    You have to go out and you have to network.
8          And remember, I asked Mr. Castelluccio on
9    cross-examination, I said, Mr. Castelluccio, you must
10   have had a huge Rolodex. You had 40 years at IBM.
11   You worked throughout the entire IT industry in
12   America. Why didn't you get on the phone and call the
13   people at WellPoint, call the people at United
14   Healthcare? You ran through a whole list of
15   generalists. Why didn't you call them up, take them
16   to lunch, see what they had?
17         Remember what he testified in response?
18   He said, I mistakenly thought I had a covenant not to
19   compete with IBM. So I didn't think I could do so.
20         And I asked him, Did you check? You're
21   looking for a job, you should check. No, he didn't
22   check. The whole reason -- do you think he was
23   serious about getting a job? Or do you think he was
24   going through the motions? Sitting at home and using
25   ExecuNet.

Page 1695

1          Now, consider the chart of what he did,
2    which I mentioned a few minutes ago. As I said, he
3    created it in the spring of 2010. It's got hundreds,
4    hundreds, not one or two, but hundreds of events in
5    2008 and 2009. I mean how can they be accurate based
6    on the spreadsheet?
7          And you'll recall I objected to that
8    chart, and I said we've asked for the backup, where is
9    the backup? Show me anything. Show me one piece of
10   paper that supports these entries on this chart. You
11   got some ExecuNet resumés. Let's put those aside.
12   Show me a piece of paper that said you went to one of
13   these conferences. Nothing. We never got anything
14   back. So I think that chart is about as -- worth
15   about what's the paper it's written on.
16         But here's the most important question
17   with regard to mitigation of damages, and whether he
18   was looking for work seriously. He never even
19   considered looking for a Band 10 position at IBM to
20   remain in the work force.
21         And you'll recall, those jobs are posted.
22   Any IBMer can go find them. You didn't need Joanne
23   Collins-Smee to find them for him. He could have
24   taken a look and he could have been on one of those
25   jobs.

Page 1696

1          And you heard Keith Holmes yesterday
2    testify that when he lost a job and couldn't find
3    anything, that's exactly what he did. He did, and he
4    got a job, and there was no reduction in salary. Mr.
5    Holmes is still with IBM today. He's a Band 10, even
6    though his executive level job was eliminated.
7          You'll also recall that Mr. Holmes
8    testified that Band 10 positions have substantial
9    responsibilities and often have high salaries. The
10   salary figure he used for 2009, the highest Band 10
11   was being paid $395,000 a year, which is not bad. And
12   Mr. Holmes testified that under IBM policy, if Mr.
13   Castelluccio had obtained the Band 10 position, the
14   worst that would have happened was he would have taken
15   a 10 percent cut in salary. And Mr. Castelluccio
16   never even inquired about that policy.
17         Now, I want you to think about this when
18   Mr. Carta talks about damages. He's asking you to
19   award his client millions of dollars, but he wouldn't
20   let -- Mr. Castelluccio wouldn't even consider bidding
21   on an IBM job that would at worst have resulted in a
22   10 percent cut in salary. Millions of dollars in
23   damages, I find it hard to believe that any reasonable
24   jury would consider doing that, and I trust that you
25   are all reasonable people.

Page 1697

1          In fact, what Mr. Carta will tell you in
2    a minute is that not only is he asking you to do that,
3    but he's asking you to double it on the grounds that
4    IBM acted willfully in this case. To act willfully,
5    IBM, it's not enough to violate the law, you have to
6    act with reckless disregard for whether your conduct
7    violates the law. And that is just not the case here.
8          And the proof of that is not only that
9    IBM acted lawfully, but it absolutely did not act with
10   reckless disregard. In fact, it did just the
11   opposite.
12         What did it do? When Mr. Castelluccio
13   filed an internal complaint of discrimination, IBM did
14   a complete investigation of that complaint. It
15   followed procedures that it established long ago to
16   make sure it doesn't violate the law. IBM takes its
17   commitment to comply with the law very seriously. It
18   employs departments of people to deal with these
19   issues. That's Russ Mandel's job. You met him.
20   That's all he does. And you'll see when you look at
21   the open door procedures, it's very clear, it's very
22   heavily regulated.
23         And I would emphasize to you as in an age
24   discrimination case, Mr. Mandel, as I said before, is
25   68 years old. He interviewed 20 witnesses in addition

Page 1698

to Mr. Castelluccio. IBM followed its normal
procedures, investigated Mr. Castelluccio's complaint
carefully, and made sure it compiled with the law, and
there's no conceivable way that IBM's conduct was in
any way reckless or undertaken with disregard for
whether its conduct violated the law.

Now, let me switch gears. I want to put
all the legal stuff away, and I want to talk to you
about what may actually have happened here, and try to
pull this together. So let's go back.

Mr. Castelluccio was used to working with
Tony Messina and with Kelton Jones. Those two guys
largely invented the delivery business at IBM. They
were there for a long time. He was used to working
with them. He liked how they worked. He liked and
respected them. He was, to use his own words from
notes with Garrett Walker, as our Exhibit 36, part of
the Messina-Jones regimen.

Tony Messina and Kelton Jones were fired
in early 2007, January 2007, and they were fired, and
at the same time IBM changed how the delivery
operation worked. They were replaced by Bob Zapfel
and Joanne Collins-Smee.

Joanne Collins-Smee was younger and had
less delivery experience than Mr. Jones or Mr.

Page 1699

Messina. You heard Mr. Carta ask her, one of his
initial questions to Joanne was whether she had any
delivery experience at all. She had substantial
delivery experience. Not as much as Jones. But the
question Mr. Carta asked showed exactly what his
client thought about her level of experience.

So all of a sudden Mr. Castelluccio goes
from working for a man he respects to a woman he
doesn't believe knows the business. And to make
matters worse, Ms. Collins-Smee pulls him out of his
vice president position within a month of her arrival
on the job. Of course Kelton Jones was going to do
that, but it's still easy to understand why Mr.
Castelluccio was upset and frustrated.

So what does he do? Well, he starts to
cash out his stock options, and to consider his
alternatives. Maybe he'll get a job with another
company, maybe he'll retire, but this new IBM
certainly is not working out for him.

Take a look at our chart.

Jean, can you put that up, of when he
cashes out his stock options?

Well, this -- so let me -- this will be
in your binders, too. But you'll recall, he starts in
2007. He's still working -- he's working on

Page 1700

WellPoint. He's working on the -- for the early part
of the year as vice president PSD, and he starts
cashing out his options, and then that continues the
next year at length.

So put up the actual chart where you can
see this. And let's enlarge that portion.

This, too, you'll have in your notebooks.

But look at the dates, when he's doing
this. 4/24, 10/15. This is '07. 12/10. The first
two of those dates he's not on the bench. He's not
told, according to him, that he's even going to not be
at WellPoint anymore. And he keeps going in '08,
3/12. He's on the bench. Nobody said anything.
5/08, that's before she gives him -- says there's
going to be a package prepared.

What's he doing? I have to say -- and I
think this is obvious, but let me say it again. You
hold on to options because the stock market -- except
in 2008 when it went like this, generally the stock
market goes up, and you have a right to buy a share of
IBM stock at whatever it is, 60 dollars, 80 dollars or
whatever, and whatever the marketplace is, it's better
if it's higher, so people hold on to their options.
Why cash these things out? I mean I saw this and I
said, what's going on here?

Page 1701

Let's keep on going. He gets put on
WellPoint, which is a tough account that requires a
lot of work. And even though Jim Castelluccio was an
expert in troubled accounts, his heart's really not in
it. He doesn't do much to inspire client confidence.
He avoids SWAT calls, Crit Sit calls, and the client
says, as you saw, he's invisible and MIA. Just the
opposite of what Gordon Crawford did.

Now, he says he was surprised by being
pulled off the WellPoint account, but that's not the
case. Keenie McDonald testified, Every time I had a
problem I told him about it. And you saw many the
e-mails about this. He wasn't getting it done. And
he knew it.

So he finds himself on the bench, and
without Tony Messina and Kelton Jones to get him a
job. Maybe they had the clout to place him somewhere,
but his new boss, Joanne Collins-Smee, doesn't. And
in any event, she doesn't share their high opinion of
him. She tries to help, but she didn't -- she can't
place him.

He doesn't do all that much on his own
behalf. He doesn't contact Bob Zapfel like Gordon
Crawford did. Instead he starts responding to
inquiries from outside recruiters.

