# 14-2854-cv

*To Be Argued By:*
**MARK R. CARTA**

IN THE

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

-against-

INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**FINAL FORM BRIEF FOR PLAINTIFF – APPELLEE JAMES CASTELLUCCIO**

Mark R. Carta, Esq.
Margaret A. Triolo, Esq.
Carta, McAlister & Moore, LLC
1120 Post Road
Darien, Connecticut 06820
(203) 202-3100

*Attorneys for Plaintiff – Appellee James Castelluccio*

# TABLE OF CONTENTS

PAGE(S)

STATEMENT OF CASE ........................................................ 1

    Castelluccio's Employment History .............................. 1

    Collins-Smee's Discriminatory Treatment of Castelluccio .......... 2

    Castelluccio's Assignment to and Removal from the WellPoint
    Account ....................................................... 4

    Castelluccio's Initial Complaints of Age Discrimination ............. 9

    Collins-Smee was Responsible for Placing Castelluccio in a New
    Position ....................................................... 10

    The Open Door Investigation ..................................... 14

    IBM's Shifting Reasons for Castelluccio's Termination .............. 16

    These Proceedings ............................................. 17

SUMMARY OF THE ARGUMENT ...................................... 18

ARGUMENT ...................................................... 20

I.    THE COURT PROPERLY UPHELD THE JURY'S
    WILLFULNESS FINDING ........................................ 20

    A.   The Jury's Willfulness finding was Reasonably Based on the
       Evidence ................................................. 21

    B.   The District Court Acted Within its Sound Discretion When
       it Initially Ruled the Open Door Evidence Inadmissible ........ 25

    C.   IBM's Substantial Rights were Unaffected by the District
       Court's Final Ruling on the Open Door Evidence .................. 27

ii

# TABLE OF CONTENTS

| | | PAGE(S) |
|---|---|---|
| 1. | IBM's Beliefs at the Time of Castelluccio's Termination Were fully Communicated to the Jury | 29 |
| 2. | Mandel's Report is Not Probative of Whether IBM Knew or Recklessly Disregarded Whether Castelluccio's Termination Violated the ADEA | 32 |
| D. | IBM's Good Faith Defense Fails as a Matter of Law and Fact | 34 |
| E. | IBM Agreed to the Court's Questioning of Mandel and the Court's Charge Regarding the Open Door Evidence | 35 |
| II. | THE COURT PROPERLY UPHELD THE JURY'S AGE DISCRIMINATION FINDING | 36 |
| A. | Castelluccio Presented Sufficient Evidence of Age Discrimination | 36 |
| 1. | Direct Evidence | 36 |
| 2. | Circumstantial Evidence | 36 |
| B. | The Jury Reasonably Concluded that Age Discrimination was the "But For" Cause of Castelluccio's Termination | 38 |
| 1. | IBM's "Valid" Reason for Castelluccio's Termination Changed Over Time | 39 |
| 2. | The Jury Reasonably Rejected IBM's Claim that Castelluccio was Terminated for Poor Performance | 41 |
| 3. | The Jury Reasonably Rejected IBM's Claim that Castelluccio was Terminated for Failure to Find a Position | 42 |

iii

# TABLE OF CONTENTS

PAGE(S)

III. CASTELLUCCIO'S EMOTIONAL DISTRESS AWARD
SHOULD NOT BE DISTURBED ................................................ 47

    A. New York Law Does not Require Independently
Corroborated Evidence of Emotional Distress ........................ 48

    B. Castelluccio's Evidence of Emotional Suffering Was
Substantial ................................................................. 49

    C. The District Court Properly Analyzed Castelluccio's
Emotional Distress Award and Did Not Base its Decision on
an Impermissible Ground ............................................... 52

IV. CASTELLUCCIO'S FEE AWARD WAS APPROPRIATE ......... 54

    A. The Cases Cited by IBM Do Not Support a Reduction of
Castelluccio's Fee Award .............................................. 56

    B. Castelluccio's Fees for Trial Preparation Are Reasonable ...... 58

    C. Castelluccio's Fees Incurred in Defeating IBM's Summary
Judgment Motion Are Reasonable .................................... 59

    D. Castelluccio's Fees for Preparation of his Post-Trial Fee
Application are Reasonable ............................................ 61

    CONCLUSION ............................................................. 62

# TABLE OF AUTHORITIES

CASES                                                    PAGE(S)

Abel v. Town Sports Int'l, LLC,
    No. 09 CIV. 10388 DF, 2012 WL 6720919  (S.D.N.Y. Dec. 18,
    2012) ................................................................................ 57

Anderson v. Branen,
    17 F.3d 552 (2d Cir. 1994) ........................................... 35

CARCO GROUP, Inc. v. Maconachy,
    718 F.3d 72 (2d Cir. 2013) ........................................... 54

Carlton v. Mystic Transp., Inc.,
    202 F.3d 129 (2d Cir. 2000) ......................................... 39

Cross v. New York City Transit Auth.,
    417 F.3d 241 (2d Cir. 2005) ......................................... 23

Crowe v. Leroy Cent. Sch. Dist.,
    949 F. Supp. 2d 435 (W.D.N.Y. 2013) ....................... 39

Cullen v. Nassau Cnty. Civil Serv. Comm'n,
    53 N.Y.2d 492 (1981) .................................................. 53

Delaney v. Bank of Am. Corp.,
    766 F.3d 163, 169 (2d Cir. 2014) ................................ 43

Detje v. James River Paper Corp.,
    167 F. Supp. 2d 248 (D. Conn. 2001) ........................ 55, 57

Dittmann v. Ireco, Inc.,
    903 F. Supp. 347  (N.D.N.Y. 1995) ........................... 34

Do Yea Kim v. 167 Nail Plaza,
    No. 05 CV8560 (GBD), 2008 WL 2676598 (S.D. N. Y. July 7,
    2008) ........................................................................... 47, 53

Dominic v. Consolidated Edison Co. of New York, Inc.,
    822 F.2d 1249 (2d Cir.1987) ....................................... 42

v

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

E.E.O.C. v. Ethan Allen, Inc.,
    44 F.3d 116 (2d Cir. 1994) ......................................................... 39, 40

E.E.O.C. v. Yellow Freight Sys., Inc.,
    No. 98 CIV. 2270(THK), 2002 WL 31011859, (S.D.N.Y. Sept.
    9, 2002) ...................................................................................... 48

Farrar v. Hobby,
    506 U.S. 103 (1992) .................................................................... 59

Gross v. FBL Fin. Servs., Inc.,
    557 U.S. 167 (2009) .................................................................... 38

Hagelthorn v. Kennecott Corp.,
    710 F.2d 76 (2d Cir. 1983) .......................................................... 55

Hazen Paper Co. v. Biggins,
    507 U.S. 604 (1993) .................................................................... 21, 24, 34

Jones v. Dunkirk Radiator Corp.,
    21 F.3d 18 (2d Cir. 1994) ............................................................ 43

Lifranc v. New York City Dep't of Educ.,
    415 F. App'x 318 (2d Cir. 2011) ................................................. 46

Lore v. City of Syracuse,
    670 F.3d 127 (2d Cir. 2012) ........................................................ 27

MacMillan v. Millennium Broadway Hotel,
    873 F.Supp.2d 546 (S.D.N.Y. 2012) ........................................... 49

Malarkey v. Texaco, Inc.,
    983 F.2d 1204 (2d Cir. 1993) ..................................................... 25

vi

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

McDaniel v. Cnty. of Schenectady,
    595 F.3d 411 (2d Cir. 2010) ........................................ 54


Mate v. New York State Dep't of Transp.,
    24 A.D.3d 330, 806 N.Y.S.2d 522 (App. Div. 2005) ................. 42

Meacham v. Knolls Atomic Power Lab.,
    381 F.3d 56 (2d Cir. 2004) cert. granted, judgment vacated on
    other grounds, sub nom. KAPL, Inc. v. Meacham, 544 U.S. 957
    (2005) ........................................................ 47, 53

Moore v. Houlihan's Rest., Inc.,
    No. 07-CV-03129 ENV RER, 2011 WL 2470023 (E.D.N.Y.
    May 10, 2011) report and recommendation adopted, No. 07-
    CV-3129 ENV RER, 2011 WL 2462194 (E.D.N.Y. June 17,
    2011) ........................................................... 56

New York City Transit Auth. v. State Div. of Human Rights,
    78 N.Y.2d 207, 216, 577 N.E.2d 40 (1991) ............................ 48

New York State Ass'n for Retarded Children, Inc. v. Carey,
    711 F.2d 1136 (2d Cir. 1983) ........................................ 62

Norton v. Sam's Club,
    145 F.3d 114 (2d Cir. 1998) ........................................ 46

Patterson v. Balsamico,
    440 F. 3d 104 (2d Cir. 2006) ........................................ 53

Spencer v. Stuart Hall Co.,
    173 F.3d 1124 (8th Cir. 1999) ...................................... 21

Tsombanidis v. City of W. Haven, Connecticut,
    208 F. Supp. 2d 263 (D. Conn. 2002) ............................... 57

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

Turley v. ISG Lackawanna, Inc.,
    No. 13-561, 2014 WL 7172061 (2d Cir. Dec. 17, 2014) ........... 48

United States v. Al-Moayad,
    545 F.3d 139, 159-60 (2d Cir. 2008) ......................................... 26

Valley Hous. Ltd. P'ship v. City of Derby,
    3:06CV1319 TLM, 2012 WL 1077848 (D. Conn. Mar. 30,
    2012), appeal dismissed (Nov. 14, 2012) ................................... 55, 60

Welch v. United Parcel Serv., Inc.,
    871 F. Supp. 2d 164 (E.D.N.Y. 2012) ........................................ 52

Wright Lining & Const. Co. v. Tully Const. Co.,
    2 F. App'x 220 (2d Cir. 2001) ..................................................... 21, 38

Zakre v. Norddeutsche Landesbank Girozentrale,
    541 F.Supp.2d 555 (S.D.N.Y 2008) ........................................... 53

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) ....................................................... 38

**STATUTES**

29 U.S.C. § 626 .................................................................................. 17
N.Y. Exec. Law § 296 ....................................................................... 17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 61 .............................................................................. 27
Fed. R. Evid. 403 .............................................................................. 25

## STATEMENT OF THE CASE

Castelluccio was terminated by IBM after 40 years of employment – his entire professional career – when he was 61 years old. Castelluccio's direct supervisor, Joanne Collins-Smee ("Collins-Smee") waged a 16 month campaign to force him into retirement motivated by age bias.

### Castelluccio's Employment History

Throughout his career at IBM, Castelluccio received a series of promotions. In early 2005 he was promoted to Vice President of Public Sector Contracts ("VP Public Sector") for IBM's Integrated Technology Division ("ITD") in which he was responsible for the overall management of the day-to-day performance of over 30 technology outsourcing contracts. Castelluccio managed 2,500 employees and revenues of $700 million. JA304, JA319; Trial Tr. at 109:13-19, 172:14-21.

All IBM employees receive annually a formal, comprehensive evaluation known as a Personal Business Commitment ("PBC"). Early each year, managers and those they oversee agree on quantitative objectives for the upcoming year. At the end of the year, employees provide their managers with a summary of their accomplishments. The employee and manager then discuss and agree on the employee's numerical performance rating. JA304-305; Trial Tr. at 110:7 to 114:2-19. Ratings range from 1 to 4, with 1 being the highest. A "2" rating is described as a "solid contributor" and is defined as "consistently meets job

responsibilities; is reliable in doing job, demonstrates appropriate level of knowledge, skill, effectiveness and initiative." JA305-306, JA726; Trial Tr. at 115:17 to 117:15. In addition to a numerical rating, managers can add comments to the PBC evaluation. The employee and manager then both sign the PBC, and it is reviewed by a second-line manager to ensure fairness and consistency. The second-line manager must approve or revise the PBC. JA306-307; Trial Tr. 120:5 to 121:22.

