# 14-2854-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

JAMES CASTELLUCCIO,

*Plaintiff-Appellee,*

—against—

INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## FINAL BRIEF FOR DEFENDANT-APPELLANT IBM

ZACHARY D. FASMAN, ESQ.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

TRACI L. LOVITT, ESQ.
JONES DAY
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

WILLIS J. GOLDSMITH, ESQ.
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant IBM*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant International Business Machines Corporation ("IBM") has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

PAGE

CORPORATE DISCLOSURE STATEMENT ......................................i

JURISDICTIONAL STATEMENT ........................................1

INTRODUCTION ...............................................2

STATEMENT OF THE ISSUES..................................6

STATEMENT OF THE CASE..................................7

    A.    IBM and its Employment Policies ......................................7

    B.    Castelluccio's Employment at IBM ..............................8

    C.    These Proceedings..................................14

SUMMARY OF ARGUMENT ..................................17

STANDARD OF REVIEW ..................................19

ARGUMENT ........................................21

I.    THE DISTRICT COURT ERRED IN FAILING TO VACATE THE JURY'S WILLFULNESS FINDING..................................21

    A.    The Jury's Willfulness Finding is Unsupportable..........................21

    B.    The Jury's Contrary Conclusion Resulted From The Erroneous And Highly Prejudicial Exclusion Of Open Door Evidence ..........27

    C.    The District Court's Contrary Conclusions Were Wrong..................29

        1.    IBM's Willfulness Cannot Be Adjudged By Collins-Smee ..................................29

        2.    The District Court Ignored The Open Door Evidence's Manifold Relevance, and Fundamentally Altered The Evidence ..................................31

II.    THE DISTRICT COURT ERRED IN UPHOLDING THE JURY'S AGE DISCRIMINATION FINDING ..........................36

    A.    Age Discrimination Was Not The But-For Cause Of Castelluccio's Termination ..............................36

    B.    The District Court's Contrary Conclusion Was Legally And Factually Wrong ..................................39

-ii-

**TABLE OF CONTENTS**
(continued)

PAGE

III. THE COURT SHOULD VACATE, OR ALTERNATIVELY
MODIFY, CASTELLUCCIO'S EMOTIONAL DISTRESS AWARD ......42

    A.    Castelluccio's Emotional Distress Claim Is Insufficiently
Corroborated Under New York Law.................................................42

    B.    Alternatively, Castelluccio's Emotional Distress Award Should
Be Reduced.........................................................................................45

    C.    The District Court Erroneously Upheld Castelluccio's
Emotional Distress Award Based On An Incorrect Standard Of
Review And An Impermissible Ground............................................49

IV. CASTELLUCCIO'S ATTORNEY'S FEE AWARD WAS
EXCESSIVE.................................................................................................52

    A.    On Its Face, Castelluccio's Fee Award Was Excessive
Compared To Those Permitted In Comparable Cases .....................53

    B.    Castelluccio's Stunning Fee Award Was The Result Of Patently
Excessive And Duplicative Billing ..................................................56

        1.    Castelluccio's Counsel Billed For Excessive Trial
Preparation ..............................................................................57

        2.    Castelluccio's Counsel Billed Excessive Time Opposing
Summary Judgment .................................................................60

        3.    Castelluccio's Post-Trial Counsel's Fee Award Was
Excessive.................................................................................61

CONCLUSION ...........................................................................................63

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

*Abel v. Town Sports Int'l, LLC*,
   No. 09 Civ. 10388 (DF), 2012 U.S. Dist. LEXIS 183444 (S.D.N.Y.
   Dec. 18, 2012)............................................................................................53, 57

*Allen v. Highlands Hosp. Corp.*,
   545 F.3d 387 (6th Cir. 2008) ...............................................................34

*Anderson v. Rochester-Genesee Reg'l Transp. Auth.*,
   388 F. Supp. 2d 159 (W.D.N.Y. 2005)..............................................60

*Annis v. Cnty. of Westchester*,
   136 F.3d 239 (2d Cir. 1998) .................................................................44

*Apple Corps.v. Int'l Collectors Soc'y*,
   25 F. Supp. 2d 480 (D.N.J. 1998)........................................................58

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of
   Albany*,
   522 F.3d 182 (2d Cir. 2007) .................................................................52

*Borja-Fierro v. Girozentrale Vienna Bank*,
   No. 91 Civ. 8743 (CMM), 1994 U.S. Dist. LEXIS 7088 (S.D.N.Y.
   May 26, 1994)......................................................................................47

*Brady v. Wal-Mart Stores, Inc.*,
   455 F. Supp. 2d 157 (E.D.N.Y. 2006) ...........................................56, 60

*Brock v. Claridge Hotel & Casino*,
   846 F.2d 180 (3d Cir. 1988) .................................................................30

*Byrnie v. Town of Cromwell Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001) ..............................................................39, 41

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

*Caravantes v. 53rd St. Partners, LLC*,
No. 09 Cv. 7821 (RPP), 2012 U.S. Dist. LEXIS 120182 (S.D.N.Y.
Aug. 23, 2012) .............................................................46, 48

*Caruolo v. John Crane, Inc.*,
226 F.3d 46 (2d Cir. 2000) .................................................20

*Clutter v. Karshner*,
No. 99-4307, 2001 WL 1006155 (6th Cir. Aug. 20, 2001)..................28

*Consorti v. Armstrong World Indus.*,
72 F.3d 1003 (2d Cir. 1995) ...............................................50

*Cross v. N.Y.C. Transit Auth.*,
417 F.3d 241 (2d Cir. 2005) ...........................................21, 42

*Cullen v. Nassau Cnty.Civil Serv. Comm'n*,
53 N.Y.2d 492 (1981) .................................................42, 51

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014) ...............................................36

*Diesel v. Town of Lewisboro*,
232 F.3d 92 (2d Cir. 2000) ................................................19

*EEOC v. Yellow Freight Sys.*,
No. 98 Civ. 2270 (THK), 2002 U.S. Dist. LEXIS 16826 (S.D.N.Y.
Sept. 4, 2002) ..............................................................44

*Evanauskas v. Strumpf*,
No. 3:00-CV-1106 (JCH), 2001 U.S. Dist. LEXIS 14326 (D. Conn.
June 27, 2001).............................................................56

*Evans v. Intel Corp.*,
167 F. App'x 34 (10th Cir. 2006).........................................28

# TABLE OF AUTHORITIES
### (continued)

**PAGE(S)**

*Farrior v. Waterford Bd. of Educ.*,
277 F.3d 633 (2d Cir. 2002) (per curiam) ........................................................20

*Fowler v. N.Y. Transit Auth.*,
No. 96 Civ 6796 (JGK), 2001 U.S. Dist. LEXIS 762 (S.D.N.Y.
Jan. 31, 2001) .............................................................................................46, 50

*Fried v. LVI Servs.*,
500 F. App'x 39 (2d Cir. 2012) ........................................................................40

*Funk v. F&K Supply, Inc.*,
43 F. Supp. 2d 205 (N.D.N.Y. 1999)................................................................59

*Gasperini v. Ctr. For Humanities, Inc.*,
518 U.S. 415 (1996)........................................................................20, 49, 50

*Gonzales v. Dallas Cnty.*,
249 F.3d 406 (5th Cir. 2001) ............................................................................34

*Grochowski v. Ajet Constr. Corp.*,
No. 97 Civ. 6269 (NRB), 2002 U.S. Dist. LEXIS 5031 (S.D.N.Y.
Mar. 27, 2002)...................................................................................................59

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009)..........................................................................18, 36, 40

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993)..........................................................................17, 21, 26

*Hensely v. Eckerhart*,
461 U.S. 424 (1983)...........................................................................................53

*Hillstrom v. Best W. TLC Hotel*,
354 F.3d 27 (1st Cir. 2003)................................................................................22

## TABLE OF AUTHORITIES
(continued)

PAGE(S)

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1998*,
  37 F. 3d 804 (2d Cir. 1994) ...............................................................34

*Kinneary v. City of N.Y.*,
  536 F. Supp. 2d 326 (S.D.N.Y. 2008) ...............................................46

*Kirsch v. Fleet St., Ltd.*,
  148 F.3d 149 (2d Cir. 1998) ......................................................19, 56

*Kolesnikow v. Hudson Valley Hosp. Ctr.*,
  622 F. Supp. 2d 98 (S.D.N.Y. 2009) .................................................25

*Levy v. Powell*,
  No. CV-00-4499 (SJF), 2005 U.S. Dist. LEXIS 42180 (E.D.N.Y.
  July 7, 2005)......................................................................................62

*Lindsey v. Walgreen Co.*,
  615 F.3d 873 (7th Cir. 2010) ......................................................30, 40

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012) ......................................................20, 46

*Lunday v. City of Albany*,
  42 F.3d 131 (2d Cir. 1994) ...............................................................52

*MacMillan v. Millenium Broadway Hotel*,
  873 F. Supp. 2d 546 (S.D.N.Y. 2012) .........................................46, 47

*Malek v. Federal Ins. Co.*,
  994 F.2d 49 (2d Cir. 1993) ................................................................28

*Martell v. Boardwalk Enters., Inc.*,
  748 F.2d 740 (2d Cir. 1984) ..............................................................45

*McDaniel v. Cnty. of Schenectady*,
  595 F.3d 411 (2d Cir. 2010) ................................................20, 50, 52

# TABLE OF AUTHORITIES
(continued)

PAGE(S)

*McGrory v. City of N.Y.*,
No. 99 Civ. 4062 (FM), 2004 U.S. Dist. LEXIS 20425 (S.D.N.Y.
Oct. 8, 2004) ............................................................................................46, 48

*McIntosh v. Irving Trust Co.*,
887 F. Supp. 662 (S.D.N.Y. 1995) ....................................................................42

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)....................................................................................22, 25

*Meacham v. Knolls Atomic Power Lab.*,
185 F. Supp. 2d 193 (N.D.N.Y 2002), *aff'd*, 381 F.3d 56 (2d Cir.
2004) ............................................................................................................passim

*Meacham v. Knolls Atomic Power Lab.*,
381 F.3d 56 (2d Cir. 2004) ..............................................................20, 45, 50

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
746 F. Supp. 2d 575 (S.D.N.Y. 2010) ..........................................................46, 52

*Michael v. Caterpillar Fin. Servs. Corp.*,
496 F.3d 584 (6th Cir. 2007) ......................................................................32, 34

*Milani v. IBM*,
322 F. Supp. 2d 434 (S.D.N.Y. 2004), *aff'd*, *Milani v. IBM*, 137 F.
App'x 430 (2d Cir. 2005) (Summary Order)......................................................24

*Millea v. Metro-North R.R.*,
658 F.3d 154 (2d Cir. 2011) ...........................................................................52

*Mincey v. Univ. of Rochester*,
262 F. App'x 319 (2d Cir. 2008) .....................................................................34

# TABLE OF AUTHORITIES
### (continued)

PAGE(S)

*Moore v. Houlihan's Rest., Inc.*,
   07-cv-03129 (EWV) (RER), 2011 U.S. Dist. LEXIS 64452
   (E.D.N.Y. May 10, 2011) ...................................................................54

*Morgan v. Ark. Gazette*,
   897 F.2d 945 (8th Cir. 1990) ..............................................................40

*Murray v. Comm'r of N.Y. Dep't of Educ.*,
   354 F. Supp. 2d 231 (E.D.N.Y. 2005) .................................................62

*N.Y.C. Transit Auth. v. State Div. of Human Rights*,
   181 A.D.2d 891 (N.Y. App. Div. 1992) ..............................................48

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983) .............................................................56

*Norville v. Staten Island Univ. Hosp.*,
   No. CV 96-5222 (RJD), 2003 U.S. Dist. LEXIS 28399
   (E.D.N.Y.Oct. 17, 2003)...............................................................46, 54

*O'Brien v. IBM*,
   No. 06-4864 (FLW), 2009 U.S. Dist. LEXIS 25358 (D.N.J. Mar.
   27, 2009) ..............................................................................................24