Page 1702

1    And when you have a chance, in the jury
2  room, take a look at the exhibits, our Defense
3  Exhibits 91 and 94. In February 2007 -- or 2008, I'm
4  sorry -- he starts talking to outside recruiters. All
5  right, so maybe he'll leave. And he's cashing out
6  hundreds of thousands of dollars in options and
7  putting them in the bank.
8    Ms. Collins-Smee meets with him on May
9  20th, 2008, and says listen, there's a separation
10 package being put together for you, and if you don't
11 find a job by the end of June, I think we'll have to
12 call it quits. IBM can't keep you on the bench
13 forever. And on that same day, that same day, he
14 renews his contact with the outside recruiters. And
15 these are our Exhibits 110 and 111.
16    And that's where all of this stands until
17 we give him a package. And the package contains
18 advice to consult with counsel. He consults with
19 counsel. And two days later he files an age
20 discrimination complaint.
21    Now, is that the true story? I don't
22 know. Only Jim Castelluccio knows whether that's the
23 true story, and he hasn't been telling us the truth.
24 But I do know one thing, and that is, none of this had
25 anything to do with age discrimination.

Page 1703

1    Thank you for your attention throughout
2  that too long statement, and for your attention
3  throughout the case
4    THE COURT: Thank you, Mr. Fasman.
5    MR. CARTA: You have been extraordinarily
6  patient and I'll not ask you to sit there too much
7  longer.
8    Let me just talk about -- for a second
9  about the stock options. I mean I have to tell you,
10 I'm quite surprised. Anybody who owns stock, there's
11 a million reasons for selling stock, and to say that
12 somehow a personal decision, a financial decision
13 that's made about when you sell stock, that that's
14 somehow indicative of Mr. Castelluccio wanting to bail
15 out of IBM, just makes no sense. You sell stock
16 because you have kids go to college and you need to
17 pay for it.
18    Frankly, if you look at the chart, I wish
19 I had been that smart. He sold at the top of the
20 market. Right after that the market crashed. That
21 alone was a superb justification for selling those
22 stocks when he did.
23    I truly don't believe that you're going
24 to be convinced for a second that Mr. Castelluccio
25 wasn't in there working his hardest and didn't want

Page 1704

1  more than anything to keep his job at IBM. This
2  suggestion that because he happened to sell some stock
3  for which there could have been a hundred reasons and
4  that somehow is indicative his intention to bail on
5  IBM just makes no sense. And it's completely
6  inconsistent with everything that you've seen. Enough
7  about that.
8    There's one thing that was said that I
9  just have to absolutely respond to. IBM just took the
10 position that Ms. Collins-Smee did exactly the same
11 thing that Mr. Kelton Jones had done. Think about
12 that. What Mr. Jones told you he planned to do was to
13 find another position for Mr. Castelluccio and move
14 him into the same position at the same time as he
15 found somebody else to take the vice president of
16 public sector position. That's hardly what Ms.
17 Collins-Smee did. She just pulled him out of the
18 position and never thought about what other job he
19 would have.
20    And I do think it's indicative of age
21 discrimination. She didn't do that with anybody
22 younger. Look at all the younger people she found
23 jobs for. So the notion that she did the same thing
24 to Kelton Jones, it's hard to even hear that and not
25 respond

Page 1705

1    Let me talk for a moment about the
2  damages, because in the end I think that is going to
3  be a part of what you're going to need to wrestle
4  with.
5    Professor Crakes explained his
6  calculation to you. I think he had some very
7  conservative reasonable assumptions, that he didn't
8  even build in any projections for increasing salary
9  with respect to the bonuses. He went back four years
10 and averaged the past four years and then projected
11 that number out over the rest of the period. He
12 didn't even add any increases.
13    And he did that because we wanted to have
14 a reasonable, justifiable, conservative number.
15 $1.345 million is a lot of money. Mr. Castelluccio
16 was a successful executive. On an annual basis he was
17 making $288,000 a year, and he was out of work that
18 times when he wanted to work for the better part of
19 five years.
20    Now, there's been some discussion about
21 when Mr. Castelluccio intended to retire. My
22 recollection is -- of his testimony is he said he
23 wanted to work through the end of his 65th year, so he
24 would have retired at the end of when he was 65, which
25 is when he became 66, and that's the number that Dr.

Page 1706

```
 1    Crakes used in this calculation, which is 4.67 years.
 2    And I don't think there's any contrary testimony
 3         The other criticism that I heard with
 4    respect to Dr. Crakes is that his calculation didn't
 5    take into account any wages that were earned by Mr.
 6    Castelluccio when he was out of a job.  Well, yeah, he
 7    was out of a job.  There weren't any wages for him to
 8    earn.
 9         It's true that in the beginning at the
10    time of his deposition Dr. Crakes did a calculation
11    that was assumed, because he didn't know, assumed that
12    Mr. Castelluccio was not going to get a job, but it
13    turned out that that was exactly the correct
14    assumption.
15         So Dr. Crakes's calculation was accurate,
16    and in fact when he testified he said he based it not
17    on what he had been told by an associate that he
18    worked with years ago, but it was based upon the
19    facts, that there was no earnings that had taken place
20    that should be used to offset the claim.  He'd been
21    without a job, so there was nothing to subtract from
22    the wages that he would have earned.
23         And I just think that's -- couldn't be
24    more clear, and I think if you think about Dr.
25    Crakes's testimony, it was pretty clear that he was
```

Page 1707

```
 1    relying on what actually happened, which was the fact
 2    that there weren't any wages that had been earned, and
 3    therefore there was nothing to deduct.
 4         You've heard testimony as well about Mr.
 5    Castelluccio's emotional distress.  Mr. Castelluccio
 6    tried to describe to you the effects that he suffered
 7    as a result of being discriminated against and losing
 8    his job.  You could see as he testified that even now,
 9    five and a half years later, he's still feeling the
10    stress, the humiliation and the anxiety that comes
11    from having your 40-year career end.  I won't say
12    anything more about that.  You do what you think is
13    right with respect to emotional distress.
14         IBM has just raised the issue of
15    willfulness.  The Judge will explain to you what that
16    term means, and he'll define it for you.  I just heard
17    an awful lot from Mr. Fasman, who is an
18    extraordinarily able New York trial lawyer, but he was
19    telling you what the law is.  That is not -- first of
20    all, at least four of the things he said to you I
21    think were just wrong.  But that's not his job.  It's
22    the Judge's job to tell you what the law is.  And what
23    Mr. Fasman told you is the law is not only wrong, but
24    it's outside the scope of what his authority is.
25         Again, it's the Judge's job to tell you what the law
```

Page 1708

```
 1    is.  He does that in the jury charge.  That's what's
 2    going to happen next.  Thank you.
 3         THE COURT:  All right, ladies and
 4    gentlemen, I've made a command decision up here while
 5    I was listening to the arguments of able counsel in
 6    this case.  In my jury charge I have to talk to you
 7    about the law, and I've got to explain some nuances
 8    and intricate things to you, and it would probably
 9    result in my talking to you or actually reading to you
10    for maybe 45 minutes.
11         Now, it's quarter to 5, and the law in
12    this area is detailed and it's complex.  The issues
13    that you have to consider are detailed and complex.  I
14    want you to listen to me with a clear mind free of the
15    fatigue that you suffered all day waiting for us and
16    coming back and forth, so I'm not going to give you
17    the jury charge at quarter to 5 and finish at 5:30 and
18    then have you go into the jury room.  There's no need
19    for that.
20         We're coming back tomorrow, and we're
21    going to be meeting here at 10 o'clock.  The lawyers
22    are going to be here before because they've got some
23    work to do looking over the exhibits before they're
24    going to you in the jury room.  The lawyers will do their
25    work, and at 10 o'clock I'll be here, and we'll be in
```

Page 1709

```
 1    all fresh and invigorated and ready to go.  Drink some
 2    V8 Juice or, you know, could have had a V8, come in,
 3    and listen to the charge, and at this point you will
 4    have the difficult task of applying the law to the
 5    facts that you find.  You are the judges of the facts.
 6    But you've been assisted in this case by the services
 7    of two very, very, very good lawyers.
 8         So ladies and gentlemen, with that,
 9    goodnight.  Do not begin deliberating.  It's
10    absolutely bitter outside.  Go home and bundle up, sit
11    by the fireplace, get a good night's rest, and we'll
12    begin tomorrow, and hopefully finish tomorrow with a
13    verdict.
14         (Jurors excused)
15         THE COURT:  Okay.  I've explained what
16    we're going to do.  And I'll see you here at 10
17    o'clock.  If you have anything to talk to my law clerk
18    about, or I'll be up any chambers before then, but you
19    got to go over the exhibits, make sure they're all in
20    order.  Nothing should go into the jury unless you are
21    in agreement that it should go.  I think that's
22    basically it, all you have to do.  I think we should
23    be able to begin at 10.
24         I would hope that the jury would be able
25    to plow through it.  They are a serious,
```

Page 1710

1    conscientious, able bunch of people, and I think
2    they're -- you have engaged them, and you've captured
3    their attention, and I look forward to see tomorrow,
4    but for now, goodnight.
5              (Court adjourned)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1711

1              CERTIFICATE OF REPORTER
2
3         I Hereby certify that the foregoing 205 pages
4    are a complete and accurate computer-aided
5    transcription of my original stenotype notes taken in
6    the Matter of James Castelluccio VS International
7    Business Machines Corporation, which was held before
8    The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9    District Court, 450 Main Street, Hartford,
10   Connecticut, on January 23, 2014.
11
12
13        Wendy Allen, RMR, CRR
14        Notary Public
15
16
17   My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

52 (Pages 1710 to 1711)

## Page 1711

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO        )
    Plaintiff        ) 3:09-cv-01145 (TPS)
                      )
VS                    ) January 24, 2014
INTERNATIONAL BUSINESS )
MACHINES CORPORATION   ) Federal Building
    Defendant         ) Hartford, Connecticut


VOLUME 9
TRIAL HELD BEFORE
THE HONORABLE THOMAS P. SMITH, U.S.M.J.


Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221

## Page 1712

Representing the Plaintiff
Carta McAlister & Moore, P.C.
1120 Boston Post Road
Post Office Boxer 83
Darien, CT  06820
    By:  Mark R. Carta, Esq.
        mark@cmm-law.com
    By:  Margaret A. Triolo, Esq.
        margaret@cmm-law.com
    By:  Troy Bailey, Esq.


Representing the Defendant

Paul Hastings, LLP
75 East 55th Street
New York, NY  10022
    By:  Zachary Fasman, Esq.
        Zacharyfasman@paulhastings.com
    By:  Todd C. Duffield, Esq.
        Toddduffield@paulhastings.com
    By:  Jean-Marie Gutierrez


ALSO PRESENT:

Daniel Fox, Esq.
IBM in-house counsel

## Page 1713

1      THE COURT:  I think we've got to deliver
2  the charge to the jury, and all of the changes that we
3  discussed in our charging conference have been
4  incorporated in this, and what I propose to do is
5  maybe sit in the jury box, which is closer -- not the
6  jury box -- in the witness stand, which is closer to
7  the jury box, and read.  Somehow when I'm in Judge
8  Covello's courtroom I prefer to do that.  It's better
9  than doing it over here.
10      But the charge is 17 pages long, and a
11  lot of it is repetitious of what I gave in the
12  preliminary charge.  And it was just called to my
13  attention that I hadn't handed out to you the
14  preliminary charge, so that you would see it before I
15  gave it, but this is longer than it needs to be
16  because it's duplicative of some things I said in the
17  preliminary charge.  But so be it, I guess.
18      You ready to get the jury?
19      MR. CARTA:  Yes, Your Honor.
20      MR. FASMAN:  Yes, Your Honor.
21      THE COURT:  Okay.  Madam clerk.
22      (Jurors present)
23      THE COURT:  Good morning, ladies and
24  gentlemen.
25      THE JURORS:  Good morning.

## Page 1714

1      THE COURT:  Please be seated.
2      Now I'm going to be giving you the law
3  that you have to apply to the facts which you find in
4  this case, and it involves a lot of reading, and so
5  you're going to have to listen carefully.  When I
6  finish, you'll have a copy of these jury instructions
7  with you in the jury room.  So let me begin.
8      There's something strange about having to
9  take off glasses to read.  Especially when they're
10  trifocals.
11      It's now up to me to give you the rules
12  of law that lie at the foundation of the various
13  matters here in issue:  The rules which, when applied
14  by you, will lead to your ultimate decision.
15      It's your duty to deliberate on this
16  case, and to arrive at a fair and just decision based
17  upon the evidence and the law.  Sympathy has no place
18  in the case, and you should conscientiously and
19  definitely avoid any considerations of sympathy as a
20  basis for your decisions.  This applies equally to the
21  plaintiff and to the defendant.
22      You must apply the law, as I give it to
23  you, to the facts you find to have been proved.  You
24  are to consider my jury charge as a whole and apply
25  the law that I give to you even if you believe the law

Page 1715

1   should be different. You will then render your
2   verdict by a unanimous vote.
3           When you go into the jury room to
4   deliberate, if you have a question, it must be set out
5   in writing and delivered to the court security
6   officers or marshals who would be here and they'll
7   transmit it to me, and we will then discuss it among
8   us and get back to you, either in writing or by
9   calling you back in here.
10          Now, as I discussed in my preliminary
11  instruction, you're going to decide what the facts are
12  from the evidence that was presented here in court.
13  The evidence consists of the sworn testimony of
14  witnesses and exhibits that have been received into
15  the trial record, and any facts to which the lawyers
16  have agreed or stipulated or which I instruct you to
17  accept.
18          Certain things are not in evidence and
19  are to be disregarded in deciding the facts of this
20  case. First, the statements and arguments of the
21  lawyers are not evidence.
22          Second, the questions to the witnesses
23  are not evidence. They may be considered only to give
24  meaning to the witnesses' answers.
25          Third, objections to questions and

Page 1716

1   arguments are not evidence. Attorneys have a duty to
2   object when they believe a question is improper under
3   the rules of evidence. So you should not be
4   influenced by the objection or my ruling on it. If
5   the objection is sustained, you should ignore the
6   question. If the objection was overruled, you should
7   treat the answer to the question like any other
8   answer.
9           Fourth, testimony that's been excluded,
10  stricken, or you have been instructed to disregard is
11  not evidence, and must be disregarded.
12          Finally, anything you may have seen or
13  heard outside of the courtroom is not evidence. You
14  are to decide the case solely on the evidence offered
15  and received in the trial.
16          Direct and circumstantial evidence.
17  There are two kinds of evidence. Direct and
18  circumstantial evidence. Direct evidence is testimony
19  by a witness about what that witness personally saw or
20  heard or did. Circumstantial evidence, on the other
21  hand, is indirect evidence of one or more facts from
22  which you may infer another fact.
23          If, for example, a witness testifies that
24  it was raining outside, that would be direct evidence
25  that it was raining. On the other hand, if the

Page 1717

1   witness testified that people were coming back into
2   the courtroom after lunch with dripping umbrellas, you
3   may -- you would have circumstantial evidence from
4   which you may infer or conclude that it is raining
5   outside.
6           Now, you may consider direct and
7   circumstantial evidence in deciding the case. The law
8   permits you to give equal weight to both, and so I
9   instruct you that circumstantial evidence may be just
10  as good and strong as direct evidence.
11          Sometimes I may order that evidence be
12  stricken or the answers be disregarded, and this means
13  you, in deciding the case, may not consider the
14  evidence that I've told you to disregard. Also,
15  evidence is sometimes admitted for a limited purpose.
16  When I said that evidence has been admitted for a
17  limited purpose, you may consider that evidence only
18  for that limited purpose and for no other.
19          The weight of testimony. There's no
20  magical formula by which one goes about evaluating
21  testimony. Instead, you should bring with you into
22  this courtroom all of the experience and background of
23  your daily lives. In your everyday affairs you
24  regularly determine for yourselves the reliability or
25  unreliability of statements that are made to you, or

Page 1718

1   documents that are given to you by others. The same
2   tests that you use in your everyday dealings are the
3   tests that you should apply in your deliberations
4   here.
5           In applying these tests you should
6   consider the demeanor of the witness on the stand, or
7   any interest that he or she may have in the outcome of
8   the case. You may also consider any bias or prejudice
9   for or against any party, the witness's opportunity to
10  observe, any reason for the witness to remember or
11  forget, the inherent probability of his or her story,
12  its consistency or lack of consistency, and its
13  corroboration or lack of corroboration by other
14  credible evidence.
15          Now, you may decide not to accept a
16  witness's testimony even if it stands uncontradicted
17  and unimpeached. On the other hand, you may find a
18  particular fact established even though it is
19  supported only by the testimony of one witness.
20          In sum, ladies and gentlemen, you alone
21  determine what weight, if any, to give to the evidence
22  presented. You should carefully scrutinize all of the
23  testimony that's been given, the circumstances under
24  which each witness has testified, and every matter in
25  evidence which tends to indicate whether a witness is

2 (Pages 1715 to 1718)

Page 1719

1  worthy of belief.  You also should consider each
2  witness's intelligence, motive, state of mind, and
3  demeanor while on the stand.  Consider also any
4  relation each witness may have to either side of the
5  case, the manner in which each witness might be
6  affected by the verdict, and the extent to which, if
7  at all, each witness is either supported or
8  contradicted by other credible evidence in the case.
9        If you should find that any witness has
10  deliberately testified falsely on any matter, you may
11  take that into consideration in determining whether
12  that witness has testified falsely on other points.
13        Now, simply because you find that a
14  witness has not testified accurately as to one fact,
15  it does not necessarily follow that the witness is
16  wrong on every other point.  A witness may honestly be
17  mistaken on one point, part of his or her testimony,
18  yet entirely accurate on others.  But if you find that
19  a witness has deliberately lied on a material point,
20  it's only natural that you should be suspicious of the
21  testimony of that witness on all points.  Under these
22  circumstances you are entitled, if you deem it
23  appropriate, to disbelieve the entire testimony of
24  that witness, or to believe it in whole or in part.
25  Whether you disbelieve it or not lies in your sound