While he was VP Public Sector, Castelluccio's direct supervisor was Arthur Kelton Jones ("Jones") who described himself as "an IBMer for life." JA540; Trial Tr. at 1044:7-9. Jones conducted Castelluccio's PBC for 2006 and assessed Castelluccio as a "2". JA734. Jones left IBM in early 2007 and was replaced by Collins-Smee. JA338-339; Trial Tr. at 246:15 to 247:1.

**Collins-Smee's Discriminatory Treatment of Castelluccio**

On or around February 22, 2007, in Castelluccio's first face-to-face meeting with Collins-Smee, she began by asking his age, and then asked him whether he was old enough to retire. JA339; Trial Tr. at 249:20 to 250:8. At the time, Castelluccio was one week shy of his 60th birthday. Castelluccio emphatically replied that he had no desire to retire and that he was committed to continuing to work. JA339-340; Trial Tr. at 250:4 to 251:7; 252: 21- 25. Despite the clarity of his response, Collins-Smee pressed Castelluccio on his retirement on two

2

subsequent occasions during meetings in which only they were present. JA373-374, JA386; Trial Tr. at 386:18 to 387:6, 435:2-20.

Prior to being questioned by Collins-Smee, Castelluccio had not considered retirement or discussed it with his prior supervisors. JA339-340; Trial Tr. at 250:9 to 251:7. Although Collins-Smee denies that she made all of these inquires, she admitted raising the subject of his retirement twice. JA511, JA519; Trial Tr. at 929:20-25, 963:21-24. She also admitted it was inappropriate to ask Castelluccio his age and to repeatedly ask an employee about retirement after he made it clear that he was not interested in retiring. JA482; Trial Tr. at 814:11-15.

Just days after their first meeting, unbeknownst to Castelluccio, Collins-Smee communicated her plan to replace Castelluccio as VP Public Sector to Keith Holmes ("Holmes"), her Human Resources Executive. She stated in an email, "[w]e need to replace Jim Castelluccio" and "I spoke to Jim C today – he understands and also wants to move, he knew for a while that it was not working…. I also need you to get Jim on Pat Kerin's 5 minute drill." JA834 (emphasis added). Collins-Smee admitted that prior to making this decision, she did not review Castelluccio's 2006 PBC or HR records. JA477; Trial Tr. 794:11-18. She also admitted that she did not place Castelluccio on Kerin's drill for eight months. JA481; Trial Tr. at 809:6-11. Castelluccio was not copied on this email, had not consented to being moved, and was not aware of Collins-Smee's email

3

until it was revealed in discovery. JA341-342; Trial Tr. at 258:21 to 259:25. Although Collins-Smee testified she consulted with Castelluccio's prior manager about Castelluccio, JA477; Trial Tr. at 795:20 to 796:8, Jones unequivocally denied this claim.[1] JA540; Trial Tr. at 1046:7 to 1047:6. Collins-Smee finally advised Castelluccio of her decision four months later. JA363; Trial Tr. at 344:12-18.

**Castelluccio's Assignment to and Removal from the WellPoint Account**

WellPoint was a public sector service contract that was universally regarded at IBM as deeply troubled. JA470-471; Trial Tr. at 768:21 to 769:12. IBM was losing tens of millions of dollars annually on WellPoint. JA483; JA739, JA789; Trial Tr. at 818:8 to 819:15. In addition, Michael Morin ("Morin"), the Delivery Project Executive ("DPE") responsible for WellPoint, had raised significant concerns about IBM's failure to allocate the necessary resources for WellPoint. As a result of the overwhelming strain of the WellPoint position, Morin resigned from IBM. JA470-471; Trial Tr. at 768:21 to 769:12. Morin was widely regarded by IBM as an outstanding executive. JA484, JA597, Trial Tr. 823:1-4, 1272:10-14.

After Morin resigned, Collins-Smee designated Castelluccio as "acting DPE" for WellPoint. However, she also required Castelluccio to continue to serve

---

[1] IBM's version of the facts hinged on the credibility of Collins-Smee, JA688-690; Trial Tr. 1629:1 to 1637:11, whom the jury and judge found to be unworthy of credence.

4

as VP Public Sector. Castelluccio performed these two full-time positions throughout April, May and part of June 2007. During this time period, Castelluccio was also required by Collins-Smee to perform substantial work on two company-wide workforce reduction initiatives. These initiatives were complex, had firm deadlines, and required serious time commitment. JA362-363; Trial Tr. at 342:21 to 343:13. Collins-Smee testified she expected Castelluccio to "shine" in this environment. JA501; Trial Tr. at 890:5-16. Collins-Smee was certainly aware of the extraordinary demands these multiple assignments placed upon Castelluccio. Indeed, one of her peers counseled Collins-Smee in an email that the workload she had assigned to Castelluccio would cause him to "implode." JA844.

Collins-Smee finally advised Castelluccio in June 2007 that she had decided to remove him as VP Public Sector. She replaced him with Miguel Echavarria, who at the time was 11 years younger than Castelluccio. JA363; Trial Tr. at 344:12 to 345:1. Collins-Smee advised Castelluccio that he would thereafter be re-assigned full time to WellPoint. JA367; Trial Tr. at 359:13-25. Later, Castelluccio learned that IBM communicated to WellPoint that his assignment was "temporary." Without Castelluccio's knowledge, Collins-Smee continued to work to find a replacement for Morin. JA369; Trial Tr. at 369:15 to 370:14; JA852. Despite serving in this "lame duck" capacity, while Castelluccio served as

WellPoint's DPE, client satisfaction improved, and Castelluccio achieved well-documented success reducing IBM's expenses while improving service quality. JA737, JA862-863, JA866, JA378-379;Trial Tr. at 404:18 to 408:24.

IBM had great difficulty finding an appropriate permanent replacement for Morin.  WellPoint's CIO, Mark Boxer ("Boxer"), was regarded by IBM as "very tough and unreasonable," with a "screw the vendor attitude."  JA749, JA757. Boxer rejected five candidates proposed by Collins-Smee, all between the ages of 43 and 55.   JA368-369; Trial Tr. at 364:20 to 368:9. In August 2007, after IBM had been trying for six months to fill the WellPoint position, Boxer advised IBM that "time is up."  JA853, JA837; Trial Tr. at 373:15-23.  In early September 2007, Collins-Smee's then boss, Robert Zapfel ("Zapfel"), an IBM General Manager, proposed Gordon Crawford, ("Crawford") as WellPoint's DPE. JA370; Trial Tr. at 374:11-16.  Boxer approved the selection of Crawford, then 59 years old, in mid-September 2007, which assignment was to be effective in January of 2008.  JA854. Again, Collins-Smee elected not to share her decision with Castelluccio for months.  In fact, it was not until the day before Thanksgiving that Collins-Smee chose to inform Castelluccio that he was being replaced at WellPoint and was not being assigned to another position.  JA371-372; Trial Tr. at 377:10 to 381:17.

Importantly, and contrary to IBM's assertion, IBM agreed that the foregoing facts could be considered by the jury when determining whether IBM was liable

6

for age discrimination. The parties' agreed-upon jury charge stated, "[t]he evidence you have heard and seen with respect to Mr. Castelluccio's removal from the two positions in 2007 is background information which you may consider, but need not consider, in determining whether Mr. Castelluccio was terminated because of his age on June 30, 2008." JA996.

When Collins-Smee removed Castelluccio from WellPoint, he asked about his future with IBM. For the second time, she suggested retirement as an option. JA373-374; Trial Tr. at 386:18 to 387:6. Castelluccio again stressed to Collins-Smee that he wished to continue working, and Collins-Smee responded that she would assist him to find a new position. JA374; Trial Tr. at 387:7-20. Castelluccio advised Collins-Smee that he was willing to relocate and if needed, to accept a one level demotion. Id. This fact is undisputed. JA374, JA622; Trial Tr. 387:7-20; 1366:16 to 1368:23; JA891, JA893.

After Collin-Smee removed him from WellPoint, she marginalized Castelluccio by failing to give him another permanent or temporary work assignment. Rather, she relegated him to "the Bench," which is IBM's term for executives who do not have a full time responsibility. He was not advised of any performance issues or complaints. JA371; Trial Tr. at 377:23 to 378:10.

Castelluccio's assignment to the Bench was an anomaly in the IT Delivery group. Jones testified that in the six years he ran the IT Delivery group, the

7

concept of a Bench was foreign. JA539, JA552; Trial Tr. at 1040:8-10, 1093:9 to 1095:4. Jones explained that executives typically worked at over one hundred percent utilization, with the expectation of eighteen percent overtime. Id. This abundance of work continued during Collins-Smee's tenure, as demonstrated by her placement of numerous executives into open positions. JA846, JA888. Morin and Crawford also testified to working around the clock in IT Delivery. JA462, JA640; Trial Tr. 734:18-23, 1438:15 to 1439:2.

In January 2008, Collins-Smee conducted Castelluccio's PBC for 2007. She initially advised Castelluccio that she was considering assessing him as a "3". However, after meeting with Castelluccio and reviewing the quantitative objectives he had achieved, she awarded him a "2" rating. Additionally, in the optional comment section, she stated, "[i]n the Public Sector role Jim's team reduced head count significantly and we were able to continue to meet our service level objectives…. [and] on the Wellpoint account Jim and the team has [sic] made significant progress on programs to improve service quality and reduce costs." JA1478. Collins-Smee's boss, Zapfel, affirmed Castelluccio's "2" rating. JA308; Trial Tr. at 126:11-24. Collins-Smee admitted that such approvals were not a mere "rubber stamp." JA523; Trial Tr. 978:22 to 979:3.

In early 2008, Castelluccio learned that he was the only one of Collins-Smee's vice presidents excluded from a best practices training seminar she

8

sponsored. Collins-Smee then denied his request for the materials distributed at her seminar. JA380-381; Trial Tr. at 413:15 to 416:2. Collins-Smee also inexplicably rejected Castelluccio's repeated requests for a Blackberry to better communicate with Boxer at WellPoint. JA355, JA367; Trial Tr. at 313:17 to 314:24, 360:22 to 361:6.

**Castelluccio's Initial Complaints of Age Discrimination**

In or about February 2008, Castelluccio advised Garrett Walker ("Walker"), a senior Human Resources executive, that Collins-Smee had removed him from two positions. In an email, Castelluccio expressed his concern that Collins-Smee had not made him aware of the Quest IT Delivery position for which he was well-qualified. JA879, JA384; Trial Tr. at 428:15 to 430:25. Collins-Smee filled the position with an employee who was ten years younger than Castelluccio. JA384-385; Trial Tr. at 430:14 to 431:15.

Walker suggested that Castelluccio meet with Collins-Smee to discuss possible work opportunities. Castelluccio immediately did so, urging Collins-Smee, at a minimum, to assign him temporary work that might expose him to long term opportunities. IBM executives without full-time assignments were routinely afforded temporary work. JA354, JA550-551; Trial Tr. at 307:21 to 308:13, 1087:18 to 1088:1. Collins-Smee's initial reaction to Castelluccio's request was to remind him, for a third time, that he could retire. JA386; Trial Tr. at 435:2-20.