*Ornstein v. N.Y.C. Health & Hosps. Corp.*,
   881 N.E.2d 1187 (N.Y. 2008).............................................................49

*Ozemebhoya v. Edison Parking Corp.*,
   No. 02-CV-10057 (BSJ), 2007 U.S. Dist. LEXIS 66552 (S.D.N.Y.
   Sept. 7, 2007) ......................................................................................24

*Quaratino v. Tiffany & Co.*,
   166 F.3d 422 (2d Cir. 1999) ...............................................................52

# TABLE OF AUTHORITIES
### (continued)

PAGE(S)

*Rand v. Town of Exeter*,
Civil No. 11-cv-55-LM, 2014 U.S. Dist. LEXIS 138402 (D.N.H.
Sept. 30, 2014) .................................................................................59

*Reiter v. Metro. Transp. Auth. of N.Y.*,
No. 01 Civ 2762 (JGK), 2003 U.S. Dist. LEXIS 17391 (S.D.N.Y.
Sept. 30, 2003) .................................................................................46

*Rivera v. Baccarat, Inc.*,
99 Civ 9478 (MBM) (JCF), 1999 U.S. Dist. LEXIS 6792
(S.D.N.Y. May 10, 1999)....................................................................57

*Scala v. Moore McCormack Lines, Inc.*,
985 F.2d 680 (2d Cir. 1993) .............................................................51

*Sea Spray Holdings v. Pali Fin. Grp., Inc.*,
277 F. Supp. 2d 323 (S.D.N.Y. 2003) ...............................................60

*Seeger v. Cincinnati Bell Tel. Co.*,
681 F.3d 274 (6th Cir. 2012) ............................................................34

*Serricchio v. Wachovia Sec., LLC*,
706 F. Supp. 2d 237 (D. Conn. 2010)................................................61

*Simmons v. Sykes Enters., Inc.*,
647 F.3d 943 (10th Cir. 2011) ..........................................................30

*Sims v. MVM, Inc.*,
704 F.3d 1327 (11th Cir. 2013) ........................................................29

*Siracuse v. Program for the Development of Human Potential*,
No. 07 CV 2205 (CLP), 2012 U.S. Dist. LEXIS 73456 (E.D.N.Y.
Apr. 30, 2012) ...........................................................................54, 62

-x-

# TABLE OF AUTHORITIES
(continued)

PAGE(S)

*Toy v. IBM*,
No. CIV 03-0860-PCT-DKD, 2005 U.S. Dist. LEXIS 21939 (D.
Ariz. Sept. 26, 2005) .............................................................24, 25, 29

*Trans World Airlines, Inc. v. Thurston*,
469 U.S. 111 (1985)............................................................21, 22, 25, 30

*Tsombanidis v. City of West Haven*,
208 F. Supp. 2d 263 (D. Conn. 2002).................................................54

*United States v. Landau*,
155 F.3d 93 (2d Cir. 1998) .................................................................20

*United States v. Titus*,
210 F.2d 210 (2d Cir. 1954) ...............................................................28

*United States v. Williams*,
443 F.3d 35 (2d Cir. 2006) ............................................................20, 50

*Wallace v. Suffolk Cnty. Police Dep't*,
04-cv-2599, 2010 U.S. Dist. LEXIS 100796 (E.D.N.Y. Sept. 24,
2010) ..................................................................................................50

*Wash. v. Phila. Cnty. Court of Common Pleas*,
89 F.3d 1031 (3d Cir. 1996) .........................................................56, 58

*Waters v. Churchill*,
511 U.S. 661 (1994)...........................................................................33

*Wilder v. Bernstein*,
725 F. Supp. 1324 (S.D.N.Y. 1989), *rev'd on other grounds*, 944
F.2d 1028 (2d Cir. 1991) ...................................................................57

*Williams v. Caterpillar Tractor Co.*,
770 F.2d 47 (6th Cir. 1985) ...............................................................30

# TABLE OF AUTHORITIES
(continued)

PAGE(S)

*Williams v. Valentec Kisco, Inc.*,
  964 F.2d 723 (8th Cir. 1992) ....................................................................21, 22

*Wolff v. Brown*,
  128 F.3d 682 (8th Cir. 1997) ...............................................................................28

*Zafiro v. United States*,
  506 U.S. 534 (1993)................................................................................................28

**STATUTES**

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1332 ..................................................................................................1

28 U.S.C. § 1367(a) ..............................................................................................1

29 U.S.C. § 621 *et seq.*........................................................................................1

29 U.S.C. § 626(b) ..............................................................................................30

N.Y. Exec. Law § 296(a) ...................................................................................14

**OTHER AUTHORITIES**

77 Fed. Reg. 19080, 19088 (Mar. 30, 2012) (to be codified 29 C.F.R.
  pt. 1625) ............................................................................................................30

Fed. R. Civ. P. 50 ...............................................................................................20

Fed. R. Civ. P. 50(a)(1)......................................................................................20

Fed. R. Civ. P. 59 ...............................................................................................20

# TABLE OF AUTHORITIES
(continued)

**PAGE(S)**

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON
ON LAW OF TORTS 265 (5th ed. 1984)................................................................40

# JURISDICTIONAL STATEMENT

This case implicates a federal question under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA"). The district court properly exercised subject matter jurisdiction under 28 U.S.C. § 1331, § 1332, and § 1367(a). IBM appeals from a July 23, 2014 final order denying its post-trial motions, and it timely filed a notice of appeal on August 8, 2014. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

This case involves an over- $3 million award for asserted age discrimination based on nothing more than circumstantial evidence of purported bias and alleged conduct that pre-dates the liability period at issue. The eye-popping award is largely attributable to the jury's failure to hear critical evidence exonerating IBM that was wrongfully excluded, prejudicing IBM's substantial rights. The verdict and award were improperly upheld below due to the district court's repeated misapplication of the law.

Specifically, Plaintiff-Appellee James Castelluccio ("Castelluccio") was removed from two positions at IBM after his co-workers and clients lodged serious complaints about his performance and leadership—complaints that were contemporaneously documented and the existence of which cannot be disputed. Rather than terminate Castelluccio, which any other employer would have done, IBM allowed Castelluccio to remain, with full salary and benefits, for six months to locate a new position within IBM. When after five months Castelluccio had not done so, his manager, Joanne Collins-Smee ("Collins-Smee"), informed Castelluccio that he would be terminated if he failed to find another IBM position in thirty days. Mere days thereafter, Castelluccio filed an internal age discrimination charge, claiming that Collins-Smee had marginalized him, repeatedly referenced his ability to retire, and was terminating him due to his

age—then 61. A senior human resources ("HR") professional investigated Castelluccio's claim and created a detailed report dismissing them. When his thirty days expired, Castelluccio was terminated, and the investigator later declined to reinstate him.

Despite what can only be described as an amply-justified termination, the jury found that Collins-Smee had discriminated against Castelluccio in violation of the ADEA and New York law, and that IBM had willfully violated the ADEA. It awarded Castelluccio $999,891.70 for back pay and benefits, $999,891.70 in liquidated damages, and $500,000 for emotional distress damages, for a total damage award of $2,499,783.40. In addition, the district court awarded Castelluccio attorney's fees, prejudgment interest and tax compensation in the amount of $1,219,137.50, for a total award of $3,718,920.90. There is no legal or factual basis for the jury's award or the out-sized attorney's fees.

The jury's willfulness finding is unsustainable in light of IBM's thorough investigation. Far from recklessly disregarding potential age discrimination, IBM had a senior HR professional conduct a near six-week investigation, involving over twenty witness interviews. The results of that investigation, which form the basis of IBM's knowledge, were that Castelluccio had significant performance problems, that Collins-Smee did not take any actions due to age discrimination, and that she aggressively assisted Castelluccio in his search for another IBM position. The jury,

-3-

however, was never allowed to review the investigator's report, findings or conclusions. The district court excluded the evidence, allowing IBM to introduce only the bare fact of the investigation and Castelluccio's request for one, which created the <u>mis</u>impression that the investigator may have found discrimination. Given the critical role the investigation plays in defining IBM's knowledge, and the incorrect impression its exclusion likely created, the exclusion was reversible error, warranting at least a new trial. But more, because the report conclusively proves that IBM did not act willfully, this Court can and should enter judgment in IBM's favor on willfulness and spare the judicial resources necessary for a new trial.

The jury's discrimination finding fares no better. Importantly, Castelluccio can assert ***no*** age discrimination claim in connection with his two removals. The district court held those claims time barred, and Castelluccio has not appealed this ruling. Castelluccio's claims arise from his termination after six months of looking for a new IBM position and his assertion of inadequate assistance with that task. Putting aside the irony that Castelluccio's claims arise from Collins-Smee's decision to give him a chance to secure another internal position rather than fire him, Castelluccio's claim should fail due to the complete lack of causation evidence.

-4-

Be forewarned, Castelluccio will argue extensively about circumstantial evidence he views as establishing Collins-Smee's discriminatory intent, which was the district court's near-exclusive focus. But intent is not causation where, as here, a legitimate reason for termination exists. Regardless of any asserted animus, Castelluccio was going to be terminated after his unsuccessful six-month search. Castelluccio cannot argue, moreover, that Collins-Smee's asserted age bias prevented him from actually securing a new job. To avoid mini-trials, Castelluccio disclaimed any argument that he would have actually been hired for open positions. Thus, the record lacks the prerequisite for cause: that Castelluccio had such superior qualifications he would have been hired but for discrimination.

Separately, the jury's emotional distress damages should be vacated or remitted. The totality of Castelluccio's distress evidence was his own, uncorroborated testimony that he had mood swings, lost some weight, and "probably" lost hair. He did not see anyone for this "distress" but would take a Tylenol. For this, Castelluccio was awarded $500,000. There is *no* New York case allowing damages this high for such vague, conclusory and uncorroborated claims. In failing to vacate or remit this award, the district court applied the wrong standard of review in violation of U.S. Supreme Court precedent and cited an invalid basis for the award—Castelluccio's sympathetic demeanor.

-5-

Finally, Castelluccio's attorney's fee award should be substantially reduced. Castelluccio received $999,891.70 in fees. There is no scenario under which a straightforward, single-plaintiff age discrimination case, which resulted in an eight-and-a-half day trial, justifies the claimed hours or fees. While Castelluccio's counsel's block billing renders his fee difficult to analyze, his excessive trial preparation—20 hours of preparation for every hour in court—is symptomatic of the problem.

## STATEMENT OF THE ISSUES

The issues on appeal are as follows:

1.  Whether the jury's willfulness finding was legally invalid and unsupported by the evidence?

2.  Whether the district court erroneously excluded critical willfulness evidence to IBM's substantial prejudice?

3.  Whether the jury's discrimination finding is legally and factually invalid?

4.  Whether the district court erred in upholding the jury's excessive emotional distress award?

5.  Whether the district court erred in failing to substantially reduce Castelluccio's attorney's fees?

## STATEMENT OF THE CASE

IBM appeals from a judgment of the District of Connecticut (Smith, Thomas P., M.J.) denying its post-trial motions for judgment as a matter of law, or alternatively, a new trial or remittitur, as well as the court's order granting attorneys' fees. The following facts were established at trial or were proffered for the record.

### A.     IBM and its Employment Policies.

IBM is an international technology and consulting company that manufactures and markets computer components, and offers infrastructure, hosting, and consulting services. IBM not only is at the technological forefront but has long advanced efforts to create a fair workplace, free of racial, gender, disability, or age bias. To this end, IBM has promulgated numerous employment processes.

For example, with respect to performance reviews, IBM has created the personal business commitment ("PBC") program, as part of which employees and managers jointly create objective, performance-evaluation criteria that, at year end, are used to evaluate the employee on a scale of "1" to "4." App. 305; App. 482-83. A "1" is given to top contributors; a "2+" is considered above average; a "2" is a solid contributor; a "3" is among the lowest contributors; and, a "4" is unsatisfactory. App. 305-06. Year-end PBC ratings are reviewed and approved by a second level manager to ensure their fairness and accuracy. App. 544.