Page 1720

1  judgment.
2        I want to before we leave this
3  credibility area stress that the instructions I've
4  given apply generally to all witnesses equally.  Any
5  witness who takes the witness stand subjects his or
6  her testimony to the tests that I've told you about.
7  This includes expert witnesses.
8        As I explained in my preliminary
9  instructions, you are not required to accept the
10  opinion of any expert witness.  As with any other
11  witness, it's up to you to decide whether to rely on
12  an expert's opinion.  In deciding whether to accept or
13  rely on the opinion of an expert witness you may
14  consider any bias of the witness, as well as the data,
15  the methodology and the reasons used to support his or
16  her conclusions.
17        As I told you in my preliminary
18  instructions, in a civil action the plaintiff bears
19  the burden of proof on each essential element of each
20  claim by a preponderance of evidence.  Again, I want
21  to point out that the burden of proof in a civil case
22  differs from the burden of proof in a criminal case.
23  In a criminal case the burden of proof is proof beyond
24  a reasonable doubt.  In a civil case the burden of
25  proof is proof by a preponderance of evidence.

Page 1721

1        To prove by a preponderance of evidence
2  means to prove that something is more likely so than
3  not.  In other words, a preponderance of evidence
4  means such evidence as when considered and compared
5  with that opposed to it has a more convincing force
6  and produces in your minds a belief that what is
7  sought to be proved is more likely true than not true.
8        Now, this is not necessarily determined
9  by the greater number of witnesses produced by a
10  party, but it means that the evidence on behalf of the
11  party on whom the burden rests must have a greater
12  qualitative force in your judgment.  A greater
13  qualitative weight.  That is, greater probative value.
14        It might help you to visualize a pair of
15  scales in equal balance.  Imagine that you can put the
16  plaintiff's evidence on one side of the scale, and the
17  defendant's evidence on the other side of the scale.
18        Now, if the scales tip ever so slightly
19  in favor of the plaintiff, that means the evidence
20  preponderates in the plaintiff's favor and the
21  plaintiff has proved its case by a preponderance of
22  evidence.  So if the scales tip ever so slightly in
23  the plaintiff's favor, then the plaintiff has proved
24  his case by a preponderance of evidence, and you
25  should find for him.

Page 1722

1        On the other hand, if the scales tip ever
2  so slightly in defendant's favor, then you will find
3  that the evidence preponderates in the defendant's
4  favor, and the plaintiff has not proved its case by a
5  preponderance of evidence.  Rather, the plaintiff has
6  not sustained his burden.
7        Now, I'm going to instruct you on the
8  substantive legal issues involved in this case.
9  Specifically I'm going to talk about the Age
10  Discrimination and Employment Act, known as the ADEA.
11  That's an acronym, A-D-E-A.
12        And New York State Human Rights Law.  The
13  New York State Human Rights Law is the state law claim
14  that the plaintiff has brought along with his age
15  discrimination -- his federal age discrimination
16  claim.
17        The plaintiff has brought a claim
18  alleging that the defendant discriminated against him
19  on the basis of his age in violation of federal and
20  state law.  The federal law at issue is the Age
21  Discrimination and Employment Act, or the ADEA for
22  short.  The state law at issue is the New York State
23  Human Rights Law.
24        Because the law governing the ADEA is
25  nearly identical to that governing New York state law,

Page 1723

1    I'm only going to instruct you on the ADEA. The only
2    difference between the two laws relates to the type of
3    damages you may award if you find for the plaintiff,
4    and I will explain the law of damages a little later
5    on.
6            If you find the plaintiff has proven his
7    age discrimination claim under the ADEA, you must also
8    find that he has proved his claim under New York state
9    law.
10           The ADEA makes it unlawful for an
11   employer to discriminate against an employee who is 40
12   years of age or older because of that employee's age.
13   The ADEA does not require an employer to give special
14   or favorable treatment to employees who are 40 or
15   older. Rather, under the ADEA, the age of an employee
16   is to have a neutral status. Thus the mere fact that
17   plaintiff is over 40 years of age and worked for the
18   defendant for many years does not mean that the
19   defendant had to retain him as an employee or offer
20   him any position within its organization.
21           The purpose of the ADEA is to prevent
22   employment discrimination based on age. Simply
23   because an employer has taken unfavorable action
24   toward an employee who is 40 years of age or older
25   does not mean that an act of age discrimination has

Page 1724

1    taken place. Under the ADEA an employer may transfer,
2    terminate or take other actions against an employee
3    for any reason, good or bad, fair or unfair, as long
4    as it does not discriminate against the employee based
5    on age.
6            In order for the plaintiff to succeed on
7    his ADEA claim he must prove by a preponderance of
8    evidence that the defendant terminated his employment
9    because of his age. In other words, he must prove
10   that age was a but-for cause of his termination,
11   rather than just a contributing factor or a
12   motivating factor.
13           The plaintiff must prove by a
14   preponderance of evidence that the defendant would not
15   have terminated him had he been younger and everything
16   else had remained the same. The plaintiff must prove
17   this through direct or circumstantial evidence. The
18   plaintiff's subjective belief alone is not sufficient
19   to prove discrimination. Discrimination is rarely
20   admitted and may be inferred from the existence of
21   other facts.
22           If the plaintiff meets his burden, your
23   verdict must be for the plaintiff. If the plaintiff
24   does not prove by a preponderance of the evidence that
25   the defendant terminated his employment because of his

Page 1725

1    age, then your verdict must be for the defendant.
2            While the law prohibits discrimination,
3    it is not unlawful for an employer to take adverse
4    employment action when its actions are based on
5    non-discriminatory factors, whether you agree with
6    those factors or not. That is, you should not, and
7    you may not second-guess the wisdom or the
8    reasonableness of an employer's legitimate business
9    judgments, regardless of what opinion you may have
10   regarding these judgments. Permissible business
11   judgments include good faith errors, unwise business
12   decisions, unnecessary personnel moves, as long as
13   they're not a pretext for age discrimination
14           Again, I remind you that the plaintiff
15   has the burden to prove by a preponderance of evidence
16   that age rather than a permissible business decision
17   was the but-for cause of his termination. An inquiry
18   about retirement is not necessarily evidence of age
19   discrimination.
20           Now, when rendering your decision I would
21   like you also to keep in mind some additional
22   instructions which the parties have asked me to
23   include. Over the past several days you heard
24   testimony about Mr. Castelluccio's removal as vice
25   president of the public sector for IT delivery in

Page 1726

1    February 2007, and his later removal as senior
2    delivery project or DPE of the WellPoint account in
3    November of 2007.
4            These removals are not the basis of Mr.
5    Castelluccio's discrimination claims and the legality
6    of Mr. Castelluccio's removal from these two positions
7    is not before you. The only issue before you is the
8    legality of Mr. Castelluccio's termination on June
9    30th, 2008.
10           The evidence you have heard and seen with
11   respect to Mr. Castelluccio's removal from the two
12   positions in 2007 is background information, which you
13   may consider, but you need not consider. Rather, the
14   evidence with respect to those removals has been ruled
15   by the Court to be simply background information.
16           The legality of those two actions is not
17   something that's before you now. Rather, that
18   evidence, as I said, of the removal is background
19   information which you may consider, but you need not
20   consider in determining whether Mr. Castelluccio was
21   terminated because of his age on June 30th, 2008. The
22   weight, if any, you give to this evidence is up to
23   you.
24           You've also heard that there were at
25   least 106 Band C and Band D executive job openings in

Page 1727

certain minute drill meetings during the period of
January 1st, 2008, through June 30th, 2008. Of those
106 openings, 16 of them were posted and filled in
Joanne Collins-Smee's organization. The remaining
positions were in other areas of IBM's business.

Joanne Collins-Smee could have requested
that Mr. Castelluccio be considered for those
positions. However, the decisions about whom to place
in these positions were made by executives other than
Joanne Collins-Smee.

Mr. Castelluccio offers this evidence to
show the number of positions that were open during the
period between January 1st, 2008, until June 30th,
2008. Mr. Castelluccio asserts that Ms. Collins-Smee
should have disclosed these positions to him, given
him an opportunity to apply for them, and in some
cases recommended him for these positions.

Mr. Castelluccio does not claim that he
should have been hired for these positions, and you
should not treat IBM's selection of someone other than
Mr. Castelluccio for any of these open positions as
evidence of age discrimination.