9

Collins-Smee then indicated that she might have temporary work for Castelluccio in the audits area, in which Jones testified he was well qualified. JA542; Trial Tr. at 1053:13 to 1054:16. Collins-Smee ultimately assigned this work to Tim Smith, then age 50. JA392-393; Trial Tr. at 456:8 to 460:8. Castelluccio reiterated his willingness to relocate and accept jobs at a lower executive level. JA386; Trial Tr. at 436:7-22. Subsequently, Castelluccio reported to Walker that Collins-Smee had once again asked him about retirement, and that he interpreted her comments as being related to his age. JA386; Trial Tr. at 436:23 to 437:11.

**Collins-Smee was Responsible for Placing Castelluccio in a New Position**

Unlike other job openings at IBM, executive openings are not posted and are considered confidential. IBM maintains a "Five Minute Drill" process for the placement of executives. In these monthly drills, IBM organizations compile lists of open executive positions, slates of employees qualified for these positions, and lists of employees who are available for new roles. The organizations then discuss the employees and their suitability for the open positions. JA343-344; Trial Tr. at 265:6 to 267:13. When Collins-Smee demoted Castelluccio to DPE of WellPoint, he no longer had access to the list of executive openings or participated in the Five Minute Drills. JA619; Trial Tr. 1353:18 to 1354:15.

As executive openings are confidential, it is imperative that managers advocate for executives during the drill process. In the absence of a manager's

10

affirmative efforts to place an executive, it is likely an executive will not obtain a new position. Jones confirmed that it was a function of IBM managers to place their executives by getting them on the appropriate drills, advocating for them on the drills, and lobbying for them outside the drill process. Indeed, Jones candidly admitted that executives were vulnerable without the affirmative support of their manager. JA547; Trial Tr. at 1072:24 to 1073:13. Holmes also conceded this point. JA624; Trial Tr. at 1375:15-25. Castelluccio testified that IBM protocol required that a manager immediately consider where to place an unassigned executive because they could not do it on their own. JA373; Trial Tr. at 383:12 to 384:6. Collins-Smee also acknowledged that it was her responsibility to place Castelluccio on drills. JA480; Trial Tr. at 807:2-21.

Castelluccio was eligible to be placed on drills in three different IBM organizations: GTS Americas, run by Kerin; IT Delivery, run by Zapfel; and ITD America, run by Collins-Smee. Despite the fact that Collins-Smee ran the Five Minute Drill that filled the positions for which Castelluccio was most qualified, she identified him as an available candidate in only one of the seventeen drills she conducted from the time she determined to replace him. JA846. Moreover, according to Holmes, Collins-Smee "rarely" even discussed Castelluccio in her drills. JA621; Trial Tr. at 1361:18 to 1362:4. She also failed to timely place Castelluccio on Kerin's Drill, JA480-481; Trial Tr. at 807:2-9, 809:6-11; JA835,

11

and made only limited use of Zapfel's Drills. JA855. The average age of individuals Collins-Smee placed through her Drills in this time period was 48. JA846.

While Castelluccio was on the Bench, there were a total of 106 executive openings filled in the IT Delivery organization. Of them, 16 were posted and filled by Collins-Smee. JA362; Trial Tr. at 339:24 to 341:14; JA981. Collins-Smee did not consider Castelluccio for or even advise him of the existence of any of these positions. JA997, JA846, JA365-366; Trial Tr. at 351:10 to 355:23.

In addition to the executives she placed through the Drills, on May 13, 2008, Collins-Smee created and filled seven executive positions within her organization. JA888. The average age of these executives was 49. JA394; Trial Tr. at 466:11-12. The memorandum announcing these positions was circulated to all of Collins-Smee's direct reports - with the exception of Castelluccio, who learned of these job openings after-the-fact, from a colleague. Although Castelluccio was qualified for several of these positions and had a comparable background and performance ratings to those placed, he was neither interviewed for nor notified of these seven openings. JA888, JA390-394; Trial Tr. at 448:3 to 466:10. These positions were filled by Collins-Smee after she had promised Castelluccio to seek work for him while he sat isolated on the Bench. JA394; Trial Tr. at 466:13-14.

12

Given that Collins-Smee had demonstrated for months that she had no intention of helping Castelluccio find a position, Castelluccio contacted numerous executives and made repeated inquiries to secure a new position while on the Bench. JA381-385, JA389-390, JA394-395; Trial Tr. 416:22 to 432:5; 444:15 to 448:2; 466:21 to 469:14; JA870-73, JA875, JA877, JA878, JA880-882, JA888, JA890, JA897.

On May 7, 2008, Collins-Smee asked that Castelluccio be added to a slate of candidates on a Zapfel Drill, albeit for a position that had already been filled. Remarkably, the Drill meeting notes admit that Collins-Smee had Castelluccio added "for the record." JA885, JA376, JA490; Trial Tr. at 396:1to 398:15; 845:20 to 848:20.

On May 20, 2008, Collins-Smee asked Castelluccio to meet with her. She informed Castelluccio that she had decided to terminate him unless he found a new position in thirty days. JA519; Trial Tr. at 962:17-24; JA895. Collins-Smee made no mention of performance issues at this meeting. JA396; Trial Tr. at 474:2-21.

Only after notifying Castelluccio of his imminent termination did Collins-Smee take further steps to place him. These half-hearted efforts included: one email to two individuals; and a request that two emails be sent, notifying a total of four people of Castelluccio's availability. JA967, JA971, JA976, JA979. These are

13

the very steps upon which IBM primarily bases its claim that Collins-Smee made substantial efforts to relocate Castelluccio.

**The Open Door Investigation**

Walker forwarded Castelluccio's emails regarding his discriminatory treatment by Collins-Smee to Russell Mandel ("Mandel"), IBM's Consulting Human Resources Professional. Mandel conducted an "Open Door" investigation into Castelluccio's report of discrimination. The purpose of an Open Door investigation is to ensure an objective and thorough review of an employee's complaint, and to determine whether an employee was treated fairly. JA954.

During his investigation, Mandel selected and interviewed 21 people over a five-week period, including Collins-Smee and Castelluccio. As is clear from the summary of his investigation ("Mandel's Report"), his interviews focused almost exclusively on Castelluccio's job performance and whether Collins-Smee was sufficiently aggressive in helping Castelluccio find a position.[2] Of the people he interviewed, Mandel's Report indicates he discussed age discrimination only with Castelluccio and Collins-Smee. Mandel's Report does not refer to the fact that Castelluccio was on the Bench for six months, or that this was IBM's stated reason for his termination. JA251.

---

[2] Collins-Smee's attempt to shirk all responsibility for placing Castelluccio after she had relegated him to the Bench, conflicts with Mandel's investigation which sought to ascertain whether "Collins-Smee [was] sufficiently aggressive in placing Mr. Castelluccio." JA254.

Notably, at her deposition, Collins-Smee testified that she did not recall Mandel indicating to her that Castelluccio was asserting an age discrimination claim. She swore Castelluccio's performance was all she discussed with Mandel. JA96. Based on Collins-Smee's sworn testimony that she had no knowledge of Castelluccio's age discrimination complaint, Castelluccio withdrew his retaliation claim at the time of IBM's Summary Judgment Motion. JA162, n.1.

Castelluccio's last day at IBM was June 30, 2008. On the same day Castelluccio was to depart, Holmes emailed Mandel asking for an update on his investigation. Mandel responded, "he goes today, though I'm still investigating. If he signs the release, he gets the money, *and I stop investigating*." JA256(emphasis added).

Mandel completed his investigation approximately five weeks after Castelluccio was fired and left IBM, rejecting its severance package and declining to give a General Release. Mandel concluded that Castelluccio was treated fairly. Mandel's Report also concluded that Collins-Smee should be reprimanded for over assessing Castelluccio in his 2007 PBC, wherein she rated him a "2". Collins-Smee was not reprimanded for anything else. JA534; Trial Tr. at 1020:19 to 1021:11. Castelluccio testified that he understood that Mandel had no authority to countermand his termination by Collins-Smee and order that he be re-hired. JA421; Trial Tr. at 573:25 to 574:8. However, Mandel claimed that he had

15

authority to rectify any wrongs his investigation uncovered. JA642; Trial Tr. at 1447:17-24.

Castelluccio was advised by Mandel in writing of the results of the Open Door investigation. JA423; Trial Tr. at 579:19 to 581:1.

Soon thereafter, Castelluccio launched his unsuccessful job quest and began receiving the pension he had earned for his 40 years of service.

**IBM's Shifting Reasons for Castelluccio's Termination**

When Collins-Smee terminated Castelluccio, she told him it was due to his failure to find a job. JA402; Trial Tr. at 495:1-5. Holmes' "Talking Points" Memorandum echoes this justification. JA895. Conversely, and despite the fact that Castelluccio never received an unfavorable performance evaluation, Mandel's investigation focused on Castelluccio's job performance. Mandel's Report notes that Castelluccio was offered a severance package "for performance." JA251. Similarly, IBM's counsel asserted before the New York State Division of Human Rights ("NYSDHR") that IBM terminated Castelluccio exclusively for poor performance. JA898. IBM repeated its performance rationale in pleadings filed early in this action. JA905. Subsequently, IBM revised its story and again claimed to have terminated Castelluccio for failure to find a position. JA134, JA232.

16

**These Proceedings**

Prior to trial, the District Court granted Castelluccio's Motion to Preclude IBM's Open Door evidence.  JA258.  In his decision, The Honorable Magistrate Judge Thomas P. Smith ("Judge Smith") stated, "[t]o the extent that IBM wishes to present evidence demonstrating its reasons for terminating Castelluccio's employment, it is free to introduce at trial the same evidence considered by Mr. Mandel."  JA264.  Although IBM declined to introduce the totality of the evidence considered by Mandel, it introduced all of Mandel's investigation, findings, and conclusions which pertained to age discrimination.

During their deliberations, the jury asked what document evidenced IBM's reason for terminating Castelluccio.  JA982.  The parties agreed to direct the jury to JA895 (reason for termination is failure to find a position) and JA911 (reason for termination is poor performance).

The jury found IBM liable for willfully discriminating against Castelluccio on the basis of age in violation of the Age Discrimination in Employment Act, ("ADEA") 29 U.S.C. § 626 and the New York State Human Rights Law ("NYSHRL") N.Y. Exec. Law § 296.  The jury awarded Castelluccio $999,891.70 in damages for back-pay and benefits, $999,891.70 in liquidated damages, and $500,000 for emotional distress.  Judgment entered on January 28, 2014. JA1004.

17

IBM then filed Renewed Motions for Judgment as a Matter of Law or, in the Alternative, For New Trial/Remittitur. JA1272. The Court denied IBM's motions. JA1414; SPA1. The Court thereafter awarded, over IBM's Objection, Castelluccio's Motion for Attorney's Fees. JA1449; SPA36. The sum awarded to Castelluccio for fees, interest, prejudgment interest and tax compensation was $1,219,137.50 for a total award of $3,718,920.78. JA1472;SPA59.

## SUMMARY OF THE ARGUMENT

The District Court acted within its sound discretion when it ruled the Open Door evidence inadmissible based upon a thoughtful balancing of its probative value versus its prejudicial effect. However, the court recognized IBM's interest in proving its beliefs at the time of Castelluccio's termination. Accordingly, it invited IBM to introduce at trial all the evidence considered by Mandel. Ultimately, the District Court revised its ruling and permitted IBM to introduce all probative facts relevant to age discrimination.