-7-

IBM has also developed several appeals processes for employees. App. 641. Relevant here is IBM's "Open Door," a formal investigatory process. The Open Door's purpose is "to make sure that managers operate . . . in an appropriate legal" manner and "in a fair and equitable manner." App. 642. After an Open Door is initiated, a trained investigator who is "sufficiently removed organizationally from the employee to provide objectivity" conducts an "objective and thorough" investigation. App. 957-59; App. 642. If the investigator finds in the employee's favor, the investigator will rectify the wrong and can impose disciplinary actions. App. 642.

Finally, and unsurprisingly, IBM has a large and active HR department. *See* App. 306; App. 341-42; App. 385.

## B. Castelluccio's Employment at IBM.

Castelluccio joined IBM in March 1968 and, over the next few decades, was promoted within the company. App. 303-04. In 2005, Castelluccio was named Vice President of the Public Sector Division ("VP-PSD"), as part of which he oversaw the commercial, information-technology-service accounts for the entire public sector. App. 316-17.

In 2006, two senior IBM executives, David Liederbach ("Liederbach") and Keenie McDonald ("McDonald"), began complaining about Castelluccio's

performance.  *See* App. 571-72; App. 574; App. 590; App. 931.  Specifically,

Leiderbach testified about these "performance concerns":

> [t]hey were in the area of responsiveness and communication to
> my management team that was dependant on either he or his
> employee base to serve our clients.  It also included areas where
> we had performance issues of employees.  Either they weren't
> performing the job that they were assigned, and/or the
> individual was deemed by the client to be ineffective in the job
> role.  And in our business your job is to satisfy clients, and you
> need to response [sic] quickly to these changes, and that was
> not occurring.

App. 571-72; *see also* App. 929-30.  Leiderbach even asked Castelluccio's then-

boss, Arthur Kelton Jones ("Jones"), to remove Castelluccio from the VP-PSD

position.  App. 572; App. 929-30.  Jones agreed to do so, but was terminated

before he could.  App. 549; App. 554.

On February 1, 2007, Collins-Smee, then fifty-years old, replaced Jones as

Castelluccio's supervisor.  App. 491; App. 540.  Collins-Smee almost immediately

received complaints concerning Castelluccio's performance, as well as requests for

Castelluccio's removal; after analyzing the complaints, Collins-Smee removed

Castelluccio from the VP-PSD position.  App. 498; App. 932; App. 937-41; App.

942; App. 943-45.  Miguel Echavarria, who was then-forty-nine years old, replaced

Castelluccio as VP-PSD.  App. 243.

In April 2007, Collins-Smee assigned Castelluccio to become the Delivery

Project Executive ("DPE") for a single public account—the WellPoint account.

IBM managed WellPoint's servers and data centers as part of an outsourcing agreement, but the account was "troubled" because the agreement had underestimated the scope of work. App. 325; App. 947. Collins-Smee, Liederbach, and McDonald agreed that Castelluccio could "shine" if he focused on only one account. App. 501. Moreover, Castelluccio's expertise was in fixing troubled accounts, which made him well-suited to the job. App. 430.

The complaints, however, continued. WellPoint executives complained that Castelluccio was "invisible" and "MIA." *See* App. 591-92; App. 948-49; App. 952-53. Liederbach complained that "he was very unhappy with Jim Castelluccio's performance, and that he was not exerting leadership, that he was unresponsive, that he didn't answer e-mails, he didn't return phone calls, and that there were client complaints." App. 496. McDonald observed that the "absence of delivery leadership [was] very noticeable." App. 592-93; App. 950-51. McDonald summed up Castelluccio's performance as follows: "Too many complaints. I mean I had lodged too many complaints with his management chain, the customer had lodged too many complaints with IBM in general." App. 593-94. In November 2007, Collins-Smee removed Castelluccio from the DPE position, replacing him with Gordon Crawford, who was then fifty-nine years old—nearly Castelluccio's age. App. 244.

-10-

Importantly, ***none*** of the aforementioned can give rise to liability. Castelluccio did not timely challenge his removal from the VP-PSD or DPE positions. App. 222-23. Consequently, only the following could give rise to liability, if any.

After these events, Collins-Smee informed Castelluccio that she was considering giving him a PBC rating of "3" for his 2007 performance. App. 307; App. 512; App. 1475-79. She ultimately rated him a "2" after meeting with Castelluccio. App. 487-88. Collins-Smee noted in Castelluccio's PBC that he "need[ed] to continue to focus on those activities that would demonstrate effective leadership." App. 307-08.

Despite Castelluccio's having been removed from two positions in less than a year, Collins-Smee, remarkably, opted not to terminate him, placing him instead on what IBM calls "the bench." While "on the bench," Castelluccio was given full salary and benefits and only one task: to locate an alternative IBM position for himself. App. 434; App. 610. Castelluccio could do so by: (i) contacting other hiring executives; (ii) identifying potential opportunities; (iii) inquiring division openings and candidates; (iv) tracking executive appointments or announcements on the internal IBM website; and, (v) searching for non-executive positions on IBM's online job board called "The Global Opportunity Marketplace." App. 610-11. IBM was not responsible for Castelluccio's job search or securing him a new

-11-

internal position; it was exclusively Castelluccio's responsibility to find a position. *See* App. 434. In this respect, Castelluccio was treated no differently than any other executive. App. 610.

During this time, Castelluccio was placed on multiple "5-minute drills," a process for filling executive positions. App. 607. Conducted roughly every month, the drills make IBM managers aware of what executive job opportunities are available, which qualified employees are available for assignment, and who the particular current candidates are for each opportunity. App. 545.

Collins-Smee requested Castelluccio's placement on her boss', Robert Zapfel's ("Zapfel's"), drills, and he appeared on some as early as June 2007. App. 375; App. 480; App. 516. Collins-Smee also requested Castelluccio's placement on Pat Kerin's drill, but unbeknownst to Collins-Smee, he was not placed on Kerin's drill. *See* App. 479; App. 481; App. 499-500; App. 946. She also reached out directly to other managers and advocated on Castelluccio's behalf in contemporaneously documented emails. *See* App. 644; App. 967-70; App. 971-75; App. 976-78; App. 979-80.

For his part, Castelluccio did little to locate a new IBM position. According to Castelluccio, he "probably took more time off in that period . . . [than] at any time else in [his] career," and took vacation time. App. 434. He did not reach out

-12-

to Zapfel or the public sector managers.  App. 434-35.  He largely relied on

Collins-Smee.  App. 435.

On May 20, 2008, after five months on the bench, Collins-Smee informed

Castelluccio that he would be terminated at the end of June if he did not find

another position.  App. 519.  Castelluccio failed to find another position, refused a

separation package, and was terminated on June 30, 2008.  App. 303.  He is

currently collecting his IBM pension.  App. 447.

Just after Collins-Smee gave him the 30-day deadline, on June 13, 2008,

Castelluccio filed an internal age discrimination charge, claiming that Collins-

Smee marginalized him and was threatening to terminate him due to ageism.  App.

244.  According to Castelluccio, during a February 2007 meeting, Collins-Smee

asked, "You're old enough to bridge to retirement, right?" and started saying,

"How old are-" before stopping herself.  App. 417.  Castelluccio claimed that

Collins-Smee referenced retirement again in November of 2007, when she

removed him as DPE, App. 370; App. 373, and asked him about retirement in

March 2008.  App. 386.  Finally, Castelluccio complained that Collins-Smee failed

to help him find a new position.

Russell Mandel ("Mandel"), a senior consulting HR professional who runs

IBM's internal appeals programs, conducted an Open Door investigation into

Castelluccio's claims.  App. 244; App. 640; App. 643.  As of the date of trial,

-13-

Mandel was 68-years old, making him roughly Castelluccio's age at the time at issue here. App. 640. Mandel interviewed Castelluccio, Collins-Smee, and nearly twenty other witnesses over five weeks. App. 643-44. He prepared a report detailing his investigation and findings (the "Open Door Report"). *See* App. 250-54. The Open Door investigation concluded after Castelluccio was terminated, but Mandel had reinstatement authority. App. 645.

In his Report, Mandel found that Castelluccio had extensive performance issues and that Collins-Smee had adequately assisted Castelluccio's job search. App. 254. Mandel concluded that Castelluccio was not subject to age discrimination. *Id.* Mandel faulted Collins-Smee, however, for "over assessing Mr. Castelluccio's performances for 2007," finding that Collins-Smee should have assessed Castelluccio a "3" on his 2007 PBC. *Id.* Mandel noted that "even a '3' was a 'charitable' assessment considering Mr. Castelluccio's lack of success in 2007." *Id.* He did not recommend reinstating Castelluccio.

## C.    These Proceedings.

On July 21, 2009, Castelluccio commenced this action alleging that IBM terminated him in violation of the ADEA and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(a).

Prior to trial, Castelluccio moved to exclude all evidence relating to the Open Door investigation, including the Open Door Report itself, Mandel's notes,

-14-

and any testimony or evidence regarding Mandel's findings and conclusions. App. 258-59. The district court granted the motion, reasoning that the evidence's prejudicial impact exceeded its probative value. App. 262. The court later revised its ruling and allowed IBM to introduce a small subset of investigation evidence to disprove willfulness. Importantly, the district court continued to exclude the Open Door report itself, Mandel's findings and conclusions, and Mandel's reinstatement authority. App. 1438 (citing App. 640-43; App. 647).

In January 2014, the case was tried before a jury. Mandel was allowed to testify, but his substantive testimony was severely limited, spanning only seven pages of the trial transcript[1] and focused largely on his background, IBM's different internal appeals processes, and Open Door investigations generally. *See* App. 640-43. He was permitted to testify about Castelluccio's request for an Open Door investigation, Mandel's initial meeting with Castelluccio, and Castelluccio's complaints, as well as the number of witnesses he interviewed, some of the documents he reviewed, and the investigation's duration. *See* App. 643-44. After an objection and a heated exchange over one of Mandel's answers regarding

---

[1] In comparison, Castelluccio's testimony spanned over 550 pages and Collins-Smee's testimony spanned over 200 pages. Even witnesses who were not as vital as Mandel, such as Jones (approximately 90 pages), Morin (approximately 75 pages), and Holmes (approximately 100 pages) testified for much longer.

-15-

termination authority, the Court took over Mandel's examination, which then consisted of the following:

> THE COURT: …It's your job at IBM to investigate allegations of this nature, correct?
>
> THE WITNESS: Yes.
>
> THE COURT: And you did that. You conducted an investigation.
>
> THE WITNESS: Yes.
>
> THE COURT: And you and IBM conduct investigations like that – like this one because you know and believe that the law with respect to discrimination is important, serious, and it should be obeyed.
>
> THE WITNESS: Yes.

App. 647. Again, IBM was not allowed to introduce the Open Door Report or examine Mandel about his findings or conclusions.

Following a nine-day trial, on January 24, 2014, the jury returned a verdict in Castelluccio's favor on both his ADEA and NYSHRL claims. App. 717-18. The jury awarded Castelluccio $999,891.70 for back pay and benefits, $999,891.70 for liquidated damages, and $500,000 for emotional distress damages, for a total damage award of $2,499,783.28. App. 717. On January 28, 2014, the district court entered judgment in Castelluccio's favor. App. 1004.

-16-

On February 25, 2014, IBM filed its Renewed Motions for Judgment as a

Matter of Law Or, In the Alternative, For New Trial/Remittitur, App. 1272-1324,

which was denied on July 23, 2014.  App. 1414-48.  The same day, the court

granted Castelluccio's motion for attorney's fees, prejudgment interest and tax

compensation, awarding him an additional $1,219,137.50.  App. 1449-71 (Smith,

J.).  The court entered final judgment in the amount of $3,718,920.78 on July 28,

2014.  App. 1472.  This appeal timely followed.  *See* App. 1473-74.

## SUMMARY OF THE ARGUMENT

IBM is entitled to judgment as a matter of law, or in the alternative a new

trial or remittitur, for numerous reasons.