In addition, Mr. Castelluccio claims that
IBM has offered two different reasons for his
termination; poor performance, and his inability to

Page 1728

locate a job after being placed on the bench. When an
employer offers different reasons for the same actions
a jury is entitled to infer that neither reason is
accurate and that the true reason is discrimination.

This is not true, however, where there
are two reasons that are both factually true and where
the two reasons are related. When this is the case,
both reasons may be accurate, and reliance on both
reasons is not evidence of a discriminatory motive.
If you find that this is the case, you should not
infer discriminatory intent simply because the
employer has come forward with two related reasons for
the action.

Finally, you heard testimony about IBM
performing an internal investigation called an open
door investigation with respect to Mr. Castelluccio's
allegations of age discrimination. You may consider
this testimony as evidence that IBM takes such
allegations seriously. You should not consider it for
any other purpose.

Damages. If you find that Mr.
Castelluccio was discharged due to age discrimination,
you must go on to determine the amount of money to be
awarded. And this is the law of damages. You should
bear in mind that the plaintiff has the burden of

Page 1729

proving both that he was damaged and the extent of
those damages.

Before I talk to you more about damages,
I want to give you a few words of caution. The fact
that I'm instructing you on the subject of damages
does not mean that I have an opinion one way or
another on whether you should or you should not reach
the issue of damages in your deliberations. In
addition, you must not construe IBM's presentation of
evidence on the issue of damages to be an admission
that it's liable to Mr. Castelluccio for damages or
that Mr. Castelluccio is entitled to damages. IBM was
required to address the issue of damages or it would
have lost the opportunity to do.

So I will now instruct you on the damages
issue in this case.

First, we have compensatory damages. The
federal law, the ADEA, says that a plaintiff may
recover money damages for lost wages and benefits,
including increases in wages. The purpose of money
damages is to compensate the victim of wrongful
discrimination by putting the victim in the same
position he would have been in if the wrongful
discrimination had not occurred.

The law places the burden on the

Page 1730

plaintiff to prove facts that will enable you to
arrive at this amount with reasonable certainty.
While it's not necessary for the plaintiff to prove
the amount of damages with mathematical precision, the
plaintiff must present evidence such as might
reasonably be expected to be available in the
circumstances.

If you find for the plaintiff on his
claim of age discrimination, you should award him
damages in the amount of the salary and benefits he
would have earned had he not been terminated from the
date of termination until the date that you find he
would have retired. This includes the plaintiff's
base salary plus any pay raises, profit sharing,
bonuses, 401 contributions, and benefits he would have
received had he continued his employment.

You should deduct from this sum any
amount that the plaintiff has received since he was
employed by IBM. These deductions include pension
benefits he has received from IBM from the time of his
termination until the date you find he would have
retired, and any wages he has obtained from other
employment.

You must also deduct amounts which could
have been earned by the plaintiff through the exercise

## Page 1731

1　of reasonable diligence.  This is known as the duty to
2　mitigate damages.  In this regard it's the plaintiff's
3　duty under the law to use all reasonable diligence to
4　obtain employment or seek other sources of income to
5　minimize or avoid any damages he might suffer.  This
6　includes the obligation to seek and accept other
7　suitable employment which might have been available
8　using reasonable efforts -- might have been available
9　to him using reasonable efforts.  A plaintiff need not
10　accept employment that is not reasonably comparable to
11　his previous position.  Unlike other aspects of the
12　case, here it's defendant's burden to prove by a
13　preponderance of the evidence that the plaintiff
14　failed to mitigate.
15　　　Now, I want to talk to you about
16　something -- up to this point I've talked to you about
17　compensatory damages, that is, damages designed to
18　compensate and to make the plaintiff whole.  Now I'm
19　talking to you about another kind of damages called
20　liquidated damages.
21　　　The ADEA also provides that if a
22　defendant's violation is willful, then the plaintiff
23　may also be awarded additional damages known as
24　liquidated damages.  This is an amount equal to the
25　lost wages and benefits you award the plaintiff.  In

## Page 1732

1　essence, if you find that the defendant willfully
2　violated the ADEA, the plaintiff would be entitled to
3　double his lost wages and benefits.  The purpose of
4　these liquidated damages is to punish an employer for
5　a violation of the ADEA that is willful.
6　　　To establish a willful violation of the
7　ADEA, the plaintiff must prove that age was the
8　but-for cause of his termination.  To show a willful
9　violation, the plaintiff must also prove by a
10　preponderance of evidence that when the defendant
11　terminated his employment, the defendant knew it was
12　violating the ADEA, or the defendant showed a reckless
13　disregard for the matter of whether it was violating
14　the ADEA.
15　　　An act or a failure to act is done with
16　reckless disregard if it's done in such a way that it
17　pays no concern to its probable or possible injurious
18　consequences, or which, though foreseeing such
19　consequences, persists despite such knowledge.  It's
20　not enough for the plaintiff to show that the
21　defendant knew that the ADEA existed and might apply
22　to its actions, or that it knew it was against the law
23　to discharge an employee because of his age.  A
24　violation is not willful if it is done by accident,
25　inadvertence or ordinary negligence.

## Page 1733

1　　　If you find that the defendant terminated
2　the plaintiff's employment reasonably and in good
3　faith, even though it turns out that the termination
4　violated the ADEA, then the violation was not willful.
5　If you find that the defendant knew it was violating
6　the ADEA, or acted with reckless disregard of whether
7　it was violating the ADEA, then the violation is
8　willful.
9　　　Now I want to talk to you about yet
10　another type of damages.  Damages under the New York
11　State Human Rights law, and specifically I want to
12　talk to you about emotional distress.
13　　　Under the New York State Human Rights
14　law, if you conclude that the defendant terminated the
15　plaintiff's employment because of his age, then he is
16　also entitled to recover a different measure of
17　damages designed to compensate him for any pain,
18　suffering or mental anguish caused by the defendant's
19　conduct.  The damages that you award must be fair
20　compensation, no more and no less.
21　　　In order for the plaintiff to recover
22　damages for emotional distress, he must prove by a
23　preponderance of evidence that he incurred actual
24　physical or emotional distress as a result of the
25　defendant's unlawful conduct.  Thus you must first

## Page 1734

1　determine whether the plaintiff actually suffered
2　emotional distress.  You must then determine whether
3　the distress was caused by the defendant's conduct as
4　opposed to other events or factors in the plaintiff's
5　life.
6　　　You may not presume that the plaintiff
7　suffered emotional harm simply because you found he
8　was a victim of discrimination.  The law does not
9　allow you to compensate a plaintiff for the normal and
10　ordinary upset or upsetting experiences one has in the
11　workplace.  Some discomfort and bad feelings are
12　inherent in the nature of work.  Furthermore, you may
13　not award any amount as damages for emotional distress
14　which arose as a result of any stress the plaintiff
15　may have experienced in connection with the process of
16　litigating this action.
17　　　In determining the amount of damages, if
18　any, for emotional distress, the law does not provide
19　a set formula.  Any award that you make should be fair
20　in light of the evidence presented.  No evidence of
21　the monetary value of such intangible things as pain
22　and suffering need be introduced into evidence.
23　Psychiatric or other medical evidence is not a
24　precondition to a recovery of emotional distress.
25　Mental and emotional distress may be proved by the

Page 1735

1 plaintiff's own testimony corroborated by reference to
2 the circumstances of the alleged misconduct. Do not
3 decline to award emotional distress for the sole
4 reason that they are difficult to measure.
5        In determining the amount of any damages
6 that you decide to award, if any, you should be guided
7 by common sense. You must use sound judgment in the
8 fixing of an award of damages, drawing reasonable
9 inferences from the facts in evidence. You may not
10 award damages based on sympathy, speculation or
11 guesswork. On the other hand, the law does not
12 require that the plaintiff prove the amount of his
13 losses with mathematical precision, but only with as
14 much definiteness and accuracy as the circumstances
15 permit.
16        Now, you'll be given a copy of these
17 instructions when you are deliberating. They'll be
18 with you in the jury room, and we have also prepared
19 the verdict form to assist you in recording your
20 verdict and guiding your deliberations.
21        You may now retire to the jury room, and
22 your first order of business should be to elect a
23 foreperson. Once we've sent the exhibits into the
24 jury room, you may begin your actual deliberations.
25        Now, if you find that it's necessary to

Page 1736

1 communicate with the Court, you should do so in
2 writing in a note signed by the foreperson and handed
3 to the court security officer who will be outside the
4 jury room. The court security officer will give it to
5 us and we will take care of whatever concern is
6 expressed in that note.
7        I believe that's it.
8        Gentlemen, anything else?
9        MR. CARTA: No, Your Honor.
10        MR. FASMAN: No, Your Honor.
11        THE COURT: Okay. Well, ladies and
12 gentlemen, you may retire. Thank you.
13        (Jurors excused)
14        THE COURT: Have counsel looked over the
15 exhibits and believe they're in order and should be
16 submitted?
17        MR. CARTA: Yes, we did it early this
18 morning, yes, Your Honor.
19        MR. FASMAN: Yes, Your Honor.
20        THE COURT: I don't think there's
21 anything else, then.
22        MR. FASMAN: No, sir.
23        THE COURT: If we get a question, I'll
24 just round everybody up. I imagine you'll be sitting
25 here. We'll answer the question as best we can.