At trial, the Court revisited its ruling. IBM identifies three elements of its Open Door evidence as critical to disproving willfulness: Mandel's findings and conclusions; Mandel's reinstatement authority; and Mandel's Open Door Report. IBM's Page Proof Brief at 18, 28. Mandel's findings and conclusions were explicitly presented to the jury in JA910, which states, "the Open Door Investigation resulted in a determination that [Castelluccio] was treated 'fairly'

18

with respect to his termination." The jury was informed of Mandel's claim to have authority to re-hire Castelluccio through his testimony that the role of an Open Door investigator includes rectifying situations in which employees are treated unfairly. JA642; Trial Tr. at 1447:17-24. However, as there was also evidence that Mandel could not countermand Collins-Smee's decision, the jury had a basis for finding Mandel's beliefs irrelevant to IBM's willfulness. The only evidence ultimately excluded was Mandel's Report, which is unreliable in that it contradicts the testimony of IBM's own witnesses, and is not probative of whether IBM knew or recklessly disregarded whether Castelluccio's termination violated the ADEA. All probative evidence concerning Mandel's Report and investigation was presented to the jury. IBM's substantial rights were not affected by the court's treatment of IBM's Open Door evidence.

The jury's conclusion that IBM willfully discriminated against Castelluccio based on age was reasonably supported by Castelluccio's extensive, credible evidence of Collins-Smee's 16-month campaign to force him into retirement. From Collins-Smee's open inquiries into Castelluccio's age and retirement, to her furtive attempts to exclude him from business opportunities, there was ample justification for the jury and District Court to conclude that IBM was indifferent to the requirements of the ADEA. Further, the jury and District Court reasonably discredited IBM's conflicting explanations for Castelluccio's termination.

19

Castelluccio's 40 year tenure, strong performance reviews and the availability of over 106 jobs that were filled during the time that he was looking for a position, confounded IBM's claims of termination for either poor performance or inability to find a position. The jury reasonably concluded that age was the "but for" cause of Castelluccio's termination.

As stated by the District Court, the jury appropriately found that IBM's egregious treatment of Castelluccio justified an upward departure from the typical "garden variety" emotional distress claim. IBM's argument to the contrary disregards the evidence and improperly faults the District Court for applying the wrong standard.

IBM's criticisms of Castelluccio's attorneys' fees are based on miscalculations and unsubstantiated claims of excessive billing. Castelluccio's fees were reasonable and often necessitated by IBM's tactics. The District Court's ruling was based on a thorough review and rejection of IBM's claims.

The judgment of the District Court should be affirmed in all regards.

## ARGUMENT

## I. THE COURT PROPERLY UPHELD THE JURY'S WILLFULNESS FINDING

"A party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden. In this Circuit, the task of an appellate court … is to determine whether a finding in the party's favor can reasonably be based on

the evidence. The court should not substitute itself for the jury by weighing the credibility of the witnesses or otherwise considering the weight of the evidence, but instead should view the record in the light most favorable to the non-moving party." Wright Lining & Const. Co. v. Tully Const. Co., 2 F. App'x 220, 223 (2d Cir. 2001) (citations and quotation marks omitted).

The District Court properly upheld the jury's finding that IBM willfully violated the ADEA. IBM's claims of error are unsupportable for the following reasons: (1) the jury's willfulness finding was reasonably based on the evidence; (2) the District Court acted within its sound discretion when it initially ruled the Open Door evidence inadmissible; and (3) IBM's substantial rights were unaffected by the preclusion of evidence, because IBM's beliefs regarding Castelluccio's termination were fully communicated to the jury and Mandel's Report is not probative of whether Castelluccio's termination was willful.

## A. The Jury's Willfulness Finding was Reasonably Based on the Evidence

An employer's ADEA violation is willful if it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Hazen Paper Co. v. Biggins, 507 U.S. 604, 617 (1993). Proof of willfulness "does not require any heightened quantum or quality of evidence beyond that already established as long as all the evidence satisfies the distinct standard for willfulness." Spencer v. Stuart Hall Co., 173 F.3d 1124, 1129 (8th Cir. 1999).

21

IBM boldly argues, "there is simply no evidence of willfulness…." IBM's Page Proof Brief at 21. Castelluccio offered compelling evidence of willfulness in the form of Collins-Smee's knowing violation of the ADEA and of IBM's reckless indifference to the law. Collins-Smee testified that she received annual training regarding age discrimination. She admitted that she knew that it was inappropriate to ask employees their age, and, most importantly, that it was illegal to base an employment decision on an employee's age. JA481; Trial Tr. at 810:5 to 811:11. She also agreed that it was not appropriate to ask an employee repeatedly if he wanted to retire, when the employee had made it clear that he was not interested in retirement. JA482; Trial Tr. at 814:1-14.

Despite her knowledge of the ADEA, and of its application to Castelluccio, Collins-Smee inquired about his age, repeatedly questioned Castelluccio regarding his retirement, and made numerous adverse employment decisions affecting Castelluccio motivated by ageism. The jury viewed Collins-Smee's testimony, training, sophistication, and years of managerial experience, and reasonably concluded that she knew that the ADEA prohibited her age-based discriminatory treatment of Castelluccio. Therefore, Collins-Smee's violation of the ADEA was willful.

Willfulness can also be established by evidence that an employer "was indifferent to the requirements of the governing statute and acted in a purposeful,

deliberate, or calculated fashion." <u>Cross v. New York City Transit Auth.</u>, 417 F.3d 241, 253 (2d Cir. 2005) (citations omitted). The "calculated" nature of Collins-Smee's conduct is most apparent in her eleventh hour request that Castelluccio be added to a slate of candidates, "for the record," for a position that had already been filled. JA885, JA376; Trial Tr. at 396:1 to 398:15. Her purposeful exclusion of only Castelluccio, the oldest of her approximately 20 direct reports from professional development opportunities and relevant emails is further indicia of the calculated nature of her willfulness. JA380-381, JA476; Trial Tr. at 413:15 to 416:2, 791:17-19; JA888.

Not only did Castelluccio conclusively demonstrate IBM's actual knowledge that its conduct violated the ADEA, he also established IBM's reckless indifference to the law, through the following evidence: (1) Collins-Smee's pretextual claim of poor performance contradicted the fact that she and her manager awarded Castelluccio a "2" rating, "solid contributor," JA1475; (2) Collins-Smee's failure to place or even to assist Castelluccio to locate a new position, especially when contrasted with her placement of younger employees, JA490-491; Trial Tr. at 845:1 to 850:2; (3) Collins-Smee's isolation of Castelluccio on the Bench despite there being an abundance of available work, which she assigned to younger employees, JA550, JA552; Trial Tr. at 1087:14-17, 1093:9 to 1095:4; (4) Collins-Smee's failure to assign temporary work to

Castelluccio, impeding his ability to find a position, and artificially bolstering her justification for firing him,  JA550-551, JA622, JA656; Trial Tr. at 1087:18 to 1088:1, 1366:3-13, 1503:9-21; (5) Collins-Smee's unjustifiable termination of Castelluccio for being on the Bench, despite the fact that she orchestrated this dead end assignment; (6) IBM's failure to conduct a true investigation of Castelluccio's age discrimination complaint; and (7) IBM's inconsistent justifications for Castelluccio's termination. JA895, JA905.

This compelling evidence, viewed in the light most favorable to Castelluccio, fully supports the jury's conclusion that IBM willfully violated the ADEA.[3]

IBM claims that the jury's finding of willfulness is unsustainable in light of its investigation of Castelluccio's complaint.  Willfulness is determined by whether the decision-maker knew or recklessly disregarded whether the adverse employment action violated the ADEA at the time the decision was made.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 617 (1993).  Mandel's investigation was concluded months after Castelluccio was terminated and left IBM.  JA644; Trial

---

[3] The District Court cited Collins-Smee's "calculated desire to remove an older employee from her organization.  While she did almost nothing for him in the way of job placement, she went out of her way to exclude him from relevant emails, certain professional development opportunities and to thwart his ability to effectively communicate with the customer." JA1434, SPA21.  The District Court did not, as misrepresented by IBM, find willfulness based solely on Collins-Smee's discrimination training or knowledge of the ADEA.

24

Tr. 1456:8-13. Accordingly, the relevancy of the investigation hinges upon Mandel's authority to countermand Collins-Smee's termination of Castelluccio. Castelluccio testified that he understood that Mandel had no such authority based on prior experiences with Mandel. JA421; Trial Tr. at 573:25 to 574:8. On these facts, the jury could reasonably have found that Mandel was powerless to rectify Castelluccio's wrongful termination and therefore, Mandel's beliefs are irrelevant to disprove willfulness.

Realizing this weakness in Mandel's post-termination investigation, IBM focuses much of its claim of prejudice on the erroneous assertion that the jury was not presented evidence of Mandel's claimed authority to re-hire. As demonstrated below, the jury was advised of Mandel's purported authority to re-hire, and nonetheless found IBM acted willfully.

**B.**     **The District Court Acted Within its Sound Discretion when it Initially Ruled the Open Door Evidence Inadmissible**

Evidentiary rulings made by the trial judge are ordinarily overturned only when found to be manifestly erroneous. <u>Malarkey v. Texaco, Inc</u>., 983 F.2d 1204, 1210 (2d Cir. 1993) (citations omitted). Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice…." "[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or

irrational." United States v. Al-Moayad, 545 F.3d 139, 159-60 (2d Cir. 2008)(citations omitted).

The District Court's initial decision to exclude the Open Door evidence was based on its careful weighing of the evidence's probative value against its prejudicial effect. IBM's Open Door evidence, particularly the report of IBM's purported expert Mandel, aspires to resolve the fundamental issue before the jury: whether Castelluccio was the victim of age discrimination. In view of this "obvious" prejudicial effect, the court scrutinized the Open Door evidence carefully. With respect to the probative value, the court explained there was "reason to suspect that the purpose of the investigation was more to exonerate IBM than to determine if Mr. Castelluccio was treated fairly." JA263. Judge Smith criticized Mandel's investigation for: minimizing Castelluccio's age discrimination complaint; being more focused on Castelluccio's job performance than on his claim of discrimination; and making conclusions based on an inadequate investigation of the facts. Contrary to IBM's contention, the court's initial ruling was not based on an assessment of its credibility. Therefore, it did not usurp the jury's role. Rather, the court determined Mandel's investigation lacked probative value because it was intended to exonerate IBM. Nonetheless, Judge Smith acknowledged IBM's concern that the Open Door evidence might be probative of

its beliefs at the time Castelluccio was terminated and invited IBM to introduce the evidence considered by Mandel.  JA261, JA264.

The court's decision cannot be said to be arbitrary or irrational, and should be upheld.

### C.  IBM's Substantial Rights were Unaffected by the District Court's Final Ruling on the Open Door Evidence

A new trial is warranted only when "'a substantial right of a party is affected,' [such] as when 'a jury's judgment would be swayed in a material fashion by the error.'" <u>Lore v. City of Syracuse,</u> 670 F.3d 127, 155 (2d Cir. 2012) (citations omitted); Fed. R. Civ. P. 61.   IBM's substantial rights were not affected as the jury was presented with IBM's beliefs at the time of Castelluccio's termination, whether adjudged by Mandel or Collins-Smee.[4]   As discussed above, Mandel's beliefs are not relevant unless he had the authority to re-hire. Nonetheless, to the extent that the Open Door evidence could have been probative, IBM realized its benefits.

---

[4] IBM argues that its willfulness must be determined by Mandel's, as opposed to Collins-Smee's, state of mind.  This revisionist twist contradicts Collins-Smee's trial and deposition testimony in which she swore that she was the decision-maker with respect to Castelluccio's termination.  JA520; Trial Tr. at 965:1-5; JA104. IBM's reliance on this testimony in its summary judgment papers resulted in Castelluccio's withdrawal of his retaliation claim. JA151 (stating, Castelluccio's "Complaint Was Never Conveyed to the Decision-Maker, Collin-Smee."). JA162, n 1.