*First*, Castelluccio presented *no* evidence of IBM's willfulness.  Willfulness,

however, requires a showing that "the employer knew or showed reckless

disregard for the matter of whether its conduct was prohibited by the ADEA."

*Hazen Paper Co. v. Biggins*, 507 U.S. 604, 614 (1993) (citation and quotation

marks omitted).  Here, far from knowing of, or recklessly disregarding, purported

age discrimination, IBM conducted a full investigation and concluded that

Castelluccio's claim had no basis in fact.  This investigation and IBM's numerous

employee safeguards affirmatively disprove willfulness.  The jury's contrary

conclusion is explained by the district court's wrongful exclusion of the most

-17-

critical willfulness evidence: the Open Door Report, Mandel's findings and conclusions, and Mandel's reinstatement authority.

*Second*, the jury's discrimination finding fails for lack of causation. "[A] plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Here, the jury, like the district court, conflated discriminatory intent and causation, ignoring the wholesale absence of causation evidence. The undisputed trial testimony was that Castelluccio could validly be terminated after sitting on the bench for six months. Castelluccio cannot, moreover, prove cause for any claim that Collins-Smee's alleged discriminatory animus precluded him from finding a new position. Castelluccio's counsel made clear that he was not arguing that Castelluccio should have been hired into any open positions.

*Third*, the jury's emotional distress award cannot be sustained. Emotional distress damages may not be presumed and are limited to compensation for an actual and proven injury. *See Meacham v. Knolls Atomic Power Lab.*, 185 F. Supp. 2d 193, 220 (N.D.N.Y 2002), *aff'd*, 381 F.3d 56 (2d Cir. 2004). Here, Castelluccio's emotional distress claim was based exclusively on his own vague, conclusory and uncorroborated testimony about mood swings, weight loss, and internalized stress. As a matter of law, this testimony is too unreliable for an emotional distress claim. And, even assuming some damages were permissible,

-18-

the jury's $500,000 award is excessive. Where corroborated, the kind of emotional injury Castelluccio claims garners closer to $30,000.

*Finally*, Castelluccio's attorney's fee award cannot be sustained at its current level—nearly $1 million—as it is the result of excessive billing. It is well-settled that "'excessive, redundant, or otherwise unnecessary'" hours must be excluded when calculating fee awards. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (quoting *Hensely v. Eckerhart*, 461 U.S. 424, 434 (1983)). To IBM's knowledge, there is no comparable award for a case of this kind—a straightforward, single plaintiff discrimination suit that resulted in only an eight-and-a-half day trial. An examination of Castelluccio's counsel's time, moreover, shows excessive trial and motion preparation, as well as block billing that precludes any true examination of the time allocations. Where, as here, counsel engages in block billing and bills facially excessive time, an across-the-board reduction is warranted.

For these reasons, and those explained below, IBM is entitled to judgment as a matter of law, or at the very least, a new trial or remittitur.

## STANDARD OF REVIEW

A district court's denial of a motion for judgment as a matter of law is reviewed by the appellate court *de novo*. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000). Thus, this Court should examine whether "a

-19-

reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on that issue."  Fed. R. Civ. P. 50(a)(1).

A district court's denial of a motion for a new trial is reviewed for abuse of discretion.  *See Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) (per curiam).  The new trial standard under Rule 59 is less demanding than the standard under Rule 50, because the court "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner," *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (citation and quotation marks omitted); and, "a new trial may be granted even if there is substantial evidence to support the jury's verdict," *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (citation and quotation marks omitted).

The denial of a request for remittitur is also reviewed for abuse of discretion. *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012).  Remittitur is appropriate when the jury's award is excessive.  *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 78 (2d Cir. 2004).  Finally, an award of attorneys' fees should be vacated for abuse of discretion.  *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 416 (2d Cir. 2010).  In both instances, misapplication of the law is an abuse of discretion.  *See Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 439 (1996); *McDaniel*, 595 F.3d at 416; *cf. United States v. Williams*, 443 F.3d 35, 46 (2d Cir.

2006) ("Abuse of discretion encompasses clearly erroneous findings of fact and misapplications of the law.").

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN FAILING TO VACATE THE JURY'S WILLFULNESS FINDING.

The district court most clearly erred in upholding the jury's willfulness finding. There is simply no evidence of willfulness, and affirmative disproof of it. IBM did not disregard the purported discrimination but investigated it.

### A. The Jury's Willfulness Finding Is Unsupportable.

The proof required to show willfulness under the ADEA is substantial. "Congress intended for liquidated damages [due to willfulness] to be punitive in nature." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125 (1985). An employer's actions are "willful" only if "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Hazen Paper Co.*, 507 U.S. at 614 (citation and quotation marks omitted); *see also Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 252 (2d Cir. 2005). Because willfulness "must be based on evidence that does not simply duplicate that needed for the compensatory damages, there must be some additional evidence of the employer's 'reckless disregard.'" *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 729 (8th Cir. 1992). Thus, while a supervisor's statements about age may be

-21-

evidence of "age based animus, it is insufficient to establish a willful violation of the Act." *Id.*

An employer's conduct is not willful where it "act[s] reasonably and in good faith in attempting to determine whether [its conduct] would violate the ADEA," even if the employer reaches the wrong conclusion. *Thurston*, 469 U.S. at 129. In addition, willfulness "is generally understood to refer to conduct that is not merely negligent." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 34 (1st Cir. 2003) (recognizing same). The evidence below did not satisfy this standard.

With respect to Castelluccio's termination, IBM's knowledge is encompassed in the Open Door Report. The purpose of the investigation was to ensure that the ADEA was not violated. App. 647. Mandel found that Castelluccio had documented performance issues and that Collins-Smee had made appropriate efforts to help place Castelluccio in another IBM executive position. App. 252-54. He ultimately concluded that Collins-Smee had not discriminated against Castelluccio on the basis of age. App. 254.

Mandel's conclusions about Castelluccio's performance issues were well supported. For example, the Report notes that while Castelluccio was VP-PSD, Leiderbach complained that "Castelluccio failed to demonstrate leadership in staffing," was "not being reachable," and failed to "fix the situation(s) when there."

-22-

App. 252.  McDonald similarly complained that Castelluccio "was never visible on the account in either role, was very ineffective, demonstrated no leadership in "CritSit" situations, and was referred to as a "no-op" by the customer." *Id.* Brian Whitfield, GTS Vice President of State and Local Government noted that Castelluccio "should have been more involved," and "seemed to be struggling in the job." *Id.* According to John Shimkus, the former GTS Vice President of Healthcare, "Mr. Castelluccio could not staff, was very ineffective, did not execute on commitments and did not address issues." *Id.*

In addition, the Report shows that various DPEs who reported to Castelluccio faulted his "lack of aggressive solutions."  App. 253.  And Echavarria, Castelluccio's VP-PSD replacement, stated that public sector accounts were "in a state of disarray" when he arrived.  *Id.*  Similarly, the Report states that Crawford, Castelluccio's DPE replacement was "more visible to the customer" and was "doing a better job with the account."  *Id.*  The Open Door Report concluded that "Mr. Castelluccio was universally seen as under involved, insufficiently aggressive in solving issues."  App. 254.

With respect to Collins-Smee's efforts to help Castelluccio find another position, the Open Door Report concluded that "[Collins-Smee] was very aggressive in trying to place Castelluccio."  App. 253.  Her placement efforts began "immediately after [Castelluccio was] removed from the public sector role

-23-

in 2007," and Collins-Smee "plac[ed] him on both Americas and Global ITD '5-minute drills,' personally recommending him for positions inside and outside ITD." *Id.* The Report concluded that Collins-Smee did not discriminate against Castelluccio on the basis of age. App. 254.

The Open Door Report's contents disprove willfulness; it demonstrates *IBM's beliefs* about Castelluccio's termination. Because they define IBM's understanding of the facts, IBM's Open Door Reports are routinely recognized as demonstrating the company's knowledge in employment cases. *See, e.g.*, *O'Brien v. IBM*, No. 06-4864 (FLW), 2009 U.S. Dist. LEXIS 25358, *85 n.48 (D.N.J. Mar. 27, 2009); *Toy v. IBM*, No. CIV 03-0860-PCT-DKD, 2005 U.S. Dist. LEXIS 21939, at *17-18 (D. Ariz. Sept. 26, 2005); *Milani v. IBM*, 322 F. Supp. 2d 434, 458 (S.D.N.Y. 2004), *aff'd*, *Milani v. IBM*, 137 F. App'x 430 (2d Cir. 2005) (Summary Order).

Here, the Open Door Report demonstrates IBM's belief that Castelluccio had performance issues; that while benched, he was appropriately assisted and that he was lawfully and fairly terminated. In light of the investigation's thoroughness, its findings, and Mandel's experience, IBM reasonably could rely on the Report and conclude that Castelluccio was not terminated in violation of the ADEA. *See Ozemebhoya v. Edison Parking Corp.*, No. 02-CV-10057 (BSJ), 2007 U.S. Dist. LEXIS 66552, at *21-22 (S.D.N.Y. Sept. 7, 2007) ("An employer may sustain its

-24-

employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information."); *Toy*, 2005 U.S. Dist. LEXIS 21939, at *17-18 (same).

To the extent Mandel's conclusions were somehow wrong, IBM was not *willful* by relying on them. There was no evidence at trial that Mandel was careless or biased, or that he was improperly influenced in any way. Misplaced reliance sounds, at most, in negligence which is insufficient to prove willfulness. *McLaughlin*, 486 U.S. at 133.

Separately, the fact of the investigation in and of itself, disproves IBM's willfulness. Rather than turn a blind eye to purported discrimination, once notified of it, IBM investigated Castelluccio's claim through a senior HR manager. Particularly given the thoroughness of the investigation, IBM made a reasonable effort to determine whether any unlawful conduct occurred. This should have precluded any willfulness finding. *See Thurston*, 469 U.S. at 129; *see Toy*, 2005 U.S. Dist. LEXIS 21939, at *17-18; *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009).

In all events, the numerous anti-discrimination safeguards applied to Castelluccio (and all other IBM employees) disprove willfulness. As Castelluccio conceded, IBM affirmatively sought to preclude unlawful employment actions through upper-level management review of employment decisions. App. 307; *see*

-25-

*also* App. 544.  Each and every employment-related action Collins-Smee took with respect to Castelluccio was independently reviewed and approved by her managers. App. 488; App. 500; App. 512-13; App. 519; App. 520; App. 576.  Castelluccio admitted, moreover, that the second-line managers engaged in no conduct suggesting age bias.  App. 415.

IBM's policy of second-line review, and Castelluccio's concession that, apart from Collins-Smee, no one at IBM evidenced age bias, disproves willfulness. IBM did not ignore the possibility of age bias; it had checks in place to detect and prevent discrimination.  And, given the absence of any bias with respect to Castelluccio's second level managers, IBM had every reason to expect that the review and approval here would prevent unlawful acts.

In contrast to this showing, Castelluccio presented *no* evidence about IBM's knowledge or notice.  There is no evidence suggesting that IBM turned a blind eye to purported discrimination, or had notice of it and did nothing.  Without evidence that IBM either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA," there cannot be any finding of willfulness. *See Hazen Paper Co.*, 507 U.S. at 614 (internal quotation marks omitted).

**B.** **The Jury's Contrary Conclusion Resulted From The Erroneous And Highly Prejudicial Exclusion Of Open Door Evidence.**

Despite its critical importance, the jury was *never* allowed to review the Open Door Report, to know of Mandel's findings or conclusions, or to truly understand Mandel's reinstatement authority or the scope of the investigation—all of which, as the preceding section proves, was fundamental to IBM's willfulness defense.

Prior to trial, the district court excluded all Open Door evidence as overly prejudicial, reasoning that the Report "represent[ed] only the findings and conclusions of IBM," and that the investigation was not "conducted by a neutral party." App. 262. Later, the court changed course and allowed Mandel to testify but *only* about his credentials, Castelluccio's investigation request, Mandel's and Castelluccio's initial meeting, Castelluccio's complaints, and bare information about the fact and scope of the investigation. *See* App. 643-44. But the ***critical*** evidence, the Open Door Report, Mandel's findings and conclusions, and Mandel's reinstatement authority remained excluded.