Page 1737

1        MR. CARTA: How short of a leash do you
2 want us on, Your Honor? Can we go across the street
3 to get a sandwich, or do you want us in the building
4 the whole time?
5        THE COURT: No, you can go get a
6 sandwich. Where would you be going, the New York Deli
7 right straight across?
8        MR. CARTA: Either that or Max Bibo's.
9 Up to you, Your Honor.
10        THE COURT: If we have a phone number,
11 cellphone number, you can go to Max Bibo's, and we'll
12 call you, get you back here.
13        MR. CARTA: Okay.
14        MR. FASMAN: All right, Your Honor.
15        MR. CARTA: Thank you.
16        MR. FASMAN: Thank you.
17        THE COURT: You're welcome.
18        Nice job, gentlemen.
19        MR. FASMAN: Thank you, sir.
20        (Recess taken from 11:03 a.m. to 1:26 p.m.)
21        THE COURT: The clerk has advised me that
22 the jury has sent out a note, and I will read the note
23 to you and let you examine it, of course, but the note
24 asks, "What is the document that shows the reason IBM
25 terminated Castelluccio?"

Page 1738

1        Let's talk about how to deal with this.
2        MR. CARTA: There certainly is one
3 document that we put in for that express reason, which
4 is a redacted document in which IBM says that it was
5 for performance --
6        (Juror opens jury room door)
7        THE CLERK: They heard somebody knocking.
8        MR. FASMAN: Your Honor, I think there
9 was one here.
10        Your Honor, I believe it was Plaintiff's
11 204 that was reported that Mr. Carta produced that
12 shows the reason.
13        MR. CARTA: That was one of the ones.
14 That was the one I just alluded to, correct. The
15 other one that we had was a demonstrative exhibit that
16 listed changes.
17        MR. FASMAN: I think it's Plaintiff's
18 204, Your Honor.
19        THE COURT: The note from the jury has
20 been examined by both counsel, and it's been marked as
21 Court's Exhibit 2, and counsel right now are going
22 over their documents, and we should have an answer
23 shortly to the question.
24        MR. CARTA: Your Honor, I think we're in
25 agreement.

Page 1739

1      MR. FASMAN: I think we're in agreement,
2  Your Honor.
3      THE COURT: Let's give a written answer
4  on a piece of paper, and I'll write it, and we'll mark
5  it as a Court exhibit and we'll send it in.
6      MR. FASMAN: There are actually two
7  documents.
8      THE COURT: What do you want me to write
9  down?
10     MR. CARTA: Plaintiff's Exhibit 92 and --
11     MR. FASMAN: Plaintiff's Exhibit 204.
12     THE COURT: So I've got Plaintiff's
13  Exhibit 92 and 204.
14     MR. FASMAN: 204 it's pages 7 and 8.
15     MR. CARTA: 7 they 8.
16     THE COURT: With counsel's agreement, we
17  are answering the jury's question by sending them an
18  answer on a piece of paper, signed by me. Counsel are
19  in agreement that the answer should say, "Plaintiff's
20  Exhibits 92 and 204 at 7 through 8."
21     MR. CARTA: I agree with that, Your
22  Honor, that's correct.
23     MR. FASMAN: Yes, Your Honor.
24     THE COURT: Okay. This will be marked as
25  Court exhibit 2.

Page 1740

1      (Recess taken from 1:26 p.m. to 2:28 p.m.)
2      THE COURT: The record should reflect
3  that the jury passed out another note which has been
4  marked as Exhibit 3. The note is a question, and it
5  says, "If needed, how do we calculate tax liability?"
6  And it's signed by the foreman.
7      Counsel and I have discussed this, and
8  counsel are in agreement that the note should be sent
9  back to the jury with the answer, "The Court makes the
10  calculation."
11     So that's what we're going to do.
12     (Recess taken from 2:29 p.m. to 2:59 p.m)
13     THE COURT: The verdict form is on my
14  bench and I'm handing it now to the clerk who would
15  read the verdict.
16     (Jurors present)
17     THE COURT: Please be seated members of
18  the jury. We understand that you have reached a
19  verdict, and the verdict form has been given to the
20  clerk, who will now read the verdict.
21     Mr. Pylman.
22     THE LAW CLERK: This is the verdict form
23  in James Castelluccio versus International Business
24  Machines Corporation, civil number 3:09-cv-1145 TPS.
25     Question 1: Has Mr. Castelluccio proven

Page 1741

1  by a preponderance of the evidence that IBM terminated
2  his employment because of his age?
3      Answer: Yes.
4      Question 2-A: What amount of back pay
5  and benefits, if any, has Mr. Castelluccio proven he
6  is entitled to by a preponderance of evidence? This
7  amount should be calculated through the date that you
8  find Mr. Castelluccio likely would have retired.
9      Amount: $1,345,042, plus tax liability.
10     Question 2-B: What amount of retirement
11  pay and/or benefits has the plaintiff received that he
12  would not have received had he remained employed at
13  IBM?
14     Amount: $345,150.36.
15     2-C: Subtracting the amount you have
16  written in 2-B from 2-A, what is your award of back
17  pay and benefits?
18     $999,891.70, plus tax liability.
19     Question 3: Has IBM proven by a
20  preponderance of evidence that after Mr. Castelluccio
21  was terminated by IBM he had made no reasonable
22  efforts to seek employment?
23     Answer: No.
24     Question 4: Has IBM proven by a
25  preponderance of evidence that after Mr. Castelluccio

Page 1742

1  was terminated by IBM suitable work existed for Mr.
2  Castelluccio?
3      Answer: Yes.
4      Question 5: What amount, if any, has IBM
5  proven by a preponderance of evidence should be
6  deducted from the amount of back pay and benefits owed
7  to Mr. Castelluccio as a result of his failure to use
8  reasonable efforts to seek employment?
9      Amount: Zero dollars.
10     Question 6: Has Mr. Castelluccio proven
11  by a preponderance of evidence that one, he suffered
12  emotional distress, and two, such distress was caused
13  by IBM's conduct?
14     Answer: Yes.
15     Question 7: What amount of damages, if
16  any, would fairly compensate Mr. Castelluccio for the
17  emotional distress he suffered as a result of IBM's
18  conduct?
19     Amount: $500,000.
20     Question 8: Has Mr. Castelluccio proven
21  by a preponderance of evidence that IBM knew or showed
22  reckless disregard for whether its termination of Mr.
23  Castelluccio constituted age discrimination?
24     Answer: Yes.
25     Your Honor, the record should reflect

**Page 1743**

1 that this verdict form has been signed by the
2 foreperson, and dated today, January 24th, 2014.
3        THE COURT: Thank you, sir.
4        Ladies and gentlemen, you've heard your
5 verdict read. Is that your verdict, so say you all?
6        THE JURORS: Yes.
7        MR. FASMAN: Your Honor, we would like to
8 pole the jury, please.
9        THE COURT: Okay.
10       Juror number 1. You heard the verdict
11 read. Is that your verdict?
12       JUROR #1: Yes.
13       THE COURT: Juror number 2. You have
14 heard the verdict read. Is that your verdict?
15       JUROR #2: Yes.
16       THE COURT: Juror number 3. You've heard
17 the verdict read. Is that your verdict?
18       JUROR #3: Yes.
19       THE COURT: Juror number 4. You've heard
20 the verdict read. Is that your verdict?
21       JUROR #4: Yes.
22       THE COURT: Juror number 5. You have
23 heard your verdict read. Is that your verdict?
24       JUROR #5: Yes.
25       THE COURT: Juror number 6. You've heard

**Page 1744**

1 the verdict read. Is that your verdict?
2        JUROR #6: Yes.
3        THE COURT: Juror number 7. You have
4 heard the verdict read. Is that your verdict?
5        JUROR #7: Yes.
6        THE COURT: Juror number 8. You have
7 heard the verdict read. Is that your verdict?
8        JUROR #8: Yes.
9        THE COURT: So is your verdict, so say
10 you all?
11       THE JURORS: Yes.
12       THE COURT: Ladies and gentlemen, is
13 there anything further that we have to do?
14       MR. CARTA: Not today, Your Honor.
15       MR. FASMAN: Your Honor, we have some
16 motions, but I don't think we need to retain the jury
17 for that purpose.
18       THE COURT: Okay. Ladies and gentlemen,
19 thank you very much for your service in this case.
20 You worked very hard over these past two weeks, and
21 you were very attentive. This was a tough case, and
22 when you make tough decisions, inevitably you make
23 some people happy and you make others not happy, but
24 that's just part of the nature of things. I order
25 that your verdict be accepted and entered, and I now