At trial, Judge Smith revisited his initial ruling regarding the admissibility of IBM's Open Door evidence on several occasions. Ultimately, IBM introduced:

- its Open Door policy documents, JA954;

- Mandel's testimony regarding the purpose of Open Door Investigations, his claimed authority to rectify wrongs and reprimand wrongdoers, and the duration and extent of his investigation into Castelluccio's claim. JA643-644; Trial Tr. at 1450:21 to 1453:4;

- testimony from Collins-Smee, Liederbach, and McDonald; witnesses selected by IBM to opine on Castelluccio's purported performance issues;

- Mandel's testimony that IBM conducted an investigation into Castelluccio's claim because it believes that age discrimination law is important, serious, and should be obeyed. JA647; Trial Tr. at 1468:12-17;

- Castelluccio's testimony that Mandel advised him in writing of the results of the investigation. JA423; Trial Tr. at 579:19-24; and

- Collins-Smee's testimony that she was reprimanded solely for her "generous" evaluation of Castelluccio's performance.

Most significantly, the jury was also provided Plaintiff's Exhibit 204, (JA905) which discloses that IBM's investigation concluded that Castelluccio was treated "fairly." Therefore, despite the District Court's initial ruling to preclude IBM's Open Door evidence, IBM ultimately introduced all material aspects of its "investigation."

28

### 1. IBM's Beliefs at the Time of Castelluccio's Termination Were Fully Communicated to the Jury

IBM summarizes the significance of Mandel's Report as follows: it "demonstrates IBM's belief that Castelluccio had performance issues; that while benched, he was appropriately assisted and that he was lawfully and fairly terminated." IBM's Page Proof Brief at 25. Evidence relevant to each of these issues was admitted.

First, without objection, the jury was presented with considerable evidence of IBM's belief that Castelluccio had performance issues. It heard testimony from Collins-Smee, MacDonald, and Liederbach, and received numerous exhibits purportedly demonstrating internal complaints. In fact, the jury heard testimony from seven of the twenty-one employees interviewed by Mandel. Had IBM chosen to do so, it could have presented all of the evidence considered by Mandel. IBM has not established that there was any non-duplicative evidence of Castelluccio's supposed performance issues that it was unable to present to the jury.

Second, IBM was in no way limited in the evidence it proffered to establish that Castelluccio was appropriately assisted in finding a job. The jury heard Collins-Smee testify and Castelluccio cross-examined on this issue and was presented exhibits reflecting IBM purported efforts to assist Castelluccio. JA967, JA971, JA976, JA979. The jury additionally heard Mandel's testimony on this

29

subject. There was no offer of evidence concerning Collins-Smee's efforts to assist Castelluccio that was precluded by the District Court.

Thirdly, and most importantly, the jury heard evidence that IBM believed that Castelluccio was lawfully and fairly terminated independent of *Mandel's testimony concerning his Open Door investigation.* When asked to describe the role of an Open Door investigator in general terms, Mandel testified, without objection:

> [to] do an impartial, fair investigation into whether or not the employee was treated fairly in a specific instance. If we find that they were treated unfairly, to rectify those situations; if we find management error, to put in place disciplinary actions.

JA642; Trial Tr. at 1447:17-24. Additionally, the jury heard Collins-Smee's testimony that Mandel reprimanded her for over-assessing Castelluccio's performance. When IBM's lawyer asked her whether Mandel had reprimanded her for anything else, she replied, "no". JA534; Trial Tr. at 1020:19 to 1021:11. Thus, the jury was presented with evidence that while Mandel claimed to have authority "to rectify" unfair treatment, not only did he decline to bring Castelluccio back or discipline Collins-Smee for firing him, but he reprimanded her for an overly generous PBC rating. In view of these facts, it is specious to maintain that the jurors did not understand that Mandel believed that Castelluccio was lawfully terminated.

30

Finally, the jury was provided documentary evidence that explicitly stated that Mandel's Open Door investigation concluded that Castelluccio was treated fairly. The jury was shown the Report of the Parties Rule 26(F) Planning Conference, JA905. This document was the subject of trial testimony and was given to the jury during its deliberations in response to one of its questions. It states: "Castelluccio was notified that the Open Door investigation resulted in a determination that he was treated 'fairly' with respect to his termination." JA910.

IBM posits the nonsensical theory that the brevity of Mandel's testimony could have created the misimpression that Mandel found discrimination had occurred. Certainly if Mandel, an IBM executive, were going to testify that Castelluccio was discriminated against, Castelluccio would have called him to the stand – or at least have elicited this testimony on cross examination. As Judge Smith succinctly stated, it followed logically from Mandel's conduct that he concluded there was no discrimination. JA645; Trial Tr. at 1457:23 to 1460:8. ("He's not back at IBM; ergo, this gentleman found that it was a non-meritorious claim….") JA645; Trial Tr. at 1460:2-8.

In sum, the jury was presented with evidence of the Open Door procedure, investigation, and the substance of Mandel's Report, including his conclusion and purported authority to re-hire. Despite IBM's broad claims that it was prejudiced by the exclusion of critical evidence to disprove willfulness, it cannot establish a

31

material, relevant fact regarding age discrimination which was not apparent to the jury. This, coupled with IBM's decision to introduce only parts of the evidence Mandel considered, thwarts IBM's ability to establish the loss of a substantial right.

**2.      Mandel's Report is Not Probative of Whether IBM Knew or Recklessly Disregarded Whether Castelluccio's Termination Violated the ADEA**

The only Open Door evidence ultimately precluded was Mandel's Report. IBM's claim of prejudice based on the exclusion of Mandel's Report is predicated on the erroneous assumption that its admission would have swayed the jury's finding of willfulness. A review of the Report indicates otherwise.

Section IV of Mandel's Report, titled "ISSUES," identifies the issues Mandel claims to have investigated: (1) was Castelluccio's performance underrated; (2) was Collins-Smee sufficiently aggressive in placing Castelluccio; and; (3) were any of Collins-Smee's actions a result of age discrimination. JA254. Conversely, section III, titled "INVESTIGATION," contains only two subsections, "performance" and "placement." Id. Conspicuously missing is evidence that Mandel *investigated whether Collins-Smee knew or recklessly disregarded whether her decision to terminate Castelluccio violated the ADEA.* Absent this inquiry, Mandel's Report is not relevant to disprove IBM's willfulness.

32

Mandel did not attempt to uncover whether Collins-Smee knowingly and recklessly treated Castelluccio differently than younger employees. Had he done so, he would have discovered that Castelluccio was the oldest of Collins-Smee's direct reports, and that he alone was excluded from professional opportunities and important communications. He also would have analyzed Collins-Smee's placement of employees, and noted that she placed a minimum of 23 executives younger than Castelluccio into positions within her organization while assigning Castelluccio to the Bench. Mandel interviewed 20 employees regarding Castelluccio's performance, but there is no indication that he asked whether they had ever known Collins-Smee to exhibit ageism. Mandel's lack of commitment to uncovering whether Collins-Smee knew her decision to violate the ADEA is most plainly evident in his own admission the day Castelluccio was to leave IBM, "If he signs the release, he gets the money, and I stop investigating." JA256.[5]

---

[5] A careful reading of Mandel's Report also raises grave concerns about its reliability. Despite his failure to investigate whether IBM knew that Castelluccio's termination violated the ADEA, Mandel concluded that Collins-Smee's decision was not improperly motivated. According to his Report, he based this conclusion in large part on Collins-Smee's denial that she made any age or retirement comments to Castelluccio, except once, in the conversation in which she terminated him. This critical finding contradicts Collins-Smee's deposition testimony that she did not recall discussing age discrimination with Mandel, JA96, and trial testimony in which she admitted discussing retirement with Castelluccio twice, JA511, JA519; Trial Tr. at 929:20-25, 963:21-24.

Mandel's Report is not probative of whether IBM knew or recklessly disregarded whether Castelluccio's termination violated the ADEA, nor does it support IBM's claim that it investigated *age discrimination*. IBM's substantial rights with respect to the jury's willfulness finding were unaffected by the District Court's exclusion of Mandel's Report.

### D. IBM's Good Faith Defense Fails as a Matter of Law and Fact

IBM argues that Mandel's investigation, its policy of management review of employment decisions, and its good faith in general, in and of themselves disprove willfulness. Mandel's investigation was the "management review" in this instance, and the jury and District Court found it to be wanting. Further, as set forth below, IBM's argument of "good faith" fails as a matter of law and fact.

The Supreme Court recognizes only two acts of "good faith and nonrecklessness" that may shield an employer from liquidated damages in disparate treatment cases such as this. Dittmann v. Ireco, Inc. 903 F. Supp. 347, 349 (N.D.N.Y. 1995) (citing Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)) (additional citations omitted). They are: where an employer based its termination decision on what it believed was a bona fide occupational qualification; or where an employer believed that the terminated employee was exempt from ADEA protection. Dittman at 349. Neither situation exists here.

34

Nonetheless, the jury was instructed: "if you find that the defendant terminated the plaintiff's employment reasonably and in good faith, even though it turns out that the termination violated the ADEA, then the violation was not willful." JA1001. The jury appropriately discredited IBM's good faith claim, and the District Court upheld this finding.

### E. IBM Agreed to the Court's Questioning of Mandel and the Court's Charge Regarding the Open Door Evidence

IBM consented to the Court's questioning of Mandel, and its jury instruction regarding the Open Door evidence. JA646; Trial Tr. at 1464:8-23. The jury was instructed, "you heard testimony about IBM performing an internal investigation, called an 'open door' investigation, with respect to Mr. Castelluccio's allegations of age discrimination. You may consider this testimony as evidence that IBM takes such allegations seriously. You should not consider it for any other purpose." JA987. IBM cannot now claim that it was prejudiced as a result of this charge. A party who fails to object to a jury instruction at trial waives consideration of claims relating to that charge on appeal. Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994) (citations omitted).

The District Court properly upheld the jury's willfulness finding. There was more than sufficient evidence of IBM's willfulness and the jury ultimately was presented all relevant material facts concerning IBM's Open Door procedures and Mandel's investigation, including his conclusion that Castelluccio had been treated

35

fairly. Moreover, an assessment of Mandel's Report reveals that it would not have swayed the jury's finding of willfulness. IBM's appeal on these grounds should be dismissed.

## II. THE DISTRICT COURT PROPERLY UPHELD THE JURY'S AGE DISCRIMINATION FINDING

### A. Castelluccio Presented Significant Evidence of Age Discrimination

The jury was presented with the following direct and circumstantial evidence from which it found age discrimination.

#### 1. Direct Evidence:

- In her opening comments at their first meeting, Collins-Smee asked Castelluccio about his age and whether he was old enough to retire. JA330-340; Trial Tr. at 250:5 to 251:7

- On three occasions, Collins-Smee asked Castelluccio whether he was interested in retiring. JA339, JA373-374, JA386; Trial Tr. 250:4-8; 386:5 to 387:6 and 435:12-20. Twice she asked about his retirement plans after he had made it clear that he had no interest in retirement. JA482; Trial Tr. at 814:1-14.

#### 2. Circumstantial Evidence:

- Collins-Smee's unjustified removal of Castelluccio from two positions without notifying him of her decision until months afterward. JA363, JA371; Trial Tr. at 344:12-18; 377:10 to 378:3.

- Collins-Smee's failure to place Castelluccio on Kerin's Five Minute Drill as she admitted she was responsible for doing. JA480, JA481; Trial Tr. at 807:2-9, 809:6-11; JA835.

36

- Collins-Smee's failure to place Castelluccio on her Five Minute Drill as either a person available or on a slate of candidates, despite 62 opportunities to do so. JA845.

- Collins-Smee's failure to discuss Castelluccio on her Five Minute Drills other than "rarely." JA621; Trial Tr. at 1361:18 to 1362:4.