As the previous section establishes, this evidence proved IBM's beliefs about what happened in connection with Castelluccio's termination, which goes to the heart of willfulness. Thus, numerous courts have held that investigatory

-27-

reports are necessary to disprove willfulness.[2]  IBM is unaware of a case, other than this one, holding an employer's internal investigation of alleged discrimination inadmissible to show the absence of reckless disregard toward the asserted discrimination.  Mandel's reinstatement authority was independently relevant to reckless disregard; it showed that IBM did not ignore asserted discrimination, but empowered Mandel to correct it.  Given this evidence's significant probative value and importance to IBM's defense, the district court abused its discretion by excluding it.  *See Zafiro v. United States*, 506 U.S. 534, 540 (1993); *cf. United States v. Titus*, 210 F.2d 210, 214 (2d Cir. 1954) (reversible error by excluding "substantial evidence which was distinctly relevant to the [defendant's] defense"); *Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993) (reversible error where exclusion "related to the central issues of this case").

In IBM's view, this Court can review the Open Door Report and determine as a matter of law that it disproves IBM's willfulness, thereby saving judicial resources from a remand.  *See Evans v. Intel Corp.*, 167 F. App'x 34 (10th Cir. 2006); *Clutter v. Karshner*, No. 99-4307, 2001 WL 1006155, at *3 n.4 (6th Cir. Aug. 20, 2001).  To the extent this Court disagrees, a new trial is warranted.

---

[2] *See Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997) ("In employment discrimination cases, internal documents relied upon by the employer in making an employment decision are … relevant and admissible because they help explain (or may help explain) the employer's conduct.").

-28-

**C.     The District Court's Contrary Conclusions Were Wrong.**

In upholding the jury's willfulness finding, the district court committed two fundamental errors:  (i) the court wrongly conflated Collins-Smee and IBM; and, (ii) it misapprehended the invalidity and impact of its exclusions.

### 1.     IBM's Willfulness Cannot Be Adjudged By Collins-Smee.

First, the district court wrongly looked to Collins-Smee to determine IBM's willfulness.  The court's primary rationale for upholding willfulness was that Collins-Smee "received training on discrimination laws on a regular basis, including laws pertaining to age discrimination" but despite "her knowledge of the law, . . . made employment decisions that adversely affected Castelluccio based on his age."  App. 1432-33.

Collins-Smee, however, does not define IBM's *knowledge* for willfulness. IBM's knowledge is defined by Mandel and the Open Door Report.  *See Toy*, 2005 U.S. Dist. LEXIS 21939, at *17-18.  Mandel was specifically empowered to investigate Castelluccio's termination, determine for IBM whether Castelluccio had been unlawfully terminated and reinstate Castelluccio if there had been a violation; moreover, there was no argument or evidence at trial that Collins-Smee controlled, dominated, or otherwise tainted his investigation.  *See* App. 642; App. 643; App. 957-59.  Accordingly, Mandel displaced Collins-Smee for defining IBM's knowledge.  *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1335, 1337 (11th Cir.

-29-

2013); *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949-50 (10th Cir. 2011);

*Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010).

In all events, the district court's reliance on Collins-Smee's training, App.

1432-33, proves too much and too little. Because *every* manager receives training

on unlawful discrimination, *see* Disparate Impact and Reasonable Factors Other

Than Age Under the ADEA, 77 Fed. Reg. 19080, 19088 (Mar. 30, 2012) (to be

codified 29 C.F.R. pt. 1625), the district court's rationale would deprive

willfulness of any meaningful limit. Directly contrary to the district court, the U.S.

Supreme Court has held that willfulness requires more than the "employer simply

[knowing] of the potential applicability of the ADEA." *Thurston*, 469 U.S. 127.

Otherwise, there would be "an award of double damages in almost every case. As

employers are required to post ADEA notices, it would be virtually impossible for

an employer to show that he was unaware of the Act and its potential applicability."

*Id.* at 128; *see also Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 188 (3d Cir.

1988) (holding seminar attendance about applicable regulations could not prove

willfulness); *Williams v. Caterpillar Tractor Co.*, 770 F.2d 47, 50 (6th Cir. 1985)

(reversing willfulness award because "mere knowledge of potential applicability of

the ADEA was insufficient to establish willfulness"). The rationale proves too

little because mere knowledge of the law is not enough. Castelluccio was required

to show willfulness with respect to an ADEA *violation*. 29 U.S.C. § 626(b).

-30-

###### 2. The District Court Ignored The Open Door Evidence's Manifold Relevance, And Fundamentally Altered The Evidence.

With respect to the Open Door evidence, the district court held that its exclusion was harmless, reasoning that Mandel's testimony regarding the fact and scope of the investigation mooted any prejudice. App. 1439-40. But Mandel was prohibited from testifying about the most relevant evidence: his findings and conclusions. And the Open Door Report, itself, was excluded. Substantial prejudice to IBM arose from *these* exclusions. About them, the district court said nothing.

In all events, the district court's limitations on Mandel's testimony gutted its effectiveness and so abridged his testimony that the jury easily could have misunderstood Mandel to have found discrimination. During trial, IBM's counsel was just starting to question Mandel when an objection arose in connection with what he had communicated to Castelluccio and Collins-Smee. App. 645. The court excused the jury and a lengthy argument ensued, after which the court controlled Mandel's questioning. App. 645-47. When the jury returned, the Court asked only three questions: if it was Mandel's job to investigate; whether he conducted the Castelluccio investigation; and whether he did so because investigating discrimination is important. App. 647. Given the sheer brevity of Mandel's testimony and the court's examination, Mandel's testimony entirely lost

-31-

its effectiveness.  The court placed so many limits on Mandel's ability to discuss the investigation, the jury could not appreciate its full scope or impact.  In addition, given the heated debate, the jury's sudden excusal, the court's subsequent voir dire, the abrupt ending to Mandel's testimony, and Mandel's conspicuous failure to state his conclusions, the jury easily could have had the misimpression that Mandel concluded that discrimination had occurred.  Thus, far from mooting prejudice, the court's intervention and limits added to it.

In addition, the court excluded, in its entirety, the Open Door Report and evidence of Mandel's findings and conclusions.  *See* App. 1437-38.  In the court's view, the investigation was potentially biased because: it was conducted by an IBM HR manager, not a neutral third party; Castelluccio was not allowed to present his own witnesses and cross-examine others; and the Report focused on Castelluccio's job performance.  *See id.*  In short, the district court concluded that the investigation's conclusions were overly prejudicial because IBM conducted an internal investigation, not an arbitration.

But, courts have "not require[d] that the decisional process used by the employer be optimal or that it left no stone unturned"—let alone, that a neutral, third-party conduct them in an adversarial fashion.  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007) (quotation marks and citation omitted).  If, as the district court concluded, an investigation is tainted simply

-32-

because it is conducted by a company's HR department, there can be no "internal" investigations. The employer's people would never suffice. That has never been the rule of any decision. Similarly, if as the district court held, an investigation is tainted because it is a series of one-on-one interviews, rather than adversarial examinations, there could be no "investigations," just trials. Here, too, this has never been a rule of decision. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 677-78 (1994) (holding that, even where discharge could violate the First Amendment, the care required in any investigation "need not be the care with which trials, with their rules of evidence and procedure, are conducted" but need only be "the care that a reasonable manager would use").

Presumably for this reason, the district court cited no supporting authority involving an employer-investigation exclusion either in its initial exclusion order, *see* App. 261-64, or in its post-judgment decision, *see* App. 1437-38. And while one could imagine instances where an investigation is too flawed, IBM knows of *no* decision wholly excluding an employer's investigation report where, as here, the employer conducted a thorough investigation, through an experienced, senior HR manager who no one—including the plaintiff himself—claims had a discriminatory motive or bias.

To the contrary, numerous courts have found employer investigations conducted far less thoroughly than IBM's, and by individuals not nearly as

experienced as Mandel, admissible to disprove willfulness. *See, e.g.*, *Michael*, 496

F.3d at 590-91, 599 (HR manager investigation comprised of employee interviews);

*Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398-99 (6th Cir. 2008) (same);

*Gonzales v. Dallas Cnty.*, 249 F.3d 406, 412 (5th Cir. 2001) (same, First

Amendment case); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286 (6th Cir.

2012) (observing that an "optimal" investigation would be "interviewing the

employee and some or all of his witnesses" but allowing something less); *Mincey v.*

*Univ. of Rochester*, 262 F. App'x 319, 321-22 (2d Cir. 2008).

    In finding IBM's investigation prejudicial, the district court further erred by

substituting its judgment for the jury's.  Ultimately, the district court's reasons for

excluding the Open Door Report—its view of the thoroughness and neutrality of

the underlying investigation—go to credibility.  "[C]redibility is a question for the

jury; to permit the judge to exclude evidence on the ground that he thinks it

incredible would be a remarkable invention and may even be a violation of the

right of the trial by jury."  *In re Air Disaster at Lockerbie Scotland on Dec. 21,*

*1998*, 37 F. 3d 804, 839 (2d Cir. 1994) (quoting Wright & Graham, *Federal*

*Practice and Procedure: Evidence* § 5214) (quotation marks omitted)).

    Finally, the district court erred by prohibiting Mandel from testifying in any

meaningful way about his reinstatement authority.  In its post-judgment decision,

the district court suggested that the jury in fact heard Mandel say that he possessed

-34-

such authority and that the "fact was self-evident to the jury." App. 1440. But the court's own on-the-record, contemporaneous observations prove that the jury did not appreciate the remark. During his testimony, Mandel stated that "[i]f [he had] found that in Jim's favor, we would bring him back to the business." App. 645. This testimony that drew an immediate objection and motion to strike from Castelluccio's counsel and led to a heated exchange over whether the testimony was purposefully elicited. *See* App. 645-47.

Importantly, the district court denied the motion to strike on the ground that the jury had *not* actually heard the testimony. The court explained: "I don't think it was emphasized to the jury. *I don't think the jury picked up on it*. I think more harm would be done by my going into detail about this testimony." App. 646 (emphasis added). Thus, the court's own contemporaneous view of Mandel's testimony was that the jury missed it.

In all events, the district court prohibited the jury from considering the broader impact of the Open Door Report evidence and Mandel's authority on willfulness through a limiting instruction. The court instructed the jury that it could consider Mandel's testimony only "as evidence that IBM takes [age discrimination] allegations seriously" but that they "should not consider it for any other purpose." App. 714. Thus, even if the jury had heard the statement, which it did not, it could not have considered Mandel's authority.

-35-

## II. THE DISTRICT COURT ERRED IN UPHOLDING THE JURY'S AGE DISCRIMINATION FINDING.

The jury's finding that Castelluccio was terminated due to his age is also unsupported by the evidence. In particular, the evidence at trial failed to prove that, "but for" age discrimination, Castelluccio would not have been terminated.[3]

### A. Age Discrimination Was Not The But-For Cause Of Castelluccio's Termination.

To establish an age discrimination claim, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176. "[T]he plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Id.* at 177. Accordingly, the plaintiff must prove by a preponderance of evidence that "the adverse employment action[] would not have occurred without [age discrimination]." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quotation marks and citation omitted).

Here, the adverse employment action that Castelluccio purports is the basis for IBM's liability is his June 30, 2008 termination. The district court correctly ruled that Castelluccio's removal from the VP-PSD and DPE positions were not actionable, and Castelluccio has not appealed that ruling. App. 222-23; *see also*

---

[3] Obviously, if the Court finds in favor of IBM on this ground, IBM is entitled to judgment on all claims.

App. 1424.  Accordingly, Castelluccio was required to show that age discrimination was the "but for" cause of his ultimate termination.  Castelluccio cannot make this showing for numerous reasons.