**Page 1745**

1 excuse you with the thanks of every person in this
2 room. I know that every person in this room does
3 thank you. And so if there's nothing further, you may
4 be excused.
5        (Jurors excused)
6        THE COURT: Mr. Fasman.
7        MR. FASMAN: Your Honor, we renew our
8 motion for directed verdict, and we'll be filing a
9 motion for entry of judgment notwithstanding the
10 verdict.
11       THE COURT: Okay. As I told you, when
12 you made the Rule 50 motion, that I would take the
13 motion under advisement. I read it, I read it
14 carefully, I read it thoroughly then, but in
15 accordance with the Second Circuit's preferred
16 practice, I held decision in reserve awaiting the
17 jury's determination. The jury's determination has
18 now made it a necessary that I address that motion in
19 detail, and that is what I intend to do.
20       Now, you are -- I think you are correct
21 in your procedure that you have to file a JNOV to
22 accompany -- I guess what I'm trying to say is I
23 believe the correct procedure would be for you to file
24 a JNOV and for me to address the Rule 50 motion and
25 the JNOV in one ruling. Frankly, I'm not sure how

**Page 1746**

1 Rule 50 -- is it 52 for the JNOV?
2        MR. FASMAN: I believe it is, Your Honor.
3        THE COURT: I'm not sure how they
4 dovetail, but I will address both of those motions in
5 the normal course of business.
6        Mr. Carta?
7        MR. CARTA: I have nothing, Your Honor.
8        THE COURT: All right. Ladies and
9 gentlemen, this was a hard-fought battle, and I think
10 all of the lawyers in this courtroom distinguished
11 themselves in representation of their respective
12 clients. Unfortunately in our profession there's one
13 side that prevails and there's one side that doesn't
14 prevail. I wish I could send everybody away happy,
15 but I can't. But I do send you off letting you know
16 that I have fond memories of presiding in this case
17 over the past two weeks, mostly on account of the
18 civility and professionalism of the counsel in this
19 case.
20       So with that, I don't think there's
21 anything more that I can do, and therefore court is
22 adjourned.
23       (Court adjourned)
24
25

Page 1747

1          CERTIFICATE OF REPORTER
2
3          I Hereby certify that the foregoing 36 pages
4     are a complete and accurate computer-aided
5     transcription of my original stenotype notes taken in
6     the Matter of James Castelluccio VS International
7     Business Machines Corporation, which was held before
8     The Honorable Thomas P. Smith, U.S.M.J., at U.S.
9     District Court, 450 Main Street, Hartford,
10    Connecticut, on January 24, 2014.
11
12
13          Wendy Allen, RMR, CRR
14          Notary Public
15
16
17    My commission expires:  April 15, 2015
18
19
20
21
22
23
24
25

# The IBM Personal Business Commitments Program

**Document number USHR105**

**February 17, 2004**

1

PLAINTIFF'S
EXHIBIT 1

3:09-CV-1145 (TPS)

CONFIDENTIAL

IBM00092892

# Table of Contents

1. IBM's Personal Business Commitments Philosophy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
2. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
3. The Annual PBC Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
3.1 Step 1: Set Your Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   *3.1.1 Goal Alignment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
3.2 Step 2: Document Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
3.3 Step 3: Ratings and Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *3.3.1 About the Ratings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *3.3.2 Ratings for People Managers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *3.3.3 Unsatisfactory Rating* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *3.3.4 New Hires* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   *3.3.5 Out-of-cycle Changes or Closeouts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
3.4 Feedback - Informal Guidance and Interim Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
4. Goal-setting Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.1 Business Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.2 Development Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
4.3 People Management Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
5. Roles and Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
6. Contact Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONFIDENTIAL

IBM00092893

A-722

# 1. IBM's Personal Business Commitments Philosophy

IBM's success depends on how well each of us achieves our individual goals and contributes to the company's strategic objectives. The PBC program is the means by which all IBM employees worldwide set their goals for the year, receive feedback on their performance and development needs, and get evaluated on their performance.

At the start of each year, you are expected to set personal business goals that align directly with IBM's overall business goals and values. These goals should guide you throughout the year. At the end of the year your manager will evaluate how well you achieved your goals, compared to your peers, and give you a PBC rating to reflect your overall performance. This rating will be a key factor in determining your performance bonus, pay increase, and career opportunities.

The entire PBC framework is designed to reinforce IBM's high-performance culture and effectively differentiate employees based on their contribution to the company. To sustain marketplace leadership, IBM must maintain an environment where every employee is stimulated to perform at an exceptional level. The PBC program is the best way to recognize top contributors, motivate above average and solid contributors to perform at their peak, and identify low contributors who need to improve. Employees who make the biggest contribution to the company get the biggest rewards, and those who are the lowest contributors will know exactly where they stand.

3

CONFIDENTIAL

IBM00092894

## 2.     Introduction

This document describes the annual PBC process and the roles and responsibilities of the employee, the manager, and the reviewing manager in the process.

**Disclaimer**

IBM reserves the right, at its discretion, to amend, change or terminate the Personal Business Commitments program as the company requires. Nothing in this brochure shall be construed as creating an express or implied obligation on the part of IBM to maintain such a program.

4

CONFIDENTIAL

## 3. The Annual PBC Cycle

There are three steps to the annual PBC cycle:

- Step 1: Set your goals
- Step 2: Document your results
- Step 3: Ratings and Assessment

### 3.1 Step 1: Set Your Goals

At the beginning of each year, all employees must set personal business goals and document them in the PBC application. In addition to setting business goals, employees also need to document one or two development objectives. Managers (of employees) also write an additional set of goals related to their management responsibilities.

#### 3.1.1 Goal Alignment

**IBM Strategic Objectives and IBM Values**

**Business Unit Goals**

**Department Goals**

**Personal Business Goals**

At the start of each year, IBM's senior management team establishes the company's annual business objectives. Then, each successive level of management sets goals that support those above it. Your manager will communicate your department's goals for the year so you can tie directly into them. These steps can happen concurrently as long as alignment is achieved.

To be considered a top performer at IBM you must not only achieve results that contribute to IBM's success, but you must do so according to IBM's values. While IBM is a results-oriented company, we are also a company that puts a great deal of weight on our values: dedication to every client's success, innovation that matters - for our company and for the world; and trust and personal responsibility in all relationships.

When setting your goals, make sure they align with IBM's core values. At the end of the year, you will be evaluated not only on what you achieved during the past 12 months, but also on how you achieved it. If you failed to live up to IBM's values while pursuing your goals—no matter how great the results may be—it will be reflected in your PBC rating.

More about how to set goals can be found in the "Goal-setting Guidelines" section of this brochure.

CONFIDENTIAL

IBM00092896

## 3.2    Step 2: Document Results

It's important to keep an ongoing and accurate record of your results throughout the year so that you can incorporate them into your year-end results summary. Your manager will assess your results when giving you your PBC rating.

Documented results are factual statements about what you have achieved against your stated goals. Your documentation should address such matters as quality, quantity, costs/savings, meeting schedules or targets, and the impact your results have had on your team or department.

All employees need to document how they achieved their personal business goals as well as the impact their development goals had on achieving their business goals. People managers must also document their people management-related results, as well as the impact their development goals had on their people management goals.

Do not wait until the end of the year to put your results in writing. Make it a point to periodically update your records. In addition, take advantage of opportunities throughout the year to get informal feedback from your manager, team leader, colleagues, and customers to check whether you're on track in meeting your goals.

At the end of the year, record all your results in the PBC web application and send the form to your manager. Be sure to include all relevant information, including any performance feedback you received during the year.

## 3.3    Step 3: Ratings and Assessment

At the end of the year, your manager will evaluate your achievements and rate your performance for the calendar year. You will receive a single year-end rating that takes into account your full year performance, including any job changes or promotions. Your performance is evaluated not only on the results you achieved against your goals, but also in terms of your contribution to IBM's success relative to your peers (known as "relative contribution") and the compatibility of your behavior to IBM's values.

Your ability to show results can be greatly influenced by your acumen in IBM's foundational competencies, such as creative problem solving, teamwork and collaboration and other behaviors. While crucial to your success, however, you will not be rated specifically on your competencies or the related development goals you set early in the year. It's the end results and how you achieved them that count the most.

You must document your results in the PBC tool yourself and then you and your manager will review your achievements together. Your manager may modify the documentation or ask you to do so, where appropriate, for accuracy or clarity.

After considering all relevant information, your manager will give you a rating and provide a rationale for the rating. You will be asked to acknowledge reviewing the assessment and rating, and two levels of management will sign the final rating form.