- Collins-Smee's request that Castelluccio be added "for the record" to a slate of candidates for a position that had already been filled. JA886, JA376; Trial Tr. at 396:1 to 398:15.

- Collins-Smee's limited use of Zapfel's Drills. JA855.

- Collins-Smee's exclusion of Castelluccio from professional development opportunities and relevant emails, and refusal to provide him with a Blackberry. JA380-381; Trial Tr. at 413:15 to 416:2; JA888.

- Collins-Smee's inexplicable assignment of Castelluccio, a 40 year veteran who was willing to relocate and accept a demotion, to the Bench, despite there being an abundance of available work. JA835, JA845, JA855.

- Collins-Smee's failure to provide Castelluccio temporary work while he was on the Bench in accordance with IBM's standard practices. JA386; Trial Tr. at 435:12 to 437:21.

- Collins-Smee's failure to inform Castelluccio of at least 106 available positions in the IT Delivery between January and May 2008. JA835, JA845, JA855.

- Collins-Smee's failure to inform or consider Castelluccio for the seven job openings she filled with younger individuals one week before she gave him notice that he was going to be terminated for failure to find a job. JA390; Trial Tr. at 448:3 to 449:11. The average age of the individuals placed was 49. JA394; Trial Tr. at 465:24 to 466:4.

- Collins-Smee's failure to advocate for Castelluccio outside of the Five Minute Drill process in accordance with IBM's standard practices. JA547; Trial Tr. at 1073:14 to 1074:14.

- IBM's shifting explanations as to why it terminated Castelluccio. JA898, JA911, JA928.

37

This evidence gave the jury a reasonable basis upon which to conclude that IBM was liable for age discrimination.

**B.    The Jury Reasonably Concluded that Age Discrimination was the "But For" Cause of Castelluccio's Termination**

IBM claims that the jury's finding of age discrimination should be vacated for lack of causation evidence.   This argument is based on two erroneous statements.   IBM declares: "[w]here, as here, there is undisputed evidence of a valid reason for termination, proof of discriminatory intent cannot prove cause" and "no evidence links Collins-Smee's purported discriminatory intent to Castelluccio's termination, because there is no proof that she actually prevented him from getting a new position."  IBM's Page Proof Brief at 41.

In this Circuit, the task of an appellate court reviewing a jury verdict is to determine "whether a finding in the party's favor can reasonably be based on the evidence." Wright Lining & Const. Co. v. Tully Const. Co., 2 F. App'x 220, 223 (2d Cir. 2001) (citations omitted).   "To establish a disparate-treatment claim under the plain language of the ADEA, … a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009).    A plaintiff may prove "but for" causation "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate … reasons for its action."   Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834 (2d Cir. 2013) (citations omitted).  Proof of "but

38

for" causation can be established through direct or circumstantial evidence. <u>Crowe</u> <u>v. Leroy Cent. Sch. Dist.</u>, 949 F. Supp. 2d 435, 445 (W.D.N.Y. 2013).

Castelluccio provided the jury and court with ample evidence to reasonably conclude that age discrimination was the "but for" cause of Castelluccio's termination. IBM's purported legitimate reasons for terminating Castelluccio were inconsistent, implausible, and most significantly, orchestrated by Collins-Smee.

### 1. IBM's "Valid" Reason for Castelluccio's Termination Changed Over Time

It is well established that an employer's inconsistent reasons for terminating an employee can support an inference of discrimination. "From such discrepancies a reasonable juror could infer that the explanations given by [the defendant] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination …." <u>E.E.O.C. v. Ethan Allen, Inc</u>., 44 F.3d 116, 120 (2d Cir. 1994); <u>Carlton v. Mystic Transp., Inc</u>., 202 F.3d 129, 137 (2d Cir. 2000).

The evidence established that Collins-Smee told Castelluccio that he was going to be terminated for failure to find a position. JA402; Trial Tr. at 495:1-12. Subsequent to Castelluccio's termination, Mandel completed an investigation that focused on Castelluccio's performance, with no mention of the fact that he did not have a position. JA251. Thereafter, IBM asserted before the NYSDHR that Castelluccio was terminated exclusively for poor performance. JA898, JA401; Trial Tr. at 492:17-20. In this lawsuit, IBM first contended that Castelluccio was

39

terminated for poor performance, JA911 ("[p]laintiff was separated from IBM for legitimate non-discriminatory business reasons – his poor performance in two assignments…."); and only later for his inability to find a position ("[t]here is not a shred of evidence in the record that IBM terminated Castelluccio for any reason other than his failure to find another position within IBM after many months of trying.")JA134, n.15; JA928.

The significance of the issue was properly brought to the jurors' attention through an agreed-upon jury charge which stated in part, "when an employer offers different reasons for the same actions a jury is entitled to infer that neither reason is accurate and that the true reason is discrimination." JA714; Trial Tr. at 1727:23 to 1728:13; JA997.

The jurors were apparently troubled by these inconsistencies. During their deliberations, they asked to be directed to a document stating the reason why IBM terminated Castelluccio. The parties provided the jury PX. 92, (JA895) IBM's Talking Points Memorandum, (terminated for failure to find a job), and PX. 204 (JA911)(terminated for poor performance). A review of these documents alone may have lead the jury to reasonably conclude that IBM's proffered reasons for termination were false and designed to obscure evidence of age discrimination. E.E.O.C. v. Ethan Allen, Inc., at 120 (2d Cir. 1994).

40

### 2. The Jury Reasonably Rejected IBM's Claim that Castelluccio Was Terminated for Poor Performance

Collins-Smee testified that when she terminated Castelluccio, she told him it was due to his failure to find a job. JA519; Trial Tr. at 962:9-24. No witness testified that Castelluccio was terminated for poor performance. The jury heard evidence that Collins-Smee herself awarded Castelluccio a "2" performance rating only months before he was terminated. JA1475, JA307; Trial Tr. at 123:10-24. Significantly, this rating was approved by Collins-Smee's boss, Zapfel. JA523; Trial Tr. 978:22 to 979:3. Although Collins-Smee took great pains to try to distance herself from this formal rating and the positive voluntary written performance summary contained in it, the jury was at liberty to disbelieve her. Even the so-called complaints from Liederbach and McDonald were limited to the admittedly disastrous WellPoint account, JA463, JA548; Trial Tr. at 740:7-12, 1078:3-9, and resulted in a request by a single individual that Castelluccio be reassigned – not terminated. Id. Further, when Castelluccio was removed from WellPoint, he was neither advised of a single complaint against him, nor told that there were any deficiencies in his performance. JA372; Trial Tr. at 380:22 to 381:22. To the contrary, the jurors heard that even with respect to the WellPoint account, Castelluccio achieved significant reductions in outages and penalties, JA861, and a strong level of client satisfaction. JA871. Finally, there were no alleged performance issues in any of Castelluccio's twenty-nine other contracts.

41

Given the facts detailed above, the jury reasonably discredited IBM's contention that Castelluccio was terminated for poor performance.

### 3. The Jury Reasonably Rejected IBM's Claim That Castelluccio Was Terminated for Failure to Find a Position

IBM argues that Castelluccio cannot prove "but for" causation because regardless of anyone's discriminatory intent, he was indisputably going to be terminated for being on the Bench for six months. IBM's Page Proof Brief at 37.

IBM's flawed logic was rejected by this Court in the case of Dominic v. Consolidated Edison Co. of New York, Inc., 822 F.2d 1249, 1255 (2d Cir.1987). In Dominic, the employer argued that it was legally impossible for the jury to conclude that the employee suffered a retaliatory discharge in light of evidence that it was dissatisfied with the employee's work performance. The Court noted that "the existence of a foundation for [the employer's] dissatisfaction with [the employee's] performance does not exclude a retaliatory motive as the cause of [the employee's] discharge." (applying "but for" causation Id. at 1260). See also, Mate v. New York State Dep't of Transp., 24 A.D.3d 330, 332 (App. Div. 2005) ("The existence of employer dissatisfaction with work performance prior to termination does not necessarily exclude a retaliatory or discriminatory motive.")

IBM's argument is tantamount to arguing that whenever an employer identifies any potentially legitimate justification for terminating an employee, an employer's age discrimination claim fails as a matter of law because the employee

cannot prove that age was the only consideration.  In this Circuit, it is well-settled that "[t]he condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers *only* consideration, but rather that the adverse employment action[ ] *would not have occurred without it.*" <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 169 (2d Cir. 2014) (emphasis in original) (citations omitted); <u>Jones v. Dunkirk Radiator Corp.</u>, 21 F.3d 18, 23 (2d Cir. 1994) (district court erred in charging jury that "but for" causation requires a finding that the reason for termination was the "one and only" cause of defendant's breach.)

The evidence provided the jury ample justification to disbelieve that Castelluccio was terminated for "being on the bench." The only evidence presented by IBM to support this contention was Collins-Smee's testimony and the Talking Points Memorandum.  IBM did not offer evidence of a written policy or even a well-established past practice that an employee was subject to termination if on the Bench for a certain time.  To the contrary, when Collins-Smee was asked by IBM's counsel whether IBM had a "hard and fast" policy for how long an executive could be on the Bench she answered, "no".  JA514; Trial Tr. at 940:11-20.   Notably, there was no evidence of another employee terminated for being on the Bench.

Most significantly, if IBM's statement were true that "Castelluccio indisputably would have been terminated after sitting on the bench for so long"

43

IBM's Page Proof Brief at 37, it makes little sense that Mandel conducted a five week investigation into the propriety of Castelluccio's termination, interviewed twenty witnesses regarding Castelluccio's *performance*, and analyzed whether Collins-Smee was "sufficiently aggressive" in placing Castelluccio. JA643-644; Trial Tr. at 1452:20 to 1453:4. Such an exercise would be superfluous if Castelluccio's termination was predetermined as a result of his being on the Bench for six months. Surely Mandel's investigation would have at least made mention of the fact that Castelluccio was on the Bench for six months if this alone were a legitimate reason for termination from IBM.

IBM claims that Castelluccio was to blame for his lack of a position, because he exclusively was responsible for finding himself a job. Collins-Smee's contemporaneous email discredits this claim by admitting that it was her responsibility to place Castelluccio on Kerin's drill. JA480; Trial Tr. at 807:2-21; JA834. This was confirmed by Jones, JA550; Trial Tr. at 1086:7-16, and again by Mandel, who made a point of investigating whether Collins-Smee was "sufficiently aggressive" in placing Castelluccio. JA251. A "sufficiently aggressive" standard certainly implies an obligation.

IBM's theory that there is no proof that Collins-Smee actually prevented Castelluccio from obtaining a new position ignores Castelluccio's substantial evidence that his inability to find a job was largely attributable to Collins-Smee's

44

refusal, motivated by age bias, to include him in the Five Minute Drill process, advise him of open positions, consider him for positions for which he was qualified, or lobby on his behalf outside of the structured placement procedures. JA390-394; Trial Tr. at 449:12 to 466:14. Collins-Smee, who the jury found to have a discriminatory animus, orchestrated Castelluccio's assignment to the Bench despite there being an abundance of work. Id.  The jury was correctly charged that it could consider that there were at least 106 executive positions filled in IT Delivery while Castelluccio was on the Bench and that Collins-Smee could have requested that Castelluccio be considered for these positions. The jury was advised that Castelluccio offered evidence of these placements to show the number of positions filled while he was on the Bench and because he believed that Collins-Smee should have disclosed these positions to him, given him an opportunity to apply for them, and in some cases, recommended him for these positions.[6]  JA997. This charge was given with IBM's consent.   The jury reasonably found it implausible that a successful executive with 40 years' experience, who was willing

---

[6] As Castelluccio was not pressing a failure to hire claim, he did not have the burden to prove that he had superior skills to the individuals placed in the available positions.  Nonetheless, both he and Jones testified that he was qualified to perform many of the jobs available, and had credentials commensurate with the individuals who were placed.   JA390-394, JA536-537, JA541-542; Trial Tr. at 449:12 to 466:14, 1031:9 to 1033:9, 1050:19 to 1052:21, 1054:5-16.