First, Castelluccio indisputably would have been terminated after sitting on the bench for so long.  As Castelluccio admitted, it was *his* responsibility to find a new IBM position for himself, and he understood he would be terminated if he failed to do so.  App. 434.  Castelluccio remained on the bench for six months, longer than any other executive, before he was terminated.  App. 516-17.  Accordingly, Castelluccio was going to be terminated, regardless of anyone's discriminatory intent.

While Castelluccio cannot claim that his placement on the bench is actionable, the record amply demonstrates that age discrimination was not the "but for" cause of his removal from the VP-PSD and DPE positions.  There is undisputed evidence proving that Castelluccio's clients and co-workers were complaining about his poor job performance.  *See supra* pp. 9-11, 22-24.  Indeed, Jones, Collins-Smee's predecessor, had decided to remove Castelluccio in 2007.  App. 549; App. 554.  Castelluccio admitted that none of the individuals who complained about his work were motivated by discriminatory intent.  App. 415.

Given the seriousness and number of complaints about Castelluccio's performance, Collins-Smee had a perfectly valid reason for terminating

-37-

Castelluccio after he was removed from the DPE position. Instead, she gave him *six months*, with full salary and benefits, to attempt to secure a new internal position. This act completely undermines the notion that Collins-Smee was acting "because of" age bias. She did not seek to terminate Castelluccio on two earlier occasions where termination would have been justified. Rather, after two removals in only one year, she gave Castelluccio a chance, fully-funded by IBM, to find a new position, terminating him only after he failed to do so in six months. Viewed in this context, it is sheer irony that Castelluccio claims discrimination arising from Collins-Smee's decision to give him the opportunity to find a new IBM job.

In all events, Castelluccio cannot argue that but for Collins-Smee's discriminatory intent he would have been placed into open IBM positions. Castelluccio's counsel specifically disclaimed making any such argument to avoid mini-trials on eligibility:

> [T]here was a question of whether or not we were going to have mini trials on whether Mr. Castelluccio was qualified for each one of those positions, and we said *we weren't claiming that he should have been hired[.] [W]e were simply claiming that he should have been informed* so that he had an opportunity to apply for them and use his resources to obtain those positions.

App. 331 (emphasis added). Thus, the parties stipulated, and the district court instructed the jury, that the evidence about jobs filled while Castelluccio was on the bench could show only that "Collins-Smee should have disclosed these

-38-

positions to him . . . . Mr Castelluccio does not claim that he should have been hired for these positions." App. 362. There is no evidence in the record that Castelluccio would have been hired for any. Any finding that he would have been hired off the bench would have been pure speculation. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (plaintiff must prove superior credentials).

Second, Collins-Smee's purported ageism, cannot be the "but for" cause of Castelluccio's termination, because the termination decision was made jointly by Collins-Smee and her then-boss Tim Shaunessy. App. 520. There is no claim, moreover, that Shaunessy was motivated by discriminatory animus, or that Shaunessy rubber stamped Collins-Smee's termination recommendation. To the contrary, Castelluccio admitted that "no one else at IBM made any comments to [him] that evidenced any sort of age bias . . . aside from Ms. Collins-Smee." App. 415.

Thus, age discrimination could not have been the "but for" cause of Castelluccio's termination.

## B. The District Court's Contrary Conclusion Was Legally And Factually Wrong.

In upholding the jury's discrimination finding, the district court discussed, at length, evidence purportedly showing Collins-Smee's discriminatory intent,

-39-

including her asserted comments about retirement and what the court viewed as her mean-spirited marginalization of Castelluccio. App. 1420-30.

But, the court failed to appreciate that asserted discriminatory intent, without more, does not prove "but for" causation. *See Morgan v. Ark. Gazette*, 897 F.2d 945, 952 (8th Cir. 1990). In the age discrimination context, the usual mixed motive instruction does not apply due to the requirement that the employer take the adverse action "because of age." *See Gross*, 557 U.S. at 176 (quotation marks and citation omitted). The "because of age" requirement means that age must be "the 'reason' that the employer decided to act." *Id.* (citation omitted). Thus, even where there is evidence of discriminatory intent, the plaintiff must prove by a preponderance of the evidence that discriminatory intent had a "'determinative influence on the outcome.'" *Id.* (quoting *Hazen Paper Co.*, 507 U.S. at 610); *see also Fried v. LVI Servs.*, 500 F. App'x 39, 41 (2d Cir. 2012) (plaintiff must show sufficient evidence of "but-for" causation); *Lindsey*, 615 F.3d at 876 (age must be "the *determinative* factor") (emphasis in original). "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984).

Where, as here, there is undisputed evidence of a valid reason for termination, proof of discriminatory intent cannot prove cause. Indeed, in this case

-40-

Castelluccio failed to present any causal evidence. The record disproves that age was the determinative factor. *See supra* pp. 9-11, 22-24.

In addition, no evidence links Collins-Smee's purported discriminatory intent to Castelluccio's termination, because there is no proof that she actually prevented him from getting a new IBM position. In this regard, the court concluded that the jury could have inferred that "Castelluccio was qualified for positions in Collins-Smee's organization," but that she failed to hire him for these positions due to her ageism. App. 1430. But, such an inference flies in the face of the parties' stipulation and the agreed-upon limiting instruction. *See supra* p. 39. And, Castelluccio failed to show that his qualifications were so superior to those who filled the positions that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103 (quotation marks and citation omitted). Again, Castelluccio did not want mini-trials on this issue. His own testimony, moreover, is that the candidate hired for the key position, the "Quest job," was qualified. App. 385.

Accordingly, IBM is entitled to judgment on Castelluccio's ADEA and NY NYSHRL claims, and thus all claims in the case.

-41-

## III. THE COURT SHOULD VACATE, OR ALTERNATIVELY MODIFY, CASTELLUCCIO'S EMOTIONAL DISTRESS AWARD.

Regardless of the merits of Castelluccio's claims, his emotional distress award should be vacated or remitted.

### A. Castelluccio's Emotional Distress Claim Is Insufficiently Corroborated Under New York Law.

Under the NYSHRL, which is the sole basis for Castelluccio's emotional distress award, a plaintiff may recover damages for emotional distress. *Cross*, 417 F.3d at 258. But, emotional distress damages may not be presumed and are limited to compensation for an actual and proven injury. *See Meacham v. Knolls Atomic Power Lab.*, 185 F. Supp. 2d 193, 220 (N.D.N.Y 2002), *aff'd* 381 F.3d 56 (2d Cir. 2004). An emotional distress award will be limited where the plaintiff offers no evidence of actual and protracted injury or corroboration through treatment or testimony from another. *See id.* at 258; *see also Cullen v. Nassau Cnty. Civil Serv. Comm'n.*, 53 N.Y.2d 492, 497 (1981) ("The record must contain proof that the complainant in fact suffered mental anguish or humiliation." ). Otherwise, emotional distress claims lack any guarantee of genuineness and create a "*per se* rule that once a defendant is found liable . . . the plaintiff is entitled to damages for mental anguish." *McIntosh v. Irving Trust Co.*, 887 F. Supp. 662, 665-66 (S.D.N.Y. 1995) (citing *Cullen*, 425 N.E.2d at 861). New York has explicitly rejected such an outcome. *Id.*

-42-

Castelluccio's emotional distress claim cannot satisfy these most basic

standards.  The *totality* of Castelluccio's evidence of emotional distress was the

following, which is his own brief and conclusory testimony:

> Q.  [Y]ou're pressing claims for emotional distress in this
> case, and during your first deposition you may recall we asked
> you about that, and you said that your symptoms included mood
> swings, sleepless nights, things like to that.  Do you remember
> that?
>
> A.  Yes, I do.
>
> *        *        *
>
> Q.  Is there anything else besides what we talked about,
> including these mood swings that you experienced?
>
> A.  An example –
>
> Q.  I'm asking you because it's your claim, severe
> emotional distress, I'm trying to understand what that is.
>
> A.  Weight loss. I probably lost hair.  I didn't have a lot
> to begin with.  I'm sure I lost more.  You know, I don't know.
>
> Q.  Okay, and –
>
> A.  I didn't have a dog, couldn't take it out on the dog, no
> dog to kick.  I was dealing with it internally.  I'm kind of a, you
> know – I don't – I didn't want to burden my family with a lot of
> this, right?  So I'm not – I probably should have been talking to
> my wife more about this, but I wasn't, because I just, you know,
> it was what it was, so it's like trying to work my way through it.
>
> Q.  Now, Mr. Castelluccio, did you see any medical
> provider for care for this?
>
> A.  No.

-43-

Q.  You saw no therapist, correct?

A.  Correct.

Q.  No psychologist?

A.  Correct.

Q .  No counselor?

A.  Correct.  Other than my wife, correct.

Q.  Right?  Now, you didn't take any medication at all for this.

A.  Well, not for depression or something like that, but – no.  I mean Tylenol, Extra Strength Tylenol.

App. 447-48.

On this record, Castelluccio failed to establish an actual, emotional injury. Castelluccio admitted that he was not sufficiently distressed as to necessitate care. He had mood swings due to the pressure of "dealing with [his work situation] internally."  *Id.*  But internalizing stress is not the kind of "evidence of concrete emotional problems" sufficient to justify an emotional distress award.  *EEOC v. Yellow Freight Sys.*, No. 98 Civ. 2270 (THK), 2002 U.S. Dist. LEXIS 16826, at *113 (S.D.N.Y. Sept. 4, 2002); *cf. Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) (finding that plaintiff's testimony—which was the only evidence of emotional distress—was "insufficient to warrant an award of compensatory damages for that injury").  Moreover, Castelluccio introduced no

-44-

evidence whatsoever to corroborate his claim—not even testimony from his wife or friends.

 Given the lack of evidence of any true, emotional injury or any corroboration of Castelluccio's testimony, the jury's award had no basis in the record and should be vacated entirely.  *See Meacham*, 185 F. Supp. 2d at 220.

> ### B.    Alternatively, Castelluccio's Emotional Distress Award Should Be Reduced.

Even assuming Castelluccio presented sufficient evidence to sustain some emotional distress award, the award he received—$500,000 for internalized stress and moodiness—was so excessive as to justify a remittitur.

An emotional distress award is excessive when it "'deviates materially from what would be reasonable compensation.'"  *Meacham*, 381 F.3d at 78 (citing New York law).  "Jury verdicts and judicial opinions approving or disapproving them, when considered over a period of time, provide some indication of the consensus of opinion of jurors and courts as to the proper relation between the character of the injury and the amount of compensation to be awarded."  *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 750 (2d Cir. 1984) (internal quotation marks and citation omitted).

Here, assuming Castelluccio's emotional distress claim passes the minimal guarantees of genuineness, which it should not, the most comparable awards would

be "garden variety" claims that "lack extraordinary circumstances," *Caravantes v. 53rd St. Partners, LLC*, No. 09 Cv. 7821 (RPP), 2012 U.S. Dist. LEXIS 120182, at *71 (S.D.N.Y. Aug. 23, 2012), and are limited to "few details of the duration, severity or consequences of the condition." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 600 (S.D.N.Y. 2010).