It is important to remember that each year you will earn a new rating based on an overall assessment of your performance for that year. With each passing year, however, the expectations

6

for your performance will rise, which means you'll have to perform at a higher level to achieve the same rating as the year before.

### 3.3.1 About the Ratings

Your PBC rating is characterized in terms of your relative contribution to IBM's success for the year and reflects the degree to which you supported IBM's goals and lived the company's values.

| Rating | Description | Definition |
|--------|-------------|------------|
| PBC 1 | Among the top contributors this year | Achieves exceptional results; as a 1 performer, clearly stands out from the rest; is a role model for the IBM values. |
| PBC 2+ | Above average contributor | Goes above and beyond job responsibilities; outperforms most peers; finds ways to grow scope and impact. |
| PBC 2 | Solid contributor | Consistently meets job responsibilities; is reliable in doing job; demonstrates appropriate level of knowledge, skill, effectiveness and initiative. |
| PBC 3 | Among the lowest contributors, need to improve | When compared to others:<br><br>• Does not fully execute all job responsibilities, or executes responsibilities with a lower degree of results, and / or;<br><br>• Does not demonstrate as high a level of knowledge, skill, effectiveness or initiative.<br><br>Consecutive ratings at the PBC 3 level are unacceptable in IBM's high performance culture and require improvement. |
| PBC 4 | Unsatisfactory | Does not demonstrate or utilize knowledge and skill required;<br><br>Does not execute against job responsibilities; and / or<br><br>Shows no significant improvement after consecutive ratings at the PBC 3 level. |

### 3.3.2 Ratings for People Managers

IBM believes that people management is so vital to the company's success that if you are not excelling in your people management role, you cannot reasonably be performing at a top level overall. Managers can get a top overall PBC rating of 1 only if they are above average in performing their people management responsibilities

You are considered to have people management responsibilities if you are responsible for direct supervision of two or more individuals, including conducting their annual performance evaluation. This includes coaches within BCS.

### 3.3.3 Unsatisfactory Rating

Where, taking all relevant information into account, an employee's results were unsatisfactory, the manager initiates the review and specifies the areas where the employee's performance needs immediate and sustained improvement and sets a period of time within which improvement is required. An Unsatisfactory rating can be given at any time during the year. If the employee successfully completes the improvement period, the manager must assess with the appropriate

7

IBM00092898

rating. Failure to adequately address the areas needing immediate and sustained improvement results in termination. Should the employee successfully complete the improvement period and his/her performance subsequently become unsatisfactory for the same or similar reasons, immediate termination could result.

### 3.3.4    New Hires

IBM wants to hire and retain employees who are able to meet and exceed performance objectives, demonstrate those skills that were expected when hired, continue to grow skills valued by IBM and the customer, and demonstrate behaviors that reflect their ability to function effectively and productively in the IBM environment. Nowhere is it more important to set this perspective than early in a person's employment with IBM. During the first two annual PBC assessment cycles, behaviors and skills demonstrated, in addition to the overall rating and assessment, are evaluated for all new hires. Failure to meet expectations with respect to behaviors or skills, even if an employee meets or exceeds his or her objectives will result in a rating of unsatisfactory.

Year-end PBCs are not required for new hires hired on or after October 1. These new hires will still be eligible for a performance bonus based on the ranges for a PBC rating of 2/2+. A PBC rating for these new hires can be given at management discretion if there has been sufficient time, opportunity and results upon which to base an assessment.

### 3.3.5    Out-of-cycle Changes or Closeouts

A close-out rating is given at the time an employee leaves IBM to go on Leave of Absence or approved extended absences for health or disability reasons and is not expected to return to work by year end. This assessment should be based on the assessment period, which ends the day before going on LOA.

A close out PBC is not given for employees who are retiring, separating under resource actions, or voluntarily leaving IBM.

All other regular active employees should have a single year-end PBC (with an assessment end date between October 1 and December 31) that takes into account their full year contributions, including any job changes. Those who change jobs prior to October 1 will be rated by their current manager, with input from the previous manager. Those who change jobs October 1 or later will be rated by their previous manager at the same time the year-end ratings are done for all other employees to ensure that the rating reflects relative contribution in the organization in which the employee worked for most of the year. The previous manager should also discuss the final rating decision with the receiving manager.

### 3.4    Feedback - Informal Guidance and Interim Review

You will participate in an assessment of your results at the end of the year; however, you need not wait to obtain feedback on how well you are meeting your commitments. You should take advantage of opportunities to ask for informal feedback during the year from the most appropriate sources - your manager, team leader, colleagues, clients, etc.

8

CONFIDENTIAL

A-728

In addition, you may request an interim review with your manager at a relevant time during the year to discuss your progress or to adjust your objectives, if appropriate. Your manager may also suggest an interim review.

No rating is assigned at an interim review.

9

CONFIDENTIAL

IBM00092900

## 4.     Goal-setting Guidelines

Below is additional information about setting business goals, development goals, and people management goals (where applicable).

### 4.1     Business Goals

You are responsible for writing a set of personal business goals that align with IBM's overall business goals and core values.

You should work with your manager to mutually agree on a set of goals that is appropriate for your position and level of responsibility. Since your performance will be evaluated based on your contribution, you should set goals that focus you on the most significant contributions you can make.

See section 3.1.1 "Goal Alignment" for more information on how your goals should align with IBM's overall business goals and core values. Also see "How Do I Write My Business Goals?" within the PBC web application help text for examples.

### 4.2     Development Goals

IBM relies on its employees to continue to grow to meet the ever-increasing challenges of the marketplace. That is why it is important for each employee to identify the ways that he or she can improve to meet his or her business goals.

In the development goals section of the PBC application, you need to identify and document one or two development goals. Including development goals within your PBC does not replace your Individual Development Plan (IDP) but rather supports it. The IDP provides you an opportunity to document your career aspirations, near-term goals, skills and development needs that support your goals in your current job assignment and your future aspirations, as well as learning activities with planned completion dates.

The development goals you include in your PBC should also be reflected in your IDP under "Near term goals that address your current job assignments". It is important that you document goals and not just activities. Development activities should be first discussed with your manager and then documented in the Individual Development Plan or other development process available to you.

See "How Do I Write Development Goals?" within the PBC web application help text for examples.

### 4.3     People Management Goals

If you have people management responsibilities, along with your business goals you need to write two to four goals related specifically to your role as manager. Managers have this additional goal-setting requirement because IBM understands that good people management is vital to the company's success and its ability to maintain a high-performance workforce.

10

IBM00092901

Managers goals should be focused on how they will demonstrate the following behaviors of excellent people managers:

- Ensure employees understand how their work contributes to IBM's strategy, market success and your organization's goals

- Lead by example, setting clear performance standards, provide straightforward feedback in a respectful way, and actively manage low contributors

- Recognize outstanding contributions by employees and teams

- Ensure a positive, high-performance climate; listen to employees, address their issues and help employees succeed in IBM's matrixed environment

- Foster teamwork and inclusion among all employees -- across locations, cultures and geos -- and promote IBM's value of diversity

- Encourage employees to be innovative; support risk-taking and good ideas

- Develop the people with whom you work; teach and coach, and continually set clear development plans and goals for every employee reporting to you

See "How Do I Write People Management Goals?" within the PBC web application help text for examples.

11

**A-731**

## 5.     Roles and Responsibilities

The PBC program is the foundation of IBM's performance management system, so it's important that all employees and managers understand and follow through on their PBC-related roles and responsibilities. By fully participating in the PBC process, you'll help IBM build and maintain the best workforce in the world and ensure that every employee is fairly recognized and rewarded for his or her performance each year. Participation of the PBC program is a condition for continued employment for regular employees at IBM.

All employees are expected to:

- Have your business goals and development goals in place by March 31.
- Your final goals are subject to your manager's input and approval.
- Seek informal feedback on your performance throughout the Year.
- Document your final results.

All people managers are expected to:

- Have your people management goals in place by March 31, and document your final results at the end of the year.
- Communicate IBM's annual business goals, as well as your unit and department goals, to all your employees.
- Assist employees with their goal setting and approve/modify their goals as necessary.
- Provide ongoing feedback, guidance, and counsel to employees.
- Ensure that your employees' final documented results are accurate.
- Determine and communicate each employee's overall assessment and rating.
- Discuss plans for expected improvement with your employees, as needed.

Reviewing managers (second line managers and above) are expected to:

- Implement the PBC program.
- Ensure fair and equitable administration of the PBC process across the organization.
- Review employee goals to ensure alignment with IBM's business goals and values.
- Review overall assessments and ratings.

12

CONFIDENTIAL

IBM00092903

A-732

## 6.　　　 Contact Information

For additional information, contact the Employee Service Center at 1-800-796-9876 or via email at the following address: askhr@us.ibm.com

13

CONFIDENTIAL

IBM00092904