45

to relocate and accept a demotion, could not be placed within a conglomerate the size of IBM.

Finally, IBM contends, for the first time, that Collins-Smee's ageism cannot be the "but for" cause of Castelluccio's termination because she made the termination decision jointly with her boss, Tim Shaughnessy. This Court generally "will not consider an issue raised for the first time on appeal." Lifranc v. New York City Dep't of Educ., 415 F. App'x 318, 320 (2d Cir. 2011) (citations omitted). IBM provides no basis to relax this rule. This argument is nothing more than an attempt by IBM to shield itself from liability, in the face of the overwhelming evidence of Collin-Smee's discriminatory animus. IBM alone knew the identity of the decision-maker in this case, and it maintained that it was Collins-Smee in order to defeat Castelluccio's retaliation claim at summary judgment. Now IBM seeks to change its version of the facts to gain further advantage by arguing that IBM's conduct should be adjudged on the basis of Mandel's or Shaughnessy's discriminatory animus. The only decision-maker in this case was Collins-Smee, and her ageism was the "but for" cause of Castelluccio's termination.

A reviewing court should "upset a jury verdict only if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture.'" Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (citing Stratton v. Department for the Aging, 132

46

F.3d 869, 878 (2d Cir. 1997)).  The jury was properly instructed that in order to find IBM liable for discrimination, it must find that age discrimination was the "but for" cause of Castelluccio's termination.  JA994.

The jury reasonably came to this conclusion based on the ample direct and circumstantial evidence of age bias and on the abundant evidence that IBM's proffered reasons were illegitimate pretext to conceal age discrimination.   As is clear from Judge Smith's detailed marshalling of the evidence, the District Court fully concurred.  JA1414.

## III.  CASTELLUCCIO'S  EMOTIONAL  DISTRESS  AWARD  SHOULD NOT BE DISTURBED

Castelluccio agrees that New York law governs his emotional distress award and that the proper standard of review is whether the award deviates materially from what would be reasonable compensation.  Do Yea Kim v. 167 Nail Plaza, No. 05 CV8560 (GBD), 2008 WL 2676598 at *5 (S.D. N. Y. July 7, 2008).  When assessing the propriety of emotional distress damage awards, the "reviewing court looks to 'the duration of a complainant's condition, its severity or consequences, any physical manifestations and any medical treatment.'"   Meacham v. Knolls Atomic Power Lab., 381 F.3d 56, 78 (2d Cir. 2004) cert. granted, judgment vacated on other grounds, sub nom. KAPL, Inc. v. Meacham, 544 U.S. 957 (2005). The reviewing court also compares the jury's award with other awards for similar injuries and determines whether it is supported by evidence. Id.  As set forth

47

below, the District Court performed each step of this analysis and found compelling evidence of Castelluccio's emotional distress.

The "calculation of damages is the province of the jury," … and "we will not 'vacate or reduce a jury award merely because we would have granted a lesser amount of damages,' " <u>Turley v. ISG Lackawanna, Inc.</u>, No. 13-561, 2014 WL 7172061, at *14 (2d Cir. Dec. 17, 2014) (<u>citations</u> <u>omitted</u>). Accordingly, the court will review the "district court's decision on remittitur of compensatory damages for abuse of discretion." <u>Id.</u> Deference must be given "to the district court, which was 'closer to the evidence, and [ ] therefore in a better position to determine whether a particular award is excessive.'" <u>Id</u>. at *16.

## A. New York Law Does Not Require Independently Corroborated Evidence of Emotional Distress

IBM erroneously contends that New York law requires corroborative testimony of emotional distress. IBM's Page Proof Brief at 45, 51. As stated clearly in a case cited by IBM, under the NYHRL, "mental injury may be proved by the complainant's own testimony, corroborated *by reference to the circumstances of the alleged misconduct.*" <u>E.E.O.C. v. Yellow Freight Sys., Inc.</u>, No. 98 CIV. 2270(THK), 2002 WL 31011859, at *34 (S.D.N.Y. Sept. 9, 2002)(citations omitted)(emphasis added); <u>New York City Transit Auth. v. State Div. of Human Rights</u>, 78 N.Y.2d 207, 216, 577 N.E.2d 40 (1991). Castelluccio

48

met this burden by presenting compelling evidence of his physical and mental suffering in addition to the circumstances of IBM's discrimination.[7]

### B. Castelluccio's Evidence of Emotional Suffering was Substantial

IBM cites a select portion of Castelluccio's deposition testimony that was introduced at trial, and represents that it is the *totality* of Castelluccio's evidence of emotional distress. IBM's Page Proof Brief at 43. This is a clear misrepresentation of the record. As the District Court stated: "[t]he jury's award reflects an understanding of the magnitude of Castelluccio's emotional distress." JA1443.

The jury heard evidence that Castelluccio repeatedly suffered the emotional effects of age discrimination during his employment, at the time Collins-Smee terminated him, throughout his unsuccessful job search, and continuing to the trial.

Castelluccio sustained multiple physical effects of emotional distress, including mood swings, sleepless nights, weight loss, and hair loss. JA447-48, JA456; Trial Tr. at 676:23-677:1, 678:13-15, 709:19-710:23. As the District Court noted, these physical manifestations of Castelluccio's emotional distress "represent

---

[7] IBM's emphasis on the fact that Castelluccio did not seek medical treatment is also misplaced. An award for emotional distress in a discrimination action "is not preconditioned on whether [the plaintiff] underwent treatment, psychiatric or otherwise." MacMillan v. Millennium Broadway Hotel, 873 F.Supp.2d 546 (S.D.N.Y. 2012) (citations omitted).

49

only a fraction of the emotional distress the jury could reasonably have concluded he suffered." JA1442.

As an example of his emotional suffering, Castelluccio vividly recalled that Collins-Smee chose the day before Thanksgiving to inform him that he was being benched. He explained to the jury that he could not bring himself to tell his wife the news until after the holiday. JA371; Trial Tr. 377:10-22. He also testified concerning his emotional and physical reaction to Collins-Smee's refusal to explain her decision to remove him from his job and her reluctance to discuss his future at IBM:

> …when you're told - - well, you have an emotional reaction to it. An emotional, physical - - I mean it's significant, what was done at that point in time. And I was even more frustrated because I couldn't get answers to the questions I was asking.

JA372; Trial Tr. 382:5-14.

When asked to describe the debilitating affect of his dismissal on him and his family, Castelluccio testified:

> I mean even today, when this is, what, six years later we've been going through this, it's still not peaceful. It continues on. And physically, and mentally, it's -- I mean anyone in this position, under these circumstances, it's hard. It's, you know, it's not as -- I can't compare it to like someone who has a terminal illness, but it is horrible. It's day in, day out. It's the sleepless nights. It's on your mind. You take the kids to a baseball little league game and it's still there. You don't –

JA456; Trial Tr. at 710:4-23.   This testimony established the omnipresent nature and duration of Castelluccio's suffering.

The magnitude of Castelluccio's suffering was further apparent when Castelluccio was asked to explain what he had endured and was unable to speak. Both the jurors and Judge correctly perceived the anguish suffered by Castelluccio as his 40 year identity as an "IBMer" was shattered by Collins-Smee.

Castelluccio provided the jury with numerous details of the ongoing discriminatory, unfair and unduly harsh treatment Collins-Smee inflicted.  The jury heard that Castelluccio was humiliated by being removed from two positions without explanation.  He then endured six months on the Bench, watching while the very supervisor who was obligated to find him work, placed younger employees into positions for which he was qualified.   Ultimately, he was unjustifiably terminated by an employer to whom he had dedicated 40 years.

Castelluccio's emotional distress was further compounded by the humbling experience of embarking on an unsuccessful job search at the age of 61 during the "great recession" of 2008.   Castelluccio's detailed evidence of the objective circumstances surrounding IBM's discrimination had a strong impact on the jury.

The jury's emotional distress award was appropriate, and the District Court did not abuse its discretion in sustaining its award.

**C.    The District Court Properly Analyzed Castelluccio's Emotional Distress Award and Did Not Base its Decision on an Impermissible Ground**

To determine whether an emotional distress award "deviates materially" from what would be reasonable compensation, a reviewing court should consider awards in analogous cases for injuries similar to those sustained by the plaintiff.  <u>Welch v. United Parcel Serv., Inc.</u>, 871 F. Supp. 2d 164, 192 (E.D.N.Y. 2012).  Although the District Court's opinion references the "shocks the judicial conscience standard," the court's reasoning and citations to specific evidence make clear that it conducted the appropriate analysis.

The District Court's evaluation of the jury's emotional distress award was detailed in its decision.  It stated, "[a]lthough Castelluccio's emotional distress is garden-variety inasmuch as he presented no corroborating testimony or evidence of medical treatment, the court concludes that the specific circumstances of this case, including IBM's egregious treatment of Castelluccio, justify an upward departure from the typical emotional distress damages award."  JA1442.  The District Court's invocation of the "garden variety" standard, and it's comparison of the jury's award to the "typical" award, indicates that it conducted the required comparative analysis and concluded that the jury's award did not "deviate materially" from what was reasonable compensation.    Accordingly, there is no resulting error from its reference to the "shocks the judicial conscience" standard.

52

When reviewed in its entirety, the record affords no sound basis for discarding the District Court's confirmation of the jury's assessment of Castelluccio's emotional suffering.

New York cases vary widely in the damages awarded for mental anguish, and no court in this circuit has defined an exact dollar figure that constitutes reasonable compensation where proof of emotional distress is based entirely on a plaintiff's testimony. Do Yea Kim v. 167 Nail Plaza, No. 05 CV8560 (GBD), 2008 WL 2676598, at *5 (S.D. N. Y. July 7, 2008). Courts have upheld substantial awards where plaintiff's emotional distress is supported by his testimony alone. In Meacham, 381 F.3d at 78 (2d Cir. 2004) this Court sustained an award of $125,000 for "subjective distress" where plaintiff offered no proof other than testimony establishing shock, nightmares, sleeplessness and humiliation. Id. at 77-78. Similarly, in Patterson v. Balsamico, 440 F. 3d 104 (2d Cir. 2006), the Court upheld the District Court's refusal to remit an award supported entirely by plaintiff's testimony describing humiliation, embarrassment, sleeplessness and a loss of self-confidence. See also, Zakre v. Norddeutsche Landesbank Girozentrale, 541 F.Supp.2d 555, 569 (S.D.N.Y 2008). The District Court's reasoning in upholding the jury's award is consistent with the reasoning in these cases.

Finally, IBM argues that the District Court improperly considered Castelluccio's personal attributes. IBM cites Cullen v. Nassau Cnty. Civil Serv.

53

Comm'n, 53 N.Y.2d 492, 494, 425 N.E.2d 858 (1981) to support this argument. A review of this decision reveals that it inapposite. Unlike Castelluccio, the plaintiff in Cullen introduced *no* evidence of emotional distress. The court reversed an award of emotional distress stating that such damages should not be a presumed consequence of discrimination, as every plaintiff will suffer a measure of emotional injury based on his degree of "sensitivity or stoicism."

Here, the District Court referenced Castelluccio's personal attributes and demeanor while testifying to describe what the jury witnessed and appreciated – a man who was utterly devastated by Collins-Smee's ongoing discriminatory treatment. JA1443.

The court's decision to uphold the jury's emotional distress award should be affirmed.