Where allowed at all, vague mental distress claims with little corroboration do not rise above the most minimal damages. *Reiter v. Metro. Transp. Auth. of N.Y.*, No. 01 Civ. 2762 (JGK), 2003 U.S. Dist. LEXIS 17391, at *26-27 (S.D.N.Y. Sept. 30, 2003); *Fowler v. N.Y. Transit Auth.*, No. 96 Civ. 6796 (JGK), 2001 U.S. Dist. LEXIS 762, at *41-42 (S.D.N.Y. Jan. 31, 2001). Non-extraordinary, garden variety damages are usually low, sometimes $30,000 or less. *See Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012); *see also MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 561-63 (S.D.N.Y. 2012) (reducing the jury's emotional damages award of $125,000 to $30,000); *Kinneary v. City of N.Y.*, 536 F. Supp. 2d 326, 331 (S.D.N.Y. 2008) (vague mental anguish claims hover between $5,000 to $30,000); *McGrory v. City of N.Y.*, No. 99 Civ. 4062 (FM), 2004 U.S. Dist. LEXIS 20425, at *46 (S.D.N.Y. Oct. 8, 2004) (where "limited factual presentation, both state and federal courts typically reduce the award to $ 30,000 or less"); *Norville v. Staten Island Univ. Hosp.*, No. CV 96-5222 (RJD),

-46-

2003 U.S. Dist. LEXIS 28399, at *12 (E.D.N.Y.Oct. 17, 2003) (vague claims hover between $5,000 to $30,000).

For example, in *MacMillan*, the district court remitted an emotional distress award on the ground that the plaintiff's testimony and his daughter's corroborating testimony lacked "any supporting detail or specific examples of emotional injuries suffered by McMillan [sic]." 873 F. Supp. 2d at 562. The court noted the absence of evidence that "McMillan [sic] ever sought medical or psychological treatment, that he missed work, that he had any difficulty sleeping, that he lost his appetite, or that his alleged emotional distress had any physical manifestations or disrupted other aspects of his daily life." *Id.* at 561. His daughter's testimony—that her father "was always sad" and "wasn't his same self"—added nothing. *Id. See also Borja-Fierro v. Girozentrale Vienna Bank*, No. 91 Civ. 8743 (CMM), 1994 U.S. Dist. LEXIS 7088, at *10, *12 (S.D.N.Y. May 26, 1994) (reducing award from $160,000 to $15,000 where "vague and conclusory testimony regarding mental anguish").

Castelluccio's supporting evidence was even more vague and conclusory. Castelluccio failed to describe the duration of his stress. He never felt the need to seek help from a medical provider or other professional. He admitted that he managed any symptoms with a Tylenol. And, he did not even attempt to corroborate his claim.

-47-

The few cases involving truly shocking emotional distress reinforce how excessive Castelluccio's award is. The plaintiff in *Caravantes*, 2012 U.S. Dist. LEXIS 120182 at *72, *77-78, for example, suffered extreme sexual harassment through, among other things, forced sexual conduct. *Id.* at *17-23. The court found that the plaintiff "suffered significant emotional distress," including serious depression, suicidal thoughts, loss of sexual intimacy, nightmares, and trouble sleeping—injuries that were all corroborated by the plaintiff's spouse, multiple licensed psychologists, and the defendants' expert. *Id.* at *72. For this pervasive emotional distress, the court permitted only $150,000 in compensatory damages. *Id.* at *78; *McGrory*, 2004 U.S. Dist. LEXIS 20425, at *55 (remitting a jury award of $533,390 for mental pain and suffering to $100,000 even though the plaintiff had presented corroborated proof of significant emotional distress); *see also N.Y.C. Transit Auth. v. State Div. of Human Rights*, 181 A.D.2d 891, 894 (N.Y. App. Div. 1992) (reinstating $450,000 emotional distress damages award where defendant's conduct was "the most shocking instance of abuse of an employee by an employer") (quotation marks omitted).

Castelluccio's asserted distress falls well short of the sort of serious, documented emotional injury supporting awards smaller than his. Indeed, to IBM's knowledge, no plaintiff has received a $500,000 emotional distress award in New York with no corroborating testimony, only vague and conclusory injury

claims, and affirmative testimony by the plaintiff disproving the presence of any severe, long-lasting emotional injury or disruption.

### C. The District Court Erroneously Upheld Castelluccio's Emotional Distress Award Based On An Incorrect Standard Of Review And An Impermissible Ground.

The district court correctly concluded that Castelluccio's emotional distress claim was "garden-variety," at best. *See* App. 1442. It failed, however, to recognize how far afield the jury went due to two errors: (i) the court applied the wrong legal standard in reviewing the award; and, (ii) it justified the award on a legally impermissible basis—both of which constitute an abuse of discretion.

Most notably, the district court utilized the wrong standard to evaluate whether the jury's award was excessive. The court concluded that "the jury's award does not *shock the conscience* and accordingly [the court] [did] not adjust it downward." App. 1443 (emphasis added). Castelluccio's claim for emotional distress, however, was predicated solely on his state law NYSHRL claim, *see* App. 49-50. New York, which supplies the correct standard as a result, does not follow the "shocks the conscience" standard but the "deviates materially" standard. *See Gasperini*, 518 U.S. at 461; *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 881 N.E.2d 1187, 1193 (N.Y. 2008) (The Appellate Division may exercise its power "to set

-49-

aside judgments that deviate materially from what would be reasonable compensation.").[4]

New York's "deviates materially" standard is *less deferential* than the federal "shocks the conscience" standard. *Id.* The state standard does not permit a reviewing court "to sustain a damage award that is out of line with other awards for similar injuries, even if the amount the jury awarded was not shocking to a court's conscience." *Fowler*, 2001 U.S. Dist. LEXIS 762, at *32-33; *see also Wallace v. Suffolk Cnty. Police Dep't*, 04-cv-2599 (RRm) (WDW), 2010 U.S. Dist. LEXIS 100796, at *29-30 n.5 (E.D.N.Y. Sept. 24, 2010) (stating that the "shocks the judicial conscience" standard is "more deferential").

As explained in the preceding section, Castelluccio's $500,000 award is nowhere near the usual amounts for even corroborated, low-level emotional injury claims. The district court's application of the wrong standard in contravention of U.S. Supreme Court precedent, *see Gasperini*, 518 U.S. at 418, is an abuse of discretion. *See McDaniel*, 595 F.3d at 416; *cf. Williams*, 443 F.3d at 46.

Second, the district court relied on legally invalid grounds to uphold the award. The district court correctly recognized that Castelluccio "presented no

---

[4] *See also Meacham*, 381 F.3d at 78 (citing N.Y. C.P.L.R. § 5501(c) and applying New York's "deviates materially" standard in light of the NYSHRL claim); *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1013 (2d Cir. 1995) (same).

corroborating testimony or evidence of medical treatment." *See* App. 1442. Nonetheless, it upheld the jury's award, citing "Castelluccio's countenance, gentle bearing, and heartfelt testimony suggest[ing] a man that was particularly sensitive and whose very nature invited being marginalized in the workplace by the likes of Collins-Smee." App. 1442-43. The court found that Castelluccio's deteriorated relationship with IBM "weighed especially heavy" on Castelluccio. *Id.*

But, a plaintiff's countenance and gentle bearing cannot support an emotional damages award—let alone, a $500,000 award lacking any corroborating evidence. It is well-settled that neither a plaintiff's "sensitivity" nor sympathy should be considered for emotional distress damages. Because "sensitivity or stoicism, as the case may be, is as variable and individualistic in its existence and in its degree as are human beings," emotional injuries must be based in fact—not perceived personal traits. *Cullen*, 425 N.E.2d at 861; *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) ("While a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy . . . ."). Regardless of how gentle a plaintiff may appear, "the record must contain proof that the complainant in fact suffered mental anguish or humiliation" for an award of emotional distress damages. *Cullen*, 425 N.E.2d at 861.

Rather than vacate or remit the jury's emotional distress award for its perceived sympathy for Castelluccio, the district court upheld the award citing only

-51-

these impermissible grounds.  This was an abuse of discretion.  *Mendez*, 746 F.

Supp. 2d at 602.

## IV.  CASTELLUCCIO'S ATTORNEY'S FEE AWARD WAS EXCESSIVE.

Finally, the district court erred in failing to reduce numerous, excessive

aspects of Castelluccio's attorney's fee award.  Attorney's fees under the ADEA

must be reasonable.  *See Millea v. Metro-North R.R.*, 658 F.3d 154, 166 (2d Cir.

2011).  "The task of determining a fair fee requires a conscientious and detailed

inquiry into the validity of the representations that a certain number of hours were

usefully and reasonably expended."  *Lunday v. City of Albany*, 42 F.3d 131, 134

(2d Cir. 1994).  Although an appellate court is deferential to the district court's

award of attorney's fees, such an award must be vacated for abuse of discretion.

*See McDaniel*, 595 F.3d at 416.

This Court has approved the lodestar formula—the calculation of a

reasonable hourly rate and the reasonable number of hours required by the case—

as a "presumptively reasonable fee."  *Arbor Hill Concerned Citizens*

*Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2007).  But, in

"determining the number of hours reasonably expended for purposes of calculating

the lodestar, the district court should exclude excessive, redundant or otherwise

unnecessary hours."  *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.

1999).  Awards in similar cases are key to determining reasonableness, which

-52-

depends on the novelty and difficulty of the matter, the skills required, and the experience of the attorneys. *See Hensely v. Eckerhart*, 461 U.S. 424, 430 n.3 (1983).

In this case, the district court's blind application of the lodestar formula, with only a minor $4,178.50 reduction, was an abuse of discretion.

### A. On Its Face, Castelluccio's Fee Award Was Excessive Compared To Those Permitted In Comparable Cases.

Notably, Castelluccio's counsel requested an extravagant fee award totaling $1,000,592.00, for 3,319.3 purported hours of work. *See* App. 1022-24; App. 1025-26 (requesting $898,232.00 for 3,017.30 hours of attorney and paraprofessional time); App. 1392-93 (requesting an additional $102,360.00 for 302 hours in a supplemental fee award request). Counsel was awarded $996,413.50—all but $4,1780.50 of his request. App. 1450. On its face, the fee award was unreasonable.

This was a straightforward, single-plaintiff employment discrimination case that was tried for only eight-and-a-half days. In this Circuit, single-plaintiff age discrimination cases usually involve *substantially* smaller attorneys' fees applications and awards—nearly one-third to one-quarter of the award here. *See, e.g.*, *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 U.S. Dist. LEXIS 183444, at *114 (S.D.N.Y. Dec. 18, 2012) (three-year, single-plaintiff age

discrimination case involving fee application of $263,363.25 for 672.75 hours, resulting in award of $130,870.50); *Moore v. Houlihan's Rest., Inc.*, 07-cv-03129 (EWV) (RER), 2011 U.S. Dist. LEXIS 64452, at *27-28 (E.D.N.Y. May 10, 2011) (four-year single-plaintiff race and sexual orientation discrimination case involving $40,000.00 fee request reduced to $26,198.00); *Norville*, 2003 U.S. Dist. LEXIS 28399 (seven-year single-plaintiff race and age discrimination action with extensive post-trial motions fee award request of $334,356.50 adjusted downward).

Similar cases involving far more complex and lengthy trials routinely fail to garner fee awards anywhere close to Castelluccio's award. For example, in *Siracuse v. Program for the Development of Human Potential*, plaintiff's counsel sought $443,465 in attorney's fees in a single-plaintiff discrimination case under the FLMA, which lasted six years and was staffed with two partners, an associate and a paralegal. No. 07 CV 2205 (CLP), 2012 U.S. Dist. LEXIS 73456, *70 (E.D.N.Y. Apr. 30, 2012). Even though counsel sought approximately half the amount awarded to Castelluccio's counsel, the court reduced the award to $353,609.75. *Id.* at *109, 116. In *Tsombanidis v. City of West Haven*, counsel sought to recover $262,622.01, for 1,358 hours of work in a four-year, multi-party case involving claims under the Fair Housing Act and Americans with Disabilities Act that culminated in an eight-day trial and substantial post-trial briefing. 208 F. Supp. 2d 263, 269, 278 (D. Conn. 2002). Although the court recognized that the

-54-

"legal issues were complex and oftentimes difficult," it concluded that the number of hours expended was "substantial" and reduced the award to $219,995.51.  *Id.* at 278, 288.

To IBM's knowledge, the closest fee award to Castelluccio's was awarded in *Meacham v. Knolls Atomic Power Laboratory*, 185 F. Supp. 2d 193 (N.D.N.Y. 2002)—an age discrimination case spanning five years and 26 plaintiffs, that resulted in a five-day liability trial and separate trials on damages.  *Id.*  There, plaintiffs' counsel made a fee application for $979,348.71, representing 6,935 hours of work.  *Id.* at 239.  The court acknowledged that a sizeable fee was justified given the "number of plaintiffs, the complexity of the case and the impact of a commitment to accept this case to a law firm like that of plaintiffs' counsel with only three attorneys," and the "unqualifiedly successful." *Id.* at 240-42. Nonetheless it reduced the fee award by over $100,000 to $873,868.09 on the grounds of excess.  *Id.* at 240-42.