## IV. CASTELLUCCIO'S FEE AWARD WAS APPROPRIATE

A district court's award of attorneys' fees is reviewed for an abuse of discretion. McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 416 (2d Cir. 2010). "The deference exercised in an abuse of discretion review 'takes on special significance when reviewing fee decisions because the district court, which is intimately familiar with the nuances of the case, is in a far better position to make such decisions than is an appellate court, which must work from a cold record." CARCO GROUP, Inc. v. Maconachy, 718 F.3d 72 (2d Cir. 2013).

An award of attorneys' fees is mandatory to a prevailing party under the ADEA.  Hagelthorn v. Kennecott Corp., 710 F.2d 76, 86 (2d Cir. 1983); Detje v. James River Paper Corp., 167 F. Supp. 2d 248, 250 (D. Conn. 2001).  In   granting Castelluccio's attorney fee application, Judge Smith noted that "the jury found in favor of Castelluccio on every claim he advanced at trial, and that the jury verdict was left undisturbed by the court in its denial of IBM's [post-trial motions]." JA1416.  In such a case, no reduction in fees is warranted. Valley Hous. Ltd. P'ship v. City of Derby, 3:06CV1319 TLM, 2012 WL 1077848 (D. Conn. Mar. 30, 2012), appeal dismissed (Nov. 14, 2012).

In addressing IBM's Objection to Castelluccio's fee application, the District Court rejected all but two of approximately ten arguments advanced by IBM, granting a reduction of $4,178.50.   IBM's reference to the "District Court's blind application of the lodestar formula," IBM's Page Proof Brief at 53, is insulting to both this Court and the District Court in that it would have this Court ignore Judge Smith's twenty-two page Ruling on Plaintiff's Motion for Attorneys' Fees. JA1449, SPA136.

Since 2008, Castelluccio has contested IBM's violation of his civil rights at considerable emotional, financial and personal expense. His efforts were fully vindicated by the jury.  Without Congress's guaranteed reimbursement of his attorneys' fees, Castelluccio, and others whose civil rights are violated by

multinational corporations, would be left defenseless. Castelluccio deserves full recovery of his attorneys' fees, as approved by the thorough and well-reasoned decision of the District Court.   JA1449.

IBM's arguments contesting Castelluccio's fee award improperly categorize Castelluccio's counsels' time entries and seek to have wholesale reductions applied without citing any specific time entries that are improper.  This approach should fail.

### A.    The Cases Cited by IBM Do Not Support a Reduction of Castelluccio's Fee Award

IBM's attempt to reduce Castelluccio's fee award by comparison to dissimilar cases is unpersuasive.  For example, in <u>Moore v. Houlihan's Rest., Inc.</u>, No. 07-CV-03129 ENV RER, 2011 WL 2470023, at *7 (E.D.N.Y. May 10, 2011) <u>report and recommendation adopted</u>, No. 07-CV-3129 ENV RER, 2011 WL 2462194 (E.D.N.Y. June 17, 2011), the court granted less than the full fee requested, noting that "since the defendants never appeared, plaintiff's burden litigating this case was minimal."  In stark contrast, IBM employed its considerable

resources to litigate every issue to the fullest extent.[8]  In Abel v. Town Sports Int'l, LLC, No. 09 CIV. 10388 DF, 2012 WL 6720919, at *33 (S.D.N.Y. Dec. 18, 2012) the court reduced the fee requested noting that plaintiff  was unsuccessful on a number of his claims.   Likewise, in Tsombanidis v. City of W. Haven, Connecticut, 208 F. Supp. 2d 263, 287 (D. Conn. 2002) the court reduced a fee request where attorneys served as both general and trial counsel, or where it found entries were overly vague.  None of these conditions exists here.

"There exists a strong presumption that the lodestar figure represents a reasonable fee."  Detje v. James River Paper Corp., 167 F. Supp. 2d 248, 250 (D. Conn. 2001). The reasonableness of Castelluccio's counsel's fee was validated by the jury's verdict and affirmed by the District Court.

---

[8]  IBM argued on six occasions that Collins-Smee's statements regarding Castelluccio's age and retirement should be precluded from evidence as "stray remarks." The issue was first raised and rejected in IBM's Motion for Summary Judgment.  Docket No. 49.  IBM unsuccessfully raised the issue a second time in a Memorandum filed the evening before trial.  Docket No. 174.  IBM then proposed a "stray remarks" charge, and when the Court declined to include it, raised the issue again at the charging conference. JA674; Trial Tr. at 1572: 14-22.   Not to be deterred, IBM's counsel argued in his closing statement that certain comments are "mere stray remarks which don't prove anything."  JA700; Trial Tr. at 1676:8-11.  Lastly, IBM argued the issue in its unsuccessful post-trial Motions. Docket No. 179 at 3-5.   IBM's persistence in the face of repeated adverse court rulings contributed to the fees incurred by Castelluccio.   A second example, which evidences the level of arguments vigorously advanced by IBM, was its request for a new trial because Castelluccio's counsel referred in his closing statement to IBM's counsel as an "extraordinarily able New York trial lawyer." JA1447-1448.

**B. Castelluccio's Fees for Trial Preparation are Reasonable**

IBM's argument seeking to reduce Castelluccio's fee request for time spent preparing for trial is overly broad, as noted by Judge Smith, JA1453-1454, and based on inaccurate estimates of the time actually incurred.

IBM states "Castelluccio's counsel estimated that he spent a staggering 1,054.70 hours preparing for trial." IBM's Page Proof Brief at 58. This is *IBM's* incorrect estimate of the time Castelluccio's attorneys spent preparing for trial. IBM requests a reduction of over 900 hours of attorney time based on a flawed and overreaching calculation that it arrived at by adding every entry containing the word "trial" or some derivation thereof.[9]

IBM also challenges Castelluccio's counsel's fees claiming trial preparation was unjustifiably begun four or six months prior to trial. Castelluccio knows of no authority that dictates when trial preparation can properly begin, but notes that many of the entries relied on by IBM concern the Joint Trial Memorandum, which was required to be filed by counsel for both parties months in advance of trial.

IBM's position that Castelluccio's trial preparation time be reduced to 104 hours is arbitrary, and there is no specific dollar reduction requested. IBM has not

---

[9] Contrary to IBM's implication, the time entries of attorneys Carta and Triolo provide ample and appropriate descriptions of the work performed preparing for trial. JA1343-1344.

disclosed the number of hours incurred by its team of lawyers and has not identified any time entries for work that it contends was unnecessary.[10]

The trial of this case lasted nine days. The jurors heard testimony of fourteen witnesses. Each side offered expert testimony. The parties introduced 285 exhibits into evidence, though a far greater number were anticipated. Notably, although IBM characterizes this case as "straightforward," its preparation for trial included: an initial exhibit list of approximately 383 documents, Doc. No. 133-2; a 76 question proposed voir dire Doc. No. 133-4; a 36 paragraph proposed jury charge, Docket No. 133-6; and an 25 page pre-trial memorandum of law addressing evidentiary issues. Docket No. 134. By any standards, this was a complex trial requiring significant preparation. Judge Smith confirmed this assessment. JA1466-1467 (noting the scope and factual complexity of the case.)

### C. Castelluccio's Fees Incurred Defeating IBM's Summary Judgment Motion Are Reasonable

Castelluccio was successful in defeating the numerous arguments advanced by IBM in its Motion for Summary Judgment. Success is the most critical factor in determining the reasonableness of a fee award. Farrar v. Hobby, 506 U.S. 103, 114 (1992).

---

[10] Judge Smith considered and rejected IBM's speculation that Castelluccio's attorneys engaged in a significant amount of secretarial work. JA1453.

Castelluccio disputes both IBM's calculation of the hours attributable to defeating IBM's Summary Judgment Motion and its assertion that the time incurred was unreasonable. IBM includes in its calculation time spent on a number of other, unrelated tasks, such as IBM's Motions to Preclude and Seal, filed on the same day as IBM's Motion for Summary Judgment. Docket Nos. 50 and 52. JA1336-1337. Accordingly, the time attributed by IBM is exaggerated and inaccurate.

Castelluccio submits that 240 hours of attorney time incurred is reasonable given the breadth of issues and arguments addressed in IBM's Summary Judgment motion.[11] Valley Hous. Ltd. P'ship at * 11 (D. Conn. Mar. 30, 2012), appeal dismissed (Nov. 14, 2012) (declining to apply an across-the-board reduction where plaintiffs prevailed on all claims and defeated defendants' motion for summary judgment.)

Once IBM's overstated estimate of Castelluccio's attorneys' fees is corrected, and the scope of IBM's Motion for Summary Judgment is considered, it is clear that counsel's time was well spent in view of Judge Squatrito's favorable ruling and Castelluccio's ultimate success at trial.

---

[11] IBM filed a 38 page memorandum, an affirmation with 23 exhibits, and a 71 paragraph Rule 56(a)1 Statement. Castelluccio responded with a 52 page memorandum, 156 paragraph affidavit, a 286 paragraph Rule 56(a)2 Statement, and 50 exhibits. Docket Nos. 47-49, 70-4, 97.

**D.    Castelluccio's Fees for Preparation of his Post-Trial Fee Application are Reasonable**

Judge Smith declined to reduce Castelluccio's fees incurred in preparing with his fee request, recognizing that the task required time to gather affidavits and supporting documentation, as well as the preparation of a memorandum of law. JA1469.   Judge Smith further noted that much of the work associated with these tasks was billed at a lower rate by an associate.   Castelluccio's fee application required the review and summary of legal services rendered over five years and was carefully and thoroughly prepared.

IBM cites no specific instances where the time incurred was unnecessary or excessive, and the cases cited by IBM are inapposite.   IBM has identified no appellate decisions and its reliance on decisions of district courts, whose opinions are based on their intimate familiarity with the nuances of the case, is misplaced. Here, IBM seeks a 30% reduction to which it claims to be entitled by simply labeling Castelluccio's time entries as excessive across the board.   IBM's request is unjustified and should be rejected for the same reasons it was rejected by Judge Smith.

Finally, without referencing a single time entry, IBM requests a 30% reduction of Castelluccio's fees for what it labels "block billing" and excessive time spent.   When rejecting this argument, Judge Smith noted that Castelluccio's counsels' entries comply with the requirements of this Court.   They specify "the

61

date, hours expended, and the nature of the work done." JA1467 (citing <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1148 (2d Cir. 1983)).  IBM's assertion of "block billing" is unjustified and unsupported.

## CONCLUSION

For the foregoing reasons, Castelluccio respectfully requests that the Court affirm the judgment of the District Court.

RESPECTFULLY SUBMITTED,
PLAINTIFF-APPELLEE
JAMES CASTELLUCCIO

_____/ S / Mark R. Carta_____
Mark R. Carta
Margaret A. Triolo
Carta, McAlister & Moore, LLC
1120 Boston Post Road, P.O. Box 83
Darien, CT 06820
Telephone 203-203-3100/Facsimile: 203-202-3012
mark@cmm-law.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  It contains 13,842 words, exclusive of the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14 point font size Times New Roman.


_____ / S / Mark R. Carta_____

Mark R. Carta
Attorney for Plaintiff-Appellee James Castelluccio
Dated: March 26, 2015

63

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 26, 2015, he filed an electronic copy of the foregoing Brief for Plaintiff-Appellant on the Court's CM/ECF system, which caused it to be served on all counsel of record.

Dated at Darien, Connecticut this 26th day of March, 2015.


_____/ S / Mark R. Carta_____
MARK R. CARTA, Esq.
Carta, McAlister & Moore, LLC
1120 Post Road
Darien, Connecticut 06820
(203) 202-3100
Attorney for Plaintiff-Appellant
James Castelluccio