The *Meacham* case puts this one into perspective:  Castelluccio's fee award exceeded that of a complex age discrimination case involving 26 plaintiffs and requiring multiple lengthy damages trials.  And, his award triples some of the higher range awards in other single-plaintiff ADEA cases.

**B.  Castelluccio's Stunning Fee Award Was The Result Of Patently Excessive And Duplicative Billing.**

The cause of Castelluccio's award is demonstrated in his billing: it is replete with excessive time charges and duplicative billing.

It is well-settled that "'excessive, redundant, or otherwise unnecessary'" hours must be excluded when calculating fee awards. *Kirsch*, 148 F.3d at 173 (quoting *Hensely*, 461 U.S. at 434 ).  Billing is excessive when the attorney's preparation time far exceeds the duration of the proceeding. *Wash. v. Phila. Cnty. Court of Common Pleas*, 89 F.3d 1031, 1039 (3d Cir. 1996).  Similarly, time is deemed excessive when a seasoned litigator spends a substantial amount of time on a reasonably straightforward motion or pleading, *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 212 (E.D.N.Y. 2006), overstaffs assignments, or bills for duplicative work (*i.e.*, charging for multiple lawyers to attend meetings, depositions, and other proceedings, including trial).  *See Evanauskas v. Strumpf*, No. 3:00-CV-1106 (JCH), 2001 U.S. Dist. LEXIS 14326, at *19-20 (D. Conn. June 27, 2001).

To prove the reasonableness of its bills, the prevailing party's counsel must provide detailed time records. *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983).  Where time entries render it difficult to identify excessive or unreasonable time, the Court may deduct a reasonable

percentage of the number of hours "as a practical means of trimming fat from a fee application." *Id.* at 1146; *see also Wilder v. Bernstein*, 725 F. Supp. 1324, 1337 (S.D.N.Y. 1989) (reducing award by 20% for vague entries), *rev'd on other grounds*, 944 F.2d 1028 (2d Cir. 1991). "Courts frequently respond to vague and difficult-to-decipher billing statements with an across-the-board percentage reduction in the hours claimed, often in the range of 20 to 30 percent." *Abel*, 2012 U.S. Dist. LEXIS 183444, at *103; *Rivera v. Baccarat, Inc.*, 99 Civ. 9478 (MBM) (JCF), 1999 U.S. Dist. LEXIS 6792, at *15 (S.D.N.Y. May 10, 1999) (finding a 20% reduction appropriate to remedy excessive billing not readily identifiable from the time entries).

Here, Castelluccio's counsel's bills show that counsel engaged in unreasonable and excessive trial and summary judgment preparation, and generally engaged in block billing to render the bills too vague to examine for excess.

### 1. Castelluccio's Counsel Billed For Excessive Trial Preparation.

Castelluccio's counsel estimated that he spent a staggering 1,054.70 hours ($359,167.50) preparing for an eight-and-a-half day trial.[5] *See* App. 1328; App.

---

[5] IBM's trial counsel reviewed Castelluccio's counsel's bills and estimated counsel's trial preparation time at 1,054.70 hours. Due to counsel's block-billing practices, however, it is nearly impossible to calculate this amount with precision. *See, e.g.*, App. 1056. Castelluccio's counsel objected to IBM's characterization of

1341-65.  That is, Castelluccio's counsel spent over 26 working weeks preparing

for an eight-and-a-half day (or 60 hour) trial—roughly 20 hours of preparation

time for every hour of trial.  Nearly *one-third* of the total hours billed to this five-

year case were spent preparing for trial.

    Spending nearly 20 times more in preparation time than trial time is, on its

face, excessive.  *See Wash.*, 89 F.3d at 1039 (affirming that 69.9 hours of trial

preparation, an amount twice as long as trial itself, was excessive and

unnecessary); *Apple Corps.v. Int'l Collectors Soc'y*, 25 F. Supp. 2d 480, 491

(D.N.J. 1998) (finding it "excessive for a senior partner to spend almost three times

as long to prepare for a hearing as to attend it," and reducing by 50% the 87 hours

of "hearing preparation" billed for a four day, or 30 hour, hearing).  In comparable

---

(continued…)

his "trial preparation" but offered no alternative estimate, App. 1374.  He did not,
because he cannot due to the block billing.  For example, on July 18, 2013,
Castelluccio's counsel recorded a 6.3 hour entry, stating "Revise and review Trial
Memorandum; revise Jury Instructions; research law on standards of proof and
elements of ADEA claims."  App. 1232.  There is no way to tell how much of the
6.3 hour entry on July 18, 2013, was spent on the trial memorandum and/or the
jury instructions as opposed to what appears to be research on the horn-book
elements of an age discrimination claim by a seasoned employment lawyer.

cases, courts have held anything much over 150 hours for a seven to eight day trial excessive.[6]

Specific examples give color to counsel's bills. As early as July 2013—*six months* before the start of trial—Castelluccio's counsel dedicated entire days to trial preparation.[7] In early September 2013—four months before trial commenced—Castelluccio's counsel dedicated an entire week to trial preparation. *See* App. 1240-41. Finally, of the approximate 1,000 hours of trial preparation, only 75 hours were billed by a paralegal, indicating that attorneys likely engaged in a significant amount of secretarial work. *See generally* App. 1220-66.

Given the facially excessive time spent on trial, IBM respectfully requests that the court reduce the award to reflect the typical ratio of trial time to

---

[6] *See, e.g.*, *Rand v. Town of Exeter*, Civil No. 11-cv-55-LM, 2014 U.S. Dist. LEXIS 138402, at *9 (D.N.H. Sept. 30, 2014) (stating that "133 hours of preparation time for a seven-day trial falls within the realm of the presumptively reasonable"); *Grochowski v. Ajet Constr. Corp.*, No. 97 Civ. 6269 (NRB), 2002 U.S. Dist. LEXIS 5031, at *11-12 (S.D.N.Y. Mar. 27, 2002) (holding that 306.1 hours for preparation of a seven-day trial was "grossly excessive"); *Funk v. F&K Supply, Inc.*, 43 F. Supp. 2d 205, 231(N.D.N.Y. 1999) (finding that 150 hours spent on preparation for a seven-day trial was excessive and the court excluded 15 of those hours from the lodestar calculation).

[7] *See, e.g.*, App. 1233 (on July 24, 2013 Mr. Carta and Ms. Triolo spent 6.1 hours and 6.3 hours, respectively, preparing for trial); App. 1236 (on August 8, 2013 Mr. Carta spent 9.1 hours and Ms. Triolo spent 8.5 hours, respectively, preparing for trial); App. 1237 (on August 12, 2013 Mr. Carta spent 7.6 hours and Ms. Triolo spent 10.0 hours, respectively, preparing for trial).

preparation—1:2—and reduce counsel's hours for trial preparation from 1,054.70 hours to 120 hours.

### 2. Castelluccio's Counsel Billed Excessive Time Opposing Summary Judgment.

A second area of excessive time involves Castelluccio's counsel's work on the summary judgment briefing. Counsel spent 272.30 hours (over six-working weeks, or $71,040) opposing IBM's motion for summary judgment motion, which did not raise complex issues. App. 1327; App. 1334-40. This was plainly excessive for a senior, seasoned lawyer like Castelluccio's counsel. *See Brady*, 455 F. Supp. 2d at 212 (200 hours was an "inordinate" amount of time for experienced attorneys on a motion that did not raise novel or complex legal issues); *see also Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 388 F. Supp. 2d 159, 164-65 (W.D.N.Y. 2005) (applying a twenty percent reduction in lodestar hours based, in part, on 140 hours spent on a routine summary judgment motion); *Sea Spray Holdings v. Pali Fin. Grp., Inc.*, 277 F. Supp. 2d 323, 325-26 (S.D.N.Y. 2003) (123.75 hours on a motion to dismiss is "excessive on its face;" 15% reduction applied). Castelluccio's counsel repeatedly spent back-to-back days billing in excess of six hours each day on this opposition from late September 2010 to early September 2011. *See* App. 1334-40; *accord* App. 1102-1200.

In the district court, Castelluccio's counsel relied on *Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237 (D. Conn. 2010), a case in which the court held that 294.25 hours was appropriate for a summary judgment opposition. *Id.* at 259, 265. The claims in *Serricchio* involved the Uniformed Services Employment and Reemployment Rights Act, and it was the *first* such case in the District of Connecticut to be tried to a verdict. *Id.* at 254. In upholding the high billings, the court recognized that the briefing "required significant expenditures of time and labor" due to its novelty. *Id.* There is no comparable basis to justify Castelluccio's "significant expenditures."

Because 100 hours is more appropriate (albeit high) for an opposition, IBM respectfully requests that the Court reduce Castelluccio's summary judgment billings to this number.

### 3. Castelluccio's Post-Trial Counsel's Fee Award Was Excessive.

Castelluccio's post-trial fees serve as a final example of excess. Castelluccio was granted his supplemental motion fees of $102,360.00, representing 302 hours of work relating to Castelluccio's fee award (including the motion for attorneys' fees, the reply to IBM's opposition and supporting materials) and for work performed in opposition to IBM's post-trial motions. App. 1391; App. 1393. A precise calculation of time dedicated to the fee award is impossible due to counsel's block-billing, but it appears that at least 115 hours (approximately

$40,000) were dedicated to the fee award. *See* App. 1396; App. 1398-1413. This is excessive, as such motions routinely take no more than 30 hours. *See Siracuse*, 2012 U.S. Dist. LEXIS 73456, at *104 (noting that 83.9 hours on the fee application was excessive); *Murray v. Comm'r of N.Y. Dep't of Educ.*, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005) (noting that even in a complex case a fee application should only take about 30 hours); *Levy v. Powell*, No. CV-00-4499 (SJF), 2005 U.S. Dist. LEXIS 42180, at *21-22 (E.D.N.Y. July 7, 2005) (justifying an across-the-board 35% reduction in part on the 101.3 hours billed for the fee application). Accordingly, IBM requests that this Court reduce the post-judgment time to 30% of the original request.

Considering only reductions for trial preparation, summary judgment, and fee-award briefing, Castelluccio's fee should be reduced by at least $434,905.70. In addition, in light of counsel's block-billing practices and generally excessive time, IBM requests an across the board reduction of 30% as to all remaining hours, or an additional reduction of $139,153.80. With these reductions, counsel's fee should be remitted to $422,354, which is still abnormally high relative to other awards.

**CONCLUSION**

For these reasons, judgment against IBM should be vacated and judgment

entered in its favor. Alternatively, the Court should order a new trial, or reduce the

damage and fee award.

Dated:        March 27, 2015

/ s / Traci L. Lovitt
Traci L. Lovitt, Esq.
Jones Day
100 High Street
Boston, Massachusetts 02110
(617) 960-3939

Willis J. Goldsmith, Esq.
Jones Day
222 East 41st Street
New York, New York 10017
(212) 326-3939

Zachary D. Fasman, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3440

*Attorney for Defendant-
Appellant IBM*

-63-

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B).  It contains 13,488 words, exclusive of the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Mircosoft Office Word 2007 in 14-point font size Times New Roman.

Dated:        March 27, 2015

/ s / Traci L. Lovitt
Traci L. Lovitt, Esq.

*Attorney for Defendant-
Appellant IBM*

# CERTIFICATE OF SERVICE

I, TRACI L. LOVITT, hereby certify that on March 27, 2015, I filed an electronic copy of the foregoing BRIEF FOR DEFENDANT-APPELLANT on the Court's CM/ECF system, which caused it to be served on all counsel of record.

Dated:      March 27, 2015

/ s / Traci L. Lovitt
Traci L. Lovitt, Esq.
Jones Day
100 High Street
Boston, Massachusetts 02110
(617) 960-3939
*Attorney for Defendant-Appellant IBM*